**FILED**
June 29, 2012
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0004317703

**115**

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
JOHN W. KILLEEN (STATE BAR NO. 258395)
jkilleen@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone:    (916) 447-9200
Facsimile:    (916) 329-4900

Attorneys for Debtor
City of Stockton

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No.   2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | D.C. No. OHS-1 |
| Debtor. | Chapter 9 |
| | **EXHIBITS J THROUGH L TO THE DECLARATION OF LAURIE MONTES IN SUPPORT OF CITY OF STOCKTON'S STATEMENT OF QUALIFICATIONS UNDER SECTION 109(C) OF THE UNITED STATES BANKRUPTCY CODE** |
| | Date:        TBD<br>Time:        TBD<br>Dept:        TBD<br>Judge:       TBD |

Exhibit J

May 26, 2010

TO:         Mayor and City Council

FROM:       Kevin O'Rourke
            Interim City Manager

SUBJECT:    **RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON
            DECLARING A STATE OF EMERGENCY BASED ON FISCAL
            CIRCUMSTANCES**

RECOMMENDATION

It is recommended that the City Council declare a fiscal emergency and direct City management to take appropriate and lawful measures to achieve a balanced budget for FY 2010-2011.  The City is in the final stages of preparing a FY 2010-2011 budget against the backdrop of the Great Recession.  Over the past two fiscal years, the economic downturn has taken its toll on the Stockton economy.  The City currently faces a gap between anticipated revenues and anticipated costs of approximately $23 million or 13.98% of anticipated general fund revenues. This significant gap threatens the City's ability to pass a balanced budget that provides essential public services.  The cost of public safety (police and fire) comprises approximately 78 percent of the City's general fund expenditures.  The City's contractual commitments to public-safety labor organizations are impeding its ability to eliminate the budget shortfall

DISCUSSION

Background

**I.      THE CITY COUNCIL MUST PASS A BALANCED BUDGET.**

The City of Stockton is the 13th largest city in California, with an estimated population of approximately 290,000 residents.  The City provides a full range of municipal services to these residents: public safety (police and fire), community development, community revitalization, economic development, public works and street maintenance, parks, recreational services, libraries, water utility, sanitation services (wastewater and stormwater utility), solid waste disposal and general administrative services.

The City of Stockton's Charter requires that the City Council adopt a balanced budget at the outset of each fiscal year, which commences on July 1.

In January 2009, the City Council's Budget, Finance and Economic Development Committee adopted the budget balancing principles which since have served as guidelines for the City Council's budget development actions.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 2)

These principles have been an important part of the Council's budget discussions over the past 18 months and include the following:

### Budget Balancing Principles

- ***Insolvency is not in the best interest*** of the City and should be avoided.

- Acknowledging that staff is the most important resource of the City, emphasis will be placed on ***reducing the number of layoffs***.

- ***One-time money should be used for one-time costs*** and cannot sustain long-term fiscal health.

- In order to ensure a thriving, livable community, there must be a balance ***between public safety, infrastructure maintenance, and quality of life services***.

- ***All community stakeholders***, both internal and external, should be ***consulted in funding a resolution*** to the City's fiscal crisis.

- Long-term fiscal health includes ***investment in meaningful reserves*** to withstand future fiscal downturns.

- Additional ***revenue sources should be explored*** in conjunction with expense reductions.

- Care must be taken ***not to cut programs which will cause reductions in revenue*** to the City.

- Reductions should be ***avoided that might exacerbate City liabilities*** or have long-term effects that would be costly to reverse.

- The long-term goal is to establish a budget that will ***ensure accountability, internal controls, and long-term financial stability***.

## II.    THE GREAT RECESSION HAS TAKEN A TOLL ON THE STOCKTON ECONOMY.

Before addressing the City's immediate budget crisis, it is important to recognize that the problems faced by Stockton's municipal government reflect the broader economic problems faced by Stockton's residents.  By almost any measure, the Great Recession has had a devastating effect on Stockton's residents, and their economic resources.

During the past decade, Stockton has experienced a significant population increase. Since 2002, the City's population has increased by over 35,000 residents.    This

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 3)

increase peaked in 2005 with an annual growth rate of four percent.  Although this
increase has recently slowed, the moderate population growth is expected to continue
past 2010.



The decade's population increase has come hand-in-hand with a development boom.
This development has added to the City's obligation to provide infrastructure support
and essential public services.

- **Decline in Single Family Dwelling Building Permits**

In the past five years, the City has experienced a significant decline in single family
residential dwelling permits.  The chart below illustrates the number of such building
permits issued since FY 2003-2004.  Single family dwelling building permits for FY
2009-2010 are projected to total 155 permits, compared to 2,926 permits in FY 2003-
2004.  The chart below illustrates the number of such building permits issued since FY
2003-2004.



- **Decline in Assessed Valuation of Property and Median Home Price
  Sales; the Related Increase in Foreclosures**

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 4)


The economic recession has depressed the City's assessed valuation of property.  The
growth rate of assessed value began to wane in FY 2007-2008, with an increase of 8.4
percent compared to the 17.7 percent increase of FY 2006-2007.  In FY 2008-2009, the
City's assessed value began to decline, by 1.3 percent in FY 2008-2009, 11.7 percent in
FY 2009-2010, and 9.2 percent (projected) in FY 2010-2011.



*Source:  San Joaquin County Auditor-Controller's Office*

The following charts compare Stockton's median home sale prices and foreclosure
rates to similarly-sized cities throughout California[1].

---

[1] The comparison group used for these slides is the cities used in setting compensation
levels for police and fire groups.

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 5)





Compared to the same group of cities, the decline in median home sale prices in Stockton is exceeded by only one City, San Bernardino. A decline in a City's assessed value is uncommon and, in Stockton's case, was caused by the unprecedented level of home foreclosures during the mortgage meltdown.



May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 6)

Compared to 20 similarly sized Cities in California, the median home sale prices in Stockton are near the bottom.



Source: RealtyTrac Foreclosure Data.

This decline in assessed value and home prices and the rise in foreclosures have significantly restricted the City's property tax revenue stream.

- **Increase in Unemployment**

As a result of the Great Recession, the unemployment rate in the Stockton metropolitan area rose from 10.5 percent in 2008, to 22.0 percent in March, 2010.[2]   Historically, Stockton's unemployment rate is several percentage points higher than the statewide California average.  This disparity is attributed, in part, to the transitory nature of the agricultural sector of San Joaquin County's economy.

---

[2] U.S. Bureau of Labor Statistics, Local Area Unemployment Statistics.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 7)

The following charts illustrate how Stockton again compares to the other cities to which
it compares itself in setting employee compensation levels.  Stockton's unemployment
rate is the highest among the 20 comparison cities.



Source: US Bureau of Labor Statistics, Local Area Unemployment Statistics.

- **Decrease in Per Capita Income**

Additionally, Stockton's per capita income of $19,659 in 2008 is expected to decline
during this recessionary period.

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 8)





Case 12-32118   Filed 06/29/12   Doc 24

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 9)

## III.    STOCKTON'S REVENUE HAS FALLEN PRECIPITOUSLY.

Over the past several years the City has experienced significant declines in its General
Fund tax revenue.  The City's General Fund is heavily reliant on three main tax revenue
sources:  (1) property tax, (2) sales tax, and (3) utility user tax.  Together, these three
sources account for approximately 56 percent of general fund revenue.

In FY 2009-2010, the City's revenues were $164.4 million: 18 percent from property
taxes, 19 percent from sales taxes, 19 percent from utility user taxes, 12 percent from
motor vehicle in lieu taxes, seven percent from franchise taxes, and six percent from
business license.   The remaining 19 percent of the total revenues are charges for
services and other miscellaneous revenues.



- **Decline in Revenue from Property Tax**

Property tax revenues are expected to drop in FY 2010-2011.  Earlier in the decade,
Stockton's General Fund property tax revenues more than doubled, from $17.2 million
in FY 2000-2001 to $37.1 million in FY 2007-2008.  The building boom, driven by
increases in market values for resale homes, contributed to this growth rate. The
dramatic decline of this revenue source began in FY 2008-2009, due to the collapse of
the housing market.  The housing market value declines deepened the beginning of FY
2009-2010.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 10)

The following graph illustrates General Fund property tax revenue trends since FY 2007-2008.  As illustrated in the chart, property tax revenues declined over a four-year period from $37.1 million in FY 2007-2008 to an estimated $27.2 million in FY 2010-2011.  *This is a 27 percent decline or a $10 million revenue loss.*



● **Decline in Revenue from Sales and Use Tax**
The second of the three largest tax revenue sources for Stockton, sales and use tax, which has declined by 24% since FY 2006-2007.  This decrease amounts to a $10.5 million revenue loss. This decline was due to the economic downturn as many Stockton citizens were losing their homes to foreclosures and being laid off from their jobs. Loss of consumer confidence in the economy contributed to this dramatic decline, from $43.5 million in FY 2006-2007 to an estimated $32.9 million in FY 2010-2011.



May 26, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES

(Page 11)

Retail sales activity especially declined in sales of automobiles, consumer goods. Furthermore, construction has declined as many businesses closed due to the recession.  Between FY 2005-2006 and FY 2008-2009, automobile and transportation sales declined by 47 percent and construction/building related sales declined by 38 percent.  During this same period, general consumer goods declined by 13 percent. The estimated sales and use tax revenues for FY 2010-2011 represent an optimistic 4.5 percent increase over the prior year estimate, reflecting the expectation that consumer confidence will improve in the future year.  The following charts illustrate how Stockton compares to the other selected cities.



**Taxable Sales Per Capita by City, CY2008**

Sources: California Board of Equalization 2008 Taxable Sales by City, US Census Bureau 2008 Population Estimates

- **Decline in Revenue from Utility User Tax**

The third of the three largest tax revenue sources is the utility user tax, which has declined by 10 percent since FY 2004-2005.  This amounts to a $3.5 million revenue loss. The majority of this decline, or $4.2 million, was experienced in FY 2006-2007 due to the reduction in the average percentage charged against the revenues of various utility industry categories from 8 percent to 6 percent.  The change in rates charged coupled with residences cutting back on utility usage contributed to this decline, from $34.9 million in FY 2004-2005 to an estimated $31.4 million in FY 2010-2011.

The estimated utility user tax revenue for FY 2010-2011 represents a 2.4 percent increase over the prior year estimate, reflecting moderate growth from this revenue source.

Case 12-32118    Filed 06/29/12    Doc 24

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 12)



Despite the significant declines in these three major revenue charts, the City collected several one-time revenues, grants, and reimbursements, and implemented various accounting changes. As a result, the decline in major revenue sources has been somewhat obscured in the last few budgets. However, none of these one-time revenues/accounting changes are available for FY 2009-2010 or anticipated FY 2010-2011.

As the chart shows, expenditures exceeded revenues in FY 06-07 and 07-08, and are expected to exceed revenues again in the current fiscal year. This has led to a sharp decline in reserve levels. The gap between revenues and expenditure in FY 10-11 is based on current (baseline), already heavily reduced expenditures, and projected revenue.

Without the necessary cost reductions to match the lower revenue base, the out-year estimated budget shortfalls widen to $27.3 million in FY 2011-2012, $31.8 million in FY 2012-2013, $35.1 million in FY 2013-2014, and $37.8 million in FY 2014-2015. The impact of not reducing costs is projected to be a decline in the City's General Fund Balance from $22.8 million in FY 2008-2009 to a deficit of ($136.5 million) in FY 2012-2015.

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 13)

### Stockton General Fund – Revenue and Expenditure Trends



## V.    STOCKTON HAS AGGRESSIVELY TACKLED ITS RISING COSTS.

The total operating budget of the City of Stockton amounts for $291.1 million in FY 2009-2010, of which $163.8 million is the tax-supported General Fund.   Overall, Stockton's operating budget is comprised of a variety of general fund and non-general funded activities, including a number of enterprise funds that are not available to the general fund.  Largest among these enterprise funds are the municipal utilities, which alone comprise 24 percent of the total operating budget.

As a result of various legal requirements, including Proposition 218, funds from the utilities are not available to the general fund.  Other services provided to City residents that are supported by dedicated revenue streams include central parking district, affordable housing, and community development.

Case 12-32118    Filed 06/29/12    Doc 24

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**

(Page 14)

**City-wide Operating Budget – Programs (FY 2009-2010 - $291.1 million)**



The general fund comprises about 56 percent of the City's total operating budget, and is the portion of the budget that faces the greatest challenges now.

Case 12-32118    Filed 06/29/12    Doc 24

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**

(Page 15)

### General Fund Budget – By Programs (FY 2009-2010 - $163.8 million)



Critically, as a result of prior cost-cutting and the rapid increase in employment costs, public safety departments dominate the general fund.  The police department alone comprises 53 percent of the general fund budget; the fire department comprises 25 percent of the general fund budget.  *In total, public safety cost alone take 78 percent of general fund revenues.*  The 9 percent of general fund budget that is "transferred out" primarily funds libraries and recreation facilities. Because public safety so completely dominates the general fund, any cost-cutting solutions will necessarily have their primary impact on public safety departments.   Put another way, even if the City completely eliminated all non-public safety functions – including the City Council, finance, human resources, public works, recreation and libraries -- which is practically impossible – the City would not bridge the present $23 million budget gap.

Within the general fund, the primary cost driver is the salaries and benefits of City employees.  Salaries and benefits alone comprise 74 percent of general fund costs.  Of the remaining portion of the general fund budget, the 9 percent transferred out, primarily to recreation and libraries, also contains a very significant labor cost component.  Thus, any solution to the City's current budget crisis must address these salary and benefit costs, either by reducing the levels of salaries and benefits, or by further reducing the size of the City's workforce.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 16)

**General Fund Budget – By Cost Area (FY 2009-2010 Totaling $163.8 million)**



Recognizing that revenues have been challenged and labor costs and benefit costs have been rising rapidly, a variety of cost reduction measures have been implemented since FY 2007-2008 that crossed many service areas and functions.  These measures included: the renegotiation of bargaining unit labor agreements; implementation of two early retirement incentive programs; 10 furlough days in FY 2008-2009 and 12 furlough days in FY 2009-2010 for all City employees including public safety personnel; a hiring freeze of City employee positions including public safety; and a reduction of City operational hours across many departments.   The staffing reductions caused the elimination of various services and programs across the City's citizen services base.

- **City Employee Reductions**

The City has significantly reduced its full-time and part-time employees over the past several years, and these staff reduction efforts have had a significant operational impact to City services in a variety of departments.  The chart below illustrates the citywide reduction of the labor force due to the impact of the Great Recession and declining revenues.  Sworn full-time positions are for both the Police and Fire Departments, while miscellaneous full-time and part-time equivalent positions are across all City departments.  The City has reduced its City employees from a total of full-time and equivalent part-timers of 1,987 in FY 2007-2008 to an estimated 1,523 for the FY 2010-2011 budget.  This is a reduction of 23 percent, or 464 full-time and part-time equivalent City staff positions.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 17)

**City Employees (FY 2004-2005 – FY 2010-2011 Budget)
Full-time Police, Fire, Miscellaneous (non-sworn) and Part-time FTE Positions**



_Footnotes to Graph_: _Increase in FY 2006 is a result of additional full-time police and fire
positions due to voter approval of the Measure W Public Safety Sales Tax Initiative (¼
cent). Increase shown in FY 2008 is due to the City's reinstatement of operations of the
Municipal Utilities Department from the private sector operating vendor (OMI/Thames)._

Referring to the above graph, police sworn full-time positions have been reduced from
410 in FY 2007-2008 to a budgeted level of 315 in FY 2010-2011, or a decrease of 23
percent (95 full-time sworn police positions over the three past fiscal years).  Total
reductions in sworn/public safety positions (police and fire) equaled 114 full-time sworn
positions since FY 2007-2008. Non-sworn City employees (categorized in the table as
Miscellaneous Full-time City employees) also were reduced.  Between FY 2007-2008
and the budgeted level for FY 2010-2011, the City reduced 222 full-time positions in this
non-sworn category, or a reduction of 20 percent.

In the table below, the employee position count change for each prior fiscal year is
provided on an annual basis.  In the past two years, the City has reduced its workforce
by 415 positions, of which 304 were full-time positions.

May 26, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES

(Page 18)

|  | Sworn | Misc. | Part-time FTE | Totals |
|---|---|---|---|---|
| FY 08-09 | (34) | (122) | (57) | (213) |
| FY 09-10 Est. | (39) | (109) | (54) | (202) |
| **Total: 2-Years** | **(73)** | **(231)** | **(111)** | **(415)** |

The previous discussion of the workforce referred to staff positions which were in held by City employees, both part-time and full-time.  The following section discusses only authorized staff positions, which are only full-time positions that were budgeted/funded. The chart below illustrates the substantial reduction in the City's work force, over the six period authorized positions have declined by 25 percent citywide and 29 percent in the General Fund.

**Authorized Staff Positions (FY 2005-2006 to FY 2010-2011)**
**Citywide vs. General Fund**



- **Staff Reduction and Salary Cost Savings Programs**

The reduction of staffing is a product of various Council actions aimed at diminishing the number of required layoffs, in conformity with the Council's "budget balancing principles."   In Fall 2008, the City provided full-time employees the opportunity to participate in the Stockton Voluntary Separation Program offering incentives for leaving City service.  Seventy employees elected to take advantage of this program.  In the latter half of 2009, the City then followed up by participating in the CalPERS "Golden Handshake" retirement incentive program that offered two additional years of service credit of pension benefits upon retirement from the City and CalPERS.  One hundred eighteen full-time employees elected to retire under this program.  In July 2009, 48 full-time employees and 250 part-time employees were laid off, primarily in the Community Services Department.  The balance of the total 416 staff reductions over the past two years were a result of natural attrition and the City's hiring freeze.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING**
**A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 19)

In late 2008, the City began its program of requiring furlough days in exchange for percentage reductions in base salaries.  For the latter half of FY 2008-2009, various bargaining units accepted 10 furlough days.  Beginning July 1, 2009, several more bargaining units accepted 12 furlough days, resulting in an approximate savings in total salaries of $4.4 million citywide.

- **Elimination of Community Programs**

Due to budget reductions, the McKinley Community Center was closed to the public in 2009 and most of the recreation programs were moved to other community centers. Residents have to travel further to participate in these recreation opportunities. Operating hours at all other community centers were reduced by 20%.    Fewer recreational classes were made available to the community. Hours of operation at the Children's Museum, Pixie Woods amusement park, and Oak Park Senior Center were also decreased. The McKinley swimming pool was closed.  The closure of Silver Lake Family Camp was recommended but a local citizens group worked with the City to keep the facility open with minimal City funding.

The City canceled various special events provided to the public such as the July 4th Celebration and Ice on the Delta.

Library services were reduced with the closure of all City branches on Sundays and a 26% reduction in hours.  Customer services and literacy programs in the Libraries have been reduced due to the loss of staff positions.  There are fewer books and library materials available to the public.  Grants provided to local homework centers across the City were eliminated.

**In summary, the following services and/or programs have been reduced or eliminated:**

**LIBRARY SERVICES**
- **Books and materials cut by 60% or $428,000 from General Fund.**

- **Homework Center Grants suspended until funding returns.**
  - An initiative of the Safe Stockton program
  - In 1997, COS contracted with school districts and community-based organization to provide after-school tutoring services
  - Offered to elementary and middle school students low grade point averages and limited opportunities which put them at educational risk

- **Open hours reduced by 30% in City branches and 23% in County branches. Mobile Library hours reduced.**
  - Part time funding cut from $380,000 to $140,000. Part time staffing used for nights, weekends, sick and annual leave.
  - Hours cut due to reduction in funding and part time hours.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 20)

- Branches closed on Sundays and overall hours cut 10-15/week

**RECREATION SERVICES**
- **Closure/Outsource  of Facilities**
  - Silver Lake Camp
  - McKinley Community Center
  - McKinley Pool

- **Modified Hours of Operations** – Community Centers, Pixie Woods, Children's Museum
  - Facilities open hours reduced by 20%
  - Modified scheduling of programs/activities

- **Contracted Out Oak Park Tennis Complex operations**

- **Canceled Special Events  -**  Ice on the Delta and 4th of July event

- **Re-structured Arts Programs**
  - Combine Public Art Program with Arts Commission
  - One staff to take dual responsibilities of two separate staff

- **Consolidate After School Program Sites (ASP) resulting in reduced programs for at-risk youth.**

**VI.    STOCKTON DOES NOT HAVE AVAILABLE RESERVES TO COVER THE CURRENT GAP BETWEEN REVENUES AND EXPENDITURES.**

Not only does the General Fund not have the available reserves to cover the budget gap, but many of the City's other operating fund reserves have been significantly depleted in the past few years due to the declining economy.  Additionally without significant expenditure reductions in the General Fund, the ability to pay for these tax-supported services from a liquidity / cash perspective will be wiped out.  The only available cash in which to continue to pay the City's bills will be from other City funds, such as the legally restricted Municipal Utilities' cash.

Stockton seeks to maintain adequate fund balances for emergencies in its governmental operations and proprietary funds.  In June 2006 the City Council adopted a reserve "rainy day" policy for the General Fund with a commitment to support funding over future years of 10 percent of total expenditures as a target reserve level.  Since 2008, the City's tax and revenue declines have made achieving the 10 percent target reserve impossible.  The City's General Fund entered FY 2009-2010 with $8.6 million in available unreserved fund balance, after legally restricted reserves, or 4.7 percent of FY 2009-2010 adopted budget total expenditures. Overall, the City's unrestricted general fund balance has declined by 45.4 percent from June 30, 2007 to June 30, 2009.

May 26, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES
(Page 21)

The financial analysis table below provides summary financial information of the General Fund's cumulative asset and liabilities balances and income statement transactions, along with prior year comparative information.

The total fund balance decreased by $300 thousand in FY 2008-2009 from the prior year to total $28.8 million.  At the end of FY 2008-2009, current assets exceeded current liabilities by $19.8 million and noncurrent assets exceeded noncurrent liabilities by $3.0 million.  Cash and investment balances increased by $3.1 million from the prior year balances, to total $7.0 million.

### General Fund Financial Analysis

*($ in millions)*

| | FY 08-09 | FY 07-08 | Variance |
|---|---|---|---|
| **_Balance Sheet_** | | | |
| Cash and investments | $    7.0 | $    3.8 | $    3.1 |
| Other current assets | 28.0 | 24.4 | 3.6 |
| Current liabilities | (15.2) | (14.8) | (0.4) |
| Net current assets (liabilities) | $   19.8 | $   13.4 | $    6.4 |
| Noncurrent assets | 11.2 | 9.8 | 1.4 |
| Noncurrent liabilities | (8.1) | - | (8.1) |
| Net noncurrent assets (liabilities) | $    3.0 | $    9.8 | $   (6.8) |
| Total Fund Balance, End of Year | $   22.8 | $   23.1 | $   (0.3) |
| | | | |
| **_Statement of Revenues, Expenditures and Changes in Fund Balance_** | | | |
| Revenues | $  187.2 | $  187.3 | $   (0.1) |
| Expenditures | (174.1) | (182.0) | 7.9 |
| Other financing sources (uses) | (7.1) | (11.2) | (4.1) |
| Special items | (6.3) | - | (6.3) |
| Total Fund Balance, Beginning of Year | $   23.1 | $   29.0 | $   (5.9) |
| Total Fund Balance, End of Year | $   22.8 | $   23.1 | $   (0.3) |
| | | | |
| Reserved Fund Balance | $   14.2 | $   13.5 | $    0.7 |
| Unreserved Fund Balance | $    8.6 | $    9.6 | $   (1.0) |

At the end of this fiscal year, the total fund balance for the General Fund of $22.8 million includes reserved fund balance of $14.2 million and unreserved fund balance of $8.6 million.  The unreserved fund balance of $8.6 million is designated as follows: $1.6 million for catastrophic events, $1.6 million for budget contingency/budget uncertainty and $5.4 million for future appropriations. As a measure of the General Fund's liquidity, it is useful to compare designated unreserved fund balances to the General Fund's total expenditures of $174.1 million: designated for catastrophic events, 0.9 percent, designated for budget contingency/budget uncertainty, 0.9 percent, and designated for future appropriations, 3.1 percent.  The following chart compares the size of Stockton's unreserved balances as of 2008 to similarly sized California cities utilizing data from Moody's.  Significantly, the unreserved general fund balance has declined significantly since then.  Moody's Investor Service credit rating agency suggests unreserved general fund balances be approximately 30% to 40% of total revenues.

Case 12-32118   Filed 06/29/12   Doc 24

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 22)



Four funds with positive cash balances are worth mentioning specifically:

**1.   The Workers' Compensation Fund:**

The City is self-insured for workers' compensation.  The Workers' Compensation fund currently has a balance of $23.6 million, and current liabilities of $6.8 million.  Hence, theoretically, the fund has an available cash balance of $16.8 million.  However, it would be very unwise to raid this fund because the actuarially-determined liability of the fund is $45 million.  Therefore, taking that cash balance and using it for other purposes would have the effect of increasing the amount the City needs to put aside on an ongoing basis, at a time when the City plainly does not have the money to do so.  Further, the cash balance of this fund is a critical source of liquidity for the City to pay its general fund obligations throughout the year since many sources of tax revenue are received sporadically.

**2.   Retirement Benefits ISF:**

The City presently has $6.3 million in the retirement internal service fund.  This amount is needed to pay the debt service on the City's pension obligation bonds.  Annual debt service on the Pension Obligation Bonds is about $6.9 million and must be disbursed to the fiscal agent at the beginning of each fiscal year in accordance with the bond agreements; therefore, there are no surplus assets available in this fund.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 23)

**3.    Vehicle and Equipment Funds:**

This ISF has a current balance of  $11 million, with net current assets of $9.8 million.
The $9.8 million reserve is needed for major equipment and technology system
replacements that have been deferred to long.  Using these assets to cover other
operating costs would defer these replacements to the detriment of service to citizens
and safety to employees.  Depleting these reserves now would also require internal
service fund charge rates to operating departments to increase to replenish these
needed reserves.  Opportunities to accomplish these replacements with lease financing
are reduced as the City's financial position has declined.

**4.    Special Revenue Funds:**

The reserves in these funds are needed for the following:

   **Emergency Communication:**   This reserve was maintained to pay refunds
required by a lawsuit settlement.  The refund period has recently expired and the
residual reserve will be used in fiscal year 2009-10 to offset public safety
telecommunication expenses already incurred in the General Fund as required by the
authorizing legislation and legal settlement.  The $489,000 reserve existing at the end of
fiscal year 2008-09 will not be available to address operating shortfalls in fiscal year
2010-11.

   **City Administration Building:**  The $940,000 reserve in this fund is needed to
offset the loss revenues from expiring leases in the building that occurred in fiscal year
2009-10.  Additional commercial leases expire in future years and may not be replaced
due to the large inventory of vacant office space in downtown Stockton.  In addition, this
reserve is needed to offset rising debt service costs projected in future years due to the
variable rate financing used to acquire the building in 2007.  Using any of this reserve
now would expose the General fund to subsidizing operating revenue losses and debt
service now supported by this fund.

   **Recreation Fund:**   The $855,000 reserve in this fund is needed to offset
potential operating losses for recreation programs recreation programs and facilities
such as the Civic Auditorium.  In addition, this fund is proposed to absorb the fiscal year
2009-10 operating loss from the Golf Enterprise Fund that is currently projected to be at
least $250,000.

**VII.    DESPITE STOCKTON'S EFFORTS TO CURTAIL SPENDING, STOCKTON
    FACES SIGNIFICANT CHRONIC COST DRIVERS**

The City's current fiscal crisis is driven by two major factors: the decline in revenues
outlined above, and a dramatic increase in employment costs.  Since June 30, 2007,
employee wages have increased significantly, driven primarily by automatic formulas in
City contracts.

Case 12-32118    Filed 06/29/12    Doc 24

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 24)

Equally problematic, the City's costs for medical coverage of active and retired employees, and pension costs are soaring.  In addition to increased costs associated with inflation and other cost drivers, the labor contracts obligate the City to cover <u>ALL costs</u>.  That is, there is no employee contribution to healthcare (except police employees who contribute $100/month) or pension.





Unfortunately, these costs are expected to continue to escalate for two reasons. First, the City's PERS pension accounts are now significantly underfunded, due to increased benefit levels, coupled with a greater than one-third decline in PERS assets that has occurred over the past two years. As a result, notwithstanding premium calculation

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 25)

methodology that will make the rate increases gradual, the City's contributions are projected to rise over the next several years.

Second, the City's retiree health contributions continue to be made on a pay-as-you-go basis only.  Based upon the 2007 Bartel Actuarial Study, the City's total OPEB liability is $388 million, with plan assets of $0.  Assuming no additional active employees were added to the program, other than the current qualified employees, the unfunded liability is estimated to be accrued in its entirely in FY 2028-2029.

### "Pay-As-You-Go" Unfunded Retiree Health Liability



In FY 2008-2009, the City had a Net OPEB Obligation of $48.8 million – which is carried as a negative balance.  Additionally, due to the annual unfunded OPEB liability, this fund's net assets are expected to further decline in each year in the future by approximately between $22 million and $23 million annually (projected to be a negative $72 million at end of FY2009-2010) until the City begins to support this liability. Beginning to fund the retiree health annual contribution in FY 2010-2011 will cost an estimated $12 million in the General Fund and $9.6 million in all other City operating funds, and approximately the same level of annual funding thereafter.  This $12 million is not included in the City's FY 2010-2011 $23 million budget shortfall, resulting in a total shortfall of $35 million.  The City must find a way to begin to reduce and/or fund this liability or even without the other fiscal problems described in this report, retiree health care costs will become unaffordable for the City.

May 26, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES

(Page 26)

| Assumes: 4.5% Discount Rate / 30-Year Amortization/ NO PRE-FUNDING / STATUS QUO | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Annual Required Contribution (ARC) (a) | Interest on net OPEB Obligation | Adjustment to ARC (b) | Annual OPEB Cost | Contributions Made (Pay-As-You-Go Current Retirees) (c ) | Increase in net OPEB Obligation | OPEB Obligation Balance | Notes |
| FY 11-12 (Est.) | 38,756,000 | 2,019,000 | (5,981,000) | 34,794,000 | (14,597,000) | 20,197,000 | 114,104,000 | Estimates |
| FY 10-11 (Est.) | 137,464,000 | 1,981,000 | (4,492,000) | 34,953,000 | (13,097,000) | 21,856,000 | 93,907,000 | Estimates |
| FY 09-10 (Est.) | 36,208,000 | 1,659,000 | (3,024,000) | 34,843,000 | (11,597,000) | 23,246,000 | 72,051,000 | Actual July-Dec 2009 *(2) for last 6 months. |
| FY 08-09 | 34,987,000 | 1,107,000 | (1,509,000) | 34,585,000 | (10,388,000) | 24,197,000 | 48,805,000 | Pg. 102, FY08-09 CAFR |
| FY 07-08 | 33,801,000 | - | - | 33,801,000 | (9,193,000) | 24,608,000 | 24,608,000 | Pg. 91, FY07-08 CAFR |
| (a)  Annual Required Contribution (ARC) based on Bartel Associates, LLC Actuarial for 6-30-2007. | | | | | | | | |
| (b)  Adjustment to the ARC includes prior year Net OPEB Obligation divided by the Amortization Factor (30 year) provided on slide 34 of 2007 GASB 45 Valuation. Estimates were based on the CALPERS Amortization Factor Tables. | | | | | | | | |
| (c)  Contributions Made (Pay-As-You-Go) Current Retirees estimate for FY2010 based on YTD data.  Estimates for FY2011 and FY2012 based on $1,500,000 annual assumption increase. | | | | | | | | |

Unfortunately, many of these obligations are difficult, if not impossible, to reduce in the short term.  Although the City could create a second-tier retirement system, the savings from doing so would be very modest in the short term.  The only meaningful way for the City to reduce its pension costs in the short run is to require that employees contribute more.  Similarly, medical costs are projected to continue rising at almost double digit rates for years to come, eventually leveling off at around 5% a year.  In general, based upon the experience of other jurisdictions, the City can expect pension costs will continue to rise.

Given the City's very limited reserves, the only way that the City can achieve a balanced budget is to reduce the number of employees, reduce the compensation of employees, and/or increase the amount that employees contribute for their benefits.  This poses a significant challenge because the two major drivers of the general fund deficit are police and fire wage and benefit costs, but the fire bargaining agreement is closed until June 20, 2011 and the police MOU is closed until June 30, 2012.  While the fire and police unions could agree voluntarily to reopen their agreements, absent a fiscal emergency, the City cannot require renegotiation of these agreements.

A summary of the City's employee labor organizations' bargaining agreements, as of the date of this report, is provided below.

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 27)

| EMPLOYEE ORGANIZATION | BARGAINING UNIT | Budgeted FTE | Expiration Date | |
|---|---|---|---|---|
| Stockton Police Officers' Association | Police Officers | 344 | 6/30/2012 | (1) |
| Stockton Police Management Association | Police Officers | 20 | 6/30/2010 | (1) |
| Stockton Firefighters' Local 456 | Firefighters | 226 | 6/30/2011 | (3) |
| Stockton Fire Management Unit | Firefighters | 8 | 6/30/2011 | (3) |
| Stockton City Employees' Association | Miscellaneous Workers | 464 | 6/30/2014 | |
| Operating Engineers' Local 3 | Miscellaneous Workers | 108 | 6/30/2008 | (2) |
| Operations and Maintenance Local 3 | Miscellaneous Workers | 138 | 12/31/2008 | (2) |
| Operations and Maintenance Supervisory Local 3 | Miscellaneous Workers | 14 | 12/31/2008 | (2) |
| Mid-Management/Supervisory Level Unit | Miscellaneous Workers | 138 | 6/30/2014 | (2) |
| Total Budgeted FTE as of Feb. 26, 2010 ---> | | 1,460 | | |

*(1) A dispute existed relative to implementation of a July 1, 2008 salary increase. The City approved a tentative agreement with the Stockton Police Officers Association in July 2009 that settled the salary survey dispute and provided for concessions of approximately $7.1 million over a three-year period.*

*(2) The employees represented by this bargaining unit continue working at the City pursuant to the terms of the expired agreement. Negotiations are in progress and discussions regarding salary and benefit changes.*

*(3) The City reached a tentative agreement with the Stockton Firefighters' Local 456 and Stockton Fire Management Unit that provided for savings of $7.4 million in Fiscal Year 2009-10 and restructured a prior Letter of Understanding that provided for restoration of previous concessions. The restructure is estimated to save $5.0 million in Fiscal Year 2009-10 over prior contract obligation estimates.*

The City's contracts with its labor unions contain a number of embedded components that contribute to a chronic cycle of escalating and unfunded costs. These components must be addressed in order to achieve fiscal integrity.

● **Retirement**

The City contracts with the California Public Employees Retirement System (PERS) for retirement benefits, and these benefits are reflected in each of the City's labor contracts. Police and fire employees ("safety") enjoy the highest level of benefits, known as "3% at 50," while all other employees ("non-safety") receive a "2% at 55" formula. Safety employees retire with an annual pension benefit of up to 90 percent of their single highest year's salary. "Salary" includes additional pays that are embedded in the contract, such as "administration pay," "education incentive," "longevity incentive," "certification pay," and "uniform pay" among others.

For example, while a Fire Captain's "salary" is listed at $101,303.95, the true salary can be increased by additional pay through the labor MOU by over $35,000 (not including benefits). Thus, a Fire Captain who retires with a base salary of $101,303.95 will receive a lifetime annual pension of over $122,000 annually.

Under the Public Employees Retirement System ("PERS") law, the contracting agency and each employee or annuitant must contribute a percentage toward their pensions (known as the mandatory employee contribution). (Gov. Code § 22890.) For safety employees, the employee contribution is nine percent of salary. For non-safety

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 28)

employees, the employee contribution is seven percent.  However, PERS also permits a contracting agency to elect to pay all or a portion of the normal contributions of members of a group or class of employment.  (Gov. Code § 20691.)  The employer-paid contribution of the employee's share is referred to as the Employer Paid Member Contribution or EPMC.  The City's labor agreements have shifted this cost  - the employee's required contribution – to the City (the employer).  Thus, the City currently pays the employee portion, or EPMC, plus the employer portion of the required pension contribution.  The employer contribution for 2010 is 27.6 percent for safety, 14.087 percent for non-safety or miscellaneous. Adding the EPMC, the City is paying about 37% of covered payroll for safety employees' retirement. This amount does not include the City's additional costs to fund a pension obligation bond, which is currently 8.637 percent.

- **Retiree Health**

The City has begun to restructure its retiree health program by negotiating retiree health trusts applicable to employees in certain unions, but only to recent hires.  The trusts are intended to fund post employment health costs, however, the trusts are currently underfunded, and again, they only cover a fraction of the City's workforce.

As a short term measure, in order to relieve the current fiscal crisis, the City has negotiated reduced contributions to these trusts.   This provides short term relief only, as the future liabilities continue to mount.

With respect to the majority of current employees, the City pays 100% of retiree health program costs.  The retiree health program is identical to the active health program – which is a PPO program sponsored by the City.

Retiree health costs for the majority of the City's workforce are presently funded on a pay-as-you-go basis.  As such, this program is unfunded, and the City faces escalating costs in the future.  In FY 2006-2007, the cost of retiree medical was $5.25 million.  In FY 2007-2008, the cost was $8.5 million, and for FY 2008-2009 it was $9.2 million.  The 2009-2010 costs are projected to be $11.6 million.  Pursuant to GASB 45, the City was required to report its Unfunded Accrued Actuarial Liability ("UAAL") in its CAFR effective in FY 2006-2007.  The unfunded liability, as of the actuarial study conduct in 2007 was $388 million.  The GASB actuarial study is being updated, but the UAAL is expected to increase due to the increased number of retirees (the City provided retirement incentives the past two years) and the decreased number of active employees.

- **Health**

Of the 1443 employees in the City, only 364 employees are required, pursuant to their labor agreements, to pay an employee contribution to healthcare (police – officers and management – contribute $100/month per employee toward healthcare costs).  Thus, most City employees receive 100% of all costs paid by the City for participation in the City's self-funded PPO plan (there are plan deductibles of $150/employee, $450 per

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 29)

family paid for by the employee and once the deductible is met, the City funds 80 percent of the cost).   The City's FY 2010-2011 costs per year for this benefit are estimated at $15,582 per active employee, or approximately $22.5 million for active employees and their dependents.

The City's Health Advisory Committee has met regularly to achieve plan design changes, and although certain agreements have been reached, there has not been agreement on an overall plan design.

The City is currently negotiating with labor unions to require an employee contribution (i.e., make a monthly payroll deduction) toward health insurance.  No agreements have been reached to date.

- **Salary Formulae**

All of the City's labor contracts tie salary to a formula.   All but two (SCEA, the clerical/technical unit and Mid-management Supervisory) are tied to CPI.   All salary formulae contain a minimum salary increase of 2.5 percent.   Other labor contracts contain salary formulae based on a survey of various agencies, including various agencies that have marginal relevance to the City of Stockton.   For example, the City's contract with its fire union requires a survey to be conducted involving the cities of Anaheim, Fresno, Garden Grove, Huntington Beach, Pasadena, San Bernardino, Santa Ana, and Torrance among others.   The contract requires the City to provide whatever pay that will place the fire employees salaries at "the bottom of the top 3rd" – i.e., the fifth highest salaries among sixteen agencies.

As a result of a survey formula in a labor contract with the Police Officers Association ("POA"), the City recently faced a legal dispute.   The POA asserted that the salary survey required the City to increase its wages as of July 1, 2008 by 23 percent, and the POA sought arbitration on this issue.   The City eventually settled, and the settlement called for a 15 percent retroactive base pay increase effective July 1, 2008.   The POA eventually agreed to partial concessions by agreeing to a furlough program, and to delay parts of the scheduled increases, however, these are short term solutions.   With respect to the POA, for example, their labor agreement currently calls for reinstatement of a uniform allowance, and additional salary increases in FY 2010-2011, as well as reinstatement of retiree medical trust contributions in FY 2011-2012.    Total costs embedded in the labor contract amount to approximately $2.3 million.   Although asked to make concessions, the POA has declined to date.

The current contractual obligations are fiscally unsustainable.   With respect to the POA MOU, for example, total base wage increases embedded in the contract amounted to nearly 36 percent from January 1, 2002 through July 1, 2008, plus the additional amount that resulted from the salary survey discussed above.   Adding to the City's general fund deficit for FY2010/2011 is the restoration of previously negotiated concessions, such as furloughs, salary survey-based increase for Fire of 8.5% and CPI-based increase of 3.68%, uniform allowances, etc.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 30)

- **Additional Pay Incentives**

Most of the City's labor agreements contain "additional pays" based on a variety of criteria.   Often, the additional pay is expressed in terms of a percentage of base pay. For example, in the POA contract, the most senior employees receive a 19% adjustment on top of base pay.  When base pay increases, the "additional pay" element also increases because it is a percentage of base pay.

Examples of "additional pays" by employee:

*Fire Battalion Chief*

Additional Pay:  $38,204.02 (31%)

*Fire Captain*

Additional Pay:  $35,591.95 (35%)

*Police Sergeant*

Additional Pay:  $32,774.76 (36%)

The categories of "additional pay" elements are too numerous to cite exhaustively here, but these are some examples from the contract with the fire union:

- Vacation "longevity" cash out
- Vacation added to "final compensation" to increase retirement benefit
- Vacation sell back option
- Sick pay sell back option at separation
- Certificate incentive pay
- Educational incentive pay
- Haz/Mat Assignment pay
- Paramedic Certification pay
- Deferred Compensation
- Uniform allowance
- Special Assignment Pay
- Acting Pay
- Call-Back Pay
- Tiller Pay
- Fire Engineer/Operator Pay
- Administrative Captain Pay
- Longevity Pay

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 31)

- **Overtime**

The City has agreed to pay overtime in numerous instances when it is not legally required by the Fair Labor Standards Act ("FLSA").  Battalion Chiefs in the Fire Department, and Captains in the Police Department, for example, receive overtime even though they presumably qualify as exempt under the FLSA.

In addition, the City pays overtime based on "paid time" status, versus hours actually worked.  Thus, for example, if an employee works 32 hours, and takes a day off for vacation, this will count as the 40-hour threshold for paying overtime.

Overtime is an additional cost driver attributable to the labor program. Overtime costs accounted for $8.2 million of the total $141 million General Funds' salaries and benefits costs in FY 2008-2009, of which 98% were in the Police and Fire departments.

- **Staffing**

The City's fire contract contains a number of "minimum staffing" requirements, including a minimum number of personnel attached to engines, trucks and Department-wide.  For example, the contract specifies that four persons must staff a fire engine, and five persons must staff a fire truck.  Of all agencies throughout the United States that maintain paid fire departments, Stockton is among a very small percentage that require staffing at this level.  The vast majority of fire departments in the State of California have three firefighters on an engine, and four firefighters on a truck.   The contract specification of additional personnel increases the City's costs enormously.

The City is seeking to achieve an agreement with the fire union to address the staffing issues.  At present, the union has maintained that it will not entertain any discussions that will affect staffing, and will not agree to any staffing reductions such as reducing the number of firefighters on a truck, or closing a fire station.

Additionally, the current labor contract restricts scheduling of patrols in the City's Police Department  to "the current 4/10 work schedule."  Therefore, the City's ability to deploy its police force in a more efficient manner, especially given the reductions in staffing, is equally restricted, absent specific agreement.  To date, the union representing police officers and sergeants has refused to meet with the City to discuss alternatives to police layoffs and demotions to close the general fund deficit and provide essential services to the City.

**VII.    CONSEQUENCES WITHOUT EMERGENCY ACTION.**

Reductions in General Fund expenditures are required in FY 2010-2011.  Given current year estimates of revenue and expenditures, the City expects to end FY 2009-2010 with $4.5 million in available unreserved fund balance and a total fund balance of $18.7 million.   This represents a reduction of $4.1 million from the prior year due to approximately $6 million in unbudgeted Fire department overspending in FY 2009-2010,

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 32)

offset by savings in other departments.  Without the needed $23 million in expenditure reductions, the City's total fund balance will be a deficit of ($4.3 million) and no available reserves, and the inability to meet its legally restricted reserve requirements of $14.2 million.

A deficit fund balance of the General Fund will result in a significant downgrade of the City's credit rating and a complete inability to access the capital debt market for needed infrastructure project improvements for many years into the future.  Additionally, a deficit will significantly hamper the City's ability to meet it's liquidity requirements, similar to what occurred with the State of California when it began to run out of cash.

    **A.**      **Impact of Police Layoffs**

Since 2008, the Police Department has had to reduce staffing in order to bring rising expenditures resulting from labor agreements in line with rapidly falling revenues.  As the table below illustrates, funding reductions in the Police Department resulted in the elimination of 73 sworn staff positions in FY 2009-10, and another 53 sworn positions are proposed to be eliminated in FY 2010-11 to balance the budget. In addition, 37 civilian positions are also proposed to be eliminated to achieve the $11.4 million cost reduction needed from the Police Department to balance the General Fund budget in 2010-11.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**

(Page 33)

| | | | | |
|---|---|---|---|---|
| **Stockton Police Sworn Staffing History** | | | | |
| | | Authorized | | Per 1,000 |
| FY | Change | Staffing | Population | Population |
| 88/89 | | 245 | 193,000 | 1.27 |
| 89/90 | +11 | 256 | 194,000 | 1.32 |
| 90/91 | +22 | 278 | 195,223 | 1.42 |
| 91/92 | +28 | 306 | 214,520 | 1.43 |
| 92/93 | +22 | 328 | 226,300 | 1.45 |
| 93/94 | +17 | 345 | 228,733 | 1.51 |
| 94/95 | +22 | 367 | 232,770 | 1.58 |
| 95/96 | +10 | 377 | 233,600 | 1.61 |
| 96/97 | +18 | 395 | 236,500 | 1.67 |
| 97/98 | +4 | 399 | 240,100 | 1.66 |
| 98/99 | +1 | 400 | 243,700 | 1.64 |
| 99/00 | 0 | 401 | 247,300 | 1.62 |
| 00/01 | 0 | 401 | 251,100 | 1.60 |
| 01/02 | 0 | 401 | 253,800 | 1.58 |
| 02/03 | -17 | 384 | 262,600 | 1.46 |
| 03/04 | +5 | 389 | 271,712 | 1.43 |
| 04/05 | +12 | 401 | 280,249 | 1.43 |
| 05/06 | +7 | 408 | 282,000 | 1.45 |
| 06/07 | +20 | 428 | 285,966 | 1.50 |
| 07/08 | +13 | 441 | 289,927 | 1.52 |
| 08/09 | 0 | 441 | 290,409 | 1.52 |
| 09/10 | -73 | 368 | 291,000 | 1.26 |
| 10/11 | -53 | 315 | 291,000 | 1.08 |

As the above table indicates, the Stockton Police Department sworn staffing level has dropped from 1.52 officers per thousand population to 1.08 in just two years. This precipitous drop is illustrated in the graph below. In FY 2009-10 sworn staffing reached 1.26 officers per thousand; a level last seen in 1988-89, and is proposed to fall to staffing level that is lower than 1992-93, when the City's population was 226,300. A sworn staffing ratio of 1.08 is consistent with California cities that have a low crime rate, such as Elk Grove and Santa Rosa. Unfortunately Stockton had the third highest overall crime rate and the second highest violent crime rate of all California cities with over 100,000 population in 2009. Stockton's crime rate is 2.25 times the crime rate of Elk Grove and twice the rate of Santa Rosa.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 34)



In 1989, the City Council approved a 33% increase in the Utility Users Tax to fund 62 additional police officers to address crime problems and a low sworn staffing ratio. Throughout the 1990's the City continued to add sworn staffing with federal and state grants gradually increasing the officer per thousand level to a high of 1.67 in FY 1996-97. Sworn staffing levels remained at or near the 400 level for the next eight years gradually eroding the officer per thousand ratio as population increased, to 1.43 in 2003-04. In 2004, the citizens of Stockton approved Measure W, a quarter cent sales tax, to fund 40 additional police officers to improve sworn staffing levels and address continuing crime problems. With this new funding, police officer staffing increased to its highest level of 441 in FY 2007-08. Due to declining sales tax revenue and increasing police officer salary and benefit costs, this quarter cent sales tax will only fund 22 police officers in FY 2010-11.

The Police Department is currently funding 20 sworn police officer positions with a federal grant (COPS Hiring and Retention Program) that will expire at the end fiscal year 2011-12. The General Fund will incur an additional $2.7 million cost burden per year if those 20 officers are to be retained.

Without emergency action, the sworn police officer staffing level of the Stockton Police Department will reach 315 in FY 2010-11, and civilian support staffing level will also be reduced. This will result in a significant reduction in the Stockton Police Department's ability to respond to calls-for-service, investigate crimes, suppress gangs, provide animal regulation services, provide traffic enforcement and safety services, and prevent crime.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**

(Page 35)

### B.    Impact of Cuts to Community Programs

In the upcoming FY 2010-11, Community Services Aquatics program will be eliminated. This is a seasonal program offered at Oak Park Pool and Victory Pool. Staff is currently working on outsourcing the pools to interested organizations to keep some of the pools available to the public.  The Children's Museum operations will be turned over to the Museum Board effective October 1st.  Hours of operations of the Community Centers will be modified to eliminate majority of remaining part-time staff assigned at these facilities.  Programs will be run mostly by full-time staff.  Vacant positions will not be filled and support staff will be reduced.    The Parks and Recreation Annex will be closed and remaining staff will be moved to the community centers to complement staffing at these facilities. The Sport's Commission Director's salary allocation to Tourism Business and Improvement District will be increased from 30% to 50%.

As a result of the reduction in general fund subsidy and the decrease in revenues, the Library Division is proposing to close Margaret Troke Branch and Fair Oaks Branch. These closures will be a huge reduction in library services especially in North Stockton. Customers are anticipated to influx Chavez library.  The books and materials budget for City branches will be totally eliminated.  Chavez Library janitorial services will be outsourced just like the other City branches.  Mailing of printed notices to library patrons will be cancelled. Notices will be sent to customers electronically or by telephone. Current vacant positions will not be filled and support staff will be reduced.  The Chavez Library will continue to circulate materials, and house reference materials for customers. Customers used to using their local branch will need to travel to Chavez for services. The amount of material will decrease, leading to longer wait times for customers, and fewer selections.  There will be longer wait times for assistance, and fewer literacy service programs.

**In summary;**

**LIBRARY SERVICES**

- **Close Margaret Troke Branch and Fair Oaks Branch.**
    - Huge reduction in library services especially in North Stockton.
    - Customers are anticipated to influx Chavez library.
    - Reduction of program services and literacy opportunities

- **The books and materials budget for City branches will be totally eliminated.**

- **Chavez Library janitorial services will be outsourced just like the other City branches.**

- **Mailing of printed notices to library patrons will be cancelled**.
    - Notices will be sent to customers electronically or by telephone.

May 26, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES

(Page 36)

- **Current vacant positions will not be filled and support staff will be reduced.**

## RECREATION SERVICES

- **Closure or Outsource of Facilities**
  - Aquatics – possible partnership with non-profit organization to keep Oak Park Pool and Sousa Pool open to the public.
  - Children's Museum -  turn over full operations to CM Board effective October 1st

- **Modify Hours at Community Centers**
  - Further reduction of part-time and full-time staff.
  - Adjust operating hours based on remaining full-time staff available.
  - Centers to remain open during peak hours

- **Staff Reduction**
  - Eliminate/freeze 4 full-time positions
  - Reduced administration and support to programs
  - Close P&R Annex and move remaining staff to centers to complement staffing at the facilities

- **Sport Commission**
  - TBID currently pays 30% of Director's salary/benefits.  Proposed increase to 50%.

In the heart of the nation's richest farmland in the Central Valley, residents are hard-pressed to buy fresh produce or find safe places to exercise.  In the eight counties of the San Joaquin Valley, nearly two-thirds of adults are overweight or obese, exceeding statewide averages across all age groups.

As stated by "American Health and Robert Wood Johnson Foundation," the numbers are compelling – the proportion of California's population that is overweight or obese continues to increase and now approaches 60% for adults and 30% for children, resulting in dramatic increases in chronic diseases and significant increase in health care costs.  The social determinants of health are the economic and social conditions under which people live that determine their health, such as income, education, literacy, employment and working conditions and social and physical environments.

The Public Policy Institute of California reported that 64% of Californians say that poorer communities have less than their fair share of well-maintained parks and recreational facilities which leads to crime.  The U.S. Census Bureau reports that almost half of Hispanic children under 18 in central cities were kept inside as much as possible because their neighborhoods were perceived as dangerous.  The same was true for more than 39% of black, 25% of non-Hispanic white, and 24% Asian children.  Children

Case 12-32118    Filed 06/29/12    Doc 24

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 37)

in sports and after school activities tend to score higher on tests and are less likely to engage in antisocial behavior.

Obesity and related health conditions such as diabetes are increasing among children. A lace of physical activity and unhealthy eating habits contribute to the rise of obesity. This issue is of even greater concern for children of color.  For instance, Latino and African-American children experience higher rates of overweight than children of other racial/ethnic groups, and Asian children get less physical activity.  Not only do obesity and related conditions pose a significant health risk, they are costly to individuals and society.  According to the California Department of Health Services, in 2000, physical inactivity, overweight and obesity cost California an estimated $21.7 billion in direct and indirect medical care, worker's compensation, and lost productivity with $13.3 billion of that total attributable to physical inactivity.

The U.S. Department of Health and Human Services reports that nationally, daily participation in physical education classes has dropped in recent years from 42% in 1991 to 28% in 2003.  As educational systems continue to struggle with their own financial restraints, Stockton's Parks and Recreation programs become more than ever important assets in promoting quality of life, active living and overall health across broad segments of the population.

Numerous studies confirm that many prisoners have low literacy skills.  One study compared two groups of at-risk three and four year olds and whether they were enrolled in an early education program.  The study found that by age 40, those who participated were almost twice as likely to have earned a post-secondary certification than those left out of the program and that by age 27, those at-risk youth who had not attended the program were five times more likely to grow up to be chronic lawbreakers than those enrolled in the program.

The Basic Skills Agency published a report in 2002 that concluded, "the Study makes it clear that there's a statistically significant connection between repeated offending and poor literacy skills."  The evidence is clear: investment in early literacy skills will reduce the investments needed to build and maintain jails.

Some statistics associated with juvenile court are: 85% of all juveniles who interface with the juvenile court system are functionally illiterate; more than 60% of all prison inmates are functionally illiterate; Penal institutions records show that inmates have a 16% chance of returning to prison if they receive literacy help, as opposed to 70% who receive no help.

Illiteracy and crime are closely related.  The Department of Justice states, "the link between academic failure and delinquency, violence, and crime is welded to reading failure."  Over 70% of inmates in America's prisons cannot read above fourth grade level.

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 38)

Literacy is learned.  Illiteracy is passed along by parents who cannot read or write.  One child in four grows up not knowing how to read.  43% of adults at Level 1 literacy skills live in poverty.  3 out of 4 food stamp recipients perform in the lowest 2 literacy levels.  90% of welfare recipients are high school dropouts.  16 to 19 year old girls at the poverty level and below, with below average skills, are 6 times more likely to have out–of-wedlock children than their literate counterparts.  Low literary costs $73 million per year in terms of direct health care costs.  These are staggering statistics that clearly demonstrates the impact of illiteracy on a community.

The high rate of illiteracy is making the fight against crime in Stockton more difficult than it ought to be.  In FY 2010-11 the Community Services Department is faced with closures of libraries, decreased library services and recreation program and facility reductions.  Crime and illiteracy will escalate even higher with literacy programs, opportunity and promotion of reading and lack of safe environments for our children and seniors going away. America's Most Literate Cities 2009 study placed Stockton 72nd of 75 cities in literacy among United States cities with populations of 250,000 or more.  Currently Stockton is 3rd from the bottom of United States cities.  Services provided in the Community Services Department act as prevention to crime, illiteracy, youth –at-risk and senior quality of life.  These services bring the community together and create its foundation

### C.    Impact on Stockton's Credit Rating

The City's current "issuer" credit rating on its General Fund is Moody's A2 and Standard & Poor's A+/negative outlook. The City's "issuer' rating is based on the financial outlook of the General Fund, but also impacts the ratings of the City's debt issuances that have a secondary pledge of General Fund resources.  These debt obligations include the City's $125 million 2007 Pension Obligations Bonds, 2007 Variable Rate Demand Bonds of $40 million used to acquire the new City Administration Building at 400 E. Main, the 2004 Stockton Event Center Revenue Bonds of $47 million, the 2009 Capital Improvement Lease Revenue Bonds of $35 million, and various other debt obligations.

Due to the budget crisis, Standard & Poor's placed the City on "negative outlook" for potential downgrade in September of 2008.  In their report, they cited "a sharply deteriorating revenue environment stemming from housing market stress and the likelihood that major revisions to the city's budget will be necessary to avoid depleting its available general fund balance."  S&P also stated that a balanced FY 2008-2009 operations and implementation of a plan to address multi-year budgetary pressure would support a return to a stable outlook.  The City remains on "negative outlook" until Standard & Poor's credit rating agency takes further action.

In July of 2008, Moody's Investor Service downgraded the City's issuer rating from A1 to A2, reflecting the City's "deteriorated financial position, which is not expected to improve in the near term...in part from the severe downturn in the city's residential real estate market and the resulting, weakening economy."  Moody's also cited concerns about the "narrowness of the city's reserves as they enter into a difficult period." In April of 2009,

May 26, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES**
(Page 39)

Moody's placed the City on the credit "watchlist" for potential downgrade based on the identified budget shortfall for FY 2009-10 which was "made even more difficult by existing labor agreements which, absent negotiated concessions, would in fact increase the deficit."  In late July of 2009 the City was removed from the Moody's watchlist since the labor concessions had been achieved for a balanced FY 2009-10 budget.

Both credit rating agencies are closely monitoring the financial outlook of the City.  City staff has been proactively sharing information on the financial health and concerns of the City to both rating agencies and City bondholders/investors.

Declines in the General fund balance will trigger a significant downgrade of the City's credit rating and a complete inability to access the capital debt market for needed infrastructure project improvements for many years into the future.  This downgrade will cause the variable interest rate on one of the City's debt obligations to shot upward to prohibitively expensive levels.  It will also cause a serious lack of confidence by the City's existing bondholders and institutional investors, as well as others in the credit community of which the City relies to finance needed capital improvements in the City.

**VIII.   CONCLUSION: THE CITY MANAGER RECOMMENDS THAT THE CITY COUNCIL DECLARE A FISCAL EMERGENCY.**

In light of the current budget shortfall and the hurdles faced by the City in tackling the shortfall, the City Manager recommends that the City Council declare a fiscal emergency and direct City management to take appropriate and lawful measures to achieve a balanced budget for FY 2010-2011.

**REQUESTS FOR INFORMATION**

This report is designed to provide citizens, taxpayers, customers, investors and creditors with an overview of the City's financial outlook and to demonstrate the City Council's commitment to accountability. For additional information concerning this report, contact the City of Stockton at City Hall, 425 North El Dorado Street, Stockton, CA 95202.

Respectfully submitted,

KEVIN O'ROURKE
INTERIM CITY MANAGER

::ODMA\GRPWISE\COS.CM.CM_Library:83370.1

Resolution No. _____

# S T O C K T O N   C I T Y   C O U N C I L

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON DECLARING
A STATE OF EMERGENCY BASED ON FISCAL CIRCUMSTANCES; MAKING
CERTAIN FINDINGS AND DIRECTING THE CITY MANAGER TO TAKE
APPROPRIATE AND LAWFUL MEASURES TO ACHIEVE A BALANCED BUDGET**

The City's Charter requires that the City Council adopt a balanced budget at the outset of each fiscal year, which commences on July 1; and

Under the California Constitution, the City Council has plenary authority to control the City's municipal affairs, including without limitation establishing and regulating wage and benefits of City employees; and

As reflected in the accompanying staff report, and based on all of the relevant financial data and analyses, the City of Stockton ("the City") faces a severe and chronic fiscal crisis that jeopardizes the delivery of essential public services; and

The City has previously taken measures aimed at ensuring its ability to more fully fund its public safety obligations, but at present the City has no legal or viable means of increasing revenue in the short term (for example, by increasing taxes); and

The police and fire departments comprise 78 percent of the City's general fund budget; and

The City's labor contract with its fire union expresses certain limitations on the City's ability to control staffing and to layoff employees; and

The City's labor contract with its police union expresses certain limitations on the City's ability to control the scheduling of employees, which limits the City's ability to gain significant potential efficiencies; and

Because the City's labor unions have not made sufficient economic concessions in connection with the upcoming 2010-2011 budget to date, the City has been forced to issue layoff notices to over 70 sworn members of the police department; and

The City and its citizens face an increasing problem with crime, and the City was recently rated by *Forbes* magazine as America's fifth most dangerous city, and by the California Department of Justice as having the second highest rate of violent crime in the State of California; and

The City possesses the authority to declare an emergency and to take appropriate and targeted measures for the benefit of the safety and well-being of its citizens; and

By this declaration of a fiscal emergency, the City seeks to achieve economic, scheduling and staffing reforms, pending negotiations with all affected labor unions; and

The City has no other reasonable or viable alternatives to this declaration; and

The City wishes to acknowledge and thank those labor unions who have stepped forward to make concessions, but there have been insufficient concessions to avert a fiscal crisis in the upcoming fiscal year; and

The City remains fully committed to negotiating in good faith with its labor unions in an effort to resolve and avert this fiscal crisis, and the City continues to invite its labor unions to negotiate pursuant to the Meyers-Milias-Brown Act ("MMBA"); now, therefore,

**BASED ON THE ACCOMPANYING STAFF REPORT, ALL APPENDICES AND ATTACHMENTS THERETO, THE INFORMATION PRESENTED TO THE COUNCIL IN RELATION TO ITS CONSIDERATION OF PRIORITIES FOR THE 2010-2011 BUDGET, RELATED EVIDENCE AND FINANCIAL ANALYSES AND ALL FURTHER MATERIAL, INFORMATION AND MATTERS DISCUSSED BY AND REVEALED TO THE COUNCIL IN ITS CONSIDERATION OF THIS MATTER, THE CITY COUNCIL OF THE CITY OF STOCKTON HEREBY FINDS AND DECLARES AN EMERGENCY JEOPARDIZING THE HEALTH, SAFETY AND OVERALL WELL BEING OF ITS CITIZENS BASED ON FISCAL CIRCUMSTANCES; MAKES CERTAIN FINDINGS AND TAKES CERTAIN ACTIONS AS SPECIFIED BELOW:**

1.     The City Council finds the above recitals to be true.

2.     The City Council finds that the City is in the midst of an unprecedented and chronic fiscal crisis that has drastically reduced the City's financial resources and has devastated its ability to provide for the basic needs of its citizens, thereby creating an imminent threat to the health, safety and well being of the City of Stockton and its citizens.

3.     The City Council finds that the City has been hampered by certain labor agreements that have through their terms pertaining to compensation, benefits, staffing, scheduling and other matters, proven to be an intractable obstacle to the City's ability to provide for the benefit of the citizens of this community the breadth of basic services they need and deserve; particularly at this time of economic recession when the needs of the community are profound.

4.     The City Council finds that the fiscal crisis unacceptably increases risks to Stockton citizens by: necessitating the layoffs of police officers at a time when the City

is experiencing high crime rates; and necessitating cuts to other critical public services that are vital to maintaining a community that is safe and healthful.

5.      The City Council finds that when the City and its various employee organizations, including but not limited to the Stockton Firefighters Local 456 and the Stockton Police Officers Association entered into their respective current labor agreements subject to an "emergency" or "extraordinary circumstances," and the Council hereby finds that the present financial crisis is, and shall remain for the foreseeable future, a condition of "emergency" and a condition of "extraordinary circumstances" within the context of each of the current labor agreements.

6.      The City shall continue to invite labor to meet and confer pursuant to the Meyers-Milias-Brown Act in an effort to reach agreement before the budget is due.

7.      The City Council hereby authorizes the presentation in its name of a letter to the Editor of the Record, or other and additional communications to the media, pertaining to the subject matter of this resolution; the content of which may be determined at the Mayor's discretion.

8.      The City Manager is hereby authorized and directed to take appropriate and lawful measures that will achieve a balanced budget for fiscal year 2010-2011, including any changes to existing labor agreements determined necessary by the City Manager, and limited to the duration of the fiscal crisis.   The final budget shall remain subject to approval by the City Council.

　　　　　PASSED, APPROVED and ADOPTED _____.




　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　ANN JOHNSTON, Mayor
　　　　　　　　　　　　　　　　　　　　　　　of the City of Stockton

ATTEST:


_____
KATHERINE GONG MEISSNER
City Clerk of the City of Stockton


::ODMA\GRPWISE\COS.CA.CA_Library:57689.1

# Exhibit K

June 21, 2010

TO:        Mayor and City Council

FROM:     Kevin O'Rourke, Interim City Manager

SUBJECT:  **CITY COUNCIL/REDEVELOPMENT AGENCY CONCURRENT AGENDA
           FOR THE MEETING OF JUNE 22, 2010**

Attached is additional information for the June 22 City Council/Redevelopment Agency
Concurrent meeting.

Enclosed are the resolution and action plan for agenda item 6.04.

> 6.04)   CC    Consider an ACTION PLAN for fiscal sustainability that will guide the City
>               and provide a blueprint for the public to understand the issues currently
>               facing the City, and act as a mandate both for making immediate changes
>               and for long-term restructuring of labor agreements to restore a balance
>               between employment costs and the preservation of City services, while
>               ensuring maximum transparency for the public.
>               (CM)

Enclosed are the agenda item and resolution for the following items, which were not
available at time of publication:

> 6.05)   CC    Resolution adopting emergency measures affecting the terms and
>               conditions of sworn employees in the FIRE DEPARTMENT.
>               (CM)

> 6.06)   CC    Resolution adopting emergency measures affecting the terms and
>               conditions of sworn employees in the POLICE DEPARTMENT.
>               (CM)

Respectfully submitted,

*[signature]*

~~for~~ KEVIN O'ROURKE
INTERIM CITY MANAGER

KO:CM:cbs

::ODMA\GRPWISE\COS.CM.CM_Library:83572.1

**CITY COUNCIL/REDEVELOPMENT AGENCY**

**AGENDA ITEM 6.04**

Resolution No. _____

# STOCKTON CITY COUNCIL

RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING AN ACTION PLAN FOR FISCAL SUSTAINABILITY

By City Council Resolution No. 10-0166, adopted on May 26, 2010, the City declared a state of emergency based on fiscal circumstances; and

The City is committed to implementing a plan that will restore long term fiscal integrity for the benefit of the City's citizens; and

The City desires that its Action Plan be transparent and understandable throughout the community; and

The City values its employees and wants to compensate them fairly and appropriately; and

The City's labor contracts include a host of costs and features that create inappropriate escalating and unfunded liabilities; and

The City desires to clearly articulate a plan that will serve as the blueprint for future labor negotiations; now, therefore,

BE IT RESOLVED BY THE COUNCIL OF THE CITY OF STOCKTON, AS FOLLOWS:

1.     The City Council of the City Stockton hereby adopts the attached Action Plan for Fiscal Sustainability.

2.     The City Manager is authorized to take such actions as are appropriate to carry out the intent of this Resolution.

PASSED, APPROVED and ADOPTED _____.


_____
ANN JOHNSTON, Mayor
of the City of Stockton

ATTEST:

_____
KATHERINE GONG MEISSNER
City Clerk of the City of Stockton

::ODMA\GRPWISE\COS.CM.CM_Library:83542.1

City Atty:
Review _____
Date_____ June 17, 2010_____

# ACTION PLAN FOR FISCAL SUSTAINABILITY AS ADOPTED BY THE CITY COUNCIL OF THE CITY OF STOCKTON JUNE 22, 2010

## Introduction

The City of Stockton ("the City") faces immediate and long term challenges caused in part by escalating and unfunded costs in its labor agreements. The City greatly values its employees and the services they provide to the community. However, labor costs have escalated exponentially and unfairly, particularly when compared to the more modest wage and benefit programs covering the majority of the City's citizens. It is unacceptable that some of the City's labor unions have insisted on higher wages and benefits at a time of recession - when the City's unemployment rate is approximately 22%, and the median household income for a family of four is just over $63,000.

This ten point Action Plan is intended to serve as a policy blueprint for the City's labor relations program. The City is committed to abiding by the Meyers-Milias-Brown Act ("MMBA"), and will continue to negotiate in good faith, seeking partnerships whenever reasonably possible with labor. This Action Plan shall serve as the benchmark for future objectives with labor.

## Issues and Action Plan Principles

### Issue No. 1 – Transparency / Hidden Costs:

The City's labor agreements contain embedded costs and obligations that are often difficult for citizens to identify or understand. For example, the City's payroll system carries over 100 different "additional pay" codes ranging from "assignment pay" to "longevity pay" and others. In many instances, these are simply disguised forms of

regular salary. These additional pays make it difficult for the public to evaluate and understand the overall compensation of City employees.

*__Action Plan Principle No. 1__*: The City shall reduce or eliminate "additional pay" categories. "Additional pays" will be authorized only when the additional pay is absolutely essential to the performance of special job tasks that are not encompassed within the job description. The City shall ensure that all compensation packages are fully, accurately and simply costed out, with total costs displayed to the public so that city residents can understand and evaluate the pay at issue. Unless there are exigent circumstances as determined by the City Council, labor agreements containing cost increases shall be publicized and made available at least two weeks prior to adoption.

__Issue No. 2__ – __Transparency / Side Letters:__  The City is aware of certain "side agreements," other informal memoranda memorializing understandings between departments and labor unions and "past practices" alleged to bind the City. Such "side agreements" and allegedly binding "past practices" are inappropriate because they increase costs, and detract from two critical principles: (1) the public has a right to know the contractual arrangements and obligations affecting public employees; and (2) pursuant to state law, labor commitments by a public agency must be approved by the City Council.

*__Action Plan Principle No. 2__*:    No side agreements or past practices shall be binding on the City unless the agreement or practice is approved in public by the City Council. New labor agreements shall supersede all previous agreements and practices, and shall not contain language preserving previous agreements or practices.

**Issue No. 3 – Salary Formulae**:   Various City labor agreements contain wage and salary formulae that mandate automatic wage increases regardless of economic reality based upon compensation paid in other cities and/or changes in the cost of living.  For example, the Police Officers Association ("POA") recently filed a grievance to enforce a wage formula that the POA contended required the City to give a 23% wage increase as of July 2008.   The salary formula itself required the City to compare salaries from communities that have little or marginal relevance to Stockton, including Irvine, Glendale, Anaheim, Chula Vista and Bakersfield.  The City eventually settled, resulting in a retroactive wage *increase* of 15% at a time when the City was in the midst of a financial crisis, and many of the City's citizens were suffering from layoffs and reduced pay.

The Fire Union is currently asserting the right to an 8.5% raise based on a similar salary formula, which confers automatic adjustments based on irrational comparisons to communities including Anaheim, Fresno, Garden Grove, Huntington Beach, Pasadena, San Bernardino, Santa Ana and Torrance.  In addition, the fire contract would provide for a 3.6% increase based upon a cost of living formula.

*Action Principle No. 3*:    The City's labor agreements shall not provide for automatic wage adjustments that are premised on formulae or automatic cost of living inflators.

**Issue No. 4 – Fairness and Parity:**   The City's labor agreements have staggered terms, meaning that they expire at different times.  This results in a "ratcheting effect" – i.e., the next union to negotiate looks to the last agreement and attempts to negotiate a better agreement.   It also results in differing benefit structures and work rules.  And, it

makes it difficult to ensure across-the-board fairness in City-wide programs that should be given uniform treatment.

   ***Action Principle No. 4***:    The City shall strive to have its labor agreements expire at the same time – particularly with public safety unions.

**Issue No. 5 – Contribution to Health and Welfare Benefits:**  Many of the City's employees make no contribution toward health benefits.  For example, City firefighters pay nothing for health coverage, regardless of whether they are single, married or in a family plan costing over $1000 per month.  This situation is in stark contrast to the vast majority of the City's residents, many of whom must contribute toward their health care, and some of whom have no health care coverage at all.  The situation is not only costly and out-of-step with other jurisdictions, it is unfair.

   ***Action Principle No. 5***:    The City shall require its employees to make reasonable contributions toward the cost of health care coverage provided through the City.

**Issue No. 6 - Health Plan:**  The City currently offers only one health plan, a self-insured plan, with the plan design itself embedded into various labor contracts.  Because the plan elements are embedded into labor contracts, it is cumbersome for the City to make changes that provide efficiencies and savings, even when those changes have little fiscal impact on employees and retirees.  In addition, because the City only offers one plan – a quality plan that has a relatively high cost – City employees have no health care choices.

**_Action Principle No. 6_**:   The City shall offer one or more additional health care insurance plans.  The City's contributions shall be negotiated based on the lowest cost plan made available by the City.

**Issue No. 7 – Retirement:**  City employees are guaranteed a specific, annual pension at retirement.   The City currently pays 100% of the retirement contribution to the California Public Employee's Retirement System (CalPERS) for all employees.   The City contribution is expected to exceed 20% of the City's payroll costs over the next few years for non-safety employees and 40% for safety employees.  In addition, current retirement is based on the highest year of salary earned.  This practice is inconsistent with both public and private sector employers.

Regular, non-safety employees receive lifelong pensions calculated using a formula of "2% at age 55."

- Regular City employees with 30 years of services receive 60% of their highest year's salary for life.

- Regular City employees with 20 years of service receive 40% of their highest year's salary for life.

- Retirees receive an annual COLA of up to 5% a year.

Safety employees receive "3% at age 50."  Upon retirement, an employee will annually receive 3% of their highest year's salary, multiplied by the number of years of service.

- Safety employees with 30 years receive 90% of their highest year's salary for life.

- Safety employees with 20 years of service receive 60% of their highest year's salary for life.

- Safety retirees receive an annual COLA of up to 2% a year.

**_Action Principle No. 7_**:   The City will require its employees to contribute  a fair share of their pension costs.   CalPERS sets a required "employee" contribution: currently 7% for non-sworn employees, and 9% for sworn employees.  City employees shall pay the entire employee contribution.   In addition, the City shall negotiate "cost share" agreements with employees to share the total burden of city pension costs, as provided under PERS rules.  Further, the City shall negotiate to establish a "second tier" pension benefit for new employees entering the workforce, costing less than the current plans and reducing overall City costs over the long run.

**Issue No. 8 – Time Off Benefits:**  Currently, City employees receive paid time off for holidays, vacation days, and sick days.  Employees can accumulate up to 8 weeks of vacation annually.   Vacation time is converted to cash through "sell-back," or at termination or retirement.   Employees can accumulate an unlimited amount of sick leave; half of an employee's sick leave is converted to cash at retirement and the other half can be added to years of service for the calculation of the retirement benefit. Staffing shortages, furloughs and closed Fridays create larger banks of accumulated vacation time that must be paid out when not used.   The budget impact is often unpredictable and unmanageable, which reduces the City's ability to deliver services to the public.

**_Action Principle No. 8_**:   The City will establish vacation use work rules that limit the accumulation of vacation time and provide for use with management approval to

ensure that the needs of the public take priority and overtime is minimized. The rules shall also limit the practice of converting vacation and sick leave to cash to situations when such cash-out is legally required. The City shall evaluate the current leave programs and implement reasonable reforms consistent with programs in the public and private sectors.

**Issue No. 9 - Work Rules**:   The labor contracts, and informal department policies, contain staffing work rules that limit management discretion and are highly inefficient. The Fire Union contract, for example, contains a variety of staffing mandates that purport to remove any discretion on the part of the City to adapt to the needs of the service and modernize. For example, the labor contract provides that fire trucks must be staffed by five firefighters, when the vast majority of jurisdictions safely operate fire trucks with four persons, and the contract contains numerous other dictates that hamper the Fire Chief's ability to manage the workforce efficiently.

*__Action Principle No. 9__*:     The City shall regain its management rights to supervise, manage and direct its workforce. The City shall not enter into labor contracts that contain inflexible staffing requirements or unreasonable restrictions on the City's management rights.

**Issue No. 10** – **Overtime**:  The City's overtime practices are out-of-step with the federal Fair Labor Standards Act ("FLSA").    In some highly publicized cases, employee overtime has *exceeded* employee base pay. There are opportunities for abuse when employees take sick or other leave that require the callback of another employee at overtime rates.

***Action Principle No. 10***:    The City shall restructure its labor agreements to bring overtime obligations in line with the minimums required by the Fair Labor Standards Act.  The City shall minimize the use of unnecessary overtime.

::ODMA\GRPWISE\COS.CA.CA_Library:57812.1

Resolution No. _____

# STOCKTON CITY COUNCIL

RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING AN ACTION PLAN FOR FISCAL SUSTAINABILITY

By City Council Resolution No. 10-0166, adopted on May 26, 2010, the City declared a state of emergency based on fiscal circumstances; and

The City is committed to implementing a plan that will restore long term fiscal integrity for the benefit of the City's citizens; and

The City desires that its Action Plan be transparent and understandable throughout the community; and

The City values its employees and wants to compensate them fairly and appropriately; and

The City's labor contracts include a host of costs and features that create inappropriate escalating and unfunded liabilities; and

The City desires to clearly articulate a plan that will serve as the blueprint for future labor negotiations; now, therefore,

BE IT RESOLVED BY THE COUNCIL OF THE CITY OF STOCKTON, AS FOLLOWS:

1.      The City Council of the City Stockton hereby adopts the attached Action Plan for Fiscal Sustainability.

2.      The City Manager is authorized to take such actions as are appropriate to carry out the intent of this Resolution.

PASSED, APPROVED and ADOPTED _____.


_____
ANN JOHNSTON, Mayor
of the City of Stockton

ATTEST:

_____
KATHERINE GONG MEISSNER
City Clerk of the City of Stockton

::ODMA\GRPWISE\COS.CM.CM_Library:83542.1

City Atty:
Review _____
Date _____ June 17, 2010 _____

**CITY COUNCIL/REDEVELOPMENT AGENCY**

**AGENDA ITEM 6.05**

June 22, 2010

TO:        Mayor and City Council

FROM:      Kevin O'Rourke, Interim City Manager

SUBJECT:   **ADOPT EMERGENCY MEASURES AFFECTING THE TERMS AND**
           **CONDITIONS OF SWORN EMPLOYEES IN THE FIRE DEPARTMENT**

RECOMMENDATION

It is recommended that the City Council adopt a resolution imposing temporary emergency measures affecting sworn members of the Fire Department.  This resolution will permit the City to achieve a balanced budget without necessitating numerous layoffs in the Police Department - layoffs that that are unacceptable given the City's crime problems.    This resolution is consistent with Resolution 10-0166, and will help ameliorate the City's state of emergency based on fiscal circumstances.

Summary

On May 26, 2010 the City declared a state of emergency based on fiscal circumstances (Resolution 10-0166).  The City and the Fire Union have met on several occasions in an effort to reach an agreement on economic concessions.  The Fire Union has declined to make *any* concessions unless the City agrees to extend the current contract for two years.    The Fire Union contracts contain a number of provisions that demand restructuring including changes that must be made if the City is to achieve a sustainable budget.  A contract extension is not a reasonable alternative under the circumstances. The City's current contractual commitments to Fire Local Union 456 impede its ability to eliminate the budget shortfall without cuts in police staffing levels that would endanger the public.   The proposed resolution will impose the following temporary measures pending re-negotiation and economic recovery: suspension of compensation increases, temporary shut down of truck # 4, freeze on leave usage, and Health Plan design changes.

DISCUSSION

Background

**ON MAY 26, 2010 THE CITY DECLARED A STATE OF EMERGENCY BASED ON**
**FISCAL CIRCUMSTANCES**

By Resolution No. 10-0166, the City Council declared a state of emergency based on a fiscal emergency.  The City faced a gap between anticipated revenues and anticipated costs of approximately $23 million.  The cost of public safety (police and fire) comprises approximately 78% of the City's general fund expenditures.  As described in the staff

June 22, 2010

**ADOPT EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF
SWORN EMPLOYEES IN THE FIRE DEPARTMENT                                              **
(Page 2)

report accompanying the declaration of fiscal emergency, the budget gap is due to extraordinary, sustained declines in revenue that are projected to continue through the 2010-11 budget year.

The City's current contractual commitments to public safety labor organizations impede its ability to eliminate the budget shortfall without cuts in police staffing levels that would endanger the public.

The proposed budget contains a "Plan A" and a "Plan B."  Plan A assumes the City successfully implements the temporary measures (described below) pending further negotiations with the Fire Union – IAFF, Local 456.   Plan A would require the layoff of 26 sworn police officers; Plan B would require the City to lay off 66 sworn police officers.

The City's firefighters are scheduled to receive raises based on the current agreements with Local 456.  It is manifestly unreasonable for the City to grant large wage increases to firefighters while laying off a significant portion of its police force.  Plan A would prevent these raises from going into effect pending further negotiations and resolution of the City's fiscal crisis.  Plan A is narrowly tailored to permit the City to balance its budget over the objection of Local 456.   The City believes Plan A is appropriate and lawful.  If the City is prevented from implementing Plan A as a result of legal actions or for any other reason, the City will be forced to implement Plan B – which necessitates the layoff of an additional forty police officers.

Stockton suffers from the second highest violent crime rate in California.   Requiring the City to layoff forty additional police officers in order to fund higher firefighter compensation is an unacceptable alternative that will place the City's citizens at risk.

**LABOR NEGOTIATIONS WITH LOCAL 456**

The City and the Fire Union have met on several occasions in an effort to reach an agreement on economic concessions.  The Fire Union's contract was extended once, and is now set to expire on June 30, 2011.

The Fire Union has declined to make *any* concessions unless the City agrees to extend the current contract for two years.  In addition, the Fire Union's proposed concessions, in general, simply extend the financial commitments (including the scheduled raises) into fiscal year 2011-2012 – when the City is predicted to again suffer from a severe budget shortfall unless major structural changes are made.

June 22, 2010

## ADOPT EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE FIRE DEPARTMENT

(Page 3)

The Fire Union contracts contain a number of provisions that demand restructuring, including work rules purporting to limit management discretion, a myriad of compensation "additional pays," fully paid retirement (employees make no contribution), and fully paid health (employees make no contribution). These and other structural changes including changes must be made if the City is to achieve a sustainable budget.

A contract extension is not a reasonable alternative under the circumstances. The contract must be permitted to expire, so the parties can fully and fairly negotiate under the Meyers-Milias-Brown Act ("MMBA").

Present Situation

## TEMPORARY MEASURES TO BE IMPOSED PENDING   RE-NEGOTIATION   AND ECONOMIC RECOVERY

There are four categories of cost savings to be imposed temporarily pending re-negotiation of the labor contract, and the City's overall economic recovery: (a) Suspension of scheduled compensation increases for fiscal year 2010-2011; (b) Closure of a Truck Company; (c) Authorizing the City Manager to Impose a Freeze on Employee Leave Usage; and (d) Health Plan design changes.

### A.    Suspension of Compensation Increases

Under the current labor agreements, there are various compensation increases scheduled to occur in the upcoming fiscal year, including: (1) 8.5% salary increase; (2) 3.68% COLA salary increase; (3)  uniform allowance; and (4)  a provision giving 5% wage increases to 15 employees achieving "Hazmat" certification.

### B.    Temporary Shut Down of Truck # 4

The Fire Department has conducted an analysis of existing trucks, and whether a truck company could be closed responsibly. The Fire Department recommends closure of Truck Company No. 4. This closure will affect 15 firefighters assigned to Truck 4. The 15 firefighters would not be laid off, but instead would be redeployed into a relief pool, thus generating an overtime savings.

The Fire Chief states as follows:

June 22, 2010

## ADOPT EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE FIRE DEPARTMENT

(Page 4)

"While all four existing truck companies are needed to provide an adequate truck company response, given the current fiscal emergency, a truck company could be closed to achieve budget savings. Closing Truck 4, quartered at the fire station located near Pacific Avenue and Robinhood Drive, will have the least service level impact. Truck 7 was opened on Hammer Lane and Alexandria Place based on the current and proposed growth on the northern boundary of the city. As this growth has slowed dramatically, Truck 7 can provide adequate response coverage into the Truck 4 primary response area. Additionally, between Truck 7 and Truck 2, the department can meet an 8 minute response time for most of the Truck 4 response area. Reducing the number of truck companies by one will create an adverse condition in depth of truck company resources which will most likely occur during significant fire incidents or other prolonged emergencies. This impact can be mitigated by firefighter call back when such incidents occur."

The City also worked with an expert in fire deployment, Stewart Gary of Citygate Associates. Mr. Gary concurs in the opinion that Truck 4 can be safely closed on a temporary basis, resulting in significant savings (approximately $2.2 million).

### C.    Freeze on Leave Usage

The current minimum staffing arrangement in the Fire Department, coupled with the significant amount of paid leave time made available to fire employees, creates a significant overtime cost. This occurs because an employee can take time off, and trigger a "hire back" requirement of another employee to work at an overtime rate.

This provision in the resolution authorizes the City Manager to impose a freeze or other restrictions on leave usages in order to curtain spiraling overtime costs.

### D.    Health Care Plan

Pursuant to City Manager Administrative Directive MAN-17 , a joint labor and management Health Advisory Committee has been meeting throughout the year to discuss alternatives to the medical plan to achieve a more cost effective model. The Committee is comprised of employees for each bargaining unit, as well as a representative appointed by the City Manager on behalf of unrepresented employees.

June 22, 2010

## ADOPT EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE FIRE DEPARTMENT

(Page 5)

After several meetings, the Committee unanimously agreed to recommend plan design changes to their respective bargaining units for adoption. The plan design changes will increase pharmacy co-pays from $3.00 for generic and $8.00 for brand names for a 30-day supply, to $3.00 and $25.00 respectively. For prescriptions that are filled through the mail, which generates a greater savings for the City, a 90-day supply will be provided for the same $3.00 and $25.00 co-pay.

Additionally, the deductibles will increase from $150 to $200 for individuals, and from $450 to $500 for a family.

It is imperative that the plan design changes are implemented City-wide to achieve maximum savings; moreover, the benefits department is not staffed to administer multiple plan designs for healthcare.

These measures are narrowly tailored to achieve required savings in the Fire Department, while minimizing hardships on employees.  These are temporary measures pending further negotiation with the Fire Union.

The measures are adopted for a public purpose to protect the vital interests of the community, including without limitation the interest in avoiding police layoffs at a time when the community faces serious crime problems.

Staff recommends that the Council adopt the Plan A budget and impose the temporary measures set forth in the accompanying resolution. This resolution will be periodically revisited – at least once per quarter (or earlier if circumstances suggest a change in conditions) to determine whether all or part of the resolution can be modified or terminated.

Respectfully submitted,

for KEVIN O'ROURKE
INTERIM CITY MANAGER

KO:CM:cbs

Attachments:  Declaration from Fire Chief Ron Hittle
                        Letter from Fire Chief Ron Hittle

::ODMA\GRPWISE\COS.CM.CM_Library:83568.1

# DECLARATION OF FIRE CHIEF RON HITTLE

1.    I am the Fire Chief of the City of Stockton Fire Department. This is my fourth year as Fire Chief. The following facts are within my personal knowledge and, if called upon to testify, I could and would testify competently with respect thereto.

2.    I have served as a sworn member in the Stockton Fire Department for approximately 23 years. I worked my way up through the ranks of Firefighter, Captain, Battalion Chief, Division Chief, Deputy Chief and Chief.   I am familiar with the practices and procedures in our fire service, and I have overall responsibility for the command and management of the Fire Department.

3.    As Fire Chief, I have grappled with various ways to reduce Fire Department costs in light of the City's economic condition and Declaration of Emergency based on fiscal circumstances. My staff and I looked at numerous options, and eventually proposed two staffing alternatives.

4.    Attached hereto as Exhibit A is a true and correct copy of my memorandum to Kevin O'Rourke, Interim City Manager. The memorandum provides two options:  (a)  the temporary shut down of Truck 4; and (b) the reduction of fire truck staffing from five to four firefighters.

5.     Either of the two options outlined in my memorandum is appropriate and reasonable for a period of time under the circumstances.

6.     I have also analyzed the option of controlling leaves, and if given management control over use of leaves, I could significantly reduce overtime costs by reducing the number of firefighters who must be hired back to cover absent firefighters.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of June 2010, in Stockton, California.

FIRE CHIEF RON HITTLE

1466861.1

June 17, 2010

MEMORANDUM

TO:         Kevin O'Rourke, Interim City Manager

FROM:       Ronald L. Hittle, Fire Chief

SUBJECT:    **TRUCK 4 CLOSURE / REDUCED TRUCK COMPANY STAFFING**

Based on our discussions I am presenting two alternatives to achieve the necessary level of budget savings for fiscal year 2011/10.  The first alternative is to close a truck company and the second is to reduce staffing on each of the four truck companies from 5 firefighters to 4.

## Truck 4 Closure

While all four existing truck companies are needed to provide an adequate truck company response, given the current fiscal emergency, a truck company could be closed to achieve budget savings.  Closing Truck 4, quartered at the fire station located near Pacific Avenue and Robinhood Drive, will have the least service level impact. Truck 7 was opened at Hammer Lane and Alexandria Place based on the current and proposed growth on the northern boundary of the city.  As this growth has slowed dramatically, Truck 7 can provide adequate response coverage into the Truck 4 primary response area.  Additionally, between Truck 7 and Truck 2, the department can meet an 8 minute response time for most of the Truck 4 response area.  Reducing the number of truck companies by one will create an adverse condition in depth of truck company resources which will most likely occur during significant fire incidents or other prolonged emergencies.  This impact can be mitigated by firefighter call back when such incidents occur.

## Reduced Truck Company Staffing

The alternative to reduce daily staffing without direct service level impact is reducing the staffing on each of the four truck companies from five to four firefighters.  While the existing truck company staffing is optimal, based on the fire department annual incident volume, reducing staffing still allows adequate staffing for the truck companies to operate effectively and safely.  This staffing modification will reduce the number of firefighters at a fire scene by two.  Additional companies can be requested to support larger scale incidents or sustained emergency incidents.  The advantage of this option is that the department maintains the depth of truck companies to respond to simultaneous emergency incidents.

RONALD L. HITTLE
FIRE CHIEF

RLH:aa

::ODMA\GRPWISE\COS.FD.FD_Library:75976.1

Resolution No. _____

# STOCKTON CITY COUNCIL

==============================================================

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE FIRE DEPARTMENT

By City Council Resolution No. 10-0166, adopted on May 26, 2010, the City declared a state of emergency based on fiscal circumstances; and

The City initiated negotiation sessions with the Stockton Firefighters' Local 456 (representing sworn fire personnel in the Fire Department) ("Local 456"); and

The City met with the Union's representatives on March 3, 2010, May 23, 2010, May 31, 2010, June 8, 2010, and June 15, 2010; and

The Union declined to discuss any possible alterations to staffing models; and

The City was otherwise unable to reach agreement on economic concessions that would achieve a balanced budget; and

The City must impose certain terms and conditions in light of the fiscal emergency, pending further negotiations with Local 456, in order to achieve a balanced budget and avert drastic measures that would endanger the health, safety and well-being of the City's citizens; now, therefore,

BASED ON THE CITY'S STATE OF EMERGENCY, THE CITY COUNCIL OF THE CITY OF STOCKTON HEREBY AUTHORIZES THE FOLLOWING TEMPORARY MEASURES:

1.      All provisions in the Memorandum of Understanding dated July 1, 2003 – June 30, 2011, between the City of Stockton and the Fire Unit of Local 456, including without limitation all amendments thereto, letters of understanding, and side letters that would require the City to grant wage or compensation increases of any kind in the fiscal year 2010-2011 are hereby suspended, pending further negotiation with Local 456 and resolution of the City's state of emergency based on fiscal circumstances.

2.      All provisions in the Memorandum of Understanding dated July 1, 2003 – June 30, 2011, between the City of Stockton and the Fire Services Management Unit of Local 456, including without limitation all amendments thereto, letters of understanding, and side letters that would require the City to grant wage or compensation increases of any kind in the fiscal year 2010-2011 are hereby suspended, pending further negotiation

CITY ATTY
REVIEW
DATE     JUN 2 1 2010

with Local 456 and resolution of the City's state of emergency based on fiscal circumstances.

3.    Truck Company No. 4 shall be closed until further notice.   Firefighters assigned to Truck Company No. 4 shall be reassigned in the discretion of the Fire Chief to reduce overtime.

4.    The City Manager is hereby authorized to impose temporary measures to regulate the use of paid leaves in order to minimize overtime and costs.

5.    The City Manager is hereby authorized to impose the health care plan design changes. This includes increasing pharmacy co-pays from $3.00 for generic and $8.00 for brand names for a 30-day supply, to $3.00 and $25.00 respectively. For prescriptions that are filled through the mail, a 90-day supply will be provided for the same $3.00 and $25.00 co-pay. Also, plan changes include increasing deductibles from $150 to $200 for individuals, and $450 to $500 for a family.

6.    The City shall continue to invite the Local 456 to negotiate concerning these measures in an effort to reach agreement in good faith.

7.    This resolution will be periodically revisited - at least once per quarter (or earlier if circumstances suggest a change in conditions) to determine whether all or part of the resolution can be modified or terminated.

8.    If any measure imposed by this resolution is found to be unenforceable, then the remaining provisions shall remain valid and enforceable unless and until the City Council determines to amend the resolution to conform to such a finding.

9.    The City Manager is hereby authorized to take the steps that are appropriate to carry out the purpose and intent of this resolution.

PASSED, APPROVED and ADOPTED _____.


_____
ANN JOHNSTON, Mayor
of the City of Stockton

ATTEST:


_____
KATHERINE GONG MEISSNER
City Clerk of the City of Stockton

::ODMA\GRPWISE\COS.CM.CM_Library:83544.1

**CITY COUNCIL/REDEVELOPMENT AGENCY**

**AGENDA ITEM 6.06**

June 22, 2010

TO:        Mayor and City Council

FROM:    Kevin O'Rourke, Interim City Manager

SUBJECT:  **RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON
ADOPTING EMERGENCY MEASURES AFFECTING THE TERMS AND
CONDITIONS OF SWORN EMPLOYEES IN THE POLICE
DEPARTMENT_____**

RECOMMENDATION

It is recommended that the City Council adopt the proposed resolution imposing
temporary emergency measures affecting sworn members of the Police Department.
This legislation will permit the City to achieve a balanced budget without necessitating
numerous additional layoffs in the Police Department - layoffs that that are
unacceptable given the City's crime problems.   This resolution is consistent with
Resolution No. 10-0166, and will help ameliorate the City's state of emergency based
on fiscal circumstances.

Summary

On May 26, 2010 the City declared a state of emergency based on fiscal circumstances
(Resolution 10-0166).  The City has repeatedly invited the SPOA to negotiate, but the
SPOA has refused unless the City waives certain legal rights.  The SPOA has declined
to make any proposal that would help the City balance its budget or achieve economic
concessions.  The proposed resolution will impose the following temporary measures
pending re-negotiation and economic recovery: suspension of compensation increases,
12 hour shifts, and Health Plan design changes.

DISCUSSION

Background

**ON MAY 26, 2010 THE CITY DECLARED A STATE OF EMERGENCY BASED ON
FISCAL CIRCUMSTANCES**

By Resolution No. 10-0166, the City Council declared a state of emergency based on a
fiscal emergency.  The City faced a gap between anticipated revenues and anticipated
costs of approximately $23 million.  The cost of public safety (police and fire) comprises
approximately 78% of the City's general fund expenditures.

The City's current contractual commitments to public safety labor organizations are
impeding its ability to eliminate the budget shortfall.

**AGENDA ITEM 6.06**

June 22, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE POLICE DEPARTMENT

(Page 2)

The proposed budget contains a "Plan A" and a "Plan B." Plan A assumes the City can successfully implement temporary measures (described below) pending negotiations with the Stockton Police Officers Association ("SPOA") and the Fire Union – IAFF, Local 456. Plan A includes a component that would require the layoff of 26 sworn police officers. Plan B would require the City to lay off 66 police officers – posing an unacceptable risk to the public.

The City's police employees are scheduled to receive raises based on the current agreements with SPOA. Plan A would stop these raises from going into effect, on a temporary basis, pending further negotiations and resolution of the City's fiscal crisis.

Plan A is narrowly tailored to permit the City to balance its budget. The City believes Plan A is appropriate and lawful. If the City is prevented by legal challenges or for other reasons from implementing Plan A, the City will be forced to implement Plan B – which necessitates the layoff of an additional forty police officers.

Stockton suffers from the second highest violent crime rate in California. Requiring the City to layoff 40 additional police officers in order to fund higher firefighter compensation is an unacceptable alternative that will place the City's citizens at risk.

The temporary measures imposed through this resolution are intended to achieve a balanced resolution, with all employees sharing in the solution.

### LABOR NEGOTIATIONS WITH THE SPOA

The City has repeatedly invited the SPOA to negotiate, but the SPOA has refused unless the City waives certain legal rights. The SPOA has declined to make any proposal that would help the City balance its budget or achieve economic concessions.

Present Situation

### TEMPORARY MEASURES TO BE IMPOSED PENDING    RE-NEGOTIATION    AND ECONOMIC RECOVERY

In addition to layoffs, there are three categories of cost savings to be imposed temporarily pending re-negotiation of the labor contract, and the City's overall economic recovery:  (a) Suspension of scheduled compensation increases for fiscal year 2010-

June 22, 2010

## RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE POLICE DEPARTMENT

(Page 3)

2011; (b)  Authorizing the City Manager to Change the Shift Schedule to a 12 Hour Per Day Schedule; and (c) Health Plan design changes.

### A.    Suspension of Compensation Increases

Under the current labor agreement, there are two compensation increases scheduled to occur in the upcoming fiscal year, including: (1) 3% salary increase effective January 1, 2011; and (2) reinstatement of a uniform allowance. This resolution would suspend these compensation increases.

### B.    12 Hour Shifts

The Police Department has conducted an analysis of current schedule in patrol, and has determined that efficiency can be improved by up to 20% by, among other things, implementing 12 hour shifts.  This efficiency will assist the City in maintaining public safety despite the 26 layoffs of sworn officers anticipated under Plan A.

The plan is outlined in the attached PowerPoint slide presentation.

### C.    Health Care Plan

The provisions in the resolution authorize the City Manager to impose health care plan design changes unanimously agreed to by the Health Advisory Committee established by City Manager Administrative Directive MAN-17.   These changes include increasing pharmacy co-pays from $3.00 for generic and $8.00 for brand names for a 30-day supply, to $3.00 and $25.00 respectively. For prescriptions that are filled through the mail, a 90-day supply will be provided for the same $3.00 and $25.00 co-pay. Also, deductibles will be increased from $150 to $200 for individuals, and from $450 to $500 for a family.

It is imperative that the plan design changes are implemented City-wide to achieve maximum savings; moreover, the benefits department is not staffed to administer multiple plan designs for healthcare.

The Health Advisory Committee is comprised of employees for each bargaining unit, as well as a representative appointed by the City Manager on behalf of unrepresented employees.

June 22, 2010

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE POLICE DEPARTMENT**

(Page 4)

These measures are narrowly tailored to achieve savings in the Police Department, while minimizing hardships on employees. These are temporary measures pending negotiation with the Police Union. The measures are adopted for a public purpose to protect the vital interests of the community, including without limitation the interest in avoiding police layoffs at a time when the community faces serious crime problems.

Staff recommends the adoption of the accompanying resolution. This resolution will be periodically revisited – at least once per quarter (or earlier if circumstances suggest a change in conditions) to determine whether all or part of the resolution can be modified or terminated.

Respectfully submitted,

KEVIN O'ROURKE
INTERIM CITY MANAGER

KO:CM:cbs

Attachments: 12-Hour Shift Plan PowerPoint

::ODMA\GRPWISE\COS.CM.CM_Library:83569.1

# 12-Hour Shift Plan



# Definitions

➢ Definitions for this Presentation

- Day 1, Night 1, Day 2, Night 2

  - Defines names for four squads

    - Can be "Team 1", "Crew 1", "Squad 1", etc

- Pitman Schedule (variation)

  - 12-hours shift plan, rotating days off, but not rotating shifts

# 12-hour shifts Options

➤ Two, three or four shifts per day

➤ About 300 different variations

➤ Rotating days off

➤ Can also rotate shifts

➤ 2, 4, 6 or 8-week repeating cycles

➤ "Flex-cars" can work earlier or later than shift for overlap

# 12-hour shifts

➢ Not scalable or flexible (multiple)

➢ Rotating days off (per work cycle)

➢ Does not address early latency (can if more than two shifts)

➢ Is not responsive to rising work load over time (multiple shifts)

➢ Significant organizational change

➢ Good if steady work load or small work force

# Options

➤ Options to consider

- Officers average 42 hours per week (36 and 48 hours per two week cycle)
  - Can pay straight time (per FLSA)
  - Can pay in compensatory time
  - Can adjust schedules to begin and end the two-week cycle with 10 hour work days. (or work one 8-hour day)
  - Create "early cars" to create shift overlap
  - Create one or two additional shifts

# Pitman Schedule

➢ The **Pitman Schedule** is the most commonly used 12-hour schedule in law enforcement today, and it is becoming more frequently used in the private sector as well.

➢ It utilizes two 12-hour shifts and is designed for organizations that require around-the-clock labor. Many employers have the shifts run from 7:00 a.m. to 7:00 p.m. and from 7:00 p.m. back to 7:00 a.m., but it can be run from any hour of the day.

➢ An employee will generally work two-on, two-off; three-on, two-off; two-on, three-off.

➢ The schedule works over a 14-day cycle and offers every other Friday, Saturday and Sunday off.

➢ In order to use the Pitman Schedule, the organization must be able to have four separate shifts or squads.

# Pitman Schedule

## Pitman Shift Schedule

▲ The Pitman fixed shift schedule uses 4 teams (crews or squads) and 2 twelve-hour shifts to provide 24/7 coverage.

▲ It consists of a 2-week cycle where each team works 2 consecutive shifts, followed by 2 days off duty, works 3 consecutive shifts, followed by 2 days off duty, works 2 consecutive shifts, followed by 3 days off duty.

▲ Two teams are assigned day shifts while the other two are assigned night shifts. On any given day, one team is on the day shift, one team is on the night shift, and two teams are off duty.

▲ Personnel are assigned to either day or night shifts for the 2-week cycle and work an average 42 hours per week.

▲ Pitman shift schedule example:

▲ Day 1:    DDOODDD-OODDOOO
  Night 1: NNOONNN-OONNOOO
  Day 2:    OODDOOO-NNOONNN
  Night 2: OONNOOO-DDOODDD

▲ Where D=Day shift, N=Night shift, and O=Off duty

**Name: Pitman Shift Schedule**

A **Applicability:** 24/7 operations

A **Teams Required:** 4

A **Shifts:** 12-hr

A **Repeat Cycle:** 14 days

A **Rotation:** Fixed plan, no rotation

A **Average Hours per Week:** 42

A **Staffing Fluctuation:** Balanced from shift to shift and day to day

A **Pluses:**

- No employee works more than three consecutive days
- 3-day weekend every other weekend
- Taking 2 vacation days on one of the 2-day work week gives 7 days off

A **Minuses:**

- Long shift length (12 hours) in addition to over shift time and court
- Requires an average of 2 overtime hours per employee per week

# 2010-2011 Projections

- 12 Sergeants each phase (24 total)
- 88 Officers Phase One
- 88 Officers Phase Two
  - Squad number can vary
  - Start-End times can change
  - Start-End times used for this presentation mirror the predicted work load
  - For the purpose of this demonstration, one phase (1/2 of available staff) is shown
  - Example, Phase One, 88 officers, 12 sergeants

# 12-hour shift plan

◆ Based on four teams or squads

◆ no overlapping hours no overlapping days

◆ Half of Patrol staff is on duty (two squads on, two off)

Pitman Model

| week # | | SUN | MON | TUES | WED | THURS | FRI | SAT |
|---|---|---|---|---|---|---|---|---|
| 1 | Day Team | | | | | | | |
| | Night Team | | | | | | | |
| 2 | Day Team | | | | | | | |
| | Night Team | | | | | | | |
| 3 | Day Team | | | | | | | |
| | Night Team | | | | | | | |
| 4 | Day Team | | | | | | | |
| | Night Team | | | | | | | |

| | Squad# |
|---|---|
| 14 day repeating cycle | |
| Every other Fri, Sat, Sun off | Day 1 |
| 2-week cycle, ave. 42 hours per week | Night 1 |
| | Day 2 |
| | Night 2 |

# Pitman Schedule 12-hour shifts, fixed days off, four week cycle



◆ Two shift configuration, no overlap

◆ Could move officers to early or late shift to create overlap

◆ Could move officers to create one or two new shifts (three or four-shift configuration)

# Basic Work load template



# 12-Plan Two Shifts



Legend
◇Day 1 (Squad 1)-44 Officers, 6 Sgts
◇◇◇Night 1 (Squad 3)-44 Officers, 6 Sgts





# 12-Plan Three Shifts

Legend
◇Day 1 (Squad 1)-29 Officers, 4 Sgts
◇◇Swing 1 (Squad 2)-30 Officers, 4 Sgts
◇◇◇Night 1 (Squad 3)-29 Officers, 4 Sgts



# 12-Plan Four Shifts

Legend
◊Day 1 (Squad 1)-22 Officers, 3 Sgts
◊◊Swing 1 (Squad 2)-22 Officers, 3 Sgts
◊◊◊Night 1 (Squad 3)-22 Officers, 3 Sgts
◊◊◊◊Late Swing (Squad 4)-22 Officers, 3 Sgts



# 12-Plan Four Shifts

**CFS Dispatched & Cleared**
**January - July 2008**

Average Number of Calls by Hour Received

Average Number of Calls Held-over Beyond Hour Received (Latent Calls)

22 officers

44 officers

66 officers

44 officers

22 officers

Avg. No. of Calls

Time Received (Military Time)

Legend

◇Day 1 (Squad 1) 22 Officers, 3 Sgts
◇◇Swing 1 (Squad 2) 22 Officers, 3 Sgts
◇◇◇Night 1 (Squad 3) 22 Officers, 3 Sgts
◇◇◇◇Late Swing (Squad 4) 22 Officers, 3 Sgts

# Current 10-Plan



Solid black line depicts the number of officers working over a 24-hr period

64 officers working from 2100-2400 hrs (based on 85 Officers, 15 Sgts)

Proposed 12-Plan (four shifts) and Current 10-Plan





# 2010 6-month Calendar



Day 1, Night 1 days off / Day 2, Night 2 days off

# 8-9-10-12 hour work week comparison

| Hrs/day | Hrs worked year/officer | Hrs worked week/officer | Days worked Year/officer | Days off year/officer |
|---------|------------------------|-------------------------|--------------------------|-----------------------|
| 8       | 2080                   | 40/40                   | 261                      | 104                   |
| 9       | 2080                   | 44/36                   | 235                      | 130                   |
| 10      | 2080                   | 40/40                   | 209                      | 156                   |
| 12      | 2184                   | 36/48                   | 183                      | 182                   |

**Example**:

If 10 officers work a 12-hour day

➢ That equals 120 hours worked

➢ Or 20 hours more than a 10-hour day (100 hours)

➢ Which equals 2 officers @ 10 hours each

➢ Or 20% more officers on the street

# Next Steps

➢ Survey departments
- Payroll
- Training
- MOU
- Work status

➢ Determine which 12-plan best suits our department

Resolution No. _____

# S T O C K T O N   C I T Y   C O U N C I L

========================================================

### RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON ADOPTING EMERGENCY MEASURES AFFECTING THE TERMS AND CONDITIONS OF SWORN EMPLOYEES IN THE POLICE DEPARTMENT

By City Council Resolution No. 10-0166, adopted on May 26, 2010, the City declared a state of emergency based on fiscal circumstances; and

The City repeatedly invited representatives of the Stockton Police Officers Association ("SPOA") to negotiate regarding concessions in light of the emergency; and

The SPOA would not negotiate with the City unless the City agreed to waive its right to invoke temporary emergency measures to resolve the emergency; and

The City was otherwise unable to reach agreement with the SPOA on economic concessions that would achieve a balanced budget; and

The City must impose certain terms and conditions in light of the fiscal emergency, pending negotiations with the SPOA, in order to achieve a balanced budget and avert drastic measures that would endanger the health, safety and well-being of the City's citizens; now, therefore,

BASED ON THE CITY'S STATE OF EMERGENCY, THE CITY COUNCIL OF THE CITY OF STOCKTON HEREBY AUTHORIZES THE FOLLOWING TEMPORARY MEASURES:

1.     All provisions in the Memorandum of Understanding dated July 1, 2005 – June 30, 2010, between the City of Stockton and the Stockton Police Officers Association, including without limitation all amendments thereto, letters of understanding and side letters, that would require the City to grant wage or compensation increases of any kind in the fiscal year 2010-2011 (including without limitation uniform allowances) are hereby suspended, pending further negotiation with SPOA and resolution of the City's state of emergency based on fiscal circumstances.

2.     Notwithstanding any provision in any memorandum of understanding, letter of understanding, side letter or other labor agreement, the City Manager is hereby authorized to impose temporary alterations to police schedules, including the use of 12 hour shifts, in order to achieve economic and service efficiencies in light of the emergency and resulting reductions in police staff.



CITY ATTY
REVIEW
JUN 2 9 2010
DATE

3.    The City Manager is hereby authorized to impose the health care plan design changes. This includes increasing pharmacy co-pays from $3.00 for generic and $8.00 for brand names for a 30-day supply, to $3.00 and $25.00 respectively. For prescriptions that are filled through the mail, a 90-day supply will be provided for the same $3.00 and $25.00 co-pay. Also, plan changes include increasing deductibles from $150 to $200 for individuals, and $450 to $500 for a family.

4.    The City shall continue to invite the SPOA to negotiate concerning these measures in an effort to reach agreement in good faith.

5.    This resolution will be periodically revisited – at least once per quarter (or earlier if circumstances suggest a change in conditions) to determine whether all or part of the resolution can be modified or terminated.

6.    If any measure imposed by this resolution is found to be unenforceable, then the remaining provisions shall remain valid and enforceable unless and until the City Council determines to amend the resolution to conform to such a finding.

7.    The City Manager is hereby authorized to take the steps that are appropriate to carry out the purpose and intent of this resolution.

PASSED, APPROVED and ADOPTED _____.


_____
ANN JOHNSTON, Mayor
of the City of Stockton

ATTEST:


_____
KATHERINE GONG MEISSNER
City Clerk of the City of Stockton


::ODMA\GRPWISE\COS.CM.CM_Library:83543.1

# Exhibit L

Case 12-32118   Filed 06/29/12   Doc 24

# CITY COUNCIL/REDEVELOPMENT AGENCY

## AGENDA ITEM 8.02

Case 12-32118    Filed 06/29/12    Doc 24

February 15, 2011

TO:        Mayor and City Council

FROM:    Bob Deis, City Manager

SUBJECT: **QUARTERLY REVIEW OF FINANCIAL CONDITIONS REQUIRED BY RESOLUTIONS 10-0200 AND 10-0201 ADOPTING EMERGENCY MEASURES FOR FISCAL YEAR 2010-11 AND GENERAL FUND BUDGET UPDATE**

RECOMMENDATION

It is recommended that the City Council adopt a resolution to declare that the City remains in an emergency based on fiscal circumstances, and continue the emergency measures adopted by Council resolutions 10-0200 and 10-0201 on June 22, 2010.

Summary

Based on the most recent revenue projections for fiscal year 2010-11; the actual General Fund expenditures incurred through December 31, 2010; the negative General Fund cash position at December 31, 2010; and continuing unresolved legal actions taken against the City by public safety labor groups, it is recommended that the emergency measures adopted by Council Resolutions 10-0200 and 10-0201 (pursuant to Resolution 10-0166) should continue.

The fiscal year 2011-12 budget process is underway and the General Fund is projected to have a $27 million deficit. Although the City has taken emergency measures in good faith and believes that the measures are lawful and will be upheld, the measures are subject to legal challenge. Of the projected $27 million deficit, $6.2 million is associated with the legal challenge. Thus, the deficit projections include a "worst case" scenario – i.e., a scenario where the City is legally forced to reverse the measures taken by the City to address the fiscal crisis. Contracted wage increases, health care costs, retirement contribution rates, and potential state impacts are the drivers of this projected deficit. City departments have received targets and are working on proposed program reductions to balance the 2011-12 budget.

DISCUSSION

Background

On May 26, 2010, the City Council enacted resolution 010-0166 declaring a state of emergency based on fiscal circumstances, and directed the City Manager to take appropriate and lawful measures to achieve a balanced budget for fiscal year 2010-11. On June 22, 2010, the City Council approved resolutions 10-0200, and 10-0201 adopting emergency measures affecting the terms and conditions of labor agreements

**115**

Case 12-32118    Filed 06/29/12    Doc 24

February 15, 2011

## QUARTERLY REVIEW OF FINANCIAL CONDITIONS REQUIRED BY RESOLUTIONS 10-0200 AND 10-0201 ADOPTING EMERGENCY MEASURES FOR FISCAL YEAR 2010-11AND GENERAL FUND BUDGET UPDATE

(Page 2)

for sworn employees in the Police and Fire Departments. The emergency measures temporarily suspend scheduled pay increases from taking effect during fiscal year 2010-11, as scheduled by labor agreements with both the police and fire unions, subject to ongoing labor negotiations. In addition, the measures restrict firefighter time off and temporarily closed Fire Truck Company 4, which reduces Fire Department overtime. These resolutions require the City Manager to review the fiscal status of the General Fund as it relates to the Police and Fire Department at least quarterly, and determine if the emergency measures should be modified or terminated.

Present Situation

The current year financial status, unresolved legal actions, and future fiscal projections all support the continuation of the emergency measures approved by Council on June 22, 2010.

- Current Fiscal Year 2010-11

Revised General Fund revenues for fiscal year 2010-11 are projected to be $165.8 million, or about $1 million below budget. The original General Fund revenue budget ($166.8 million), the revised revenue projection ($165.8 million), and revenues received through December 31, 2010 ($52.5 million) are shown on Attachment A. Projected gains in the major tax revenues are offset by reductions in indirect cost allocation reimbursements to the General Fund due to reduced activity in other funds, reduced Fire contract revenue, and reduced code enforcement revenue. The revised revenue projection of $165.8 million is 1% less than actual fiscal year 2009-10 revenues. These projected reductions are the result of the continuing economic slowdown affecting businesses in the City of Stockton and throughout the nation.

As of December 31, 2010, the General Fund expenditures for the 2010-11 fiscal year equal $80,712,000, or 48% of the annual budget, as shown on Attachment B. The $3,335,000 (2%) savings to-date represents normal seasonal fluctuations and savings from vacant positions. It does not reflect long-term structural savings that can be reallocated to undo emergency measures, fund new costs, or build permanent reserves. Some of the savings from all departments will be needed to offset the revenue shortfall and additional costs that will be incurred retroactively if legal actions by labor groups, currently underway, result in unfavorable decisions against the City. Additional legal costs will also be incurred for labor negotiations and legal actions related to labor agreements continuing throughout the fiscal year.

**116**

February 15, 2011

**QUARTERLY REVIEW OF FINANCIAL CONDITIONS REQUIRED BY RESOLUTIONS 10-0200 AND 10-0201 ADOPTING EMERGENCY MEASURES FOR FISCAL YEAR 2010-11AND GENERAL FUND BUDGET UPDATE**
(Page 3)

The General Fund held a deficit cash position of -$13.5 million at December 31, 2010, and continues to be projected at a deficit through May 2011. This General Fund cash flow projection is another basis for continuing the emergency measures. Attachment C1 represents the cash flows projected from discontinuing emergency measures, and Attachment C2 assumes the emergency measures continue. The General Fund deficit cash balance and cash flow projections for the remainder of the fiscal year without the emergency measures in place (as shown in Attachment C1) do not support termination or modifications to the measures. As Attachment C1 shows, without the emergency measures increased costs in the Police and Fire Departments would lead to a projected deficit cash balance at year end. With the emergency measures in place, the General Fund projected cash position at the end of fiscal year 2010-11 is positive (Attachment C2).

- Status of Emergency Measures

The Stockton Firefighters Local 456 and the Stockton Police Officers Association have both initiated legal actions against the City to force termination of the emergency measures that resulted in stopping scheduled increases to salary and benefit packages, imposing leave usage restrictions, and closing Fire Truck Company 4, as imposed by the City Manager subject to on-going negotiations. The City Manager imposed these emergency measures as authorized by the City Council in Resolutions 10-0166, 10-0200, and 10-0201 to maintain a balanced General Fund budget for fiscal year 2010-11, as approved by Council Resolution 010-0202, on June 22, 2010.

With respect to Resolution 10-0201 affecting Police personnel, one emergency measure involved the implementation of a twelve-hour schedule in order to achieve savings and efficiencies. Through negotiations with the Police Officers Association, the City reached a consensus that the twelve-hour schedule need not be implemented on an immediate basis. The City and the Stockton Police Officers Association continue to discuss this issue.

- Future Fiscal Years

As we look ahead, the City continues to face dramatic fiscal challenges. The General Fund deficit for fiscal year 2011-12 is now projected to exceed $27 million on a revenue base of $168 million. These projections represented in Attachment D, a multiyear financial projection for the General Fund, assume scheduled wage and benefit increases in current labor contracts to go into effect and the conservative "worst case" scenario that emergency measures are reversed by legal action. The main drivers of this deficit include;

**117**

February 15, 2011

**QUARTERLY REVIEW OF FINANCIAL CONDITIONS REQUIRED BY RESOLUTIONS 10-0200 AND 10-0201 ADOPTING EMERGENCY MEASURES FOR FISCAL YEAR 2010-11 AND GENERAL FUND BUDGET UPDATE**
(Page 4)

- o scheduled wage increases for four of the City's largest labor groups
- o increasing health care costs for employees and retirees,
- o increases in retirement contribution rates required by CalPERS,
- o potential state budget impacts.

A longer-term view of the General Fund is presented on Attachment D. In fiscal year 2012-13 the deficit is further compounded to over $33.6 million by the expiration of the federal stimulus grant funding of 20 police officers, which needs to be absorbed by the General Fund along with additional increases in healthcare and retirement costs. Also, in fiscal year 2012-13, the General Fund is committed to begin repaying the Enterprise Zone subsidy to the Development Services Fund amounting to about $1.3 million a year for four years, as required by Council Resolution 10-0202. In fiscal year 2013-14 the deficit continues to increase, reaching $37.8 million as increasing revenues are still outpaced by compounding increases in healthcare and retirement costs.

The final reason for continuing the emergency measures is the long-term liability the City has for retiree healthcare. This liability is reported, as required, in the City's comprehensive annual financial report for the fiscal year ending June 30, 2010. The liability is determined by an Other Post-Employment Benefits (OPEB) actuary that estimates retiree healthcare costs. The OPEB actuary report from 2009 estimates that the City has a $544 million unfunded liability for retiree healthcare costs. In order to properly fund this liability the City should be setting aside an additional $27 million on an annual basis. The City has not been setting these funds aside.

- Budget Process

The City of Stockton has a very limited time window in which to adjust its cost and service levels to fit within available revenues prior to the start of the 2011-12 fiscal year. A balanced budget is needed prior to July 1, 2011 to support internal borrowing necessary to cover General Fund cash flow deficits, pending receipt of property and other major tax revenues later in the fiscal year.

The City's program departments are already working with General Fund budget targets as proposed by the City Manager, and will propose specific program reductions and changes necessary to balance the budget without changes to existing labor agreements. These proposed program reduction will be discussed at a Council Budget Study Session in either late March or early April. On a parallel track, City labor negotiators have already initiated discussions with one labor group to discuss potential changes in benefits and other compensation terms. The balance of the employee groups will be approached soon.

**118**

February 15, 2011

## QUARTERLY REVIEW OF FINANCIAL CONDITIONS REQUIRED BY RESOLUTIONS 10-0200 AND 10-0201 ADOPTING EMERGENCY MEASURES FOR FISCAL YEAR 2010-11AND GENERAL FUND BUDGET UPDATE

(Page 5)

Town-hall meetings in each City Council District are anticipated in April to seek additional input from the community on proposed budget reductions and service level changes. City Council budget study sessions and the formal public hearings on the proposed budget are scheduled for May and June, as required by the City Charter.

Based on the indicators of financial condition and future projections noted above, and further detailed in Attachments A, B, C1, C2, and D, it is recommended that the City Council adopt a resolution to declare that the City remains in an emergency based on fiscal circumstances, and continue the emergency measures adopted by Council resolutions 10-0200 and 10-0201 on June 22, 2010.

## FINANCIAL SUMMARY

This action will continue to reduce General Fund costs resulting from suspended increases to salary and benefits , and leave usage reductions, and closure of Fire Truck Company 4. Continuance of these measures is necessary to generate savings needed to maintain a balanced budget and maintain solvency of the General Fund during fiscal year 2010-11.

Respectfully submitted,

BOB DEIS
CITY MANAGER

BD:SM:jm

Attachment A – General Fund Revenues and Transfers In FY 2010-11 through Period 6
Attachment B – FY 2010-11 December Budget vs Actual
Attachment C1 – General Fund Cashflow Projection FY 2010-11 Without Salary/Benefit
      Reductions from Fire and Police Unions
Attachment C2 – General Fund Cashflow Projection FY 2010-11 Estimate Based on
      Adopted Budget "Plan A" with Additional Legal Costs
Attachment D – General Fund Financial Summary

::ODMA\GRPWISE\COS.CM.CM_Library:86770.1

**119**

**ATTACHMENT A**

City of Stockton
**General Fund Revenues and Transfers In**
**FY 2010-11 through Period 6 (12/31/10)**

| Revenue Source | 2010-11 Budget | 2010-11 Projection | Increase/ (Decrease) | 2010-11 YTD Per. 6 | % of Budget |
|---|---|---|---|---|---|
| Sales Tax | 32,915,000 | 33,709,399 | 794,399 | 8,299,748 | 25% |
| Utility Users Tax | 31,380,000 | 31,380,000 | - | 12,316,935 | 39% |
| Property Tax | 27,185,001 | 28,042,432 | 857,431 | 13,566,875 | 50% |
| Motor Vehicle In-Lieu | 19,030,000 | 19,106,911 | 76,911 | 268,005 | 1% |
| Franchise Tax | 11,560,000 | 11,560,000 | - | 3,190,231 | 28% |
| Business License Tax | 10,119,602 | 9,759,000 | (360,602) | 1,287,987 | 13% |
| Subtotal Major Taxes | 132,189,603 | 133,557,742 | 1,368,139 | 38,929,781 | 29% |
| | | | | | |
| Indirect Cost Allocation | 6,772,298 | 6,100,000 | (672,298) | 2,489,562 | 37% |
| Fire Contracts | 5,479,000 | 4,742,288 | (736,712) | 2,345,376 | 43% |
| Code Enforcement | 5,317,450 | 4,403,200 | (914,250) | 2,881,306 | 54% |
| Charges for Services | 3,081,706 | 3,081,706 | - | 917,585 | 30% |
| Other Taxes | 2,785,000 | 2,403,000 | (382,000) | 715,409 | 26% |
| Fines & Forfeitures | 2,764,100 | 2,995,288 | 231,188 | 1,356,410 | 49% |
| Rents/Leases/Concessions | 2,609,682 | 2,609,682 | - | 190,677 | 7% |
| Refunds & Reimbursements | 2,237,975 | 2,237,975 | - | 1,049,436 | 47% |
| Rev from Other Agencies | 892,089 | 892,089 | - | 138,684 | 16% |
| Interest | 650,000 | 650,000 | - | 109,796 | 17% |
| Licenses & Permits | 370,975 | 430,000 | 59,025 | 173,934 | 47% |
| Misc Other Revenues | (274,500) | (277,133) | (2,633) | 45,111 | -16% |
| | | | | | |
| Transfers In | | | | | |
| Transfer from IT | 1,200,000 | 1,200,000 | - | 600,000 | |
| Central Parking Debt | 773,622 | 773,622 | - | 547,976 | 71% |
| **Total Revenues** | **166,849,000** | **165,799,459** | **(1,049,541)** | **52,491,043** | **31%** |

**120**

## ATTACHMENT B

**City of Stockton**
**General Fund Expenditures and Transfers Out**
**FY 2010-11 through Period 6 (12/31/10)**

**DECEMBER** BUDGET vs ACTUAL                                    50.00% of fiscal year
    ($ in thousands)

| General Fund Departments | FY 2010-11 Budget & Encumbrances | Year-To-Date Actuals 12/31/2010 | Year-To-Date (Over) Under 50% of Budget | % of Budget |
|---|---|---|---|---|
| City Council | $        521 | $        250 | $        11 | 48.0% |
| City Manager | 1,172 | 484 | 102 | 41.3% |
| City Attorney | 1,048 | 455 | 69 | 43.4% |
| City Clerk | 812 | 370 | 36 | 45.6% |
| City Auditor | 449 | 106 | 119 | 23.6% |
| Administrative Services | 3,224 | 1,251 | 361 | 38.8% |
| Human Resources | 1,671 | 668 | 167 | 40.0% |
| Housing & Economic Development | 405 | 203 | (0) | 50.1% |
| Non-departmental | 4,309 | 1,262 | 892 | 29.3% |
| Police | 88,572 | 43,603 | 683 | 49.2% |
| Fire | 46,890 | 23,205 | 241 | 49.5% |
| Public Works | 7,777 | 3,680 | 209 | 47.3% |
| Arts Commission | 41 | 23 | (2) | 56.0% |
| Transfers-out | 11,200 | 5,150 | 450 | 46.0% |
| **General Fund Totals** | **$   168,093** | **$   80,712** | **$   3,335** | **48.0%** |

| **Measure W Fund** | | | | |
|---|---|---|---|---|
| Police | 3,806 | 1,824 | 79 | 47.9% |
| Fire | 3,901 | 1,740 | 211 | 44.6% |
| **Measure W Fund Totals** | **7,707** | **3,563** | **290** | **46.2%** |

**121**

**Attachment C1**

### CITY OF STOCKTON, GENERAL FUND CASHFLOW PROJECTION
### FY 2010-2011 ESTIMATE BASED ON ADOPTED BUDGET
### WITHOUT SALARY/BENEFIT REDUCTIONS FROM FIRE AND POLICE UNIONS

|  | Beginning Cash | Projected Receipts | Projected Disbursements | Variance To Actuals | Ending Cash |
|---|---|---|---|---|---|
| Jul-10 | 7,552,666 | 7,040,262 | 12,037,871 | (1,260,440) | 1,294,617 |
| Aug-10 | 1,294,617 | 9,127,573 | 14,537,772 | 595,347 | (3,520,236) |
| Sep-10 | (3,520,236) | 8,315,104 | 14,010,001 | (2,762,979) | (11,978,112) |
| Oct-10 | (11,978,112) | 7,107,397 | 13,298,498 | (893,326) | (19,062,539) |
| Nov-10 | (19,062,539) | 7,548,459 | 13,709,033 | 2,940,756 | (22,282,357) |
| Dec-10 | (22,282,357) | 22,602,857 | 14,066,046 | 239,246 | (13,506,300) |
| Jan-11 | (13,506,300) | 14,625,882 | 16,662,256 | 190,233 | (15,352,441) |
| Feb-11 | (15,352,441) | 21,112,453 | 14,875,870 | 190,233 | (8,925,625) |
| Mar-11 | (8,925,625) | 11,393,976 | 15,529,044 | 190,233 | (12,870,460) |
| April-11 | (12,870,460) | 18,339,108 | 16,088,895 | 190,233 | (10,430,014) |
| May-11 | (10,430,014) | 10,317,793 | 14,554,256 | 190,233 | (14,476,244) |
| June-11 | (14,476,244) | 28,268,594 | 15,179,458 | 190,233 | (1,196,875) |
| Totals |  | 165,799,458 | 174,549,000 |  |  |

**122**

**Attachment C2**

## CITY OF STOCKTON, GENERAL FUND CASHFLOW PROJECTION
## FY 2010-2011 ESTIMATE BASED ON ADOPTED BUDGET
## <u>"PLAN A" WITH $1.5 MILLION ADDITIONAL LEGAL COSTS</u>

|  | Beginning Cash | Projected Receipts | Projected Disbursements | Variance To Actuals | Ending Cash |
|---|---|---|---|---|---|
| Jul-10 | 7,552,666 | 7,040,262 | 12,037,871 | (1,260,440) | 1,294,617 |
| Aug-10 | 1,294,617 | 9,127,573 | 14,537,772 | 595,347 | (3,520,236) |
| Sep-10 | (3,520,236) | 8,315,104 | 14,010,001 | (2,762,979) | (11,978,112) |
| Oct-10 | (11,978,112) | 7,107,397 | 13,298,498 | (893,326) | (19,062,539) |
| Nov-10 | (19,062,539) | 7,548,459 | 13,709,033 | 2,940,756 | (22,282,357) |
| Dec-10 | (22,282,357) | 22,602,857 | 14,066,046 | 239,246 | (13,506,300) |
| Jan-11 | (13,506,300) | 14,625,882 | 14,257,990 | 190,233 | (12,948,175) |
| Feb-11 | (12,948,175) | 21,112,453 | 14,118,064 | 190,233 | (5,763,553) |
| Mar-11 | (5,763,553) | 11,393,976 | 15,074,050 | 190,233 | (9,253,394) |
| April-11 | (9,253,394) | 18,339,108 | 14,918,850 | 190,233 | (5,642,903) |
| May-11 | (5,642,903) | 10,317,793 | 13,895,645 | 190,233 | (9,030,522) |
| June-11 | (9,030,522) | 28,268,594 | 14,425,180 | 190,232 | 5,003,125 * |
| Totals |  | 165,799,458 | 168,349,000 |  |  |

\* Note: The projected ending cash balance reflects the General Fund's cash flow.
The projected ending fund balance available for budgetary purposes, as presented on Attachment D, is net of accounts receivable, payables, and other restrictions.

**123**

# CITY OF STOCKTON-GENERAL FUND PROJECTION
## FINANCIAL SUMMARY

**ATTACHMENT D**

**124**

SELECT FUND — 010-GENERAL FUND

| | 2009A | 2010A | Adopted Budget w/Impositions Plan A 2011B | Projection if Impositions Fail 2011F | 2012F | 2013F | 2014F | 2015F |
|---|---|---|---|---|---|---|---|---|
| **REVENUE & SOURCES** | | | | | | | | |
| PROPERTY TAXES | 33,399,905 | 29,530,368 | 27,550,001 | 28,781,139 | 28,872,401 | 29,738,573 | 30,630,730 | 31,549,652 |
| SALES & USE TAXES | 37,344,891 | 32,710,114 | 32,915,000 | 33,709,399 | 33,968,280 | 34,987,328 | 35,862,012 | 36,758,562 |
| OTHER TAXES | 2,666,486 | 2,308,764 | 2,785,000 | 2,403,000 | 2,785,000 | 2,840,700 | 2,897,514 | 2,955,464 |
| FRANCHISES | 11,607,817 | 11,354,317 | 11,560,000 | 11,560,000 | 11,837,440 | 12,157,051 | 12,460,977 | 12,772,502 |
| LICENSES & PERMITS | 640,622 | 391,661 | 370,975 | 430,000 | 389,524 | 399,262 | 409,243 | 419,474 |
| UTILITY USERS TAXES | 30,852,101 | 30,716,902 | 31,380,000 | 31,380,000 | 32,195,880 | 33,032,973 | 33,858,797 | 34,705,267 |
| BUSINESS LICENSES | 9,196,450 | 9,288,875 | 10,119,602 | 9,759,000 | 10,018,406 | 10,268,866 | 10,525,588 | 10,788,727 |
| FINES & FORFEITURES | 4,492,026 | 5,045,033 | 4,384,100 | 4,402,962 | 4,693,703 | 4,811,045 | 4,931,321 | 5,054,604 |
| REVENUES FROM OTHER AGENCIES | 25,395,865 | 21,160,313 | 19,557,089 | 19,649,000 | 20,330,487 | 20,937,705 | 21,563,073 | 22,207,132 |
| CHARGES FOR SERVICES | 11,893,487 | 10,737,602 | 11,882,506 | 10,073,975 | 11,244,864 | 11,525,986 | 11,808,785 | 12,098,549 |
| USE OF MONEY & PROPERTY | 5,388,274 | 3,770,886 | 3,305,282 | 3,305,282 | 3,039,248 | 3,115,229 | 3,193,110 | 3,272,938 |
| INDIRECT COST ALLOCATIONS | 7,973,212 | 6,243,086 | 6,772,298 | 6,100,000 | 6,070,000 | 6,126,037 | 6,187,297 | 6,249,170 |
| OTHER REVENUES | 6,364,733 | 2,094,189 | 2,259,213 | 2,259,213 | 2,304,397 | 2,350,485 | 2,397,494 | 2,445,444 |
| DISPOSITION/FIXED ASSETS | 118,330 | 1,789 | 34,313 | 12,867 | 34,999 | 35,699 | 36,413 | 137,141 |
| TRANSFERS IN | 5,897,107 | 1,228,660 | 1,973,622 | 1,973,622 | 773,622 | 773,622 | 773,622 | 773,622 |
| **TOTAL - REVENUES & SOURCES** | 193,231,306 | 166,582,560 | 166,849,000 | 165,799,459 | 168,558,251 | 173,100,562 | 177,535,977 | 182,188,250 |
| *Annual % Revenue Growth* | 0.0% | -13.8% | 0.2% | -0.5% | 1.0% | 2.7% | 2.6% | 2.6% |
| **EXPENDITURES & USES** | | | | | | | | |
| **BY: ACCOUNT GROUP** | | | | | | | | |
| SALARIES AND WAGES | 87,860,202 | 79,582,178 | 74,398,964 | 78,440,364 | 84,056,413 | 87,267,542 | 88,140,217 | 88,314,792 |
| RETIREMENT | 25,963,647 | 23,871,523 | 24,272,065 | 25,964,065 | 30,155,658 | 34,645,115 | 38,476,111 | 38,998,604 |
| HEALTHCARE BENEFITS | 19,034,883 | 18,329,964 | 21,159,605 | 21,159,605 | 25,969,818 | 27,366,079 | 29,143,772 | 31,038,116 |
| WORKER'S COMPENSATION | 3,139,068 | 1,943,229 | 4,804,213 | 5,128,213 | 6,860,800 | 7,030,408 | 7,419,882 | 7,656,012 |
| OTHER EMPLOYEE BENEFITS | 3,825,212 | 2,935,344 | 3,099,717 | 3,242,317 | 3,658,122 | 3,826,450 | 3,903,451 | 3,911,684 |
| **SALARIES & BENEFITS** | 139,823,012 | 126,662,238 | 127,734,564 | 133,934,564 | 150,700,811 | 160,135,593 | 167,083,433 | 169,919,208 |
| OTHER SERVICES | 45,040,087 | 23,412,422 | 24,167,563 | 25,667,563 | 27,903,058 | 28,393,399 | 29,103,234 | 29,830,815 |
| MATERIAL AND SUPPLIES | 3,465,253 | 2,410,045 | 2,529,694 | 2,529,694 | 2,460,733 | 2,519,163 | 2,582,142 | 2,646,695 |
| OTHER EXPENSES | 836,646 | 836,580 | 1,216,985 | 1,216,985 | 1,219,945 | 1,350,426 | 1,419,972 | 1,493,404 |
| DEBT SERVICE | 774,497 | 777,164 | 773,622 | 773,622 | 774,470 | 749,837 | 750,985 | 751,835 |
| CAPITAL PROJECTS | 45,521 | 3,800 | - | - | 575,000 | 618,750 | 934,375 | 1,401,563 |
| TRANSFERS OUT | 12,328,447 | 14,419,033 | 10,426,572 | 10,426,572 | 12,150,742 | 13,019,366 | 13,448,122 | 14,247,052 |
| **TOTAL - EXPENDITURES & USES** | 202,313,463 | 168,521,282 | 166,849,000 | 174,549,000 | 195,784,158 | 206,786,533 | 215,322,263 | 220,290,571 |
| *Annual % Expenditure Growth* | | | -1.0% | 3.6% | 12.2% | 5.6% | 4.1% | 2.3% |
| **SURPLUS / (DEFICIT)** | | | | | | | | |
| SURPLUS / DEFICIT | (9,082,157) | (1,938,722) | (0) | (8,749,542) | (27,225,907) | (33,685,971) | (37,786,287) | (38,102,321) |
| % REVENUES & SOURCES | -5% | -1% | 0% | -5% | -16% | -19% | -21% | -21% |
| ADJUSTMENTS/OTHER TRANSFERS | 8,062,484 | (5,567,530) | | | | | | |
| **FUND BALANCES** | | | | | | | | |
| AVAILABLE BALANCE - FISCAL YEAR END | $ 8,607,327 | $ 1,101,075 | $ 1,101,075 | $ (7,648,467) | $ (34,874,374) | $ (68,560,346) | $ (106,346,632) | $ (144,448,954) |
| % REVENUES & SOURCES | 4% | 1% | 1% | -5% | -21% | -40% | -60% | -79% |

Resolution No. _____

# STOCKTON CITY COUNCIL

**RESOLUTION BY THE CITY COUNCIL OF THE CITY OF STOCKTON CONTINUING EMERGENCY MEASURES ADOPTED IN RESOLUTIONS 010-0200 AND 010-0201**

By City Council Resolution No. 10-0166, adopted May 26, 2010, the City declared a state of emergency based on fiscal circumstances; and

By City Council Resolution Nos. 10-0200 and 10-0201, adopted June 22, 2010, emergency measures necessary to achieve a balanced budget for the 2010-11 fiscal year were implemented pursuant to the declared state of emergency; and

Because the City's public safety labor unions have not made sufficient sustainable economic concessions and legal actions brought by the unions related to the imposed emergency measures are still unresolved; and

Because the City's General Fund revenue, expenditure, and cash flow projections for fiscal year 2010-11 have not significantly changed through the second quarter ending December 31, 2010, and termination or modification of the emergency measures would result in an unacceptable negative cash position at fiscal year end; and;

Due to the General Fund structural budget deficits projected for subsequent fiscal years along with significant unfunded actuarial liabilities for retiree healthcare costs; now, therefore,

BE IT RESOLVED BY THE COUNCIL OF THE CITY OF STOCKTON, AS FOLLOWS:

1. The emergency measures adopted by City Council Resolution Nos. 010-0200 and 010-0201 on June 22, 2010, and implemented by the City Manager on July 1, 2010, are hereby authorized to continue, subject to ongoing negotiations with the affected labor unions.

2. The City Manager is hereby authorized to take whatever actions are appropriate to carry out the purpose and intent of this resolution.

PASSED, APPROVED and ADOPTED _____.

_____
ANN JOHNSTON, Mayor
of the City of Stockton

ATTEST:

_____
KATHERINE GONG MEISSNER, City Clerk
of the City of Stockton

::ODMA\GRPWISE\COS.CM.CM_Library:86775.1
City Atty:
Review _____
Date __February 7, 2011__

**125**