**43**

MICHAEL J. GEARIN *admitted pro hac vice*
MICHAEL B. LUBIC (SBN 122591)
MICHAEL K. RYAN *admitted pro hac vice*
BRETT D. BISSETT (SBN 280366)
K&L GATES LLP
10100 Santa Monica Boulevard, Seventh Floor
Los Angeles, California 90067
Telephone:     310.552.5000
Facsimile:     310.552.5001
Email:         michael.lubic@klgates.com
               brett.bissett@klgates.com

Attorneys for California Public Employees'
Retirement System

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No.   2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | D.C. No. OHS-1 |
| Debtor. | Chapter 9 |

**CALPERS' BRIEF IN SUPPORT OF THE CITY OF STOCKTON'S PETITION**

Date:      February 26, 2013
Time:      1:30 p.m.
Place:     Robert T. Matsui U.S. Courthouse,
           501 I Street
           Department C, Fl. 6, Courtroom 35
           Sacramento, CA 95814
Judge:     Hon. Christopher M. Klein

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ............................................................................. 1

II. RELEVANT FACTUAL BACKGROUND ........................................................... 3

    A.    What Is CalPERS? ................................................................................. 3

    B.    The Need for Preservation of the Integrity of the State's Public
          Employees' Retirement System. ........................................................... 7

          1.    A Sound Public Pension System Benefits the State and its Citizens. ......... 7

          2.    An Actuarially Sound Pension System is Essential for the Payment
                of Pension Benefits. ..................................................................... 8

          3.    California's Expressions of Priority for Wages and Benefits. .................... 8

    C.    The Nature of the City of Stockton's Relationship with CalPERS......................... 9

    D.    Explanation of the Nature of Certain Calculated Liabilities................................. 10

    E.    The Termination Process and the Consequences of Termination........................ 13

          1.    Termination and the Termination Process. ................................................. 13

          2.    Termination is Not a Viable Option............................................................. 15

          3.    Funded Status of the Termination Pool and Availability of an
                "Alternate Plan." ............................................................................. 16

    F.    CalPERS Has Limited Flexibility in Setting Contribution Rates. ........................ 18

          1.    The PERL Specifies Benefit Formulas Which Cannot Be Reduced
                Through Negotiations. ..................................................................... 18

           2.    Hardship Extension. ......................................................................... 19

          3.    Potential Jeopardy to Tax Exempt Status. ................................................. 22

    G.    The City Has Made Requests to Modify Its CalPERS Contract in
          Compliance with the PERL.................................................................... 23

    H.    CalPERS Participated in the AB 506 Process.................................................. 24

III. ARGUMENT ............................................................................................ 24

    A.    The City Has Complied with the "Good Faith" Requirement of Both
          Section 109(c)(5)(B) and Section 921(c) of the Bankruptcy Code...................... 25

          1.    The Plain Language of Section 109(c)(5)(B) Requires Only That
                the City Negotiate With Those Creditors It Intends to Impair................. 26

i

2.    The Cases Relied Upon by the Capital Markets Creditors are
      Easily Distinguished. ............................................................................... 29

3.    The Capital Markets Creditors' Argument Rests on a Faulty
      Premise and is Merely a Test-Run for Their Opposition to the
      City's Eventual Plan of Adjustment........................................................... 31

4.    The City Meets the "Good Faith" Requirement of Section 921(c). .......... 33

B.    There is Nothing Unfair About Stockton Exercising Its Business Judgment
      and Retaining Its Relationship With CalPERS. ................................................... 36

IV. CONCLUSION ................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Alley v. Resolution Trust Corp.*,
    984 F.2d 1201 n.11 (D.C. Cir. 1993) ...................................................................... 4

*Barroga v. Bd. of Admin. of CalPERS*,
    No. 2:12-cv-01179, 2012 WL 5337326 at *5 (E.D. Cal. Oct. 26, 2012) .................................. 3

*CalPERS v. Moody's Corp.*,
    No. C09-03628, 2009 WL 3809816 at *6 (N.D. Cal. Nov. 10, 2009) .................................... 3

*Caminetti v. United States*,
    242 U.S. 470 (1917) ..................................................................................... 26

*Feinstein v. Lewis*,
    477 F. Supp. 1256 (S.D.N.Y. 1979) ..................................................................... 4

*Fuqua Nat'l, Inc. v. United States*,
    334 F. Supp. 1116 (S.D. Ga. 1971) ..................................................................... 23

*Hightower v. Tex. Hosp. Ass'n*,
    65 F.3d 443 (5th Cir. 1995) ............................................................................ 4

*In re Chilhowee R-IV School Dist.*,
    145 B.R. 981 (W.D. Mo. 1992) ........................................................................ 35

*In re City of Vallejo*,
    408 B.R. 280 (9th Cir. BAP 2009)............................................................. 3, 27, 28

*In re Cottonwood Water & Sanitation District*,
    138 B.R. 973 (Bankr. D. Colo. 1992) .................................................................. 28

*In re Ellicott School Building Authority*,
    150 B.R. 261 (Bankr. D. Colo. 1992) ............................................................. 29, 30

*In re McCurtain Mun. Auth.*,
    2007 WL 4287604 (Bankr. E.D. Okla. 2007) ............................................................ 35

*In re Pleasant View Utility Dist.*,
    24 B.R. 632 (Bankr. M.D. Tenn. 1982) ................................................................. 28

*In re Sullivan County Regional Refuse Disposal District*
    165 B.R. 60 (Bankr. D. N.H. 1994) .............................................................. passim

*In re Villages at Castle Rock Metro. Dist. No. 4*,
    145 B.R. 76 (Bankr. D. Colo. 1990) ................................................................... 34

*Marek v. Chesny*,
    473 U.S. 1 n.5 (1985) .................................................................................. 27

*Rose v. Long Island R.R. Pension Plan*,
    828 F.2d 910 (2d Cir. 1987) ............................................................................ 4

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) ..................................................................................... 26

**State Cases**

*Bd. of Admin. v. Wilson*,
    52 Cal. App. 4th 1109, 1131–32 (1997) .............................................................. 8, 9

*Bd. of Ret. of the Santa Barbara County Emps. Ret. Sys. v. Santa Barbara County Grand Jury*,
    58 Cal. App. 4th 1185 (1997) ........................................................................... 6

*Betts v. Bd. of Admin.*,
    21 Cal.3d 859 (1978) .................................................................................. 19

*Cal. Ass'n of Prof'l Scientists v. Schwarzenegger*,
    137 Cal. App. 4th 371 (2006) ........................................................................... 5

*City of Oakland v. Pub. Emps. Ret. Sys.*,
    95 Cal. App. 4th 29 (2002) ...................................................................... 4, 5, 6, 9

iii

*City of Sacramento v. PERS,*
    229 Cal. App. 3d 1470 (1991)..............................................................................6
*Fiscal v. City & County of San Francisco,*
    158 Cal. App. 4th 895 (2008) .............................................................................9
*Hittle v. Santa Barbara Country Employees Retirement Assn.,*
    39 Cal. 3d 374 (1985) .........................................................................................6
*In re Shaw,*
    32 Cal. App. 2d 84 (1939) ..................................................................................8
*Jasper v. Davis,*
    164 Cal. App. 2d 671 (1958)..............................................................................9
*United Firefighters of LA v. City of LA,*
    210 Cal. App. 3d. 1095 (1989) ......................................................................6, 19
*Valdes v. Cory,*
    139 Cal. App. 3d 773 (1983) ...........................................................................8, 9
*Wheeler v. Bd. of Admin. of PERS,*
    25 Cal.3d 600 (1979) ..........................................................................................5

## Federal Regulations

11 U.S.C. § 109 ..................................................................................................... passim
11 U.S.C. § 921 ..................................................................................................... passim
11 U.S.C. § 943 ..................................................................................................... 28, 32
29 U.S.C. § 1002 ..........................................................................................................4
29 U.S.C. § 1003 ..........................................................................................................4
Internal Revenue Code § 503 ................................................................................22, 23

## State Statutes

Cal Gov. Code § 207570 ..............................................................................................9
Cal. Const., art. XVI, § 17 .......................................................................................5, 6
Cal. Gov. Code § 20000 ...............................................................................................4
Cal. Gov. Code § 20001 ...............................................................................................4
Cal. Gov. Code § 20002 ...............................................................................................3
Cal. Gov. Code § 20003 .............................................................................................22
Cal. Gov. Code § 20015 ...............................................................................................9
Cal. Gov. Code § 20120 ...............................................................................................9
Cal. Gov. Code § 20131 ...............................................................................................9
Cal. Gov. Code § 20132 ...............................................................................................9
Cal. Gov. Code § 20133 ...............................................................................................9
Cal. Gov. Code § 20460 .........................................................................................9, 18
Cal. Gov. Code § 20474 .......................................................................................18, 29
Cal. Gov. Code § 20475 .......................................................................................17, 19
Cal. Gov. Code § 20487 ...............................................................................................9
Cal. Gov. Code § 20506 ...............................................................................................9
Cal. Gov. Code § 20532 .............................................................................................10
Cal. Gov. Code § 20535 .............................................................................................10
Cal. Gov. Code § 20536 .............................................................................................10
Cal. Gov. Code § 20570 .............................................................................................13
Cal. Gov. Code § 20571 .............................................................................................13
Cal. Gov. Code § 20572 .............................................................................................13
Cal. Gov. Code § 20574 .............................................................................................15
Cal. Gov. Code § 20576 .............................................................................................14
Cal. Gov. Code § 20577 ....................................................................................... passim
Cal. Gov. Code § 20812 .............................................................................................20
Cal. Gov. Code § 20831 .........................................................................................9, 10

Cal. Gov. Code § 21350 ................................................................................................ 18
Cal. Gov. Code § 21353 ................................................................................................ 18
Cal. Gov. Code § 21354 ................................................................................................ 18
Cal. Gov. Code § 21362 ................................................................................................ 18
Cal. Labor Code § 227 .................................................................................................... 8
Statutes of 1927, Chapter 431 ........................................................................................ 7

**Other Authorities**

Report of the Commission on Pension of State Employees (December 31, 1928) ............................... 7

The California Public Employees' Retirement System ("CalPERS") files this brief in support of the request of the City of Stockton (the "City" or "Stockton") that this Court determine it to be eligible for chapter 9 protection. This Court should (1) overrule the objections of the Capital Markets Creditors;[1] (2) determine that Stockton is eligible for protection under chapter 9; and (3) enter an order for relief. In addition to what the City argues, as explained below, the objections of the Capital Markets Creditors should be overruled because the City did not act in bad faith in making the legitimate business decision to continue to offer benefits to its employees and retirees through CalPERS.

## I. **PRELIMINARY STATEMENT**

The Capital Markets Creditors have forced the City of Stockton and other parties in interest to spend millions of dollars and more than seven months litigating the City's eligibility for bankruptcy protection.[2] The Capital Markets Creditors' public relations efforts and their litigiousness are an effort to bully the City into abandoning its provision of retirement benefits to its employees and retirees through the CalPERS system. That this strategy is not really about eligibility is apparent in the statements made by the Capital Markets Creditors' counsel in Court just a few weeks ago "Lord help us," one counsel proclaimed, if this case gets dismissed and it has to be re-filed. Another stated that dismissal of this case "is in no one's interest." *See* Declaration of Michael B. Lubic ("Lubic Dec."), Exhibit 1 at 89, 75 (relevant portions of Transcript of Hearing Held January 30, 2013 Regarding Rule 9019 ("9019 Hearing")). On this score, the Capital Markets Creditors are absolutely correct: It is in no one's interest to continue to delay the City's access to the Bankruptcy Court for the purpose of proposing a plan of adjustment of its debts. Entry of an order of relief will allow the City to move forward with its necessary financial restructuring.

---

[1] The term "Capital Markets Creditors" refers to the following entities: (1) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively "Assured"); (2) National Public Finance Guarantee Corporation ("National"); (3) Franklin High Yield Tax Free Income Fund and Franklin Corporation High Yield Municipal Fund ("Franklin"); and (4) Wells Fargo Bank, National Association, in its capacity as an indenture trustee.

[2] CalPERS has itself spent hundreds of thousands of dollars responding to discovery requests of the Capital Markets Creditors and their eligibility litigation campaign.

The Capital Markets Creditors fundamental argument in opposition to the City's eligibility is that, as a matter of law, the City was required to "negotiate" with CalPERS for a modification of the debts that are owed to it in order to be eligible for bankruptcy relief.  On this point, the Capital Markets Creditors are wrong.  The Capital Markets Creditors misconstrue (perhaps intentionally) the nature of the relationship between CalPERS and the City to support a tortured argument that the City's relationship to CalPERS is the same as the City's relationship to its bondholders and bond insurers.  CalPERS' relationship with the City is not remotely similar—CalPERS is an arm of the State of California which administers the State's public pension system.  CalPERS acts as a trustee for the public employment retirement system and has fiduciary obligations to maintain the integrity of that system for benefit of its members and for the ultimate benefit of the citizens of the State of California.

The City is a participant in the public employment retirement system with legal obligations to comply with the State's laws in connection with the provision of benefits to CalPERS' members. The relationship between CalPERS and the City is executory in nature:  CalPERS continues to provide benefits and the City continues to report, fund and otherwise comply with State law in connection with its participation in the system.  The City's obligations to CalPERS are not negotiable.  A well developed, substantial body of State law governs the obligations of the City to CalPERS.  It is nonsensical to suggest that the City could or should negotiate with CalPERS regarding its ongoing legal obligations relating to provision of benefits through the system.  CalPERS submits below an explanation of its role in providing benefits to the public employees of the State of California and other public agencies, as well as its relationships with employers like the City, to better inform the Court regarding the nature of the legal relationship between the City and CalPERS.

The Capital Markets Creditors also misconstrue the nature of the financial obligations that the City owes to CalPERS.  So long as the City continues to participate in the system, it does not owe CalPERS unfunded liability amounts or termination obligations in the millions or billions of dollars. To that extent, it is inaccurate to state that CalPERS is presently the largest creditor of the City.  The City has a continuing obligation to fund its payments to CalPERS as determined by CalPERS' actuaries.  The City is in good standing with CalPERS and is current on its payments to the system.

2

Accordingly, there is no debt to CalPERS that will be adjusted in the City's plan. The City's pendency plan, which is the predicate for its eligibility, contemplates the continuation of its relationship with CalPERS. In connection with a plan that the City will ultimately propose, the Court will consider the legal right of the City to exercise its business judgment to continue the relationship and assume the obligations to CalPERS. The Court's determination of the merits of the City's decision to assume this important relationship is properly brought in the context of confirmation of a plan, but has no place in the consideration of the City's eligibility for relief.

Nothing in the Bankruptcy Code requires that a municipality seeking protection under chapter 9 impair, seek to impair, or request impairment from, counterparties to its executory relationships in order to be eligible. Indeed, the "good faith" requirement of section 109(c)(5)(B), by its plain terms, requires only that the City negotiate in good faith with those creditors that it intends to impair at the time of plan confirmation. This position is supported by the Bankruptcy Appellate Panel's decision in *In re City of Vallejo*, 408 B.R. 280 (9th Cir. BAP 2009) ("*Vallejo*"). Once Stockton made the business decision to remain in the CalPERS system, the necessity of negotiations with CalPERS—if it ever existed--ceased to exist. As demonstrated by the City's submissions and supported by this brief, the City has met its burden in support of its eligibility for relief. The Court should enter an order for relief and allow the City to move forward with the proposal of its plan and the restructuring of the City's financial affairs.

## II. RELEVANT FACTUAL BACKGROUND

### A. What Is CalPERS?

CalPERS is an arm of the State of California, *i.e.* an agency that is an integral part of the State, through which the State acts. *See* Cal. Gov. Code § 20002 (stating CalPERS "is a unit of the State and Consumer Service Agency."); *see also Barroga v. Bd. of Admin. of CalPERS*, No. 2:12-cv-01179, 2012 WL 5337326 at *5 (E.D. Cal. Oct. 26, 2012) (finding that CalPERS is an "arm of the state" for sovereign immunity purposes) (citing cases holding the same); *cf. CalPERS v. Moody's Corp.*, No. C09-03628, 2009 WL 3809816 at *6 (N.D. Cal. Nov. 10, 2009) (concluding CalPERS is

"an arm of the state" for diversity jurisdiction purposes).[3]  Courts have recognized that the creation and implementation of State pension systems, like the CalPERS system, is an aspect of State sovereignty.  *See, e.g., Feinstein v. Lewis,* 477 F. Supp. 1256, 1261 (S.D.N.Y. 1979) (emphasis added), *aff'd* 622 F.2d 573 (2d Cir. 1980) (quoting legislative history of ERISA to state that "State and local governments must be allowed to make their own determination of the best method to protect pension rights of municipal and state employees.  These are questions of state and local sovereignty and the Federal Government should not interfere.").  As a result, the administration of California's public retirement system is exempt from ERISA based, in part, on principles of federalism, especially the fact that State public employee retirement systems are shaped, in part, by the legislative process of the individual States.  *See, e.g.*, *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995) (noting public pension plans are exempt from ERISA "due to the resulting federalism implications."); *Alley v. Resolution Trust Corp.*, 984 F.2d 1201, 1205 n.11 (D.C. Cir. 1993) (R.B. Ginsburg, J.) (noting "[c]oncern about protecting state authority over relations with state employees was one reason for" the ERISA exemption of public plans); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 914 (2d Cir. 1987) ("This Congressional reluctance to interfere with the administration of public retirement plans is in part based on principles of federalism.").[4]

The Public Employees' Retirement Law (Cal. Gov. Code, § 20000 *et seq.*) ("PERL") establishes a retirement system for certain State and local government employees.  *City of Oakland v. Pub. Emps. Ret. Sys.,* 95 Cal. App. 4th 29, 33 (2002).  The purpose of the PERL is to "effect economy and efficiency in the public service" by providing a pension plan to pay retirement compensation and death benefits.  Cal. Gov. Code § 20001; *see also Wheeler v. Bd. of Admin. of*

---

[3]  The California Attorney General recently affirmed its view that CalPERS is an "arm of the state." *See* Lubic Dec., Exhibit 2 (relevant portions of State of California's Complaint against Standard & Poor's, filed Feb. 5, 2013) ¶ 37 ("PERS and STRS are arms of the State of California, operating under the California Constitution and the California Government Code.").

[4] The administration of California's public retirement system is exempt from the Employee Retirement Income Security Act (ERISA) based on principles of federalism, especially the fact that state public employee retirement systems are shaped, in part, by the legislative process. *See, e.g., Rose*, 828 F.2d 910 (2d Cir. 1987). This exemption of governmental plans from ERISA is codified in 29 U.S.C. §§ 1002(32),1003(b)(l).

4

*PERS*, 25 Cal.3d 600, 605 (1979) ("Pension programs for public employees serve two objectives:  to induce persons to enter into and continue in public service, and to provide subsistence for disabled or retired employees and their dependants.") (quotation and citation omitted).  The California Legislature established CalPERS in 1932 to provide retirement benefits to California State employees and, in 1939, public agencies were allowed to participate.  *See* Lubic Dec., Exhibit 3 (California Public Employees' Retirement System, Office of Public Affairs, Facts at a Glance: General (June 2012)).  CalPERS provides pension fund and healthcare services for approximately 1.6 million California public employees, retirees, and their families.  *Id.*  A "state employee generally becomes a member of the Public Employees' Retirement System ... 'upon his or her entry into employment.'" *Cal. Ass'n of Prof'l Scientists v. Schwarzenegger,* 137 Cal. App. 4th 371, 376 (2006).  Local government employers may participate in the CalPERS system to provide pension and retirement benefits to their employees.

For public employees serving municipalities in California, CalPERS provides retirement benefits to employees through a three-way structure:  (1) the municipality has a "contract" with CalPERS that triggers statutes and other laws governing the provision of pension benefits through CalPERS; (2) the public servant has an employment contract with the municipality that includes pension benefits; and (3) CalPERS has a fiduciary responsibility to provide and protect the pension benefits of its employee members.  This three-way structure is the basis for the trust relationship between the parties where the municipality is the trustor, the members are the beneficiaries and CalPERS is the trustee.

The CalPERS Board is governed by the California Constitution and statutes, such as Cal. Const., art. XVI, § 17 subd. (b), which mandates that the CalPERS Board ensure the rights of CalPERS members and retirees to their full earned benefits.  *City of Oakland,* 95 Cal. App. 4th at 39-40.  In 1992, California voters approved Proposition 162, which gave the CalPERS Board exclusive

authority over the administration and investment of pension funds.[5]  In enacting Proposition 162, the electorate amended article XVI, section 17 of the California Constitution, to read in part as follows:

> Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have **plenary authority and fiduciary responsibility** for investment of moneys and administration of the system, subject to ... the following: [¶] ... The retirement board shall ... have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries.

*Bd. of Ret. of the Santa Barbara County Emps. Ret. Sys. v. Santa Barbara County Grand Jury,* 58 Cal. App. 4th 1185, 1192 (1997) (emphasis added).  Proposition 162 amended the California Constitution to provide that the CalPERS Board has "the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets" of the system.  Cal. Const., art. XVI, sec. 17, subd. (e).  The intent behind the measure was to protect public pension funds by vesting the authority to direct actuarial determinations solely with the governing board.  *See* Lubic Dec., Exhibit 4 at 36 (Relevant Portions of Official Ballot Pamphlet (Nov. 3, 1992)).  By granting the CalPERS Board sole authority to administer the system, Proposition 162 prevented the legislative and executive branches from "raiding" pension funds to balance the State budget.  *Id.* at 38.

Moreover, the courts have recognized that pension plans create a fiduciary relationship between the system's members (*i.e.*, employees) and the trustee of the funds.  *Hittle v. Santa Barbara Country Employees Retirement Assn.*, 39 Cal. 3d 374, 391-93 (1985).  The trustee must exercise this fiduciary trust "in good faith and must deal fairly" with the participants and beneficiaries.  *Id.* at 392. In addition, the California Constitution cannot be interpreted to require CalPERS to administer the system to the advantage of the employer and at the expense of the beneficiaries to whom it owes a fiduciary duty.  *City of Sacramento v. PERS*, 229 Cal. App. 3d 1470, 1493 (1991).  The underlying principle of a pension system is "affording retirees with a reasonable degree of economic security." *United Firefighters of LA v. City of LA*, 210 Cal. App. 3d. 1095, 1113 (1989).

---

[5] The ballot pamphlet accompanying Proposition 162 explained that pension system boards should give "highest priority" to providing benefits to members and their beneficiaries. *City of Oakland,* 95 Cal. App. 4th at 54.

6

**B.    The Need for Preservation of the Integrity of the State's Public Employees' Retirement System.**

  *1.    A Sound Public Pension System Benefits the State and its Citizens.*

In the late 1920s, the State of California created a Commission on Pensions of State Employees to thoroughly investigate the establishment and structure of a statewide public retirement system.  *See* Chapter 431 of the Statutes of 1927.  The Commission engaged in a comprehensive process which included open meetings, study of other public retirement systems, analysis of existing State employee data and questionnaires to develop a proposed framework.  *See* Lubic Dec., Exhibit 5 at 5-7 (Relevant Portions of Report of the Commission on Pension of State Employees (December 31, 1928)).  The Commission Report described the State's public retirement system as a means "to secure the improvement of its working personnel [concluding that] [a] sound retirement system provides the state with a sure and just method of eliminating from its active force those employees who have become incapable of performing their best work because of disability or superannuation."  *Id*. at 8.  The Commission Report emphasized that, with the increasing complexity of governmental and regulatory functions, a sound retirement system helps recruit top-level talent for its workforce.  *Id*. at 9.  For the retirement system to be an effective tool, the report stressed the need for the system to have a "sound financial basis."  *Id*.  This sentiment is as true now as it was then.  California and its citizens benefit when the State and its local municipalities are able to offer an overall competitive compensation and benefits package.  CalPERS is an integral part of that benefits package and this only holds true only if the retirement system is able to fund the promised benefits.

Further, as Proposition 162 demonstrates, CalPERS and its authority are part of the State political process.  By removing the fiduciary responsibility from those elected officials that may be presented with conflicting motives, California voters recognized the value of sustaining the soundness of the fund.  Vesting "plenary authority and fiduciary responsibility" with the CalPERS Board is an expression of the political will of the people of California.  Through the political process, the voters took this authority away from the Legislature and the Governor and shifted it to the CalPERS Board.

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                              2012-32118

1

>    2.    *An Actuarially Sound Pension System is Essential for the Payment of Pension Benefits.*

2    California courts acknowledge the value of safeguarding the funding of pension assets.

3    Specifically, it has been held that members have a right to an actuarially sound retirement system and

4    courts have a strong preference for interpreting the statutory pension provisions as guaranteeing

5    adequate funding for full payment to participants and beneficiaries. *Bd. of Admin. v. Wilson*, 52 Cal.

6    App. 4th 1109, 1131–32 (1997); *see also Valdes v. Cory*, 139 Cal. App. 3d 773, 785-86 (1983).  The

7    right to an actuarially sound system is "necessarily implied" from a public employer's commitment to

8    provide a pension benefit because otherwise the converse would impair the pension right. *Wilson*, 52

9    Cal. App. 4th at 1133.

10

>    3.    *California's Expressions of Priority for Wages and Benefits.*

11    California has prioritized the payment of wages and benefits.  Section 227 of the California

12    Labor Code provides:

13

>    Whenever an employer has agreed with any employee to make payments to a health or welfare fund, pension fund or vacation plan, or other similar plan for the benefit of the employees, or a negotiated industrial promotion fund, or has entered into a collective bargaining agreement providing for these payments, it shall be unlawful for that employer willfully or with intent to defraud to fail to make the payments required by the terms of that agreement.  A violation of any provision of this section where the amount the employer failed to pay into the fund or funds exceeds five hundred dollars ($500) shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, or in a county jail for a period of not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both that imprisonment and fine.  All other violations shall be punishable as a misdemeanor.

14

15

16

17

18

19

20    Cal. Labor Code § 227.  Section 227 makes the failure to pay agreed-upon pension contributions a

21    felony, establishes the maximum period of imprisonment for the offense, and establishes the

22    maximum monetary fine for the offense.  Lesser violations are punishable as misdemeanors, but

23    failures to pay that exceed five hundred dollars are subject to more severe imprisonment.  The fact

24    that a willful violation of section 227 constitutes a criminal offense demonstrates that section 227 is a

25    matter of statewide concern. *See In re Shaw*, 32 Cal. App. 2d 84, 86 (1939) (finding that because acts

26    constituting criminal offenses under the laws of the state it "cannot now be said that the commission

27    of such acts is strictly and solely a municipal affair"); *Fiscal v. City & County of San Francisco*, 158

28

8

1    Cal. App. 4th 895, 918-19 (2008) (finding comprehensive laws addressing firearm regulation in the

2    Penal Code supported that the matter was a statewide concern).

3           C.     **The Nature of the City of Stockton's Relationship with CalPERS.**

4           Under the PERL, a municipality may participate in the CalPERS system by entering into a

5    contract with CalPERS that describes the benefits to its employees and contributions required by the

6    municipality and its employees.  Cal. Gov. Code § 20460.  However, this "contract" is not of the

7    same character as a commercial contract; rather, it is an election into a statutory system of deferred

8    compensation.  *See Jasper v. Davis*, 164 Cal. App. 2d 671, 675 (1958).  Once a city makes this

9    statutory election, it is bound by the statutory provisions governing the system and the decisions of

10   the CalPERS Board.  Cal. Gov. Code § 20506; *City of Oakland v. PERS*, 95 Cal. App. 4th 29, 55

11   (2002).  Those provisions include prohibitions against failure to timely pay required employer

12   contributions and rejection of a contract or agreement under the bankruptcy provisions of chapter 9.

13   Cal. Gov. Code §§ 20831 & 20487.  The courts view the statutory pension provisions as a

14   fundamental part of the employment relationship, which should be read to require adequate funds to

15   meet reasonable expectations of the employees.  *Valdes*, 139 Cal. App. 3d at 786.  Participating cities

16   cannot alter their funding obligation to CalPERS.  *Wilson*, 52 Cal. App. 4th at 1122.[6]

17          For this reason, the City's obligations to CalPERS are not defined by the language of its

18   agreements with CalPERS; rather, they are defined by law.  The CalPERS Board is solely responsible

19   for "management and control of th[e] system."  Cal. Gov. Code § 20120.  The CalPERS Board must

20   keep "data necessary for the actuarial valuation of the system," and in accordance with that data,

21   adopt annual and actuarial interest rates.  *Id.* §§ 20131–32.  To make these calculations, the CalPERS

22   Board may employ an actuary who will actuarially valuate the assets and liabilities of the system.  *Id.*

23   §§ 20015 & 20133.

24          The PERL requires an agency participating in the CalPERS system to make timely

25   contributions for employees in amounts recommended by CalPERS' actuary and approved by the

26   _____

27   [6] As discussed more fully below, a participating agency may elect to terminate its participation in the
     retirement system prospectively, but such termination does not affect contribution obligations for

28   benefits accrued prior to termination.  *See* Cal Gov. Code § 20570.

9

1  CalPERS Board.  Cal. Gov. Code §§ 20532 & 20831.  The PERL explicitly provides that a

2  participating agency may not refuse to pay the required contributions as determined by CalPERS

3  within the prescribed deadlines.  *Id.* at § 20831.  A participating agency is also responsible to

4  CalPERS for the expenses of determining the approximate and actual contributions, as well as of

5  administering the CalPERS system.  *Id.* at §§ 20535 & 20536.

6       In September 1944, the City of Stockton, through its City Council, elected to participate in the

7  California State Retirement System, subject to the provisions of the State Employees' Retirement

8  Act.  *See, e.g.,* Exhibits 232, 233 & 234 (Stockton/CalPERS Original Contract & Amendments).[7]

9  The City has two subplans with different benefit formulas—safety workers and miscellaneous

10  employees.  *See id*. & Exhibits 422 & 423 (Annual Valuation Report as of June 30, 2011 for the

11  Miscellaneous and Safety Stockton Plans).  All City employees who are not safety workers are part of

12  the miscellaneous subplan and all contributions made to this subplan are allocated to this subplan as a

13  whole.  *See id*.

14       **D.**     **Explanation of the Nature of Certain Calculated Liabilities.**

15       Throughout this bankruptcy case, the Court will hear numerous terms that relate to how

16  Stockton's payments to CalPERS are calculated.  While these terms may be common to those versed

17  in actuarial science, CalPERS provides an explanation on how Stockton's contributions to the

18  CalPERS system are calculated as this is important in order to understand the nature of the City's

19  financial obligations to CalPERS relevant to the bankruptcy process.

20       The City's ongoing obligations to contribute to CalPERS are determined on an actuarial basis

21  taking into account expected investment returns, employee life expectancy, projected retirement date

22  and projected compensation.  All actuarial calculations are based on a number of assumptions about

23  the future: (a) demographic assumptions include the percentage of employees that will terminate, die,

24  become disabled, and retire in each future year and (b) economic assumptions include future salary

25

26  [7] CalPERS will seek to coordinate with Assured on the assembly and delivery of a joint exhibit

27  binder related to exhibits referenced in this brief and that of Assured or will in the alternative provide
copies of the exhibits referenced in this brief to the Court, the Debtor and the Capital Markets

28  Creditors in advance of the eligibility status conference.

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                 2012-32118

increases for each active employee and future investment returns.  *See* Declaration of David Lamoureux ("Lamoureux Dec."), ¶ 5.  The basic premise of a defined benefit pension plan is that the payments are determined based on actuarial assumptions and calculations and the risk is pooled among the participants in the plan.  For a homogeneous population, predictions for larger groups are more accurate than for smaller groups.  Accordingly, as a pool is made larger and larger, the volatility of the cost per member decreases because the risk is pooled among a larger group.  *Id.* at ¶ 6.

The term "Employee Contribution," which is also known as a "Member Contribution," is an amount set by a California statute and refers to the amount of money an individual employee must contribute through each paycheck to be in the CalPERS system.  Lamoureux Dep. 39:16-25 & 40:1.[8] The term "Employer Contribution Rate" is an amount that is set by the CalPERS actuarial staff on an annual basis.  Because each employee member is guaranteed a certain level of benefits, the Employer Contribution Rate can vary from year to year based on investment performance.  *Id.* at 40:2-7 & 41:12-16.  An Employer's Contribution Rate is annually calculated and is based on a percentage of payroll.  Lamoureux Dec., ¶ 8.

The most recent Annual Valuation Reports for the City of Stockton, *see* Exhibits 422 & 423, which cover the valuations as of June 30, 2011, are prepared by CalPERS' actuaries to:

(1)    Set forth the actuarial assets and accrued liabilities of each plan as of June 30, 2011;

(2)    Determine the required Employer Contribution Rate for each plan for the fiscal year July 1, 2013 – June 30, 2014;

(3)    Provide actuarial information as of June 30, 2011 to the CalPERS Board of Administration and other interested parties; and

(4)    Provide pension information as of June 30, 2011 to be used in financial reports subject to Governmental Accounting Standards Board Statement 27 for a single employer defined benefit pension plan.

Lamoureux Dec., ¶ 9.  In these Reports, the actuarial valuations provide the following funding and rate information for fiscal years 2010 and 2011:

(1)    The actuarial and market value of the assets;

---

[8]  Cited portions of the deposition of David Lamoureux are attached as Exhibit 6 to the Lubic Dec.

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                    2012-32118

1

     (2)     The current unfunded liability; and

2

     (3)     The funded ratio.

For fiscal years 2012 and 2013, the reports provide projected Employer and Employee Contribution

3

Rates for service credit earned during the applicable periods. Lamoureux Dec., ¶ 10.

4

     For any given year, contribution amounts are calculated by adding together two different

5

elements: (1) The "Normal Cost," which means "the cost of providing one year of benefits to the

6

current employees." Lamoureux Dep. 44:3-5. In other words, it is the plan's annual premium for

7

service earned in the upcoming year in the absence of any unfunded or overfunded liability to be

8

amortized. It is expressed as a percentage of payroll. Lamoureux Dec., ¶ 11; and (2) Payment

9

toward any "Unfunded Accrued Liability," which is obtained by comparing the assets of the plan to

10

the actuarial accrued liability of the plan (*i.e.* the present value of the benefit for all credited past

11

service of current members). *Id.* at 11. Unfunded Accrued Liability is expressed as a lump sum

12

dollar amount. *Id.* at ¶ 11.

13

     The Unfunded Accrued Liability calculations as described in the Annual Valuation Reports

14

are not a reflection of any amounts that are currently owed by an employer. Unfunded Accrued

15

Liability is simply a component of the actuarial calculation used to determine the employer

16

contribution rate for upcoming fiscal year. *Id.* at ¶ 12.[9] The annual contribution is borne by both the

17

employer and the employees and the future benefits for current employees will be assured only if all

18

contributions of both employer and employees are made timely and in full. *Id.* at ¶¶ 13-14.

19

     Finally, in the event of termination,[10] a terminated agency is required to make a payment to

20

CalPERS in an amount determined by the CalPERS Board (based on actuarial information) to be

21

sufficient to ensure payment of all vested pension rights of the terminated agency's employees

22

accrued through the termination date. This is referred to as the "Termination Payment." Lamoureux

23

Dec., ¶ 15. The Termination Payment is due immediately and is subject to interest and is more fully

24

discussed below. Cal. Gov. Code § 20577 & Lamoureux Dep. 191:17-23.

25

---

26

[9] According to the most recent Annual Valuation Reports, the City must pay CalPERS approximately $29.5 million during the 2012-13 fiscal year in order to remain current on its payments

27

to CalPERS. *See* Exhibits 422 at 5 & 423 at 5 ("Total Employer Contribution" line item).

28

[10] *See infra* Section II.E (discussing termination).

12

### E.  The Termination Process and the Consequences of Termination.

Throughout their objections, the Capital Markets Creditors repeatedly refer to the fact that Stockton has the ability to terminate its relationship with CalPERS.  This argument is a red herring.  While it may be technically correct that Stockton can terminate its relationship with CalPERS, the Capital Markets Creditors are laboring under a misconception that somehow Stockton or CalPERS had the ability to negotiate the terms and conditions of termination, including the amount of the Termination Payment.  *See, e.g.*, National Objection [Dkt. No. 477] at 13, ¶ 48 ("Given that the PERL permits CalPERS to terminate the City's contracts and transfer its plan assets and liabilities to the terminated agency pool . . . the City could have, at a minimum, requested CalPERS to do so and attempted to negotiate reduced contribution rates for existing and future retirees.").  The required payment upon termination is not, however, subject to negotiation.

#### 1.  Termination and the Termination Process.

As set forth in the PERL, some circumstances allow for the termination of the relationship, or a portion thereof, between a contracting agency[11] and CalPERS.  For instance, contracts which have been in effect for at least five years can be terminated through approval of an ordinance or resolution of the contracting agency's governing body, or through an ordinance adopted by the electorate, with one year's notice to CalPERS.  Cal. Gov. Code §§ 20570 & 20571.  Also, if a contracting agency fails to pay its required periodic contributions within 30 days after demand by the CalPERS Board, or fails to file any information required in the administration of the system, or if the CalPERS Board determines the contracting agency no longer exists, the CalPERS Board may terminate the contract by resolution. Cal. Gov. Code § 20572.

In the event of termination, a terminated agency is required by law to make a payment to CalPERS in an amount determined by the CalPERS Board (based on actuarial calculations) to be sufficient to ensure payment of all pension benefits of the terminated agency's employees accrued through the termination date.  Cal. Gov. Code § 20577.  The Termination Payment is due immediately and subject to interest.  *Id.* ("The amount of difference shall be subject to interest at the

---

[11]  "Contracting agency" means, among other entities, any public agency that has elected to have all or any part of its employees become members of this system and that has contracted with the board for that purpose. *See* Cal. Gov. Code § 20022.

13

1   actuarial rate from the date of contract termination to the date the agency pays this system."). The

2   Termination Payment goes into the "Terminated Agency Pool." Cal. Gov. Code § 20577.5.

3          In making this calculation, CalPERS is subject to investment risk, longevity risk and wage

4   fluctuation risk associated with the future payment of the terminated agency's benefits. Unlike in an

5   ongoing plan, these risks cannot be addressed by adjusting contribution rates in future years. Because

6   there is no mechanism for receiving additional payments should the actuarial assumptions not be met,

7   the investments in the Terminated Agency Pool, and the assumptions to determine the Termination

8   Payment, must be more conservative. To address the longevity risk, the Termination Payment

9   calculation includes an increase to the liabilities to address mortality fluctuations. Cal. Gov. Code

10  § 20576. In addition, the CalPERS Board has adopted a policy to determine the discount rate,

11  inflation assumption and wage growth assumption for termination calculations aimed at protecting

12  the pension system from investment risk, inflation and wage growth changes. *See* Lubic Dec., Exhibit

13  11 (CalPERS Circular Letter No. 200-058-11 (August 19, 2011)) & Exhibit 12 (Aug. 2011 Agenda

14  Item). In addition, the CalPERS Board recently adopted a conservative asset allocation for the

15  Terminated Agency Pool, which helps the pool's funds given that CalPERS has no further recourse to

16  a terminating employer once the Termination Payment is made and contributed to the pool. *See*

17  Lubic Decl., Exhibit 13 (Dec. 2012 Agenda Item) & Lamoureux Dep. 110:6-25, 111:1-25 & 113:3-

18  24.

19         A primary driver in determining the amount of the Termination Payment is the setting of the

20  discount rate, which is "a reflection of the asset policy or how the assets are invested." *Id.* at 190:15-

21  17. Given the conservative nature of the investments in the Terminated Agency Pool, the discount

22  rate related to a Termination Payment is low when compared with the actuarial rate for the portfolio

23  for ongoing participating agencies. *Id.* at 190:15-25 & 191 1-15. The cumulative effect of these

24  policies is that a terminated agency's actuarial liability upon termination is significantly larger than

25  the actuarial liability on an ongoing basis.

26         Stockton's 2011 Annual Valuation Reports each provide a line item for "unfunded

27  termination liability," which is an estimate as to how much Stockton would owe to CalPERS if its

28  contracts had been terminated as of *June 30, 2011*. The Miscellaneous Plan lists this liability at

14

1    $357,707,135 and the Safety Plan lists this liability at $588,422,928, which totals almost $950

2    million.  *See* Exhibit 422 at p. 15 & Exhibit 423 at p. 15.[12]  If a terminated agency fails to pay the

3    Termination Payment, benefits under the contract must be reduced pro rata based on the amount of

4    the Termination Payment that is not funded.[13]  Cal. Gov. Code § 20577.  This is a one-time

5    opportunity for CalPERS to reduce the benefits payable under the terminated contract.  *Id*.  Once the

6    terminated agency's assets and liabilities have been merged into the Terminated Agency Pool

7    account, no further benefit adjustments are permitted under the PERL.  Ultimately, it is probable that

8    the CalPERS general pool—all of the funds of all the participating employers—bears the risk if there

9    are not enough assets to pay the benefits under the terminated contract.  Accordingly, a shortfall

10   shifts the burden not only to Stockton members, but also to other municipalities and the State,

11   together with all of their members.

12             2.       *Termination is Not a Viable Option.*

13          Given that Stockton could not have negotiated the amount of any Termination Payment with

14   CalPERS, it is irrelevant to this Court's eligibility determination what the actual consequences of

15   termination would have been.  Nevertheless, given the dogged focus of the Capital Markets Creditors

16   on termination, it is useful to understand the consequences of termination to underscore the weakness

17   inherent in the Capital Markets Creditors' argument.

18   _____

19   [12]  When a contracting agency terminates its relationship with the retirement system, the PERL
20   specifically provides that the terminated agency is liable to CalPERS for the Termination Payment
     and costs of collection, including attorney's fees.  Cal. Gov. Code § 20574.  This section of the PERL
21   also grants a lien in favor CalPERS "on the assets of a terminated contracting agency, subject only to
     a prior lien for wages."  *Id.*  Based on the legislative history, the intent of this section (adopted in
22   1982) was to elevate CalPERS' rights from that of a general unsecured creditor to that of a senior
     secured creditor as a matter of law.  The legislative history contains discussion of the intent to "grant
23   PERS a lien against the assets of public agencies who have terminated their membership in the
     system, usually as a result of agency dissolution and bankruptcy who have unfunded liabilities owed
24   to PERS for vested employee benefits and have no ability to pay such liabilities."  The legislative
     history goes on to indicate that under then existing law, CalPERS was only an unsecured creditor.
25   *See* Lubic Dec., Exhibit 7 at 35 (Relevant Portions of Legislative History to Cal. Gov. Code §
     20574).

26   [13]  CalPERS may choose to make no reduction or a lesser reduction if the CalPERS Board has made
27   reasonable efforts to the collect the payment and the CalPERS Board determines that failure to make
     a reduction will not impact the actuarial soundness of the Terminated Agency Pool account.  Cal.
28   Gov. Code § 20577.5.

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                                      2012-32118

Because the City has continued to make its monthly payments to CalPERS, the only way the City's contract with CalPERS can be terminated is if the City itself chooses to request termination. If Stockton chose to terminate its relationship with CalPERS, the City would be faced with an immediately due and owing massive termination liability. Based on the City's most recent Actuarial Valuation Reports, the City would face an immediately due liability of approximately $950 million upon termination of its CalPERS contract. Given that this calculation was made based on a hypothetical termination date of June 30, 2011, due to the subsequent decrease in market interest rates, the amount of Stockton's termination payment would likely have been even greater if it terminated during the AB 506 process. *See* Lamoureux Dep. 110:6-25 & 111:1-25. Obviously, the almost $950 million figure (or some larger amount) is far larger than the City's current ongoing payment obligations and would cause a far more significant adverse impact to its financial condition.[14] Consequently, termination provides no advantage, either to the City itself or to its various creditors, including the Capital Markets Creditors, and this is particularly so because under the PERL not only is a terminating agency liable for various fees and costs but also is subject to a senior priority secured lien in the amount of the Termination Payment.

Put simply, the actuarial calculation that makes up the Termination Payment is not negotiable because it is based on statutorily required Board policies which are necessarily guided by CalPERS' statutory and constitutional mandates to act as a fiduciary of the system as a whole.

### 3. Funded Status of the Termination Pool and Availability of an "Alternate Plan."

National makes much of the fact that (1) the Terminated Agency Pool is currently approximately 200% funded; and (2) that Stockton's pension plans can simply be "replaced by new affordable defined benefit plans." *See* National Supplemental Objection [Dkt. No. 635] at 13. Both of these assertions are misleading.

---

[14]  Indeed, the almost $950 million (or some larger figure) would be more than double than the estimated $350 million (excluding the amounts the City attributes to CalPERS) owed to other creditors listed on the City's List of Creditors Holding 20 Largest Unsecured Claims [Dkt. No. 4] making the termination liability claim approximately 73% of the unsecured pool. As noted earlier, however, the termination claim is secured, not unsecured.

First, although the Terminated Agency Pool is currently superfunded, it is funded by termination payments of a number of small employers such that the total assets of the pool are relatively small. *See, e.g.*, Lamoureux Dep. 97:6-23. Indeed, the total assets currently in the Terminated Agency Pool are dwarfed by the payment Stockton would be required to make if it terminated its relationship with CalPERS. Stockton's size as a large employer, and the magnitude of its unfunded termination liabilities, would overwhelm whatever surplus the pool now enjoys. This result would provide no benefit to the City's employees and could prevent employees of other agencies in the pool from collecting their full share of accrued benefits. Obviously, Stockton does not currently have almost $950 million (or more) to pay its Termination Payment. Placing Stockton's employees into the Terminated Agency Pool would no doubt materially adversely alter the funding level of the pool based on the hypothetical Termination Payment as of June 30, 2011.

CalPERS cannot simply choose to reduce benefits as a means to reduce the City's obligations under its CalPERS contract. *See, e.g.*, Cal. Gov. Code § 20475. CalPERS has no statutory authority to impose a benefit reduction unilaterally; instead, CalPERS may reduce benefits only upon the termination of an agency's contract. Cal. Gov. Code § 20577.5. Moreover, in a termination, CalPERS may maintain benefits without reduction only if the Board finds that this will not impact the actuarial soundness of the Terminated Agency Pool. *Id.* In this case, however, as described above, merger of the City's plan into the pool would significantly impact the actuarial soundness of the pool, given the size of the plan and its unfunded status. As a result, if Stockton cannot fund its shortfall, CalPERS would be required to reduce benefits accordingly before merging Stockton's assets into the Terminated Agency Pool.

Second, with respect to "new affordable defined benefits plans," the capital markets parties offer absolutely no evidence that any such plans actually exist.[15] Surely, if such plans existed, the Capital Markets Creditors would have provided evidence of such plans to the Court. Further, if the

---

[15] Even if such an alternative plan were to exist, query how much value an employee would place on the benefits of such an alternative system, given that the City had terminated its plan with CalPERS causing massive retroactive reductions in benefits. Wouldn't an employee suspect that the alternative system could also be arbitrarily terminated?

17

City chooses to terminate its relationship with CalPERS, the City could not renew its relationship with CalPERS for at least three years from the date of termination. Cal. Gov. Code § 20460. During this time, the City would have no viable alternative for providing benefits to its employees. Although the City's existing employees that had benefits accrued as of the termination date in CalPERS would retain their benefits (albeit likely reduced dramatically), they would earn no additional benefits, and new employees would have no retirement system in which to participate. Such a situation would undoubtedly impact Stockton's ability to retain and hire new employees and further impair its ability to provide essential services to its residents.

Terminating its relationship with CalPERS during the AB 506 process was simply not a viable option for the City because it would have given rise to an enormous Termination Payment obligation, the amount of which is not subject to negotiation. As explained more fully below, once Stockton made the decision to remain in the CalPERS system, it was under no obligation to negotiate with CalPERS. The Capital Markets Creditors fixation on termination is a mere distraction to the ultimate question of whether Stockton is eligible for protection under chapter 9.

**F.    CalPERS Has Limited Flexibility in Setting Contribution Rates.**

CalPERS' relationship with its members, which include the City, is governed by both California statutes and the California Constitution. In essence, both the PERL and the California Constitution establish a set of rules that govern the relationship among CalPERS, contracting agencies (like the City), and employee members of the system. In addition, CalPERS is further constrained by federal tax law.

*1.    The PERL Specifies Benefit Formulas Which Cannot Be Reduced Through Negotiations.*

The PERL provides a finite array of benefit formulas for contracting agencies to elect for its employees. Cal. Gov. Code § 21350 *et seq.* Stockton has chosen the 2% at age 55 benefit and 2% at age 60 benefit for its miscellaneous employees and the 3% at age 50 benefit for its safety workers. Cal. Gov. Code §§ 21353, 21354 & 21362.2. Once a municipality makes an election, it is irrevocable and benefits provided by the election can only be increased. Cal. Gov. Code § 20474 ("Any election made by amendment to the contract shall be irrevocable until the contract is terminated. However,

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                                    2012-32118

benefits provided by the amendment may be increased or improved from time to time by further amendment to the contract.").  A municipality, however, may amend its contract to reduce benefits, terminate provisions or provide for different benefits, but only for new employees and employees who switch classifications.  Cal. Gov. Code § 20475(b) ("A member shall be subject to the contract as amended only if, after the effective date of the contract amendment, the member either (1) receives service credit for the first time within a classification, or (2) the member returns to service with a classification following termination of membership[.]").  As explained in detail above, CalPERS only has the ability to reduce benefits through the termination process.

In addition, under California law, pension benefits are considered "vested rights" and therefore neither Stockton nor CalPERS can unilaterally adjust those benefits because to do so may violate the Contracts Clause of the United States and the California Constitutions.  *See Betts v. Bd. of Admin.*, 21 Cal.3d 859, 863, 867 (1978).  In fact, under California law, promised benefits may not be decreased without a comparable new advantage.  *See, e.g., United Firefighters of Los Angeles City v. City of Los Angeles*, 210 Cal.App.3d 1095, 1103 (1989).  Given this, CalPERS lacks the authority, absent specific statutory provisions, to unilaterally decrease pension benefits, even if a request to do so comes from a financially distressed city like Stockton.

The Capital Markets Creditors argument that a "modest" reduction of pension benefits would be acceptable completely ignores this State law backdrop against which any modifications to benefits must be viewed.  Put simply, any unilateral reduction in benefits, whether by the City or by CalPERS, would violate State law.  Thus, even if Stockton had asked CalPERS for a "modest" reduction in pension benefits, CalPERS lacked the statutory authority to grant any such request, even if this request occurred within the process of pre-bankruptcy negotiations.  This is a point that the Capital Markets Creditors refuse to accept, perhaps because it is fatal to their claim that the City did not negotiate in good faith.

### 2.    *Hardship Extension.*

While CalPERS lacks the authority to unilaterally change pension benefits and must be cognizant of the federal tax rules, CalPERS does have the ability to provide the option for contracting agencies experiencing financial difficulties to request what is commonly referred to as a "hardship

19

extension." A hardship extension allows an agency to re-amortize the agency's unfunded liability. *See* Cal. Gov. Code § 20812. This hardship extension period is set by statute and limited to 30 years. *Id.* Assured, in a footnote and without citation, claims that "CalPERS' governing statute gives its board broad discretion to work with municipalities, to adjust discount rates, and to stretch repayment horizons, and the City's failure to even request a hardship exemption from CalPERS indicates it was not interested in even exploring any options CalPERS might be able to facilitate." Assured Supplemental Objection [Dkt. No. 638] at 27 n.18. This is not so and appears to be based on the erroneous assumption that such requests are granted as a matter of course. As with termination, the decision to deny or accept a hardship extension is not subject to negotiation. CalPERS' decision to grant a hardship extension must be guided by its fundamental duty to maintain and protect the actuarial soundness of the system and to preserve its members' benefit levels.

The CalPERS Board intends that the amortization extension policy will eliminate unfunded liabilities "in a manner that maintains benefit security for the members of the System while minimizing substantial variations in employer contribution rates." *See* Exhibit 510 (30 Year Amortization Extension Policy Guidelines, CalPERS (Sept. 14, 2010)). An agency requesting an extension must demonstrate its need for financial relief by submitting the following:

(1)     A statement of hardship from the employer;

(2)     A statement that the employer has notified employees or employee groups of the request for an extension of the employer's amortization period; and

(3)     A statement that the employer is aware of the potential for a reduction in benefits in the event that the employer terminates the plan without providing continuation of funding adequate to fully fund the liabilities upon termination.

Nevertheless, even if the agency is in genuine financial need, it also must demonstrate that the extension will actually provide relief. Agencies unfunded liabilities are subject to varying rates of amortization, depending on the cause of the unfunded status.

Agencies have multiple factors contributing to their overall unfunded liability, and each portion attributable to a different factor also is likely subject to a different amortization rate. For example, an unfunded liability resulting from a change in plan provisions or actuarial assumptions is subject to a 20-year amortization period, while a liability resulting from an investment gain or loss is

20

subject to a 30-year period.  *See* Exhibit 507 (CalPERS Board Resolution No. ACT-96-O5E, revised April 2005).  To determine the agency's overall average amortization period, CalPERS averages the periods associated with the different sources on a pro rata basis.  Only if an agency's average period is significantly less than 30 years is a hardship extension appropriate.  According to CalPERS policy, "if the current net amortization period is already near 30 years, then extending to 30 years will not produce measurable rate relief and is unwarranted."  *See* Exhibit 509 (CalPERS 30 Year Amortization Extension Policy Guidelines (Feb. 19, 2003)); *see also* Exhibit 510 (CalPERS Review of 30 Year Amortization Extension Policy Guidelines (Sep. 14, 2010)).

In addition to the degree of relief obtainable by an extension, the CalPERS Chief Actuary also must consider whether reducing the agency's contribution rate will produce long-term harm to the agency's plan.  To make this determination, the CalPERS Chief Actuary likely will review estimates of the plan's future cash flows and its future funded status, and it will weigh these factors against the likelihood that the plan would be able to cover all liabilities in the event of plan termination without any benefit reductions.  Historically, when denying a hardship extension request, the CalPERS Chief Actuary has done so due to concerns about the contracting agency's ability to pay its future contributions, even subject to the extended amortization period.  In other words, the granting of a hardship extension is subject to credit analysis.

On December 4, 2012, Stockton made a formal request to CalPERS for a hardship extension. After reviewing Stockton's request, on January 2, 2013, CalPERS informed the City that the City's request, in its current form, did not meet the necessary criteria because "[t]he plans' assets were not sufficient to cover all plan liabilities on a termination basis as of June 30, 2011 as was shown in the hypothetical termination liability calculation included in the most recent actuarial valuation report." *See* Lubic Dec., Exhibit 8 (Jan. 2 email from CalPERS to Stockton).  In so stating, CalPERS informed the City that it could provide additional information to support its current request.  *See id.* In addition, CalPERS informed the City that an "exception" exists to the requirements Stockton initially failed to meet noting the exception's language:

> If the plan's assets will not be sufficient, other factors will be considered on a case
> by case basis based on the specific facts and circumstances of each request,
> including without limitation, the likelihood of the employer terminating its

21

> contract, the employer's ability to provide continuation of funding at termination, whether annual contributions continue to and are projected to continue to exceed benefits paid to retirees and beneficiaries, and/or whether the rate of relief would have a material impact on the plan's funded status.

*Id.*  After noting the exception, CalPERS invited the City to provide additional documentation to determine whether it qualified under the exception, noting that it "would be pleased to review any such submission." *Id.*

### 3.    Potential Jeopardy to Tax Exempt Status.

In addition to these State law constraints, any unilateral reduction of pension benefits by CalPERS may ultimately impact the federal tax treatment of CalPERS' members' benefits.  A tax-qualified pension plan must comply with its terms to maintain tax-qualified status.  If a tax-qualified plan's operation does not comply with its terms, the plan has an operational failure that could jeopardize the plan's tax-qualified status. *See* Lubic Dec., Exhibit 9 (Rev. Proc. 2008-50, Section 5.01(2)(b), 2008-35 I.R.B. 464).  In the case of CalPERS, the PERL and the relevant parts of the California Code of Regulations serve as the official plan document. *See, e.g.*, Cal. Gov. Code § 20003.  Thus, CalPERS and its Board cannot take any action under the plan that is not authorized by the PERL without jeopardizing the tax-qualified status of the plan.

Further, a tax-qualified plan may not violate prohibited transaction rules.  Governmental plans that are tax-qualified are subject to the prohibited transaction rules of Section 503 of the Internal Revenue Code of 1986, as amended (the "IRC") and, if violated, the plan may lose its tax-qualified status.  IRC Section 503(a)(1)(B).  This section of the IRC generally requires arm's-length dealings between the creator of the trust and the trustee. *See* Lubic Dec., Exhibit 10 (General Counsel Memorandum 38972 (Mar. 25, 1983) (citing S. Rep. No. 2375, 81st Cong., 2d Sess. 36-37, 1950-2 C.B. 483, 509-511)).  The prohibited transactions include: (1) the lending of any part of the trust income or corpus without the receipt of adequate security and a reasonable rate of interest to the creator or contributor, (2) the substantial purchase of securities or other property for more than adequate consideration from the creator or contributor, and (3) the sale of a substantial part of its securities or property for less than adequate consideration to the creator or contributor.  IRC Section 503(b)(1), (4) and (5).

Any restructuring of CalPERS' members' benefits could potentially violate the prohibited transaction rules of IRC Section 503 if the restructuring applies to contributions already owed.  The IRS has issued guidance regarding a City's delay in making immediate cash contributions for which it was currently liable and held that "a loan may be implied and . . . transactions must be viewed according to their real nature rather than mere form."  *See* Lubic Dec., Exhibit 10 (General Counsel Memorandum 38972 (Mar. 25, 1983) (citing *Fuqua Nat'l, Inc. v. United States*, 334 F. Supp. 1116 (S.D. Ga. 1971)).  Loss of tax-qualified status would mean that all members would have immediate tax liability.[16]  The IRS treats a plan as disqualified for all plan years after an error has occurred until the error is corrected.  Under this approach, a disqualification error that occurred prior to the open tax years (*i.e.*, occurred in years for which the statute of limitations has run) can cause the plan to be treated as disqualified in the open years if the IRS identifies the error.  If a plan is disqualified for some or all open tax years, the employer, the plan participants, and the plan trust may suffer significant negative consequences.

In essence, any restructuring of CalPERS' members' benefits has the potential to cause great financial harm to the both the City and its employees and retirees, as well as the State of California itself, because it may jeopardize the tax-exempt status of CalPERS.

### G.    The City Has Made Requests to Modify Its CalPERS Contract in Compliance with the PERL.

As noted above, while the relationship between Stockton and CalPERS is initiated by a contract, the terms of the contract are enforced by applying the applicable provisions of the PERL. The PERL constitutes a set of ground rules that governs the relationship between CalPERS and participating cities, including the City.  Deviation from this set of rules is not permissible under

---

[16]  First, to the extent taxes were owed, the sponsoring employer may risk liability for failure to withhold and remit income, FICA, and FUTA taxes on vested contributions and earnings owned by the employees.  Second, if a plan loses its qualified status, the plan trust might be required to pay taxes and penalties on the investment earnings earned during the disqualified years.  Finally, to the extent that employees are vested or became vested in contributions made in (or with respect to) the disqualified years, they may owe income and FICA taxes on such contributions and associated investment earnings.  In addition, plan participants may also owe penalties for failure to pay taxes on their income in a timely manner.  Former employees who received distributions from the plan during the disqualified period must pay taxes on the entire amount of the distribution, even if they rolled the distribution over to another plan or IRA.

California law and therefore not subject to negotiation.  While the Capital Markets Creditors either fail to grasp this fact or simply fail to acknowledge it because it is an inconvenient truth that undercuts the entire premise of their "good faith" arguments, Stockton understands this reality as evidenced by actions it has taken over the past eight months.

Throughout this process, the City has complied with applicable rules when requesting an alteration in the benefits to its employees, both past and present.  For example, prior to filing for chapter 9 relief, on June 7, 2012, the City made a request of CalPERS to initiate conversations to understand what the potential savings would be, and how the process would work, for the City to limit the annual Cost-of-Living Adjustment ("COLA") for its miscellaneous employees from five to two percent.  *See* Exhibit 183 (June 7, 2012 letter from Stockton to CalPERS).  On July 3, CalPERS responded to the City's request and noted that "[w]hile CalPERS wishes to be cooperative with the City as it seeks to address its fiscal difficulties, the System lacks the authority to grant the City's request on this issue."  Exhibit 184 (July 3, 2012 letter from CalPERS to Stockton).  In so doing, CalPERS pointed to various sections of the PERL, as well as the "vested rights" doctrine, as the basis for denying Stockton's pre-bankruptcy filing request.  *See id.*  Likewise, after this request, Stockton made a request to add an exclusion to the City's retirement contract, which sought to exclude elected officials from coverage.  On September 21, 2012, CalPERS granted the amendment request and noted that the exclusion was "prospective only" and would not "apply to current elected officials who are already members of the system."  Exhibit 424 (Sep. 21, 2012 letter from CalPERS to Stockton).

**H.    CalPERS Participated in the AB 506 Process.**

At the initiation of the AB 506 process, the City invited CalPERS, along with other creditors, to participate in the AB 506 process.  CalPERS attended mediation sessions and meetings of creditors through its general counsel and outside counsel as requested by the mediator and the City.

# III. <u>ARGUMENT</u>

The Capital Markets Creditors' arguments that the City lacks good faith, whether under section 109(c)(5)(B) or section 921(c) of the Bankruptcy Code, are without merit and constitute a premature attempt to litigate plan confirmation issues.  CalPERS believes that the City is eligible for relief under chapter 9 of the Bankruptcy Code.  Stockton engaged in extensive pre-filing negotiations

1    with creditors holding a majority of the claims the City intends to impair in this bankruptcy case.  The

2    City's negotiations took place over the course of 90 days and all parties in interest were provided

3    with the City's 790 page "Ask" that forms the basis for its eventual plan of adjustment.  Furthermore,

4    the City only filed its bankruptcy petition in the face of extreme financial distress and after enacting

5    drastic cost-cutting measures over more than three years.  The Capital Markets Creditors ignore the

6    plain language of section 109(c)(5)(B) to the extent that they insist that the City was required to

7    negotiate with CalPERS notwithstanding the City's intent to maintain its relationship with CalPERS.

8         **A.**     **The City Has Complied with the "Good Faith" Requirement of Both Section 109(c)(5)(B) and Section 921(c) of the Bankruptcy Code.**

9

10        Distilled to its essence, the Capital Markets Creditors argument is that, <u>as a matter of law</u>, a

11   debtor cannot satisfy section 109(c)(5)(B)'s good faith requirement unless it attempts to negotiate an

12   impairment of all of its significant executory relationships prior to filing a chapter 9 petition, even

13   when that debtor does not intend to impair such parties in a plan of adjustment.  *See, e.g.*, National

14   Supplemental Objection [Dkt. No. 635] at 1 ("As a matter of law, a debtor fails to negotiate in good

15   faith under section 109(c) when it shields its largest creditor while insisting the remaining similarly-

16   situated creditors compensate by carrying a disproportionate burden of impairment.") and Assured

17   Supplemental Objection [Dkt. No. 638] at 28 ("By failing to negotiate at all with CalPERS, the City

18   cannot claim to have negotiated in good faith for purposes of 11 U.S.C. § 109(c)(5).").  This

19   argument is contrary to the plain language of section 109(c)(5)(B) and represents a premature attempt

20   to contest whether the City's eventual plan of adjustment will unfairly discriminate against the

21   Capital Markets Creditors.  Stockton satisfies the requirements of section 109(c)(5)(B) because the

22   City negotiated in good faith with those creditors it intended to impair based on the City's "Ask."

23        While the concept of "good faith" is not defined in the Bankruptcy Code, it is a fact-intensive

24   inquiry that must be based on context.  The Capital Markets Creditors seek to apply a one-size-fits-all

25   approach to the good faith legal standard.  That approach must be rejected.  Once Stockton made the

26   business decision to retain the benefits of its continued relationship with CalPERS and participation

27   in the CalPERS system, it did not need to seek adjustments from CalPERS to reduce benefits because

28

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                2012-32118

1    nothing in the Bankruptcy Code requires that a municipality seeking protection under chapter 9, seek

2    to adjust the terms of significant executory relationships in order to be eligible.

3                    1.      *The Plain Language of Section 109(c)(5)(B) Requires Only That the City*
                              *Negotiate With Those Creditors It Intends to Impair.*

4            The Capital Markets Creditors' argument is that, by not seeking to impair CalPERS, the City

5    cannot, as a matter of law, satisfy the "good faith" requirement of section 109(c)(5)(B).  This

6    argument must be rejected because it ignores the plain language of the Bankruptcy Code and because

7    it is not supported by the very cases upon which the Capital Markets Creditors rely.  As shown

8    below, under the plain language of section 109(c)(5)(B), the City was not required, in its prepetition

9    negotiations, to seek impairment of each one of its creditors, no matter how large.  Rather, the City

10   was only required to negotiate with a majority of each class of creditors that it intends to impair.  Of

11   more relevance to the arguments raised here, section 109(c)(5)(B) does not require a municipality to

12   negotiate with parties to executory relationships which the municipality does not intend to impair.

13   Because the City engaged in good faith negotiations with a majority of the creditors it seeks to impair

14   under its "Ask," it has satisfied its burden under section 109(c)(5)(B) of the Bankruptcy Code.

15           It is a cardinal principle of statutory construction that the interpretation of a statute must

16   always begin with, and should most often end with, its text.  *See, e.g.*, *United States v. Ron Pair*

17   *Enters., Inc.*, 489 U.S. 235, 241 (1989) (noting that where a "statute's language is plain 'the sole

18   function of the courts is to enforce it according to its terms.'") (quoting *Caminetti v. United States*,

19   242 U.S. 470, 485 (1917)).  In pertinent part, the Bankruptcy Code provides that an entity may be a

20   debtor under chapter 9 if the debtor, has among other things, "**negotiated in good faith with**

21   **creditors** and has failed to obtain the agreement of creditors holding at least a majority in amount of

22   the claims of each class **that such entity intends to impair under a plan** in a case under such

23   chapter[.]"  11 U.S.C. § 109(c)(5)(B) (emphasis added).  The emphasized language demonstrates that

24   a debtor need only negotiate with those creditors it intends to impair under a plan.  Prior to entering

25   into the AB 506 negotiations, the City made the business decision to retain its relationship with

26   CalPERS.  Once that decision was made, the City was under no obligation under section

27   109(c)(5)(B)'s plain language to modify, impair, or even inquire about impairing, its ongoing

28

                                                     26

1  statutory obligations to CalPERS. The Capital Markets Creditors' reading of the statute is

2  nonsensical because it would require a financially distressed municipality to expend its scarce

3  resources negotiating an impairment of an obligation it wished to assume and could not readily

4  through negotiation. If Congress had intended that a debtor be required to seek concessions from

5  parties to executory relationships, it would have written such requirement into the Bankruptcy Code.

6  Instead, sections 109(c)(5)(A) & (B) refer only to a majority of the class of creditors which the debtor

7  seeks to impair. The plain terms of section 109(c)(5)(B) must govern the determination of the City's

8  good faith on this basis.

9      The Capital Markets Creditors' interpretation of section 109(c)(5)(B) is inconsistent with the

10  Ninth Circuit BAP's decision in *In re City of Vallejo*, 408 B.R. 280 (9th Cir. BAP 2009) ("*Vallejo*").

11  In *Vallejo*, the court considered whether under section 109(c)(5)(B), a municipality's good faith

12  negotiations with creditors must concern the possible terms of a plan of adjustment. In interpreting

13  that section, the court stated that the phrase "negotiated in good faith with creditors" must be given

14  meaning consistent with the remaining language in the statute. *Vallejo*, 408 B.R. at 296 (citing

15  *Marek v. Chesny*, 473 U.S. 1, 16 n.5 (1985) (Brennan, J., dissenting). The BAP, in concluding that

16  the negotiations must revolve "around a proposed plan, at least in concept," stated the following:

17        The statute references adverse treatment ("impairment") to the interests of numerically
      important creditors ("majority … of each class") and specifically calls out creditors

18        holding at least a majority in the amount of claims of each class that a petitioner
      intends to impair under a plan. . . . **In the end, the negotiations referred to in the**

19        **statute cannot be separated from its context, which clearly and unambiguously**
      **refers to the treatment of impaired creditors under a plan**. The significance the

20        Code places on the lack of agreement with creditors identified by § 109(c)(5)(B)
      bolsters our interpretation that the negotiations must cover their treatment under a

21        plan. **The creditors identified by § 109(c)(5)(B) are those necessary to confirm a**
      **consensual plan of adjustment**.

22
*Vallejo*, 408 B.R. at 296-97 (emphasis added). Because the City made a business decision to assume

23  its relationship with CalPERS in its "Ask," the CalPERS' relationship would not be classified or

24  impaired under a plan. Accordingly, the City was not required to negotiate with CalPERS to become

25  eligible for chapter 9 relief. The statute, as the BAP stated, "clearly and unambiguously refers to the

26  treatment of impaired creditors under a plan." *Id.* It does not, as the Capital Markets Creditors would

27  suggest, refer to all creditors. *See In re Pleasant View Utility Dist.*, 24 B.R. 632, 639 (Bankr. M.D.

28

Tenn. 1982) (concluding that section 109(c)(5)(B) was met where evidence demonstrated that debtor unsuccessfully negotiated in good faith with creditors who held more than 50% of the outstanding bonds of the District). Because the City negotiated in good faith with the creditors holding at least a majority in amount of the claims of each class that the City intended to impair under its plan, the City is eligible for relief under the plain terms of section 109(c)(5)(B) and *Vallejo*. Any arguments to the contrary must be rejected.

National argues at length in its initial objection to the City's eligibility that the City did not meet the requirements of section 109(c)(5)(B) "because the City did not present a feasible plan that is in the best interest of creditors in the AB 506 process negotiations." National Objection [Dkt. No. 477] ¶ 54. Nothing in the plain language of section 109(c)(5)(B) requires the City to establish that it negotiated the terms of a plan that is feasible and in the best interests of creditors. These are requirements for a court's confirmation of a plan of adjustment. *See* 11 U.S.C. § 943(b)(7) ("The court shall confirm the plan if— . . . (7) the plan is in the best interests of creditors and is feasible."). The Capital Markets Creditors put the cart before the horse by prematurely objecting to the confirmation of a plan of adjustment based upon the City's "Ask." This is improper. All that is required of the City to gain entry into the gates of chapter 9 is that it negotiated with the creditors it intends to impair under a "proposed plan, at least in concept." *Vallejo*, 408 B.R. at 297 (also stating that "a complete plan is not required," but rather "some outline or term sheet of a plan . . . is necessary"). Even the court in *In re Sullivan County Regional Refuse Disposal District* ("*Sullivan County*"), a case upon which both National and Assured place great reliance, stated that no "formal plan" is required, but rather that a comprehensive workout plan is necessary to "avoid a too early and rapid resort to the bankruptcy courts by municipalities." 165 B.R. 60, 78 (Bankr. D. N.H. 1994). Nor does *In re Cottonwood Water & Sanitation District*, also cited by National, require the City to establish that it presented and negotiated a formal plan that meets the requirements of section 943 to creditors in negotiations prior to filing for bankruptcy. 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (stating that the debtor "must be prepared to show that it engaged in good faith negotiations with its creditors concerning the **possible terms of a plan** to be effected pursuant to section 941") (emphasis added). Thus, neither the Bankruptcy Code, nor the decisional authority cited by the Capital Markets

28

1    Creditors, require the City to establish that the plan that formed the basis of the City's negotiations

2    meet the confirmation requirements of section 943.  If that were the case, than the separate

3    requirements of eligibility and plan confirmation would be merged at the beginning of the case.  That

4    is not how Congress wrote the Bankruptcy Code nor can it be what Congress intended.

5    Lastly, the Capital Markets Creditors' interpretation of section 109(c)(5)(B) makes little sense

6    when one considers that a reduction of pension benefits administered by CalPERS for current and

7    former employees of the City would be impermissible under State law.  *See, e.g.*, Cal. Gov. Code

8    § 20474 ("Any election made by amendment to the contract shall be irrevocable until the contract is

9    terminated.  However, benefits provided by the amendment may be increased or improved from time

10   to time by further amendment to the contract.").  It cannot be the case that the City is required to

11   negotiate with creditors it does not intend to impair and for which negotiations would be futile

12   because restructuring would be in violation of State law.  Thus, the Capital Markets approach to good

13   faith must be rejected.

                2.    *The Cases Relied Upon by the Capital Markets Creditors are Easily*
14                    *Distinguished.*

15   The Capital Markets Creditors primarily argue, based on *Sullivan County* and *In re Ellicott*

16   *School Building Authority*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992) ("*Ellicott*"), that the City did

17   not negotiate in good faith because it "refus[ed] to negotiate an impairment to its single largest

18   liability."  National Supplemental Objection [Dkt. No. 635] ¶ 12.  First, as explained, even if

19   CalPERS were the City's largest creditor (which it is not) the Bankruptcy Code does not impose a

20   requirement upon the City to negotiate with CalPERS prepetition given that the City does not seek to

21   terminate its relationship with CalPERS under the terms of its "Ask."  In addition, the cases relied

22   upon by the Capital Markets Creditors are distinguishable from this case and neither creates the

23   bright line rule that the Capital Markets Creditors advance.

24   In *Ellicott*, the court concluded that the debtor school authority did not meet the requirements

25   of 11 U.S.C. § 109(c)(5)(B) where it merely held three public meetings at which it "explained" its

26   proposed plan of adjustment but were advised that the "economic provisions" of the proposed plan

27   were not negotiable.  *Ellicott*, 150 B.R. at 266.  Stockton's negotiations were vastly more involved

28

than those which took place in *Ellicott*. Stockton's negotiations took place pursuant to AB 506 over the course of 90 days during which the City held numerous meetings with its creditors facilitated by a distinguished mediator, presented financial and other information, and provided its 790-page "Ask" to all interested parties. City of Stockton's Memorandum in Support of Eligibility [Dkt. No. 19] at 18-19. The fact that the City proposed, based on a business decision, to maintain its relationship with CalPERS does not negate the fact that it negotiated in good faith with those parties it may ultimately seek to impair in a plan of adjustment. In *Ellicott,* the entirety of the Authority's proposed plan was not open to discussion. Here, the City willingly negotiated with a majority of the impaired creditors of each class regarding the terms of the "Ask." Such was not the case in *Ellicott*.

Likewise, *Sullivan County* is also distinguishable from this case. In *Sullivan County*, the court ruled that the debtors failed to negotiate in good faith with regard to a plan where "at no time prior to the Chapter 9 filing did the [debtors] set out . . . a comprehensive workout plan dealing with all of their liabilities and all of their assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code." 165 B.R. at 78. The court also reasoned that a party cannot negotiate in good faith where it ignores the contractual rights of the other party and "refuses to acknowledge or throw into the negotiating equations a large and significant asset that it holds." *Id*. Here, the City provided a 790 page "Ask," which will form the basis for its plan of adjustment, to all parties in interest during the AB 506 process. Furthermore, the City did not ignore a large asset of the estate, because CalPERS is not an "asset" of the City in the sense that the ability to raise revenue through assessments was a significant asset in *Sullivan County*. *Id.* ("In the present case, the most significant asset held by the Districts was the power to assess the member municipalities for the unpaid service fees and thus in effect access the borrowing or taxing powers of those municipalities to meet the debtor's obligations."). Indeed, National acknowledges this. *See* National Objection [Dkt. No. 477] at 12 ("Similar to the debtor leaving out a major asset in the negotiations in *Sullivan County*, the City intentionally left out its single largest unsecured liability during the AB 506 process—its CalPERS liability.").

Thus, the Capital Markets Creditors' reliance on *Sullivan County* completely ignores the context of that case. When one considers the context of Stockton's prepetition negotiations, the

30

misplacement of the Capital Markets Creditors' reliance on *Sullivan County* becomes apparent. It makes little sense for the Capital Markets Creditors to suggest that the City's sound business decision to maintain its relationship with CalPERS in order to preserve benefits for the employees of City is somehow equivalent to the City ignoring a large and significant asset in its pre-bankruptcy negotiations with creditors regarding its intended plan. This is especially apparent given the City's inability to unilaterally reduce its current and former employees' benefits because to do so would violate State law. Placed in its proper context, *Sullivan County*, and the bright line rule the Capital Markets Creditors try to extract from it, has no application to the facts of this case.

Finally, the Capital Markets Creditors and their experts make much of the fact that Stockton did not apply for a hardship extension until December 2012 and suggest that this somehow evinces a lack of good faith. Underlying this entire argument appears to be the assumption that such requests are granted by CalPERS as a matter of course. As the City's case demonstrates, this is not so. Given CalPERS' fiduciary obligations to the system as a whole, each hardship request must be reviewed on an individual basis. Thus, the Capital Markets Creditors reliance on the timing of Stockton's request as being an indicia of bad faith is specious because they can point to no facts that would establish that the City would have qualified for the hardship extension prior to its filing for chapter 9 protection.

> 3. *The Capital Markets Creditors' Argument Rests on a Faulty Premise and is Merely a Test-Run for Their Opposition to the City's Eventual Plan of Adjustment.*

The Capital Markets Creditors argue that the Court should ignore the sound business decision of the City not to seek further concessions affecting City employees. They state that CalPERS is the "single largest liability" and construe the "Ask" as a take-it-or-leave it proposal. The Capital Markets Creditors' assertion is based on the incorrect assumption that the "Unfunded Accrued Liability" that CalPERS reflects in its Annual Valuation Reports is a current obligation of the City representing a prepetition unsecured claim. The City may have had the same misperception at the time it filed its bankruptcy petition. In its "List of Creditors Holding 20 Largest Unsecured Claims," [Dkt. No. 4], Stockton listed CalPERS as its largest unsecured creditor and claims that it owes CalPERS $147.5 million. This is incorrect. This amount, and the amounts cited by the Capital Markets Creditors, are based on a fundamental misunderstanding of how the CalPERS systems works and what the term

31

1   "Unfunded Accrued Liability" means.  In fact, even though the Capital Markets Creditors have

2   already deposed CalPERS' Deputy Chief Actuary, and are therefore aware of the fact that this

3   number does not represent what Stockton actually owed CalPERS as of the date of the City's filing,

4   they repeatedly cite this figure (or more recent figures) as the cornerstone of their "lack of good faith"

5   argument.  As explained above, as of the date of its filing Stockton did not owe, nor did it have an

6   obligation to pay, CalPERS $147.5 million.  Rather, according to the most recent Annual Valuation

7   Reports, the City must pay CalPERS approximately $29.5 million during the 2012-13 fiscal year in

8   order to remain current on its payments to CalPERS.  *See* Exhibits 422 at 5 & 423 at 5 ("Total

9   Employer Contribution" line item).  The City has a continuing obligation to comply with State law

10  with respect to its participation in CalPERS to include funding its ongoing payment obligations.

11  Should the City fail to fulfill its payment obligations to CalPERS during the course of the chapter 9

12  case, CalPERS would hold an administrative claim for any unpaid obligations and other statutorily

13  required amounts to be paid under the PERL, which claim would have to be paid in full in order for a

14  plan to go effective.  11 U.S.C. § 943(b)(5).

15        Once the faulty premise regarding the nature of CalPERS' relationship with the City is

16  clarified, the true purpose of the Capital Markets Creditors' arguments on bad faith is obvious.  The

17  Capital Markets Creditors are using this costly and protracted eligibility litigation to (1) extract

18  financial pain from the City in order to force the City to reconsider its decision to remain in the

19  CalPERS system; and (2) to preview arguments that they intend to make when the City proposes its

20  plan of adjustment.  For example, the concept of "unfair discrimination" or variants on the same

21  theme, permeate the arguments made by both National and Assured.  *See, e.g.*, National

22  Supplemental Objection [Dkt. No. 635] ¶ 2 (claiming "disproportionate burden of impairment"), ¶ 4

23  ("the City entered bankruptcy intending to spread losses disproportionately among a subset of

24  creditors"), ¶ 9 ("City's unstinting efforts to shelter CalPERS as the expense of its bondholders");

25  ¶ 12 ("If the City has its way, the remaining creditors will be forced to fight over a radically reduced

26  pool[.]") &  ¶ 38 ("[T]he City never intended, and still does not intend, to seek to impair its largest

27

28

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                    2012-32118

unsecured creditor, CalPERS.");[17] *see also* Assured Supplemental Objection [Dkt. No. 638] at 3 (claiming lack of negotiations with CalPERS "target[s]" the Capital Markets Creditors). Indeed, the disingenuous nature of the Capital Markets Creditors objections and their strident requests for dismissal is on full display when one considers the statements made by counsel at the Court's recent hearing on the Rule 9019 Motion. For example, Franklin's counsel noted that dismissing the City's chapter 9 petition "is in no one's interest. Everyone gets hurt then. The City gets hurt. Creditors get hurt. That's in no one's interest." *See* Lubic Decl., Exhibit 1 at 75 (9019 Hearing) Likewise, National's counsel proclaimed "Lord help us" if the case was dismissed and had to be re-filed. *Id.* at 89. These statements by counsel, in open court, demonstrate the real motives behind the Capital Markets Creditors in opposing the City's eligibility.

> ### 4. The City Meets the "Good Faith" Requirement of Section 921(c).

The Capital Markets Creditors complain that because the City intends to impair their claims under their "Ask"—stating that this is the sole purpose of the filing—that the City filed its petition in "bad faith." The City's filing of the petition was not an abuse of the bankruptcy process and the fact that the Capital Markets Creditors claims may be impaired, while the City assumes its executory relationship with CalPERS, does not compel a conclusion that the petition was filed in bad faith.

Although the term "good faith" is not defined in the Bankruptcy Code, the requirement provides "a useful means for the Court to preserve the protection of the Code for those for which it was actually intended." *Sullivan County*, 165 B.R. at 80 (citations omitted). In ascertaining the meaning of this phrase, the court in *Sullivan County* exhaustively reviewed case law under previous

---

[17] In addition, National spends a significant portion of its brief addressing extraneous matters. To wit: That the City cannot claim that negotiations with CalPERS were "impracticable," within the meaning of section 109(c)(5)(C) because CalPERS can be impaired under chapter 9 without violating section 903 or the Tenth Amendment to the United States Constitution. National Supplemental Objection [Dkt. 635] at 16-19. This Court should not prematurely address arguments about whether Stockton's obligations to CalPERS can, consistent with section 903 or the Tenth Amendment, be impaired in this chapter 9 case. In support of eligibility, Stockton has not argued that negotiations with CalPERS were "impracticable" because its obligations to CalPERS cannot be impaired in bankruptcy. If these issues are presented in connection with the proposal of the City's plan of adjustment, the Court can address them at that time.

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                                    2012-32118

1  versions of the Bankruptcy Act to determine what constitutes "good faith."  *Id,.* at 80-82.  In sum, the

2  court summarized the requirement as follows:

> In the Chapter 11 context, 'good faith' has been described as a requirement which
> prevents abuse of the bankruptcy process by debtors whose overriding motive is
> to delay creditors without benefitting them in any way or to achieve reprehensible
> purposes.  Determining whether a petition has been filed in good faith requires an
> evaluation of a debtor's financial condition, motives, and the local financial
> realities.  These comments would appear to be equally applicable, at least in part,
> to a Chapter 9 petition.

7  *Id,.* at 82. (quotations and citations omitted).  Thus, under *Sullivan County*, a case upon which the

8  Capital Markets Creditors heavily rely, the City can only be found to have filed its petition in bad

9  faith (*i.e.*, not in good faith) if this Court concludes that the City's "overriding motive is to delay

10  creditors" or that it seeks "to achieve reprehensible purposes."  Nothing in the Capital Markets

11  Creditors arguments support such findings.  The City has not filed its petition to harass or delay

12  creditors, nor has it done so for reprehensible purposes.  Instead, the City, after exhausting all other

13  options, including the imposition of serious cost-cutting measures, formulated a detailed "Ask" and

14  only after its 90-day negotiation efforts failed did it file its petition.  The City's prepetition conduct

15  demonstrates exactly what a financially distressed municipality should do before it makes the

16  decision to file for protection under chapter 9.  The City's actions are in no way an abuse of the

17  bankruptcy process; instead, the City's actions are consistent with the very purpose of the Bankruptcy

18  Code.  *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 81 (Bankr. D. Colo. 1990)

19  (concluding that the district's chapter 9 petition was filed in good faith where the debtor was

20  financially distressed, lacked funds to make its next scheduled payment to bondholders, and had been

21  attempting for some time to achieve a restructuring of its debt and filed its petition to do so).

22  The Capital Markets Creditors' argument that the City filed its petition in bad faith under

23  section 921(c) because it failed to negotiate for an impairment of CalPERS is no more meritorious

24  than their arguments that the City failed to negotiate in good faith under section 109(c)(5)(B).  Unlike

25  the debtor in *Sullivan County*, the City's decision to file its bankruptcy petition took place after the

26  City underwent significant efforts to avoid bankruptcy and was "the end result of considered debate,

27  weighing the benefits and consequences of the petition."  165 B.R. at 82.  The City's Memorandum

28  in Support of Eligibility extensively catalogs all of the efforts the City undertook in an effort to

1    reduce costs and expenses in the hopes of avoiding having to file a chapter 9 petition.  *See generally*

2    City of Stockton's Memorandum in Support of Eligibility [Dkt. No. 19] at 3-17.

3              Despite these efforts, Assured boldly asserts that "the City's entire purpose in filing this case

4    has been to force Assured and the other Capital Markets Creditors to pay for otherwise-unfunded

5    benefits to labor-including CalPERS' ever-increasing pension benefits costs."  Assured Supplemental

6    Objection [Dkt. No. 638] at 34.  National is no less timid, stating that "[a]ll of this is evidence of the

7    City's primary goal in its bankruptcy filing, which is to maintain the bloated CalPERS pensions doled

8    out to City employees (including members of the SDT) in richer times and have its remaining

9    creditors, including National, foot the bill."  National Supplemental Objection [Dkt. No. 635] at 15.

10   These claims ignore reality because they turn a blind eye to all of the things the City did to cut wages

11   and benefits prior to filing for chapter 9 protection and instead focus their sites solely on the City's

12   business decision to remain within the CalPERS system.  Moreover, they also ignore the fact that the

13   City's first order of business on entering into chapter 9 was to unilaterally cut its retirees' health

14   benefits and that the City has negotiated for other significant compensation concessions from labor

15   before and after the filing of the case.  That the City chose to maintain its relationship with CalPERS

16   under its "Ask" is not evidence that the City filed its petition in bad faith—especially in light of the

17   significant reductions to employee compensation and benefits that have been made to date and which

18   are proposed under the "Ask," and given that a reduction of pension benefits administered by

19   CalPERS for current and former employees of the City would violate State law. *See, e.g.*, *In re*

20   *Chilhowee R-IV School Dist.*, 145 B.R. 981, 983 (W.D. Mo. 1992) (overruling objections to debtor's

21   chapter 9 petition and stating "to say that [the school board] had to institute the highest possible levy

22   (requiring state approval) before taking any other action or be guilty of bad faith filing, is

23   unrealistic."); *see also In re McCurtain Mun. Auth.*, 2007 WL 4287604, *6 (Bankr. E.D. Okla. 2007)

24   (failure to generate revenues by assessing citizens does not necessarily indicate bad faith where water

25   and sewer rates in the city were higher than surrounding areas and where unlikely that sufficient

26   funds could be generated by assessment or imposition of higher rates).

27             The City's decision to file was the result of the serious financial realities faced by the City and

28   was made only after the City undertook serious measures over the course of the last three years with

the purpose of avoiding having to file for protection under chapter 9. To suggest that the City's "entire purpose" or "primary goal" of filing for chapter 9 protection was to require the Capital Markets Creditors' to "foot the bill" for the benefits CalPERS' provides is completely divorced from reality. For these reasons, dismissal of the case is not warranted under section 921(c).

**B.    There is Nothing Unfair About Stockton Exercising Its Business Judgment and Retaining Its Relationship With CalPERS.**

A consistent theme throughout the Capital Markets Creditors' objections is that the City's business decision to maintain its relationship with CalPERS is somehow unfair. While this argument has nothing to do with whether the City is eligible for protection under chapter 9, put simply, there is nothing unfair about the City's desire to retain its relationship with CalPERS.

First, two of the most vocal Capital Markets Creditors—Assured and National—assumed the risk of their financial responsibilities by choosing to insure the bonds at issue in this case. Presumably both Assured and National performed appropriate due diligence prior to insuring the bonds, including diligence regarding the City's pension obligations and relationship with CalPERS. Presumably both were paid significant premiums for their assumption of those risks. Indeed, the entire purpose of both Assured's and National's business relationship with Stockton was to insure Stockton's bonds in the event of non-payment. Now that Assured and National are being asked to honor their commitments, they seek to impose additional financial burdens on Stockton's employees' through a reduction of past and present pension benefits—benefits that those individuals earned and earn by showing up to work each day. If anything is unfair, it is Assured's and National's attempt to shift to Stockton's employees and retirees the risks that these insurers were paid to assume.

Second, despite the Capital Markets Creditors' rhetoric to the contrary, CalPERS stands on much different footing than the Capital Markets Creditors. Unlike the Capital Markets Creditors, CalPERS is not a purveyor of exotic financial instruments and insurance for profit. In fact, CalPERS sells nothing and makes no profit from the contributions it receives from its members and their employers. Any gains CalPERS realizes in the market go to pay benefits to individuals who have worked (some for a lifetime) to earn those benefits. CalPERS is a not-for-profit entity. The Capital Markets Creditors business purpose is to profit for their shareholders and investors through the

1    acceptance of financial risk.  The Capital Markets Creditors' claim that the entire purpose of

2    Stockton's bankruptcy filing was to force the bondholders and those insuring those bonds to pay for

3    Stockton's unfunded pension benefits is simple hyperbole.  Put simply, Stockton has already slashed

4    and cut its current and former employees' salaries and it is not unfair for the City to continue to

5    administer its public employee benefits through CalPERS.

6                                    **IV. <u>CONCLUSION</u>**

7            For the reasons stated above, and those provided by the City, CalPERS respectfully requests

8    that this Court (1) overrule the objections of the Capital Markets Creditors; (2) determine that the

9    City of Stockton is eligible for protection under the chapter 9; and (3) enter an order of relief.

10

11                                            Respectfully submitted,

12                                            Michael J. Gearin
                                             Michael B. Lubic
13                                           Michael K. Ryan
                                             Brett D. Bissett
14                                           K&L GATES LLP

15

16   Dated:  February 15, 2013          By:   */s/  Michael B. Lubic*
                                             Michael B. Lubic
17
                                             Attorneys for California Public Employees'
18                                           Retirement System

     K:\2037631\00191\20919_MR\20919P22DM
19

20

21

22

23

24

25

26

27

28

CALPERS' BRIEF IN SUPPORT OF STOCKTON'S PETITION                    2012-32118