**121**

1  MARC A. LEVINSON (STATE BAR NO. 57613)
   malevinson@orrick.com
2  NORMAN C. HILE (STATE BAR NO. 57299)
   nhile@orrick.com
3  JOHN W. KILLEEN (STATE BAR NO. 258395)
   jkilleen@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
5  Sacramento, California  95814-4497
   Telephone:    (916) 447-9200
6  Facsimile:     (916) 329-4900

7  Attorneys for Debtor
   City of Stockton
8

9              UNITED STATES BANKRUPTCY COURT

10             EASTERN DISTRICT OF CALIFORNIA

11                 SACRAMENTO DIVISION

12

13  In re:                          Case No.   2012-32118

14  CITY OF STOCKTON, CALIFORNIA,   D.C. No. OHS-1

15          Debtor.                 Chapter 9

16                                  **DECLARATION OF VANESSA**
                                    **BURKE IN SUPPORT OF CITY OF**
17                                  **STOCKTON'S REPLY TO**
                                    **OBJECTIONS TO ITS STATEMENT**
18                                  **OF QUALIFICATIONS UNDER**
                                    **SECTION 109(C) OF THE UNITED**
19                                  **STATES BANKRUPTCY CODE**

20                                  Date:      February 26, 2013
                                    Time:      1:30 p.m.
21                                  Dept:      C
                                    Judge:     Hon. Christopher M. Klein
22

23

24

25

26

27

28

I, Vanessa Burke, hereby declare:

1.      I am the Chief Financial Officer, Treasurer, and Director of the Administrative Services Department (the "Department") for the City of Stockton, California ("the City" or "Stockton").  I make this declaration in support of the City's Reply to Objections to Statement of Qualifications Under Section 109(c).  On July 3, 2012, I submitted a declaration in support of the Statement of Qualifications the City filed on June 29, 2012 (the "July Declaration" or "July Decl.").  At that time, I was the Assistant Director of Administrative Services for the City.  Subsequently, the City hired me as the Director of Administrative Services, Treasurer, and Chief Financial Officer.  In this role, my responsibilities include, among other things, management of the City's finance, budget, revenue, treasury, and information technology functions.

2.      I have reviewed the declaration and reports of Nancy Zielke and Robert Bobb, filed on December 14, 2012.  While Ms. Zielke and Mr. Bobb have significant experience in municipal finance, neither is a Certified Public Accountant ("CPA"); nor does either appear to have any accounting experience, in either the private or public sector.  By contrast, I have been a CPA for over 18 years, with extensive experience and expertise in the audits of governmental agencies at both the state and local level.  In addition to being a member of the Government Finance Officers Association (of which Ms. Zielke was once the president), I am a member of the California Society of Certified Public Accountants ("CalCPA"), the largest state-level association of CPAs in the country, and the American Institute of Certified Public Accountants ("AICPA").  I serve as a member of the CalCPA Governmental Accounting and Auditing Committee, whose aim is to improve the quality of financial reporting by governmental entities by providing guidance in the area of governmental accounting and auditing in the State of California.  I also have taught courses regarding various accounting topics at the CalCPA annual government conference and serve on the planning committee for the annual conference.

### *Cash Solvency*

3.      As described in the July Declaration, the City projected that on June 30, 2012, it had ended the 2011-12 fiscal year with a General Fund pooled cash balance of approximately $1.3 million.  *See* July Decl., ¶ 8.  The City now has closed June 2012 of its fiscal year and is

1    making final adjustments to ready its books for audit.  The final adjustments will not have a

2    material impact on the ending General Fund cash balances, as cash has been reconciled through

3    the end of the year and cash activity has been recorded.  Attached hereto as Exhibit A is a true

4    and correct copy of the June 30, 2012 cash balances in each of the City's unrestricted and

5    restricted funds.  As seen in Exhibit A, the City ended the 2011-12 fiscal year with an actual

6    General Fund pooled cash balance of approximately $1.55 million[1], $250,000 higher than

7    projected.  The City also ended the 2011-12 fiscal year with a balance of approximately $266,700

8    in its Pooled Investments Fund, which is the difference between the undistributed investments

9    earnings of the pool at June 30, 2012, net of cash earned but not yet received (i.e. accrued

10   interest).  Of this $266,700, less than approximately $10,000 was distributable to the General

11   Fund alone, and could be included in General Fund unrestricted cash.

12        4.     Based on the City's initial projection of a $1.3 million General Fund cash balance

13   at June 30, 2012, I stated in the July Declaration that "with no reserves or additional anticipated

14   revenue in the short term, though, this unrestricted General Fund cash balance is projected to be

15   entirely depleted within the first few days of the next fiscal year."  Specifically, the City faced

16   two immediate obligations: a $1.1 million Jarvis settlement payment due July 1, 2012, which

17   would have drawn down available cash to approximately $430,000, and the next General Fund

18   payroll payment of approximately $4.4 million due July 20, 2012.  Even with an unrestricted

19   General Fund cash balance that was $1.55 million, the City would not have received General

20   Fund Revenues by July 20, 2012 sufficient to cover its first payroll payment of the 2012-13 fiscal

21   year.  Nor would it have had sufficient funds in *any* month in fiscal year 2012-13 to permit it to

22   pay the General Fund obligations that it would have incurred outside of chapter 9.  *See* July Decl.,

23   ¶ 11 & Ex. C.

24        5.     In response to the cash flow projection attached as Exhibit C to the July

25   Declaration, Ms. Zielke raises several criticisms on page 21 of her report.  None of these

26   criticisms, in my opinion, validly refute the projection's underlying analysis or conclusion, which

---

27   [1] As explained in the Declaration of Laurie Montes, that the City was in a positive cash position at all was due only to
28   the actions taken by the City Council on February 28, 2012, which actions included defaulting on certain debt
payments in March 2012 and delaying disbursement of leave payments.

DECLARATION OF VANESSA BURKE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

1  is that, without the protections of chapter 9, the City would not have been unable to meet its

2  obligations as they became due in fiscal year 2012-13.

3        6.     Ms. Zielke's first criticism is that "expenditures for salaries will vary according to

4  timing of hires and the separation of employees."  This is true, but does not detract from the

5  validity of the allocation method used in the projection.  A *projection* cannot precisely account

6  for the "timing of hires" or the "separation of employees," and the corresponding variances in

7  expenditures, that would occur in fiscal year 2012-13.  To state the obvious, the events have not

8  happened yet, and rather than try to divine the small ups and downs of payroll from month to

9  month, the cash flow projection charted a middle ground by assuming constant payroll each

10  month.

11        7.     To significantly invalidate the method used, changes in hiring or separations

12  would have to be wholesale, such as substantial workforce reductions, hiring freezes, or other

13  major workforce or pay changes.  The City's highest payroll month since July 1, 2012 through the

14  date of this declaration has varied by no greater than $350,000 or 4% when compared to the

15  average payroll for the same period, and the variance has averaged less than 1.0% for that same

16  period.  The variance could be due to seasonality, such as construction periods, fire season, and

17  other variables in any single period.  But, with a variance that small, it is not a valid reason to

18  reject the projections on a straight line basis absent any other more precise method.

19        8.     Similarly, Ms. Zielke's statement that "the cash flow projections did not assume

20  the hire of vacant positions" is incorrect because the cash flow projection was based on gross

21  personnel costs for all authorized positions and included a 0.8% budgeted vacancy savings.  The

22  cash flow projection thus assumed all vacancies in excess of that small amount would be filled

23  evenly throughout the fiscal year.

24        9.     Ms. Zielke's second criticism is that "cyclical revenues, such as hotel/motel tax . . .

25  are also flat lined."  This is simply not true.  In footnote N to Exhibit C, the City explained that

26  "Hotel/Motel tax is received quarterly with the majority of receipts being received in the first

27  month of the quarter and trailing off to the 3rd month of the quarter.  Forecast is based on the

28  estimated collections based on average of prior two years collections and generally follows an

DECLARATION OF VANESSA BURKE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

1    approximate pattern of receipt by quarter." The projection allocated these tax receipts

2    accordingly, with a high month of $325,980 and a low month of $9,054.

3         10.    Finally, Ms. Zielke criticizes the City for not accounting for adjustments that had

4    not yet occurred when I was preparing the cash flow projection in June 2012, at the end of the

5    2011-12 fiscal year. This appears to miss the entire point of the projection, which was to

6    ascertain whether the City, looking prospectively, had enough cash to survive the first few

7    months of the fiscal year. To take just one example, there could be "no factor in the model" to

8    account for better-than-expected sales tax revenues that were accrued in fiscal year 2011-12 but

9    which the City did not receive until late September 2012, *see infra* Paragraph 15, because the City

10   did not learn of their existence until several months after it had filed the projection. In addition,

11   all accounting adjustments related to prior years, as previously disclosed in the staff report

12   presented to the City Council on February 28, 2012, had been accounted for, and the unrestricted

13   cash balance published in the audited CAFR for the general fund remained unchanged. None of

14   the audit adjustments posted changed the beginning unrestricted cash balance, which was the

15   focus of the cash flow projection.

16        *The Positive Fiscal Year 2011-12 Fund Balance Was Not Pooled Cash Available For Use On*

17                                   *July 1, 2012*

18        11.    In the July Declaration and in the concurrently filed declaration of Laurie Montes,

19   the City described how on February 28, 2012, in order to preserve operating liquidity, the City

20   Council authorized staff not to pay some of the City's legal obligations, including bond payments

21   and separation payments to retiring City employees. Following the February 28, 2012, actions,

22   staff projected that the City would end the fiscal year with an available unrestricted fund balance

23   of approximately zero dollars.

24        12.    As Ms. Zielke notes in her report, on December 11, 2012, I presented the fiscal

25   year 2011-12 unaudited General Fund year-end results to the City Council. Attached hereto as

26   Exhibit B is a true and correct copy of the December 11 staff report in which I presented these

27   results.

28

DECLARATION OF VANESSA BURKE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

13.    In the December 11 report, I reported that the City ended fiscal year 2011-12 with a positive fund balance of $5.6 million.  This was due in part to slightly higher than adjusted budget revenues ($1.46 million, or 1%, higher than projected) and in part to unanticipated savings in several categories of General Fund expenses ($5.4 million, or 3.2%, lower than expected).  Ms. Zielke suggests several times in her report that this positive fund balance was a "surplus" available to the City as pooled cash on June 30 and which the City could have used for operations as early as July 2012.

14.    This is absolutely not the case.  As explained in the December 11 staff report, "The revised preliminary fund balance of $5.6 million includes transactions through June 30, 2012 and accruals for revenues and expenses incurred prior to the end of the fiscal year but received after June 30, 2012.  Much of the fund balance change is due to uptick in revenue or savings that occurred in the second half of the fiscal year after the close of the fiscal year which were accrued back to 2011-12 due to the modified accrual basis of accounting used in the General Fund."  *See* Ex. B, p. 2.  Simply put, while certain items were accrued in fiscal year 2011-12, new revenues were not realized as net cash until well into the 2012-13 fiscal year, not soon enough to enable the City to pay its bills as they became due.

15.    For example, part of the positive fund balance consisted of revenues that were $1.46 million higher than budgeted.  *See* Ex. B, p. 4.  Sales tax, property tax, and code enforcement revenues constituted the vast majority of this adjustment.  *Id.*  Sales tax came in at $1.1 million more than budgeted, but the City did not know of the higher collections—or receive the additional cash—until September 2012, when sales tax is received for the final quarter of the prior fiscal year.  Conversely, property tax came in at $555,000 less than budgeted, which the City did not know until it received its final check from San Joaquin County on July 31 (well before it received the good news about sales tax).  And the positive results in code enforcement revenues were a result of additional positions filled, which generated more revenue at the end of the prior fiscal year.  Code enforcement has historically experienced extreme fluctuations in revenue; therefore, it was appropriately conservative not to increase this estimate based on newly hired staff and a ramping up of enforcement efforts until the results were realized.

- 6 -

16.     The expenditures component of the positive fund balance was the result of variances from budgeted expenditures and therefore did not create additional cash flow to the City.  Because the City's unanticipated expense savings were never realized as cash, they would not have altered the cash solvency analysis (as seen in the only $250,000 difference between projected and actual June 30 General Fund cash balances).  An analogy is not writing a check that you originally thought you might need.  You do not spend what you thought you would have to spend, but your cash position stays the same; it does not go *up*.

*2010-11 Comprehensive Annual Financial Report*

17.     Also on December 11, 2012, staff presented to the City Council the City's 2010-11 Comprehensive Annual Financial Report ("CAFR").  Attached hereto as Exhibit C is a true and correct copy of the December 11 report under which staff submitted the CAFR, along with true and correct copies of excerpts from the CAFR.

18.     While Ms. Zielke highlights the "nearly forty (40) material weaknesses and significant deficiencies" language found in the CAFR, her characterization of the auditors' findings and understanding of its impact on the financial statements is incomplete and therefore inaccurate.  Most critically, Ms. Zielke fails to explain (or perhaps understand) the distinction between the integrity of the actual financial data as reported in the CAFR and the City's systems of internal controls underlying the data, as discussed not in the CAFR but in the auditors' "Memorandum on Internal Controls and Required Communications."

19.     The material weaknesses and significant deficiencies with regard to the *controls* had already been identified and made public under the direction of City Manager Robert Deis and my predecessors, Chief Financial Officer Susan Mayer and Interim Chief Financial Officer David Millican.  This information came to light as part of the new management team's commitment to get the City's "fiscal house in order" prior to any audit of the numbers.  The weaknesses in internal controls and the inaccuracies in accounts discovered by the City's staff and confirmed by its auditors led to extensive review and analysis to assure that financial data was accurate and reconciled before the CAFR was released.  This effort caused the delays criticized by Ms. Zielke,

DECLARATION OF VANESSA BURKE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

1    but also provided a strong basis for the auditors' ability to express an unqualified opinion on the

2    report.

3        20.    The result of all this hard work is that while the City is still working on the

4    corrective actions reported on December 11 to shore up and improve its internal financial

5    controls, the *financial numbers themselves* in the 2010-11 CAFR were deemed materially correct.

6    In fact, there were no material audit adjustments to the City's General Fund as a result of the audit

7    process.  The numbers used by the City as it was participating in the AB 506 process and

8    preparing its chapter 9 petition were thus both reliable and accurate.

9        21.    The City's auditors confirmed this by issuing an "unqualified" opinion of the

10    City's 2010-11 financial results: "[T]he basic financial statements referred to above present fairly,

11    in all material respects, the financial position of the governmental activities, the business-type

12    activities, each major fund, and the aggregate remaining fund information of the City as of June

13    30, 2011, and the respective changes in the financial position and cash flows where applicable

14    thereof, listed as part of the basic financial statements for the year then ended, in conformity with

15    accounting principles generally accepted in the United States of America." Ex. C, p. 393.  An

16    unqualified opinion is issued when an independent auditor concludes that financial statements are

17    free from material misstatements.  The City's auditors also did not feel it necessary to "propose

18    any audit adjustments that, in our judgment, could have a significant effect either individually or

19    in the aggregate, on the entity's financial reporting process." Ex C., p. 686.

20        22.    In addition to not having a complete understanding of the difference between

21    financial reporting and the system of internal controls that support financial reporting, Ms. Zielke

22    does not provide any context for the auditors' findings in its Memorandum of Internal Controls.

23    While the auditors list "material weaknesses" and "deficiencies," they also recognize that the

24    City's recent CFOs "identified many issues and errors and began taking appropriate action." Ex.

25    C., p. 652.  Moreover, the auditors identify as the City's "top priority" not the fixing of every

26    financial control, but its "return to financial solvency." Ex. C., p. 650.  My immediate

27    predecessors and I thus have prioritized support for the City's AB 506 process and chapter 9

28    filing, and all in the face of severe resource challenges that would only be exacerbated were the

DECLARATION OF VANESSA BURKE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

City to reduce the budget of the Administrative Services Department by an additional 15%, as suggested in Ms. Zielke's Alternative Model. Unlike Ms. Zielke, the City's independent auditors recognized the City's efforts and the need to increase rather than decrease the City's finance resources: "However, the Finance Department remains under intense strain and pressure to respond to bankruptcy data demands and filings as well as to get the interim periodic financial reporting back on a regular schedule. Additional permanent finance management staff are needed." Ex. C, p. 652.

23.    Finally, Ms. Zielke refers often in her report to a September 2011 memorandum from Susan Mayer to Robert Deis. *See, e.g.*, Zielke Report, p. 24. Attached hereto as Exhibit D is a true and correct copy of the September 2011 memorandum on the Resource Plan for the Administrative Services Department to which Ms. Zielke appears to refer. The City hired me as the Assistant Director of Administrative Services, directly subordinate to Ms. Mayer, a few months after this report identified the department's needs. My responsibilities included working to remedy many of the problems identified by Ms. Mayer in her report. While work remains and despite severe resource shortages and demands from the chapter 9 bankruptcy, the City has already implemented all of the recommendations presented by Ms. Mayer in that report and has made significant progress on many of the other areas in the plan, such as: reconciling and correcting housing loan portfolio balances, utility billing system balances, providing allowances against uncollectible inter-fund loans, establishing a debt and treasury division, restoring and filled the revenue officer position, filling the vacancies in the budget officer and information technology officer positions, and many other needs identified in the Resource Plan.

Executed this 15th day of February 2013, at STOCKTON    , California. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

_____
Vanessa Burke

DECLARATION OF VANESSA BURKE IN SUPPORT OF CITY'S REPLY TO OBJECTIONS TO STATEMENT OF QUALIFICATIONS UNDER SECTION 109(C)

# Exhibit A

Date: 01-23-13

POOLED CASH AND INVESTMENTS SUMMARY BY FUND
at 6/30/2012 as of 01/23/13

| Fund Title | Account Number | Pooled Cash 101's | Investments 107's | Total Pooled Cash & Investments | |
|---|---|---|---|---|---|
| GENERAL FUND | 10-0000-101.00-00 | 1,547,872.55 | 0.00 | 1,547,872.55 | |
| PAYROLL CLEARING FUND | 11-0000-101.00-00 | 4,398,221.45 | 0.00 | 4,398,221.45 | |
| POOLED INVESTMENTS FUND | 098-0000-101.00-00 | (228,977,781.57) | 229,244,456.78 | 266,675.21 | 5 |
| TOTAL GENERAL FUND | | (223,031,687.57) | 229,244,456.78 | 6,212,769.21 | |
| CITY/COUNTY LIBRARY | 41-0000-101.00-00 | 3,722,917.33 | 0.00 | 3,722,917.33 | |
| RECREATION SERVICES | 44-0000-101.00-00 | 303,294.01 | 0.00 | 303,294.01 | |
| RECREATION VENUES OPERATIONS | 86-0000-101.00-00 | 273,817.58 | 0.00 | 273,817.58 | |
| BOAT LAUNCHING FACILITIES | 45-0000-101.00-00 | 313,022.56 | 0.00 | 313,022.56 | |
| TOTAL SPECIAL REVENUE | | 4,613,051.48 | 0.00 | 4,613,051.48 | |
| GF & SPEC REVENUE | | (218,418,636.09) | 229,244,456.78 | 10,825,820.69 | |

Governmental Funds:

Special Revenue Funds

| | | | | | |
|---|---|---|---|---|---|
| SPECIAL PURPOSE GRANTS | 20-0000-101.00-00 | (743,612.17) | 0.00 | (743,612.17) | |
| LOW & MOD INC HOUSING FUND | 21-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| LITIGATED ASSET SEIZURES | 23-0000-101.00-00 | 342,739.52 | 0.00 | 342,739.52 | |
| SUPP LAW ENFORCEMENT SRVS | 24-0000-101.00-00 | 164,758.52 | 0.00 | 164,758.52 | |
| LAW ENF BLK GRNT PRGM (FED) | 25-0000-101.00-00 | (915,445.58) | 0.00 | (915,445.58) | |
| GAS TAX | 30-0000-101.00-00 | 1,470,126.42 | 0.00 | 1,470,126.42 | |
| GAS TAX - TDA NON MOTOR | 34-0000-101.00-00 | 166,121.23 | 0.00 | 166,121.23 | |
| GAS TAX – ISTEA | 38-0000-101.00-00 | (7,631,232.02) | 0.00 | (7,631,232.02) | |
| TRAFFIC CONGESTION RELIEF (STATE) | 39-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| SOLID WASTE & RECYCLING PGM | 47-0000-101.00-00 | 1,887,202.51 | 0.00 | 1,887,202.51 | |
| DEVELOPMENT SERVICES | 48-0000-101.00-00 | 1,654,779.97 | 0.00 | 1,654,779.97 | |
| URBAN DEVELOP ACTION GRANT | 51-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| COMM DEV BLOCK GRANT | 52-0000-101.00-00 | (1,933,033.15) | 0.00 | (1,933,033.15) | |
| CDBG SPECIAL PURPOSE LOANS | 53-0000-101.00-00 | (87,779.85) | 0.00 | (87,779.85) | |
| COMM DEV BLK GRANT LOANS | 54-0000-101.00-00 | 2,089,700.13 | 0.00 | 2,089,700.13 | |
| FACE REHAB LOAN FUND | 56-0000-101.00-00 | (0.20) | 0.00 | (0.20) | |
| EMERGENCY SHELTER GRANT PGM | 57-0000-101.00-00 | (34,241.51) | 0.00 | (34,241.51) | |
| HOME PROGRAM LOAN FUND | 58-0000-101.00-00 | (3,400,425.66) | 0.00 | (3,400,425.66) | |
| HOME PROGRAM | 59-0000-101.00-00 | 4,153,631.73 | 0.00 | 4,153,631.73 | |
| CALHOME REUSE LOAN PROGRAM | 60-0000-101.00-00 | (216,362.47) | 0.00 | (216,362.47) | |
| STATE HOUSING PROGRAM | 61-0000-101.00-00 | 406,584.58 | 0.00 | 406,584.58 | |
| CDBG REVOLVING LOAN FUND | 62-0000-101.00-00 | 938,616.46 | 0.00 | 938,616.46 | |
| NEIGHBORHOOD STABILIZATION PGM | 63-0000-101.00-00 | 1,346,153.29 | 0.00 | 1,346,153.29 | |
| NEIGHBORHOOD STABILIZATION PGM 3 | 64-0000-101.00-00 | (8,762.44) | 0.00 | (8,762.44) | |
| LIGHTING MAINTENANCE | 71-0000-101.00-00 | 163,897.61 | 0.00 | 163,897.61 | |
| ASSESSMENT DIST MAINTENANCE | 72-0000-101.00-00 | 12,441,279.66 | 0.00 | 12,441,279.66 | |
| PARKING & BUS. IMPR. DISTRICTS | 73-0000-101.00-00 | 89,046.25 | 0.00 | 89,046.25 | |
| STREET REPAIRS - MEASURE K | 80-0000-101.00-00 | (387,806.77) | 0.00 | (387,806.77) | |
| DISTRICT SALES TAX – MEASURE W | 81-0000-101.00-00 | (682,204.14) | 0.00 | (682,204.14) | |
| MEASURE K – STREET MAINTENANCE | 82-0000-101.00-00 | 6,115,926.80 | 0.00 | 6,115,926.80 | |
| CITY ADMIN. BLDG-MAIN ST. OPER | 85-0000-101.00-00 | (6,339.01) | 0.00 | (6,339.01) | |
| SUCCESSOR AGENCY LOW & MODERATE | 329-0000-101.00-00 | (1,495.31) | 0.00 | (1,495.31) | 2 |
| Total Special Revenue Funds | | 17,381,824.40 | 0.00 | 17,381,824.40 | |

Debt Service Funds

| | | | | | |
|---|---|---|---|---|---|
| DEBT SERVICE FUND (GENERAL) | 201-0000-101.00-00 | (263,911.02) | | (263,911.02) | |
| REDEVELOPMENT AGENCY DEBT SER | 230-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| SUCCESSOR AGENCY RDA DEBT SER | 231-0000-101.00-00 | 0.00 | 0.00 | 0.00 | 1 |
| Total Debt Service Funds | | (263,911.02) | 0.00 | (263,911.02) | |

Capital Improvement Funds

| | | | | | |
|---|---|---|---|---|---|
| CAPITAL IMPROVEMENTS (GENERAL) | 301-0000-101.00-00 | 1,658,251.05 | 0.00 | 1,658,251.05 | |
| CAPITAL IMPROV.-OTHER SERVICES | 304-0000-101.00-00 | (4,208,743.92) | 0.00 | (4,208,743.92) | |
| ESB / PARKING STRUCTURE & CITY ADMIN BL | 305-0000-101.00-00 | 83,726.20 | 0.00 | 83,726.20 | |

| Fund Title | Account Number | Pooled Cash 101's | Investments 107's | Total Pooled Cash & Investments |
|---|---|---|---|---|
| PUBLIC ART FUND | 306-0000-101.00-00 | 574,314.93 | 0.00 | 574,314.93 |
| CAPITAL PROJECTS-CLEARING FUND | 399-0000-101.00-00 | (3,316,018.18) | 0.00 | (3,316,018.18) |
| Total Capital Improvement Funds | | (5,208,469.92) | 0.00 | (5,208,469.92) |
| **Permanent Funds** | | | | |
| TRICENT ADMIN TRUST (UNEXP) | 609-0000-101.00-00 | 8,370.87 | 0.00 | 8,370.87 |
| HARTMAN & GARRETT (UNEXP) | 610-0000-101.00-00 | 7,468.52 | 0.00 | 7,468.52 |
| COS CHARITABLE IMPROV FNDTN | 611-0000-101.00-00 | 8,797.09 | 81,235.70 | 90,032.79 |
| ARTS ENDOWMENT | 613-0000-101.00-00 | 102,679.86 | 0.00 | 102,679.86 |
| C. K. KOLAK LIBRARY MEM TRUST (RIPON BR) | 614-0000-101.00-00 | 190,030.18 | 0.00 | 190,030.18 |
| BESS LARSON LIBRARY (EXP) | 621-0000-101.00-00 | 1,381.45 | 0.00 | 1,381.45 |
| G. CADY TRUST (EXP) | 622-0000-101.00-00 | 11,155.85 | 0.00 | 11,155.85 |
| E BLUM – GENERAL RECREATION | 623-0000-101.00-00 | 2,025.80 | 0.00 | 2,025.80 |
| E BLUM - PIXIE WOODS (EXP) | 624-0000-101.00-00 | 9,663.34 | 0.00 | 9,663.34 |
| E BLUM - RED FEATHER (EXP) | 625-0000-101.00-00 | 13,291.35 | 0.00 | 13,291.35 |
| ARLO CROSS (EXP) | 626-0000-101.00-00 | 47,434.82 | 9,301.22 | 56,736.04 |
| ANNE WAGNER (EXP) | 627-0000-101.00-00 | 67,786.04 | 0.00 | 67,786.04 |
| KIERSCH MEMORIAL (EXP) | 628-0000-101.00-00 | 4,751.50 | 0.00 | 4,751.50 |
| STOCKTON ARTS COMMISSION | 641-0000-101.00-00 | 29,377.75 | 0.00 | 29,377.75 |
| GENERAL GOVT EXPENDABLE TRUST | 642-0000-101.00-00 | 76,600.42 | 0.00 | 76,600.42 |
| PARKS & REC EXPENDABLE TRUSTS | 643-0000-101.00-00 | 229,206.38 | 0.00 | 229,206.38 |
| LIBRARY EXPENDABLE TRUSTS | 644-0000-101.00-00 | 274,898.04 | 0.00 | 274,898.04 |
| POLICE EXPENDABLE TRUSTS | 645-0000-101.00-00 | 620,255.01 | 0.00 | 620,255.01 |
| FIRE EXPENDABLE TRUSTS | 646-0000-101.00-00 | 127,211.49 | 0.00 | 127,211.49 |
| STOCKTON SPORTS COMMISSION | 647-0000-101.00-00 | 1,587.13 | 0.00 | 1,587.13 |
| PARKING GARAGES-W FARGO | 679-0000-101.00-00 | 26,466.61 | 0.00 | 26,466.61 |
| HOLIDAY PARK ASSESSMENT | 680-0000-101.00-00 | 21,828.03 | 0.00 | 21,828.03 |
| DEFERRED COMPENSATION | 682-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| PARKS & RECREATION TRUSTS | 683-0000-101.00-00 | 300,984.34 | 0.00 | 300,984.34 |
| LIBRARY & CULTURAL TRUST | 684-0000-101.00-00 | 20,153.56 | 0.00 | 20,153.56 |
| PUBLIC SAFETY - POLICE | 685-0000-101.00-00 | 64,515.19 | 0.00 | 64,515.19 |
| AREA OF BENEFITS FEES | 686-0000-101.00-00 | 12,703,385.72 | 0.00 | 12,703,385.72 |
| PUBLIC FACILITIES FEES-SEWD,SJAFCA,COG, S | 687-0000-101.00-00 | 1,090,670.94 | 0.00 | 1,090,670.94 |
| MISC AGENCY FUND | 689-0000-101.00-00 | 5,642,240.74 | 0.00 | 5,642,240.74 |
| Total Permanent Funds | | 21,704,218.02 | 90,536.92 | 21,794,754.94 |
| **Total Governmental Funds** | | (184,804,974.61) | 229,334,993.70 | 44,530,019.09 |
| **Proprietary Funds** | | | | |
| **Enterprise Funds** | | | | |
| CENTRAL PARKING DISTRICT | 416-0000-101.00-00 | 985,574.24 | 0.00 | 985,574.24 |
| CENTRAL PARKING DIST BOND CONST | 417-0000-101.00-00 | (2,780.61) | 0.00 | (2,780.61) |
| STOCKTON WATER UTILITY | 421-0000-101.00-00 | 35,313,947.90 | 0.00 | 35,313,947.90 |
| WATER COP | 423-0000-101.00-00 | (5,398,215.88) | 0.00 | (5,398,215.88) |
| WATER CONNECTION FEES | 424-0000-101.00-00 | 34,150.24 | 0.00 | 34,150.24 |
| DELTA WATER SURFACE FEE | 425-0000-101.00-00 | 295,409.52 | 0.00 | 295,409.52 |
| WATER RATE STABILIZATION | 426-0000-101.00-00 | 8,184,568.34 | 0.00 | 8,184,568.34 |
| WATER - CAPITAL PROJECTS | 427-0000-101.00-00 | 4,648,614.63 | 0.00 | 4,648,614.63 |
| MUNICIPAL WASTEWATER UTILITY | 431-0000-101.00-00 | 4,233,032.31 | 0.00 | 4,233,032.31 |
| WASTEWATER COP | 433-0000-101.00-00 | (15,309.50) | 0.00 | (15,309.50) |
| WASTEWATER CONNECTION FEES | 434-0000-101.00-00 | 19,647,805.84 | 0.00 | 19,647,805.84 |
| WASTEWATER TREATMENT PLANT CIP | 435-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| WASTEWATER - CAPITAL PROJECTS | 437-0000-101.00-00 | 9,428,745.32 | 0.00 | 9,428,745.32 |
| STORM DRAINAGE | 441-0000-101.00-00 | 2,270,210.77 | 0.00 | 2,270,210.77 |
| STORM WATER-CAPITAL PROJECTS | 447-0000-101.00-00 | (76,741.27) | 0.00 | (76,741.27) |
| STORM DRAINAGE - CAPITAL PROJECTS | 451-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| GARDEN REFUSE COLLECTION | 455-0000-101.00-00 | 619.38 | 0.00 | 619.38 |
| DOWNTOWN MARINA COMPLEX | 460-0000-101.00-00 | 291,608.96 | 0.00 | 291,608.96 |
| GOLF COURSES | 481-0000-101.00-00 | (1,749,834.49) | 0.00 | (1,749,834.49) |
| UTILITY BILLING CUSTOMER SERVICE | 498-0000-101.00-00 | (726,581.72) | 0.00 | (726,581.72) |
| Total Enterprise Funds | | 77,364,823.98 | 0.00 | 77,364,823.98 |

| Fund Title | Account Number | (UNAUDITED) | | |
|---|---|---|---|---|
| | | Pooled Cash 101's | Investments 107's | Total Pooled Cash & Investments |
| Internal Service Funds | | | | |
| INTERNAL SERV-VEHICLE FLEET EQUIP | 501-0000-101.00-00 | 3,393,877.12 | 0.00 | 3,393,877.12 |
| INTERNAL SERV-COMPUTER EQUIP | 502-0000-101.00-00 | 5,683,880.64 | 0.00 | 5,683,880.64 |
| INTERNAL SERV-RADIO EQUIPMENT | 503-0000-101.00-00 | 387,823.03 | 0.00 | 387,823.03 |
| INTERNAL SERV-TELEPHONE SERVICE | 504-0000-101.00-00 | 707,495.97 | 0.00 | 707,495.97 |
| INTERNAL SERV-OFFICE EQUIPMENT | 505-0000-101.00-00 | 464,015.81 | 0.00 | 464,015.81 |
| INTERNAL SERV-PRINTING & MAILING | 508-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| INTERNAL SERV-GENERAL INSURANCE | 541-0000-101.00-00 | 2,539,873.78 | 0.00 | 2,539,873.78 |
| INTERNAL SERV-WORKERS COMP | 551-0000-101.00-00 | 14,612,084.16 | 0.00 | 14,612,084.16 |
| INTERNAL SERV-HEALTH BENEFITS (EE) | 552-0000-101.00-00 | 2,747,393.11 | 0.00 | 2,747,393.11 |
| INTERNAL SERV-UNEMPLOY INSURANCE | 556-0000-101.00-00 | 274,584.81 | 0.00 | 274,584.81 |
| INTERNAL SERV - LTD & LIFE | 557-0000-101.00-00 | 114,067.06 | 0.00 | 114,067.06 |
| INTERNAL SERV-PUBLIC EMP RETIREMENT SY! | 561-0000-101.00-00 | 1,350,584.12 | 0.00 | 1,350,584.12 |
| INTERNAL SERV –SEPARATION PAY BENEFITS | 562-0000-101.00-00 | 71,304.32 | 0.00 | 71,304.32 |
| **Total Internal Service Funds** | | 32,346,983.93 | 0.00 | 32,346,983.93 |
| | | | | |
| **Total Proprietary Funds** | | 109,711,807.91 | 0.00 | 109,711,807.91 |
| | | | | |
| Fiduciary Funds | | | | |
| Public Facilities Impact Fees | | | | |
| TRAFFIC SIGNALS-CITY WIDE | 900-0000-101.00-00 | 79,415.23 | 0.00 | 79,415.23 |
| TRAFFIC SIGNALS-ZONE #1 | 901-0000-101.00-00 | 286,814.16 | 0.00 | 286,814.16 |
| TRAFFIC SIGNALS-ZONE #2 | 902-0000-101.00-00 | 239,627.15 | 0.00 | 239,627.15 |
| TRAFFIC SIGNALS-ZONE #3 | 903-0000-101.00-00 | 127,317.45 | 0.00 | 127,317.45 |
| TRAFFIC SIGNALS-ZONE #4 | 904-0000-101.00-00 | 6,220.18 | 0.00 | 6,220.18 |
| STREET IMPROVEMENTS-CITY WIDE | 910-0000-101.00-00 | 22,157,451.48 | 0.00 | 22,157,451.48 |
| STREET IMPROVEMENTS-FA #3 & #4 | 913-0000-101.00-00 | (1,071.03) | 0.00 | (1,071.03) |
| STREET IMPROVEMENTS-FA #5 & #6 | 915-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| STREET IMPROVEMENTS-REGIONAL TRAFFIC | 917-0000-101.00-00 | 1,484,907.07 | 0.00 | 1,484,907.07 |
| COMMUNITY REC CENTER-CITY WIDE | 920-0000-101.00-00 | 32,060.35 | 0.00 | 32,060.35 |
| CITY OFFICE SPACE | 930-0000-101.00-00 | 781,605.41 | 0.00 | 781,605.41 |
| FIRE STATION-CITY WIDE | 940-0000-101.00-00 | 92,003.57 | 0.00 | 92,003.57 |
| LIBRARY-CITY WIDE | 950-0000-101.00-00 | 9,148,925.48 | 0.00 | 9,148,925.48 |
| POLICE STATION EXPANSION | 960-0000-101.00-00 | (189,692.48) | 0.00 | (189,692.48) |
| PARKLAND-CITY WIDE | 970-0000-101.00-00 | 5,066,636.53 | 0.00 | 5,066,636.53 |
| STREET TREES-CITY WIDE | 978-0000-101.00-00 | 346,655.48 | 0.00 | 346,655.48 |
| STREET SIGNS-CITY WIDE | 979-0000-101.00-00 | 138,650.97 | 0.00 | 138,650.97 |
| STREET LIGHTS-CITY WIDE | 980-0000-101.00-00 | 129,194.69 | 0.00 | 129,194.69 |
| STREET LIGHTS-FA #1 & # 2 | 981-0000-101.00-00 | 33,076.14 | 0.00 | 33,076.14 |
| STREET LIGHTS-FA #3 & # 4 | 983-0000-101.00-00 | 79,179.17 | 0.00 | 79,179.17 |
| STREET LIGHTS-FA #5 & # 6 | 985-0000-101.00-00 | 197,338.46 | 0.00 | 197,338.46 |
| AIR QUALITY MITIGATION | 990-0000-101.00-00 | 1,095,276.74 | 0.00 | 1,095,276.74 |
| PUBLIC FACILITIES FEES - ADMIN | 999-0000-101.00-00 | 126,236.80 | 0.00 | 126,236.80 |
| **Total Public Facilities Impact Fees** | | 41,457,829.00 | 0.00 | 41,457,829.00 |
| | | | | |
| Redevelopment Agency Funds - Old | | | | |
| REDEVELOPMENT AGENCY | 330-0000-101.00-00 | (67.00) | 0.00 | (67.00) 4 |
| WEST END AREA | 334-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| MIDTOWN PROJECT AREA | 337-0000-101.00-00 | (1,330.00) | 0.00 | (1,330.00) 4 |
| SOUTH STOCKTON PROJECT AREA | 338-0000-101.00-00 | (1,373.00) | 0.00 | (1,373.00) 4 |
| LOW & MODERATE INCOME HOUSING | 339-0000-101.00-00 | (501.04) | 0.00 | (501.04) 4 |
| NORTH STOCKTON PROJECT AREA | 340-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| RDA 2006 BOND PROJECTS (SNI) | 342-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| MERGED WATERFRONT PROJECT AREA | 343-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| RDA ADMINISTRATION | 344-0000-101.00-00 | 0.00 | 0.00 | 0.00 |
| **Total Redevelopment Agency funds - Old** | | (3,271.04) | 0.00 | (3,271.04) |
| | | | | |
| Redevelopment Agency Funds - Successor | | | | |
| SUCCESSOR-RDA ADMINISTRATION | 633-0000-101.00-00 | 4,682.23 | 0.00 | 4,682.23 |
| SUCCESSOR-RDA MIDTOWN | 634-0000-101.00-00 | 350,440.10 | 0.00 | 350,440.10 |
| SUCCESSOR-RDA SOUTH STKN | 635-0000-101.00-00 | 81,142.63 | 0.00 | 81,142.63 |

| Fund Title | Account Number | Pooled Cash 101's | Investments 107's | Total Pooled Cash & Investments | |
|---|---|---|---|---|---|
| | | **(UNAUDITED)** | | | |
| SUCCESSOR-RDA NORTH STKN | 636-0000-101.00-00 | 48,961.87 | 0.00 | 48,961.87 | |
| SUCCESSOR-RDA WATERFRONT | 637-0000-101.00-00 | 238,164.59 | 0.00 | 238,164.59 | |
| SUCCESSOR-RDA STRONG NGBH I | 638-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| SUCCESSOR AGENCY RDA DEBT SER | 231-0000-101.00-00 | 3,127,405.13 | 0.00 | 3,127,405.13 | 1 |
| SUCCESSOR AGENCY LOW & MODERATE | 329-0000-101.00-00 | 0.00 | 0.00 | 0.00 | 2 |
| Total Redevelopment Agency funds - Successor | | 3,850,796.55 | 0.00 | 3,850,796.55 | |
| Agency Funds | | | | | |
| MELLO-ROOS UNDISTRIBUTED | 250-0000-101.00-00 | (127,362.90) | 0.00 | (127,362.90) | |
| WESTON RANCH CFD 1 | 251-0000-101.00-00 | 3,519,661.07 | 0.00 | 3,519,661.07 | |
| BROOKSIDE ESTATES CFD 90-2 | 252-0000-101.00-00 | 3,924,475.86 | 0.00 | 3,924,475.86 | |
| SOUTH STKN INTERIM SEWER CFD 90-1 | 253-0000-101.00-00 | 1,319,286.97 | 0.00 | 1,319,286.97 | |
| SPANOS PARK CFD 90-4 | 254-0000-101.00-00 | 2,208,913.28 | 0.00 | 2,208,913.28 | |
| CAMERA EST CFD 2003-1 | 257-0000-101.00-00 | 235,803.92 | 0.00 | 235,803.92 | |
| DEV. FEE FIN. CFD 96-01 – SERIES A | 259-0000-101.00-00 | 1,759.03 | 0.00 | 1,759.03 | |
| DEV. FEE FIN. CFD 96-01 – SERIES B | 260-0000-101.00-00 | 145,257.00 | 0.00 | 145,257.00 | |
| ARCH RD. CFD 99-02 | 261-0000-101.00-00 | 1,237,714.40 | 0.00 | 1,237,714.40 | |
| SPANOS PARK WEST CFD 2001-1 | 262-0000-101.00-00 | 1,138,450.55 | 0.00 | 1,138,450.55 | |
| RIVER BEND CFD 2006-1 | 263-0000-101.00-00 | 315,397.24 | 0.00 | 315,397.24 | |
| NORTHBROOK CFD 2006-3 | 264-0000-101.00-00 | 345,831.72 | 0.00 | 345,831.72 | |
| Spanos Park Refi CFD 90-4/ AD91-1 | 280-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| WESTON RANCH CFD 1 | 351-0000-101.00-00 | 71,645.92 | 0.00 | 71,645.92 | |
| BROOKSIDE ESTATES PHASE I CFD 90-2 | 352-0000-101.00-00 | 147,136.55 | 0.00 | 147,136.55 | |
| SOUTH STKN INTERIM SEWER M/R CFD 90-1 | 353-0000-101.00-00 | 1,591.84 | 0.00 | 1,591.84 | |
| SPANOS PARK CFD 90-4 | 354-0000-101.00-00 | 12,095.17 | 0.00 | 12,095.17 | |
| CFD #90-2 / BROOKSIDE PHASE II | 355-0000-101.00-00 | 42,256.10 | 0.00 | 42,256.10 | |
| NO. STKN. OPEN SPACE 91-3 | 356-0000-101.00-00 | 1,034,714.82 | 0.00 | 1,034,714.82 | |
| ARCH RD CFD 99-02 | 361-0000-101.00-00 | 55,441.97 | 0.00 | 55,441.97 | |
| SPANOS PARK WEST CFD 2001-1 | 362-0000-101.00-00 | 16,337.94 | 0.00 | 16,337.94 | |
| RIVER BEND CFD 2006-1 | 363-0000-101.00-00 | 6,372.02 | 0.00 | 6,372.02 | |
| NORTHBROOK CFD 2006-3 | 364-0000-101.00-00 | 426.33 | 0.00 | 426.33 | |
| MARKS-ROOS BOND POOL 1997 | 380-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| MARKS-ROOS BOND POOL 1998 | 381-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| A/D UNDISTRIBUTED | 701-0000-101.00-00 | (57,176.23) | 0.00 | (57,176.23) | |
| WEBER SPERRY A/D 88-1 | 773-0000-101.00-00 | 317,918.91 | 0.00 | 317,918.91 | |
| NORTH STOCKTON INTERIM SEWER A/D 88-2 | 776-0000-101.00-00 | 114,138.53 | 0.00 | 114,138.53 | |
| SPANOS PARK A/D 91-1 | 778-0000-101.00-00 | 631,314.08 | 0.00 | 631,314.08 | |
| STOCKTON AIRPORT BUS PK PH IV A/D 84-1 | 781-0000-101.00-00 | 1,049,938.74 | 0.00 | 1,049,938.74 | |
| ARCH ROAD REFINANCE A/D 84-2 | 782-0000-101.00-00 | 679,181.12 | 0.00 | 679,181.12 | |
| BLOSSOM RANCH A/D 93-1 | 784-0000-101.00-00 | 224,158.14 | 0.00 | 224,158.14 | |
| STOCKTON AIRPORT BUS PK PH V A/D 84-1 | 785-0000-101.00-00 | 106,903.64 | 0.00 | 106,903.64 | |
| LA MORADA A/D 96-04 | 786-0000-101.00-00 | 100,240.90 | 0.00 | 100,240.90 | |
| LITTLE JOHN CREEK A/D 97-01 | 787-0000-101.00-00 | 33,049.88 | 0.00 | 33,049.88 | |
| WEST EIGHTH ST REFUNDING A/D  90-5 | 788-0000-101.00-00 | 1,691,193.59 | 0.00 | 1,691,193.59 | |
| MORADA RANCH A/D 2000-1 | 789-0000-101.00-00 | 463,239.69 | 0.00 | 463,239.69 | |
| 2001 COMBINED A/D REFUNDING (771, 776,7 | 790-0000-101.00-00 | 163,732.11 | 0.00 | 163,732.11 | |
| MORADA NORTH A/D 2002-1 | 791-0000-101.00-00 | 404,742.68 | 0.00 | 404,742.68 | |
| WATERFORD ESTATES A/D 2002-03 | 792-0000-101.00-00 | 337,372.04 | 0.00 | 337,372.04 | |
| MOSHER A/D 2003-02 | 793-0000-101.00-00 | 1,306,295.21 | 0.00 | 1,306,295.21 | |
| WATERFORD ESTATES PH II A/D 2003-03 | 794-0000-101.00-00 | 216,713.89 | 0.00 | 216,713.89 | |
| MARCH LANE/ HOLMAN RD AD 2003-01 | 795-0000-101.00-00 | 181,374.47 | 0.00 | 181,374.47 | |
| 2005 COMBINED A/D REFUNDING (784,786,7 | 796-0000-101.00-00 | 7,495.34 | 0.00 | 7,495.34 | |
| UNDISTRIBUTED | 801-0000-101.00-00 | 0.00 | 0.00 | 0.00 | |
| WEST LANE CALAVERAS STORM #218 | 806-0000-101.00-00 | 341,287.42 | 0.00 | 341,287.42 | |
| THE LANDING #212 | 812-0000-101.00-00 | 40,748.01 | 0.00 | 40,748.01 | |
| SPANOS PARK #218 | 818-0000-101.00-00 | 1,672,774.45 | 0.00 | 1,672,774.45 | |
| STOCKTON BUSINESS PARK # 219 | 819-0000-101.00-00 | 276,736.38 | 0.00 | 276,736.38 | |
| STOCKTON AIRPORT PH IV | 821-0000-101.00-00 | 307,510.18 | 0.00 | 307,510.18 | |
| ARCH ROAD REFINANCE III | 822-0000-101.00-00 | 15,531.53 | 0.00 | 15,531.53 | |
| WESTERN PACIFIC IND PK REFUNDING | 823-0000-101.00-00 | 9,067.84 | 0.00 | 9,067.84 | |
| BLOSSOM RANCH A/D 93-1 | 824-0000-101.00-00 | 1,001,232.36 | 0.00 | 1,001,232.36 | |
| STOCKTON AIRPORT PH V # 226 | 825-0000-101.00-00 | 5,823.45 | 0.00 | 5,823.45 | |

| Fund Title | Account Number | Pooled Cash 101's | Investments 107's | Total Pooled Cash & Investments |
|---|---|---|---|---|
| | | **(UNAUDITED)** | | |
| LA MORADA A/D 96-04 | 826-0000-101.00-00 | 553,057.46 | 0.00 | 553,057.46 |
| 1999 WEST EIGHTH ST A/D 90-5 | 828-0000-101.00-00 | 482.24 | 0.00 | 482.24 |
| MORADA RANCH # 229 | 829-0000-101.00-00 | 400,557.62 | 0.00 | 400,557.62 |
| 2001 COMBINED A/D REFUNDING (771, 776,7 | 830-0000-101.00-00 | 12,580.30 | 0.00 | 12,580.30 |
| MORADA NORTH A/D 2002-1 | 831-0000-101.00-00 | 223,248.09 | 0.00 | 223,248.09 |
| WATERFORD ESTATES A/D 2002-03 | 832-0000-101.00-00 | 428,204.86 | 0.00 | 428,204.86 |
| MOSHER A/D 2003-02 | 833-0000-101.00-00 | 1,350,463.22 | 0.00 | 1,350,463.22 |
| WATERFORD ESTATES PH II A/D 2003-03 | 834-0000-101.00-00 | 441,142.91 | 0.00 | 441,142.91 |
| MARCH LANE/ HOLMAN RD AD 2003-01 | 835-0000-101.00-00 | 501,555.54 | 0.00 | 501,555.54 |
| Total Agency Funds | | 31,207,037.39 | 0.00 | 31,207,037.39 |
| | | | | |
| Total Fiduciary Funds | | 76,512,391.90 | 0.00 | 76,512,391.90 |
| | | | | |
| Total all fund types | | 1,419,225.20 | 229,334,993.70 | 230,754,218.90 |
| | | | | |
| SUB TOTAL | | 1,419,225.20 | 229,334,993.70 | 230,754,218.90 |
| | | | | |
| | OTHER ACCOUNTS: | | | |
| CDBG Special Purpose Loans | 053-0000-101.22-06 | 81,661.61 | 0.00 | 81,661.61 |
| CDBG Special Purpose Loans | 053-0000-101.22-08 | 176,016.70 | 0.00 | 176,016.70 |
| City Admin. Bldg-Main St. Operations | 085-0000-101.22.10 | 301,016.33 | 0.00 | 301,016.33 |
| Rec Venue Operations | 086-0000-101.13-03 | 27,936.00 | | 27,936.00 |
| Rec Venue Operations - Box Office | 086-0000-101.13-04 | 628,272.00 | | 628,272.00 |
| Kemper Sports Operations | 481-0000-101.22.12 | 1,819,855.56 | 0.00 | 1,819,855.56 |
| SUB TOTAL | | 3,034,758.20 | 0.00 | 3,034,758.20 |
| | | | | |
| Vault Cash | 010-0000-101.6X-00 | 21,790.00 | 0.00 | 21,790.00 |
| Vault Cash | 481-0000-101.60-03 | 800.00 | 0.00 | 800.00 |
| Petty Cash | 010-0000-101.70-00 | 1,400.00 | 0.00 | 1,400.00 |
| Boat Launching - change fund | 045-0000-101.70-00 | 500.00 | 0.00 | 500.00 |
| Rec Venue Operations - change fund | 086-0000-101.13-05 | 6,300.00 | 0.00 | 6,300.00 |
| SUB TOTAL | | 30,790.00 | 0.00 | 30,790.00 |
| | | | | |
| Petty Cash-Central Parking Dist | 416-0000-101.70-00 | 850.00 | 0.00 | 850.00 |
| Downtown Marina Complex | 460-0000-101.18-02 | 20,436.75 | | 20,436.75 |
| Petty Cash-Golf Courses | 481-0000-101.70-00 | 500.00 | 0.00 | 500.00 |
| Cash Investments - Water | 421-0000-105.11-00 | 0.00 | 0.00 | 0.00 |
| FNB Transfers in Transit | 421-0000-101.40-00 | 74,058.11 | | 74,058.11 |
| FNB Transfers in Transit | 421-0000-102.40-00 | (74,058.11) | | (74,058.11) |
| SUB TOTAL | | 21,786.75 | 0.00 | 21,786.75 |
| | | | | |
| SUB TOTAL OTHER ACCTS | | 3,087,334.95 | 0.00 | 3,087,334.95 |
| | | | | |
| CASH POSITION-ALL FUNDS | | 4,506,560.15 | 229,334,993.70 | 233,841,553.85 |

1 The Successor Agency RDA Debt Service Fund has been reclassified and moved from the Debt Service Funds category to the Redevelopment Agency Funds - Successor category to reflect funds now held in a fiduciary capacity.

2 The Low & Moderate Income Housing RDA Loans Fund has been reclassified and moved from the Redevelopment Agency Funds - Successor category to the Governmental Funds - Special Revenue Funds category to reflect funds held by the City.

3 There are pending expenditure allocations for year end project close out.

4 There are pending entries to transfer costs to the Successor Agency.

5 Balances are interim and unaudited pending final adjustments in the investment income allocations.

G:\FIN\priv\Accounting\2011-12\Cash & Investments\Cash Balance reports by Todd\[Cash Balances 06-30-12 at 01-23-13.xlsx]C & I for 06-30-12 at 01-23-13

# Exhibit B

**NEW BUSINESS**

AGENDA ITEM 15.02

December 11, 2012

TO:        Mayor and City Council

FROM:    Vanessa Burke, Chief Financial Officer

SUBJECT: **FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**

RECOMMENDATION

It is recommended that the City Council:

1) Accept by motion this status report on the 2011-12 and 2012-13 General Fund budgets and

2) Adopt a resolution amending the Fiscal Year 2011-12 General Fund Budget to address appropriation overages and authorizing the establishment of a reserve within 2011-12 for Chapter 9 Costs ($5.6 million).

Summary

Staff has conducted a review of unaudited year-end results for the General Fund for the 2011-12 fiscal year. Because they are unaudited, the results should be considered as preliminary and subject to adjustments as part of the final year-end closing process. The analysis of the General Fund results indicates that the Fund ended the year with a positive fund balance in the amount of $5.6 million (3.5% of General Fund expenditures). The positive fund balance at year end was the result of slightly higher than budgeted revenues ($1.46 million or 1%) and unanticipated savings in several categories of General Fund expenses ($5.4 million or 3.2%). These variances are explained in detail later in this report.

There were also, however, instances in the 2011-12 General Fund where individual appropriations were exceeded. As evidenced by the overall positive ending fund balance, there were adequate funds available in the General Fund to cover those overages. In order to address these overages, in this report, the Council is being asked to adopt a resolution amending the 2011-12 budget to correct these appropriations.

The 2012-13 Adopted Budget contained authorization to carry-over and appropriate in the 2012-13 budget any and all remaining AB506 process savings. Through that action additional AB506 savings ($566,000) have been added to the current year budget and will be used for Chapter 9 expenses in Fiscal Year 2012-13.

690

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 2 of 13)

In this report, staff is seeking City Council authorization to reserve the remaining available balance at June 30, 2012, for the creation of a reserve for Chapter 9 associated costs in the amount of $5.6 million. If approved, the result will be a 2011-12 ending fund balance of $0. This will have no impact on the 2012-13 Adopted Budget as there was no Beginning Available Fund Balance presumed in that balanced budget.

The Budget Office has also conducted a review of the results of the first three months of the current fiscal year. Although it is too early in the year to draw precise judgments regarding year-end projections, a combination of the examination of prior year results, new information received from our outside Sales and Property Tax consultants, and a review of spending trends to date indicates that we are on track for slightly higher than budgeted revenues ($655,000 or 0.4%) and expenditure savings which at current spending levels would approximate $2.3 million or 1.5%. The elements of these variances are also explained in detail below.

DISCUSSSION

Background

One of the strategic initiatives developed to support the City Council's "Fiscal Sustainability – Getting our Fiscal House in Order" goal was to provide regular analysis and reporting of the City's financial status. This report is being provided as part of that effort.

The Fiscal Year 2011-12 Budget, as adopted by Council on June 21, 2011, was balanced using a combination of service reductions and significant employee compensation reductions imposed under the City's second declaration of fiscal emergency. On February 28, 2012 the budget update provided to Council projected a negative net annual operating deficit of $8.6 million for Fiscal Year 2011-12. This was primarily due to AB506 costs, Redevelopment backfill, and other items described in that report. The Council approved $15 million in fund transfers and other actions to address prior year accounting adjustments (e.g. writing off accounts receivables, cash reconciliation variances, etc.) and balance the 2011-12 Budget. Without these actions at year end, the General Fund would have ended 2011-12 with a large negative available balance.

On June 26, 2012 the Council closed a $26 million deficit by approving the 2012-13 Annual Budget and Pendency Plan. The Pendency Plan suspended debt payments, reduced retiree medical benefits, continued reductions of pay and benefits imposed under Declarations of Fiscal Emergency and reduced compensation components that exceeded those in the City's labor market. The City filed for Chapter 9 Bankruptcy in

691

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**

(Page 3 of 13)

June 2012 and is currently in the eligibility determination phase. The City is able to continue providing services under the Pendency Plan while under Chapter 9 protection. The 2012-13 Pendency Plan was amended by Council on September 11, 2012, to adjust for new property tax information and labor agreement amendments.

The Pendency Plan anticipated an available balance of $0 at the end of 2011-12. The revised preliminary fund balance of $5.6 million includes transactions through June 30, 2012 and accruals for revenues and expenses incurred prior to the end of the fiscal year but received after June 30, 2012. Much of the fund balance change is due to uptick in revenues or savings that occurred in the second half of the fiscal year after the close of the fiscal year which were accrued back to 2011-12 due to the modified accrual basis of accounting used in the General Fund. With approval of the recommendation to reserve within the 2011-12 fund balance this entire amount, the available 2012-13 Beginning Available Fund Balance will be $0, consistent with the Adopted Pendency Plan.

Present Situation

**2011-12 General Fund Year-end Results**

Overview

A review of the preliminary (unaudited) 2011-12 General Fund expenditure and revenue results indicates that the fund ended the year with a fund balance of approximately $5.6 million. The Revised Budget was the product of actions approved on February 28, 2012, necessary to fill a $15.2 million gap that reflected poor accounting practices of the past and had been discovered through a review of our finances directed by the City Council as part of the Fiscal Sustainability goal. This process resulted in the $6.6 million restatement of previous fund balances in 2010-11, as well as a shortfall projected at $8.7 million in the 2011-12 budget. In order to close those gaps and avoid insolvency and an uncontrolled default, the City Council approved a painful series of actions totaling $15.2 million which involved taking unrestricted monies from eight different City funds, eliminating the Arts Endowment Fund ($1.3 million), and directing that debt service in the amount of $2.0 million owed for the remainder of the year not be paid. That budget envisioned ending the year with no ending fund balance.

Actual revenue collections as a whole were above budget by approximately $1.46 million, and expenditures were below budget by approximately $5.4 million. The Beginning Fund Balance was adjusted downward by $1.24 million. These elements combined to produce the $5.6 million fund balance referenced above.

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**

(Page 4 of 13)

General Fund
Available Fund Balance
Unaudited June 30, 2012

| | | |
|---|---|---|
| June 2012 Available Balance, as previously projected (General Fund only) | $ | - |
| **Adjustments** | | |
| Beginning Balance | | |
| Retroactive interest allocation and other adjustments | | (1,242,929) |
| Revenues | | |
| Sales Tax | | 1,117,000 |
| Property Tax | | (555,000) |
| Code Enforcement | | 770,000 |
| Other | | 129,788 |
| | | 1,461,788 |
| Expenditures: | | |
| Department Results | | 2,730,290 |
| AB506 | | 1,065,823 |
| AB506 Carry forward | | (1,065,823) |
| Redevelopment | | 1,288,151 |
| Tax Collection and Election | | 545,977 |
| Labor Litigation | | 236,428 |
| Contingency | | 572,586 |
| | | 5,373,432 |
| June 2012 Projected Available Balance | | $ 5,592,291 |

## Beginning Fund Balance

The 2011-12 Beginning Fund Balance was adjusted downward by approximately $1.24 million to reflect a retroactive and corrected General Fund interest reallocation from pooled cash, required by a change in allocation methodology. The actual correction methodology and its impact on the fund balance was not available for either the February 28, 2012, staff report, nor in time to be reflected in the 2012-13 Proposed Budget.

## Revenues

As shown in Attachment A, General Fund revenue collections in 2011-12 totaled $160.3 million. This was approximately $1.46 million (1.0%) higher than budgeted. This outcome was the result of over and under budget results in a variety of General Fund revenue accounts. The primary variances however occurred in the following categories:

693

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**

(Page 5 of 13)

- Sales Tax – Sales Tax receipts for the final quarter of every fiscal year are not received until well after the end of the fiscal year. In the final quarter of 2011-12 the City experienced higher than anticipated growth in several categories, the largest of which were auto sales and gasoline sales, due to higher prices. These trends and resulting higher collections were not known until three months after the close of the year. The result was collections that exceeded budget by $1.1 million (3.1%).

- Property Tax – Estimates used to project 2011-12 collection levels for Property Tax collections came from our outside consultant and from information received from the County Assessor's Office. Only in July, with the receipt of the final tax payment, did we learn that the results were $555,000 or 1.2% below previous projections given to us by the consultant and the Assessor.

- Code Enforcement – As a result of declining revenue collections noted at mid-year, the City Manager directed the Police Department to add staff which resulted in collections increasing significantly late in the year, once the staff were finally in place. In addition, in March, after a number of North Stockton foreclosures were converted to rental properties, additional revenue was unexpectedly generated by the Rental Inspection Program. The combined results were collections above budgeted levels of approximately $770,000.

- Business License Tax – Revenues unexpectedly fell short of the budgeted level by $230,000. The bulk of the revenue in this category is collected in the last quarter and the shortfall was not detected in time to include in estimates provided in the Pendency Plan. Staff in the Administrative Services Department is examining why the shortfall occurred and opportunities to improve estimates and collections.

- The remaining revenue variances reflected a variety of offsetting over and under budget collections in various other accounts, including Fire Contracts, Utility Users Tax, Fines and Forfeitures, and other categories.

Expenditures

As shown in Attachment B, General Fund expenditures in 2011-12 totaled $161.3 million. This was $5.4 million (3.2%) below the Revised Budget. The savings resulted from a combination of program and departmental under expenditures, offset by some programs that exceeded their appropriation. The primary contributors are discussed below.

694

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 6 of 13)

- Police Department – Despite aggressive efforts to fill Police Officer vacancies, salary savings in the amount of $1,756,000 were realized, the bulk of which occurred in the latter half of the fiscal year.  This level of savings reflects the continued attrition and the difficulty the City has experienced in recruiting new officers.  The savings represent 2.1% of the department's budget.  Salary savings were offset to some extent by overages in overtime and hiring costs as the department attempted to cover for the increasing vacancy levels.  The extent of the savings amount was not known until after the Pendency Plan was published.  High vacancy levels have continued into the current fiscal year, but headway is being made in increasing the officer headcount in the City.

- Redevelopment Support – Due to the fluid and evolving nature of the Redevelopment Agency dissolution process, expenses and Successor Agency operation costs were very difficult to estimate, and remain so due to recent legislation and evolving interpretation of the new law by the state.  Total savings of $1,288,000 were realized in this category last fiscal year.  The primary elements of the savings were in litigation activity ($740,000 in savings), where dissolution expenses and other outstanding litigation costs were below what had been anticipated, and savings achieved from not making the Legal Settlement payment for Marina Towers ($312,000).

- Tax Collection and Election – Savings of $546,000 were achieved in this category.  An unanticipated favorable IRS ruling received in August, well after the end of the fiscal year, which reduced the City's liability for past errors on retiree health trusts accounted for the bulk of these savings.

- AB506 – Costs incurred in 2011-12 for the AB506 Mediation Process were $1,065,823 less than budgeted.  The fact that no city before Stockton had gone through this process made it very difficult to estimate actual costs.  The proposed Pendency Plan budget included an assumption that some savings were likely to occur.  The Pendency Plan included a conservative estimate of $500,000 in savings, which were approved to be carried over and appropriated in the 2012-13 Adopted Budget.  The Adopted Budget Resolution also included direction that any additional savings that were to occur in this account should also be automatically carried over to 2012-13.  In compliance with this direction, an additional $565,823 has been added to the 2012-13 appropriation for Chapter 9 Litigation expenses.  Because prior Council direction authorized this carry-over, the savings are not part of the 2011-12 ending fund balance.  The total appropriation for bankruptcy costs is now $4,065,000 in the General Fund ($5,465,000 from all funds).

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 7 of 13)

- Contingency – A total of $572,586 remained unspent in the City's General Fund Contingency Reserve at year-end.  This contingency was originally budgeted at $2 million and was reduced by Council authorization throughout the year.

- Labor Litigation Savings – A total of $236,000 remained unspent in this account at year-end.  Negotiations extended late into the fiscal year, and bills for these costs were still being received as late as October.

- Public Works – A total of $312,000 in savings were experienced in this department.  The savings were primarily in maintenance and repair costs for Parks.

- Other Department Savings – Savings totaling a net $662,000 were achieved in the remaining departments and programs in the General Fund.  Relatively small amounts of savings were experienced in the Economic Development, City Manager, City Attorney, City Clerk, City Auditor, Administrative Services, and Human Resources departments, as well as savings in the Non Departmental and Grant Match accounts.  These savings were partially offset by overages in the Peacekeeper, Capital Improvement Program, and Debt Administrative accounts, as described below.

Budget Amendment Actions

Council action is needed to amend 2011-12 General Fund Budget to address appropriation overages based on the preliminary 2011-12 General Fund results.  As evidenced by the overall positive ending fund balance, there were adequate funds available in the General Fund to cover overages.

1. Peacekeeper Program – The Peacekeeper Program expended more General Fund dollars ($64,000) than budgeted because of a mid-year timing change by a granting agency.  In addition to the Peacekeeper program budget, the General Fund had over $100,000 budgeted in grant match funds on a separate line item.  This funding was not needed as grant match so it is available to cover the overage on the Peacekeeper line item.

   The following is the proposed budget action:

   General Fund 010-0000-992 Grant Match Funds          (64,000)
   General Fund 010-0138-530 Peacekeeper Program          64,000

696

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 8 of 13)

2. Capital Improvement Funds –The February 28, 2012 staff report swept almost $800,000 from the General Fund supported Capital Improvement Fund (301). A review of the City's numerous capital improvement accounts is underway and staff is in the process of implementing a system that will provide more controls to better manage these accounts. After accommodating contractual obligations in this fund's project accounts, it is estimated that the Capital Fund will need an additional $120,000. Among the projects with potential overruns are the Civic Center HVAC, Cesar Chavez Library HVAC, and Entertainment Venue structural repairs at the Stockton Ballpark.

   The following is the proposed budget action:

   | | |
   |---|---:|
   | General Fund 010 Contingency | (120,000) |
   | General Fund 010 - Transfer to Capital Improvement Fund | 120,000 |
   | Capital Improvement Fund 301 Transfer In | 120,000 |
   | Capital Improvement Fund 301 Expenditures | 120,000 |

3. Transfer to Debt Service Fund – Administrative expenses in the City's Debt Service Fund exceeded the adopted budget by $169,000 because of expenses incurred prior to the AB506 process. The City incurred higher costs for debt administration due to the City's financial situation. Outside experts were used to explore possible debt restructuring options and assist in communications with the bond market. Expenses related to the AB506 process have been charged to the AB506 budget. This overage is due to work performed in preparation for the AB506 process and debt payment defaults approved by Council on February 28, 2012.

   The following is the proposed budget action:

   | | |
   |---|---:|
   | General Fund 010 Contingency | (169,000) |
   | General Fund 010 - Transfer to Debt Fund | 169,000 |
   | Debt Service Fund 201 Transfer In | 169,000 |
   | Debt Service Fund 201 Expenditures | 169,000 |

4. Howard Jarvis Settlement - An additional $37,200 needs to be transferred to cover the cost of the actual 2011-12 Howard Jarvis Legal Settlement payment which was repaid to the Municipal Utility Funds on July 1, 2011. The budgeted payment amount was incorrect because it was based on an outdated payment schedule document which was not consistent with the actual repayment schedule in the legal settlement.

697

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 9 of 13)

The following is the proposed budget action:

| | |
|---|---|
| General Fund 010 Contingency | (37,200) |
| General Fund 010 - Transfer to Debt Fund | 29,000 |
| General Fund 010 - Transfer to Capital Improvement Fund | 8,200 |
| Capital Improvement Fund 301 Transfer In | 8,200 |
| Capital Improvement Fund 301 Transfer to Debt Fund | 8,200 |
| Debt Service Fund 201 Transfer In | 37,200 |
| Debt Service Fund 201 Expenditures | 37,200 |

These actions have been included in the preliminary ending available fund balance of $5.6 million.

Reserve for Chapter 9 Costs

A total of $5.6 million in fund balance remains.  In this report, staff is seeking City Council authorization to reserve the remainder of the fund balance for the creation of a reserve within the 2011-12 ending balance for Chapter 9 costs.  Accessing that reserve to address any 2012-13 expenditure needs would require separate City Council action.  This will not impact the 2012-13 Adopted Pendency Plan, because that budget/Plan was built assuming a $0 Beginning Fund Balance.

The recommendation to reserve these funds is made in light of the many uncertainties facing the City in its current situation.  The risks are many given the challenges that have been made to our Pendency Plan by creditors, retirees, and other parties, as well as the uncertainty about how long the bankruptcy process will last and how high the expenses associated with the process will be.  The City faces many other risks such as: the yet to be negotiated reduction to sports teams operating costs; the potential need to move the Information Technology Division from 400 E. Main, due to higher lease costs; and the potential need to find alternate City Hall space or consider making improvements to City Hall.  In addition, changing Redevelopment Successor Agency laws, follow up audits on our dissolution process and state budget impacts are always a concern.  Given the fact that deficits are forecasted for years into the future, committing any of these funds to improving operations would help only briefly, and would only exacerbate the deficit situation we face in the future.  As the City develops the Plan of Adjustment necessary to exit bankruptcy it will also need to have funds and a plan for addressing claims, as well as paying for ongoing operations, rebuilding services, maintaining facilities and building reserves.  The $5.6 million reserve recommended in this report represents only 3.5% of our General Fund expenditures, a very modest amount considering the myriad of risks we face.  The Government Finance Officers Association recommends, at a minimum, that local governments, regardless of size,

698

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 10 of 13)

maintain an unrestricted fund balance in their General Fund of no less than two months of regular General Fund operating revenues or regular General Fund operating expenditures. Given a budget of approximately $161 million, our City should have an unrestricted fund balance of about $27 million.

**2012-13 General Fund First Quarter Results**

As shown in Attachment C the Budget Office has reviewed expenditure and revenue results in the General Fund for the first three months of the current fiscal year. Although it is too early in the year to draw precise judgments regarding year-end projections, a combination of the examination of prior year results, new information received from our outside Sales and Property Tax consultant, and a review of spending trends to date, indicates that we are on track for slightly higher than budgeted revenues ($655,000) and expenditure savings, which at current spending levels could be approximately $2.3 million.

<u>Revenue</u>

The net revenue gain that would result if current trends hold is the result of projections for higher than budgeted collections in Sales ($511,000 or 1.6%), Property ($605,000 or 1.2%) and Utility Users ($268,000 or 1%) taxes, offset by lower than budgeted collections projected for Business License ($335,000 or 3.8%) and Fire Contract ($470,000 or 13.6%) revenues.

Sales tax revenue received in the first quarter consists of a one month advance that is not calculated on actual sales tax collected. The increase in our projection is based instead on a recent revision in the annual collection estimate provided to us by our outside Sales Tax consultant. The revision reflects trends they have spotted in City collections in a number of areas, the largest of which are auto sales and construction materials.

The majority of Property Tax revenue is received in December and May. The collection estimate variances are the result of recently received updated projections by the outside consultant who provides us with detailed estimates. They update their estimates throughout the year. The primary change in their projection is updated information from the Assessor concerning the City's share of County Property Tax proceeds, which is up slightly from earlier estimates.

The lowered estimate for Business License Tax collections reflects the actual collection level for 2011-12, which came in below budget. The Administrative Services

699

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**
(Page 11 of 13)

Department is working to ascertain the exact reason for this shortfall and hopes that improved collection efforts will improve revenues.

Fire Contract revenue is the reimbursement received from the Fire Districts that the City provides fire service to, and is based on actual cost. The reduction in reimbursement revenue reflects the District's share of the savings due to the reduced cost of Fire personnel from new MOU's.

Staff believes that it is too early in the year to actually change the budget by formally updating revenue estimates due to the many uncertainties that could significantly impact revenue collections. Our second largest revenue source, Sales Tax, is particularly vulnerable to changes in the economy, which is very tenuous. State, national and international events all loom as dangers to the modest recovery that we have seen. Property Tax receipts are subject to additional adjustments by the Assessor, and Utility User Taxes can be impacted by seasonal weather changes. Staff will continue to monitor the status of revenue and, at an appropriate time later in the year, will bring forward any required adjustments to the revenue budget.

Expenditures

Three months of expenditure data has also been reviewed. As is the case with revenues, it is too early to draw conclusions about observed trends.

It does appear that, if current expenditure patterns hold, the amount of salary and benefit savings being experienced, primarily in the Police Department, will exceed the amount budgeted. The 2012-13 Adopted Pendency Plan included a vacancy factor that called for cumulative salary and benefit savings of $976,000. At current expenditure levels the Police Department alone is on track to experience salary and benefit savings of close to $3.5 million (4.3%). A smaller but measurable level of savings is also being experienced in the Fire Department, which at current trends would experience about $240,000 in savings. Due to the recent retirement and movement of staff from the City Auditor's Office, savings are accumulating in that department. Up to $280,000 in savings is currently estimated. Much, if not all of those savings, will be required as part of the process of establishing a contracted Auditor's Office. Other departments appear to be running at or slightly below budgeted levels and no appreciable savings are currently apparent in any of the Non-Departmental categories.

In the Police Department, some progress is being made on filling officer vacancies that should lower the currently projected savings level in that department. As of today, the department has increased officer staffing from the approximately 320 level they were at as the fiscal year began, to 333. They are projecting they will reach 344 by the end of

700

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**

(Page 12 of 13)

the calendar year (authorized staffing is 361).  There are four recruits in academy that will graduate by December, nine more due to begin academy at about the same time, and a sizeable number of candidates undergoing background checks.  It is also hoped that the new Lateral Hiring Incentive Program recently approved by Council will provide a means of achieving additional hires.  Lateral hires would come in at a higher cost than new academy graduates, which will further reduce the vacancy savings trend.

In the Program Support for Other Funds category, the trend analysis indicates that most programs are on track with the budgeted subsidy levels.  The Library and Recreation funds, for example, are performing at budgeted levels, as are all but two of the other programs.  We are projecting that in the Golf Course Fund, additional subsidy funding may be required.  Expenditure and revenue performance to date would indicate the need for additional funding of as much as $55,000 (on top of the $322,000 subsidy included in the Pendency Plan).  This is largely the result of reduced revenue due to loss of golf rounds to other courses that offer discounted play along with a reopened golf course.  Staff is working with the golf operator to reduce additional subsidy needs as much as possible.  In the Entertainment Venues category, first quarter revenue performance, primarily at the Arena, was below anticipated levels.  As you may recall, SMG was aggressive in their original estimates.  SMG is working to improve events and event revenues, but if the current trend continues, an increase in the subsidy of approximately $225,000 (14%) would be needed.

Costs of administering the City's bonds are charged to the Debt Administration Fund (201) and allocated to the General Fund and other City funds with bonds.  Based on year to date activity in the Debt Administration Fund, it may be necessary to increase the General Fund subsidy by approximately $100,000.  Bond administration and reporting is more costly as a result from the City's financial situation.

Staff will continue to monitor General Fund expenditure levels, returning with reports and any appropriate budget actions that developments may require.

FINANCIAL SUMMARY

This report provides an analysis of 2011-12 General Fund year-end results, along with an initial review of first quarter 2012-13 results.  The analysis of the General Fund 2011-12 year-end expenditure and revenues indicates the fund ended the year with a fund balance of approximately $5.6 million, reflecting greater than budgeted revenues and lower than budgeted expenditures.  The report recommends that the entire $5.6 million be reserved within the 2011-12 fund balance for future Chapter 9 costs. Utilization of this reserve in FY 2012-13 will require a subsequent City Council appropriation approval.

December 11, 2012

**FISCAL YEAR 2011-12 UNAUDITED GENERAL FUND YEAR-END RESULTS, FIRST QUARTER 2012-13 GENERAL FUND STATUS UPDATE, AUTHORIZATION TO AMEND THE 2011-12 GENERAL FUND BUDGET, AND AUTHORIZATION FOR RESERVING 2011-12 ENDING FUND BALANCE**

(Page 13 of 13)

Budget amendments and transfers are proposed to address overages in the General Fund in 2011-12 in the Peacekeeper Program, the Capital Improvement Transfer category, the Transfer to Debt Service category, and for the Howard Jarvis Settlement appropriation. These budget amendments are outlined in Exhibit 1 of the Resolution.

This report addresses 2011-12 results for the General Fund only. As the process for completing and analyzing year-end results for all other funds is completed, additional Council action may be necessary to close FY 2011-12 and will be brought forward in a staff report as soon as the process is completed.

The review of first quarter 2012-13 General Fund performance indicates that it is on track to achieve salary savings above budget, primarily in the Police Department, and that revenues are projected to slightly exceed budget, primarily as a result of Property and Sales Tax collections. Potential variances are being monitored in the Golf Course, Entertainment Venue and Debt Administration subsidy categories where, if current trends continue, additional subsidies may be required. We will continue to monitor trends and return with recommendations for changes where appropriate.

All other updates presented in this report are for information purposes only. No amendments to the 2012-13 Budget are recommended at this time.

Respectfully submitted,                                    APPROVED BY:

VANESSA BURKE                                              LAURIE MONTES
CHIEF FINANCIAL OFFICER                                    DEPUTY CITY MANAGER

VB:KT

Attachment A: 2011-12 General Fund Revenue Summary
Attachment B: 2011-12 General Fund Expenditure Summary
Attachment C: 2012-13 First Quarter Budget Update - General Fund

::ODMA\GRPWISE\COS.CM.CM_Library:92511.1

702

ATTACHMENT A

**General Fund - 010**
**2011-12 End of Year Projected Revenues**                                        12/11/2012

| | FY 2009-2010 Actual | FY 2010-2011 Unaudited Actual | FY 2011-2012 Original Budget | FY 2011-2012 Current Budget | FY 2011-2012 Year End Projection | Over/(Under) vs. Current Budget | % Change vs. Prior Year |
|---|---|---|---|---|---|---|---|
| **General Tax Revenues** | | | | | | | |
| Property Taxes | | | | | | | |
| Property Taxes | $ 29,169,700 | $ 28,318,428 | $ 28,230,000 | $ 26,848,000 | $ 26,375,894 | $ (472,106) | -6.9% |
| In-Lieu of Motor Vehicle Fees | 19,612,336 | 18,534,224 | 18,615,775 | 17,664,970 | 17,582,487 | (82,483) | -5.1% |
| | 48,782,036 | 46,852,652 | 46,845,775 | 44,512,970 | 43,958,381 | (554,589) | -6.2% |
| Sales Tax | | | | | | | |
| 75% Point of Sale | 24,558,180 | 25,463,533 | 25,877,000 | 26,628,762 | 27,727,667 | 1,098,905 | 8.9% |
| 25% County ERAF Backfill | 7,086,587 | 8,118,132 | 8,614,000 | 8,392,001 | 8,392,001 | - | 3.4% |
| Proposition 172 | 1,065,346 | 1,087,330 | 1,159,000 | 1,159,238 | 1,177,150 | 17,912 | 8.3% |
| | 32,710,113 | 34,668,995 | 35,650,000 | 36,180,001 | 37,296,818 | 1,116,817 | 7.6% |
| Utility Users Tax | | | | | | | |
| Water | 2,541,674 | 2,699,052 | 2,877,188 | 2,952,000 | 3,159,294 | 207,294 | 17.1% |
| Electric & Gas | 16,068,172 | 16,517,005 | 16,835,548 | 16,850,000 | 17,108,465 | 258,465 | 3.6% |
| Cable | 1,995,069 | 1,985,307 | 1,965,000 | 1,943,326 | 1,945,475 | 2,149 | -2.0% |
| Telecommunications | 10,111,984 | 9,784,959 | 9,464,000 | 9,491,410 | 9,289,408 | (202,002) | -5.1% |
| | 30,716,899 | 30,986,323 | 31,141,736 | 31,236,736 | 31,502,642 | 265,906 | 1.7% |
| Franchise Tax | | | | | | | |
| PG&E | 1,745,610 | 1,799,027 | 1,850,000 | 1,835,000 | 1,864,105 | 29,105 | 3.6% |
| Cable/Video | 2,094,157 | 2,204,115 | 2,240,000 | 2,940,000 | 3,105,218 | 165,218 | 40.9% |
| Waste Haulers | 7,514,550 | 7,499,593 | 7,666,238 | 7,432,238 | 7,495,512 | 63,274 | -0.1% |
| | 11,354,317 | 11,502,735 | 11,756,238 | 12,207,238 | 12,464,835 | 257,597 | 8.4% |
| Business License Tax | 9,288,875 | 9,249,774 | 8,669,432 | 9,145,000 | 8,915,457 | (229,543) | -3.6% |
| Hotel/Motel Tax | 1,750,153 | 1,798,740 | 1,800,000 | 1,800,000 | 1,932,630 | 132,630 | 7.4% |
| Document Transfer Tax | 558,611 | 583,418 | 640,000 | 604,000 | 603,313 | (687) | 8.1% |
| Motor Vehicle License | 855,878 | 1,479,303 | 1,047,400 | - | - | - | -100.0% |
| Interest | 1,014,602 | 881,221 | 668,250 | 140,250 | 260,885 | 120,635 | -70.4% |
| | 13,468,119 | 13,992,456 | 12,825,082 | 11,689,250 | 11,712,285 | 23,035 | -16.3% |
| **Program Revenues** | | | | | | | |
| Fire Contracts | 4,688,889 | 3,885,672 | 3,990,981 | 4,915,879 | 4,646,119 | (269,760) | 19.6% |
| Code Enforcement | 5,504,189 | 3,670,739 | 4,038,100 | 3,266,084 | 4,036,131 | 770,047 | 10.0% |
| Charges for Services | 2,549,574 | 2,128,003 | 2,366,377 | 1,971,385 | 1,907,680 | (63,705) | -10.4% |
| Fines & Forfeitures | 3,461,164 | 2,486,772 | 2,054,100 | 1,393,500 | 1,729,972 | 336,472 | -30.4% |
| Revenues from Other Agencies | 1,052,767 | 832,931 | 839,600 | 742,400 | 780,975 | 38,575 | -6.2% |
| Licenses & Permits | 391,661 | 143,191 | 432,500 | 458,226 | 395,949 | (62,277) | 176.5% |
| Misc. Other Revenues | 452,994 | 254,512 | 85,998 | 58,856 | 74,531 | 15,675 | -70.7% |
| Acct. Receivable Allowance | (287,061) | | (113,514) | (113,514) | (366,000) | (252,486) | |
| | 17,814,177 | 13,401,820 | 13,694,142 | 12,692,816 | 13,205,357 | 512,541 | -1.5% |
| **Interfund Reimbursements** | | | | | | | |
| Indirect Cost Allocation | 6,243,088 | 6,005,969 | 5,800,000 | 5,300,000 | 5,118,202 | (181,798) | -14.8% |
| Workers Comp Reimbursement | 1,503,684 | 1,492,517 | - | - | - | - | -100.0% |
| Refunds & Reimbursements | 430,981 | 1,195,388 | 971,625 | 820,431 | 872,300 | 51,869 | -27.0% |
| Rents/Leases/Concessions | 2,655,215 | 2,544,647 | 2,302,200 | 2,588,557 | 2,559,555 | (29,002) | 0.6% |
| | 10,832,968 | 11,238,521 | 9,073,825 | 8,708,988 | 8,550,057 | (158,931) | -23.9% |
| **Transfers In** | | | | | | | |
| Transfers In | 451,496 | 22,321,880 | - | - | - | - | -100.0% |
| From Technology Fund - 502 | | 1,200,000 | - | - | - | - | -100.0% |
| From Parking for Debt Service | 777,164 | 779,311 | 774,515 | 1,578,515 | 1,577,927 | (588) | 102.5% |
| | 1,228,660 | 24,301,191 | 774,515 | 1,578,515 | 1,577,927 | (588) | -93.5% |
| **Total Revenues** | $166,907,289 | $186,944,693 | $161,761,313 | $158,806,514 | $160,268,302 | $ 1,461,788 | -14.3% |

703

General Fund - 010                                                                ATTACHMENT B
2011-12 End of Year Budget Projection by Program - December 11, 2012
Unaudited

| | 2011-12 Revised Budget | Projected Actual + Encumbrances | Under/(Over) vs. Current Budget |
|---|---|---|---|
| **Est. Beginning Balance** | $    6,603,929 | $    5,361,000 | $    1,242,929 |
| Encumbrance Reserve | 1,299,320 | 1,299,320 | - |
| | 7,903,249 | 6,660,320 | 1,242,929 |
| | | | |
| **Revenues** | | | |
| General Tax Revenues | 135,826,195 | 136,934,961 | (1,108,766) |
| Program Revenues | 12,805,816 | 13,571,357 | (765,541) |
| Interfund Reimbursements | 8,708,988 | 8,550,057 | 158,931 |
| AR Allowance | (113,000) | (366,000) | 253,000 |
| Transfers In | 1,578,515 | 1,577,927 | 588 |
| | 158,806,514 | 160,268,302 | (1,461,788) |
| | | | |
| **Expenditures** | | | |
| _Programs_ | | | |
| Police | 83,306,025 | 81,549,707 | 1,756,318 |
| Fire | 41,909,108 | 41,883,768 | 25,340 |
| Public Works | 7,438,423 | 7,126,077 | 312,346 |
| Economic Development | 487,199 | 354,424 | 132,775 |
| Peacekeeper Program | 132,055 | 195,653 | (63,598) |
| Arts Commission | 36,737 | 35,981 | 756 |
| | 133,309,547 | 131,145,610 | 2,163,937 |
| | | | |
| _Program Support for Other Funds_ | | | |
| Library | 3,977,759 | 3,977,759 | - |
| Recreation | 2,757,263 | 2,757,263 | - |
| Entertainment Venues | 2,441,299 | 2,441,299 | - |
| Redevelopment | 3,100,000 | 1,811,849 | 1,288,151 |
| Downtown Marina | 732,000 | 732,000 | - |
| Capital Improvement | 500,000 | 620,000 | (120,000) |
| Administration Building | 480,538 | 480,538 | - |
| Grant Match | 303,100 | 32,670 | 270,430 |
| Golf | - | - | - |
| Development Services | 150,000 | 150,000 | - |
| | 14,441,959 | 13,003,378 | 1,438,581 |
| | | | |
| _Administration_ | | | |
| City Council | 501,797 | 501,695 | 102 |
| City Manager | 748,054 | 742,691 | 5,363 |
| City Attorney | 838,894 | 735,989 | 102,905 |
| City Clerk | 766,597 | 710,141 | 56,456 |
| City Auditor | 535,545 | 473,236 | 62,309 |
| Administrative Services | 3,333,066 | 3,321,373 | 11,693 |
| Human Resources | 1,358,532 | 1,256,443 | 102,089 |
| Tax Collection & Election | 2,620,000 | 2,074,023 | 545,977 |
| Other Administration | (330,282) | (629,852) | 299,570 |
| Inventory Adjustment | - | 20,054 | (20,054) |
| Labor Litigation | 1,500,000 | 1,263,572 | 236,428 |
| AB506 | 3,500,000 | 2,434,177 | 1,065,823 |
| AB506 Balance Carry Forward | - | 1,065,823 | (1,065,823) |
| | 15,372,203 | 13,969,366 | 1,402,837 |
| | | | |
| _Debt Service_ | | | |
| MUD Jarvis Settlement | 1,112,998 | 1,150,032 | (37,034) |
| Pension Obligation Bond | 876,000 | 876,000 | - |
| Debt Administration | 250,000 | 418,019 | (168,019) |
| Parking District | 774,470 | 773,927 | 543 |
| | 3,013,468 | 3,217,978 | (204,510) |
| | | | |
| Contingency | 572,586 | - | 572,586 |
| | | | |
| **Total Expenditures** | 166,709,763 | 161,336,331 | 5,373,432 |
| % of Budget | | | _3.2%_ |
| | | | |
| **Net Annual Activity** | (7,903,249) | (1,068,029) | (6,835,220) |
| | | | |
| **Proj. Available Fund Balance** | $            - | $    5,592,291 | $    (5,592,291) |

704

ATTACHMENT C

**City of Stockton**
**2012-13 First Quarter Budget Update - December 11, 2012**
**General Fund - 010 by Program**

| | Approved Budget | Year to Date Activity as of 9/30/12 | Year End Projection | Projected Remaining Balance |
|---|---:|---:|---:|---:|
| **Beginning Available Balance** | | | | |
| Prior Year AB506 Balance | $ 1,065,823 | | $ 1,065,823 | |
| | | | | |
| **Revenues** | | | | |
| General Tax Revenues | 136,112,867 | 10,594,431 | 137,237,900 | 1,125,033 |
| Program Revenues | 11,506,189 | 2,070,842 | 11,036,411 | (469,778) |
| Interfund Reimbursements | 7,532,129 | 1,006,009 | 7,532,129 | - |
| Transfers In | 836,528 | 606,396 | 836,528 | - |
| | 155,987,713 | 14,277,678 | 156,642,968 | 655,255 |
| | | | | |
| **Expenditures** | - | | | |
| | | | | |
| Programs | | | | |
| Police | 82,137,004 | 19,138,347 | 78,685,231 | 3,451,773 |
| Fire | 36,038,573 | 8,343,206 | 35,798,283 | 240,290 |
| Public Works | 6,512,650 | 1,501,099 | 6,509,033 | 3,617 |
| Economic Development | 683,605 | 222,276 | 683,605 | - |
| Peacekeeper Program | 176,949 | 83,760 | 176,949 | - |
| Arts Commission | 33,327 | 5,242 | 33,327 | - |
| | 125,582,108 | 29,293,931 | 121,886,428 | 3,695,680 |
| | | | | |
| Program Support for Other Funds | | | | |
| Library | 3,907,000 | 976,750 | 3,907,000 | - |
| Recreation | 2,540,000 | 635,000 | 2,540,000 | - |
| Entertainment Venues | 1,737,350 | 434,338 | 1,962,350 | (225,000) |
| RDA Successor Agency | 1,069,248 | 267,312 | 1,069,248 | - |
| Downtown Marina | 47,299 | 11,825 | 47,299 | - |
| Capital Improvement | 575,000 | 143,750 | 575,000 | - |
| Administration Building | 162,000 | 40,500 | 162,000 | - |
| Golf Courses | 322,000 | 80,500 | 377,000 | (55,000) |
| Grant Match | 300,000 | | 300,000 | - |
| Development Services | 1,000,000 | 250,000 | 1,000,000 | - |
| | 11,659,897 | 2,839,974 | 11,939,897 | (280,000) |
| | - | | | |
| Administration | | | | |
| City Council | 465,512 | 105,778 | 465,512 | - |
| City Manager | 1,008,741 | 236,232 | 1,008,741 | - |
| City Attorney | 933,639 | 128,939 | 933,639 | - |
| City Clerk | 715,664 | 172,328 | 715,664 | - |
| City Auditor | 435,233 | 68,407 | 435,233 | - |
| Administrative Services | 3,541,986 | 678,772 | 3,541,986 | - |
| Human Resources | 1,904,815 | 288,001 | 1,904,815 | - |
| Tax Collection & Election | 2,745,250 | 134,521 | 2,745,250 | - |
| Other Administration | (418,316) | 166,906 | (418,316) | - |
| Vacancy Savings | (975,618) | - | | (975,618) |
| Labor Litigation | 2,000,000 | 87,491 | 2,000,000 | - |
| Chapter 9 | 4,065,823 | 572,210 | 4,065,823 | - |
| AB506 Funds | - | | | - |
| | 16,422,729 | 2,639,584 | 17,398,347 | (975,618) |
| | | | | |
| Debt Service | 978,560 | 606,396 | 1,078,560 | (100,000) |
| | | | | |
| Contingency | 2,000,000 | - | 2,000,000 | - |
| | | | | |
| **Expenditure Subtotal** | 156,643,294 | 35,379,885 | 154,303,232 | 2,340,062 |
| | | | | |
| **Net Annual Activity** | (655,581) | (21,102,207) | 2,339,736 | |
| | - | | | |
| **Proj. Ending Available Balance** | 410,242 | | 3,405,559 | |

Resolution No.

# STOCKTON CITY COUNCIL

**RESOLUTION OF THE CITY COUNCIL OF THE CITY OF STOCKTON APPROVING AMENDMENTS TO THE 2011-2012 ANNUAL BUDGET, AND ESTABLISHING A RESERVE FOR BANKRUPTCY COSTS**

Fiscal Sustainability is one of the City Council's goals; and

The City Council adopted the 2011-2012 Annual Budget on June 21, 2011; and

In order to prepare the City's financial statements for Fiscal Year 2011-2012, certain budget adjustments must be made and the Council desires to direct staff to make such adjustments; and

The City Council adopted the 2012-2013 Annual Budget and Pendency Plan on June 26, 2012; and

By the staff report accompanying this Resolution, incorporated into this Resolution by this reference (Staff Report), the Council has been provided with additional information upon which the actions set forth in this Resolution are based; now, therefore,

BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF STOCKTON, AS FOLLOWS:

1.     The status report on the 2011-2012 and 2012-2013 General Fund budgets is accepted.

2.     The 2011-2012 Annual Budget is amended to include the adjustments to the General Fund budget and inter-fund transfers as outlined in Exhibit 1.

CITY ATTY
REVIEW

DATE ___DEC 0 5 2012___

**706**

3.    A reserve for Chapter 9 bankruptcy costs is established within 2011-2012

in the amount of the ending available fund balances, estimated to be $5.6 million.

4.    The City Manager is authorized and directed to take such actions as are

appropriate to carry out the intent of this resolution.

PASSED, APPROVED, and ADOPTED _____ December 11, 2012 _____.


_____
ANN JOHNSTON, Mayor
of the City of Stockton

ATTEST:


_____
BONNIE PAIGE
City Clerk of the City of Stockton

707

City of Stockton                                                                  **EXHIBIT 1**
Amendments to the 2011-2012 Annual Budget
December 11, 2012

| | Account # | 2011-12 Revised Budget | Budget Increase/ (Decrease) | 2011-12 Final Budget |
|---|---|---|---|---|
| **Move Budget from:** | | | | |
| General Fund Grant Match Funds | 010-0000-992 | 303,100 | (64,000) | 239,100 |
| General Fund Contingency | 010-0131-510 | 572,586 | (326,200) | 246,386 |
| **Move Budget to:** | | | | |
| 1)  Peacekeeper Program | | | | |
| General Fund Peacekeeper Program | 010-0138-530 | 132,055 | 64,000 | 196,055 |
| 2)  Capital Improvement Funds | | | | |
| Transfer From: | | | | |
| General Fund #010 | 010-0000-992 | 500,000 | 120,000 | 620,000 |
| Transfer To: | | | | |
| Capital Improvement Fund #301 | 301-0000-492 | 500,000 | 120,000 | 620,000 |
| 3)  Debt Administration Fund | | | | |
| Transfer From: | | | | |
| General Fund #010 | 010-0000-992 | 250,000 | 169,000 | 419,000 |
| Transfer To: | | | | |
| Debt Service Fund #201 | 201-0000-492 | 250,000 | 169,000 | 419,000 |
| 4)  Howard Jarvis Settlement | | | | |
| Transfer From: | | | | |
| General Fund #010 | 010-0000-992 | 1,112,998 | 37,200 | 1,150,198 |
| Transfer To: | | | | |
| Capital Improvement Fund #301 | 301-0000-492 | 644,997 | 8,200 | 653,197 |
| Transfer From: | | | | |
| Capital Improvement Fund #301 | 301-0000-992 | 644,997 | 8,200 | 653,197 |
| Transfer To: | | | | |
| Debt Service Fund #201 | 201-0000-492 | 1,112,998 | 37,200 | 1,150,198 |

G:\FIN\priv\Budget\FY2012-13\Quarterly Report\12-04-12 Council Report\[12-04-12 Amend 2011-12 Budget Reso Attachment at 11-16-12.xlsx]Exhibit 1 2011-12

708

# Exhibit C

## NEW BUSINESS

---

AGENDA ITEM 15.01

December 11, 2012

TO:          Honorable Mayor and City Council

FROM:        Vanessa Burke, Chief Financial Officer

SUBJECT:     **FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011**

RECOMMENDATION

It is recommended the City Council accept by motion the Comprehensive Annual Financial Report for the year ended June 30, 2011.

Summary

This report transmits the Comprehensive Annual Financial Report (CAFR) for the year ended June 30, 2011.  Also included is the Memorandum on Internal Controls and Required Communications, frequently referred to as the Management Letter. This report will be presented to the City Council on December 11, 2012.

Background

**Annual Audit**

The City Charter Section 1911 requires the City of Stockton ("City") to have an annual audit conducted by a firm of Certified Public Accountants.   The audit is to be made in accordance with generally accepted audit standards for audits of public agencies.  Federal and state grant agreements and bond indentures also require the City to have an annual audit.

In 2006, the City Council approved a five year contract for annual audit services with Macias, Gini and O'Connell.  In preparation for the end of the contract term, in 2010, the City Council approved the issuance of a Request for Proposals for annual audit services. In 2011, City Council approved a contract with Maze & Associates. The firm has conducted an independent audit and issued their report. This is the first year of a five year contract with Maze & Associates.  In first year audits, it is customary to only present the current year being audited in the financial statements rather than on a comparative basis to the prior year.  This audit was performed on the fiscal year ended June 30, 2011.  The audit for the fiscal year ended June 30, 2010 was audited by the previous auditors.

**Timing of Report**

The annual financial report is normally published by December for the fiscal year ending in June of that year.  However, this has not been a typical year for the City.  The completion of this year's financial statements and audit  results have been delayed 12 months for numerous reasons including allowing sufficient time for new management and the audit

362

December 11, 2012

**FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011**
(Page 2 of 7)

firm to conduct an extensive review of our fiscal condition and prior year accounting. This was in large part due to the Council's Strategic Initiative to get the City's "Fiscal House in Order" and what we found in reviewing the accounting records and practices. These efforts were further hampered by competing priorities with the huge demands of the AB506 process, additional audits conducted by the California State Controller's Office, the dismantling of the Redevelopment Agency by the state, the Chapter 9 bankruptcy filing on June 28, 2012, and now the extensive litigation process.

Through a methodical process of reviewing City funds and programs, the City's new management team discovered many problems that needed to be addressed before a "clean" set of books could be turned over to the auditors for review. The accounting and financial management errors required a huge movement of funds that only the Council could approve. The implications were significant, including the City's solvency. As a result, we contracted with Management Partners. This assessment served as a doctor's second opinion of the dire financial situation the City was facing. The results of the financial assessment were presented to City Council on February 28, 2012, confirming the precarious financial situation the City faced. We were quickly approaching insolvency.

Also on February 28, 2012, the City Council was presented with a report that detailed several problems such as bookkeeping errors, overdrafts, and lack of proper controls. These problems and others created a hole in the General Fund of more than $15.2 million that needed to be closed in order to maintain a balanced budget. Council approved the painful staff recommendations to close the $15.2 million gap by suspending debt payments, suspending vacation and sick leave payoffs to separating employees, and by sweeping virtually all of the City's available unrestricted funds to balance June 30, 2011 and the forecasted negative balance at June 30, 2012. Recognizing the long term fiscal problems, the City Council authorized the commencement of the AB506 process in an attempt to resolve the City's fiscal crisis.

The audit of the City's books could not begin until financial statements were prepared with the accurate information discovered by the City's new management team. Of the $15.2 million in transfers approved on February 28, 2012, $6.6 million was an adjustment to the General Fund at June 30, 2011.

Although this audit took an extensive amount of time to complete, the audit firm did not identify any material adjustments needed for the financial statements prepared by the City's new management. <u>It is important to note that the results of this audit are consistent with the dire financial situation described by staff and affirmed by Management Partners.</u>

**Independent Auditor's Report on Financial Statements**

The auditor has opined that the balances in the financial statements present fairly, in all material respects, the financial position of the City in accordance with Generally Accepted Accounting Principles (GAAP), with two explanatory paragraphs as follows:

363

December 11, 2012

**FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011**
(Page 3 of 7)

1. In the Independent Auditor's Report (see page 1 of the CAFR) the auditor discusses the City and Redevelopment Agency's ability to continue as going concern as follows:

   - The City has filed a case seeking bankruptcy protection and the adjustment of its liabilities under Chapter 9 of the US Bankruptcy Code in the year subsequent to the reporting date.
   - As of June 30, 2011, the Redevelopment Agency had extremely low spendable resources, coupled with severe decline in the tax increment revenue, which in combination indicate a sign of severe financial distress.
   - In addition, with the passage of AB x1 26 and a subsequent California Supreme Court ruling validating the provision of the ABx1 26, the Redevelopment Agency was effectively dissolved on January 31, 2012.

More information on the City's bankruptcy status and the Redevelopment Agency dissolution is presented in the Note 17 of the CAFR.

2. The auditor also emphasized changes in the accounting method for governmental funds housing loans receivable balances and restatement of certain fund balances and net assets as of July 1, 2010 due to various corrections of errors.  These adjustments are detailed in Note 14 of the CAFR.  These adjustments reduced beginning governmental fund balances by $91,715,659 for the change in accounting method.  The correction of prior errors resulted in a decrease in beginning fund balances in the governmental funds by $17,950,408, and increase in proprietary beginning fund net assets by $27,791,603.  Some of these adjustments are the result of errors which have already been reported to Council.  The adjustments include:

   - Interfund loans that are uncollectible
   - Establishing allowances for uncollectible receivables
   - Double counting of parking citation revenue
   - Adjustments to correct receivables for loans to property owners (It should be noted that the $91.7 million reduction to fund balance is due to the establishment of a deferred revenue account as an offset to homeowner loans payable, versus including the outstanding loan as part of the fund balance)
   - Correction of accounting errors
   - Transfer of Downtown Marina to record in proper fund

The full Independent Auditor's Report is printed on pages 1 and 2 of the CAFR.  Detail about these prior period adjustments can be found beginning on page 129 of the CAFR.

December 11, 2012

## FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011

(Page 4 of 7)

### Audit Adjustments

The external auditor did not propose any additional audit adjustments that, in their judgment, could have a significant effect on the City's financial statements.  There were some additional audit adjustments identified by staff, or the audit firm but were not posted.  These are reported in the Memorandum on Internal Controls and Required Communications.  Staff and the auditor agree that these adjustments do not have a material effect on the audited financial statements, individually or in the aggregate.

These additional adjustments are in a table in the Memorandum of Internal Controls and Required Communications as Attachment A.  Items of significance include a liability for the employee compensation changes imposed through the Fiscal Emergency.  The amount of the imposed concessions, not yet settled as of June 30, 2011, is approximately $1.1 million.  The liability is questionable given that the City had declared a fiscal emergency and had the legal authority to impose these changes.  Additionally, should the Council approve the recently ratified new Memorandum of Understanding with the Police Officers Association, this liability would be eliminated.

The only other adjustment that is a significant dollar amount is an approximately $2.4 million net increase to capital assets. This adjustment represents less than a 0.2% adjustment to the City's more than $1.4 billion of capital assets.  Upon the reconciliation of the transfer of assets to the Redevelopment Successor Agency, it was discovered that multiple properties owned by the Redevelopment Agency were expensed and never capitalized and three properties no longer owned by the Redevelopment Agency needed to be removed from our schedule of capital assets.  Again, the total of these adjustments are not considered material.

### New Accounting Standard

There were no new accounting standards that were required to be adopted in the fiscal year ended June 30, 2011, since the City had previously adopted the provisions of GASB 54, *Fund Balance Reporting* in the June 30, 2010 financial statements. There also are no new accounting standards that are required to be implemented in the next fiscal year.

### General Fund Results

Total General Fund balance declined from $23.2 million to $12.3 million during the year. The primary cause for this decline was the recording of an adjustment to the fund balance as originally reported in the fiscal year 2009-10 audited financial statements of $15.1 million. This adjustment is comprised of approximately $13.3 million to establish allowances for doubtful accounts for loans and accounts receivable that are not likely to be recovered.  The remaining amount is due to corrections of errors made during that year: a $497,000 adjustment for the double counting of parking citation revenue and other accrual adjustments of $1.3 million.

December 11, 2012

## FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011
(Page 5 of 7)

After these adjustments and the action taken by Council on February 28, 2012 to sweep available unrestricted funds to balance the deficit, the General Fund ended the fiscal year as of June 30, 2011, with $12.3 million all of which was considered assigned, committed, restricted or non-spendable.

**New Indebtedness**

### State Animal Control Obligation

In March 2011, the State Controller's Office issued its audit report of the Animal Adoption Program, which disallowed the City's SB90 (mandated cost) reimbursement over multiple years.  It identified a finding resulting in a $1.9 million balance owed to the State of California.  The City had two options for repayment of the $1.9 million: 1) a one-time disbursement, or 2) a reduction in all future State mandated costs (SB90) claims reimbursement until the liability is paid off which as a zero cash flow effect on the City.  The second option is how this liability has been recorded.  Because the City receives very little in claim reimbursement from the State, this liability will take many years to be repaid. The outstanding balance was $1.6 million on June 30, 2011, and is described in the Note 6 of the CAFR.

### Delta Water Supply Project

In October 2010, the City issued $55 million in Variable Rate Demand Water Revenue Bonds, Series 2010A for the first phase of the Delta Water Supply Project.  Repayment of the bonds is financed from net revenues pledged by the restricted Water Utility Fund. This amount is outstanding as of June 30, 2011.

### California Department of Boating and Waterway Notes

The City drew an additional $1.6 million to complete the construction of the Downtown Marina.  The total loan outstanding as of June 30, 2011 is $11.1 million.

A description of the City's long-term debt is included in Note 6 to the CAFR.

**Deficit Fund Balances**

There are four funds with deficits in fund balance or net assets.  These funds include the Stockton Public Financing Authority and three internal service funds-General Liability, Workers' Compensation Insurance, and Employee and Retiree Health.  The deficits are described in Note 13 to the CAFR.  The latter three have been discussed on multiple occasions with the Council.

December 11, 2012

## FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011

(Page 6 of 7)

### Expenditures in Excess of Appropriations

In the CAFR, two programs in the General Fund (Public Works and City Auditor) and the Low-Moderate Income Housing Loans Special Revenue Fund reported expenditures in excess of appropriations for the year ended June 30, 2011 (see page 128). However, Public Works was within budget. This variance resulted from certain costs for Parks being reported in the CAFR differently than in the final budget. The City Auditor overrun was due to accrued costs related to the June 30, 2011 audit appropriated in the next fiscal year. However, the total General Fund expenditures did not exceed appropriations (the legal level of budgetary control), therefore the Fund was in compliance. The Low-Moderate Income Housing Loan Fund exceeded appropriations by $4.9 million due to the change in accounting method to recognize new loans made in the Statement of Revenues, Expenditures and Changes in Fund Balances rather than on the Balance Sheet. The adoption of an alternative and acceptable method of accounting was done after the close of the Final Budget. This change was a result of the City's cleanup efforts, resulting in a one-time overrun. Future budgets will include an appropriation for new loans anticipated to be made.

### Special Items

The City's financial statements reflect a gain of $3.3 million due to the early redemption of $16.3 million of the 2006 Series A Revenue Bonds of the Redevelopment Agency which is reported as a special item in the financial statements as it is considered infrequent in occurrence. This was the City's attempt to reduce future ongoing costs given the dramatic reduction in tax increment. The transaction is reported in Note 15 to the CAFR.

### Other Significant Disclosures

The last footnote of the financial statements (Note 17) discloses the many events and challenges that have impacted the City which include the declaration of fiscal emergency, AB506 negotiations, Chapter 9 bankruptcy and Pendency Plan adoption, bond rating downgrades, and the changes in legislation affecting California Redevelopment Agencies.

### Memorandum on Internal Controls

The auditor's findings and recommendations are further emphasized in their Memorandum on Internal Control report as presented at Attachment B. This report describes material weaknesses, significant deficiencies, and other matters, that we pointed out to them or they uncovered when conducting their audit.

The new auditing firm is reporting 12 material weaknesses and 25 significant deficiencies, and one other matter in the Memorandum on Internal Controls and Required Communications for Fiscal Year 2010 – 2011. It is important to note that most of the findings were identified by the City's new management and turned over to the auditor prior

December 11, 2012

**FINANCIAL REPORT FOR FISCAL YEAR ENDED JUNE 30, 2011**
(Page 7 of 7)

to the start of the auditor's work and reported to Council in Fall 2011 and Spring 2012. In comparison to the prior fiscal year, less than a handful of Material Weaknesses and Significant Deficiencies were identified and reported, combined. We believe the increased findings were due partially to our disclosures and due to an enhanced effort by our auditors, at our request. The status of those prior year findings are included in this report.

**Future Audit Committee Agenda**

Three additional audit reports for the year ended June 30, 2011 are still in progress and will be scheduled on an upcoming Audit Committee and Council agenda. These reports include:

- Redevelopment Agency Financial Statements
- Single Audit, including the Schedule of Expenditures of Federal Awards
- Measure W Public Safety Tax Fund

Staff is completing documentation on the findings and developing action plans to address auditor recommendations related to the remaining reports. Staff anticipates the completion of these audits and review by Council in February 2013.

Staff is working with Maze and Associates to develop the audit schedule for the fiscal year ended June 30, 2012.

FINANCIAL SUMMARY

There is no financial impact associated with accepting this report.

Respectfully submitted,                          APPROVED BY:

VANESSA BURKE                                    LAURIE MONTES
CHIEF FINANCIAL OFFICER                          DEPUTY CITY MANAGER

Attachment A - Comprehensive Annual Financial Report for the fiscal year ended June 30, 2011
Attachment B - Memorandum on Internal Control and Required Communications

ODMA\GRPWISE\COS.CM.CM_Library:92499.1

368



# CITY OF STOCKTON

# COMPREHENSIVE
# ANNUAL FINANCIAL REPORT

## FOR THE FISCAL YEAR ENDED JUNE 30, 2011
## CITY OF STOCKTON, CALIFORNIA

Prepared and Issued by
Administrative Services Department

VANESSA BURKE

Chief Financial Officer



370



**INDEPENDENT AUDITOR'S REPORT**

To the City Council of the
City of Stockton, California

We have audited the accompanying financial statements of the governmental activities, the business-type activities, each major fund, and the aggregate remaining fund information of the City of Stockton, California, as of and for the year ended June 30, 2011, which collectively comprise the City's basic financial statements as listed in the Table of Contents. These financial statements are the responsibility of the City's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards for financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance as to whether the basic financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the basic financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinions.

In our opinion, based on our audit, the basic financial statements referred to above present fairly, in all material respects, the financial position of the governmental activities, the business-type activities, each major fund, and the aggregate remaining fund information of the City as of June 30, 2011, and the respective changes in the financial position and cash flows where applicable thereof, listed as part of the basic financial statements for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the City and Redevelopment Agency will continue as going concerns, that is the presumption that the City and Agency will be able to pay their expenses and debt service as they come due. As discussed in Note 17, there are conditions which raise doubts about this presumption, including the following:

- On June 28, 2012, the City filed a case seeking bankruptcy protection and the adjustment of its liabilities under Chapter 9 of the United States Bankruptcy Code. Also as discussed in Note 17, the City defaulted on certain debt payments subsequent to year end.

- As of June 30, 2011 the Agency had no unrestricted cash balances. Tax increment revenue has shown severe downward trends over the last three years, and during the fiscal year 2010-11 the Agency reported $12.7 million for the year as compared to the $25.6 million reported in fiscal year 2008-09. These trends indicate financial distress of Redevelopment finances.

**Accountancy Corporation**
3478 Buskirk Avenue, Suite 215
Pleasant Hill, CA 94523

т 925.930.0902
f 925.930.0135
e maze@mazeassociates.com
w **mazeassociates.com**

393

- As disclosed in Note 17, the State of California adopted ABx1 26 on June 28, 2011, which suspended all new redevelopment activities except for limited specified activities as of that date and dissolved Redevelopment Agencies.  However, on August 11, 2011, the California Supreme Court issued a partial stay of ABx1 26 and on December 28, 2011 validated its provisions.  As a result the Redevelopment Agency was dissolved on January 31, 2012 and its non-housing activities assumed by a Successor Agency.

Management's plans regarding these matters are also described in Note 17.  The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As disclosed in Note 14, the City changed its method of accounting for governmental fund receivables which are not available for expenditure as of year end by removing the net asset effect from fund balance. The City also restated fund balances and net assets as of July 1, 2010 due to various corrections of errors.

In accordance with *Government Auditing Standards*, we have also issued our report dated November 17, 2012 on our consideration of the City's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

Management's Discussion and Analysis and other required supplementary information are not required parts of the basic financial statements but are supplementary information required by the Government Accounting Standards Board.  We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information.  However, we did not audit the information and express no opinion on it.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole.  The supplemental information listed in the Table of Contents is presented for purposes of additional analysis and is not a required part of the basic financial statements of the City.  Such information has been subjected to the auditing procedures applied in our audit of the basic financial statements and in our opinion is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

The introductory section and statistical section listed in the Table of Contents were not audited by us and we do not express an opinion on this information.

*Maze & Associates*

November 17, 2012

394

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**
**AND**
**REQUIRED COMMUNICATIONS**

**FOR THE YEAR ENDED**
**JUNE 30, 2011**

This Page Left Intentionally Blank

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**
**AND**
**REQUIRED COMMUNICATIONS**

**For the Year Ended June 30, 2011**

**Table of Contents**

<u>**Page**</u>

*Memorandum on Internal Control* ............................................................................................... 1

    Schedule of Material Weaknesses ............................................................................................. 3

    Schedule of Significant Deficiencies ....................................................................................... 15

    Schedule of Other Matters ....................................................................................................... 31

    Status of Prior Year Material Weaknesses .............................................................................. 33

    Status of Prior Year Significant Deficiencies .......................................................................... 35

*Required Communications* ......................................................................................................... 37

    Financial Statement Audit Assurance ..................................................................................... 37

    Other Information Included with the Audited Financial Statements ....................................... 37

    Accounting Policies ................................................................................................................. 37

    Unusual Transactions, Controversial or Emerging Areas ....................................................... 38

    Estimates .................................................................................................................................. 39

    Disagreements with Management ............................................................................................ 39

    Retention Issues ....................................................................................................................... 39

    Difficulties ............................................................................................................................... 39

    Audit Adjustments ................................................................................................................... 40

    Uncorrected Misstatements ...................................................................................................... 40

    Summary of Passed Adjusting Journal Entries – Debit (Credit) ............................................. 41

This Page Left Intentionally Blank



## MEMORANDUM ON INTERNAL CONTROL

November 17, 2012

To the City Council of
City of Stockton, California

We have audited the financial statements of the City of Stockton for the year ended June 30, 2011, and have issued our report thereon dated November 17, 2012. In planning and performing our audit of the financial statements of the City as of and for the year ended June 30, 2011, in accordance with auditing standards generally accepted in the United States of America, we considered the City's internal control over financial reporting (internal control) as a basis for designing our auditing procedures for the purpose of expressing our opinions on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the City's internal control. Accordingly, we do not express an opinion on the effectiveness of the City's internal control.

Our consideration of internal control was for the limited purpose described in the preceding paragraph and was not designed to identify all deficiencies in internal control that might be significant deficiencies or material weaknesses and, therefore, there can be no assurance that all such deficiencies have been identified. In addition, because of inherent limitations in internal control, including the possibility of management override of controls, misstatements due to error or fraud may occur and not be detected by such controls.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct misstatements on a timely basis. A material weakness is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the City's financial statements will not be prevented, or detected and corrected on a timely basis. We identified certain deficiencies in internal control that we consider to be material weaknesses that are included on the Schedule of Material Weaknesses.

A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention to those charged with governances. We identified deficiencies in internal control that we considered to be significant deficiencies, which are listed on the Schedule of Significant Deficiencies.

Included in the Schedule of Other Matters are recommendations not meeting the above definitions.

The City's written responses included in this report have not been subjected to the audit procedures applied in the audit of the financial statements and, accordingly, we express no opinion on them.

This communication is intended solely for the information and use of management, City Council, others within the organization, and agencies and pass-through entities requiring compliance with generally accepted government auditing standards, and is not intended to be and should not be used by anyone other than these specified parties.

Maze & Associate

**Accountancy Corporation**
3478 Buskirk Avenue, Suite 215
Pleasant Hill, CA 94523

T 925.930.0902
F 925.930.0135
E maze@mazeassociates.com
W mazeassociates.com

1

647

This Page Left Intentionally Blank

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF MATERIAL WEAKNESSES**

**2011 – 1:   Going Concern And The Auditor's Opinion – City Finances**

**Criteria:**  As auditors of the City, Council has engaged us to perform an audit of the City's financial statements, opine on the City's financial statements and provide assurance to the readers of the statements, including Council, that they are prepared in accordance with generally accepted accounting principles.  A basic concept in preparing financial statements is that they are prepared assuming the City is a going concern.  That is, the assumption that City has the ability to pay its bills as they come due without substantial disposition of assets outside the normal course of operations, restructuring of debt or forced revisions of its operations.  As part of our audit, we are required to consider conditions and events which indicate that there is substantial doubt about the City's ability to continue as a going concern through June 30, 2012, its next fiscal year end.

**Condition:**  There are a number of factors raising doubt:

➢  On May 26, 2010 and May 17, 2011, the Council adopted Declarations of Fiscal Emergency and Adoptions of Fiscal Emergency Measures which reduced compensation for city employees as temporary measures to ease fiscal distress.

➢  The June 30, 2010 audit opinion issued by the prior audit firm included special emphasis paragraphs concerning the City's unfunded OPEB liabilities and certain fund deficits. Based on the actuarial data as disclosed in the June 30, 2011 financial statement these unfunded liabilities amounted to $154 million and $417 million, respectively.  The prior auditors issued their reported dated February 16, 2011 and disclosed that in addition to the OPEB liability above several of the City's funds were carrying deficit fund balances.

➢  As of June 30, 2011 and 2010, we estimate that the City had 27 days and 44 days of General Fund balance left, respectively, and Internal Service Funds had 20 days and 34 days of working capital left, respectively.

➢  In the spring of 2012 the City began AB506 proceedings and on June 28, 2012 filed a petition for bankruptcy protection.

➢  The City began operating under a pendency plan after that date.

➢  Subsequent to June 30, 2011 year end the City defaulted on certain debt payments in order to preserve liquidity in its General Fund.

**Cause:**  The City's debt load accumulated over many years and the long and deep impacts of the Great Recession have had a severe adverse impact on City finances.  The City has taken strong steps to balance its budget and reduce costs by making several rounds of budget cuts over the last three years.  However, these efforts have been unsuccessful in balancing the City's budget resulting in a budget gap of over $26.0 million in fiscal year 2012-2013.

**Effect:**  In cases where there is substantial doubt about an entity's ability to continue to operate there are two primary considerations auditors are required to address that affect the audit opinion.  The first consideration is the disclosure of the issue in the audit opinion.  This additional paragraph is considered a modification and informs the reader that there is substantial doubt about the entities ability to continue.

649

## CITY OF STOCKTON
## MEMORANDUM ON INTERNAL CONTROL

### SCHEDULE OF MATERIAL WEAKNESSES

The second consideration is the impact of the going concern on the financial statement data, including disclosures. For the financial statements to be accurate, staff must be able to rely on arms length agreements to accurately report and properly classify transactions and balances, and facts surrounding the going concern must be adequately disclosed in the financial statements. For that to occur, measurement and classification must be determinable.

**Recommendation:** The City has hired consultants and legal experts to assist the City's new management team work through the bankruptcy proceedings and develop other cost savings measures in order to enter a plan of adjustment that will return the City to financial health. City staff and management should continue to work as expeditiously as possible to return to financial solvency. This single issue remains the top priority.

**Management Response:**

The City agrees with the findings and recommendation. Relative to the recommendation, the City as part of its Chapter 9 bankruptcy protection is working with all of its significant creditors to return the City to solvency but it is a complex process that can have a myriad of outcomes and the timing is not known.

### 2011 – 2:    Going Concern And The Auditor's Opinion – Redevelopment Finances

**Criteria:** As auditors of the Redevelopment Agency, the Board has engaged us to perform an audit of the Agency's financial statements, opine on the Agency's financial statements and provide assurance to readers of the statements, including the Board, that they are prepared in accordance with generally accepted accounting principles. The Agency's financial statements are prepared assuming the Agency is a going concern. That is, the assumption that Agency has the ability to pay its bills as they come due without substantial disposition of assets outside the normal course of operations, restructuring of debt or forced revisions of its operations. As part of that work we are required to consider conditions and events which indicate that there is substantial doubt about the Agency's ability to continue as a going concern through June 30, 2012, its next fiscal year end.

**Condition:**    There are a number of factors raising doubt:

➢ As of June 30, 2010, the Agency's unrestricted cash and investments amounted to $10.4 million however all of those funds were needed to repay $11.5 million in short term interfund borrowings. As of June 30, 2011 the Agency's unrestricted cash and investments had declined to $1.2 million.

➢ Annual Tax Increment Revenues are showing serious declines dropping from $25.6 million in 2008-09, $16.4 million in 2009-10, and $12.7 million for fiscal 2010-11.

➢ For at least two years the Agency has been using cash reserves to buy back debt in an effort to reduce future debt service in response to declining revenues.

➢ Although the Agency's dissolution and commensurate transfer of its assets to and assumption of its debt by the Successor Agency pursuant to ABX1-26, eliminated the Agency, its activities as now operated by the Successor Agency will likely remain constrained by the above trends.

650

## CITY OF STOCKTON
## MEMORANDUM ON INTERNAL CONTROL

## SCHEDULE OF MATERIAL WEAKNESSES

**Cause:** The Agency's heavy debt load accumulated over many years and the long and deep impacts of the Great Recession have had a detrimental effect on redevelopment finances.

**Effect:** In prior years, the City advanced approximately $81 million, including accumulated interest, to the Agency to assist in financing Agency projects and programs. The reporting of these borrowings as liabilities of the Agency and assets of the City in financial statements is limited by generally accepted accounting principles. Such balances may continue to be reported in the financial statements as liabilities and assets if repayment is expected within a reasonable period of time. Although a time period is not specified, the above trends are so severe and the amount owed so large that management concluded and we concur that repayment is unlikely and agree with management's valuation allowances to effectively reducing the balances to zero.

These issues resulted in a modification to the audit opinion due to going concern issues.

**Recommendation:** The Successor Agency has limited options under the law which has effectively terminated ongoing redevelopment activity. The focus should now be turned toward debt repayment and where appropriate restructuring.

**Management Response:**

The City agrees with the findings and generally agrees with the recommendation. Relative to the recommendation, the Successor Agency is continuing to meet its Recognized Obligation Payment Schedule. However, AB1484 became effective June 27, 2012 and made several changes including the way tax increments were used to pay for Recognized Enforceable Obligations. This has complicated the Agency and the City's situation because the bill never contemplated that former RDAs may have been fundamentally fiscally unsound. The mechanics of AB 1484, along with the City's prior actions supporting RDA obligations, have the effect of threatening the City's General Fund as well as the Agency's pledge of certain tax increment revenues to debt service for which the General Fund would otherwise be responsible. The Agency has requested a meet and confer with the State of California, Department of Finance to discuss these matters.

## 2011 – 3:   Accuracy and Timeliness of Financial Statement Information

**Criteria:** Management is responsible for the accuracy of the financial statements including disclosures. As part of satisfying that responsibility, staff must possess the skills and knowledge necessary to complete the year end close and must diligently employ that knowledge and skill to produce reliable and accurate financial information.

**Condition:** Inaccurate financial reporting in prior years' required restatement and correction of beginning balances of numerous balances including interfund balances, receivables, accrued interest receivable, accrued liabilities, compensated absences, pollution remediation obligation and others.

Facts indicate a lack of diligent application of appropriate procedures and accounting theory in prior years. In some cases, staff had procedural breakdowns which resulted in errors such a lack of comparison of subledgers to general ledger balances for certain receivables. In other cases, staff had not applied sound accounting principles to determine that errors were present, such as in valuation allowances for interfund balances and certain receivables.

651

CITY OF STOCKTON
MEMORANDUM ON INTERNAL CONTROL

SCHEDULE OF MATERIAL WEAKNESSES

Control weaknesses or errors were not universal for a particular account balance. For example, some receivable balances contained prior year errors while many did not. This made the year end closing very cumbersome and expanded staff year end closing procedures. Audit effort was also severely impacted requiring significant audit scope expansion and multiple site visits to evaluate these prior year errors and control weaknesses.

In evaluating these prior year issues and assessing the risk that current year errors may exist, we held numerous conferences with the current and former CFO's, several consultants hired to assist the Finance Department, and a variety of staff members. It is evident that the CFOs identified many issues and errors and began taking appropriate action. However, the Finance Department remains under intense strain and pressure to respond to bankruptcy data demands and filings as well as to get the interim periodic financial reporting back on a regular schedule. Additional permanent finance management staff are needed. This is in our view a high priority.

**Cause:** Facts indicate a lack of diligent application of appropriate procedures and accounting theory in prior years.

**Effect:** Inaccurate financial reporting in prior years required restatement and correction of beginning balances. Timeliness of year end processes and closings was also adversely affected by turnover.

**Recommendation:** The City should hire a new Assistant Finance Director and Finance Department Managers as soon as possible with well trained, experienced staff who possess the knowledge and skills necessary to produce reliable, accurate financial data in a timely manner.

**Management Response:**

The City agrees with this finding. In September 2011, the new Chief Financial Officer completed a written evaluation of the Administrative Services Department. Most of the items described above were discussed with the audit firm and resulted in a change order to the audit contract in order to take into account the impact these deficiencies would have on their services. The audit firm at that time also issued their interim report which revealed similar findings thereby validating the analysis that had been made. At that time all division heads were either vacant or filled with interim personnel. The Chief Financial Officer, the Assistant Director of Administrative Services, Information Technology Officer, and Budget Officer positions have now been filled and a management team is in place that increases the expertise in the auditing and financial reporting areas.

At the division level, the lack of resources in the Administrative Services Department contributed to the timeliness issues and delay in financial reporting areas. The inaccuracies of the prior years were a result in the lack of monitoring controls and training in the department. Additional factors that continue to affect our financial reporting are staffing turnover and shortages in key positions, the increased workload due to the information requests and responses to the AB 506 and bankruptcy demands, the five SCO audits initiated at the same time, and the antiquated computer system. The Chief Financial Officer and Assistant Director of Administrative Services will be evaluating the staffing needs, technology resources of the department, and accountability for financial reporting.

652

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF MATERIAL WEAKNESSES**

**2011 – 4:    Preparation of Financial Statements - Extended Reporting**

**Criteria:**  Management is responsible for the accuracy of the financial statements including disclosures. The staff should have resources available to produce financial information in an efficient manner and minimize the need for manual adjustment during the financial statement preparation process.

**Condition:**  Historically, the City has used a financial system module called Extended Reporting to link general ledger information into the financial statements. However, this module is part of a 20 year old system and is cumbersome and lacks an efficient audit trail between the linked accounts and the report. Without a labor intensive effort by staff it was ineffective and not functioning for fiscal 2010-11. The result was that data was manually entered into the financial statements. Manual adjustments were made to appropriately classify balances in the financial statements which were sometimes well documented and sometime not well documented.  This made for an extremely inefficient process requiring extra effort to compete the financial statements.

**Cause:**  System upkeep of this module is highly labor intensive and staff turnover had an adverse impact on this area.

**Effect:**  This caused a severe adverse impact on the financial statement preparation process and audit as data had to be manually traced through to the general ledger. The manual processes raised the risk of error requiring additional effort to ensure accuracy in financial reporting and had a detrimental effect on timing of the report delivery.

**Recommendation:**  The City should develop a process or purchase a compatible report writer to produce accurate financial statement data efficiently.

**Management Response:**

We agree with this finding and recommendation.  In fact, this system was identified by City in its Citywide Technology Strategic Plan for replacement.  However, the plan for replacement may not be near term enough to meet the ongoing demands for accurate and timely financial reporting. City staff has been working to determine an immediate term fix for the antiquated system and reporting tools available. Historically, the Extended Reporting module has been used to generate financial statements since the City purchased the H.T.E. system in 1991.  The module is cumbersome and requires constant maintenance and substantial investment of personnel hours in order to produce accurate financial reports.  Additional responsibilities and staffing shortages in Administrative Services the AB506 process, the chapter 9 bankruptcy filing and discovery requests, the five State Controller's Audits all collectively created competing priorities.  As a result, staff was not able to complete module maintenance properly in the current year and financial reports were not balanced and were inaccurate and have been subsequently been corrected in the FY 2011 CAFR.

Management is aware of the issue and is investigating alternate methods to facilitate compilation of data to meet the requirements of producing accurate and timely financial reports including the Comprehensive Annual Financial Report (CAFR).

653

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF MATERIAL WEAKNESSES**

**2011 – 5:    Maintaining Allowances for Doubtful Accounts**

**Criteria:**   Generally accepted accounting principles require the recording of allowances for doubtful accounts when there is doubt as to the collectability of receivable balances.  All receivable balances are subject to this requirement.

**Condition:**   Although the City had recorded allowances for doubtful accounts in prior years related to certain receivables, the analyses were inconsistently applied and sometimes inaccurate. For example, we saw no evidence that analyses had been prepared nor allowances established for loans receivable in foreclosure or default, or for interfund balances which is one of the most material areas.  The City reduced its receivables and interfund balances due to these issues by the following:

Aged Receivables:
      General Fund - $2.7 million
      Capital improvement Funds - $56,000
      Public Facility Impact Funds - $226,000

Interfund Balances:
      Redevelopment Agency - $81 million
      General Fund - $10.6 million
      Public Facility Impact Funds – approximately $1 million
      Capital Improvement Funds - $17.2 million
      Central parking - $1.1 million
      Golf Course - $800,000

We found no evidence that staff had included the above amounts in their prior years' analyses of collectability and corrections to prior year balances appears appropriate as proposed by management.

**Cause:** Staff analyses in prior years were inconsistently applied and sometimes inaccurate.

**Effect:** Prior year financial statements were restated and the adjustments were material to the financial statements in most cases.

**Recommendation:** Staff should routinely analyze receivable balances and adjust allowances where appropriate.  The analyses should be a routine part of their work and staff should subject all receivable balances to review.

654

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF MATERIAL WEAKNESSES**

**Management Response:**

Management agrees that receivables and allowances should be analyzed and adjusted on a regular basis to meet financial reporting as established by the generally accepted accounting principles. Most of these accounting errors were identified by new management as part of the City Council's strategic initiative of getting the City's fiscal house in order. Steps were being taken to get the books reconciled. The interfund balance and accounts receivable issues were reported to Council after a preliminary assessment was done in Fall 2011. The auditors confirmed that the initial assessment was accurate and steps were taken in the Accounting division to get the financial statements corrected. The effects of which have been recorded in the June 30, 2011 financial statements or as restatements to the June 30, 2010 financial statements. Administrative Services is working closely with departments to improve communication and is taking steps to provide additional reports to department managers. Administrative Services is also working with IT to develop a management tool for improved monitoring, internal control, and consistency.

**2011 – 6:    Reconciliations of Subledgers To General Ledger Balances**

**Criteria:** The City's financial information system is dated and several subledgers are not integrated with the general ledger. Account balances must be manually reconciled to supporting subledgers and adjustments must be prepared and posted to update the general ledger to ensure ending balances are accurate.

**Condition:** In prior years, not all receivable balances were reconciled to subledgers and adjusted as part of routine year end closing procedures. Prior receivable balances which required correction due to this issue: 2010 loan receivable balances in the HOME Fund were reduced $2.3 million and accounts receivable balances in the Wastewater Enterprise Fund were reduced $2 million. Other receivable adjustments included the Capital Improvement Fund for $41,000 and Stormwater Enterprise Fund for $155,000.

**Cause:** Lack of consistent, timely reconciliation of subledgers to general ledger account balances and recording of appropriate adjustments.

**Effect:** Balances were misstated in prior years and required current year correction.

**Recommendation:** Subledgers should be routinely reconciled to general ledger accounts balances and adjustments recorded in the accounting period to which they relate.

**Management Response:**

New management became aware of this finding and reported this in its initial assessment of the Administrative Services Department. Management is cognizant of the importance of subledger reconciliation to the general ledger balances and is working closely with departments to establish roles and responsibilities and communicating the importance of accurate and timely information. Accounting works closely with departments daily to coordinate module interface issues to ensure that updates occur timely and accurately. However, more timely reconciliation and monitoring must be put in place. Accounting will include additional checklist items in the month end and year end closing schedule to ensure that all reports are run timely and subledger detail is readily available for review by management.

# CITY OF STOCKTON
# MEMORANDUM ON INTERNAL CONTROL

## SCHEDULE OF MATERIAL WEAKNESSES

### 2011 – 7:    Reversal of Prior Year Liabilities

**Criteria:**  Current year balances of accrued liabilities should be analyzed to ensure payments have been appropriately applied and liability balances recorded in prior years have been reduced.

**Condition:**  The June 30, 2010 accounts payable balance in the Redevelopment Waterfront Capital Project Fund was overstated by $1.17 million due to a June 30, 2009 accrual for payments made in fiscal 2009-10. Payments made in fiscal 2009-10 were not appropriately applied to eliminate this balance. Similarly, accrued payroll in the General Fund was also overstated $315,000 for a similar issue going back to 2005.

**Cause:** Lack of a thorough analysis of ending balances.

**Effect:**  Liabilities were overstated by the above errors in prior years.

**Recommendation:** Liability account balances should be analyzed to ensure they are accurate and up to date.  Subsequent payments should be applied and balances appropriately reduced.

**Management Response:**

In management's comprehensive review of the funds and accounts, we determined that the payroll clearing account had not been reconciled for a period of time and that a large liability still remained. Upon further research and investigation we determined that a manual reversing entry had been made but for the wrong pay period amount in 2005.  This type of error is attributable to a late accrual entry and an incorrect reversal of an accrual.  Procedures have been put into practice whereby when year-end accrual entries are approved; they are accompanied by the reversing entries to ensure that accruals and reversals are completed timely.   Management believes that a review of fund analyses by a staff member other than the preparer will ensure that balances are properly documented and supported and that reversals of accruals are done accurately and timely.

### 2011 – 8:    Marina Debt Reporting

**Criteria:** Debt should be recorded by the entity that is obligated on the debt.

**Condition:**  Our review of the Marina loan agreements with the State of California Department of Boating and Waterways showed the City as debtor with repayment pledged to be made from Marina Enterprise Fund revenues.  In prior years, this debt was recorded and reported on the Redevelopment Agency's financial statements.

**Cause:** Staff did not understand the appropriate treatment of the debt when the City issued the debt.  The debt was originally planned to be Agency debt but ultimately became City debt when the transaction was finalized.

**Effect:** A lack of understanding of the debt agreements caused inaccurate financial reporting and caused the debt and the related asset to be recorded in the wrong fund.

656

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF MATERIAL WEAKNESSES**

**Recommendation:** Debt should be recorded by the issuer that is obligated to repay the debt. Reimbursement arrangements should be fully documented and approved by the Board prior to recording debt on the Agency's financial statements.

**Management Response:**

Administrative Services management will review all debt obligation arrangements carefully to ensure that transactions are recorded in the proper fund for financial statement reporting.

**2011 – 9:    Receipt Collection Site Operational Audits**

**Criteria:** Receipt collections are high risk assets susceptible to fraud. Good internal control practices provide for recurring operational audits of collection sites to ensure adequate procedures and controls are in place and operating effectively. Controls should reduce the risk of loss or error to a low level.

**Condition:** The City has 39 remote sites with cash collections. Four sites process collections that are material to the financial statements and were subject to our audit procedures.  For each of these sites, we performed interviews of staff, observed procedures, selected transactions and subjected them to audit and evaluated the results of our tests.  We noted several internal control weaknesses related to collection controls which are discussed separately in this memorandum.

We also asked staff about whether the City had a recurring program of subjecting cash collection sites to tests of processing controls and tests to determine compliance with prudent collection procedures, but were told none exists.

**Effect:** Without a program to test for adequate controls and procedures, there is a higher risk of error and fraud.

**Cause:** The City had not identified this as a high risk area and therefore cash audits were absent.

**Recommendation:** The City should establish a program to routinely verify whether prudent procedures and controls are in place and operating effectively.  The program should include an evaluation of the design of processes and procedures, evaluate segregation of duties and test the operational effectiveness of the procedures and controls.

**Management Response:**

We are in agreement with the finding and recommendation.  Once a new internal auditor firm is hired, these procedures will be considered as part of the overall risk assessment of the City.

**2011 – 10:  Journal Entry Reviews**

**Criteria:** Good internal controls provide for checks and balances ensure that appropriate reviews are in place to ensure accuracy and limit the risk of error or fraud.  Adjusting journal entries represent a key transaction cycle affecting virtually every account balance. Journal entries prepared by one employee should be reviewed by another employee to ensure controls are in place to minimize the risk of misstatement.

657

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF MATERIAL WEAKNESSES**

**Condition:** Journal entries are not consistently reviewed by a second employee. We selected forty journal entries from August 2010 through May 2011 to test the accuracy of the amounts posted, the adequacy of supporting documentation and the reliability of control procedures. While we noted amounts posted were accurate and supporting documentation adequate, ten of our selections did not show evidence of review.

**Effect:** Without an adequate review process in place, there is a higher risk of material error or misstatements.

**Cause:** Lax enforcement of journal entry reviews and staff turnover.

**Recommendation:** Journal entries should be reviewed for accuracy and that review should be evidenced by initialing the journal entry.

**Management Response:**

Management is aware of the importance of timely journal entry review and approved an additional position of Senior Accountant in the 2011-12 budget to mitigate this issue. Journal entry review was specifically identified as a primary assignment to assist management in this area. This assignment is currently assigned to temporary staffing and journal entry review is being completed timely. Management anticipates that once the position is filled permanently, additional efforts to streamline the process can be put in place to strengthen internal control and further limit the risk of error and fraud.

**2011 – 11: Accrued Interest On Long Term Receivables Should Be Recorded.**

**Criteria:** The City has various loan programs to third parties that contain interest provisions. Similarly interfund balances contain interest provisions. Generally accepted accounting principles require the recording of account balances in accordance with the underlying terms of the agreements.

**Condition:** Accrued interest had not been recorded in prior years on loans from property owners and for certain interfund balances. Interest on interfund loans due from the Redevelopment Agency to the City was not reflected on the City's prior year financial statements, while it had been reflected on the Redevelopment Agency's prior year financial statements.

**Effect:** Understatement of receivable balances.

**Cause:** Lack of applying analytical thinking based on the terms of the agreement to the account balances.

**Recommendation:** Terms of loan programs should be understood by staff and applied to balances reported in the general ledger. Account balances should be complete based on the terms of the underlying agreements.

## CITY OF STOCKTON
## MEMORANDUM ON INTERNAL CONTROL

### SCHEDULE OF MATERIAL WEAKNESSES

**Management Response:**

Accounting will work with departments to review the various loan programs to gain a clear understanding of the associated interest provisions for loan agreements and develop checklist items to facilitate compilation of required support documentation for year-end accruals and analysis. Management will review current procedures and practices for all loan programs to ensure balances are recorded accurately with the underlying terms of agreements and follow generally accepted accounting principles.

### 2011 – 12:   The Operational/Internal Audit Program Should Be More Robust

**Criteria:**  Large complex organizations should provide for a robust program of internal or operational audits designed to test controls and processes and provide results and recommendations for improvements to be made.

**Condition:** The City has an internal audit department that conducts operational and internal audits. However, we noted during our audit and commensurate evaluation of controls there are many areas requiring attention.  Cash collection site controls, journal entry reviews, cash account reconciliation processes, system issues and vendor transaction processing oversight are all areas we believe would benefit from a robust program of internal or operational audit.

**Effect:**  Controls and processes are not receiving operational scrutiny.

**Cause:**  Staffing cuts and a weak risk assessment process to determine areas of need.

**Recommendation:**   We recommend a more robust program testing processes, procedures and controls.

**Management Response:**

We agree that the City Auditor's Office needed to have a more robust and improved risk assessment process which was identified as one of City Council's Strategic Initiatives.  As a result, the majority of work conducted by the audit office was on operational audits.

Due to the recent retirement and separation of the City Auditor and Assistant City Auditor, the City will be issuing a request for proposal to recruit an outside audit firm to conduct an Internal Control and Risk Assessment audit.  The results of the audits will be used to determine an audit plan to address the high risk areas needing scrutiny.  The goal is to have a contract in place by the end of this calendar year.

659

This Page Left Intentionally Blank

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**2011 – 13:    Investment Report Timeliness**

**Criteria:** Government code Section 53646 contains a provision that Investment Reports be submitted to Council within 30 days of quarter end.  Investments represent a material asset class and the reporting of investment balances and activities to management and Council on a timely basis is an important reporting function.

**Condition:** We noted on the June 7, 2011 agenda that Investment Reports for the quarters ended September 30, 2010, December 31, 2010 and March 31, 2011 were submitted to the Council.

**Effect:** City is out of compliance with the Government Code. Investment data is old by the time it is submitted to Council.

**Cause:** Staff turnover, especially at the senior finance staff level.

**Recommendation:** Investment reports should be submitted to management and Council with 30 days of quarter end.

**Management Response:**

Management is working to correct this issue which is directly attributable to staff turnover and a vacancy in Administrative Services management.  The position has been filled now as well as an internal reorganization to re-assign this responsibility.  Moving forward management will monitor due dates to ensure investment reports are submitted to Council in a timely manner.

**2011 – 14:  Indirect Cost Plans and Indirect Cost Allocations**

**Criteria:** Indirect costs allocations should be based on an approved Indirect Cost Plan. Indirect costs should be uniformly charged to programs and activities and routinely included in requests for reimbursement from outside agencies.  Staff should be well informed and trained on the appropriate use of the Indirect Cost Plan to maximize reimbursement for allowable indirect costs.

**Condition:** Staff does not uniformly charge indirect costs on all programs and activities. Our conversations with several program staff indicates that there is a lack of understanding on Indirect Cost Plans and their use in charging programs and activities. The Accounting Division recently took over oversight of the cost plan process.  The Chief Financial Officer has been working with a consultant to determine possible changes with regard to indirect costs and their application to the City programs and activities.

**Effect:**  Staff is under billing for costs that might otherwise be eligible for reimbursement.

**Cause:**  Lack of a uniform policy to charge and bill for indirect costs and lack of sufficient training on the use of indirect cost plans.

**Recommendation:**  The City should develop a uniform policy on indirect costs and train an educate staff on the appropriate use of the indirect cost plan to charge programs and activities.

### CITY OF STOCKTON
### MEMORANDUM ON INTERNAL CONTROL

### SCHEDULE OF SIGNIFICANT DEFICIENCIES

**Management Response:**

We are in agreement with this finding. New management in its evaluation of the Administrative Services Department had identified that an additional key assignment will be development and administration of an updated city-wide cost allocation methodology to replace our fragmented salary allocation system. In addition, the City has hired a new consultant to help prepare a more robust indirect cost plan and recently issued the City-wide Cost Allocation Plan for FY 2011-12. As part of that transition management is evaluating, with their help of the consultant, the current costing methods used by the City to ensure that we are obtaining all cost recovery that is available. In addition, the consultant will assist in training staff to help them better understand governmental guidelines to afford adequate support/methodology and recover overhead costs from other governmental agencies.

### 2011 – 15:   Conformity of Budgetary Reporting in the Financial Statements to the Annual Budget

**Criteria:** Section 1908 of the Charter states that, "No member of the Council, officer, department or agency of the City, during any budget year, shall expend or incur any obligation to expend money for any class or category of expenditure not authorized by or in excess of the amounts appropriated in the budget." Budgetary reporting contained in the annual financial statements should be presented in a format that easily presents budgetary compliance or noncompliance.

**Condition:** The City's 2010-11 Annual Budget and year end financial reporting are inconsistent. The General Fund for financial reporting purposes consists of several general ledger funds that are separately budgeted. Expenditure classifications are similar to but not identical between the 2010-11 Annual Budget and budget versus actual statement contained in the annual financial statements.

**Cause:** Use of different formats in the 2010-11 Annual Budget and annual financial statements.

**Effect:** The inconsistency makes determining budgetary compliance difficult.

**Recommendation:** Reformat the presentations in the 2010-11 Annual Budget and annual financial statements to be consistent such that budgetary compliance or noncompliance is easy to determine.

**Management Response:**

We agree with this finding and recommendation. There was confusion on the level of funds and what the differences between GAAP and budgetary basis were for reporting in the CAFR. Accounting and budget staff will be working more closely to ensure that the differences are identified and the proper schedules are included in the CAFR for FY 2011-12.

### 2011 – 16:   Completeness of Proprietary Fund Receivable Balances

**Criteria:** Revenues should be recorded in proprietary funds when earned.

**Condition:** Management identified that the prior year June 30, 2010 Water Enterprise Fund receivables were understated $1.8 million representing unbilled revenues and the General Liability Internal Service Fund receivables were understated for property damage reimbursements amounting to $1 million.

**Cause:** Evaluation of subsequent activity and billing cycle procedures were not present.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Effect:** June 30, 2010 receivable balances were understated.

**Recommendation:** Staff should analyze proprietary fund activities to determine accrued revenues that should be recorded.

**Management Response:**

Administrative Services management strongly encourages open communication between Revenue Services and Accounting and sharing information more readily. Accounting is working closely with Revenue Services to ensure proper revenue recognition cut off procedures are in place and that transaction billing cycles are recorded in the correct accounting period. Additional checklist items have been added to the month end and year end closing schedules to ensure that all cut off and timing issues are monitored and identified so that reports are run timely and are readily available for review by management. In addition, staff meetings will be scheduled to discuss the various billing cycles and proper revenue recognition to facilitate information sharing between the units.

**2011 – 17:  Cash Account Reconciliations**

**Criteria:**  Cash account reconciliations should be completed accurately and timely and adjustments recorded as appropriate.

**Condition:** During fiscal 2010-11 staff recorded adjustments amounting to $681,000 to correct prior year balances. The lack of timely bank reconciliations and a difference of approximately $500,000 was identified Auditor's Report to the Audit Committee by the prior auditor. As a result, Staff identified procedural issues and hired a consultant to assist with resolving them and has since modified bank reconciliation procedures and corrected the errors.

**Cause:** Double counting of parking citation revenues and other procedural problems.

**Effect:** Prior year cash balances were misstated by $681,000.

**Recommendation:** Staff should continue enhanced bank reconciliation procedures and ensure that bank reconciliations are completed timely and adjustments, if any, are recorded timely.

**Management Response:**

We agree with the finding and recommendations. As noted in our response to findings noted during the previous year's audit, we have given cash reconciliations a high priority. Staff developed procedures for daily posting of receipts to the general ledger and daily reconcilement of those receipts to bank statements and to the modules used for receipting. Non-cashiered cash activity, such as wire transfers in and out, are recorded in the general ledger and reconciled with bank records weekly. The new practices assist in identifying and correcting errors as they occur. Cash activity is monitored and reported to management daily. It should be noted that the activity of pooled investments and cash with fiscal agents, which represent approximately 97% of the City's cash holdings, are recorded in the general ledger and reconciled to source documents timely.

CITY OF STOCKTON
MEMORANDUM ON INTERNAL CONTROL

SCHEDULE OF SIGNIFICANT DEFICIENCIES

**2011 – 18:  Evidence Of Bank Reconciliation Preparation And Review**

**Criteria:**  Staff should leave a documentary trail indicating when and who completes bank reconciliations and when and who reviews them.  This is to ensure that they are being prepared and reviewed by different employees and completed in a timely manner.

**Condition:**  The June 2012 bank reconciliations did not indicate if they were prepared within 30 days from receipt of the bank statement.  In addition, the bank reconciliations did not indicate who prepared or reviewed them.  We understand that there are several Finance employees who are involved with the reconciliation process with a separate Finance employee compiling the bank reconciliation.  However, there is no evidence that a review occurs after it is completed.

**Effect:**  Controls over the City's cash accounts are insufficient and staff may not detect errors or fraud in a timely manner.

**Cause:**  Poor documentation of monitoring control.

**Recommendation:**  We recommend that the City implement procedures to ensure the timely preparation of the bank reconciliations and that an overall review is complete.  And the reviewer and the preparer should sign and date the reconciliations.

**Management Response:**

We concur with the recommendation that bank reconciliations be prepared and reviewed on a timely basis.  Bank reconciliations were current up until the rigorous demands were placed on Accounting staff to undergo the year end audit, the five SCO audits, the demands to gather multi-year records to respond in the AB506 and chapter 9 bankruptcy filing.  Without the use of additional temporary staff, we have not been able to focus on timely reconciliations to the extent needed.   However, we are reconciling and reporting on daily cash activity which identifies book to bank differences and provides a level of monitoring control the City did not have before.  Monthly reconciliations are now prepared, documented and cross-referenced to facilitate management review.  We anticipate filling vacant accounting positions and recently hired an Assistant Administrative Services Director.  As a result, we expect to dedicate more staff resources to preparation and review of bank reconciliations.

**2011 – 19:  Accrued Compensated Absences Calculations**

**Criteria:**  Accrued compensated absences should be calculated including vested benefits owed as defined in the underlying bargaining unit agreements. Calculations should be accurately completed and supporting records should be scrutinized for errors.

**Condition:**  Prior year calculations did not include provisions for merit pay and longevity which resulted in a restatement of the prior year financial statements. In addition, system reports used as a basis for calculating the liabilities contained program flaws that created mathematical errors in the unused compensated absence hours.

**Cause:** Programming flaws and lack of thorough understanding of terms contained in the underlying bargaining unit agreements caused reports to exclude certain accruals such as longevity.

664

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Effect:** Understatement of accrued compensated absences.

**Recommendation:** Underlying bargaining unit agreements should be carefully reviewed and provisions for vested benefits should be included in the calculation of accrued compensated absences.

**Management Response:**

Due to the radical modifications to employment agreements over the last two and half years and the very complex and long list of premium pays, it has created significant challenges to manually track and monitor. In addition, the HTE system is severely outdated and limited in that many of the reports are real time reports that needs to be run manually at a date in time or that period of measurement is lost from a reporting capacity. Thus retroactive changes have to be calculated and input manually.

Payroll is now supplying staff with necessary amounts for Fire Longevity hours and City staff compensatory time. The calculation error from the programmed report has been corrected in the fiscal year 2010-11 comprehensive annual financial report but will need to be recalculated manually for fiscal year 2012 closing due to the inability to implement timely the changes necessary before the deadline of running the reports. Moving forward, the system generated reports have been corrected for fiscal year 2012-13 financial statements

**2011 – 20:  Pollution Remediation Liability Calculations**

**Criteria:**  Liability calculations should be reviewed for accuracy.

**Condition:**  The prior year calculation of the pollution remediation liability contained a mathematical error in the excel spreadsheet which understated the liability by $1.1 million.

**Cause:**  Excel spreadsheets inherently have higher risk of error without a sufficient review of the calculation.

**Effect:** Understatement of the liability in prior years.

**Recommendation:** Sufficient manual reviews should be performed to provide a good check and balance against the possibility of calculation errors.

**Management Response:**

We agree with this finding and recommendation. This liability is part of the Successor Agency and therefore the critical aspect of the calculations with be transferred to the Successor Agency staff.

**2011 – 21:  Check Register Reviews**

**Criteria:** Check registers for the main bank accounts should be reviewed, approved and documented with an initial or signature and date.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Condition:** Prior to the hiring of the prior Chief Finance Officer in January 2011, there was no evidence that check registers were being reviewed.

We are aware that department heads or their designees approve disbursements prior to payment. Our tests of forty disbursements showed that for those selections, approval was made. It is this review process that partially mitigates the lack of register review and in our view reduces the risk of error.

**Effect:** Without evidence of a review there is no indication that the City completed a review of check registers before processing checks. This raises the potential risk of undetected errors or fraud.

**Cause:** Staffing turn over.

**Recommendation:** We recommend that staff continue to review the registers and provide evidence that such a review has been completed timely.

**Management Response:**

We agree with this finding and recommendation. This was previously identified by new management. After the new CFO was hired, two levels of review and approval on the check registers and payroll registers were implemented. The Assistant Director reviews the detailed register and approves prior to giving to the CFO for review. Checks from that register are often times haphazardly selected for detailed review of the supporting documentation. This review has added time to process the checks for release but we are reworking other processes to regain efficiencies with the new improved controls in place.

**2011 – 22:  Updating Signature Cards for Authorized Signatories**

**Criteria:** Signature cards for bank and investment accounts should be updated within a reasonable amount of time whenever there are changes in authorized signers.

**Condition:** When the City hired the prior Chief Finance Officer in January 2011, the staff added her on the signature card of the City's general checking account and removed the previous Chief Finance Officer. The City was still in process of updating signature cards for the other accounts during our July site visit. The City should not have former employees as authorized signers on bank and investment accounts.

**Effect:** Having former employees on the bank and investment accounts may lead to unauthorized transactions.

**Cause:** Staff turnover.

**Recommendation:** The City should update the signature cards in a timely manner whenever there are changes to signatures.

666

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Management Response:**

We concur with the recommendation that signature cards be updated in a timely manner.  Since the auditor's July site visit, we have updated the signature cards.  No employees who have left the City or who have been assigned to other departments or duties remain on signature cards.  In order to ensure that we have appropriate signers for all accounts and to facilitate future updates, we developed an inventory of the City's checking and investment accounts with information on current signers.  The inventory is updated when circumstances change and the signature cards are updated accordingly.

**2011 – 23:**      **Purchasing Policy - Authorization for Payment Method**

**Criteria:** Authorizations for Payments (AP) is a simplified method used to process purchases that does not require the use of purchase orders.  APs may be used only for expenditures in the twenty-one categories listed in the City Manager Administrative Directive *Contracts-25.1f, Authorization for Payment*.  Purchase orders are to be used for all other goods and services.

**Condition:** We selected forty disbursements for control testing and noted six disbursements, authorized under Directive *Contracts 25.1f, Authorization for Payment*, that did not fall into one of the specified categories, and we believe should have gone through a purchase order process.

**Effect:** Non-compliance with policy. Potential over-expenditure of funds.

**Cause:** Lax enforcement of the Directives.

**Recommendation:** Policy requirements should be complied with to ensure expenditures are only made with proper authority.

**Management Response:**

Since July 2011, due to compliance concerns expressed previously by the City Manager, Administrative Services has been reviewing 100% of all payments made using the alternative "Authorization For Payment" non-contract disbursement process ("AFP").  Initially, after the Temp Agency disbursement issues were identified in 2010, compliance review of these payments has been conducted at an increased rate of 25 transactions per month.  After ongoing compliance issues were identified, sampling was then elevated from 25 transactions per month to 100% of all "AFP" transactions received.

Accounts Payable reviews each disbursement request for completeness of information:  approval signatures, correct account number, acceptable "Authorization for Payment" category, and whether disbursement amount falls within Council limit.  All AFPs with missing/inappropriate information are returned to the departments for correction.  However, non-compliance surrounding inappropriate category use is submitted to Purchasing for compliance determination. During the period from July through September 2011, 667 AFPs were identified to be non-compliant. During the same period of time in 2012, the number of non-compliant AFPs from July through September 2012 was reduced to six from 667. Now all non-compliant AFPs are returned to the departments for correction to the appropriate method of procurement before payment is made.

667

## CITY OF STOCKTON
## MEMORANDUM ON INTERNAL CONTROL

### SCHEDULE OF SIGNIFICANT DEFICIENCIES

**2011 – 24:**    **Purchasing Policy Update and Codification**

**Criteria:** The Purchasing Policy document should be in an easy to use format.

**Condition:** We noted the City's Purchasing Policy is derived from the Charter and is documented in a series of Directives, some dating back many years. The approach makes the policy requirements difficult to understand and apply.

**Effect:** The structure raises the risk of non-compliance.

**Cause:** Past practices were to update and change policy with new directives.

**Recommendation:** Policy requirements should be updated, combined and codified into a single comprehensive document that is easy to use and apply.

**Management Response:**

Management concurs with this finding.  Efforts by Purchasing to revise the purchasing manual have been underway.  A revised purchasing manual is anticipated to be submitted to the Executive Team by January 2013 for review and approval.

The revised purchasing manual includes updated Charter and Municipal Code references, as well as consolidation of Administrative Directives that provides a more cohesive and flowing policy.

**2011 – 25:**    **Capital Asset Policy Should Be Updated For Actual Useful Lives Used**

**Criteria:**    Useful lives used for deprecation for should fall within the range outlined in the City's capitalization policy.

**Condition:** During depreciation tests we noted for five out of 43 samples were being depreciated using a useful life of 65 years for streets and roads and two out of 43 samples for improvements were being depreciated using a useful life of 10 years. According to the City's Capital Asset Policy, streets and roads should be depreciated using a useful life of between 50 and 60 years and improvements should be depreciated using a useful life of between 20- 30 years.

**Effect:**  City is out of compliance with its own capitalization policy.

**Cause:**  Staff do not review the policy when inputting the useful life into the system.

**Recommendation:** Useful lives should conform to the policy or the policy should be changed.

**Management Response:**

We agree with this finding and recommendation.  We will review all our fixed assets for the appropriate useful lives and will modify any depreciation calculations.  This is considered a change in estimate and will be reported prospectively.  The CFO and Accounting Manager are working to assign one accountant to be the fixed asset accountant for the City due to the many errors encountered in this area.

668

## CITY OF STOCKTON
## MEMORANDUM ON INTERNAL CONTROL

### SCHEDULE OF SIGNIFICANT DEFICIENCIES

**2011 – 26:    Depreciation Expense Does Not Recalculate Properly**

**Criteria:** Deprecation should calculate accurately.

**Condition:** During deprecation testing we selected 43 samples and found that 6 samples did not calculate accurately. Although the variance between our tests and amounts produced by the system was not material, there may be system issues that need to be corrected.

**Effect:** Depreciation expense is not being correctly calculated.

**Cause:** This appears to be caused by the change of accounting systems in 2003 it appears that some changes from the previous system where not transferred to the new system.

**Recommendation:** We recommend that staff reevaluate the capital assets module to ensure that it is calculating depreciation properly.

**Management Response:**

We agree with this finding and recommendation. We will review all our fixed assets for the appropriate useful lives and will modify any depreciation calculations. This is considered a change in estimate and will be reported prospectively. The CFO and Accounting Manager are working to assign one accountant to be the fixed asset accountant for the City due to the many errors encountered in this area.

**2011 – 27:    Redevelopment Rental Property Not Capitalized**

**Criteria:** The Redevelopment should ensure that properties being rented are actually recorded in capital assets.

**Condition:** The Redevelopment Agency is currently renting out property and it appears that the property has not been recorded as a capital asset. The property being rented was purchased with another property for a total of $350,930.

**Cause:** The property purchase was expensed and not recorded as a capital asset.

**Effect:** The City is understating amount reported as capital assets.

**Recommendation:** The error should be corrected and additional reviews performed to ensure other errors do not exit.

**Management Response:**

We agree with this finding and recommendation.

Property acquired by the Redevelopment Agency has typically been recorded as property for resale without verifying documentation. The presumption being that the Agency would transfer the property to either a developer, or the City. No in depth analysis of property purchases was done on the part of Accounting staff which resulted in the present situation of a non-capitalized asset.

669

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

Now that the Agency has been transferred to the Successor Agency a complete reconciliation of all properties has been performed and analyzed by Accounting staff to ensure that the property is for resale, or should be capitalized.

**2011 – 28:  Vendor Transaction Processing Controls and 3rd Party Audits/ SAS 70 Reviews:**

**Criteria:**  Revenues are highly susceptible to fraud. Internal controls should provide adequate safeguards to ensure all revenues are accounted for and timely recorded.

**Condition:**  The City supplements its staff resources by using 3rd parties which process transactions for the City. When an organization relies on 3rd party processing, it should perform some effort to gain assurance that the controls and data are accurate.  The form of effort can be:

- ✓ Staff analysis and review of transactions and data to ensure data accuracy, such as is the case with debt transactions recorded by trustees and investment manager reports.
- ✓ Obtaining a 3rd party audit of operator activities.  This is the strategy employed for the new operator of the Events Center.
- ✓ Alternatively, the City could request a review of internal controls of the processor under Statement on Standards for Attestation Engagements 16 (Reporting on Controls at a Service Organization), (formerly SAS 70).

Certain transactions where procedures were insufficient to limit the risk that revenues are incomplete include:
- ➢ Parking Citation Collections
- ➢ Parking Meter Collections
- ➢ Utilities billing (north side) Cal Water
- ➢ Loans from Property Owners

**Cause:**  Insufficient oversight.

**Effect:** The City runs the risk that revenues are incomplete or are remitted late.

**Recommendation:** Staff should provide some oversight and analysis for the above revenue/receivable cycles employing one of the three alternatives to ensure controls are operating effectively at the processing agent.

**Management Response:**

The City agrees with this finding and recommendation.  Since many of the above procedures are outsourced to other governmental agencies it is highly likely that a SAS 70 audit has not been performed at those agencies.  Absent that review, the City must perform enough procedures over internal controls to ensure it is satisfied that its revenue and receivables are complete and accurate. This will be included as one of the areas the new internal auditor will need to evaluate in its risk assessment and consider building into their procedures.  In addition, the agencies we contract with for outsourced services should be required to provide a SAS 70 report if they are a significantly material to the City.  We will include that requirement in future requests for proposals.

670

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**2011 – 29: Parking Meters Revenue Collection Process Oversight.**

**Criteria**: Physical cash is the most liquid of assets and has the highest risk of theft, embezzlement, and misappropriation. In general, the following rules over cash controls are especially beneficial:

➢ A single employee should not be able to handle a cash transaction from beginning (cash receipts) to end (bank deposit) without review.

➢ The cash handling function should be separated from the function of recording cash transactions in the books of account.

➢ Cash receipts should be deposited to the bank intact on a daily basis.

➢ Employees not involved with cash processing should prepare bank reconciliations.

**Condition:** Currently, a third party service organization (Organization) collects all the cash from parking meters. They also count the cash and prepare the bank deposit. The bank recounts the cash and sends a report, showing the total daily receipts to the City.

**Effect:** Because only the Organization is involved in the whole cash collection process without supervision or review, there is an increased risk for misappropriation of cash.

**Cause:** Limited staffing resources and outdated meter machines.

**Recommendation:** We suggest the following to improve internal control over the parking meter cash collection:

● On a random basis, a supervisor or another employee should accompany the Organization to perform the cash collection. If done over a period of time, the amount of cash collected can then be analyzed to determine what should be the reasonable range. Knowing that a supervisor is conducting random checks can also further discourage the Organization from misappropriating cash.

● Alternatively, the City could request a review of internal controls of the processor under Statement on Standards for Attestation Engagements 16 (Reporting on Controls at a Service Organization), (formerly SAS 70).

**Management Response:**

We agree with this finding and will implement the recommendations.

**2011 – 30:    Permit Center Cash Edit Listings**

**Criteria:** The Permit Center should ensure that supporting documents are attached to deposit batches that are sent over to the Central Cashier.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Condition:** During our testing to verify that total cash receipts reconciled to the system generated cash reports we selected 25 batches and compared entries to supporting documents and noted that for one selection a "Cash Edit Listing" (a report that provides the total cash received by permit type), was not attached to the batch.

**Cause:** The cashier forgot to generate the report at the end of shift and the batch was sent over to the Central Cashier.

**Effect:** Unable to determine if all revenues that were supposed to be collected, were actually collected.

**Recommendation:** We recommend that the cashiers carefully produce and attach all necessary documents to deposit batches sent over to the Central Cashier.

**Management Response:**

Management agrees with this finding and will meet with cashiering and supervisory staff to review policies and procedures and roles and responsibilities. Procedures will be updated as necessary. Management is cognizant of the necessity to safeguard City assets and will ensure that complete and accurate documentation of each day's cash receipts, including the "Cash Edit Listing" report is forwarded to the Central Cashier.


**2011 – 31:    Receipt Batches Sent To Central Cashier Not Being Reviewed**

**Criteria:** Central Parking should have a supervisor review all cash receipts batches before being remitted to Central Cashier.

**Condition:** Daily report batches are not reviewed before they are taken over to the Central Cashier.

**Cause:** Lack of Staffing.

**Effect:** Weak controls for receipts batches.

**Recommendation:** We recommend that a Supervisor review and sign all batches before they are remitted to the Central Cashier.

**Management Response:**

Management agrees with this finding and has implemented procedures that require review of cash receipt batches by the Central Parking District supervisor before being forwarded to the Central Cashier.


**2011 – 32:    Lack of Independent Void Process**

**Criteria:** Central Parking should have someone not involved with the cashier function void receipts. The segregation of duties will limit the possibility to void receipts and interception cash.

**Condition:** The Office Assistant is included in the cashier function and is capable of voiding receipts.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Cause:** There are no integrated cash registers at Central Parking. When a payment is made (only cash or checks are accepted at Central Parking), a manual receipt is prepared and a copy is kept along with the payment and placed in an envelope. Therefore, the cashiers have the authority to void receipts.

**Effect:** Possible misappropriation of assets.

**Recommendation:** We recommend that a supervisor voids all receipts and attaches a signed voided slip with the daily cash batches remitted to Central Cashier.

**Management Response:**

Management agrees with this finding. As of October 2011, a cash receipt machine that interfaces with the City's mainframe computer system was installed. This now enables payment transactions to be recorded real time directly into the City's financial system. If a receipt is voided in the financial system, three ASD personnel, including a supervisor, are notified immediately that a receipt was voided and the reason for the voiding. This information is incorporated into the review of the Central Parking District's daily cash deposit by the ASD staff. In the event that a manual receipt is issued due to a computer transaction error, the voided receipt, along with a voided batch report, are sent to ASD for review as part of the daily cash deposit. Any discrepancies between the void reports are provided to the supervisor in the Central Cashier's office who follows up on them.


**2011 – 33:    Establishing Bank Accounts**

**Criteria:** Bank accounts under the City's control should be established through the Finance Department and recorded in the general ledger.

**Condition:** Bank accounts for the Marina Bank of the West account and the SMG (Events Center) account in the amount of $7,094 and $254,831, respectively, were established but these accounts and related operating activity were not recorded in the general ledger on a timely basis.

**Effect:** Underreporting of cash and activity balances increases the risk of unauthorized activity.

**Cause:** The operator for the Marina and the Stockton Event Center opened the bank accounts and provided activity reports to the City accounting but these were not recorded on a combined basis.

**Recommendation:** Bank accounts under the City's control should be established through the Finance Department and recorded in the general ledger. Clear authority of account signatories and disbursements should be established and control based on the terms of the operator agreements and City policy.

**Management Response:**

We agree that the transactions recorded in the operator-owned checking accounts had not been recorded in the general ledger. Previous to fiscal year 2010-2011, management did not believe that such treatment was warranted under Generally Accepted Accounting Principles. However, the new CFO and Assistant Director determined it was appropriate and necessary to record the activities of the outside operators in the general ledger as the accounts are in the City's name and are the funds and operations of the City. This was accomplished by combining these accounts for the year-end reporting of fiscal year 2010-2011.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**2011 – 34:**    <u>Direct Labor Allocations for Housing Activities</u>

**Criteria:** Payroll charges for Housing Activities are based on predetermine allocations. A large portion of Housing activities are funded with federal awards which are subject to Office of Management and Budget Circular A-87, *Cost Principles for State, Local, and Indian Tribal Governments*. This regulation requires the use of contemporaneous time keeping records as a basis for charging direct labor costs to federal awards.  The use of allocations is permitted if time studies are conducted in accordance with requirements of A-87 quarterly and allocations are trued up.

**Condition:**   During our testing of Housing Division payroll costs we noted that nine employees charged time to federally funded housing activities. Per conversation with Housing staff, the allocation of payroll is based on an estimate of how much time each employee is going to spend working on Housing activities. We noted staff conducted two forms of time studies, but neither appears to conform to A-87 requirements. Further, we found no evidence that the time study results are used to true up allocations.

**Effect:**  The City is not in compliance with A-87 requirements and direct labor costs charged to federal programs may not be fair and equitable.

**Cause:**  Lack of understanding of federal regulations and their application to direct labor charges to programs.

**Recommendation:**  We recommend the City review Circular A-87 and employ those requirements as they relate to direct labor costs charged to federal award programs.

**Management Response:**

We are in agreement with the finding and the recommendation.  We brought this to the attention of the audit firm at the beginning of the audit and asked for additional guidance in this area.  We are aware of the OMB A-87 requirements and will be working with the Indirect Cost Plan consultant, budget, Human Resources and others in order to improve the activity based costing currently used by the City for charging payroll to Federal programs.

Time sheet sampling was implemented in 2005.  HUD has conducted other monitoring visits since we have implemented this system and we have received no findings or concerns from them on the issue.
Upon completion of the sampling, the time sheets are reviewed and if a major discrepancy between the time sheet and the salary allocation is found, the staff person and/or their supervisor is asked to explain the differences. If there are no mitigating factors, then charges may be adjusted and allocations revised appropriately.

One area where improvement will be made is in reviewing the results of the quarterly time sheet sampling and adjusting the employee's salary costs each quarter to reflect the sampling results. In addition, the results will be reviewed annually, and used as a tool to justify or deny proposed salary allocations during preparation of the annual budget. As noted above, we previously reviewed the sampling and followed-up on major discrepancies.  We are now reviewing all of the sampling results on a quarterly basis and adjusting the salary charges accordingly.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**2011 – 35:  Prompt Recording of Cost Disallowances**

**Criteria:** Programs funded by resources from other governments are subject to program audits which include specific tests to determine cost allowability.  Upon staff acceptance of the results of the program audit, any costs disallowances should be recorded in the general ledger.

**Condition:**  During year end closing procedures, staff determined that a program audit of Measure K activities indicated cost disallowances on street projects in the amount of $1.6 million were known in prior years by program staff but not recorded or other funding sources identified.

**Effect:** Receivables were overstated in the prior year by the amount of the cost disallowance since it was not reserved or written off.

**Cause:** Poor communication between departments.

**Recommendation:** Cost disallowances should be promptly recorded once audit results are accepted.

**Management Response:**

We agree with this finding and recommendation.  Cost disallowances of this magnitude can have a significant impact on City finances to cover the disallowance.  In the future, procedures will be established whereby the departments notify Administrative Services Department of external audits.  At the completion of the audit, an exit conference should be held.  When the departments receive the final audit findings they will be required to report the findings to the Administrative Services Department with identification of any additional funding source for the costs.  In instances where this will require the departments to appropriate additional funds and require council action, depending upon the amount of the disallowance, the departments should coordinate with Accounting and Budget when these circumstances are encountered.    Absent other funding sources this can impact an already cash constrained General Fund.  Processes are currently in place to reallocate the costs to other funds, with appropriate approval, if there is sufficient funding available from another source.

**2011 – 36:  Review and Approval of Changes To The Employee Database**

**Criteria:** Good internal controls require appropriate segregation of duties to limit the risk of error of fraud. In the absence of complete segregation, a second employee should be involved in processing transactions to ensure there are appropriate checks and balances.

**Condition:** During our tests of internal controls over processing payroll, we noted that payroll employees have access to the employee database and may make changes to the database without the involvement of a second employee or department such as Human Resources.

**Effect:** There is an increased risk that errors or fraud could occur and go undetected.

**Cause:** Inadequate segregation of duties.

**Recommendation:** Either payroll personnel should not have access to make changes to the employee database or a second employee should review and approves changes to the employee database.

675

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF SIGNIFICANT DEFICIENCIES**

**Management Response:**

We are in agreement with this finding and recommendation. However, Human Resources is not currently in a position with current capacity constraints to take on these responsibilities. In order to provide mitigating controls, payroll often requires payroll changes to be calculated or verified by Human Resources in order to have a manual monitoring control in place that is verifiable. We will also evaluate the HTE system controls to determine if limits on authorizations by login can be placed on those able to update payroll master files and separate those individuals from the ability to cut the checks.

**2011 – 37:  Permanent Funds**

**Criteria:** Generally accepted accounting principles permits the reporting of resources (e.g. donations, gifts, and bequests) that are constrained by third party agreements and possess a corpus that may not be expended as a permanent fund in the City's financial statements.

**Condition:**  It appears in prior years that resources reported as permanent funds may not meet the above criteria. However, the City reviewed the nature of these funds and determined they were not permanent by terms of the agreement and those funds were reclassified. As of June 30, 2011, the City has corrected the financial statements and no permanent funds remain.

**Effect:** The City may be misreporting resources that do not meet the permanent fund definition.

**Cause:** Lack of sufficient attention to the underlying agreements.

**Recommendation:** Staff should perform a detail analysis of funds included in the financial statements as permanent funds and reclassify those amounts not meeting the above criteria.

**Management Response:**

We agree with the finding and recommendation. The City identified the Arts Endowment Fund as a fund that was classified in prior years as a permanent fund and has as part of Council's approved actions on February 28, 2012 moved $1.3 million of to the general fund. Though the corpus of the fund may not be permanently restricted we feel these funds still meet the definition of an agency fund and will be restricted but available to be spent on restricted purposes rather than the corpus needing to be preserved.

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF OTHER MATTERS**

**2011 – 38:  IT Best Practices**

**Criteria:** We believe Information System controls must be continuously improved and enhanced to stay ahead of the ever increasing sophistication of hackers and criminals.

**Condition:** Currently, there are no Information Technology standards which local governments are required to conform to. Indeed there are a wide variety of informal guidelines and suggested controls from many different organizations which local governments can use to implement appropriate controls to ensure adequate security over information technology. Our Information Technology staff have reviewed these informal guidelines and concluded that the certification and accreditation framework developed by the National Institute of Standards and Technology (NIST) for the Federal Information Security Management Act (FISMA) are the most appropriate for local government. NIST and FISMA represent the minimum security requirements for federal government agencies information systems. We understand the U.S. Department of Justice recommends these for local governments. Our procedures included performing an external network scan based on NIST criteria and in determining that internal control provides for:

- ✓ Internet access defenses including hacker prevention, detection and deterrent systems
- ✓ Security of data from physical or network access
- ✓ Adequately protecting data from unauthorized internal access
- ✓ Reasonable measures to ensure continuation of service
- ✓ Information systems risk management

**Effect:** While the results of our work did not indicate material weaknesses or significant deficiencies as they relate to financial reporting and the financial system, we did note overall information technology areas which could be improved to conform to NIST guidelines.

**Cause:** Complex And Ever Changing Information Technology.

**Recommendation:**
*Patch and Vulnerability Management* - Computer or information systems are dynamic, that is, they are in a state of continuous change. This state of change leads to change in risk to the information contained on those systems. Some changes to systems lead to vulnerabilities or weaknesses that potentially could be exploited by malicious attackers such as hackers. Our scans indicate the City's information systems have numerous vulnerabilities. While these vulnerabilities do not directly affect the financial reporting of the City, they do present an unnecessary risk to the City's information systems. The City should develop a method for finding and remediate such vulnerabilities before they can be exploited. "Patch and vulnerability management is a security practice designed to proactively prevent the exploitation of IT vulnerabilities that exist within an organization. The expected result is to reduce the time and money spent dealing with vulnerabilities and exploitation of those vulnerabilities. Proactively managing vulnerabilities of systems will reduce or eliminate the potential for exploitation and involve considerably less time and effort than responding after exploitation has occurred.

*Payment Card Industry Compliance* - The City is not in compliance with the Payment Card Industry Data Security Standard (PCI-DSS). Any organization that processes credit cards is required to comply with PCI-DSS, even if the processing is outsourced. Failure to meet compliance requirements results in higher transaction fees and liability if a security breach is found. Because the City accepts credit cards as a form of payment, the City must be compliant with the applicable controls.

677

# CITY OF STOCKTON
## MEMORANDUM ON INTERNAL CONTROL

### SCHEDULE OF OTHER MATTERS

*General Information System Controls* - Our review is based on the National Institute of Standards and Technology (NIST) control catalog NIST SP 800-53 rev. 3 for a moderate system as defined by NIST SP 800-60. We reviewed the compliance of the City's information systems with the NIST information security standards based on a moderate risk system. Although there is no required IT standard for local governments, NIST encourages state, local and tribal governments to consider the use of these guidelines, as appropriate. In adopting NIST standards the local government demonstrates due diligence in designing and implementing appropriate controls around its information systems. Our work indicates there are approximately 60 high impacts control areas, 10 moderate control areas and 10 low control areas which should be evaluated by staff and where appropriate inclusion into a cohesive IT plan.

**Management Response:**

The City agrees with the finding. The City has been working since 2011 with an independent consultant firm to develop a Citywide Technology Strategic Plan (CTSP). The CTSP was adopted by the City Council on June 19, 2012, and is the basis for management and improvements in technology throughout the City. One of the key elements of the Strategic Plan was the overall IT Assessment. As part of this assessment Nexlevel reviewed  network security –  Nexlevel's test was "The effective application of policy and standards, user conduct, software tools (filtering, monitoring, etc.), and audits to validate that the City's material and software resources are used only for their intended purposes". The results of this work is that Nexlevel found the City's technology security practices (network and system infrastructure) are satisfactory and preforming as intended.

While the IT Assessment found the City to be above average in overall technology security, they made a number of recommendations for improvements as part of the CTSP. These recommendations are currently being implemented as part of the CTSP.

- Execute an annual network vulnerability scan and penetration test.
- Remediate identified security issues from annual vulnerability scan.
- Create a City-wide security policy.
- Create a software license policy.
- Perform routine desktop software audits.
- Monitor email retention and manage disk capacity expansion.
- Re-evaluate email retention policy.
- Create a formal disaster recovery plan.
- Consider establishing an EOC at 400 E. Main.
- Modify timing of desktop virus scan.
- Staff Help Desk during patch management and virus scanning procedures.
- Modify timing of desktop patch procedure.

In addition, the City had a vacancy in the Information Technology Officer position for many months. Absent permanent staffing the initiatives did not move forward as quickly as we would have liked. The Administrative Services department has now filled this position and the Strategic Plan is the model that is governing the department's priorities and operations.

678

# CITY OF STOCKTON
# MEMORANDUM ON INTERNAL CONTROL

## SCHEDULE OF PRIOR YEAR MATERIAL WEAKNESS

**Finding 2010-01: – Library Fund Accounts Receivable (Material Weakness)**

**Criteria:** A material weakness is a deficiency, or combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis.

**Condition:** The City did not have approximately $3.4 million of accounts receivable representing uncollected fines, fees, and other charges for services recorded in the general ledger for the Library Fund. The accounting system used by the Library to account for and track the accounts receivable does not directly interface and upload into the City's accounts receivable module within the primary financial accounting and reporting system.

**Cause:** Based on observations and inquiry of City management, the error appears to result from the lack of routine reconciliations being performed between the decentralized subsidiary ledger utilized by the Library, and the City's accounts receivable module, as well as, inadequate monitoring and follow-up on outstanding accounts receivable balances.

**Effect:** The City was omitting financial transactions related to accounts receivable and revenue of the Library Fund from its financial statements.   However, the City has recorded the related accounts receivable, allowance for doubtful accounts, and net revenue of approximately $127,000 in the City's financial statements as of and for the year ended June 30, 2010.

**Recommendation:** The Library should implement procedures establishing specific control activities for the performance of routine reconciliation of accounts receivable between the Library Funds subsidiary ledger and the City's general ledger.   The Library should also establish monitoring procedures to ensure that the reconciliations and being performed on a timely basis, as well as, ensuring that a periodic analysis of the Library Fund's accounts receivable aging is conducted for identifying amounts that are no longer collectible.

**Current Status:**

This issue was discovered as part of an internal audit.  The City's new management teams has reviewed and analyzed the Library accounts receivable account balances for collectability and also reconciled the two systems.  Allowances for doubtful accounts have been established and will be monitored quarterly on an ongoing basis.   A quarterly review of the aging report will be completed by Library staff and Accounting. Procedures are in place to evaluate receivable activity to ensure that collection activity is within expectations.

679

This Page Left Intentionally Blank

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF PRIOR YEAR SIGNIFICANT DEFICIENCIES**

**2010 - 01:   Cash Reconciliations (Significant Deficiency)**

**Criteria:** A significant deficiency is a deficiency, or combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

**Condition:** During our testing of the City's cash and investments, we noted that the reconciliation of the City's main checking account was not being performed monthly on a timely basis, resulting in unexplained and unidentified differences.

**Cause:** Based on our observations it appears that due to the lack of timely monitoring and oversight, bank reconciliations were not being timely reviewed to ensure their completeness and accuracy and to identify and determine the necessary follow-up of reconciling amounts and unexplained differences.

**Effect:** As of June 30, 2010, there were unidentified reconciling differences related to deposits in transit for the City's main checking account of approximately $533,000.

**Recommendation:** The Administrative Services Department should improve upon the timeliness of performing bank reconciliations and strengthen the oversight and monitoring procedures, ensuring that complete and accurate reconciliations are being performed and there is timely follow-up to resolve any reconciling amounts and unexplained differences. Furthermore, all reconciling amounts should be clearly documented and supported.

**Current Status:**

See response to Finding 2011-17 for current status on the bank reconciliation process. The prior year errors have been identified and corrected.

**2010 - 02:   Advances to Property Owners Reconciliation (Significant Deficiency)**

**Condition:** During our testing we noted that the reconciliation between loans to property owners recorded in the general ledger and the loan balance amounts as reported by the third party administrator, were not being performed timely, resulting in unidentified reconciling amounts.

**Cause:** Based on our observations it appears that there was insufficient follow-up procedures performed related to unidentified reconciling amounts between the loans to property owners amounts reported by the third party administrator and the amounts recorded in the City's general ledger.

**Effect:** As of June 30, 2010, there were unidentified reconciling differences between the loan portfolio of the third party administrator and the City's general ledger of approximately $1.3 million.

681

**CITY OF STOCKTON**
**MEMORANDUM ON INTERNAL CONTROL**

**SCHEDULE OF PRIOR YEAR SIGNIFICANT DEFICIENCIES**

**Recommendation:** The Administrative Services Department should improve upon the completeness of the reconciliations between the third party administrator and the general ledger and strengthen the oversight and monitoring procedures, ensuring that complete and accurate reconciliations are performed and there is timely follow-up to resolve any reconciling amounts and unexplained differences. Furthermore, all reconciling amounts should be clearly documented and supported.


**Current Status:**

Advances to Property Owners have been reconciled for the current year. The development of a reconciliation process is on-going due to the nature of the loan projects. Each loan project must be analyzed to ensure the project module agrees with the General Ledger and the third party administrator. These loans can be problematic in that loan amounts are reported at face value by the third party administrator and at net expended in the General Ledger. Reconciliation methodology has been to compare the list of loans provided by the third party administrator to the project module in the finance system; then identify any variances. Variances are then researched by the Housing and Accounting departments and adjustments made as necessary. This method was used to reconcile Advances to Property Owners to the General Ledger for fiscal 2010-2011. However, this method proved inaccurate. Reconciliation of Advances to Property Owners for 2011-2012, using a more detailed methodology, exposed an inherent weakness in the methodology developed for 2010-2011. The weakness being; if a project was not on the third party administrator list and had no current year expenditures, the project total could be excluded from the calculation.

Current methodology is to complete a roll forward, by project, analysis of the general ledger accounts that make up the total loan balance; compare the calculated project balances to the third party administrator record and the project module. Using this methodology, staff discovered several loans omitted in the reconciliation of 2010-2011 Advances to Property Owners. The resulted in a correction of the 2010 – 2011 receivable balance of $19,773 additional loans in CDBG Programs and $1,910,056 additional loans in HOME Programs. These corrections include five small CDBG projects and three large HOME projects

Management believes the most current methodology, although cumbersome and labor intensive, will provide the most accurate analysis of the loan projects. Monthly analysis of Advanced to Property Owners will ensure that reconciling items are identified and processed in a timely fashion, eliminating further prior period adjustments.

**REQUIRED COMMUNICATIONS**

**MAZE**
& ASSOCIATES

November 17, 2012

To the City Council of
The City of Stockton, California

We have audited the financial statements of the City of Stockton as of and for the year ended June 30, 2011 and have issued our report thereon dated November 17, 2012. Professional standards require that we advise you of the following matters relating to our audit.

**Financial Statement Audit Assurance:** Our responsibility, as prescribed by professional standards, is to plan and perform our audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit in accordance with generally accepted auditing standards does not provide absolute assurance about, or guarantee the accuracy of, the financial statements. Because of the concept of reasonable assurance and because we did not perform a detailed examination of all transactions, there is an inherent risk that material errors, fraud, or illegal acts may exist and not be detected by us.

**Other Information Included with the Audited Financial Statements:** Pursuant to professional standards, our responsibility as auditors for other information in documents containing the City's audited financial statements does not extend beyond the financial information identified in the audit report, and we are not required to perform any procedures to corroborate such other information. Our responsibility also includes communicating to you any information that we believe is a material misstatement of fact. Nothing came to our attention that caused us to believe that such information, or its manner of presentation, is materially inconsistent with the information, or manner of its presentation, appearing in the financial statements. This other information and the extent of our procedures is explained in our audit report.

**Accounting Policies:** Management has the responsibility to select and use appropriate accounting policies. A summary of the significant accounting policies adopted by the City is included in Note 1 to the financial statements. There have been no initial selections of accounting policies and no changes in significant accounting policies or their application during 2011, except for the change in method of accounting for the effect of long term receivables in governmental funds as discussed in Note14 to the financial statements.. The following pronouncement became effective, but did not have a material effect on the financial statements:

- **Statement No. 59 Financial Instruments Omnibus**

  The objective of this Statement is to update and improve existing standards regarding financial reporting and disclosure requirements of certain financial instruments and external investment pools for which significant issues have been identified in practice. This is a technical clean up pronouncement that had no material impact to the financial statements.

**Accountancy Corporation**
3478 Buskirk Avenue, Suite 215
Pleasant Hill, CA 94523

T 925.930.0902
F 925.930.0135
E maze@mazeassociates.com
W mazeassociates.com

683

**Unusual Transactions, Controversial or Emerging Areas:**  No matters have come to our attention that would require us, under professional standards, to inform you about (1) the methods used to account for significant unusual transactions and (2) the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus.  There have been no initial selections of accounting policies and no changes in significant accounting policies or their application during 2011.

*Redevelopment Dissolution:* As discussed in Note 19 to the financial statements, prior to June 30, 2011, in an effort to balance its budget, the State passed ABx1 26, which substantially changes California redevelopment law, suspends redevelopment activities and dissolves redevelopment agencies effective October 1, 2011.  The State also passed ABx1 27 which provided a voluntary program under which agencies may opt out of the mandatory dissolution provided they pay substantial annual contributions to local schools and special districts. Concurrently with these two measures were the passing of various budget and trailer bills that are related and collectively constitute the Redevelopment Restructuring Acts.  In addition, the Acts give the State the power to review transactions on or after January 1, 2011 between the Redevelopment Agency and City and to require the return of assets by the City to the Redevelopment Agency it finds violate the provisions of the Acts.

On July 18, 2011, the California Redevelopment Association, the League of California Cities and other parties filed suit with the California Supreme Court challenging the validity and constitutionality of the measures and sought a stay of the provisions of the Acts until the Court renders a decision on the case.  On August 11, 2011, as modified on August 17, 2011, the Court granted a hearing and issued a partial stay regarding suspension of the effectiveness of ABx1 26-27 until it can rule on the validity and constitutionality of these two bills.  A ruling is expected by January 15, 2012.

As of the date of our report, the court has not ruled on the case, nor has the Redevelopment Agency which is subject to the Acts, formally adopted an opt-in ordinance electing participation in the voluntary program.

These facts indicate that there is more than a remote possibility the Redevelopment Agency may not continue as a going concern beyond October 1, 2011.  The continuation of the Redevelopment Agency beyond October 1, 2011 will initially depend on whether the court rules in favor of the petitioners.  Should the court uphold the provisions of the Acts, the Redevelopment Agency's continuation will then depend on whether it adopts an opt-in ordinance electing participation in the voluntary program, pays the 2011-12 annual contributions of $5,849,170, as estimated by the State, as well as meeting any other provisions of the Acts which may be upheld by the court.

The provisions of ABx1 26, the Dissolution Act, are more severe.  If upheld, it requires Redevelopment Agencies to preserve assets and revenues and minimize obligations and liabilities and expressly states that enforceable obligations to be paid by successor agencies created under the Acts to assume Redevelopment activities, do not include agreements, contracts or arrangements between Redevelopment Agency and the City and that there should be no asset transfers from a Redevelopment Agency to the City after January 1, 2011.  Prior to dissolution, any transfers of Agency assets subsequent to January 1, 2011 to the City, including those discussed in Notes 4 and 7, that were not obligated to third parties or encumbered may be subject to the State Controller's review discussed above and required to be returned to the Agency.  Asset transfers may occur under certain conditions provided there is a third party commitment or outstanding encumbrances.

684

**Estimates:** Accounting estimates are an integral part of the financial statements prepared by management and are based on management's current judgments. Those judgments are normally based on knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ markedly from management's current judgments.   The most sensitive accounting estimates affecting the financial statements are:

- *Estimated Fair Value of Investments:* As of June 30, 2011, the City held approximately $360 million of cash and investments as measured by fair value. Fair value is essentially market pricing in effect as of June 30, 2011.   These fair values are not required to be adjusted for changes in general market conditions occurring subsequent to June 30, 2011.

- *Claims Loss Reserves* – The City is exposed to a variety of risks of loss due to general liability and workers compensation claims and records an estimate of these losses based on an actuarial study performed by a third party consultant actuary.  This study is prepared based on the City's prior claims history which is used as a basis for extrapolating losses for known and incurred but not reported claims.  Actual loss experience will vary from estimates.

- *Unfunded Pension and Retiree Medical Benefits* - Based on the actuarial data as disclosed in the June 30, 2011 financial statement these unfunded liabilities amounted to $154 million and $417 million, respectively.   Actuaries use a variety of assumptions to estimate these unrecorded liabilities and small changes in assumptions can result in significant increases in contributions.

**Disagreements with Management:** For purposes of this letter, professional standards define a disagreement with management as a matter, whether or not resolved to our satisfaction, concerning a financial accounting, reporting, or auditing matter that could be significant to the City's financial statements or the auditor's report.  No such disagreements arose during the course of the audit.

Management informed us that, and to our knowledge, there were no consultations with other accountants regarding auditing and accounting matters. However,we are aware that the City hired an accounting firm to assist management with the preparation of the financial statements.

**Retention Issues:**  We did not discuss any major issues with management regarding the application of accounting principles and auditing standards that resulted in a condition to our retention as the City's auditors.

**Difficulties:**  We encountered no serious difficulties in dealing with management relating to the performance of the audit. However, we did experience difficulties in completing our work as a result of staff turnover, competing demands for staff to first to correct numerous prior year errors, then to address data needs for the AB506 process and then process information for the City's bankruptcy filing.

Audit timing was significantly delayed and audit scope was severely impacted by the above conditions.

685

**Audit Adjustments:** For purposes of this communication, professional standards define an audit adjustment, whether or not recorded by the City, as a proposed correction of the financial statements that, in our judgment, may not have been detected except through the audit procedures performed. These adjustments may include those proposed by us but not recorded by the City that could potentially cause future financial statements to be materially misstated, even though we have concluded that the adjustments are not material to the current financial statements.

We did not propose any audit adjustments that, in our judgment, could have a significant effect, either individually or in the aggregate, on the entity's financial reporting process.

**Uncorrected Misstatements:** Professional standards require us to accumulate all known and likely misstatements identified during the audit, other than those that are trivial, and communicate them to the appropriate level of management. We have reported the misstatement found during our audit in Attachment A to management. Management has concluded that these adjustments do not have a material effect individually or in total for each major fund or non-major funds in the aggregate. We do not disagree with management's conclusion but are required by professional standards to report these unposted entries to the audit committee.

******

This report is intended solely for the information and use of the audit committee, City Council, and management and is not intended to be and should not be used by anyone other than these specified parties.

*Moss + Associates*

686

# Exhibit D

**MEMORANDUM**

September 12, 2011

TO:         Laurie Montes, Deputy City Manager

FROM:      Susan Mayer, Chief Financial Officer

SUBJECT:   **RESOURCE PLAN FOR ADMINISTRATIVE SERVICES DEPARTMENT**

Summary

This memo transmits an organization, recruitment, and resource plan to restore service delivery by the Administrative Services Department. After eight months with the City, I continue to be amazed at the Department's past failures to capture, communicate, and control the City's essential and diminishing financial resources. Financial planning and reporting failures have misrepresented the City's condition and left the City at the brink of insolvency. With four of the five division management positions currently vacant, the department has an unusual opportunity to rebuild its financial organization from the ground up. However, recruitments have been initiated with an alarming low level of response. Salary benchmarks have been surveyed and benchmarked for your consideration of potential range adjustment. Finally, interim resources have been proposed to continue operations during the recruitment period.

Recommendation

The following specific approvals are requested:

1. Consideration of salary benchmarks for the Assistant Director and Information Technology Officer positions.
2. Interim backfill contracts with Management Partners for vacant budget and fiscal management positions, and with Nexlevel for vacant Technology management position
3. Outsourcing for debt administration services in 2011-12.
4. Reallocation of five budgeted positions between classifications, with no net changed in total authorized staffing.

1

Resource Plan For Administrative Services Department
September 12, 2011
Page 2

Background

*Overall Assessment*
The depth of department challenges approach gross negligence that has built up over the past years and decades.  Staff has operated in isolation with little outside exposure to other cities or municipal norms.  Basic and essential process and controls are simply not in place.

The cost and risk to the City of this condition is severe.  Absent timely and accurate financial reporting, along with weak financial management, the City has overspent and overleveraged its depleted bank account to the brink of insolvency.  I remain challenged to cobble together the reliable financial data points necessary to support program and executive team decisions.  We have not yet hit bottom in discovering material misstatements in the City's financial records and the lapses in processing, substantiation, analysis, and management review that have enabled this condition.  The following examples demonstrate the depth of financial mismanagement:

- Bank accounts have not been reconciled for years.  Year-end bank balances have been out of sync with the City's general ledger in fluctuating amounts, both up and down, with annual swings in recent years in excess of a million dollars. A substantial portion of the out-of-balance variance of $538,000 at June 2010 was subsequently determined to be a double counting of a single General Fund revenue source every day for two and a half years, but a range of operating failures also contributed to other misreported transactions.  After six months of intensive effort, we will be starting the 2011-12 year with a beginning reconciled balance.
- The City's housing loan portfolio of $100 million has not been reconciled to the general ledger since before 2008 and has been misstated by over $1 million.  Subsidiary ledgers have now been reconciled.
- The City's utility billing system has likewise not been reconciled to the City's general ledger in years. No current staff members are aware of any reconciliation efforts during their tenure.  While research continues, it appears that the Wastewater Fund assets may have been over reported in the City's financial statements by an amount in excess of $2 million, while Water Fund assets may have been understated in excess of $1 million, for unrelated reasons.  This is particularly troublesome as both programs carry significant debt financing programs with disclosure requirements to the capital market. Bondholders rely on the reported financial condition of these funds. The Wastewater Fund also transferred and used $10 million of restricted development funds for ineligible purposes. This amount has recently been repaid.
- City programs have accumulated an astonishing $130 million in inter-fund borrowings through June 2010. We have made progress in the repayment of $30 million during the 2010-11, but will be left with $55 million in bad loans without the apparent ability to be repaid.  In other words, the City's June 2010 assets were overstated by this $55 million, including $11 million in unauthorized City loans by the Redevelopment Agency.
- The capital program has been over committed in excess of $20 million.  Commitments were made on the assumption of continued development revenues that slowed down

2

G:\FIN\priv\ASD Correspondence\ASD Resource Plan\ASD Structure Memo 9-12-11.docx

Resource Plan For Administrative Services Department
September 12, 2011
Page 3

before spending was curtailed. The current capital program has $13 million in grant expenditures that have not been collected, creating $13 million in cash deficits and proposed inter-fund borrowing at June 2011. Effective procedures are not in place to ensure accurate allocation of construction costs to their funding sources, timely billing, and collection of the City's large capital grant awards.

- In addition to housing loans, utilities, inter-fund borrowing, and capital grant receivable issues, it appears that General Fund accounts receivable may also have been over stated at June 2010 by an initial estimate of $4 million. This analysis is in progress and is expected to result in a recommendation to write down large balances, some for programs the City has not conducted for years. The devastation here is that the City lost a recent fire arbitrator ruling based in part upon reliance on an apparently overstated balance sheet and fund balance position. City Council, City Management, and City programs have acted on the assumption of a June 2010 fund balance reserve that doesn't appear to have been collectable.

- A year ago, the City contracted to migrate into a new enterprise information and financial system based upon anticipated future product development by the vendor. The contract was signed without benefit of product specifications, testing, or an established track record for the product. The vendor company has been mired in litigation and was subsequently sold. The City is in need for strong technology project management to quickly evaluate options and chart a path forward to replace this essential financial system and to resolve high priority needs for fire payroll and development services technology.

Overall, the City is underserved by the Administrative Services Department. The City's investment in a workforce of 100 employees should have the capacity to deliver exceptional service to the City's internal and external customers. Each of the Department's functional divisions currently fall far short of this expectation, including Budget, Revenue, Accounting, Payroll/Accounts Payable, Purchasing, and Technology. The Department is missing qualified managers, trained employees, structured processes, supporting technology, and a culture of teaming with City program departments. Exacerbating this problem, given the number of key vacancies, the department's workload backlog deepens every week.

### Loss of Key Staff

The department has not sufficiently adjusted to its loss of twenty-two employees from its authorized staffing level of 122 in 2008-09. It has been particularly impacted by the retirement of the long-tenured Accounting and Revenue Managers two years ago. While these managers did not provide efficient or sufficient processes or controls, at a minimum they had kept basic accounting and reporting functioning. There has been a steady erosion of controls and basic accounting integrity since their retirement. Well-intentioned supporting staff members have assumed these manager duties, while retaining their full original duties. However, the result is overworked and overwhelmed mangers that are insufficiently trained and experienced to meet expectations at this time.

G:\FIN\priv\ASD Correspondence\ASD Resource Plan\ASD Structure Memo 9-12-11.docx

TEMPORARY CONFIDENTIAL                              STOCK060723

Resource Plan For Administrative Services Department
September 12, 2011
Page 4

### External Audit Lapses

The City's external audit team experienced key staff reassignment about the same as the retirement of the Accounting and Revenue managers. An audit firm employee advised me that the firm had difficulty assigning staff to Stockton's engagement since the City's audit was cumbersome and City staff was unequipped and unwilling to take ownership of issues and results. In my perception, the external audit team for the past two years was weak and missed a significant number of reporting valuation errors. I believe the June 2010 financial statements had at least a dozen, and probably 20, material misstatements in the fund financial statements. The City has since contracted with a new audit firm who has started their fresh look at our statements. I have considered if the City might have action against its former auditor. At this time I think it would be a distraction from the City's efforts to gain negotiating credibility with its employee organizations, creditors, and other stakeholders. I will continue to assess this possibility as we continue review of the general ledger in preparation for this year's audit. Further, given the depth and scope of misstatements in the general ledger, and the number of current staff vacancies, the City is unable to meet the committed work paper delivery schedule for the June 2011 audit. The City's new auditor has issued twenty four pages of preliminary comments, issues, and potential findings after their short initial interim field work. Most significantly, based upon a risk assessment from these apparent misstatements, the auditor has proposed both scope and fee adjustment for the current audit. We will be working with the City Auditor to address schedule and cost concerns.

### Budget Team

The City's financial planning effort has suffered from isolation and denial. In recent years, there has been insufficient linkage between program departments, the real value of their available resources, and the financial planning process. Operating deficits have been papered over and overtly covered to avoid disruption to services and project delivery. For example, the former budget officer advised me that the deficit balance in the Redevelopment Agency budget was intentionally overwritten to zero, since he believed that presentation of such a deficit was not acceptable. As another example, the Parking Division manager advised me that he was unaware that the parking program had approximately $2 million in loans due to other funds, and that he relied on accounting reports that showed a healthy cash balance in the program without regard to these significant liabilities. To remedy, cross-function meetings between budget, accounting, and program staff have been scheduled and conducted twice in the last few months, to prepare for the 2011-12 budget, and to review 2010-11 year-end results.

### Third Party Technology Assessment

The City has contracted with the technology management firm Nexlevel to conduct an assessment of the City's Information Technology Division. Nexlevel reports a similar "lost in time" condition with painfully outdated systems, organization norms, and service delivery focus. Their initial assessment has provided over 80 recommendations. The organization needs an overhaul and a jump start on replacement of aging and failing systems and hardware. As an example, a recent security system upgrade, installed on a live system without the benefit of validation through off-line testing, caused 5 network servers to fail, resulting in a loss of access

4

TEMPORARY CONFIDENTIAL

STOCK060724

Resource Plan For Administrative Services Department
September 12, 2011
Page 5

to applications and user data for up to a three week window.   The City's technology
infrastructure is essential to providing organizational capacity to a depleted workforce and
needs a management "driver" to reestablish an executive level technology committee to best
coordinate efforts and resources between departments.  Of particular concern is an evaluation
and updated strategy and work plan for the replacement of the City's enterprise information
system.

In response, this memo proposes an organization chart, recruiting plan, timeline, and proposal
for supplemental resources to address immediate areas of concern.

<u>Organization Chart</u>

*Overview*
A proposed organization chart is included in this packet.  The chart graphically introduces the
following key objectives and recommendations:

1. <u>Restores the former Assistant Director position</u> through upgrade of the existing Fiscal
   Officer position.  Both positions were staffed as recently as 2008-09.  This position would
   be responsible for restoring controls to the accounting, payroll, and accounts payable
   function.  The proposed position would also assume oversight of the purchasing function
   to best link the disbursements cycle and to provide oversight and development to the
   City's relatively inexperienced Purchasing Agent.  An additional key assignment will be
   development and administration of an updated city-wide cost allocation methodology to
   replace our fragmented salary allocation system.

2. <u>Establishes Treasury Function</u> to acknowledge and provide appropriate resources to
   support the City's 48 bond issues and related investor relations, market disclosures, and
   financing/refinancing programs.  The position requires a high degree of specialized
   municipal bond knowledge, public message sensitivity, and positive/accurate/timely
   interaction with the City's extensive cadre of supporting bond advisors, underwriters,
   trustees, remarketing agents, insurers, liquidity providers, and trustees.  Given the City's
   worsening financial condition, it is essential at this time to maintain a highly performing
   treasury/debt administration function to maximize our public message, enhance workout
   negotiations if necessary, and minimize compliance risk.   This position would also
   spearhead the feasibility analysis of the proposed wastewater capital improvement
   financing.  The position was allocated as a Program Manager II starting with the 2010-11
   budget but has not been filled.  The function has been outsourced to one of the City's
   financial advisors on an as-needed basis during the past six months.  No change in
   approved allocation is requested at this time.

3. <u>Restores administrative unit</u>, including an administrative Program Manager II, to provide
   organizational capacity to support city-wide administrative processes, the care of 100
   employees, communication with a dozen internal departments, external service

TEMPORARY CONFIDENTIAL                                                                    STOCK060725

Resource Plan For Administrative Services Department
September 12, 2011
Page 6

contracts, public record requests, and formal communication with the City's customers, vendors, and creditors. The former analyst has taken on the Revenue Officer function in an acting capacity since the retirement of the Revenue Officer two years ago. The size of the department and the sensitivity of its communications, in comparison to staffing in other departments, prompted consideration of an alternative reallocation to the Program Manager III level. However, the position is proposed at the II level to fit within the existing budget. The position is proposed for reallocation from the "Business Analyst" position, which was budgeted but has never been formally established in the city's class structure.

4. <u>Reassigns technical and clerical staff from Administration to the Accounting Division to increase accounting capacity.</u> A vacant Accountant position is recommended for upgrade to a Senior Accountant and a vacant Office Specialist is recommended for downgrade to a Finance Assistant. This movement to Accounting will provide resources to help regain control over timely and accurate general ledger reporting. It also assigns clerical assistance to free technical time for higher-level analysis. Further, it positions the department to prepare for an anticipated financial system review, upgrade or replacement. An external recruitment is anticipated to tap the current oversupplied market for outside expertise, although internal candidates will be encouraged to apply.

5. <u>Restores the specific Revenue Officer classification</u> from a generic Program Manager III classification. Given the technical and industry-specific requirements of the position, this proposal allows for focused recruitment and hiring of an individual with targeted training and experience. Favored expertise includes banking and cash handling, administration of utility billing system and customers, knowledge of California revenue sources including business licenses, utility user and franchise taxes, and hotel taxes, as well as management of a large customer service workforce. The recruitment of this position from a promotional Program Manager III process is not likely to attract candidates with this specific experience. The proposed position, which is represented, is an upgrade from the Program Manager III level due to equity adjustments extended to the B&C unit that were not extended to the unrepresented unit.

6. <u>Establishes two Revenue Division lead workers</u> to maximize customer service and timely resolution of issues. These employees back-up the supervisors with adjustment authority and handling of complex customer issues when supervisors are unavailable, expediting resolution. The proposed classification have been recommended but not implemented over a period of the past 4-5 years given changing levels of management and executive support. Employees have been functioning in this capacity and receiving Special Assignment pay for over 18 months. This proposal formalizes this arrangement and class assignment. Human Resources is evaluating the classification options available to merge or "deep class" the proposed positions with other established positions to best navigate the Civil Service and City Council class approval process. No specific approval is requested at this time pending evaluation and recommendation of

6

TEMPORARY CONFIDENTIAL

STOCK060726

Resource Plan For Administrative Services Department
September 12, 2011
Page 7

> options by Human Resources.    Union support is anticipated since it provides an
> additional development track for employees.

7.  Updates Information Technology Officer Job Title – The current job title of "Assistant
    Director of Information Technology" implies that the holder is the second line manager.
    The title is now proposed as "Information Technology Officer."  A listing of comparable
    job titles at other Cities is included in this packet.

### *Summary of Proposed Position Reallocations*

The proposed organization chart anticipates the reallocation of five positions from the
classifications authorized in the 2011-12 budget.  Some positions have been upgraded, and
another downgraded, without change to the total number of positions.  The following is a
summary of proposed actions.  There is a nominal cost impact to the General and other funds
which has been absorbed by salary savings from these vacancies.

| Current Allocation | Cost Impact | Proposed Allocation |
| --- | --- | --- |
| Fiscal Officer | Upgrade | Assistant Director |
| Business Analyst | Parallel (step savings) | Program Manager II |
| Accountant | Upgrade | Senior Accountant |
| Office Specialist | Downgrade | Finance Assistant II |
| Program Manager III | Upgrade | Revenue Officer |

| Current Title | Impact | Proposed Title |
| --- | --- | --- |
| Asst Director of IT | Name Change | IT Officer |

### *Wish List Items – Additional Unmet Needs*

The proposed organization plan works within the existing staff level and budget constraints and
addresses most but not all of the departmental unmet needs.  Future consideration is warranted
to address workload capacity in Purchasing.  Additional Budget Office capacity to support labor
negotiations is likely to become necessary if labor contracts are renegotiated on an annual
basis.  Finally, the department is staffed with multiple budgeted part-time front line positions in
both its revenue and disbursement operations.  These are shadow employees that have been in
place for several years, both on the city payroll without benefits, and hired through temporary
agencies.  Long-term staffing in this framework circumvents the budgetary control of authorized
positions.  We will revisit each of these unmet needs in the context of the 2012-13 budget
development.

Market Benchmark – Salaries

Salary survey information is included in this report for each of the four division managers in the
department, including the Assistant Director and Budget, Revenue, and Technology Officers.
Results for the Assistant Director and Information Technology positions support additional
discussion and policy consideration.  Human Resources has provided analysis that shows the

7

TEMPORARY CONFIDENTIAL                                                          STOCK060727

Resource Plan For Administrative Services Department
September 12, 2011
Page 8

two positions are 15% and 8% below market, respectively. We understand the current public focus on management compensation and the difficult policy position of evaluating salary in times of fiscal emergency and the imposed compensation losses to employees. However, based upon the current weak response to the City's recruited positions, it appears the market is requiring a salary range beyond the current offering. The following additional information is provided for context and discussion.

### Assistant Director of Administrative Services
At $118,000, the Assistant Director salary represents a significant gap below the CFO mark of $170,000. Human Resources reports that a normal range between management classes would be 7-20%. With the 15% equity adjustment proposed by Human Resources, the Assistant Director salary would move from $118,000 to $136,000. One other City department has an assistant with a higher salary range. The Engineering Manager/Assistant MUD Director carries a salary of $144,000. The City's uncertain fiscal condition and distance from other population areas may challenge this recruitment. The City has advertised for this position at $118,000 with disheartening response. Of the eleven applications received through the first ten days, only one has passed the HR screening for minimum qualifications, and this applicant does not have City finance experience. Further, the City has received only one applicant for Budget Officer that has passed HR screening for minimum qualifications and holds City finance experience.

### Information Technology Officer
The current salary is also $118,000. The Doug Johnson survey from 2010 supports a market salary of $127,000 to $134,000. The candid response of the City's Nexlevel consultant team is that a salary of $135,000 would start to attract some interesting candidates, and that candidates with solid experience willing to relocate would start to appear at $150,000. Their formal assessment, offered in conjunction with the Strategic Plan, is to consider appointment of a Chief Information Officer reporting at the Deputy City Manager level. While this option warrants consideration at a future time, the addition of another Department Director does not appear to be a realistic option for the City in upcoming budget cycles. We will revisit this recommendation with a current salary survey prior to recruitment.

### Proposed 2011-12 Outsourcing – Debt Administration

Due to the immediate need for strong technical resources in debt management, the Treasury/Debt Management Program Manager II position is proposed for outsourcing during 2011-12. The City is in a fragile economic position that is dependent on municipal bond investors to repurchase its variable rate bonds on a weekly basis. It is also subject to increased scrutiny by the rating agencies and its bond insurers due to public bankruptcy discussion and recent financial reversals. We receive numerous market inquiries each week on our financial status. We also respond to internal city customers about current or proposed financing plans. The City is best served by a seasoned profession to handle these sensitive and SEC regulated communications during this period of uncertainty. The City will also benefit from an experienced

TEMPORARY CONFIDENTIAL

STOCK060728

Resource Plan For Administrative Services Department
September 12, 2011
Page 9

financial advisor to evaluate and work with the MUD rate consultant to create an initial financing structure for the upcoming Wastewater plant renovation.

The City has a financial advisor vendor pool established in November, 2006. During the past six months we have contracted with Ken Dieker of Rio Associates from this pool to support debt administration. Ken's payments under this contract are approaching the Council limit and $30,000 contract cap. Ken's billing rate of $175 per hour is a significant discount from other vendors in the pool such as PFM with rates up to $275 per hour. Ken works on an as-needed basis generally from 4-10 hours per week and provides additional value because he is local and familiar with the City's stakeholders and program departments, particularly Utilities. He has recently addressed debt issues for Community Services, Public Works, and Redevelopment. We could not recruit or develop the skill set necessary to support this year's market sensitive investor communications at this weekly price.

We have an internal candidate for this position with unusually strong debt technical skills that provides additional support for the function, but the employee could benefit from additional time to mature into a manager ready to handle external market communication. For these reasons, I recommend that the City extend the existing vendor contract to continue to outsource this Treasury/Debt Administration function in 2011-12.

Recruitment Plan and Timeline

Charts with proposed recruitments, required authorizations, and the timeline to fill these positions are included in this report. The Assistant Director, Budget Officer, and Revenue Officer recruitments have opened. Classified positions will require an initial notification to the Civil Service Commission. The projected timeline fills management positions by December if external appointments, and in November if filled through internal appointment.

Supplemental Resources

Interim resources are proposed to address department workload, backlog, and areas of critical concern.

**Budget and Fiscal Officers**
Over the past six months, I have extensively searched for interim resources through established agencies, through inquiry with our various consultants, and from informal networks. I have reviewed two dozen resumes and interviewed many. Frankly, few candidates are up to the depth of Stockton's challenges and rapidly changing fiscal environment. I have not found experienced candidates interested in commuting on a full-time basis from the Bay Area or Sacramento. Instead, I currently rely on occasional and part-time support from two retirees not interested in full time work or in full management responsibilities. Sarah Ragsdale is contracted through Intellibridge Partners at $88 per hour and works a few hours each morning assisting Accounting and reviewing staff reports. Kathleen Rooney is employed by the City on a part-time

9

TEMPORARY CONFIDENTIAL                                    STOCK060729

Resource Plan For Administrative Services Department
September 12, 2011
Page 10

basis at a voluntarily low hourly rate of $ 40.55 because of her desire to help the profession. She works 6-8 days a month, produced the budget document, and is now focused on organizing and evaluating the City's accounts receivable, with a focus on utility billing receivables.

With the City's deteriorating financial condition, and anticipated December recruitment timeline, we are in critical need of resources to deliver the following products:

Budget
      2011-12 - Rebalancing strategy
      2012-15 - Revenue, labor cost, program support, and debt strategy

Fiscal
      2010-11 - General ledger close, CAFR and related year-end reports
      2011-12 - Cost Allocation Plan (restructured)
      2011-12 – Operational controls, reconciliation, and reporting
      Responses to three internal audits

Further, as fiscal conditions further deteriorate, it is becoming more apparent that we are in need of an expedited workout plan for negotiation with our bond holders and bond insurance/liquidity business partners. We anticipate the need for a heavy-hitter public finance expert to assist the workout team in development of a restructuring plan.

Management Partners has submitted a proposal to provide part time interim services at rates from $110 to $125 per hour, discounted from their standard rates of $150-$175. We are competing with other distressed Cities for these services. While retirees advertise on the league's Finance Officer web site at lower rates, I have found that these individuals tend to be from smaller cities without experience sufficient to address the City's complex financial transactions. Accordingly, I recommend contracting with Management Partners for the services of Larry Lisenbee, retired Budget Director for the City of San Jose, to expedite delivery of a Four year General Fund financial plan. Larry's hourly rate would be discounted to $125. Larry has committed to a three day working schedule.

Further, Management Partners has proposed the services of Ray Durant, retired Assistant Finance Director in Fremont, to deliver the City's CAFR. Ray also has limited availability on a part time schedule. His hourly rate is $110.

### Information Technology Officer

Nexlevel Information Technology in nearing completion of its contract to prepare the City's Technology Strategic Plan. The City has invested $132,860 in Nexlevel time to conduct in-depth interviews and prepare an assessment of the City's technology structure and capacity. By all accounts, their performance and interaction with City departments has been positive and demonstrated their industry expertise and understanding of the City's technology environment.

10

TEMPORARY CONFIDENTIAL

STOCK060730

Resource Plan For Administrative Services Department
September 12, 2011
Page 11

I have asked Nexlevel to assess the capacity of the current staff for an interim or permanent candidate for the vacant Information Technology Officer position. They report no clear leader in the current supervisor ranks. After two months of weekly meetings with IT supervisors, I concur. Nexlevel has proposed an interim assignment, by their firm or another, as an intervention to jump start key process revisions, reestablishment of the executive technology oversight committee, renegotiation of maintenance contracts, evaluation of frontline outsourcing options, implementing a staffing realignment and workplan, and most importantly, facilitation and resolution of the City's "Innoprise" enterprise system approach, to get the "Technology House in Order," not unlike the City Council goal to get the City's "Fiscal House in Order." Without a strong management lead, the City will remain impaired by its out-of-date financial reporting system, unable to support essential on-line building services and fire payroll. I support this recommendation, and specifically recommend Nexlevel staff member Lee Curtis for this assignment because of the investment we have already made in his assessment and knowledge of the City's current technology condition. Further, I recommend that Nexlevel take the lead in the recruitment of this position, leveraging their industry contacts to generate interest for the position. I believe this approach will be the fastest track to restoring technology capacity to the organization.

The proposal for Lee's services is for 28 hours per week, with 24x7 emergency voice mail response. The hourly rate has been negotiated down from $130 to $125, inclusive of travel. The weekly cost of $3500 is within the budgeted cost of the vacant position of $3552 (net of Plan B concessions). Staff has inquired through the IT "MISAC" list serve for alternative resources and prices. I interviewed one project manager with an hourly rate of $175 with unsatisfactory results. Another list serve response quoted project manager rates at $150-$160. However, both of these quotes were for project management, not at the level of Division management. I further spoke with Andy Belknap of Management Partners about their experience with interim IT resources. When they can find them, Management Partners tries to bill out at $110-$120 per hour. However, good resources are not often available, and they had no referrals for the City at this time. Their primary IT resource bills at $225 per hour. Overall, we have additional referrals for project management outsourcing, but few options for management of the Division. For these reasons, I recommend Nexlevel as the most cost effective option with demonstrated expertise to jump start a technology overhaul and to set the stage for a promising recruitment.

### Staff Level Agency Backfill
Finally, to invest additional resources in contemporaneous cash reconciliation and controls, I recommend a temporary agency backfill for the vacant senior accountant to keep cash current during the 2011-12 year while the existing staff continues to close up 2010-11. Further, I recommend a temporary agency backfill for the vacant finance assistant to best leverage professional staff time with help on paraprofessional duties.

G:\FIN\priv\ASD Correspondence\ASD Resource Plan\ASD Structure Memo 9-12-11.docx

                                    STOCK060731

Resource Plan For Administrative Services Department
September 12, 2011
Page 12

Overall, these proposed part-time and agency resources still do not provide the full-time coverage necessary to restore interim services by the department during a recruiting window. However, these professionals are the best available at this time until the scheduled recruitments can put permanent resources into place.

Conclusion

We have not yet reached bottom in our service delivery.  The depth of internal control and valuation issues, coupled with outdated technology and compounded by management vacancies, continues to hold back timely reporting and the forward strategy necessary to ensure the City's fiscal survival.  This organization, recruiting, and resource plan starts up the process to get permanent resources in place to move the organization towards that goal.

SUSAN MAYER
CHIEF FINANCIAL OFFICER

SM:jl

Attachments:
    A.  Organization Chart
    B.  Recruitment Plan
    C.  Salary Surveys

12

G:\FIN\priv\ASD Correspondence\ASD Resource Plan\ASD Structure Memo 9-12-11.docx

TEMPORARY CONFIDENTIAL

STOCK060732

# Attachment A
Organization Chart

TEMPORARY CONFIDENTIAL

STOCK060733

August 10, 2011

# Administrative Services Department
# Organization Plan



G:\F\Ngnv\ASD Correspondence\Admin Org Chart1
8/10/11

TEMPORARY CONFIDENTIAL

14

STOCK060734

## Attachment B
Recruitment Plan

15

STOCK060735

## Administrative Services Department
## Recruitment Plan - Required Approvals

8/11/2011

| | Reallocation of Budgeted Position Requisition Approval by Budget/ DCM | Name Change (No Change in Class Spec) Approval by HR Director | Evaluate Salary Range Approval by City Manager | Establish New Classification Approval by Civil Service City Council | Update Class Specification Approval by Civil Service City Council | Appoint Internal Backfill Approval by HR DCM | Outsource/ Contract for Interim Backfill CM City Council |
|---|---|---|---|---|---|---|---|
| **Current Recruitments** | | | | | | | |
| Budget Officer | | | | | | Done- Special Assignment Pay | Management Partners (2-3 Days/wk) |
| Revenue Officer / Proposed Reallocation from Program Manager III | X | | | | | Done - Acting Pay | Done - Intellibridge (Part-time) |
| Assistant Administrative Services Director / Proposed Reallocation from Fiscal Officer | X | | X | | | | |
| Program Manager II (Admin Unit) / Proposed Reallocation from Business Analyst | X | | | | | Acting Pay - Proposed | |
| Senior Accountant / Proposed Reallocation from Accountant | X | | | | | Proposed - Temp Agency Employee | |
| Finance Assistant II / Proposed Reallocation from Office Specialist | X | | | | | Proposed - Temp Agency Employee | |
| Sr. Revenue Assistant (2) / Proposed Reallocation from Revenue Assistant | X | | | X or | X | Done- Special Assignment Pay | |
| Technology Officer / Formerly Assistant Director of Technology | | X | X | | X | Done- Special Assignment Pay | Nexlevel Contracts 1)-Manager 2)-Fin System |
| **Future Recruitments/Proposed 2011-12 Outsourcing** | | | | | | | |
| Program Manager II (Treasurer) | | | | | | | Financial Advisor (Part-time) |

16

STOCK060736

8/11/2011

## Administrative Services Department
## Recruitment Plan - Timeline

| | Requisition Submitted | CMO Approval | Civil Service Approval | Conclude on Job Announcement, Supplemental, Ads | Recruitment Opened | Recruitment Closed | Applications to Department | Interview Panel | Selection Interview | Start Date Internal/External | City Council Agenda |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Recruitments** | | | | | | | | | | | |
| **Unclassified** | | | | | | | | | | | |
| Budget Officer | 8/11/2011 | n/a | n/a | 8/21/2011 | 8/28/2011 | 9/16/2011 3 weeks | 9/23/2011 | 10/5/2011 | 10/6/2011 | 10/17/2011 | 9/13/2011 Mgt Partners Contract |
| Revenue Officer | 8/11/2011 | 8/19/2011 Reallocation | n/a | 8/21/2011 | 8/28/2011 | 9/16/2011 3 weeks | 9/23/2011 | 10/5/2011 | 10/6/2011 | 10/17/2011 12/1/2011 | n/a |
| Assistant Admin Services Director | 8/11/2011 | 8/19/2011 Reallocation | n/a | 8/21/2011 | 8/28/2011 | 9/16/2011 3 weeks | 9/23/2011 | 10/5/2011 | 10/6/2011 | 10/17/2011 12/1/2011 | 9/13/2011 Mgt Partners Contract |
| Program Manager II - Administration *Incumbent is Acting Revenue Officer* | Pending Revenue Recruitment | 8/19/2011 Reallocation | n/a | → | | | | | | 10/17/2011 | n/a |
| Technology Officer *Newlevel Contract* | 8/19/2011 | 8/19/2011 | n/a | | | | | | | | 9/13/2011 Newlevel Contract |
| **Classified/Civil Service** | | | | | | | | Civil Service | | | |
| Senior Accountant | 8/11/2011 Reallocation | 8/19/2011 Reallocation | 9/15/2011 Notification | 9/15/2011 | 9/25/2011 | 10/7/2011 2 weeks | Exam October | 11/17/2011 | 11/30/2011 | 12/1/2011 | n/a |
| Finance Assistant II | 8/11/2011 Reallocation | 8/19/2011 Reallocation | 9/15/2011 Notification | 9/19/2011 | 9/25/2011 | 10/7/2011 2 weeks | October | 11/27/2011 | 11/30/2011 | 12/1/2011 1/1/2011 | n/a |
| Sr. Revenue Assistant (2 positions) *Establish new lead worker position or amend another related position; Incumbents have been receiving special assignment pay* | Pending HR Analysis of Options | Pending HR Analysis of Options | 10/20/2011 Approve New Position Or Amend Other Position | → | | | | | | | Establish Class December 2011 |
| **2011-12 Outsourcing** | | | | | | | | | | | |
| Program Manager II (Treasure) *Financial Advisor Contract* | 8/19/2011 Outsource | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 9/13/2011 FA Contract |

17

STOCK060737

# Attachment C
Salary Surveys

18

TEMPORARY CONFIDENTIAL

STOCK060738

MEMORANDUM

September 6, 2011

| TO: | Laurie Montes, Deputy City Manager |
|---|---|
| FROM: | Teresia Haase, Director of Human Resources |
| SUBJECT: | SALARY SURVEY FOR ASSISTANT DIRECTOR OF ADMINISTRATIVE SERVICES |

A base salary survey for the Assistant Director of Administrative has been revised using the approved sixteen (16) comparable agencies. A copy of the survey is attached. This survey has been completed using base monthly salary and we have listed the comparable titles for your review along with comments if there are no comparable positions. The results show that the salary for the classification of Assistant Director of Administrative Services is currently 15.32% under market.

Recommendation

The Assistant Director of Administrative Services is an unrepresented and unclassified classification and is covered by the Unrepresented Compensation Plan (UCP), as such, this class has not received a cost of living adjustment (COLA) or equity increase since January of 2008. The previous Assistant Director of Administrative Services retired in 2009 and the position was eliminated in the 2010-11 budget.

This department has experienced extreme turnover and a reduced budget due to the recession the economy is currently facing. Changes to the department include the hiring of a new Chief Financial Officer who, in turn has been tasked with restructuring the department. Changes include restructuring the department to include the addition of staff from the Budget Division, formerly a part of the City Manager's Office. Information Technology is also being restructured as its role has been rescaled into a functional division with Administrative Services. Salary changes for positions within these divisions are not recommended at this time, but title changes are currently being prepared for approval.

The following table summarizes the study done to compare Stockton's salary with the 16 market agencies. Also included in a comparison of compaction within the market agencies:

| Title | Market Salary Comparison Results: 15.32% Recommended | | Compaction Comparison Results: 9.9% | |
|---|---|---|---|---|
| | Top Monthly Base Salary | Salary % Diff between levels | Top Monthly Base Salary | Salary % Diff between levels |
| Chief Financial Officer | $170,005 | | $170,005 | |
| Assistant Director of Administrative Services | $136,105 | 24.9% | $129,750 | 31.00% |
| Budget Officer | $118,020 | 15.3% | $118,020 | 9.9% |
| Information Technology Officer | $118,020 | 15.3% | $118,020 | 9.9% |
| Finance Officer | $110,820 | 22.8% | $110,820 | 17.1% |
| Revenue Officer | $104,460 | 30.3% | $104,460 | 24.2% |

19

TEMPORARY CONFIDENTIAL

SALARY SURVEY FOR ASSISTANT DIRECTOR OF ADMINISTRATIVE SERVICES

Human Resources is in support of the reorganization and the need to fill the Assistant Director of Administrative Services. In order to fill this position, Stockton needs to be competitive within this market. Therefore it is our recommendation to give the classification an equity increase of 15.32% to bring it up to the market salary and in line with the newly organized department. This would change the top step of the salary range for the Assistant Director of Administrative Services from $118,020 to $136,105 per year. The following table shows the details:

| Title | Current Annual Top Step | Proposed Annual Top Step | Difference |
|-------|------------------------|--------------------------|------------|
| Assistant Director of Administrative Services | $118,020 | $136,105 | 15.32% |

Should you have any additional questions, please let me know.

TERESIA HAASE
DIRECTOR OF HUMAN RESOURCES

TH:dls

Enclosures

CONCUR:

_____
LAURIE MONTES
DEPUTY CITY MANAGER

APPROVAL:

_____
BOB DEIS
CITY MANAGER
Date: _____

::ODMA\GRPWISE\COS.PER.PER_Library:85839.1

20

## CITY OF STOCKTON SALARY SURVEY
## CHIEF/ASSISTANT CHIEF FINANCIAL OFFICER COMPARISON

9/12/2011

| | | Population | Department/Structure | Annual Base Compensation | | | % Diff | Position Title |
|---|---|---|---|---|---|---|---|---|
| | | | | Dept Head | 2nd Level | 3rd Level | | |
| 1 | Bakersfield | 328,692 | Finance Department | $137,182 | | | | Finance Director |
| | | | Depts: revenue generation, budgetary accounting and reporting, investments, business licenses and permits, purchasing and real property management. | | $105,880 | | 29.6% | Assistant Finance Director - Note: only responsible for one division, narrower scope. Less responsibility Not a strong comparison |
| 2 | Chula Vista | 231,305 | Finance Department | $177,805 | | | | Director of Finance |
| | | | Depts: Office of Budget & Analysis, Comptroller, Revenue & Recovery and Purchasing | | $136,851 | | 29.9% | Assistant Director of Finance - Good Match organizationally, with the exception of IT. structure is similar to Stockton. |
| | | | | | | N/C | | |
| 3 | Fairfield | 106,753 | Administrative Services | $132,781 | | | | Director of Admin Services |
| | | | | | NC | | | No Comparable |
| | | | Depts: Accounting, Financial Svcs, Employee Relations, Risk and IT | | | $101,477 | 30.8% | Financial Services Manager - Less scope of duties, not a strong match organizationally.  No deputy level, mgt leads over each area. |
| 4 | Fremont | 213,512 | Finance Department | $192,430 | | | | Finance Director |
| | | | Depts: Accounts Payable, Purchasing, City Investment and banking functions, Cashiering, Business and hotel / motel tax and other revenue collection | | $141,857 | | 35.7% | Finance Operations Manager - May act as Finance Director in their absence, Good Match with Stockton's structure. |
| 5 | Fresno | 486,171 | Finance Department | $160,404 | | | | City Controller/Finance Director |
| | | | Depts: Accounting, Admin, Utilities Billing and Collections | | NC | | | Principal Budget Analyst is second in command, only responsible for budget, supervisor level not manager. |
| | | | | | | $89,067 | 80.1% | Principal Budget Analyst |

TEMPORARY CONFIDENTIAL

STOCK060741

9/12/2011

| # | City | Population | Department | Director Salary | Match Salary | NC / % | Salary | Position / Notes |
|---|---|---|---|---|---|---|---|---|
| 6 | Hayward | 149,205 | Department of Finance<br>Depts: Accounting, Finance, Purchasing, & Budget. | $178,048 | | NC | | Four managers below Director level, Accounting, Revenue, Purchasing and Budget, no official second in command. |
| | | | | | | 55.3% | $114,629 | Accounting Manager |
| | | | | | | 71.0% | $104,146 | Finance Supervisor |
| | | | | | | 49.1% | $119,392 | Purchasing Manager |
| | | | | | | 55.3% | $114,629 | Budget Officer |
| 7 | Livermore | 83,604 | Administrative Services Department<br>Depts: Finance, Human Resources, and Information Technology Divisions | $169,104 | | NC | | Administrative Services Director |
| | | | | | | | | Financial Services Manager only oversees one section of Finance Division; lower level, with less responsibility. |
| | | | | | | 38.2% | $122,318 | Financial Services Manager |
| | | | | | | 38.2% | $122,340 | HR Programs Manager |
| | | | | | | 38.2% | $122,318 | Information Technology Manager |
| 8 | Lodi | 63,362 | Finance Department<br>Depts: Budget, Financial Services, Human Resources Information Systems | $145,000 | | NC | | Deputy City Manager/Internal Services Director |
| | | | | | | | | Financial Services Manager is second in command, but lower level responsibility, narrower scope. |
| | | | | | | 33.2% | $108,820 | Financial Services Manager |
| | | | | | | 33.2% | $108,820 | Budget Manager |
| | | | | | | 33.2% | $108,820 | Human Resources Manager |
| | | | | | | 46.7% | $98,809 | Information Systems Manager |
| 9 | Manteca | 66,451 | Finance Department<br>Depts: Accts Payable, Accts Rec, Utilities Operations, Budget Prep, Audit, Investments, Finance and Treasury Operations | $156,461 | $110,646 | 41.4% | | Finance Director |
| | | | | | | | | Deputy Director of Finance - Good Match -- Note the size of the City is much smaller than Stockton and the operating budget is much smaller. |
| 10 | Modesto | 209,936 | Finance Department<br>Depts: Treasury, Finance, data processing, purchasing, central store, utility billing, business license and customer service | $139,453 | | NC | | Director of Finance |
| | | | | | | | | Deputy Director of Finance-Position exists, however not filled. Restructured and eliminated this level |
| | | | | | | 51.5% | $ 92,025 | Budget and Financial Analysis Manager |
| | | | | | | 51.5% | $ 92,025 | Principal Accountant |
| | | | | | | 51.5% | $ 92,025 | Purchasing Manager |
| | | | | | | 51.5% | $ 92,025 | Customer Services Manager |

22

TEMPORARY CONFIDENTIAL

9/12/2011

| # | City | Population | Department | | | | % | Role / Notes |
|---|---|---|---|---|---|---|---|---|
| 11 | Riverside | 296,842 | Finance Department<br>Depts: Administration, Accounting, Revenue, Purchasing, Risk Management, Safety and Workers' Compensation | $230,028 | $209,112 | $135,984 | 10.0%<br>53.8% | Assistant City Manager/Chief Financial Officer - Direct report to CM with all financial responsibilities<br>Finance Director/Treasurer - Exec Level - City is same size, with a higher cost of living. Good match.<br>Assistant Finance Director - Mgt Level |
| 12 | Sacramento | 475,743 | Finance Department<br>Depts: Accounting, Admin, Budget, and Revenue | $169,548 | $119,304 | | 42.1% | Director of Finance - Dept similar, except IT not included. Several employees with higher operating budget.<br>Budget Manager - Receives assignments from Director. Good Match |
| | | | | | | $113,520 | 5.1% | Accounting Manager |
| | | | | | | $113,520 | 5.1% | Revenue Manager |
| 13 | Salinas | 150,898 | Finance Organization<br>Depts: Accounting, Purchasing, Information Systems, & Revenue and Licensing | $155,508 | NC | | 44.9% | Finance Director<br>No Deputy level assigned, have managers directly reporting to Director |
| | | | | | | $107,340 | | Accounting Officer |
| | | | | | | $111,600 | 39.3% | Information Systems Manager |
| | | | | | | | | Purchasing Officer - Inactive |
| | | | | | | | | Revenue Officer - Inactive |
| 14 | San Bernardino | 205,493 | Finance Department<br>Depts: Accounting, Accounts Payable, Payroll, Purchasing, Budgeting, and Cash Management | $165,648 | $129,084 | | 28.3% | Director of Finance<br>Deputy Director of Finance/Budget Manager - Good match, however city is much smaller in size with a smaller operating budget. |
| 15 | San Joaquin County | 174,268 | Auditor-Controller<br>Depts: Audit, Accounting, Budget, Finance, and Payroll | $148,740 | $118,767 | | 25.24% | N/C - Auditor-Controller handles budget-elected official<br>N/C Deputy Auditor Controller - Not a good match, does not have budget, IT, or revenue services. |
| 16 | Tracy | 81,548 | Finance & Admin Svc Dept<br>Depts: Budget, Accounting & Info Sys | $180,603 | NC | | | Finance & Administrative Services Director<br>No second in command. Three managers in each area below Director. |
| | | | | | | $111,560 | 61.89% | Inform Systems Admin |
| | | | | | | $108,204 | 66.91% | Budget Officer |
| | | | | | | $108,204 | 66.91% | Accounting Officer |

TEMPORARY CONFIDENTIAL

23

STOCK060743

9/12/2011

| | | | | | | |
|---|---|---|---|---|---|---|
| Current | | $170,005 | | | | Chief Financial Officer |
| Stockton | Administrative Services | | | | | |
| 289,927 | | | | $118,020 | 44.05% | Assistant Director of Administrative Services (Current Title) |
| | | | | $118,020 | 0.0% | Budget Officer |
| | | | | $118,020 | 0.0% | IT Officer |
| | | | | $110,820 | 6.5% | Finance Officer |
| | | | | $104,460 | 13.0% | Revenue Officer |
| Proposed - Recommended 15.32% increase to base salary | | | | | | |
| Stockton | Administrative Services | $170,005 | $136,105 | | | Chief Financial Officer |
| 289,927 | | | | $118,020 | 24.9% | Assistant Director of Administrative Services (Current Title) |
| | | | | $118,020 | 15.3% | Budget Officer |
| | | | | $118,020 | 15.3% | IT Officer |
| | | | | $110,820 | 22.8% | Finance Officer |
| | | | | $104,460 | 30.3% | Revenue Officer |
| Proposed - Not Recommended - 9.93% increase in relation to market compaction | | | | | | |
| Stockton | Administrative Services | $170,005 | $129,750 | | | Chief Financial Officer |
| 289,927 | | | | $118,020 | 31.0% | Assistant Director of Administrative Services (Current Title) |
| | | | | $118,020 | 9.9% | Budget Officer |
| | | | | $118,020 | 9.9% | IT Officer |
| | | | | $110,820 | 17.1% | Finance Officer |
| | | | | $104,460 | 24.2% | Revenue Officer |
| | | | | | | |
| City Median | | $165,648 | $129,084 | | | Median Difference between Director and Assistants in comparing agencies is 29.93% |
| 189,881 | | | | | | |
| % Difference (median) 34.51% | | 2.56% | -9.37% | | | |
| City Average | | $166,619 | $136,105 | | | Average difference between Directors and Assistants in comparing agencies of 31.00% |
| 207,736 | | | | | | |
| % Difference (average) 28.35% | | 1.99% | -15.32% | | | |
| | | | | | | NC = Not Comparable |

24

TEMPORARY CONFIDENTIAL

DRAFT

Date Effective January 2011

Stockton
Assistant Director of Information Technology

| Survey Agency | Comparable Class | Range Max. | Deferred Comp. | Longevity | Educ. Incent. | Rel. Field Up | Base + Cash | Health | Dental | Vision | Sub-total | Base + Cash + Inc. | Vac. Max | Admin Leave | Holiday | Base + Cash + Leave | Emp. Ret. | Total Comp | Ret. Health | TC w/ Ret. Health |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bakersfield | Director of Information Technology | $10,025 | | | | $802 | $10,827 | $1,006 | $102 | $11 | $1,118 | $11,945 | $771 | $386 | $501 | $13,603 | $1,274 | $14,877 | | $14,877 |
| Chula Vista | Director of Information Technology Sciences | $13,166 | | | | $1,053 | $14,219 | $1,187 | Inc | Inc | $1,187 | $15,407 | $1,266 | $508 | $658 | $17,837 | $2,682 | $20,519 | | $20,519 |
| Fairfield | Chief Information Officer | $10,203 | $797 | | | $721 | $11,822 | $962 | Inc | $50 | $1,012 | $12,834 | $991 | $713 | $430 | $14,974 | $1,562 | $16,536 | | $16,536 |
| Fremont | No Comparable Class | | | | | | | | | | | | | | | | | | | |
| Fresno | Chief Information Officer | $10,804 | | | | $746 | $10,804 | $739 | Inc | Inc | $739 | $11,533 | $1,185 | $315 | $545 | $13,677 | $1,757 | $15,434 | | $15,434 |
| Hayward | Information Systems Manager | $10,657 | $362 | | | $610 | $11,765 | $1,756 | $137 | $23 | $1,915 | $13,680 | $1,025 | $820 | $594 | $16,119 | $1,273 | $17,392 | $275 | $17,667 |
| Livermore | Information Technology Manager | $10,197 | | | | $576 | $10,707 | $1,592 | Inc | Inc | $1,592 | $12,299 | $941 | $549 | $471 | $14,260 | $1,540 | $15,800 | $408 | $16,208 |
| Lodi | Information Systems Manager | $8,234 | $247 | | | | $9,057 | $1,652 | $83 | $14 | $1,750 | $10,808 | $475 | $317 | $428 | $12,027 | $995 | $13,022 | | $13,022 |
| Manteca | Information Technology Manager | $8,574 | $129 | $143 | | $696 | $8,846 | $1,761 | $122 | $22 | $1,904 | $10,750 | $759 | $386 | $386 | $12,300 | $1,484 | $13,785 | $100 | $13,885 |
| Modesto | Chief Information Officer | $12,209 | $305 | | | | $13,320 | $1,008 | $46 | $46 | $1,100 | $14,420 | $1,174 | $470 | $517 | $16,581 | $1,126 | $17,706 | | $17,706 |
| Riverside | Chief Information Officer | $14,433 | $250 | | | $1,155 | $15,938 | $1,008 | $46 | Inc | $951 | $16,889 | $1,277 | $111 | $611 | $18,887 | $2,574 | $21,461 | | $21,461 |
| Sacramento | Chief Information Officer | $13,057 | $522 | | | $314 | $15,145 | $1,200 | Inc | $18 | $1,201 | $16,346 | $1,004 | $502 | $703 | $18,556 | $1,531 | $20,087 | $385 | $20,492 |
| Salinas | Information Systems Manager | $9,300 | | $653 | | | $9,908 | $1,427 | $150 | Inc | $1,684 | $11,592 | $1,160 | $591 | $501 | $13,855 | $1,069 | $14,923 | | $14,923 |
| San Bernardino | Director of Information Technology | $13,132 | | $465 | $233 | | $13,132 | $1,092 | Inc | Inc | $1,092 | $14,224 | $1,263 | $556 | $707 | $16,690 | $1,743 | $18,442 | $108 | $18,550 |
| San Joaquin County | Information Systems Director | $13,440 | $872 | | | $818 | $14,112 | $2,002 | Inc | Inc | $2,002 | $16,114 | $1,189 | $517 | $724 | $18,544 | $1,349 | $21,866 | | $21,895 |
| Tracy | Information Systems Manager | $10,226 | $511 | | | | $11,556 | $1,655 | Inc | Inc | $1,655 | $13,211 | $1,062 | $544 | $511 | $15,138 | $1,182 | $15,320 | | $15,320 |
| Stockton | Assistant Director of Information Technology | $9,035 | | | | | $12,083 | $1,478 | Inc | Inc | $1,478 | $13,477 | $1,324 | | $530 | $15,837 | $1,777 | $17,213 | | $17,003 |
| | Average | $11,191 | | | | | $12,083 | | | | | $13,477 | | | | $15,837 | | $17,213 | | |
| | % +/- Average | -13.8% | | | | | -0.2% | | | | | -2.4% | | | | -7.2% | | -6.5% | | |
| | Median | $10,657 | | | | | $11,765 | | | | | $13,211 | | | | $14,395 | | $16,536 | | |
| | % +/- Median | -5.4% | | | | | -4.2% | | | | | -5.2% | | | | -5.2% | | -3.2% | | |

Gain/Loss 6.1%

4

Pols Due: 2/22/2011

STOCK060745

# CITY OF STOCKTON SALARY SURVEY
## Budget Officer

| | Population | Top Step Annual Compensation | | Position Title |
|---|---|---|---|---|
| 1 Bakersfield | 321,078 | | NC | |
| 2 Chula Vista | 230,000 | $128,069 | | Budget and Analysis Manager |
| 3 Fairfield | 106,434 | | NC | |
| 4 Fremont | 209,000 | $133,294 | | Budget Manager |
| 5 Fresno | 502,303 | $131,905 | | Budget Manager |
| 6 Hayward | 150,878 | $114,624 | | Budget Officer |
| 7 Livermore | 73,345 | | NC | |
| 8 Lodi | 62,133 | $108,820 | | Budget Manager |
| 9 Manteca | 65,631 | | NC | |
| 10 Modesto | 211,536 | $92,025 | | Budget and Financial Analysis Manager |
| 11 Riverside | 304,051 | | NC | |
| 12 Sacramento | 486,189 | | NC | |
| 13 Salinas | 144,276 | | NC | |
| 14 San Bernardino | 204,800 | | NC | |
| 15 San Joaquin County | 674,860 | $119,205 | | Budget Finance Coordinator |
| 16 Tracy | 82,107 | $108,204 | | Budget Officer |
| **Stockton** | **292,133** | **$118,020** | | **Budget Officer** |
| | | | | |
| City Median | 206,900 | $ 116,915 | | |
| % Difference (median) | -29.18% | 0.94% | | |
| City Average | 239,289 | $ 117,018 | | |
| % Difference (average) | -18.09% | 0.85% | | |
| | | | | |
| | | NC = Not Comparable | | |

26

TEMPORARY CONFIDENTIAL

# CITY OF STOCKTON SALARY SURVEY
## Finance Officer

| | | | Top Step | Position |
|---|---|---|---|---|
| | | Population | Annual Compensation | Title |
| 1 | Bakersfield | 321,078 | $98,748 | City Treasurer |
| 2 | Fairfield | 106,434 | NC | NC |
| 3 | Fremont | 209,000 | $141,857 | Finance Operations Manager |
| 4 | Fresno | 502,303 | $130,032 | Assistant Controller |
| 5 | Hayward | 150,878 | NC | NC |
| 6 | Livermore | 73,345 | $122,319 | Financial Services Manager |
| 7 | Lodi | 62,133 | $108,820 | Financial Services Manager |
| 8 | Manteca | 65,631 | NC | NC |
| 9 | Modesto | 211,536 | $120,660 | Deputy Director of Finance |
| 10 | Sacramento | 486,189 | $113,520 | Revenue Manager |
| 11 | San Joaquin County | 674,860 | $106,059 | Chief Deputy Auditor Controller |
| 12 | Tracy | 82,107 | NC | Accounting Officer |
| | **Stockton** | **292,133** | **$110,820** | **Finance Officer** |
| | | | | |
| | City Median | 179,939 | $ 117,090 | |
| | % Difference (median) | -38.41% | -5.66% | |
| | City Average | 245,458 | $ 117,752 | |
| | % Difference (average) | -15.98% | -6.26% | |
| | | | | NC = Not Comparable |

TEMPORARY CONFIDENTIAL

Case 12-32118    Filed 02/15/13    Doc 715

## CITY OF STOCKTON SALARY SURVEY
### Revenue Officer

| | | Top Step | Position | |
|---|---|---|---|---|
| | Population | Annual Compensation | Title | |
| 1 Bakersfield | 321,078 | $98,748 | City Treasurer | |
| 2 Fairfield | 106,434 | $101,477 | Financial Services Manager - No job description available | |
| 3 Fremont | 209,000 | $141,857 | Revenue and Treasury Manager | |
| 4 Fresno | 502,303 | $103,841 | Revenue Manager | |
| 5 Hayward | 150,878 | $114,629 | Revenue Manager | |
| 6 Livermore | 73,345 | $122,319 | Financial Services Manager | |
| 7 Lodi | 62,133 | $108,820 | Financial Services Manager | |
| 8 Manteca | 65,631 | NC | NC | |
| 9 Modesto | 211,536 | $120,659 | Deputy Director of Finance | |
| 10 Sacramento | 486,189 | $113,520 | Revenue Manager | |
| 11 San Joaquin County | 674,860 | $89,357 | Chief Deputy - Revenue and Recovery | |
| 12 Tracy | 82,107 | NC | NC | |
| **Stockton** | **292,133** | **$104,467** | | |
| | | | | |
| City Median | 179,939 | $ 111,170 | | |
| % Difference (median) | -38.41% | -6.42% | | |
| City Average | 245,458 | $ 111,523 | | |
| % Difference (average) | -15.98% | -6.75% | | |
| | | | | |
| | | | NC = Not Comparable | |

6/22/2011

28

TEMPORARY CONFIDENTIAL

STOCK060748