**288**

1  MARC A. LEVINSON (STATE BAR NO. 57613)
   malevinson@orrick.com
2  NORMAN C. HILE (STATE BAR NO. 57299)
   nhile@orrick.com
3  JOHN W. KILLEEN (STATE BAR NO. 258395)
   jkilleen@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
5  Sacramento, California  95814-4497
   Telephone:    (916) 447-9200
6  Facsimile:    (916) 329-4900

7  Attorneys for Debtor
   City of Stockton

8

9                UNITED STATES BANKRUPTCY COURT

10               EASTERN DISTRICT OF CALIFORNIA

11                   SACRAMENTO DIVISION

12

13  In re:                          Case No. 2012-32118

14  CITY OF STOCKTON, CALIFORNIA,   D.C. No. OHS-1

15          Debtor.                 Chapter 9

16                                  **DECLARATION OF NORMAN C.**
                                    **HILE IN SUPPORT OF CITY OF**
17                                  **STOCKTON'S REPLY TO**
                                    **OBJECTIONS TO ITS STATEMENT**
18                                  **OF QUALIFICATIONS UNDER**
                                    **SECTION 109(C) OF THE UNITED**
19                                  **STATES BANKRUPTCY CODE**

20                                  Date:      February 26, 2013
                                    Time:      1:30 p.m.
21                                  Dept:      C
                                    Judge:     Hon. Christopher M. Klein
22

23

24

25

26

27

28

I, Norman C. Hile, hereby declare:

1.      I am an attorney licensed to practice law in California and admitted to practice before the United States District Court for the Eastern District of California. I am a partner with the firm of Orrick, Herrington & Sutcliffe LLP, counsel of record for the City of Stockton, California (the "City"), in this chapter 9 case.  I make this declaration in support of the City's Reply to Objections to its Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code.  Except as to those matters set forth on information and belief, I have personal knowledge of the facts set forth herein and if called as a witness I could testify competently to such facts.

2.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts of testimony from the Deposition of Robert C. Bobb ("Bobb"), taken in this matter on January 25, 2013.

3.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts of the proceedings before the Stockton City Council on February 28, 2012.

4.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts of the proceedings before the Stockton City Council on June 5, 2012.

5.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts of testimony from the Deposition of Nancy L. Zielke ("Zielke"), taken in this matter on January 31, 2013.

6.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts of the Reporter's Transcript of Proceedings Before the Honorable Michael S. McManus on Tuesday, August 19, 2008, at 9:00 a.m. in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, in *In re City of Vallejo, California*, Case No. 08-26813-A-9.

7.      Attached hereto as **Exhibit F** is a true and correct copy of excerpts of testimony from the Deposition of Joseph Brann, taken in this matter on January 24, 2013.

8.      Attached hereto as **Exhibit G** is a true and correct copy, obtained by my staff from the Office of the City Clerk of Oakland, California, of an Oakland Council Agenda Report and its related Resolution, without attachments, dated December 11, 2001.  This document was forwarded to the Oakland City Council by staff of then-City Manager Bobb.  This document was introduced at Bobb's deposition as Exhibit 1021.  *See* Ex. A, p. 176:17-177:4.

9.     Attached hereto as **Exhibit H** is a true and correct copy, obtained by my staff from the Office of the City Clerk of Oakland, California, of an Oakland Council Agenda Report and its related Resolution, without attachments, dated June 26, 2001.  This document was forwarded to the Oakland City Council by staff of then-City Manager Bobb.  This document was introduced at Bobb's deposition as Exhibit 1020.  *See* Ex. A, pp. 155:25-156:19.

10.     Attached hereto as **Exhibit I** is a true and correct copy of a March 3, 2004 news article authored by Cecily Burt and published in the Oakland Tribune under the title "Crime-prevention measure close to failing."  This document was introduced at Bobb's deposition as Exhibit 1024.  *See* Ex. A, p. 208:14-209:22.

11.     Attached hereto has **Exhibit J** is a true and correct copy of a April 17, 2003 news article authored by Laura Counts and published in the Oakland Tribune under the title "Nothing safe as Oakland trims budget; City manager includes library, City Hall closures on preliminary list of cuts."  This document was introduced at Bobb's deposition as Exhibit 1015.  *See* Ex. A, p. 143:12-21.

12.     Attached hereto as **Exhibit K** is a true and correct copy of a May 14, 2003 news article authored by Janine DeFao and published in the San Francisco Chronicle under the title "Brown's plan calls for 115 layoffs, closing fire station, program cuts."  This document was introduced at Bobb's deposition as Exhibit 1017.  *See* Ex. A, pp. 146:21-147:11.

13.     Attached hereto as **Exhibit L** is a true and correct copy of certain documents produced by Zielke.  The first page is titled "GFOA of the US & Canada – Fiscal First Aid" and contains a table titled "Treatments to Use with Extreme Caution."  These documents were introduced at Zielke's deposition as Exhibit 1041.  *See* Ex. D, p. 171:14-21.

14.     Attached hereto as **Exhibit M** is a true and correct copy of a publication of the California Local Government Finance Almanac dated February 6, 2013 under the title "Local Revenue Measures in California: November 2012 Results."  This document is publicly available online at http://www.californiacityfinance.com/Votes1211final.pdf.

15.     Attached hereto as **Exhibit N** is a true and correct copy of a publication by the Government Finance Officers Association ("GFOA") under the title "The Public Finance Officers

1   Role in Sustainability (Revised) (BUDGET) (2002, 2012)." This document was introduced at

2   Zielke's deposition as Exhibit 1045. *See* Ex. D, pp. 235:19-236:3. It is publicly available online

3   at http://www.gfoa.org/downloads/GFOABPBudgetsustainability2012.pdf.

4         16.    Attached hereto as **Exhibit O** is a true and correct copy of a publication by the

5   GFOA under the title "Improving the Timeliness of Financial Reports (2008) (CAAFR)." This

6   document was introduced at Zielke's deposition as Exhibit 1038. *See* Ex. D, p. 141:13-21. It is

7   publicly available online at http://www.gfoa.org/downloads/ImprovingTimelinessFINAL.pdf.

8         17.    Attached hereto as **Exhibit P** is a true and correct copy of a letter from Matthew

9   Cohn to John Luebberke with subject "Re: Intention to Conditionally Participate in Neutral

10   Evaluation Process." This document was produced by National Public Finance Guarantee

11   Corporation ("NPFG").

12         18.    Attached hereto as **Exhibit Q** is a true and correct copy of excerpts of testimony

13   from the Deposition of Peter H. Mixon, taken in this matter on December 5, 2012.

14         19.    Attached hereto as **Exhibit R** is a true and correct copy of excerpts of the

15   CalPERS Annual Valuation Report as of June 30, 2011 for the Miscellaneous Plan of the City of

16   Stockton. This document was introduced at the Deposition of David Lamoureux as Exhibit 422.

17   *See* Ex. T, pp. 49:20-50:20.

18         20.    Attached hereto as **Exhibit S** is a true and correct copy of excerpts of the Annual

19   Valuation Report as of June 30, 2011 for the Safety Plan of the City of Stockton. This document

20   was introduced at the Deposition of David Lamoureux as Exhibit 423. *See* Ex. T, pp. 50:21-51:3.

21         21.    Attached hereto as **Exhibit T** is a true and correct copy of excerpts of testimony

22   from the Deposition of David Lamoureux, taken in this matter on November 16, 2012.

23         22.    Attached hereto as **Exhibit U** is a true and correct copy of excerpts of testimony

24   from the Deposition of Eric Jones, taken in this matter on November 7, 2012.

25         23.    Attached hereto as **Exhibit V** is a true and correct copy of excerpts of testimony

26   from the Deposition of David Neumark, taken in this matter on February 5, 2013. The excerpts

27   taken from this deposition are from the rough draft of the deposition transcript, as I have not yet

28   received the final draft as of the date of this declaration.

1      24.    Attached hereto as **Exhibit W** is a true and correct copy of a June 21, 2012 email

2  from Christopher Young to Adam Bergonzi and Barbara Flickinger with subject "stockton."  This

3  document was produced by NPFG.

4

5      Executed this 15th day of February 2013, at New York City, New York.  I declare under

6  penalty of perjury under the laws of the State of California and the United States of America that

7  the foregoing is true and correct.

8          */s/ Norman C. Hile*

9          Norman C. Hile

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF NORMAN C. HILE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

1

## TABLE OF EXHIBITS

2

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Excerpts from Transcript of Deposition of Robert C. Bobb. |
| B | Excerpts from February 28, 2012 proceedings before Stockton City Council |
| C | Excerpts from June 5, 2012 proceedings before Stockton City Council |
| D | Excerpts from Transcript of Deposition of Nancy L. Zielke |
| E | Excerpts from Reporter's Transcript of Proceedings before the Honorable Michael S. McManus on August 19, 2008 in *In re City of Vallejo, California* |
| F | Excerpts from Transcript of Deposition of Joseph E. Brann |
| G | Council Agenda Report for City Council of Oakland, California dated December 11, 2001 |
| H | Council Agenda Report for City Council of Oakland, California, dated June 26, 2001 |
| I | Oakland Tribune news article titled "Crime-prevention measure close to failing" published March 3, 2004 |
| J | San Francisco Chronicle news article titled "Nothing safe as Oakland trims budget; City manager includes library, City Hall closures on preliminary list of cuts" published May 3, 2003 |
| K | San Francisco Chronicle news article titled "Brown's plan calls for 115 layoffs, closing fire station, program cuts" published May 14, 2003 |
| L | GFOA document titled "Fiscal First Aid" with table titled "Treatments to Use with Extreme Caution" |
| M | California Local Government Finance Almanac publication titled "Local Revenue Measures in California: November 2012 Results" dated February 6, 2013 |
| N | GFOA document titled "The Public Finance Officers Role in Sustainability (Revised) (BUDGET) (2002, 2012)" |
| O | GFOA document titled "Improving the Timeliness of Financial Reports (2008) (CAAFR)" |
| P | Letter from Matthew Cohn to John Luebberke with subject "Re: Intention to Conditionally Participate in Neutral Evaluation Process" |
| Q | Excerpts from Transcript of Deposition of Peter H. Mixon |
| R | Excerpts from CalPERS Annual Valuation Report for the Miscellaneous Plan of the City of Stockton dated June 30, 2011 |
| S | Excerpts from CalPERS Annual Valuation Report for the Safety Plan of the City of Stockton dated June 30, 2011 |
| T | Excerpts from Transcript of Deposition of  David Lamoreaux |
| U | Excerpts from Transcript of Deposition of Eric Jones |
| V | Excerpts from Transcript of Deposition of David Neumark |
| W | Email from Christopher Young to Adam Bergonzi and Barbara Flickinger with subject "stockton" |

DECLARATION OF NORMAN C. HILE IN SUPPORT
OF CITY'S REPLY TO OBJECTIONS TO STATEMENT
OF QUALIFICATIONS UNDER SECTION 109(C)

# Exhibit A

1

1               UNITED STATES BANKRUPTCY COURT

2                     EASTERN DISTRICT

3                   SACRAMENTO DIVISION

4    In re:

5    CITY OF STOCKTON, CALIFORNIA,    No. 12-32118

6                    Debtor.          Chapter 9

7                          /

8

9               Videotape Deposition of

10                  ROBERT C. BOBB

11               (Expert Witness)

12            Friday, January 25, 2013

13                          `

14

15

16   Reported by:

17   SANDRA BUNCH VANDER POL, RMR, CRR, CSR #3032

18   Realtime Systems Administrator credentialed

19   Fellow, Academy of Professional Reporters

20   Job No. 40416

21

22   ------------------------------------------------------

23

24              ALDERSON REPORTING
                1-800-FOR-DEPO
25

31

1    Declaration of Robert C. Bobb in Support of

2    Supplemental Objection of Assured Guaranty Corp.,"

3    and it goes on.  Have you seen this document before?

4    A.      Yes.

5    Q.      And look at Exhibit A to Exhibit 1009, your

6    declaration.  And is this your current curriculum

7    vitae or biography or résumé?

8    A.      Yes.

9    Q.      And is it -- as of the time that it was

10   submitted in December of 2012, was this an accurate

11   description of your background and experience?

12   A.      Yes.

13   Q.      Is there anything that you have worked on or

14   done since you submitted this declaration with your

15   C.V. that you would add to this as part of your

16   qualifications in this case?

17   A.      No.

18   Q.      Is it correct that you're not a certified

19   public accountant?

20   A.      Correct.

21   Q.      Have you ever studied to take the certified

22   public accounting exam?

23   A.      No.

24   Q.      Is Jordan Kramer a CPA?

25   A.      No.

Case 12-32118    Filed 02/16/13    Doc 717

1    was it that the City failed to take the steps

2    expected of a financially distressed city?

3    A.         We reviewed the history of the City's

4    financial problems.  In our opinion -- in my opinion,

5    all steps, all actions, that are necessary to bring a

6    City out of financially distressed should be on the

7    table and, in reviewing the various documents of the

8    City, did not see where -- I was not provided any

9    documents, nor did we find any documents, where all

10   of the various options were placed on the table; not

11   only expenditure options but also revenue options as

12   well.

13   Q.         Okay.  So is it fair to say, then, that as

14   of December 14th, 2012, when you wrote this, it was

15   your opinion that the City had not, as of that date,

16   yet taken the steps expected of a financially

17   distressed city?

18   A.         In working with Ms. Zielke, in reviewing the

19   research and data that she had provided, as well as

20   the alternative financial plan; in reviewing that,

21   giving my opinion based on my years of experience of

22   managing cities of various sizes, when a city is

23   facing a financial distress, every option should be

24   placed on the table.

25               And all of the options in our analysis, and

Case 12-32118   Filed 02/16/13   Doc 717

1    Stockton about whether they have talked to CalPERS?

2    A.      No.

3    Q.      In your experience as a city manager for a

4    number of cities in California, have you ever asked

5    CalPERS for a reduction in what they said the city

6    you were working for required -- was required to pay

7    CalPERS for its annual payments for employee

8    pensions?

9    A.      No.

10   Q.      Have you ever heard of a city in California

11   asking CalPERS to reduce the amount that CalPERS says

12   was owed and being granted that reduction?

13   A.      Not to my knowledge.

14   Q.      Do you know of any legal basis upon which a

15   city could ask CalPERS to reduce the pension

16   obligation that it has for its employees?

17           MR. NEAL:  Objection.  Calls for a legal

18   conclusion.  This witness is not a lawyer.

19           MR. HILE:  You can answer.

20           THE WITNESS:  Not being a lawyer, I'm not

21   aware of any restrictions on any city manager

22   approaching any of its creditors when a city is in

23   crisis, be it whether he or she is an attorney or

24   not.  That's one of the obligations of putting

25   everything on the table.

Case 12-32118    Filed 02/16/13    Doc 717

1    proposed increases may or may not have been

2    aggressive -- too aggressive or may not have been

3    aggressive.  And I can't recall specifically which

4    ones.

5    Q.       Okay.  But, ultimately, with respect to the

6    menu of taxes that's in her report, that was

7    something that you had input on and agreed with?

8    A.       Oh, yes, I agree with it.

9    Q.       Okay.  How about the operational changes?

10   What was too aggressive about some of the things you

11   said there?

12   A.       Well, for example, there was a significant

13   reduction in the -- well, not significant, but there

14   was a proposed reduction in the alternative report --

15   to use one department, as an example, Public Works,

16   and whether or not a 12 percent reduction in the

17   Public Works Department is something that should have

18   been -- should be included in the report.

19          And at the end of the day, we -- I concluded

20   in the recommendation that the report was not overly

21   aggressive.  That's only one example.

22          But we did discuss considerably all of the

23   reductions on the operational side as well as

24   proposed reductions and/or elimination of various

25   subsidies to various either entertainment and/or

Case 12-32118    Filed 02/16/13    Doc 717

53

1     recreational services.

2     Q.        Okay.

3     A.        I might add that, not to say that any of --

4     none of -- that any of these services were not

5     important to the City.  We made no judgment as to the

6     importance of those services to the City.  But we

7     made judgment with respect to when the city is in

8     crisis, whether or not the menu of alternatives had

9     thoroughly been pursued such that those services

10    would be continuing either at the current rate, a

11    reduced rate, et cetera.

12            And so I gave her the benefit of my

13    experience of having managed cities of small size,

14    having managed a $8 billion city budget with 30 some

15    thousand employees; and so she had the benefit of

16    that experience.

17    Q.        Did you and Ms. Zielke sit down and decide

18    what were the nice-to-haves and what were the

19    must-haves for the City?

20    A.        We had considerable discussions with respect

21    to the must-have, nice-to-have.  And those were

22    generally my input into what were the must-have,

23    nice-to-have, and the analysis around either of those

24    services.

25    Q.        How about the bond debt payments?  Did you

Case 12-32118    Filed 02/16/13    Doc 717

1    A.        We also -- we also recognized the fact that

2    public safety is, you know, a key service that the

3    city should provide.

4    Q.        In fact, in the Zielke report you don't

5    recommend further cuts to either fire or police, do

6    you?

7    A.        No, we do not.

8    Q.        So the cuts that have already been made were

9    as much as you felt that they could possibly be made,

10   correct?

11   A.        From my experience in this world, yes.

12   Q.        And doing anything to reduce those services

13   more was something that the City couldn't tolerate,

14   according to the Zielke report, correct?

15   A.        To reduce those services more -- it doesn't

16   mean that those services should be totally exempted

17   from any further cuts.  But it does mean that in the

18   lists of the priority of cuts, we did not propose it

19   because we showed that the City was not insolvent at

20   the time; that it -- had it followed some of the menu

21   services that we're proposing, that the City was not

22   insolvent at the time it submitted its budget.

23   Q.        When you use the term "insolvent," what do

24   you mean?

25   A.        The inability for the City, a municipality

Robert C. Bobb                                        January 25, 2013
Sacramento, CA

89

1    nor have we seen the results of this particular

2    action -- I can't sit here concretely and say these

3    things, in fact, happened.  But what we have not been

4    privy to is the City's strategy and overall plan for

5    outsourcing any and all of the operations that it

6    believes should be outsourced.

7    Q.        Take a look, sir, if you would, then, at

8    Exhibit 1011.  It should be in front of you.  It's

9    the October of 2011 proposal to the City of Stockton.

10             That's it.  And take a look at the Executive

11   Summary, which is on the sixth page.

12             Do you see that?

13   A.        Which page am I looking at?

14   Q.        The sixth page, Executive Summary.  It's

15   actually at the bottom.  It says, "Page 1."

16   A.        Oh, page 1.  Okay.

17   Q.        Now, this is the report that you submitted

18   to the City in October of 2011 with respect to a

19   proposal to be giving advice to the City, correct?

20   A.        Yes.

21   Q.        If you go down six lines, the line begins,

22   at the end of the sentence, "Cost savings

23   initiatives."

24             Do you see that?

25   A.        In the first paragraph?

Robert C. Bobb                                                                                    January 25, 2013
Sacramento, CA

1    Q.        Yes.

2    A.        Yes.

3    Q.        The next sentence says -- correct me if

4    I'm -- don't read it right -- "Stockton has

5    demonstrated leadership through tightening spending

6    and focusing scarce resources on those programs that

7    are most critical to the needs of its residents."

8              Do you see that?

9    A.        Yes.

10   Q.        That was true when you submitted this

11   report, correct?

12   A.        Correct.

13   Q.        In your opinion, as of October of 2011, the

14   City had demonstrated leadership through tightening

15   spending and focusing scarce resources on the most

16   critical programs, correct?

17   A.        Correct.

18   Q.        And then you say, "Having already reduced

19   the General Fund workforce by 30 percent, additional

20   service level cuts must be judicious to maintain

21   community safety, as Stockton has the highest crime

22   rate in the state."

23             Do you see that?

24   A.        Yes.

25   Q.        So you acknowledge that the General Fund

Case 12-32118   Filed 02/16/13   Doc 717

100

1    everything on the table.

2            You restructure, you look at an

3    organization, and you look at every avenue.  It gives

4    a City -- it gives an organization an opportunity --

5    an opportunity to reboot.

6    Q.        All right.  And it also, as you say here,

7    requires the advice of a financial adviser skilled in

8    developing and implementing comprehensive plans.

9            That includes your firm, correct?

10   A.        Correct.

11   Q.        And it also includes Management Partners who

12   was hired, correct?

13   A.        I would assume they had the capacity to do

14   exactly that, if that's what the City requested of

15   them.

16   Q.        Okay.  And you have seen the Management

17   Partners' report in February of 2012.  It's one of

18   the documents listed in your report that you

19   reviewed.  You've seen that, correct?

20   A.        Yes.

21   Q.        And that was Management Partners', as you

22   read it, assessment of the City's situation and

23   evaluation of what steps the City needed to take to

24   go forward, correct?

25   A.        I think the report that I read for

1    Management Partners provided an excellent

2    comprehensive analysis of where the City stood.

3              And -- but I don't recall -- and there was

4    some recommendation, but I don't recall in the report

5    where the City engaged them to take them -- take the

6    City through a series of recommendations out of

7    its -- implementing that No. 1 principle of

8    insolvency is not the answer.

9    Q.        All right.  Let's take a look at it, if you

10   would.  It's Exhibit 67.

11             On the first page of the report there are

12   three summary observations.  The first one is, "The

13   General Fund is insolvent from a service deliveries

14   perspective as it cannot fund the full cost of

15   consistently providing the current level of service."

16             Now, would you agree that as of February of

17   2012, the Stockton General Fund was insolvent from a

18   service delivery perspective?

19   A.        I have no reason to dispute the conclusions

20   that Management Partners came through -- identified

21   with respect to service delivery insolvency, General

22   Fund insolvency -- and I think that there's a third

23   one.  So I have no reason to -- to dispute the

24   conclusions of that firm.

25   Q.        So the second one is that the General Fund

102

1    is insolvent from a budget perspective.  Do you see

2    that?

3    A.       Correct.

4    Q.       And you're not disputing that?

5    A.       No.

6    Q.       As of February 23rd, 2012, the General Fund

7    was insolvent from a budget perspective?

8    A.       I have no reason to dispute it.

9    Q.       And then the third conclusion, the next

10   page, is that the cash solvency in the General Fund

11   is tenuous.

12           Any reason to dispute that?

13   A.       I have no reason to dispute it.  But in this

14   situation, the City of Stockton has not failed to

15   make payroll.  And so it has used its pooled cash,

16   its pool fund.

17           So, generally, if a city is on the brink of

18   bankruptcy, as it were, one of the challenges that it

19   faces is its inability to make payroll.  There is

20   nothing that we have been able to see nor conclude

21   that at any point the City of Stockton has been in

22   jeopardy or has put out some acknowledgment that on a

23   given date or a given month that the City will not be

24   able to make payroll.  We have not seen that.

25   Q.       You haven't seen that?

116

1          Do you see that?

2     A.        Yes.

3     Q.        So -- so the documents made available to you

4     by the City before your report was written do show

5     that the City would not be able to pay its cash flow

6     debts as they became due in the first few days of

7     July 2012, do they not?

8     A.        Yes.

9     Q.        Okay.  And if you look at Exhibit C, which

10    is capital markets creditors Exhibit 17, the ending

11    cash balance for every month for the City of Stockton

12    for the period May 1st, 2012 through June 30th, 2013

13    shows a negative cash balance, correct?

14    A.        It does.

15    Q.        Now, did you do anything to analyze this

16    report to show why it was not correct?

17    A.        No.

18    Q.        With it now in front of you, do you have any

19    reason to dispute that the City would have had a

20    negative cash balance in every month of 2000- --

21    fiscal year 2012/13 had it not filed for bankruptcy?

22    A.        Repeat the question.

23          MR. HILE:  Would you read it back, please.

24          (Record read as follows:  QUESTION:  With it

25    now in front of you, do you have any reason to

117

1    dispute that the City would have had a negative cash

2    balance in every month of fiscal year 2012/13 had it

3    not filed for bankruptcy?)

4            THE WITNESS:  I don't know.  I will go back

5    to our analysis that we did in the Zielke report.

6            And, again, as I stated earlier, had

7    everything been put on the table, had the City

8    executed the menu of options that are presented in

9    that report on 1 July of 2012, the City would have

10   been in a positive cash flow position.

11           And so irrespective of what's in the report

12   and Ms. Burke's declaration, in our opinion, based on

13   our analysis, had the City put everything on the

14   table early on in this process, considered all of its

15   options, the City would have been in a position to

16   have positive cash flow going forward.

17   BY MR. HILE:

18   Q.      All right.  Let me ask you about that for a

19   second.  The Zielke report assumes, does it not, the

20   passage of at least four tax measures to add revenue

21   to the City's coffers during the fiscal year

22   2012/2013, correct?

23   A.      Correct.  But the way I see it, it offers

24   the city a menu of options, and either the city could

25   take one or two of those options or none -- or

124

1    the City first discovered that they had these

2    financial issues, couldn't produce financial reports,

3    couldn't produce cash flow reports, and if you go to

4    the GFOA list of things, one of them says spend money

5    to save money.

6              So in the beginning of this crisis, the City

7    did not move with dispatch to invest in getting its

8    accounting system straight, ensuring that its cash

9    flow statements would be presented on a timely basis,

10   that its Comprehensive Annual Financial Reports would

11   be done quickly.

12             So in the beginning, the City did not make

13   an aggressive move to fix its financial operation

14   such that it would be in a better position to deal

15   with its short- and long-term financial needs.  So,

16   yes.

17   Q.        Yes, okay.  The answer is, "Yes."

18             All right.  And when you say, "in the

19   beginning," when are you talking about?

20   A.        I'm going back to -- if you go back to the

21   interim city manager's report, there was a new city

22   manager coming on board.

23   Q.        So in your judgment, the City should have

24   spent more money on its finance department than it

25   did?

125

1    A.        In the beginning, it should have fixed its

2    financial operations.  And it did fail to do so.

3    Q.        And is it your position that because the

4    City didn't do that back a year or two earlier, that

5    it's not entitled to file for Chapter 11 -- sorry,

6    Chapter 9?

7    A.        Which process are we in?

8    Q.        Chapter 9.  I apologize.  Numbers were never

9    my strength.

10   A.        I'm not trying to be smug at all.

11             Say that again.

12   Q.        Is it your position that because the City

13   didn't spend the money a year and a half earlier to

14   put more resources into its finance department, it's

15   not entitled to file a Chapter 9 petition?

16   A.        No.  My opinion is if you go back into the

17   Zielke report, and you go back to the analysis and

18   the option that we presented to the City, the City

19   would not be in a position, had it moved aggressively

20   along with the menu of options that we presented, in

21   filing for Chapter 9 bankruptcy.  That's our opinion.

22   Q.        All right.  Now, taking you -- going forward

23   then with respect to your position on more money in

24   the finance department, I assume that it would be

25   your opinion that the City needed to put resources

Robert C. Bobb                                                    January 25, 2013
Sacramento, CA

1    They are funded outside of the city for good and

2    sufficient reasons.  And the arts thrive in those

3    communities.

4            Again, there are cities that have excellent

5    library services that are funded and supported in a

6    much broader way than does.  And so the argument that

7    many of these things aren't important, they are all

8    important.

9            THE REPORTER:  Exhibit 1013.

10                   (Exhibit No. 1013 was marked.)

11   BY MR. HILE:

12   Q.      Mr. Bobb, the reporter has marked as

13   Exhibit 1-0-1-3, 1013, a two-page document which is a

14   printout of an article from the Washington Post on

15   April 6, 2004.  The headline is, "Impatient Force

16   Meets Immutable D.C. bureaucracy.  Outspoken

17   administrator brings hands-on push for change to

18   City."

19           Have you seen this article before?

20   A.      Yes.

21   Q.      On the second page, about halfway down,

22   there's a sentence that begins in the middle of the

23   page -- and feel free to read around it, if you would

24   like.  The sentence begins, "Broad approaches to

25   crime."

1          Do you see that?

2     A.       Yes.

3     Q.       Okay.  Why don't you read that sentence and

4     the next one to yourself, then I will ask you some

5     questions about it.

6     A.       Okay.

7     Q.       Is this an accurate representation of what

8     you told the reporter?

9     A.       Yes.

10    Q.       Both sentences?

11    A.       Yes.

12    Q.       Okay.  So is it not your opinion that

13    programs that are not simply police related can have

14    the effect of reducing crime?

15    A.       Yes.

16    Q.       And is it not part of what makes the City

17    livable to have programs that provide the types of

18    services that reduce crime?

19    A.       Yes.  And in this case, because the District

20    of Columbia is a city, county and state in one, we

21    found no evidence in the crime-fighting strategies

22    for the City of Stockton where the Department of

23    Mental Health, Social Services, other city agencies

24    are engaged in the non-police side in those efforts.

25    We didn't see a strategy, not a plan, that would

139

1   relate to what -- the statement that I'm making here.

2   Q.        Well, you are aware that the City had

3   greatly reduced it community policing budget,

4   correct, over the years, leading up to the time that

5   you reviewed its documents?

6   A.        Community policing takes many forms.  You

7   know, I was part of the national movement to help

8   create the whole concept of community policing

9   nationally, and so it does take many forms.  And some

10  police departments choose to have a cadre of

11  community police officers.  But there are other ways

12  in which you can engage the community and create an

13  environment for community policing.

14  Q.        But you're aware that the City did, as a

15  result of its budget problems, have to reduce

16  community policing?

17  A.        It made that choice.

18  Q.        Okay.  And another choice that it made was

19  to reduce its recreational programs, correct?

20  A.        It made that choice.

21  Q.        And it also made the choice to reduce the

22  number of libraries that were open and the hours that

23  they were open, correct?

24  A.        Correct.

25  Q.        And all of those types of services can have

1    an impact on crime, can they not?

2    A.       There's no evidence that library hours have

3    a positive impact on crime.  I have not in my years

4    of experience have seen -- now, is a library a good

5    service to have in the community?  Absolutely.  Do I

6    support library services?  Absolutely.  I've been

7    part of a process that helped to create a master plan

8    for library services.

9             Recreation services, there is a direct

10   correlation more so than -- in my experience, than

11   libraries.

12   Q.       And would you agree with me that each of

13   those services -- community policing, recreational

14   programs and library services -- are important to

15   keeping a viable city?

16   A.       I believe that all of those services are

17   important to having a viable city and a viable

18   community.  This is a question at the end of the day

19   is:  The extent to which we fund those services and

20   look for alternative ways in which those services can

21   be funded during the time of financial crisis.

22             MR. HILE:  Take a look, if you would, sir,

23   at what I will give you as the next exhibit in order.

24             THE REPORTER:  1014.

25                    (Exhibit No. 1014 was marked.)

Robert C. Bobb                                                                January 25, 2013
Sacramento, CA

```
 1    BY MR. HILE:

 2    Q.        This is a memorandum to the Office of the

 3    City Manager, with you as one of the attentions, from

 4    the Budget Office for the City of Oakland.  It's a

 5    Council Agenda Report dated May of 2003.

 6              Have you seen this before?

 7    A.        It's been a while.  I have not seen it

 8    recently, no.

 9    Q.        Well, were you the city manager at the time

10    that this report was sent to the -- to the City

11    Council?

12    A.        Yes, I was.

13    Q.        Okay.  And did you review it before it was

14    sent to the City Council?

15    A.        Yes, I did.

16    Q.        And did you approve of what was said in it

17    before it went to the City Council of Oakland?

18    A.        Yes.

19    Q.        Look at the top of page 4.  The sentence at

20    the top of the page says, "Aside from the

21    quality-of-life implications and looking only within

22    the realm of public safety, the projected overrun has

23    severely limited council's latitude to fully consider

24    options such as after-school programs and other

25    important public safety programs which may help in
```

1    the long run to reduce crime in the first place."

2              Do you agree with that statement?

3    A.       Yes.

4    Q.       And is it true that, in your view, that

5    after-school programs can, in the long run, help to

6    reduce crime?

7    A.       They are a contributor for crime reduction.

8    But it can -- in the case that's -- in my review of

9    the City of Stockton's program, I have not seen the

10   robustness of any after-school program that the City

11   has -- has implemented or was on the City's book.

12   Q.       Now --

13   A.       I'm not aware of such programs existing in

14   the City of Stockton.

15   Q.       But programs such as that -- this is just a

16   "such as after-school programs" -- may help in the

17   long run to reduce crime?

18   A.       May.

19   Q.       Mr. Bobb, if you would take a look at page

20   29 of your report, which is Exhibit 1009.

21   A.       Page?

22   Q.       At the bottom, 29.  You make the statement

23   midway through the full paragraph on that page --

24   it's about ten lines down -- "I have been involved in

25   such reviews in Kalamazoo, Oakland, Detroit and

Robert C. Bobb                                                    January 25, 2013
Sacramento, CA

143

1    Richmond.  They are painful processes, as difficult
2    choices have to be made."
3           And that's referring to the -- deciding
4    which are must-have versus nice-to-have services.  Do
5    you see that?
6    A.      Yes.
7    Q.      I want to ask you about some of the
8    decisions that you made in Oakland during the 2003 to
9    2005 period.
10          Take a look, if you would, at what I will
11   ask the reporter to mark as the next exhibit.
12          THE REPORTER:  1015.
13                  (Exhibit No. 1015 was marked.)
14   BY MR. HILE:
15   Q.      This is a printout, Mr. Bobb, of an article
16   taken from the Oakland Tribune, April 17th, 2003.
17   The headline is, "Nothing safe as Oakland trims
18   budget.  City manager includes library, city hall
19   closures on preliminary list of cuts."
20          Do you see that?
21   A.      Yes.
22   Q.      So in April of 2003, as the city manager in
23   Oakland, I take it Oakland was facing a budget
24   shortfall of close to $30 million; is that true?  Or
25   maybe even more.

1    Council Member De La Fuente's quote about making

2    tough choices.  Nothing is sacred.

3              That was the mind-set in Oakland during a

4    financial crisis.  We did not see evidence of a

5    similar mind-set in terms of addressing Stockton's

6    difficult financial problems, issues.

7    Q.        And it's your testimony that you didn't see

8    it --

9    A.        This is coming from the president of the

10   City Council.

11   Q.        Sure.  Your testimony here is that you

12   didn't see any indication of that mind-set in

13   Stockton with all of the documents that you read?

14   A.        In terms of putting everything on the table,

15   in terms of -- and I use the word "reboot," but it

16   may be not a good word to use.  What it means is

17   during the time of a financial crisis, everything is

18   on the table.  Nothing is sacred.  That includes

19   revenue reductions as well as -- revenue enhancements

20   as well as operational expenses reductions.

21             THE REPORTER:  1017.

22                       (Exhibit No. 1017 was marked.)

23   BY MR. HILE:

24   Q.        Exhibit 1017 is a one-page document.  It's

25   an article from the San Francisco Chronicle dated

147

1    May 14, 2003, the headline being, "Mayor Submits

2    Oakland Budget."

3         And in the third paragraph you can see it

4    says, "Brown and city manager, Robert Bobb, outlined

5    a two-year $1.78 billion budget that includes closing

6    city buildings one day a month, laying off 115 city

7    workers, closing one fire station, reducing hours at

8    some library branches, and increasing fees for

9    services from parking to garbage collection."

10        Do you see that?

11   A.      Yes.

12   Q.      And that was part of what the proposed

13   budget was that was submitted to the City Council,

14   correct?

15   A.      Yes.

16   Q.      And then a couple of paragraphs down,

17   there's a sentence that begins, "Libraries and

18   recreation centers."  Do you see that?

19   A.      Yes.

20   Q.      It says, "Libraries and recreation centers

21   floated for possible closures in an earlier,

22   worst-case budget scenario escaped relatively

23   unscathed.  But some library branches would cut back

24   from six to five days a week, and program directors

25   at recreation centers would be eliminated."

149

1    entertainment facilities over libraries and fire

2    engines.  And so putting everything -- did not bring

3    before the voters any type of revenue enhancements.

4    And so everything was not on the table.

5            And if you use the Oakland scenario, other

6    scenarios, where I have dealt with these issues over

7    the years, everything was on the table.  Nothing was

8    sacred.  And you make your case.  And at the end of

9    the day, the City Council votes it up or down.  But

10   you make the case.  You make the presentation.  You

11   present the options as the city manager.

12           THE REPORTER:  Exhibit 1018.

13                   (Exhibit No. 1018 was marked.)

14   BY MR. HILE:

15   Q.      Mr. Bobb, Exhibit 1018 is an article from

16   the Oakland Tribune dated May 14, 2003.  The headline

17   is, "Council gets mayor's plan for budget.  Brown's

18   no-fat fiscal proposal has cuts, possible layoffs,

19   fee increases and fire station closing."

20           In the text of the article it says, "Though

21   Mayor Jerry Brown said Tuesday that the budget is in,

22   quote, 'pretty good shape,' closed quote, given the

23   economy, sparing libraries, recreation and senior

24   centers from closure, the City Council is in for a

25   rough month as it closes a projected $48.3 million

Robert C. Bobb                                    January 25, 2013
Sacramento, CA

150

1    two-year budget gap."

2          Do you see that?

3    A.      Yes.

4    Q.      Further down it says, "More than a hundred

5    people could be laid off, a fire station could be

6    closed, and community policing staff will be cut."

7          And the next sentence says, "Brown said

8    there is no fat left to trim."  Quote, "There is no

9    bad left in the budget.  So when you are cutting, you

10   are cutting the good and not the bad, Brown told the

11   council in a brief presentation before turning things

12   over to City Manager Robert Bobb and leaving."

13         Now, in -- do you agree with then Mayor and

14   now Governor Brown that there was no fat left in the

15   budget even though libraries were continuing to be

16   open, recreation and senior centers were open?

17   A.      Yes.

18   Q.      So those are, to some extent, must-haves?

19   A.      To some extent, those were priorities that

20   were made during the context of the budget session.

21   Because their revenue projection increases that were

22   pretty substantial in the budget as well.  So, again,

23   everything was on the table.

24         THE REPORTER:  Exhibit 1019.

25              (Exhibit No. 1019 was marked.)

1      it morphed over to -- I mean, it still exists, and

2      then a new system was put in place, wherein police

3      and fire could become part of CalPERS.

4              So you still have some retirees in an old

5      system, then you have some -- I mean, police and

6      firefighters, and then you have some retirees in

7      the -- and contributors to the CalPERS system.  So

8      there are two separate plans in Oakland.

9      Q.      All right.  That's helpful.  So -- but with

10     respect to non-police and fire, they are CalPERS?

11     A.       Including police and fire.

12     Q.      All right.  All right.  Just one other

13     question with respect to how that works.

14              When police and fire became covered by

15     CalPERS -- when the CalPERS program was put together

16     for police and fire, did that only start with new

17     hires and the old hires continued to contribute to

18     the old system?  Or did they -- did they start -- did

19     the people who had been in the old system start

20     contributing to CalPERS in place of the old system?

21     A.      I really don't know the details.  It was --

22     those systems were in place before I arrived in

23     Oakland.

24              MR. HILE:  All right.

25              THE REPORTER:  Exhibit 1020.

Robert C. Bobb                                                                January 25, 2013
                              Sacramento, CA

 1                          (Exhibit No. 1020 was marked.)

 2      BY MR. HILE:

 3      Q.          Is Exhibit 1020 a Council Agenda Report that

 4      was submitted by you to the council when you were the

 5      city manager?

 6      A.          Yes.

 7      Q.          And it looks like, again, Dolores was the

 8      one who signed for you; is that correct?

 9      A.          Correct.

10      Q.          Now, the title of this report appears to be

11      a proposed resolution to approve a Memorandum of

12      Understanding with the -- between the City and the

13      firefighters and the police to transfer them to the

14      PERS system; is that correct?

15      A.          Let me take time to read this and refresh my

16      memory.

17      Q.          Sure.

18      A.          This is a memorandum with respect to

19      firefighters contract negotiations.

20      Q.          Okay.  And this was a resolution to have the

21      city and the firefighters enter into a new contract

22      by which firefighters would be entitled to

23      participate in the PERS retirement plan, correct?

24      A.          Correct.

25      Q.          Okay.  Now, if you look in the second

161

1      8,000 people showed up to fill those vacancies.

2      Q.        Okay.  How about in the police area?

3      A.         In the police area, market survey is

4      important, to some extent.  But, again, it all

5      depends on affordability.

6      Q.        Okay.  Putting affordability aside for a

7      moment, what's the importance of it?  Why is it

8      important?

9      A.         Only to see where you stand in the

10     marketplace from a recruitment standpoint.

11     Q.        Okay.  When you say, "from a recruitment

12     standpoint," does that mean that you're going to have

13     an easier time recruiting new people to take police

14     spots if you can show those people that you were

15     paying the same or more than places where they might

16     also get a job?

17     A.         It's a two-edged sword.  On the one hand, it

18     may be correct.  But also, on the other hand, it

19     depends on the level of activity in the community

20     that a police officer -- that he or she chooses to

21     serve in.

22             Some police agencies you have individuals

23     who are willing to serve because of the nature of the

24     experience they will get in a relatively short period

25     of time.

Robert C. Bobb                                                          January 25, 2013
Sacramento, CA

162

1          There are others who choose communities

2    where they don't have the same level of activity

3    and -- and so it's an individual choice.

4    Q.       But it's still important for you to know,

5    for purposes of recruitment, that you are at the

6    market, correct?

7    A.       It's important information to have.  And it

8    has been a standard part of negotiations.  I mean, if

9    you go to my declaration, I make the point that I,

10   too, have participated in these salary surveys for

11   police and fire.  It's outlined in my declaration.

12          What we find is the ratcheting-up process,

13   it's the me-too.  It has been very standard in

14   California, in other places where I've negotiated

15   with labor unions.

16   Q.       Okay.  And I understand that.  And let me

17   just -- let me just say that I want to distinguish

18   between using a salary survey in such a way that

19   automatically requires a ratcheting up -- that's one

20   thing on one side -- and the other side is using a

21   salary survey to determine whether or not you're

22   going to be able to either hire new people or retain

23   current people without it forcing stuff.

24          The latter seems to me is a valid use of a

25   salary survey, correct?

163

1    A.          There are -- there are a whole -- excuse me.

2              There's a whole series of issues surrounding

3    the retention of personnel.  And it's not

4    necessarily -- and those issues aren't always tied to

5    salary.  They aren't always tied to benefits.

6    Q.          Okay.  But let me get back to my question

7    again.  Let me see if I can ask it in such a way that

8    I can get an answer.

9              I take it from your report that you are not

10   in favor of a situation where salary surveys are used

11   to automatically ratchet up salaries for, in this

12   example, police because some other jurisdiction has a

13   higher salary and so you're -- it's an automatic

14   thing that you don't like that.  But, on the other

15   hand, you do use salary surveys, and it's okay to use

16   salary surveys, in your opinion, simply to determine

17   whether or not you are at market for purposes of both

18   recruiting and retention?

19   A.          For certain positions.  And if you go back

20   to my declaration, I also said it's not necessary to

21   have a broad market survey that reaches many -- to

22   many jurisdictions if you're recruiting certain

23   positions within your own market area; clerical

24   positions, analyst positions, that are in your

25   community.

Robert C. Bobb                                                                              January 25, 2013

Sacramento, CA

 1    A.        I can't say concretely, no.

 2    Q.        Is there any other reason that you can

 3    explain the expense overrun due to its retirement

 4    increases as a result of transferring public safety

 5    employees to CalPERS?

 6    A.        No.

 7    Q.        So as a result of transferring firefighters

 8    to the CalPERS system, the City of Oakland was

 9    required to pay more in retirement contributions than

10    it had been under the old system, correct?

11    A.        What I don't know and cannot recall is

12    whether or not -- what percentage of the cost overrun

13    was contributed to the transfer to CalPERS and, in

14    addition, to cost overruns within the police

15    department.

16              MR. HILE:  Okay.

17              THE REPORTER:  Exhibit 1021.

18                   (Exhibit No. 1021 was marked.)

19    BY MR. HILE:

20    Q.        Mr. Bobb, Exhibit 1021 is a December 11th,

21    2001 Council Agenda Report to the Office of the City

22    Manager dated December 11th, as I said, 2001.

23              And is this a document which your office

24    sent to the City Council for its approval?

25    A.        Yes.

Case 12-32118    Filed 02/16/13    Doc 717

1    Q.        And is it recommending approval of a

2    memoranda of understanding between the city and the

3    police officers association?

4    A.        Yes.

5    Q.        The third paragraph starts, quote, "It also

6    includes a significant change in retirement benefits

7    beginning with an agreement to amend the city's

8    contract with the California Public Employees

9    Retirement System, paren, quote, PERS, closed quote,

10   closed paren, July 2003.  This amendment would allow

11   police officers enrolled in PERS to be eligible for a

12   3 percent retirement package at the age of 50."

13            What was the PERS retirement package before

14   this MOU?

15   A.        I don't recall.

16   Q.        Was it 2 percent at 55?

17   A.        I don't recall.

18   Q.        Why did you recommend to the City of Oakland

19   that it amend the -- the City's contract with CalPERS

20   to make a significant change in retirement benefits?

21   A.        It is part of negotiations with the police

22   officers association and a committee of City Council

23   who was involved in those negotiations as well.

24   Q.        And if you look at the second page of the

25   document under "Background," the second sentence

Case 12-32118    Filed 02/16/13    Doc 717

1    approval to the Oakland City Council as the Oakland

2    city manager, correct?

3    A.        That's correct.  But, again, just to be

4    clear, there's no date that confirms that this

5    document is part of the document -- the memorandum

6    that went to the City Council.

7    Q.        Okay.  And I appreciate that, and we will

8    take the laboring oar of convincing you that that's

9    the case.

10            Now, in this case, the MOU started in --

11   went into effect in 2001, and it went through 2007;

12   is that correct?

13   A.        It was executed in 2001.  Again, I don't see

14   in this document that this is the long-term MOU.

15            And just to help you out, it is on

16   Appendix F.

17   Q.        Okay.  I wanted you to take a look at

18   page -- page 4 that has the salary list for every

19   year from June of 2001 through July of 2006.

20            Do you see that?

21   A.        Yes.  Page 4 references the annual uniform

22   allowance.  It doesn't reference the salary.

23   Q.        Okay.

24   A.        I thought you said this references the

25   salary.

Case 12-32118    Filed 02/16/13    Doc 717

1    to being sued and having to pay attorneys' fees and

2    perhaps penalties for having breached the rights of

3    the -- asserted by the retirees?

4            MR. NEAL:  Objection to the extent it calls

5    for a legal conclusion.

6            THE WITNESS:  No.  My guess is, you know,

7    anyone can sue.

8    BY MR. HILE:

9    Q.      Let me ask about the alternative model with

10   respect to its inclusion of additional revenues to be

11   raised by raising taxes through ballot propositions.

12           Other than what Ms. Zielke says in her

13   report, did you do anything to determine whether or

14   not, in the City of Stockton, any one of those

15   revenue proposals would pass the voters?

16   A.      We read the survey that the City itself did

17   to determine whether or not some of these tax

18   measures would -- could be adopted.  And as I recall

19   from reading those documents, that there is a good

20   likelihood that those things -- those -- some of

21   those tax increases could be or would be approved.

22   Q.      All right.  Other than just reading those,

23   did you do any other feasibility analysis with

24   respect to that?

25   A.      No, we did not do any feasibility analysis.

Robert C. Bobb                                                    January 25, 2013
Sacramento, CA

1    But, again, I will go back to my initial point.  My

2    point is, the City of Stockton did not place

3    everything on the table.  It did not fundamentally

4    change its business model.  It did not restructure

5    its government.  It did not reset its entire

6    operations.  It made cuts on its operational side,

7    but it didn't put everything on the table.

8             And, clearly, the one thing that was not put

9    on the table, that we have not been able to find any

10   documentation to, is the issue of enhanced revenues,

11   coupled with the reductions on the expenditure side.

12   Q.       Well, dealing with that last one, you did

13   read the polling that was done by the City, correct?

14   A.       I did.

15   Q.       So that's something that the City did,

16   correct?

17   A.       But it didn't go forward.  The fact is, the

18   City did not have -- it had a plan.  It didn't

19   execute the plan.  It didn't make its plan

20   operational.  It did not put everything on the table.

21            I mean, I don't know how many times I can

22   say that, other than the fact --

23   Q.       I don't, either.  Go ahead.

24   A.       But I will continue to say it because it's a

25   fact.  The City did not put everything on the table,

1    A.        Yes.

2    Q.        What is the majority by which a parcel tax

3    has to pass in California?

4    A.        It's a higher test than a sales tax.

5    Q.        Okay.  It's two-thirds, correct?

6    A.        Correct.

7    Q.        Can you give me examples of places where

8    parcel taxes that were not already in place have been

9    passed in the last two or three years?

10    A.        No, I cannot.  But I can tell you that

11    here's -- here's a menu in the Zielke report that

12    shows some of the other options wherein taxes could

13    have -- have been successful in California.

14            THE REPORTER:  1024.

15                    (Exhibit No. 1024 was marked.)

16    BY MR. HILE:

17    Q.        Mr. Bobb, Exhibit 1024 is a March 3rd, 2004

18    Oakland Tribune article with the headline, "Crime

19    Prevention Measure Close to Failing."

20            Have you seen this before?

21    A.        No.

22    Q.        It talks about, in the first sentence, a

23    $110 million measure to try and stem Oakland's murder

24    rate by hiring more police officers and funding

25    programs to help parolees lead law abiding,

209

 1    productive lives.

 2           And you see in the sixth paragraph that

 3    starts, "This is the second time Oakland voters..."

 4    Do you see that?

 5    A.      Yes.

 6    Q.      And the second sentence says, "In November

 7    2002, voters were faced with a confusing collection

 8    of four related issues that aim to generate

 9    $70 million to hire 100 new police officers by

10    raising hotel, parking, and utility taxes for five

11    years.  Another $5 million was earmarked for three

12    violence prevention programs that work with

13    ex-offenders, at-risk youth, and after-school

14    programs.  Although voters narrowly approved the

15    concepts, they defeated the taxes that would have

16    paid for it."

17           Do you recall that in March of 2004, when

18    you were the city manager in Oakland, a collection of

19    four issues -- sorry, in November of 2002, that

20    voters rejected four related tax increase measures

21    for police officer use?  Do you remember that?

22    A.      I do recall.

23    Q.      Okay.  And that particular proposal, which

24    didn't pass, included a raise in the hotel parking

25    and utility taxes, correct?

228

1    additional expense -- percentage going forward in the

2    future.

3    Q.       Is zero-based budgeting appropriate, in your

4    view, when a city is in financial distress and needs

5    to act quickly and doesn't have many resources to pay

6    for it?

7    A.       One of -- if you're going to go back to GFOA

8    as one of the standard bearers in the industry, and

9    you look at a list of tests that one -- that

10   municipalities should take when they are in distress,

11   one of the tests is spend money to save money.

12   Q.       Well, let me ask my question again.  Is

13   zero-based budgeting appropriate, in your view, when

14   the City is in financial distress and needs to act

15   quickly and doesn't have many resources to pay for

16   it?

17   A.       Absolutely.  I believe that.

18   Q.       Okay.  Let me ask you to look at page 3, the

19   paragraph that goes over at the top of the page.  The

20   first full sentence starts, "In fact."

21           Do you see that?

22   A.       Yes.

23   Q.       Quote, "In fact, our research found that use

24   of, quote, textbook, closed quote, ZBB is almost

25   unheard of in local government today."

231

1    Detroit.  Everything was on the table.

2              The City of Stockton did not put everything

3    on the table.

4              THE REPORTER:  1027.

5                        (Exhibit No. 1027 was marked.)

6    BY MR. HILE:

7    Q.        The reporter has marked as Exhibit 1027 a

8    copy of an article from Education Week dated

9    May 18th, 2001.  The title of the article is,

10   "Detroit Deep in Debt As Manager Leaves."

11             Mr. Bobb, have you seen this article before?

12   A.        No, I have not seen an article written by an

13   anonymous author.

14   Q.        Let me take a look -- ask you to take a look

15   at the full text.  It starts off, "As the Detroit

16   Public School's emergency financial manager Robert

17   Bobb wraps up his final days in the job, he is facing

18   a district that continues to lose students and

19   money."

20             The next sentence says, "This $200 million

21   deficit he inherited two years ago is now at least

22   $327 million."

23             Do you see that?

24   A.        I see that.

25   Q.        Is that correct as of May of 2011?

Robert C. Bobb                                                    January 25, 2013
Sacramento, CA

232

1    A.        Putting everything on the table and just do

2    a little bit deeper research, when I went into

3    Detroit, the deficit was reported at $148.7 million.

4              Immediately, within two months of my being

5    there, we confirmed the deficit at $305 million.  And

6    so those are well-documented facts.

7              The school district continues to lose

8    students annually.

9    Q.        All right.  Take a look then, sir, if you

10   would, down towards the bottom of the page.  There's

11   a sentence that begins right at the left-hand column

12   with the word, "After he was criticized," about an

13   inch above the subject there.

14             Do you see that, "after he was criticized"?

15   A.        Yes.

16   Q.        Let me -- let me read this for the record.

17             It says, "After he was criticized for a

18   deficit elimination plan that called for closing half

19   the district's 141 schools and increasing class

20   sizes, he changed course, saying that while it would

21   have wiped out the deficit in a few years, it was too

22   severe."

23             Now, is it correct, Mr. Bobb, that after you

24   did your zero-based budgeting process for the Detroit

25   schools that included the closing of 141 schools and

Case 12-32118    Filed 02/16/13    Doc 717

1    increasing class sizes, you then changed course,

2    saying that that was too severe?

3    A.        We -- in the Detroit Public Schools, we

4    closed 75 school buildings.  We built 500,000.  We

5    implemented and built 23 new school facilities.

6           We did what Stockton did not do.  We put

7    everything on the table to eliminate and fight the

8    deficit problem that we had in the Detroit Public

9    Schools.

10           We were losing students.  We had a school

11    district that, in 2002, I believe, had 186,000

12    students.  80 -- 58 -- 56,000 students were in the

13    district when I left.  Losing 10,000 students per

14    year.

15           And if you look at the current Deficit

16    Elimination Plan as it was just submitted to the

17    state by my predecessor, the school district by 2016

18    will have 13,000 students.

19    Q.        Okay.  But is it true that after proposing

20    closing 141 schools and increasing class sizes, you

21    changed course, citing that that was too severe?

22    A.        No.  I don't know where this anonymous

23    author received his or her information.  There was

24    never a plan to close 141 schools.

25           There was 192 schools when I arrived in

1    Detroit.  We closed and consolidated about 75
2    schools.
3    Q.      So that would be one-half of the 170- -- 141
4    schools, correct?
5    A.      Yeah, this information is very incorrect.
6    Q.      Well, a half of 141 would be 70, correct?
7    A.      Put it in its total context.  We're building
8    new schools.  We built -- we built a new school.  We
9    consolidated.  We closed three.  Students moved to
10   that one school.
11            So in some instances we closed schools.  But
12   we were implementing a $500 million bond program to
13   build new schools.  And in some instances, we were
14   closing schools and moving students from one school
15   building to -- closing two schools to -- three
16   schools to move students to one new school based on a
17   declining enrollment.
18   Q.      All right.  So you did change the number of
19   schools you were going to close after your initial
20   proposal; is that correct?
21   A.      That isn't correct.  We had a -- we did what
22   this city did not do.  We had a master plan for
23   school closures.  We had a master plan for how we
24   would eliminate and deal with the deficit.  We put
25   everything on the table.  We decided what our core

Robert C. Bobb                                                                January 25, 2013

Sacramento, CA

257

1                    CERTIFICATE OF REPORTER

2           I, SANDRA BUNCH VANDER POL, a Certified

3    Shorthand Reporter, hereby certify that the witness

4    in the foregoing deposition was by me duly sworn to

5    tell the truth, the whole truth and nothing but the

6    truth in the within-entitled cause;

7           That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13          That before completion of the deposition,

14   review of the transcript was requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18          I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23   DATED:  FEBRUARY 4, 2013

24          _____

25                  SANDRA BUNCH VANDER POL, CSR #3032

# Exhibit B

**Transcript of Proceedings Before the Stockton City Council on February 28, 2012**

A video of the complete February 28, 2012 proceedings is publicly available at
http://stockton.granicus.com/MediaPlayer.php?view_id=48&clip_id=3894.  Represented below is a
true and correct transcript of a portion of the proceedings, with an estimate of what time on the
publicly available tape the transcript excerpt appears.

| 5:09:00 | |
|---|---|
| Mayor Ann Johnston | We don't believe that until we get our house in order is anyone going to approve any kind of tax in this city. |
| | We will not cut services, or we will try not to cut services any further.  We've cut to the bone on police and on fire and other services.  This Council—certainly myself—we're not ready to do that.  The safety of our citizens is more important.  We need to preserve the services we have because we've cut so far to this point.  We don't want to go there.  We could say we'll find another $20 million dollars.  We'll just cut a bunch more police officers, a bunch more people.  That's not where we want to go. |
| **5:19:15** | |
| Councilmember Diana Lowery | To continue what we've been doing, and make cuts after cuts after cuts; we can't do it. . . . I've been doing it since I arrived here, and we simply can't continue to exist. |
| **5:31:55** | |
| Vice-Mayor Katherine Miller | We've reduced our services to a level that I don't think anyone who lives in the City thinks is acceptable. |

# Exhibit C

**Transcript of Proceedings Before the Stockton City Council on June 5, 2012**

A video of the complete June 5, 2012 proceedings is publicly available at
http://stockton.granicus.com/MediaPlayer.php?view_id=48&clip_id=4080.  Represented below is a
true and correct transcript of a portion of the proceedings, with an estimate of what time on the
publicly available tape the transcript excerpt appears.

| ~4:20:00 | |
|---|---|
| Major Ann Johnston | We've been making serious cuts over the last three years that have affected everyone. |
| Vice-Mayor Katherine Miller | We had to sweep $15 million…just to make it to June 30 this year. |

# Exhibit D

Case 12-32118   Filed 02/16/13   Doc 717

1               UNITED STATES BANKRUPTCY COURT

2                     EASTERN DISTRICT

3                    SACRAMENTO DIVISION

4    In re:

5    CITY OF STOCKTON, CALIFORNIA,    No. 12-32118

6                    Debtor.          Chapter 9

7                          /

8

9              Videotaped deposition of

10                 NANCY L. ZIELKE

11             Thursday, January 31, 2013

12

13                              `

14

15

16   Reported by:

17   VICKI HAINES, CSR #5995

18   Job No. 40418

19

20

21

22

23

24

25

1    Michigan.

2    Q.        How long was the course to receive that

3    certification?

4    A.        It was two or three days.  I can't recall

5    the exact timing.

6    Q.        Is the certification then a State of

7    Michigan certification?

8    A.        It's a certificate through Michigan State

9    University.

10   Q.        Okay.  Are you a certified public

11   accountant?

12   A.        No.

13   Q.        Have you ever sat for the CPA exam?

14   A.        No.

15   Q.        Have you ever taken any courses that were

16   designed to lead to being able to take the CPA exam?

17   A.        In my undergraduate work as well as my

18   graduate work, I did take accounting classes.

19   Q.        What type of accounting classes did you

20   take?

21   A.        Sir, we're going back here a few years.  I

22   remember taking a cost accounting course, a -- I

23   remember taking basic, you know, general accounting

24   course.

25   Q.        Anything else?

 1   Ms. Zielke, that I have looked through it for that,

 2   and I can't find it, so if you can find it today or

 3   some other time, would you please let me know?

 4   A.      Again, without going through all 76 pages of

 5   the report, I cannot say whether the word "menu" is

 6   used in here.  But the terminology "options" and

 7   "scenarios" is used in the report.  But, again,

 8   without going through to look for that specific word,

 9   I can't answer.

10   Q.      All right.  I'd like to ask you to look at

11   what was previously marked as Exhibit 28.  For the

12   record, Exhibit 28 is Exhibit N to the Declaration of

13   Vanessa Burke.  And after Exhibit N, there is a table

14   of fund restrictions, City of Stockton fund

15   restriction table.

16           Do you see that?

17   A.      I'm just looking at the exhibit now.

18   Q.      Okay, thank you.

19   A.      But, yes, I see there's a table following

20   the cover.

21   Q.      Now, Exhibit 28 is one of the exhibits

22   that's listed in your report as something that you

23   reviewed, is it not?

24   A.      If I could take a moment just to -- yes,

25   document reviewed, Exhibit 28.

1  Q.      Okay.  So this is an exhibit that you

2  reviewed before you completed your report, correct?

3  A.      Yes.

4  Q.      Did you make any attempt to determine

5  whether or not any of the funds that are listed here

6  are incorrectly listed as being either unrestricted,

7  restricted or partially restricted?

8  A.      Again, please.

9  Q.      Did you make any attempt to determine

10  whether or not any of the funds that are listed here

11  are incorrectly listed under the categories of

12  restricted, partially restricted or unrestricted?

13  A.      We reviewed the various source restrictions

14  as presented in this table.

15  Q.      And you agreed with them; is that correct?

16  A.      We agreed as it relates to the information

17  that was provided.

18  Q.      Okay.  And as a result of that review of

19  these -- of this table, you didn't recommend, did

20  you, in your report, that the city could sweep funds

21  from other funds into the general fund, did you?

22  A.      We didn't -- in the report as presented, we

23  did not recommend that the city sweep funds as they

24  had in previous years, no.

25  Q.      And isn't that because you found that there

Case 12-32118    Filed 02/16/13    Doc 717

Page 90

1   A.        No, it's not.

2   Q.        And it's not mandated by federal law, is it?

3   A.        I'm not sure if it's mandated by charter

4   law, but let me go back -- the city charter does

5   require that the city provide and complete an annual

6   comprehensive financial report.

7   Q.        So, now, is the accounting department an

8   essential service?

9   A.        Yes, it is.

10   Q.        Okay.  So, to your assessment, the

11   accounting department is not something that should be

12   cut because it's an essential service; is that

13   correct?

14   A.        Again, there's some assumptions there.  I

15   mean, an accounting department, in my opinion, is an

16   essential part of local government.

17              Whether or not those services, those

18   functions are performed by -- by individuals or

19   outside resources that -- providing reliable

20   financial reports is an essential part of local

21   government.

22   Q.        Okay.  And let's take police.  Are police

23   services mandated by state law?

24   A.        I don't know in this case if it's mandated

25   by state law.

Case 12-32118    Filed 02/16/13    Doc 717

1    of those debt service payments.

2    Q.        Did you review all of the debt service

3    payments to determine whether or not they were

4    mandated in some way?

5    A.        I looked at the debt service schedules as

6    related to the outstanding debt, and each one of

7    those was put in place through an offering statement

8    or as relates to the city's borrowing.

9    Q.        That's not state law, is it?

10   A.        It would be based on city charter as well as

11   city ordinances.

12   Q.        So it's your position here that making debt

13   payments is an essential service that must be made as

14   mandated by state, federal or city charter law?

15   A.        City charter and local ordinance -- or, I

16   mean, local ordinance and adopting ordinances.

17   Q.        How about library services, are they

18   mandated by state law?

19   A.        Not to my knowledge.

20   Q.        By federal law?

21   A.        Not to my knowledge.

22   Q.        By the city charter?

23   A.        Not to my knowledge.

24   Q.        So, in your view, are those non-essential

25   services?

Case 12-32118    Filed 02/16/13    Doc 717

1   A.        In my view, providing for health and safety

2   and quality of life are important to local

3   government.

4   Q.        But they are not essential, correct?

5   A.        They are not essential as it relates to how

6   those services are provided.

7             THE REPORTER:  I don't think I heard that

8   correctly.  Can you repeat that answer, please?

9             THE WITNESS:  I believe my answer was they

10  are not essential as it relates to how, and I'd like

11  to continue on with that answer, as well as how they

12  are funded.

13  Q.        BY MR. HILE:  Now, in Mr. Bobb's report, he

14  talks about must-haves and nice-to-haves.  Do you

15  remember seeing that?

16  A.        Just one moment, please.  Yes, I do recall

17  seeing that.

18  Q.        Is there any difference between what you

19  call essential services and what Mr. Bobb calls

20  must-haves versus what you call non-essential

21  services and he calls nice-to-haves?

22  A.        Again, from recalling my memory of what

23  Mr. Bobb has in the report, I think there is some

24  similarity of what a non-essential versus

25  nice-to-have would represent, and must-haves

 1    Full-service lawyer.

 2              Have you seen Exhibit 1030 before,

 3    Ms. Zielke?

 4    A.        Again, I was just handed a copy of the

 5    Detroit Public Schools 2011 Comprehensive Annual

 6    Report and -- -- I can say I'm not sure if I have.

 7    Q.        Well, take a look, if you would, at page --

 8    this is Roman numeral XXVIII.

 9              Do you have that in front of you?

10    A.        Yes, I do.

11    Q.        And it shows under the Cabinet for the

12    Detroit Public Schools, as a budget consultant, Nancy

13    Zielke.  Is that you, ma'am?

14    A.        Yes, it is.

15    Q.        So you were serving at least in the cabinet

16    for purposes -- of the Detroit Public Schools, as the

17    budget consultant for purposes of the -- working

18    during the fiscal year ending June 30, 2011, correct?

19    A.        During fiscal year 2011, I was in the

20    capacity of providing advisory service and serving as

21    a budget consultant to the city -- to the school

22    district, I apologize.

23    Q.        In the school district.

24              And you assisted in the preparation of the

25    2010-2011 budget, correct, for the Detroit Public

1    Schools?

2    A.        Yes.

3    Q.        I'm looking at page 11, under the section

4    that says, "general fund Budgetary Highlights."

5              Do you see that?

6    A.        I see the section you're referring to.

7    Q.        And then the last sentence of that first

8    paragraph under "general fund Budgetary Highlights"

9    says:  "Significant budget variances were as

10   follows."

11             Do you see that?

12   A.        Again, first time looking at this today.  I

13   see where you're at.

14   Q.        And number two just says, an example:  "The

15   original adopted budget revenues of $947.2 million

16   are $190.5 million less than the actual budget

17   revenues of $1,125.7 million."

18             Do you see that?

19   A.        I'm reading the sentence now, but I see

20   where you're referring to, yes.

21   Q.        So the revenues at the end of the year,

22   according to this CAFR for the Detroit Public

23   Schools, came in above what was predicted in the

24   budget, correct?

25   A.        Yes.

1    Q.        And that's by more than ten percent,

2    correct?

3    A.        That's correct.

4    Q.        And you don't see anything that is out of

5    the ordinary with that happening, do you?

6    A.        No.  In this case, we -- we reported that to

7    the emergency financial manager as we saw those

8    trends occurring.

9    Q.        And number three says:  "The actual support

10   services expenditures of $484.9 million are

11   $39.5 million less than the final budget of

12   $524.4 million."

13            Do you see that?

14   A.        Yes.

15   Q.        So expenditures came in below what the

16   budget had predicted, correct?

17   A.        That's correct.

18   Q.        And there's nothing wrong with a budget

19   ending up not being exactly what the actual results

20   are, is there?

21   A.        No, there's not.

22   Q.        When you were at the Detroit Public Schools

23   as the budget consultant, you didn't have any problem

24   with reporting that there were differences in these

25   amounts between what was budgeted and what the actual

1   position was on July 1st, 2012?

2   A.      I know the cash position as it was reported

3   on December 11th in the presentation to the city

4   council.

5   Q.      Now, with that in mind, as to what was

6   reported on December 11th, did you make an analysis,

7   either in your report or afterwards, to determine

8   whether or not the city could have paid its bills

9   during the month of July 2012 with the cash that it

10  had?

11  A.      Again, the analysis, based on the cash it

12  had, the city had $5.6 million here in general fund

13  dollars, plus it also had available -- because it

14  pools its resources, it had over $200 million in

15  other funds.

16  Q.      But it couldn't use unrestricted funds,

17  could it -- sorry -- it couldn't have used restricted

18  funds, could it?

19  A.      The way the city pools its cash, yes.

20  Q.      Let me just get a yes or no answer to this.

21          Did you do a cash analysis to determine how

22  much cash was in the city's pooled account for the

23  general fund as of July 1st, 2012?

24          MR. NEAL:  Objection.  Ms. Zielke, if you

25  can't answer the question yes or no, answer it the

Case 12-32118    Filed 02/16/13    Doc 717

1    best way you can.

2            THE WITNESS:  Based on the information that

3    was available or unavailable, we had to rely on the

4    information that was provided.  We did not do a full

5    cash flow projection.

6    Q.      BY MR. HILE:  But when you wrote your

7    report, you did have the December 11th report that we

8    have been looking at, because you refer to it in your

9    report, correct?

10   A.      That's correct, it came out as we were

11   finalizing our report.

12   Q.      And when you looked at that, you didn't do a

13   cash flow analysis to determine what the city's cash

14   was as of July 1st, 2012, did you?

15   A.      Our analysis was based on the infor -- as

16   reported in the report, it was determined based on

17   the information we received from the December 11th

18   report.

19   Q.      Take a look at page 21 again of your report.

20           In the last full paragraph you discuss a

21   one-year cash flow projection prepared by the city.

22   Do you see that?

23   A.      Yes.

24   Q.      And what you're referring to in that

25   sentence is what was marked as Exhibit C to Vanessa

Case 12-32118    Filed 02/16/13    Doc 717

1    Burke's declaration; is that right?

2    A.        Again, I can't recall which exhibit number

3    it represents.

4    Q.        Okay.  I'm handing you Exhibit 17 previously

5    marked.  Is that the document you're referring to in

6    your report?

7    A.        Yes.

8    Q.        Now, this is a general fund cash flow

9    projection, correct?

10   A.        I'm making the assumption that's what that

11   represents, yes.

12   Q.        Any reason to disbelieve that that's what it

13   is?

14   A.        Having to rely on the testimony provided by

15   Ms. Burke.

16   Q.        And having done this and as an expert in

17   this field, have you had any reason to disbelieve

18   that that's what this is?

19   A.        What this represents is a projection -- is

20   Ms. Burke's projection, or whoever the author of this

21   is, as it relates of the timing of the revenues and

22   expenditures.

23   Q.        Okay.  Did you prepare a cash flow

24   projection for the general fund for 2012 to 13?

25   A.        No.

1    who have come into that position as the city's CFO.

2    I have several names, but I'm not sure of the exact

3    sequencing of the staff.

4    Q.        So, are you aware that the predecessor as

5    CFO at the City of Stockton to Susan Mayer was

6    Kathleen VonAachen?

7    A.        I'm not sure Kathleen VonAachen was the CFO.

8    Q.        Isn't it true that Alvarez and Marcel

9    retained Kathleen VonAachen as the subcontractor

10   after September of 2011?

11   A.        Yes.

12   Q.        And what has she done for Alvarez and

13   Marcel?

14   A.        Kathleen -- through discussions and through

15   interviewing, we asked her to provide us an overview

16   as related to fund structure, trying to understand

17   the over 200 different funds that the city has.

18   Q.        So Alvarez and Marcel hired Ms. VonAachen to

19   help it with this report?

20   A.        Kathleen did not assist in preparing or

21   working on this report.

22   Q.        But she did do some work that was background

23   for the report, correct?

24   A.        She provided us her opinions early on in our

25   engagement.

Case 12-32118   Filed 02/16/13   Doc 717

1    the president of GFOA.  It was not a paid position.

2    Q.        And you have been involved in reviewing the

3    Best Practices Guidelines for Improving the

4    Timeliness of Financial Reports, have you not?

5    A.        Again, please.

6    Q.        You have been involved in reviewing Best

7    Practices Guidelines for Improving the Timeliness of

8    Financial Reports as set forth by GFOA, have you not?

9    A.        My role as being a member of the board of

10   directors and as the past president, we review the

11   recommended practices that come through the various

12   standing committees.

13            THE REPORTER:  Exhibit 1038.

14            (Whereupon, Exhibit No. 1038 was

15             marked for Identification.)

16   Q.        BY MR. HILE:  Ms. Zielke, the court reporter

17   has marked as Exhibit 1038 a document which is two

18   pages, and it's a GFOA document, "Best Practice,

19   Improving the Timeliness of Financial Reports, 2008."

20            Have you seen this document before?

21   A.        Yes, I have.

22   Q.        And did you have anything do with creating

23   this best practice document?

24   A.        I was not personally involved in the

25   creation of the document, no.

Case 12-32118   Filed 02/16/13   Doc 717

1   A.       These measures as well as the other measures

2   we identified.  We identified nine, nine-and-a-half

3   million dollars of revenue alternatives that the

4   city, you know, could or should have looked at as it

5   relates to the 12-13 budget.

6   Q.       But the only way we would have gotten

7   $9.5 million in 2012-2013 would have been if, in

8   addition to everything else, all four of these tax

9   measures were put on the ballot and they all four

10  passed, correct?

11  A.       Well, whether they would have been put on

12  the ballot in 2012 or put on the ballot in previous

13  years.

14           THE REPORTER:  Exhibit 1041.

15                (Whereupon, Exhibit No. 1041 was

16                marked for Identification.)

17  Q.       BY MR. HILE:  Exhibit 1041 is a GFOA

18  document called "Fiscal First Aid" and it refers to

19  "Treatments To Use With Extreme Caution."

20           Do you see that?

21  A.       Yes, I do.

22  Q.       And it includes, in the revenue side for

23  fiscal first aid, levying a broad tax increase; do

24  you see that?

25  A.       Yes, I do.

Case 12-32118   Filed 02/16/13   Doc 717

1    Q.        And underneath on the revenue, it says,

2    quote:  "Levy a broad tax increase.  A distressed

3    government likely has not earned the trust of its

4    citizens.  Large tax increases may further alienate

5    citizens, reducing their support for government at

6    best, and prompting a tax revolt at worst.  Rather,

7    governments should concentrate on maximizing

8    efficiency and focusing on priority services."

9            Had you seen this GFOA document before

10   discussing whether or not a city needing fiscal first

11   aid should levy a broad tax increase?

12   A.        Yes, I have.

13   Q.        And do you disagree with any of the

14   statements in this document?

15   A.        Are you saying the entire document or just

16   the paragraph you read?

17   Q.        The paragraph I read.

18   A.        No, I do not disagree with it.

19   Q.        And on the next page of the exhibit under

20   "Management Practices," do you see where it says,

21   "Large or sustained across-the-board budget cuts"?

22   A.        Yes, I do.

23   Q.        And the second sentence in this management

24   practices says:  "Reduced public value lowers

25   citizens' opinion of government, making it less

Case 12-32118    Filed 02/16/13    Doc 717

1    value as a result of those cuts is likely to have
2    lowered citizen opinion of government making it less
3    likely that they would approve -- sorry -- support
4    new taxes and fees?
5    A.        Again, I have -- I have no way to validate
6    or judge what the public opinion is as it relates to
7    the level of services that were -- of the budget
8    reductions the city undertook.
9    Q.        In fact, you didn't do any polling, did you,
10   to determine whether or not the city citizens would
11   approve any new tax measures, correct?
12   A.        We did not do a poll, and I don't see where
13   the city did a poll either until after they approved
14   the pendency plan and the bankruptcy filing.
15   Q.        Well, we'll get to the polling in a minute.
16   But you didn't do any polling, correct?
17   A.        No.
18   Q.        So you didn't do any analysis of whether or
19   not a series of tax increases would have been
20   supported by the public, did you?
21   A.        Again, please, Mr. Hile.
22   Q.        You didn't do any analysis of whether or not
23   a series of tax increases put on the ballot would
24   have been supported by the public, did you?
25   A.        A&M did not do a poll or an independent

Nancy L. Zielke                                                    January 31, 2013
Sacramento, CA

1    Q.      Okay.  Anything else?

2    A.      Those are the two that I'm recalling at this

3    moment.

4    Q.      Did you try to determine how many

5    jurisdictions in California considered but did not

6    choose to place a tax measure on a ballot in

7    November 2012?

8    A.      No, we did not.

9    Q.      Why not?

10    A.      First of all, being able to obtain that

11    information of what cities had considered tax

12    increases would have required, you know, reviewing

13    and going into individual city council documents and

14    city council budgets to determine that.

15    Q.      But wouldn't that information be relevant in

16    determining whether a city should attempt to place a

17    tax measure on the ballot?

18    A.      Again, Mr. Hile, that's a hype -- I mean,

19    those are assumptions there.  Every city and its need

20    and willingness to put a measure on the ballot

21    depends on each jurisdiction's revenue and expense

22    requirements.

23    Q.      Well, did you at least try to find out which

24    cities placed before the city council a

25    recommendation that it put a tax increase on the

1    determine what's essential versus non-essential, and

2    determine what's the best mix or what's the best way

3    to use its general fund dollars.  We did not see

4    where the city provided that type of analysis.

5    Q.        But I just want an answer to my question.

6              Would your alternative budget model result

7    in providing funding to improve existing city

8    services or to restore services that had previously

9    been cut?

10   A.        The budget model, if the city had done its

11   homework, done some heavy lifting, it could have

12   re-prioritized or could have prioritized the services

13   it deemed most essential to the community.

14   Q.        Point to one line anywhere in your budget

15   model which shows that the city is going to improve

16   existing services or restore services.  Where is it?

17   A.        It's a 76-page document.  What I'm saying is

18   if the city had done its heavy lifting and looked at

19   the services it provides and determined what it could

20   afford, they could determine what services needed to

21   be provided.

22   Q.        But your budget model on page 47 of your

23   report does not have anything in it which would

24   increase or restore services that had previously been

25   cut, would it?

Nancy L. Zielke                                                                    January 31, 2013
Sacramento, CA

1    A.        No.  The budget model as its presented

2    assumes -- it takes the city's baseline budget as the

3    basis for the model.

4    Q.        In fact, it cuts everything other than

5    public safety by 15 percent, correct?

6    A.        The budget model recommends that the city

7    take a look at other expenditure reductions, and in

8    the non-safety departments its recommended potential

9    reductions in the non-public safety departments.

10   Q.        Of 15 percent?

11   A.        That's the alternative that's been

12   presented.

13   Q.        And in your alternative budget model,

14   however, existing debt holders are paid every dime

15   that they assert they have coming to them, correct?

16   A.        Based on a contractual obligation between

17   the city and the bondholders, yes.

18             Can we take a break?

19   Q.        Oh, sure.  Off the record.

20             THE VIDEOGRAPHER:  We're off the video

21   record at approximately 4:03 p.m.

22     (Whereupon, a recess was taken from 4:03 to 4:19)

23             THE VIDEOGRAPHER:  We're now back on the

24   video record at approximately 4:19 p.m.

25   Q.        BY MR. HILE:  Ms. Zielke, on Page 49 of your

1    likely to support instituting a parcel tax on those

2    homes?

3    A.       Repeat the first part of the question,

4    please.

5    Q.       Did you do any analysis to determine whether

6    or not property owners who are already under water on

7    their homes and facing foreclosure in Stockton would

8    be likely to support a parcel tax on those homes?

9    A.       Again, there's an awful lot of winding in

10   the question.

11            As the recommendation states here, in many

12   instances, as in the other cities we have listed who

13   have parcel taxes, in many instances, those parcel

14   taxes are dedicated for specific program purposes.

15   Q.       So you didn't do any analysis to determine

16   whether or not it would pass if the voters were asked

17   to pass a parcel tax, did you?

18   A.       No.  At the same time, I don't see where the

19   city considered that option either.

20   Q.       Okay.  And looking at the three parcel taxes

21   that you refer to on page 51 of your report, those

22   being in Vallejo, Oakland and Davis, none of those

23   parcel taxes passed in 2012 was for a new parcel tax,

24   was it?

25   A.       There's two questions, whether it was passed

Page 205

1    saying they should have?

2    A.        No.  The city implemented that as part of

3    its final budget adoption.

4    Q.        So this $300,000 was something the city

5    recovered or shifted, correct?

6    A.        Correct.  It was not in the original

7    proposed budget.  It was part of the final adopted

8    budget.

9    Q.        Under the community services column or

10   section of this, the letter is D, D as in dog, are

11   all of these line items for the Arts Commission,

12   library, recreational services, golf course, are

13   these all non-essential in your mind?

14   A.        As it's presented here in item number D, we

15   identified $4.2 million in either -- in subsidy that

16   the general fund is currently subsidizing today.

17   Q.        But, Ms. Zielke, I'm sorry, I know it's

18   late.  I'm just asking:  Are these all non-essential,

19   in your mind, as you categorize things?

20   A.        Arts Commission, in my mind, is not an

21   essential city service.

22   Q.        How about the library services?

23   A.        Library services is important to a

24   community.  In many communities, library services are

25   provided by county government, they're provided by,

1    A.        For retiree health.

2    Q.        I take it, then, the answer to my question

3    is that you didn't do any analysis of the legal

4    potential for reducing retirees' medical benefits by

5    25 percent?

6              MR. NEAL:  Objection, calls for a legal

7    conclusion.  The witness is not a lawyer.

8    Q.        BY MR. HILE:  I'm just asking if you did the

9    analysis.  I'm not asking if they hired a lawyer to

10   do it.

11   A.        Again, I did not do a legal analysis.

12   Q.        Did you try to get one from outside?

13   A.        I did not -- Alvarez and Marcel did not try

14   to get outside legal opinion.

15   Q.        Does your model then assume that the city

16   can legally do it?

17   A.        Yes.

18   Q.        Assuming that it's legal for the city to

19   unilaterally reduce retiree medical benefits, do you

20   consider retiree medical benefits an essential item

21   or a non-essential item?

22   A.        Again, going back to -- I believe I've

23   answered that earlier this afternoon.

24   Q.        Okay.  Tell me your answer again.  I don't

25   remember you answering it, but go ahead.

1    A.        Again, essential city services are those

2    that are mandated by federal law, state statute and

3    city charter ordinance.

4    Q.        Under that definition then, this is a

5    non-essential cost, correct?

6    A.        The definition, as I stated, this would be a

7    non-essential cost.

8    Q.        And isn't it true that retiree medical costs

9    in fact deliver no service benefit to the city or its

10   residents?

11   A.        Again, please.

12   Q.        Isn't it true that payment of retiree

13   medical costs delivers no service benefit to the city

14   or to its residents?

15   A.        Can I look at the question?

16   Q.        Sure.

17   A.        Payment of medical costs is not delivering a

18   benefit to the city.

19   Q.        So if retiree medical benefits are a

20   non-essential service, why didn't you, in your

21   report, eliminate all of the city's retiree medical

22   costs?

23   A.        Our report was based on what we saw with

24   industry trends as it relates to retiree healthcare,

25   as well as we looked at the retiree -- at the

1    A.        We did not see where they had done that in

2    2003 or even in -- excuse me -- 2013 or even in the

3    prior year budget as well.

4    Q.        But you do recognize there had been a

5    43 percent reduction in non-safety positions over the

6    last four years, correct?

7    A.        There was a reduction in budget positions,

8    but at the same time, some of those programs, some of

9    those positions were shifted to other funds as well.

10    Q.        And do you have a criticism of the city for

11    trying to shift the cost of some of those positions

12    to other funds?

13    A.        No, I do not have a criticism.  The issue

14    here represents -- is the city did not roll up its

15    sleeves and do the heavy lifting in looking to see

16    are there alternative ways they could fund the

17    non-public safety programs.  They did not do a

18    program-based or a zero-based budget.  They did not

19    do any type of efficiency reviews, operational

20    improvement reviews to demonstrate the funding level

21    that's needed for the non-public safety departments.

22    Q.        If a city is cash insolvent, is it your

23    position that, if it has not done the bottom-up

24    review of its positions, that it's not entitled to

25    protection under Chapter 9 of the Bankruptcy Code?

1   difficult for me to answer because I'm not sure I

2   understand what you're asking, what you're asking me

3   to answer.  I cannot render a legal opinion.

4   Q.      I know, but weren't you asked to render an

5   opinion as to whether or not the city was insolvent

6   under section 109(c)(3) of the Bankruptcy Code?

7   A.      Yes, I was.

8   Q.      So I'm asking for your opinion.

9   A.      As the report stands, we determined the city

10  was cash solvent as of June 28, 2012.

11  Q.      Where does it say that in your report?

12  A.      Mr. Hile, we pointed out that earlier today.

13  Q.      Let's take a break.

14          THE VIDEOGRAPHER:  Off the video record at

15  approximately 6:04.

16   (Whereupon, a recess was taken from 6:04 to 6:13.)

17          THE VIDEOGRAPHER:  We're now back on the

18  video record at approximately 6:13.

19          THE REPORTER:  Exhibit 1045.

20              (Whereupon, Exhibit No. 1045 was

21              marked for Identification.)

22  Q.      BY MR. HILE:  Ms. Zielke, the reporter has

23  marked as Exhibit 1045 a three-page document with the

24  GFOA logo on it, best practice, and it is entitled:

25  "The Public Finance Officer's Role in

Case 12-32118    Filed 02/16/13    Doc 717

1    Sustainability."

2              Have you seen this before?

3    A.        Not that I recall, no.

4    Q.        In the third -- fourth paragraph in bold, it

5    says:  "Helping to define sustainability."  It says:

6    "Each government should define 'sustainability' for

7    itself."

8              Do you agree with the GFOA best practice

9    here that each government should define

10   sustainability for itself?

11   A.        Mr. Hile, I haven't even read the document.

12   You just presented it to me, so I would need to look

13   at it, I'm sorry.

14   Q.        Okay.  Well, do you agree that

15   sustainability goals should be fully integrated into

16   the budgeting process?

17   A.        I need for you to define for me how you're

18   defining "sustainability."

19   Q.        At the top of the first page, it says:

20   "Sustainability means 'meeting the needs of the

21   present without compromising the ability of future

22   generations to meet their own needs.'"

23             Why don't you use that definition.

24   A.        Okay.  I need to go back to your question,

25   please.

Nancy L. Zielke                                                          January 31, 2013
Sacramento, CA

1                    CERTIFICATE OF REPORTER

2          I, VICKI HAINES, a Certified Shorthand

3     Reporter, hereby certify that the witness in the

4     foregoing deposition was by me duly sworn to tell the

5     truth, the whole truth and nothing but the truth in

6     the within-entitled cause;

7          That said deposition was taken down in

8     shorthand by me, a disinterested person, at the time

9     and place therein stated, and that the testimony of

10    the said witness was thereafter reduced to

11    typewriting, by computer, under my direction and

12    supervision;

13         That before completion of the deposition,

14    review of the transcript was requested.  If

15    requested, any changes made by the deponent (and

16    provided to the reporter) during the period allowed

17    are appended hereto.

18         I further certify that I am not of counsel or

19    attorney for either or any of the parties to the said

20    deposition, nor in any way interested in the event of

21    this cause, and that I am not related to any of the

22    parties thereto.

23    DATED:  FEBRUARY 11, 2012

24

25                     _____

Alderson Reporting Company
1-800-FOR-DEPO

# Exhibit E



**FILED**

September 19, 2008

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0001418476

1            UNITED STATES BANKRUPTCY COURT

2            EASTERN DISTRICT OF CALIFORNIA

3              SACRAMENTO DIVISION

4                --oOo--

5

6    IN RE             )

                      )

7    CITY OF VALLEJO,   ) CASE NO. 08-26813-A-9

    CALIFORNIA,       )

8         DEBTOR.    )

    _____)

9

10

11                --oOo--

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14   BEFORE THE HONORABLE MICHAEL S. MCMANUS

15               --oOo--

16    TUESDAY, AUGUST 19, 2008, 9:00 A.M.

17               --oOo--

18

19

20

21

22

23

24    REPORTED BY:            LAURIE A. HOWARD

                        CSR NO. 9802

25

DIAMOND COURT REPORTERS (916) 498-9288

```
 1                        APPEARANCES

 2                          --oOo--

 3    FOR THE DEBTOR, CITY OF VALLEJO, CALIFORNIA:

 4         ORRICK, HERRINGTON & SUTCLIFFE
           BY:  MARK A. LEVINSON, ESQ.
 5              NORMAN C. HILE, ESQ.
                MICHAEL C. WEED, ESQ.
 6         400 CAPITOL MALL, SUITE 3000
           SACRAMENTO, CALIFORNIA  95814
 7

 8    FOR THE INTERNATIONAL ASSOCIATION OF FIREFIGHTERS,
      LOCAL 1186, VALLEJO POLICE OFFICERS ASSOCIATION,
 9    AND INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS:

10         FARELLA, BRAUN & MARTEL, LLP
           BY:  DEAN M. GLOSTER, ESQ.
11              KELLY A. WOODRUFF, ESQ.
                MONICA M. SWANSON, ESQ.
12         235 MONTGOMERY STREET
           SAN FRANCISCO, CALIFORNIA  94104
13
      FOR UNION BANK OF CALIFORNIA:
14
           JEFFER, MANGELS, BUTLER & MARMARO, LLP
15         BY:  NICOLAS DE LANCI, ESQ.
           TWO EMBARCADERO CENTER, 5TH FLOOR
16         SAN FRANCISCO, CALIFORNIA  94111

17    FOR WELLS FARGO BANK:

18         REED SMITH, LLP
           BY:  MIKE C. BUCKLEY, ESQ.
19         1999 HARRISON STREET, SUITE 2400
           OAKLAND, CALIFORNIA  94612
20

21
                          --oOo--
22

23

24

25
                                                  2
                 DIAMOND COURT REPORTERS (916) 498-9288
```

1    MILLION SITTING IN FLOSDEN.  THAT'S THE FLOSDEN

2    CAPITAL PROJECTS.  AND THEN IF YOU LOOK AT --

3            THE COURT:  IT DOESN'T NEED THAT MONEY.

4    IT'S JUST SITTING THERE?

15:50:37  5            MR. GLOSTER:  OH, YOUR HONOR, THEY HAVE BIG

6    PLANS FOR THAT MONEY.  SEE, WHAT THEY PLAN TO DO WITH

7    THAT MONEY IS FLOSDEN IS JUST GOING TO GO WILD ON ALL

8    KINDS OF COMMUNITY REDEVELOPMENT.  THEY'RE GOING TO

9    BUILD A NORTHGATE COMMUNITY CENTER.  THEY'RE GOING TO

15:50:50 10    PAY FOR AN AWFUL LOT OF CAPITAL IMPROVEMENTS AND

11    THAT'S THEIR PLAN TO DO WITH THAT.

12            MR. LEVINSON:  YOUR HONOR, NONE OF THIS IS

13    BASED ON THE EVIDENCE.

14            MR. HILE:  THERE'S NO BASIS FOR ANY OF

15:50:58 15    THIS.

16            MR. LEVINSON:  THIS IS ALL ARGUMENT.

17            MR. GLOSTER:  I CAN ACTUALLY TRACK DOWN FOR

18    YOU IF YOU GIVE ME 15 MINUTES.

19            THE COURT:  I KNOW, BUT, THERE'S A

15:51:06 20    DISCONNECT HERE.  ON THE ONE HAND YOU SAY THIS HONEY

21    IS AVAILABLE AND THEY DON'T NEED TO SPEND IT ON ALL

22    THESE REDEVELOPMENT PROJECTS, BUT DOWN A LITTLE LOWER

23    THEY'VE GOT TO SPEND THE MONEY ON THE REDEVELOPMENT

24    TO INCREASE THE TAX REVENUE.

15:51:17 25            MR. GLOSTER:  IT'S A CHOICE, YOUR HONOR.

1       SERIOUSLY, IT'S A CHOICE.  WHAT HAPPENS IS -- YOU

2       KNOW, I SAID IN MY OPENING STATEMENT IF WE WERE TO

3       FIGURE OUT THE BEST WAY FOR VALLEJO TO SPEND MONEY, I

4       THINK THE WORST WOULD BE ON US BANKRUPTCY LAWYERS AND

15:51:32  5     A REALLY GOOD ONE WOULD BE ON SALARIES FOR POLICE,

6       FIREFIGHTER AND SKELETAL CITY STAFF, BUT THE VERY

7       BEST WAY THAT VALLEJO TO SPEND ITS MONEY IS TO BUY

8       T-SHIRTS FOR EVERYBODY ON THE CITY COUNCIL AND

9       EVERYBODY WHO SORT OF WORKS IN THE REDEVELOPMENT

15:51:47 10     AGENCY THAT SAY "STOP ME BEFORE I REDEVELOPMENT

11      AGAIN."  VALLEJO HAS MADE A CHOICE.

12           THE COURT:  WELL, YOU KNOW, BUT THIS IS THE

13      PROBLEM I HAVE WITH THIS ARGUMENT.  WE WOULDN'T -- IF

14      I OVERRULE THE MOTION AND I PERMIT THIS CASE TO GO

15:52:05 15     FORWARD AND FIND THAT THE CITY OF VALLEJO IS

16      ELIGIBLE, YOU CAN'T MAKE THIS ARGUMENT IN CONNECTION

17      WITH -- ONCE THE CASE GETS GOING.  I MEAN, 904 SAYS

18      THAT THE COURT HAS NO JURISDICTION TO TALK ABOUT ANY

19      GOVERNMENTAL POWER, POLITICAL POWER, CANNOT INTERFERE

15:52:23 20     WITH THE PROPERTY OR REVENUES OF THE DEBTOR.  YOU

21      KNOW, BASICALLY YOU'RE TRYING TO GET IN THE BACK DOOR

22      WHAT I CAN'T GET IN THE FRONT DOOR.

23           MR. GLOSTER:  NO.  I THINK IT'S IMPORTANT

24      FOR TWO THINGS.  FIRST, YOU'RE JUST DEAD ON.  WE

15:52:37 25     CAN'T COMPLAIN ABOUT HOW THEY SPEND THE MONEY AND YOU

1    CAN'T GOVERN IT, RIGHT?  ALL YOU CAN DECIDE IS

2    WHETHER THEY ARE ELIGIBLE FOR THIS COURT'S RELIEF

3    BECAUSE THEY'RE TRULY INSOLVENT.

4         THE COURT:  OKAY, WELL, SEE ON THE

15:52:51  5    INSOLVENCY ISSUE, I'VE GOT TO AGREE THAT I HAVEN'T

6    HEARD ANYTHING THAT THIS MONEY IS ACTUALLY AVAILABLE,

7    UNCOMMITTED, IS REAL DOLLARS RIGHT NOW FOR THIS YEAR.

8    I MEAN, I DON'T THINK I'VE HEARD ANYTHING LIKE THAT.

9    MAYBE IT'S IN THE PAPERS.  BUT, WELL, I MEAN THAT'S

15:53:10  10   THE PRIMARY ISSUE ON SOLVENCY.  AND ON GOOD FAITH TO

11   THE EXTENT THIS IS RELEVANT TO GOOD FAITH, YOU KNOW,

12   YOU ARE IN THE BANKRUPTCY COURT.  IT MAY SURPRISE YOU

13   TO LEARN PEOPLE MADE BAD CHOICES BEFORE THEY GOT

14   HERE.

15:53:24  15        MR. GLOSTER:  WE ARE ALL AWARE OF THAT THAT

16   THIS IS THE PLACE WHERE BAD CHOICES COME HOME TO

17   ROOST AND HERE WE ARE.

18        THE ISSUE, HOWEVER, IS, SORT OF, TWO

19   THINGS.  ONE, YOUR HONOR, THEY BEAR THE BURDEN OF

15:53:38  20   PROOF ON ALL OF THESE ISSUES, NOT ME.

21        THE COURT:  WELL, I'M JUST TELLING YOU THAT

22   THE FACT THAT SOMEONE MAY HAVE MADE A BAD FINANCIAL

23   DECISION ISN'T A DISQUALIFIER TO COME TO BANKRUPTCY

24   COURT.

15:53:47  25        MR. GLOSTER:  IT ABSOLUTELY IS NOT.  AND IF

1                    REPORTER'S CERTIFICATE

2

3    STATE OF CALIFORNIA      )
                              )  SS.
4    COUNTY OF SACRAMENTO     )

5        I, LAURIE A. HOWARD, CERTIFY THAT I WAS THE

6    OFFICIAL REPORTER, PRO TEM, AND THAT I REPORTED

7    VERBATIM IN SHORTHAND WRITING THE FOREGOING

8    PROCEEDINGS; THAT I THEREAFTER CAUSED MY SHORTHAND

9    WRITING TO BE REDUCED TO TYPEWRITING, AND THE PAGES

10   NUMBER 1 THROUGH 226, INCLUSIVE, CONSTITUTE A

11   COMPLETE, TRUE, AND CORRECT RECORD OF SAID

12   PROCEEDINGS:

13

14   COURT:  UNITED STATES BANKRUPTCY COURT
     JUDGE:  THE HONORABLE MICHAEL S. MCMANUS
15   CAUSE:  CITY OF VALLEJO, CALIFORNIA
     DATE:   TUESDAY, AUGUST 19, 2008, 9:00 A.M.
16

17

18       IN WITNESS WHEREOF, I HAVE SUBSCRIBED THIS

19   CERTIFICATE AT SACRAMENTO, CALIFORNIA, ON THIS, THE

20   26TH OF AUGUST, 2008.

21

22

23

24                          _____
                            LAURIE A. HOWARD
                            CSR NO. 9802
25

                                                227
         DIAMOND COURT REPORTERS (916) 498-9288

# Exhibit F

Case 12-32118   Filed 02/16/13   Doc 717

1                UNITED STATES BANKRUPTCY COURT

2                      EASTERN DISTRICT

3                    SACRAMENTO DIVISION

4    In re:

5    CITY OF STOCKTON, CALIFORNIA,   No. 12-32118

6                   Debtor.          Chapter 9

7                           /

8

9                 Videotape Deposition of

10                     JOSEPH BRANN

11                   (Expert Witness)

12               Thursday, January 24, 2013

13

14

15

16   Reported by:

17   SANDRA BUNCH VANDER POL, RMR, CRR, CSR #3032

18   Realtime Systems Administrator credentialed

19   Fellow, Academy of Professional Reporters

20   Job No. 40076

21

22   --------------------------------------------------------

23

24                  ALDERSON REPORTING

25                    1-800-FOR-DEPOS

Joseph Brann                                                    January 24, 2013
Sacramento, CA

1    The reason that I state that it's not well founded or

2    it's unlikely, I have never seen this happen.  There

3    have been other times in financial crisis, what have

4    you, that organizations have dealt with, you just

5    simply don't see people leaving in large numbers

6    because of a single type of an occurrence or an

7    event.  I'm trying to put that in perspective for

8    you.

9    Q.      Is that your understanding of what's

10   happening in Stockton, that there's a -- we're just

11   contemplating a single event, and that's what we

12   believe might trigger additional officers to leave?

13   A.      I believe that's part of the argument.

14   Q.      So when we use the term here, again, the --

15   I want to find out the basis for this opinion, No.

16   Roman Numeral III here.

17   A.      Okay.

18   Q.      You say, "Stockton's claim that officers

19   will leave in a 'mass exodus' if police pension

20   benefits are reduced."

21          So is it your understanding that for the

22   term "mass exodus," you used the term officers -- so

23   many officers that would leave that would cause the

24   department to be paralyzed; is that correct?

25   A.      Huh-huh.

Joseph Brann                                                                    January 24, 2013
Sacramento, CA

1   footnote here is that I just received some additional

2   data.  That's what that was in reference to.

3           But it struck me, too, if there's anything

4   else that comes out at a later point in time, I

5   wanted to make sure that I indicate that I do reserve

6   that right.

7   Q.      Mr. Brann, if -- in paragraph 4 of your

8   declaration, which is Exhibit 1004, and throughout

9   your report, which is Exhibit 1003, you refer to a

10  modest -- quote "modest," end quote, pension benefit

11  reduction.

12          And your opinion is that a modest pension

13  benefit reduction would not lead to a mass exodus of

14  police officers or have any significant effect on the

15  crime rate, public safety, or safety of officers; is

16  that correct?

17  A.      That's correct.

18  Q.      Can you define what you mean by "modest"?

19  A.      Yes.  I was asked to assume we would be

20  talking about -- because this is an area that I felt

21  I needed to have a better understanding of.

22          I was asked to assume that we were

23  considering something in the range of a 10 percent

24  reduction.

25  Q.      What does that mean entirely, a

Case 12-32118    Filed 02/16/13    Doc 717

1    10 percent -- could you flesh that out for me a

2    little bit more in terms of a 10 percent reduction

3    in -- and I'm assuming you're talking about CalPERS

4    benefits, but can you flesh out for me what you

5    really mean by that?

6    A.        Ultimately what would be the impact.  And,

7    yes, we are talking about the CalPERS retirement

8    benefits.

9    Q.        So you were asked to assume, for the

10   purposes of formulating your opinions, that by

11   modest -- the term "modest" meant a 10 percent

12   reduction in CalPERS benefits to all police officers,

13   current -- current and retired police officers at the

14   City of Stockton; is that correct?

15   A.        I don't recall actually having that

16   discussion about how that might be executed.  But I

17   actually took it to mean that this could be an

18   across-the-board type of reduction.

19   Q.        So your understanding is that your client,

20   Assured Guaranty, contemplates a 10 percent reduction

21   in pension benefits; is that correct?

22   A.        That Assured Guaranty is assuming that?

23   Q.        That what they are contemplating in the

24   context of Chapter 9 is asking for a 10 percent

25   reduction in pension benefits?

1   significant.

2            There comes ultimately -- if you keep

3   changing the numbers, there's ultimately going to be

4   some level that you could say this will absolutely do

5   it.  One would be to say we are going to eliminate

6   the benefit program altogether.  We simply can't

7   afford to do that.  You guys are on your own.

8            Yeah, that's going to have an impact.  I

9   don't question that at all.

10           MR. RIDDELL:  We have to go off the record

11   and change the tape.

12           THE VIDEOGRAPHER:  This marks the

13   beginning -- sorry.  This marks the end of Disk 1 in

14   the deposition of Joseph Brann.  The time is

15   11:17 a.m., and we are going off the record.

16           (Recess taken.)

17           THE VIDEOGRAPHER:  This marks the beginning

18   of Disk 2 to the deposition of Joseph Brann.  The

19   time is now 11:30 a.m., and we are on the record.

20   BY MR. RIDDELL:

21   Q.      Mr. Brann, what you have in front of you has

22   been previously marked as Exhibit 50, and it's a copy

23   of what we have been referring to as the City of

24   Stockton's Ask.

25           Have you seen this document before?

Case 12-32118    Filed 02/16/13    Doc 717

1    several years back, but I don't -- I do not know what

2    level of medical benefits were covered.  There was a

3    discussion or discussions I've had with people over

4    time about various types of perks and benefits

5    organizations have.

6    Q.      Were you aware that the Stockton benefits

7    included the benefits for -- medical benefits for

8    their retirees and their spouses for life?

9    A.      Yes.

10   Q.      Are you aware that was a benefit paid for by

11   the City as opposed to the officers?

12   A.      I can't -- no, I can't tell you that I knew

13   that.

14   Q.      Are you aware as part of the -- the Ask,

15   that Stockton proposed in this AB 506 negotiations

16   eliminating retiree benefits?

17   A.      No.

18   Q.      Retiree medical benefits, you're not aware

19   of that?

20   A.      No.

21   Q.      Well, with respect to your -- the impact of

22   a modest -- modest pension benefit reduction, you

23   didn't take into account the proposal to eliminate

24   retirees' medical benefits, did you?

25   A.      No.

1   from local, you know, voter initiatives, ballot

2   initiatives.  Obviously, you're well aware, too, of

3   the two-tiered systems that are being created.  Each

4   agency is making their own decision on that.  Those

5   are -- those are the bigger market conditions.

6   Q.       Right.

7   A.       Yes.

8   Q.       But are you aware of any that are

9   considering or have imposed a 10 percent cut in

10  pension benefits?

11  A.       No.  I'm also not aware -- you know, the

12  only agencies that I can think of that are facing or

13  considering bankruptcy too, we know that Vallejo went

14  through that, Stockton, San Bernardino.  Their

15  situation happens to be different, yes.

16  Q.       So are you aware of any police department in

17  the state of California that has either imposed or

18  considered imposing a 5 percent reduction in pension

19  benefits?

20  A.       Again, I haven't -- I don't care what the

21  number is.  I haven't sat down to specifically look

22  at what's being considered by every agency.

23  Q.       So in formulating your opinions regarding

24  the effect of a modest pension benefit reduction, did

25  you consider the impact of previous wage and benefit

Joseph Brann                                                        January 24, 2013
Sacramento, CA

1    reductions would have on an officer's willingness to

2    remain at the Stockton Police Department?

3    A.        No.

4    Q.        Are you aware of the reduction in authorized

5    and funded sworn officer positions at the Stockton

6    Police Department that occurred in fiscal years 08/09

7    and 11/12?

8    A.        I did look at the overall staffing, yes.

9    The authorized positions have been cut.

10   Q.        Do you know by how much?

11   A.        I don't -- it's -- basically, it's contained

12   in the charts that show what the staffing level is.

13   Q.        In formulating your opinions regarding the

14   effect of a modest pension benefit reduction, did you

15   consider the impact of a 25 percent reduction police

16   strength would have on an officer's willingness to

17   stay at the City of Stockton versus lateraling to

18   another department?

19   A.        No.

20   Q.        Why not?

21   A.        Why come up with 25 percent?  What's the --

22   Q.        Pardon me?

23   A.        Well, restate the question.  Let me make

24   sure that I understood this.

25   Q.        In formulating your opinions regarding the

Case 12-32118   Filed 02/16/13   Doc 717

1    effect of a modest pension benefit reduction, did you

2    consider the impact of a 25 percent reduction in

3    police strength -- a 25 percent reduction in police

4    strength would have on an officer's willingness to

5    stay at the City of Stockton versus lateraling to

6    another department?

7    A.        I did misunderstand the question.  Thank you

8    for that.

9              No, I did not specifically deal with the

10   issue of a 25 percent reduction.  To be clear about

11   this, are you talking about what's already occurred

12   or what's going to occur?

13   Q.        What has.

14   A.        Okay.  I did not look at the specific

15   numbers.  What I did look at is the very thing that

16   the City was using in their comparisons.  They were

17   doing it on the basis of an officer-per-thousand

18   comparison, which there are definitely problems with

19   using that.

20             I have both worked with enough different

21   agencies and I've been in a situation, too, with

22   extraordinarily low staffing levels, and my

23   observation about the impact that staffing reductions

24   have is, yes, it does have an impact, but it's also

25   something one has to manage.

Joseph Brann                                                    January 24, 2013
Sacramento, CA

1    such things as the retirements.  It would be those

2    service retirements or even medical retirements,

3    because oftentimes we have got people under 48/50

4    time for a prolonged period of time.  You know

5    there's a likelihood that they are going to be

6    departing.  So those things can be anticipated, and

7    there's ways to get out ahead of it.

8    Q.        I want you to -- for my next question, I'd

9    like to have you make a few assumptions, so I'm going

10   to give you the assumptions first, and then I'm going

11   to ask the questions at the end.

12             So in terms of the assumptions, I want you

13   to assume that as a chief of police you had

14   20 percent of your sworn authorized officers leave

15   the force in one calendar year, with at least

16   10 percent of them going to other departments.  And I

17   want you to also assume that within the past few

18   years, there were pay cuts similar to those that

19   experienced in Stockton.  And I also want you to

20   assume that a 25 percent reduction in force and

21   retiree medical benefits were proposed for

22   elimination.

23             Taking all of those things into

24   consideration, as a chief of police, would it be

25   reasonable for you to have serious concerns regarding

1    the effect any further reduction in benefits could

2    have on your ability to retain the officers that you

3    currently employ?

4    A.        Yes.

5    Q.        Why is that?

6    A.        Again, you've got to be looking out for the

7    organization, the ability to perform.  Again, it's

8    one more variable.

9    Q.        Again, assuming those things, if you were

10   the chief of police and you didn't have concerns

11   based on all of those assumptions, would it -- would

12   that be kind of foolish of you?

13   A.        Yes.

14   Q.        I believe because you've read Chief Jones's

15   deposition testimony, you're aware that he testified

16   that he had conducted exit interviews with officers

17   that had been lateraling to other departments.

18             Are you aware of that testimony?

19   A.        Yes.

20   Q.        And are you also aware that in those

21   interviews, Chief Jones testified that he was told by

22   a number of those officers that they were leaving

23   because of the cuts in wages and benefits.

24             Are you aware of --

25   A.        Yes.

Case 12-32118    Filed 02/16/13    Doc 717

 1    said, "Chief" -- I need to give a little bit further

 2    context on this.

 3         The reason I was concerned is these were

 4    primarily minority officers.  And this officer

 5    indicated to me, he said, "This has a lot to do with

 6    our FTO program, the way we are training, the way

 7    these people are treating the trainees, a host of

 8    other things."

 9         The bottom line is what I ended up doing is

10    myself picking up the phone and calling -- exit

11    interviews had been done with these people.  The exit

12    interviews still wasn't telling us what we ultimately

13    needed to find out.  And that is, by going back and

14    talking to these people six months to a year after

15    they had left, they opened up.

16         And they said, "Well, gee, I never thought

17    anybody would really want to follow up."  And they --

18    at this point they are in another job.  They are

19    feeling quite secure.  And they were telling me

20    things that I never would have heard as a result of

21    the way the exit interviews were previously being

22    conducted.

23         We got to that information only because we

24    had an interest.  We looked at other types of data

25    and information that told us pay attention to this,

1   accurate?

2   A.          Yes.

3   Q.          Same reasons as before?

4   A.          It's all tied to that.

5   Q.          But you didn't -- you haven't spoken to any

6   of the officers who have left the department --

7   A.          No.

8   Q.          -- is that correct?

9   A.          That's correct.

10  Q.          And you haven't spoken to any of the

11  officers who have spoken to Chief Jones regarding the

12  possibility that they might leave the department if

13  there were any further cuts; is that right?

14  A.          That's correct, I have not.

15  Q.          So in light of that, I would like to know

16  what evidence did you consider regarding officers'

17  reasons for leaving the department last year?

18  A.          I'm still not sure now what you're --

19  Q.          Have you --

20  A.          You said what evidence have I considered for

21  what?

22  Q.          Regarding their reasons for departing the

23  department.

24  A.          I was basing my observations on what was in

25  the material, basically what had been identified.

Joseph Brann                                                    January 24, 2013
Sacramento, CA

1          But, yeah, the younger officers, the rookie

2     officers, clearly are not where you want them to be

3     yet.

4     Q.      Are there any other concerns that you would

5     associate with an officer before they become

6     proficient, such as their likelihood to be -- or

7     their propensity to be engaged in hot pursuits where

8     a seasoned officer might think better of it?

9     A.      I would say there's no question that

10    seasoned officers have an advantage because they have

11    been exposed to that.  At the same time, I've seen

12    young officers exercise extraordinary judgment.  I've

13    seen very senior officers exercise very poor

14    judgment.  That being one example of a type of a

15    concern that you might have.

16          There's also the issue -- there's a flip

17    side of this.  Your younger officers, your newer

18    officers, oftentimes are more energetic.  Let's face

19    it, police work is an adrenalin junky's idea of

20    heaven.  And cops are, by and large, adrenaline

21    junkies.  They love to get out there, be engaged on

22    the street; they love to be doing something.

23          As they've been -- the longer they are

24    around, the more they tend to slow down.  It doesn't

25    necessarily mean in all instances their productivity.

1    subscribe to the point of view that there should be

2    some sort of a balance between seasoned officers and

3    rookies and those in the middle.

4              Do you actually subscribe to that point of

5    view, irrespective of whether there's an absolute

6    magic number?

7    A.        I subscribe to the view that it's -- it's

8    good to have -- you would not want to create -- as an

9    example, you would not want to create a brand-new

10   agency.

11             Let's say you're creating an agency from

12   scratch and simply hire inexperienced personnel as

13   police officers.  You would go out and look for a way

14   of trying to bring about a combination of experience

15   as well as looking for individuals that are going to

16   be high energy, that are going to function

17   effectively in that organization.  It's also a match

18   with the organization.

19             So I can't honestly state that there's a lot

20   of people that subscribe to this.  Frankly, my

21   experience has shown me that most people don't really

22   spend a great deal of time thinking about it unless

23   they are confronting some type of a crisis or a

24   deficiency in some area of the organization.

25             So I can't say that -- I have never seen any

1           These are the -- that's the time frame, the

2    age group, that we see that are responsible for a

3    disproportionate number of crimes.  So one should be

4    looking at that in the population mix because it can

5    tell you certain things.

6           Demographics.  Poverty.  We can go on and on

7    about all the social conditions that exist that play

8    a role.  But, in and of themselves, none of those is

9    a -- is a sure determinant that crime is going to be

10   at such and such a level.

11          It's looking at the totality of it, the

12   uniqueness of the organization -- excuse me, the

13   uniqueness of the community, changes that are taking

14   place.  Stockton is certainly dealing, as an example,

15   with a high instance of foreclosures, displaced

16   families.  Those things all ultimately have some kind

17   of an impact, too.

18          So look at all of these, and many, many

19   additional variables would be important to do.

20   Q.        Okay.  You didn't -- just to be clear, you

21   didn't look at those issues, though, because that

22   wasn't part of the scope of your assignment?

23   A.        No.

24   Q.        So if we put aside the officer-per-thousand

25   ratio for a moment, and irrespective of what

1   everyone's take is on the usefulness of the

2   officer-per-thousand ratio, in your opinion, is there

3   a point that a police department reaches where it's

4   actually got a floor or a minimum number of police

5   officers that it needs to have on staff in order to

6   fulfill the basic needs of policing the community?

7   A.      I think there would ultimately be a point

8   for any organization that, yes, you could be so

9   severely compromised, that that would occur.

10  Q.      How would you go about determining what the

11  floor is or the minimum number is?

12  A.      It's really going to vary, again, based upon

13  some of these conditions and others that we have

14  already talked about.  It's also ultimately, too, a

15  matter of what are your public policymakers focused

16  on?  What do they have to deal with?

17          Any police department's ability to achieve a

18  certain level of staffing, much less provide certain

19  types of services, are going to be dependent upon the

20  budget, it's going to be dependent upon the resources

21  that can, therefore, be brought to the table.

22          And, again, whether it's Stockton or any

23  other community, it would be important to go through

24  and do a full-blown assessment first and foremost to

25  figure out -- to clearly identify what are the

Case 12-32118    Filed 02/16/13    Doc 717

1    demands for service."

2              You don't have any factual basis on whether

3    or not to opine as to whether or not the Stockton

4    Police Department could find the additional manhours

5    they need through this process, do you?

6    A.        I cannot draw any specific conclusions at

7    this point as to what Stockton has or has not done,

8    that's correct.  But with respect to the notion, the

9    idea, that there is benefit in doing that level of

10   analysis, that's -- my opinion is, in fact, based

11   upon experience in that area.

12   Q.        I understand that.  But this is just -- what

13   you're saying here regarding finding additional

14   manhours is just a generality as opposed to something

15   specific to whether or not Stockton could benefit

16   from this; is that correct?

17   A.        That's correct.

18   Q.        I believe we spoke about -- earlier about

19   lateral candidates, but I don't think we covered new

20   recruits.  So if this question sounds familiar, I

21   think it's a little bit more nuanced.

22              But do you have any familiarity --

23   familiarity with the quality of the candidates that

24   have been applying as new recruits to the Stockton

25   Police Department over the past year?

Case 12-32118    Filed 02/16/13    Doc 717

1    impact on the -- on the retirement, the pension.

2    Q.        Were you asked to make an assumption

3    regarding the modest reduction being, as you just

4    said, quote, "something in the neighborhood of

5    10 percent," or were you asked to assume that it was,

6    in fact, 10 percent?

7    A.        I cannot remember the exact wording.  But I

8    took it to mean 10 percent.  That's more or less what

9    we were doing.

10   Q.        Were you asked to make any other

11   assumptions?

12   A.        Not that I can think of.

13   Q.        As part of the modest pension benefit

14   assumption -- modest pension benefit reduction

15   assumption that you were asked to make, were you

16   given any information regarding how to assume that

17   reduction would be applied to officers?

18   A.        No.

19   Q.        Or retirees?

20   A.        No.

21   Q.        So, in other words, you weren't told how --

22   A.        What might be implemented?

23   Q.        Yeah.

24   A.        No, I was not.  To be clear, my view is that

25   once -- and my understanding is that once the --

Joseph Brann                                                                January 24, 2013
Sacramento, CA

1   somebody is drawing the pension benefits, they are

2   entitled to that, that's not going to change.  But

3   that's -- that wasn't even a discussion with -- with

4   the attorneys on this.

5   Q.      But that's your understanding?

6   A.      Yes.

7           MR. RIDDELL:  I'm going to take a few

8   minutes.  So off the record, please.

9           THE VIDEOGRAPHER:  This marks the end of

10  Disk 3 to the deposition of Joseph Brann.  The time

11  is now 4:10 p.m., and we are going off the record.

12          (Recess taken.)

13          THE VIDEOGRAPHER:  Here marks the beginning

14  of Disk 4 to the deposition of Joseph Brann.  The

15  time is now 4:24 p.m., and we are off the record.

16  BY MR. RIDDELL:

17  Q.      Mr. Brann, I understand, having spoken with

18  your counsel during the break, that there is

19  something that you -- that you noticed in your expert

20  report, while you were reviewing it earlier, that you

21  wanted to point out; that there was a modification

22  you wanted to make to it.

23  A.      Yes.

24  Q.      Would you go ahead and please explain what

25  that is.

1    A.        On page 16, 16/24 -- 16 on the top, 24 on

2    the bottom, the second paragraph, what I would like

3    to do is to end that sentence after the word

4    "retention" on the second line -- the last word,

5    second line, and then eliminate the rest of that --

6    of that sentence, that part of the paragraph.

7              And then on the following paragraph --

8              MR. NEAL:  Before you go there, if you could

9    just read aloud what you want to strike.

10             THE WITNESS:  Okay.  I'd like to strike the

11   words, "and then cited recent annual lateral transfer

12   rates in Florida at 14 and 20 percent; Alaska at

13   35 percent; North Carolina at an average of

14   14 percent, and Vermont municipalities at 8 and a

15   quarter percent."

16   BY MR. RIDDELL:

17   Q.        So if I'm correct in my understanding, that

18   you wish to strike through that, and so that sentence

19   would end after the word "retention"?

20   A.        That's correct.

21   Q.        So, in other words, that whole paragraph

22   would now read, "An article in International

23   Association of Chiefs of Police publication on

24   retention practices noted that, quote, 'Little has

25   been done to establish an acceptable benchmark or

1    standard,' end quote, "on retention," period.

2    A.        Period.  Correct.

3    Q.        Thank you.

4              Was there another modification that you

5    needed to make?

6    A.        And then in the following paragraph, have it

7    read, "Even looking only at the 2012 data, the

8    lateral departure rate of 8.1 percent is higher than

9    the California POST data."  Stop the sentence right

10   there.  "But lower than the rates" -- and strike "but

11   lower than the rates in many of the IACP

12   jurisdictions."

13             And then -- actually, here -- let me

14   double-check this.

15             I'm thinking -- I'm trying to go back to my

16   train of thought on this.  Okay.  I remember now.

17             Change that "California POST data, but" --

18   and then strike the words "lower than the rates in

19   many of the IACP jurisdictions and," and that would

20   be the last word to strike.  So it now reads "but

21   hardly the sign of a mass exodus."

22             MR. NEAL:  Mr. Brann, if you could repeat

23   only the language that you would like to have

24   stricken from that paragraph.

25             THE WITNESS:  Okay.  "Lower than the rates

Page 230

1    in many of the IACP jurisdictions and."

2    BY MR. RIDDELL:

3    Q.        What -- were there any other changes?  I'm

4    sorry.

5    A.        No.  That was it.

6    Q.        Thank you for making those clarifications.

7              Would you please explain the reasons that

8    you are making those -- well, let's take it one at a

9    time.

10             What is the reason for striking the language

11   in the first paragraph that you struck language from?

12   A.        When I went back and again looked at the

13   data, I began to realize that that statement would be

14   mixing apples and oranges; that, in fact, the

15   references being made were not just to lateral

16   transfers.

17             This had to do with overall attrition, a

18   variety of different categories.  It was different

19   depending upon which one of those sources of

20   information you were looking at.  So I felt it would

21   be inappropriate to -- I didn't want it to be

22   misleading.  That was the fundamental reason.

23   Q.        Is it also true that that information was --

24   that data was based on 18 months' worth of data as

25   opposed to -- an 18-month period as opposed to an

1    annual or 12-month period?

2    A.        I think that may be the case, but I'm not

3    certain.  I know my primary concern was, when I was

4    looking at it, recognizing that we weren't comparing

5    exactly the same things.

6    Q.        Okay.  And the second section of language

7    that you wanted to strike, what is the reason for

8    striking that?

9    A.        Well, again, this is making reference to the

10   information above that, that we just struck from

11   the -- from the report.  So it would be inappropriate

12   now to try to compare that.

13   Q.        Does this modify any of your opinions --

14   A.        No.

15   Q.        -- that you have expressed today?

16   A.        No, it did not.  I just want it to be

17   accurate.

18   Q.        Does it influence or alter any of your

19   conclusions that you've testified about today?

20   A.        No.

21             THE REPORTER:  1007.

22                   (Exhibit No. 1007 was marked.)

23   BY MR. RIDDELL:

24   Q.        Mr. Brann, you've been handed an exhibit

25   marked as No. 1007.  And the face page of that

Case 12-32118    Filed 02/16/13    Doc 717

1            "The City agrees to review information

2    provided by the Association regarding the comparable

3    City demographics and the duties, requirements and

4    obligations of police officers.

5            "If the City and Association agree that any

6    of the ten cities are no longer sufficiently similar

7    or comparable, substitution of other cities for

8    comparison will be considered."

9            Do you see where it says that?

10   A.       Yes.  Yes.

11   Q.       In the context of the labor negotiations

12   that were going on while you were the chief of police

13   at the City of Hayward, why did the City agree to

14   use -- to the use of ten cities for the purposes of

15   salary and benefit comparison?

16   A.       That's a common practice.

17   Q.       Common amongst whom?

18   A.       The cities and their bargaining units.

19   Q.       Is that a common practice in the state of

20   California or just throughout the country or --

21   A.       Certainly in the state of California.

22   Q.       So -- I'm sorry.  Go ahead.

23   A.       Could I offer one point of clarification?

24   Q.       Yes.

25   A.       You will find, as the case here, in this

1   MOU, that sometimes that is actually entered into the

2   MOUs.  In other instances, some cities have just

3   determined, well, we, the City, are going to

4   determine what those comparable cities will be.

5            Each has -- the City and the bargaining

6   unit, each have different motivations and reasons for

7   doing it the way that they do.  But it's very common

8   to have typically somewhere in the neighborhood of

9   ten comparable cities or jurisdictions to look at.

10  Q.       So, in your experience, it's -- is it a

11  police industry, at least in -- let me back up.

12           For California, in your experience, is it an

13  industry practice or standard industry practice to

14  use other comparable jurisdictions for the purpose of

15  determining the appropriate level of wages and

16  compensation to be paid to police officers?

17  A.       Yes.  Usually, again, as a guide.  It's not

18  absolute.  However, there are some MOUs where it

19  specifically spells out that this bargaining unit

20  will be at no less than the median or will be in the

21  top two or three of these comparable jurisdictions.

22           There's just different approaches depending

23  upon the bargaining units involved.

24  Q.       Would it be abnormal in the state of

25  California to not rely upon other jurisdictions to

Case 12-32118    Filed 02/16/13    Doc 717

1    inform your decisions about compensation?

2    A.      My experience over the years has shown me

3    that most jurisdictions do this in one form or

4    another.  Again, the question being whether it's

5    going to be in the MOU, the bargaining unit

6    agreement, or whether it's going to be determined

7    elsewhere.

8    Q.      Which cities do you -- do you recall which

9    cities were used as comparable cities for Hayward?

10   A.      I don't recall off the top of my head.

11   Q.      Do you recall any of them?

12   A.      To be honest, no.  It's been so long.

13   Q.      No.

14   A.      I'm certain if I were to look at the list, I

15   would be able to confirm, yes, I remember seeing

16   these.

17   Q.      Well, if you were to -- if you were to form

18   a list of comparable cities for -- for any city that

19   you were working with, how would you go about

20   identifying which cities are comparable?

21   A.      Well, having -- I will give you two

22   perspectives on this.  One, I've been involved in

23   bargaining on behalf of a police association, the

24   police association in Santa Ana and the Police

25   Management Association in Santa Ana.  I was actually

Case 12-32118   Filed 02/16/13   Doc 717

1  at the bargaining table, sitting at the bargaining

2  table, and a lot of times we would go in with cities

3  that we felt were -- it was more appropriate to use.

4         The -- that's, again, I think relatively

5  common when you're doing this through the bargaining

6  process.  But, typically, many jurisdictions

7  absolutely do not want to get engaged in negotiations

8  over that.  If they can protect themselves from

9  dealing with that at the bargaining table, they will

10 try to do that.

11        So to say how common or abnormal it is, the

12 approach, I can't unequivocally state that.

13 Q.       Well, but how would you go about determining

14 which cities you would want to use?  Is it -- what

15 cities -- in your experience working with multiple

16 jurisdictions throughout California, how do cities --

17 you know, what's an accurate or reliable way of going

18 about determining which cities are generally in the

19 neighborhood of comparable cities to use for purposes

20 of salary and compensation analysis?

21 A.       Generally, what ultimately gets agreed to is

22 something -- using comparable cities that are in that

23 region, the area of that city.  Not in all instances,

24 but generally so.

25        Another factor would be population, size of

Joseph Brann                                                                January 24, 2013

Sacramento, CA

1                    CERTIFICATE OF REPORTER

2          I, SANDRA BUNCH VANDER POL, a Certified

3    Shorthand Reporter, hereby certify that the witness

4    in the foregoing deposition was by me duly sworn to

5    tell the truth, the whole truth and nothing but the

6    truth in the within-entitled cause;

7          That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13         That before completion of the deposition,

14   review of the transcript was requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18         I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23   DATED:  JANUARY 30, 2013

24         _____

25              SANDRA BUNCH VANDER POL, CSR #3032

# Exhibit G

## CITY OF OAKLAND
### COUNCIL AGENDA REPORT

TO:       Office of the City Manager
ATTN:    Robert C. Bobb
FROM:   Office of Personnel
DATE:    December 11, 2001

RE:   REPORT AND PROPOSED RESOLUTION APPROVING THE MEMORANDUM OF
      UNDERSTANDING BETWEEN THE CITY OF OAKLAND AND OAKLAND POLICE
      OFFICERS ASSOCIATION

## SUMMARY

The City of Oakland and the Oakland Police Officers Association have reached a tentative agreement on a new Memorandum of Understanding, which would be effective July 1, 2001. This is a five-year agreement, which terminates on June 30, 2006.

Items of significance contained within this agreement include: general wage increases of 6% for the first eighteen months, 6% for the following year, beginning January, 2003, then 5% increases for the next three years beginning in January of each successive year.

It also includes a significant change in retirement benefits, beginning with an agreement to amend the City's contract with the California Public Employees' Retirement System ("PERS") in July 2003. This amendment would allow police officers enrolled in PERS to be eligible for a 3% retirement package at the age of 50. It also allows active police officers currently enrolled in the City of Oakland's Police and Fire Retirement System ("PFRS") to transfer into the PERS system before March, 2003, pursuant to enabling legislation contained in a recent amendment to the City Charter, Section 2600(a) of Article XXVI.

This MOU also contains certain changes in operations, including the cessation of overtime pay for Captains and Assistant Chiefs and the granting of a 5% wage increase to captains; the cessation of "line-up" pay; the addition of differential pay premium for certain hard-to-fill shifts on swing and night shift in order to encourage more experienced officers to take night shifts; an agreement to use alternative dispute procedures as an alternative to arbitration; a confidentiality clause and bilingual pay.

## FISCAL IMPACT

Wage and Benefit Package

The costs by fiscal year are as follows:

Case 12-32118    Filed 02/16/13    Doc 717

|  | Salary Increase | Retirement Benefit | Salary and retirement Cost | Differential pay, bilingual pay, increased pay for evidence technicians and captains | Total |
|---|---|---|---|---|---|
| **July 1, 2001** | 6% |  | 6% = $4,191,774 | $969,269 differential pay $441,955 Other pay | $5,602,998 |
| **January 1, 2003** | 6% |  | 6% = $4,486,642 |  | $4,486,642 |
| **July 1, 2004** |  | 3%@ 50 | $4,438,356 |  | $4,438,356 |
| **January 1, 2004** | 5% |  | 5% = $3,963,200 |  | $3,963,200 |
| **January 1, 2005** | 5% |  | 5% = $4,161,360 |  | $4,161,360 |
| **January 1, 2006** | 5% |  | 5% = $2,184,714 |  | $2,184,714 |
| **Total costs for actives** |  |  | $23,426,046 | $1,411,224 | $24,837,270 |

The total impact to the PFRS system of the salary and benefit changes and of the proposed transfer is approximately $11 million dollars.

First year costs total $5.6 million. Funding in the amount of $4.1 million is included in the non-departmental budget to partially cover this expense. It is recommended that the remaining cost of $1.5 million be transferred to the Police Department from the General Fund Reserve.

## BACKGROUND

The City has been negotiating with the OPOA since January 2001. The primary issues for the OPOA have been 3% at 50 as a retirement benefit and significant raises in order to keep Police Officers in their relative placement with other like jurisdictions. The major issues for the City have included ways to cut administrative costs, streamline procedures, and keep police officers within their relative placement in the salary survey with like Bay Area Cities. Because the most expensive part of this negotiation for the City involved amending our contract with PERS to allow for retirement at 3% at 50 and because the Oakland Police force is relatively young, the OPOA agreed to forestall this change until the third year of the contract term, July of 2003. As an additional cost-saving measure, the OPOA agreed to wait until January of the second year of the contract term to implement the second pay raise of 6%, and to then use January as the date of successive pay raises until the end of the term.

Recent Charter Amendment, section 2600 (a) of Article XXVI allows active members of the PFRS system to terminate their membership in PFRS and become members of the PERS system. This transfer is allowable with the agreement of the Union and the City Council, and upon the agreement of the Board of PFRS. On May 17th, the Board heard testimony regarding the proposed transfer of sworn members and heard relevant financial and actuarial information from their actuary, Mark Johnson. Mr. Johnson explained that the transfer of funds from the PFRS system would be cost neutral to the fund if the present value of benefits for the members transferring were transferred at the same percentage rate that the fund was funded. Present value of benefits is the amount in the fund that is estimated to cover all of the expenses of a particular member, when that member retires. Therefore, if, for example, the fund were funded at 95%, a transfer of 95% of the present value of benefits for the affected member would then be

transferred to the City's PERS fund. According to Mr. Johnson, this transfer will not have any net affect on the ability of the PFRS fund to fund its obligations; the fund would still be funded at the original rate, which, at the time the PFRS board considered the action, was 95%.

On May 30th, the Board met, heard questions and answers regarding financial and actuarial matters, heard public comment and passed a Resolution of the Board agreeing to transfer the required assets in the formula recommended by Mr. Johnson. This Resolution was contingent on City Council approval of the transfer, which took place earlier this year.

## KEY ISSUES AND IMPACTS

The new MOU provides the salary increases and retirement benefits, which bring the Oakland Police Officers to a very favorable position among police officers in comparable cities in the Bay Area. It also includes small increases in dental and uniform allowances, accounting for actual cost increases in these areas. In granting these benefits, the City was able to negotiate the following benefits on behalf of the City:

- Bilingual Pay Provision
- Shift differential to encourage more experienced officers to work night patrol shifts and other hard-to-fill shifts; in exchange for the cessation of line-up pay
- No overtime for Captains, in exchange for a 5% pay increase
- New Alternative Dispute Procedures in the grievance process
- Confidentiality Provisions in the grievance procedure
- Slight increases in life insurance ($6 per month increase) and dental rates to reflect actual increases in cost
- Some streamlining of grievance procedures, including the ability to bypass steps by mutual agreement, and faster processing of steps
- Increased power for the Chief to impose Early Intervention Procedures upon officers
- Reimbursement for approved safety vests of choice for experienced officers - up to the amount normally spent for City-issued vests
- Time limits for disciplinary investigations
- Provisions giving the Chief greater flexibility in the transfer policy
- 5% differential for sworn evidence technicians
- Agreement to form committee to discuss physical fitness requirement and incentives
- Increases in uniform allowance by $20 per year.

## ENVIRONMENTAL OPPORTUNITIES

There are no environmental opportunities or impacts associated with approval of this Resolution and MOU.

December 11, 2001                                                      Page 4

## DISABILITY AND SENIOR CITIZEN ACCESS

There is no impact on residents with disabilities and/or senior citizens relative to accessibility.

## RECOMMENDATION

Staff recommends the approval of the attached Resolution.

Respectfully submitted,

Walter L. Johnson, Sr.
Director, Office of Personnel

Prepared by:
Stephanie Garrabrant-Sierra,
Manager, Employee Relations

## APPROVED FOR FORWARDING TO
## THE CITY COUNCIL

Robert C. Bobb
City Manager

Item 33
City Council
December 11, 2001

# OAKLAND CITY COUNCIL

RESOLUTION NO._____ C.M.S.

INTRODUCED BY COUNCILMEMBER_____

RESOLUTION APPROVING MEMORANDA OF UNDERSTANDING BETWEEN THE CITY OF OAKLAND AND OAKLAND POLICE OFFICERS' ASSOCIATION, REPRESENTING EMPLOYEES IN REPRESENTATION UNIT PP1, COVERING THE PERIOD OF JULY 1, 2001 TO JUNE 30, 2006

**WHEREAS,** the memorandum of understanding to be entered into between the City of Oakland and Oakland Police Officers' Association has been presented to the City Council for determination pursuant to Section 3505.1 of the Government Code of the State of California; and

**WHEREAS,** the terms and conditions contained in said memorandum are in the best interests of the City, now, therefore; be it

**RESOLVED:** That said agreement be, and is , hereby, approved; and be it

**FURTHER RESOLVED:** That the provisions of said Memorandum of Understanding are effective July 1, 2001 through June 30, 2006.

IN COUNCIL, OAKLAND, CALIFORNIA,_____, 2001

**PASSED BY THE FOLLOWING VOTE:**

AYES-  BRUNNER, CHANG, MAYNE, NADEL, REID, SPEES, WAN
              AND PRESIDENT DE LA FUENTE

NOES-

ABSENT-

ABSTENTION-

ATTEST: 

CEDA FLOYD
City Clerk and Clerk of the Council
of the City of Oakland, California

83

ORA/COUNCIL

DEC 1 1 2001

# Exhibit H

## CITY OF OAKLAND
### *COUNCIL AGENDA REPORT*

TO:      Office of the City Manager
ATTN:    Robert C. Bobb
FROM:    Office of Personnel
DATE:    June 26, 2001

RE:      REPORT AND PROPOSED RESOLUTION APPROVING THE MEMORANDUM
         OF UNDERSTANDING BETWEEN THE CITY OF OAKLAND AND
         INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 55, AND
         APPROVING THE TRANSFER OF ACTIVE FIREFIGHTERS CURRENTLY
         ENROLLED IN THE POLICE AND FIRE RETIREMENT SYSTEM TO THE CITY
         OF OAKLAND'S PUBLIC EMPLOYMENT RETIREMENT SYSTEM ("PERS")
         RETIREMENT PLAN FOR FIREFIGHTERS

## SUMMARY

A resolution has been prepared for City Council consideration that approves the Memorandum of Understanding (MOU) between the City of Oakland and the International Association of Firefighters, Local 55 and approves the transfer of active firefighters currently enrolled in the Police and Fire Retirement System (PFRS) to the City of Oakland's Public Employment Retirement System (PERS) retirement plan for firefighters.

This MOU becomes effective July 1, 2001 and is a six-year agreement that terminates on June 30, 2007. Items of significance contained in this agreement include general wage increases of 8%, 6%, 6% and 5% in the first four years, with 4% increases anticipated in years five and six. The increases for years five and six may be adjusted based upon changes in the Consumer Price Index (CPI). If, in December 2006, the CPI were more than 5.5%, the Firefighters would be able to reopen the contract for salary purposes only and these increases for years five and six would have a floor of 2% with a 5% cap. In the fifth year of the Agreement there may be an additional market adjustment of not more than 3% based on a mutually agreed upon salary survey utilizing the cities the City surveyed during this negotiation period. If this survey indicates that the salaries of Oakland firefighters are lower than an average of the 4th and 5th ranked cities in the survey, or if the salaries of police officers in Oakland become ranked significantly higher than firefighters in Oakland, this adjustment may be implemented.

The agreement also includes a significant change in retirement benefits, beginning with an agreement to amend the City's contract with the California Public Employees' Retirement System ("PERS") allowing firefighters enrolled in PERS to be eligible for a 3% retirement package at the age of 55, and, beginning at the fourth year, for 3% at 50. The firefighters will pay a large proportion of the increased costs resulting from these increased retirement benefits through their salary increases at the rates outlined below. The agreement also allows active firefighters currently enrolled in the City of Oakland's Police and Fire Retirement System

Item # **25**
City Council
June 26, 2001

("PFRS") to transfer into the PERS system, pursuant to enabling legislation contained in a recent amendment to the City Charter, Section 2600(a) of Article XXVI.

This MOU also contains significant changes in operations, including the cessation of the long-standing practice of allowing 60 full days and 60 half days of sick leave for each occurrence, the substitution of a conventional sick day policy in place of this plan, greater community services commitments, an agreement to use alternative dispute procedures as an alternative to arbitration, a confidentiality clause, an agreed upon flat rate for Fair Labor Standards Act ("FLSA") overtime, and agreed upon policies for military leave, pregnancy and birth bonding leave, transitional leave and bilingual pay.

## FISCAL IMPACT

1.  Wage and Benefit Package

The costs by fiscal year are as follows:

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Salary** | 8.0%<br>$4,011,707 | 6.0%<br>$3,249,482 | 6.0%<br>$3,444,451 | 5.0%<br>$3,042,599 | 4.0%<br>$2,555,783 | 4.0%<br>$2,658,014 | 33.0%<br>$18,962,036 |
| **Retirement/ City Contribution** | 3% @ 55(4%)<br>0 | 2.0%<br>$971,713 | 2.0%<br>1,030,016 | 3% @ 50 (9%)<br>1.0%<br>$540,758 | | | 5.0%<br>$2,542,487 |
| **Net Salary Increase** | 4% | 4% | 6% | 1% | 4% | 4% | |
| **Dental Increase** | $36,300 | $37,980 | $39,600 | $42,120 | $43,800 | $46,200 | $246,000 |
| **Bilingual Pay Provision** | $45,500 | $45,500 | $45,500 | $45,500 | $45,500 | $45,500 | $273,000 |
| **Increase in Uniform Allowance** | $10,000 | $20,000 | $30,000 | $40,000 | $50,000 | $60,000 | $210,000 |
| **TOTAL** | $4,103,507 | $4,324,675 | $4,589,567 | $3,710,977 | $2,695,083 | $2,809,714 | $22,233,523 |

2.  PFRS to PERS Transfer :

Because the cost savings and costs described below are dependant upon date of retirement and other factors which cannot be guaranteed, these figures have not been attributed to the costs of this package. They are provided to give best estimates of costs and savings of this transfer.

- Fixed Cost to City of Transfer - $1.5 million, if no PFRS members retire in the first year, to account for employer contribution rate of new PERS members. As these firefighters retire, this amount decreases. This group represents those firefighters who joined the City prior to 1976, most of whom have stated a desire to retire in the first two years of the contract.

- Projected Savings – The elimination of the "60 full, 60 half" sick provision has been estimated to save the City approximately $375,000 per year. Salary savings are also expected to accrue from reduced City-Paid "4850" Pre-Retirement Salary, as the PFRS system allows disability-retired members to remain on payroll indefinitely, while PERS system limits this time to one year. While more speculative, savings could also accrue from the retirement of a large number of firefighters now eligible for retirement and their replacement by new, less-experienced firefighters.

## BACKGROUND

The City has been negotiating with Local 55 since Fall 2000. The primary issues for Local 55 have been 3% at age 50 as a retirement benefit, significant raises in order to keep firefighters in their relative placement with other like jurisdictions, and the transfer of fire members currently in the PFRS plan to the PERS plan. The major issues for the City have included ways to cut administrative costs, streamline procedures, and keep firefighters within their relative placement in the salary survey with like Bay Area Cities. After cooperative fact-finding with Local 55 regarding the costs and benefits of 3% at 50 and 55, it was discovered that 3% at 55 represented significant cost savings over the 3% at 50 plan. As a large number of firefighters (approximately 110) are currently in the PFRS system and have stated a desire to transfer into PERS with the intention of retiring within one or two years, firefighters were willing to take the benefit of 3% of 55 in order to save costs both to the City and to their membership.

Recent Charter Amendment, section 2600 (a) of Article XXVI allows the transfer of active members of the PFRS system to terminate their membership in PFRS and become members of the PERS system. This transfer is allowable with the agreement of the Union and the City Council, and upon the agreement of the Board of PFRS. On May 17th, the Board heard testimony regarding the proposed transfer and heard relevant financial and actuarial information from their actuary, Mark Johnson. Mr. Johnson explained that the transfer of funds from the PFRS system would be cost neutral to the fund if the present value of benefits for the members transferring were transferred at the same percentage rate that the fund was funded. Present value of benefits is the amount in the fund that is estimated to cover all of the expenses of a particular member, when that member retires. Therefore, if, for example, the fund were funded at 95%, a transfer of 95% of the present value of benefits for the affected member would then be transferred to the City's PERS fund. According to Mr. Johnson, this transfer will not have any net affect on the ability of the PFRS fund to fund its obligations; the fund would still be funded at the original rate, which in this example, would be 95%.

On May 30th, the Board met, heard questions and answers regarding financial and actuarial matters, heard public comment and passed a Resolution of the Board agreeing to transfer the required assets in the formula recommended by Mr. Johnson. This Resolution was contingent on City Council approval of the transfer. The proposed transfer applies only to firefighters at the present time. If the Oakland Police Officers' Association negotiates such a transfer, a resolution would be prepared for Council consideration at that time.

Item # **2S**
City Council
June 26, 2001

## KEY ISSUES AND IMPACTS

The new MOU provides the salary increases and retirement benefits as outlined above, which bring the Oakland firefighters in an appropriate position among firefighters in comparable cities in the Bay Area. It also includes small increases in dental and uniform allowances, accounting for actual cost increases in these areas. In granting these benefits, the City was able to negotiate the following benefits on behalf of the City:

- The elimination of the current 60 full and 60 half day sick leave provision, estimated to save the City approximately $375,000 per year
- The resolution of the cash-in-lieu grievance with a policy identical to other bargaining units
- A provision allowing up to eight companies out of service, which allows the Chief much greater flexibility in assigning personnel to community service and other out-of-service obligations
- Bilingual Pay Provision
- Stronger Acting Higher Rank Provision
- Stronger Community Service Provision
- New Alternative Dispute Procedures in the grievance process
- New Industrial Illness and Injury Procedures conforming to current law
- Pregnancy and Birth Bonding Leave Procedures conforming to current law
- Military Leave Provisions conforming to current law
- New Protective Clothing Provisions
- Resolution of substantial conflicts regarding Paramedic Program
- Confidentiality Provisions in the grievance procedure
- More comprehensive and current list of arbitrators

## ENVIRONMENTAL OPPORTUNITIES

There are no environmental opportunities or impacts associated with approval of this Resolution and MOU.

## DISABILITY AND SENIOR CITIZEN ACCESS

The new MOU provides for premium pay for firefighters who are conversant in American Sign Language. It is hoped that this provision will assist hearing impaired residents in accessing the City's emergency services.

**RECOMMENDATION**

Staff recommends the approval of the attached Resolution

Respectfully submitted,

**WALTER L. JOHNSON, SR.**
**Director of Personnel**

Prepared by:
Stephanie Garrabrant-Sierra,
Manager, Employee Relations

APPROVED AND FORWARDED TO THE
CITY COUNCIL

**OFFICE OF THE CITY MANAGER**

√ A C

# OAKLAND CITY COUNCIL

## RESOLUTION NO._____C.M.S.

INTRODUCED BY COUNCILMEMBER_____

**RESOLUTION APPROVING MEMORANDA OF UNDERSTANDING BETWEEN THE CITY OF OAKLAND AND INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 55, REPRESENTING EMPLOYEES IN REPRESENTATION UNIT FQ1, COVERING THE PERIOD OF JULY 1, 2001 TO JUNE 30, 2007**

**WHEREAS,** the memorandum of understanding to be entered into between the City of Oakland and International Association of Firefighters, Local 55 has been presented to the City Council for determination pursuant to Section 3505.1 of the Government Code of the State of California; and

**WHEREAS,** the terms and conditions contained in said memorandum are in the best interests of the City, now, therefore; be it

**RESOLVED:** That said agreement be, and is , hereby, approved; and be it

**FURTHER RESOLVED:** That the provisions of said Memorandum of Understanding are effective July 1, 2001 through June 30, 2007.

IN COUNCIL, OAKLAND, CALIFORNIA,_____, 2001

**PASSED BY THE FOLLOWING VOTE:**

AYES-  BRUNNER, CHANG, MAYNE, NADEL, REID, SPEES, WAN
           AND PRESIDENT DE LA FUENTE

NOES-

ABSENT-

ABSTENTION-

ATTEST:

CEDA FLOYD
City Clerk and Clerk of the Council
of the City of Oakland, California



ORA/COUNCIL
JUN 2 6 2001

# Exhibit I

**News**Room

3/3/04 Oakland (Calif.) Tribune (Pg. Unavail. Online)
2004 WLNR 17116174

Oakland Tribune, The (CA)

Copyright © 2004 The Oakland Tribune. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.

March 3, 2004

Section: Election Results

Crime-prevention measure close to failing

Cecily Burt, STAFF WRITER

OAKLAND -- A $110 million measure to try and stem Oakland's murder rate by hiring more police officers and funding programs to help parolees lead law-abid-ing, productive lives was narrowly losing in early returns Tuesday.

Measure R, sponsored by Councilmember Nancy Nadel (Downtown-West Oakland), with backing from Mayor Jerry Brown and Police Chief Richard Word, would raise $11 million a year for 10 years via a $90 annual assessment on single-family homes and up to $180 on large apartment buildings. The measure requires a two-thirds vote to pass. With 39 percent of precincts reporting, the measure had only 62.7 percent of the vote.

Despite the odds, Nadel was upbeat at a party at Van Kleef's bar on Telegraph Avenue Tuesday night, insisting the plan had widespread support around the city.

"I'm still feeling hopeful," she said.

Across town, Brown acknowledged it would be an uphill battle to garner the needed votes. Both said they would likely come back with another version of the measure for the Nov. 2 election, with Nadel saying a close vote now would mean the measure would only require "a little tweak" to make it a winner in November. Brown said he planned to include funding for fire services in his next version.

This is the second time Oakland voters have been asked to help the cash-strapped city hire more officers and pay for services for ex-offenders. In November 2002, voters were faced with a confusing collection of four related issues that aimed to generate $70 million to hire 100 new police officers by raising hotel, parking and utility taxes for five years. Another $5 million was earmarked for three violence prevention programs that work with ex-offenders, at-risk youth and after school programs. Although voters narrowly approved the concept, they defeated the taxes that would have paid for it.

The allocation defined in Measure R is more equal, with 40 percent of the money raised dedicated to social programs to steer under-privileged youth away from crime, drugs and gangs. Another 40 percent would be used to hire about 30 more police officers to focus on drug-related shootings and domestic violence.

The remaining 20 percent would be used to fund job-training and counseling programs for parolees. A civilian oversight board will keep tabs on how the money is spent.

Backers say the combination of enforcement and services offers the best chance to reduce violent crime, and give hope and a hand up to ex-cons who want to keep their lives on track.

Opponents complain the measure won't hire enough officers and is too vague about how the violence prevention program money will be spent. Unlike the previous cops measure, none of the anti-violence programs that could potentially receive funding are defined in the ballot language.

Nadel said that was intentional, because there was no guarantee nonprofit agencies specializing in violence prevention work would be viable, or offer the services the city was seeking, next year or 10 years from now.


---- **Index References** ----

News Subject: (Social Issues (1SO05))


Language: EN

Other Indexing: (COUNCILMEMBER NANCY NADEL; NADEL) (Backers; Brown; Jerry Brown; Opponents; Richard Word; Telegraph Avenue)

Word Count: 596

End of Document                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# Exhibit J

Jason Baker, 13, tinker with the computers at the Dimond Branch Library in Oakland., (4) Meters like this one on Grand Avenue will need more coins. / Photos by Christina Koci Hernandez/The Chronicle / Photos by Christina Koci Hernandez/The Chronicle

Links: Link to full text

Subject: Proposals; Municipal employees; Layoffs; Public works; Budgeting -- Oakland California

Location: Oakland California

Publication title: San Francisco Chronicle

Pages: A.17

Number of pages: 0

Publication year: 2003

Publication date: May 3, 2003

Year: 2003

Section: BAY AREA

Publisher: Hearst Communications Inc., Hearst Newspapers Division

Place of publication: San Francisco, Calif.

Country of publication: United States

Journal subject: General Interest Periodicals--United States

ISSN: 19328672

Source type: Newspapers

Language of publication: English

Document type: News

ProQuest document ID: 411625073

Document URL: http://ezproxy.kcls.org/docview/411625073?accountid=46

Copyright: Copyright San Francisco Chronicle, a division of Hearst Communications Inc. May 3, 2003

Last updated: 2010-08-26

Database: Western Newsstand

---

## Nothing safe as Oakland trims budget ; City manager includes library, City Hall closures on preliminary list of cuts

Author: Counts, Laura

Publication info: Oakland Tribune [Oakland, Calif] 17 Apr 2003: 1.

ProQuest document link

Abstract: A preliminary list from City Manager Robert Bobb of "all ideas" under consideration includes closing library branches, shutting down city government for as many as two days a month and closing Feather River Camp in 2004-05. The city won't know what the Legislature will decide to do by the time it puts its budget together. So Oakland officials must decide whether to assume that all or none of the state money will be lost

when they write the budget. If all of the money is lost, then the list of cuts would be long, Bobb said. In addition to program cuts, 250 to 350 positions would be eliminated, Bobb said. Among the proposed cuts to police are eliminating command positions, freezing vacant officer and dispatcher positions, eliminating the mounted patrol, canceling police academies, reducing spending on car phones, cutting neighborhood services coordinators and eliminating the Beat Health Unit.

**Links:** Base URL to 360 Link:

**Full Text:** OAKLAND -- Everything is on the table as the city prepares to slash as much as $46.5 million from next year's budget -- including sacred cows just barely spared in the previous round of cuts. A preliminary list from City Manager Robert Bobb of "all ideas" under consideration includes closing library branches, shutting down city government for as many as two days a month and closing Feather River Camp in 2004-05. The list also includes elimination of community policing neighborhood services coordinators and the beat health unit. A proposed budget from Bobb and Mayor Jerry Brown will not be released until May 2. This week's list does not have dollar figures attached to each item and was compiled to show the City Council what's to come. But it seems likely that cuts will be deep and affect all departments. "I don't want to sound totally pessimistic, but the reality is it's going to be a very difficult budget year," Bobb said Wednesday. "The level of difficulty depends largely on the economy, and on the state." The City Council already cut about $48 million from its $380 million general purpose fund budget this fiscal year, which ends June 30. The projected shortfall of $29.5 million to $46.5 million in next year's General Fund -- plus an additional $11 million to $12 million in 2004-05 -- is mainly because of decreasing revenue; increasing pension plan costs due to investment losses in the massive state CalPERS fund and enhanced benefits to employees; and the potential loss of money from state vehicle license fee "backfill" money. Oakland could lose $18 million from those fees. When the state cut taxes in 1998, it pledged to compensate cities for the difference, but Gov. Gray Davis' budget took that away. All cities are in the same boat as the state struggles to balance its budget on the backs of localities. The city won't know what the Legislature will decide to do by the time it puts its budget together. So Oakland officials must decide whether to assume that all or none of the state money will be lost when they write the budget. If all of the money is lost, then the list of cuts would be long, Bobb said. In addition to program cuts, 250 to 350 positions would be eliminated, Bobb said. That doesn't mean there would be that many layoffs, though. In the previous round of cuts, 60 positions were eliminated but only 23 people were laid off. Also likely: closing down city government for one or two days a month, or possibly during the Christmas holiday season, he said. Councilmember Danny Wan (Grand Lake-Chinatown), who chairs the council finance Committee, said a government shutdown could be a way to save money without cutting some popular programs. But it won't eliminate the need for other cuts, he said. "My goal is going to be to preserve direct services, like parks and recreation and public works, and save as many of the priorities the council has already set," said Council President Ignacio De La Fuente (San Antonio-Fruitvale). "You are going to see some major restructuring, some major changes and people hitting the streets." But with millions to cut, some services will inevitably be affected. Police Chief Richard Word said his department would likely take a $10 million to $11 million hit. "Some of these cuts are going to be painful," he said. "They made it clear we have to share in the pain. My approach was to the greatest extent possible to avoid layoffs and not impact direct services on the streets." Among the proposed cuts to police are eliminating command positions, freezing vacant officer and dispatcher positions, eliminating the mounted patrol, canceling police academies, reducing spending on car phones, cutting neighborhood services coordinators and eliminating the Beat Health Unit. The last three items are seen as the core of the community policing program, and cutting them is sure to set off a firestorm. "It would be political suicide for an awful lot of people if they cut those," said Don Link, who chairs the Community Policing Advisory Board. "If they cut the (neighborhood services coordinators), that would essentially be the end of community policing." The Police Department eliminated community policing officers last year as part of an overall restructuring in which every patrol officer

was supposed to take on a problem-solving role. At first, patrol officers were coming to meetings of Neighborhood Crime Prevention Councils and getting to know neighborhood issues, Link said. But they were being paid on overtime to do that, and when overtime was slashed in the previous round of budget cuts, they stopped coming, Link said. The neighborhood services coordinators are the public face of community policing, and even eliminating one position has caused an outcry in the past. Car phones are also the main way for citizens to contact their beat officers under the new system, and the popular beat health unit deals with blight issues. "You'll have people storming City Hall," Link said. The same goes for proposed cuts to the libraries and recreation centers. Library supporters celebrated when the council turned down Bobb's recommendation in February to cut $2.1 million from the libraries by closing seven branch libraries -- only to learn Wednesday that the proposal is back on the table. Among budget-cutting proposals: closing one branch in each council district and reducing library hours. "We are just outraged," said Tracey Scott, chair of the Library Advisory Commission. "We can't cut the library budget anymore. We heard loudly last time that it's not acceptable. We are passed bare bones already -- we are about to be crippled." Victoria Kelly of Save Oakland Libraries said the coalition has already begun mobilizing for another fight.

**Publication title:** Oakland Tribune

**Pages:** 1

**Number of pages:** 0

**Publication year:** 2003

**Publication date:** Apr 17, 2003

**Year:** 2003

**Section:** Headline News

**Publisher:** Bay Area News Group

**Place of publication:** Oakland, Calif.

**Country of publication:** United States

**Journal subject:** General Interest Periodicals--United States

**ISSN:** 10685936

**Source type:** Newspapers

**Language of publication:** English

**Document type:** NEWSPAPER

**ProQuest document ID:** 351881254

**Document URL:** http://ezproxy.kcls.org/docview/351881254?accountid=46

**Copyright:** Copyright ANG Newspapers Apr 17, 2003

**Last updated:** 2011-09-28

**Database:** Western Newsstand

---

**Oakland eyes hard budget choices / Libraries, fire stations, rec centers could close**

# Exhibit K

Case 12-32118    Filed 02/16/13    Doc 717


LexisNexis®

FOCUS - 105 of 424 DOCUMENTS

Copyright 2003 The Chronicle Publishing Co.

**San Francisco Chronicle**

The San Francisco Chronicle

MAY 14, 2003, WEDNESDAY, FINAL EDITION

**SECTION:** BAY AREA; Pg. A15

**LENGTH:** 635 words

**HEADLINE:** Mayor submits Oakland budget;

Brown's plan calls for 115 layoffs, closing fire station, program cuts

**SOURCE:** Chronicle Staff Writer

**BYLINE:** Janine DeFao

**BODY:**
Oakland Mayor Jerry Brown presented a "difficult" budget to the City Council Tuesday night but said his city remains in relatively good shape compared with others in the Bay Area.

"The budget is definitely a difficult budget for a tough economic time," Brown said, noting that expenses have outstripped revenues. "You increase some fees, and you reduce the number of employees or some programs. There's no other way to do it."

Brown and City Manager Robert Bobb outlined a two-year, $1.78 billion budget that includes closing city buildings one day a month, laying off 115 city workers, closing one fire station, reducing hours at some library branches and increasing fees for services from parking to garbage collection.

The City Council is scheduled to begin a series of budget hearings on Thursday at 2 p.m. and to approve a budget in a preliminary vote on June 5.

The city projected a shortfall of $29.5 million to $46.5 million in the $387 million general fund budget, the discretionary portion of the overall budget, for the coming fiscal year beginning July 1.

City officials anticipate that revenues, which generally increase 4.6 percent a year, will grow only 2.2 percent next year due to relatively flat sales, hotel and business taxes at a time when Oakland expects to pay an additional $28 million in salaries and increased pension costs.

Like cities throughout the state, Oakland is still waiting to learn whether it will lose vehicle license fee funds the state has been paying since it reduced residents' car registration fees. If the vehicle fee reimbursement is completely cut, Oakland would lose $17 million to $18 million in the coming fiscal year. The budget projects a 50 percent loss.

Libraries and recreation centers, floated for possible closures in an earlier worst-case budget scenario, escaped relatively unscathed. But some library branches would cut back from six to five days a week, and program directors at recreation centers would be eliminated.

The fire department would close Station 2 in Jack London Square and its fireboat -- a major water source in the event of an earthquake that damages water mains -- and could close a second station next year.

Case 12-32118   Filed 02/16/13   Doc 717

Mayor submits Oakland budget;Brown's plan calls for 115 layoffs, closing fire station, program cuts   The San Francisco Chronicle MAY 14, 2003, WEDNESDAY,

Already, the department is rotating closures of two engine companies at a time.

"We'll be at a level where we where 60 years ago," Steve Splendorio, president of the firefighters union, told the council. "It continues to diminish services to the citizens of Oakland."

The police department would freeze the current number of officers and eliminate vacant positions, but the budget also increases the department's overtime budget, which it typically exceeds, by $5 million to $12.5 million. The budget also includes $1.6 million per year to pay for increased supervision and other changes mandated by the settlement in the Riders police misconduct lawsuits.

In addition, the proposed budget eliminates management positions throughout the city administration and combines several departments in an attempt to preserve basic city services, Bobb said.

Brown and Bobb are proposing $7 million in new revenue through increased fees and fines.

Parking meter rates would increase 25 cents an hour, to $1.25 downtown and $1 elsewhere. Fines for parking at an expired meter would rise from $30 to $35, and street sweeping violations would jump from $42 to $64. The city would end its ticket "give-back" program, which allows ticket writers to rip them up if drivers arrive while they're being written.

The city plans to implement a $25 to $35 annual permit fee for burglar alarms and fines starting at $100 for the 34,000 false alarm calls police respond to each year.

E-mail Janine DeFao at jdefao@sfchronicle.com.

**GRAPHIC:** PHOTO, Mayor Jerry Brown said Oakland is in better financial shape than most Bay Area cities.

**LOAD-DATE:** May 14, 2003

# Exhibit L

Case 12-32118    Filed 02/16/13    Doc 717

# GFOA of the US & Canada

- HOME
- CONTACT US
- JOIN GFOA
- MEMBER DIRECTORY
- PUBLICATIONS
- TRAINING
- CONSULTING

**Fiscal First Aid**

| Treatments to Use with Extreme Caution | |
|---|---|
| **Revenue** | **Human Resources and Benefits** |
| Levy a broad tax increase | Make across-the-board wage cuts |
| Create special taxing districts | Defer compensation |
| **Capital and Debt** | **Management Practices** |
| | Make large or sustained across-the-board budget cuts |

## Revenue

***Levy a Broad Tax Increase.*** A distressed government likely has not earned the trust of its citizens. Large tax increases may further alienate citizens, reducing their support for government, at best, and prompting a tax revolt at worst. Rather, governments should concentrate on maximizing efficiency and focusing on priority services.

*Evaluation*

- While a broad tax increase is fair – everyone pays – it may not be in the best long-term interest of government. It could reduce citizen support for government, hurt economic competitiveness, and remove pressure for needed reform. It is essential to carefully evaluate all legal and economic implications of a proposed tax increase. There may be limitations on the government's capacity as well as limitations on overlapping rates that cause conflict. Further, a tax increase may cause negative results on collections if there are large taxpayers adversely affected. Perceptions of inequity or misfeasance may also trigger expensive and extended legal battles.
- A tax increase should always be accompanied by a plan to cuts costs. This is vital for retaining credibility with the public.

Top

***Create Special Taxing Districts.*** Some states allow local government to create special districts for specific purpose and that levy their own tax. This can off-load service responsibilities and/or create a new source of revenue.

*Evaluation*

NZ-01-0000271

- Implementing special taxing districts to get around local tax limitations increases government fragmentation, thereby increasing the total price of government citizens are subject too and therefore their ability to support public services.
- Issue specific taxation creates misperceptions about community and organizational priorities leading to funding discrepancies that are difficult to address due to the myriad restrictions established through special districts, authorities, and dedicated taxes.

Top

## Human Resources and Benefits

***Make Across-the-Board Wage Cuts.*** This destroys morale and drives off high-performing employees.

*Evaluation*

- This destroys morale and drives off high-performing employees.

Top

***Defer Compensation.*** If the budget doesn't exist to pay employees today, benefits that provide compensation in the future can be provided. Examples include post-retirement health benefits or increased pension benefits.

*Evaluation*

- This only defers the financial reckoning day and can create extremely large liabilities that hit the budget much sooner than expected. This is a slippery slope and can be difficult to reverse.
- Use relevant data like OPEB liability and pension funding ratios to fully disclose and analyze the cost and impact of deferred compensation.

*Resources*
BP Ensuring the Sustainability of Other Postemployment Benefits (2007)

Top

## Management Practices

***Large or Sustained Across-the-Board Budget Cuts.*** Across the board cuts usually reduce the value created by public services, making government seem ineffective and this problem is amplified when the cuts are large or when across-the-board cuts are repeatedly used as first aid tactic. Reduced public value lowers citizen opinion of government, making it less likely they will support new taxes and fees. It could also really hurt the poor if crucial social services are diluted. These do not reflect priorities of the organization or take goals into consideration.

*Evaluation*

- Across-the-board cuts have certain, cursory sense of fairness because they "spread the pain" equally.
- However, this assumes that all services are of equal importance to the citizens and that programs have roughly equal ability to absorb cuts.
- It can be extremely difficult to communicate the impacts of across-the-board cuts to the public and governing body.
- There is a limited amount of cuts that can be made or that can be sustained for an extended period without directly impacting services. There may not be any more "fat to cut" out of City Hall.
- It can be important to future priority discussions and for citizen support of service reductions that citizens be involved and impacted by reductions. If future cuts are anticipated or the reductions are quasi-permanent, they can be mislead by the impression that earlier cuts were not real or were only a reduction of "waste."

NZ-01-0000272

Case 12-32118    Filed 02/16/13    Doc 717

Case 12-32118    Filed 02/16/13    Doc 717

*Resource*

Fiscal First Aid Quick Reference: Across the Board Budget Cuts

Top

NZ-01-0000273

# Exhibit M

*CaliforniaCityFinance.Com*

**Final** February 6, 2013

# Local Revenue Measures in California
## November 2012 Results

The November 6, 2012 presidential election featured 368 local measures in California on questions including land use development, government organization, bond authorizations and tax increases. Among these were 240 measures seeking approval for taxes, bonds or fees, including three by initiative. Three other measures sought by initiative to reduce previously approved taxes.

This volume of local measures is quite comparable to the number of local measures on each of the last two presidential election ballots in California. In November 2008, there were 233 revenue measures including 116 school bonds and taxes. In November 2004, there were 249 revenue measures including 86 school bonds or taxes.

K-12 schools districts and community colleges requested total of $14.429 billion in 106 separate bond measure authorizations for school bonds to construct facilities, acquire equipment and make repairs and upgrades. There were 25 measures to increase or extend school parcel taxes.

Among the 109 non-school local revenue measures were seven general obligation bond measures and 36 special taxes and parcel taxes requiring two-thirds voter approval. There were 35 proposals to extend or increase transactions and use taxes (so-called add-on sales taxes) and 24 proposals to increase or extend non-school parcel taxes.



**Proposed Local Revenue Measures**
**November 2012**

School Bond 106
School ParcelTax 2/3Vote, 25
SpecDistr 16
County Special Tax 12
City Special Tax or G.O.Bond 15
*2/3 Vote*
City General Taxes 60
County General Taxes 6
*Majority Vote*

© 2012 Michael Coleman

**Types of Non-School Local Tax Measures**
November 2012

UUT 2/3vote 1
PropTransf Tax MajVote 1
General Tax-Other 4*
SalesTax 2/3vote 7
ParcelTax 2/3vote 24*
SpecialTax-Other 2/3vote, 4
G.O. Bond 2/3vote, 7
BusinessTax MajVote 7*
SalesTax MajVote, 28
UtilityUsers Tax MajVote, 8
HotelTax MajVote 17*

*Vacaville's Measure M combined a business license tax, parcel tax and hotel tax. It is counted here as a "General Tax - other"

© 2012 Michael Coleman

2217 Isle Royale Lane • Davis, CA • 95616-6616
Phone: 530.758.3952 • Fax: 530.758.3952

Case 12-32118    Filed 02/16/13    Doc 717

## Overall Passage Rates

Following post-election night canvases and recounts, five additional 55% school bond measures and one additional two-thirds vote school parcel tax were declared passing.  This brings the total number of passing measures to 178 of the 240 tax/revenue measures proposed.

### Local Revenue Measures November 2012

|  | Total | Pass | Passing% |
|---|---|---|---|
| City General Tax (Majority Vote) | 60 | 48 | 80% |
| County General Tax (Majority Vote) | 6 | 4 | 67% |
| City SpecialTax orG.O.bond (2/3 Vote) | 15 | 5 | 33% |
| County (Special Tax) 2/3 Vote | 12 | 7 | 58% |
| Special District (2/3) | 16 | 7 | 44% |
| School ParcelTax2/3 | 25 | 16 | 64% |
| School Bond 2/3 | 1 | 1 | 100% |
| School Bond 55% | 105 | 90 | 86% |
| Total | 240 | 178 | 74% |
| Redux by intitative | 3 | 0 | 0% |

The rate of passage of school measures slightly exceeded historic passage rates.  Final results indicate 90 of the 105 55% school bonds passed.  The one two- thirds vote school bond passed as well as 16 of the 25 school parcel taxes.



School Tax & Bond Measures November 2012

*One school bond required two-thirds aproval.  It passed.

Local non-school majority vote tax measures did somewhat better this election than in prior years with 52 of 66 passing.  Among the failing measures were three taxes proposed in San Diego County cities as a part of marijuana dispensary initiatives.  These taxes on the sale of marijuana probably could not have been implemented had they passed.

Among the 43 non-school special taxes, parcel taxes and bonds requiring two-thirds voter approval, 19 passed, a very similar passage rate compared to past elections.

Case 12-32118    Filed 02/16/13    Doc 717

## City / County / Special District Tax & Bond Measures November 2012



General purpose tax measures fared especially well, especially add-on sales taxes (local transactions and use taxes). Parcel taxes and G.O. bonds had a much more difficult time, mostly, it appears, due to the two-thirds supermajority vote thresholds. Five of the 25 non-school parcel taxes failed to even garner 50% yes votes.

## Passing and Failing City / County / Special District Measures by Type November 2012



## Local Add-On Sales Taxes (Transaction and Use Taxes)

Final Results of Local Revenue Measures November 2012          – 4 –          Rev February 6, 2013

   Twenty five cities and three counties proposed general purpose majority vote add-on sales tax rates ranging from 1/8 percent in Santa Clara County to one percent in several cities.   Voters approved all but three of these measures.

### Transactions and Use Tax (Add-on Sales Tax) - General Tax - Majority Approval

| Agency Name | County | | Rate | Sunset | YES% | NO% | |
|---|---|---|---|---|---|---|---|
| Albany | Alameda | Measure F | 1/2 cent | | 79.0% | 21.0% | PASS |
| Culver City | Los Angeles | Measure Y | 1/2percent | 10 yrs | 76.6% | 23.4% | PASS |
| Lathrop | San Joaquin | Measure C | 1cent | | 76.0% | 24.1% | PASS |
| Salinas | Monterey | Measure E | 1/2cent | extend | 75.7% | 24.3% | PASS |
| Carmel | Monterey | Measure D | 1cent | 10yrs | 75.4% | 24.6% | PASS |
| Nevada City | Nevada | Measure L | 3/8cent | 5yrs | 74.2% | 25.8% | PASS |
| Sebastopol | Sonoma | Measure Y | 1/2cent | 8yrs | 70.8% | 29.2% | PASS |
| Williams | Colusa | Measure G | 1/2cent | extend | 70.5% | 29.5% | PASS |
| Rio Vista | Solano | Measure O | 3/4cent | 5yrs | 70.2% | 29.8% | PASS |
| Moraga | Contra Costa | Measure K | 1cent | 20yrs | 70.1% | 29.9% | PASS |
| Orinda | Contra Costa | Measure L | 1/2cent | 10yrs | 69.1% | 30.9% | PASS |
| Vacaville | Solano | Measure M | 1/4cent | 5yrs | 69.0% | 31.0% | PASS |
| Commerce | Los Angeles | Measure AA | 1/2percent | | 67.3% | 32.7% | PASS |
| Fairfield | Solano | Measure P | 1cent | 5yrs | 66.5% | 33.6% | PASS |
| Grass Valley | Nevada | Measure N | 1/2cent | 10yrs | 66.3% | 33.7% | PASS |
| La Mirada | Los Angeles | Measure I | 1cent | 5yrs | 66.0% | 34.0% | PASS |
| County of San Mateo | San Mateo | Measure A | 1/2cent | 10years | 64.6% | 35.5% | PASS |
| Sacramento | Sacramento | Measure U | 1/2cent | 6yrs | 63.1% | 36.9% | PASS |
| Paso Robles | San Luis Obis | Measure E | 1/2cent | 12yrs | 59.0% | 41.0% | PASS |
| | | Measure F | Advisory | | 71.3% | 28.7% | PASS |
| Hollister | San Benito | Measure E | 1cent | extend   5yrs | 57.4% | 42.6% | PASS |
| County of Santa Clara | Santa Clara | Measure A | 1/8cent | | 56.3% | 43.7% | PASS |
| Trinidad | Humboldt | Measure G | 3/4cent | 4/1/2013 for 4yrs | 55.4% | 44.6% | PASS |
| Healdsburg | Sonoma | Measure V | 1/2cent | 10yrs | 55.4% | 44.6% | PASS |
| Half Moon Bay | San Mateo | Measure J | 1/2 cent | 3yrs | 53.9% | 46.1% | PASS |
| Capitola | Santa Cruz | Measure O | 1/4cent | | 50.8% | 49.2% | PASS |
| Yucca Valley | San Bernardin | Measure U | 1cent | | 48.2% | 51.8% | FAIL |
| County of Plumas | Plumas | Measure D | 1/4cent | 4yrs | 36.2% | 63.8% | FAIL |
| Maricopa (224 voters) | Kern | Measure R | 1cent | 10yrs | 32.6% | 67.4% | FAIL |

   There were seven add-on sales tax measures earmarked for specific purposes.  Five of these were county-wide measures.  All seven received over 60% yes votes, but four fell short of the two-thirds approval needed including transportation measures in Alameda and Los Angeles and two measures related to roads and water quality in Lake County.

## Transactions and Use Tax (Add-on Sales Tax) - Special Tax - Two-Thirds Approval

| Agency Name | County | Rate | Purpose | | Sunset | YES% | NO% | |
|---|---|---|---|---|---|---|---|---|
| County of Napa | Napa | Measure T  1/2cent | streets (was flood) extend 25yrs after 2018 | | | 74.4% | 25.6% | PASS |
| County of Marin | Marin | Measure A  1/4cent | openspace | | | 73.6% | 26.4% | PASS |
| County fo Fresno | Fresno | Measure B  1/8cent | Library | extend | 16yrs | 71.8% | 28.3% | PASS |
| County of Alameda | Alameda | Measure B1 1/2c+1/2c=1cent | transportation | extends&incr | | 65.5% | 34.5% | FAIL |
| County of Los Angeles | Los Angeles | Measure J  1/2cent | transportation | extend | 30yrs | 64.7% | 35.3% | FAIL |
| County of Lake | Lake | Measure E  1/2cent | water quality | | | 62.2% | 37.8% | FAIL |
| Clearlake | Lake | Measure G  1cent | streets/roads | | | 61.1% | 38.9% | FAIL |

## Transient Occupancy (Hotel) Taxes

There were eighteen measures to increase or expand Transient Occupancy (Hotel) Taxes.  All but three passed.  Plymouth voters also approved a companion advisory measure that expresses the preference that "the additional revenues be used primarily for the purpose of  repairing and maintaining the city's roadways."

### Transient Occupancy Tax Tax Measures: All General Majority Vote

| Agency Name | County | | Rate | YES% | NO% | |
|---|---|---|---|---|---|---|
| Santa Cruz | Santa Cruz | Measure Q | +1%to11% | 82.1% | 17.9% | PASS |
| Vacaville | Solano | Measure L | +2%TOT* | 80.1% | 19.9% | PASS |
| Carpinteria | Santa Barbara | Measure E | +2%to12% | 77.6% | 22.4% | PASS |
| Menlo Park | San Mateo | Measure K | +2%to12% | 73.6% | 26.4% | PASS |
| County of Santa Cruz | Santa Cruz | Measure N | +1.5%to11% | 72.1% | 27.9% | PASS |
| Goleta | Santa Barbara | Measure H | +2%to12% | 71.5% | 28.5% | PASS |
| Exeter | Tulare | Measure M | +4%to8% | 66.2% | 33.8% | PASS |
| Garden Grove | Orange | Measure Y | +1.5%to14.5% | 66.1% | 33.9% | PASS |
| County of Amador | Amador | Measure Q | +4%to10% | 60.5% | 39.5% | PASS |
| Coronado | San Diego | Proposition F | +2%to10% | 60.5% | 39.5% | PASS |
| Plymouth | Amador | Measure R | +4%to10% | 57.5% | 42.5% | PASS |
| | | Measure S | Advisory | 65.0% | 35.0% | PASS |
| Solvang | Santa Barbara | Measure Z | +2%to12% | 57.2% | 42.8% | PASS |
| Santee | San Diego | Proposition U | +4%to10% | 56.6% | 43.4% | PASS |
| Buellton | Santa Barbara | Measure D | +2%to12% | 54.8% | 45.2% | PASS |
| Willows | Glenn | Measure Q | +2%to12% | 52.9% | 47.2% | PASS |
| Pomona | Los Angeles | Measure V | +2%to12% | 48.2% | 51.8% | FAIL |
| County of Plumas | Plumas | Measure C | +2%to11% | 41.1% | 58.9% | FAIL |
| Red Bluff | Tehama | Measure A | 10% camping/RV | 39.6% | 60.4% | FAIL |

*measure is an "excise tax" also includes BLT, etc.*

## Utility User Taxes

Voters in ten cities considered measures to increase or expand utility user taxes. Several of the proposals were to modernize existing taxes on telecommunications and among these, five proposed a reduction in the tax rate as a part of effectively expanding the tax base to wireless communications. Chico is one of very few cities to have rejected this approach at the polls.

Among the ten measures, only Citrus Heights earmarked the tax for specific purposes. But voters rejected the proposed increase.

Voters in Arcata approved a novel UUT, a 45% tax on excessive electricity use aimed at home grow houses.

### Utility User Taxes

| Agency Name | County | | Rate | | %Needed | YES% | NO% | |
|---|---|---|---|---|---|---|---|---|
| Berkeley | Alameda | Measure Q | same7.5% | expand/reduce | 50.0% | 84.5% | 15.5% | PASS |
| San Luis Obispo | San Luis Obispo | Measure D | to4.8%from5% | expand/reduce | 50.0% | 83.5% | 16.5% | PASS |
| Downey | Los Angeles | Measure D | 5%to4.8% | expand/reduce | 50.0% | 79.4% | 20.6% | PASS |
| Pinole | Contra Costa | Measure M | 8% | extend | 50.0% | 78.7% | 21.3% | PASS |
| Los Alamitos | Orange | Measure DD | 6%to5% | expand/reduce | 50.0% | 69.5% | 30.5% | PASS |
| Arcata | Humboldt | Measure I | 45% on excessive electric use | new | 50.0% | 69.0% | 31.0% | PASS |
| Bellflower | Los Angeles | Measure P | 2% | increase | 50.0% | 61.3% | 38.7% | PASS |
| Needles* | San Bernardino | Measure T | +2.5%-2.5%fee=no change | validate/extend | 50.0% | 51.4% | 48.6% | PASS |
| Chico | Butte | Measure J | 5%to4.5% | expand/reduce | 50.0% | 46.9% | 53.2% | FAIL |
| Citrus Heights | Sacramento | Measure K | +1.75%to4.25% | increase | 66.7% | 44.2% | 55.8% | FAIL |

## Business License Taxes

There were eight business license tax measures, including two proposals to tax sugared beverages, a new idea among local measures in California. A proposal to increase local taxes on "businesses engaged in the manufacture, piping, refining, storage and wholesale distribution of petroleum products" failed in Rialto. The sugared beverage taxes were resoundingly rejected. Companion measures in both cities that expressed the preferred use of the funds for particular programs did not help. Six other measures passed easily.

### Business License Tax Measures: Majority Vote General

| Agency Name | County | | Rate | YES% | NO% | |
|---|---|---|---|---|---|---|
| Vacaville* | Solano | Measure L | | 80.1% | 19.9% | PASS |
| Rancho Cordova | Sacramento | Measure L | cardrooms | 79.3% | 20.7% | PASS |
| Needles | San Bernardino | Measure S | tax on Marijuana | 79.3% | 20.7% | PASS |
| Artesia | Los Angeles | Measure M | general incr | 78.0% | 22.0% | PASS |
| San Francisco | San Francisco | Proposition E | gross rcpts | 70.6% | 29.4% | PASS |
| Rialto | San Bernardino | Measure V | on petrol busn | 47.1% | 52.9% | FAIL |

*measure is an "excise tax" also includes TOT, parcel tax

### Sugared Beverage Taxes

| Agency Name | County | | YES% | NO% | |
|---|---|---|---|---|---|
| Richmond | Contra Costa | Measure N | 33.1% | 66.9% | FAIL |
| El Monte | Los Angeles | Measure H | 23.2% | 76.8% | FAIL |

## Property Transfer Tax

A proposal to increase the property transfer tax in Pomona failed.  Pomona pursued the ill-advised approach of placing multiple tax measures on the ballot at once: a hotel tax, a parcel tax (2/3 vote), and this property transfer tax.   All failed.

### Property Transfer Taxes

| Agency Name | County | Measure Na | Rate | YES% | NO% | |
|---|---|---|---|---|---|---|
| Pomona | Los Angeles | Measure W | from $1.10 to $2.20 | 24.6% | 75.4% | FAIL |

## Parcel Taxes and Special Taxes (non-school)

There were 25 parcel taxes including 13 in special districts, ten in cities, and two in counties.  Under a state constitutional provision included in Proposition 13 (1978), parcel taxes require two-thirds supermajority approval.  Ten of 25 measures passed.   Among these ten, six extended – but did not increase – existing parcel taxes.

An initiative measure to revise and reduce a fire parcel tax in Newcastle was rejected by voters in that community.  The measure received 61% approval but required two-thirds approval.

### City, County and Special District Parcel Taxes (2/3 vote)

| Agency Name | County | | Amount | Purpose | YES% | NO% | |
|---|---|---|---|---|---|---|---|
| Vacaville* | Solano | Measure L | $58/parcel | general -extend | 80.1% | 19.9% | PASS |
| Circle XX Community Services District | Calaveras | Measure D | +$100 to $400 | roads | 78.3% | 21.7% | PASS |
| Santa Monica Mountains Rec Consv Au | Los Angeles | Measure HH | $24/parcel | open space | 76.2% | 23.8% | PASS |
| Santa Clara Valley Water District | Santa Clara | Measure B | $56/parcel | water -extend | 72.7% | 27.4% | PASS |
| Ross | Marin | Measure D | $950/parcel | general -extend/rec | 72.3% | 27.7% | PASS |
| Groveland Community Services District | Tuolumne | Measure G | $70/parcel | EMS -extend | 69.4% | 30.6% | PASS |
| Piedmont | Alameda | Measure Y | varies | general -extend | 68.7% | 31.3% | PASS |
| Santa Monica Mountains Rec Consv Au | Los Angeles | Measure MM | $19/Parcel | open space | 68.1% | 32.0% | PASS |
| Cayucos Fire Protection District | San Luis Obispo | Measure C | $25/parcel | Fire/EMS -extend | 67.9% | 32.1% | PASS |
| Wildomar | Riverside | Measure Z | $28/parcel | parks/rec | 66.8% | 33.2% | PASS |
| Mesa Parks Firehouse Community Park A | Marin | Measure E | $49/parcel | parks/rec | 65.4% | 34.6% | FAIL |
| County of Alameda | Alameda | Measure A1 | $12/parcel | zoo | 62.7% | 37.3% | FAIL |
| Rancho Adobe Fire Protection District | Sonoma | Measure Z | +$60/parcel | Fire/EMS | 62.6% | 37.4% | FAIL |
| Petaluma | Sonoma | Measure X | $52/parcel | parks/rec | 61.1% | 38.9% | FAIL |
| Pomona | Los Angeles | Measure X | $37/parcel | Library | 60.2% | 39.8% | FAIL |
| Berkeley | Alameda | Measure O | $0.00779/sqft | pools | 59.7% | 40.4% | FAIL |
| Guadalupe | Santa Barbara | Measure I | $20/parcel | libraries | 56.5% | 43.5% | FAIL |
| McCloud Community Services District | Siskiyou | Measure Q | $12/parcel | Library | 52.7% | 47.3% | FAIL |
| Contra Costa County Fire Protection Dist | Contra Costa | Measure Q | $75/sfu | Fire/EMS | 52.5% | 47.6% | FAIL |
| Black Mountain Fire and Emergency Res | Siskiyou | Measure P | $30/parcel | Fire/EMS | 50.0% | 50.0% | FAIL |
| Spalding Community Services District | Lassen | Measure V | $70/parcel | Fire/EMS | 46.4% | 53.6% | FAIL |
| County of El Dorado | El Dorado | Measure L | $17.58/parcel | Library -extend | 44.3% | 55.7% | FAIL |
| Laguna Beach | Orange | Measure CC | $120/parcel | open space | 44.1% | 55.9% | FAIL |
| Lassen Community Library District | Lassen | Measure W | $28/parcel | Library | 42.7% | 57.3% | FAIL |
| Indian Wells | Riverside | Measure R | $171/parcel | lighting/landscapi | 26.8% | 73.2% | FAIL |

## Abandoned Vehicle Abatement Taxes

Four counties had measures to extend $1 per motor vehicle charges to fund abandoned vehicle abatement programs.  These charges were once imposed by the County Boards of Supervisors as fees without a vote of the people.  The passage of Proposition 26 in 2010 requires voter approval as taxes of any extension of these charges.  All four measures passed.

### Abandoned Vehicle Abatement Tax
### (Fees prior to Prop26 of 2010) - 2/3 voter approval required

| County of Mendocino | Measure G | $1/veh | **78.8%** | 21.2% | PASS | extend |
|---|---|---|---|---|---|---|
| County of Butte | Measure H | $1/veh | **73.4%** | 26.6% | PASS | extend |
| County of Calaveras | Measure B | $1/veh | **70.9%** | 29.1% | PASS | extend |
| County of Amador | Measure U | $1/veh | **68.8%** | 31.2% | PASS | extend |

## General Obligation Bonds

There were seven local general obligation bond measures in three cities and three special districts. The three passing measures are all in the San Francisco Bay Area.  Voters in Berkeley approved a bond for critical drainage and water quality improvements but turned failed to garner the two-thirds approval needed for a parks improvement bond.   A hospital bond in Fremont and a parks and environmental clean-up bond in San Francisco also passed.

### City, County and Special District Bond Measures (2/3 vote)

| **Agency Name** | **County** | | **Amount** | | **YES%** | **NO%** | |
|---|---|---|---|---|---|---|---|
| Berkeley | Alameda | Measure M | $30 million | drainage/waterqua | **73.3%** | 26.7% | PASS |
| Washington Township Health Care Distri | Alameda | Measure Z | $186 million | hospital | **73.0%** | 27.0% | PASS |
| San Francisco | San Francisco | Proposition B | $195million | park/rec/env-clean | **72.0%** | 28.0% | PASS |
| Berkeley | Alameda | Measure N | $19.4million | park/rec | 62.1% | **37.9%** | FAIL |
| El Medio Fire Protection District | Butte | Measure M | $1million | fire | 56.5% | **43.5%** | FAIL |
| Rio Dell | Humboldt | Measure J | $2million | streets | 54.9% | **45.1%** | FAIL |
| Truckee Donner Recreation and Park Dist | Nevada/Placer | Measure J | $8.52million | parks/rec | 54.1% | **45.9%** | FAIL |

## School Parcel Taxes

School parcel taxes fared better than non-school parcel taxes.  The ballot included 25 local school parcel taxes.  Sixteen passed.  San Leandro USD's tax passed by 24 votes after training in the election night tally.  Historically, around four out of five school parcel tax measures are approved.

### School Parcel Taxes (2/3 voter approval)

| Agency Name | County | | Rate | YES% | NO% | |
|---|---|---|---|---|---|---|
| Berryessa Union School District | Santa Clara | Measure K | $79/parcel | 77.3% | 22.7% | PASS |
| Arcata Elementary School District | Humboldt | Measure E | $49/parcel | 77.3% | 22.7% | PASS |
| West Contra Costa Unified School | Contra Costa | Measure G | 7.2c/sf | 74.7% | 25.4% | PASS |
| Little Lake City USD | Los Angeles | Measure TT | $48/parcel | 74.1% | 25.9% | PASS |
| San Francisco Community College | San Francisco | Proposition A | $79/parcel | 72.5% | 27.5% | PASS |
| West Sonoma County Union Hi | Sonoma | Measure K | $48/parcel | 72.3% | 27.7% | PASS |
| Shoreline Unified School District | Marin/Sonoma | Measure C | $185/parcel | 71.5% | 28.5% | PASS |
| Sebastopol Union School District | Sonoma | Measure O | $76/parcel | 71.4% | 28.6% | PASS |
| Mill Valley School District | Marin | Measure B | $196/parcel | 70.4% | 29.6% | PASS |
| Santa Barbara Elementary SD | Santa Barbara | Measure B | $48/parcel | 69.6% | 30.4% | PASS |
| Centinela Valley Union High School | Los Angeles | Measure CL | 2c/sf | 69.5% | 30.5% | PASS |
| Davis Joint Unified School District | Yolo/Solano | Measure E | $204/parcel | 68.9% | 31.1% | PASS |
| Santa Barbara Unified SD | Santa Barbara | Measure A | $45/parcel | 68.6% | 31.4% | PASS |
| Martinez Unified School District | Contra Costa | Measure C | $55/parcel | 67.7% | 32.3% | PASS |
| Ventura Unified School District | Ventura | Measure Q | $59/parcel | 67.1% | 32.9% | PASS |
| San Leandro Unified School Dis | Alameda | Measure L | $39/parcel | 66.8% | 33.3% | PASS |
| Pacific Grove Unified School Dis | Monterey | Measure A | $65/parcel | 66.4% | 33.6% | FAIL |
| Fort Ross School District | Sonoma | Measure L | $48/parcel | 65.4% | 34.6% | FAIL |
| Contra Costa Community College | Contra Costa | Measure A | $11/parcel | 64.8% | 35.2% | FAIL |
| Three Rivers School District | Tulare | Measure I | $60/parcel | 61.6% | 38.4% | FAIL |
| Chabot-Las Positas Community | Alameda/Contra | Measure I | $28/parcel | 62.5% | 37.5% | FAIL |
| San Bruno Park SD | San Mateo | Measure G | $199/parcel | 58.5% | 41.5% | FAIL |
| Westside Union SD | Los Angeles | Measure WP | $96/parcel | 53.6% | 46.4% | FAIL |
| Mohave Unified School District | Kern | Measure N | $42/parcel | 50.4% | 49.6% | FAIL |
| Pleasant Ridge Union School Di | Nevada | Measure K | $92/parcel | 36.7% | 63.3% | FAIL |

## Fiscal Referenda

Local voters in effect rejected three citizen advanced measures to overturn or alter existing taxes.  The approval of Measure AA in Huntington Beach validates the city's taxes extended to the annexed area of Sunset Beach.

### Referenda concerning municipal fees or taxes

| Agency Name | | Rate | YES% | NO% | |
|---|---|---|---|---|---|
| Newcastle Fire Protection | Measure K | retain existing tax structure | 61.5% | 38.5% | FAIL |
| Huntington Beach | Measure Z | retain PropProp13 Property Tax rate for employee retirement | 49.6% | 50.4% | FAIL |
| Huntington Beach | Measure AA | retain taxes on annexed Sunset Beach area | 84.0% | 16.0% | PASS |

## School Bonds

There were 106 school bond measures on the ballot for a total of over $14.429 billion in bonds. All but one required 55% approval. Final tabulations show 91 of the measures passed for bonds totaling $13.279 billion, among these a $2.8 billion bond in San Diego.

### School Bond Measures

| Agency Name | County | | Amount | YES% | NO% | |
|---|---|---|---|---|---|---|
| Inglewood USD | Los Angeles | Measure GG | $90million | 85.9% | 14.1% | PASS |
| Oakland Unified School District | Alameda | Measure J | $475million | 84.9% | 15.1% | PASS |
| Earlimart School District | Tulare | Measure H | $3.6million | 81.3% | 18.7% | PASS |
| Alum Rock Union School District | Santa Clara | Measure J | $125million | 78.8% | 21.2% | PASS |
| Pacific Elementary School District | Santa Cruz | Measure M | $0.83million | 78.0% | 22.0% | PASS |
| Ocean View School District | Ventura | Measure P | $4.2million | 77.4% | 22.6% | PASS |
| Jefferson Elementary SD | San Mateo | Measure P | $67.5million | 76.2% | 23.8% | PASS |
| Little Lake City USD | Los Angeles | Measure EE | $18million | 75.8% | 24.2% | PASS |
| Hueneme Elementary School District | Ventura | Measure T | $19.6million | 75.7% | 24.3% | PASS |
| McFarland Unified School District | Kern | Measure M | $25million | 75.2% | 24.8% | PASS |
| Arcata Elementary School District | Humboldt | Measure F | $7million | 74.8% | 25.2% | PASS |
| South Bay Union School District | San Diego | Proposition Y | $26million | 74.3% | 25.7% | PASS |
| Soledad Unified School District | Monterey | Measure C | $40million | 73.7% | 26.3% | PASS |
| Mt. Pleasant School District | Santa Clara | Measure L | $25million | 73.6% | 26.4% | PASS |
| Jefferson Union High SD | San Mateo | Measure E | $41.9million | 73.5% | 26.5% | PASS |
| Mendota Unified School District | Fresno | Measure M | $19million | 73.3% | 26.7% | PASS |
| Palmdale SD | Los Angeles | Measure DD | $220million | 72.8% | 27.2% | PASS |
| Washington Unified School District | Fresno | Measure W | $22million | 72.5% | 27.5% | PASS |
| Covine-Valley USD | Los Angeles | Measure CC | $129million | 72.4% | 27.6% | PASS |
| Stockton Unified School District | San Joaquin | Measure E | $156million | 72.1% | 28.0% | PASS |
| Whittier Elementary SD | Los Angeles | Measure Z | $55million | 71.9% | 28.1% | PASS |
| Bellflower USD | Los Angeles | Measure BB | $79million | 71.6% | 28.4% | PASS |
| Delhi Unified School District | Merced | Measure E | $8million | 70.8% | 29.2% | PASS |
| East Side Union High School District | Santa Clara | Measure I | $120million | 70.5% | 29.5% | PASS |
| San Jose Unified School District | Santa Clara | Measure H | $290million | 70.3% | 29.8% | PASS |
| Cerritos CCD | Los Angeles | Measure G | $350million | 69.9% | 30.1% | PASS |
| San Bernardino City Unified | San Bernardino | Measure N | $250million | 69.6% | 30.4% | PASS |
| Folsom Cordova Unified School District | Sacramento | Measure P | $68million | 69.4% | 30.6% | PASS |
| Rancho Santiago Community College Dist | Orange | Measure Q | $198million | 69.3% | 30.7% | PASS |
| Standard School District | Kern | Measure Q | $11.2million | 69.2% | 30.8% | PASS |
| Lancaster USD | Los Angeles | Measure L | $63million | 68.8% | 31.2% | PASS |
| Sacramento City Unified School District | Sacramento | Measure Q | $346million | 68.8% | 31.3% | PASS |
| Roseland School District | Sonoma | Measure N | $7million | 68.2% | 31.8% | PASS |
| Sanger Unified School District | Fresno | Measure S | $50million | 68.1% | 31.9% | PASS |
| Hemet Unified School District | Riverside | Measure U | $49million | 68.0% | 32.0% | PASS |
| Santa Monica-Malibu USD | Los Angeles | Measure ES | $385million | 67.7% | 32.3% | PASS |
| El Camino CCD | Los Angeles | Measure E | $350million | 67.6% | 32.4% | PASS |
| Rowland USD | Los Angeles/Or | Measure R | $158.8million | 67.6% | 32.4% | PASS |
| Somis Union School District | Ventura | Measure S | $9million | 67.4% | 32.6% | PASS |
| Chula Vista Elementary School District | San Diego | Proposition E | $90million | 66.9% | 33.1% | PASS |

## School Bond Measures (continued)

| Agency Name | County | | Amount | YES% | NO% | |
|---|---|---|---|---|---|---|
| Pajaro Valley Unified School Dis | Santa Cruz / Mo | Measure L | $150million | 66.7% | 33.3% | PASS |
| San Carlos SD | San Mateo | Measure H | $72million | 66.7% | 33.3% | PASS |
| Sacramento City Unified School | Sacramento | Measure R | $68million | 66.6% | 33.4% | PASS |
| Burlingame Elementary SD | San Mateo | Measure D | $56million | 66.4% | 33.6% | PASS |
| Visalia Unified School District | Tulare | Measure E | $60.1million | 66.1% | 33.9% | PASS |
| Oxnard School District | Ventura | Measure R | $90million | 65.6% | 34.4% | PASS |
| Brawley Elementary SD | Imperial | Measure S | $7.5million | 65.3% | 34.7% | PASS |
| Gravenstein Union School Distri | Sonoma | Measure M | $6million | 65.1% | 34.9% | PASS |
| Coachella Valley Unified School | Riverside/Imper | Measure X | $41million | 64.6% | 35.4% | PASS |
| Castaic USD | Los Angeles | Measure QS | $51million | 64.5% | 35.5% | PASS |
| Caruthers Unified School Distric | Fresno | Measure C | $12million | 64.3% | 35.7% | PASS |
| Morgan Hill Unified School Dist | Santa Clara | Measure G | $198.25million | 64.0% | 36.0% | PASS |
| Panama-Buena Vista Union Scho | Kern | Measure P | $147million | 63.7% | 36.3% | PASS |
| West Contra Costa Unified Scho | Contra Costa | Measure E | $360million | 63.5% | 36.5% | PASS |
| Redondo Beach USD | Los Angeles | Measure Q | $63million | 63.4% | 36.7% | PASS |
| Chico Unified School District | Butte | Measure E | $78million | 63.3% | 36.7% | PASS |
| Temple City USD | Los Angeles | Measure S | $128.8million | 63.1% | 36.9% | PASS |
| Temecula Valley Unified School | Riverside | Measure Y | $165million | 63.0% | 37.0% | PASS |
| Escalon Unified School District | San Joaquin | Measure B | $19.5million | 63.0% | 37.0% | PASS |
| Nuview Union School District | Riverside | Measure V | $4million | 63.0% | 37.0% | PASS |
| Chaffey Joint Union High Schoo | San Bernardino | Measure P | $848million | 62.9% | 37.1% | PASS |
| Solano Community College Distr | Yolo/Solano | Measure Q | $348million | 62.3% | 37.7% | PASS |
| Wilmar Union School District | Sonoma | Measure P | $4million | 62.3% | 37.7% | PASS |
| Alvord Unified School District | Riverside | Measure W | $79million | 61.8% | 38.2% | PASS |
| Antioch Unified School District | Contra Costa | Measure B | $56.5million | 61.6% | 38.5% | PASS |
| Westside Union SD | Los Angeles | Measure WR | $18.5million | 61.4% | 38.6% | PASS |
| Kings Canyon Joint Unified Sch | Fresno/Tulare | Measure K | $40million | 60.8% | 39.2% | PASS |
| Wheatland Union High School I | Yuba | Measure U | $9million | 60.8% | 39.2% | PASS |
| San Diego Unified School Distri | San Diego | Proposition Z | $2800million | 60.3% | 39.8% | PASS |
| La Habra City School District | Orange | Measure O | $31million | 60.2% | 39.8% | PASS |
| Fortuna High School District | Humboldt | Measure D | $10million | 60.0% | 40.0% | PASS |
| Perris Union High School Distric | Riverside | Measure T | $153.42million | 59.5% | 40.5% | PASS |
| Spreckels Union School District | Monterey | Measure B | $7million | 59.0% | 41.0% | PASS |
| Tustin Unified School District | Orange | Measure S | $135million | 58.8% | 41.2% | PASS |
| San Juan Unified School District | Sacramento | Measure N | $350million | 58.3% | 41.7% | PASS |
| St. Helena Unified School Distri | Napa | Measure C | $30million | 57.6% | 42.4% | PASS |
| Templeton Unified School Distri | San Luis Obispo | Measure H | $35million | 57.3% | 42.7% | PASS |
| Lindsay Unified School District | Tulare | Measure L | $16million | 57.1% | 42.9% | PASS |
| West Hills Community College I | Fresno/Kings | Measure L | $12.655million | 56.8% | 43.2% | PASS |
| Ripon Unified School District | San Joaquin | Measure G | $25.2million | 56.6% | 43.4% | PASS |
| Grossmont-Cuyamaca Communi | San Diego | Proposition V | $398million | 56.5% | 43.5% | PASS |
| Cajon Valley Union School Distr | San Diego | Proposition C | $88.4million | 56.4% | 43.6% | PASS |
| Weaver Union School District | Merced | Measure G | $9million | 56.1% | 43.9% | PASS |
| Coast Community College Distri | Orange | Measure M | $698million | 56.0% | 44.1% | PASS |

## School Bond Measures (continued)

| Agency Name | County | | Amount | YES% | NO% | |
|---|---|---|---|---|---|---|
| Anderson Union High School District | Shasta | Measure C | $12.3million | 55.9% | 44.1% | PASS |
| Lynwood USD | Los Angeles | Measure K | $93million | 55.7% | 44.3% | PASS |
| San Dieguito Union High School District | San Diego | Proposition AA | $449million | 55.5% | 44.5% | PASS |
| Sonora Union High School District | Tuolumne | Measure J | $23million | 55.3% | 44.8% | PASS |
| Dehesa School District | San Diego | Proposition D | $3million | 55.2% | 44.8% | PASS |
| San Ramon Valley Unified School District | Contra Costa | Measure D | $260million | 55.2% | 44.8% | PASS |
| Summerville Union High School District | Tuolumne | Measure H | $8million | 55.1% | 45.0% | PASS |
| MiraCosta Community College District | San Diego | Proposition EE | $497million | 54.8% | 45.2% | FAIL |
| Del Mar Union School District | San Diego | Proposition CC | $76.8million | 54.3% | 45.7% | FAIL |
| Ocean View School District | Orange | Measure P | $198million | 53.9% | 46.1% | FAIL |
| Willows Unified School District | Glenn | Measure P | $14.7million | 53.8% | 46.2% | FAIL |
| Yucaipa-Calimesa Joint Unified School Di | Riverside/SanBe | Measure O | $98million | 50.6% | 49.4% | FAIL |
| Fountain Valley School District | Orange | Measure N | $23.5million | 49.8% | 50.2% | FAIL |
| Ramona Unified School District | San Diego | Proposition R | $66million | 49.5% | 50.5% | FAIL |
| Porterville Unified School District | Tulare | Measure J | $90million | 48.6% | 51.4% | FAIL |
| Butteville Union School District | Siskiyou | Measure R | $3.5million | 46.3% | 53.7% | FAIL |
| Santa Ynez Valley High SD | Santa Barbara | Measure L | $19.84million | 46.2% | 53.8% | FAIL |
| Knightsen Elementary School District | Contra Costa | Measure H | $3million | 45.1% | 54.9% | FAIL |
| College SD | Santa Barbara | Measure K | $12million | 44.1% | 55.9% | FAIL |
| Mountain Empire Unified School District | San Diego | Proposition G | $30.8million | 43.9% | 56.1% | FAIL |
| Elk Hills School District (114 voters) | Kern | Measure O | $6.2million | 43.0% | 57.0% | FAIL |
| Gridley Unified School District | Butte | Measure G | $11million | 36.7% | 63.3% | FAIL |

## Other Measures of Interest re: Local Government Finance and Governance

### Appointed City Clerk, Treasurer, Administrator

There were ten proposals to make clerk or treasurer/auditor offices to professional appointments of the agency elected governing board.

**Appointed City Clerk / City Treasurer / etc.**

| Agency Name | | | YES% | NO% | |
|---|---|---|---|---|---|
| County of Yolo | Measure H | Appt/Consolid Auditor/Control | **65.8%** | 34.2% | PASS |
| Chico | Measure L | appt clerk | **64.4%** | 35.6% | PASS |
| Sutter Creek | Measure T | appt clerk | **61.4%** | 38.6% | PASS |
| Exeter | Measure N | appt clerk | **52.5%** | 47.5% | PASS |
| Exeter | Measure O | appt treasurer | 49.5% | **50.5%** | FAIL |
| Lincoln | Measure H | appt treasurer | 48.4% | **51.6%** | FAIL |
| Concord | Measure J | appt treasurer | 47.1% | **52.9%** | FAIL |
| County of San Mateo | Measure C | appt controller | 40.5% | **59.5%** | FAIL |
| Taft | Measure S | appt clerk | 30.3% | **69.7%** | FAIL |
| County of Los Angeles | Measure A | Appt Assessor - Advisory | 22.3% | **77.8%** | FAIL |

### Charter Cities

Voters in three cities considered becoming charter cities.

**Charter City**

| City | | YES% | NO% | |
|---|---|---|---|---|
| Escondido | Proposition P | 47.1% | **52.9%** | FAIL |
| Costa Mesa | Measure V | 40.7% | **59.3%** | FAIL |
| Grover Beach | Measure I | **50.2%** | 49.8% | PASS |

### Local Ballot Box Reaction to Citizens United

Five local measures were approved declaring that corporations are not persons. The Richmond measure reads: "Should Richmond's congressional representatives be instructed to propose, and Richmond's state legislators instructed to ratify, an amendment to the United States Constitution to provide that corporations are not entitled to the Constitutional rights of real people, and that there should be limits on all spending in political campaigns, including ballot measures and "independent" expenditures?"

**Corporations are Not Persons**

| Agency Name | | YES% | NO% | |
|---|---|---|---|---|
| Chico | Measure K | **58.1%** | 41.9% | PASS |
| Arcata | Measure H | **81.6%** | 18.4% | PASS |
| Richmond | Measure P | **72.4%** | 27.6% | PASS |
| San Francisco | Proposition G | **80.7%** | 19.3% | PASS |
| County of Mendocino | Measure F | **73.3%** | 26.7% | PASS |

Case 12-32118    Filed 02/16/13    Doc 717

## Observations

At the local government level, voters can usually connect the direct consequences of the passage or failure of a tax measure to specific public services or facilities – rather than just dollar values. This confidence and understanding in what the money will do is essential to passing a measure. By contrast, a source of the failure of many statewide tax measures has been voter uncertainty about what the funds will truly be used for, that the government has done reasonably the best it can with the revenues it already receives, and what the consequences are of passage or failure in terms of specific important public services and facilities.

The success of most city majority vote general purpose tax proposals in this election demonstrates this. Most of the successful city or county measures were majority vote general purpose taxes in cities where a majority of the voters were apparently confident that the money is necessary and trusted their local elected leaders to use it well. They had seen enough of the city's efforts to balance their budgets with existing resources and believed those efforts were sincere and that the additional tax revenue is necessary and worth paying.

On the other hand, very few non-school super-majority taxes are passing these days except for extensions of existing taxes.

But supermajority vote parcel taxes for schools continue to pass – about two out of three succeed – consistent with what we have seen historically. As for school bonds, 91 of 106 bond measures passed, slightly exceeding historic passage rates.

************

For more information: Michael Coleman 530-758-3952.  coleman@muni1.com

**Source:** County elections offices.

mc

# Exhibit N



**BEST PRACTICE**

### The Public Finance Officers Role in Sustainability (Revised) (BUDGET) (2002, 2012)

<u>Background.</u> Sustainability means "meeting the needs of the present without compromising the ability of future generations to meet their own needs."[i] The International Council for Local Environmental Initiatives (ICLEI), an international association of local governments for sustainable practices, identifies three interrelated bases of sustainability: environment, social equity, and economic (see Exhibit 1). ICLEI asserts that to act sustainably is to balance the aims of these bases with the need to use resources efficiently.[ii]



Exhibit 1 – The Three Pillars of Sustainability

Acting in a sustainable manner is in the interest of all local governments. However, it is often unclear whether a specific decision or set of decisions can be considered "sustainable." This can present a particular challenge when it comes to public finance.

<u>Recommendation.</u> The Government Finance Officers Association (GFOA) recommends that finance officers take an active role in their governments' efforts to think and act sustainably. Below are a number of tasks that the finance officer can undertake to support sustainability.

**Helping to Define "Sustainability."** Each government should define "sustainability" for itself. Some governments may emphasize one of ICLEI's three bases over the others or emphasize particular elements within a base. The objective is to reach a shared understanding of what sustainability means, while providing a definition that is specific enough to apply to a given project, program, or policy. Governments should also clarify whether their definition of sustainability applies only to the organization or to the community that the government serves. Of course, a broader definition will be more challenging to implement and will have different implications for which strategies are selected. The finance officer can contribute to this conversation by highlighting the need to balance the aims of environmental, social, and economic sustainability with the need to use resources efficiently.

In particular, the finance officer should suggest a definition for "financial sustainability," which can support the imperative to use resources efficiently. A starting point for the definition of financial sustainability is "a government's ability to manage its finances so it can meet its spending commitments, both now and in the future," and whether "it ensures future generations of taxpayers do not face an unmanageable bill for government services provided to the current generation."[iii] The finance officer should facilitate a discussion of what it means to be financially sustainable, with the objective of arriving at a set of principles that elected and appointed officials both agree to.[iv] These principles serve as the starting point for developing more detailed policies and are the basis for evaluating financial decisions.

**Reporting.** Once a definition of sustainability has been established, the finance officer should develop reporting methods that encompass environmental, social, and economic concerns. The objective is to help decision-makers better understand the implications of their decisions by developing salient measures of sustainability and demonstrating the impact of decisions on those measures (see Exhibit 2 for examples). Trends and the projected long-term disposition of these measures should be reviewed as part of the planning and budgeting process in order to assess the effectiveness of existing programs and to highlight where greater efforts may be needed.

> **Exhibit 2 - Examples of Sustainability Measures[v]**
> Environmental
> - Waste: Trends in recycling, refuse, and yard waste.
> - Water: Water consumption
> - Transportation: Public transit ridership
> Economic
> - Personal income: Personal income per capita
> - Unemployment: Unemployment rate
> - Competitiveness: Third-party reports that rank the region
> Social
> - Safety and security: Crime statistics
> - Education: Degree attainment levels of citizens
> - Health and wellness: Infant mortality & blood lead levels

**Analyzing Return on Investment.** The finance officer should develop systems to analyze the return on investment (ROI) on projects/programs. This includes mechanisms that articulate less tangible benefits or costs that are difficult to translate into real dollar impacts (e.g., impacts made on measures of environmental, economic, and/or social sustainability), but that still highlights the real-dollar short, medium, and long-term affordability of an investment. The ROI analysis should highlight projects with material intangible benefits or costs. This will help decision-makers come to a more informed choice about the potential investment, based not just on the hard-dollar impact, but also on balancing competing goals.

Importantly, the application of ROI analysis should not be limited to capital projects. It could, for example, be applied to evaluating a tax change or a new fee intended to change certain behaviors on the part of constituents. Hence, the finance officer must both acclimate the organization to applying ROI analysis more broadly *and* develop ROI tools that are adaptable to different circumstances.

Finally, beyond just calculating an expected ROI, the finance officer should develop a monitoring system to determine if the ROI is actually being achieved. If not, then the program should be modified or cancelled so that its resources can be used more productively elsewhere.

**Integrate sustainability goals into planning and budgeting.** Sustainability goals should be fully integrated into the planning and budgeting process. Specific actions that should be taken include:
- *Promote the consideration of full lifecycle costs in making investment decisions.* Full lifecycle costing considers the affordability of an investment over the short, medium, and long term, from initial acquisition to disposal. For example, a more efficient technology may cost more up-front, but have a better long-term ROI. Lifecycle costing should be applied to both capital and operating investments.
- *Promote preventative investments.* The budgeting system should encourage decisions that prevent outcomes that negatively impact sustainability goals. Often, the alternative to a preventative investment is more expensive, after-the-fact mitigation.
- *Supplement budgeting with methods to systematically improve efficiency.* Waste in business processes often translates to environmental and financial waste. The budget process is not the ideal forum for systematically identifying efficiency opportunities. The finance officer can promote process improvement methods that take place outside of budgeting, but that will ultimately have a positive impact on the budget.
- *Create the right incentives.* Promote budget policies to encourage departments to invest in efficiency. For example, a policy that rewards departments for reducing energy consumption will provide a better incentive than one that immediately turns the savings over to central control (e.g., allow the department to invest its first year energy savings in a short-term project).
- *Promote analysis of intergenerational equity and socio-economic equity in capital investment and financing.* Make sure the capital improvement planning process takes into account issues such as

balancing investments between different geographic areas of the community and when a capital asset is paid for versus when it is consumed.

- *Integrate resiliency into capital project evaluations.* Resilient systems "reduce the probabilities of failure, the consequences of failure (such as deaths and injuries, physical damage, and negative economic and social effects); and the time for recovery."[vi] Hence, the objective of a capital planning system should be to maximize an asset's resistance to extreme events and minimize the time required for recovery (while, of course, balancing against costs). Resiliency complements sustainability because a resilient asset will be better positioned to serve future generations of constituents than a non-resilient one.

- *Regularly update long-range financial plans and forecasts.* Long-range financial plans and forecasts are an important tool for ensuring that a government's cost structure and service strategies are economically and financially sustainable and should be updated on a regular basis.

---

[i] This quote is derived from the work of the United Nation's "Brundtland Commission," which issued a report that advanced the use of this definition in 1987.

[ii] Visit www.iclei.org

[iii] Derived from work performed by Local Government Association of South Australia.

[iv] Finance officers may consult the GFOA whitepaper "Characteristics of a Financially Resilient Government" for examples of characteristics of a financially resilient system, many of which would translate easily to a discussion on sustainability.

[v] Examples adapted from an article by Timothy F. Slaper and Tanya J. Hill ("The Triple Bottom Line: What is it and How Does it Work" in the Spring 2011 issue of *Indiana Business Review*. The authors had taken their examples from a report developed by the City of Grand Rapids, Michigan.

[vi] Kathleen Tierney and Michael Bruneau, "Conceptualizing and Measuring Resilience: A Key to Disaster Loss Reduction," *TR News*, May-June 2007.

Approved by the GFOA's Executive Board, January, 2012.

# Exhibit O



**BEST PRACTICE**

## <u>Improving the Timeliness of Financial Reports (2008) (CAAFR)</u>

<u>Background.</u> Financial reports are intended to meet the needs of decision makers. Accordingly, *timeliness* was identified as one of the *characteristics of information in financial reporting* in Concepts Statement No. 1 of the Governmental Accounting Standards Board (GASB), *Objectives of Financial Reporting*. To accomplish this objective, financial reports must be available in time to inform decision making. Therefore, financial reports should be published as soon as possible after the end of the reporting period.

Timely financial reporting cannot be reduced to a well managed "busy season," but rather requires careful, year-long planning and monitoring[1] (e.g., data processing, audit field work). Sometimes the need for timeliness has to be balanced against the need for reliability, which also was identified as one of the *characteristics of information in financial reporting* identified in GASB Concepts Statement No. 1. While governments certainly should not sacrifice reliability for timeliness, minor gains in precision ought not to be purchased at the price of indefinite delay (e.g., accounting estimates).

Legislative deadlines for submitting financial statements should be viewed as a minimum standard rather than as an ideal objective. The same holds true for the submission deadlines used by various award programs such as theGFOA's Certificate of Achievement for Excellence in Financial Reporting Program.

The additional cost of more timely financial reporting (e.g., additional staff and overtime) also needs to be considered. As always, the cost to be incurred should never exceed the benefits anticipated.

<u>Recommendations.</u> The Government Finance Officers Association (GFOA) makes the following recommendations about ways to improve the timeliness of financial reports for governmental entities.

1. *<u>Recording activity throughout the year</u>*

a. *Transactions processing.* A government should undertake a process at least quarterly to ensure the ongoing completeness and accuracy of the data it collects. This process should include appropriate reconciliations to identify needed adjustments, as well as financial analysis of interim management reports to identify anomalous or incomplete data that may need to be corrected.  This verification process should be particularly useful in identifying amounts that will need to be estimated as part of the annual verification process so that the data needed to make those estimates at year end can be collected throughout the period. Also, this process should facilitate the recording of certain items, for example, capital assets, throughout the year rather than after the fiscal year has ended.

---

[1] Such a year-long process can help a government avoid material auditor-identified adjustments that Statement on Auditing Standards No. 112, *Communicating Internal Control Matters Identified in an Audit*, would require to be reported as a significant deficiency or a material weakness. Refer to the GFOA recommended practice on *Mitigating the Negative Effects of Statement on Auditing Standards No. 112*.

b.    *Accounting policies and procedures.* The government's documented accounting policies and procedures should 1) identify those items that may need to be estimated[2] and 2) set forth the specific steps (including significant assumptions) to be followed in preparing each different kind of estimate. The procedures should specifically address whether each of these items is to be handled during the year, as part of the initial year end closing process, or in the adjustment and analysis process immediately prior to the final year end closing process.

## 2.    *Closing and financial statement preparation processing*

a.    *The annual closing process.* The initial annual close normally occurs within a week to ten days following the end of the period. To avoid delays, all items related to budgetary expenditures (e.g., purchase orders) should be recorded by the end of the period (with exceptions being made only for highly unusual items like natural disasters and major information systems failures).

b.    *Component Units.* When a government includes component units (either blended or discretely presented) as part of its financial reporting entity, there needs to be early and ongoing communication with those units to ensure that the government receives all of the information it needs to include them in its own report without delaying its issuance. Experience appears to demonstrate that there is no substitute for one or more face-to-face meetings for this purpose, although ongoing updates normally can be managed effectively by e-mail, telephone, or FAX.

c.    *Unforeseen circumstances.* The financial report preparation process and the independent audit may identify items that could affect the amounts reported in the financial statements (e.g., lawsuits; legal or contractual violations that include a monetary penalty; instances of potential or actual fraud or abuse).   Considerable time may be needed to definitively resolve such items. In such cases, the inherent uncertainty should not unduly delay the financial report preparation process and the independent audit. Accordingly, it often is better to proceed with the issuance of the financial statements based upon estimates, rather than to delay their issuance.

## 3.    *Implementation of new accounting standards*

a.    *Facilitating implementation of new accounting standards.* To ensure that accounting standards are implemented by their mandated effective date a government should monitor the issuance of final guidance from the Governmental Accounting Standards Board (GASB). Upon issuance of such guidance, a government should determine the fiscal year by which the guidance must be implemented and when steps to implement the guidance should be scheduled prior to and during the year of implementation as well as during the financial statement preparation process. To the extent practical, governments should attempt to implement the guidance by at least the period before implementation is mandated.

## 4.    *Financial report format and distribution*

a.    *Electronic distribution.* To save time and avoid potential delays, the government should initially distribute its financial report electronically (e.g., posting on website, e-mailing an electronic file, or mailing a CD-ROM).

## 5.    *Contracting for professional services*

a.    *Audit procurement.*[3] The request for proposal (RFP) for the services of an independent auditor should specify a public release date for the financial statements.

b.    *Contracts for professional services other than auditing.* RFPs for nonaudit services that have a bearing on the financial statements (e.g., actuarial services) should specify the public release date of the financial statements and expressly mention that those services need to be completed in time to allow the government to meet that deadline.

Approved by the GFOA's Executive Board, February 22, 2008.

---

[2] Examples would include items related to derived tax revenues (e.g., sales and income taxes), uncollectible accounts, claims and judgments, the liability for landfill closure and postclosure care costs, and pollution remediation obligations.
[3] See GFOA's best practice on *Audit Procurement.*

# Exhibit P



E X P E R I E N C E        C O M M I T M E N T        S T R E N G T H

March 15, 2012

Mr. John Luebberke
City Attorney
Office of the City Attorney
City Hall
425 North El Dorado Street
Stockton, CA 95202-1997

Re: Intention to Conditionally Participate in Neutral Evaluation Process

Dear Mr. Luebberke:

The City of Stockton (the "City") has identified National Public Finance Guarantee Corp ("National")[1] as an "interested party" in its Notice of the Initiation of the Neutral Evaluation Process dated February 29, 2012 (the "506 Notice") and pursuant to California Government Code sections 53760 through 53760.7 (the "Act"). National hereby notifies the City of its intention to participate as an "interested party" (as defined in the Act) in the City's neutral evaluation process (the "506 Process") to be conducted under the Act, subject to the terms and conditions set forth below.

National reserves all of its rights and remedies with respect to the payment of any and all debt that National insures related to the City and explicitly disclaims any express or implied legal or contractual obligation under the Act, the 506 Notice or otherwise to adjust, reduce, compromise or otherwise modify the terms and conditions of such debt. National's participation in the 506 Process is not, and shall not be construed as, a waiver of any such rights or remedies. Specifically and without limitation, on March 7, 2012, National directed Wells Fargo Bank, National Association, the Indenture Trustee for the Stockton Public Financing Authority Lease Revenue Bonds, Series 2004 (Parking and Capital Projects), which are insured by National, to commence an unlawful detainer action against the City in the Superior Court of the State of California, County of San Joaquin (the "Action"). National intends to direct the Trustee to pursue the Action and other remedies against the City, notwithstanding National's participation in the 506 Process.

---

[1] National, a stock insurance corporation duly organized and existing under the laws of the State of New York, is successor in interest to MBIA Insurance Corp. ("MBIA"), pursuant to a Quota Share Reinsurance Agreement, effective as of January 1, 2009. Pursuant to that certain Reinsurance Agreement, effective as of September 30, 2008, by and between Financial Guaranty Insurance Company ("FGIC") and MBIA, National, as successor in interest to MBIA, now acts on behalf of FGIC with respect to certain of the debt that National insures related to the City.



national
public finance
guarantee

National Public Finance Guarantee Corporation  113 King Street, Armonk, NY 10504  1-914-765-3333  www.nationalpfg.com



E X P E R I E N C E      C O M M I T M E N T      S T R E N G T H

National also reserves all of its rights and remedies in connection with any obligations or requirements that are or may purport to be imposed on National under the Act, the 506 Notice or pursuant to the 506 Process.    Specifically, National will not provide any documentation, including, but not limited to, documentation that may be requested by any party pursuant to Sections 53760.1(d) and/or Section 53760.3(k) of the Act, that National in its sole discretion deems to be privileged, sensitive business information, or otherwise confidential.    National will also not be bound by the provisions of Section 53760.3(q) of the Act to the extent that disclosure of documents or information received by National in connection with the 506 Process is required by law or in connection with any legal proceedings or otherwise requested by or required to be produced to, any governmental agency, regulatory authority (including, any self-regulatory organization claiming to have jurisdiction) any insurance regulatory examiner, or any statistical rating organization or similar body or other reinsurers of debt related to the City.

National expressly disclaims any obligation or liability for the payment of any costs or expenses under Section 53760.3(s) of the Act or otherwise in connection with the 506 Notice, the Act or pursuant to the 506 Process or otherwise.    National reserves all of its rights to indemnity and reimbursement for costs and expenses, including, without limitation, costs and expenses of its outside counsel, pursuant to any applicable law or agreements.

National reserves all of its rights and remedies with respect to the 506 Process, including, without limitation, interpretation of the terms, requirements and provisions of the Act and implementation of the neutral evaluation process contemplated thereunder.

National reserves all of its rights and remedies under federal bankruptcy law, including but not limited to its rights to challenge the eligibility of the City to be a debtor under 11 U.S.C. Section 109(c).

In addition to the above, National further reserves all of its rights and remedies, including, but not limited to, all rights and remedies under any of the relevant indentures, documents or insurance policies and agreements related to any and all debt that National insures related to the City, and any other rights and remedies available at law or in equity now or in the future.

National's participation in the 506 Process pursuant to the 506 Notice and the Act shall be deemed acceptance by the City of the above terms and conditions.

Sincerely yours,

Name:  Matthew Cohn
Title:   Director

cc: Lawrence A. Larose, Esq.
    Winston & Strawn LLP

2

NY:1383974.5

# Exhibit Q

Page 1

1                UNITED STATES BANKRUPTCY COURT

2                      EASTERN DISTRICT

3                    SACRAMENTO DIVISION

4    In re:

5    CITY OF STOCKTON, CALIFORNIA,    No. 12-32118

6                     Debtor.         Chapter 9

7                           /

8

9                     Deposition of

10                     PETER MIXON

11         (CalPERS Person Most Knowledgeable)

12               Wednesday, December 5, 2012

13                              `

14

15

16   Reported by:

17   SANDRA BUNCH VANDER POL, RMR, CRR, CSR #3032

18   Realtime Systems Administrator credentialed

19   Fellow, Academy of Professional Reporters

20   Job No. 39772

21

22   --------------------------------------------------------

23

24                   ALDERSON REPORTING

25                     1-800-FOR-DEPO

Case 12-32118   Filed 02/16/13   Doc 717

1    seek state approval of those policies?

2    A.        I don't understand your question.

3    Q.        Is there a process by which CalPERS must

4    seek state approval prior to enacting certain policy?

5              MR. RYAN:  Object to the form.  Outside the

6    scope.  Vague and ambiguous.  Assumes facts.

7              THE WITNESS:  It -- you know, I think the

8    answer is, it depends.

9              But the structure of CalPERS is such that it

10   is governed by a 13-member Board of Administration

11   that is -- has independent authority of, for example,

12   of the governor's office.  And that -- and I will --

13   I think I will end this by saying that's all laid out

14   in the Constitution of the State of California, our

15   governing statutes, other statutes that apply to

16   CalPERS.

17             So if you -- if you're going to start asking

18   me questions like, well, how does all this work, and

19   what are the -- what are those duties, and what are

20   the rules that govern the system, I mean, my answer

21   is going to be, look, let's get the statutes out and

22   take a look.  Because we have a whole book just of

23   statutes that just govern the system.

24             MR. NEAL:  I'm not going to do that to

25   you --

Page 47

1              MR. RYAN:  Thank you, Guy.

2              MR. NEAL:  -- or to anyone in this room.

3              THE WITNESS:  I will take my coat off and

4    roll up your sleeves.  I'm sure you have a law

5    library here somewhere.

6    BY MR. NEAL:

7    Q.        I would like, however, to understand the

8    pyramid, so to speak, of the regulations, the rules

9    by which CalPERS operates in broad terms.

10             So let me go back and say you pointed out

11   to -- you pointed to the State Constitution, correct?

12   A.        Yes.

13   Q.        And there are --

14   A.        There are provisions in the State

15   Constitution that apply to CalPERS, yes.

16   Q.        And there are provisions in state law,

17   correct?

18   A.        Yes.

19   Q.        And then are there regulations?

20   A.        Yeah.  The CalPERS Board of Administration

21   has authority to adopt regulations that pertain to

22   the administration of the system.

23   Q.        And then there are policies, correct?

24   A.        Yes.  The board has adopted policies that

25   pertain to the administration of the system, yes.

Peter Mixon                                                                December 5, 2012
Sacramento, CA

```
 1    Q.       Is there anything else that wouldn't be
 2    covered in those four buckets we just articulated?
 3    A.       I think -- you know, there are motions or
 4    resolutions that the board has adopted and passed
 5    that wouldn't necessarily be reflected in policies.
 6    Q.       Is there anything else?
 7             MR. RYAN:  Objection.
 8             THE WITNESS:  Yeah, I mean --
 9             MR. RYAN:  Calls for speculation.
10             THE WITNESS:  Not as I sit here right now.
11    I mean, anything else what?  You mean actions on the
12    part of the system?
13    BY MR. NEAL:
14    Q.       No.  Anything else that would govern the
15    operations and authority --
16    A.       Oh.
17    Q.       -- of the system.
18             MR. RYAN:  Outside the scope.
19             THE WITNESS:  Yeah, I mean, there's a whole
20    host of laws that apply to the California Public
21    Employees Retirement System.
22    BY MR. NEAL:
23    Q.       Understood.  And you mentioned those as
24    statutes.
25    A.       It's not just the statutes that I -- that I
```

Case 12-32118    Filed 02/16/13    Doc 717

1    have identified.

2    Q.        But they are statutes?  That's -- I'm just

3    talking broadly.  I'm not talking about specific

4    laws.  I wouldn't ask you to identify every law.

5    A.        Yeah.  Yeah.  I mean, I think that there

6    are -- for example, the due process clause of the --

7    Q.        Right.

8    A.        -- United States Constitution applies to us.

9    We have to give due process to our members.

10   Q.        No, I --

11   A.        Part of my job is -- I'm laughing because

12   there's just so much.

13   Q.        I know there is so much.

14   A.        You have no idea of the breadth of law that

15   I have to deal with in advising my client, which is

16   one of the things that makes my job interesting.

17   Q.        Are there -- we talked about constitution,

18   state and federal, statutes, regulations, policy,

19   resolutions.  Is there -- are there guidelines

20   internal at CalPERS?  Is there a manual at CalPERS?

21   A.        We have many manuals, many, many policies,

22   and many, many procedures.

23   Q.        Okay.

24             MR. RYAN:  We have been going almost an

25   hour.  Do you want to take a break soon, or are you

Peter Mixon                                                December 5, 2012
Sacramento, CA

Page 50

```
1    almost done with this line?  Whenever is a good
2    logical stopping point for you.
3              How are you doing?
4              THE WITNESS:  I'm fine.  I'm fine.
5              MR. RYAN:  Court reporter, are you
6    all right?
7              THE REPORTER:  I'm fine.
8              MR. NEAL:  Yes.  Why don't we -- why don't
9    we take a ten-minute break.
10             MR. RYAN:  Okay.
11             THE WITNESS:  That's fine with me.
12             (Recess taken at 10:46 a.m.  Back on the
13   record at 11:00 a.m.)
14   BY MR. NEAL:
15   Q.       Mr. Mixon, I want to go back to Exhibit 518,
16   which you still have in front of you.
17   A.       Yes, I do.
18   Q.       I would ask you to turn to page 14.  And,
19   sir, there's only one sentence in this entire
20   document I want to ask you about, and that's the
21   sentence before heading B, "Nonvested Rights."
22             And the sentence is, "Finally, there remains
23   a question as to whether vested rights may be
24   consensually modified through collective bargaining
25   without offending the contracts clause."
```

Case 12-32118   Filed 02/16/13   Doc 717

1           Do you see that?

2     A.        I see the sentence.

3     Q.        If the City of Stockton bargained for a

4     reduction of pension benefits for current employees,

5     would CalPERS be willing to administer such a plan?

6           MR. RYAN:  Objection.  Calls for

7     speculation.  Assumes facts.

8           You don't have to answer.  It's speculative.

9           THE WITNESS:  Yeah, I mean, I wouldn't want

10    to give a definitive answer because there are so many

11    variables there.

12          CalPERS is charged with administering the

13    plan consistent with the statutes and other rules

14    that govern its operations.

15    BY MR. NEAL:

16    Q.        So CalPERS could take the position that such

17    a plan would be inconsistent with those statutes and

18    other rules that govern its operations?

19          MR. RYAN:  Objection.  It calls for

20    speculation.

21          THE WITNESS:  Yeah.

22          MR. RYAN:  Assumes facts.  I don't want the

23    witness speculating about something that has not

24    actually happened.

25          THE WITNESS:  Yeah, I'm not going to

1   speculate.

2   BY MR. NEAL:

3   Q.      Do you know of anything prohibiting CalPERS

4   from administering such a modified plan; any law, any

5   policy, any guidelines?

6           MR. RYAN:  Object to the form.  Speculation.

7   Outside the scope.  Calls for a legal conclusion.

8           THE WITNESS:  Yeah, I think you're asking me

9   for my legal opinion.  And if I was presented with a

10  actual situation, then I would want to, you know,

11  perform my professional duties to my client and give

12  it advice.  But I don't think it's appropriate for me

13  really to give legal advice as part of this

14  proceeding.

15          I would want to advise my client, which is

16  my job, based on, you know, my expertise and my

17  skills.  And that's what I would do.

18  BY MR. NEAL:

19  Q.      To your knowledge, has a city ever bargained

20  for a reduction of pension benefits for current

21  employees and had CalPERS administer such a plan?

22          MR. RYAN:  Object to the form.  Outside the

23  scope.

24          And I'm reading the transcript.  It has "the

25  City."  So we're referring to Stockton?  Or a city?

Case 12-32118    Filed 02/16/13    Doc 717

1          MR. NEAL:  I misspoke.  Let me repeat my

2     question.

3     Q.        To your knowledge, has a city ever bargained

4     for a reduction of pension benefits for current

5     employees and had CalPERS administer such a plan?

6          MR. RYAN:  Object to the form.  Outside the

7     scope.

8          THE WITNESS:  Yeah, not -- not that I'm

9     aware of.  I don't recall.

10    BY MR. NEAL:

11    Q.        Has CalPERS ever considered whether it would

12    administer a plan that contained a bargain for a set

13    of reductions for current employees?

14         MR. RYAN:  Objection.  Outside the scope.

15    Calls for speculation.  Assumes facts.  Incomplete

16    hypothetical.  I'm not --

17         THE WITNESS:  Yeah, I'm not -- as I sit

18    here, I don't recall.  I'm not aware of that.

19         MR. RYAN:  And I would also just belatedly

20    object, to the extent it calls for a legal analysis.

21    Attorney-client privileged information as well.

22    BY MR. NEAL:

23    Q.        Related to my prior question -- and your

24    objections can be -- remain standing -- has CalPERS

25    ever considered what kinds of reductions it would be

Page 54

1    willing to administer?

2              MR. RYAN:  Same objections.

3              MR. NEAL:  Let me restate.

4    Q.        Has CalPERS ever considered what kind of

5    reductions in a pension plan for current employees it

6    would be willing to consider?

7              MR. RYAN:  Same objections.

8              THE WITNESS:  I'm really not sure about what

9    that means, "CalPERS consider."  But if you're asking

10   whether the -- I don't -- I don't understand the

11   question.

12   BY MR. NEAL:

13   Q.        All right.  Let me --

14   A.        You mean, in our minds have we ever thought

15   of that?  I mean, it's kind of a weird question.

16   Q.        I'm looking for specific instances --

17   A.        Okay.

18   Q.        -- in which CalPERS has addressed -- for

19   instance, let me give you an example, a plan that had

20   no COLAs or very reduced COLAs; a plan that capped

21   plans at $100,000.

22              Any alternative to plans that may be

23   provided under the, I guess, still existing pension

24   law or what may exist under the Public Employees

25   Pension Reform Act?

 1          MR. RYAN:  Same objections.

 2          THE WITNESS:  Yeah, I'm not -- I don't know.

 3   I'm not aware of any specific instances where a

 4   particular city proposed reducing benefits to active

 5   employees as part of the CalPERS system.

 6   BY MR. NEAL:

 7   Q.      Do you know if any city has considered doing

 8   so and sought to implement such a plan outside of the

 9   CalPERS system?

10          MR. RYAN:  Objection.  Outside the scope.

11          THE WITNESS:  I have no idea.  I don't know.

12   BY MR. NEAL:

13   Q.      I want to turn to CalPERS's involvement in

14   the City of Stockton AB 506 process.

15   A.      Yes.

16   Q.      Do you understand what I mean by the "City

17   of Stockton's AB 506 process"?

18   A.      The prepetition mediation process.

19   Q.      Before we address the AB 506 process, are

20   you aware of any communications that CalPERS has had

21   with the City of Stockton predating AB 506 relating

22   to a potential modification or restructuring of its

23   CalPERS liability?

24   A.      Yeah.  As I sit here, I'm not aware, no.

25   Q.      Did CalPERS receive notice of Stockton's

Peter Mixon                                                    December 5, 2012
Sacramento, CA

1                   CERTIFICATE OF REPORTER

2           I, SANDRA BUNCH VANDER POL, a Certified

3    Shorthand Reporter, hereby certify that the witness

4    in the foregoing deposition was by me duly sworn to

5    tell the truth, the whole truth and nothing but the

6    truth in the within-entitled cause;

7           That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13          That before completion of the deposition,

14   review of the transcript was requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18          I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23   DATED:  December 13, 2012

24          _____

25                   SANDRA BUNCH VANDER POL, CSR #3032

# Exhibit R



**California Public Employees' Retirement System**
**Actuarial Office**
P.O. Box 942701
Sacramento, CA  94229-2701
TTY: (916) 795-3240
(888) 225-7377 phone · (916) 795-2744 fax
www.calpers.ca.gov

October 2012

**MISCELLANEOUS PLAN OF THE CITY OF STOCKTON (CalPERS ID 6373973665)**
**Annual Valuation Report as of June 30, 2011**

Dear Employer,

As an attachment to this letter, you will find a copy of the June 30, 2011 actuarial valuation report of your pension plan. This report contains important actuarial information about your pension plan at CalPERS. Your CalPERS staff actuary is available to discuss the report with you.

**Changes Since the Prior Year's Valuation**

The CalPERS' Board of Administration adopted updated actuarial assumptions to be used beginning with the June 30, 2011 valuation. In addition, a temporary modification to our method of determining the actuarial value of assets and amortizing gains and losses was implemented for the valuations as of June 30, 2009 through June 30, 2011. The effect of those modifications continue in this valuation.

There may also be changes specific to your plan such as contract amendments and funding changes.

Further descriptions of general changes are included in the "Highlights and Executive Summary" section and in Appendix A, "Statement of Actuarial Data, Methods and Assumptions." The effect of the changes on your rate is included in the "Reconciliation of Required Employer Contributions." **As noted on page 13 of the report, your plan can elect not to phase-in the cost of the assumption change by notifying your plan actuary prior to May 1, 2013.**

**Future Contribution Rates**

The exhibit below displays the required employer contribution rate before any cost sharing and Superfunded status for 2013/2014 along with estimates of the contribution rate for 2014/2015 and 2015/2016 and the probable Superfunded status for 2014/2015. The estimated rate for 2014/2015 is based solely on a projection of the investment return for fiscal 2011/2012, namely 0%. The estimated rate for 2015/2016 uses the valuation assumption of 7.5% as the investment return for fiscal 2012/2013. See Appendix D, "Analysis of Future Investment Return Scenarios", for rate projections under a variety of investment return scenarios. **These rates may not be GASB compliant.** See Appendix C for the GASB compliant rate. Please disregard any projections that we may have provided to you in the past.

| Fiscal Year | Employer Contribution Rate | Superfunded? |
|---|---|---|
| 2013/2014 | 17.939% | NO |
| 2014/2015 | 19.6% (projected) | NO |
| 2015/2016 | 20.2% (projected) | N/A |

Member contributions other than cost sharing, (whether paid by the employer or the employee) are in addition to the above rates.

The estimates for 2014/2015 and 2015/2016 also assume that there are no future amendments and no liability gains or losses (such as larger than expected pay increases, more retirements than expected, etc.). This is a very important assumption because these gains and losses do occur and can have a significant impact on your contribution rate. Even for the largest plans, such gains and losses often cause a change in the employer's contribution rate of one or two percent and may be even larger in some less common instances. These gains and losses cannot be predicted in advance so the projected employer contribution rates are just estimates. Your actual rate for 2014/2015 will be provided in next year's report.

TEMPORARY CONFIDENTIAL

STOCK147926

EXHIBIT 422

MISCELLANEOUS PLAN OF THE CITY OF STOCKTON (CalPERS ID 6373973665)
October 2012
Page 2

**California Actuarial Advisory Panel Recommendations**

The report satisfies all basic disclosure requirements under the Model Disclosure Elements for Actuarial Valuation Reports recommended by the California Actuarial Advisory Panel, except for the original base amounts of the various components of the unfunded liability amortization.

The report gives the following additional information classified as enhanced risk disclosures under the Model Disclosure Elements for Actuarial Valuation Reports recommended by the California Actuarial Advisory Panel:

- "Deterministic stress test", projecting future results under different investment income scenarios.   (See Appendix D's Analysis of Future Investment Return Scenarios.)
- "Sensitivity analysis", showing the impact on current valuation results of a plus or minus 1% change in the discount rate.  (See Appendix D's Analysis of Discount Rate Sensitivity.)

We are very busy preparing actuarial valuations for other public agencies and expect to complete all such valuations by the end of October.  We understand that you might have a number of questions about these results.  While we are very interested in discussing these results with your agency, in the interest of allowing us to give every public agency their result, we ask that, if at all possible, you wait until after October 31 to contact us with questions.  If you have questions, please call (888) CalPERS (225-7377).

Sincerely,

ALAN MILLIGAN
Chief Actuary



# ACTUARIAL VALUATION
### as of June 30, 2011

# for the
# MISCELLANEOUS PLAN
# of the
# CITY OF STOCKTON
### (CalPERS ID 6373973665)

# REQUIRED CONTRIBUTIONS
# FOR FISCAL YEAR
# July 1, 2013 – June 30, 2014

TEMPORARY CONFIDENTIAL

STOCK147928

# TABLE OF CONTENTS

**ACTUARIAL CERTIFICATION**                                           1

**HIGHLIGHTS AND EXECUTIVE SUMMARY**
Purpose of the Report                                                5
Required Employer Contribution                                       5
Funded Status                                                        6
Cost                                                                 6
Changes Since the Prior Valuation                                    7

**SUMMARY OF LIABILITIES AND RATES**
Development of Accrued and Unfunded Liabilities                      11
(Gain) / Loss Analysis 06/30/10 – 06/30/11                          12
Schedule of Amortization Bases                                       13
Reconciliation of Required Employer Contributions                    14
Employer Contribution Rate History                                   15
Funding History                                                      15
Hypothetical Termination Liability                                   15

**SUMMARY OF ASSETS**
Reconciliation of the Market Value of Assets                         19
Development of the Actuarial Value of Assets                         19
Asset Allocation                                                     20
CalPERS History of Investment Returns                                21

**SUMMARY OF PARTICIPANT DATA**
Summary of Valuation Data                                            25
Active Members                                                       26
Transferred and Terminated Members                                   27
Retired Members and Beneficiaries                                    28

**APPENDIX A – ACTUARIAL METHODS AND ASSUMPTIONS**
Actuarial Data                                                       A-1
Actuarial Methods                                                    A-1
Actuarial Assumptions                                                A-3
Miscellaneous                                                        A-17

**APPENDIX B – PLAN PROVISIONS**
Summary of Plan's Major Benefit Options                              B-1
Description of CalPERS' Principal Plan Provisions                    B-3

**APPENDIX C – GASB STATEMENT NO. 27**

**APPENDIX D – RISK ANALYSIS**
Volatility Ratios                                                    D-1
Analysis of Future Investment Return Scenarios                       D-2
Analysis of Discount Rate Sensitivity                                D-3

**APPENDIX E – GLOSSARY OF ACTUARIAL TERMS**

FIN PROCESS CONTROL ID (CY) 389091        FIN PROCESS CONTROL ID (PY) 356790        REPORT ID 69068

TEMPORARY CONFIDENTIAL                                      STOCK147929

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# ACTUARIAL CERTIFICATION

To the best of our knowledge, this report is complete and accurate and contains sufficient information to disclose, fully and fairly, the funded condition of the MISCELLANEOUS PLAN OF THE CITY OF STOCKTON. This valuation is based on the member and financial data as of June 30, 2011 provided by the various CalPERS databases and the benefits under this plan with CalPERS as of the date this report was produced. It is our opinion that the valuation has been performed in accordance with generally accepted actuarial principles, in accordance with standards of practice prescribed by the Actuarial Standards Board, and that the assumptions and methods are internally consistent and reasonable for this plan, as prescribed by the CalPERS Board of Administration according to provisions set forth in the California Public Employees' Retirement Law.

The undersigned is an actuary for CalPERS, who is a member of the American Academy of Actuaries and the Society of Actuaries and meets the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained herein.


KELLY STURM, ASA, MAAA
Associate Pension Actuary, CalPERS

TEMPORARY CONFIDENTIAL

STOCK147930

# HIGHLIGHTS AND EXECUTIVE SUMMARY

- **PURPOSE OF THE REPORT**

- **REQUIRED CONTRIBUTIONS**

- **FUNDED STATUS**

- **COST**

- **CHANGES SINCE THE PRIOR VALUATION**

TEMPORARY CONFIDENTIAL

STOCK147931

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Purpose of the Report

This report presents the results of the June 30, 2011 actuarial valuation of the MISCELLANEOUS PLAN OF THE CITY OF STOCKTON of the California Public Employees' Retirement System (CalPERS). The valuation was prepared by the Plan Actuary in order to:

- set forth the actuarial assets and accrued liabilities of this plan as of June 30, 2011;
- determine the required employer contribution rate for this plan for the fiscal year July 1, 2013 through June 30, 2014;
- provide actuarial information as of June 30, 2011 to the CalPERS Board of Administration and other interested parties; and
- provide pension information as of June 30, 2011 to be used in financial reports subject to Governmental Accounting Standards Board (GASB) Statement Number 27 for a Single Employer Defined Benefit Pension Plan.

The use of this report for any other purposes may be inappropriate. In particular, this report does not contain information applicable to alternative benefit costs. The employer should contact their actuary before disseminating any portion of this report for any reason that is not explicitly described above.

# Required Employer Contribution

|  | Fiscal Year 2012/2013 | Fiscal Year 2013/2014 |
|---|---|---|
| **Required Employer Contributions** | | |
| 1. Contribution in Projected Dollars | | |
| a) Total Normal Cost | $ 10,692,583 | $ 10,319,364 |
| b) Employee Contribution[1] | $ 4,334,496 | $ 4,107,560 |
| c) Employer Normal Cost [(1a) − (1b)] | 6,358,087 | 6,211,804 |
| d) Unfunded Contribution | $ 4,095,062 | $ 4,314,437 |
| e) Total Employer Contribution [(1c) + (1d)] | 10,453,149 | 10,526,241 |
| f) Employee Cost Sharing | $ | $ 0 |
| g) Net Employer Contribution [(1e) − (1f)] | | 10,526,241 |
| Annual Lump Sum Prepayment Option[2] [(1g) / 1.075^.5] | 10,070,209 | 10,152,408 |
| 2. Contribution as a Percentage of Payroll | | |
| a) Total Normal Cost | 17.268% | 17.586% |
| b) Employee Contribution[1] | 7.000% | 7.000% |
| c) Employer Normal Cost [(2a) − (2b)] | 10.268% | 10.586% |
| d) Unfunded Rate | 6.613% | 7.353% |
| e) Total Employer Rate [(2c) + (2d)] | 16.881% | 17.939% |
| f) Employee Cost Sharing | | 0.000% |
| g) Net Employer Contribution Rate [(2e) − (2f)] | | 17.939% |

[1]This is the percentage specified in the Public Employees Retirement Law, net of any reduction from the use of a modified formula. Employee cost sharing is shown separately and is therefore not included in this line item.

[2]Payment must be received by CalPERS before the first payroll reported to CalPERS of the new fiscal year and after June 30.

TEMPORARY CONFIDENTIAL

STOCK147932

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

## Funded Status

|  | | June 30, 2010 | | June 30, 2011 |
|---|---|---|---|---|
| 1. Present Value of Projected Benefits | $ | 622,602,191 | $ | 639,969,106 |
| 2. Entry Age Normal Accrued Liability | $ | 548,129,809 | $ | 568,852,600 |
| 3. Actuarial Value of Assets (AVA) | | 495,325,729 | | 513,963,229 |
| 4. Unfunded Liability (AVA Basis) [(2) − (3)] | $ | 52,804,080 | $ | 54,889,371 |
| 5. Funded Ratio (AVA Basis) [(3) / (2)] | | 90.4% | | 90.4% |
| 6. Market Value of Assets (MVA) | $ | 383,364,117 | $ | 450,853,223 |
| 7. Unfunded Liability (MVA Basis) [(2) − (6)] | | 164,765,692 | | 117,999,377 |
| 8. Funded Ratio (MVA Basis) [(6) / (2)] | | 69.9% | | 79.3% |
| Superfunded Status | | No | | No |

## Cost

**Actuarial Cost Estimates in General**

What will this pension plan cost?  Unfortunately, there is no simple answer.  There are two major reasons for the complexity of the answer.  First, all actuarial calculations, including the ones in this report, are based on a number of assumptions about the future.  These assumptions can be divided into two categories.
- Demographic assumptions include the percentage of employees that will terminate, die, become disabled, and retire in each future year.
- Economic assumptions include future salary increases for each active employee, and the assumption with the greatest impact, future asset returns at CalPERS for each year into the future until the last dollar is paid to current members of your plan.

While CalPERS has set these assumptions to reflect our best estimate of the real future of your plan, it must be understood that these assumptions are very long term predictors and will surely not be realized in any one year.  For example, while the asset earnings at CalPERS have averaged more than the assumed return of 7.5% for the past twenty year period ending June 30, 2012, returns for each fiscal year ranged from -24% to +21.7%

Second, the very nature of actuarial funding produces the answer to the question of plan cost as the sum of two separate pieces.
- The Normal Cost (i.e., the future annual premiums in the absence of surplus or unfunded liability) expressed as a percentage of total active payroll.
- The Past Service Cost or Accrued Liability (i.e., the current value of the benefit for all credited past service of current members) which is expressed as a lump sum dollar amount.

The cost is the sum of a percent of future pay and a lump sum dollar amount (the sum of an apple and an orange if you will).  To communicate the total cost, either the Normal Cost (i.e., future percent of payroll) must be converted to a lump sum dollar amount (in which case the total cost is the present value of benefits), or the Past Service Cost (i.e., the lump sum) must be converted to a percent of payroll (in which case the total cost is expressed as the employer's rate, part of which is permanent and part temporary).  Converting the Past Service Cost lump sum to a percent of payroll requires a specific amortization period, and the employer rate will vary depending on the amortization period chosen.

TEMPORARY CONFIDENTIAL

STOCK147933

# Changes since the Prior Valuation

**Actuarial Assumptions**

The CalPERS Actuarial office conducted a study and hired an independent evaluator to assess current economic assumptions. Based on the information from both studies, the CalPERS Board of Administration has adopted updated economic assumptions to be used beginning with the June 30, 2011 valuation. In particular, the recommendation based on both studies was to lower the price inflation from 3.00 to 2.75 percent.

Lowering the price inflation had a direct impact on the Investment Return and the Overall Payroll Growth assumptions. The Investment Return assumption is calculated as the sum of the price inflation and the real rate of return. Our assumed real rate of return is 4.75 percent. When added to our new price inflation of 2.75 percent, the resulting investment return is 7.50 percent. The Overall Payroll Growth is calculated as the sum of the price inflation and real wage inflation. Our assumed real wage inflation is 0.25 percent. When added to our new price inflation of 2.75 percent, the resulting overall payroll growth is 3.00 percent.

The new assumptions are described in Appendix A. The effect of change in assumption on the unfunded liability is shown in the "(Gain)/Loss Analysis" and the effect on your employer contribution rate is included in the "Reconciliation of Required Employer Contributions". **As noted on page 13 of the report, your plan can elect not to phase-in the cost of the assumption change by notifying your plan actuary prior to May 1, 2013.**

The limitations on benefits imposed by Internal Revenue Code Section 415 were taken into account in this valuation. The effect of these limitations has been deemed immaterial on the overall results and no additional charge to the change in assumptions base was added.

**Actuarial Methods**

A method change was adopted by the CalPERS Board in June 2009. We are in the third year of a 3-year temporary change to the asset smoothing method and the amortization of gains and losses in order to phase in the impact of the -24% investment loss experienced by CalPERS in fiscal year 2008-2009. The following changes were adopted:

- Increase the corridor limits for the actuarial value of assets from 80%-120% of market value to 60%-140% of market value on June 30, 2009
- Reduce the corridor limits for the actuarial value of assets to 70%-130% of market value on June 30, 2010
- Return to the 80%-120% of market value corridor limits for the actuarial value of assets on June 30, 2011 and thereafter
- Isolate and amortize all gains and losses during fiscal year 2008-2009, 2009-2010 and 2010-2011 over fixed and declining 30 year periods (as opposed to the current rolling 30 year amortization)

A complete description of all methods is in Appendix A. The detailed calculation of the actuarial value of assets is shown in the "Development of the Actuarial Value of Assets."

**Benefits**

The standard actuarial practice at CalPERS is to recognize mandated legislative benefit changes in the first annual valuation whose valuation date follows the effective date of the legislation. Voluntary benefit changes by plan amendment are generally included in the first valuation that is prepared after the amendment becomes effective even if the valuation date is prior to the effective date of the amendment.

This valuation generally reflects plan changes by amendments effective before the date of the report. Please refer to Appendix B for a summary of the plan provisions used in the valuation. The effect of any mandated benefit changes or plan amendments on the unfunded liability is shown in the "(Gain)/Loss Analysis" and the effect on your employer contribution rate is shown in the "Reconciliation of Required Employer Contributions". It should be noted that no change in liability or rate is shown for any plan changes which were already included in the prior year's valuation.

TEMPORARY CONFIDENTIAL

STOCK147934

# SUMMARY OF LIABILITIES AND RATES

- **DEVELOPMENT OF ACCRUED AND UNFUNDED LIABILITIES**

- **(GAIN) / LOSS ANALYSIS 06/30/10 - 06/30/11**

- **SCHEDULE OF AMORTIZATION BASES**

- **RECONCILIATION OF REQUIRED EMPLOYER CONTRIBUTIONS**

- **EMPLOYER CONTRIBUTION RATE HISTORY**

- **FUNDING HISTORY**

- **HYPOTHETICAL TERMINATION LIABILITY**

TEMPORARY CONFIDENTIAL

STOCK147935

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Development of Accrued and Unfunded Liabilities

| | | | |
|---|---|---|---|
| 1. | Present Value of Projected Benefits | | |
| | a) Active Members | $ | 251,756,113 |
| | b) Transferred Members | | 22,763,328 |
| | c) Terminated Members | | 8,967,525 |
| | d) Members and Beneficiaries Receiving Payments | | 356,482,140 |
| | e) Total | $ | 639,969,106 |
| 2. | Present Value of Future Employer Normal Costs | $ | 41,568,577 |
| 3. | Present Value of Future Employee Contributions | $ | 29,547,929 |
| 4. | Entry Age Normal Accrued Liability | | |
| | a) Active Members [(1a) - (2) - (3)] | $ | 180,639,607 |
| | b) Transferred Members (1b) | | 22,763,328 |
| | c) Terminated Members (1c) | | 8,967,525 |
| | d) Members and Beneficiaries Receiving Payments (1d) | | 356,482,140 |
| | e) Total | $ | 568,852,600 |
| 5. | Actuarial Value of Assets (AVA) | $ | 513,963,229 |
| 6. | Unfunded Accrued Liability (AVA Basis) [(4e) − (5)] | $ | 54,889,371 |
| 7. | Funded Ratio (AVA Basis) [(5) / (4e)] | | 90.4% |
| 8. | Market Value of Assets (MVA) | $ | 450,853,223 |
| 9. | Unfunded Liability (MVA Basis) [(4e) - (8)] | $ | 117,999,377 |
| 10. | Funded Ratio (MVA Basis) [(8) / (4e)] | | 79.3% |

TEMPORARY CONFIDENTIAL

STOCK147936

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# (Gain)/Loss Analysis 6/30/10 — 6/30/11

To calculate the cost requirements of the plan, assumptions are made about future events that affect the amount and timing of benefits to be paid and assets to be accumulated. Each year actual experience is compared to the expected experience based on the actuarial assumptions. This results in actuarial gains or losses, as shown below.

**A   Total (Gain)/Loss for the Year***

| | | | |
|---|---|---|---|
| 1. | Unfunded Accrued Liability (UAL) as of 6/30/10 | $ | 52,804,080 |
| 2. | Expected Payment on the UAL during 2010/2011 | | 2,218,248 |
| 3. | Interest through 6/30/11 [.0775 x (A1) - ((1.0775)$^{1/2}$ - 1) x (A2)] | | 4,007,963 |
| 4. | Expected UAL before all other changes [(A1) - (A2) + (A3)] | | 54,593,795 |
| 5. | Change due to plan changes | | 4,033,437 |
| 6. | Change due to assumption change | | 595,033 |
| 7. | Expected UAL after all other changes [(A4) + (A5) + (A6)] | | 59,222,265 |
| 8. | Actual UAL as of 6/30/11 | | 54,889,371 |
| 9. | Total (Gain)/Loss for 2010/2011 [(A8) - (A7)] | $ | (4,332,894) |

**B   Contribution (Gain)/Loss for the Year**

| | | | |
|---|---|---|---|
| 1. | Expected Contribution (Employer and Employee) | $ | 12,248,284 |
| 2. | Interest on Expected Contributions | | 465,765 |
| 3. | Actual Contributions | | 12,805,695 |
| 4. | Interest on Actual Contributions | | 486,962 |
| 5. | Expected Contributions with Interest [(B1) + (B2)] | | 12,714,049 |
| 6. | Actual Contributions with Interest [(B3) + (B4)] | | 13,292,657 |
| 7. | Contribution (Gain)/Loss [(B5) - (B6)] | $ | (578,608) |

**C   Asset (Gain)/Loss for the Year**

| | | | |
|---|---|---|---|
| 1. | Actuarial Value of Assets as of 6/30/10 Including Receivables | $ | 495,325,729 |
| 2. | Receivables as of 6/30/10 | | 510,605 |
| 3. | Actuarial Value of Assets as of 6/30/10 | | 494,815,124 |
| 4. | Contributions Received | | 12,805,695 |
| 5. | Benefits and Refunds Paid | | (27,362,477) |
| 6. | Transfers and miscellaneous adjustments | | 48,733 |
| 7. | Expected Int. [.0775 x (C3) + ((1.0775)$^{1/2}$ - 1) x ((C4) + (C5) + (C6))] | | 37,796,475 |
| 8. | Expected Assets as of 6/30/11 [(C3) + (C4) + (C5) + (C6) + (C7)] | | 518,103,550 |
| 9. | Receivables as of 6/30/11 | | 367,537 |
| 10. | Expected Assets Including Receivables | | 518,471,087 |
| 11. | Actual Actuarial Value of Assets as of 6/30/11 | | 513,963,229 |
| 12. | Asset (Gain)/Loss [(C10) - (C11)] | $ | 4,507,858 |

**D   Liability (Gain)/Loss for the Year**

| | | | |
|---|---|---|---|
| 1. | Total (Gain)/Loss (A9) | $ | (4,332,894) |
| 2. | Contribution (Gain)/Loss (B7) | | (578,608) |
| 3. | Asset (Gain)/Loss (C12) | | 4,507,858 |
| 4. | Liability (Gain)/Loss [(D1) - (D2) - (D3)] | $ | (8,262,144) |

**Development of the (Gain)/Loss Balance as of 6/30/11****

| | | | |
|---|---|---|---|
| 1. | (Gain)/Loss Balance as of 6/30/10 | $ | 18,538,699 |
| 2. | Payment Made on the Balance during 2010/2011 | | 1,113,267 |
| 3. | Interest through 6/30/11 [.0775 x (1) - ((1.0775)$^{1/2}$ - 1) x (2)] | | 1,394,415 |
| 4. | Scheduled (Gain)/Loss Balance as of 6/30/11 [(1) - (2) + (3)] | $ | 18,819,847 |

* The Total (Gain)/Loss for 2010/2011 is being amortized over a fixed and declining 30-year period and is shown as "Special (Gain)/Loss" in the "Schedule of Amortization Bases" on the following page.

** This (Gain)/Loss represents the 6/30/11 balance of the accumulation of (gains)/losses through 6/30/08 and is amortized using a rolling 30-year period. Gains and losses incurred after 6/30/2011 will again accumulate to this base.

TEMPORARY CONFIDENTIAL

STOCK147937

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6379973665

## Schedule of Amortization Bases

There is a two year lag between the Valuation Date and the Contribution Fiscal Year.
- The assets, liabilities and funded status of the plan are measured as of the valuation date (June 30, 2011).
- The employer contribution rate determined by the valuation is for the fiscal year beginning two years after the valuation date (fiscal year 2013/2014).

This two year lag is necessary due to the amount of time needed to extract and test the membership and financial data, and due to the need to provide public agencies with their employer contribution rates well in advance of the start of the fiscal year.

The Unfunded Liability is used to determine the employer contribution and therefore must be rolled forward two years from the valuation date to the first day of the fiscal year for which the contribution is being determined. The Unfunded Liability is rolled forward each year by subtracting the expected Payment on the Unfunded Liability for the fiscal year and adjusting for interest. The Expected Payment on the Unfunded Liability for a fiscal year is equal to the Expected Employer Contribution for the fiscal year minus the Expected Normal Cost for the year. The Employer Contribution Rate for the first fiscal year is determined by the actuarial valuation two years ago and the rate for the second year is from the actuarial valuation one year ago. The Normal Cost Rate for each of the two fiscal years is assumed to be the same as the rate determined by the current valuation. All expected dollar amounts are determined by multiplying the rate by the expected payroll for the applicable fiscal year, based on payroll as of the valuation date.

| Reason for Base | Date Established | Amorti-zation Period | Balance 6/30/11 | Expected Payment 2011/2012 | Balance 6/30/12 | Expected Payment 2012/2013 | Amounts for Fiscal 2013/2014 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Balance 6/30/13 | Scheduled Payment for 2013-2014 | Payment as Percent-age of Payroll |
| FRESH START | 06/30/06 | 12 | $13,919,036 | $1,341,881 | $13,571,672 | $1,385,492 | $13,153,039 | $1,422,229 | 2.424% |
| (GAIN)/LOSS | 06/30/08 | 30 | $18,819,847 | $1,130,150 | $19,059,571 | $1,147,289 | $19,299,504 | $1,158,945 | 1.975% |
| ASSUMPTION CHANGE | 06/30/09 | 18 | $12,610,127 | $952,458 | $12,568,357 | $983,412 | $12,491,361 | $1,009,861 | 1.721% |
| SPECIAL (GAIN)/LOSS | 06/30/09 | 28 | $15,025,553 | $962,350 | $16,229,684 | $993,626 | $16,416,697 | $1,020,794 | 1.740% |
| SPECIAL (GAIN)/LOSS | 06/30/10 | 29 | $(6,848,912) | $0 | $(7,362,580) | $(443,158) | $(7,455,298) | $(455,325) | (0.776%) |
| GOLDEN HANDSHAKE | 06/30/11 | 20 | $4,033,437 | $0 | $4,335,945 | $0 | $4,661,141 | $351,941 | 0.600% |
| ASSUMPTION CHANGE | 06/30/11 | 20 | $595,033 | $(47,567) | $688,979 | $(48,994) | $791,450 | $19,920 | 0.034% |
| SPECIAL (GAIN)/LOSS | 06/30/11 | 30 | $(4,332,894) | $0 | $(4,657,861) | $0 | $(5,007,201) | $(300,685) | (0.512%) |
| PAYMENT (GAIN)/LOSS | 06/30/11 | 30 | $68,144 | $(824,259) | $927,865 | $(431,386) | $1,444,725 | $86,757 | 0.148% |
| TOTAL | | | $54,889,371 | $3,515,013 | $55,361,632 | $3,586,281 | $55,795,418 | $4,314,437 | 7.353% |

The special (gain)/loss bases were established using the temporary modification recognized in the 2009, 2010 and 2011 annual valuations. Unlike the gain/loss occurring in previous and subsequent years, the gain/loss recognized in 2009, 2010, and 2011 annual valuations will be amortized over fixed and declining 30 year periods so that these annual gain/losses will be fully paid off in 30 years.

The discount rate assumption is 7.5% after June 30, 2011 in the amortization schedule above.

Note: The assumption change at June 30, 2011 was phased-in over a two-year period. Without the phase-in, the total payment on the amortization bases would increase from 7.353% to 7.421%. Your plan can elect not to phase-in the cost of the assumption change by notifying your plan actuary prior to May 1, 2013. The required employer contribution rate with no phase-in is 18.007%.

TEMPORARY CONFIDENTIAL

STOCK147938

# Reconciliation of Required Employer Contributions

| | Percentage of Projected Payroll | Estimated $ Based on Projected Payroll |
|---|---|---|
| 1. Contribution for 7/1/12 – 6/30/13 | 16.881% | $ 10,453,149 |
| 2. Effect of changes since the prior year annual valuation | | |
| a) Effect of unexpected changes in demographics and financial results | 0.338% | 197,873 |
| b) Effect of plan changes | 0.600% | 352,077 |
| c) Effect of changes in Assumptions | 0.120% | 70,415 |
| d) Effect of change in payroll | - | (547,273) |
| e) Effect of elimination of amortization base | 0.000% | 0 |
| f) Effect of changes due to Fresh Start | 0.000% | 0 |
| g) Net effect of the changes above [Sum of (a) through (f)] | 1.058% | 73,092 |
| 3. Contribution for 7/1/13 – 6/30/14 [(1)+(2g)] | 17.939% | 10,526,241 |

The contribution actually paid (item 1) may be different if a prepayment of unfunded actuarial liability is made or a plan change became effective after the prior year's actuarial valuation was performed.

TEMPORARY CONFIDENTIAL

STOCK147939

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Employer Contribution Rate History

The table below provides a recent history of the employer contribution rates for your plan, as determined by the annual actuarial valuation.  It does not account for prepayments or benefit changes made in the middle of the year.

### Required By Valuation

| Fiscal Year | Employer Normal Cost | Unfunded Rate | Total Employer Contribution Rate |
|---|---|---|---|
| 2009 - 2010 | 10.871% | 2.213% | 13.084% |
| 2010 - 2011 | 10.844% | 3.243% | 14.087% |
| 2011 - 2012 | 10.546% | 6.395% | 16.941% |
| 2012 - 2013 | 10.268% | 6.613% | 16.881% |
| 2013 - 2014 | 10.586% | 7.353% | 17.939% |

# Funding History

The Funding History below shows the recent history of the actuarial accrued liability, the market value of assets, the actuarial value of assets, funded ratios and the annual covered payroll.  The Actuarial Value of Assets is used to establish funding requirements and the funded ratio on this basis represents the progress toward fully funding future benefits for current plan participants.  The funded ratio based on the Market Value of Assets is an indicator of the short-term solvency of the plan.

| Valuation Date | Accrued Liability | Actuarial Value of Assets (AVA) | Market Value of Assets (MVA) | Funded Ratio AVA | Funded Ratio MVA | Annual Covered Payroll |
|---|---|---|---|---|---|---|
| 06/30/07 | $ 453,621,297 | $ 434,989,302 | $ 500,599,835 | 95.9% | 110.4% | $ 57,119,972 |
| 06/30/08 | $ 491,467,308 | $ 460,950,390 | $ 467,269,585 | 93.8% | 95.1% | $ 66,743,768 |
| 06/30/09 | $ 535,150,533 | $ 478,673,431 | $ 345,912,268 | 89.4% | 64.6% | $ 62,265,227 |
| 06/30/10 | $ 548,129,809 | $ 495,325,729 | $ 383,364,117 | 90.4% | 69.9% | $ 56,256,198 |
| 06/30/11 | $ 568,852,600 | $ 513,963,229 | $ 450,853,223 | 90.4% | 79.3% | $ 53,699,986 |

# Hypothetical Termination Liability

In August 2011, the CalPERS Board adopted an investment policy and asset allocation strategy that more closely reflects expected benefit payments of the Terminated Agency Pool.  With this change, CalPERS increased benefit security for members while limiting its funding risk.

The table below shows the hypothetical termination liability, the market value of assets, the unfunded termination liability and the termination funded ratio.  The assumptions used, including the discount rate, are stated in Appendix A and take into account the yields available in the US Treasury market on the valuation date and the mortality load for contingencies.  The discount rate is duration weighted and is not necessarily the rate that would be used for this plan if it were to terminate.  The discount rate for this plan's termination liability would depend on the duration of the liabilities of this plan.  For purposes of this estimate, the discount rate used, 4.82%, is the June 30, 2011 30-year US Treasury Stripped Coupon Rate.  Please note, as of June 30, 2012 the 30-year US Treasury Stripped Coupon Rate was 2.87%.

| Valuation Date | Hypothetical Termination Liability | Market Value of Assets (MVA) | Unfunded Termination Liability | Termination Funded Ratio | Discount Rate |
|---|---|---|---|---|---|
| 06/30/11 | $ 808,560,358 | $ 450,853,223 | $ 357,707,135 | 55.8% | 4.82% |

TEMPORARY CONFIDENTIAL

STOCK147940

# SUMMARY OF ASSETS

- **RECONCILIATION OF THE MARKET VALUE OF ASSETS**

- **DEVELOPMENT OF THE ACTUARIAL VALUE OF ASSETS**

- **ASSET ALLOCATION**

- **CALPERS HISTORY OF INVESTMENT RETURNS**

TEMPORARY CONFIDENTIAL

STOCK147941

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Reconciliation of the Market Value of Assets

| | | | |
|----|----|----|---:|
| 1. | Market Value of Assets as of 6/30/10 Including Receivables | $ | 383,364,117 |
| 2. | Receivables for Service Buybacks as of 6/30/10 | | 510,605 |
| 3. | Market Value of Assets as of 6/30/10 | | 382,853,512 |
| 4. | Employer Contributions | | 7,479,032 |
| 5. | Employee Contributions | | 5,326,663 |
| 6. | Benefit Payments to Retirees and Beneficiaries | | (27,208,149) |
| 7. | Refunds | | (146,698) |
| 8. | Lump Sum Payments | | (7,630) |
| 9. | Transfers and Miscellaneous Adjustments | | 48,733 |
| 10. | Investment Return | | 82,140,221 |
| 11. | Market Value of Assets as of 6/30/11 | $ | 450,485,686 |
| 12. | Receivables for Service Buybacks as of 6/30/11 | | 367,537 |
| 13. | Market Value of Assets as of 6/30/11 Including Receivables | $ | 450,853,223 |

# Development of the Actuarial Value of Assets

| | | | |
|----|----|----|---:|
| 1. | Actuarial Value of Assets as of 6/30/10 Used For Rate Setting Purposes | $ | 495,325,729 |
| 2. | Receivables for Service Buybacks as of 6/30/10 | | 510,605 |
| 3. | Actuarial Value of Assets as of 6/30/10 | | 494,815,124 |
| 4. | Employer Contributions | | 7,479,032 |
| 5. | Employee Contributions | | 5,326,663 |
| 6. | Benefit Payments to Retirees and Beneficiaries | | (27,208,149) |
| 7. | Refunds | | (146,698) |
| 8. | Lump Sum Payments | | (7,630) |
| 9. | Transfers and Miscellaneous Adjustments | | 48,733 |
| 10. | Expected Investment Income at 7.75% | | 37,796,475 |
| 11. | Expected Actuarial Value of Assets | $ | 518,103,550 |
| 12. | Market Value of Assets as of 6/30/11 | $ | 450,485,686 |
| 13. | Preliminary Actuarial Value of Assets [(11) + ((12) − (11)) / 15] | | 513,595,692 |
| 14. | Maximum Actuarial Value of Assets (120% of (12)) | | 540,582,823 |
| 15. | Minimum Actuarial Value of Assets (80% of (12)) | | 360,388,549 |
| 16. | Actuarial Value of Assets {Lesser of [(14), Greater of ((13), (15))]} | | 513,595,692 |
| 17. | Actuarial Value to Market Value Ratio | | 114.0% |
| 18. | Receivables for Service Buybacks as of 6/30/11 | | 367,537 |
| 19. | Actuarial Value of Assets as of 6/30/11 Used for Rate Setting Purposes | $ | 513,963,229 |

TEMPORARY CONFIDENTIAL

STOCK147942

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Asset Allocation

CalPERS follows a strategic asset allocation policy that identifies the percentage of funds to be invested in each asset class. The current target allocation was adopted by the Board in December 2010.

The asset allocation and market value of assets shown below reflect the values of the Public Employees Retirement Fund (PERF) in its entirety as of June 30, 2011. The assets for CITY OF STOCKTON MISCELLANEOUS PLAN are part of the Public Employees Retirement Fund (PERF) and are invested accordingly.

| (A)<br>Asset Class | (B)<br>Market Value<br>($ Billion) | (C)<br>Current<br>Allocation |
|---|---|---|
| 1) Short-Term Investments | 7.9 | 3.3% |
| 2) Domestic Equity | 56.3 | 23.5% |
| 3) International Equity | 60.4 | 25.2% |
| 4) Domestic Debt | 49.2 | 20.6% |
| 5) International Debt | 3.9 | 1.6% |
| 6) Inflation Linked | 8.1 | 3.4% |
| 7) Real Estate | 19.1 | 8.0% |
| 8) Alternative Investment | 34.4 | 14.4% |
| **Total Fund** | **$239.3** | **100.0%** |



TEMPORARY CONFIDENTIAL

STOCK147943

CALPERS ACTUARIAL VALUATION - June 30, 2011
MISCELLANEOUS PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# CalPERS History of Investment Returns

The following is a chart with historical annual returns of the Public Employees Retirement Fund for each fiscal year ending on June 30.  Beginning with June 30, 2002 the figures are reported as gross of fees.



TEMPORARY CONFIDENTIAL                                    STOCK147944

# Exhibit S



**California Public Employees' Retirement System**
**Actuarial Office**
P.O. Box 942701
Sacramento, CA  94229-2701
TTY: (916) 795-3240
(888) 225-7377 phone · (916) 795-2744 fax
www.calpers.ca.gov

**October 2012**

**SAFETY PLAN OF THE CITY OF STOCKTON (CalPERS ID 6373973665)**
**Annual Valuation Report as of June 30, 2011**

Dear Employer,

As an attachment to this letter, you will find a copy of the June 30, 2011 actuarial valuation report of your pension plan. This report contains important actuarial information about your pension plan at CalPERS. Your CalPERS staff actuary is available to discuss the report with you.

**Changes Since the Prior Year's Valuation**

The CalPERS' Board of Administration adopted updated actuarial assumptions to be used beginning with the June 30, 2011 valuation. In addition, a temporary modification to our method of determining the actuarial value of assets and amortizing gains and losses was implemented for the valuations as of June 30, 2009 through June 30, 2011. The effect of those modifications continue in this valuation.

There may also be changes specific to your plan such as contract amendments and funding changes.

Further descriptions of general changes are included in the "Highlights and Executive Summary" section and in Appendix A, "Statement of Actuarial Data, Methods and Assumptions." The effect of the changes on your rate is included in the "Reconciliation of Required Employer Contributions." **As noted on page 13 of the report, your plan can elect not to phase-in the cost of the assumption change by notifying your plan actuary prior to May 1, 2013.**

**Future Contribution Rates**

The exhibit below displays the required employer contribution rate before any cost sharing and Superfunded status for 2013/2014 along with estimates of the contribution rate for 2014/2015 and 2015/2016 and the probable Superfunded status for 2014/2015. The estimated rate for 2014/2015 is based solely on a projection of the investment return for fiscal 2011/2012, namely 0%. The estimated rate for 2015/2016 uses the valuation assumption of 7.5% as the investment return for fiscal 2012/2013. See Appendix D, "Analysis of Future Investment Return Scenarios", for rate projections under a variety of investment return scenarios. **These rates may not be GASB compliant.** See Appendix C for the GASB compliant rate. Please disregard any projections that we may have provided to you in the past.

| Fiscal Year | Employer Contribution Rate | Superfunded? |
|---|---|---|
| 2013/2014 | 34.605% | NO |
| 2014/2015 | 38.9% (projected) | NO |
| 2015/2016 | 39.8% (projected) | N/A |

Member contributions other than cost sharing, (whether paid by the employer or the employee) are in addition to the above rates.

The estimates for 2014/2015 and 2015/2016 also assume that there are no future amendments and no liability gains or losses (such as larger than expected pay increases, more retirements than expected, etc.). This is a very important assumption because these gains and losses do occur and can have a significant impact on your contribution rate. Even for the largest plans, such gains and losses often cause a change in the employer's contribution rate of one or two percent and may be even larger in some less common instances. These gains and losses cannot be predicted in advance so the projected employer contribution rates are just estimates. Your actual rate for 2014/2015 will be provided in next year's report.

TEMPORARY CONFIDENTIAL

SAFETY PLAN OF THE CITY OF STOCKTON (CalPERS ID 6373973665)
October 2012
Page 2

**California Actuarial Advisory Panel Recommendations**

The report satisfies all basic disclosure requirements under the Model Disclosure Elements for Actuarial Valuation Reports recommended by the California Actuarial Advisory Panel, except for the original base amounts of the various components of the unfunded liability amortization.

The report gives the following additional information classified as enhanced risk disclosures under the Model Disclosure Elements for Actuarial Valuation Reports recommended by the California Actuarial Advisory Panel:
- "Deterministic stress test", projecting future results under different investment income scenarios.   (See Appendix D's Analysis of Future Investment Return Scenarios.)
- "Sensitivity analysis", showing the impact on current valuation results of a plus or minus 1% change in the discount rate.  (See Appendix D's Analysis of Discount Rate Sensitivity.)

We are very busy preparing actuarial valuations for other public agencies and expect to complete all such valuations by the end of October.  We understand that you might have a number of questions about these results.  While we are very interested in discussing these results with your agency, in the interest of allowing us to give every public agency their result, we ask that, if at all possible, you wait until after October 31 to contact us with questions.  If you have questions, please call (888) CalPERS (225-7377).

Sincerely,

ALAN MILLIGAN
Chief Actuary

TEMPORARY CONFIDENTIAL



**CalPERS**

# ACTUARIAL VALUATION
### as of June 30, 2011

# for the
# SAFETY PLAN
# of the
# CITY OF STOCKTON
### (CalPERS ID 6373973665)

# REQUIRED CONTRIBUTIONS
# FOR FISCAL YEAR
# July 1, 2013 – June 30, 2014

TEMPORARY CONFIDENTIAL

STOCK147991

# TABLE OF CONTENTS

**ACTUARIAL CERTIFICATION** ........................................... 1

**HIGHLIGHTS AND EXECUTIVE SUMMARY**
Purpose of the Report ..... 5
Required Employer Contribution ..... 5
Funded Status ..... 6
Cost ..... 6
Changes Since the Prior Valuation ..... 7

**SUMMARY OF LIABILITIES AND RATES**
Development of Accrued and Unfunded Liabilities ..... 11
(Gain) / Loss Analysis 06/30/10 - 06/30/11 ..... 12
Schedule of Amortization Bases ..... 13
Reconciliation of Required Employer Contributions ..... 14
Employer Contribution Rate History ..... 15
Funding History ..... 15
Hypothetical Termination Liability ..... 15

**SUMMARY OF ASSETS**
Reconciliation of the Market Value of Assets ..... 19
Development of the Actuarial Value of Assets ..... 19
Asset Allocation ..... 20
CalPERS History of Investment Returns ..... 21

**SUMMARY OF PARTICIPANT DATA**
Summary of Valuation Data ..... 25
Active Members ..... 26
Transferred and Terminated Members ..... 27
Retired Members and Beneficiaries ..... 28

**APPENDIX A – ACTUARIAL METHODS AND ASSUMPTIONS**
Actuarial Data ..... A-1
Actuarial Methods ..... A-1
Actuarial Assumptions ..... A-3
Miscellaneous ..... A-17

**APPENDIX B – PLAN PROVISIONS**
Summary of Plan's Major Benefit Options ..... B-1
Description of CalPERS' Principal Plan Provisions ..... B-3

**APPENDIX C – GASB STATEMENT NO. 27**

**APPENDIX D – RISK ANALYSIS**
Volatility Ratios ..... D-1
Analysis of Future Investment Return Scenarios ..... D-2
Analysis of Discount Rate Sensitivity ..... D-3

**APPENDIX E – GLOSSARY OF ACTUARIAL TERMS**

FIN PROCESS CONTROL ID (CY) 390713     FIN PROCESS CONTROL ID (PY) 368370     REPORT ID 69069

# ACTUARIAL CERTIFICATION

To the best of our knowledge, this report is complete and accurate and contains sufficient information to disclose, fully and fairly, the funded condition of the SAFETY PLAN OF THE CITY OF STOCKTON. This valuation is based on the member and financial data as of June 30, 2011 provided by the various CalPERS databases and the benefits under this plan with CalPERS as of the date this report was produced. It is our opinion that the valuation has been performed in accordance with generally accepted actuarial principles, in accordance with standards of practice prescribed by the Actuarial Standards Board, and that the assumptions and methods are internally consistent and reasonable for this plan, as prescribed by the CalPERS Board of Administration according to provisions set forth in the California Public Employees' Retirement Law.

The undersigned is an actuary for CalPERS, who is a member of the American Academy of Actuaries and the Society of Actuaries and meets the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained herein.


KELLY STURM, ASA, MAAA
Associate Pension Actuary, CalPERS

TEMPORARY CONFIDENTIAL

STOCK147993

# HIGHLIGHTS AND EXECUTIVE SUMMARY

- **PURPOSE OF THE REPORT**

- **REQUIRED CONTRIBUTIONS**

- **FUNDED STATUS**

- **COST**

- **CHANGES SINCE THE PRIOR VALUATION**

TEMPORARY CONFIDENTIAL

STOCK147994

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Purpose of the Report

This report presents the results of the June 30, 2011 actuarial valuation of the SAFETY PLAN OF THE CITY OF STOCKTON of the California Public Employees' Retirement System (CalPERS). The valuation was prepared by the Plan Actuary in order to:

- set forth the actuarial assets and accrued liabilities of this plan as of June 30, 2011;
- determine the required employer contribution rate for this plan for the fiscal year July 1, 2013 through June 30, 2014;
- provide actuarial information as of June 30, 2011 to the CalPERS Board of Administration and other interested parties; and
- provide pension information as of June 30, 2011 to be used in financial reports subject to Governmental Accounting Standards Board (GASB) Statement Number 27 for a Single Employer Defined Benefit Pension Plan.

The use of this report for any other purposes may be inappropriate. In particular, this report does not contain information applicable to alternative benefit costs. The employer should contact their actuary before disseminating any portion of this report for any reason that is not explicitly described above.

# Required Employer Contribution

|  | | Fiscal Year 2012/2013 | | Fiscal Year 2013/2014 |
|---|---|---|---|---|
| **Required Employer Contributions** | | | | |
| 1. Contribution in Projected Dollars | | | | |
| a) Total Normal Cost | $ | 17,898,897 | $ | 16,760,403 |
| b) Employee Contribution[1] | $ | 5,428,478 | $ | 5,011,749 |
| c) Employer Normal Cost [(1a) − (1b)] | | 12,470,419 | | 11,748,654 |
| d) Unfunded Contribution | $ | 6,704,208 | $ | 7,521,294 |
| e) Total Employer Contribution [(1c) + (1d)] | | 19,174,627 | | 19,269,948 |
| f) Employee Cost Sharing | $ | | $ | 0 |
| g) Net Employer Contribution [(1e) − (1f)] | | | | 19,269,948 |
| Annual Lump Sum Prepayment Option[2] [(1g) / 1.075^.5] | | 18,472,186 | | 18,585,588 |
| 2. Contribution as a Percentage of Payroll | | | | |
| a) Total Normal Cost | | 29.675% | | 30.098% |
| b) Employee Contribution[1] | | 9.000% | | 9.000% |
| c) Employer Normal Cost [(2a) − (2b)] | | 20.675% | | 21.098% |
| d) Unfunded Rate | | 11.115% | | 13.507% |
| e) Total Employer Rate [(2c) + (2d)] | | 31.790% | | 34.605% |
| f) Employee Cost Sharing[3] | | | | 0.000% |
| g) Net Employer Contribution Rate [(2e) − (2f)] | | | | 34.605% |

[1]This is the percentage specified in the Public Employees Retirement Law, net of any reduction from the use of a modified formula. Employee cost sharing is shown separately and is therefore not included in this line item.

[2]Payment must be received by CalPERS before the first payroll reported to CalPERS of the new fiscal year and after June 30.

[3]Because your contract includes cost sharing rates by employee category, cost sharing is not reflected anywhere in this report.

TEMPORARY CONFIDENTIAL

STOCK147995

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Funded Status

| | | June 30, 2010 | | June 30, 2011 |
|---|---|---|---|---|
| 1. Present Value of Projected Benefits | $ | 914,777,607 | $ | 946,603,971 |
| 2. Entry Age Normal Accrued Liability | $ | 758,325,561 | $ | 802,778,310 |
| 3. Actuarial Value of Assets (AVA) | | 662,601,684 | | 685,732,778 |
| 4. Unfunded Liability (AVA Basis) [(2) − (3)] | $ | 95,723,877 | $ | 117,045,532 |
| 5. Funded Ratio (AVA Basis) [(3) / (2)] | | 87.4% | | 85.4% |
| | | | | |
| 6. Market Value of Assets (MVA) | $ | 509,873,530 | $ | 598,289,135 |
| 7. Unfunded Liability (MVA Basis) [(2) − (6)] | | 248,452,031 | | 204,489,175 |
| 8. Funded Ratio (MVA Basis) [(6) / (2)] | | 67.2% | | 74.5% |
| Superfunded Status | | No | | No |

# Cost

### Actuarial Cost Estimates in General

What will this pension plan cost? Unfortunately, there is no simple answer. There are two major reasons for the complexity of the answer. First, all actuarial calculations, including the ones in this report, are based on a number of assumptions about the future. These assumptions can be divided into two categories.

- Demographic assumptions include the percentage of employees that will terminate, die, become disabled, and retire in each future year.
- Economic assumptions include future salary increases for each active employee, and the assumption with the greatest impact, future asset returns at CalPERS for each year into the future until the last dollar is paid to current members of your plan.

While CalPERS has set these assumptions to reflect our best estimate of the real future of your plan, it must be understood that these assumptions are very long term predictors and will surely not be realized in any one year. For example, while the asset earnings at CalPERS have averaged more than the assumed return of 7.5% for the past twenty year period ending June 30, 2012, returns for each fiscal year ranged from -24% to +21.7%.

Second, the very nature of actuarial funding produces the answer to the question of plan cost as the sum of two separate pieces.

- The Normal Cost (i.e., the future annual premiums in the absence of surplus or unfunded liability) expressed as a percentage of total active payroll.
- The Past Service Cost or Accrued Liability (i.e., the current value of the benefit for all credited past service of current members) which is expressed as a lump sum dollar amount.

The cost is the sum of a percent of future pay and a lump sum dollar amount (the sum of an apple and an orange if you will). To communicate the total cost, either the Normal Cost (i.e., future percent of payroll) must be converted to a lump sum dollar amount (in which case the total cost is the present value of benefits), or the Past Service Cost (i.e., the lump sum) must be converted to a percent of payroll (in which case the total cost is expressed as the employer's rate, part of which is permanent and part temporary). Converting the Past Service Cost lump sum to a percent of payroll requires a specific amortization period, and the employer rate will vary depending on the amortization period chosen.

TEMPORARY CONFIDENTIAL

STOCK147996

# Changes since the Prior Valuation

**Actuarial Assumptions**

The CalPERS Actuarial office conducted a study and hired an independent evaluator to assess current economic assumptions.  Based on the information from both studies, the CalPERS Board of Administration has adopted updated economic assumptions to be used beginning with the June 30, 2011 valuation.  In particular, the recommendation based on both studies was to lower the price inflation from 3.00 to 2.75 percent.

Lowering the price inflation had a direct impact on the Investment Return and the Overall Payroll Growth assumptions.  The Investment Return assumption is calculated as the sum of the price inflation and the real rate of return.  Our assumed real rate of return is 4.75 percent.  When added to our new price inflation of 2.75 percent, the resulting investment return is 7.50 percent.  The Overall Payroll Growth is calculated as the sum of the price inflation and real wage inflation.  Our assumed real wage inflation is 0.25 percent.  When added to our new price inflation of 2.75 percent, the resulting overall payroll growth is 3.00 percent.

The new assumptions are described in Appendix A.  The effect of change in assumption on the unfunded liability is shown in the "(Gain)/Loss Analysis" and the effect on your employer contribution rate is included in the "Reconciliation of Required Employer Contributions".  **As noted on page 13 of the report, your plan can elect not to phase-in the cost of the assumption change by notifying your plan actuary prior to May 1, 2013.**

The limitations on benefits imposed by Internal Revenue Code Section 415 were taken into account in this valuation.  The effect of these limitations has been deemed immaterial on the overall results and no additional charge to the change in assumptions base was added.

**Actuarial Methods**

A method change was adopted by the CalPERS Board in June 2009.  We are in the third year of a 3-year temporary change to the asset smoothing method and the amortization of gains and losses in order to phase in the impact of the -24% investment loss experienced by CalPERS in fiscal year 2008-2009.  The following changes were adopted:

- Increase the corridor limits for the actuarial value of assets from 80%-120% of market value to 60%-140% of market value on June 30, 2009
- Reduce the corridor limits for the actuarial value of assets to 70%-130% of market value on June 30, 2010
- Return to the 80%-120% of market value corridor limits for the actuarial value of assets on June 30, 2011 and thereafter
- Isolate and amortize all gains and losses during fiscal year 2008-2009, 2009-2010 and 2010-2011 over fixed and declining 30 year periods (as opposed to the current rolling 30 year amortization)

A complete description of all methods is in Appendix A.  The detailed calculation of the actuarial value of assets is shown in the "Development of the Actuarial Value of Assets."

**Benefits**

The standard actuarial practice at CalPERS is to recognize mandated legislative benefit changes in the first annual valuation whose valuation date follows the effective date of the legislation.  Voluntary benefit changes by plan amendment are generally included in the first valuation that is prepared after the amendment becomes effective even if the valuation date is prior to the effective date of the amendment.

This valuation generally reflects plan changes by amendments effective before the date of the report.  Please refer to Appendix B for a summary of the plan provisions used in the valuation.  The effect of any mandated benefit changes or plan amendments on the unfunded liability is shown in the "(Gain)/Loss Analysis" and the effect on your employer contribution rate is shown in the "Reconciliation of Required Employer Contributions".  It should be noted that no change in liability or rate is shown for any plan changes which were already included in the prior year's valuation.

TEMPORARY CONFIDENTIAL   STOCK147997

# SUMMARY OF LIABILITIES AND RATES

- **DEVELOPMENT OF ACCRUED AND UNFUNDED LIABILITIES**

- **(GAIN) / LOSS ANALYSIS 06/30/10 - 06/30/11**

- **SCHEDULE OF AMORTIZATION BASES**

- **RECONCILIATION OF REQUIRED EMPLOYER CONTRIBUTIONS**

- **EMPLOYER CONTRIBUTION RATE HISTORY**

- **FUNDING HISTORY**

- **HYPOTHETICAL TERMINATION LIABILITY**

STOCK147998

# Development of Accrued and Unfunded Liabilities

1. Present Value of Projected Benefits
   a) Active Members                    $     385,445,707
   b) Transferred Members                7,019,468
   c) Terminated Members                3,439,354
   d) Members and Beneficiaries Receiving Payments    550,699,442
   e) Total                            $     946,603,971

2. Present Value of Future Employer Normal Costs    $     100,279,893

3. Present Value of Future Employee Contributions    $     43,545,768

4. Entry Age Normal Accrued Liability
   a) Active Members [(1a) - (2) - (3)]        $     241,620,046
   b) Transferred Members (1b)             7,019,468
   c) Terminated Members (1c)             3,439,354
   d) Members and Beneficiaries Receiving Payments (1d)    550,699,442
   e) Total                            $     802,778,310

5. Actuarial Value of Assets (AVA)         $     685,732,778
6. Unfunded Accrued Liability (AVA Basis) [(4e) − (5)]    $     117,045,532
7. Funded Ratio (AVA Basis) [(5) / (4e)]             85.4%

8. Market Value of Assets (MVA)            $     598,289,135
9. Unfunded Liability (MVA Basis) [(4e) - (8)]      $     204,489,175
10. Funded Ratio (MVA Basis) [(8) / (4e)]          74.5%

TEMPORARY CONFIDENTIAL

STOCK147999

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# (Gain)/Loss Analysis 6/30/10 – 6/30/11

To calculate the cost requirements of the plan, assumptions are made about future events that affect the amount and timing of benefits to be paid and assets to be accumulated.  Each year actual experience is compared to the expected experience based on the actuarial assumptions.  This results in actuarial gains or losses, as shown below.

| | | | |
|---|---|---|---:|
| **A** | **Total (Gain)/Loss for the Year*** | | |
| | 1. | Unfunded Accrued Liability (UAL) as of 6/30/10 | $ 95,723,877 |
| | 2. | Expected Payment on the UAL during 2010/2011 | 1,468,791 |
| | 3. | Interest through 6/30/11 [.0775 x (A1) - ((1.0775)½ - 1) x (A2)] | 7,362,747 |
| | 4. | Expected UAL before all other changes [(A1) - (A2) + (A3)] | 101,617,833 |
| | 5. | Change due to plan changes | 3,079,815 |
| | 6. | Change due to assumption change | 13,696,329 |
| | 7. | Expected UAL after all other changes [(A4) + (A5) + (A6)] | 118,393,977 |
| | 8. | Actual UAL as of 6/30/11 | 117,045,532 |
| | 9. | Total (Gain)/Loss for 2010/2011 [(A8) - (A7)] | $ (1,348,445) |
| | | | |
| **B** | **Contribution (Gain)/Loss for the Year** | | |
| | 1. | Expected Contribution (Employer and Employee) | $ 18,258,616 |
| | 2. | Interest on Expected Contributions | 694,320 |
| | 3. | Actual Contributions | 18,411,150 |
| | 4. | Interest on Actual Contributions | 700,120 |
| | 5. | Expected Contributions with Interest [(B1) + (B2)] | 18,952,936 |
| | 6. | Actual Contributions with Interest [(B3) + (B4)] | 19,111,270 |
| | 7. | Contribution (Gain)/Loss [(B5) - (B6)] | $ (158,334) |
| | | | |
| **C** | **Asset (Gain)/Loss for the Year** | | |
| | 1. | Actuarial Value of Assets as of 6/30/10 Including Receivables | $ 662,601,684 |
| | 2. | Receivables as of 6/30/10 | 779,684 |
| | 3. | Actuarial Value of Assets as of 6/30/10 | 661,822,000 |
| | 4. | Contributions Received | 18,411,150 |
| | 5. | Benefits and Refunds Paid | (39,292,021) |
| | 6. | Transfers and miscellaneous adjustments | (55,871) |
| | 7. | Expected Int. [.0775 x (C3) + ((1.0775)½ - 1) x ((C4) + (C5) + (C6))] | 50,495,044 |
| | 8. | Expected Assets as of 6/30/11 [(C3) + (C4) + (C5) + (C6) + (C7)] | 691,380,302 |
| | 9. | Receivables as of 6/30/11 | 598,451 |
| | 10. | Expected Assets Including Receivables | 691,978,753 |
| | 11. | Actual Actuarial Value of Assets as of 6/30/11 | 685,732,778 |
| | 12. | Asset (Gain)/Loss [(C10) - (C11)] | $ 6,245,975 |
| | | | |
| **D** | **Liability (Gain)/Loss for the Year** | | |
| | 1. | Total (Gain)/Loss (A9) | $ (1,348,445) |
| | 2. | Contribution (Gain)/Loss (B7) | (158,334) |
| | 3. | Asset (Gain)/Loss (C12) | 6,245,975 |
| | 4. | Liability (Gain)/Loss [(D1) - (D2) - (D3)] | $ (7,436,086) |
| | | | |
| | **Development of the (Gain)/Loss Balance as of 6/30/11**** | | |
| | 1. | (Gain)/Loss Balance as of 6/30/10 | $ 19,854,956 |
| | 2. | Payment Made on the Balance during 2010/2011 | 1,192,309 |
| | 3. | Interest through 6/30/11 [.0775 x (1) - ((1.0775)^{1/2} - 1) x (2)] | 1,493,419 |
| | 4. | Scheduled (Gain)/Loss Balance as of 6/30/11 [(1) - (2) + (3)] | $ 20,156,066 |

* The Total (Gain)/Loss for 2010/2011 is being amortized over a fixed and declining 30-year period and is shown as "Special (Gain)/Loss" in the "Schedule of Amortization Bases" on the following page.

** This (Gain)/Loss represents the 6/30/11 balance of the accumulation of (gains)/losses through 6/30/08 and is amortized using a rolling 30-year period.  Gains and losses incurred after 6/30/2011 will again accumulate to this base.

TEMPORARY CONFIDENTIAL

STOCK148000

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Schedule of Amortization Bases

There is a two year lag between the Valuation Date and the Contribution Fiscal Year.
- The assets, liabilities and funded status of the plan are measured as of the valuation date (June 30, 2011).
- The employer contribution rate determined by the valuation is for the fiscal year beginning two years after the valuation date (fiscal year 2013/2014).

This two year lag is necessary due to the amount of time needed to extract and test the membership and financial data, and due to the need to provide public agencies with their employer contribution rates well in advance of the start of the fiscal year.

The Unfunded Liability is used to determine the employer contribution and therefore must be rolled forward two years from the valuation date to the first day of the fiscal year for which the contribution is being determined. The Unfunded Liability is rolled forward each year by subtracting the expected Payment on the Unfunded Liability for the fiscal year and adjusting for interest. The Expected Payment on the Unfunded Liability for a fiscal year is equal to the Expected Employer Contribution for the fiscal year minus the Expected Normal Cost for the year. The Employer Contribution Rate for the first fiscal year is determined by the actuarial valuation two years ago and the rate for the second year is from the actuarial valuation one year ago. The Normal Cost Rate for each of the two fiscal years is assumed to be the same as the rate determined by the current valuation. All expected dollar amounts are determined by multiplying the rate by the expected payroll for the applicable fiscal year, based on payroll as of the valuation date.

| Reason for Base | Date Established | Amortization Period | Balance 6/30/11 | Expected Payment 2011/2012 | Balance 6/30/12 | Expected Payment 2012/2013 | Amounts for Fiscal 2013/2014 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Balance 6/30/13 | Scheduled Payment for 2013-2014 | Payment as Percentage of Payroll |
| FRESH START | 06/30/06 | 25 | $22,304,013 | $1,413,731 | $22,511,026 | $1,459,677 | $22,685,928 | $1,499,414 | 2.693% |
| (GAIN)/LOSS | 06/30/08 | 30 | $20,156,066 | $1,210,391 | $20,412,811 | $1,228,748 | $20,669,779 | $1,241,231 | 2.229% |
| ASSUMPTION CHANGE | 06/30/09 | 18 | $16,627,413 | $1,255,888 | $16,572,337 | $1,296,704 | $16,470,811 | $1,331,579 | 2.391% |
| SPECIAL (GAIN)/LOSS | 06/30/09 | 28 | $30,791,897 | $1,849,083 | $31,184,119 | $1,909,179 | $31,543,449 | $1,961,378 | 3.522% |
| SPECIAL (GAIN)/LOSS | 06/30/10 | 29 | $11,724,842 | $0 | $12,604,205 | $758,655 | $12,762,930 | $779,484 | 1.400% |
| GOLDEN HANDSHAKE | 06/30/11 | 20 | $3,079,815 | $0 | $3,310,801 | $0 | $3,559,111 | $268,732 | 0.483% |
| ASSUMPTION CHANGE | 06/30/11 | 20 | $13,696,329 | $(301,290) | $15,035,938 | $(310,328) | $16,485,388 | $414,912 | 0.745% |
| SPECIAL (GAIN)/LOSS | 06/30/11 | 30 | $(1,348,444) | $0 | $(1,449,577) | $0 | $(1,558,296) | $(93,576) | (0.168%) |
| PAYMENT (GAIN)/LOSS | 06/30/11 | 30 | $13,601 | $(1,228,119) | $1,287,962 | $(562,093) | $1,967,350 | $118,140 | 0.212% |
| TOTAL | | | $117,045,532 | $4,199,684 | $121,469,622 | $5,780,542 | $124,586,450 | $7,521,294 | 13.507% |

The special (gain)/loss bases were established using the temporary modification recognized in the 2009, 2010 and 2011 annual valuations. Unlike the gain/loss occurring in previous and subsequent years, the gain/loss recognized in the 2009, 2010, and 2011 annual valuations will be amortized over fixed and declining 30 year periods so that these annual gain/losses will be fully paid off in 30 years.

The discount rate assumption is 7.5% after June 30, 2011 in the amortization schedule above.

Note: The assumption change at June 30, 2011 was phased-in over a two year period. Without the phase-in, the total payment on the amortization bases would increase from 13.507% to 14.997%. Your plan can elect not to phase-in the cost of the assumption change by notifying your plan actuary prior to May 1, 2013. The required employer contribution rate with no phase-in is 36.095%.

TEMPORARY CONFIDENTIAL

STOCK148001

# Reconciliation of Required Employer Contributions

|  | Percentage of Projected Payroll | Estimated $ Based on Projected Payroll |
|---|---|---|
| 1. Contribution for 7/1/12 – 6/30/13 | 31.790% | $    19,174,627 |
| 2. Effect of changes since the prior year annual valuation | | |
| a) Effect of unexpected changes in demographics and financial results | 1.013% | 563,835 |
| b) Effect of plan changes | 0.483% | 268,964 |
| c) Effect of changes in Assumptions | 1.319% | 734,500 |
| d) Effect of change in payroll | - | (1,471,978) |
| e) Effect of elimination of amortization base | 0.000% | 0 |
| f) Effect of changes due to Fresh Start | 0.000% | 0 |
| g) Net effect of the changes above [Sum of (a) through (f)] | 2.815% | 95,321 |
| 3. Contribution for 7/1/13 – 6/30/14 [(1)+(2g)] | 34.605% | 19,269,948 |

The contribution actually paid (item 1) may be different if a prepayment of unfunded actuarial liability is made or a plan change became effective after the prior year's actuarial valuation was performed.

TEMPORARY CONFIDENTIAL

STOCK148002

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Employer Contribution Rate History

The table below provides a recent history of the employer contribution rates for your plan, as determined by the annual actuarial valuation. It does not account for prepayments or benefit changes made in the middle of the year.

### Required By Valuation

| Fiscal Year | Employer Normal Cost | Unfunded Rate | Total Employer Contribution Rate |
|---|---|---|---|
| 2009 - 2010 | 19.053% | 2.308% | 21.361% |
| 2010 - 2011 | 19.193% | 4.078% | 23.271% |
| 2011 - 2012 | 20.255% | 8.844% | 29.099% |
| 2012 - 2013 | 20.675% | 11.115% | 31.790% |
| 2013 - 2014 | 21.098% | 13.507% | 34.605% |

# Funding History

The Funding History below shows the recent history of the actuarial accrued liability, the market value of assets, the actuarial value of assets, funded ratios and the annual covered payroll. The Actuarial Value of Assets is used to establish funding requirements and the funded ratio on this basis represents the progress toward fully funding future benefits for current plan participants. The funded ratio based on the Market Value of Assets is an indicator of the short-term solvency of the plan.

| Valuation Date | Accrued Liability | Actuarial Value of Assets (AVA) | Market Value of Assets (MVA) | Funded Ratio AVA | Funded Ratio MVA | Annual Covered Payroll |
|---|---|---|---|---|---|---|
| 06/30/07 | $ 619,816,290 | $ 592,315,427 | $ 677,896,511 | 95.6% | 109.4% | $ 54,127,744 |
| 06/30/08 | $ 664,028,434 | $ 625,633,414 | $ 630,768,567 | 94.2% | 95.0% | $ 56,811,031 |
| 06/30/09 | $ 724,324,197 | $ 644,939,577 | $ 461,800,556 | 89.0% | 63.8% | $ 58,595,623 |
| 06/30/10 | $ 758,325,561 | $ 662,601,684 | $ 509,873,530 | 87.4% | 67.2% | $ 54,798,082 |
| 06/30/11 | $ 802,778,310 | $ 685,732,778 | $ 598,289,135 | 85.4% | 74.5% | $ 50,960,671 |

# Hypothetical Termination Liability

In August 2011, the CalPERS Board adopted an investment policy and asset allocation strategy that more closely reflects expected benefit payments of the Terminated Agency Pool. With this change, CalPERS increased benefit security for members while limiting its funding risk.

The table below shows the hypothetical termination liability, the market value of assets, the unfunded termination liability and the termination funded ratio. The assumptions used, including the discount rate, are stated in Appendix A and take into account the yields available in the US Treasury market on the valuation date and the mortality load for contingencies. The discount rate is duration weighted and is not necessarily the rate that would be used for this plan if it were to terminate. The discount rate for this plan's termination liability would depend on the duration of the liabilities of this plan. For purposes of this estimate, the discount rate used, 4.82%, is the June 30, 2011 30-year US Treasury Stripped Coupon Rate. Please note, as of June 30, 2012 the 30-year US Treasury Stripped Coupon Rate was 2.87%.

| Valuation Date | Hypothetical Termination Liability | Market Value of Assets (MVA) | Unfunded Termination Liability | Termination Funded Ratio | Discount Rate |
|---|---|---|---|---|---|
| 06/30/11 | $ 1,186,712,063 | $ 598,289,135 | $ 588,422,928 | 50.4% | 4.82% |

TEMPORARY CONFIDENTIAL

STOCK148003

# SUMMARY OF ASSETS

- **RECONCILIATION OF THE MARKET VALUE OF ASSETS**

- **DEVELOPMENT OF THE ACTUARIAL VALUE OF ASSETS**

- **ASSET ALLOCATION**

- **CALPERS HISTORY OF INVESTMENT RETURNS**

TEMPORARY CONFIDENTIAL

STOCK148004

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Reconciliation of the Market Value of Assets

| | | | |
|---|---|---|---|
| 1. | Market Value of Assets as of 6/30/10 Including Receivables | $ | 509,873,530 |
| 2. | Receivables for Service Buybacks as of 6/30/10 | | 779,684 |
| 3. | Market Value of Assets as of 6/30/10 | | 509,093,846 |
| 4. | Employer Contributions | | 12,600,426 |
| 5. | Employee Contributions | | 5,810,724 |
| 6. | Benefit Payments to Retirees and Beneficiaries | | (39,234,862) |
| 7. | Refunds | | (57,159) |
| 8. | Lump Sum Payments | | 0 |
| 9. | Transfers and Miscellaneous Adjustments | | (55,871) |
| 10. | Investment Return | | 109,533,580 |
| 11. | Market Value of Assets as of 6/30/11 | $ | 597,690,684 |
| 12. | Receivables for Service Buybacks as of 6/30/11 | | 598,451 |
| 13. | Market Value of Assets as of 6/30/11 Including Receivables | $ | 598,289,135 |

# Development of the Actuarial Value of Assets

| | | | |
|---|---|---|---|
| 1. | Actuarial Value of Assets as of 6/30/10 Used For Rate Setting Purposes | $ | 662,601,684 |
| 2. | Receivables for Service Buybacks as of 6/30/10 | | 779,684 |
| 3. | Actuarial Value of Assets as of 6/30/10 | | 661,822,000 |
| 4. | Employer Contributions | | 12,600,426 |
| 5. | Employee Contributions | | 5,810,724 |
| 6. | Benefit Payments to Retirees and Beneficiaries | | (39,234,862) |
| 7. | Refunds | | (57,159) |
| 8. | Lump Sum Payments | | 0 |
| 9. | Transfers and Miscellaneous Adjustments | | (55,871) |
| 10. | Expected Investment Income at 7.75% | | 50,495,044 |
| 11. | Expected Actuarial Value of Assets | $ | 691,380,302 |
| 12. | Market Value of Assets as of 6/30/11 | $ | 597,690,684 |
| 13. | Preliminary Actuarial Value of Assets [(11) + ((12) − (11)) / 15] | | 685,134,327 |
| 14. | Maximum Actuarial Value of Assets (120% of (12)) | | 717,228,821 |
| 15. | Minimum Actuarial Value of Assets (80% of (12)) | | 478,152,547 |
| 16. | Actuarial Value of Assets {Lesser of [(14), Greater of ((13), (15))]} | | 685,134,327 |
| 17. | Actuarial Value to Market Value Ratio | | 114.6% |
| 18. | Receivables for Service Buybacks as of 6/30/11 | | 598,451 |
| 19. | Actuarial Value of Assets as of 6/30/11 Used for Rate Setting Purposes | $ | 685,732,778 |

TEMPORARY CONFIDENTIAL

STOCK148005

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# Asset Allocation

CalPERS follows a strategic asset allocation policy that identifies the percentage of funds to be invested in each asset class. The current target allocation was adopted by the Board in December 2010.

The asset allocation and market value of assets shown below reflect the values of the Public Employees Retirement Fund (PERF) in its entirety as of June 30, 2011. The assets for CITY OF STOCKTON SAFETY PLAN are part of the Public Employees Retirement Fund (PERF) and are invested accordingly.

| (A)<br>Asset Class | (B)<br>Market Value<br>($ Billion) | (C)<br>Current<br>Allocation |
|---|---|---|
| 1) Short-Term Investments | 7.9 | 3.3% |
| 2) Domestic Equity | 56.3 | 23.5% |
| 3) International Equity | 60.4 | 25.2% |
| 4) Domestic Debt | 49.2 | 20.6% |
| 5) International Debt | 3.9 | 1.6% |
| 6) Inflation Linked | 8.1 | 3.4% |
| 7) Real Estate | 19.1 | 8.0% |
| 8) Alternative Investment | 34.4 | 14.4% |
| **Total Fund** | **$239.3** | **100.0%** |



TEMPORARY CONFIDENTIAL

STOCK148006

CALPERS ACTUARIAL VALUATION - June 30, 2011
SAFETY PLAN OF THE CITY OF STOCKTON
CalPERS ID 6373973665

# CalPERS History of Investment Returns

The following is a chart with historical annual returns of the Public Employees Retirement Fund for each fiscal year ending on June 30. Beginning with June 30, 2002 the figures are reported as gross of fees.



TEMPORARY CONFIDENTIAL

STOCK148007

# Exhibit T

Case 12-32118   Filed 02/16/13   Doc 717

Page 1

```
 1                UNITED STATES BANKRUPTCY COURT

 2                      EASTERN DISTRICT

 3                    SACRAMENTO DIVISION

 4    In re:

 5    CITY OF STOCKTON, CALIFORNIA,    No. 12-32118

 6                    Debtor.          Chapter 9

 7                          /

 8

 9                    Deposition of

10            DAVID LAMOUREUX 30(b)(6)

11            Friday, November 16, 2012

12

13                              `

14

15

16    Reported by:

17    VICKI HAINES, CSR #5995

18    Job No. 39245

19

20

21

22

23

24

25
```

 1          To the extent that you know without

 2     revealing any board communications, I suppose you can

 3     answer.

 4          THE WITNESS:  Basically, it was done in an

 5     attempt to -- if you want, to -- to reduce changes in

 6     employer rates from year to year.

 7          Prior to that, that 15-year smoothing to be

 8     adopted, rates were either increasing a lot or

 9     decreasing a lot each year when we had either a good

10     or poor investment performance.  So our board did

11     that in order to dampen the impact of swings in

12     investment return.

13          MR. RYAN:  We've been going almost an hour.

14     Would this be a good breaking point?

15          MR. NEAL:  Yes, this would be a very good

16     breaking point.  Thank you.  Off the record.

17      (Whereupon, a recess was taken from 9:55 to 10:12.)

18     BY MR. NEAL:

19     Q.     Back on the record.

20          Mr. Lamoureux, I'm going to show you what

21     I'd like to have marked as Exhibit 422 and

22     Exhibit 423.

23          THE REPORTER:  These are already marked.

24     BY MR NEAL:

25     Q.     And my first question relates to

Page 50

1    Exhibit 422, has a date on it October 2012, and it's

2    the Miscellaneous Plan of the City of Stockton Annual

3    Valuation Report as of June 30th, 2011, correct?

4    A.      Yes.

5    Q.      This is in fact a true and correct copy of

6    that Annual Valuation Report?

7    A.      Yes.

8    Q.      Have you read this report before, the

9    Stockton report?

10   A.      No.

11   Q.      You're familiar with the format of the

12   report?

13   A.      Yes.

14   Q.      And the format of this report is similar to

15   the format of all valuation reports prepared by

16   CalPERS, correct?

17   A.      Identical.

18   Q.      The only thing that changes is the number

19   and the contribution amounts, correct?

20   A.      And the name of the employer, correct.

21   Q.      If you could turn to what is Exhibit 423.

22           Exhibit 423, dated October 2012, Safety Plan

23   of the City of Stockton, Annual Valuation Report, as

24   of June 30th, 2011; do you see that?

25   A.      Yes.

1    Q.       And is this a true and correct copy of the

2    Annual Valuation Report as of June 30th for the City?

3    A.       Yes.

4    Q.       And on the first page, it lists the employer

5    contribution rate that is set for three different

6    fiscal years, is that correct?  Excuse me.  Let's

7    just start with the year 2013-2014.

8    A.       Yes, it sets the contribution rate for

9    2013-2014.

10   Q.       And it also serves to provide a projection

11   for 2014-2015 and 2015-2016, correct?

12   A.       Yeah, and an estimate to help the employer

13   for budget purposes.  It is not a fixed rate.  It is

14   an estimate.

15   Q.       And CalPERS also provides the employer with

16   an analysis of future investment return scenarios; is

17   that correct?

18   A.       Yes.

19   Q.       And that would be on -- in Appendix D, page

20   D-2 in the bottom right-hand corner; is that right?

21   A.       Yes.

22   Q.       And can you describe what the information in

23   this chart on D-2 is intended to convey?

24           MR. RYAN:  Just to be clear, are we looking

25   at 423 or 422, or does it matter?

Case 12-32118   Filed 02/16/13   Doc 717

Page 52

1           MR. NEAL:  I'm going to stick with 423,

2     which is the Safety Plan.

3           MR. RYAN:  Okay, thank you.

4           THE WITNESS:  This information is in

5     Appendix D, which is called Risk Analysis Appendix of

6     our report.  The table is being provided to the

7     employer to provide them with an understanding of

8     where their contribution requirement to CalPERS --

9     you know, what it may be in the future in the event

10    that we were to earn -- for example, if we were to

11    meet all of our actuarial assumptions, meet our

12    seven-and-a-half percent, or in the event that we

13    were to have better than expected investment

14    performance or worse than expected investment.

15          So we have provided them with a range of two

16    better than expected returns and two worse than

17    expected returns.  So we're providing them as

18    information purposes to help them understand the risk

19    associated with their pension plan, where the

20    contribution rate may go, you know, potential trends

21    over the next few years.

22    BY MR. NEAL:

23    Q.      So, for example, if CalPERS investment

24    return is negative 4.1 percent, the estimated

25    employer rate for 2015-2016 is 48.6 percent, correct?

1   A.         Correct.  And that's assuming all other

2   actuarial assumptions are realized as well.

3   Q.         And for the record, what is the UAAL for the

4   Safety Plan as of June 30th, 2011; where would I find

5   that in this document?

6   A.         So if you go to page six, and we are still

7   talking about Exhibit 423.

8   Q.         Yes, we're going to stay on that document

9   for now.

10  A.         Okay.  On this page, as I mentioned before,

11  we show the unfunded liability under various bases in

12  this report.

13          On a funding ongoing basis, assuming City of

14  Stockton retains its relationship with CalPERS, we

15  provide two unfunded liability figures here.

16          On row four, you have here what is referred

17  to as the unfunded liability on the actual value of

18  asset basis.  That's estimated to be 117 million -- I

19  won't worry about the rest of the numbers -- on

20  June 30th, 2011.  This is the unfunded liability that

21  is being used for purposes of setting the

22  contribution requirement for Stockton Safety Plan for

23  '13-'14 fiscal year.

24          On row seven, we also show them here -- I'll

25  backtrack a second.  The unfunded liability on row

1    four was calculated by comparing the entry age normal

2    accrued liability as shown on row two in the amount

3    of 802.8 million to the actuarial value of assets of

4    685.7 million.  That's how we came up with 117.

5                On row six, we also show the market value of

6    assets in the amount of 598.3 million.

7                When you compare that to the liabilities,

8    you have an unfunded liability on a market value of

9    asset basis of 204 million -- $204.5 million for the

10   Safety Plan.

11               So on a funding ongoing basis, we have two

12   measures in our report.  The first one on row four is

13   used solely to set the contribution rate.  The second

14   one, the reason we show it there is just so that we

15   also show them the funded ratio so they can see that

16   they are -- on a market value of asset basis, they

17   are 74.5 percent funded.  That means the market value

18   of assets covers roughly 74.5 percent of the accrued

19   liability on June 30th, 2011.

20   Q.          Thank you.

21               From an actuarial standpoint, which I think

22   you are the person to provide it, why do we see a

23   difference in funded ratios?  I understand how the

24   math works, but why would the funded ratio be higher

25   than the -- funded ratio for the AVA basis, line

1    letter out to the members stating you're not going to

2    get any benefits.

3    A.        Yes.

4    Q.        They in fact received no benefits, right,

5    they did not get put into the pool?

6    A.        There was nothing to put in the pool because

7    by having no benefits, they have no liabilities and

8    no assets.  You can say we added them to the pool,

9    but it added zero to both sides.  I think in this

10   case, I think it was more voiding -- the contract, I

11   guess, never existed, but I don't know.

12   Q.        Are the assets and liabilities of each

13   terminated agency kept segregated or are they pooled

14   together?

15   A.        They are pooled together into one big

16   account.  We have no way to know how much belongs

17   to -- you know, the liabilities we can, but not the

18   assets.

19   Q.        And what is the current state of the assets

20   and liabilities of the Terminated Agency Pool?

21             MR. RYAN:  Object to the form, outside the

22   scope.

23             If you know.

24             THE WITNESS:  We will present the results to

25   our board in December of June 30th, 2011.  If I

1    recall, the liabilities are in the neighborhood of

2    $90 million and the assets in the neighborhood of

3    180.  So it's about 200 percent funded.  So it has

4    about $90 million surplus.

5            And again, I think the actual results will

6    be made public to our board in December.

7    BY MR. NEAL:

8    Q.        Are prior years' results made public as

9    well?

10   A.        We have never in the past -- we have done

11   the calculation internally, but we have never

12   presented it to our board in the past.  But we -- our

13   chief actuary has asked us to start presenting the

14   results to the board for the Terminated Agency Pool.

15   But we have done the valuation internally every

16   single year.  We have done the calculations.  We have

17   not published an official report, but we have done a

18   calculation of the assets and liabilities every year

19   because it's our duty to make sure that the pool is

20   properly funded.

21   Q.        If Stockton were terminated, its assets

22   would be put into the Terminated Agency Pool?

23   A.        And liabilities.

24   Q.        And its liabilities?

25   A.        Correct.  Unless they were to ask to move to

David Lamoureux 30(b)(6)                                    November 16, 2012
Sacramento, CA

1    a different retirement system which, again, I'm not

2    sure that the law would allow right now, but if it

3    were to come to that, then they would not go into the

4    Terminated Agency Pool.

5    Q.        Does the law that you referred to in your

6    prior testimony, is it specific to Los Angeles and

7    San Francisco or --

8    A.        If I recall, I believe that the law that

9    existed before allowed a transfer to the Los Angeles

10   County Retirement System and one more that I can't

11   recall right now, and then it had to be changed to

12   allow to do it with City and County of San Francisco.

13   Q.        It's specific as to the contracting agency?

14   A.        No, it's specific to the retirement system

15   that said that transfers can occur between CalPERS

16   and the Los Angeles County Retirement System.

17   Q.        Describe to me how Stockton's hypothetical

18   termination liability would be calculated?

19   A.        What do you mean by "would be" because it's

20   already been calculated here.

21   Q.        Thank you.

22   A.        No, no, I was just wondering --

23   Q.        No, that's very helpful.  I appreciate the

24   precision, I do.

25   A.        Correct, I'm an actuary, I want precision

1    before I answer.

2            So, in this case, for 6-30-11 -- remember,

3    we are presenting the information based on the

4    membership and information we had in place on

5    June 30th, 2011.

6            So the purpose of this is if Stockton had

7    terminated their contract on June 30th, 2011, and we

8    had invested the assets, in accordance with the

9    direction our board has given us to immunize the

10   liabilities, we -- and I -- the question didn't come

11   up, but in August, 2011 when our board adopted --

12   when our board gave staff the direction to change the

13   way the assets are invested for the Terminated Agency

14   Pool, they also adopted a board policy on the

15   discount rate for the Terminated Agency Pool.  And

16   it's -- the policy does not have a discount rate

17   stated in it.  It has a method to derive what the

18   discount rate should be that involves looking at

19   duration of liabilities and durations of 30-year

20   treasury bonds and 10-year treasury bonds.  We do a

21   calculation based on that policy, and the answer we

22   got, on June 30th, 2011, based on the rates that

23   were -- the treasury rates that were in effect on

24   June 30, 2011, the answer was 4.82 percent.

25              So, if you look at the number here, had they

 1    terminated on June 30, 2011, and had we been able to

 2    invest the assets at the rates that were in effect

 3    back then, the liabilities would have been about --

 4    for this plan, $1.186 billion.  Since their assets,

 5    the market value is only 598 million, that leaves a

 6    shortfall of $588 million.  The unfunded liability,

 7    the shortfall on termination, had they terminated

 8    back in 2011 would have been 588 million.

 9          In this report -- and when we have

10    conversations with employers, we make sure they are

11    aware of the way our board has moved toward investing

12    the Terminated Agency Pool.  Now, as a result, the

13    liabilities at termination are very sensitive to

14    interest rates, especially treasury rates in the

15    market.  This is why we inserted that sentence that

16    you have highlighted in your report, the last

17    sentence just above the table that says that we want

18    to give them a heads-up that please note that as of

19    June 30, 2012, the 30-year U.S. Treasury strip coupon

20    rate was now 2.87 percent.

21          This is just to give them a heads-up that a

22    year from now when we do the 2012 valuation telling

23    them what their termination liability would have been

24    had they terminated back in 2012, it's going to be

25    even higher than what we show here.

Case 12-32118    Filed 02/16/13    Doc 717

1    Q.        Such that their unfunded termination

2    liability was --

3    A.        Would be even higher.  And if they were to

4    come today to say we want to terminate our contract

5    with CalPERS, the rates today, if you keep -- you

6    know, if you're looking to refinance to buy a home,

7    you're probably very happy right now.  I don't know

8    exactly what it is, but I think it's now below

9    two percent, what the 30-year treasury rate is.  I

10   may be mistaken, but it's much lower than the

11   2.87 percent you see there.

12           So our intent going forward is that table

13   will be a historical table.  We will keep at least

14   five years of information similar to the two tables

15   above to help an employer understand that the point

16   in time to terminate now will have a big influence.

17   Like the interest rate in the market at the time of

18   termination will have a big influence on what the

19   amount owed at termination will be.

20   Q.        On the date of termination?

21   A.        On the date of termination.

22           And we have processes set in place at

23   CalPERS with respect -- you know, they call us today

24   and say, "I want to terminate tomorrow," the

25   effective date is not going to be tomorrow.  There

1  are different processes in place by law, depending on

2  who asks for the termination.

3  Q.      But the discount rate reflected here on page

4  15 of 4.82 percent, that's not provided by law,

5  that's provided by board policy?

6  A.      Board policy, yeah, and it's the rate

7  that -- if you want, that links to the valuation

8  date.  This is what we would have been able to obtain

9  on our investments had we terminated them on June 30,

10  2011.

11  Q.      And that is because the assets are invested

12  differently after termination, correct?

13  A.      Correct, in a much more conservative

14  fashion, mostly because we have no recourse back to

15  employers.  So we don't want to leave the money all

16  in the stock market because, if it tanks, then we

17  don't have enough money to pay the benefits.  It's

18  never gotten to that, but that's the reason we do

19  that.  We don't want to ever get to that point where

20  we don't have enough money to pay benefits because we

21  cannot go back to employers and tell them and ask for

22  additional contribution from them.  And also, most of

23  the employers that have already terminated their

24  contract with CalPERS are no longer in existence.

25  Q.      Has there ever been a termination of an

1    for the Terminated Agency Pool, which is a reflection

2    of how the assets will be invested.  As I mentioned

3    earlier this morning, it's a mix.  The policy states

4    that we have to look at the duration of our

5    liabilities, compare it to the duration of ten-year

6    treasury bonds and 30-year treasury bonds.  We apply

7    a formula.  And for the June 30th, 2011, the answer

8    we got was 4.82 percent.

9             On June 30, 2012, as we stated in our

10   report, on page 15 of Exhibit 423, it will be

11   2.87 percent.  And again, it's a reflection of the

12   rates because we are going to invest -- we are

13   investing in bonds, in treasury bonds.  It's related

14   directly to the rates in effect at that time.  So

15   today, that rate is even lower.

16   BY MR. WALSH:

17   Q.      If the City of Stockton were to terminate

18   its pension plans, over what period would CalPERS

19   expect the termination of liability to be funded?

20           MR. RYAN:  Calls for speculation.

21           THE WITNESS:  When an employer terminates

22   and we calculate how much is owed at termination, we

23   seek these funds immediately.

24   BY MR. WALSH:

25   Q.      You testified this morning about your

David Lamoureux 30(b)(6)                                      November 16, 2012
Sacramento, CA

1                    CERTIFICATE OF REPORTER

2          I, VICKI HAINES, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth and nothing but the truth in

6    the within-entitled cause;

7          That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13         That before completion of the deposition,

14   review of the transcript was requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18         I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23   DATED:  NOVEMBER 23, 2012

24         _____

25                    VICKI HAINES, CSR #5995

# Exhibit U

1

1              UNITED STATES BANKRUPTCY COURT

2                     EASTERN DISTRICT

3                   SACRAMENTO DIVISION

4     In re:

5     CITY OF STOCKTON, CALIFORNIA,    No. 12-32118

6                     Debtor.          Chapter 9

7                          /

8

9                    Deposition of

10                     ERIC JONES

11             Wednesday, November 7, 2012

12

13                          `

14

15    Reported by:

16    SANDRA BUNCH VANDER POL, RMR, CRR, CSR #3032

17    Realtime Systems Administrator credentialed

18    Fellow, Academy of Professional NNReporters

19    Job No. 38861

20

21    -------------------------------------------------------

22

23                    ALDERSON REPORTING

24                     1-800-FOR-DEPO

25

1    for some period from 2000 to 2012 that you could

2    provide?

3    A.      From --

4            MR. RIDDELL:  Object to the form of the

5    question.

6            THE WITNESS:  No, not as far as an average

7    amount of regular attrition.  I followed closely,

8    more closely, the attrition of those that were

9    leaving to other departments.  But as far as just

10   regular -- what we would call regular retirement, I

11   don't know have those numbers.

12   BY MR. GEOLOT:

13   Q.      And what information do you have with

14   respect to individuals who leave to go to other

15   departments that you just mentioned in your answer?

16   A.      Okay.

17           MR. RIDDELL:  Calls for a narrative

18   response.

19           THE WITNESS:  Up through 2008, we had very,

20   very few officers leaving, if ever, to other

21   departments.

22           Beginning in 2008, when fiscal emergencies

23   began, is when we began to see the exodus of officers

24   leaving.  And since then we have had, I would say, 60

25   to 70 officers leave to go be employed at other

 1    police departments.

 2    BY MR. GEOLOT:

 3    Q.        And what is the source of that information?

 4    A.        That we track in our personnel training

 5    section.  And that -- I personally was involved in

 6    most of those exit interviews, if you will, of the

 7    officers that were leaving to other -- to other

 8    agencies.  I didn't exit interview people who were

 9    just retiring.

10    Q.        And please tell me the process surrounding

11    the exit interview process?

12    A.        Not entirely formal.  Whenever I heard of an

13    officer who was leaving, I would reach out to them.

14    If I heard they were in the application process for

15    another agency, I would request a meeting with them

16    to attempt to retain them, try to talk them into

17    staying.

18              However, if they already got -- sought

19    employment, were hired, whatever the case is, and

20    then they had to go turn in their equipment, the

21    Personnel and Training Section employees would then

22    set up a meeting with me.  So then I was set up with

23    an actual interview, and I would talk to them and ask

24    them why they were -- why they were leaving.

25    Q.        Was a record created of that conversation?

1    BY MR. GEOLOT:

2    Q.       We are starting generally, then we are going

3    specifically.

4    A.       Okay.  General is a little easier, as I sit

5    here today.

6            The one common theme I would have to say to

7    a tee for all of them was they want to stay at

8    Stockton Police Department.  They are happy with the

9    direction that the police department is going.  They

10   just can't take the upwards to 30 percent cut of

11   total compensation that has been imposed on them.

12   And they have either lost their home or they all had

13   an individual story, many of them.

14           But they couldn't -- couldn't stay any

15   longer because of the cuts that have been imposed on

16   them, and there were too many other agencies out

17   there that would for less work give them more pay.

18   Q.       Anything else that you recall generally in

19   terms of what they said?

20   A.       That was quite a bit to me.  But I think

21   that that was the theme, was -- it was exactly that,

22   what I told you.

23   Q.       Okay.  And can you tell me the range of ages

24   of the police that you're talking about who were

25   departing?

Case 12-32118   Filed 02/16/13   Doc 717

261

1                    CERTIFICATE OF REPORTER

2          I, SANDRA BUNCH VANDER POL, a Certified

3    Shorthand Reporter, hereby certify that the witness

4    in the foregoing deposition was by me duly sworn to

5    tell the truth, the whole truth and nothing but the

6    truth in the within-entitled cause;

7          That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13         That before completion of the deposition,

14   review of the transcript was requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18         I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23   DATED:  NOVEMBER 16, 2012

24                    _____

25                         SANDRA BUNCH VANDER POL, CSR #3032

# Exhibit V

1              *REALTIME ROUGH DRAFT*

2                      DISCLAIMER

3           THIS REALTIME ROUGH DRAFT TRANSCRIPT IS BEING

4   PROVIDED TO COUNSEL PURSUANT TO CODE OF CIVIL PROCEDURE

5   SECTION 2025.540(b), WHICH PROVIDES AS FOLLOWS:

6           "WHEN PREPARED AS A ROUGH DRAFT TRANSCRIPT,

7   THE TRANSCRIPT OF THE DEPOSITION MAY NOT BE CERTIFIED

8   AND MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE

9   CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS.

10  THE ROUGH DRAFT TRANSCRIPT MAY NOT BE CITED OR USED IN

11  ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT THE

12  CERTIFIED TRANSCRIPT OF DEPOSITION PROCEEDINGS AS

13  PROVIDED BY THE DEPOSITION OFFICER."

14          IT IS AGREED BY ALL PARTIES RECEIVING A COPY

15  OF THE REALTIME ROUGH DRAFT TRANSCRIPT TO USE IT ONLY

16  FOR THE PURPOSE OF AUGMENTING YOUR NOTES AND NOT TO USE

17  OR CITE IT IN ANY COURT PROCEEDING OR TO DISTRIBUTE IT

18  IN ANY FORM TO ANY PERSON OR PARTY OUTSIDE OF THIS

19  LITIGATION WITHOUT THE APPROVAL OF THE CERTIFIED

20  SHORTHAND REPORTER.

21          REALTIME ROUGH DRAFT TRANSCRIPT OF THE

22          DEPOSITION OF:   **DAVID NEUMARK**

23           February 5, 2012 (Pages 1 - 241)

24  REPORTED BY:  VICKI HAINES, CSR #5995

25

1          ***REALTIME ROUGH DRAFT***

2    ambiguous.

3               THE WITNESS:  I would say this is -- this is

4    -- the nature of what I was asked to do was not sort of

5    an independent statistical study that would try to come

6    up with an estimate of a particular input, namely a

7    reduction in pension, among on the outcomes being

8    considered.  I was focusing on assessing the strength

9    of the evidence and the case for the claims that were

10   being made.  So given that, I didn't need a precise

11   number, I didn't need to write down a precise number.

12   There was nothing in any of the materials I was

13   reviewing to which, you know, it was relevant whether

14   it was 10 percent or 14 percent or 17 percent.  As I

15   said, whether it was qualitatively large or modest was

16   something I needed a sense of but not more than that.

17   Q.        BY MR. RIDDELL:  Do you associate some

18   qualitative meaning to the term modest?

19   A.        Qualitative?  Sure.

20   Q.        What does it mean to you?

21   A.        I think qualitatively, it means relatively

22   small.

23   Q.        And then quantitatively, what does the term

24   modest mean to you?

25   A.        I was operating under the assumption that we

1    ***REALTIME ROUGH DRAFT***

2    were in the range of ten or so percent, plus or minus,

3    you know, 5 or 6 or 7 percent.  Again, no more specific

4    than that, you know, but as opposed to 60 percent or

5    90 percent or something like that.  I think I was

6    thinking about, you know, what does that mean -- again,

7    going back to the qualitative question, you know, one

8    could imagine -- one could imagine an elimination of

9    pensions being viewed as a dramatic change in a

10    person's financial circumstances.  And I think modest

11    is kind of ruling out that qualitatively, although it's

12    still something real.

13    Q.      So you were not asked to make any assumptions

14    with respect to the amount of pension reduction that

15    was in play; is that correct?

16    A.      No more than I mentioned.

17    Q.      Which is that nobody told you what you should

18    assume; is that right?

19    A.      That -- well, no, I was told that I should be

20    thinking about modest reductions in pensions.

21    Q.      And did you seek guidance on what was meant

22    by modest?

23    A.      I -- I looked through documents -- again, as

24    I said I looked through documents to see was anything

25    more specific ever mentioned, and the answer was no, so

1       *REALTIME ROUGH DRAFT*

2       these subjects, what I mean is the information

3       regarding where people went, what you described

4       earlier?

5       A.        Right.

6       Q.        -- where people went, what their pay was

7       going to be, why they went there, how they were being

8       recruited, things of that nature?

9       A.        Well, the information I got was really, I

10      think, of three dimensions.  I think I have this right.

11      I had some data of different years, I think 2008

12      through 2012 so I had something about the timing of

13      changes that occurred.  We knew where people moved to.

14      So this is data -- I should say this document was

15      provided to me without a detailed explanation of

16      exactly what I was looking at so I'm operating under

17      the assumption that this is a database of people who

18      worked for the Stockton Police Department, whether they

19      left or not, and why they left.  I can't vouch for its

20      accuracy in that sense.  It wasn't our data.

21              So I knew years, I knew where they went, and

22      we had a classification of departures into retirement,

23      lateral transfers and then all departures which would

24      include the latter two as well as others let's say for

25      example someone moving to a private sector job but not

1                    *REALTIME ROUGH DRAFT*

2       retiring or laterally transferring.  So that's the

3       information that was there.

4            What I learned from that I would say is not a

5       lot.  There's a lot of missing information.  I don't

6       know -- there's nothing provided about lateral

7       transfers in, I don't know if they occurred or not.

8       There was nothing that told me whether the level much

9       transfers and retirements that I was seeing was unusual

10      relative to other departments or other years.  I mean,

11      there's going to be random fluctuations in these things

12      across space and over time, and I had no basis for

13      knowing whether I was looking at something highly

14      unusual or not.

15           I did see in those data, I would say evidence

16      against the claim that at least past compensation cuts

17      or whatever else happened, because I don't know what

18      else happened entirely, but evidence against the claim

19      that the City was facing a mass exodus of experienced

20      police officers because according to these data

21      experience levels were actually rising slightly over

22      this period in the police department, and that's what I

23      can recall at the moment.

24      Q.      So you just testified that you received this

25      particular document, was it the sworn count document?

1          ***REALTIME ROUGH DRAFT***

2     A.       That's what it's called.

3     Q.       So you received the sworn count document in

4     response to your request for additional information, is

5     that accurate?

6     A.       I'm not sure that a request was conveyed to

7     anyone that resulted in it being delivered.  I got it

8     somewhat late in the process of writing my report.

9     Q.       But you did make a request to somebody for

10    additional information on the subject matters you've

11    just testified about, is that correct?

12    A.       I remember raising the question of do we know

13    more?  I don't recall specifically asking for a

14    specific document because I didn't know if it existed.

15    Q.       Who did you ask whether or not we need more?

16    A.       I would assume it was -- I mean I assume I

17    would have directed that question first to the CRA

18    folks who as I said were looking through everything

19    that was delivered.

20    Q.       And by that you mean Charles River

21    Associates?

22    A.       Yes, CRA, yes.

23    Q.       Do you know if they in turn requested

24    information?

25    A.       I don't know what specifically prompted us to

1                    *REALTIME ROUGH DRAFT*

2   get that document.

3   Q.        Do you know if your requests for additional

4   information were ever conveyed to counsel?

5   A.        I don't know specifically, no.

6   Q.        Earlier you mentioned that it would have been

7   helpful to have information to find out the reasons

8   that employees or Stockton police officers had already

9   left, is that correct?

10  A.        I think I qualified that by saying I would

11  have really liked to have information that would let me

12  assess as labor economist would go about doing so what

13  kind of factors affected these decisions.

14  Q.        As a labor economist how would you go about

15  obtaining information with respect to why individuals

16  left the department?

17  A.        That's a good question.  Well, I would want

18  data on let's start without comes.  So some of the kind

19  of information that's in the -- that's in that sworn

20  count document, but I didn't know -- as I said, I

21  didn't know necessarily everything about those people,

22  rank, what kind of positions they were in.  I didn't

23  know anything about flows in the other direction.  So

24  in an ideal world I would want that kind of information

25  for you know all police departments or all reasonably

1           *REALTIME ROUGH DRAFT*

2    sized police departments or something like that in

3    California.

4           I would want to know information on the kind

5    of things that the economic migration literature points

6    to which as we discussed earlier would be relative pay

7    and compensation would be part of that, but other

8    information on these people would be part of it that

9    the economic migration literature points to.  So were

10   they married, did the spouse work, what did she make,

11   did their kids live there, factors like that.

12          Ideally, some -- some measures of -- of how

13   compensation or even better yet pension benefits might

14   have changed across areas that would actually let me

15   say look here's a jurisdiction where pensions did

16   change and here's what happened or didn't happen.  I

17   would want to know about, some of this is in the report

18   -- about the quality of life broadly speaking or

19   amenities of the different regions people were working

20   in or could work in.

21   Q.       So, did you do anything to research or assess

22   any of the -- these issues you just testified about?

23   A.       I was not asked as part of my work on this to

24   engage in that kind of study.

25   Q.       Well, what specifically were you asked to do?

1          ***REALTIME ROUGH DRAFT***

2     A.        I was asked to look at the documents that

3     were provided, to focus on the claims that were being

4     made about pension cuts and the prospect of a mass

5     exodus of experienced police officers and to discuss

6     whether -- whether the case was made in whatever I was

7     provided that this was a reasonable fear, and then to

8     go to the existing literature not do independent

9     research of the kind you were just asking me about, and

10    to the extent possible, to say what I could say about

11    factors affecting the kind of decisions and question

12    what we could draw from the existing literature that

13    might be informative about these claims.

14    Q.        Was that the entire scope of your assignment?

15    A.        To the best of my recollection, yes.

16    Q.        You said that -- you mentioned that part of

17    your assignment was then to go to the existing

18    literature and not do independent regarding the type of

19    subject we were just talking about, that was your

20    testimony, and what we were just talking about was how

21    you would go about determining why individuals left the

22    department, so you were specifically said don't look at

23    that issue?

24          MR. GARDENER:  Objection.

25          THE WITNESS:  I can't recall whether I was

1          *REALTIME ROUGH DRAFT*

2    specifically told not to.  I was contacted about doing

3    this work relatively close to the date when the report

4    was due.  I think it was about -- a little fuzzy here,

5    around 6 or 7 weeks before it at most.  And it was very

6    much take the evidence that's been offered, assess it

7    as best you can as an expert, give us your opinion on

8    it.  Give us your opinion on what you can draw from the

9    existing literature which is partly when we talked

10   earlier about searching for other studies on this

11   topic, that was certainly part of that.  It was -- I

12   honestly don't recall whether I asked -- I probably

13   didn't because I knew there wasn't time, about the

14   prospect of -- actually I'll correct that. we did

15   actually discuss whether there were data sets we could

16   go to to learn anything about the kinds of questions we

17   have been talking about, and decided that, you know

18   there was nothing near the amount of time one would

19   need p even if we could do it with existing data to do

20   that kind of you know an affirmative study of can I do

21   an original research that says the claims are valid,

22   the claims aren't valid based on the best evidence one

23   could design if I was sort of doing a research project

24   on this question.

25   Q.       BY MR. RIDDELL:  Well, in terms of timing you

1              ***REALTIME ROUGH DRAFT***

2    were just talking about, you wouldn't have had enough

3    time to conduct that research given the constraints of

4    when a report would have been due, is that correct?

5    A.      Yes.

6    Q.      So how long would it have taken you to

7    undertake that study?

8    A.      Well, it's hard to say for two reasons but I

9    will answer your question.  I'm not even sure that that

10   information is available, okay?  But were you to say

11   let me -- you know, let me go to the data out there

12   that the City has provided and really do sort of the

13   best assessment I can do have this, you know, given

14   that I can't work full time on this because I have

15   another job, right?  You know many, many many months

16   possibly closer to a year than to half a year, I would

17   think.

18   Q.      And just so that I'm clear, what are you

19   talking about that would take a year, what would you be

20   studying in trying to determine over the course of that

21   time frame?

22   A.      Well, I think a lot of it would be see what's

23   an existing data source that might tell us something

24   about this, and my guess is there isn't much.

25   Q.      I apologize because I want to be really clear

1                    *REALTIME ROUGH DRAFT*

2      on this.  Instead of saying what the data points would

3      show about this, can you be more specific?  In other

4      words, we're talking about what you would envision

5      taking a year I want to be really specific about what

6      you would be looking and and trying to determine over

7      the course of that year?

8      A.       Let's talk about what I would be trying to

9      determine is from the best available evidence which

10     would be new in this case, what can we say about

11     compensation changes or pension changes and their

12     affects on mobility decisions of ideally police workers

13     or perhaps some broader group because that's all we

14     could get reliable data on.

15     Q.       Would your findings have been specific to

16     Stockton or you would take what you've learned with

17     respect to other departments and be able to kind of

18     apply and interpret that data in a way that's relevant

19     to Stockton?

20     A.       Speculating, I think most likely, I would

21     look for any cases in sort of recent past, maybe in

22     California or comparable states, of where this kind of

23     thing has happened.  Because again, I don't think --

24     you know, in social science research we do believe that

25     one can generalize.  Now, obviously, if I can look at

1          *REALTIME ROUGH DRAFT*

2     other police departments as opposed to, you know, other

3     people in some other field where something like this

4     happened, the generalization is more valid.

5            But I would try to get as much evidence as I

6     could from departments that might have undergone

7     similar experiences subject to there being information

8     on -- how behavior changed in response to those.

9     Q.       Are you aware of in departments who have had

10    anything remotely similar to what has been experienced

11    at the Stockton Police Department over the past four

12    years?

13    A.       Well, these other California cities -- San

14    Diego and San Jose have had changes in pensions, to my

15    understanding, that is -- their increased contributions

16    to current workers, but pension formulas changes for

17    new workers.  So if we are talking about the prospect

18    of actually cutting pensions for existing workers, no,

19    but -- so I haven't run across an event like that.

20    Q.       So, I'm sorry, because I kind of went off

21    track of what you were just testifying about to ask

22    that specific question, but --

23            So the ultimate, what you would be trying to

24    determine are validate or invalidate, what's the

25    ultimate call of the question, I suppose, with respect

1    *REALTIME ROUGH DRAFT*

2    to what the purpose of that study would have been?

3    A.        Maybe it's useful to go back to the example

4    of the Hill study we talked about before, you asked is

5    there any evidence on pension cuts and separation, I

6    think is the way you put it.

7             So that was a study of data from, you know, a

8    huge sample of, I think, essentially all private firms

9    in the U.S. and whether they converted from defined

10   benefits to defined contribution plans.  And in that

11   data set you had information on workers over time, so

12   you could actually see did they leave their firm.  And

13   that, you could have asked but didn't -- it actually

14   looked at where they went as well.  So for example,

15   something along that design of a project would be what

16   I'd have in mind.

17   Q.        And the purpose would be to answer what

18   ultimate question?

19   A.        Well, ultimately, ideally I should say, you

20   know, whether -- if public agencies let's say had

21   implemented modest pension cuts, what kind of responses

22   we saw, were there many departures, were they more

23   experienced departures getting at exactly what the core

24   issues are I think in this case.

25   Q.        And if you were able to work on it full time

1                    *REALTIME ROUGH DRAFT*

2     putting aside your other responsibilities, can you give

3     me an estimate about how long it would take to conduct

4     such a study?

5     A.        Me with support?  And having the data, big

6     if, six months but roughly.

7     Q.        Do you have a rough idea how much that would

8     cost to hire you and your support staff full time and

9     I'm just asking for an estimate?

10    A.        No.

11    Q.        Not an exact amount.

12    A.        Well, if I was well over -- well half a

13    million or more I think if we priced the time and the

14    Charles Rivers consultants.

15    Q.        You said if the data was available, what do

16    you mean by assuming or if the data was available for

17    you to conduct that study?

18    A.        Well, two things really.  One is we actually

19    need data that would let you track at least somewhat

20    appropriate workers you might say private sector

21    workers like from the Hill Study would be not the best

22    P group to study.  I believe the study she used was a

23    longitudinal data set which I believe excludes the

24    public sector.  I don't know there's a readily

25    available set that includes the public sector workers.

1       *REALTIME ROUGH DRAFT*

2   You can go to existing data sets something called the

3   American community survey and, you know see people's

4   industry and occupation and do they work in the public

5   sector.  That's not a great day to set though for --

6   for seeing moves although there's some information on

7   that.  So you need information on workers and what they

8   do, roughly speaking and then -- and this is

9   potentially the fatal flaw here, the best study of what

10  might happen when you cut pensions is studies what

11  happens elsewhere when you cut pensions, right?  So

12  whether there were instances of that which occurred is

13  something I don't know and it might be that you need to

14  go to a state where that happened more where maybe

15  legally it could happen more, if that's the right

16  framework and that's not something I've investigated.

17  Q.       Okay.  If you weren't available do it, does

18  such a study -- do you have any logical candidates for

19  who would be another good choice for doing that type of

20  work?  Or do you think you're more uniquely qualified

21  do that than other candidates?

22  A.       I think I have strong qualifications.  I

23  don't think I'm uniquely qualified do that, no.  Again,

24  you know, I think you wouldn't have to be an expert in

25  this particular area already do that kind of study.

1    ***REALTIME ROUGH DRAFT***

2    There's nothing here about what I might expect to see

3    10 or 15, 20 years from now, there would be flow basis

4    for making that.  The economic migration literature

5    although not addressed specifically in this context,

6    does not study behavior over 10 or 15 years it's kind

7    of typically over a one year range.

8    Q.        So is it your opinion then in a one year

9    range?

10   A.        I think -- I can't be pinned down

11   specifically because I wasn't asked to you know kind of

12   assess the timing question, but I'm thinking -- my

13   opinion refers to something in the short-term of let's

14   call it roughly a year or less.

15   Q.        So in your report then, your conclusions

16   don't specifically address the period of time that

17   would be covered for the mass exodus, is that correct?

18   A.        Yes.  It doesn't say it might not happen in

19   one month but it might happen in two.

20   Q.        Right and you haven't formed any opinions

21   based on defining what that time frame would be,

22   correct?

23   A.        I have no opinions about the specific timing

24   within that relatively year term of the year or so.

25   Q.        Now, in the same text that we just went over

1                    ***REALTIME ROUGH DRAFT***
2    from your declaration, you state that you cannot
3    conclude that a City would face a mass exodus of
4    experienced employees as a result of pension cuts,
5    correct?
6    A.        Correct.
7    Q.        Do you contend that it was unreasonable for
8    city leaders to be concerned that the City would
9    experience problems associated with retention of police
10   officers under those circumstances?
11   A.        I would say, you know, putting aside any
12   evidence, is it -- if I was going to predict -- if I
13   was going to worry about what direction cuts might be
14   if I cut pension this would be a reasonable question to
15   ask.  Most questions would regard a cut in pension as a
16   negative so my statement one cannot conclude is a
17   statement based on the evidence that I was able to see
18   and what I was provided with and whether that made a
19   case that that was the mass exodus experienced workers
20   was a serious concern.
21   Q.        I'd like to ask you the same question with
22   respect to whether or not it would have been reasonable
23   in your view for city leaders to be concerned with the
24   effect that a proposed benefit reduction might have on
25   recruitment of new police officers.  Would your answer

1                    ***REALTIME ROUGH DRAFT***
2    be the same?
3    A.        I think yes.  I would qualify it in the sense
4    that we -- I think the research establishes pretty well
5    that young workers, young people don't pay a lot of
6    attention to pensions so if I was coming at this from
7    that literature I might be more reasonable to think
8    about a 50-year old maybe kind of thinking about
9    retirement probably somebody who knows something about
10   his or her phone pension probably pay more attention to
11   it than recruits whose pensions are very far in the
12   future.
13   Q.        So I believe I know the answer to this but I
14   need to ask it prior to this the litigation have you
15   written or researched about this particular subject
16   matter that you're expressing opinions about?
17   A.        No.
18   Q.        Who prepared this report?
19   A.        I did.
20   Q.        Did you author the entirety of its contents?
21   A.        Yes.
22   Q.        On page three of your report you refer to?
23   A.        The report?
24   Q.        Your report, yes.  You refer to Charles River
25   Associates.  What was the role of Charles River

1          *REALTIME ROUGH DRAFT*

2     see any reason it would change materially.  I do

3     discuss two points that might affect whether -- and I

4     believe we discussed this earlier, whether more or less

5     experienced officers are more likely to respond to

6     this, and I think things cut both ways as far as that

7     goes.

8     Q.       And, again, what do you mean by the term

9     "modest"?

10              MR. GARDENER:  Objection, asked and answered.

11              THE WITNESS:  I'm operating with a rough

12    definition of about ten percent, and if you added 5 or

13    6 or 7 percent to that in either direction or a little

14    more or a little less, I wouldn't view that as any

15    different really.

16    Q.       BY MR. RIDDELL:  Okay.  So you state here in

17    -- turning back to your declaration, that no convincing

18    evidence has been presented by the City in any, and I

19    emphasize the word any, cut in pension benefits or even

20    a modest cut would lead to a mass exodus of police

21    officers.

22              What do you mean when you use the word "any"

23    in that sentence?

24              MR. GARDENER:  Objection, asked and answered.

25              THE WITNESS:  By any, I mean smaller than

1           *REALTIME ROUGH DRAFT*
2    have happened in some states.  I haven't investigated
3    it.
4    Q.        So you would want to -- in an ideal scenario,
5    you would want to look at that information, those data
6    sets in order to determine the likelihood that officers
7    would leave in response to a certain amount of pension
8    benefit reductions, is that correct?
9    A.        Yeah, what I'm thinking of is data that gets
10   me a lot closer to the relevant population, city
11   workers maybe, police officers even better, if that's
12   feasible and that is -- is closer to the kind of change
13   being contemplated, that is a reduction in defined
14   benefit pension payments.  As opposed to, for example,
15   on the Hill study it's a -- which looks at conversions
16   from defined benefit to defined contribution which is
17   not quite the same, but has the same flavor of -- at
18   least for older workers, feeling like pension cuts.
19   Q.        So to get to determining the likelihood that
20   we were discussing, in order to determine the
21   likelihood that officers would leave in response to a
22   certain and the of pension benefit reductions you would
23   ideally want to conduct the study you described earlier
24   and then after you've done that you would be able to
25   make reasoned and informed decisions with respect to

1        *REALTIME ROUGH DRAFT*

2    the likelihood of departures.  Is that accurate?

3    A.        That would give me more information than I

4    have to work with now certainly.

5    Q.        I guess it would.  I would agree with you on

6    that.  Then you indicated there would be a less than

7    ideal way to calculate the likelihood of departures and

8    what would that be?

9    A.        So what I have in mind, again, shooting from

10   the hip a little bit here is that I wanted -- the

11   public sector isn't that big, right, and if I want to

12   capture police officers of course, if I have a sample

13   of the entire national population and even if there's

14   hundreds of thousands of people I'm not going to get

15   that many police officers.  So I could go to the

16   American community survey which captures around a few

17   million people a year it's a very large sample.  I

18   could figure out from that whether you're a public

19   sector worker.  I would figure out whether you're in

20   corrections I'm not sure I could figure out whether

21   you're a police officer specifically.  So if I had that

22   data, over time, across locations, I could describe to

23   tie it to the other missing piece which is places that

24   have had changes in public sector pensions over time

25   and try to learn something from observations on you

1          ***REALTIME ROUGH DRAFT***
2    know is the sample showing me fewer police officers in
3    I don't think you'd see Stockton data but maybe in a
4    really big city am I seeing fewer officers there
5    subsequent to a reduction from pension than prior to it
6    relative to other cities where other changes of
7    similar, but there has been pension reductions.
8    Q.       So in order -- with respect to this less than
9    ideal scenario, the second way that you might go about
10   approaching that problem, I understand that you would
11   need to look at public sector pension benefit
12   reductions that have taken place elsewhere is that
13   fair?
14   A.       That was a hypothetical.  I don't know that
15   they have.
16   Q.       Right, right, but floored to conduct that
17   study you would need to look at that?
18   A.       That would be the best.
19   Q.       But you're not aware of whether or not any
20   such data exists, is that correct?
21   A.       My concern is not the data but about the
22   event actually.  I mean if the event occurred I could
23   date it and place it.
24   Q.       But you're not aware of actual -- any public
25   sector pension benefit reductions?

1                    *REALTIME ROUGH DRAFT*

2    A.        I'm not.  I haven't investigated that in

3    great detail.  I do reference a couple of -- one study

4    -- there is one study that talks about some changes for

5    new workers.

6    A.        You know those have occurred, including

7    states wide in California now.  But explicit reductions

8    to current workers of the kind we're talking about I

9    don't know.

10   Q.        Without knowing the likelihood or without

11   knowing how likely it is that officers would leave the

12   Stockton Police Department for other police

13   departments, do you believe it's reasonable for

14   Stockton to voluntarily reduce its pension benefits in

15   the way you've described?

16   A.        Can I ask you to read back the question?

17   Q.        Yeah.  You would agree that Stockton -- well

18   --

19             Different question here.  In formulating your

20   opinions regarding the likelihood that a modest pension

21   benefit reduction would not lead to recruiting and

22   retention problems, did you assume that there were no

23   other significant current events taking place within

24   the police department?

25             MR. WALSH:  Objection, vague and ambiguous.

1          ***REALTIME ROUGH DRAFT***

2                    THE WITNESS:  I would say -- I was -- I was

3      -- I was trying to focus on that change in isolation.

4      I mean in a statistical study we do that, you know, in

5      formal ways.  The economic migration literature I refer

6      to takes into account multiple factors at once in which

7      case you're holding constant other things.  But this

8      was not done as a statistical study so not in any

9      formal way.

10     Q.        BY MR. RIDDELL:  Well, when you say that your

11     trying to focus on that change in isolation,

12     specifically what change are you referring to?

13     A.        A proposed or perspective cut in pensions.

14     Q.        So when you were formulating your opinions,

15     you weren't considering other -- other significant

16     events that had occurred within the City of Stockton or

17     the police department over, say, the last four years,

18     is that correct?

19                    MR. GARDENER:  Objection mischaracterizes

20     itself testimony.

21                    THE WITNESS:  So I interpreted your question

22     differently so shall I -- that was your first question

23     so shall I answer that question.  They struck me as two

24     different questions although they probably weren't in

25     your perspective.

1                         ***REALTIME ROUGH DRAFT***

2    Q.        BY MR. RIDDELL:  Well, go ahead and -- what's

3    -- what question are you?

4    A.        If you could read back the previous one

5    before you mentioned four years in the police

6    department.

7    Q.        I was asking, when you said you were trying

8    to focus on that change in isolation specifically, what

9    change were you referring to?

10   A.        So, what I meant was a lot of other things

11   have been happening in Stockton, both to the economy

12   overall, to the housing market and city finances,

13   however, that will all get resolved.  So I'm not

14   thinking of my opinion as what is the combined effects

15   of all the stuff or even just all the things that are

16   going to pertain to Stockton trying to to resolve its

17   fiscal situation.  I was just trying to isolate, you

18   know, the incremental effect of whether there would be

19   a reduction in pensions or not.

20   Q.        So then if I understand correctly, just to

21   parrot back what you're saying is, so correct me if

22   this is inaccurate about what you're saying, but you're

23   saying that when you were studying whether or not a

24   pension benefit reduction would result in the departure

25   of police officers to other police departments, you

1                ***REALTIME ROUGH DRAFT***

2 happened, would apply here.

3 Q.     Is that because this is a unique set of

4 circumstances that you're not aware has occurred

5 anywhere else?

6            MR. GARDENER:  Objection, misstates the

7 testimony.

8            THE WITNESS:  It's not so much that.  It's

9 that we, you know -- whenever we do empirical research

10 based on a statistical model, we never explain

11 100 percent of the variation in whatever outcome we're

12 trying to understand.  So there's always a possibility,

13 whether it's Stockton in 2013 or some other city in

14 some other year, that something coincided with the

15 policy change, let's say a cut in pensions, that the

16 researcher failed to take account of that gave us --

17 that gave us a different set of outcomes.  Or that for

18 whatever reason the response of Stockton police

19 officers is not like the response of other police

20 officers, even if we could hold everything else

21 constant.

22        So you're always back to I could do a study,

23 I could say from that study, again, in an ideal world,

24 you know, based on on the experience of so many other

25 cities that have engaged in a similar kind of policy,

1               *REALTIME ROUGH DRAFT*

2    even more ideal under a similar set of circumstances,

3    this is what's happened.

4               That would be -- you know, you'd have a

5    pretty good basis for using that to predict what would

6    happen in Stockton.  But just like you would never use

7    a statistical model to say, you know, this predicts

8    what person X will do.  This tells me, I should say.

9    It does predict.  This tells me definitively what

10   person X will do.  It doesn't tell me definitively what

11   the policy would do in this place at that time.

12   Q.       BY MR. RIDDELL:  Right, I understand.

13              But you're not -- in conducting your research

14   analysis for the purpose of formulating your opinions,

15   you have not come across any jurisdiction that is --

16   that has in the past or is currently considering

17   reducing pension benefits in the way that's

18   contemplated in your study; is that correct?

19              MR. GARDENER:  Objection, asked and answered.

20              THE WITNESS:  By the way, it's contemplated

21   in my report.

22   Q.       BY MR. RIDDELL:  Correct.

23   A.       Yeah, that's correct.

24   Q.       It's correct that you have not come across

25   anything?

1        *REALTIME ROUGH DRAFT*

2    A.       I have not come across anything.

3    Q.       Did you look to see if there was anything

4    similar?

5    A.       I looked for academic studies, as I

6    mentioned, quite a while back.  Not finding those, I

7    didn't -- I didn't look for, you know, a search that

8    would have been meant to uncover cities that have cut

9    pensions.  I could have, but, you know -- and there

10   might be -- so I'm pretty confident there's not an

11   academic study of such an event.  Does that mean it

12   didn't happen somewhere?  Maybe in a state where

13   legally that can happen more easily and there's not

14   some consulting report, a government report studying

15   it, I can't say.

16   Q.       I understand.

17            On page 16 of your report, the last sentence

18   of the last full paragraph beginning on the right-hand

19   side of the page you state:

20            "It may seem like stating the obvious, but

21   the only type of evidence based on past behavior that

22   could predict future response to pension cuts would be

23   past evidence on pension cuts."

24            Why do you believe that to be true?

25   A.       I don't know what else would be true.  I

1          ***REALTIME ROUGH DRAFT***

2    mean, that's -- this is kind of exactly along the lines

3    of your questions about if I could conduct the ideal

4    study, what would I do?  And I think what I've

5    described should be, I think, exactly consistent with

6    what I say here.

7    Q.        Okay.  So is it true or fair to say that your

8    conclusion that the city would not face a mass exodus

9    of experienced employees or face recruitment and

10   retention problems as a result of any or modest cuts in

11   pensions is not based on any evidence of what other

12   cities have actually experienced?

13             MR. GARDENER:  Vague and ambiguous.

14             THE WITNESS:  Yeah, I would agree with that.

15   Q.        BY MR. RIDDELL:  On page 12 of your report,

16   you note that some of this evidence is dated in

17   reference to the literature that you cite.

18   A.        Could you tell me where exactly?

19   Q.        Yeah, it's on page 12, last full paragraph,

20   first sentence.

21   A.        Got it.

22   Q.        "While some of this evidence is dated," so

23   you're referring to the evidence above, I believe, that

24   are studies from the 1950s and 1970s and 1960s.  Is

25   that correct?

1          *REALTIME ROUGH DRAFT*

2      relative to what people with similar qualifications

3      earn.

4      Q.          But that's an inference that's not supported

5      by social science standards of evidence, correct?

6      A.          Well, the last statement is a fact.  They

7      earn more than non-college educated.  The inference

8      that -- that they might be getting decent applicants is

9      not supported by any direct evidence.

10     Q.          Do you know anything regarding how many

11     applicants it typically takes to fill a single police

12     officer position at the Stockton Police Department?

13     A.          I recall some discussion of that in one of

14     the -- I think I recall in one of the depositions, but

15     I -- I don't have other specific information nor -- I

16     don't recall exactly what it said nor do I know whether

17     it was correct.

18     Q.          Do you know anything regarding what are the

19     minimum qualifications for becoming either a Stockton

20     Police Department officer or an officer elsewhere in

21     the State of California?

22     A.          I have not studied the qualifications needed,

23     no, to make the cut.

24     Q.          On page 17 of your report, you discuss the

25     average experience level of officers at the Stockton

| 1 | ***REALTIME ROUGH DRAFT*** |
| 2 | was the response you'd expect, that the more senior |
| 3 | ones are really the ones who would respond to it, |
| 4 | police officers in particular, or at least if they are |
| 5 | the ones you care about, then, yes, it's an offset to |
| 6 | that. |
| 7 | Q.        So you're simply proposing this as an idea or |
| 8 | alternative to retain police officers, but you're not |
| 9 | proposing the way in which that would be carried out, |
| 10 | correct? |
| 11 | A.        I'm not being specific about how it would be |
| 12 | carried out, no. |
| 13 | Q.        So, is it also true that you don't have any |
| 14 | opinions with respect to what level of incentive |
| 15 | compensation you would need in order to offset the |
| 16 | proposed benefit reductions? |
| 17 | A.        I wasn't asked to try to assess that |
| 18 | question. |
| 19 | Q.        I'm not sure if we covered this earlier, but |
| 20 | did you -- did you interview any Stockton police |
| 21 | officers or any other City of Stockton employees for |
| 22 | the purpose of conducting your research and formulating |
| 23 | your opinions? |
| 24 | A.        No. |
| 25 | Q.        Okay, let's go ahead and go off the record. |

1               *REALTIME ROUGH DRAFT*

2    Q.       BY MR. RIDDELL:  So you have not researched

3    that subject matter, is that correct?

4    A.       Correct.

5    Q.       And have you conducted any studies with

6    respect to whether or not officers that are eligible

7    for retirement would retire earlier than they otherwise

8    would have retired if there were a reduction in pension

9    benefits?

10              MR. GARDENER:  Objection.

11              THE WITNESS:  I have not explicitly studied

12   that, no.

13   Q.       BY MR. RIDDELL:  Okay.  Thank you for your

14   time.  I don't have any further questions.

15   A.       Thank you.

16              THE VIDEOGRAPHER:  This marks the end of disc

17   number four of four and concludes today's deposition of

18   David Neumark.  The master tapes will be maintained by

19   Alderson Reporting.  The time is 5:39 p.m., and we are

20   off the record.

21

22

23

24

25

# Exhibit W

| | |
|---|---|
| **From:** | Young, Christopher </O=MBIA/OU=ARMONK/CN=RECIPIENTS/CN=YOUNGC> |
| **Sent:** | Thursday, June 21, 2012 4:05 PM |
| **To:** | Bergonzi, Adam <Adam.Bergonzi@nationalpfg.com>; Flickinger, Barbara <barbara.flickinger@nationalpfg.com> |
| **Subject:** | stockton |

From the below article it seems as if Stockton has put the 506 plan they presented us out there for all to see. Without commenting on how it compares to our conversations in the confidential 506 process, are we considering speaking out about the absurdity of this proposal and the fact that the problems are created by non-debt related costs?

## Stockton Ready to Slash Debt as Chap. 9 Looms

Thursday, June 21, 2012                                  ⎙Print    ✉Email   ✂Reprints
                                                                                  inShare

By Randall Jensen

**RELATED**

SAN FRANCISCO — Stockton, Calif., has proposed a plan to slash more than $10 million of debt payments to help close its budget deficit while at the same time declaring bankruptcy.

The City Council will consider the "pendency" plan for next year's budget on Tuesday, which would include filing for Chapter 9 protection if ongoing negotiations with creditors provide no solutions by Monday's deadline, city officials said in statements Wednesday night.

Stockton's plan would balance its budget mainly by cutting debt payments, which makes up 40% of the proposed reductions, to close an estimated $26 million general fund gap.

"Without restructuring of its finances in the AB 506 process or seeking the protection of Chapter 9, the city could not pay its employees, retirees, bondholders or vendors," city manager Bob Deis said in a filing to the Municipal Securities Rulemaking Board's online EMMA system Wednesday night. "Bankruptcy protection assures that this will not happen in Stockton, though it is clear that creditors will not recover 100 cents on the dollar for their claims."

If it moves ahead with a bankruptcy, Stockton, with more than 300,000 residents, could become the largest city in the country ever to file for bankruptcy.

Debt service paid out of Stockton's general fund has increased nearly six-fold to a projected $17 million in fiscal 2013 from $3 million in fiscal 2007, according to an earlier staff report.

Various other loan payments would also be scaled back as part of the proposed debt-service reduction. The majority of the rest of the proposed cuts, 38%, would come from reducing employee salaries and benefits, according to the staff report. City officials have reported that retiree health care costs could increase by 115% over the next 10 years, and pension costs by 94%.

According to the proposed plan, Stockton would withhold a $2.58 million payment on its 2007 variable-rate lease revenue bonds and a $5.7 million payment on its 2007 pension obligation bonds. The city also said it would continue to miss payments on its 2004 lease revenue bonds.

In an effort to stave off insolvency, Stockton has already let three sets of lease revenue bonds default after the city decided in February to stop paying its part on $110 million of par value of debt through the end of the fiscal year. Seven bond issues rely in some way on support from the city's general fund.

As a result of the defaults, the city has lost control of three parking garages and an office building that had been slated to become the next city hall. Stockton lost a court case last month to Wells Fargo NA, the trustee of $40 million of bonds sold in 2007 that are backed by lease revenues from the building. That followed the city's loss in April of the garages tied to $32 million of 2004 lease

revenue bonds after it lost a similar court case.

City officials have also said that $55 million of variable-rate revenue bonds issued in 2010 by Stockton's financing authority could be declared in default by Union Bank, the letter-of-credit provider on the debt, resulting in a mandatory tender. City officials have noted that the bankruptcy court could deem the default unenforceable.

Stockton's general fund also backs the city redevelopment agency's's $13 million of housing certificates of participation sold in 2003 and $46 million of paper issued in 2004 to fund the events center. The city recently took over as the "successor agency" to the RDA following the dissolution of all California redevelopment agencies by a new state law last year.

The city had more than $702 million of bonds outstanding as of the end of June 2010, including debt issued for restricted enterprise funds such as water, sewer and parking enterprise debt, according to financial statements.

Stockton official have said the debt tied to restricted funds would be protected from the bankruptcy process. The City Council voted on Feb. 28 to enter into deliberations with creditors under last year's Assembly Bill 506, which strongly encourages municipalities to try mediation prior to filing for Chapter 9 protection.

The mediation sessions, set up under terms of a recent state law designed to discourage bankruptcy filings, will end June 25. The talks were extended 30 days following 60 days of discussions. Confirmed participants in the mediation process include Wells Fargo, the trustee for several outstanding bonds, the California Public Employees Retirement System, and bond insurers and liquidity providers.

The creditors include the two main insurers of Stockton's bonds, National Public Finance Guarantee Corp. and Assured Guaranty Corp. National, a subsidiary of MBIA Inc., insures $224 million of debt issued by the city, $89 million of which is tied to Stockton's general fund.

Assured Guaranty said it is exposed to $150 million net par of Stockton's bond debt.

Mammoth Lakes is the only other municipality in California using the AB 506 process to try to prevent bankruptcy.

Stockton has struggled with its budget for years since tax collections tumbled in the wake of the housing bust and the recession. The Stockton region's unemployment rate tops 15%, according to the Bureau of Labor Statistics. In addition to its economic problems, Stockton has handed out rich retirement benefits and incurred large debts to fund a myriad of new facilities, including a downtown improvement project with a hockey arena, baseball park and the new city hall.

Stockton has also admitted accounting errors in past years that contributed to losses. The California controller's office is conducting an audit of the city's finances. Stockton still hasn't released its audited finances for 2011.