**25**

ROBERT K. SALL (SBN 83782)
rsall@sall-lawoffice.com
SUZANNE BURKE SPENCER (SBN 188597)
sburke@sall-lawoffice.com
MICHAEL A. SALL (SBN 287981)
msall@sall-lawoffice.com
THE SALL LAW FIRM
A Professional Corporation
32351 Coast Highway
Laguna Beach, CA 92651
Telephone: 949-499-2942
Facsimile:  949-499-7403

Attorneys for Party in Interest California Public Employees' Retirement System

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | DC No. SLF-1 |
| Debtor. | Chapter 9 |
| | **MOTION OF PARTY IN INTEREST CALPERS TO DISQUALIFY WINSTON & STRAWN LLP** |
| | Date:      July 2, 2013 |
| | Time:     9:30 a.m. |
| | Place:    United States Courthouse |
| | Dept. C, Courtroom 35 |
| | 501 I Street |
| | Sacramento, CA 95814 |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................3

        A.    The Defecting Lawyers' Representation of CalPERS in the
              Chapter 9 Cases...........................................................................................3

              1.    Commencement of the Chapter 9 Cases...........................................3

              2.    Evidence in Support of Motion ........................................................3

              3.    The CalPERS' Litigation Team.........................................................3

              4.    Winston Raids K&L Gates' Restructuring and
                    Bankruptcy Practice Group, Charlotte Office. ................................4

        B.    CalPERS and National's Interests in the Chapter 9 Cases Are
              Directly Adverse ..........................................................................................7

III.    ARGUMENT..........................................................................................................8

        A.    California Law Applies to Matters of Attorney Disqualification ............10

        B.    A Lawyer Who Attempts to Switch Sides in a Dispute Is
              Disqualified From Further Representation ................................................11

        C.    Winston Is Vicariously Disqualified from Representing
              National Based on the Defecting Lawyers' Imputed Conflict .................14

              1.    Even a Timely and Effective Ethical Screen Cannot Cure
                    the Ailment Created By Side Switching Lawyers...........................14

              2.    A Client's Right to Choose Counsel is Outweighed By the
                    Court's Interest in the Fair Administration of Justice and
                    Integrity of the Judicial Process ....................................................18

        D.    Even if Ethical Screening Was Otherwise Possible, Winston's
              Conduct Here Calls Into Question Its Reliability and Candor
              With Regard to This Conflict.....................................................................20

IV.     REQUESTED RELIEF .......................................................................................21

# TABLE OF AUTHORITIES

**Federal Cases**

*Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*,
No. CV 11-04239 DDP (AJWx), 2012 WL 6618239
(C.D. Cal. Dec. 19, 2012) ..............................................................................................10

*Aoki v. Gilbert*, No. 2:11-cv-02797 MCE-CKD,
2012 WL 2450658 (E.D. Cal. June 26, 2012)................................................................10

*Beltran v. Avon Products, Inc.*,
867 F. Supp. 2d 1068 (C.D. Cal. 2012) ..................................10, 12, 13, 16, 17, 20, 21

*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*,
809 F. Supp. 1383 (N.D. Cal. 1992) ......................................................................14, 19

*Guifu Li v. A Perfect Day Franchise, Inc.*, No. 11-CV-01189-JHK,
2011 WL 4635176 (N.D. Cal. Oct. 5, 2011)..................................................................10

*In re County of Los Angeles*,
223 F.3d 990 (9th Cir. 2000)..........................................................................................10

*j2 Global Comm'ns, Inc. v. EasyLink Servs. Int'l Corp.*,
No. CV 09-04189 DDP AJWX, 2012 WL 6618609
(C.D. Cal. Dec. 19, 2012) ..............................................................................................14

*T. C. Theatre Corp. v. Warner Bros. Pictures*,
113 F. Supp. 265 (S.D.N.Y. 1953)................................................................................19

*Trone v. Smith*,
621 F.2d 994 (9th Cir. 1980)..........................................................................................20

**State Cases**

*Adams v. Aerojet-Gen. Corp.*,
86 Cal. App. 4th 1324, 104 Cal. Rptr. 2d 116 (2001)...................................................14

*City Nat'l Bank v. Adams*,
96 Cal. App. 4th 315, 117 Cal. Rptr. 2d 125 (2002).........................................10, 11, 15

*City of Santa Barbara v. Superior Court*,
122 Cal. App. 4th 17, 18 Cal. Rptr. 3d 403 (2004).......................................................14

*Dill v. Superior Court*,
158 Cal. App. 3d 301, 205 Cal. Rptr. 671 (1984).....................................................19, 20

*Flatt v. Superior Court*,
9 Cal. 4th 275, 36 Cal. Rptr. 2d 537 (1994)......................................................11, 12, 14

*Henriksen v. Great Am. Sav. & Loan*,
11 Cal. App. 4th 109, 14 Cal. Rptr. 2d 184 (1992)...............................12, 15, 16, 17

*In re Zamer G.*,
153 Cal. App. 4th 1253, 63 Cal. Rptr. 3d 769 (2007)....................................................12

*Jessen v. Hartford Cas. Ins. Co.*,
  111 Cal. App. 4th 698, 3 Cal. Rptr. 3d 877 (2003) .......................................................11

*Kirk v. First American Title Ins. Co.*,
  183 Cal. App. 4th 776, 108 Cal. Rptr. 3d 620 (2010).......................................15, 16, 17

*Meza v. H. Muehlstein & Co., Inc.*,
  176 Cal. App. 4th 969, 98 Cal. Rptr. 3d 422 (2009)...............................................15, 16

*Oasis West Realty, LLC v. Goldman*,
  51 Cal.4th 811, 124 Cal. Rptr. 3d 256 (2011) ...........................................................19

*People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc.*,
  20 Cal. 4th 1135, 1145, 86 Cal. Rptr. 2d 816, 980 P.2d 371 (1999) ...................9, 10, 12, 14, 20

*Pound v. DeMera DeMera Cameron*,
  135 Cal. App. 4th 70, 36 Cal. Rptr. 3d 922 (2005) ...................................................17

*River West, Inc. v. Nickel*,
  188 Cal. App. 3d 1297, 234 Cal. Rptr. 33 (1987) ......................................................12

*Rosenfeld Constr. Co. v. Superior Court*,
  235 Cal. App. 3d 566, 286 Cal. Rptr. 609 (1983) ................................................14, 19

*Roush v. Seagate Tech., LLC*,
  150 Cal. App. 4th 210, 58 Cal. Rptr. 3d 275 (2007)............................................12, 14

**Rules**

Cent. Dist. Cal. L.R. 83-3.1.2 .......................................................................................10

Cent. Dist. LBR 2090-2 ..............................................................................................10

E. Dist. Cal. L.R. 180 ...................................................................................................10

E. Dist. LBR 1001-1 .....................................................................................................10

N.C. Rules of Professional Conduct, Rule 8.5 .............................................................10

1    Party in Interest California Public Employees' Retirement System ("CalPERS") hereby

2    moves the Court for an order disqualifying Winston & Strawn LLP from representing Creditor

3    National Public Finance Guarantee Corporation ("National") or any other parties in this case.

## I.    INTRODUCTION

5    Within the past three to four weeks, National's attorneys, Winston & Strawn, LLP, have

6    raided the Restructuring and Insolvency practice group of CalPERS' lawyers in the Charlotte, North

7    Carolina office of K&L Gates. At least five lawyers were recruited by Winston, including one partner

8    and two associates who performed over five hundred hours of legal services for CalPERS in two

9    Chapter 9 matters involving the bankruptcy cases of the cities of Stockton, California and San

10   Bernardino, California (collectively, the "Chapter 9 Cases"). In a classic case of side-switching, those

11   lawyers are now working  for Winston, the law firm that contentiously represents CalPERS' litigation

12   adversary, National, in the two Chapter 9 Cases.[1]  By hiring from K&L Gates' Charlotte office,

13   Winston has knowingly obtained lawyers who were at the heart of the K&L Gates litigation team

14   representing CalPERS, taking a partner who was a key lieutenant, instrumental in the strategy of

15   K&L Gates' representation of CalPERS, and two associates who were under that partner's

16   supervision. Winston now has an irreconcilable conflict of interest that cannot and will not be

17   waived. Under such circumstances, Winston cannot be permitted to continue to represent National in

18   this case, and must be disqualified from its representation of National or any other party.

19   Winston contends that it is entitled to continue representing National because it has erected an

20   ethical wall around the defecting lawyers.  Ethical walls or screens, however, cannot save a firm from

21   disqualification under California law where the defecting lawyers have switched sides in the same

22   case.  In "side-switching" cases, California law is clear that disqualification is mandatory

23   notwithstanding the erection of any ethical wall.  This is because, among other things, side switching

24   implicates not only the duty of confidentiality, but also the duty of loyalty to the former client.  An

25   alleged ethical wall does not and cannot address or cure the breach of loyalty a client suffers when its

26   lawyers walk out the door and join the ranks on the other side ***of the very matter in which the***

---

[1]    One of those lawyers, partner Felton E. Parrish, joined Winston on April 23, 2013.  Two other lawyers, associates William Petraglia and Nathan Lebioda, have accepted offers and will join Winston on May 20, 2013.

1   *lawyers formerly represented the client*. Nor does an ethical wall in such a case address an

2   attorney's duty to maintain the integrity of the judicial process. Disqualification is mandatory under

3   such circumstances.

4        Moreover, even if ethical screening could under some circumstances permit lawyers in a

5   California based case to switch sides, which it does not, CalPERS here should not be required to

6   simply accept the word of its litigation adversary that ethical screening will prevent its confidential

7   information from dissemination. The extent of such confidential information in these lawyers'

8   possession is significant. The defecting lawyers – especially partner Felton E. Parrish – were

9   intimately involved in the development and planning of CalPERS' strategy in the Chapter 9 Cases,

10   billed hundreds of hours for the work on those cases, engaged in direct client communications, shared

11   confidences in weekly conference calls concerning all of CalPERS' cases handled by the K&L Gates,

12   and researched core issues upon which CalPERS' strategy in the Chapter 9 Cases is based.

13        In response to CalPERS' objections to these lawyers joining the other side, Winston has been

14   evasive and less than candid – first denying that there was any effort to recruit Mr. Parrish while

15   secretly making him an offer, next saying that the infected lawyers would not be hired unless

16   CalPERS waived conflicts, and then hiring them anyway when CalPERS declined its consent. Even

17   though a screen is not sufficient here as a matter of law, there is also evidence that the supposed

18   screen implemented by Winston has already been violated. Other evidence suggests that Mr. Parrish

19   still has access to the memoranda, research and confidential communications that he sent to his

20   personal email account. Particularly given the deceptive nature of Winston's actions and the

21   defecting lawyers' communications with K&L Gates more specifically described below, CalPERS

22   should not be required to rely on the word of Winston – its adversary – that ethical screening will

23   shield confidential information from dissemination.

24        This is a mandatory disqualification, and the motion should accordingly be granted.

25

26

27

28

## II.    BACKGROUND

### A.    The Defecting Lawyers' Representation of CalPERS in the Chapter 9 Cases

#### 1.    Commencement of the Chapter 9 Cases.

On June 28, 2012, the City of Stockton, California filed its chapter 9 petition under title 11 of the United States Code (the "Bankruptcy Code").  The Court determined that the City was eligible for relief under chapter 9 and entered an order for relief on April 1, 2013.  Approximately one month later, on August 1, 2012, the City of San Bernardino filed its Chapter 9 petition under title 11 of the Bankruptcy Code.  CalPERS is a party in interest and National is a creditor in both cases.  As they relate to CalPERS, many of the issues raised in both cases are identical and CalPERS is adverse to National in both cases.  K&L Gates represents CalPERS in both cases and Winston presently represents National in both cases.[2]

#### 2.    Evidence in Support of Motion

The factual support for this motion is established by the Declaration of Michael Gearin in Support of CalPERS' Motion to Disqualify Winston & Strawn LLP (the "Gearin Declaration"), the Declaration of Sean M. Jones in Support of CalPERS Motion to Disqualify Winston & Strawn LLP (the "Jones Declaration") the Declaration of Charles A. Dale, III in Support of CalPERS' Motion to Disqualify Winston & Strawn LLP (the "Dale Declaration") and the Declaration of Peter Mixon Support of CalPERS' Motion to Disqualify Winston & Strawn LLP (the "Mixon Declaration"), all filed substantially contemporaneously herewith.

#### 3.    The CalPERS' Litigation Team

Michael J. Gearin and Michael Lubic are K&L Gates partners with primary responsibility for the representation of CalPERS in the Chapter 9 Cases. Mr. Gearin and Mr. Lubic have supervisory responsibility for other partners and associates working on K&L Gates' team for the Chapter 9 Cases, which consist of attorneys from multiple offices including K&L Gates' offices in California, Washington, Illinois, Massachusetts and North Carolina. Attorneys from the North Carolina office performed significant legal services for CalPERS in the Chapter 9 Cases, including services

---

[2]    CalPERS filed on May 17, 2013 a Motion to Disqualify Winston in the City of San Bernardino Chapter 9 case as well.  The hearing on that Motion is set for June 13, 2013.

1   performed by former partner Felton E. Parrish, and former associates, Nathan Lebioda and William

2   Petraglia. Collectively, these three North Carolina attorneys provided over 500 hours of legal services

3   for CalPERS in the Chapter 9 Cases, and Mr. Parrish had a substantial and direct role in client contact

4   and strategic planning.[3]

5               **4.    Winston Raids K&L Gates' Restructuring and Bankruptcy Practice**

6                       **Group, Charlotte Office.**

7               On April 15, 2013, Jo Ann Brighton, at that time a partner in K&L Gates' Charlotte office,

8   resigned from K&L Gates and joined Winston. At the time of her departure, she had informed two

9   K&L Gates partners, Sean M. Jones and Charles Dale, of her intent to take the entire Restructuring

10  and Insolvency practice group from the Charlotte office to Winston's Charlotte office, including at

11  least Mr. Parrish, Mr. Petraglia and Mr. Lebioda.[4]  At the time of her resignation, Ms. Brighton had

12  only a peripheral involvement in K&L Gates' representation of CalPERS in the Chapter 9 Cases,

13  having billed only 0.8 hours on that work.

14              Other bankruptcy attorneys in K&L Gates' Charlotte office, however, had much more

15  significant involvement in K&L Gates' representation of CalPERS in the Chapter 9 Cases.[5]  Felton E.

16  Parrish was a key member of the core K&L Gates team handling the CalPERS representation in the

17  Chapter 9 Cases.[6]  Mr. Parrish routinely participated in high level strategy conferences and

18  conference calls, was engaged in direct communication with the client, performed research and

19  analysis of key legal issues, core strategies and options available to CalPERS in the cases and was

20  responsible for the research, development, and drafting of multiple memoranda and briefs concerning

21  those strategies and arguments.  Since Fall 2012, Mr. Parrish billed approximately 366 hours on

22  CalPERS matters in these cases.  Additionally, Mr. Parrish worked with, relied upon, and supervised

23  the work of the two associates, Mr. Lebioda and Mr. Petraglia, who have billed 85.8 and 53.3 hours

24  to the Chapter 9 Cases, respectively.[7]  The extensive work on the CalPERS representation that was

25  performed by Mr. Parrish, Mr. Lebioda and Mr. Petraglia is described in their time records (Exhibit 1

26  _____

27  [3]  Gearin Declaration, ¶¶ 2, 3, 5-7 and Exhibit 1 thereto; Mixon Declaration, ¶¶ 3-5.
    [4]  Dale Declaration, ¶¶ 2-3; Jones Declaration, ¶¶ 2-3.

28  [5]  Gearin Declaration, ¶¶ 4-6.
    [6]  Id., ¶ 5.
    [7]  Id., ¶¶ 6-8; Mixon Declaration, ¶¶ 4-5.

to the Gearin Declaration) and the subject matters of their work are detailed in ¶¶ 6, 7 and 8 of the Gearin Declaration

On April 12, 2013, Ms. Brighton told Sean M. Jones, the Administrative Partner of K&L Gates' Charlotte office, that she was proceeding in discussions with Winston to join that firm, and that K&L Gates was at risk for losing the entire Restructuring and Insolvency practice group. That group included the three above-named lawyers who had performed extensive work on CalPERS representation, and others.[8] On April 12, 2013, Ms. Brighton told Charles Dale, a partner in the Boston office, that she was going to Winston and that everyone in the Restructuring and Bankruptcy practice group from the Charlotte office would be going with her.[9] Thus, it was Winston's plan in advance to acquire the entire Charlotte insolvency practice group that included Parrish, Petraglia and Lebioda.

Despite the plan, Winston was secretive and misleading in its approach. On the day she resigned, April 15, Ms. Brighton solicited Mr. Gearin for his preliminary view of whether CalPERS would provide a consent not to disqualify Winston if she defected. Since her role in CalPERS representation had been quite limited, less than an hour of billed time, Mr. Gearin told Ms. Brighton that based on her limited involvement and her representations that she held no confidential information, he did not believe her joining Winston would be objectionable to CalPERS, but that he would need to inquire with his client.[10] Mr. Gearin did not have authority to waive any conflict on behalf of CalPERS. That authority resides with CalPERS' General Counsel, Peter Mixon.[11] This was plainly acknowledged by Ms. Brighton.[12]

What Mr. Gearin, as one of the leaders of the CalPERS team at K&L Gates, did not know at that time was that Ms. Brighton was also negotiating to take other key members of the Charlotte office, including Messrs. Parrish, Lebioda and Petraglia. Fearing this possibility, Mr. Gearin had told Ms. Brighton up front that CalPERS would have a problem if Mr. Parrish joined Winston, because of

---

[8]  Jones Declaration, ¶ 2.
[9]  Dale Declaration, ¶ 2.
[10]  Id., ¶ 8.
[11]  Id., ¶¶ 8-9.
[12]  Id., ¶ 18.

the extent of his involvement in the representation of CalPERS. Rather than revealing Winston's plan, Ms. Brighton adamantly denied that she would have any involvement in recruiting Mr. Parrish or other lawyers from K&L Gates to join Winston.[13] Yet, without informing Mr. Gearin, Ms. Brighton had been negotiating for Winston to make offers to other lawyers from the Charlotte office, consistent with her plan to take the whole practice group.[14] Within days, Winston recruited Mr. Parrish, who resigned on April 22, and the two associates under his supervision. Those associates, Mr. Petraglia and Mr. Lebioda, announced in April their intent to depart, and that they were waiting on confirmation of Winston's offers.[15]

During this time, Winston was less than candid regarding whether its hiring of these lawyers was or was not contingent upon clearing conflicts with CalPERS. First, there was a letter from Winston dated April 19, which addressed only Ms. Brighton, and specifically requested that CalPERS agree it would not seek to disqualify Winston, provided that Winston and Ms. Brighton adhere to screening procedures that were not detailed in the letter.[16] That letter was received on April 21. The next day, on April 22, another letter arrived, requesting the same consent as to *both* Ms. Brighton and Mr. Parrish, provided that they comply with screening procedures, which were also not detailed in the letter.[17] By this time, Winston already knew that CalPERS would have a major problem with Winston taking Mr. Parrish.[18] However, by April 23, Ms. Brighton and Mr. Parrish had already started at Winston. Parrish had announced that although Winston wanted a consent letter signed, it was prepared to go forward without one, as it ultimately did.[19] Winston was formally notified by Mr. Gearin in a letter of April 24, 2013 that CalPERS would move to disqualify Winston if it hired Mr. Parrish – which it apparently had already done, ignoring its earlier request for a consent.[20] CalPERS explicitly declined to provide its consent for Winston to hire Mr. Parrish.[21]

Furthering its lack of candor, Winston specifically told a K&L Gates partner that the two

---

[13] Id., ¶ 10.
[14] Jones Declaration, ¶ 2, 3.
[15] Jones Declaration, ¶¶ 4-7, 9, 10, 13.
[16] Gearin Declaration, ¶ 13 and Exhibit 2 thereto.
[17] Id., ¶¶ 14, 15 and Exhibit 3 thereto.
[18] Id., ¶ 10.
[19] Jones Declaration, ¶¶ 5-6; Gearin Declaration, ¶¶ 14, 15, 21 and Exhibits 3, 4 and 7 thereto.
[20] Gearin Declaration, ¶ 17 and Exhibit 5 thereto.
[21] Mixon Declaration, ¶ 6.

1  associates, Mr. Petraglia and Mr. Lebioda, would not be hired until the question of CalPERS' consent

2  was fully and finally resolved, but it went ahead and hired them anyway, promising to make them

3  whole, financially, due to the absence of obtaining consent from CalPERS.[22]

4          On April 29, 2013, Winston sent a letter to Mr. Gearin asserting that an ethical screen for

5  Ms. Brighton and Mr. Parrish would eliminate any basis for disqualifying Winston. The letter falsely

6  characterized the extent of work done by Mr. Parrish, and gave indications that the supposed screen

7  had already been breached, since it was obvious that Mr. Parrish had revealed details of his work on

8  the CalPERS cases to Winston, despite the prior representation in Exhibit 3 that he would talk to no

9  one at Winston regarding the Chapter 9 Cases. Contrary to the breezy assurances of Winston's

10 lawyers, there are also clear indications that Mr. Parrish still has electronic access to data pertaining

11 to CalPERS. Exhibit 8 to Mr. Gearin's Declaration contains a series of redacted emails showing that

12 Mr. Parrish routinely forwarded research memos, work product, team communications and client

13 communications to his personal email address, where he presumably would still be able to access

14 them.[23]

15          Despite having extended offers and planning to hire them in April, Winston did not notify

16 CalPERS of its actual hiring of Mr. Petraglia and Mr. Lebioda until a letter of May 13, 2013. That

17 May 13 letter did not even request consent from CalPERS – it simply took the position that a screen

18 would be implemented for these side-switching lawyers, relying upon an ABA Model Rule provision

19 that has not been adopted and is contrary to the law in California.[24] CalPERS immediately objected,

20 and does not consent to Winston's hiring of Mr. Petraglia or Mr. Lebioda.[25]

21          **B.      CalPERS and National's Interests in the Chapter 9 Cases Are Directly Adverse**

22          National, along with certain other financial institutions appearing in the Chapter 9 Cases who

23 collectively are referred to as the "Capital Markets Creditors," have allegedly provided purported

24 credit enhancements to Stockton and San Bernardino in connection with municipal bond issuances in

25 the form of bond insurance.  As such, Capital Markets Creditors such as National claim to be the

26

27  [22] Jones Declaration, ¶¶ 9, 11, 12.
    [23] Gearin Declaration, ¶ 19, 22 and Exhibit 6 and 8 thereto.
28  [24] Id. ¶ 23 and Exhibit 9 thereto.
    [25] Id. ¶ 24 and Exhibit 10 thereto; Mixon Declaration, ¶ 7.

1    ultimate parties in interest with respect to hundreds of millions of dollars in insured bond issuances.

2         CalPERS, on the other hand, administers the pension and retirement benefits provided by

3    Stockton and San Bernardino to their employees and retirees.  Pursuant to California law, the

4    CalPERS Board of Administration has plenary authority and fiduciary responsibility for the

5    investment of moneys and the administration of the Public Employees' Retirement System.

6    CalPERS is responsible for the administration of the system in a manner which assures the prompt

7    delivery of benefits to participants in the system.  The Capital Markets Creditors have made clear

8    their intentions to disrupt the cities' relationships with CalPERS and to compel the Cities to seek to

9    impair CalPERS through Chapter 9 plans of adjustment.  In the Stockton case, National, and the other

10   Capital Markets Creditors, argue that the consequences of the financial risks they contracted to accept

11   are unfair unless the cities' employees and retirees and the public employee retirement system of the

12   State of California shoulder the financial burdens of the cities.  CalPERS disagrees.

13        In this Case, the Capital Markets Creditors including National have been directly adverse to

14   CalPERS on multiple contested matters.  Indeed, the Court has noted that the Capital Markets

15   Creditors, including National, have had CalPERS in their cross hairs since the inception of the case,

16   and many of their arguments have been aggressively advanced by Winston on behalf of National.

17   National has intended to drag CalPERS into a fight since well before this bankruptcy case was filed

18   and has continued that strategy throughout this case.[26]  The Court's ruling on the eligibility of the

19   City of April 1, 2013 found that National had refused to negotiate with the City unless the City would

20   agree to "impair" CalPERS during the pre bankruptcy state law mandated mediation process.

21   National filed objections to the City's eligibility in which it took the position that the City was

22   required to "impair" CalPERS in order to be eligible for relief under chapter 9.  [Dkt. # 477, Dkt.

23   # 635].  National has also taken the position that CalPERS must be impaired in order to confirm a

24   plan of adjustment in the case.[27]  Winston was the lawyer of record in presenting these objections and

25   arguments to the Court.  The issues regarding the City's ability to confirm a plan remain in contest in

26

27   _____
     [26] Gearin Declaration, ¶ 26, and Exhibit 12 thereto.
28   [27] National contends that a plan of adjustment cannot be confirmed over its objection absent
     impairment of CalPERS because such a plan unfairly discriminates against the Capital Markets
     Creditors.  [Dkt # 477, p. 17, fn 7].

1   the case.  Mr. Parrish researched and drafted memoranda containing legal analysis of the treatment of

2   pension plan obligations in bankruptcy reorganization cases for CalPERS.  That legal analysis

3   remains relevant to the plan of adjustment issues in this case.  Winston has asserted and continues to

4   assert positions in this case that are directly contrary to the positions taken and work product created

5   on behalf of CalPERS by the very lawyers that Winston has now hired.

6          On May 17, 2013, CalPERS filed its motion to disqualify Winston in the San Bernardino

7   bankruptcy proceeding.  The same day, Winston sent Mr. Gearin another letter asserting that its

8   screening procedures are effective to avoid disqualification, and even asserting that an attorney who

9   moves from a firm representing one creditor to a firm representing another creditor is not a case of

10  extreme or direct conflict.[28]  Although Winston's May 17 letter was not seen until after the motion in

11  the San Bernardino case was already filed, it does nothing to alter CalPERS' position.  For Winston

12  to suggest that it is not a serious or direct conflict of interest for lawyers to switch sides from actively

13  representing CalPERS in the Chapter 9 Cases, to working for the law firm that represents National, is

14  to ignore the practical realities of this case and the way it has been litigated.  The Court is fully aware

15  of the extent of disagreement between National and CalPERS.  There being no legal basis in

16  California for a screen to protect against the serious breach of loyalty that arises in a side-switching

17  case such as this, the integrity of the legal process demands that CalPERS bring this motion.

18                            **III.    <u>ARGUMENT</u>**

19          "A trial court's authority to disqualify an attorney derives from the power inherent in every

20  court to control in furtherance of justice, the conduct of its ministerial officers, and of all other

21  persons in any manner connected with a judicial proceeding before it, in every matter pertaining

22  thereto."  *People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1145, 86

23  Cal. Rptr. 2d 816 (1999) (internal quotations omitted).  Disqualification motions involve "a conflict

24  between the clients' right to counsel of their choice and the need to maintain ethical standards of

25  professional responsibility.  The paramount concern must be to preserve public trust in the scrupulous

26  administration of justice and the integrity of the bar.  The important right to counsel of one's choice

27

28  [28] Gearin Declaration, ¶ 25, and Exhibit 11 thereto.

1    must yield to ethical considerations that affect the fundamental principles of our judicial process." *Id.*

2    at 1145; *accord City Nat'l Bank v. Adams*, 96 Cal. App. 4th 315, 324, 117 Cal. Rptr. 2d 125, 132-33

3    (2002);  *see also Beltran v. Avon Products, Inc.*, 867 F. Supp. 2d 1068, 1077 (C.D. Cal. 2012).

4        As further discussed below, such fundamental principles of the judicial process are

5    jeopardized where, as here, attorneys directly involved in representation on behalf of one client

6    switch sides to join a firm representing an adversary in that case.  Disqualification is accordingly

7    mandated and extends, *per se*, to the entire firm to which the side switching attorneys have joined.

8    This is true regardless of whether the side switching attorneys are directly involved in the

9    representation of the adverse party or an ethical "screen" is erected.  Winston, thus, must be

10    disqualified from further representing National or any other party to the Chapter 9 Cases.

11        **A.    California Law Applies to Matters of Attorney Disqualification**

12        Federal courts in California apply California state law in determining matters of

13    disqualification.  *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("Because we apply

14    state law in determining matters of disqualification, we must follow the reasoned view of the state

15    supreme court when it has spoken on the issue."); *Advanced Messaging Techs., Inc. v. EasyLink*

16    *Servs. Int'l Corp.*, No. CV 11-04239 DDP (AJWx), 2012 WL 6618239, at *5 (C.D. Cal. Dec. 19,

17    2012) ("The Ninth Circuit . . . has made clear that a federal court in California must apply California

18    law in a disqualification motion."); *Aoki v. Gilbert*, No. 2:11-cv-02797 MCE-CKD, 2012 WL

19    2450658, at * 3 (E.D. Cal. June 26, 2012) ("In deciding motions for disqualification, the court applies

20    the relevant state law."); *Guifu Li v. A Perfect Day Franchise, Inc.*, No. 11-CV-01189-JHK, 2011

21    WL 4635176, *3 (N.D. Cal. Oct. 5, 2011) ("This Court . . . applies state law in determining matters

22    of disqualification.").  The rules and statutes governing attorneys in California expressly apply to

23    lawyers practicing in the Eastern and Central Districts.  *See* E. Dist. LBR 1001-1(c) and E. Dist. Cal.

24    L.R. 180(e) (adopting the State Bar Act, the Rules of Professional Conduct of the State Bar of

25    California, and the applicable judicial decisions thereto as the Eastern District's standards of

26    professional conduct); Cent. Dist. LBR 2090-2(a) and Cent. Dist. Cal. L.R. 83-3.1.2 (same); *see also*

27    N.C. Rules of Professional Conduct, Rule 8.5(b)(1) ("for conduct in connection with a matter

28    pending before a tribunal, the rules of the jurisdiction in which the tribunal sits" are applied to North

1    Carolina lawyers).

2         **B.**     **A Lawyer Who Attempts to Switch Sides in a Dispute Is Disqualified From**

3                    **Further Representation**

4         Rule 3-310(E) of California's Rules of Professional Conduct prohibits an attorney, without

5    the client's informed written consent, from accepting employment adverse to the interests of a current

6    or former client, "where, by reason of the representation of the client or former client, the member

7    has obtained confidential information material to the employment."

8         The receipt of material confidential information is presumed where an attorney is directly

9    involved in the representation of the former client.  *See Jessen v. Hartford Cas. Ins. Co.*, 111 Cal.

10    App. 4th 698, 709, 3 Cal. Rptr. 3d 877, 885 (2003).  Each of the defecting attorneys here was

11    personally involved in the representation of CalPERS by K&L Gates.  Collectively, they billed over

12    500 hours in representing CalPERS in the Chapter 9 Cases.  Moreover, as discussed above, and as

13    reflected in their time sheets and work product, the defecting attorneys actually received confidential

14    information of CalPERS.  These attorneys are therefore prohibited from representing any interests

15    adverse to CalPERS in the Chapter 9 Cases, including National's.

16         Where an attorney was not directly involved in the prior representation, receipt of confidential

17    information will nonetheless be presumed if the matter in which the attorney formerly represented a

18    client is substantially related to the successive representation.  *See Flatt v. Superior Court*, 9 Cal. 4th

19    275, 283, 36 Cal. Rptr. 2d 537 (1994).  Here, National, the new client, is directly adverse to

20    CalPERS, the former client, in the very same matters in which the defecting attorneys previously

21    represented CalPERS.  Where a lawyer switches sides, such that his current and former employment

22    are on the opposite sides of the same matter, "the nature of the former representation will ***always*** be

23    such that the exchange of relevant confidences must be presumed."  *City Nat'l Bank*, 96 Cal. App. 4th

24    at 328.  Thus, even if Winston now challenges the extent of the defecting attorneys' personal

25    involvement in CalPERS' representation in the Chapter 9 Cases, the receipt of confidential

26    information by them is presumed under California law.

27         The defecting attorneys are accordingly barred from representing National – or any other

28    party adverse to CalPERS – in the Chapter 9 Cases and must be disqualified:

The classic disqualification case involves the attorney switching sides, 'so that an attorney who once represented 'A' now seeks to represent 'B' in a matter materially related to the original representation.' ([Citation.])  Disqualification in such a case is necessary to safeguard the attorney-client relationship.   'A client should not fear that confidences conveyed to his attorney in one action will return to haunt him in a later one.' ([Citation.]).

*Roush v. Seagate Tech., LLC*, 150 Cal. App. 4th 210, 218-19, 58 Cal. Rptr. 3d 275, 280-81 (2007);

*see also In re Zamer G.*, 153 Cal. App. 4th 1253, 1262, 63 Cal. Rptr. 3d 769, 776 (2007) ("A lawyer

who represents clients with adverse interests in the same litigation automatically will be disqualified,

as will a lawyer who switches sides during pending litigation, because both situations present an

unacceptable risk that the lawyer's duties of loyalty and confidentiality will be compromised.");

*SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th at 1139 ("For attorneys in the same firm to represent

adverse parties in the same litigation is so patently improper that the rule of disqualification is a per

se or 'automatic' one.")

When a substantial relationship is found between the successive representations, "[t]he rights

and interests of the former client will prevail.  Conflict will be presumed; disqualification will be

ordered."  *River West, Inc. v. Nickel*, 188 Cal. App. 3d 1297, 1308-09, 234 Cal. Rptr. 33 (1987); *see*

*also Flatt v. Superior Court*, 9 Cal. 4th 275, 283, 36 Cal. Rptr. 2d 537, 885 P.2d 950 (1994) (upon

establishing a substantial relationship, "access to confidential information by the attorney in the

course of the first representation . . . is presumed and disqualification of the attorney's representation

of the second client is mandatory"); *Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109, 114,

14 Cal. Rptr. 2d 184 (1992) ("If the former client establishes the existence of a substantial

relationship between the two representations the court will conclusively presume that the attorney

possesses confidential information adverse to the former client and order disqualification.").

In *Beltran v. Avon Prods., Inc.*, 867 F. Supp. 2d 1068 (C.D. Cal. 2012), a former associate of

Paul Hastings spent over 300 hours and billed more than $100,000 on three matters related to

products liability and advertising issues for Avon, a client of Paul Hastings.  *Id.* at 1072.  That

associate subsequently left Paul Hastings to join another firm, which ultimately represented a certain

class of plaintiffs that alleged that Avon misrepresented its practices in regards to animal testing.  *Id.*

at 1072-75.  Based on (1) sworn declarations from the associate's former supervising attorney that the

associate acquired adverse confidential information regarding the former client's "business, corporate witnesses, legal strategies, product testing protocols, and marketing and advertising practices" and (2) the former associate's time entries, which substantiated the fact that the former associate was exposed to a variety of confidences that were not part of the public record, that court concluded that the former associate actually possessed confidential information. *Id.* at 1078-81. Moreover, that court concluded that there was a substantial relationship between the associate's former representation and his new firm's representation based on the similar factual and legal issues involved in those representations. The receipt of confidential information by him could therefore also be presumed. *Id.* at 1082.

Here, there is much more than a mere substantial relationship between Winston's representation of National and K&L Gates' representation of CalPERS: The two are adverse parties in the very same matter. National and CalPERS have diametrically opposed interests in the Chapter 9 Cases, and the resolution of these cases may ultimately depend on the outcome of the contentious disputes between the Capital Markets Creditors, including National, and CalPERS. Not only are the factual situations and legal issues posed by the current and prior representations similar – they are identical. Moreover, one of the defecting attorneys, former K&L Gates partner Felton Parrish, was a core K&L Gates team member handling the CalPERS representation, billing approximately 366 hours on work related to that representation. Mr. Parrish was significantly involved in the development of attorney work product at K&L Gates, and he was responsible for researching, developing, and drafting memoranda and briefs concerning core strategies and arguments on behalf of CalPERS. The associates, Messrs. Petraglia and Lebioda, between them spent more than 150 hours representing CalPERS. The extent of these attorneys' involvement in CalPERS' representation put them in a position to, and they in fact did, acquire material confidential information and attorney work product during the course of representing CalPERS. The defecting attorneys are accordingly disqualified from representing National.

**C.**    **Winston Is Vicariously Disqualified from Representing National Based on the Defecting Lawyers' Imputed Conflict**

**1.**    **Even a Timely and Effective Ethical Screen Cannot Cure the Ailment Created By Side Switching Lawyers**

"When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm." *SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th at 1139; *see also Flatt*, 9 Cal. 4th at 283 (an attorney's disqualification from representing a second client "extends vicariously to the entire firm"). This is true even if the tainted lawyer is no longer with the firm and even if confidences were never, in fact, imparted by or to the tainted lawyer. *See Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1393 (N.D. Cal. 1992); *j2 Global Comm'ns, Inc. v. EasyLink Servs. Int'l Corp.*, No. CV 09-04189 DDP AJWX, 2012 WL 6618609, at *7 (C.D. Cal. Dec. 19, 2012) ("The general rule is that presuming an attorney possesses confidential information requires presuming the same for his law firm ('the Vicarious Presumption Rule').") In California, the knowledge of any particular member of a law firm is considered knowledge of all attorneys in the firm as a matter of law. *See Adams v. Aerojet-Gen. Corp.*, 86 Cal. App. 4th 1324, 1333, 104 Cal. Rptr. 2d 116, 122 (2001); *Rosenfeld Constr. Co. v. Superior Court*, 235 Cal. App. 3d 566, 573, 286 Cal. Rptr. 609, 612 (1983). Here, there is no question that the defecting attorneys are disqualified from representing National or any other parties in the Chapter 9 Cases because they previously represented CalPERS in the same matter. The confidential knowledge of these attorneys, and their conflict, are imputed to Winston and prohibits both Winston and the disqualified lawyers from representing National against CalPERS. *See City of Santa Barbara v. Superior Court*, 122 Cal. App. 4th 17, 20, 18 Cal. Rptr. 3d 403, 404 (2004) ("An attorney who switches sides during litigation is disqualified from representing his or her former adversary. The disqualification extends to the attorney's entire new law firm."); *see also Roush v. Seagate Technology*, 150 Cal. App. 4th 210, 219 (2007) (disqualification is warranted even where direct information is not obtained by the firm because attorneys have a duty to maintain the integrity of the judicial process).

Winston here has attempted to avoid the rule of automatic disqualification resulting from its

14

1  employment of three members CalPERS' litigation team by claiming that it has erected an ethical

2  screen around the tainted lawyers.  Citing the California appellate decision in *Kirk v. First American*

3  *Title Ins. Co.*, 183 Cal. App. 4th 776, 108 Cal. Rptr. 3d 620 (2010), Winston claims that such a screen

4  can rebut the presumption of its receipt of material confidential information and prevent its

5  disqualification.  Winston is simply incorrect.  In fact, the *Kirk* case makes clear that an ethical screen

6  cannot prevent Winston's disqualification under circumstances such as those present here.

7       In *Kirk*, the Court of Appeal held that under certain limited circumstances, ethical screening

8  may rebut the presumption of imputed knowledge to a tainted attorney's law firm, but "if the tainted

9  attorney was actually involved in the representation of the first client, and switches sides in the same

10  case, ***no amount of screening will be sufficient***, and the presumption of imputed knowledge is

11  conclusive."  *Kirk*, 183 Cal. App. 4th at 814 (emphasis added).  That is precisely the case here.  As

12  set forth above, each of the defecting attorneys was actually involved in the representation of

13  CalPERS by K&L Gates and either actually or presumptively possessed confidential information of

14  CalPERS relating to the Chapter 9 Cases.  Under such circumstances, no amount of ethical screening

15  by Winston will suffice and the entire firm is disqualified from representing National or any other

16  party in the Chapter 9 Cases.  *Id.* at 800 ("vicarious disqualification should be ***automatic***" where

17  tainted attorney switches sides); *see also City of Santa Barbara*, 122 Cal. App. 4th at 20; *Meza v. H.*

18  *Muehlstein & Co., Inc.*, 176 Cal. App. 4th 969, 979, 98 Cal. Rptr. 3d 422 (2009) (in a side switching

19  case, "an 'ethical wall' between an attorney with confidential information and his or her firm will

20  generally not preclude the disqualification of the firm").  This is because, in part, side switching cases

21  "implicate the lawyer's duty of loyalty as well as confidentiality."  *City Nat'l Bank*, 96 Cal. App. 4th

22  at 329.  An ethical screen, which is designed to address only the duty of confidentiality, cannot and

23  does not address the breach of the duty of loyalty and the adverse impact on the integrity of the

24  judicial process present when an attorney switches sides in the same case.

25       This rule of automatic disqualification in side switching cases was first stated in *Henriksen v.*

26  *Great American Savings & Loan*, 11 Cal. App. 4th 109, 14 Cal. Rptr. 2d 184 (1992), a case directly

27  on point here.  In *Henriksen*, counsel for the plaintiff in pending litigation hired an associate who

28  formerly represented the adverse party in the same proceeding.  The Court held that "even if the law

1  firm takes measures to insulate the new associate from any involvement in the current litigation,"

2  disqualification is mandated. *Henriksen*, 11 Cal. App. 4th at 111. The associate there spent "in

3  excess of 200 hours" working on a variety of matters (*e.g.*, "learning the case, attending and taking

4  depositions, appearing in court, retaining and preparing expert witnesses, and doing any other work

5  that needed to be done on the file") and there was no dispute that the associate acquired confidential

6  information during his former representation. *Id.* at 112-14. "[W]here an attorney is disqualified

7  because he formerly represented and therefore possesses confidential information regarding the

8  adverse party in the current litigation, vicarious disqualification of the entire firm is compelled as a

9  matter of law." *Id.* at 117. This is true even if the tainted associated "has been ethically screened

10  from day one." *Id.* at 116; *see also Beltran v. Avon Products, Inc.*, 867 F. Supp. 2d 1068 (C.D. Cal.

11  2012) (where partner in the firm representing the plaintiffs in pending litigation had previously

12  worked on related matters for the defendant, firm was disqualified, even though partner had no

13  involvement in litigation and was ethically screened); *Meza v. H. Muehlstein & Co.*, 176 Cal. App.

14  4th at 974-75, 978 (despite "extensive screening procedures," disqualification mandated where

15  plaintiff's law firm hired an associate attorney that previously worked on matters in the same

16  litigation for the law firm representing a defendant in the case, even though the associate was no

17  longer employed by plaintiff's counsel by the time the motion to disqualify was filed).

18      Until *Kirk v. First American Title Ins. Co.* was decided in 2010, the question of whether an

19  ethical screen could be used to prevent disqualification by rebutting the presumption that

20  confidential information in the possession of tainted lawyers is imputed to the tainted lawyers' entire

21  firm, was open and unresolved in California. *Kirk* answered that question in the affirmative, but

22  made clear that an ethical screen could be employed only "in the proper circumstances" and that

23  vicarious disqualification remains the general rule. *Kirk*, 183 Cal. App. 4th at 801. The

24  circumstances before the Court in *Kirk*, then, must be examined to understand the extent of its

25  holding.

26      In *Kirk*, during certain earlier, related matters, plaintiff's counsel solicited the services of an

27  outside legal consultant. *Kirk*, 183 Cal. App. 4th at 786. During a seventeen minute telephone

28  conversation between plaintiff's counsel and the outside consultant, certain confidential information

1   and attorney work product was shared.  *Id.*  The consultant was never ultimately retained by the

2   plaintiff's counsel.  Although there were certain follow-up communications between the two, the

3   seventeen minute telephone call formed the central basis of the dispute in *Kirk*: whether

4   Sonnenschein Nath & Rosenthal LLP, after it subsequently hired the outside consultant as a partner,

5   was automatically, vicariously disqualified from representing a defendant title insurance company in

6   a class action suit represented by the same plaintiff's counsel.  *Id.* at 791.  The trial court had applied

7   the automatic disqualification rule and granted plaintiff's motion to disqualify, notwithstanding the

8   establishment of a screen.  The appellate court reversed and remanded with instructions to reconsider

9   in light of the circumstances of that case.  *Id.* at 809.

10       The facts present here are clearly distinguishable.  The tainted attorneys here collectively

11   spent over 500 hours representing CalPERS in the Chapter 9 Cases.  Mr. Parrish in particular was

12   involved extensively with developing strategy for the cases and prepared numerous key memoranda

13   that analyzed and advised CalPERS with respect to its strategy in the cases.  He participated in

14   weekly internal telephone conferences concerning the CalPERS cases and participated in conference

15   call with the client.  Far less involvement in the prior representation has been found sufficient to

16   warrant disqualification of a side switching lawyer's entire firm.  *See Beltran v. Avon Products, Inc.*,

17   867 F. Supp. 2d 1068 (C.D. Cal. 2012) (300 hours and over $100,000 billed by tainted attorney);

18   *Henriksen v. Great American Savings & Loan*, 11 Cal. App. 4th 109, 14 Cal. Rptr. 2d 184 (1992)

19   (tainted attorney spent in excess of 200 hours representing former client); *Pound v. DeMera DeMera*

20   *Cameron*, 135 Cal. App. 4th 70, 74-76, 36 Cal. Rptr. 3d 922 (2005) (one hour interview between

21   defense counsel and an outside attorney in which they discussed "the case in specific terms,

22   including issues, personalities, [and] vulnerabilities," may provide a sufficient basis for

23   disqualification where the outside attorney associated with plaintiff's counsel in the same litigation

24   some years later).

25       A 17 minute telephone call that ultimately did not result in the consultant being retained to

26   represent the client is nothing like the involvement of the tainted attorneys here, each of whom

27   actually represented CalPERS and was extensively and directly involved in CalPERS' representation

28

1    in the very case in which Winston represents an adverse party.  The limited "proper circumstances"

2    under which an ethical screen may otherwise be sufficient under *Kirk* are clearly not present here.

3        Moreover, the *Kirk* court made clear that ethical screening could never prevent

4    disqualification in a side-switching case and expressly adopted the rule of automatic disqualification

5    in such cases as set forth in *Henriksen*:

> [W]e believe that neither *Flatt* nor *SpeeDee Oil* addressed the issue of
> whether vicarious disqualification is absolute, and the state of the law
> is that as initially expressed by the appellate courts: (1) a case-by-case
> analysis based on the circumstances present in, and policy interests
> implicated by, the case; (2) **tempered by the *Henriksen* rule that
> vicarious disqualification should be automatic in cases of a tainted
> attorney possessing actual confidential information from a
> representation, who switches sides in the same case.**

*Kirk*, 183 Cal. App. 4th at 800 (emphasis added).  Thus, *Kirk* lends no support legally or factually to

Winston's position that an ethical screen may prevent its disqualification here.

        Accordingly, under established California case law, there is a conclusive presumption that the

defecting attorneys' knowledge of material, confidential information actually or presumptively

obtained during the course of their representation of CalPERS, is imputed to the whole of Winston.

That Winston supposedly implemented an ethical screen designed to prevent the sharing of that

material confidential information cannot prevent disqualification.

## 2.    A Client's Right to Choose Counsel is Outweighed By the Court's Interest in the Fair Administration of Justice and Integrity of the Judicial Process

        There is no question here that the tainted lawyers received – either actually or presumptively –

confidential information of CalPERS related to the identical matters in which Winston represents

National adverse to CalPERS.  Allowing Winston to continue to represent National, a party adverse

to a former client of three of Winston's lawyers in the same matter, would implicate more than

concerns about the duties of confidentiality to CalPERS.  It implicates the attorneys' continuing duty

of loyalty to their former client.  It calls into question the integrity of the judicial process, the public

perception of the ethics of lawyers generally, and standards of professional conduct for the bar, which

are factors that outweigh National's right to counsel of its choosing.

        Side switching goes directly to the public perception of the honesty and loyalty of lawyers to

their clients.  Both the public and clients can and should expect that their fiduciaries will remain loyal

1   to them and preserve their confidences even after the representation ceases. Such loyalty is, indeed,

2   required of lawyers. *See, e.g., Rosenfeld Constr. Co., Inc.*, 235 Cal. App. 3d at 573 ("'[a] lawyer's

3   duty of absolute loyalty to his client's interest does not end with his retainer.'" (quoting *T. C. Theatre*

4   *Corp. v. Warner Bros. Pictures,* 113 F. Supp. 265 (S.D.N.Y. 1953)).

5         When the tainted lawyers joined Winston, Winston stepped into their ethical shoes. These

6   lawyers' ethical obligations to CalPERS became the ethical obligations of the entire firm. Those

7   duties include a duty of loyalty to CalPERS "not to do anything which will injuriously affect [the

8   lawyer's] former client in any manner in which he formerly represented him" and not to "use against

9   his former client knowledge or information acquired by virtue of the previous relationship." *Elan*

10  *Transdermal Ltd*., 809 F. Supp. at 1387; *see also Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th

11  811, 821, 124 Cal. Rptr. 3d 256, 263 (2011).

12        The continuing duty of loyalty includes a duty not to take positions adverse to the fruits of the

13  lawyer's prior representation. *Elan Transdermal Ltd*., 809 F. Supp. at 1387 (law firm that employed

14  patent attorneys who obtained defendant's patents could not represent plaintiff in infringement

15  litigation, even though the patent attorneys were no longer with the firm because, among other things,

16  the firm could not "attack the very fruits of its work as intellectual property counsel to" the

17  defendant); *see also Oasis West Realty, LLC*, 51 Cal.4th at 821-22 (former attorney's continuing duty

18  of loyalty precluded him from publicly taking positions adverse to development project that was the

19  subject of his prior representation). Thus, as with the defecting attorneys themselves, Winston cannot

20  take positions adverse to the fruits of those lawyers' prior representation of CalPERS in the Chapter 9

21  Cases. Moreover, Winston is presumed to have confidential information of CalPERS, precluding

22  Winston's representation of any party adverse to CalPERS in the Chapter 9 Cases. Winston is

23  therefore vicariously disqualified from representing National.

24        As the Court held in *Dill v. Superior Court*, 158 Cal. App. 3d 301, 205 Cal. Rptr. 671 (1984)

25  (a side switching vicarious disqualification case):

26            We are mindful of the right of parties to counsel of their choice, and of
              the financial burden imposed if disqualified counsel must be replaced.
27            ( [Citation.])  However, those interests must be balanced against the
              need to maintain high ethical standards of professional responsibility.
28            ([Citation.])  Here, the compelling reason for disqualification from
              representation is Hale's former personal involvement on petitioner's

behalf in the identical action.  Under these circumstances, the law firm representing real parties also must be disqualified.  ([Citation.]).

*Id.* at 305-06; *see also SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th at 1145; *Beltran*, 867 F. Supp. 2d at 1082 (disqualification warranted because allowing firm to continue representation of plaintiff where one of firm's partners previously represented the defendant in related matters "compromises the appearance of judicial integrity and standards of professional conduct for the bar"); *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980) ("Both the fact and appearance of total professional commitment are endangered by adverse representation in related cases.").

The integrity of the judicial process requires Winston's disqualification here.

**D.**     **Even if Ethical Screening Was Otherwise Possible, Winston's Conduct Here Calls Into Question Its Reliability and Candor With Regard to This Conflict**

As set forth above, Winston's attorneys have been less than candid with K&L Gates and CalPERS in their purported efforts to address the conflict presented by the acquisition of key members of CalPERS' litigation team.  Winston was disingenuous in its request for consent from CalPERS – indicating that offers had been made to Ms. Brighton and Mr. Parrish contingent on clearing conflicts, but in fact had no intention of waiting for a response from CalPERS before hiring either.  Indeed, Mr. Parrish joined the Winston firm the day after the request for consent was sent to CalPERS, without even waiting for a response.[29]

Finally, Winston assured CalPERS that an ethical screen had been erected, stating "…Winston & Strawn LLP will erect an ethical screen prohibiting them from participating in our representation of [National] in the CalPERS Matters and from discussing the CalPERS Matters with any Winston & Strawn LLP attorneys or staff."  (See Exhibits 2 and 4 to Gearin Declaration).  However, as reflected in those exhibits, the Winston letters of April 22 and 29, it is clear that Mr. Parrish has spoken with Winston attorneys Cottingham and Desideri about his prior involvement in the Chapter 9 Cases and what roles he played in the representation of CalPERS.  Those discussions alone would violate this ethical screen that Winston has assured CalPERS it has erected.  Thus, even if an ethical screen could otherwise be erected under these circumstances, the Court may properly be

---

[29]  Gearin Declaration, ¶¶ 15-18, and Exhibits 2, 3, 4 and 5 thereto.

1  skeptical of the likely efficacy of the screen Winston claims exists here. *See, e.g., Beltran*, 867 F.

2  Supp. 2d at 1083-84 (a purportedly screened off attorney providing information concerning his prior

3  involvement in the case and receiving information concerning the disqualification motion "casts

4  doubt" as to whether an ethical wall could be successfully implemented or maintained).

5       Winston's April 29, 2013 letter goes even further in its lack of candor about a screen. It

6  purports to assure CalPERS that Mr. Parrish has no access to CalPERS' files or electronic documents.

7  Yet, CalPERS investigation has revealed that Mr. Parrish routinely sent to his personal email account

8  copies of his team's research, memoranda on various legal issues, work product of himself and the

9  associates, communications with team members and even communications with the client's general

10 counsel. All of that information is likely still available to Mr. Parrish when he accesses his personal

11 email. (See Gearin Declaration, ¶ 22 and Exhibit 8 thereto). In sum the representations of Winston

12 simply cannot be accepted, and CalPERS is not prepared to entrust its confidences to the adverse

13 counsel.

14                     **IV.     REQUESTED RELIEF**

15      WHEREFORE, CalPERS respectfully requests that the Court enter an order disqualifying

16 Winston.

17 DATED:  May 20, 2013               Respectfully Submitted,

18                            THE SALL LAW FIRM
19                            A Professional Corporation

20                                /s/ Suzanne Burke Spencer
21                        By: _____
                                Robert K. Sall
22                               Suzanne Burke Spencer
                              Michael A. Sall

23                         Attorneys for Party in Interest
24                         California Public Employees' Retirement System

25

26

27

28