**12**

ROBERT K. SALL (SBN 83782)
rsall@sall-lawoffice.com
SUZANNE BURKE SPENCER (SBN 188597)
sburke@sall-lawoffice.com
MICHAEL A. SALL (SBN 287981)
msall@sall-lawoffice.com
THE SALL LAW FIRM
A Professional Corporation
32351 Coast Highway
Laguna Beach, CA 92651
Telephone: 949-499-2942
Facsimile:  949-499-7403

Attorneys for Party in Interest California Public Employees' Retirement System

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Debtor. | Case No.     2012-32118<br><br>DC No. SLF-1<br><br>Chapter 9<br><br>**DECLARATION OF MICHAEL J. GEARIN IN SUPPORT OF CALPERS' MOTION TO DISQUALIFY WINSTON & STRAWN LLP**<br><br>Date:     July 2, 2013<br>Time:    9:30 a.m.<br>Place:    United States Courthouse<br>            Dept. C, Courtroom 35<br>            501 I Street<br>            Sacramento, CA 95814 |

I, Michael J. Gearin, hereby declare:

1. I am an attorney with K&L Gates LLP ("K&L Gates") representing Party in Interest California Public Employees' Retirement System ("CalPERS") in certain bankruptcy matters, including this above referenced Chapter 9 proceeding involving the City of Stockton, and another Chapter 9 proceeding styled as *In re: City of San Bernardino, California*, Central District of California, Riverside Division, Case No. 6: 12-bk-28006-MJ (collectively referred to as the "Chapter 9 Cases"). I make this declaration in support of the CalPERS' Motion to Disqualify Winston &

1 Strawn LLP ("Winston"). Except as to those matters as set forth on information and belief, I have personal knowledge of the facts set forth herein and if called as a witness I could testify competently to such facts.

2. I am one of the K&L Gates' partners primarily responsible for the representation of CalPERS in the Chapter 9 Cases, along with Michael Lubic of our Los Angeles office. In that role, Mr. Lubic and I have supervisory responsibility for other partners and associates working on the representation, and have extensive contact with members of K&L Gates' team for the Chapter 9 Cases. The K&L Gates legal team consists of attorneys from multiple offices including offices in California, Washington, Illinois, Massachusetts and North Carolina. Several of K&L Gates' attorneys from our Charlotte, North Carolina office have performed significant legal services for CalPERS in the Chapter 9 Cases, including services performed by partner Felton E. Parrish, who based upon my observations and his time records worked approximately 366 hours, associate Nathan Lebioda, who worked approximately 86 hours, and associate William Petraglia, who worked approximately 53 hours.

3. As described in greater detail below and in the Declaration of Sean M. Jones, I have been informed and believe that Mr. Parrish has left K&L Gates, and taken a position at Winston, effective as of April 23, 2013. I am informed and believe that Mr. Lebioda and Mr. Petraglia have also announced their intentions to take positions offered to them at Winston. I have personally reviewed our firm's time records for the services associated with the above described attorneys in the Chapter 9 Cases. As is the case with most law firms, attorneys at K&L Gates keep records of the time they expend in providing services to clients by logging a description of the nature of the services and the amount of time into the firm's billing software system. K&L Gates' policy requires attorneys to record their time daily no later than the business day following the date of provision of services. The billing records of each attorney are accumulated into specific client matter numbers which provide the basis for the bills which are eventually sent to clients. The billing records constitute business records which are kept in the ordinary course of K&L Gates' business. The billing software allows one to produce summaries of time records by individual attorney. I asked our accounting department to produce summaries of time records for all services provided by Mr. Parrish , Mr. Lebioda and

Mr. Petraglia on the chapter 9 cases. A redacted version of the time records relating to the services performed for CalPERS in the Chapter 9 Cases by Mr. Parrish, Mr. Lebioda and Mr. Petraglia is attached hereto as Exhibit 1.

4. On or about April 15, 2013, Jo Ann Brighton, who was at that time a partner in K&L Gates' Charlotte office, informed me that she intended to resign from K&L Gates to join Winston. At that time, Ms. Brighton had been a co-lead in K&L Gates' Restructuring and Insolvency practice group. She had minimal involvement in the Chapter 9 Cases and our work for CalPERS, having billed only 0.8 hours on the Chapter 9 Cases.

5. Unlike Ms. Brighton, Mr. Parrish was a K&L Gates partner who has been an integral part of the core K&L Gates team in the CalPERS representation. He was a key lieutenant in the CalPERS Chapter 9 team and I worked with him extensively in matters related to the Chapter 9 Cases. Mr. Parrish, at my direction and that of Mr. Lubic, researched and drafted numerous memoranda relating to various issues in the Chapter 9 Cases. He drafted multiple pleadings and inserts for pleadings in the San Bernardino case. He participated extensively in multiple conference calls related to particular matters on which he worked and participated in a number of team-wide status and strategic planning conference calls. My review of his time records discloses that he participated in at least eight of our weekly conference calls in which our K&L Gates CalPERS team discussed critical issues and strategy and reported on progress of initiatives we were working on for CalPERS. He was on at least one conference call with me and other members of the Chapter 9 team on December 15, 2012 for which he billed 1.7 hours, speaking directly to CalPERS general counsel, Peter Mixon regarding strategic decisions involving the draft of CalPERS reply in connection with its motion for relief from stay in the San Bernardino case. Over the course of the next two days, Mr. Parrish billed more than 14 hours drafting the reply and communicated directly with Mr. Mixon regarding the draft of that brief. In connection with the Chapter 9 Cases, Mr. Parrish sent or received hundreds of emails, including those regarding strategic planning for CalPERS. Mr. Parrish also supervised the work of the two Charlotte associates – Mr. Petraglia and Mr. Lebioda – with regard to their work on the Chapter 9 Cases, including review of their research and work product. While almost all of Mr. Parrish's time was billed to the San Bernardino billing number, the large majority of

Mr. Parrish's work in the Chapter 9 Cases concerned core strategies and arguments that are relevant to both the City of Stockton and City of San Bernardino cases. For example, Mr. Parrish was the principal author of at least four research memoranda three of which were generally applicable to both cases and one of which, while addressing specific issues relevant to San Bernardino, could also have relevance to Stockton. Since Fall 2012, Mr. Parrish performed the following services related to the Chapter 9 Cases, which I have generally described by categories. As previously indicated, he billed approximately 366 hours on matters for CalPERS in performing these services:

- Research and draft memorandum re: automatic stay and application to CalPERS remedies.

- Research and draft motion and reply for relief from automatic stay in San Bernardino case.

- Participate in team-wide conference calls on particular subjects as well as weekly status and case strategy calls.

- Research and draft memorandum re: CalPERS's options in the bankruptcy court.

- Research and draft memorandum re: CalPERS's set-off rights.

- Research and draft memoranda re: administrative claims and legislative history re: same.

- Research and draft inserts for San Bernardino eligibility brief.

- Research and draft memorandum re: San Bernardino eligibility.

- Research and draft memoranda re: treatment of private pensions in bankruptcy.

- Research and draft memorandum re: administrative expenses.

- Research re: ERISA issues in bankruptcy.

- Research and draft response to motion to reject collective bargaining agreement in San Bernardino case.

- Research and draft memorandum re: insurance premiums as administrative expenses.

- Supervise the work of William Petraglia and Nathan Lebioda on the Chapter 9 Cases.

- Multiple Conferences with Nathan Lebioda and William Petraglia regarding their work on the Chapter 9 Cases.

- Participation in at least nineteen (19) conference calls related to the Chapter 9 Cases.

- Participation in numerous emails and correspondence including written communications with CalPERS' General Counsel, Peter Mixon.

- Telephonic attendance at court hearing on December 21, 2012 in the City of San Bernardino case.

6. Additionally, Mr. Lebioda, one of the associates in K&L Gates' Charlotte office, was supervised by Mr. Parrish. Mr. Lebioda billed 85.8 hours to the Chapter 9 Cases, and generally performed the following tasks:

- Research and draft memorandum re: automatic stay in Chapter 9 cases.

- Participate in conference calls with litigation team re: specific matters.

- Research and draft memorandum re: legislative history and automatic stay.

- Research and draft insert re: preemption issues for reply re: relief from automatic stay.

- Research and draft memorandum re: administrative expenses in municipal bankruptcies.

- Research re: grounds to challenge Chapter 9 bankruptcy petitions.

- Research and draft memorandum re: rejection of collective bargaining agreements.

- Participation in emails and conferences with other members of the K&L Gates Chapter 9 team.

7. Likewise, Mr. Petraglia, another associate in K&L Gates' Charlotte office, was also supervised by Mr. Parrish. Mr. Petraglia billed 53.3 hours to the Chapter 9 Cases, and generally performed the following tasks:

- Research and draft memorandum re: administrative priority of private pensions.

- Research and draft memorandum email re: statutory interpretation.

- Participation in emails and conferences with other members of the K&L Gates Chapter 9 team.

8. During the period April 15 through April 21, 2013, I had communications with Ms. Brighton in which we discussed the conflict issues which would result from her leaving K&L Gates and joining Winston. I initially learned that Ms. Brighton was planning to join Winston in a telephone conversation on April 15, 2013 with K&L Gates Administrative Partner for the Charlotte office, Sean M. Jones. Later that day, I called another K&L Gates partner in the Charlotte office, J. Michael Booe, who was the co-lead of the Restructuring and Bankruptcy group in the Charlotte office as I was concerned that he to might be considering leaving the firm. Mr. Booe and I spoke about whether Mr. Parrish might be considering leaving K&L Gates and Mr. Booe indicated that he had made efforts to persuade Mr. Parrish to stay. Mr. Booe and I spoke about the fact that Ms. Brighton had done some work on the CalPERS matters. I expressed my concerns to Mr. Booe that if Felton Parrish was planning to go to Winston, that he had extensive involvement in the Chapter 9 Cases, and I was sure that would be a problem for CalPERS. Within an hour of my conversation with Mr. Booe, Ms. Brighton emailed me, requesting that I call her cell phone. I did call Ms. Brighton that afternoon. In our conversation, Ms. Brighton inquired as to whether her prior representation of CalPERS would be viewed as a disqualifying conflict of interest by CalPERS. Ms. Brighton indicated that she had worked very little on the CalPERS matters and held no information that could be viewed as confidential. Based upon my role in the case, I knew that to be true. I indicated to her that given her limited involvement and her representation to me that she held no confidential information that I did not believe the conflict would be objectionable to CalPERS, but that I would need to inquire with the client.

9. I do not have authority to waive any conflict on behalf of CalPERS. Such authority resides with Peter Mixon, General Counsel of CalPERS.

10. During our conversation of April 15, 2013, Ms. Brighton and I went on to discuss whether Ms. Brighton intended to recruit other lawyers, including Mr. Parrish, to Winston. Ms. Brighton adamantly denied to me that she would have any involvement in recruiting Mr. Parrish or other lawyers from K&L Gates to join Winston as she did not wish to "burn any bridges" with K&L Gates. I subsequently learned in a conversation with my partner Charles Dale that she had informed Mr. Dale a few days earlier that she intended to take the entire bankruptcy group from

Charlotte's offices to Winston with her including Mr. Parrish. I informed Ms. Brighton in our call of April 15 that Mr. Parrish had much more extensive involvement in the CalPERS representation than she and that he certainly held extensive client confidences, such that CalPERS' view of his joining Winston would likely be very different from that of Ms. Brighton's joining the adverse firm. We discussed the importance of the Chapter 9 Cases to CalPERS, the high degree of sensitivity of the confidences that Mr. Parrish held and the contentiousness of the disputes between CalPERS and Winston's client National. I made it very clear to Ms. Brighton that if Mr. Parrish chose to join Winston, his access to CalPERS confidential information would not be a conflict that I thought could or would be waived.

11. On the morning of Saturday, April 20, 2013, Ms. Brighton and I met for breakfast at the American Bankruptcy Institute's Annual Conference. This was after she had resigned from K&L Gates. Ms. Brighton indicated at that point that she had been announcing her intention to join Winston at the conference and asked whether I would assist in making a request to CalPERS for a waiver such that Winston would not risk disqualification in the Chapter 9 Cases due to her joining the Winston firm. Ms. Brighton did not suggest that Mr. Parrish would be joining Winston or request a consent with respect to Mr. Parrish at the breakfast meeting. I do not recall discussing Mr. Parrish or the Charlotte associates at all at our breakfast meeting.

12. During the week of April 15, after I learned that Ms. Brighton intended to leave K&L Gates, I sought to reach Mr. Parrish on several occasions, among other things, to ascertain whether he was considering leaving K&L Gates and if so, to try to persuade him to stay. Among the issues I had intended to discuss with him were the CalPERS confidences that he held. While Mr. Parrish and I exchanged voice mails, we did not ever speak during that timeframe.

13. On Sunday, April 21, 2013, Ms. Brighton emailed to me a letter from Winston partner Thomas Cottingham dated April 19, 2013. A true and correct copy of this letter is attached hereto as Exhibit 2 and incorporated herein by reference. The letter informed me of Winston's offer of employment to Ms. Brighton, subject to clearing conflicts. It said nothing about Winston's plans to employ Mr. Parrish or any other attorneys from K&L Gates' Charlotte office. The letter requested that CalPERS acknowledge that it would not seek to disqualify Winston from its representation of

National in the Chapter 9 Cases due to Winston's employment of Ms. Brighton.

14. On Monday afternoon April 22, 2013, Felton Parrish sent an email to me informing me that he too had received an offer of employment from Winston. A true and correct copy of that email is attached hereto as Exhibit 3, incorporated herein by reference.

15. Attached to Mr. Parrish's email was a letter dated April 22, 2013 from Thomas Cottingham to Peter Mixon, who is our principal client contact at CalPERS. A true and correct copy of this letter is attached hereto as Exhibit 4, incorporated herein by reference. Mr. Parrish requested that I forward the letter to Mr. Mixon.

16. I have been informed by my Charlotte partners and Mr. Parrish confirmed that he resigned from K&L Gates effective April 22, 2013.

17. On Wednesday April 24, 2013, I sent a letter to Mr. Cottingham responding to the April 22 Winston Letter. A true and correct copy of my April 24 letter is attached hereto as Exhibit 5, incorporated herein by reference. In this letter, I explained why CalPERS would be willing to provide consent for Mr. Brighton to be employed at Winston, but not as to Mr. Parrish. My April 24 letter to Mr. Cottingham confirms that CalPERS would not seek to disqualify Winston from representing parties in the Chapter 9 Cases on account of Ms. Brighton's employment, conditioned upon proper screening and certain other representations from Ms. Brighton. I obtained authority from my client to communicate that position as to Winston's employment of Ms. Brighton. My April 24 letter also informed Winston of CalPERS' position that, in light of Mr. Parrish's significant involvement in the Chapter 9 Cases while at K&L Gates, CalPERS would seek to disqualify Winston if Mr. Parrish became associated with Winston. As of that point in time, neither Ms. Brighton nor anyone from Winston had informed me that they were going to be making offers to Mr. Petraglia or Mr. Lebioda, or to secretaries who were familiar with the Chapter 9 Cases, and I had received no communications from Winston about those other lawyers or staff. I have not received a response from Ms. Brighton that confirms her agreement to the conditions under which CalPERS provided its consent, as set forth in my April 24, 2013 letter. I have likewise not received any agreement from Winston accepting those terms.

18. On Thursday, April 25, 2013, I received a call from Ms. Brighton. She expressed

1  surprise at the content of my letter of April 24 to Mr. Cottingham. She said that I had told her during
2  breakfast that "K&L Gates" would not seek to disqualify Winston because that is not the way we do
3  business. I told her that K&L Gates was not the decision maker here, it was the client. She admitted
4  that our conversation at breakfast on Saturday April 20, 2013 was before there had been any
5  indication that Felton was to receive an offer from Winston and that I had told her that the consent
6  decision was the client's. She indicated that she did not mention Felton during our breakfast because
7  he had not yet received an offer. I told her that there was nothing personal involved, that this was a
8  client decision on matters that were obviously important to both CalPERS and National. I told her
9  that I was very surprised that Winston would solicit Felton during ongoing litigation when they knew
10 the import of the cases and knew the level of Felton's involvement. I said that the matters were now
11 between Winston and CalPERS and that she and I would not have any further discussions about them
12 over the phone.
13        19. On April 29, 2013, Winston partner Lawrence Desideri sent a letter to me disputing the
14 extent of Mr. Parrish's involvement in K&L Gates' representation of CalPERS and arguing that an
15 ethical screen of Mr. Parrish and Ms. Brighton eliminates any basis for disqualifying Winston. A true
16 and correct copy of this letter is attached hereto as Exhibit 6, incorporated herein by reference. That
17 letter falsely characterizes the involvement of Mr. Parrish in the representation of CalPERS, and
18 unless Mr. Parrish has breached confidences, Mr. Desideri could have no personal knowledge of the
19 specific nature or extent of the services performed by Mr. Parrish.
20        20. As I understand and am informed by the Declaration of Sean M. Jones, Winston has also
21 recently extended offers of employment to two secretaries, Debbie Vitelli and Jane Butler, and to
22 K&L Gates bankruptcy associates Nathan Lebioda and William Petraglia. The two Charlotte
23 associates were significantly involved in the CalPERS representation while at K&L Gates. No one
24 from Winston has ever communicated with me about whether or not CalPERS would consent to the
25 employment of Mr. Lebioda or Mr. Petraglia. On May 13, 2013, I was informed that Mr. Lebioda
26 and Mr. Petraglia had accepted offers of employment with Winston and would be joining the
27 Winston firm on May 20, 2013.
28

MDQ W&S - Gearin Decl. - St.Doc        9  DECLARATION OF MICHAEL J. GEARIN IN SUPPORT
                                            OF CALPERS' MOTION TO DISQUALIFY

21. After Mr. Parrish's departure from K&L Gates, at the request and direction of one of my partners, IT personnel retrieved Mr. Parrish's emails on the K&L Gates computer system. We discovered that Mr. Parrish was having communications on April 22, 2013 with Winston's office administrator, regarding sending correspondence directly to our client representative, Peter Mixon, at CalPERS, and regarding arrangements for Winston to retrieve "a few boxes" at K&L Gates' offices. Copies of seven pages of these emails and an attachment referenced in the email, from K&L Gates' system, reflecting these communications are attached hereto collectively as Exhibit 7.

22. At the request and direction of one of my partners, our IT Staff retrieved emails from K&L Gates' computer system that were sent or received by Mr. Parrish regarding the Chapter 9 Cases. Attached hereto collectively as Exhibit 8, and incorporated herein by reference, is a redacted copy of multiple emails dated October 8, 2012, October 18, 2012, December 16, 2012, January 10, 2013, January 13, 2013, and January 18, 2013 to or from Felton Parrish's personal email address identified as feltonparrish@hotmail.com which were routed through his office email at K&L Gates. We have redacted these emails as they contain client confidential information or work product. The emails confirm that Mr. Parrish used his personal email account to send and receive research and memoranda pertaining to the CalPERS representation, including communications with me, Mr. Lubic, Mr. Petraglia, Mr. Lebioda, Mr. Ryan (also of our office), and even communications with our client's General Counsel, Peter Mixon. The fact that he used his personal email account to send and receive such communications and work product raises concerns that he may still have electronic access to some of the client work he did and the client communications with CalPERS while at K&L Gates.

23. On May 13, 2013, I received a letter from Thomas Cottingham at Winston, addressing Winston's hiring of Mr. Petraglia and Mr. Lebioda. Attached hereto as Exhibit 9 is a true and correct copy of that May 13, 2013 letter. The letter asserts that Winston has hired these two associates, and that they will be joining the Winston firm "in the near future." The letter asserts that Winston will establish screening procedures that "are in compliance with ABA Model Rule of Professional Conduct Rule 1.10."

24. On May 14, 2013, I sent a written response to Mr. Cottingham on behalf of my client CalPERS, setting forth CalPERS response with respect to Winston's handling of the hiring of these associates, and the conflict situation into which Winston has placed itself. Attached hereto as Exhibit 10 is a true and correct copy of my May 14, 2013 letter to Mr. Cottingham.

25. On May 17, 2013, I received in the afternoon a letter from Lawrence Desideri, on behalf of Winston, apparently in response to Exhibit 10 (my letter of May 14, 2013), described in the preceding paragraph. A true and correct copy of Mr. Desideri's May 17 letter is attached hereto as Exhibit 11. I have not responded to Mr. Desideri's letter, as the disputed issues pertaining to disqualification of Winston are now being handled by The Sall Law Firm, A Professional Corporation, on behalf of CalPERS. CalPERS strongly disagrees with the position taken by Winston, and had already filed its Motion to Disqualify Winston in the bankruptcy of San Bernardino, California on May 17, 2013, prior to my return to my office from a court appearance and my review and forwarding of Exhibit 11.

26. The Court is fully aware of the extent of the disagreement between National and the other Capital Markets Creditors and CalPERS in this case. As the Court commented in its ruling on the City's eligibility, the Capital Markets Creditors have had CalPERS in their cross hairs over a number of issues since the inception of the case. As is reflected in the internal email communication between National representatives, attached as Exhibit 12, which was produced to CalPERS by National, National has intended to "drag CalPERS into [a] fight" since well before the bankruptcy case was filed. CalPERS has defended itself and has vigorously contested the assertions of the Capital Markets Creditors that they are being treated unfairly and a multitude of other legal and factual points throughout the case. These issues are core to the resolution of the case, and absent a settlement between the Capital Markets Creditors and the City, will be contested in the plan confirmation process that the City has now commenced. Mr. Parrish, Mr. Petraglia and Mr. Lebioda have represented CalPERS with respect to these contested matters for many months.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 20, 2013                     By:     /s/ Michael J. Gearin
                                                Michael J. Gearin

MDQ W&S - Gearin Decl. - St.Doc

12 DECLARATION OF MICHAEL J. GEARIN IN SUPPORT OF CALPERS' MOTION TO DISQUALIFY