37

1   MARC A. LEVINSON (STATE BAR NO. 57613)
    malevinson@orrick.com
2   PATRICK B. BOCASH (STATE BAR NO. 262763)
    pbocash@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    400 Capitol Mall, Suite 3000
4   Sacramento, California  95814-4497
    Telephone:     +1-916-447-9200
5   Facsimile:     +1-916-329-4900

6   Attorneys for
    City of Stockton
7

8               UNITED STATES BANKRUPTCY COURT

9               EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11

12  | In re:                          | Case No.  2012-32118 |
    |---------------------------------|----------------------|
13  | CITY OF STOCKTON, CALIFORNIA,   | Chapter 9            |
14  |          Debtor.                | **CITY'S SUBMISSION OF RESPONSE TO REQUEST FOR APPOINTMENT OF OFFICIAL TAXPAYERS' COMMITTEE** |
15  |                                 |                      |
16  |                                 | No Hearing Required  |

17          The City of Stockton, California (the "City") hereby submits its response to the request of

18  the "Ad Hoc Taxpayers of Stockton Working Group" (the "Working Group") that the U.S.

19  Trustee appoint an official taxpayers' committee.  The City is filing and serving this response

20  because the Working Group's request was attached to a pleading that was filed and served.

21

22  Dated: July 1, 2013                      MARC A. LEVINSON
23                                           PATRICK B. BOCASH
                                             Orrick, Herrington & Sutcliffe LLP
24

25                                       By: _____ /s/ *Marc A. Levinson* _____
26                                              MARC A. LEVINSON
                                                  Attorneys for
27                                                City of Stockton

28

CITY'S SUBMISSION OF RESP. TO REQUEST FOR
APPOINTMENT OF OFFICIAL TAXPAYERS' CMTE.



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
400 CAPITOL MALL
SUITE 3000
SACRAMENTO, CALIFORNIA 95814-4497

*tel* +1-916-447-9200
*fax* +1-916-329-4900

WWW.ORRICK.COM

July 1, 2013

Marc A. Levinson
(916) 329-4910
malevinson@orrick.com

***VIA U.S. MAIL & EMAIL***

Antonia G. Darling
Assistant US Trustee
U.S. Department of Justice,
Office of the US Trustee
501 I Street, Suite 7-500
Sacramento, CA 95814

Re:     *In re City of Stockton* (Case No. 12-32118)
        City's Response to the June 28, 2013 Letter from Karol K. Denniston Requesting that the
        United States Trustee Appoint an Official Taxpayers' Committee

Dear Ms. Darling:

I write on behalf of the City of Stockton ("City" or "Stockton") in response to the June 28, 2013
letter from Karol K. Denniston requesting that the United States Trustee ("UST") appoint a
group of five men (the so-called "Working Group") to serve as a self-nominated official
taxpayers' committee ("Letter"). For the reasons described below, the City strenuously opposes
the appointment of an official taxpayers' committee, whether or not it is staffed by one or more
of the members of the Working Group. Not only is the appointment of an official committee that
does not represent creditors or equity security holders not authorized by the Bankruptcy Code,
but such an appointment would be an affront to the only legitimate representatives of the
taxpayers of Stockton – the duly elected City Council. The Working Group presumes to play the
role of "fiduciary" for taxpayers, yet its members possess no basis to legitimately claim that role.
In short, the City's voters have chosen their spokespersons, and the request flies in the face of the
form representative government established by the City Charter ("Charter").

<u>The Appointment Of A Taxpayers' Committee Is Not Authorized By The Bankruptcy Code.</u>

Bankruptcy Code section 901(a) makes section 1102 applicable in chapter 9 cases. As you
know, the City supported the appointment of an official retirees' committee to represent the
interests of its approximately 2,400 retirees, all of whom are creditors due to the City's pension
obligations, and approximately 1,100 of whom are creditors on account of the City's
prebankruptcy health benefits obligations to them.



**ORRICK**

The members of the Working Group, and indeed taxpayers *qua* taxpayers – i.e., the persons whose rights and interests a taxpayers' committee presumably would represent – are not creditors.  The Letter acknowledges this in its footnote 1, identifying them as parties in interest within the contemplation of Bankruptcy Code section 1109(b).  Indeed, the *City* is the creditor vis-à-vis taxpayers.

Section 1102 does not extend to parties in interest.  Not only is it entitled "Creditors' and equity security holders' committees," but each of its various subsections refers solely to creditors and equity security holders.  The issue of the appointment of an official committee comprised solely of parties in interest was directly addressed in a memorandum decision authored by Judge Dennis Montali in the Pacific Gas & Electric case filed on May 18, 2001 ("Memorandum" filed in "*PG&E*").  A copy of the Memorandum is attached as Exhibit A.

In *PG&E*, the UST appointed a committee of ratepayers, and the debtor moved the bankruptcy court to vacate the order.  Judge Montali granted the motion for a number of reasons, but perhaps the primary one was the fact that the Bankruptcy Code does not authorize the appointment of official committees of parties in interest.  Such conclusion followed his finding that the ratepayers were not creditors.  See the discussion beginning at line 25 of page 4 of the Memorandum.  Judge Montali also concluded that Congress knew the difference between parties in interest and creditors when it chose to permit the UST to appoint creditors' committees rather than committees of parties in interest.  See page 8, line 6, *et seq.*[1]

The Memorandum also addresses an issue similar to the one raised in footnote 1 of the Letter ("… taxpayers … will be affected by a tax increase proposed by the plan…").  In *PG&E*, the ratepayers' committee argued for creditor status on account of "various situations [that] may give rise to future claims."  Memorandum at page 6, line 3.  The argument was flatly rejected because "… no one is able to articulate a particular claim of any ratepayer *qua* ratepayer that existed on the petition date."  Id.

Finally, Judge Montali addressed whether Bankruptcy Code section 105(a) permitted the appointment of an official committee to represent parties in interest, concluding it did not because of the clear and preemptive language of 1102 limiting official committees to service as fiduciaries for creditors and equity security holders.

---

[1] As parties in interest, the members of the Working Group may participate in the public discourse regarding this case or any tax measure, and in fact have done so.  And they may appear in court or file pleadings as individuals or as the Working Group.



ORRICK

Antonia G. Darling
July 1, 2013
Page 3

The City acknowledges that *PG&E* is not "binding" on the UST. But it is clearly correct, and the City submits that it is dispositive of the Working Group's request.

<u>The City Council, And Not A Self-Selected Group of Taxpayers, Is The Voice of the City</u>.

Stockton is a large and diverse City. According to the US Census, its 2010 population was 291,707, with a diverse ethnic makeup. The chart attached as Exhibit B, which was prepared for the City by the National Demographics Corporation in June 2011 for the purpose of realigning Council districts as the result of the 2010 census, reflects that in 2010, the ethnicity of the City broke down as follows: Hispanic (40.3%), Non-Hispanic White (22.9%), Asian American (21.7%), African American (12.1%) and Other (3%). The City encompasses approximately 65.4 square miles. It includes a wide range of business and is comprised of many distinct neighborhoods of varying socio-economic circumstances.

The City's voters approved the City Charter, which establishes a carefully-crafted template for governance of the City designed to assure that all residents and all geographic areas of the City will be fairly represented. Section 400 of the Stockton City Charter ("Charter") provides: "The City Council shall be the governing body of the municipality. All powers of the City shall be vested in the Council subject to the provisions of this Charter, the Constitution of the State of California and the Constitution of the United States. The Council may establish the method or methods by which any of such powers may be exercised." Section 601 of the Charter requires that each of the six districts of the City shall be represented by a Councilmember. It further provides that each district shall select two candidates during the primary election, and that the City as a whole votes in the general election to choose the winner. The Mayor is selected without regard to district.

The system works: Elections have been competitive, and frequently draw multiple candidates for each office. The Council is as diverse as the City – among the seven members of the Council (the six Councilmembers and the Mayor), two are Latino, two are African American and two are women. Two are in their 20's, a third is under 35 and the Mayor is under 40. They are representative of the community that elected them.

In arguing for the appointment of a taxpayers' committee, the last paragraph of page 2 of the Letter says "At present there is no other group that represents the interests of taxpayers." That is flat out wrong. The proposed "Working Group" clearly is not at all representative of the broad array of interests in the City – rather, it is a self-selected group of five men who apparently share a political and economic philosophy, and who appear to believe they are best suited to determine



ORRICK

Antonia G. Darling
July 1, 2013
Page 4

the interests of all of the City's taxpayers. In contrast, by dint of gaining the support of the majority of the voters in their respective elections, the members of the City Council and the Mayor are the only people who can legitimately say that they truly represent the interests of the people of the City, including its taxpayers.[2]

The Council conducts its business pursuant to the Charter and to California law.[3] Thus, the meetings at which it makes all significant decisions are open to the public, which has (and exercises) the right to speak and be heard. Council debates are spirited and lively, and often last until the late hours – occasionally going until past midnight. In addition, the Council conducts Town Hall meetings (some specifically designed to provide opportunities for Spanish-speaking residents to participate) in order to obtain input from the community. Recently, it conducted a series of meetings about the Marshall Plan, which was adopted by the Council after months of effort by a committee of community-wide stakeholders, and which, if implemented, will put more sworn police officers the street. It also has solicited input on the ballot measure which is the apparent *raison d'être* of the Working Group.

Not only do the Mayor and the other Councilmembers solicit input from Stockton residents and taxpayers, but they are accountable to their constituents and can be voted out of office or even recalled. Contrast that to the Working Group and the putative taxpayers' committee, which, if appointed, would serve as a fiduciary for all City taxpayers. How would it solicit input? Would it conduct Town Hall meetings? Would its members be cast out of office for making decisions that a majority of its constituents felt were the wrong decisions? Of course not. The idea of an official committee that has chosen its own homogenous members during a closed door session to

---

[2] The letter refers to the prospect of a ¾ cent sales tax ballot measure in November, a matter that will be taken up by the City Council during an open session on the evening of July 9, 2013. A sales tax impacts *all* Stockton residents, and the duly-elected Council will decide whether to put such a measure on the ballot.

[3] The City Council must be transparent and must comply with the Brown Act, Cal. Govt. Code 54950 *et seq*. The Brown Act begins as follows: "In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." Cal. Govt. Code 54950.



ORRICK

Antonia G. Darling
July 1, 2013
Page 5

speak for the City's residents stands the democratic process on its head, and would be an insult to the people of Stockton. The request for the appointment of a committee should be firmly and quickly rejected.[4]

<u>The Working Group Is Unqualified To Represent The Interests Of Taxpayers.</u>

As noted in Exhibit 2 to the Letter, Dale Fritchen, one of the five members of the Working Group, was elected to the Stockton City Council in 2008. The Letter neglects to disclose that when he ran for reelection in November 2012, Mr. Fritchen was defeated by a margin of 61.82% to 38.18%. The then-Mayor and three Councilmembers stood for election last November, and of the four unsuccessful candidates, Mr. Fritchen received the smallest percentage of the vote. Attached as Exhibit C is a copy of the relevant pages of the report of the San Joaquin County Registrar of Voters. It may be found on the Registrar's website.

Similarly, David Renison, another member of the Working Group, was a candidate to fill the remainder of the term of a City Councilmember who was elected to the County Board of Supervisors. The City Charter mandates that the replacement be chosen by the City Council from among the candidates who are electors in the district in which the vacancy occurs.[5] At a special meeting conducted on January 7, 2009, after the Council interviewed the candidates, the Council selected Elbert Holman rather than Mr. Renison or one of the other candidates. Attached as Exhibit D are the minutes of the January 7th meeting.

Thus, the putative taxpayers' committee not only self-selected, but it chose as two of its members men who had sought to speak for the people of Stockton through the channels established by the City Charter, but who were unsuccessful – one of them on the wrong side of a

---

[4] Judge Klein has ruled that the bankruptcy court in a chapter 9 case has no ability to dictate to a municipality how to run its operations or how to use its property. See, *Ass'n of Retired Employees of the City of Stockton v. City of Stockton, Ca. (In re City of Stockton, Ca.),* 478 B.R. 8 (Bankr. E.D. Cal. 2012) and *In re City of Stockton, Ca,* 486 B.R. 194 (Bankr. E.D. Cal. 2013). Ironically, while the court lacks such power, the Working Group seeks official committee status in order to weigh in on such topics in some capacity somehow superior to the rights of rank and file Stockton residents.

[5] Section 601 (f) of the Charter provides: "If a vacancy shall occur in the office of any Councilmember, the Council shall appoint a person to fill such a vacancy. The vacancy in the Council shall be filled by the Council from the electors of the district in which the vacancy occurs."



Antonia G. Darling
July 1, 2013
Page 6

landslide vote after he had held office four years.  This is hardly a basis for claiming to be fiduciaries for the taxpayers of Stockton.

Conclusion.

For the foregoing reasons, the UST should not appoint a taxpayers' committee.  Should one be appointed, and should such appointment survive judicial scrutiny, the City will not pay the fees and costs of the committee or any professionals that such committee chooses to employ.

Please do not hesitate to contact me with any questions or comments.

Very truly yours,

Marc A. Levinson

Encls.

Note:  There are no cc's, as the City will be filing this response under cover of a face sheet pleading.
It is doing so because the Letter was attached to a pleading that was filed and served.

# Exhibit A

FILED

01 MAY 18 PM 2:57

RECD... C. CASADY, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
SAN FRANCISCO, CA.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 01-30923DM |
| PACIFIC GAS & ELECTRIC COMPANY, | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) |

MEMORANDUM DECISION REGARDING MOTION FOR ORDER
VACATING APPOINTMENT OF COMMITTEE OF RATEPAYERS

I.  Introduction

     The court has considered the Motion for Order Vacating

Appointment by United States Trustee of Official Committee of

Ratepayers ("Motion") filed by Pacific Gas and Electric Company

("PG&E"), the above-named debtor, the opposition to the Motion

filed by the United States Trustee ("UST"), the submissions of

various parties in interest in support of and in opposition to the

Motion, all declarations, requests for judicial notice, and other

papers presented, and the oral arguments presented at the hearing

earlier today.  Appearances have been noted on the record.

     For the reasons set forth below, the court determines that

-1-

1  there is no authority in the Bankruptcy Code[1] for the appointment
2  of the Official Committee of Ratepayers ("Ratepayers Committee").
3  In addition, the court notes that ratepayers have other means and
4  other fora to protect their interests.  Accordingly, the court
5  will grant the Motion and vacate the UST's appointment of the
6  Ratepayers Committee.

7  II.  Discussion

8      A.  The court has the authority and duty to review the UST's
          appointment of the Ratepayers Committee.

9      The UST relies on Smith v. Wheeler Technology, Inc. (In re
10 Wheeler Technology, Inc.), 139 B.R. 235 (9th Cir. BAP 1992), for
11 the proposition that the court has no or limited jurisdiction to
12 review the UST's discretionary appointment of the Ratepayers
13 Committee under 11 U.S.C. § 1102(a)(2).  PG&E counters with a
14 citation to In re Pierce, 237 B.R. 748, 755 (Bankr. E.D. Cal.
15 1999), which notes that review of action taken by the UST was not
16 the issue in Wheeler and that "the BAP commentary" regarding
17 section 1102 (and, in particular, section 1102(c)) was dicta.

18     This court believes that neither Wheeler nor Pierce applies
19 directly here, because neither case addressed a request to disband
20 a committee in its entirety where it is not authorized by law.
21 Nonetheless, this court agrees with the analysis of Pierce --
22 which is consistent with that of the majority of cases that have
23 addressed the issue -- supporting the proposition that a
24 bankruptcy court may use section 105(a) to review the UST's
25 actions.  Pierce, 237 B.R. at 753-54 (section 105 may be utilized
26

27     [1]Unless otherwise indicated, all section and rule references
   are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 and the Federal
28 Rules of Bankruptcy Procedure, Rules 1001-9036.

-2-

1   to review decisions of UST; "[a]ppointments by the UST must,
2   logically, be reviewable in some manner, by some forum"). <u>See also</u>
3   <u>Bodenstein v. Lentz (In re Mercury Finance Co.)</u>, 240 B.R. 270,
4   276-77 (N.D. Ill. 1999) ("The majority view is that [section 105]
5   both preserved and expanded the courts' equitable power to review
6   the [UST's] decisions about committee membership.  These courts
7   hold that the bankruptcy court has the inherent power to review
8   acts of the [UST], as well as authority under [section] 105(a),
9   and use an 'arbitrary and capricious' or 'abuse of discretion'
10  standard of review.") (citing numerous other cases).  Otherwise,
11  there would be no means for judicial review of the UST's actions,
12  even if the UST exceeded her authority and acted contrary to law.
13  "The court finds that the [UST] has failed to establish that
14  Congress meant to completely insulate the [UST's] decisions in
15  this way.  Specifically, there is a strong presumption in favor of
16  judicial review of administrative action." <u>Mercury Finance</u>, 240
17  B.R. at 277.[2]

18      B.  <u>The standard of review is "abuse of discretion."</u>

19      The majority of courts have held that the bankruptcy court
20  has the power under section 105 to review the acts of the UST

21

22      [2]The UST cites one case in which a bankruptcy court was asked
    to review the creation of a committee.  That case, <u>In re New Life</u>
23  <u>Fellowship, Inc.</u>, 202 B.R. 994 (Bankr. W.D. Okla. 1996), involved
    the appointment of an official bondholders committee.  The case
24  trustee, the unsecured creditors' committee and the bondholders'
    indenture trustee requested that the court vacate appointment of
25  the bondholders committee, and the court held that it lacked
    authority to review decisions of the UST regarding appointment of
26  committees.   This court will not follow <u>New Life</u>, because the
    reasoning of <u>Pierce</u> and the other majority decisions is more
27  persuasive, because <u>New Life</u> is not binding, and because <u>New Life</u>
    involved the appointment of a committee specifically authorized by
28  law.

-3-

1  under an "arbitrary and capricious" or "abuse of discretion"
2  standard of review.  Mercury Finance, 240 B.R. at 276 (citing
3  numerous authorities); Pierce, 237 B.R. at 753-54 (section 105
4  gives the court power to review UST's actions under abuse of
5  discretion standard of review).

6      Courts have drawn from appellate practice in applying these
7  standards of review to UST decisions.  See, e.g., Pierce, 237 B.R.
8  at 754.  Applying these appellate standards, this court cannot
9  simply substitute its judgment for that of the UST, but it can
10 overturn a UST's decision that is based on an erroneous
11 interpretation of the law.  Koon v. United States, 518 U.S. 81,
12 100 (1996) ("district court by definition abuses its discretion
13 when it makes an error of law"); United States v. Iverson, 162
14 F.3d 1015, 1026 (9th Cir. 1999) ("district court abuses its
15 discretion when it makes an error of law or rests its decision on
16 clearly erroneous findings of fact"); Natural Resources Defense
17 Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998), cert.
18 denied, 526 U.S. 1111 (1999) (agency action is reversible when it
19 is arbitrary, capricious, an abuse of discretion or otherwise not
20 in accordance with law).

21     While this court does not sit as an appellate court reviewing
22 a judicial decision by the UST, the standard of review is the
23 same.  In other words, the court must decide whether the UST, in
24 exercising her discretion, disregarded controlling law.

25     C.   There is no authority for creation of the Ratepayers
            Committee.
26
27     Section 1102(a)(1) authorizes the UST to appoint a committee
28 of creditors holding unsecured claims.  It also authorizes the UST

-4-

1   to appoint additional committees of <u>creditors</u> as the UST deems
2   appropriate.   Bankruptcy Code section 1102(a)(2) authorizes a
3   party in interest to request the court to order the appointment of
4   additional committees of creditors "... if necessary to assure
5   <u>adequate representation of creditors</u> ...." (emphasis added).   As
6   noted by the court in <u>In re Eastern Maine Electric Cooperative,</u>
7   <u>Inc.,</u> 121 B.R. 917, 927 (Bankr. D. Me. 1990): "Unless the
8   interests of the cooperative's membership [i.e., the ratepayers]
9   can be <u>characterized as those of creditors</u> or of equity security
10  holders, [section] 1102(a) grants no authority to establish a
11  committee." (Emphasis added).

12      Section 1102(b) then directs that a committee of creditors
13  appointed under section 1102(a) "... shall ordinarily consist of
14  the persons, willing to serve, that hold the seven largest claims
15  against the debtor of the kinds represented on such committee."

16      Section 101(10) defines "creditor" to mean an entity that has
17  a "... claim against the debtor <u>that arose at the time of or</u>
18  <u>before the order for relief</u> ...." (Emphasis added).   Thus, even
19  though rights to payment that arose after the order for relief may
20  be encompassed within the definition of "claim" (see 11 U.S.C. §
21  101(5)), Congress had in mind that the creditors committees
22  appointed in Chapter 11 could consist only of holders of pre-
23  petition claims, not post-petition claims.[3]

24

25

26

_____

27      [3]For an instructive discussion on the interpretation of
    "hold" and "holding" claims for the purposes of section 1102, <u>see</u>
28  <u>Mercury Finance</u>, 240 B.R. at 279.

-5-

D.   **The Ratepayers Committee is not representative of any pre-petition creditors.**

The UST and a pro se ratepayer argue that various situations may arise giving rise to future claims, but no one is able to articulate a particular claim of any ratepayer _qua_ ratepayer that existed on the petition date.  Specifically:

1.   The point is made that past blackouts may have caused damage to a ratepayer.  That may be, and just as a non-rate payer with a damage claim arising from a blackout, the interests of those claimants are protected by the Official Committee of Unsecured Creditors as pre-petition holders of unsecured claims and some could also be protected by the Attorney General.[4]  At oral argument PG&E's general counsel provided the court with authority that PG&E, as a regulated utility, would be insulated from liability because of problems encountered by ratepayers as a result of rolling blackouts.  That authority was not questioned by counsel for the UST or others appearing in opposition to the Motion.  See also, Niehaus Bros. Co. v. Contra Costa Water Co. 159 Cal. 305, 318-319 (1911); Lowenschuss v. Southern California Gas Co., 11 Cal.App.4th 496, 14 Cal.Rptr.2d 59 (1992).

2.   Whatever recoveries may eventually come from activities involving PG&E's affiliates via the avoiding powers of the Bankruptcy Code will redound to the benefit of the estate generally, and not to a separate class of ratepayers.  Whatever benefits may be ordered by regulatory agencies such as the California Public Utilities Commission ("CPUC") will no doubt follow proceedings before such a body, and the right of ratepayers

---

[4] _See_ discussion at section E, _infra_.

-6-

1  or others to be heard there will be established under applicable
2  non-bankruptcy law.

3      3.   No one opposing the Motion could rebut PG&E's general
4  counsel's explanation that refunds ordered by the CPUC will take
5  the form of rate adjustments in the future.

6      4.   No authority has been presented which indicates that any
7  events occurring prior to the petition date give any particular
8  ratepayer a "right to payment" (section 101(5)) or establish that
9  PG&E owes a "debt" (section 101(12)) to such ratepayer.

10     E.   Ratepayers have options available to them to protect
            their interests.
11
       As the parties well recognize, the Attorney General of the
12
    State of California has been given access to the bankruptcy court
13
    in Fed. R. Bankr. P. 2018(b).  That rule permits the Attorney
14
    General to appear and be heard on behalf of consumer creditors as
15
    long as the court determines that the appearance is in the public
16
    interest.[5]  For whatever reason, the Attorney General has decided
17
    not to accept the invitation to this court, apparently fearing
18
    that sovereign immunity protection will be lost if the State of
19
    California takes advantage of this right.  The court expresses no
20
    opinion on whether that will occur or whether it makes sense for
21
    the Attorney General[6] to explore the possibility of a stipulation
22
    that would preserve the sovereign immunity defense for other
23

24
   _____

25      [5]That would probably be the case here, but the court will
   address that issue only if and when it is presented.
26
        [6]If the ratepayers of PG&E believe they are entitled to the
27  assistance of the Attorney General they should resort to the
   political arena to seek relief.  The court cannot help them
28  because Congress has not provided a means for it to do so.

                              -7-

1  matters.[7]

2      Next, section 1109(b) gives a "party in interest," including
3  various enumerated entities, the right to appear and be heard on
4  any issue in a case.  The list of those entities is not exclusive.
5  11 U.S.C. § 102(3).

6      "Party in interest" is not defined in the Bankruptcy Code but
7  it appears in numerous instances.  In re Public Service Co. of New
8  Hampshire, 88 B.R. 546, 551 (Bankr. D. N.H. 1988) ("There are some
9  46 references to 'party in interest' within the Bankruptcy Code
10 and the Bankruptcy Rules.").   Congress certainly knew the
11 difference between "parties in interest" and "creditors" when it
12 empowered the latter to organize as a committee and participate in
13 bankruptcy cases at the expense of the estate.  It did not extend
14 that right to "parties in interest."

15     Finally, the UST argues that the ratepayers are greatly
16 interested in the outcome of this case and the financial affairs
17 of PG&E.  That goes without saying.  But having an interest in a
18 result (as all ratepayers do), does not rise to the level of
19 having a claim as defined in the Bankruptcy Code.

20         While regulatory agencies and ratepayers certainly are
           "interested" in a utility, they do not have the same
21         direct financial investment in a utility as its
           creditors and shareholders.  Furthermore, it can be
22         argued that ratepayers are already protected, or at
           least represented, by the PUC with respect to rate-
23         related issues. . . . Although clearly interested in the
           outcome of the Utility's organization [sic] proceedings,

24

25     [7]Both PG&E and the Official Committee of Unsecured Creditors
   have already agreed to this possibility on the record at the
26 hearing.  In addition, both PG&E and the committee have agreed
   that they are willing to stipulate that the Attorney General can
27 represent all ratepayers, notwithstanding the possible limitation
   of Rule 2018 that the Attorney General can represent only
28 "consumer creditors."

-8-

1   ratepayers arguably lack a strong enough investment in a
    utility to warrant an independent and unfettered voice
2   in the reorganization.

3   Public Service, 88 B.R. at 553, quoting Flaschen & Reilly,

4   Bankruptcy Analysis of a Financially-Troubled Utility, 22 Hous. L.

5   Rev. 965, 971-73 (1985).

6       When any particular ratepayer comes before the court to be

7   heard on any matter, the court will then decide whether, and to

8   what extent, that ratepayer may be considered a party in interest

9   and be heard.  Further, in the event the court is ever called upon

10  to exercise power and authority traditionally vested in any

11  regulatory agency, the status of a ratepayer as a party in

12  interest or the appropriateness of a committee consisting of

13  ratepayers may have to be revisited.[8]

14      F.   Section 105(a) is not available to save the Ratepayers
             Committee.

15

16      One might reasonably argue that the court, having used

    section 105(a) to review the UST's decision, should be consistent

17  and use the same section to serve the public interest and create a

18  ratepayers committee notwithstanding the limitations found in

19  Bankruptcy Code section 1102(a) discussed above.  There is,

20  however, no inconsistency.  The Code is silent on whether or not

21  the decision of the UST can be reviewed.  That silence suggests to

22  this court that utilizing section 105 is proper because such use

23  does not conflict with any other provision of the Bankruptcy Code.

24  On the other hand, section 1102(a) preempts the issue of committee

25

26  _____

27      [8]It should be obvious, but nothing in this order is intended
    to or should affect the right of any ratepayer, or any member of
    the Ratepayers Committee, to be heard anywhere other than in the
28  bankruptcy court.

-9-

1  creation, describing only two categories of entities who may be
2  organized as official committees, creditors and equity security
3  holders.   The court will not use section 105 to override the clear
4  limitations of the statute, for to do so would itself be an abuse
5  of discretion.   <u>Missoula Federal Credit Union v. Reinertson (In re</u>
6  <u>Reinertson)</u>, 241 B.R. 451, 455 (9th Cir. BAP 1999) ("Despite the
7  broad grant of equitable powers [under section 105], bankruptcy
8  courts cannot use them 'to defeat clear statutory language, nor to
9  reach results inconsistent with the statutory scheme established
10  by the Code.'").

11  III. <u>Conclusion</u>

12      In summary, the court reminds the parties that the Bankruptcy
13  Code, and the bankruptcy court, were designed to resolve debtor-
14  creditor problems; state agencies are where issues such as rates
15  for electricity are handled.   In its wisdom, Congress was correct:
16  the estate should pay for dealing with those debtor-creditor
17  issues in bankruptcy.   It should not be burdened with matters
18  likely to be resolved elsewhere.

19  ///

20

21

22

23

24

25

26

27

28

-10-

1    For the foregoing reasons, the court concludes that, while

2 the UST no doubt acted with good intentions and with the interests

3 of ratepayers in mind, she abused her discretion by going beyond

4 the authority given her in the Bankruptcy Code, erring as a matter

5 of law.  The Motion will be granted.  The court is concurrently

6 issuing an order vacating the UST's appointment of the Ratepayers

7 Committee.[9]

8 Dated: May 18, 2001

9                              _____

10                              Dennis Montali
                                United States Bankruptcy Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  _____

26    [9]Because the court concludes that the Ratepayers Committee
    cannot serve as an official committee, the court need not address
27  whether those entities selected by the UST could be
    representatives of ratepayers nor whether the political activities
28  of any such member is at all relevant to issues presented in the
    Motion.

                              -11-

1    I, the undersigned, a regularly appointed and qualified
clerk in the office of the Bankruptcy Judge of the United States
2    Bankruptcy Court for the Northern District of California, at San
Francisco, hereby certify:
3
That I, in the performance of my duties as such clerk,
4    served a copy of the foregoing document by placing said copy(ies)
in a postage paid envelope addressed to the person(s) hereinafter
5    listed, by depositing said envelope in the U.S. Mail, or by
placing said copy(ies) into an inter-office delivery receptacle
6    located in the Clerk's Office, or by facsimile to the facsimile
numbers listed below, at San Francisco, California, on the date
7    shown below.

8
Dated: May /9, 2001
9
                                        Dorothy A. Irwin
10

11    James L. Lopes, Esq.
Jeffrey L. Schaffer, Esq.
12    Janet Nexon, Esq.
Howard, Rice, Nemerovski, Canady, Falk & Rabkin
13    Three Embarcadero Center, 7th Fl.
San Francisco, CA 94111-4065
14
Robert Jay Moore, Esq.
15    Milbank, Tweed, Hadley & McCloy
601 S. Figueroa St., 30th Fl.
16    Los Angeles, CA 90017-5735

17    Penn Ayers Butler, Esq.
721 Colorado Ave., Ste. 101
18    Palo Alto, CA 94303-3913

19    Richard A. Lapping, Esq.
Louis J. Ciz, III, Esq.
20    Thelen Reid & Preist LLP
101 Second St., Ste. 1800
21    San Francisco, CA 94105-3601

22    William Bates, III, Esq.
Randy Michelson, Essq.
23    McCutchen, Doyle, Brown & Enersen, LLP
Three Embarcadero Ctr.
24    San Francisco, CA 94111-4067

25    Patricia A. Cutler, Asst. U.S. Trustee
Stephen L. Johnson, Trial Atty.
26    Office of the United States Trustee
250 Montgomery St., Ste. 1000
San Francisco, CA 94104

Exhibit B

Case 12-32118    Filed 07/01/13    Doc 979



# Stockton 2011 Redistricting

National Demographics Corporation

June 2, 2011

# Current Demographics

Based on Census data from the 2010 Decennial Census:

- **Total Population**
  - 2010 Census total: **291,707**
    - + 47,936 (19.7 %) growth from 2000
    - 40.3 % Hispanic
      - up 7.8% from 2000
    - 22.9 % Non-Hispanic White
      - down 9.3%
    - 12.1 % African-American
      - up 0.9%
    - 21.7 % Asian-American
      - up 1.6%
    - 3.0 % Other
      - down 0.9%

- **Voting Age Population**
  - 2010 Census count: 204,369
    - 35.9 % Hispanic
      - up 6.5% from 2000
    - 27.5 % Non-Hispanic White
      - down 10.5%
    - 11.6 % African-American
      - up 1.4%
    - 22.2 % Asian-American
      - up 3.5%
    - 2.8 % Other
      - down 1%

2

# Current Demographics

Based on data from the Census Bureau's American Community Survey (ACS) and from the California Statewide Database:

## Citizen Voting Age Population

From ACS: 157,844

- 26.1 % Hispanic
- 39.7 % Non-Hispanic White
- 13.2 % Black
- 18.2 % Asian American

From Special Tabulation: 156,743

- 26.3 % Hispanic
- 38.7 % Non-Hispanic White
- 13.5 % Black
- 19.1 % Asian American

## Voter Data

- Voter Registration (Nov. 2010)
  - 108,703 Total
  - 27.1 % Hispanic-surname
  - 6.0 % Asian-surname (excl. Filipino)
  - 3.6 % Filipino

- Voter Turnout (Nov. 2010)
  - 57,367 Total
  - 23.2 % Hispanic-surname
  - 5.2 % Asian-surname (excl. Filipino)
  - 3.5 % Filipino

3

# Exhibit C

| | |
|---|---|
| **Election Summary Report** | 12/03/12 |
| **General Election** | 16:01:47 |
| **Summary For Jurisdiction Wide, All Counters, All Races** | |
| **San Joaquin County** | |
| **November 6, 2012** | |
| **Official Final Results** | |

Registered Voters 293004 - Cards Cast 206843 70.59%

Num. Report Precinct 430 - Num. Reporting 430 100.00%

### PRESIDENT AND VICE PRESIDENT

| | | Total | |
|---|---|---|---|
| Number of Precincts | | 430 | |
| Precincts Reporting | | 430 | 100.0 % |
| Vote For | | 1 | |
| Total Votes | | 205364 | |
| **BARACK OBAMA** | DEM | 114121 | 55.57% |
| JILL STEIN | GRN | 773 | 0.38% |
| THOMAS HOEFLING | AI | 553 | 0.27% |
| MITT ROMNEY | REP | 86071 | 41.91% |
| GARY JOHNSON | LIB | 1839 | 0.90% |
| ROSEANNE BARR | PF | 920 | 0.45% |
| Write-in Votes | | 1087 | 0.53% |

### US SENATOR

| | Total | |
|---|---|---|
| Number of Precincts | 430 | |
| Precincts Reporting | 430 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 199493 | |
| **DIANNE FEINSTEIN** | 113706 | 57.00% |
| ELIZABETH EMKEN | 85787 | 43.00% |

### US REP 9TH DIST

| | Total | |
|---|---|---|
| Number of Precincts | 311 | |
| Precincts Reporting | 311 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 139775 | |
| RICKY GILL | 63975 | 45.77% |
| **JERRY MCNERNEY** | 75800 | 54.23% |

### US REP 10TH DIST

| | Total | |
|---|---|---|
| Number of Precincts | 119 | |
| Precincts Reporting | 119 | 100.0 % |

| **KIRSTIN A. HOLTBERG** | 2327 | 55.95% |
|---|---|---|
| KIM EHLERT | 628 | 15.10% |
| Write-in Votes | 6 | 0.14% |

**LAMMERSVILLE JT. USD**

| | Total | |
|---|---|---|
| Number of Precincts | 11 | |
| Precincts Reporting | 11 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 2955 | |
| CHRIS CUNNINGHAM | 1263 | 42.74% |
| **SHARON LAMPEL** | 1671 | 56.55% |
| Write-in Votes | 21 | 0.71% |

**GALT JT UNION BOARD MEMBER**

| | Total | |
|---|---|---|
| Number of Precincts | 5 | |
| Precincts Reporting | 5 | 100.0 % |
| Vote For | 2 | |
| Total Votes | 2198 | |
| AARON STANLEY | 666 | 30.30% |
| **AMY MADISON** | 806 | 36.67% |
| **TERRY PARKER-OWNING** | 711 | 32.35% |
| Write-in Votes | 15 | 0.68% |

**COUNTY SUPERVISOR 5TH DIST**

| | Total | |
|---|---|---|
| Number of Precincts | 91 | |
| Precincts Reporting | 91 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 36318 | |
| RHODESIA R. RANSOM | 17324 | 47.70% |
| **BOB ELLIOTT** | 18877 | 51.98% |
| Write-in Votes | 117 | 0.32% |

**STOCKTON MAYOR**

| | Total | |
|---|---|---|
| Number of Precincts | 132 | |
| Precincts Reporting | 132 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 74519 | |
| **ANTHONY SILVA** | 44159 | 59.26% |
| ANN JOHNSTON | 30360 | 40.74% |

**STOCKTON COUNCIL DIST 2**

| | Total |
|---|---|

Case 12-32118    Filed 07/01/13    Doc 979

| | | |
|---|---|---|
| Number of Precincts | 132 | |
| Precincts Reporting | 132 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 68450 | |
| RANDY HATCH | 27933 | 40.81% |
| KATHY MILLER | 40517 | 59.19% |

**STOCKTON COUNCIL DIST 4**

| | Total | |
|---|---|---|
| Number of Precincts | 132 | |
| Precincts Reporting | 132 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 69406 | |
| MOSES ZAPIEN | 35834 | 51.63% |
| DIANA MACCINI LOWERY | 33572 | 48.37% |

**STOCKTON COUNCIL DIST 6**

| | Total | |
|---|---|---|
| Number of Precincts | 132 | |
| Precincts Reporting | 132 | 100.0 % |
| Vote For | 1 | |
| Total Votes | 69709 | |
| MICHAEL TUBBS | 43092 | 61.82% |
| DALE FRITCHEN | 26617 | 38.18% |

**MANTECA CITY COUNCIL**

| | Total | |
|---|---|---|
| Number of Precincts | 39 | |
| Precincts Reporting | 39 | 100.0 % |
| Vote For | 2 | |
| Total Votes | 30549 | |
| BENJAMIN CANTU | 7541 | 24.68% |
| STEVE DE BRUM | 8504 | 27.84% |
| DEBBY MOORHEAD | 8585 | 28.10% |
| SHEILA RAYA | 5815 | 19.03% |
| Write-in Votes | 104 | 0.34% |

**LODI CITY COUNCIL**

| | Total | |
|---|---|---|
| Number of Precincts | 32 | |
| Precincts Reporting | 32 | 100.0 % |
| Vote For | 2 | |
| Total Votes | 29682 | |
| DOUG (KEEN) KUEHNE | 8206 | 27.65% |
| JO ANNE L. MOUNCE | 12264 | 41.32% |
| BOB JOHNSON | 9066 | 30.54% |

Exhibit D

**MINUTES**
**SPECIAL CITY COUNCIL**
**JANUARY 7, 2009**

**CITY HALL**
**CITY COUNCIL CHAMBERS**
**STOCKTON, CALIFORNIA**

I.    **Roll Call <u>5:28 PM</u>**

Roll Call 5:28 PM
Present:
Councilmember Eggman
Councilmember Fritchen
Councilmember Lowery
Councilmember Martin
Vice Mayor Miller
Mayor Johnston

Pastor Wayne Bibelheimer from Quail Lakes Baptist Church provided the Invocation. The Pledge of Allegiance was led by Vice Mayor Miller.

**Note:** District 1 Council Seat vacant.

### Mayor Johnston <u>5:30 PM</u>

Mayor Johnston announced the appointment of Katherine Miller as Vice Mayor.

II.    **Public Comment <u>5:31 PM</u>**

### David Thomas <u>5:32 PM</u>

Mr. Thomas spoke in support of Candidate Mark Martinez.

### Tocan Nguyen <u>5:34 PM</u>

Tocan Nguyen spoke regarding the Council District 1 candidates.

III.    **Council District 1 candidate interviews and selection <u>5:39 PM</u>**

<u>LINK TO 2009-01-07 Council Agenda Item III Staff Report (PDF)</u>

a)    **Approve Council voting procedure for District 1 vacancy <u>5:39</u>**

<u>PM</u>

City Clerk Katherine Gong Meissner provided the staff report. A memo to the Council dated January 7, 2009 from Ms. Meissner was distributed at the meeting relative to additional clarifying language to the proposed voting procedure (filed).

<u>LINK TO 2009-01-07 Special Council Agenda Item III a - Filed Around the Bench (PDF)</u>

The following Councilmembers asked questions and discussed the proposed process:

**Councilmember Eggman**

**Mayor Johnston**

**Councilmember Fritchen**

**Mayor Johnston**

**Councilmember Martin**

**City Clerk Meissner**

**Mayor Johnston**

**Councilmember Eggman**

**City Clerk Meissner**

**Mayor Johnston**

**Councilmember Martin**

**City Clerk Meissner**

**Councilmember Eggman**

**Councilmember Martin**

**City Attorney Nosky**

The following citizen inquired about the questions that would be asked of the candidates:

**John Beckman**

**Motion**: Approve **Resolution 09-0006** approving the Council voting procedure for the District 1 vacancy and incorporating Exhibit A which includes clarifying language regarding Round 2 of the voting process if Round 2 is deemed necessary.

**Moved by**: Councilmember Fritchen, seconded by Vice Mayor Miller.

**Vote**: Motion carried 6-0

**Yes**: Councilmember Eggman, Councilmember Fritchen, Councilmember Lowery, Councilmember Martin, Vice Mayor Miller, and Mayor Johnston.

LINK TO 2009-01-07 Council Special Agenda Item III a - Reso 09-0006 (PDF)

b)    **Conduct interviews for one mid-term vacancy on The Stockton City Council - District One**

**Eleven Applicants**
- **Ken Davis**
- **Wayne Flores**
- **Yolanda Flores**

- Paul Green Jr.,
- Philip C. Hawtin
- Elbert Holman Jr.,
- Doug Kuehne
- Mark Martinez
- Xochitl Paderes
- Rosie Rangel
- David Renison
6:04 PM

**Mayor Johnston** <u>6:04 PM</u>

Mayor Johnston directed the City Clerk to begin the interview process.

**City Clerk Katherine Gong Meissner** <u>6:04 PM</u>

City Clerk Meissner filed a memo dated January 7, 2009 to the Council forwarding additional correspondence from various public members in support of Candidates Yolanda Flores, Philip Hawtin, or David Renison (filed).

City Clerk Meissner began the interview process by posing the following proposed questions to each of the candidates:
1)  Why are you interested in being on the City Council and what in your background or experience qualifies you to govern a city of 290,000 people?
2) What are the three top challenges facing Stockton and how would you go about addressing these issues?

The following candidates were sequestered and interviewed one at a time.  If time allowed, additional questions were posed by the Councilmembers.

<u>LINK TO 2009-01-07 Special Council Agenda Item III b - Filed Around the Bench (PDF)</u>

**Candidate Ken Davis** <u>6:05 PM</u>

**Candidate Wayne Flores** <u>6:24 PM</u>

Mr. Flores filed a written copy of his presentation (filed).

LINK TO 2009-01-07 Special Council Agenda Item III b - Filed Wayne Flores (PDF)

**Candidate Yolanda Flores <u>6:41 PM</u>**

**Candidate Paul Green, Jr. <u>6:58 PM</u>**

**Candidate Philip Hawtin <u>7:14 PM</u>**

Note: The Mayor announced the Council would break for 5 minutes and resume the interview process at 7:40 p.m.

**Candidate Elbert Holman <u>7:38 PM</u>**

**Candidate Doug Kuehne <u>7:54 PM</u>**

**Candidate Mark Martinez <u>8:10 PM</u>**

Mr. Martinez presented two items: 1) document outlining his experience and qualifications, and 2) newspaper article from The Record entitled "S.J. Hispanic chamber gives back to community" (filed).

LINK TO 2009-01-07 Special Council Agenda Item III b - Filed Mark Martinez - Experience and Qualifications (PDF)

LINK TO 2009-01-07 Special Council Agenda Item III b - Filed Mark Martinez (PDF)

**Candidate Xochitl Paderes <u>8:22 PM</u>**

**Candidate Rosie Rangel <u>8:37 PM</u>**

**Candidate David Renison <u>8:53 PM</u>**

Mayor Johnston announced that Council would take a break at this time and return at 9:20 p.m. to proceed with the voting process.

The following Councilmembers disclosed the names of the candidates they met with individually prior to the interviews:

**Mayor Johnston <u>9:21 PM</u>**

**Councilmember Lowery <u>9:22 PM</u>**

**Councilmember Martin <u>9:22 PM</u>**

**Councilmember Fritchen <u>9:22 PM</u>**

**Councilmember Eggman <u>9:22 PM</u>**

**Vice Mayor Miller <u>9:23 PM</u>**

## Round 1

City Clerk Katherine Gong Meissner distributed ballots for the first round of voting to the Mayor and Councilmembers. The ballots were collected and City Clerk Meissner tallied the vote as follows:

1 vote for Candidate Ken Davis
3 votes for Candidate Elbert Holman
2 votes for Candidate David Renison

## Round 2

The Council proceeded to Round 2 of voting as no one candidate received the required 4 votes of the Council to win the appointment.

The results of Round 2 were as follows:

5 votes for Candidate Elbert Holman
1 vote for Candidate David Renison

City Clerk Meissner pronounced Elbert Holman as the successful candidate.

**Motion**: Approve **Resolution 09-0007** approving the appointment of Elbert Holman, Jr., to fill the District 1 vacancy, term effective upon appointment and ending December 31, 2010.

**Moved by**: Councilmember Martin, seconded by Councilmember Fritchen.

**Vote**: Motion carried 6-0

**Yes**: Councilmember Eggman, Councilmember Fritchen, Councilmember Lowery, Councilmember Martin, Vice Mayor Miller, and Mayor Johnston.

LINK TO 2009-01-07 Council Special Agenda Item III b - Reso 09-0007 (PDF)

LINK TO 2009-01-07 Council Agenda Item III b - Elbert Holman Jr Application (PDF)

City Clerk Katherine Gong Meissner administered the Oath of Office to Councilmember Elbert Holman.

Councilmember Elbert Holman thanked the Council for this opportunity to serve the City. The Mayor then asked Councilmember Holman to join his colleagues on the dais. He was greeted by a round of applause and a standing ovation by the Council and the audience.

Mayor Johnston welcomed the Councilmember and thanked all the candidates and encouraged them to stay involved.

**COUNCIL COMMENTS 9:36 PM**

The following Councilmembers welcomed Councilmember Holman and offered their congratulations:

**Councilmember Fritchen 9:36 PM**

**Councilmember Martin 9:36 PM**

**Vice Mayor Miller 9:37 PM**

**Councilmember Lowery 9:37 PM**

**Councilmember Holman 9:38 PM**

Councilmember Holman extended his thanks and stated he would be calling on the other candidates in the future.

**Mayor Johnston 9:39 PM**

Mayor Johnston thanked everyone for attending and participating in the appointment process.

IV.    **Adjournment 9:39 PM**

KATHERINE GONG MEISSNER
CITY CLERK OF THE CITY OF
STOCKTON