**55**

Jerome R. Satran, Esq. (SBN 188286)
Joseph T. Speaker, Esq. (SBN 277921)
KOELLER, NEBEKER, CARLSON & HALUCK, LLP
1478 Stone Point Drive, Suite 400
Roseville, CA 95661
Telephone: (916) 724-5700
Facsimile: (916) 788-2850

Attorney for Movants
DEAN ANDAL

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CITY OF STOCKTON,<br>CALIFORNIA,<br><br>Debtor, | Case No. 12-32118-C-9<br>DC No.: JTS-01<br><br>**Judge: Hon. Christopher M. Klein**<br><br>**DEAN ANDAL'S SUPPLEMENTAL EXHIBIT TO MOTION FOR RELIEF FROM AUTOMATIC STAY**<br><br>**Date: August 21, 2013**<br>**Time: 10:00 a.m.**<br>**Courtroom: 35** |

Pursuant to this Court's request, DEAN ANDAL, an individual, (hereinafter "Movant") hereby submits a copy of its proposed State Court Petition for a Writ of Mandate, as a Supplemental Exhibit to its previously filed Motion for Relief from the Automatic Stay in the above matter.

DATED: August 20, 2013          KOELLER, NEBEKER, CARLSON & HALUCK, LLP


_____
Jerome R. Satran, Esq.
Joseph T. Speaker, Esq.
Attorneys for Movant
DEAN ANDAL

1
SUPPLEMENTAL EXHIBIT TO MOTION FOR RELIEF FROM AUTOMATIC STAY

# EXHIBIT "A"



1  Chad N. Dunigan, Esq. (SBN 204946)
   Joseph T. Speaker, Esq. (SBN 277921)
2  KOELLER, NEBEKER, CARLSON & HALUCK, LLP
   1478 Stone Point Drive, Suite 400
3  Roseville, CA  95661
   Telephone:  (916) 724-5700
4  Facsimile:  (916) 788-2850

5  Attorneys for Petitioner
   DEAN ANDAL

6

7

8                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                           **COUNTY OF SAN JOAQUIN**

10

11  DEAN ANDAL, an individual                Case No. _____

12              Plaintiff,                    **PETITION FOR PEREMPTORY WRIT
                                              OF MANDATE AND ALTERNATIVE
13  v.                                        WRIT OF MANDATE**

14  BONNIE PAIGE, in her official capacity as
    City Clerk for the City of Stockton,      **Hearing Time:**
                                              **Hearing Date:**
15  AUSTIN ERDMAN, in his official capacity    **Hearing Dept:**
    as Registrar of Voters,
16                                            Action Filed:
17              Respondents.                   Trial: Not Set

18  ANTHONY SILVA, in his official capacity
    as Mayor of Stockton City Council;
19

20

21              Real Party In Interest.

22          Petitioner petitions this Court for a Writ of Mandate directed to Respondent AUSTIN

23  ERDMAN, Registrar of Voters for the County of San Joaquin and BONNIE PAIGE, as City

24  Clerk for the City of Stockton, and by this petition alleges:

25          1.      Petitioner DEAN ANDAL (hereinafter "Petitioner") is a registered California

26  voter, resident of San Joaquin County and Stockton, and a California taxpayer. Petitioner has

27  served in a variety of public positions involving California tax, including as a California State

28  Assemblyman serving on the Revenue and Taxation Committee, Chairman of the Board of

                                          1

1    Equalization, the Franchise Tax Board, and was even appointed by the U.S. Speaker of the House

2    to serve on the U.S. Advisory Commission on Electronic Commerce. Petitioner brings this

3    petition in his individual capacity.

4        2.    Respondents AUSTIN ERDMAN, in his capacity as Registrar of Voters for the

5    County of San Joaquin, and BONNIE PAIGE, in her capacity as City Clerk for the City of

6    Stockton are elections officials responsible for, among other things, the preparation of the

7    November 5, 2013 election ballot pamphlet ("Ballot Pamphlet"), the printing of the local ballot

8    ("Local Printer") and publishing the proposed ballot measures.

9        3.    Real Party In Interest ANTHONY SILVA, in his representative capacity as Mayor

10   and head of the CITY COUNCIL OF THE CITY OF STOCKTON (hereinafter the "City

11   Council") is responsible for adopting a certain resolution, identified below, placing a tax measure

12   on the November 5, 2013 ballot.

13       4.    The true names and capacities, whether individual, corporate, associate,

14   representative, or otherwise of real parties in interest named herein as DOES 1 through 100,

15   inclusive, are unknown to Petitioner, who, therefore, names said real parties in interest by such

16   fictitious names. Petitioner will amend this petition to show their true names and capacities when

17   the same have been ascertained.

18           **I.**    **BACKGROUND**

19       5.    On July 9, 2013 the City Council passed a resolution titled, "RESOLUTION OF

20   THE CITY COUNCIL OF THE CITY OF STOCKTON CALIFORNIA, ORDERING THE

21   SUBMISSION TO THE QUALIFIED ELECTORS OF THE CITY OF STOCKTON A

22   CERTAIN MEASURE RELATING TO A PROPOSED ORDINANCE IMPOSING A 3/4 CENT

23   TRANSACTION AND USE TAX FOR GENERAL PURPOSES, GIVING NOTICE, AND

24   REQUESTING CONSOLIDATION OF A SPECIAL ELECTION TO BE HELD TUESDAY,

25   NOVEMBER 5, 2013" (hereinafter "Resolution") to hold a special election on November 5, 2013

26   to place a particular tax measure on ballot. A true and correct copy of the Resolution is attached

27   hereto as Exhibit "A" and incorporated herein by this reference.

28



6.      The Resolution places a ¾ cent tax measure on the November 5, 2013 ballot. The tax measure specifically states:

**Law Enforcement, Crime Prevention, and Other Essential City Services Measure**

**To pay for law enforcement and crime prevention services such as those described in Stockton's Marshall Plan on Crime, to help end the bankruptcy and restore other City services; and provided it shall sunset in ten years or when economic recovery occurs, a Citizen's Oversight Committee reports on the use of proceeds, and independent audits are done annually; shall Ordinance ____ be adopted to impose a 3/4-cent transaction and use (sales) tax?**

(hereinafter "Measure")

The recently passed Measure, would serve to place a ¾ cent transaction and use tax for "general" purposes on the November 5, 2013 ballot. (A true and correct copy of the "Measure" is attached hereto as Exhibit "B" and incorporated herein by this reference.) Nowhere in the title to the Measure is the word "tax" even mentioned.

7.      This Petition is brought pursuant to California Elections Code section 9295 which provides that this Court may issue a writ of mandate to prevent the publication of false or misleading information in the Ballot Pamphlet for the November 5, 2013 election. Moreover, this petition is timely brought because a search of the Registrar of Voters and City Clerk's records indicates that the 10-day examination period as required by California Elections Code 9295(a) has not yet elapsed.

## FIRST CAUSE OF ACTION

### (Violation of Cal. Elec. Code § 9295- Misleading Language)

8.      Petitioner realleges paragraphs 1 through 7 of this Petition as though fully set out herein.

9.      Petitioner brings the instant Petition based on California Elections Code section 9295, which provides in pertinent part:

(a) The elections official shall make a copy of the material ...

3

1    available for public examination in the elections official's office
for a period of 10 calendar days immediately following the filing
2    deadline for submission of those materials.

3                                                  …

4    (b)(1) During the 10-calendar-day public examination period
provided by this section, *any voter of the jurisdiction in which the*
5    *election is being held, or the elections official, himself or herself,*
*may seek a writ of mandate or an injunction requiring any or all of*
6    *the materials to be amended or deleted.* The writ of mandate or
injunction request shall be filed no later than the end of the 10-
7    calendar-day public examination period.

8    (2) A peremptory writ of mandate or an injunction shall be issued
9    only upon clear and convincing proof that *the material in question*
*is false, misleading, or inconsistent with the requirements of this*
10   *chapter*, and that issuance of the writ or injunction will not
substantially interfere with the printing or distribution of official
11   election materials as provided by law.

12
(3) The elections official shall be named as respondent, and the
13   person or official who authored the material in question shall be
named as real parties in interest. In the case of the elections official
14   bringing the mandamus or injunctive action, the board of
supervisors of the county shall be named as the respondent and the
15   person or official who authored the material in question shall be
16   named as the real party in interest.

17   (Cal. Elec. Code § 9295 [emphasis added].)

18   A.    **The Ballot Language is Misleading Based on the California Constitution and**
19   **Governing Authority.**

20       10.    The Measure language to be included in the Ballot Pamphlet (hereinafter "Ballot

21   Language") contains the following biased, false and misleading text:

22       **Law Enforcement, Crime Prevention, and Other Essential City**
**Services Measure**
23

24       To pay for law enforcement and crime prevention services
such as those described in Stockton's Marshall Plan on Crime,
25       to help end the bankruptcy and restore other City services;
and provided it shall sunset in ten years or when economic
26       recovery occurs, a Citizen's Oversight Committee reports on
the use of proceeds, and independent audits are done annually;
27       shall Ordinance ____ be adopted to impose a 3/4-cent
transaction and use (sales) tax?
28

4

11.     California courts have held that a statement is false or misleading if members of the public are likely to be deceived. (*Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 363; *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 334.) "A ballot title and summary must reasonably inform the voter of the character and real purpose of the proposed measure." (*Horneff v. City and County of San Francisco* (2003) 110 Cal.App.4th 810, 820) "The main purpose of these requirements is to avoid misleading the public with inaccurate information." (*Ibid.*) "An outright falsehood or a statement that is objectively untrue may be stricken." (*Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1432.) Additionally, "a statement that, in one sense, can be said to be literally true can still be materially misleading." (*Ibid.*)

                 1.     *Any Reference to A Specific City Service in the Ballot Language Violates the Restriction on a General Tax.*

12.     The above Ballot Language is false and misleading, because it lists specific city services, such as law enforcement and crime prevention, as the intended beneficiary of the ¾ cent tax. The California Constitution mandates that a tax to be used for "general governmental purposes" may not be earmarked for any specific purpose. (*Howard Jarvis Taxpayer's Association v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1185 citing Cal. Const., art. XIII C, § 1, subd. (a).) In contrast, a "special tax" is any tax earmarked for specific purposes (i.e. funding law enforcement or crime prevention), even if the proceeds are placed into a general fund. (*Howard Jarvis Taxpayer's Association, supra,* 106 Cal.App.4th at 1185 citing Cal. Const., art. XIII C, § 1, subd. (d).) A "special tax", however, requires a 2/3 vote, while a "general tax" requires only a simple majority. (*Id.*) The Measure above is a "general tax" being disguised as a "special tax". The Resolution specifically states that the Measure is a "general tax" which requires a simple majority. (*See* Exhibit "A" Section 1.) The proposed text of the Ballot Language states that the tax is to be used "[t]o pay for law enforcement and crime prevention services…", despite being a "general tax" not a "special tax." Pursuant to the California Constitution Article XIII C, § 1, subd. (a), and *Howard Jarvis Taxpayer's Association, supra,* 106 Cal.App.4th at 1185, the tax proposed in the Ballot Language cannot be earmarked for a specific purpose without being

a special tax and requiring a 2/3 vote. The text of the Ballot Language therefore misleads the average voter into believing the ¾ cent general tax "must" be used for "law enforcement and crime prevention" when in reality it can be used for any "general governmental purpose", including non-law enforcement and crime prevention services.

13.    The issue faced by this Court in analyzing the misleading nature of trying to pass a "general tax" off as a "special tax" was recently dealt with by the court in *Howard Jarvis Taxpayer's Association, supra,* 106 Cal.App.4th 1178 (hereinafter "*Howard Jarvis*"). Specifically, the court in *Howard Jarvis* was tasked with evaluating whether a city's attempt to pass a general tax that earmark funds constituted a "special tax" requiring a 2/3 vote, rather than a simple majority. In *Howard Jarvis*, the court reasoned:

> When a local government asks the voters to approve a tax, it must decide whether to ask for a general tax or a special tax. If it asks for a general tax, only majority approval is required; *but the local government must forgo any electoral advantage that might be gained from limiting the use of revenues to specific purposes.* If the local government asks the voters to approve a special tax, it might gain an electoral advantage; but a two-thirds vote is required for approval. Such a measure must be placed before the voters on an all-or-nothing basis. [Emphasis added.]

(*Howard Jarvis Taxpayer's Association, supra,* 106 Cal.App.4th at 1189.)

14.    Thus, the City Council cannot call the Measure a "general tax" and earmark funds for "law enforcement and crime prevention services", like a "special tax." To do so would circumvent the distinction between the "general tax" and "special tax." The City Council must either require a 2/3 vote to pass the Measure, or remove any reference to specific city services that will be funded from the tax.

2.    *The Wording of the Title and Ballot Language is Biased and Misleads Voters Into Believing the Ballot Language is Aimed at Crime Prevention and Law Enforcement.*

15.    There is no doubt that the City Council will argue that although the tax must be used for "general purposes" it is the intent of the City Council to use the tax to pay for the services it identifies in the Measure (i.e. law enforcement and crime prevention services.) This position was taken in the almost identical case of *McDonough v. Superior Court* (2012) 204

6

Cal.App. 4th 1169 (hereinafter "*McDonough*"). In the *McDonough* case, the court was asked, just as here, on a writ of mandate under California Elections Code section 9295, to determine if proposed language in a ballot measure was misleading. The *McDonough* court was specifically asked to evaluate whether the text of a proposed measure aimed at modifying retirement benefits for current employees and retirees and establishing a more limited retirement plan for future employees was unfairly biased and therefore misleading. The specific text of the challenged ballot measure read:

> PENSION REFORM
>
> To protect essential services, including neighborhood police patrols, fire stations, libraries, community centers, streets and parks, shall the Charter be amended to reform retirement benefits of City employees and retirees by: increasing employees' contributions, establishing a voluntary reduced pension plan for current employees, establish pension cost and benefit limitations for new employees, modify disability retirement procedures, temporarily suspend retiree COLAs during emergencies, require voter approval for increases in future pension benefits?

(*McDonough, supra*, 204 Cal.App. 4th at 1173)

16.    In analyzing the above ballot language the court reasoned that "the ballot title, for example, must not be false, misleading, or partial to one side.... We understand 'partial' to mean that the council's language signals to voters the council's view of how they should vote, or casts a favorable light on one side of the issue while disparaging the opposing view." (*Id.* at 1174.) In applying this rule of law, the *McDonough* Court reasoned:

> We believe that the ballot title, "PENSION REFORM," is such a 'clear case.' The word 'reform' in both definition and connotation evokes a removal of defects or wrongs. By combining this charged word with 'pension' in the title, all in capital letters, the City Council has implicitly characterized the existing pension system as defective, wrong, or susceptible to abuse, thereby taking a biased position in the very titling of the measure itself. The title should be altered to read 'PENSION MODIFICATION' to eliminate the use of the argumentative word 'reform.'

(*McDonough, supra*, 204 Cal.App. 4th at 1174-1175)

7

PETITION FOR PEREMPTORY WRIT OF MANDATE AND ALTERNATIVE WRIT

1        17.    Moving on from the ballot title to the text of the ballot question, the *McDonough*

2    Court continued to conclude:

> The text of the ballot question also contains a more extensive flaw
> rendering it inconsistent with the applicable Elections Code
> provisions. The central objective of Measure B appears to be the
> reduction of pension and retirement costs paid by the City. *The*
> *introductory phrase, however, suggests that the proposed*
> *measure is designed principally to 'protect essential services,*
> *including neighborhood police patrols, fire stations, libraries,*
> *community centers, streets and parks.' In other words, it*
> *promotes Measure B by implying that if voters do not endorse*
> *pension reform by passing the measure, the public will lose fire*
> *and police protection and be deprived of popular community*
> *resources*
>
>                        . . .
>
> Real parties maintain, however, that preservation of services is
> indeed the purpose behind Measure B, and thus the statement of
> purpose in the ballot question is accurate and not misleading. They
> state that before passing Resolution No. 76158 the City Council
> received reports indicating that the 'rising costs of employee
> pension benefits' contribute to the City's budget deficits and a
> corresponding reduction in 'key City services.' *These points,*
> *however, properly belong in the ballot arguments in favor of the*
> *measure, not in the ballot question, which must be cast in*
> *neutral, unbiased language.* [Emphasis added.]

(*McDonough, supra,* 204 Cal.App. 4th at 1175-1176)

18        18.    The *McDonough* Court's reasoning above is directly on point for the instant

19    Petition. Like the ballot measure in *McDonough*, the Ballot Language purports to list idyllic city

20    services that "could" benefit from the tax increase in an attempt to unduly influence voter

21    support. Regardless of whether the City Council intends to use the general tax for law

22    enforcement and crime prevention, the fact remains that the City Council is not obligated to do

23    so. The open ended nature of the proposed general tax is akin to the facts in *McDonough* and any

24    reference to specific earmarked city services is better suited for the argument for or against the

25    Measure and not the text of the actual Ballot Language itself.

        3.    *The Use of the Word "Restore" In the Ballot Language Misleads Voters*
              *Into Believing Unless They Vote for the Measure, the City Services Will*
              *Not Be Funded.*

8

1    19.    Moreover, like in *McDonough*, by stating "and *restore* other City services" (Ballot

2    Language [emphasis added]) the Ballot Language implies that unless this Measure is passed, city

3    services will not otherwise be "restored" or funded. This use of "restored" is analogous to the use

4    of "reform" in the *McDonough* case. The Ballot Language attempts to pander to the average

5    voter's desire for increased law enforcement and crime prevention needs, while masking that the

6    new tax does not guarantee law enforcement or crime prevention will receive a single penny of

7    the proposed tax. By listing specific city services that will be "restored", the Ballot Language

8    misleads the average voter into believing the general tax is earmarked for specific services, and

9    that those services will not otherwise be "restored" unless the tax is passed.

10

11    **4.    *The Ballot Language's Reference to a Sunset Date Misleads Voters Into Believing the Measure Has a Mandatory End Date.***

12    20.    It should also be pointed out that any reference to a "Citizen's Oversight

13    Committee" or "sunset date" is also misleading considering Exhibit 1, Section 17, of the

14    Resolution provides:

15

16    However, the voters hereby authorize the Council to extend the sunset of the taxes pursuant to paragraph (b) of this Section 17.

17    (b) The City Council may extend the sunset of the taxes imposed by this Ordinance as follows. The Council shall hold two publicly

18    noticed meetings at least 14 days apart and shall adopt findings based on evidence before it that: (i) the revenues provided by the

19    taxes imposed by this Ordinance continue to be necessary to accomplish the purposes stated in Section 21 of this Ordinance and

20    (ii) the total compensation paid to City employees is not excessive when compared to those of other similarly situated public-sector

21    employers.

22

23    21.    By the very wording of the Resolution adopting the Measure, the City Council has

24    the ultimate authority to decide whether the ¾ cent tax sunsets or not, not the Citizen's Oversight

25    Committee. A committee that serves at the pleasure of the City Council cannot "oversee" that

26    council's work. The text of the Ballot Language regarding the sunset date states, "it shall sunset

27    in ten years or when economic recovery occurs, a Citizen's Oversight Committee reports on the

28    use of proceeds, and independent audits are done annually." This language would mislead any

1    reasonable mind into believing that the ¾ cent tax must sunset in ten (10) years or earlier, should

2    economic recovery occur, as dictated by the Citizen's Oversight Committee. Despite saying one

3    thing, Exhibit 1, section 17 to the Resolution clearly states that the City Council retains ultimate

4    decision making ability as to when the tax sunsets, if ever.  The City Council need not ever bring

5    the tax back to the voters and, at the City Council's will, the tax could continue indefinitely. No

6    reasonable person would view this as a true "sunset". Because the Ballot Language directly

7    contradicts the Resolution, it is nearly impossible to see how any voter would not be mislead by

8    the reference to the sunset date and Citizen's Oversight Committee.

9            5.     ***The Ballot Title Fails to Use the Word "Tax" and Thus Misleads Voters***

10                  ***as to the Purpose of the Measure.***

11           22.    Perhaps more misleading than anything, the title of the Ballot Language reads,

12    "Law Enforcement, Crime Prevention, and Other Essential City Services Measure." Nowhere in

13    the title is the word "tax". Over a ten year period, the Measure boasts an increased $280 million

14    dollars in additional tax revenue, yet the word "tax" is nowhere in the title. (See Exhibit "C" pg.

15    389-A true and correct copy of the Agenda Item 15.02 to the June 25, 2013 City Council meeting

16    where the resolution was placed on the agenda.) Simply put, all the Measure does is create a ¾

17    cent use tax for general purposes. Any reference to any earmarked purpose other than "general"

18    purposes is misleading and deceptive and violates California Elections Code section 9295 and

19    California Constitution, Article XIII C, § 1, subd. (a) and (d).  The proposed tax cannot guarantee

20    where or how the money is spent without being a special tax, thus any reference to an earmarked

21    beneficiary of the tax is misleading and inaccurate. Like the title in *McDonough*, the title of the

22    Measure is biased and misleading, because it deceives the average voter into believing the

23    purpose of the Measure is "Law Enforcement, Crime Prevention, and Other Essential City

24    Services" rather than simply a ¾ cent "tax" for any and all general government purposes.

25           23.    Based on the above, Petitioner proposes an amended Ballot Language that simply

26    reads:

                              **City General Use Tax Measure**

27           Shall  Ordinance  ____  be  adopted  to  impose  a  3/4-cent
             transaction  and  use  (sales)  tax  for  general  governmental
28           purposes?

                                        10

24.     Petitioner believes the above language provides the most impartial and accurate description of the Measure, based on the Resolution and clear California authority. The above language is not biased, references no specific city service, and does not mislead the voters into believing there is a definite sunset date. The items removed from the above Ballot Language are better suited for the arguments for and against the Measure and should not be placed into the neutral ballot language, as mandated by the long line of California statutes and authority cited above.

25.     Petitioner has no plain, speedy and adequate remedy in the ordinary course of law and the appropriate method for securing the relief requested herein is by writ of mandate.

26.     Issuance of a writ will not substantially interfere with the printing and distribution of the Ballot Pamphlet because deletion or amendment of the Ballot Language does not affect the remaining text, nor impact the unprinted Ballot Pamphlet.

27.     Irreparable injury will occur if the alternative writ does not issue and if the Court does not expeditiously consider this Petition. If this court's writ does not issue, Petitioner will be unable to prevent the printing of false and misleading statements of fact, prejudicial statements in the Ballot Pamphlet and Ballot Language, and the Ballot Pamphlet may later have to be recalled to correct it, at great expense to the taxpayers. Also, the nature of the issues involved, which concern informing the voters of the contents of the Measure before they go to the polls, demands that the alternative writ issue and the hearing on the peremptory writ be scheduled as soon as the Court's calendar will permit.

28.     Petitioner is not ignorant of the financial situation facing the City of Stockton, however Petitioner does not believe misleading language aimed and pre-determining an outcome is the answer to solving the City of Stockton's problems. Petitioner only asks that the voters be provided the most neutral and unbiased ballot language in order to make the most informed decision possible.

WHEREFORE, Petitioner prays for relief as follows:

1.     That an alternative writ of mandate issue ordering respondent and real parties in interest to appear before this Court to show cause, if any they have, why a peremptory writ of

11



1  mandate should not issue commanding respondent and real parties in interest, and their officers,

2  agents and all persons acting by, through or in concert with them, to delete and/or in the

3  alternative, amend the statements listed in this Petition from the Ballot Pamphlet and Ballot

4  Language for the November 5, 2013 election ballot.

5        2.    That a peremptory writ of mandate issue commanding respondent and the real

6  parties in interest, and their officers, agents and all persons acting by, through or in concert with

7  them to delete, and/or in the alternative, amend the statements listed in this petition from the

8  Ballot Pamphlet and Ballot Language for the November 5, 2013 election ballot.

9        3.    That a hearing on this petition take place at the earliest practicable time, so that the

10  issues involved in this petition may be adjudicated in sufficient time that the false and/or

11  misleading material can be amended in the Ballot Pamphlet and Ballot label and that the Local

12  Printer will have sufficient time to print and distribute the Ballot Pamphlet prior to the November

13  5, 2013 election;

14        4.    That Petitioner be granted such other and further relief as the court may deem just

15  and equitable.

16  DATED:  August 20, 2013          KOELLER, NEBEKER, CARLSON & HALUCK, LLP

17

18                                 Chad N. Dunigan, Esq.
                                    Joseph T. Speaker, Esq.
19                                 Attorneys for Petitioner
                                    DEAN ANDAL
20

21

22

23

24

25

26

27

28

12


**VERIFICATION**

I, DEAN ANDAL, declare as follows:

I am a Petitioner in this action. I have read the foregoing Petition for Peremptory Writ of Mandate and know its contents. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _19_ th day of August, 2013, at _Stockton_, California.

<u>DEAN ANDAL</u>

EXHIBIT A





RECEIVED

13 JUL 10 AM 11: 10

~~~~~~ OF VOTERS

DEPUTY

## CITY OF STOCKTON
### OFFICE OF THE CITY CLERK

**I, BONNIE PAIGE,** do hereby certify as follows:

I am the duly appointed, qualified City Clerk of the City of Stockton, a California municipal corporation; as such City Clerk, I am the custodian of the official records of the City Council of said City.  The attached Resolution is a full, true, and correct copy of Resolution No. 2013-07-09-1601 of said City Council, which was adopted by the City Council on July 9, 2013, on file in the City Clerk's office.

**IN WITNESS WHEREOF,** I have hereto affixed my hand and the seal of the City of Stockton on July 10, 2013.

**BONNIE PAIGE, CITY CLERK
CITY OF STOCKTON**

By: _____

Geoffrey S. Aspiras, Deputy City Clerk

Case 12-32118    Filed 08/20/13    Doc 1083



RECEIVED

13 JUL 10 AM 11: 10

REGISTRAR OF VOTERS

OFFICE

Resolution No. 2013-07-09-1601

# STOCKTON CITY COUNCIL

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF STOCKTON, CALIFORNIA, ORDERING THE SUBMISSION TO THE QUALIFIED ELECTORS OF THE CITY OF STOCKTON A CERTAIN MEASURE RELATING TO A PROPOSED ORDINANCE IMPOSING A 3/4 CENT TRANSACTION AND USE TAX FOR GENERAL PURPOSES, GIVING NOTICE, AND REQUESTING CONSOLIDATION OF A SPECIAL ELECTION TO BE HELD TUESDAY, NOVEMBER 5, 2013

WHEREAS, the City Council desires to hold a special municipal election on November 5, 2013 (the "Election"); and

WHEREAS, the City Council has submitted to the voters at the Election an ordinance imposing a general transactions and use tax (the "Ordinance"); and

WHEREAS, the Ordinance imposes a general tax, the revenues from which are to be placed in the general fund of the City and to be used for any lawful purpose of the City (the "Tax"); and

WHEREAS, the City Council desires to submit an advisory question to the voters regarding the use of proceeds of the Tax; and

WHEREAS, the City Council desires to submit its advisory question to the voters at the Election; now, therefore,

BE IT RESOLVED, BY THE CITY COUNCIL OF THE CITY OF STOCKTON, CALIFORNIA, AS FOLLOWS:

SECTION 1. Pursuant to Elections Code section 10210, there shall be and hereby is called a special election in the City of Stockton on Tuesday, the 5th day of November, 2013. The City Council hereby finds that a fiscal emergency exists in the City that necessitates placing the general tax proposal stated in Section 2 of this resolution on a special election ballot. The City's next general municipal election will not occur until November 2014 but the City has an urgent need for additional funding to provide adequate levels of law enforcement and other public services to protect public safety and to help resolve the City's bankruptcy. Accordingly, this resolution is adopted by a unanimous vote of the Councilmembers present to declare that emergency as required by Article XIII C, section (b) of the California Constitution.



SECTION 2. The City Council hereby orders the following question to be submitted to the voters at the special municipal election called for Tuesday, November 5, 2013:

| Law Enforcement, Crime Prevention, and Other Essential City Services Measure | | |
|---|---|---|
| To pay for law enforcement and crime prevention services such as those described in Stockton's Marshall Plan on Crime, to help end the bankruptcy and restore other City services; and provided it shall sunset in ten years or when economic recovery occurs, a Citizen's Oversight Committee reports on the use of proceeds, and independent audits are done annually; shall Ordinance ____ be adopted to impose a 3/4-cent transaction and use (sales) tax? | YES | |
| | NO | |

This question requires the approval of a majority of those casting votes and the Ordinance referenced therein is Ordinance No. _____ of the City, attached hereto as Exhibit 1.

SECTION 3. The City Council hereby orders the following question to be submitted to the voters at the advisory municipal election called for Tuesday, November 5, 2013:

| Advisory Vote Only | YES | |
|---|---|---|
| If Measure ____ is approved by the voters, shall (i) 65% of its proceeds be used only to pay for law enforcement and crime prevention services in the City such as those described in the City's Marshall Plan on Crime and (ii) 35% of its proceeds be used only to pay for the City's efforts to end the bankruptcy and for services to residents, businesses, and property owners? | NO | |

This question requires the approval of a majority of those casting votes. It is an advisory measure only. The City Clerk is hereby authorized to complete the blanks in the ballot label set forth above with the letter or number assigned to the measure proposed by Section 2 of this resolution.

SECTION 4. The City Attorney of the City of Stockton is hereby authorized and directed to prepare by July 26, 2013, an impartial analysis of the measure and the City Clerk is authorized, instructed, and directed to give further or additional notice of the election in time, form, and manner as required by law.

SECTION 5. The City Council hereby declares its intent to consolidate the Advisory Election with the Special District Election to be held on November 5, 2013, and requests that the San Joaquin County Board of Supervisors add this Ordinance to said ballot as set forth herein.



SECTION 6. The deadline for the filing of arguments for or against the measure shall be August 2, 2013, for direct arguments, and August 12, 2013, for rebuttal arguments.

SECTION 7. The City Council authorizes Councilmember Elbert Holman to oversee the drafting of a direct argument in favor of the Ordinance, and to oversee the drafting of a rebuttal to the direct argument against the Ordinance, and give preference and priority to such arguments pursuant to Elections Code section 9287(a); and delegates to Elbert Holman the selection of others to join him in signing such arguments.

SECTION 8. In all particulars not recited in this Resolution, the Election shall be held and conducted as provided by applicable law.

SECTION 9. Notice of the time and place of holding the Election is hereby given and the City Clerk is authorized, instructed, and directed to sign and publish notice as required by law.

SECTION 10. The City Manager is hereby authorized and directed to appropriate the necessary funds to pay for the City of Stockton's cost of placing the Measure on the election ballot and to execute any necessary agreements, including the agreement substantially in the form of Exhibit 2.

SECTION 11. The City Clerk is hereby authorized and directed to take all steps necessary to place the Measure on the ballot and to cause the Measure to be printed. A copy of the Measure shall be made available to any voter upon request.

SECTION 12. The City Clerk is directed to file a certified copy of this Resolution with the Board of Supervisors of San Joaquin County and the Registrar of Voters of San Joaquin County.

PASSED AND ADOPTED by the City Council of the City of Stockton, on July 9, 2013, by the following vote:

AYES: Councilmember Burgos, Councilmember Holman, Councilmember Miller
Councilmember Tubbs, Councilmember Zapien, Vice Mayor Canepa, Mayor Silva

NOES: 0

ABSENT: 0

ANTHONY SILVA, Mayor of
the City of Stockton

ATTEST:

BONNIE PAIGE, Clerk of
the City of Stockton



RECEIVED

13 JUL 10 AM 11: 10

Exhibit 1

ORDINANCE NO. 2013-07-09-1601

# AN ORDINANCE OF THE CITY OF STOCKTON ENACTING A GENERAL TRANSACTIONS AND USE TAX TO BE ADMINISTERED BY THE STATE BOARD OF EQUALIZATION, UPON ADOPTION BY THE VOTERS

The people of the City of Stockton do ordain as follows:

**Section 1.    Title.** This ordinance shall be known as the City of Stockton Transactions and Use Tax Ordinance.

**Section 2.    Definitions.** The following words and phrases shall be defined as set forth in this Ordinance, except that any term or phrase not defined in this Ordinance shall have the same meaning as that term or phrase is defined in the California Revenue and Taxation Code, Division 2, Parts 1.6 and 1.7:

A. "City" means the City of Stockton.

B. "Operative Date" means the first day of the first calendar quarter commencing more than 110 days after the adoption of this ordinance by vote of the electorate on November 5, 2013.

C. "Ordinance" means the City of Stockton Transactions and Use Tax Ordinance.

D. "State" means the State of California.

**Section 3.    Purpose.** This Ordinance is adopted to achieve the following among other purposes, and the Ordinance shall be interpreted liberally in order to accomplish all of its lawful purposes:

A. To impose a retail transactions and use tax to be applied throughout the entire territory of the City to the fullest extent permitted by law and in accordance with the provisions of Part 1.6 (commencing with section 7251) of Division 2 of the Revenue and Taxation Code and section 7285.9 of Part 1.7 of Division 2, which authorizes the City to adopt this Ordinance if a majority of the electors voting on the measure vote to approve the imposition of the tax at an election called for that purpose.

B. To adopt a retail transactions and use tax ordinance that incorporates provisions identical to those of the Sales and Use Tax Law of the State of California insofar as those provisions are not inconsistent with the requirements and limitations contained in Part 1.6 of Division 2 of the Revenue and Taxation Code.

1



C. To adopt a retail transactions and use tax ordinance that imposes a tax and provides a measure that can be administered and collected by the State Board of Equalization in a manner that adapts itself as fully as practicable to, and requires the least possible deviation from, the existing statutory and administrative procedures followed by the State Board of Equalization in administering and collecting the California State Sales and Use Taxes.

D. To adopt a retail transactions and use tax ordinance that can be administered in a manner that will be, to the greatest degree possible, consistent with the provisions of Part 1.6 of Division 2 of the Revenue and Taxation Code, minimize the cost of collecting the transactions and use taxes and, at the same time, minimize the burden of record keeping upon persons subject to taxation under the provisions of this Ordinance.

E. To provide transactions and use tax revenue to the City to be used for the general governmental purposes of the City, with any transactions and use tax revenue received being placed into the City's general fund.

**Section 4.    Contract with the State.** Prior to the Operative Date, the City shall contract with the State Board of Equalization to perform all functions incident to the administration and operation of this Ordinance; provided, that if the City shall not have contracted with the State Board of Equalization prior to the Operative Date, it shall nevertheless so contract and in such a case the Operative Date shall be the first day of the first calendar quarter following the execution of such a contract.

**Section 5.    Transactions Tax Rate.** For the privilege of selling tangible personal property at retail, a transactions tax is hereby imposed upon all retailers in the incorporated territory of the City at the rate of 0.75% of the gross receipts of any retailer from the sale of all tangible personal property sold at retail within the territory of the City on and after the Operative Date of this Ordinance.

**Section 6.    Place of Sale.** For the purposes of this Ordinance, all retail sales are consummated at the place of business of the retailer unless the tangible personal property sold is delivered by the retailer or his agent to an out-of-state destination or to a common carrier for delivery to an out-of-state destination. The gross receipts from such sales shall include delivery charges, when such charges are subject to the state sales and use tax, regardless of the place to which delivery is made. In the event a retailer has no permanent place of business in the State or has more than one place of business, the place or places at which the retail sales are consummated shall be determined under rules and regulations to be prescribed and adopted by the State Board of Equalization.

**Section 7.    Use Tax Rate.** An excise tax is hereby imposed on the storage, use or other consumption in the City of tangible personal property purchased from any retailer on and after the Operative Date of this Ordinance for storage, use or other consumption in the territory of the City at the rate of 0.75% of the sales price of the property. The

sales price shall include delivery charges when such charges are subject to State sales or use tax regardless of the place to which delivery is made.

**Section 8.    Adoption of Provisions of State Law.** Except as otherwise provided in this Ordinance, and except insofar as they are inconsistent with the provisions of Part 1.6 of Division 2 of the Revenue and Taxation Code, all of the provisions of Part 1 (commencing with section 6001) of Division 2 of the Revenue and Taxation Code are hereby adopted, incorporated, and made a part of this Ordinance as though fully set forth herein.

**Section 9.    Limitations on Adoption of State Law and Collection of Use Taxes.** In adopting the provisions of Part 1 of Division 2 of the Revenue and Taxation Code:

A.  Wherever the State is named or referred to as the taxing agency, the name of the City shall be substituted. However, this substitution shall not be made when:

1.  The word "State" is used as a part of the title of the State Controller, State Treasurer, State Board of Control, State Board of Equalization, State Treasury, or the Constitution of the State of California;

2.  The result of the substitution would require action to be taken by or against the City or any agency, officer, or employee thereof rather than by or against the State Board of Equalization, in performing the functions incident to the administration or operation of this Ordinance.

3.  In those sections, including, but not necessarily limited to, sections referring to the exterior boundaries of the State of California, where the result of the substitution would be to:

a.  Provide an exemption from the tax in this Ordinance with respect to certain sales, storage, use or other consumption of tangible personal property which would not otherwise be exempt from the tax while such sales, storage, use or other consumption remain subject to tax by the State under the provisions of Part 1 of Division 2 of the Revenue and Taxation Code; or

b.  Impose this tax with respect to certain sales, storage, use or other consumption of tangible personal property which would not be subject to tax by the State under the same provision of that code.

4.  In sections 6701, 6702 (except in the last sentence thereof), 6711, 6715, 6737, 6797 or 6828 of the Revenue and Taxation Code.

B.  The word "City" shall be substituted for the word "State" in the phrase "retailer engaged in business in this State" in section 6203 and in the definition of that phrase in section 6203.

**Section 10. Permit Not Required.** If a seller's permit has been issued to a retailer under section 6067 of the Revenue and Taxation Code, an additional transactor's permit shall not be required by this Ordinance.

**Section 11. Exemptions and Exclusions.**

A. There shall be excluded from the measure of the transactions tax and the use tax the amount of any sales tax or use tax imposed by the State or by any city, city and county, or county pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law or the amount of any state-administered transactions or use tax.

B. There are exempted from the computation of the amount of transactions tax the gross receipts from:

   1. Sales of tangible personal property, other than fuel or petroleum products, to operators of aircraft to be used or consumed principally outside the county in which the sale is made and directly and exclusively in the use of such aircraft as common carriers of persons or property under the authority of the laws of this State, the United States, or any foreign government;

   2. Sales of property to be used outside the City, which is shipped to a point outside the City pursuant to the contract of sale by delivery to such point by the retailer or his agent, or by delivery by the retailer to a carrier for shipment to a consignee at such point. For the purposes of this paragraph, delivery to a point outside the City shall be satisfied:

      a. With respect to vehicles (other than commercial vehicles) subject to registration pursuant to Chapter 1 (commencing with Section 4000) of Division 3 of the Vehicle Code, aircraft licensed in compliance with Section 21411 of the Public Utilities Code, and undocumented vessels registered under Division 3.5 (commencing with Section 9840) of the Vehicle Code by registration to an out-of-City address and by a declaration under penalty of perjury, signed by the buyer, stating that such address is, in fact, his or her principal place of residence; and

      b. With respect to commercial vehicles, by registration to a place of business out-of-City and declaration under penalty of perjury, signed by the buyer, that the vehicle will be operated from that address.



3. The sale of tangible personal property if the seller is obligated to furnish the property for a fixed price pursuant to a contract entered into prior to the Operative Date of this Ordinance.

4. A lease of tangible personal property which is a continuing sale of such property, for any period of time for which the lessor is obligated to lease the property for an amount fixed by the lease prior to the Operative Date of this Ordinance.

5. For the purposes of subparagraphs (3) and (4) of this section, the sale or lease of tangible personal property shall be deemed not to be obligated pursuant to a contract or lease for any period of time for which any party to the contract or lease has the unconditional right to terminate the contract or lease upon notice, whether or not such right is exercised.

C. There are exempted from the use tax imposed by this Ordinance, the storage, use or other consumption in this City of tangible personal property:

1. The gross receipts from the sale of which have been subject to a transactions tax under any state-administered transactions and use tax ordinance;

2. Other than fuel or petroleum products purchased by operators of aircraft and used or consumed by such operators directly and exclusively in the use of such aircraft as common carriers of persons or property for hire or compensation under a certificate of public convenience and necessity issued pursuant to the laws of this State, the United States, or any foreign government. This exemption is in addition to the exemptions provided in sections 6366 and 6366.1 of the Revenue and Taxation Code of the State of California;

3. If the purchaser is obligated to purchase the property for a fixed price pursuant to a contract entered into prior to the Operative Date of this Ordinance;

4. If the possession of, or the exercise of any right or power over, the tangible personal property arises under a lease which is a continuing purchase of such property for any period of time for which the lessee is obligated to lease the property for an amount fixed by a lease prior to the Operative Date of this Ordinance.

5. For the purposes of subparagraphs (3) and (4) of this section, storage, use, or other consumption, or possession of, or exercise of any right or power over, tangible personal property shall be deemed not to be obligated pursuant to a contract or lease for any period of time for which



any party to the contract or lease has the unconditional right to terminate the contract or lease upon notice, whether or not such right is exercised.

6. Except as provided in subparagraph (7), a retailer engaged in business in the City shall not be required to collect use tax from the purchaser of tangible personal property, unless the retailer ships or delivers the property into the City or participates within the City in making the sale of the property, including, but not limited to, soliciting or receiving the order, either directly or indirectly, at a place of business of the retailer in the City or through any representative, agent, canvasser, solicitor, subsidiary, or person in the City under the authority of the retailer.

7. "A retailer engaged in business in the City" shall also include any retailer of any of the following: vehicles subject to registration pursuant to Chapter 1 (commencing with Section 4000) of Division 3 of the Vehicle Code, aircraft licensed in compliance with Section 21411 of the Public Utilities Code, or undocumented vessels registered under Division 3.5 (commencing with Section 9840) of the Vehicle Code. That retailer shall be required to collect use tax from any purchaser who registers or licenses the vehicle, vessel, or aircraft at an address in the City.

D. Any person subject to use tax under this Ordinance may credit against that tax any transactions tax or reimbursement for transactions tax paid to a district imposing, or retailer liable for, a transactions tax pursuant to Part 1.6 of Division 2 of the Revenue and Taxation Code with respect to the sale to the person of the property the storage, use or other consumption of which is subject to the use tax.

**Section 12. Amendments.** All amendments subsequent to the Effective Date of this Ordinance to Part 1 of Division 2 of the Revenue and Taxation Code relating to sales and use taxes and which are not inconsistent with Part 1.6 and Part 1.7 of Division 2 of the Revenue and Taxation Code, and all amendments to Part 1.6 and Part 1.7 of Division 2 of the Revenue and Taxation Code, shall automatically become adopted and part of this Ordinance; provided, however, that no such amendment shall operate so as to affect the rate of tax imposed by this Ordinance. The City Council or the City's voters may amend this Ordinance to comply with applicable law or as may be otherwise necessary to further the Ordinance's stated purposes. However, as required by Article XIII C of the California Constitution, no amendment to this Ordinance may increase the rates of the taxes authorized by this Ordinance unless such amendment is submitted to and approved by the voters.

**Section 13. Prohibition on Enjoining Collection.** No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action or proceeding in any court against the State or the City, or against any officer of the State or the City, to prevent or enjoin the collection under this Ordinance, or Part 1.6 of Division 2 of the Revenue and Taxation Code, of any tax or any amount of tax required to be collected under this Ordinance.



**Section 14. Severability.** If any provision of this Ordinance or the application thereof to any person or circumstance is held invalid, the remainder of the Ordinance and the application of such provision to other persons or circumstances shall not be affected thereby.

**Section 15. Effective Date.** This Ordinance relates to the levying and collecting of City transactions and use taxes and shall take effect immediately. However, no tax imposed by this Ordinance shall be effective unless that tax has been approved by the voters of the City as required by section 2(b) of Article XIII C of the California Constitution and applicable law.

**Section 16. Precedence over Other Provisions in the Municipal Code.** Any provision of the Stockton Municipal Code or appendices thereto inconsistent with the provisions of this Ordinance, to the extent of such inconsistency and no further, is hereby repealed or modified to the extent necessary to effect the provisions of this Ordinance.

**Section 17. Sunset of Tax.** (a) The taxes imposed by this Ordinance shall remain effective until the soonest to occur of the following: (i) the City Council repeals, or the voters repeal, this Ordinance; (ii) the City Council determines that the City has experienced economic recovery as defined in Section 18 of this ordinance, or (iii) ten (10) years from the date the taxes imposed by this Ordinance are first collected. However, the voters hereby authorize the Council to extend the sunset of the taxes pursuant to paragraph (b) of this Section 17.

(b)     The City Council may extend the sunset of the taxes imposed by this Ordinance as follows. The Council shall hold two publicly noticed meetings at least 14 days apart and shall adopt findings based on evidence before it that: (i) the revenues provided by the taxes imposed by this Ordinance continue to be necessary to accomplish the purposes stated in Section 21 of this Ordinance and (ii) the total compensation paid to City employees is not excessive when compared to those of other similarly situated public-sector employers.

**Section 18. Economic Recovery Review.** Peak revenues to the City's general fund occurred in fiscal year 2008–2009, when the City received approximately $203,101,529 in such revenues. In the event the City, during any fiscal year in which this Ordinance is in effect, receives general fund (excluding amounts of such revenues transferred by the City to San Joaquin County pursuant to any tax sharing agreement, and excluding revenues under this Ordinance) in excess of the peak amount reached in fiscal year 2008–2009 adjusted for inflation from July 1, 2008 to the date of measurement using an average of the Consumer Price Indices for All Urban Consumers (1982-84=100) (CPI-U) for (i) U.S. City Average; (ii) San Francisco-Oakland-San Jose; and (iii) Western Urban, then the City Council shall hold a noticed public hearing to consider whether to reduce or eliminate the tax imposed by this Ordinance.



**Section 19. Citizen Oversight.** The City Council shall appoint a seven-member Citizens' Advisory Committee, which shall meet at least annually to review the expenditure of revenues generated by the tax imposed by this Ordinance and to make recommendations to the City Council regarding those expenditures. The minutes of Citizens' Advisory Committee meetings shall be provided to the City Council and placed on the next available regular Council meeting agenda thereafter.   The Citizens' Advisory Committee shall also review progress toward peak general fund revenues as described in section 18 of this Ordinance and any findings made by the City Council under that section or section 17, subdivision (b).

**Section 20. Audit and Review.** The proceeds of the tax imposed by this Ordinance, as well as the expenditure thereof, shall be audited annually by an independent accounting firm. The City Council shall discuss the results of such audit at a meeting of the City Council that is open to the public. The report of such audit shall be posted on the City's website.

**Section 21. Declaration.** The proceeds of the taxes imposed by this Ordinance may be used for any lawful purpose of the City, as authorized by ordinance, resolution or action of the City Council. These taxes are not special taxes within the meaning of section 1, subdivision (d) of Article XIII C of the California Constitution, but are general taxes imposed for general governmental purposes.

**Section 22. Execution.** The Mayor shall sign and the City Clerk shall attest to the passage of this Ordinance upon certification by the City Council of the results of the election approving this Ordinance.

PASSED AND ADOPTED by the City Council of the City of Stockton, on July 9, 2013, by the following vote:

AYES: Councilmember Burgos, Councilmember Holman, Councilmember Miller
Councilmember Tubbs, Councilmember Zapien, Vice Mayor Canepa, Mayor Silva

NOES: 0

ABSENT: 0

ANTHONY SILVA, Mayor of
the City of Stockton

ATTEST:

BONNIE PAIGE, Clerk of
the City of Stockton

8



I hereby certify that this Ordinance was APPROVED by the voters of the City of Stockton, State of California, at a general election held on November 5, 2013, and by the City Council of the City of Stockton at a regular meeting of the Council held on _____ _____, 2013.


_____
ANTHONY SILVA, Mayor of
the City of Stockton


ATTEST:


_____
BONNIE PAIGE, Clerk of
the City of Stockton

DRAFT

EXHIBIT B





# CITY OF STOCKTON
## OFFICE OF THE CITY CLERK

RECEIVED
13 JUL 10 AM 11:10
REGISTRAR OF VOTERS

July 10, 2013

Austin Erdman
Registrar of Voters
San Joaquin County Registrar's Office
44 North San Joaquin Street
Stockton, CA 95202

**TRANSMITTAL OF CERTIFIED CITY COUNCIL RESOLUTION AND ORDINANCE FOR CITY-INITIATED MEASURE TO BE PLACED ON THE BALLOT, SPECIAL ELECTION 2013**

Enclosed is a certified resolution No. 2013-07-09-1601 and Ordinance 2013-07-09-1601, for the City-Initiated Measure "Law Enforcement, Crime Prevention, and Other Essential City Services Measure," to be submitted to the qualified voters at the special election of November 5, 2013. The measure relates to a proposed ordinance imposing a ¾ cent transaction and use tax for general purposes, giving notice, and requesting consolidation of a special election to be held Tuesday, November 5, 2013.

Should you have any questions regarding this matter, please call me at 937-7121 or Assistant City Clerk Bret Hunter at 937-7123.

*Bonnie Paige*

BONNIE PAIGE
CITY CLERK

Enclosures (2)



BEFORE THE BOARD OF SUPERVISORS OF
THE COUNTY OF SAN JOAQUIN
STATE OF CALIFORNIA

R-13 _____

CONSOLIDATION OF SPECIAL ELECTION FOR THE CITY OF STOCKTON
WITH THE UNIFORM DISTRICT ELECTION ON NOVEMBER 5, 2013

WHEREAS, on July 9, 2013, the City Council of the City of Stockton adopted

Resolution No. 2013-07-09-1601, calling for a special municipal election for the purpose of

submitting on the ballot, to the qualified electors of the City of Stockton, the following measures:

**Measure A:**

Law Enforcement, Crime Prevention, and

Other Essential City Services Measure

To pay for law enforcement and crime prevention services such as

those described in Stockton's Marshall Plan on Crime, to help end the

bankruptcy and restore other City services; and provided it shall sunset

in ten years or when economic recovery occurs, a Citizen's Oversight

Committee reports on the use of proceeds, and independent audits are

done annually; shall Ordinance 2013-07-09-1601 be adopted to impose

a 3/4-cent transaction and use (sales) tax?

Yes _____          No _____

DRAFT

**Measure B:**

Advisory Vote Only

If Measure A is approved by the voters, shall (i) 65% of its proceeds be used only to pay for law enforcement and crime prevention services in the City such as those described in the City's Marshall Plan on Crime and (ii) 35% of its proceeds be used only to pay for the City's efforts to end the bankruptcy and for services to residents, businesses, and property owners?

Yes _____          No _____

WHEREAS, the Members of the City Council of the City of Stockton have requested that said election be consolidated with the Uniform District Election to be held on Tuesday, November 5, 2013.

WHEREAS, the City of Stockton has agreed to reimburse the County for any additional cost associated with placing the proposed measures on the election ballot.

NOW, THEREFORE, BE IT RESOLVED that the Board of Supervisors does hereby authorize and direct the Registrar of Voters to consolidate and conduct the special municipal election for the City of Stockton with the Uniform District Election to be held on November 5, 2013.



PASSED AND ADOPTED this 23rd day of July 2013, by the following vote of the

Board of Supervisors, to wit:


AYES:

NOES:

ABSENT:


_____
Ken Vogel, Chairman
Board of Supervisors
County of San Joaquin
State of California


ATTEST:  Mimi Duzenski
Clerk of the Board of Supervisors
of the County of San Joaquin
State of California


By: _____ (seal)
             Clerk


REVIEWED BY:

DAVID WOOTEN
County Counsel

Distribution:

COB:              Original
ROV:                 2


By: _____
      Jason R. Morrish
      Deputy County Counsel



EXHIBIT C



**NEW BUSINESS**

◆◆◆

AGENDA ITEM 15.02





# City of Stockton

## Legislation Text

File #: 13-0549, Version: 1

## FUNDING PROPOSAL FOR STOCKTON'S MARSHALL PLAN ON CRIME AND RECOVERY FROM BANKRUPTCY

### RECOMMENDATION

Schedule a noticed public hearing and consideration of a tax measure on July 9, 2013, for placement before the voters at the regularly scheduled election of November 5, 2013. On July 9 it will be recommended that the Council adopt a Resolution declaring a fiscal emergency; calling for the election and approving an Ordinance establishing the specificity for a ¾ cent sales tax to be considered by the voters.

### Summary

This report presents a recommendation to place a tax measure before the voters on November 5, 2013. Its purpose will be twofold. First, it will provide the necessary general fund resources to fund the City's comprehensive Marshall Plan on Crime. Second, it will provide the necessary resources to put the general fund back into a solvent position and fund the City's bankruptcy exit plan. While six of you directed me to come back with this funding plan, explained later in this report such action will require a unanimous vote of the Councilmembers present to hear the item.

As you know, bankruptcy was a necessary action to maintain health and safety services to our community. It was a necessary but interim condition for the City to develop an ultimate recovery plan. In addition to emerging from bankruptcy and becoming solvent again, the City must restore services and, most importantly, invest in the Marshall Plan on Crime. In order to meet these objectives the City needs additional tax revenues. It is important to note that while the tax measure will result in significant new revenues, it will not get the City back, revenue-wise, to where it was before the Great Recession (which was nothing short of a disaster for Stockton), nor provide the means to restore all service reductions. Moreover, even with all the restructuring savings the City is seeking and can obtain only under Chapter 9, the general fund will fall an average of $11 million short each year from being balanced just at its current level of inadequate public services. This leaves no resources to pay for the Marshall Plan, and leaves the City stuck in a service insolvent position. This is not a feasible option if the City is to achieve a sustainable budget that pays for adequate public services.

The only way to balance the general fund budget sustainably over time, restore adequate reserves, and improve public safety in the community, is to seek voter approval of additional tax revenue. The City has polled likely voters and determined that a 0.75% local sales tax, if structured so that the City could pay for improved safety services, has a good chance of garnering the needed majority vote for



a general tax measure. A unanimous vote of the members of the Council present on July 9, the date of the public hearing, is required to declare a fiscal emergency that allows such a tax on the November 5, 2013 ballot. Given the critical need to improve public safety funding, the lag time before tax proceeds come in and the lengthy process to fully implement the Marshall Plan, the City needs to pursue this tax in November, rather than wait until 2014. While the City has not concluded its bankruptcy proceeding, and may not have done so by the November 5 election, we have been declared eligible for Chapter 9 protection, and we will have a bankruptcy exit plan (Plan of Adjustment) before the judge by the election. The judge has made various rulings that minimize our concerns about voter approval of a tax before exiting bankruptcy. Furthermore, even if we received the judge's approval of a Plan of Adjustment, it would be contingent upon a voter approval of additional revenues, given the insolvent nature of the general fund from a cash and service delivery standpoint. Given the time constraints for a November ballot, the City must take action now.

*The "old" City of Stockton*

Prior to beginning the road to Chapter 9 protection, staff felt and the Council concurred, the City was not in a supportable position to ask voters for additional tax revenues. At that time, we had: (1) compensation that was above the labor market average; (2) a retiree medical insurance program that would require setting aside 30% of payroll for the next 30 years to fund; (3) outstanding lawsuits with two labor groups over past compensation impositions; (4) a growing debt burden; and, (5) no realistic potential to restore services. Any new taxes would have been consumed by the above factors. Professional polling supported the City assertions that voters would not approve new taxes without restoring services.

*The "new" City of Stockton*

However, we now have new labor agreements that have radically reduced compensation to a level that is below the labor market average for similar public agencies. We have resolved any outstanding lawsuits with the two labor groups. We have agreements with labor and retirees that will lead to the complete elimination of retiree medical insurance. The general fund's annual budget is $40 million lighter due to these reforms. We are in the process of restructuring our debt burden. We now have an omnibus plan for restoring public safety services via the Marshall Plan on Crime. We have a new management team implementing "best practices" throughout the organization. In other words, we now have something to offer the voters. We have a reformed City organization with a comprehensive plan to restore public safety services.

The recommended action will give voters a chance to restore the revenues necessary to operate the City effectively. Management and policy changes made since the disaster will allow the City to operate efficiently. There are alternatives, of course, and they are presented here. The primary alternative approach would be more service reductions and expense cutting, but I do not believe this is consistent with a viable municipality. It should be noted the suggestion that the City somehow pull out of CalPERS to solve our problems is just a variation on this theme. Losing retirement benefits that are the standard statewide would, as the prevailing evidence showed in the bankruptcy eligibility


proceedings, result in a mass exodus of employees, leaving the City unable to staff at the numbers and quality needed to sustain critical public services. Cancelling the CalPERS contract would also saddle the City with a $946 million termination payment obligation to pay for accrued liability, which the City has no ability to fund. We would have a crippled organization with a mass employee exodus and no potential for hiring replacements. We would also gain a new "battle front" with another creditor that will consume time and resources, but to what ends? We would have to replace CalPERS with a market competitive pension plan. Instead, we need to continue advocating for CalPERS reform in Sacramento.

Finally, there is the nature of the tax proposal itself. While it is currently being drafted, some basic concepts I heard from Council members and the public include: (1) it should be a general tax to address the two goals of exiting bankruptcy and the Marshall Plan; (2) if "good times" come back, there should be some measures to reduce the likelihood of monies being "wasted" on new risky adventures or excessive employee compensation; and (3) the vast majority of the new tax proceeds should be spent on restoring public safety services. I look forward to any further goals from the Mayor or Council before the City Attorney and I submit ballot measure language for the July 9th City Council agenda.

## BACKGROUND

### Budget Impacts

Given Stockton's heavily leveraged position, the Great Recession was nothing short of a fiscal disaster for the City. General fund revenues plunged from about $203 million to $166.5 million in one year and kept falling with a projected low of $156.8 million as of your Quarter 2 Budget Report. This revenue implosion coincided with growing costs for debt service, retiree medical coverage and compensation and benefits for employees. The City initially drew down any and all reserves, followed by deep cuts to services and reductions in any discretionary cost categories. Eventually the City was forced to declare a fiscal emergency and unilaterally implement employee compensation and benefit cuts. When these efforts all proved insufficient the City was forced to enter the AB506 mediation process and finally bankruptcy in order to address debt, labor and retiree medical cost obligations.

In other words, the City of Stockton was and remains service insolvent, meaning it is unable to pay all costs of providing services at the level and quality required for community health, safety and welfare. The budgets for fiscal years 2008-09, 2009-10 and 2010-11 combined to implement $52 million in labor compensation reductions and $38 million in staffing and service level reductions, for a total of $90 million in cuts, equivalent to a 36% reduction in the general fund budget.

Employee compensation was reduced to levels that surveys now show to be below the labor market. Depending on the labor group, compensation was cut between 12% and 34%, including the following impacts:

- Furloughs since 2008

City of Stockton    Page 3 of 19    Printed on 6/19/2013
powered by Legistar™
379

File #: 13-0549, Version: 1

- Salary COLAs eliminated beginning in 2008
- Employees paying their own employee retirement contribution of 7-9% of salary
- Medical plan design changes resulting in higher deductibles and co-pays, with a cap on City contribution
- Add-pays, deferred compensation, longevity, education, uniform allowances either eliminated or reduced
- Reduction in leave accruals and change in sick/vacation leave cash outs at retirement

Staffing level reductions resulted in the following general fund position cuts:

- Sworn police officers down 25% (-98 FTE)
- Non-sworn police staffing down 20% (-47 FTE)
- Fire staffing down 30% (-76 FTE)
- Non-safety staffing down 43% (-203 FTE)

In addition to 424 total general fund position cuts (31% of total), a net reduction of 42 positions in all other funds resulted in a loss of 466 positions for all funds, or 25% of the entire City workforce. Back when the budget cuts began in FY 2008-09, about 69% of general fund expenditures were allocated to labor costs, and most labor costs (86%) were for public safety. As a result, Stockton has been unable to avoid making reductions in police and fire services, despite the fact that the City ranks low in median income and high in total crime rate. The following factors highlight why the impact of these public safety reductions is more critical in Stockton than in most other California cities.

Police Service Impacts:    Low staffing levels have had the following significant impacts on safety for the community:

- Activation of a "condition blue" during times of peak activity where residents must use on-line or telephone reporting and depending on the type of report, the department may only respond to crimes-in-progress.
- Elimination of the School Resource Officer Program which puts the burden on school districts to provide funding for a law enforcement presence on campus. This has contributed to a rise in juvenile crime and gang membership.
- Reduction in gang and drug focused missions to only those funded with grants or outside agencies. Gang-related homicides have increased 525% in three years
- Elimination of the Narcotics Enforcement Team resulted in an increase of drug trafficking within the City and also reduces the funds received through disposition of asset forfeiture

proceeds. These proceeds are used to fund capital equipment and other one-time needs such as tactical gear, weapons and protective equipment critical to equipping sworn staff.

- Significant cutbacks to Proactive Policing Strategy have erased all progress made in the mid-2000s, returning the city to the high crime rates and overwhelming perception that the city is no longer a safe place to live, work or raise a family. A limited Proactive Policing Strategy is employed only on a case-by-case basis. However, there is a complete inability to sustain any efforts after a major mission. The officers are simply too busy responding to calls and cannot get out of their cars to interact with the community as part of any community policing effort. The detectives group has been greatly reduced, thus triaging what crimes they do investigate.

- Reduction of Community Service Officers has severely limited the ability of the Police Department to attend community meetings and respond to non-emergency accidents and calls for service including traffic control and parking enforcement (which has also reduced traffic violation revenue).

Fire Service Impacts:   Sworn staffing has been reduced from 225 total sworn positions at the beginning of FY 2010-11 to the current level of 181 for a total reduction of 44 positions, a reduction of nearly 32% in the past 24 months. Staffing on each piece of equipment has been reduced by one person per company, with truck companies currently staffed at four persons, and engine companies staffed with three personnel. In addition, one fire station and one engine company have closed due to the reduced staffing plan. These reductions have had the following major service impacts on the community:

- Reduction in the number of trucks assigned in the northern half of the City, which increases the response time for a second truck company, when required, on all structure fires.

- Increase in response times for engines located outside of the Fire Station One area by 1-3 minutes on average and an average increase in 5 to 7 minutes to residents and businesses within in the Fire Station One area.

Exacerbating these impacts are the following workload demands:

- The Fire Department responded to more than twice the number of fire calls of Fresno, Sacramento, or Oakland, each of which have 50,000-150,000 more in total population served and have more than twice the on-duty staffing.

- The Fire Department responded to 483 working structure fires in 2011, compared to 599 in the City of Fresno, 273 in the City of Oakland and 444 in the City of Sacramento. The City of Stockton has fewer than half the fire sworn staffing of the Cities of Fresno, Oakland, and Sacramento.

- AMR (the paramedic service provider in Stockton) exceeded its maximum emergency response time every 4 hours in the City of Stockton, compared to exceeding that response time criteria only every 70 plus hours in the cities of Lodi and Tracy.

City of Stockton                    Page 5 of 19                    Printed on 6/19/2013
powered by Legistar™
381

Public Infrastructure and City Facility Impacts:    The City has been unable to dedicate sufficient dollars of regular and periodic maintenance of the city's public infrastructure or facilities for many years.  The general fund contributed just $575,000 in FY 2012-13 to capital improvements, with no funding programmed in the FY 2012-17 Capital Improvement Program for the succeeding four years of the proposed five-year program.  While not a complete list, the following illustrates the magnitude of the deferred maintenance and capital investment:

- *Vehicles*:  The replacement backlog is $8.5 million, with 172 units past their useful life.

- *Trees:*  About $3.1 million is needed to bring the urban forest up to an acceptable standard, with an additional $3.5 million is needed annually to provide proper maintenance.

- *Roadways*: Approximately $10 million per year is needed to maintain the City's roadways in their current condition; the City's current street maintenance program allocates only $2 million per year.  The current condition can be quantified using a Pavement Condition Index (PCI) which provides an overall rating between 0 and 100 of the entire pavement in a community.  The current PCI for Stockton is 66, which, while in the middle of the fair range, will degrade 2 to 3 points per year. If the network is allowed to deteriorate, repairs become more expensive as cost effective maintenance strategies are no longer feasible.

- *Parks:*  About $12 million would be required to bring play areas, park furnishings, irrigation systems, buildings, courts, ball fields, and flatwork up to a standard level, able to be maintained in the future.

- *City Facilities*:  The proposed program to provide critically needed improvements to City Hall includes $7 million to replace the roof, replace the HVAC system, and update interior finishes.  For a complete renovation, the cost is likely double that amount ($14 million).  Other City facilities would require at least $6 million to catch up on maintenance, not including about $7 million for roof repair alone.

Library Service Impacts:    A reduction in the Stockton-San Joaquin County Public Library system-wide operating hours by 28% and staffing levels by 50%.  Customer services and literacy programs in the libraries have been reduced and there are fewer books and library materials available to the public, as well as long wait times for materials that are available.  Specific reductions in library services include:

- Reduction of open hours by 48% and 11% in City and County branches, respectively.

- Reduction of Mobile Library hours by 60%.

- Reduction in books and materials by 50% over the last six years, which severely impacts the ability to acquire new format materials, e.g., digital books.

- Suspension of Homework Center Grants offered to elementary and middle school students

File #: 13-0549, Version: 1

with low grade point averages and limited opportunities which put them at educational risk.

Community Program Service Impacts:     As a result of the elimination of 15 full-time positions and an 80% reduction in part-time hours, Recreation programs have experienced significant service reductions including:

- Partial Closure of the McKinley Community Center in 2009. Most of the recreation programs were moved to other community centers, so residents have to travel further to participate in these recreation opportunities.

- Reduction in operating hours at all other community centers of 20%.

- Fewer recreational classes.

- Decrease in operational hours at the Children's Museum, Pixie Woods amusement park, and Oak Park Senior Center.

- Consolidation of After School Program (ASP) sites resulting in reduced programs for at-risk youth.

Internal Support Needs:     What is invisible to most citizens is the degradation of programs necessary to support all services, including public safety.

- The internal self-insurance funds were gradually drained of their resources to the point our workers compensation fund has a negative $43 million fund balance. Our liability fund has a negative $5 million fund balance.

- Our technology systems have not been replaced in a timely fashion. For example, our financial system is 21 years old, with an estimated replacement cost of $10 million.

This level of cuts, while unheard of among California cities, was still not enough to avoid insolvency. To be truly sustainable, many of these prior cuts will have to be reinstated at some point. As emphasized in its AB506 restructuring proposal, the City must remain viable as a municipality by achieving a sustainable fiscal position and regain service solvency. Chapter 9 was the only possible option for creating a viable foundation to meet these goals. However, while the restructuring savings achievable only under Chapter 9 are vitally necessary, they are insufficient, even with all of the prior City budget cuts, to resolve the City's financial woes, without additional resources.

Bankruptcy Process

The City has experienced massive budget deficits for the past several years, owing to the economic collapse of the Central Valley economy during the Great Recession, an excessive debt burden amassed by the City since 2003, the granting of unsustainable labor contracts and retiree medical benefits, past financial miscalculations and the elimination by the state of redevelopment agencies. Even after implementing $90 million of extraordinary service reductions, privatization measures and

huge employee compensation reductions, the FY 2012-13 Budget faced a shortfall of $26 million.

In February 2012 the City implemented budget corrections to retain a balanced budget through June 30, and started the AB506 mediation process in an effort to avoid bankruptcy. During the AB506 process some participants worked very hard to understand the City's financial status and many tried to reach agreements that would improve the City's unsustainable financial position. The City was required by its Charter and by state law to adopt a balanced budget by June 30, and so on June 26, 2012 the City closed its remaining deficit by approving the 2012-13 Pendency Plan. The Pendency Plan suspended debt payments, phased out all retiree medical benefits over one year, continued reductions of pay and benefits imposed under previous Declarations of Fiscal Emergency and reduced compensation components that exceeded those in the City's labor market to close the $26 million gap.

The City's eligibility for bankruptcy was immediately challenged by a consortium of financial debt creditors consisting of Assured Guaranty, National Public Finance Guaranty and Franklin Funds, collectively known as the Capital Markets Creditors. While the eligibility issue was being litigated, the City's bankruptcy Judge, the Honorable Christopher Klein, ordered the City to mediate obligations in dispute and appointed Judge Elizabeth Perris to act as our Mediation Judge.

In mediation with Judge Perris, the hard work and good faith efforts of the City's labor team and labor groups begun in AB506 continued, resulting in six amended labor agreements by July 24, 2012. Another two agreements with labor were reached on August 28, 2012. Those agreements resulted in waiving claims to prior imposed pay and benefit reductions, achieving approximately 85% of the original AB506 ask with respect to future savings, and avoided further litigation costs between the labor groups and the City.

In March 2013 the City was able to negotiate a tentative agreement with Ambac relating to the 2003 Certificates of Participation debt obligation. This agreement was finalized in April 2013.

As mentioned above, the Capital Markets Creditors challenged the City's eligibility for bankruptcy, which consumed months of effort. This legal process culminated in Judge Klein's ruling on April 1, 2013 granting Stockton access to bankruptcy protection, in which he ruled that Stockton officials and financial experts had demonstrated the City was indeed insolvent on June 28, 2012, that it needed the muscle of Chapter 9 to maintain its viability and that the City had acted in good faith. Through this bankruptcy case the judge has made another important decision. He confirmed that the judiciary cannot tell the City Council how to run itself and spend its money. We believe this is an important decision that greatly reduces the risk of seeking more tax revenues before the judge actually rules on a bankruptcy Plan of Adjustment. Since then the City has continued to be engaged in mediation efforts with retirees, bond creditors and other claimants.

In June 2013 the City was able to reach a tentative agreement with one of the largest creditors in the bankruptcy, the Association of Retired Employees of the City of Stockton (approximately 1,100 retired individuals who had been promised lifetime medical insurance coverage at no cost for the



retiree and a spouse). This agreement should be finalized in July 2013.

We also have a tentative agreement with the Marina Towers group.

We have continued to mediate with the remaining creditors which consist of

- The Capital Markets Creditors (Assured, NPFG and Franklin), which have five secured and one unsecured debt obligation between them

- Sports teams (the Stockton Thunder and Ports), which are both subsidized by the City

- Two legal settlements known as the Price and Jarvis matters

- The State of California Department of Boating and Waterways relative to loan funding for the Stockton Marina

Our schedule calls for submittal of a plan of adjustment in the third Quarter of 2013 which will set the stage for a final resolution via a litigated confirmation process. Once the plan is approved it becomes the basis for exiting bankruptcy. However, I do not think Stockton's recovery of much needed services should be held hostage to an unknown court schedule and creditor actions.

Bankruptcy presents a special challenge in the context of voter consideration of a new general tax measure. It introduces some uncertainty but because of the previously mentioned judge's decision we think it is a manageable risk. As I said earlier, neither the Court nor the creditors override the discretion of the elected City Council to determine the requirements for the municipal corporation and to make decisions about the allocation of the resources available. Stockton has been completely honest and transparent about the need to obtain additional general fund revenues for the purposes of addressing the critical public safety needs which exist and addressing the other critical needs of the City.  We have shared this fact with creditors.

In addition, such revenues are necessary to allow the City to meet the requirements of the restructuring proposals which have been made in the AB506 process and bankruptcy mediation. Any plan of adjustment approved by the judge will be contingent on voter approval, anyways.  Thus, voter approval of more resources makes for a stronger plan from the City.  The Court has rebuffed efforts by the creditors to submit alternative spending proposals which are implicitly anchored in alternative public policy determinations, in order to substitute them for the considered determinations actually made by the elected City Council. Our proposal to submit a general tax measure for consideration is shaped by the fact that such a tax best meets the needs of the City and its citizens, and the settled law under Chapter 9.  The City retains its ability to make the determinations about resource allocation which are fundamental to elected representative governance.



DEVELOPMENT OF MARSHALL PLAN TO IMPROVE PUBLIC SAFETY

In April 2012 the City initiated development of a Marshall Plan to reduce homicides and violence. This is a multi-generational chronic problem that has only gotten worse with a hard economy and reduced police staffing levels, as illustrated by the following points:

- The City of Stockton has the second highest total crime rate per capita for any city with a population of 100,000 or greater in California.

- While violent crime rates dropped 5.5% nationwide in 2010, they were up in Stockton, which ranked 10th in the entire U.S. with 13.81 violent crimes per 1,000 residents.

- Despite this high service demand, budget cuts have reduced sworn police staffing from 1.52 per 1,000 residents in 2005 to 1.17 currently (before addition of 17 grant-funded positions), which is the lowest ratio for cities over 250,000 population, notwithstanding our high crime rate.

- The City has a lower level of sworn police staffing than has been recommended by industry standards or which is observed in other similar service settings. The 2006 Braga study recommended sworn officer staffing levels at 2.0 per 1,000 residents, which even with the pending addition of 17 grant-funded officers, would require the addition of 240 police officers at a total annual cost (including equipment and support costs) of $50 million when fully implemented in FY 2020-21.

As the Marshall Plan report endorsed by the City Council stated, violence is a learned and contagious behavior perpetrated by a relatively small number of individuals. There is no single solution to violence, and the Marshall Plan has engaged key stakeholders in the community and criminal justice system to develop workable strategies. This will require a significant financial commitment by the City in excess of $20 million annually.

With five of the six City Council Town Hall Meetings concluded, the feedback has been cautiously supportive. The most common concern revolves around past Council decisions in the areas of employee compensation, retiree health and new business ventures (debt and operating subsidies). Other feedback on the Marshall Plan was consistent with what you heard at your Council meeting, e.g. we need additional employment opportunities and can we really impact the balance of the criminal justice system. On the topic of mistrust due to previous decisions, I will be submitting a tax proposal on July 9 that responds to these concerns.

Table 1 shows the projected cost by major element of the Marshall Plan, including additional sworn officers added over a three-year period, and staffing level relative to population. Officer costs include supervisory positions needed for an expanded force, vehicles, equipment and overtime. Salaries and benefits include projected future cost increases. Support positions include additional crime analysts and records assistants needed to service the increased number of officers and a small Office of Violence Reduction, whose sole focus will be to ensure the sustainability of the Marshall Plan goals. Operation Ceasefire (currently grant-funded) would be continued and Operation Peacekeepers would

Case 12-32118   Filed 08/20/13   Doc 1083



be expanded.  Neighborhood improvement programs include expanded code enforcement and neighborhood "blitz" teams.

Table 1

**Projected Marshall Plan Cost Over General Fund Forecast**

| ($ in Millions) | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 |
|---|---|---|---|---|---|---|---|---|---|---|
| New Officers | - | - | - | 40 | 40 | 40 | - | - | - | - |
| Total Sworn FTE | 345 | 362 | 362 | 402 | 442 | 482 | 482 | 482 | 482 | 482 |
| Est City Pop (000) | 295.0 | 296.5 | 297.9 | 299.4 | 300.9 | 302.4 | 303.9 | 305.5 | 307.0 | 308.5 |
| Sworn FTE/1000 Pop | 1.17 | 1.22 | 1.22 | 1.34 | 1.47 | 1.59 | 1.59 | 1.58 | 1.57 | 1.56 |
| Costs: | | | | | | | | | | |
| New Officers | - | - | - | $6.64 | $12.72 | $19.37 | $19.98 | $21.51 | $23.10 | $24.44 |
| Support Staff | - | - | - | 0.52 | 0.60 | 0.75 | 0.76 | 0.78 | 0.79 | 0.81 |
| Violence Reduction Offi | - | - | - | 0.25 | 0.26 | 0.26 | 0.27 | 0.27 | 0.28 | 0.28 |
| Ceasefire/Peacekeepers | - | - | - | 0.61 | 0.63 | 0.64 | 0.65 | 0.66 | 0.68 | 0.69 |
| Neighborhood Imprvmt | - | - | - | 1.31 | 0.71 | 0.52 | 0.53 | 0.54 | 0.55 | 0.56 |
| Total Cost | - | - | - | 9.33 | 14.91 | 21.53 | 22.18 | 23.76 | 25.40 | 26.78 |

## TRANSACTIONS AND USE TAX TO FUND THE MARSHALL PLAN AND OTHER CRITICAL NEEDS

In fall 2012 the City polled likely voters to assess attitudes toward a potential ballot measure to enact an additional local sales tax rate.  In January 2013, Mayor Silva proposed a special tax initiative devoted to public safety.  On April 2 the City Council discussed that proposal and concerns about harming our bankruptcy efforts and exacerbating the general fund's financial condition.  The Council directed me to facilitate town hall meetings on the Marshall Plan and return with a funding proposal for it. Following discussions with business leaders the City was urged to bring forward a general tax proposal that would both balance the general fund budget and fund the Marshall Plan for improved public safety, which will be the measure before you on July 9.

A local sales tax, technically known as a transactions and use tax, requires voter approval.  Normally, a general tax requiring majority voter approval must appear on a municipal ballot along with council elections.  The next Stockton municipal ballot does not occur until June 2014, which is too long to wait given the City's dire financial condition and the need to begin recovery. However, pursuant to Section 2(b) of Article XIIIC of the California Constitution, the City Council may, upon declaration of a fiscal emergency by a unanimous vote of the members of the Council present at the public hearing, submit the proposed transactions and use tax as a special election, in this case consolidating it with the county's uniform district election of November 5, 2013.



DRAFT

File #: 13-0549, Version: 1

As shown by the magnitude of the budget cuts already enacted, the City is not in a position to absorb any more cuts. The only alternative to further reducing public services is additional tax revenue. The California Constitution requires voter approval for new taxes, and a number of other California cities have taken tax proposals to their residents in recent years. As reported by the California Local Government Finance Almanac, on the November 2012 statewide ballot a total of 48 of 60 city general tax (majority vote) measures were passed (80% approval rate), while 5 of 15 city special tax (two-thirds vote) measures passed (33.3% approval rate). As to local transactions and use tax measures specifically, 31 of 33 city general tax measures passed (93.9% approval rate) versus 1 of 3 city special tax measures (33.3% approval rate). This recent level of success of general taxes is significantly higher than the outcome for such measures since 1995, as shown in Table 2.

Table 2

| City Transaction and Use Tax Measures (1995-2013) | | | | |
|---|---|---|---|---|
| | Passed | Failed | Total | % Passed |
| General Tax | 115 | 54 | 169 | 68.0% |
| Special Tax | 27 | 28 | 55 | 49.1% |
| Total | 142 | 82 | 224 | 63.4% |

Table 3 breaks down the city transaction and use taxes currently in effect by level of tax rate. Section 7285.9 of the Revenue and Taxation Code provides that a city may levy a transactions and use tax in multiples of 0.125% provided all overlapping tax rates do not exceed 2.00%. No city in California has ever levied greater than a combined 1.00% local rate. There are 10 other cities that have two transaction and use tax rates, as would Stockton if this measure is enacted. Stockton has the 0.25% Measure W rate now, and adding 0.75% would go to the maximum any other city is charging. For competitive reasons, it would not be prudent to go in excess of this amount.

Table 3
Transaction and Use Taxes Currently in Effect

| Rate | General Tax | Special Tax | Total |
|---|---|---|---|
| 0.250% | 14 | 6 | 20 |
| 0.375% | 1 | 0 | 1 |
| 0.500% | 59 | 17 | 76 |
| 0.750% | 6 | 2 | 8 |
| 1.000% | 20 | 0 | 20 |
| City Total | 100 | 25 | 125 |
| Other Agencies | | | 39 |
| Grand Total | | | 164 |

File #: 13-0549, Version: 1

The City's poll of likely voters last fall showed an initial 71% support for a 0.75% general sales tax to "improve and maintain essential City services, which may include a community-wide plan, developed by local leaders and criminal justice experts, with strategies to reduce crime in Stockton, including expanding the police force, improving 9-1-1 emergency response services, increasing anti-gang and crime prevention programs, and other general services such as street repair, libraries and parks." After hearing both pro and con arguments the level of support moved to 68%. Alternatively, only 21% supported a measure whose proceeds "would primarily provide funding to pay existing debt holders, employee compensation and benefits, and city paid retiree medical benefits, but would not improve existing services or restore services that have previously been cut."

PROPOSED TAX

The proposed ballot measure language is currently being drafted and will be available during the normal publication of the July 9 City Council Agenda. The proposed new tax would be a 0.75% transaction and use tax (sales tax) that as a general tax requires a majority voter to enact. It is expected to produce approximately $28 million in its first full year and grow at a rate of about 3.5% annually. Over a ten-year period approximately $219 million would be used to fund the Marshall Plan, and approximately $112 million would be used to fund the City's exit from bankruptcy. With a three-year phase-in to full additional police staffing, and the need to eliminate the remaining general fund shortfall and re-establish reserves at the outset, in the initial years a larger proportion of funds would be devoted to the Bankruptcy Recovery Plan. By year four and thereafter the added public safety services would require 70-75% of the additional tax revenues; over time the ratio is projected to be approximately 66% for Marshall Plan expenses and 34% for the Bankruptcy Recovery Plan and other services. Given the well documented poor practices of the past, I will be recommending very unique accountability measures in the tax ordinance that ameliorate the risks going forward.

Table 4 shows the recent and future changes in total sales tax rate applicable in Stockton, assuming implementation of a 0.75% transactions and use tax.

Table 4

| Change in Total Sales Tax Rate in Stockton | | |
|---|---|---|
| Rate | Date | Action |
| 8.00% | 1/1/12 | Before Prop 30 |
| 8.25% | 1/1/13 | After Prop 30 |
| 9.00% | 4/1/14 | Approval of New Tax |
| 8.75% | 1/1/16 | Prop 30 Expires |

Table 5 compares the current and proposed level of total sales tax rate in Stockton to the current total rates applicable in surrounding jurisdictions.

City of Stockton          Page 13 of 19          Printed on 6/19/2013
powered by Legistar™
389

Table 5

**Surrounding Jurisdiction Tax Rates**

| | |
|---|---|
| 9.000% | Lathrop |
| 9.000% | Livermore |
| 9.000% | Stockton (proposed) |
| 8.625% | Fairfield |
| 8.500% | Manteca |
| 8.500% | Sacramento |
| 8.500% | Tracy |
| 8.250% | Stockton (current) |
| 8.000% | Elk Grove |
| 8.000% | Lodi |
| 7.625% | Modesto |

FINANCIAL SUMMARY

Revenue Generating Capacity

If the tax is approved on the November 5, 2013 ballot, it will take effect on April 1, 2014, and the City will accrue one quarter's worth of revenue (approximately $6.8 million) for FY 2013-14, with full year collection starting in FY 2014-15 at approximately $28 million annually.

A transaction and use tax may raise less (or more) than the equivalent rate of sales tax due to special provisions affecting vehicle sales and other transactions that are based on residency of the buyer, rather than location of the sale. HdL Companies, a sales tax consultant, summarizes the revenue effect as follows: "In projecting revenues, cities who serve a regional market for vehicles or merchandise to be delivered elsewhere such as contractor materials or industrial equipment and goods, will find that their transactions and use tax is proportionally lower than their sales tax revenues. A city whose residents and businesses must shop outside the city for vehicles and business and construction related goods, will find that their transactions and use tax receipts are proportionally higher than their sales tax revenues."

As a regional market, a transactions and use tax in Stockton would raise proportionately less than its sales tax revenue, which is the experience with the City's current 0.25% tax for public safety (Measure W), which generates around 94.6% of a comparable rate of sales tax. The revenue projected from the proposed 0.75% tax is based on the revenue-generating capacity of Measure W (i.e., three times the revenue collected from Measure W's 0.25% tax rate).



File #: 13-0549, Version: 1

Table 6 shows the projected use of the new tax proceeds between balancing the general fund budget (Bankruptcy Recovery Plan) and improving public safety services (Marshall Plan). Initially more proceeds are devoted to bankruptcy recovery, and then as Marshall Plan costs are fully phased in, more proceeds will be used to fund this improvement in public safety services. Over a ten-year period, it is estimated that safety services will consume approximately 66% of total tax proceeds, and balancing the general fund budget and emerging from bankruptcy will require approximately 34% of total tax proceeds.

Table 6

| Projected Use of New Tax Revenue Over Ten Year Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ($ in Millions) | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 | 21-22 | 22-23 | 23-24 |
| New Tax Revenue | $6.9 | $28.4 | $29.4 | $30.4 | $31.5 | $32.7 | $33.8 | $35.0 | $36.2 | $37.5 | $29.1 |
| Marshall Plan | - | $9.3 | $14.9 | $21.5 | $22.2 | $23.8 | $25.4 | $26.8 | $27.0 | $27.5 | $21.0 |
| % Annual Use of Tax | 0% | 33% | 51% | 71% | 70% | 73% | 75% | 77% | 75% | 73% | 72% |
| % Cumulative Use | 0% | 26% | 37% | 48% | 46% | 58% | 61% | 63% | 65% | 66% | 66% |
| Bankrupcy Recovery | $6.9 | $19.1 | $14.5 | $8.9 | $9.4 | $8.9 | $8.4 | $8.2 | $9.2 | $10.0 | $8.1 |
| % Annual Use of Tax | 100% | 67% | 49% | 29% | 30% | 27% | 25% | 23% | 25% | 27% | 28% |
| % Cumulative Use | 100% | 74% | 63% | 52% | 46% | 42% | 39% | 37% | 35% | 34% | 34% |

General Fund Forecast

Unless this tax is approved by the voters, the City will continue to run shortfalls. Tables 7, 8 and 9 on the following pages are based on 2011-12 financial statements pending audit and 2012-13 projections as of your Quarter 2 Budget Report. Table 7 shows the annual general fund shortfall and ending fund balance after Chapter 9 restructuring savings, but without both the Marshall Plan and new tax revenue, over the City's 10-year forecast period; the annual shortfall ranges from $8.6 million in FY 2013-14 to $79.1 million by FY 2020-21, and deficits begin in FY 2014-15.

Table 7

| Summary Forecast After Chapter 9 But No Marshall Plan and No New Tax | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($ in Millions) | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 |
| Total Revenue | $160.3 | $156.8 | $159.5 | $161.5 | $165.5 | $171.1 | $176.0 | $181.1 | $186.3 | $190.1 |
| Total Expenditures | 166.8 | 156.9 | 159.5 | 170.1 | 177.0 | 179.1 | 186.0 | 192.9 | 200.7 | 204.9 |
| Net Annual | (6.6) | (0.1) | - | (8.6) | (11.5) | (8.0) | (10.0) | (11.8) | (14.4) | (14.8) |
| Beginning Balance | 6.6 | 0.1 | - | - | (8.6) | (20.1) | (28.1) | (38.1) | (49.9) | (64.3) |
| Ending Balance | 0.1 | 0.0 | - | (8.6) | (20.1) | (28.1) | (38.1) | (49.9) | (64.3) | (79.1) |
| Bal as % of Total Exp | 0.0% | 0.0% | 0.0% | -5.0% | -11.3% | -15.7% | -20.5% | -25.9% | -32.0% | -38.6% |

File #: 13-0549, Version: 1

Table 8 shows the impact of adding the cost of the Marshall Plan to Chapter 9 savings, but without the new tax, which results in annual shortfalls $17.9 in FY 2014-15 to $223.0 million by FY 2020-21; the ending fund balance falls dramatically farther into deficit.

Table 8

| ($ in Millions) | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 |
|---|---|---|---|---|---|---|---|---|---|---|
| Summary Forecast After Chapter 9 With Marshall Plan But No New Tax | | | | | | | | | | |
| Total Revenue | $160.3 | $156.8 | $159.5 | $161.5 | $165.5 | $171.1 | $176.0 | $181.1 | $186.3 | $190.1 |
| Total Expenditures | 166.8 | 156.9 | 159.5 | 179.4 | 191.9 | 200.6 | 208.2 | 216.7 | 226.1 | 231.7 |
| Net Annual | (6.6) | (0.1) | - | (17.9) | (26.4) | (29.5) | (32.2) | (35.6) | (39.8) | (41.6 |
| Beginning Balance | 6.6 | 0.1 | - | - | (17.9) | (44.3) | (73.8) | (106.0) | (141.6) | (181.4 |
| Ending Balance | 0.1 | 0.0 | - | (17.9) | (44.3) | (73.8) | (106.0) | (141.6) | (181.4) | (223.0 |
| Bal as % of Total Exp | 0.0% | 0.0% | 0.0% | -10.0% | -23.1% | -36.8% | -50.9% | -65.4% | -80.2% | -96.2% |

Table 9 shows the impact of adding a 0.75% local sales tax, as well as the cost of the Marshall Plan and Chapter 9 savings, which results in a balanced budget throughout the forecast period, with reserve levels averaging approximately 8% for the period of FY 2013-14 through 2020-21.  While the balance declines in the latter years of the City's 10-year forecast, beyond that forecast period the rate of decline slows in the mid-2020's and the general fund is projected to avoid going into deficit due largely to the expected long-term trend of pension costs.

CalPERS rates are projected to increase significantly through 2020 due to recently adopted rate smoothing and unfunded liability amortization policies, an expected further reduction in the discount rate (actuarial investment return), and other changes.  However, the Public Employee Pension Reform Act (PEPRA) grants lower benefits to new employees, so savings will accrue over time with turnover in the workforce.  Also, under the smoothing and amortization changes the City pays more in the near-term, but less later on.  As a consequence of this restructuring, pension contribution rates as a percent of payroll will level off and then begin to decline, resulting in projected annual surpluses and increasing fund balance by the late 2020's.  The City is projecting this rate of decline at a much more conservative rate than that discussed by CalPERS staff.

File #: 13-0549, Version: 1

Table 9

| ($ in Millions) | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Summary Forecast After Chapter 9 With Both Marshall Plan and New Tax | | | | | | | | | |
| Total Revenue | $160.3 | $156.8 | $166.4 | $190.1 | $195.3 | $202.0 | $208.0 | $214.2 | $220.5 | $225.3 |
| Total Expenditures | 166.8 | 156.9 | 159.5 | 179.4 | 191.9 | 200.6 | 208.2 | 216.7 | 226.1 | 231.7 |
| Net Annual | (6.6) | (0.1) | 6.9 | 10.8 | 3.4 | 1.3 | (0.2) | (2.5) | (5.6) | (6.3) |
| Beginning Balance | 6.6 | 0.1 | - | 6.9 | 17.6 | 21.0 | 22.3 | 22.2 | 19.7 | 14.0 |
| Ending Balance | 0.1 | 0.0 | 6.9 | 17.6 | 21.0 | 22.3 | 22.2 | 19.7 | 14.0 | 7.7 |
| Bal as % of Total Exp | 0.0% | 0.0% | 4.3% | 9.8% | 11.0% | 11.1% | 10.6% | 9.1% | 6.2% | 3.3% |

## ALTERNATIVE TO NEW TAX REVENUE IS ADDITIONAL BUDGET CUTS

The alternative to enacting a new tax is to make additional reductions in service levels. Otherwise, the City cannot present a viable Plan of Adjustment for exiting bankruptcy.

- Balancing the general fund budget without both the Marshall Plan and new tax would require a 7% reduction in the total general fund expenditures remaining after Chapter 9 restructuring. This would generate approximately $11 million in savings when fully implemented in FY 2014-15 (half that amount in FY 2013-14 by the time cuts could be started), with growth in the value of the avoided costs over time.

- Balancing the general fund budget with the Marshall Plan but no new tax would require a 15% reduction in total general fund expenditures remaining after Chapter 9 restructuring, which would generate approximately $26 million in savings when fully implemented in FY 2014-15 (half that amount in FY 2013-14 by the time cuts could be started), with growth in the value of the avoided costs over time.

Additional budget cuts in this range of $11-26 million, especially if the weight of cuts were borne by non-safety services, would seriously undermine the long-term viability of Stockton. Even if the Marshall Plan is adopted, the City's viability is not determined by public safety services alone. As important as is public safety, citizens and businesses don't move to or stay in a city solely on the basis of police services. Parks, libraries, recreation and/or entertainment opportunities, schools, employment opportunities, reputation, sense of safety, predictability and lifestyle are all part of a city's long-term viability.

Table 10 shows the type of budget cuts that might be required in the absence of new tax revenue. These items were on a contingent cut list from the FY 2011-12 budget and total $22 million. This is more than enough to balance the general fund budget without the Marshall Plan, or just enough to

Case 12-32118    Filed 08/20/13    Doc 1083

DRAFT

balance the budget while funding about 75% of the Marshall Plan.

Table 10

**Example of $22 Million in Additional Cuts That Might Be Required in the Absense**
**New Tax Revenue Based on Contingent Departmental Cut List from 2011-12 Budget (**

| Non-Safety: | | Fire: | |
|---|---|---|---|
| Admin, CC, Non-Dept-cut 5 FTE | $354 | Truck 2-cut 1 FF/sh | $405 |
| Admin Svc-cut 9 FTE | 442 | Truck 3-cut 1 FF/sh | 405 |
| Auditor-15% reduction | 65 | Truck 7-cut 1 FF/sh | 405 |
| City Atty-cut 1 advisory atty | 126 | Close Engine 6 | 1,351 |
| City Clerk-cut 1 FTE | 79 | Close Engine 11 | 1,351 |
| Econ Dev-15% reduction | 103 | Close Engine 14 | 1,351 |
| Ent Venue-reduce maint/other | 244 | Close Truck 3 | 1,351 |
| Ent Venue-close ballpark | 366 | Other savings | 65 |
| Develop Svcs-elim GF subsidy | 1,000 | Reduced Fire Dist reimburse | (662) |
| Golf-close Van Buskirk | 250 | Subtotal Fire Dept | 6,022 |
| CIP-cut GF funding | 575 | | |
| HR-reduce training | 80 | Police: | |
| HR-cut 3 FTE | 184 | Cut 30 CSOs (net of rev loss) | 1,751 |
| Library-cut 7 FTE/31% fewer hrs | 500 | Records staff cut 3 FTE | 199 |
| Library-cut landscaping 50% | 10 | Telecommunication cut 3 FTE | 267 |
| Rec-cut 3 FT/3 PT | 242 | Investig/traffic/other cut 14 F | 1,139 |
| Rec-after school reduction | 48 | Traffic section cut 12 FTE | 1,368 |
| Peacekeepers-cut GF 15% | 27 | Investig cut 21 FTE (6 left) | 2,543 |
| PW-park maint to min levels | 185 | Patrol cut 31 FTE | 3,727 |
| PW-cut water use 50% | 165 | Subtotal Police Dept | 10,994 |
| PW-cut 1 FTE, fund shift to Gas | 170 | | |
| Subtotal Non-Safety Depts | 5,214 | Grand Total Cuts | 22,230 |

It would be difficult, however, to implement the Marshall Plan while simultaneously cutting other key elements of the Police Department. Table 11 shows that if the $11 million in Police cuts were spread to other departments, the percentage impact jumps to unsustainable levels: if both Police and Fire were held harmless from cuts of this magnitude, non-safety would suffer a 54% reduction in budget levels.

Table 11

| Sample Impact Assuming Re-Allocation of Contingent Cut List Among Safety and Non-Safety Departments ($ in 000) | | | | |
|---|---|---|---|---|
| ($ in 000) | Other Depts | Fire Dept | Police Dept | Totals |
| Cuts from Contingent List | $5,214 | $6,022 | $10,994 | $22,230 |
| % Cut (13-14 dollars) | 13% | 17% | 13% | |
| No Cuts to Police | 11,125 | 11,105 | - | $22,230 |
| % Cut (13-14 dollars) | 27% | 31% | 0% | |
| No Cuts to Police+Fire | 22,230 | - | - | $22,230 |
| % Cut (13-14 dollars) | 54% | 0% | 0% | |

These impacts are limited to the $22 million value of the cuts on the existing list.  Cutting the entire $26 million needed to both balance the budget and fund the full Marshall Plan, without affecting the Police and Fire departments, would boost the cuts to the remaining non-safety departments from 54% to 62%.  All of this comes on top of previously implemented cuts totaling 36% of total general fund expenditures. Even if none of these cuts came from the Police Department, this action would be like building a structure on a crumbling foundation. It would be difficult, if not impossible, to run the entire City without the administrative, planning, financial and other support functions that would be largely eliminated through an effort to balance the general fund budget, and pay for the Marshall Plan, without any additional resources.

CONCLUSION

It is recommended that the City Council call for a public hearing for July 9 and consider placing a tax measure before the voters for approval on November 5, 2013. On July 9 it will be recommended that the Council adopt the Resolution calling the election, and approve the Ordinance establishing the terms and conditions of a sales tax for consideration by the voters.  First reading of the ordinance is done by Council and under state law the second reading is the action by voters at the election.