The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**145**

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone:    +1-916-447-9200
Facsimile:     +1-916-329-4900

JEFFERY D. HERMANN (STATE BAR NO. 90445)
jhermann@orrick.com
JOHN A. FARMER (STATE BAR NO. 242775)
jfarmer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017-5855
Telephone:    +1-213-629-2020
Facsimile:     +1-213-612-2499

Attorneys for Debtor
City of Stockton

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | Chapter 9 |
| Debtor. | **PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA (OCTOBER 10, 2013)** |

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

I.     DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION ................. 1

   A.    Definitions ................................................................................................. 1

   B.    Rules of Construction.............................................................................. 52

   C.    Plan Supplement .................................................................................... 52

II.    TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS ........................... 52

   A.    Treatment of Administrative Claims........................................................ 52

   B.    Treatment of Professional Claims............................................................ 52

   C.    Priority Claims in Chapter 9 .................................................................. 53

   D.    Deadline for the Filing and Assertion of Other Postpetition Claims, Administrative Claims and Professional Claims ................................... 53

III.    DESIGNATION OF CLASSES OF CLAIMS ................................................ 54

IV.    TREATMENT OF CLAIMS ........................................................................ 55

   A.    Class 1A – Claims of Ambac – 2003 Fire/Police/Library Certificates ................. 55

      1.    Impairment and Voting ........................................................ 55

      2.    Treatment ............................................................................ 55

         a.    Forbearance ............................................................ 56

            (1)    General Fund Payments .................................. 56

            (2)    Assignment of 2003 Fire/Police/Library Certificates Reimbursement Agreement............................... 57

            (3)    Application of Housing Set-Aside Amounts.................... 57

            (4)    Extension of Fire/Police/Library Lease Back Term and 2003 Fire/Police/Library Certificates Reimbursement Agreement............................... 58

         b.    Debt Service Reserve Fund....................................... 58

         c.    Successor Agency Sale Proceeds.............................. 59

         d.    Plan Support Commitment........................................ 59

         e.    Reimbursement of Attorneys' Fees.......................... 60

         f.    Approval and Authorization to enter into the Ancillary Documents ............................................ 60

            (1)    2003 Fire/Police/Library Certificates Supplemental Trust Agreement............................................. 60

            (2)    Fire/Police/Library Lease Out Assignment Agreement....................................................... 61

   B.    Class 1B – Claims of Holders of 2003 Fire/Police/Library Certificates............... 61

   C.    Class 2 – SEB Claims of the 2006 SEB Bond Trustee/NPFG – 2006 SEB Bonds ........................................................................................... 61

Filed 10/10/13          Case 12-32118          Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be. the solicitation of a vote on this draft plan or on any other plan.

   1. Impairment and Voting .......................................................................... 61

   2. Treatment ............................................................................................... 61

  D. Class 3 – Arena Claims of the 2004 Arena Bond Trustee/NPFG – 2004 Arena Bonds................................................................................................. 62

   1. Impairment and Voting .......................................................................... 62

   2. Treatment ............................................................................................... 62

  E. Class 4 – Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG – 2004 Parking Bonds ................................................................ 62

   1. Impairment and Voting .......................................................................... 62

   2. Treatment ............................................................................................... 62

  F. Class 5 – Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty – 2007 Office Building Bonds ................................. 63

   1. Impairment and Voting .......................................................................... 63

   2. Treatment ............................................................................................... 63

  G. Class 6 – Pension Obligation Bonds Claims of Assured Guaranty ..................... 64

   1. Impairment and Voting .......................................................................... 64

   2. Treatment ............................................................................................... 64

  H. Class 7 – Claims of DBW ................................................................................... 65

  I. Class 8 - SCC 16 Claims ..................................................................................... 66

   1. Impairment and Voting .......................................................................... 66

   2. Treatment ............................................................................................... 66

  J. Class 9 – Thunder Claims .................................................................................... 66

   1. Impairment and Voting .......................................................................... 66

   2. Treatment ............................................................................................... 67

  K. Class 10 – Claims of Holders of Restricted Revenue Bond and Note Payable Obligations ............................................................................................ 67

   1. Impairment and Voting .......................................................................... 67

   2. Treatment ............................................................................................... 68

  L. Class 11 – Claims of Holders of Special Assessment and Special Tax Obligations ......................................................................................................... 68

   1. Impairment and Voting .......................................................................... 68

   2. Treatment ............................................................................................... 69

  M. Class 12 – General Unsecured Claims ................................................................ 69

   1. Impairment and Voting .......................................................................... 69

   2. Treatment ............................................................................................... 69

  N. Class 13 – Convenience Class Claims ................................................................ 70

CITY OF STOCKTON'S PLAN OF ADJUSTMENT

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

|  |  |  | 1. | Impairment and Voting | 70 |
|  |  |  | 2. | Treatment | 71 |
|  | O. | Class 14 – Claims of Certain Tort Claimants | | | 71 |
|  |  |  | 1. | Impairment and Voting | 71 |
|  |  |  | 2. | Treatment | 71 |
|  | P. | Class 15 – Claims Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS, as Trustee under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants | | | 71 |
|  |  |  | 1. | Impairment and Voting | 71 |
|  |  |  | 2. | Treatment | 71 |
|  | Q. | Class 16 – Claims of Equipment Lessors | | | 72 |
|  |  |  | 1. | Impairment and Voting | 72 |
|  |  |  | 2. | Treatment | 72 |
|  | R. | Class 17 – Workers Compensation Claims | | | 72 |
|  |  |  | 1. | Impairment and Voting | 72 |
|  |  |  | 2. | Treatment | 73 |
|  | S. | Class 18 – SPOA Claims | | | 73 |
|  |  |  | 1. | Impairment and Voting | 73 |
|  |  |  | 2. | Treatment | 73 |
| V. | ACCEPTANCE OR REJECTION; CRAMDOWN | | | | 74 |
|  | A. | Voting of Claims | | | 74 |
| VI. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | | | 75 |
|  | A. | Assumption of Executory Contracts and Unexpired Leases | | | 75 |
|  | B. | Cure Payments | | | 75 |
|  | C. | Rejection of Executory Contracts and Unexpired Leases | | | 75 |
|  | D. | Claims Arising From Rejection | | | 76 |
|  | E. | Executory Contracts and Unexpired Leases Not Included in Motion | | | 76 |
| VII. | IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN | | | | 76 |
| VIII. | RESERVATION OF THE CITY'S RIGHTS OF ACTION | | | | 79 |
| IX. | DISTRIBUTIONS | | | | 79 |
|  | A. | Distribution Agent | | | 79 |
|  | B. | Delivery of Distributions | | | 79 |
|  | C. | Undeliverable Distributions | | | 80 |
|  |  |  | 1. | Holding of Undeliverable Distributions | 80 |

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

| | | | | |
|---|---|---|---|---|
| | | 2. | Unclaimed Property | 80 |
| | | 3. | Notification and Forfeiture of Unclaimed Property | 80 |
| | D. | | Distributions of Cash | 80 |
| | E. | | Timeliness of Payments | 81 |
| | F. | | Compliance with Tax, Withholding, and Reporting Requirements | 81 |
| | G. | | Time Bar to Cash Payments | 81 |
| | H. | | No De Minimis Distributions | 82 |
| | I. | | No Distributions on Account of Disputed Claims | 82 |
| | J. | | No Postpetition Accrual | 82 |
| X. | | | DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS | 82 |
| | A. | | Claims Objection Deadline; Prosecution of Objections | 82 |
| | B. | | Reserves, Payments, and Distributions with Respect to Disputed Claims | 83 |
| XI. | | | EFFECT OF CONFIRMATION | 83 |
| | A. | | Discharge of the City | 83 |
| | B. | | Injunction | 84 |
| | C. | | Term of Existing Injunctions or Stays | 84 |
| XII. | | | RETENTION OF AND CONSENT TO JURISDICTION | 84 |
| XIII. | | | CONDITIONS PRECEDENT | 86 |
| | A. | | Condition Precedent to Confirmation | 86 |
| | B. | | Conditions Precedent to Effective Date | 86 |
| | | 1. | Confirmation Order | 86 |
| | | 2. | Plan Documents | 86 |
| | | 3. | Authorizations, Consents, Etc | 87 |
| | | 4. | Timing | 87 |
| | C. | | Waiver of Conditions to Effective Date | 87 |
| | D. | | Effect of Failure of Conditions | 87 |
| | E. | | No Admission of Liability | 88 |
| XIV. | | | MISCELLANEOUS PROVISIONS | 88 |
| | A. | | Dissolution of the Retirees Committee | 88 |
| | B. | | Severability | 88 |
| | C. | | Governing Law | 89 |
| | D. | | Effectuating Documents and Further Transactions | 89 |
| | E. | | Notice of Effective Date | 90 |

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be. the solicitation of a vote on this draft plan or on any other plan.

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*In re County of Orange v. Fuji Securities Inc.,*
  31 F. Supp. 2d 768 (C.D. Cal. 1991) ..................................................................... 16

## STATE CASES

*City of Oxnard v. Dale,*
  45 Cal. 2d 729 (1955) ....................................................................................... 15

## FEDERAL STATUTES

11 U.S.C. § 101 ....................................................................................................... 14

11 U.S.C. § 102 ....................................................................................................... 52

11 U.S.C. § 105 ....................................................................................................... 84

11 U.S.C. § 365 ............................................................................... 10, 22, 42, 61, 75, 77

11 U.S.C. § 501 ......................................................................................................... 5

11 U.S.C. § 502 .................................................................................................... 5, 22

11 U.S.C. § 503 .................................................................................................... 4, 53

11 U.S.C. § 506 .................................................................................................. 44, 47

11 U.S.C. § 507 .................................................................................................... 4, 53

11 U.S.C. § 553 .................................................................................................. 47, 84

11 U.S.C. § 901 .................................................................................................... 4, 53

11 U.S.C. § 902 .................................................................................................. 68, 69

11 U.S.C. § 904 ......................................................................................................... 4

11 U.S.C. § 922 ....................................................................................................... 84

11 U.S.C. § 928 .................................................................................................. 15, 66

11 U.S.C. § 941 ......................................................................................................... 1

11 U.S.C. § 943 .................................................................................................. 14, 52

11 U.S.C. § 944 ....................................................................................................... 83

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

11 U.S.C. § 1102 ................................................................................................................. 43

11 U.S.C. § 1122 ................................................................................................................. 54

11 U.S.C. § 1123 .......................................................................................................... 14, 54

11 U.S.C. § 1124 .......................................................................................................... 26, 51

11 U.S.C. § 1125 ................................................................................................................. 17

11 U.S.C. § 1129 .......................................................................................................... 75, 86

11 U.S.C. § 1142 ................................................................................................................. 85

## STATE STATUTES

Cal. Gov't Code § 810 *et seq.* ........................................................................................... 22

Cal. Gov't Code § 53570 .................................................................................................... 39

Cal. Labor Code § 3200 *et seq.*. ....................................................................................... 51


## CHARTER OF CITY OF STOCKTON

§ 510 ................................................................................................... 7, 20, 24, 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.**

1    The City of Stockton, California, a debtor under chapter 9 of the Bankruptcy Code

2    in the case styled as *In re City of Stockton, California*, Case No. 2012-32118, currently pending in

3    the United States Bankruptcy Court for the Eastern District of California, hereby proposes the

4    following Plan of Adjustment of Debts pursuant to section 941 of the Bankruptcy Code.[1]

5        Please refer to the accompanying Disclosure Statement for a discussion of the

6    City's financial condition, the developments throughout the Chapter 9 Case, a summary and

7    analysis of this Plan, and for other important information. The City encourages you to read this

8    Plan and the Disclosure Statement in their entirety before voting to accept or reject this Plan. No

9    materials other than the Disclosure Statement and the various exhibits and schedules attached to

10   or incorporated therein have been approved for use in soliciting acceptance or rejection of this

11   Plan.

12   **I.    DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION**

13        **A.    Definitions.**

14            **1.    2003 Fire/Police/Library Certificates** has the meaning set forth in the

15   definition of Fire/Police/Library Lease Back Transaction.

16            **2.    2003 Fire/Police/Library Certificates Reimbursement Agreement**

17   means the Reimbursement Agreement, dated as of June 1, 2003, by and between the Successor

18   Agency and the City, pursuant to which the Successor Agency has agreed to utilize the Housing

19   Set-Aside Amounts (as defined in the 2003 Fire/Police/Library Certificates Reimbursement

20   Agreement) to reimburse the City for the monies paid by the City under the Fire/Police/Library

21   Lease Back.

22            **3.    2003 Fire/Police/Library Certificates Reserve Fund** has the meaning set

23   forth in the definition of Fire/Police/Library Lease Back Transaction.

24            **4.    2003 Fire/Police/Library Certificates Supplemental Trust Agreement**

25   means the First Supplemental Trust Agreement, dated as of May 9, 2013, by and among Wells

26   Fargo, the Financing Authority, and the City, the form of which is attached as Exhibit B to the

27

28   ───────────────
[1]The definitions of capitalized terms used throughout this Plan are set forth in Section I(A). Unless otherwise noted, all references to a "section" are references to a section of the Bankruptcy Code.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Declaration of Robert Deis in Support of the City Of Stockton's Motion Under Bankruptcy Rule 9019 for Approval of Its Settlement with Ambac Assurance Corporation, filed in the Chapter 9 Case on February 26, 2013 [Dkt. No. 725].

        **5.**        **2003 Fire/Police/Library Certificates Trust Agreement** is the Trust Agreement, dated as of June 1, 2003, by and among Wells Fargo, the Financing Authority, and the City, relating to the 2003 Fire/Police/Library Certificates.

        **6.**        **2003 Fire/Police/Library Certificates Trustee** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

        **7.**        **2003A Fire/Police/Library Certificates** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

        **8.**        **2003B Fire/Police/Library Certificates** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

        **9.**        **2004 Arena Bond Indenture** means the Indenture of Trust, dated as of March 1, 2004, by and between the Redevelopment Agency and the 2004 Arena Bond Trustee, relating to the 2004 Arena Bonds.

        **10.**        **2004 Arena Bond Reserve Fund** has the meaning set forth in the definition of Arena Lease Back Transaction.

        **11.**        **2004 Arena Bond Trustee** has the meaning set forth in the definition of Arena Lease Back Transaction.

        **12.**        **2004 Arena Bonds** has the meaning set forth in the definition of Arena Lease Back Transaction.

        **13.**        **2004 Parking Bond Reserve Fund** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

        **14.**        **2004 Parking Bond Trustee** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

        **15.**        **2004 Parking Bonds** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

CITY OF STOCKTON'S PLAN OF ADJUSTMENT

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**16.**     **2004 Parking Bonds Indenture** means the Indenture of Trust, dated as of June 1, 2004, by and between the Financing Authority and the 2004 Parking Bond Trustee, relating to the 2004 Parking Bonds.

**17.**     **2006 SEB Bond Reserve Fund** has the meaning set forth in the definition of SEB Lease Back Transaction.

**18.**     **2006 SEB Bond Trustee** has the meaning set forth in the definition of SEB Lease Back Transaction.

**19.**     **2006 SEB Bonds** has the meaning set forth in the definition of SEB Lease Back Transaction.

**20.**     **2006 SEB Indenture** means the Indenture of Trust, dated as of March 1, 2006, by and between the Financing Authority and the 2006 SEB Bond Trustee, relating to the 2006 SEB Bonds.

**21.**     **2007 Lease Ask Payments** has the meaning set forth in the Assured Guaranty Term Sheet, attached to the Plan as **Exhibit A**, and represent payments being made from the City's general fund that had been proposed to be made on the 2007 Office Building Bonds under the City's AB 506 restructuring proposal.

**22.**     **2007 Office Building Bond Reserve Fund** has the meaning set forth in the definition of Office Building Lease Back Transaction.

**23.**     **2007 Office Building Bond Trustee** has the meaning set forth in the definition of Office Building Lease Back Transaction.

**24.**     **2007 Office Building Bonds** has the meaning set forth in the definition of Office Building Lease Back Transaction.

**25.**     **2009 Golf Course/Park Bond Indenture** means the Indenture of Trust, dated as of September 1, 2009, by and between the Financing Authority and the 2009 Golf Course/Park Bond Trustee, relating to the 2009 Golf Course/Park Bonds.

**26.**     **2009 Golf Course/Park Bond Reserve Fund** has the meaning set forth in the definition of Golf Course/Park Lease Back Transaction.

CITY OF STOCKTON'S PLAN OF ADJUSTMENT

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1   **27.**     **2009 Golf Course/Park Bond Trustee** has the meaning set forth in the

2   definition of Golf Course/Park Lease Back Transaction.

3   **28.**     **2009 Golf Course/Park Bonds** has the meaning set forth in the definition

4   of Golf Course/Park Lease Back Transaction.

5   **29.**     **400 E. Main Office Building Property** has the meaning set forth in the

6   definition of Office Building Lease Back Transaction.

7   **30.**     **AB 26** has the meaning set forth in the definition of Arena Lease Back

8   Transaction.

9   **31.**     **AB 506** means Assembly Bill 506, codified at California Government

10  Code 53760 *et seq.*, which provides that a local public entity in California may file a petition for

11  bankruptcy if it has participated in a neutral evaluation process or has declared a fiscal emergency

12  and adopted a resolution by a majority vote of the governing board.

13  **32.**     **AB 1484** has the meaning set forth in the definition of Arena Lease Back

14  Transaction.

15  **33.**     **Additional Tax Increment Revenues** has the meaning set forth in the

16  definition of Arena Lease Back Transaction.

17  **34.**     **Administrative Claim** means any Claim, not already paid by the City, for

18  an administrative expense of the kind allowed under section 503(b) and entitled to priority under

19  section 507(a)(2), after giving effect to sections 901 and 904:  (i) which the City agrees is an

20  Allowed administrative expense claim; or (ii) which the Bankruptcy Court determines is an

21  Allowed administrative expense claim.  The City's consent to the Bankruptcy Court adjudicating

22  Administrative Claim status is given without the City in any way consenting or agreeing that

23  other Claims for postpetition obligations of the City would be entitled to status as Administrative

24  Claims as "the actual necessary costs and expenses of preserving the estate" under section 503(b),

25  and the City reserves its right to maintain that such Claims would instead constitute Other

26  Postpetition Claims as defined herein.

27  **35.**     **Allowed** means a Claim that:

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

(a)     Has been listed on the list of creditors filed by the City, as such list may be amended from time to time pursuant to Bankruptcy Rule 1009; is not listed as unliquidated, contingent or disputed; and for which no contrary proof of claim has been filed (subject to objection as set forth in the next subsection);

(b)     Is asserted in a proof of claim filed in compliance with section 501 and any applicable orders of the Bankruptcy Court or listed in the list of creditors filed by the City and as to which: (i) no objection has been, or subsequently is, filed within the deadline established pursuant to Section X(A) of the Plan (as such deadline may be extended by the Bankruptcy Court upon application of the City from time to time); (ii) the Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but only in the amount so allowed); or (iii) the Bankruptcy Court has entered a Final Order under section 502(c) estimating the amount of the Claim for purposes of allowance;

(c)     Is subject to a stipulation between the City and the holder of such Claim providing for the allowance of such Claim;

(d)     Is deemed "Allowed" pursuant to this Plan;

(e)     Is designated as "Allowed" in a pleading entitled "Designation Of Allowed Claims" (or a similar title of the same import) filed with the Bankruptcy Court by the City on or after the Effective Date; or

(f)     Is an Administrative Claim or Other Postpetition Claim as to which the Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but only in the amount so allowed).

**36.** **Ambac** means Ambac Assurance Corporation, a Wisconsin stock insurance corporation.

**37.** **Ambac Effective Date** means the first business day following the day on which all the conditions contained in section 5.1 of the Ambac Settlement Agreement have either occurred or been expressly waived by the parties thereto.

**38.** **Ambac Insurance Policy** means the financial guaranty policy issued by Ambac in connection with the Fire/Police/Library Lease Back Transaction, which insures the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

2003 Fire/Police/Library Certificates executed and delivered by the 2003 Fire/Police/Library Certificates Trustee to fund affordable housing projects in the City.

39. **Ambac Settlement Agreement** means the Stipulation and Settlement Agreement, dated as of February 26, 2013, by and among the City, the Financing Authority, the 2003 Fire/Police/Library Certificates Trustee, and Ambac, which is attached as Exhibit A to the Declaration of Robert Deis in Support of the City of Stockton's Motion Under Bankruptcy Rule 9019 for Approval of Its Settlement with Ambac Assurance Corporation, filed in the Chapter 9 Case on February 26, 2013 [Dkt. No. 725].

40. **Ambac Settlement Agreement Motion** means the motion filed in the Chapter 9 Case on February 26, 2013 [Dkt. No. 723].

41. **Arena** has the meaning set forth in the definition of Arena Lease Back Transaction.

42. **Arena Claims of the 2004 Arena Bond Trustee/NPFG** means the Claims arising in connection with the Arena Lease Back Transaction (which claims were held by the Redevelopment Agency, but are now controlled and asserted by the 2004 Arena Bond Trustee at the direction of NPFG (as the insurer of the 2004 Arena Bonds) as a result of the assignment by the Redevelopment Agency of all of its rights under the Arena Lease Out and the Arena Lease Back to the 2004 Arena Bond Trustee), as modified by the NPFG Settlement. The Arena Claims of the 2004 Arena Bond Trustee/NPFG do not include any claims arising out of non-payment of the 2004 Arena Bonds as all such claims are claims against the Redevelopment Agency and are not obligations of the City (except to the extent specifically provided under the terms of the NPFG Settlement).

43. **Arena Lease Back** has the meaning set forth in the definition of Arena Lease Back Transaction.

44. **Arena Lease Back Rental Payments** has the meaning set forth in the definition of Arena Lease Back Transaction.

45. **Arena Lease Back Transaction** means the transaction described as follows:

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

*Financial Instruments Involved*.  The financial instruments involved in this transaction are the Redevelopment Agency of the City of Stockton Revenue Bonds, Series 2004, (Stockton Events Center – Arena Project) issued on March 16, 2004, in the aggregate principal amount of $47,000,000 (the "**2004 Arena Bonds**").  Wells Fargo is the indenture trustee under the 2004 Arena Bonds Indenture (together with any successor trustee, the "**2004 Arena Bond Trustee**").  A reserve fund exists for the 2004 Arena Bonds with a balance as of September 1, 2013, of $3,511,392.02 (the "**2004 Arena Bond Reserve Fund**").  The funds in the 2004 Arena Bond Reserve Fund are pledged to support repayment of the 2004 Arena Bonds.  The 2004 Arena Bonds are insured by NPFG.

*Property Involved/Lease*.  As described in more detail below, the property and facility involved in this transaction is the Stockton Arena (as more particularly described below, the "**Arena**").  In order to facilitate the financing provided by the 2004 Arena Bonds, the City, as owner of the Arena, leased the Arena to the Redevelopment Agency pursuant to that certain Site Lease dated as of March 1, 2004, for a term ending on September 1, 2036, with a possible extension of the term, or reduction in term, to the date upon which the 2004 Arena Bonds are paid in full (the "**Arena Lease Out**").  Under section 510 of the City Charter, the Arena Lease Out may not extend for more than 55 years, or until February 28, 2059.  The City contemporaneously leased the Arena back from the Redevelopment Agency for the same number of years (but the lease term cannot extend beyond September 1, 2046) pursuant to the terms of that certain Lease Agreement dated as of March 1, 2004 (the "**Arena Lease Back**").  Thus, the City is the lessor and the Redevelopment Agency is the tenant under the Arena Lease Out, and the Redevelopment Agency is the lessor and the City is the tenant in the Arena Lease Back.

As tenant under the Arena Lease Out, the Redevelopment Agency paid rent for the entire lease term in amount equal to $1.00.  The Redevelopment

CITY OF STOCKTON'S PLAN OF ADJUSTMENT

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Agency agreed under the Arena Lease Back to allow the City to use the proceeds of the 2004 Arena Bonds to construct the Arena facilities. As tenant under the Arena Lease Back, the City agreed to make semi-annual rental payments in varying amounts ($2,570,687 for fiscal year 2012-13, $2,621,346 for fiscal year 2013-14, $2,673,221 for fiscal year 2014-15, etc.) (the "**Arena Lease Back Rental Payments**"). The Redevelopment Agency assigned its rights under the Arena Lease Back, including the rights to enforce the lease after default by the City, and including the stream of Arena Lease Back Rental Payments from the City, to support the repayment of the 2004 Arena Bonds. In addition, pursuant to the terms of that certain Pledge Agreement between the City as pledgor and the Redevelopment Agency as pledgee dated as of March 1, 2004 (the "**Arena Pledge Agreement**"), the City pledged certain incremental tax revenues (the "**Pledged Tax Increment**") expected to be collected from the West End Urban Renewal Project No. 1, a former development project area consisting of 642 acres surrounding and including the Arena, located in the heart of downtown Stockton, just north of the City's Crosstown Freeway and east of Interstate 5, containing a mix of commercial, industrial, and residential uses (the "**West End Project Area**"). As a result of the enactment of Assembly Bill X1 26 ("**AB 26**") as modified by Assembly Bill 1484 ("**AB 1484**"), amending certain sections of the California Government Code and the Health and Safety Code, which together effected the dissolution of redevelopment agencies in the State of California, certain other tax increment monies formerly allocated to the former redevelopment agencies have been transferred to their successor agencies (in this case, the City acting in that capacity) and are available in addition to pledged revenues to pay enforceable obligations such as the Arena Pledge Agreement (the "**Additional Tax Increment Revenues**"). No other revenues or assets are pledged to support the repayment of the 2004 Arena Bonds, the repayment obligation is non-recourse to the Redevelopment Agency, and the 2004 Arena Bonds are payable solely from

Filed 10/10/13

Case 12-32118   Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

the 2004 Arena Bond Reserve Fund, the Arena Lease Back Rental Payments, the Pledged Tax Increment, and the Additional Tax Increment Revenues.

The subject property is the land described as Parcel 4, as shown on the Parcel Map filed for record in the office of the Recorder of the County of San Joaquin, State of California, on March 4, 2003, in Book 23 of Maps, page 15, and the Arena located thereon, an indoor facility capable of hosting events such as ice hockey, indoor football, indoor soccer, concerts, boxing events, rodeos, and other such indoor events, and located at 248 West Fremont Street in downtown Stockton.  The Arena includes officials' facilities, media facilities, food services facilities, 24 luxury suites for approximately 288 patrons, the Record Press Club Level with 344 Club Seats, 5,000 square feet of conference space, and ample backstage amenities.  The Arena can be configured for 8,600 to 12,000 seats, based upon the nature of the event.  The Arena sports an 85 by 200 foot ECHL regulation ice sheet and is home to the Stockton Thunder ice hockey team.

The Arena is part of the Stockton Events Center project (the "**Events Center Project**"), which also includes a baseball stadium with a seating capacity of approximately 5,000 people, the University Plaza Waterfront Hotel and University Lofts, the Stockton Events Center Parking Structure, and approximately 60,000 square feet of retail/commercial space.  The Events Center Project, including the Arena, is located in downtown Stockton on approximately 24 acres immediately north of and adjacent to the Stockton Channel and within the West End Project Area.

The Arena currently operates at a net loss before debt service and requires a significant General Fund subsidy just to remain in operation.

**46.** **Arena Lease Out** has the meaning set forth in the definition of Arena Lease Back Transaction.

**47.** **Arena Pledge Agreement** has the meaning set forth in the definition of Arena Lease Back Transaction.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

48.     **Assumption Motion** means the motion to be filed by the City pursuant to section 365(a) pursuant to which the City shall seek approval and authorization for its assumption of such executory contracts and unexpired leases as shall be identified in the Assumption Motion.

49.     **Assured Guaranty** means Assured Guaranty Municipal Corp.

50.     **Assured Guaranty Contingent General Fund Payments Term Sheet** has the meaning set forth in the definition for Assured Guaranty Settlement.

51.     **Assured Guaranty Settlement** means that certain settlement among the City, the 2007 Office Building Bond Trustee, the Pension Obligation Bonds Trustee, and Assured Guaranty regarding the treatment under this Plan of the Claims arising out of the Office Building Lease Back Transaction and the Pension Obligation Bonds, as set forth in that certain "Final Settlement Term Sheet, Assured Guaranty Municipal Corp. and City of Stockton" dated as of October 2, 2013 (the "**Assured Guaranty Settlement Term Sheet**"), to which is attached as Exhibit A that certain "Final Term Sheet for Contingent General Fund Payments" dated as of October 2, 2013 (the "**Assured Guaranty Contingent General Fund Payments Term Sheet**", and together with the Assured Guaranty Settlement Term Sheet, the "**Assured Guaranty Term Sheet**"), both of which are attached hereto as **Exhibit A** and incorporated by reference, and as more particularly set forth in that certain "Settlement Agreement, Assured Guaranty Municipal Corporation and City of Stockton" (the "**Assured Guaranty Settlement Agreement**"), set forth in the documentation annexed as Exhibit 1 to the Plan Supplement. The Assured Guaranty Settlement shall include representations, warranties, covenants, conditions, and mutual releases as are customary for such agreements.  Any conflict between the terms of the Assured Guaranty Settlement Term Sheet, the Plan, the Disclosure Statement and the Assured Guaranty Settlement Agreement shall be resolved as set forth in the Assured Guaranty Settlement Agreement.  While the Assured Guaranty Settlement Term Sheet and Assured Guaranty Settlement Agreement should be consulted for the precise terms of the Assured Guaranty Settlement, a summary of the Assured Guaranty Settlement is as follows:

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**Disposition of the 400 E. Main Office Building Property:**

- The Office Building Lease Out and Lease Back will be terminated, and the City shall have no obligations under the same.  The City will transfer fee title in the 400 E. Main Office Building Property to Assured Guaranty or its designee at Assured Guaranty's election, subject to the New 400 E. Main Lease.  Assured Guaranty may elect to keep the property or to sell it at some future date, subject to the New 400 E. Main Lease.  Assured Guaranty shall be entitled to all net rent and profits of the property after the transfer and to all of the sales proceeds of the property should Assured Guaranty elect to sell the property, and Assured Guaranty shall be obligated to pay all costs of operation and maintenance of the property.  The City shall be released from any and all liability with respect to the 2007 Office Building Bonds and associated documents and the terminated Office Building Lease Out and Lease Back and other related bond documents.

- The New 400 E. Main Lease shall include the terms set forth in the Assured Guaranty Term Sheet, including without limitation the following:  the initial term shall begin on the Effective Date and end on June 30, 2022; the City shall enjoy exclusive use of the City Space (as defined in the Assured Guaranty Term Sheet); the City shall make monthly rent payments as specified in the Assured Guaranty Term Sheet; the New 400 E. Main Lease supersedes the Fourth Floor Lease of 400 E. Main.

**Non-Contingent Payments on Pension Obligation Bonds:**

- The City agrees to make non-contingent payments on the Pension Obligation Bonds in each fiscal year equal to the sum of the 2007 Lease Ask Payments, Special Fund Payments, and Supplemental

11    CITY OF STOCKTON'S PLAN OF ADJUSTMENT

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Payments on the dates and in the amounts set forth in the Assured Guaranty Term Sheet.

- Assured Guaranty shall also be entitled to Contingent Payments in accordance with the City's Contingent Payment Model, a copy of which is attached to the Assured Guaranty Term Sheet as Exhibit A. If the City does not exceed its baseline financial projections in the upcoming years, Assured Guaranty would receive no Contingent Payments. However, if the City were to exceed its financial projections over the years—which the City and Assured Guaranty believe may be achievable—Assured Guaranty would receive Contingent Payments until Assured Guaranty has received payment in full on the Pension Obligation Bond Class 6 Claims; *provided*, that the last date a Contingent Payment is required to be paid is June 1, 2052. Contingent Payments will be based upon the City's budget in each year, subject to adjustment following year-end audit.

- Contingent Payments on the Pension Obligation Bonds for each fiscal year shall be paid on June 1 of such fiscal year, commencing June 1, 2018 and ending on June 1, 2052, subject to adjustment based on audits as mentioned above.

**Other Terms:**

- Assured Guaranty and the City shall each bear their own professional fees. The City will waive rights to seek reimbursement of attorneys' fees related to the eligibility trial in the Chapter 9 Case, and Assured Guaranty and the Trustee will waive rights to seek attorneys' fees under the bond documents except for any attorneys' fees incurred as a result of a future breach of the Plan.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

52.     **Assured Guaranty Settlement Agreement** has the meaning set forth in the definition of Assured Guaranty Settlement.

53.     **Assured Guaranty Settlement Term Sheet** has the meaning set forth in the definition for Assured Guaranty Settlement.

54.     **Assured Guaranty Term Sheet** has the meaning set forth in the definition of Assured Guaranty Settlement.

55.     **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy Court in the Plan Solicitation Order accompanying the Disclosure Statement and provided to each holder of a Claim entitled to vote to accept or reject this Plan.

56.     **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 9 Case.

57.     **Bankruptcy Court** means the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, or such other court that lawfully exercises jurisdiction over the Chapter 9 Case.

58.     **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 9 Case, together with the local rules of the Bankruptcy Court applicable to the Chapter 9 Case. Unless otherwise indicated, references in this Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules of Bankruptcy Procedure.

59.     **Bar Date** means the applicable date by which a particular proof of claim must be filed, as established by the Bankruptcy Court.

60.     **Business Day** means a day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York, are required or authorized to close by law or executive order.

61.     **CalPERS** means the California Public Employees' Retirement System.

62.     **CalPERS Pension Plan** means the pension plan contract between CalPERS and the City, dated as of September 1, 1944, as amended (CalPERS ID 6373973665).

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

63.      **CalPERS Pension Plan Participants** means those current and former City employees and their survivors and other dependents who are the beneficiaries of the CalPERS Pension Plan.

64.      **Cash** means cash and cash equivalents, including withdrawable bank deposits, wire transfers, checks, and other similar items.

65.      **Chapter 9 Case** means the case under chapter 9 of the Bankruptcy Code commenced by the City, styled as *In re City of Stockton, California,* Case No. 2012-32118, currently pending in the Bankruptcy Court.

66.      **City** means the City of Stockton, California, the debtor in the Chapter 9 Case.

67.      **City Council** means the duly elected legislative body of the City.

68.      **CJPRMA** means California Joint Powers Risk Management Authority.

69.      **Claim** means a claim against the City or the property of the City within the meaning of section 101(5).

70.      **Class** means any group of Claims classified herein pursuant to section 1123(a).

71.      **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

72.      **Confirmation Hearing** means the hearing to be conducted by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned, reconvened or continued from time to time.

73.      **Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 943.

74.      **Construction Agreement** means that certain "Agreement Regarding Construction Costs" dated as of April 29, 2008, among SCC 16, the City, and the Redevelopment Agency, relating to the City's obligation to reimburse SCC 16 for construction costs paid by SCC 16 that the City was otherwise liable to pay, for the construction of improvements to certain premises located in the Edmund S. Coy Parking Structure leased by SCC 16.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

75. **Controller** means the California State Controller's Office.

76. **Convenience Class Claim** means any Allowed Claim that is greater than $0 in Allowed amount and less than or equal to $100 in Allowed amount or irrevocably reduced to $100 in Allowed amount at the election of the holder of the Allowed Claim as evidenced by the Ballot submitted by such holder; *provided*, *however*, that an Allowed Claim may not be subdivided into multiple Claims of $100 or less for purposes of receiving treatment as a Convenience Class Claim.

77. **DBW** means the California Department of Boating and Waterways, now the Boating and Waterways division of the Department of Parks and Recreation.

78. **DBW Construction Loan Claim** means the Claim of DBW under the Marina Construction Loan Agreement, secured by a pledge of gross revenues under the terms of a Collateral Assignment of Rents and Leases for the Project Area, which pledge is converted to a pledge of net revenues by virtue of section 928(b).  The "**Marina Project**" (as defined and described in the Marina Construction Loan Agreement) has generated no net operating revenues since its official opening on October 30, 2009.  The City General Fund subsidy for the Marina Project totals $1,905,299 from fiscal year 2010-11 through the adopted budget for fiscal year 2013-14.  The Marina Construction Loan Agreement provides that DBW, upon default, may take over the operations of the Marina Project and charge the costs of operations to the City; however, under the Debt Limit, the City is not liable for such payments in future fiscal years because the Marina Construction Loan was not approved by a 2/3 vote of the voters of the City.  Pursuant to the terms of the Marina Construction Loan Agreement, any obligation to repay the Marina Construction Loan from the General Fund is subject to the Debt Limit.  Because the Marina Construction Loan was not submitted to and approved by 2/3 of the voters of the City, any obligation of the City's General Fund to make payments under the Marina Construction Loan is *void ab initio*, and the unsecured portion of this Claim is not an Allowed Claim.[2]

---

[2] The obligation to pay the Marina Construction Loan from revenues of the Marina Project—as opposed to the General Fund—does not violate the Debt Limit because the Marina Project operates as an enterprise fund.  *See City of Oxnard v. Dale*, 45 Cal. 2d 729, 737, 290 P.2d 859, 863 (1955).

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

79.     **DBW Marina Planning Report Loan Claim** means the Claim of DBW under the Marina Planning Report Loan.  This Claim is an unsecured Claim against the Redevelopment Agency, is not a claim against the City, and is included herein for information only.

80.     **DBW Transaction** means two loans made by DBW:  the first an unsecured loan to the Redevelopment Agency in the amount of $280,000, bearing interest at 4.5% per year with a repayment term of 10 years, with equal annual installment payments due on August 1 of each year commencing on August 1, 2003, as evidenced by that certain Stockton Waterfront Marina $180,000 Planning Loan Contract (also titled the Planning Study Contract, Stockton Waterfront Marina Study Loan) dated as of September 13, 1996, as the same has been amended from time to time (the "**Marina Planning Report Loan**");  and the second a loan to the City in the amount of $13,300,000 for the stated purpose of construction of the Marina Project, bearing interest at 4.5% per year with interest and principal payments due annually on August 1 of each year for 30 years commencing on the August 1 after the final disbursement of loan proceeds, secured by a Collateral Assignment of Rents and Leases for the Project Area as evidenced by that certain Stockton Waterfront Marina $13,300,000 Loan Contract dated as of June 21, 2004 (the "**Marina Construction Loan**" and, as amended, the "**Marina Construction Loan Agreement**" respectively).

81.     **Debt Limit** means the debt limit imposed by article XVI, section 18 of the California Constitution.  *See In re County of Orange v. Fuji Securities Inc.*, 31 F. Supp. 2d 768 (C.D. Cal. 1998).

82.     **Dexia** means Dexia Crédit Local, a banking corporation duly organized and existing under the laws of the Republic of France, acting through its New York branch.

83.     **Disallowed** means a Claim or portion thereof that:  (i) has been disallowed by a Final Order of the Bankruptcy Court; (ii) has been listed by the City in its list of creditors, as it may be amended from time to time in accordance with Bankruptcy Rule 1009, as in the amount of $0, contingent, disputed, or unliquidated, and as to which no proof of claim has been filed by the applicable deadline or deemed timely filed pursuant to any Final Order of the Bankruptcy

Filed 10/10/13          Case 12-32118          Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    Court; (iii) as to which the holder thereof has agreed to be equal to $0 or to be withdrawn,

2    disallowed or expunged; or (iv) has not been listed in the list of creditors and as to which no proof

3    of claim has been filed by the applicable deadline or deemed timely filed pursuant to a Final

4    Order of the Bankruptcy Court.

5         **84.**   **Disclosure Statement** means the disclosure statement, and all exhibits and

6    schedules incorporated therein, that relates to this Plan and that is approved by the Bankruptcy

7    Court pursuant to section 1125, as the same may be amended, modified, or supplemented in

8    accordance with the Bankruptcy Code.

9         **85.**   **Disposition and Development Agreement** means that certain Disposition

10   and Development Agreement between SCC 16 and the Redevelopment Agency, dated as of

11   October 8, 2002, regarding the development of the City Center Cinema project in Stockton,

12   California.

13        **86.**   **Disputed Claim** means any Claim or portion thereof that has not become

14   Allowed and that is not Disallowed. In the event that any part of a Claim is a Disputed Claim,

15   except as otherwise provided in this Plan, such Claim shall be deemed a Disputed Claim in its

16   entirety for purposes of distribution under this Plan unless the City otherwise agrees in writing in

17   its sole discretion. Without limiting the foregoing, a Claim that is the subject of a pending

18   application, motion, complaint, objection, or any other legal proceeding seeking to disallow,

19   limit, reduce, subordinate, or estimate such Claim shall be deemed to be a Disputed Claim.

20        **87.**   **Effective Date** means a Business Day after the Confirmation Date

21   specified by the City on which the conditions specified in Section XIII of the Plan have been

22   satisfied or waived. For purposes of calculating various payments, the Effective Date was

23   assumed to be [_____]. However, because the Confirmation Hearing will not occur until

24   [_____], the City estimates that the Effective Date will occur in [_____], so the

25   calculations will be slightly altered.

26        **88.**   **Events Center Project** has the meaning set forth in the definition of Arena

27   Lease Back Transaction.

28

Filed 10/10/13    Case 12-32118    Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

89.    **Final Order** means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which:  (a) the time to appeal or petition for review, rehearing, or certiorari has expired and no appeal or petition for review, rehearing, or certiorari is then pending; or (b) any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

90.    **Financing Authority** means the Stockton Public Financing Authority, a joint powers authority organized and existing under the laws of the state of California and that certain Joint Exercise of Powers Agreement dated as of June 16, 1990, by and between the City and the Redevelopment Agency.

91.    **Fire/Police/Library Lease Back** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

92.    **Fire/Police/Library Lease Back Rental Payments** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

93.    **Fire/Police/Library Lease Back Transaction** means the transaction described as follows:

> ***Fire/Police/Library Financial Instruments Involved***.  The financial instruments involved in this transaction are the City of Stockton Certificates of Participation (Redevelopment Housing Projects) Series 2003A, issued on June 27, 2003, in the original principal amount of $1,160,000 (the "**2003A Fire/Police/Library Certificates**") and the Certificates of Participation (Redevelopment Housing Projects) Taxable Series 2003B, issued on June 27, 2003, in the original principal amount of $12,140,000 (the "**2003B Fire/Police/Library Certificates**", and together with the 2003A Fire/Police/Library  Certificates, the "**2003 Fire/Police/Library Certificates**"). Wells Fargo is the trustee under the 2003 Fire/Police/Library Certificates Trust

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Agreement (together with any successor trustee, the "**2003 Fire/Police/Library Certificates Trustee**").  A reserve fund exists for the 2003A Fire/Police/Library Certificates with a balance as of September 1, 2013 of $59,746.48 and for the 2003B Fire/Police/Library Certificates with a balance as of September 1, 2013 of $706,781.35 (together, the "**2003 Fire/Police/Library Certificates Reserve Fund**").  The funds in the 2003 Fire/Police/Library Certificates Reserve Fund are pledged to support payment of the lease payments under the Fire/Police/Library Lease Out evidenced and represented by the 2003 Fire/Police/Library Certificates.  The 2003 Fire/Police/Library Certificates are insured by Ambac.  The City also entered into a Reimbursement Agreement, dated as of June 1, 2003 (the "**2003 Fire/Police/Library Certificates Reimbursement Agreement**"), with the former Redevelopment Agency of the City of Stockton (the "**Former Redevelopment Agency**").  The City, as successor (the "**Successor Agency**") to the Former Redevelopment Agent per California Assembly Bill AB x1 26 (2011-12) which dissolved California's redevelopment agencies as of February 1, 2012, is successor in interest to the Former Redevelopment Agency under the 2003 Fire/Police/Library Certificates Reimbursement Agreement.  Pursuant to the terms of the 2003 Fire/Police/Library Certificates Reimbursement Agreement, the Successor Agency is obligated to reimburse the City for lease payments the City makes under the Fire/Police/Library Lease Bank (as defined below) from Housing Set-Aside Amounts (as defined in the 2003 Fire/Police/Library Certificates Reimbursement Agreement).

*Properties Involved/Leases*.  As described in more detail below, the properties that are involved in this transaction are three fire stations, the City's Main Police Facility, and the Maya Angelou Southeast Branch Library (collectively, the "**Fire/Police/Library Properties**").  In order to facilitate the financing to be provided by the 2003 Fire/Police/Library Certificates, the City, as owner of the Fire/Police/Library Properties, leased the properties to the Financing

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Authority pursuant to that certain Site and Facility Lease dated as of June 1, 2003, for a term ending on June 1, 2033, with a possible extension of the term to the date upon which the 2003 Fire/Police/Library Certificates are paid in full (the "**Fire/Police/Library Lease Out**"). Pursuant to section 510 of the City Charter, the term of the Fire/Police/Library Lease Out cannot extend for more than 55 years or to May 31, 2058. The City contemporaneously leased the Fire/Police/Library Properties back from the Financing Authority for the same number of years pursuant to the terms of a Lease Agreement dated as of June 1, 2003 (the "**Fire/Police/Library Lease Back**"). Thus, the City is the lessor and the Financing Authority is the tenant under the Fire/Police/Library Lease Out, and the Financing Authority is the lessor and the City is the tenant in the Fire/Police/Library Lease Back.

As tenant under the Fire/Police/Library Lease Out, the Financing Authority paid rent for the entire lease term in a lump sum payment in the amount of $11,838,678.30, being the net proceeds of the 2003 Fire/Police/Library Bonds. As tenant under the Fire/Police/Library Lease Back, the City agreed to make semi-annual rental payments in varying amounts (the "**Fire/Police/Library Lease Back Rental Payments**"). The Financing Authority assigned to the 2003 Fire/Police/Library Certificates Trustee its rights, other than certain retained rights, under the Fire/Police/Library Lease Back, including the rights to enforce the lease after default by the City, and including the stream of Fire/Police/Library Lease Back Rental Payments from the City, to support the repayment of the 2003 Fire/Police/Library Certificates. The repayment obligation is non-recourse to the Financing Authority, and the 2003 Fire/Police/Library Certificates are payable solely from the 2003 Fire/Police/Library Certificates Reserve Fund and the Fire/Police/Library Lease Back Rental Payments.

*Leased Properties.* The subject properties are the Fire/Police/Library Properties, which consist of City's Main Police Facility,

Filed 10/10/13

Case 12-32118    Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

located at 22 E. Market Street; the Maya Angelou Southeast Branch Library, located at 2324 Pock Lane; Fire Station No. 1, located at 1818 Fresno Avenue; Fire Station No. 5, located at 3499 Manthey Road; and Fire Station No. 14, located at 3019 McNabb Street.

**Fire Stations.** The City owns 13 fire stations, of which 12 are operating. Fire Stations No. 1, 5, and 14 were built in 1995-96. Each station primarily serves the neighborhood in which it is located and occupies a half-acre site with a building of approximately 5,000 square feet. Station No. 1 is located in the south area of the City in the South Stockton Redevelopment Project Area; it was closed as a result of budget cuts. Station No. 5 is located in the south area off Interstate 5 in the Weston Ranch Subdivision. Station No. 14 is located in the north area in a newer residential community commonly referred to as Spanos Park located off Interstate 5 and Eight Mile Road.

**Main Police Facility.** The Main Police Facility is located in the downtown area of the City. It was built in 1970 on a two-acre site and includes approximately 44,000 square feet of building space with 140 parking spaces.

**Library.** The Maya Angelou Southeast Branch Library is located in the south area of the City. It was built in 1996 on a 1.8-acre site and includes approximately 20,000 square feet of building space. The library serves the residents of both the City and San Joaquin County in multiple South Stockton neighborhoods and is one of 12 libraries that comprise the Stockton-San Joaquin County Public Library System.

94.    **Fire/Police/Library Lease Out** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

95.    **Fire/Police/Library Lease Out Assignment Agreement** means the Assignment Agreement by and between the Financing Authority and the 2003 Fire/Police/Library

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Certificates Trustee, pursuant to which the Financing Authority has agreed to assign all rights and interests in the Fire/Police/Library Lease Back to the 2003 Fire/Police/Library Certificates Trustee in substantially the form annexed to the Ambac Settlement Agreement as Exhibit A (and referred to in the Ambac Settlement Agreement as the "Site Lease Assignment Agreement"), which such Ambac Settlement Agreement is attached as Exhibit A to the Declaration of Robert Deis in Support of the City of Stockton's Motion Under Bankruptcy Rule 9019 for Approval of Its Settlement with Ambac Assurance Corporation, filed in the Chapter 9 Case on February 26, 2013 [Dkt. No. 725].

96. **Fire/Police/Library Properties** has the meaning set forth in the definition of Fire/Police/Library Lease Back Transaction.

97. **Fourth Floor Lease of 400 E. Main** has the meaning set forth in the definition of Office Building Lease Back Transaction.

98. **Franklin** means, together, Franklin Advisers, Inc., Franklin High Yield Tax Free Income Fund, and Franklin California High Yield Municipal Fund.

99. **General Fund** means the City's chief operating fund, which is used to account for all financial resources except those required to be accounted for in another fund (such as the Restricted Funds).

100. **General Liability Claim** means a tort or contract Claim filed against the City pursuant to the Government Claims Act, California Government Code section 810 *et seq*.

101. **General Unsecured Claim** means any unsecured Claim *that is not* (1) an Administrative Claim; (2) a General Liability Claim; or (3) a Workers Compensation Claim.

102. **Golf Course/Park Claims of the 2009 Golf Course/Park Bond Trustee/Franklin** means the Claims arising from the rejection by the City of the Golf Course/Park Lease Back (as limited under section 502(b)(6)) and the Claims, if any (given the option of possession and quiet enjoyment of the Golf Course/Park Properties under section 365(h)), arising from the rejection by the City of the Golf Course/Park Lease Out, which claims were held by the Financing Authority, but are now controlled and asserted by the 2009 Golf Course/Park Bond Trustee at the direction of Franklin, or its authorized successor in interest,

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1   as the sole holder of the 2009 Golf Course/Park Bonds as a result of the assignment by the

2   Financing Authority of all of its rights under the Golf Course/Park Lease Out and the Golf

3   Course/Park Lease Back to the 2009 Golf Course/Park Bond Trustee.  The Golf Course/Park

4   Claims of the 2009 Golf Course/Park Bond Trustee/Franklin do not include any claims arising out

5   of non-payment of the 2009 Golf Course/Park Bonds as all such claims are non-recourse claims

6   against the Financing Authority secured only by the assignment by the Financing Authority of the

7   Golf Lease Back Rental Payments and all of its rights under the Golf Course/Park Lease Out and

8   the Golf Course/Park Lease Back, and are not obligations of the City.

9          103.   **Golf Course/Park Lease Back** has the meaning set forth in the definition

10   of Golf Course/Park Lease Back Transaction.

11          104.   **Golf Course/Park Lease Back Rental Payments** has the meaning set

12   forth in the definition of Golf Course/Park Lease Back Transaction.

13          105.   **Golf Course/Park Lease Back Transaction** means the transaction

14   described as follows:

15          *Financial Instruments Involved*.  The financial instruments

16          involved in the Golf Course/Park Lease Back Transaction are the Stockton Public

17          Financing Authority Lease Revenue Bonds, 2009 Series A (Capital Improvement

18          Projects), issued on September 9, 2009, in the aggregate principal amount of

19          $35,080,000 (the "**2009 Golf Course/Park Bonds**").  Wells Fargo is the indenture

20          trustee under the 2009 Golf Course/Park Bonds Indenture (together with any

21          successor trustee, the "**2009 Golf Course/Park Bond Trustee**").  A reserve fund

22          exists for the 2009 Golf Course/Park Bonds with a balance as of September 1,

23          2013, of $904,380.81 (the "**2009 Golf Course/Park Bond Reserve Fund**").  The

24          funds in the 2009 Golf Course/Park Bond Reserve Fund are pledged to support

25          repayment of the 2009 Golf Course/Park Bonds.  The 2009 Golf Course/Park

26          Bonds are not insured; however, Franklin is the sole holder of the bonds.

27          *Properties Involved/Leases*.  As described in more detail below, the

28          properties that are involved in this transaction are Oak Park, the Van Buskirk Golf

Course, and the Swenson Golf Course (as defined below, the "**Golf Course/Park Properties**").  In order to facilitate the financing to be provided by the 2009 Golf Course/Park Bonds, the City, as owner of the Golf Course/Park Properties, leased the properties to the Financing Authority, pursuant to a Site and Facility Lease dated as of September 1, 2009, for a term ending on September 1, 2038, with a possible extension of the term to the date upon which the 2009 Golf Course/Park Bonds are paid in full.  Pursuant to section 510 of the City Charter, the term of the lease cannot extend for more than 55 years or to August 31, 2064. (the "**Golf Course/Park Lease Out**").  The City contemporaneously leased the properties back from the Financing Authority for the same number of years pursuant to the terms of the Lease Agreement dated as of September 1, 2009 (the "**Golf Course/Park Lease Back**").  Thus, the City is the lessor and the Financing Authority is the tenant under the Golf Course/Park Lease Out, and the Financing Authority is the lessor and the City is the tenant in the Golf Course/Park Lease Back.

As tenant under the Golf Course/Park Lease Out, the Financing Authority paid rent for the entire lease term in a lump sum payment in the amount of $1.00.  Pursuant to the terms of the Golf Course/Park Lease Back, the Financing Authority agreed to provide the net proceeds of the 2009 Golf Course/Park Bonds (with gross proceeds equal to $35,080,000) to the City for the purpose of financing various capital projects.  As tenant under the Golf Course/Park Lease Back, the City agreed to make semi-annual rental payments in varying amounts ($2,415,838 for fiscal year 2012-13, $2,923,119 for fiscal year 2013-14, $2,926,332 for fiscal year 2014-15, etc.) (the "**Golf Course/Park Lease Back Rental Payments**").  The Financing Authority assigned to the 2009 Golf Course/Park Bond Trustee its rights under the Golf Course/Park Lease Back, including the rights to enforce the lease after default by the City, and including the stream of Golf Course/Park Lease Back Rental Payments from the City, to support the repayment of the 2009 Golf

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Course/Park Bonds. No other revenues or assets are pledged to support the repayment of the 2009 Golf Course/Park Bonds, the repayment obligation is non-recourse to the Financing Authority, and the 2009 Golf Course/Park Bonds are payable solely from the Golf Course/Park Lease Back Rental Payments. A default occurred on March 1, 2012 in the payment by the City of amounts due under the Golf Course/Park Lease Back.

The subject properties consist of three separate properties, each of which continues to be owned by the City (subject to the Golf Course/Park Lease Out to the Financing Authority and the Golf Course/Park Lease Back from the Financing Authority) (as described below, the "**Golf Course/Park Properties**").

**Oak Park**. This property is a public park of approximately 61.2 acres, bounded on the east by Union Pacific railroad tracks, on the north by East Fulton Street, on the south by East Alpine Street, and on the west by North Sutter and Alvarado Streets. Oak Park features group picnic areas, 20 picnic tables, two tot lots, 15 barbecue pits, and four restrooms. In addition, Oak Park features 11 tennis courts; two regulation softball fields; the Billy Hebert Field, a 6,000-seat, regulation professional minor league baseball field (renovated in 2002); a multi-use field; a community swimming pool complex with changing facilities; and an approximately 13,875-square-foot ice-rink facility with seating for 350. A one-story senior center of approximately 5,000 square feet, which is available for rental to the public, is also located at Oak Park.

**Swenson Golf Course**. This property was opened in 1952 and is located on approximately 219 acres at 6803 Alexandria Place. Swenson Golf Course features a classic championship 18-hole, par 72 course; a nine-hole executive, par three course; a 15-station driving range; two putting greens and a practice bunker; and paved cart paths. Also located on this property is a clubhouse, an approximately 2,000-square-foot

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

pro shop, an approximately 5,000-square-foot maintenance and storage facility, and an approximately 2,500-square-foot café with seating.

        **Van Buskirk Golf Course**. This property was opened in 1962 and is located on approximately 214.0 acres at 1740 Houston Avenue. Van Buskirk Golf Course features a classically designed par 72, 18-hole course, an all-grass driving range with 15 stations, two practice greens, and partially paved cart paths. Also located on this property is a clubhouse, an approximately 2,000-square-foot pro shop, an approximately 5,000-square-foot maintenance and storage facility, and an approximately 2,500-square-foot cafe with seating. The Van Buskirk Golf Course real property is subject to a senior reversionary interest, and if it were to be converted from a public recreational use it may revert to private parties.

106. **Golf Course/Park Lease Out** has the meaning set forth in the definition of Golf Course/Park Lease Back Transaction.

107. **Golf Course/Park Properties** has the meaning set forth in the definition of Golf Course/Park Lease Back Transaction.

108. **Impaired** means a Claim or interest that is impaired within the meaning of section 1124.

109. **Indenture Trustee** means Wells Fargo, together with any successor trustee, in its role as the 2003 Fire/Police/Library Certificates Trustee, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee, the 2006 SEB Bond Trustee, the 2007 Office Building Bond Trustee, and/or the 2009 Golf Course/Park Bond Trustee, as the context requires.

110. **Insured Portion** means that portion of an Allowed Workers Compensation Claim or an Allowed General Liability Claim that is covered by one or more of the excess risk-sharing pools of which the City is a member, up to the amount of the policy limits, including any excess coverage policies.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

111.    **Leave Buyout Claim** means a Claim of a former City employee on account of unpaid sick leave or other compensation or reimbursement due upon such employee's retirement or other separation from City service.

112.    **Marina Construction Loan** has the meaning set forth in the definition of DBW Transaction.

113.    **Marina Construction Loan Agreement** has the meaning set forth in the definition of DBW Transaction.

114.    **Marina Planning Report Loan** has the meaning set forth in the definition of DBW Transaction.

115.    **Marina Project** has the meaning set forth in the definition of DBW Construction Loan Claim.

116.    **Marshall Plan** means the plan titled "Marshall Plan: Violence Reduction Strategy, Stockton, California," written by David M. Bennett and Donna D. Lattin and adopted by the City Council. The Marshall Plan aims to reduce homicides and gun violence in the City through, among other measures, additional hires of police and other safety officers. The Marshall Plan is publicly available at http://www.stocktongov.com/files/CouncilAgenda_2013_4_02_ item_15_01_MarshallPlan.pdf.

117.    **Measure A** means the City measure on the November 5, 2013 ballot, which, if passed by the electorate, will raise sales tax in the City by 3/4 cent.

118.    **Measure B** means the nonbinding advisory City measure on the November 5, 2013 ballot, which, if passed by the electorate, expresses an opinion that 65% of the tax proceeds from Measure A should be used to pay for law enforcement and crime prevention services, such as those described in the City's Marshall Plan, and 35% should be used only to pay for the City's efforts to end bankruptcy and for services to residents, businesses, and property owners.

119.    **New 400 E. Main Lease** means the lease to the City of a portion of the 400 E. Main Office Building Property, as described in the Assured Guaranty Term Sheet.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

120.  **Notice of the Effective Date** shall have the meaning ascribed to such phrase in Section XIV(E) of the Plan.

121.  **NPFG** means National Public Finance Guarantee Corporation, a New York stock insurance corporation.

122.  **NPFG Arena Settlement** means the settlement between the City and NPFG relating to the Arena Lease Back Transaction, the terms of which are summarized by the NPFG Settlement Term Sheet, which will be superseded by the terms of the definitive documents set forth in the documentation annexed as Exhibit 2 to the Plan Supplement.

123.  **NPFG Parking Settlement** means the settlement between the City and NPFG relating to the Parking Structure Lease Back Transaction, the terms of which are summarized by the NPFG Settlement Term Sheet, which will be superseded by the terms of the definitive documents set forth in the documentation annexed as Exhibit 3 to the Plan Supplement.

124.  **NPFG SEB Settlement** means the settlement between the City and NPFG relating to the SEB Lease Back Transaction, the terms of which are summarized by the NPFG Settlement Term Sheet, which will be superseded by the terms of the definitive documents set forth in the documentation annexed as Exhibit 4 to the Plan Supplement.

125.  **NPFG Settlement** means, collectively, the NPFG Arena Settlement, the NPFG Parking Settlement, and the NPFG SEB Settlement, the terms of which are summarized by the NPFG Settlement Term Sheet. The NPFG Settlement shall include representations, warranties, covenants, conditions, and mutual releases as are customary for such agreements. The terms of the NPFG Settlement Term Sheet will be superseded by the terms of definitive documents comprising the NPFG Arena Settlement, the NPFG Parking Settlement, and the NPFG SEB Settlement. While the NPFG Arena Settlement, the NPFG Parking Settlement, and the NPFG SEB Settlement should be consulted for the precise terms thereof, the basic terms of such settlements are as follows:

- The City will assume the SEB Lease Back, and as a result, the City will continue to remain in possession, custody, and control of the SEB Properties.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

- After modification of the payment terms of the Arena Lease Back that will reduce the exposure of the General Fund on account of Arena Lease Back Rental Payments, the City will assume the Arena Lease Back, and as a result, the City will continue to remain in possession, custody, and control of the Arena.

- The City will create a new parking authority for the City that will be comprised of the Parking Structure Properties, other downtown parking structures and lots, and downtown parking meters, as well as parking enforcement revenues.

- The effectiveness of the NPFG Settlement is contingent upon the entry into the SCC 16 Settlement.  In the event the parties are unable to agree to the terms of such settlement that is acceptable to NPFG, then the City, at the request or direction of the 2004 Parking Bond Trustee or NPFG, shall take such actions (if any) that may be required by the 2004 Parking Bond Trustee or NPFG to terminate the Parking Structure Lease Back as part of an alternative arrangement that is acceptable to the City and the 2004 Parking Bond Trustee that is not conditioned on the occurrence of such settlement.

- Revenues from the newly created parking authority will be pledged to the 2004 Parking Bond Trustee in support of a new schedule of installment payments to NPFG in exchange for a forbearance agreement on the part of NPFG with respect to remedies for default on the Parking Structure Lease Back, and the General Fund will have no liability for such new installment payments schedule, nor any obligation to make payments under the Parking Structure Lease Back.  NPFG will transfer its current possessory interest in the Parking Structure Properties to the newly created parking authority

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

in exchange for the right to receive the installment payments from the parking authority.

- All parties to the NPFG Settlement shall bear their own professional fees.

- All parties to the NPFG Settlement will exchange limited mutual releases except for obligations created under the NPFG Settlement and this Plan.

126.    **NPFG Settlement Term Sheet** means that certain "Settlement Term Sheet, City of Stockton and National Public Finance Guarantee Corporation" dated as of September 27, 2013, attached hereto as **Exhibit B**, which shall be superseded by the terms of the definitive documents comprising the NPFG Arena Settlement, the NPFG Parking Settlement, and the NPFG SEB Bond Settlement.

127.    **Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty** means the Claims arising in connection with the Office Building Lease Back Transaction (which claims were held by the Financing Authority, but are now controlled and asserted by the 2007 Office Building Bond Trustee at the direction of Assured Guaranty (as the insurer of the 2007 Office Building Bonds) as a result of the assignment by the Financing Authority of all of its rights under the Office Building Lease Out and the Office Building Lease Back to the 2007 Office Building Bond Trustee.  The Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty do not include any claims arising out of non-payment of the 2007 Office Building Bonds as all such claims are non-recourse claims against the Financing Authority secured only by the assignment by the Financing Authority of the Office Building Lease Back Rental Payments and are not obligations of the City.

128.    **Office Building Lease Back** has the meaning set forth in the definition of Office Building Lease Back Transaction.

129.    **Office Building Lease Back Rental Payments** has the meaning set forth in the definition of Office Building Lease Back Transaction.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

130. **Office Building Lease Back Transaction** means the transaction described as follows:

*Financial Instruments Involved.* The financial instruments involved in this transaction are the Stockton Public Financing Authority Variable Rate Demand Lease Revenue Bonds, 2007 Series A (Building Acquisition Financing Project), issued on November 29, 2007, in the aggregate principal amount of $36,500,000 (the "**2007 Series A Bonds**") and the Stockton Public Financing Authority Taxable Variable Rate Demand Lease Revenue Bonds, 2007 Series B (Building Acquisition Financing Project), issued on November 29, 2007, in the aggregate principal amount of $4,270,000 (the "**2007 Series B Bonds**" and together with the 2007 Series A Bonds, the "**2007 Office Building Bonds**"). Wells Fargo is the indenture trustee under the 2007 Office Building Bonds Indenture (together with any successor trustee, the "**2007 Office Building Bond Trustee**"). The 2007 Office Building Bonds are insured by Assured Guaranty.

*Property Involved/Lease.* As described in more detail below, the property that is involved in this transaction is an office building that was purchased with the net proceeds of the 2007 Office Building Bonds and located at 400 E. Main Street in Stockton (the "**400 E. Main Office Building Property**"). In order to facilitate the financing to be provided by the 2007 Office Building Bonds, the City, as prospective owner of the 400 E. Main Office Building Property, leased the property to the Financing Authority pursuant to that certain Site and Facility Lease dated as of November 1, 2007, for a term ending on September 1, 2048, with a possible extension of the term to the date upon which the 2007 Office Building Bonds are paid in full, but in any event no later than September 1, 2058 (the "**Office Building Lease Out**"). The City contemporaneously leased the 400 E. Main Office Building Property back from the Financing Authority for the same number of years pursuant to the terms of the Lease Agreement dated as of November 1, 2007 (the "**Office Building Lease Back**"). Thus, the City is the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

lessor and the Financing Authority is the tenant under the Office Building Lease Out, and the Financing Authority is the lessor and the City is the tenant under the Office Building Lease Back.

As tenant under the Office Building Lease Out, the Financing Authority paid rent for the entire lease term in the amount of $1.00. Pursuant to the Office Building Lease Back, the Financing Authority agreed to provide to the City the net proceeds of the 2007 Office Building Bonds (with gross proceeds equal to $40,355,000), which the City then used to acquire the 400 E. Main Office Building Property. As tenant under the Office Building Lease Back, the City agreed to make annual rental payments in the amount of interest accruing on the 2007 Office Building Bonds plus principal amortization specified in the Office Building Lease Back (such principal amortization is scheduled as $155,000 due on September 1, 2012, $165,000 due on September 1, 2013, and $175,000 due on September 1, 2014, etc.) (the "**Office Building Lease Back Rental Payments**"). The Financing Authority assigned its rights under the Office Building Lease Back, including the rights to enforce the lease after default by the City, and including the stream of Office Building Lease Back Rental Payments from the City, to support the repayment of the 2007 Office Building Bonds. No other revenues or assets are pledged to support the repayment of the 2007 Office Building Bonds, the repayment obligation is non-recourse to the Financing Authority, and the 2007 Office Building Bonds are payable solely from the Office Building Lease Back Rental Payments.

Even before filing the Chapter 9 Case, due to a lack of revenues generated by the 400 E. Main Office Building Property, and as a result of the deteriorating finances of the City, the City defaulted in the payment of the Office Building Lease Back Rental Payments. As a result, the 2007 Office Building Bond Trustee filed suit to enforce the Office Building Lease Back, with the result that the Superior Court of the State of California for the County of San Joaquin

Filed 10/10/13　　Case 12-32118　　Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1　entered a Judgment of Possession on May 31, 2012 authorizing Main Street

2　Stockton LLC, as designee of the 2007 Office Building Bond Trustee, to enter into

3　possession of the 400 E. Main Office Building Property.  *See* Judgment of

4　Possession, filed May 31, 2012, *Wells Fargo Bank, National Association v. City of*

5　*Stockton*, Superior Court of California, County of San Joaquin, case no. 39-2012-

6　00280741-CU-UD-STK.  The Judgment of Possession found the City to be in

7　unlawful detainer of the 400 E. Main Office Building Property and awarded

8　possession of the 400 E. Main Office Building Property to the 2007 Office

9　Building Bond Trustee.  Under the Judgment of Possession, the 2007 Office

10　Building Bond Trustee can operate and re-let the 400 E. Main Office Building

11　Property for the account of the City, but cannot cause the fee interest or the

12　leasehold interest of the City in the 400 E. Main Office Building Property to be

13　sold.  The Judgment of Possession also entitles the 2007 Office Building Bond

14　Trustee to reimbursement of its costs for the unlawful detainer proceeding, as well

15　as reimbursement of its attorney fees and expenses under the Office Building

16　Lease Back.

17　　　　Subsequent to the change in control of the management of the

18　property, the City has leased space on the fourth floor of the 400 E. Main Office

19　Building from the management company for the use and occupancy of the City's

20　information technology (the "**Fourth Floor Lease of 400 E. Main**").  As

21　described in the Assured Guaranty Settlement Term Sheet, the Fourth Floor Lease

22　of 400 E. Main will be superseded by the New 400 E. Main Lease.

23　　　　The 2007 Office Building Bonds were issued as variable rate

24　demand bonds under the terms of which the interest rate was reset on a weekly

25　basis.  Holders of the 2007 Office Building Bonds had the right to tender their

26　bonds for purchase by the 2007 Office Building Bonds Trustee, acting as tender

27　agent, on any date.  Tendered bonds were to be remarketed to other investors

28　pursuant to a remarketing agreement between the Financing Authority and a

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

registered broker dealer.  In order to provide liquidity to holders of the 2007 Office Building Bonds in the event that the tendered bonds could not be so remarketed, the Financing Authority and the City entered into a Standby Bond Purchase Agreement, dated as of November 29, 2007 (the "**Office Building Standby Agreement**"), with Dexia.  Under the Office Building Standby Agreement, Dexia agreed to purchase any 2007 Office Building Bonds that could not be remarketed.  In the event of such a purchase, the bonds so purchased ("**Bank Bonds**") were subject to adjustments to their terms so long as they were held by Dexia.  On February 28, 2012, the City Council voted to commence the AB 506 process, and on April 26, 2012 an event of default of occurred in the payment by the City of the amounts due under the Office Building Lease Back.  As a result of the announcement of the commencement of the AB 506 process, the occurrence of the default, and the filing of the Chapter 9 Case, all of the 2007 Office Building Bonds were tendered for purchase and were unable to be remarketed (the final tender date for the 2007 Series A Bonds is February 29, 2012, and the final tender date for the 2007 Series B Bonds is September 14, 2012).  Accordingly, Dexia purchased the 2007 Office Building Bonds and is now the sole holder thereof.  As Bank Bonds, the 2007 Office Building Bonds now bear interest at the Default Rate under the Office Building Standby Agreement, which is equal to the Base Rate plus 3% (currently, 6.25%).[3]  In addition, the Bank Bonds are subject to mandatory early redemption over a seven-year period.

     *Leased Property*.  The 400 E. Main Office Building Property is located at 400 East Main Street, Stockton.  It consists of a Class A, eight-story,

---

[3] As defined in the Office Building Standby Agreement, Default Rate "means a rate per annum equal to the Base Rate plus an amount equal to three hundred basis points (3.00%)."  Base Rate "means the higher of (a) the fluctuating rate per annum equal to the 'prime rate' listed daily in the 'Money Rate' section of The Wall Street Journal, or if The Wall Street Journal is not published on a particular Business Day, then, the 'prime rate' published in any other national financial journal or newspaper selected by Dexia, and if more than one such rate is listed in the applicable publication, the highest such rate shall be used or (b) the Fed Funds Rate plus fifty basis points (0.5%).  Any change in the Base Rate shall take effect on the date specified in the announcement of such change."

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

steel-framed office building with approximately 246,541 square feet.  The office building is situated on a 2.07-acre site, which is a square block fronting on East Main Street, Market Street, South California Street, and South Sutter Street.  The building has an "H"-shaped floor plate with office wings flanking a central lobby on the first floor.  The lower three floors step back successively to form terraces extending around the building at Floors 2, 3, and 4, while the tower above Floor 4 has planar walls.  The building's exterior consists of polished granite walls with tinted single-pane glass window and painted bronze aluminum sections.  It was constructed in 1988 and is supported by a foundation of cast-in-place concrete pile in the form of a two-floor subterranean parking garage, which offers a parking ratio of approximately 2.1 per 1,000 square feet, for a total of approximately 518 stalls.  The 400 E. Main Office Building Property continues to be owned by the City (subject to the Office Building Lease Out to the Financing Authority and the Office Building Lease Back from the Financing Authority).

131.    **Office Building Lease Out** has the meaning set forth in the definition of Office Building Lease Back Transaction.

132.    **Office Building Standby Agreement** has the meaning set forth in the definition of Office Building Lease Back Transaction.

133.    **Omitted Agreements** shall have the meaning ascribed to such phrase in Section VI(E).

134.    **Other Postpetition Claims** means Claims asserted against the City for services rendered to, or goods delivered to, or obligations incurred by, the City after the Petition Date that do not constitute Administrative Claims.

135.    **Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG** means the Claims arising in connection with the Parking Structure Lease Back Transaction (which claims were held by the Financing Authority, but are now controlled and asserted by the 2004 Parking Bond Trustee at the direction of NPFG (as the insurer of the 2004 Parking Structure Bonds) as a result of the assignment by the Financing Authority of all of its rights under the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Parking Structure Lease Out and the Parking Structure Lease Back to the 2004 Parking Bond Trustee), as modified by the NPFG Settlement. The Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG do not include any claims arising out of non-payment of the 2004 Parking Bonds as all such claims are non-recourse claims against the Financing Authority secured only by the assignment by the Financing Authority of the Parking Structure Lease Back Rental Payments and are not obligations of the City (except to the extent specifically provided under the terms of the NPFG Settlement).

136. **Parking Structure Lease Back** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

137. **Parking Structure Lease Back Rental Payments** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

138. **Parking Structure Lease Back Transaction** means the transaction described as follows:

*Financial Instruments Involved.* The financial instruments involved in this transaction are the Stockton Public Financing Authority Lease Revenue Bonds, Series 2004, (Parking and Capital Projects) issued on June 25, 2004, in the aggregate principal amount of $32,785,000 (the "**2004 Parking Bonds**"). Wells Fargo is the indenture trustee under the 2004 Parking Bonds Indenture (together with any successor trustee, the "**2004 Parking Bond Trustee**"). A reserve fund exists for the 2004 Parking Bonds with a balance as of September 1, 2013, of $78,693.23 (the "**2004 Parking Bond Reserve Fund**"). The funds in the 2004 Parking Bond Reserve Fund are pledged to support repayment of the 2004 Parking Bonds. The 2004 Parking Bonds are insured by NPFG.

*Properties Involved/Leases.* As described in more detail below, the properties and facilities involved in this transaction are the Edmund S. Coy Parking Structure, the Stockton Events Center Parking Structure, and the Market Street Garage (as more particularly defined below, the "**Parking Structure**

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**Properties**"). In order to facilitate the financing provided by the 2004 Parking Bonds, the City, as owner of the Parking Structure Properties, leased the properties to the Financing Authority, pursuant to a Site and Facility Lease dated as of June 1, 2004, for a term ending on September 1, 2034, with a possible extension of the term to the date upon which the 2004 Parking Bonds are paid in full (the "**Parking Structure Lease Out**"). Pursuant to section 510 of the City Charter, the term of the Parking Structure Lease Out cannot extend for more than 55 years or to May 31, 2059. The City contemporaneously leased the properties back from the Financing Authority for the same number of years pursuant to the terms of the Lease Agreement dated as of September 1, 2004 (the "**Parking Structure Lease Back**"). Thus, the City is the lessor and the Financing Authority is the tenant under the Parking Structure Lease Out, and the Financing Authority is the lessor and the City is the tenant in the Parking Structure Lease Back.

As tenant under the Parking Structure Lease Out, the Financing Authority paid rent for the entire lease term in the amount of $1.00. Pursuant to the Parking Structure Lease Back, the Financing Authority agreed to provide to the City the net proceeds of the 2004 Parking Bonds (with gross proceeds equal to $32,785,000), which were used by the City to fund the construction of the Edmund S. Coy Parking Structure (described below) and other capital improvements. As tenant under the Parking Structure Lease Back, the City agreed to make semi-annual rental payments in varying amounts ($1,960,916 for fiscal year 2012-13) (the "**Parking Structure Lease Back Rental Payments**"). The Financing Authority assigned its rights under the Parking Structure Lease Back, including the rights to enforce the lease after default by the City, and including the stream of Parking Structure Lease Back Rental Payments from the City, to support the repayment of the 2004 Parking Bonds. No other revenues or assets are pledged to support the repayment of the 2004 Parking Bonds, the repayment obligation is

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

non-recourse to the Financing Authority, and the 2004 Parking Bonds are payable solely from the Parking Structure Lease Back Rental Payments.

Even before filing the Chapter 9 Case, due to a lack of revenues generated by the Parking Structure Properties, and as a result of the deteriorating finances of the City, the City defaulted in the payment of the Parking Structure Lease Back Rental Payments. As a result of these circumstances, the 2004 Parking Bond Trustee filed suit to enforce the Parking Structure Lease Back, with the result that the Superior Court of the State of California for the County of San Joaquin issued two decisions on April 19, 2012, one granting the 2004 Parking Bond Trustee "Judgment of Possession After Unlawful Detainer" and the other appointing a receiver for the Parking Structure Properties under an "Order Appointing Receiver." *See Wells Fargo Bank, National Association v. City of Stockton*, Superior Court of the State of California, County of San Joaquin, case no. 39-2012-002777622-CU-UD-STK.

*Leased Properties*. The subject properties consist of three parking structures that continue to be owned by the City (subject to the Parking Structure Lease Out to the Financing Authority and the Parking Structure Lease Back from the Financing Authority) (the "**Parking Structure Properties**").

**Edmund S. Coy Parking Structure.** This structure is located at N. Hunter Street and E. Channel Street in downtown Stockton. The six-story parking structure provides approximately 575 parking spaces to the Central Business District to accommodate parking for existing retail, commercial, and office development. The structure has approximately 7,500 square feet of ground-level commercial/retail fronting E. Channel Street and was constructed using a single-threaded helix design. The total cost of construction was originally estimated at $9,540,000, with all such amounts provided by proceeds of the 2004 Parking Bonds.

**Stockton Events Center Parking Structure.** This

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

structure is located in the vicinity of Fremont and Van Buren streets in downtown Stockton.  The seven-story parking structure provides approximately 600 parking spaces on the north shore of the Stockton Channel to accommodate sports fans, concert goers, and event attendees.  The structure has approximately 7,500 square feet of ground-level commercial/retail fronting Fremont Street and was constructed using a single-threaded helix design.  The total cost of construction was originally estimated at $9,595,000, with all such amounts provided by proceeds of the 2004 Parking Bonds.

**Market Street Garage.**  This structure is located within the City's Central Parking District on Market Street between Sutter and California Streets and was constructed in 1989.  The four-story parking structure provides approximately 780 parking spaces and provides both monthly parking for employees of downtown businesses and hourly parking for patrons of downtown businesses.  The structure also houses the Central Parking District management offices.

139.  **Parking Structure Lease Out** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

140.  **Parking Structure Properties** has the meaning set forth in the definition of Parking Structure Lease Back Transaction.

141.  **Pendency Plan** means the budget adopted by the City Council on June 26, 2012, and its subsequent versions, under which the City has operated during the Chapter 9 Case.

142.  **Pension Obligation Bonds** means the City of Stockton 2007 Taxable Pension Obligation Bonds issued on April 5, 2007 in the aggregate principal amount of $125,310,000 pursuant to articles 10 and 11 (commencing with section 53570) of chapter 3 of part 1 of division 2 of title 5 of the Government Code of the State of California and an Indenture of Trust, dated as of April 1, 2007, by and between the City and Wells Fargo, as trustee (together with any successor trustee, the "**Pension Obligation Bonds Trustee**"), to refinance the obligation

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

of the City to make payments to CalPERS for retirement benefits accruing to the City's employees and retirees.  The Pension Obligation Bonds are insured by Assured Guaranty.

143.  **Pension Obligation Bonds Claims** means the Claims of Assured Guaranty in connection with the Pension Obligation Bonds, as insurer of the Pension Obligation Bonds.

144.  **Pension Obligation Bonds Trustee** has the meaning set forth in the definition of Pension Obligation Bonds.

145.  **Petition Date** means June 28, 2012.

146.  **Plan** means this Plan of Adjustment of Debts, together with any exhibits, each in their present form or as they may be altered, amended or modified from time to time in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

147.  **Plan Document** means any agreement or instrument contemplated by, or to be entered into pursuant to, this Plan, that is in form and substance acceptable to the City, has been duly and validly executed and delivered, or deemed executed by the parties thereto, and for which all conditions to its effectiveness have been satisfied or waived.

148.  **Plan Financial Projections** mean the financial projections set forth in the Long-Range Financial Plan of City of Stockton, attached as Exhibit B to the Disclosure Statement.

149.  **Plan Solicitation Order** means the Order Approving (1) Adequacy of Information in Disclosure Statement with Respect to the City's Plan of Adjustment; (2) Form, Scope and Nature of Solicitation, Balloting, Tabulation and Notices with Respect Thereto; and (3) Related Confirmation Procedures, Deadlines and Notices, by which the Bankruptcy Court on [_____] approved the Disclosure Statement as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of this Plan and established certain rules, deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

150.  **Plan Supplement** means the supplement to be filed with the Bankruptcy Court prior to the deadline established for voting on the Plan, containing without limitation the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

forms of the documents effectuating the Assured Guaranty Settlement, the NPFG Arena Settlement, the NPFG Parking Settlement, the NPFG SEB Settlement, and the SCC 16 Settlement.

151.    **Pledged Tax Increment** has the meaning set forth in the definition of Arena Lease Back Transaction.

152.    **Ports License Agreement** means that certain "Events Center Ball Park License Agreement" dated as of March 2, 2004, between the City and 7th Inning Stretch, LLC regarding the terms and conditions upon which the Stockton Ports baseball team may use the Banner Island Ballpark located next to the Arena in downtown Stockton.

153.    **Pre-Confirmation Date Claims** shall have the meaning ascribed to such phrase in Section XI(A).

154.    **Price Claims** mean the Claims of the Price Judgment Creditors, who filed a proof of claim in the Chapter 9 Case in the amount of $1,423,164.

155.    **Price Judgment Creditors** mean Richard Price and five other low-income individuals who were displaced from single-room-occupancy housing units in downtown Stockton in connection with the City's code-enforcement activities, and the Interfaith Council of San Joaquin (formerly Stockton Metro Ministry Inc.), who collectively filed an action against the City, the Redevelopment Agency, and other parties on May 2, 2002, captioned as *Price, et al. v. City of Stockton, et al.*, US District Court for the Eastern District of California, case no. 2:02-cv-00065-LKK-KJM.  In their complaint, the Price Judgment Creditors alleged that the defendants had violated certain state and federal redevelopment, relocation assistance, and fair housing laws. The parties settled the action pursuant to a settlement agreement, dated as of January 9, 2006.  *See* Exhibit B to Declaration of Hilton S. Williams in Support of Motion for Relief from Stay, filed in the Chapter 9 Case on November 29, 2012 [Dkt. No. 628].  On January 12, 2006, the District Court entered judgment against the defendants pursuant to this settlement agreement.  *See* Exhibit C to Declaration of Hilton S. Williams in Support of Motion for Relief from Stay, filed on November 29, 2012 in the Chapter 9 Case [Dkt. No. 628].  Among other things, the judgment obligated the City to construct low-income housing and to establish a restricted fund in the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

amount of approximately $1.45 million for distribution by a special master over a five-year period to persons displaced by the City's activities.

156.    **Professional Claim** means a Claim required to be filed pursuant to Section II(B) of the Plan for approval of amounts, if any, to be paid after the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan.

157.    **Redevelopment Agency** means the Redevelopment Agency of the City of Stockton, and as the context requires, the City acting solely in its role as the successor agency after the dissolution of the Redevelopment Agency of the City of Stockton.

158.    **Rejection Motion** means one or more motion to be filed by the City pursuant to section 365(a) by which the City shall seek approval and authorization for the rejection of such executory contracts and unexpired leases as shall be identified in the Rejection Motion.

159.    **Restricted Funds** means the approximately 200 special purpose and enterprise funds administered by the City, the use of which is restricted by, among other things, grants, federal law, the California Constitution, or other California law, such that the assets of the Restricted Funds may not lawfully be used to pay obligations of the General Fund.  Among the uses of the assets in the Restricted Funds is payment of the Restricted Revenue Bond and Note Payable Obligations.

160.    **Restricted Revenue Bond and Note Payable Obligations** means, collectively, (i) City of Stockton Revenue Certificates of Participation 1998 Series A (Wastewater System Project); City of Stockton Certificates of Participation 2003 Series A (Wastewater System Project); Stockton Public Financing Authority 2005 Water Revenue Bonds, Series A (Water System Capital Improvement Project); Stockton Public Financing Authority Water Revenue Bonds, Series 2009A (Tax Exempt) (Delta Water Supply Project) & Series 2009 B (Taxable Build America Bonds); Stockton Public Financing Authority Variable Rate Demand Water Revenue Bonds, Series 2010A (Delta Water Supply Project); and (ii) Special Assessment and Special Tax Obligations.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

161.  **Retiree Health Benefit Claim** means a Claim by a former City employee on account of or in any way related to the City's postpetition reduction of its contribution to health benefit payments to former City employees.

162.  **Retiree Health Benefit Claimant** means a former City employee who was eligible for retiree health benefits based on his or her collective bargaining agreement at the time of retirement and: (a) who was receiving City retiree health benefits as of June 30, 2012 (which includes any retiree who had waived coverage prior to that date but was otherwise eligible, or any retiree who had exceeded the 15-year cap for under-65 retiree health benefits, but who was eligible for a City retiree benefit for an over-65 retiree); or (b) who retired prior to July 1, 2012 with his or her last day on payroll having occurred on or before June 30, 2012; or (c) who was a surviving spouse of a deceased retiree who was receiving retiree benefits on June 30, 2012.

163.  **Retirees Committee** means the Official Committee of Retirees, appointed in the Chapter 9 Case on April 1, 2013 [Dkt. No. 846], by the Office of the United States Trustee pursuant to sections 1102(a)(1) and 1102(b)(1), as the membership thereof may have been reconstituted from time to time by the Office of the United States Trustee.

164.  **Retirees Settlement** means the agreement between the City and the Retirees Committee by which the City agrees to propose a plan of adjustment containing the provisions set forth in the Retirees Settlement.

165.  **Rights of Action** means any rights, claims, or causes of action owned by, accruing to, or assigned to the City pursuant to the Bankruptcy Code or pursuant to any contract, statute, or legal theory, including without limitation any rights to, claims, or causes of action for recovery under any policies of insurance issued to or on behalf of the City.

166.  **Risk Management Internal Service Fund** means the fund established by the City to accumulate resources for interdepartmental charges expended on self insurance for General Liability Claims.  The City also has other internal service funds.

167.  **Rust Omni** means Rust Consulting/Omni Bankruptcy, the Ballot Tabulator in the Chapter 9 Case.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

168.    **SCC 16** means Stockton City Center 16, LLC, a California limited liability company.

169.    **SCC 16 Claims** means any Claim of SCC 16 arising out of the Construction Agreement, which claims shall be Secured Claims within the meaning of section 506(a) to the extent of any right to offset from any monies owing from SCC 16 to the City pursuant to the Construction Agreement and shall be General Unsecured Claims to the extent of any difference between the balance on the SCC 16 Promissory Note as of the Petition Date and any right of offset.

170.    **SCC 16 Promissory Note** means that certain promissory note executed by the City in favor of SCC 16 pursuant to, and in accordance with, the Construction Agreement.

171.    **SCC 16 Settlement** means that certain settlement, if consummated, among the City, the 2004 Parking Structure Bond Trustee, and SCC 16, regarding certain matters, set forth in that certain settlement agreement among the City, the 2004 Parking Structure Bond Trustee, and SCC 16 (the "**SCC 16 Settlement Agreement**") annexed as Exhibit 5 to the Plan Supplement.

172.    **SCC Settlement Agreement** has the meaning set forth in the definition of SCC 16 Settlement.

173.    **SEB Claims of the 2006 SEB Bond Trustee/NPFG** means any Claims arising under the SEB Lease Back or the SEB Lease Out, if any.

174.    **SEB Lease Back** has the meaning set forth in the definition of SEB Lease Back Transaction.

175.    **SEB Lease Back Rental Payments** has the meaning set forth in the definition of SEB Lease Back Transaction.

176.    **SEB Lease Back Transaction** means the transaction described as follows:

*Financial Instruments Involved*.  The financial instruments involved in this transaction are the Stockton Public Financing Authority 2006 Lease Revenue Refunding Bonds, Series A, issued on April 6, 2006, in the aggregate principal amount of $13,965,000 (the "**2006 SEB Bonds**").  Wells Fargo

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

is the indenture trustee under the 2006 SEB Bonds Indenture (together with any successor trustee, the "**2006 SEB Bond Trustee**"). A reserve fund exists for the 2006 SEB Bonds in the amount of the initial reserve requirement, funded by a surety policy provided by the insurer, in the amount of $919,093.75 (the "**2006 SEB Bond Reserve Fund**"). The funds in the 2006 SEB Bond Reserve Fund are pledged to support repayment of the 2006 SEB Bonds. The 2006 SEB Bonds are insured by NPFG.

*Properties Involved/Leases*. As described in more detail below, the properties that are involved in this transaction are the Stewart/Eberhardt Building and the adjacent parking facility (the "**SEB Properties**"). In order to facilitate the financing to be provided by the 2006 SEB Bonds, the City, as owner of the SEB Properties, leased the properties to the Financing Authority pursuant to that certain Ground Lease dated as of March 1, 2006, for a term ending on August 1, 2031, with a possible extension of the term to the date upon which the 2006 SEB Bonds are paid in full, but in any event no later than August 1, 2041 (the "**SEB Lease Out**"). The City contemporaneously leased the SEB Properties back from the Financing Authority for the same number of years pursuant to the terms of the Lease Agreement dated as of March 1, 2006 (the "**SEB Lease Back**"). Thus, the City is the lessor and the Financing Authority is the tenant under the SEB Lease Out, and the Financing Authority is the lessor and the City is the tenant in the SEB Lease Back.

As tenant under the SEB Lease Out, the Financing Authority paid rent for the entire lease term in the amount of $1.00. As tenant under the SEB Lease Back, the City agreed to make semi-annual rental payments in varying amounts ($907,494 for fiscal year 2012-13, $906,194 for fiscal year 2013-14, $909,194 for fiscal year 2014-15, etc.) (the "**SEB Lease Back Rental Payments**"). The Financing Authority assigned to the 2006 SEB Bond Trustee its rights under the SEB Lease Back, including the rights to enforce the lease after

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

default by the City, and including the stream of SEB Lease Back Rental Payments from the City, to support the repayment of the 2006 SEB Bonds.  No other revenues or assets are pledged to support the repayment of the 2006 SEB Bonds, the repayment obligation is non-recourse to the Financing Authority, and the 2006 SEB Bonds are payable solely from the 2006 SEB Bond Reserve Fund and the SEB Lease Back Rental Payments.  The City is not in default under the SEB Lease Back, and to date all amounts due on the 2006 SEB Bonds have been paid in full and on time.

*Leased Properties*.  The subject properties consist of the Stewart/Eberhardt Building (the "**Eberhardt Building**") located at 22 East Weber Avenue and the adjacent public parking facility located at 15 North El Dorado Street in downtown Stockton, both of which continue to be owned by the City (subject to the SEB Lease Out to the Financing Authority and the SEB Lease Back from the Financing Authority) (as described below, the "**SEB Properties**").

**Stewart/Eberhardt Building.**  The Eberhardt Building is a four-story, 99,792 square foot, steel and precast concrete-clad office building constructed in 2001.  It was designed to meet the standards for, and is certified as, an Essential Services Building, as defined in the Essential Services Buildings Seismic Safety Act of 1986, commencing with section 16000 of the California Health and Safety Code.  It currently houses several city departments including Human Resources, Police Investigations, Public Works, and the Police Crime Lab.

**SEB Public Parking Facility.**  The SEB public parking facility is a 284,420-square-foot, eight-level, reinforced masonry and cast-in-place concrete structure with approximately 780 parking spaces.  Constructed in 2001, it also includes approximately 7,000 square feet for Police Department property storage and a "sally port" exclusively for Police Department functions on the ground floor.

Filed 10/10/13     Case 12-32118     Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy
Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be
construed to be, the solicitation of a vote on this draft plan or on any other plan.

177.    **SEB Lease Out** has the meaning set forth in the definition of SEB Lease Back Transaction.

178.    **SEB Properties** has the meaning set forth in the definition of SEB Lease Back Transaction.

179.    **Secured Claim** means a Claim that is secured, in whole or in part, (a) by a lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law; or (b) as a result of rights of setoff under section 553; but in any event only to the extent of the value, determined in accordance with section 506(a), of the holder's interest in the City's interest in property or to the extent of the amount subject to such setoff, as the case may be.

180.    **SIR Claim Portion** means the portion of a Workers Compensation Claim or General Liability Claim subject to the City's self insurance retention.  For any resolved Workers Compensation Claim, the SIR Claim Portion is the first $500,000.  For any resolved General Liability Claim, the SIR Claim Portion is the first $1,000,000.  The SIR Claim Portion is an obligation of the City rather than an obligation of any excess risk-sharing pool of which the City is a member.

181.    **Special Assessment and Special Tax Obligations** means, collectively:

- City of Stockton Revenue Certificates of Participation 1998 Series A (Wastewater System Project);

- Stockton Public Financing Authority Reassessment Revenue Bonds (Arch Road and Stockton Business Park Assessment Districts) Series 1998;

- City of Stockton Camera Estates Community Facilities District No. 2003-1 Special Tax Bonds, Series 2003;

- City of Stockton Certificates of Participation 2003 Series A (Wastewater System Project);

- City of Stockton Limited Obligation Improvement Bonds March Lane/Holman Assessment District 2003-1;

Filed 10/10/13
Case 12-32118    Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

- City of Stockton Limited Obligation Improvement Bonds Mosher Assessment District 2003-02;

- City of Stockton Limited Obligation Improvement Bonds Waterford Estates East Phase II Assessment District 2003-03;

- Stockton Public Financing Authority Refunding Revenue Bonds (West Eighth Street Reassessment District);

- Stockton Public Financing Authority 2005 Water Revenue Bonds, Series A (Water System Capital Improvement Project);

- City of Stockton South Stockton Community Facilities District No. 90-1 2005 Special Tax Refunding Bonds;

- Stockton Public Financing Authority Refunding Revenue Bonds (2005 Assessment Districts Refinancing) Series A Senior Lien Bonds and Series B Subordinate Lien Bonds;

- City of Stockton Community Facilities District No. 90-2 (Brookside Estates) 2005 Special Tax Refunding Bonds;

- City of Stockton Community Facilities District No. 1 (Weston Ranch) Special Tax Refunding Bonds, Series 2006;

- City of Stockton Spanos Park West Community Facilities District No. 2001-1 Special Tax Refunding Bonds, Series 2006;

- City of Stockton Community Facilities District No. 2006-1 (Riverbend) Special Tax Bonds, Series 2006;

- City of Stockton Community Facilities District No. 2006-3 (Northbrook) Woodside Improvement Area 1 Special Tax Bonds, Series 2007;

- City of Stockton Arch Road East Community Facilities District No. 99-02 2007 Special Tax Bonds;

- Stockton Public Financing Authority 2008 Refunding Revenue Bonds;

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

- Stockton Public Financing Authority Water Revenue Bonds, Series 2009A (Tax Exempt) (Delta Water Supply Project) & Series 2009 B (Taxable Build America Bonds); and

- Stockton Public Financing Authority Variable Rate Demand Water Revenue Bonds, Series 2010A (Delta Water Supply Project).

182.    **Special Fund Payments** has the meaning set forth in the Assured Guaranty Term Sheet, attached to the Plan as **Exhibit A**.  These payments represent in each fiscal year the amount of regularly scheduled debt service on the Pension Obligation Bonds that the City has determined can be allocated to the solvent Restricted Funds.

183.    **SPOA** means the Stockton Police Officers' Association.

184.    **SPOA Claims** means the Claims of members of the SPOA in the approximate amount of $13 million included in and resolved under the SPOA MOU by, in general, allowing such members a total of 44 additional hours of paid leave time through fiscal year 2014-15.

185.    **SPOA MOU** means the Memorandum of Understanding between the City and the SPOA effective July 1, 2012, through June 30, 2014, as approved by the City.

186.    **Successor Agency** means the City, in its capacity as Successor Agency to the Redevelopment Agency of the City.

187.    **Supplemental Payments** has the meaning set forth in the Assured Guaranty Term Sheet, attached to the Plan as **Exhibit A** and represent additional payments being made from the City's General Fund.

188.    **Thunder Claims** means the Claims arising in connection with the Thunder License Agreement, as modified by the Thunder Settlement.

189.    **Thunder License Agreement** means that certain agreement dated as of March 2, 2004, titled "Team Lease for Stockton Events Center (Ice Hockey Team)" between the City and IFG-Stockton Franchise Group, Inc. as the same may have been amended from time to time, relating to the rights of the Stockton Thunder ice hockey team to use the facilities of the Arena.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

190.    **Thunder Settlement** means that certain settlement between the City and SC Hockey Franchise Corporation, as successor to IFG-Stockton Franchise Group, Inc., regarding the treatment under this Plan of the claims arising out of the Thunder License Agreement as set forth in that certain "Term Sheet—Proposed Amendments to Team Lease for Stockton Events Center" dated as of September 18, 2013, and attached hereto as **Exhibit C** and incorporated by reference (the "**Thunder Settlement Term Sheet**").   The Thunder Settlement is summarized as follows (the Thunder Settlement Term Sheet should be consulted for the precise terms of the Thunder Settlement):

- The Base Rent payable to the City will be increased by $2,000 per regular season home game.  Base Rent for pre-season and playoff games remains unchanged.
- Catering Services Adjusted Gross Revenue paid to the team will be reduced from 30% to 10%.
- The team will have the exclusive right to sell team merchandise, will retain 100% of revenues from the same and bear the expenses of the same.
- The team will purchase five luxury suites from the City each year for a total cost of $150,000, adjusted annually for any increases in the costs of other luxury suites sold by the City.  The team shall have the right to sublease the luxury suites (but not to current luxury suite lessees of the City or prospective lessees - as specified in the Thunder Settlement Term Sheet).  Revenues received on account of such leases shall be subject to the existing sharing formula of 65% to the City and 35% to the team.
- Additional payments to the City shall be made once certain performance benchmarks of paid attendees and advertising are reached.

191.    **Thunder Settlement Term Sheet** has the meaning set forth in the definition of Thunder Settlement.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

192.    **Unclaimed Property** shall have the meaning ascribed to such phrase in Section IX(C)(2).

193.    **Unimpaired** means a Claim that is not Impaired within the meaning of section 1124.

194.    **Uninsured Portion Claim** means the amount in excess of the Insured Portion of an Allowed Workers Compensation Claim or an Allowed General Liability Claim that is covered by one or more of the excess risk-sharing pools of which the City is a member.

195.    **Unsecured Claim Payout Percentage** means the percentage of the Allowed Amount of General Unsecured Claims that will be paid to holders of Class 12 Claims, equal to the percentage paid on account of the Retiree Health Benefit Claims (unless the amount of the Retiree Health Benefit Claims changes, that percentage will be $5,100,000/$545,000,000 = 0.93578%), or such other amount as is determined by the Bankruptcy Court before confirmation of this Plan to constitute a pro-rata payment on such other General Unsecured Claims; *provided*, *however*, the dollar amount to be paid on account of General Unsecured Claims other than the Retiree Health Benefit Claims on the Effective Date shall not exceed $500,000.  If the amounts to be paid exceed $500,000, then such excess amounts shall be made in two equal annual installments on the first and second anniversary of the Effective Date, together with simple interest accruing from and after the Effective Date at 5% per annum.  Such excess amounts may be prepaid at the option of the City.

196.    **Wells Fargo** means Wells Fargo Bank, National Association, acting solely in its role as bond trustee under the bond indenture agreements referenced herein.

197.    **West End Project Area** has the meaning set forth in the definition of Arena Lease Back Transaction.

198.    **Workers Compensation Claims** means those Claims pursuant to California workers compensation law (California Labor Code section 3200 *et seq.*) of current and former City employees who have suffered an eligible injury while employed by the City

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**199.**   **Workers Compensation Internal Service Fund** means the fund established by the City to accumulate resources for interdepartmental charges expended on self insurance for Workers Compensation Claims.

**B.**   **Rules of Construction.**

The following rules of construction apply to this Plan:  (a) unless otherwise specified, all references in this Plan to "sections" (lowercased) are references to a section of the Bankruptcy Code; (b) unless otherwise specified, all references in this Plan to "Sections" and "Exhibits" (uppercased) are to the respective Section in or Exhibit to this Plan, as the same may be amended or modified from time to time; (c) the headings in this Plan are for convenience of reference only and do not limit or otherwise affect the provisions of this Plan; (d) words denoting the singular number include the plural number and vice versa; (e) the rules of construction set forth in section 102 apply; (f) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply; and (g) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

**C.**   **Plan Supplement.**

No later than 14 days prior to the deadline established by the Bankruptcy Court for voting on the Plan, the City shall file and serve the Plan Supplement.  The exhibits and schedules contained in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth herein.

**II.**   **TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**A.**   **Treatment of Administrative Claims.**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the City or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such Claim, Cash in an amount equal to such

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such

2    Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.

3          **B.**     **Treatment of Professional Claims.**

4          Pursuant to section 943(a)(3), all amounts paid following the Effective Date or to

5    be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to

6    this Plan must be disclosed to the Bankruptcy Court and must be reasonable.  There shall be paid

7    to each holder of a Professional Claim, in full satisfaction, release, and discharge of such Claim,

8    Cash in an amount equal to that portion of such Claim that the Bankruptcy Court approves as

9    reasonable, on or as soon as reasonably practicable following the date on which the Bankruptcy

10   Court enters a Final Order determining such reasonableness.  The City, in the ordinary course of

11   its business, and without the requirement for Bankruptcy Court approval, may pay for

12   professional services rendered and costs incurred following the Effective Date.

13         **C.**     **Priority Claims in Chapter 9.**

14         The only priority claims incorporated into chapter 9 through section 901 are

15   Administrative Claims allowed under section 503(b) and entitled to priority under

16   section 507(a)(2).  The treatment of all such Administrative Claims is set forth immediately above

17   in Sections II(A) and II(B).  No other kinds of priority claims set forth in section 507 are

18   recognized in chapter 9 cases, and Claims that are not Administrative Claims herein and that

19   would constitute administrative claims in a case under another chapter of the Bankruptcy Code

20   are treated in chapter 9 and in this Plan as General Unsecured Claims.

21         **D.**     **Deadline for the Filing and Assertion of Other Postpetition Claims,**
           **Administrative Claims and Professional Claims.**
22

23         **All proofs of claim for Other Postpetition Claims arising on or after**

24   **August 16, 2013,[4] and requests for payment or any other means of preserving and obtaining**

25

26   [4] Proofs of claim for Other Post-Petition Claims that arose before August 16, 2013 must have been filed by August 16, 2013 in order to be considered timely.  *See* Order (1) Fixing August 16, 2013 Bar Date For All Claims Other Than Claims Based On Retiree Health Benefits And The Rejection Of Executory Contracts Or Unexpired

27   Leases; (2) Fixing September 30, 2013 Bar Date For Claims Of Governmental Units; (3) Approving Form Of Notice Of Bar Dates; And (4) Requiring City To Publish And Transmit Notice Of Bar Date To Creditors And Parties In

28   Interest By No Later Than June 28, 2013 [Dkt. No. 960].

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**payment of Administrative Claims that have not been paid, released, or otherwise settled, and all requests for approval of Professional Claims, must be filed with the Bankruptcy Court and served upon the City no later than 30 days after the date on which the Notice of Effective Date is mailed.** Any proof of claim for Other Postpetition Claims, or request for payment of an Administrative Claim or a Professional Claim, that is not timely filed by such date will be forever barred, and holders of such Claims shall be barred from asserting such Claims in any manner against the City.

III.  <u>DESIGNATION OF CLASSES OF CLAIMS</u>

Pursuant to sections 1122 and 1123(a)(1), all Claims other than Administrative Claims and Professional Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

<u>Class 1A</u> – Claims of Ambac – 2003 Fire/Police/Library Certificates;

<u>Class 1B</u> – Claims of Holders of 2003 Fire/Police/Library Certificates;

<u>Class 2</u> – SEB Claims of the 2006 SEB Bond Trustee/NPFG;

<u>Class 3</u> – Arena Claims of the 2004 Arena Bond Trustee/NPFG;

<u>Class 4</u> – Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG – 2004 Parking Structure Bonds;

<u>Class 5</u> – Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty – 2007 Office Building Bonds;

<u>Class 6</u> – Pension Obligation Bonds Claims of Assured Guaranty;

<u>Class 7</u> – Claims of DBW;

<u>Class 8</u> – SCC 16 Claims;

<u>Class 9</u> – Thunder Claims;

<u>Class 10</u> – Claims of Holders of Restricted Revenue Bond and Note Payable Obligations;

<u>Class 11</u> – Claims of the Holders of Special Assessment and Special Tax Obligations;

<u>Class 12</u> – General Unsecured Claims.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

This Class includes:

- General Unsecured Claims;

- the Golf Course/Park Claims of the 2009 Golf Course/Park Bond Trustee/Franklin;

- the Retiree Health Benefit Claims;

- the Leave Buyout Claims;

- the Price Claims; and

- Other Postpetition Claims.

Class 13 – Convenience Class Claims;

Class 14 – Claims of Certain Tort Claimants;

Class 15 – Claims Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS, as Trustee under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants;

Class 16 – Claims of Equipment Lessors;

Class 17 – Workers Compensation Claims;  and

Class 18 – SPOA Claims.

## IV.     TREATMENT OF CLAIMS

### A.     Class 1A – Claims of Ambac – 2003 Fire/Police/Library Certificates.

#### 1.     Impairment and Voting.

Class 1A is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of Ambac, the holder of the Claims.  Accordingly, this Class is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

#### 2.     Treatment.

On February 26, 2013, the City filed a motion with the Bankruptcy Court in which it requested the Bankruptcy Court to enter an order approving the Ambac Settlement Agreement [Dkt. No. 723].  A copy of the Ambac Settlement Agreement is attached as Exhibit A to the Declaration of Robert Deis in Support of the City of Stockton's Motion Under Bankruptcy

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Rule 9019 for Approval of Its Settlement with Ambac Assurance Corporation, filed on February 26, 2013 [Dkt. No. 725]. On April 24, 2013, the Bankruptcy Court entered its order granting the Ambac Settlement Agreement Motion in its entirety and approving the Ambac Settlement Agreement in its entirety [Dkt. No. 888].

Among other things, the Ambac Settlement Agreement restructures the City's obligations under the 2003 Fire/Police/Library Certificates and provides additional liquidity for the City. The salient terms of the Ambac Settlement Agreement are summarized below.[5]

a. <u>Forbearance</u>. Subject to the express provisions of the Ambac Settlement Agreement, Ambac and the 2003 Fire/Police/Library Certificates Trustee agree to forbear from exercising their rights and remedies under the Fire/Police/Library Lease Back and the 2003 Fire/Police/Library Certificates Trust Agreement. The agreement to forbear is conditioned upon and subject to the following conditions of forbearance:

(1) <u>General Fund Payments</u>. The City shall make General Fund Payments (as defined in the Ambac Settlement Agreement) in an amount equal to the lesser of (A) the amounts set forth in the General Fund Payment Schedule (as defined in the Ambac Settlement Agreement), or (B) the amount equal to the difference between the stated principal and interest payments on the 2003 Fire/Police/Library Certificates due on each Payment Date (as defined in the Ambac Settlement Agreement) and the amount available to the City pursuant to section 5.04, clauses 1 and 2(d)(ii) of the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement and section 2.7 of the Ambac Settlement Agreement to be applied to the payment of the 2003 Fire/Police/Library Certificates.

The General Fund Payments shall be paid by the City directly to the 2003 Fire/Police/Library Certificates Trustee; provided that from and after the date on which the 2003 Fire/Police/Library Certificates holders (other than Ambac) are paid in full, the General Fund Payments shall be paid by the City directly to Ambac for its own account as reimbursement for

---

[5] This summary is presented for convenient reference by the Court and parties in interest, but is not intended as a complete or exhaustive description of all terms of the Ambac Settlement Agreement, which is the definitive and controlling document. To the extent that there is any discrepancy between the terms as stated in this Plan and the terms as stated in the Ambac Settlement Agreement, the terms of the Ambac Settlement Agreement prevail.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

amounts owing to Ambac on account of the Ambac Payments (as defined in the Ambac Settlement Agreement) and the payment of legal fees pursuant to section 6.8 of the Ambac Settlement Agreement, together with interest thereon, pursuant to section 2.8 of the Ambac Settlement Agreement. At such time as all 2003 Fire/Police/Library Certificates and Ambac Payments have been paid in full, no further General Fund Payments shall be payable.

(2) <u>Assignment of 2003 Fire/Police/Library Certificates Reimbursement Agreement</u>. As additional security in connection with, and application toward, the City's payment obligations as provided in the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement and described in Section A.2.(3) below, as of the Ambac Effective Date, the City's 2003 Housing Set-Aside Rights shall be pledged and collaterally assigned to the 2003 Fire/Police/Library Certificates Trustee. Once the 2003 Fire/Police/Library Certificates holders (other than Ambac) are paid in full, the 2003 Fire/Police/Library Certificates Trustee will further assign the 2003 Housing Set-Aside Rights to Ambac as provided in, and subject to the terms of, the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement.

(3) <u>Application of Housing Set-Aside Amounts</u>. In accordance with the terms of the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement, the Housing Set-Aside Amounts shall be applied (A) to the scheduled payment of amounts due on all 2003 Fire/Police/Library Certificates then due and payable from the Ambac Effective Date until the date all monies in the 2003 Fire/Police/Library Certificates Reserve Fund that existed as of the Ambac Effective Date are exhausted; (B) after all monies in the 2003 Fire/Police/Library Certificates Reserve Fund as of the Ambac Effective Date are exhausted pursuant to Section 2.7 of the Ambac Settlement Agreement in the following order and priority: (1) to the scheduled payment of all 2003 Fire/Police/Library Certificates then due and payable, in an amount equal to 19.5% of such scheduled payment; (2) to Ambac, to repay any payments made by Ambac under the Ambac Insurance Policy to the registered owners of the 2003 Fire/Police/Library Certificates, with interest as required by section 2.8 of the Ambac Settlement Agreement; (3) to Ambac and the 2003 Fire/Police/Library Certificates Trustee, to repay any payments made by Ambac for fees and expenses including attorney's fees and expenses of Ambac and the 2003 Fire/Police/Library

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

Trustee, with interest as required by section 6.8 of the Ambac Settlement Agreement; (4) on-parity dollar-for-dollar basis to (i) the 2003 Fire/Police/Library Certificates Reserve Fund, in the amount necessary to make the balance therein equal the Reserve Requirement (as defined in the 2003 Fire/Police/Library Certificates Trust Agreement), and (ii) the payment of the scheduled payment of all 2003 Fire/Police/Library Certificates then due and payable as a credit to the City for General Fund Payment; and (5) to the City to reimburse the City for any General Fund Payments previously paid and to the extent the City has been fully reimbursed for all such General Fund Payments (with interest to the extent permitted by the 2003 Fire/Police/Library Certificates Reimbursement Agreement), for deposit by the City to the Community Redevelopment Property Trust Fund (as defined in the Ambac Settlement Agreement).

(4)    Extension of Fire/Police/Library Lease Back Term and 2003 Fire/Police/Library Certificates Reimbursement Agreement.  As of the Ambac Effective Date, the City and Financing Authority agree that the term of the Fire/Police/Library Lease Back is extended until September 5, 2048 or such later date until all amounts owing to the 2003 Fire/Police/Library Certificates holders and Ambac under the Ambac Settlement Agreement have been paid in full.  As a result of the extension of the Fire/Police/Library Lease Back, the term of the 2003 Fire/Police/Library Certificates Reimbursement Agreement is also extended pursuant to Section 5 thereof.

b.    Debt Service Reserve Fund.  The 2003 Fire/Police/Library Certificates Trustee agrees to apply monies in the 2003 Fire/Police/Library Certificates Reserve Fund as exists as of the Ambac Effective Date to pay principal of and interest on the 2003 Fire/Police/Library Certificates commencing with the payment due on September 1, 2013 in the amount necessary to pay debt service on the 2003 Fire/Police/Library Certificates minus amounts available from Housing Set-Aside Subaccount of the Lease Payment Fund (as defined in the 2003 Fire/Police/Library Certificates Trust Agreement) established pursuant to the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement until the 2003 Fire/Police/Library Certificates Reserve Fund is exhausted.  Amounts so applied from the 2003 Fire/Police/Library Certificates Reserve Fund shall be a credit against the General Fund Payments due from the City

**The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.**

under the Ambac Settlement Agreement. Replenishment of the 2003 Fire/Police/Library Certificates Reserve Fund to the Reserve Requirement will take place with excess Housing Set-Aside Amounts paid pursuant to the 2003 Fire/Police/Library Certificates Reimbursement Agreement as set forth in the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement.

           c.    <u>Successor Agency Sale Proceeds</u>. The City shall cause the Successor Agency to work with Ambac to agree upon a list of all properties (i) which will be sold by the Successor Agency, or (ii) to be transferred to the Community Redevelopment Property Trust Fund of the Successor Agency and sold pursuant to the long-range property management plan developed and authorized in accordance with the applicable sections of the Health and Safety Code. The City and Ambac will, and the City shall cause the Successor Agency to, use their best efforts to obtain written approval of the long-range property management plan developed by the Successor Agency and approved by Ambac prior to submission which will provide, among other things, that all of the proceeds from the sale of the properties be used to satisfy outstanding obligations under the bonds of the Successor Agency and 2003 Fire/Police/Library Certificates Reimbursement Agreement in accordance with the existing priorities under applicable law prior to any distribution of such proceeds to taxing agencies under the Health and Safety Code. The City shall, and the City shall cause the Successor Agency to, diligently pursue the sales of the properties in accordance with applicable law and shall provide Ambac and the 2003 Fire/Police/Library Certificates Trustee with a written monthly report of all progress and activity taken in connection with such sales.

           d.    <u>Plan Support Commitment</u>. From and after the entry into the Ambac Settlement Agreement, and provided that (i) the Bankruptcy Court has entered the Approval Order, and (ii) the City has complied with its covenants and obligations under the Ambac Settlement Agreement, Ambac will support the Plan and take such action as is reasonably necessary to support confirmation and consummation of the Plan which provides for separate classification of the Claims of Ambac and the 2003 Fire/Police/Library Certificates holders with respect to the 2003 Fire/Police/Library Certificates into two classes; each class shall provide for

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1   all Claims of Ambac and the 2003 Fire/Police/Library Certificates holders to be satisfied through

2   the City's recognition and performance of its obligations under the Ambac Settlement Agreement.

3   Ambac in its capacity as insurer and sole owner of all 2003 Fire/Police/Library Certificates

4   pursuant to the 2003 Fire/Police/Library Trust Agreement agrees to vote for such Plan. Subject to

5   the terms and conditions of the Ambac Settlement Agreement, the Plan will affirm that the

6   Fire/Police/Library Lease Back, 2003 Fire/Police/Library Certificates Trust Agreement,

7   Fire/Police/Library Lease Out and 2003 Fire/Police/Library Certificates Reimbursement

8   Agreement shall be assumed and remain in full force and effect.

9         e.     **Reimbursement of Attorneys' Fees**. The City shall reimburse

10   Ambac and the 2003 Fire/Police/Library Certificates Trustee for the fees and expenses of Ambac

11   and 2003 Fire/Police/Library Certificates Trustee, including attorney's fees and expenses incurred

12   in connection with the 2003 Fire/Police/Library Certificates and the Chapter 9 Case (i) in relation

13   to Ambac, accrued through the date of execution and delivery of the Ambac Settlement

14   Agreement in the amount of $240,000, and (ii) in relation to Ambac and 2003 Fire/Police/Library

15   Certificates Trustee accrued from the date of the execution and delivery of the Ambac Settlement

16   Agreement through the effective date of the Plan (the "**Outstanding Fees and Expenses**")

17   through application of Housing Set-Aside Amounts paid pursuant to the 2003 Fire/Police/Library

18   Certificates Reimbursement Agreement as set forth in section 5.04 of the 2003

19   Fire/Police/Library Certificates Trust Agreement. The 2003 Fire/Police/Library Certificates

20   Trustee and Ambac shall submit invoices to the City relating to the Outstanding Fees and

21   Expenses specified in (ii) herein on a monthly basis. Interest will accrue on the Outstanding Fees

22   and Expenses at an interest rate of 8% compounded annually. The City and the Financing

23   Authority will be obligated to pay ongoing 2003 Fire/Police/Library Certificates Trustee fees and

24   expenses as required under the 2003 Fire/Police/Library Certificates Trust Agreement and

25   Fire/Police/Library Lease Back.

26         f.     Approval and Authorization to enter into the Ancillary Documents.

27           (1)     2003 Fire/Police/Library Certificates Supplemental Trust

28   Agreement. On the Ambac Effective Date, the Supplemental Trust Agreement, dated as of

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

May 9, 2013 (the "**2003 Fire/Police/Library Certificates Supplemental Trust Agreement**"), by and among the City, the Financing Authority and the 2003 Fire/Police/Library Certificates Trustee, shall become effective.

(2)    Fire/Police/Library Lease Out Assignment Agreement.  On the Ambac Effective Date, the Financing Authority and the 2003 Fire/Police/Library Certificates Trustee shall be authorized to and shall enter into Fire/Police/Library Lease Out Assignment Agreement and the City shall be authorized to and shall acknowledge and consent thereto.

**B.**    **Class 1B – Claims of Holders of 2003 Fire/Police/Library Certificates.**

**1.**    **Impairment and Voting.**

Class 1B is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.**    **Treatment.**

The treatment of the Class 1B claimants, the 2003 Fire/Police/Library Certificates holders, is identical to the treatment of Ambac, the Class 1A claimant.

**C.**    **Class 2 – SEB Claims of the 2006 SEB Bond Trustee/NPFG – 2006 SEB Bonds.**

**1.**    **Impairment and Voting.**

Class 2 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, NPFG, as the deemed holder of the Claims in this Class, is not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.**    **Treatment.**

On the Effective Date, the City will assume the SEB Lease Back and the SEB Lease Out under section 365(a) pursuant to the NPFG SEB Settlement.  The finding by the Bankruptcy Court that the Plan is feasible shall constitute adequate assurance of future performance of the SEB Lease Back and the SEB Lease Out.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**D.**　　**Class 3 – Arena Claims of the 2004 Arena Bond Trustee/NPFG – 2004 Arena Bonds.**

**1.**　　**Impairment and Voting.**

Class 3 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, NPFG, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.**　　**Treatment.**

The treatment of the Class 3 Claims will be as set forth in the NPFG Arena Settlement, which should be consulted for the precise terms of the treatment. In summary, with respect to these Claims, after modification of the payment terms of the Arena Lease Back, as provided in the NPFG Arena Settlement, on the Effective Date, the City will assume the Arena Lease Back (as modified), and as a result, the City will continue to remain in possession, custody, and control of the Arena.

**E.**　　**Class 4 – Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG – 2004 Parking Bonds.**

**1.**　　**Impairment and Voting.**

Class 4 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, NPFG, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.**　　**Treatment.**

The treatment of the Class 4 Claims will be as set forth in the NPFG Parking Settlement, which should be consulted for the precise terms of the treatment. In summary, with respect to these Claims, the City will create a new parking authority for the City and will transfer ownership and control of the Parking Structure Properties, other downtown parking structures and lots, and downtown parking meters, as well as parking enforcement revenues, to the parking authority. The City Council members will sit *ex officio* as the board members of the new parking

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    authority. Revenues from the newly created parking authority will be pledged to the 2004

2    Parking Bond Trustee in support of a new schedule of installment payments to NPFG in exchange

3    for (i) transfer of the possessory interest currently held by the 2004 Parking Bond Trustee on

4    behalf of NPFG and the bondholders to the new parking authority and (ii) a forbearance

5    agreement on the part of NPFG and the 2004 Parking Bond Trustee with respect to remedies for

6    default on the Parking Structure Lease Back. The General Fund will have no liability for such

7    new installment payments schedule, nor any obligation to make payments under the Parking

8    Structure Lease Back.

9        The effectiveness of the NPFG Settlement is contingent upon the entry into the

10   SCC 16 Settlement Agreement. In the event the parties are unable to agree to the terms of such

11   settlement that is acceptable to NPFG, then the City, at the request or direction of the 2004

12   Parking Bond Trustee or NPFG shall take such actions (if any) that may be required by the 2004

13   Parking Bond Trustee or NPFG to terminate the Parking Structure Lease Back as part of an

14   alternative arrangement that is acceptable to the City and the 2004 Parking Bond Trustee that is

15   not conditioned on the occurrence of such settlement.

16    F.    **Class 5 – Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty – 2007 Office Building Bonds.**

17

18            **1.    Impairment and Voting**

19        Class 5 is Impaired by this Plan since the treatment of this Class will affect the

20   legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of

21   the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the

22   Plan Solicitation Order.

23            **2.    Treatment.**

24        The treatment of the Class 5 Claims will be as set forth in the Assured Guaranty

25   Settlement, which should be consulted for the precise terms of the treatment. A summary of the

26   treatment follows:

27        • The Office Building Lease Out and Lease Back will be terminated, and the

28            City shall have no obligations under the same. The City will transfer fee title

63                    CITY OF STOCKTON'S PLAN OF ADJUSTMENT

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

in the 400 E. Main Office Building Property to Assured Guaranty or its designee at Assured Guaranty's election, subject to the New 400 E. Main Lease. Assured Guaranty may elect to keep the property or to sell it at some future date, subject to the New 400 E. Main Lease. Assured Guaranty shall be entitled to all net rent and profits of the property after the transfer and to all of the sales proceeds of the property should Assured Guaranty elect to sell the property, and Assured Guaranty shall be obligated to pay all costs of operation and maintenance of the property. The City shall be released from any and all liability with respect to the 2007 Office Building Bonds and associated documents and the terminated Office Building Lease Out and Lease Back.

- The New 400 E. Main Lease shall include the terms set forth in the Assured Guaranty Term Sheet, including without limitation the following: the initial term shall begin on the Effective Date and end on June 30, 2022; the City shall enjoy exclusive use of the City Space (as defined in the Assured Guaranty Term Sheet); the City shall make monthly rent payments as specified in the Assured Guaranty Term Sheet; the New 400 E. Main Lease supersedes the Fourth Floor Lease of 400 E. Main.

G.    **Class 6 – Pension Obligation Bonds Claims of Assured Guaranty.**

1.    **Impairment and Voting.**

Class 6 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

2.    **Treatment.**

The treatment of the Class 6 Claims will be as set forth in the Assured Guaranty Settlement, which should be consulted for the precise terms of the treatment. A summary as it relates to these Claims follows.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

- The City agrees to make non-contingent payments on the Pension Obligation Bonds in each fiscal year equal to the sum of the 2007 Lease Ask Payments, Special Fund Payments, and Supplemental Payments on the dates and in the amounts set forth in the Assured Guaranty Term Sheet.

- Assured Guaranty shall also be entitled to Contingent Payments in accordance with the City's Contingent Payment Model, a copy of which is attached to the Assured Guaranty Term Sheet as Exhibit A. If the City does not exceed its baseline financial projections in the upcoming years, Assured Guaranty would receive no Contingent Payments. However, if the City were to exceed its financial projections over the years—which the City and Assured Guaranty believe may be achievable—Assured Guaranty would receive Contingent Payments until Assured Guaranty has received payment in full on the Pension Obligation Bond Class 6 Claims; *provided*, that the last date a Contingent Payment is required to be paid is June 1, 2052. Contingent Payments will be based upon the City's budget in each year, subject to adjustment following year-end audit.

- Contingent Payments on the Pension Obligation Bonds for each fiscal year shall be paid on June 1 of such fiscal year, commencing June 1, 2018 and ending on June 1, 2052, subject to adjustment based on audits as mentioned above.

H.    **Class 7 – Claims of DBW**.

1.    **Impairment and Voting.**

Class 7 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.**

### 2. Treatment.

The General Fund will have no obligation to pay debt service on this obligation, or to reimburse operating expenses to DBW should DBW take over operations of the Marina Project. DBW will retain its pledge of rents and leases generated from the Marina Project. However, the pledge of gross revenues will be converted to a pledge of revenues net of all reasonable and direct operating expense of the Marina Project, calculated on a fiscal year basis ending June 30 of each year pursuant to section 928(b). Should DBW decide to take over operations of the Marina Project, DBW will be responsible for payment of all operating expenses of the Marina Project and the City will have the right to ensure that the Marina Project is operated in a responsible and safe manner, including providing adequate security, and the City shall have the right to compel DBW to alter its manner of operations if such operations pose a threat to the public welfare or if such operations abet a public nuisance. The General Fund shall have no liability, directly or indirectly, for the Claims of DBW, and the City may decide at any time to cease subsidizing the operating deficits of the operation of the Marina Project. DBW has stated to the City an interest in exercising its remedy of taking possession of the Marina Project.

### I. Class 8 - SCC 16 Claims.

#### 1. Impairment and Voting.

Class 8 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

#### 2. Treatment.

To the extent SCC 16 has any offset rights arising under the Construction Agreement or the Disposition and Development Agreement, SCC 16 shall apply any such offsets against amounts owing under the SCC 16 Promissory Note. To the extent SCC 16 has an Unsecured Claim, it will be entitled to the treatment of General Unsecured Claims in Class 12.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**J.**     **Class 9 – Thunder Claims.**

**1.**     **Impairment and Voting.**

Class 9 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.**     **Treatment.**

The treatment of the Class 9 Claims will be as set forth in the Thunder Settlement. The Thunder Settlement is summarized as follows (the Thunder Settlement Term Sheet should be consulted for the precise terms of the Thunder Settlement):

- The Base Rent payable to the City will be increased by $2,000 per regular season home game.  Base Rent for pre-season and playoff games remains unchanged.

- Catering Services Adjusted Gross Revenue paid to the team will be reduced from 30% to 10%.

- The team will have the exclusive right to sell team merchandise, will retain 100% of revenues from the same and bear the expenses of the same.

- The team will purchase the use of five luxury suites from the City each year for a total cost of $150,000, adjusted annually for any increases in the costs of other luxury suites sold by the City.  The team shall have the right to sublease the luxury suites (but not to current luxury suite lessees of the City or prospective lessees—as specified in the Thunder Settlement Term Sheet). Revenues received on account of such leases shall be subject to the existing sharing formula of 65% to the City and 35% to the team.

- Additional payments to the City shall be made once certain performance benchmarks of paid attendees and advertising are reached.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**K.**     **Class 10 – Claims of Holders of Restricted Revenue Bond and Note Payable Obligations.**

**1.**     **Impairment and Voting.**

Class 10 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.**     **Treatment.**

Class 10 consists of Claims of the holders of Restricted Revenue Bond and Note Payable Obligations that are secured by special and restricted sources of revenues and are not payable from the General Fund.

Restricted Revenue Bond and Notes Payable Obligations.  The City's Restricted Revenue Bond and Notes Payable Obligations are secured by a pledge of and lien on revenues of various of the City's systems and enterprises, which are restricted revenues pursuant to the California Constitution, and are "special revenues" as defined in section 902(2).  These revenues are not a part of or available to the General Fund, and the General Fund is not obligated to make any payment on the Restricted Revenue Bond and Note Payable Obligations.  The City may transfer amounts from the restricted revenues to the General Fund only to pay costs which are incurred by the General Fund to provide the facility or enterprise-related services and which are allocated to the enterprises on a reasonable basis in accordance with the City's accounting and allocation policies and pursuant to the provisions of the relevant documents related to the Restricted Revenue Bonds and Notes Payable Obligations.  Such transfers are treated by the facility or enterprise as operation and maintenance expenses.  The City will continue to apply restricted revenues to pay the Restricted Revenue Bond and Notes Payable Obligations as required by the terms of such obligations.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**L.**    **Class 11 – Claims of Holders of Special Assessment and Special Tax Obligations.**

        **1.**    **Impairment and Voting.**

Class 11 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

        **2.**    **Treatment.**

Class 11 consists of Claims of the holders of Special Assessment and Special Tax Obligations that are secured by special and restricted sources of revenues consisting of specific levies on real property within certain financing districts created by the City and are not payable from the General Fund.

        <u>Special Assessment and Special Tax Obligations</u>. The Special Assessment and Special Tax Obligations are secured by certain special assessments and special taxes levied on specific real property within the respective districts for which these obligations were issued. These special assessment and special tax revenues are legally restricted to the payment of debt service on the Special Assessment and Special Tax Obligations under California statutes and the California Constitution, are "special revenues" as defined in section 902(2), and cannot be used for any other purpose or be transferred to the General Fund. The General Fund is not obligated to pay debt service on the Special Assessment and Special Tax Obligations. The City will continue to apply revenues from the applicable special assessments and special taxes to pay the Special Assessment and Special Tax Obligations as required by the terms of such obligations.

**M.**    **Class 12 – General Unsecured Claims.**

        **1.**    **Impairment and Voting.**

Class 12 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

## 2. Treatment.

The major claims in this Class include without limitation: (1) the Retiree Health Benefit Claims; (2) the Golf Course/Park Claims of the 2009 Golf Course/Park Bond Trustee/Franklin; (3) the Leave Buyout Claims; (4) the Price Claims; and (5) Other Postpetition Claims.

The Retiree Health Benefit Claims are held by approximately 1,100 of the City's former employees, and the Retirees Committee maintains that the aggregate amount of the Retiree Health Benefit Claims is approximately $545,000,000.[6] Pursuant to the Retirees Settlement, on the Effective Date, the City will pay the Retirees an aggregate amount of $5,100,000 in full satisfaction of Allowed Retiree Health Benefit Claims, and no other retiree health benefits will be provided by the City. If required by state or federal law, the City will withhold from the aggregate $5,100,000 payment any taxes or other deductions to be withheld from the individual payment to each Retiree Health Benefit Claimant. The individual recipient is responsible for any tax liability for this payment, and the City will not provide any advice to any recipient as to the taxable impact of this payment.

All other General Unsecured Claims shall receive cash on the Effective Date in the amount equal to a percentage of the Allowed Amount of such Claims, which such percentage equals the Unsecured Claim Payout Percentage, or such other amount as is determined by the Bankruptcy Court before confirmation of this Plan to constitute a pro-rata payment on such other General Unsecured Claims; *provided*, *however*, the dollar amount to be paid on account of General Unsecured Claims other than the Retiree Health Benefit Claims on the Effective Date shall not exceed $500,000. If the amounts to be paid exceed $500,000, then such excess amounts shall be made in two equal annual installments on the first and second anniversary of the Effective Date, together with simple interest accruing from and after the Effective Date at 5% per annum. Such excess amounts may be prepaid at the option of the City.

---

[6] This does not include the retiree health benefit claims of employees employed as of July 1, 2012, who waived their claims of approximately $1 billion of previously earned benefits for no additional compensation, as part of memoranda of understanding negotiated in 2012.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**N.**      **Class 13 – Convenience Class Claims.**

**1.      Impairment and Voting.**

Class 13 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Convenience Class Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.      Treatment.**

Holders of Convenience Class Claims will receive cash on the Effective Date in the amount of their Allowed Convenience Class Claim, but not to exceed $100.

**O.**      **Class 14 – Claims of Certain Tort Claimants.**

**1.      Impairment and Voting.**

Class 14 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.      Treatment.**

The SIR Claim Portion of each Allowed General Liability Claim will be paid on the Effective Date from the Risk Management Internal Service Fund, and will receive the same percentage payment on the dollar of Allowed Claim as will the holders of Allowed Class 12 Claims.  The Insured Portion of each Allowed General Liability Claim is not Impaired, and shall be paid by the applicable excess risk-sharing pool.

**P.**      **Class 15 – Claims Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS, as Trustee under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants.**

**1.      Impairment and Voting.**

Class 15 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holder of such Claims, and, accordingly, the holder of the Claims in this Class is not entitled to vote to accept or reject this Plan.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

### 2.     Treatment.

In order to be both clear and transparent, the Plan designates the CalPERS contract in a separate Class. The Plan expressly provides that CalPERS will continue as the Trustee for the City's pension plan for its employees and that the contract will be assumed by the City.

The City will continue to honor its obligations to its employees and retirees to fund employee retirement benefits under the CalPERS Pension Plan, and CalPERS as trustee and the CalPERS Pension Plan Participants retain all of their rights and remedies under applicable nonbankruptcy law. Thus, CalPERS and the CalPERS Pension Plan Participants will be entitled to the same rights and benefits to which they are currently entitled under the CalPERS Pension Plan.[7] CalPERS, pursuant to the CalPERS Pension Plan, will continue to be made available to provide pension benefits for participants in the manner indicated under the provisions of the CalPERS Pension Plan and remedies under applicable nonbankruptcy law.

### Q.     Class 16 – Claims of Equipment Lessors.

#### 1.     Impairment and Voting.

Class 16 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holder of such Claims, and, accordingly, the holders of the Claims in this Class is not entitled to vote to accept or reject this Plan.

#### 2.     Treatment.

Any equipment leases not specifically rejected by the Rejection Motion will be assumed under this Plan. The City believes that it is current on all such equipment leases and therefore no cure payments are required.

---

[7] As a result of negotiated labor contracts that changed certain pension provisions, as well as changes in state law, pension benefits for new hires effective January 2013 have been reduced by 50-70% (including loss of retiree health benefits) and in some cases higher for some types of new hires; new hires are also required to pay a greater share of their future pensions; additionally, while the loss of retiree health benefits and the loss of "pension spiking" will reduce the postemployment retirement benefits of current employees 30-50%; and lastly, employee compensation reductions that occurred in 2011 and 2012, which ranged up to 30% in pensionable compensation in some cases, will further reduce their future pension benefit that they otherwise would have received; these concessions are unaffected by this Plan.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**R.     Class 17 – Workers Compensation Claims.**

**1.     Impairment and Voting.**

Class 17 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.     Treatment.**

The City must pay Allowed SIR Claim Portions related to Workers Compensation Claims in full.  If not, the City will lose its State workers compensation insurance for those claims in excess of the SIR Claim Portions, exposing the City's current and former workers to grave risk. The City will pay the SIR Claim Portions related to Worker Compensation Claims from the Workers Compensation Internal Service Fund.

**S.     Class 18 – SPOA Claims.**

**1.     Impairment and Voting.**

Class 18 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.     Treatment.**

The City will honor the SPOA Claims held by SPOA members on the terms and conditions set forth in the SPOA MOU, which in general provides each SPOA member with 44 hours of additional paid leave time through fiscal year 2014-15.

Specifically, the SPOA MOU provides as follows:

2.  SPOA's Claims.  SPOA alleges that its members have claims in the bankruptcy case against the City relating to the City's modification of its 2009 Memorandum of Understanding ("2009 MOU"), pursuant to Declarations of Fiscal Emergency beginning on or about May 26, 2010 and continuing in effect thereafter, and in connection with the treatment of the claims of SPOA and its members under the Pendency Plan (collectively, the "Claims"), and that, in the aggregate, the Claims exceed thirteen million dollars ($13,000,000).  The City disputes the Claims and contends that the Claims would not be allowed in the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

chapter 9 case. It further asserts that, if the Claims were allowed, they would be allowed in an amount aggregating less than thirteen million dollars ($13,000,000).

In consideration of resolving the above differences and agreement on the MOU, the City agrees that the Claims shall be provided for in the Plan as follows:

(a) The Claims will be deemed allowed in the chapter 9 case in the aggregate amount of eight million, five hundred thousand dollars ($8,500,000) (the "Allowed Claims"). In consideration for the reduction in the amount of the Claims SPOA members employed during fiscal year 2010-2011 and/or 2011-2012 shall be credited, upon final approval of the MOU by the Parties and, if necessary, by the Bankruptcy Court, twenty-two (22) additional hours of paid leave in fiscal year 2012-2013. These additional hours of paid leave shall have no cash value and shall be utilized any time prior to the date upon which the SPOA member leaves employment with the City. Only those employees who were employed during some portion of the period July 1, 2010 and July 1, 2012 and who were still current employees upon the effective date of this Agreement shall be entitled to this treatment.

(b) The Allowed Claims shall be satisfied under the Plan by the City by crediting SPOA members employed during fiscal year 2010-2011 and/or 2011-2012 eleven (11) additional paid leave hours in the fiscal year of approval of the Plan and eleven (11) additional paid leave hours in the fiscal year after approval of the Plan. This benefit shall only apply to those employees who were employed during some portion of the period July 1, 2010 and July 1, 2012 and who are current employees as of the date the Plan is approved by the Bankruptcy Court. The total additional paid leave per SPOA member under paragraphs 2(a) and 2(b) of this article shall equal forty-four (44) hours. These additional paid leave hours shall have no cash value, and shall be utilized any time prior to the date upon which the SPOA member leaves employment with the City. It is understood that the provision of these hours shall be the sole compensation for the Claims of SPOA and its members. The additional twenty-two (22) hours additional paid leave credit contained in this paragraph 2(b) shall be contingent upon confirmation of the Plan and on the Plan becoming effective.

(c) Notwithstanding the foregoing, in the event that the Plan is not confirmed and does not become effective, the Claims shall not be allowed as specified herein, and both SPOA and the City agree that the Claims will be considered unresolved, with each Party reserving the right to assert or contest the Claims; provided, however, that the monetary equivalent of any paid leave hours taken pursuant to this Article shall serve as a credit against the Claims.

SPOA MOU at 55-56.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

## V.    ACCEPTANCE OR REJECTION; CRAMDOWN

### A.    Voting of Claims.

Each holder of an Allowed Claim classified into Classes 1A, 1B, 3, 4, 5, 6, 7, 8, 9, 12, 13, 14, and 18 shall be entitled to vote each such Claim to accept or reject this Plan.

With respect to any Class of Impaired Claims that fails to accept this Plan, the City, as proponent of this Plan, intends to request that the Bankruptcy Court nonetheless confirm this Plan pursuant to the so-called "cramdown" powers set forth in section 1129(b).

## VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption of Executory Contracts and Unexpired Leases.

Except as otherwise provided in this Plan, as to any executory contract or unexpired lease that the City elects to assume, the City shall make the Assumption Motion, which, if granted, shall cause the City to assume such contracts and leases pursuant to order of the Bankruptcy Court.

### B.    Cure Payments.

After the provision of notice and the opportunity for a hearing on the Assumption Motion, in accord with the Bankruptcy Rules, the Bankruptcy Court shall resolve all disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (b) the ability of the City to provide "adequate assurance of future performance" within the meaning of section 365 under the contract or lease to be assumed; and (c) any other matter pertaining to such assumption and assignment.  Any party to an executory contract or unexpired lease that is included in the Assumption Motion that asserts that any payment or other performance is due as a condition to the proposed assumption shall file with the Bankruptcy Court and serve upon the City a written statement and accompanying declaration in support thereof, specifying the basis for its Claim within such deadline and in the manner established for filing objections as shall be set forth in the Assumption Motion.  The failure to timely file and serve such a statement in accordance with the instructions set forth in the Assumption Motion shall be deemed to be a waiver of any and all objections to the proposed assumption and any claim for cure amounts of the agreement at issue.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**C.**      **Rejection of Executory Contracts and Unexpired Leases.**

The Rejection Motion shall seek authority to reject all executory contracts and unexpired leases that that the City in the exercise of its business judgment deems warranted. The City anticipates rejecting any executory contract and unexpired lease that is not needed for it to continue operating as a city.

**D.**      **Claims Arising From Rejection.**

Proofs of claim arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the City no later than 30 days after the date on which notice of entry of the order approving the Rejection Motion is served on the parties to the executory contracts and expired leases subject to the Rejection Motion. Any Claim for which a proof of claim is not filed and served within such time will be forever barred and shall not be enforceable against the City or its assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 12 (General Unsecured Claims) and treated accordingly.

**E.**      **Executory Contracts and Unexpired Leases Not Included in Motion.**

The City is a party to hundreds of executory contracts and unexpired leases. It is reasonable to expect that due to accident or inadvertence, one or more will be omitted from the schedules that will be attached to the Assumption Motion and the Rejection Motion (collectively, "**Omitted Agreements**"). The Omitted Agreements, if any, shall be deemed assumed as of the Effective Date, *provided*, *however*, that any non-debtor party may, within 60 days of receiving notice from the City that such agreement is being assumed, file a motion in the Bankruptcy Court seeking an order reconsidering the assumption of the agreement.

**VII.**      **IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN**

This Plan is predicated upon passage of Measure A. If Measure A fails to pass, the City will be compelled to implement a plan of adjustment that further slashes staffing and services provided by the City to its residents and will likely be unable to consummate the proposed settlements with Ambac, Assured Guaranty, and NPFG.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    Following the Effective Date, the City will continue to operate pursuant to the City

2  Charter, the California Constitution, and other applicable laws. While the City Council adopted

3  fiscal policies and projections to govern the allocation of the City's unrestricted resources, the

4  City acknowledges and understands that financial plans and budgets are not fixed in stone, and

5  that ongoing adjustments will have to be made in order to enable the City to adjust to changing

6  economic and operational needs. However, this Plan represents the City's commitment to the

7  binding treatment of the holders of Claims in the various Classes as enumerated in this Plan.

8    By the Rejection Motion, the City will reject, among other leases, the Office

9  Building Standby Agreement, the Golf Course/Park Lease Out, and the Golf Course/Park Lease

10  Back. Rejection of these leases will provide the City with relief from the operating and financing

11  shortfalls associated with these leases that historically have been subsidized by the General Fund.

12  As part of the Rejection Motion, the City intends to request the Bankruptcy Court to impose

13  reasonable terms and conditions on the right to possess and to attend to all issues necessary to

14  ensure a smooth transition to the new possessors that will expose the residents of the City to the

15  lease possible disruption.

16    After rejection, the counterparties to the lease out transactions above may have the

17  option, under section 365(h), to possess the leased properties. Alternatively, such counterparties

18  may decide not to possess, with the result that, notwithstanding the rejection of the leases, the

19  City may continue to operate the properties under such terms and conditions as the City and such

20  parties negotiate or subject to the order of the Bankruptcy Court or other court with jurisdiction.

21  As to each of the leased properties, the City is party to executory contracts with vendors,

22  managers and operators of services and facilities located on such properties (e.g., the Golf

23  Courses are managed by a management company). Should the City not continue to operate a

24  given property, the City will likely reject the executory contracts related to that property, but if

25  the City remains in possession and control of that property, the City will likely re-negotiate such

26  contracts or may assume such executory contracts. At this time the City does not know whether

27  the counterparties to the lease out transactions will elect to remain in possession (which the City

28  may contest or attempt to impose conditions upon). When the City is in a position to make such

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    decisions, the City will decide to reject, assume or renegotiate executory contracts with such

2    vendors.

3              Pursuant to the Rejection Motion, the City also intends to reject certain executory

4    contracts including the Ports License Agreement.

5              On the Effective Date, (i) pursuant to the NPFG SEB Settlement, the City will

6    assume, among other leases, the SEB Lease Out and the SEB Lease Back; (ii) pursuant to the

7    NPFG Arena Settlement, the City will assume the Arena Lease Out and the Arena Lease Back, as

8    modified by the NPFG Arena Settlement; and (iii) pursuant to the NPFG Parking Settlement, the

9    City will assume the Parking Structure Lease Out and the Parking Structure Lease Back, as

10   modified by the NPFG Parking Settlement (alternatively, the Parking Structure Lease Back will

11   be terminated as provided in the NPFG Parking Settlement).

12             As described in the Assured Guaranty Settlement Term Sheet, the Office Building

13   Lease Out and Lease Back will be terminated, and the City shall have no obligations under the

14   same.  Further, the Fourth Floor Lease of 400 E. Main will be superseded by the New

15   400 E. Main Lease.

16             Passage of Measure A is necessary to implement the Plan.  If passed, Measure A is

17   expected to generate approximately $30 million per year in new revenue from a 3/4 of one

18   percent increase in sales taxes (from 8.25% to 9%).  The Plan Financial Projections assume that

19   Measure A will pass.  Simultaneously with Measure A, the voters of the City are being asked to

20   vote on an advisory measure (Measure B) that advises the City Council to use approximately two-

21   thirds of the new revenue over time to enhance depleted police services under the Marshall Plan,

22   and the remainder to fund the City's ongoing expenses, including the cost of implementing the

23   Plan.  Conversely, as demonstrated in graphs included with the Plan Financial Projections, failure

24   of Measure A means that the City will continue to incur a substantial operating deficit even if the

25   additional hires of police and other safety officers contemplated by the Marshall Plan do not take

26   place.  Moreover, the City will be incapable of fulfilling its obligations under the Plan, and the

27   City will be required to make additional significant cuts to existing City's services and to

28   renegotiate or change the treatment of creditors hereunder.  The City cannot predict whether it

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1   would be able to continue to function under such a scenario, and it does not have detailed plans in

2   place at this point to deal with such further across-the-board staffing and service reductions.

3          In addition, at the time of preparation of this Plan, the City hopes to resume

4   negotiations with Franklin, is still involved in negotiations with other creditors, and is hopeful

5   that those negotiations will culminate in agreements with such creditors on the terms of a

6   consensual plan of adjustment that would retain City control of its assets. However, no such plan

7   will be possible unless additional funds flow to the General Fund through Measure A.

8   **VIII.   <u>RESERVATION OF THE CITY'S RIGHTS OF ACTION</u>**

9          All of the City's claims, causes of action, rights of recovery, rights of offset,

10   recoupment rights to refunds, and similar rights shall be retained by the City. The failure to list in

11   the Disclosure Statement any potential or existing Right of Action retained by the City is not

12   intended to and shall not limit the rights of the City to pursue any such action. Unless a Right of

13   Action is expressly waived, relinquished, released, compromised, or settled in this Plan, the City

14   expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion

15   doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

16   preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Rights of

17   Action upon or after the confirmation or consummation of this Plan or the Effective Date. In

18   addition, the City expressly reserves the right to pursue or adopt against any other entity any

19   claims alleged in any lawsuit in which the City is a defendant or an interested party.

20   **IX.   <u>DISTRIBUTIONS</u>**

21          **A.   <u>Distribution Agent</u>.**

22          On or after the Effective Date, the City may retain one or more agents (including

23   Rust Omni) to perform or assist it in performing the distributions to be made pursuant to this

24   Plan, which agents may serve without bond. The City may provide reasonable compensation to

25   any such agent(s) without further notice or Bankruptcy Court approval.

26          **B.   <u>Delivery of Distributions</u>.**

27          All distributions to any holder of an Allowed Claim shall be made at the address of

28   such holder as set forth in the books and records of the City or its agents, unless the City has been

Case 12-32118    Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    notified by such holder in a writing that contains an address for such holder different from the

2    address reflected in the City's books and records. All such notifications of address changes and

3    all address confirmations should be mailed to:  Rust Consulting/Omni Bankruptcy, 5955 DeSoto

4    Avenue, Suite 100, Woodland Hills, CA 91367.  All distributions to the Indenture Trustee shall

5    be made in accordance with the relevant indenture, as applicable.

6        **C.**      **Undeliverable Distributions.**

7                  **1.**      **Holding of Undeliverable Distributions.**

8              If any distribution to any holder of a Claim is returned to the City or its agent as

9    undeliverable, no further distributions shall be made to such holder unless and until the City is

10   notified in writing of such holder's then-current address.  Unless and until the City is so notified,

11   such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in

12   accordance with Section IX(C)(2).

13                 **2.**      **Unclaimed Property.**

14             If any entity entitled to receive distributions pursuant to this Plan does not present

15   itself on the Effective Date or on such other date on which such entity becomes eligible for

16   distribution, such distributions shall be deemed to be "Unclaimed Property."  Unclaimed Property

17   shall be set aside and held in a segregated account to be maintained by the City pursuant to the

18   terms of this Plan.

19                 **3.**      **Notification and Forfeiture of Unclaimed Property.**

20             No later than 60 days after the date of the first distributions under the Plan, the

21   City will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule

22   that identifies the name and last-known address of holders of the Unclaimed Property; the City

23   otherwise will not be required to attempt to locate any such entity.  On the 60th day following the

24   date of the first distributions made under the Plan, all remaining Unclaimed Property and accrued

25   interest or dividends earned thereon will be remitted to and vest in the City for any such use as the

26   City sees fit.

27

28

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**D.**     **Distributions of Cash**.

Any payment of Cash to be made by the City or its agent pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the City.

**E.**     **Timeliness of Payments**.

Any payments or distributions to be made pursuant to this Plan shall be deemed to be timely made if made within 14 days after the dates specified in this Plan. Whenever any distribution to be made under this Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been timely made on the date due.

**F.**     **Compliance with Tax, Withholding, and Reporting Requirements**.

The City shall comply with all tax, withholding, reporting, and like requirements imposed on it by any government unit, including without limitation, any payments related to CalPERS's required pension obligations, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099, or 1042) or withholding is required, the City shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information which is required by law to avoid withholding has not been received by the City, the City at its sole option may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

**G.**     **Time Bar to Cash Payments**.

Checks issued by the City on account of Allowed Claims shall be null and void if not negotiated within 90 days from and after the date of issuance thereof. Requests for reissuance

**The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.**

1  of any check shall be made directly to the City by the holder of the Allowed Claim with respect to

2  which such check originally was issued. Any claim in respect of such a voided check must be

3  made on or before the second anniversary of the Effective Date. After such date, all Claims in

4  respect of voided checks will be discharged and forever barred and the City will retain all moneys

5  related thereto.

6         **H.**    **No *De Minimis* Distributions.**

7         Notwithstanding any other provision of this Plan, no Cash payment of less than

8  $10.00 will be made by the City on account of any Allowed Claim.

9         **I.**    **No Distributions on Account of Disputed Claims.**

10         Notwithstanding anything to the contrary in this Plan, no distributions shall be

11  made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then

12  only to the extent so Allowed). Distributions made after the Effective Date in respect of Claims

13  that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed

14  to have been made as of the Effective Date.

15         **J.**    **No Postpetition Accrual.**

16         Unless otherwise specifically provided in this Plan or Allowed by order of the

17  Bankruptcy Court, the City will not be required to pay to any holder of a Claim any interest,

18  penalty, or late charge accruing with respect to such claim on or after the Petition Date. This

19  provision does not apply to holders of the 2003 Fire/Police/Library Certificates, the 2004 Arena

20  Bonds, the 2004 Parking Bonds, the 2006 SEB Bonds, the 2007 Office Building Bonds, and the

21  2009 Golf Course/Park Bonds, which are not obligations of the City and therefore are not Claims.

22  Therefore, the holders of such bonds and certificates will retain all of their rights to postpetition

23  interest, penalties, and late charges.

24  **X.**    **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS**

25

26        **A.**    **Claims Objection Deadline; Prosecution of Objections.**

27         The City will have the right to object to the allowance of Claims filed with the

28  Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    Unless otherwise ordered by the Bankruptcy Court, the City must file and serve any such

2    objections to Claims by not later than 180 days after the Effective Date (or, in the case of Claims

3    lawfully filed after the Effective Date, by not later than 180 days after the date of filing of such

4    Claims).

5         **B.**    **Reserves, Payments, and Distributions with Respect to Disputed Claims.**

6         After the Effective Date has occurred, at such time as a Disputed Claim becomes

7    an Allowed Claim, in whole or in part, the City or its agent will distribute to the holder thereof the

8    distributions, if any, to which such holder is then entitled under this Plan. Such distributions, if

9    any, will be made as soon as practicable after the date that the order or judgment of the

10   Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the

11   Claim becomes an Allowed Claim), but in no event more than 60 days thereafter. Unless

12   otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, no

13   interest will be paid on Disputed Claims that later become Allowed Claims.

14   **XI.**    **EFFECT OF CONFIRMATION**

15        **A.**    **Discharge of the City.**

16        Pursuant to section 944, upon the Effective Date, the City will be discharged from

17   all debts (as defined in the Bankruptcy Code) of the City and Claims against the City other than

18   (a) any debt specifically and expressly excepted from discharge by this Plan or the Confirmation

19   Order, or (b) any debt owed to an entity that, before the Confirmation Date, had neither notice nor

20   actual knowledge of the Chapter 9 Case.

21        The rights afforded in this Plan and the treatment of all holders of Claims, be they

22   Claims Impaired or Unimpaired under this Plan, will be in exchange for and in complete

23   satisfaction, discharge, and release of all Claims of any nature whatsoever arising on or before the

24   Effective Date, known or unknown, including any interest accrued or expenses incurred thereon

25   from and after the Petition Date, whether against the City or any of its properties, assets, or

26   interests in property. Except as otherwise provided herein, upon the Effective Date all Claims

27   against the City that arose prior to the Confirmation Date (the "**Pre-Confirmation Date Claims**")

28

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1   will be and shall be deemed to be satisfied, discharged, and released in full, be they Impaired or

2   Unimpaired under this Plan.

3       **B.**     **Injunction.**

4         Except as otherwise expressly provided in this Plan, all entities who have held,

5   hold, or may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after

6   the Confirmation Date from:  (a) commencing or continuing in any manner any action or other

7   proceeding of any kind with respect to any such Pre-Confirmation Date Claim against the City or

8   its property; (b) enforcing, attaching, collecting, or recovering by any manner or means any

9   judgment, award, decree, or order against the City or its property with respect to such Pre-

10   Confirmation Date Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any

11   kind against the City or its property; and (d) asserting any right of setoff, subrogation, or

12   recoupment of any kind against any obligation due to the City with respect to any such Pre-

13   Confirmation Date Claim, except as otherwise permitted by section 553.

14       **C.**     **Term of Existing Injunctions or Stays.**

15         Unless otherwise provided, all injunctions or stays provided for in the Chapter 9

16   Case pursuant to sections 105, 362, or 922, or otherwise, and in existence on the Confirmation

17   Date, will remain in full force and effect until the Effective Date.

18

19   **XII.**     **RETENTION OF AND CONSENT TO JURISDICTION**

20         Following the Effective Date, the Bankruptcy Court shall retain and have

21   exclusive jurisdiction over any matter (1) arising under the Bankruptcy Code and relating to the

22   City, (2) arising in or related to the Chapter 9 Case or this Plan, and (3) otherwise for the

23   following:

24       1.     to resolve any matters related to the assumption, assumption and assignment, or

25   rejection of any executory contract or unexpired lease to which the City is a party or with respect

26   to which the City may be liable, and to hear, determine and, if necessary, liquidate any Claims

27   arising therefrom, including those matters related to the amendment after the Effective Date of

28   this Plan, and to add any executory contracts or unexpired leases to the Rejection Motion, as

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

necessary;

2. to enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, and all other contracts, instruments, releases, and other agreements or documents related to this Plan;

3. to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the City after the Effective Date or that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 Case, whether or not such action initially is filed in the Bankruptcy Court or any other court;

4. to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

5. to hear and determine any objections to Claims or to proofs of Claim filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

6. to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

7. to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142(b);

8. to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9. to the extent that the City elects to bring such matters before the Bankruptcy Court, to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

10. to hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or

Filed 10/10/13    Case 12-32118    Doc 1133

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

enforcement of this Plan or the Confirmation Order or the extent of any entity's obligations incurred in connection with or released under this Plan or the Confirmation Order;

11.     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of this Plan;

12.     to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement;

13.     to hear any other matter for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

14.     to hear and determine all disputes or controversies arising in connection with or relating to the terms or enforcement of any relevant agreements; and

15.     to enter a final decree closing the Chapter 9 Case.

## XIII.   CONDITIONS PRECEDENT

### A.   Condition Precedent to Confirmation.

The entry of the Confirmation Order that is in form and substance satisfactory to the City, and that is reasonably satisfactory to _____, is a condition precedent to confirmation of this Plan. The approval of the State of California Department of Finance of the restructuring of the Arena Pledge Agreement as described in the NPFG Settlement is also a condition precedent to confirmation of this Plan.

### B.   Conditions Precedent to Effective Date.

The "effective date of the plan," as used in section 1129, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XIII(C)) of the following conditions precedent:

1.     **Confirmation Order**. The Confirmation Order shall have been entered, shall be in full force and effect, and shall be a Final Order (but the

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court.  The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

1    requirement that the Confirmation Order be a Final Order may be waived by the City

2    at any time).

3            **2.**        **Plan Documents**.  All agreements and instruments

4    contemplated by, or to be entered into pursuant to, this Plan shall be in form and

5    substance acceptable to the City (and in the case of all agreements and instruments

6    between the City and Ambac, Assured Guaranty, and NPFG, acceptable to Ambac,

7    Assured Guaranty, and NPFG respectively); shall have been duly and validly executed

8    and delivered (including, but not limited to, any documents necessary to be executed

9    on or prior to the Effective Date so as to implement the Ambac Settlement, the

10    Assured Guaranty Settlement, and the NPFG Settlement, respectively, and the

11    satisfaction or waiver of the conditions precedent to the Ambac Settlement, the

12    Assured Guaranty Settlement, and the NPFG Settlement, respectively), or deemed

13    executed by the parties thereto; and all conditions to their effectiveness shall have

14    been satisfied or waived.

15            **3.**        **Authorizations, Consents, Etc.**  The City shall have received

16    any and all authorizations, consents, regulatory approvals, rulings, no-action letters,

17    opinions, and documents that are necessary to implement the Plan and that are

18    required by law, regulation or order.

19            **4.**        **Timing**.  The Effective Date shall occur on a Business Day

20    specified by the City on which the conditions set forth in Section XIII(B)(1) and

21    (B)(2) are satisfied or waived; *provided* that, unless otherwise ordered by the

22    Bankruptcy Court, the Effective Date must occur by no later than six months after the

23    Confirmation Date.

24    C.        **Waiver of Conditions to Effective Date.**

25            The City may waive in whole or in part any condition to effectiveness of this Plan.

26    Any such waiver of a condition may be effected at any time, without notice or leave or order of

27    the Bankruptcy Court and without any formal action, other than the filing of a notice of such

28    waiver with the Bankruptcy Court.

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**D.**     **Effect of Failure of Conditions**.

In the event that the conditions to effectiveness of this Plan have not been timely satisfied or waived, and upon notification submitted by the City to the Bankruptcy Court, (a) the Confirmation Order shall be vacated, (b) no distributions under this Plan shall be made, (c) the City and all holders of Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all of the City's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the City or any other entity or to prejudice in any manner the rights, remedies, or claims of the City or any entity in any further proceedings involving the City.

**E.**     **No Admission of Liability**.

The Plan constitutes a settlement and compromise between and among the City and various parties. The Plan shall not be deemed an admission or concession by any party with respect to any factual or legal contention, right, defense, or position taken by the City.

**XIV.   MISCELLANEOUS PROVISIONS**

**A.**     **Dissolution of the Retirees Committee**.

On the Effective Date, the Retirees Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 9 Case, and the Retirees Committee shall be deemed dissolved and its appointment terminated.

**B.**     **Severability**.

If, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court or any other court having jurisdiction, including on appeal, if applicable, to be invalid, void, or unenforceable, the Bankruptcy Court, in each such case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding,

**The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.**

1    alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in

2    full force and effect and shall in no way be affected, impaired, or invalidated by such holding,

3    alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and

4    shall provide that each term and provision of this Plan, as it may have been altered or interpreted

5    in accordance with the foregoing, is valid and enforceable pursuant to its terms.

6          **C.**     **Governing Law.**

7          Except to the extent that the Bankruptcy Code or other federal law is applicable, or

8    to the extent that an exhibit hereto or Plan Document provides otherwise, the rights, duties, and

9    obligations arising under this Plan shall be governed by, and construed and enforced in

10   accordance with, the laws of the State of California, without giving effect to principles of

11   conflicts of laws.

12         **D.**     **Effectuating Documents and Further Transactions.**

13         Each of the officials and employees of the City is authorized to execute, deliver,

14   file, or record such contracts, instruments, releases, indentures, and other agreements or

15   documents and take such actions as may be necessary or appropriate to effectuate and further

16   evidence the terms and provisions of this Plan.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

**E.    Notice of Effective Date.**

On or before 14 days after occurrence of the Effective Date, the City or its agent shall mail or cause to be mailed to all holders of Claims the Notice of the Effective Date, which will inform such holders of: (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of the City's executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (d) the deadline established under this Plan for the filing of Administrative Claims; (e) the procedures for changing an address of record pursuant to Section IX; and (f) such other matters as the City deems to be appropriate.

DATED:  October 10, 2013                    CITY OF STOCKTON, CALIFORNIA

By: _____
    Robert Deis
    City Manager

Submitted By:

ORRICK, HERRINGTON & SUTCLIFFE
LLP


By:_____/s/ Marc A. Levinson_____
    Marc A. Levinson
    Jeffery D. Hermann
    Norman C. Hile
    Patrick B. Bocash
    John A. Farmer

Attorneys for the City of Stockton

The draft disclosure statement accompanying this draft plan of adjustment has not been approved by the Bankruptcy Court. The distribution of the draft disclosure statement and of this draft plan is not intended as, and should not be construed to be, the solicitation of a vote on this draft plan or on any other plan.

# EXHIBITS TO THE PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA (OCTOBER 10, 2013)

| | |
|---|---|
| Exhibit A | Final Settlement Term Sheet, Assured Guaranty Municipal Corp. and City of Stockton |
| Exhibit B | Settlement Term Sheet, City of Stockton and National Public Finance Guarantee Corporation |
| Exhibit C | Term Sheet—Proposed Amendments to Team Lease for Stockton Events Center |

EXHIBIT A


FINAL SETTLEMENT TERM SHEET
ASSURED GUARANTY MUNICIPAL CORP.
AND
CITY OF STOCKTON

FINAL SETTLEMENT TERM SHEET

ASSURED GUARANTY MUNICIPAL CORP.
and
CITY OF STOCKTON

October 2, 2013

*I.  Background*

This memorandum (the "Term Sheet") summarizes the proposal of the City of Stockton, California (the "City") to Assured Guaranty Municipal Corp. ("AGM") concerning the AGM Debt Obligations.  Capitalized terms used herein are defined in Part III of the Term Sheet.  This Term Sheet supersedes all prior term sheets, memoranda and other communications with respect to the AGM Obligations.

*II.  Introduction*

AGM and the City have engaged in mediation for several months with The Hon. Elizabeth Perris, as mediator, and have exchanged several offers and counteroffers, and the parties believe they have now reached conceptual agreement on a settlement as outlined below.  It should be noted that all of the provisions of this term sheet are subject to final documentation and final approval of the City Council.  Such final approved documents shall control for all purposes any settlement.  Until final definitive documents are executed and delivered by both parties, neither party shall be bound by this Term Sheet.  All definitive documentation pertaining to this term sheet (including the Plan) shall be in form and substance acceptable to AGM and the City, and shall include other non-monetary terms and conditions not set forth herein (including events of default) as agreed to by the parties.

*III.  Definitions*

"2007 Lease Ask Payments" means, for each fiscal year, the payments shown in Schedule 1.

"2007 Office Building Bonds" means the Stockton Public Financing Authority Variable Rate Demand Lease Revenue Bonds, 2007 Series A (Building Acquisition Financing Project) and the Stockton Public Financing Authority Taxable Variable Rate Demand Lease Revenue Bonds, 2007 Series B (Building Acquisition Financing Project).

"400 E. Main Office Building Property" means the real property and improvements thereon located at 400 East Main Street, Stockton that are subject to the Office Building Lease Back.

"AGM" means Assured Guaranty Municipal Corp, in its capacity as insurer of the 2007 Office Building Bonds and the Pension Obligation Bonds.

"AGM Obligations" means, collectively, the 2007 Office Building Bonds and the Pension Obligation Bonds.

1

"Base Rental Payments" means for each fiscal year, the amount shown in Schedule 2, which are payable to AGM or any successor in interest pursuant to the New 400 E. Main Lease.

"City" means the City of Stockton, California.

"City Space" means the space identified by the City in the 400 E. Main Office Building Property and use of the parking spaces identified by the City. The City space shall be approximately 65,000 square feet of rentable space. The City will work with AGM and CB Richard Ellis, as the property manager of the building ("CBRE") to define the City Space based on the City's programmatic needs. The space will likely include the 4th floor and a portion for the 3rd floor and will also include a portion of the ground floor space for public access needs and provision of services to the general public, such as building permits and cashier functions.

"Common Areas" means the portions of 400 E. Main Office Building Property that are used in common by the City with respect to its occupancy of the City Space and other tenants or users of 400 E. Main Office Building Property. The City will work with AGM and CBRE to define the Common Areas based on the City's programmatic needs.

"Effective Date" means the date that the Settlement becomes effective, being the effective date of the Plan, which includes the terms set forth in this Term Sheet.

"New 400 E. Main Lease" means the lease to the City of a portion of the 400 E. Main Office Building Property as described in Part IV.

"Office Building Lease Back " means that certain Lease Agreement, dated as of November 1, 2007, by and between the Stockton Public Financing Authority, as lessor, and the City, as lessee.

"Plan" means the City's plan of adjustment, as confirmed by an order entered in its pending chapter 9 bankruptcy case.

"Pension Obligation Bonds" means the City of Stockton 2007 Taxable Pension Obligation Bonds, Series A and the City of Stockton 2007 Taxable Pension Obligation Bonds, Series B.

"Pension Obligation Bonds Claim" means the amount owing to AGM on account of the Pension Obligation Bonds on June 28, 2013, which is comprised of unpaid principal of $124.28 million plus any accrued and unpaid interest as of such date.

"Pension Obligation Bonds Payments" means, collectively the four forms of payment on the Pension Obligation Bonds specified in Section V of this Term Sheet.

"Settlement" means the settlement between the City and AGM effecting the terms set forth in this Term Sheet, as documented and incorporated into the Plan.

"Special Fund Payments" means the payments on the Pension Obligation Bonds set forth in Schedule 3.

"Supplemental Payments" means the payments on the Pension Obligation Bonds set forth in Schedule 4.

2

"Term" means the term of the Settlement, which commences on the Effective Date and ends on July 1, 2053.

*IV. The New 400 E. Main Lease and Disposition of 400 E. Main Office Building Property*

Upon written request of AGM, the City will transfer fee title in the 400 E. Main Office Building Property ("400 E. Main") to AGM, subject only to the New 400 E. Main Lease. Prior to such transfer, AGM shall sublease the City Space to the City as provided in the New 400 E. Main Lease. After such transfer, AGM may elect to keep the property or sell it at some future date to the County of San Joaquin or any other purchaser, subject to the New 400 E. Main Lease. AGM shall be entitled to all rent and profits of 400 E. Main after the transfer, and to all of the sales proceeds of the Building should AGM elect to sell 400 E. Main. Pursuant to the Settlement, the City shall be released from any and all liability with respect to the 2007 Office Building Bonds and the leases and other contracts to which the City is a party in connection with such bonds shall be terminated. AGM shall obtain the consent of the Trustee to such termination and release.

The New 400 E. Main Lease shall include the following terms:

- Initial term starts on Effective Date (or such date as agreed ) and ends on June 30, 2022. Term may be extended at City's option for two additional 2-year periods from June 30, 2022 to June 30, 2024, and again from June 30, 2024 to June 30, 2026, upon at least 90 days prior notice to AGM or its successor in interest.
- City shall enjoy exclusive use of the City Space and joint use of the Common Areas of the 400 E. Main Office Building Property.
- City shall be responsible for the cost of all tenant improvements to the City Space.
- City shall pay Base Rental Payments in equal monthly installments, in advance, on the first business day of each month. Such rent is based on a "fully serviced" building and shall not be grossed up for CAM charges, insurance, taxes etc..
- City's obligations under the New 400 E. Main Lease shall be subject to abatement in the event City does not enjoy beneficial use and occupancy of the City Space or joint use of the Common Areas.
- The New 400 E. Main Lease will supersede the existing lease between the City and AGM's agents for the 4th floor space.
- City shall have the right to sublet or assign any portion of its leasehold premises with the prior written consent of Landlord (not to be unreasonably withheld), so long as City remains obligated on the New 400 E. Main Lease. Grounds for a reasonable denial of Landlord consent shall include, without limitation, City marketing space for assignment or sublease to third parties at a time when Landlord is marketing other space in the Building to third parties for direct lease; provided that City and Landlord shall each have the right to market their respective space on market terms.
- Any transferee, whether voluntary or involuntary, of AGM's ownership interest in 400 E. Main takes title subject to the New 400 E. Main Lease, and City's use and occupancy of the City Space and the Common Areas shall not be disturbed so long as City is not in default under the New 400 E. Main Lease.

3

*V.  Non-Contingent Payments on Pension Obligation Bonds.*

City agrees to make payments on the Pension Obligation Bonds in each fiscal year equal to the sum of the following:

- 2007 Lease Ask Payments;
- Special Fund Payments; and
- Supplemental Payments;

*provided that,* the Pension Obligation Bonds Payments shall be the sole non-contingent payments payable to AGM or any other party with respect to the Pension Obligation Bonds, *and provided further that*, the Pension Obligations Bond Claim shall be satisfied only if the Pension Obligation Bonds Payments, together with interest on advances made by AGM with respect to such obligations at the rate of interest on the Pension Obligation Bonds, have been paid in full pursuant to the requirements of this Term Sheet.

Payments on the Pension Obligation Bonds shall be paid on the dates and in the amounts shown in the Schedules attached hereto.

AGM shall also be entitled to Contingent Payments in accordance with the City's Contingent Payment Model, which is attached as Exhibit A.

*VI.  Other Creditor Settlements/Treatments*

City agrees that it will not enter into any settlement agreement (except the settlement agreement with NPFG previously described to AGM and the settlement agreement with AMBAC previously entered into) or provide plan treatment for any unsecured creditor holding a claim on the petition date (e.g., an unsecured judgment claim) or any capital markets creditor, payable from the City's general fund (but excluding payments made by any third party such as an insurer) which provides a net present value recovery (applying a 5% discount rate) to such creditor, based upon non-contingent cash payments from the general fund, in excess of the net present value return of non-contingent general fund payments provided hereunder to AGM on the Pension Obligation Bonds, unless AGM is provided with the same level of non-contingent cash payments from the general fund on the Pension Obligation Bonds.

*VII.  AGM Support of Plan of Adjustment*

AGM agrees to fully support and vote in favor of the Plan; *provided that*, the Plan contains Settlement terms as set forth in this Term Sheet in connection with the treatment of AGM's claims.

*VIII.  Attorney and Professional Fees and Expenses*

AGM and the City shall each bear their own attorneys' and other professional and consulting fees and expenses.  Wells Fargo Bank, National Association, as trustee under the 2007 Office Building

Bond documents and the Pension Obligation Bond documents (the "2007 Office Building Bond Trustee" and the "Pension Obligation Bond Trustee," respectively) shall be entitled to collect reasonable attorney's fees, but only from amounts held by the 2007 Office Building Bond Trustee under the indenture for the 2007 Office Building Bonds and the Pension Obligation Bond Trustee under the indenture for the Pension Obligation Bonds, and the City shall not be obligated to replenish or reimburse such funds. City will waive right to seek reimbursement of attorneys' fees related to the eligibility trial, and AGM will waive rights to seek attorneys fees under the various bond documents except for any attorneys fees incurred as a result of a future breach of the Plan.

*List of Schedules and Exhibits:*

Schedule 1: 2007 Lease Ask Payments
Schedule 2: Base Rental Payments
Schedule 3: Special Fund Payments
Schedule 4: Supplemental Payments

Exhibit A: Contingent Payments Model

5

### SCHEDULE 1: 2007 LEASE ASK PAYMENTS

**Assumed Settlement Date:**
**June 1, 2014**

| Payment Date | 2007 Lease Ask Payments | Payment Date | 2007 Lease Ask Payments |
|---|---|---|---|
| 6/1/2014 | - | 6/1/2034 | $2,531,688 |
| 6/1/2015 | - | 6/1/2035 | 2,531,313 |
| 6/1/2016 | - | 6/1/2036 | 2,529,938 |
| 6/1/2017 | - | 6/1/2037 | 2,527,563 |
| 6/1/2018 | $1,334,875 | 6/1/2038 | 2,529,125 |
| 6/1/2019 | 1,334,875 | 6/1/2039 | 2,529,563 |
| 6/1/2020 | 1,334,875 | 6/1/2040 | 2,528,875 |
| 6/1/2021 | 1,334,875 | 6/1/2041 | 2,532,000 |
| 6/1/2022 | 1,334,875 | 6/1/2042 | 2,528,938 |
| 6/1/2023 | 2,529,750 | 6/1/2043 | 2,529,688 |
| 6/1/2024 | 2,529,125 | 6/1/2044 | 2,529,188 |
| 6/1/2025 | 2,527,750 | 6/1/2045 | 2,532,375 |
| 6/1/2026 | 2,530,563 | 6/1/2046 | 2,529,250 |
| 6/1/2027 | 2,532,500 | 6/1/2047 | 2,529,813 |
| 6/1/2028 | 2,528,625 | 6/1/2048 | 2,529,000 |
| 6/1/2029 | 2,528,938 | 6/1/2049 | 2,531,750 |
| 6/1/2030 | 2,528,375 | 6/1/2050 | 2,528,063 |
| 6/1/2031 | 2,531,875 | 6/1/2051 | 2,527,938 |
| 6/1/2032 | 2,529,438 | 6/1/2052 | 2,531,250 |
| 6/1/2033 | 2,531,063 | **Total** | **$82,569,688** |

S1-1

## SCHEDULE 2: BASE RENTAL PAYMENTS

**Assumed Settlement Date:**
**June 1, 2014**

| Fiscal Year Ending June 30 | Monthly Payments** | Total Payments |
|---|---|---|
| 2014 | $70,200 | $70,200 |
| 2015 | $70,200 | $842,400 |
| 2016 | $70,200 | $842,400 |
| 2017 | $70,200 | $842,400 |
| 2018 | $70,200 | $842,400 |
| 2019 | $88,816 | $1,065,792 |
| 2020 | $88,816 | $1,065,792 |
| 2021 | $88,816 | $1,065,792 |
| 2022 | $88,816 | $1,065,792 |
| 2023[*] | $107,432 | $1,289,184 |
| 2024[*] | $107,432 | $1,289,184 |
| 2025[*] | $123,240 | $1,478,880 |
| 2026[*] | $123,240 | $1,478,880 |

[*]   Extension of lease term to such Fiscal Year at option of the City as provided in the Term Sheet.

**   Based on 65,000 square feet.

OHSUSA:754620297.6

## SCHEDULE 3: SPECIAL FUND PAYMENTS

**Assumed Settlement Date:
June 1, 2014**

| Payment Date | Special Fund Payments | Payment Date | Special Fund Payments |
|---|---|---|---|
| 6/1/2014 | $2,154,219 | 7/1/2035 | $1,684,302 |
| 7/1/2015 | 1,441,164 | 7/1/2036 | 1,707,838 |
| 7/1/2016 | 1,465,386 | 7/1/2037 | 1,731,908 |
| 7/1/2017 | 1,489,254 | 7/1/2038 | 2,009,482 |
| 7/1/2018 | 1,514,381 | 7/1/2039 | 2,009,482 |
| 7/1/2019 | 1,540,593 | 7/1/2040 | 2,009,482 |
| 7/1/2020 | 1,566,255 | 7/1/2041 | 2,009,482 |
| 7/1/2021 | 1,592,496 | 7/1/2042 | 2,009,482 |
| 7/1/2022 | 1,618,283 | 7/1/2043 | 2,009,482 |
| 7/1/2023 | 1,646,025 | 7/1/2044 | 2,009,482 |
| 7/1/2024 | 1,673,742 | 7/1/2045 | 2,009,482 |
| 7/1/2025 | 1,701,251 | 7/1/2046 | 2,009,482 |
| 7/1/2026 | 1,455,516 | 7/1/2047 | 2,009,482 |
| 7/1/2027 | 1,504,553 | 7/1/2048 | 2,009,482 |
| 7/1/2028 | 1,526,057 | 7/1/2049 | 2,009,482 |
| 7/1/2029 | 1,548,562 | 7/1/2050 | 2,009,482 |
| 7/1/2030 | 1,569,945 | 7/1/2051 | 2,009,482 |
| 7/1/2031 | 1,591,762 | 7/1/2052 | 2,009,482 |
| 7/1/2032 | 1,614,631 | 7/1/2053 | 2,009,482 |
| 7/1/2033 | 1,637,417 | | |
| 7/1/2034 | 1,660,736 | **Total** | **$70,787,984** |

S3-1

## SCHEDULE 4:  SUPPLEMENTAL PAYMENTS

**Assumed Settlement Date**
**June 1, 2014**

| Payment Date | Supplemental Payments | Payment Date | Supplemental Payments |
|---|---|---|---|
| 6/1/2014 | - | 6/1/2034 | $250,000 |
| 6/1/2015 | - | 6/1/2035 | 250,000 |
| 6/1/2016 | - | 6/1/2036 | 250,000 |
| 6/1/2017 | - | 6/1/2037 | 250,000 |
| 6/1/2018 | - | 6/1/2038 | 250,000 |
| 6/1/2019 | - | 6/1/2039 | 250,000 |
| 6/1/2020 | - | 6/1/2040 | 250,000 |
| 6/1/2021 | - | 6/1/2041 | 250,000 |
| 6/1/2022 | - | 6/1/2042 | 250,000 |
| 6/1/2023 | $250,000 | 6/1/2043 | 350,000 |
| 6/1/2024 | 250,000 | 6/1/2044 | 350,000 |
| 6/1/2025 | 250,000 | 6/1/2045 | 350,000 |
| 6/1/2026 | 250,000 | 6/1/2046 | 350,000 |
| 6/1/2027 | 250,000 | 6/1/2047 | 350,000 |
| 6/1/2028 | 250,000 | 6/1/2048 | 350,000 |
| 6/1/2029 | 250,000 | 6/1/2049 | 350,000 |
| 6/1/2030 | 250,000 | 6/1/2050 | 350,000 |
| 6/1/2031 | 250,000 | 6/1/2051 | 350,000 |
| 6/1/2032 | 250,000 | 6/1/2052 | 350,000 |
| 6/1/2033 | 250,000 | **Total** | **$8,500,000** |

OHSUSA:754620297.6

**EXHIBIT A:  CONTINGENT PAYMENTS**

OHSUSA:754588877.5

EXHIBIT A

FINAL TERM SHEET FOR CONTINGENT GENERAL FUND PAYMENTS

DATED:  OCTOBER 2, 2013

*I.  Background*

This memorandum summarizes the structure of a Contingent Payment component of the restructured obligations of Participating Creditors.  Capitalized terms used herein are defined in Part III of the Term Sheet.  This Term Sheet supersedes all prior term sheets, memoranda and other communications with respect to the Contingent Payments.

*II.  Underlying Basis for Model*

At the time the City incurred most of its general fund debt, the general fund's year over year increases in revenue averaged about 7.6%.  In seven years, the City's core general fund revenues grew from $94 million to $158 million.  In addition, the scheduled debt service for all general fund capital markets obligations was increased from approximately $5.8 million in 2006-07 to approximately $19.2 million in 2012-13, and under the terms of the relevant obligations, would continue to grow to approximately $23.7 million in 2031-32.   It is clear from the actions taken by the City in incurring this large amount of debt, and in many of the other budgetary decisions made by the City during this period, that the City's leaders based these decisions on the premise that growth would continue in general fund revenues at a significant rate, such that the City would be able to afford to pay back all of this debt service and accommodate the other structural expenditures built into its budget going forward.  That the capital markets extended this large amount of credit structured to include the ramping up of the payments further validated City's view that it was on solid footing given the growth being experienced.

Had the growth continued, the City would have been able to service the debt. However, what actually occurred is that revenues declined dramatically, making it infeasible for the City to pay the debt as scheduled and still maintain minimally satisfactory services. Given that the future cannot be predicted, it is reasonable for the City to provide some assurance that, if above anticipated revenue growth does occur in the future, creditors should be able to share in some of the gain in order to more fully repay the debt originally owed to them.

Accordingly, this model first determines an "Expected Core Revenues" level, which is meant to approximate (albeit most likely on the conservative side) the picture of growth in general fund revenues that underlay the decisions made during the first decade of this century.

Second, the model establishes a different measure of Core Revenues, called the Baseline Core Revenues.  This is the amount that the City expects to receive in Core Revenues, based on its budget model, and assuming modest growth over time.  This baseline will form the foundation for the City's Plan of Adjustment by determining how much the City can pay for all general fund expenditures, including debt service, on a non-contingent basis.

Third, if the Actual Core Revenues received in any given fiscal year exceed the Baseline Core Revenues, the model determines proportionally how close the Actual Core Revenues got to the Expected Core Revenues, and generates a contingent payment equal to a Participating Creditor's proportion of the Shortfall Amount, which is an amount derived as an estimate of the total shortfalls in each year for all general fund capital markets creditors. Note that the "Shortfall Amount" will be fixed going forward based on this estimate, and is not directly tied to any actual shortfall experienced by creditors in any specific year.

The premise of this model is that, had the revenues achieved the Expected Core Revenue curve, the City would have been able to pay all of its debts and would not have had to file for bankruptcy; therefore, the closer the City gets in the future to achieving those Expected Core Revenues, the closer the City should get to making full payment on obligations of the Participating Creditors.

Finally, there are a number of adjustments and limitations included in order to smooth the model and protect the City against having to make a payment when other factors beyond the City's control prevent it from having the free cash flow to make the payments.

*III. Definitions*

"Allocable Share" means, with respect to any Participating Creditor, a fraction, the numerator of which is the principal amount of such Participating Creditor's Obligations as of July 1, 2012 and the denominator of which is the sum of all the principal amounts of Participating Creditors' Obligations as of such date.

"Annexed Area Revenues" means the Core Revenues (except for Motor Vehicle License Fee revenue) generated from any territory annexed to the City after the Effective Date.

"Actual Core Revenues" means the amount of Core Revenues actually received by the City in a given Fiscal Year.

"Actual Core Revenue Increment" means, for any Fiscal Year, the amount, if any, by which the Actual Core Revenues exceed the Baseline Core Revenues.

"AGM" means Assured Guaranty Municipal Corp., as insurer of the AGM Obligations.

"Baseline Core Revenues" means the amount of Core Revenues the City expects to receive in each Fiscal year under the Budget Model, as projected through the Term and as shown on Schedule 1.

"Budget Model" means the City's comprehensive Budget Model provided separately.

"Core Revenues" means, for each Fiscal Year, the City's Unrestricted general fund receipts, net of any required refunds, rebates or legally required adjustments, from the following sources:

- *ad valorem* property tax (excluding any special overrides for voter approved general obligation bonds);
- sales and transaction and use taxes;

- utility taxes;
- transient occupancy taxes;
- franchise taxes;
- business license taxes;
- motor vehicle license fees;
- other Unrestricted taxes approved by the voters after Fiscal Year 2013-14; and
- Net revenues generated from the sale of Surplus Property;

*provided*, that Core Revenues does not include any Annexed Area Revenues or Realignment Revenues. Attached hereto as Exhibit A is a statement of Core Revenues for Fiscal Year 2012-13.

"City" means the City of Stockton, California.

"Contingent General Fund Payments" means, for each Fiscal Year commencing with Fiscal Year 2017-18 the amount determined pursuant to Section IV below.

"Effective Date" means the date that this Settlement becomes effective, being the effective date of the Plan of Adjustment which includes the terms of this Settlement.

"Expected Core Revenues" means, for each fiscal year, the amount shown in Schedule 2 attached hereto.

"Expected Core Revenue Increment" means, for any Fiscal Year, the difference between the Baseline Core Revenues and the Expected Core Revenues, as shown in Schedule 3.

"Extraordinary Expense Event" means an expense or combination of expenses that are involuntary obligations of the City which are at least 5% of the City's prior fiscal year budgeted general fund expenses. An Extraordinary Expense Event may include a judgment against the City that is finally determined to be due and payable (provided that the City shall exercise any right with respect to such judgment to make installment payments thereon), payments required to be made by the City to respond to a natural disaster where a declaration of emergency has been declared by the State of California or Federal government or unfunded mandates of the State of Federal government or other similar extraordinary expenses, but shall not include any changes to pension or other post employment benefit costs.

"Incremental Revenue Ratio" means the ratio of the Actual Core Revenue Increment to the Expected Core Revenue Increment. The Incremental Revenue Ratio may not be less than 0 nor more than 1.

"Obligations means the bonds, notes or other evidences of indebtedness issued to a Participating Creditor by the City and payable from the City's general fund. With respect to AGM, the Obligations are the City of Stockton 2007 Taxable Pension Obligation Bonds, Series A and Series B only.

"Plan of Adjustment" means the City's plan of adjustment, as confirmed by an order entered in its pending chapter 9 bankruptcy case.

"Participating Creditor" means AGM and any creditor holding Obligations who enters into a settlement agreement with the City that includes participation in the Contingent Payments.

"Realignment Revenues" means Core Revenues received by the City as a result of structural changes in tax distributions imposed by the State of California in connection with any realignment of State and local government services and obligations such that the additional revenues are intended to offset additional cost burdens required to be assumed by the City.

"Settlement" means this settlement, as documented and incorporated into the Plan of Adjustment.

"Shortfall Amount" means, for each fiscal year, the amount shown in Schedule 4.

"Surplus Property" means (i) the properties currently identified by the City as surplus property pursuant to Exhibit B plus (ii) any property declared surplus by the City which is not being sold to generate revenues to provide replacement property in order to deliver the same category of service or amenity that the sold property previously delivered.

"Term" means the term of this Settlement, which commences on the Effective Date and ends on June 2, 2052, except to the extent it is extended pursuant to Part V.

"Unrestricted" means, with respect to Core Revenues, amounts that are not subject to any legal limitation or encumbrance as to use for a specific purpose, and includes revenues from taxes that are defined as general taxes under Article XIIIC of the State Constitution, except to the extent that the voters of the City, simultaneously with the passage of a tax measure which approved any such taxes, adopted an advisory measure which directs the City Council to expend the proceeds of such taxes for a purpose inconsistent with their treatment as Core Revenues hereunder but only to the extent the City uses such funds for such inconsistent purpose; provided that if Measure A should expire before or not be extended through 2052, then this exception shall not apply to an amount of revenues which Measure A was expected to generate for each year through 2052.

*IV. Contingent General Fund Payments*

Contingent General Fund Payments shall be calculated each Fiscal Year as follows:

1.      Determine the average Incremental Revenue Ratio for such Fiscal Year and each of the previous two Fiscal Years.

2.      Multiply the amount determined in (1) above by the Shortfall Amount.

Contingent General Fund Payments for each fiscal year shall be paid on June 1 of such fiscal year, based on the City's adopted budget for such fiscal year. After the completion of the audited financial statements for each fiscal year, an adjustment shall be made in the next fiscal year's Contingent Payment for any under-paid or over-paid amount with respect to the audited fiscal year.

Contingent Payments shall be paid to each Participating Creditor in accordance with its Allocable Share, except that with respect to the Contingent Payments payable on or after June 1, 2039 the Allocable Share for AGM shall be equal to 100%.

The cumulative amount of Contingent General Fund Payments for any Participating Creditor shall not exceed the sum of (a) the cumulative amount which, when added to any other amounts paid to such Creditor by the City, would have been paid on such Creditor's obligation(s) had the obligations been paid in full as originally scheduled; plus (b) interest on the unpaid portion of such amounts accrued at the rate of interest as the underlying bonds between the scheduled payment date and the actual date such amounts are paid.

*V. Suspension of Contingent General Fund Payments*

The Contingent General Fund Payments in any Fiscal year may be suspended by the City in any Fiscal Year in which an Extraordinary Expense Event occurs or is continuing. The amount of such suspended payment, if any, shall remain an obligation of the City payable no later than 10 years after the suspension of such payment, and shall bear interest at the Wall Street Journal Prime Rate (or equivalent) until paid.

The Term shall be extended until all such suspended Contingent General Fund Payments, together with interest thereon, are paid.

*List of Schedules and Exhibits:*

Schedule 1: Baseline Core Revenues
Schedule 2: Expected Core Revenues
Schedule 3: Expected Core Revenue Increment
Schedule 4: Shortfall Amounts

Exhibit A: 2012-13 Core Revenues Statement
Exhibit B: Surplus Property

**SCHEDULE 1**

**BASELINE CORE REVENUE**

| | |
|---|---|
| 13-14 | 146,318,767 |
| 14-15 | 170,322,938 |
| 15-16 | 174,986,445 |
| 16-17 | 180,338,955 |
| 17-18 | 186,108,308 |
| 18-19 | 192,087,079 |
| 19-20 | 198,283,410 |
| 20-21 | 204,344,766 |
| 21-22 | 210,611,428 |
| 22-23 | 217,090,741 |
| 23-24 | 223,790,319 |
| 24-25 | 230,718,058 |
| 25-26 | 237,742,635 |
| 26-27 | 244,861,090 |
| 27-28 | 252,070,377 |
| 28-29 | 259,367,371 |
| 29-30 | 266,748,873 |
| 30-31 | 274,211,621 |
| 31-32 | 281,752,292 |
| 32-33 | 289,367,514 |
| 33-34 | 297,053,866 |
| 34-35 | 304,807,893 |
| 35-36 | 312,626,106 |
| 36-37 | 320,504,991 |
| 37-38 | 328,441,016 |
| 38-39 | 336,430,635 |
| 39-40 | 344,470,297 |
| 40-41 | 352,556,451 |
| 41-42 | 360,685,548 |
| 42-43 | 368,854,054 |
| 43-44 | 377,058,448 |
| 44-45 | 385,295,232 |
| 45-46 | 393,560,931 |
| 46-47 | 401,852,105 |
| 47-48 | 410,165,345 |
| 48-49 | 418,497,285 |
| 49-50 | 426,844,601 |
| 50-51 | 435,369,106 |
| 51-52 | 444,074,692 |

**SCHEDULE 2**

**EXPECTED CORE REVENUE**

| | |
|---|---|
| 13-14 | 219,655,852 |
| 14-15 | 230,638,644 |
| 15-16 | 242,170,577 |
| 16-17 | 254,279,106 |
| 17-18 | 266,993,061 |
| 18-19 | 280,342,714 |
| 19-20 | 294,359,850 |
| 20-21 | 309,077,842 |
| 21-22 | 324,531,734 |
| 22-23 | 340,758,321 |
| 23-24 | 357,796,237 |
| 24-25 | 375,686,049 |
| 25-26 | 394,470,351 |
| 26-27 | 414,193,869 |
| 27-28 | 434,903,562 |
| 28-29 | 456,648,740 |
| 29-30 | 479,481,177 |
| 30-31 | 503,455,236 |
| 31-32 | 528,627,998 |
| 32-33 | 555,059,398 |
| 33-34 | 582,812,368 |
| 34-35 | 611,952,986 |
| 35-36 | 642,550,635 |
| 36-37 | 674,678,167 |
| 37-38 | 708,412,076 |
| 38-39 | 743,832,679 |
| 39-40 | 781,024,313 |
| 40-41 | 820,075,529 |
| 41-42 | 861,079,305 |
| 42-43 | 904,133,271 |
| 43-44 | 949,339,934 |
| 44-45 | 996,806,931 |
| 45-46 | 1,046,647,278 |
| 46-47 | 1,098,979,641 |
| 47-48 | 1,153,928,623 |
| 48-49 | 1,211,625,055 |
| 49-50 | 1,272,206,307 |
| 50-51 | 1,335,816,623 |
| 51-52 | 1,402,607,454 |

**SCHEDULE 3**

**EXPECTED CORE REVENUE INCREMENT**

| | |
|---|---|
| 13-14 | 73,337,084 |
| 14-15 | 60,315,706 |
| 15-16 | 67,184,132 |
| 16-17 | 73,940,150 |
| 17-18 | 80,884,753 |
| 18-19 | 88,255,635 |
| 19-20 | 96,076,440 |
| 20-21 | 104,733,076 |
| 21-22 | 113,920,306 |
| 22-23 | 123,667,580 |
| 23-24 | 134,005,918 |
| 24-25 | 144,967,991 |
| 25-26 | 156,727,716 |
| 26-27 | 169,332,779 |
| 27-28 | 182,833,185 |
| 28-29 | 197,281,370 |
| 29-30 | 212,732,304 |
| 30-31 | 229,243,615 |
| 31-32 | 246,875,706 |
| 32-33 | 265,691,884 |
| 33-34 | 285,758,501 |
| 34-35 | 307,145,093 |
| 35-36 | 329,924,529 |
| 36-37 | 354,173,176 |
| 37-38 | 379,971,060 |
| 38-39 | 407,402,045 |
| 39-40 | 436,554,016 |
| 40-41 | 467,519,078 |
| 41-42 | 500,393,757 |
| 42-43 | 535,279,216 |
| 43-44 | 572,281,486 |
| 44-45 | 611,511,699 |
| 45-46 | 653,086,346 |
| 46-47 | 697,127,537 |
| 47-48 | 743,763,278 |
| 48-49 | 793,127,769 |
| 49-50 | 845,361,707 |
| 50-51 | 900,447,517 |
| 51-52 | 958,532,762 |

**SCHEDULE 4**

**SHORTFALL AMOUNT**

| | |
|---|---|
| 13-14 | 12,679,871 |
| 14-15 | 12,837,892 |
| 15-16 | 12,982,350 |
| 16-17 | 13,138,135 |
| 17-18 | 12,153,178 |
| 18-19 | 12,389,270 |
| 19-20 | 12,465,367 |
| 20-21 | 11,776,507 |
| 21-22 | 11,933,835 |
| 22-23 | 10,305,305 |
| 23-24 | 10,967,926 |
| 24-25 | 10,893,494 |
| 25-26 | 9,529,926 |
| 26-27 | 9,802,415 |
| 27-28 | 9,949,495 |
| 28-29 | 10,099,224 |
| 29-30 | 10,239,149 |
| 30-31 | 10,383,763 |
| 31-32 | 10,538,010 |
| 32-33 | 9,792,585 |
| 33-34 | 9,941,691 |
| 34-35 | 10,102,916 |
| 35-36 | 7,171,754 |
| 36-37 | 7,270,821 |
| 37-38 | 8,562,273 |
| 38-39 | 10,770,330 |
| 39-40 | 10,770,330 |
| 40-41 | 10,770,330 |
| 41-42 | 10,770,330 |
| 42-43 | 10,770,330 |
| 43-44 | 10,770,330 |
| 44-45 | 10,770,330 |
| 45-46 | 10,770,330 |
| 46-47 | 10,770,330 |
| 47-48 | 10,770,330 |
| 48-49 | 10,770,330 |
| 49-50 | 10,770,330 |
| 50-51 | 10,770,330 |
| 51-52 | 10,770,330 |

**EXHIBIT A**

**CORE REVENUE DETAIL: FY 2012-13**

Property Taxes
|  |  |
|---|---:|
| Property Taxes | 26,280,000 |
| In-Lieu of Motor Vehicle Fees | 17,307,349 |
| Subtotal Property Taxes | 43,587,349 |

Sales Taxes
|  |  |
|---|---:|
| 75% Point of Sale | 28,330,077 |
| 25% County ERAF Backfill | 9,937,923 |
| Proposition 172 | 1,270,000 |
| Subtotal Sales Taxes | 39,538,000 |

|  |  |
|---|---:|
| Utility Users Tax | 31,790,000 |
| Franchise Tax | 11,595,600 |
| Business License Tax | 9,125,000 |
| Hotel/Motel Tax | 1,975,000 |
| Document Transfer Tax | 456,000 |
| Motor Vehicle License | 150,000 |
| Measure A | n/a |
| Totals | 138,216,949 |

Exhibit B: Surplus Property

A chart of the values is as follows:

| No. | APN | Prop. Address | Site Area | USE | Low Range | High Range | Estimated Likely Sales Price |
|---|---|---|---|---|---|---|---|
| 1 | 046 017 037 | Hogan Lake, no situs address | 3.15 acres | Vacant - Hogan Parcels | $12,600 | $15,750 | $22,050 |
| 2 | 046 017 049 | Hogan Lake, no situs address | 38.3 acres | Vacant - Hogan Parcels | $19,150 | $30,640 | $24,895 |
| 3 | 046 017 053 | Hogan Lake, no situs address | 124.46 acres | Vacant - Hogan Parcels | $62,230 | $124,460 | $93,345 |
| 4 | 046 019 010 | Hogan Lake, no situs address | 37.7 acres | Vacant - Hogan Parcels | $18,850 | $37,700 | $28,275 |
| 5 | 046 019 011 | Hogan Lake, no situs address | 46.89 acres | Vacant - Hogan Parcels | $23,445 | $46,890 | $35,167 |
| 6 | 046 019 016 | Hogan Lake, no situs address | 66.0 acres | Vacant - Hogan Parcels | $33,000 | $66,000 | $49,500 |
| 7 | 046 019 017 | Hogan Lake, no situs address | 40.0 acres | Vacant - Hogan Parcels | $20,000 | $40,000 | $30,000 |
| 8 & 9 | 046 019 049, 046 019 050 (new apn) (046 019 037 old apn) | Hogan Lake, no situs address | 59.32 acres | Vacant - Hogan Parcels | $237,280 | $296,600 | $266,940 |
| 10 | 046 025 005 | Hogan Lake, no situs address | 86.54 acres | Vacant - Hogan Parcels | $43,270 | $86,540 | $64,905 |
| 11 | 046 026 009 | Hogan Lake, no situs address | 89.22 acres | Vacant - Hogan Parcels | $44,610 | $89,220 | $66,915 |
| 12 | 046 026 011 | Hogan Lake, no situs address | 608.58 acres | Vacant - Hogan Parcels | $304,290 | $608,580 | $456,435 |

| # | APN | Situs Address | Acreage | Description | | | |
|---|---|---|---|---|---|---|---|
| 13 | 046 026 019 (current APN) (046 026 005 026n 005 old apn) | Hogan Lake, no situs address | 38.55 acres | Vacant - Hogan Parcels | $21,320 | $42,640 | $31,980 |
| 14 | 046 027 002 | Hogan Lake, no situs address | 125.80 acres | Vacant - Hogan Parcels | $62,900 | $125,800 | $94,350 |
| 15 | 050 003 006 | Hogan Lake, no situs address | 53.5 acres | Vacant - Hogan Parcels | $107,200 | $160,500 | $133,750 |
| 16 | 050 003 018 (Old APN 046 003 018) | Hogan Lake, no situs address | 102.54 acres | Vacant - Hogan Parcels | $410,160 | $512,700 | $461,430 |
| 17&18 | 050 003 022 & 23 | Hogan Lake, no situs address | 129.68 acres | Vacant - Hogan Parcels | $196,010 | $325,690 | $260,850 |
| 19 | 050 004 008 | Hogan Lake, no situs address | 8.4 acres | Vacant - Hogan Parcels | $33,600 | $42,000 | $37,800 |
| 20 | 050 004 011 | Hogan Lake, no situs address | 0.55 acres | Vacant - Hogan Parcels | $5,000 | $5,000 | $5,000 |
| 21 | 050 008 002 | Hogan Lake, no situs address | 20.41 acres | Vacant - Hogan Parcels | $40,820 | $61,230 | $51,025 |
| 22 | 050 008 003 (changed from 050 009 003) | Hogan Lake, no situs address | 38.0 acres | Vacant - Hogan Parcels | $76,000 | $114,000 | $95,000 |
| 23 | 050 008 031 | Hogan Lake, no situs address | 7.56 acres | Vacant - Hogan Parcels | $15,120 | $22,680 | $18,900 |
| 49 | 137 300 12 | 139 South Center Street | 0.41 acres | Vacant Land - Future PD expansion site | $215,988 | $287,984 | $251,986 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 61 | 149 140 09 | 33 South San Joaquin Street | 0.25 acres (4,623 SF building, includes 1,250 SF basement) | Vacant - El Tecolote Hotel - Former SRO hotel | $67,460 | $101,190 | $84,325 |
| 71 | 149 180 08 | 635 East Main Street | 0.11 acres | Vacant - La Verta Hotel - Former SRO hotel | $15,000 | $40,000 | $25,000 |
| 80 | 169 077 03 | 2135 South Airport Way | 0.33 acres | Vacant Land | $50,309 | $93,431 | $71,870 |
| 81 | 169 100 30 & 42 | 2427 South Airport Way | 1.22 acres | Vacant Land | $186,001 | $345,430 | $265,715 |
| 82 | 179-270-17/18 | Arch-Airport Road and HWY 99 | 0.47 acres | Vacant Land | $25,592 | $51,183 | $25,592 |
| Total | | | | | $2,347,205 | $3,773,838 | $3,053,000 |

EXHIBIT B


SETTLEMENT TERM SHEET
CITY OF STOCKTON
AND
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

SETTLEMENT TERM SHEET

CITY OF STOCKTON
and
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

September 27, 2013

*Background*

This Settlement Term Sheet (the "***Term Sheet***") is intended to summarize the results of negotiations by and between the City of Stockton (the "***City***") and National Public Finance Guarantee Corporation ("***NPFG***") which have been undertaken over the course of the past several months in mediation presided over by The Hon. Elizabeth Perris, as mediator. This Term Sheet is only intended to cover the major economic points and some key business terms of the settlement (the "***Settlement***"). It contemplates that complete documentation of the proposed Settlement will be prepared which will supersede this Term Sheet and control for purposes of the Settlement and further that such complete documentation will be included in the City's Plan of Adjustment (the "***Plan***") presented to the United States Bankruptcy Court for the Eastern District of California (the "***Bankruptcy Court***") for confirmation. Due to time constraints, the Plan initially filed may only contain a description of the Settlement and refer to documentation to be approved by the parties prior to the effectiveness of the Plan, but the intent of the parties will be to complete such documentation and to file an amended Plan containing such documentation prior to confirmation.

This Term Sheet deals with the disposition of three bond issues which represent obligations of the City, as follows:

Stockton Public Financing Authority Lease Revenue Bonds, Series 2004 (Parking and Capital Projects) (the "***2004 Parking Bonds***")

Redevelopment Agency of the City of Stockton Revenue Bonds, Series 2004 (Stockton Events Center—Arena Project) (the "***2004 Arena Bonds***")

Stockton Public Financing Authority 2006 Lease Revenue Refunding Bonds, Series A (the "***2006 SEB Bonds***" and, collectively with the 2004 Parking Bonds and the 2004 Arena Bonds, the "***NPFG Bonds***")

All of the NPFG Bonds are covered by financial guaranty insurance policies pursuant to which NPFG is obligated to make full and timely payment of scheduled debt service to the holders thereof in the event that the revenues pledged to such bonds under the NPFG Bond documents are insufficient therefor. All of the NPFG Bonds are secured by leases pursuant to which the City is obligated to pay certain rental payments from its general fund. In addition, the 2004 Arena Bonds are secured by a Pledge Agreement, dated as of March 1, 2004 (the "***Arena Pledge Agreement***"), by and between the City and the Successor Agency to the Redevelopment Agency of the City of Stockton (the "***Redevelopment Agency***"), as successor in interest, pledging certain

1

tax increment revenues of the Redevelopment Agency (the "***Pledged Tax Increment***") to secure the 2004 Arena Bonds. Pursuant to this Settlement, all of the NPFG Bonds will remain outstanding and there will be no amendments to the documents securing the NPFG Bonds other than as described below

*The 2006 SEB Bonds*

The City will assume the lease relating to the 2006 SEB Bonds and continue to comply with its obligations thereunder, which, in turn, will allow Wells Fargo Bank, as trustee (the "***2006 SEB Bond Trustee***") under the indenture relating to the 2006 SEB Bonds to continue to make full and timely payment on them in accordance with the 2006 SEB Bond documents.

*The 2004 Arena Bonds*

The City, Wells Fargo Bank, as trustee under the indenture with respect to the 2004 Arena Bonds (the "***2004 Arena Bond Trustee***"), and NPFG will enter into a Forbearance Agreement (the "***Arena Forbearance Agreement***") pursuant to which NPFG and the 2004 Arena Bond Trustee will agree not to take any action to enforce remedies under the 2004 Arena Bond documents against the City so long as the terms of the Arena Forbearance Agreement are complied with. The Arena Forbearance Agreement will provide for a restructured payment schedule for Pledged Tax Increment as shown in Schedule 1. The 2004 Arena Bond Trustee and the Redevelopment Agency will enter into an Amended and Restated Pledge Agreement (the "***Amended Pledge Agreement***") to effect such restructuring of the Redevelopment Agency's obligations pursuant to the provisions of California Health & Safety Code Section 34177.5. The Amended Pledge Agreement will provide for the new, reduced payment schedule as well as a revision to the pledge of the Pledged Tax Increment to reflect the effect of the dissolution of the former Redevelopment Agency of the City of Stockton and the change to tax increment cashflows effected by California Health & Safety Code Section 34183. The Amended Pledge Agreement will be subject to approval by the Agency's Oversight Board as well as the State Department of Finance (the "***DOF***"). Such approvals will be conditions precedent to the effectiveness of this Settlement. The Redevelopment Agency will commence the approval process as soon as possible, beginning with an informal meeting with DOF followed by the formal approval process at the time definitive documents are prepared.

In addition to the restructured Pledged Tax Increment payment schedule, the Arena Forbearance Agreement will provide a new schedule of payment obligations from the City's general fund pursuant to the Lease Agreement, dated as of March 1, 2004 (the "***Arena Lease Back***"), by and between the City and the Redevelopment Agency, as successor in interest. This schedule, attached hereto as Schedule 2, reflects slightly lower payments than the payments under Schedule 1. To the extent that the available Pledged Tax Increment is insufficient to make the payments in Schedule 1, but is in excess of the amounts payable under Schedule 2, the City will have no obligation to make up such shortfall. However, any such delinquent payments will be included on subsequent Recognized Obligation Payments Schedule filed by the Redevelopment Agency and recoverable to the extent that Pledged Tax Increment in future years is sufficient to meet the Redevelopment Agency's current debt service obligations and make up the shortfall. To the extent that the available Pledged Tax Increment in any year is less than the amounts payable by the City pursuant to Schedule 2, the City will be obligated to make up the shortfall

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

from its general fund, subject only to the provisions of the Arena Lease Back that excuse payment in the event of abatement.

The City will agree to continue to occupy and maintain the Arena and will be responsible for any operating subsidy; *provided, however,* that in the event of a default under the Arena Forbearance Agreement by the City, NPFG or the 2004 Arena Bond Trustee shall be entitled to exercise remedies as provided in the Arena Forbearance Agreement. Such rights and remedies shall include, but are not limited to, the right to relet the Arena. The Arena Forbearance Agreement shall provide that the City has assigned its rights in any leases, licenses or contracts relating to the Arena, which assignment shall become operative from and after the occurrence of an event of default by the City under the Arena Forbearance Agreement, in each instance, at the option of NPFG or the 2004 Arena Bond Trustee.

*The 2004 Parking Bonds*

The City Council will determine that there is a need for the Parking Authority of the City of Stockton to function and exercise its powers pursuant to California Government Code Section 32650 et seq. in connection with the Settlement, and will transfer to the Parking Authority the City's fee simple title to the three parking garages and any other property that is currently subject to the (i) Site and Facility Lease dated as of June 1, 2004 by and between the Stockton Public Financing Authority (the "***Authority***") and the City (the "***Parking Structure Lease Out***") and the (ii) Lease Agreement, dated as of June 1, 2004, by and between the Authority, as lessor, and the City, as lessee (the "***Parking Structure Lease Back***" and collectively, with the Parking Structure Lease Out, the "***2004 Parking Bonds Leases***") (such property and garages, collectively, the "***Garages***").

The Parking Authority will accept fee simple title to the Garages, subject to the 2004 Parking Bonds Leases and any other applicable documents or agreements relating to the 2004 Parking Bonds (such document the "***2004 Parking Bond Documents***"). In connection therewith, so long as the City and NPFG do not pursue an alternate transaction if the SCC 16 Settlement (as hereinafter defined) is not effectuated, (i) the City shall assign to the Parking Authority all of the City's rights, title and interest as lessor under the Parking Structure Lease Out, subject to the Parking Structure Lease Back, and the Parking Authority shall assume all of the City's obligations under the Parking Structure Lease Out, (ii) the City shall assign to the Parking Authority all of the City's rights, title and interest as lessee under the Parking Structure Lease Back, subject to (A) the Master Lease, dated as of February 26, 2008 (as amended and supplemented, including as amended and supplemented by the SCC 16 Settlement, the "***SCC 16 Lease***") and (B) the rights of the Authority, Wells Fargo Bank, as trustee under the indenture with respect to the 2004 Parking Bonds (the "***2004 Parking Bond Trustee***") and NPFG under the 2004 Parking Bond Documents, and the Parking Authority shall assume all of the City's obligations under the 2004 Parking Bonds Leases, the SCC 16 Lease, and the 2004 Parking Bond Documents.

The City will also transfer all of its rights, title and interests in each of the other parking facilities within the Downtown Parking District, being the area shown on Figure 1, to the Parking Authority, including surface parking lots and other parking garages. The Parking Authority will also take over the operation, maintenance and collection of revenues from parking meters in the

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

Downtown Parking District. Also, the Parking Authority will take over responsibility for parking enforcement in the Downtown Parking District and the citation revenues from such enforcement activity shall be assigned to the Parking Authority. The Parking Authority will likely hire a private contractor to perform all or substantially all of its operations. In addition, any new parking assets within the Downtown Parking District shall be owned by the Parking Authority.

NPFG and the 2004 Parking Bond Trustee will turn over possession of the Garages to the Parking Authority.

The City, Parking Authority, 2004 Parking Bond Trustee and NPFG will enter into a Forbearance Agreement (the "*Parking Forbearance Agreement*," and together with the Arena Forbearance Agreement, the "*Forbearance Agreements*") pursuant to which NPFG and the 2004 Parking Bond Trustee will agree not to take any action to enforce remedies under the 2004 Parking Bond Documents against the City so long as the terms of the Parking Forbearance Agreement are complied with. Pursuant to the Parking Forbearance Agreement, the Parking Authority will agree to make payments to the 2004 Parking Bond Trustee as set forth in Schedule 3.

The obligation of the Parking Authority to make the payments to the 2004 Parking Bond Trustee at the times and in the amounts set forth on Schedule 3 shall be limited obligations of the Parking Authority payable solely from and secured by a first priority lien on and security interest in the gross revenues of the Parking Authority, and shall be treated as an Operation and Maintenance expense of the Parking Authority enterprise fund, senior to any future Parking Authority debt service obligations. The City's general fund will not have any obligation with respect to such payments.

The Parking Authority will have the right to prepay, in whole, but not in part, the payments described in Schedule 3 at any time, upon 30 days' prior written notice to the 2004 Parking Bond Trustee, by payment to the 2004 Parking Bond Trustee of an amount equal to the aggregate unpaid principal and interest amounts set forth on Schedule 3 plus **[amount reflecting present value of the remaining stream of payments]** required to be made by the Stockton City Center 16, LLC (the "*SCC 16*") to the City pursuant to the SCC 16 Settlement.

The Parking Authority will have the right to issue revenue bonds secured by a pledge of the net revenues of the Parking Authority, on a subordinate basis to the obligations to make the payments under Schedule 3, so long as it meets a net revenue coverage test of 1.1 times the maximum annual debt service on such parking revenue bonds, based on the most recent audited financial statement of the Parking Authority.

Special tax revenues from the City's Community Facilities District 2001-1 (the "*Downtown CFD*") are *not* pledged to any payment under this settlement, and would not constitute Parking Authority revenues; however, a portion of such special tax revenues are expected to be used as permitted under the Downtown CFD proceedings to support some of the maintenance and operations costs of certain parking facilities within the Downtown District, thereby reducing the amount of such expenses that must be paid from the Parking Authority revenues.

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

The City, the 2004 Parking Bond Trustee and NPFG anticipate entering into a Settlement Agreement (the "**SCC 16 Settlement**") with SCC 16. Pursuant to the SCC 16 Settlement, SCC 16 will (among other things) agree to make certain payments as additional rent under the SCC 16 Lease, from rental income received by SCC 16 from its subtenants under certain subleases of the space leased by the SCC 16 pursuant to the SCC 16 Lease (the "**Subleased Space**"). The City and Parking Authority will agree that all such payments from SCC 16 to the City shall be assigned and payable to the 2004 Parking Bond Trustee for the 2004 Parking Bonds.

The City and Parking Authority will agree that, upon the occurrence of an event of default under the SCC 16 Lease or in the event that the Subleased Space is abandoned by SCC 16 or the SCC 16 Lease with SCC 16 is terminated for any reason, in addition to or in connection with the exercise of all of the other rights granted to the 2004 Parking Bond Trustee as assignee of the City and the Parking Authority, the 2004 Parking Bond Trustee shall have the right, with or without terminating the SCC 16 Lease, to reenter the Subleased Space, remove all persons and property therefrom and to relet the Subleased Space on behalf of the Parking Authority in accordance with the terms of the Parking Structure Lease Back, to any then-existing subtenants thereof or to any other parties as the 2004 Parking Bond Trustee may determine, and any reletting revenues derived therefrom shall be assigned, and paid directly to, the 2004 Parking Bond Trustee to be applied to the payment of the principal of, and interest on the 2004 Parking Bonds at such times and in such manner as shall be determined by NPFG. **Other than as provided in the immediately preceding sentence, in no event will the City or the Parking Authority be required to make any payment with respect to the SCC 16 Settlement from any source of funds other than the actual amounts, if any, received by the City or the Parking Authority with respect to the Subleased Space.** The City and Parking Authority will agree to assign absolutely and unconditionally their rights under the SCC 16 Lease to the 2004 Parking Bond Trustee and/or NPFG to the extent necessary to allow the 2004 Parking Bond Trustee and/or NPFG to enforce the SCC 16 Lease and the SCC 16 Settlement and will agree that they will not amend or consent to any waiver, forbearance or modification of the SCC 16 Lease or the SCC 16 Settlement without the prior written consent of the 2004 Parking Bond Trustee and NPFG; *provided that*, at the direction of NPFG or the 2004 Parking Bond Trustee, the City shall take such actions as may be required by NPFG or the 2004 Parking Bond Trustee to enforce the SCC 16 Settlement against SCC 16.

*Professional Fees*

Each of the City and NPFG shall bear the fees and costs of its respective professionals (including, but not limited to, its attorneys and financial advisors). Without limiting the foregoing, the City will waive the right to seek reimbursement of any fees and costs incurred by its professionals (including, but not limited to, its attorneys and financial advisors) related to the eligibility trial or the AB 506 "ask," and NPFG will waive the right to seek fees incurred by its professionals under the bond documents except for any professional fees incurred as a result of a future breach of the Plan.

The 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee and the 2006 SEB Bond Trustee shall each be entitled to recover reasonable attorneys' fees and costs from reserve fund amounts held by the respective trustees under the respective bond documents and to recover reasonable attorneys' fees with respect to any breach of the Plan in the future from such amounts; but, in the

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

event the respective reserve fund amounts do not cover fees to date for any of the trustees (which we do not believe is the case), such trustee shall not be entitled to payment of same from the City's general fund.

*Support for the Plan*

NPFG, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee, and the 2006 SEB Bond Trustee will agree to support the City's Plan so long as it contains terms consistent with this Settlement with respect to the NPFG Bonds.

*Mutual Releases*

The City, NPFG, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee, and the 2006 SEB Bond Trustee, will exchange mutual releases, subject to certain carve-outs for, among other things, the transactions contemplated herein, the NPFG Bonds, the NPFG policies securing the payment of the NPFG Bonds, and breaches of the Settlement and/or the SCC 16 Settlement.

*No Adverse Effect*

The City shall cause a nationally recognized bond counsel reasonably acceptable to the City and NPFG, which may be Orrick, to deliver its opinion to the Authority, NPFG and the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee and the 2006 SEB Bond Trustee, as applicable, for the benefit of the holders of the NPFG Bonds, that the transactions contemplated herein shall not cause interest on the NPFG Bonds to become includable in the gross income of the holders thereof for federal income tax purposes, and the City and the Authority shall agree to take such actions as may reasonably necessary to preserve such tax-exempt status of interest on the NPFG Bonds, including, without limitation, the tax-exempt current refunding of the bonds for federal income tax purposes, if necessary.

*Documentation and Effectiveness*

The City, NPFG and the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee and the 2006 SEB Bond Trustee, as applicable, will work diligently to complete the preparation of the Forbearance Agreements and any other documents required to implement this Term Sheet. The City will commence the process of determining that there is a need for the Parking Authority of the City of Stockton to function and exercise its powers pursuant to California Government Code Section 32650 et seq. in connection with the Settlement concurrently with the proceedings for approval of the Plan.

The Forbearance Agreements, supplemental indentures, deeds, assignments, pledge agreements, control agreements, disclosure documents, and all of the other documents, instruments and agreements to be executed and delivered in connection with the consummation of the transactions contemplated hereby, including, without limitation, the opinion letters of counsel to the City and bond counsel, and the provisions of the Plan implementing the terms hereof shall, in each case, be in form and substance reasonably satisfactory to the City, NPFG, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee and the 2006 SEB Bond Trustee, as applicable, and shall contain representations, warranties, covenants, events of default and such additional terms and conditions as are customary for transactions of this nature and otherwise reasonably

acceptable to the City, NPFG, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee and the 2006 SEB Bond Trustee, as applicable.

The parties anticipate that the effectiveness of all of the documents involved in this Settlement be contingent upon the confirmation by the Court of the Plan and the Plan becoming effective.

The effectiveness of this Settlement is also contingent upon the entry into, and effectiveness of, the SCC 16 Settlement; *provided*, *however*, in the event that the parties are unable to agree to the terms of an SCC 16 Settlement that is acceptable to NPFG, the City, at the request or direction of the 2004 Parking Bond Trustee or NPFG shall take such actions (if any) that may be required by the 2004 Parking Bond Trustee or NPFG to terminate the Parking Structure Lease Back as part of an alternative arrangement that is acceptable to the City and the 2004 Parking Bond Trustee that is not conditioned upon the SCC 16 Settlement.

*FRE 408*

This Term Sheet and all any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts and term sheets; whether oral, written or both, relating to the various courses of action described herein or which may be explored with respect to or in connection with the NPFG Bonds and the transactions contemplated herein and therein (the "**Discussions**") shall be considered to be communications to compromise and settle disputed matters. Nothing herein is intended to imply that Discussions prior to the date of this Term Sheet, were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "**Rules**"). This Term Sheet and all Discussions shall be considered "compromise negotiations" pursuant to the Rules, and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any bankruptcy case, legal proceeding, case, or litigation concerning any of the NPFG Bonds or for any other purpose such as to proving bias, admission of default, prejudice, interest of a witness or a party, negating a contention of undue delay, or an effort to obstruct a criminal investigation or prosecution as provided by the Rules.

This Term Sheet is being distributed and presented as a preliminary proposal for discussion purposes only and is not intended to be nor shall it be deemed a commitment or an offer on the part of any party hereto or any other person to enter into any of the transactions contemplated herein or otherwise. This Term Sheet merely represents a proposal of certain of the terms and conditions with respect to the proposed transactions and does not purport to reflect all matters on which the parties must reach agreement before they intend to be legally bound, and material and essential terms of such an agreement remain yet to be negotiated. Any final agreement with respect to the transactions contemplated herein may be conditioned upon additional terms and conditions and/or be substantially different from the terms and conditions discussed in this term sheet. Neither the delivery of this Term Sheet nor any discussions or representations with respect to the transactions contemplated hereby are intended to be, nor shall they constitute, a commitment, approval or binding offer of any kind or an admission of any liability or otherwise on the part of the City, NPFG, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

and/or the 2006 SEB Bond Trustee, or any of their respective affiliates or any other party, and receipt of this Term Sheet does not in any way constitute a commitment or offer or admission of liability by the City, NPFG, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee and/or the 2006 SEB Bond Trustee or any of their respective affiliates or any other party, to enter into any agreement or to enter into, offer or accept the above described transactions or otherwise. None of the parties referred to herein shall be bound by any of the terms hereof. **This is not a commitment, offer, acceptance, approval or admission of any kind or an indication that any commitment, offer, acceptance, approval or admission will be forthcoming. This term sheet is subject to change or withdrawal at any time.**

8

*Attachments*

Schedule 1:  Revised Pledged Tax Increment Payment Schedule
Schedule 2:  City's Maximum General Fund Payment Schedule, 2004 Arena Bonds
Schedule 3:  Parking Installment Payment Schedule

Figure 1:  Downtown Parking District Map

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

**SCHEDULE 1:  REVISED PLEDGED TAX INCREMENT PAYMENT SCHEDULE**

| Date | Annual Debt Service |
|------|--------------------:|
| 9/1/2013 | |
| 9/1/2014 | 2,542,553.95 |
| 9/1/2015 | 2,591,972.37 |
| 9/1/2016 | 2,650,716.64 |
| 9/1/2017 | 2,703,523.65 |
| 9/1/2018 | 2,762,164.13 |
| 9/1/2019 | 2,789,110.81 |
| 9/1/2020 | 2,901,782.49 |
| 9/1/2021 | 2,975,126.93 |
| 9/1/2022 | 3,046,835.85 |
| 9/1/2023 | 3,113,133.32 |
| 9/1/2024 | 3,185,079.49 |
| 9/1/2025 | 3,255,771.74 |
| 9/1/2026 | 3,368,434.55 |
| 9/1/2027 | 3,444,630.00 |
| 9/1/2028 | 3,519,247.35 |
| 9/1/2029 | 3,627,234.10 |
| 9/1/2030 | 3,735,787.50 |
| 9/1/2031 | 3,811,362.85 |
| 9/1/2032 | 3,891,702.35 |
| 9/1/2033 | 3,976,028.20 |
| 9/1/2034 | 4,058,599.95 |
| 9/1/2035 | 4,143,968.70 |
| 9/1/2036 | 4,236,750.00 |
| | |
| **Totals** | **76,331,516.92** |

S1-1

## SCHEDULE 2: CITY'S MAXIMUM GENERAL FUND PAYMENT SCHEDULE, 2004 ARENA BONDS

| Date | Annual Debt Service |
|---|---|
| 9/1/2013 | |
| 9/1/2014 | 2,542,553.95 |
| 9/1/2015 | 2,591,972.37 |
| 9/1/2016 | 2,650,716.64 |
| 9/1/2017 | 2,703,523.65 |
| 9/1/2018 | 2,762,164.13 |
| 9/1/2019 | 2,789,110.81 |
| 9/1/2020 | 2,898,756.25 |
| 9/1/2021 | 2,956,156.25 |
| 9/1/2022 | 3,019,556.25 |
| 9/1/2023 | 3,081,962.50 |
| 9/1/2024 | 3,144,625.00 |
| 9/1/2025 | 3,210,450.00 |
| 9/1/2026 | 3,280,750.00 |
| 9/1/2027 | 3,351,750.00 |
| 9/1/2028 | 3,419,750.00 |
| 9/1/2029 | 3,499,500.00 |
| 9/1/2030 | 3,570,000.00 |
| 9/1/2031 | 3,641,250.00 |
| 9/1/2032 | 3,717,750.00 |
| 9/1/2033 | 3,798,750.00 |
| 9/1/2034 | 3,878,500.00 |
| 9/1/2035 | 3,951,500.00 |
| 9/1/2036 | 4,042,500.00 |
| | |
| **Totals** | **74,503,547.81** |

S2-1

**SCHEDULE 3:  PARKING INSTALLMENT PAYMENT SCHEDULE**

S3-1

**City of Stockton**
**Parking Enterprise Fund**
**Projected Payment Schedule**
**Gross Debt Service Schedule**

| Date | Principal | Coupon | Yield | Dollar Price | Accreted Interest | Periodic Debt Service | Fiscal Year Debt Service | Scheduled Debt Service | Remaining Principal | Optional Prepayment |
|---|---|---|---|---|---|---|---|---|---|---|
| 06/01/14 | | | | | | | | | | |
| 09/01/14 | 699,611.38 | - | 5.000 | 98.765 | 8,691.12 | 708,302.50 | | 708,302.50 | 25,611,145.68 | 26,319,448.18 |
| 03/01/15 | 682,547.65 | - | 5.000 | 96.364 | 25,754.85 | 708,302.50 | 1,416,605.00 | 708,302.50 | 24,928,598.03 | 25,636,900.53 |
| 09/01/15 | 665,900.15 | - | 5.000 | 94.014 | 42,402.35 | 708,302.50 | | 708,302.50 | 24,262,697.88 | 24,971,000.38 |
| 03/01/16 | 649,658.68 | - | 5.000 | 91.721 | 58,643.82 | 708,302.50 | 1,416,605.00 | 708,302.50 | 23,613,039.20 | 24,321,341.70 |
| 09/01/16 | 633,813.35 | - | 5.000 | 89.483 | 74,489.15 | 708,302.50 | | 708,302.50 | 22,979,225.85 | 23,687,528.35 |
| 03/01/17 | 618,354.48 | - | 5.000 | 87.301 | 89,948.02 | 708,302.50 | 1,416,605.00 | 708,302.50 | 22,360,871.37 | 23,069,173.87 |
| 09/01/17 | 603,272.67 | - | 5.000 | 85.172 | 105,029.83 | 708,302.50 | | 708,302.50 | 21,757,598.70 | 22,465,901.20 |
| 03/01/18 | 588,558.70 | - | 5.000 | 83.094 | 119,743.80 | 708,302.50 | 1,416,605.00 | 708,302.50 | 21,169,040.00 | 21,877,342.50 |
| 09/01/18 | 644,547.16 | - | 5.000 | 81.068 | 150,526.85 | 795,074.01 | | 795,074.01 | 20,524,492.84 | 21,319,566.85 |
| 03/01/19 | 628,826.50 | - | 5.000 | 79.090 | 166,247.51 | 795,074.01 | 1,590,148.02 | 795,074.01 | 19,895,666.34 | 20,690,740.35 |
| 09/01/19 | 615,997.01 | - | 5.000 | 77.161 | 182,327.00 | 798,324.01 | | 798,324.01 | 19,279,669.33 | 20,077,993.34 |
| 03/01/20 | 600,972.69 | - | 5.000 | 75.279 | 197,351.32 | 798,324.01 | 1,596,648.02 | 798,324.01 | 18,678,696.64 | 19,477,020.65 |
| 09/01/20 | 588,749.47 | - | 5.000 | 73.443 | 212,889.54 | 801,639.01 | | 801,639.01 | 18,089,947.17 | 18,891,586.18 |
| 03/01/21 | 574,389.72 | - | 5.000 | 71.652 | 227,249.29 | 801,639.01 | 1,603,278.02 | 801,639.01 | 17,515,557.45 | 18,317,196.46 |
| 09/01/21 | 562,743.89 | - | 5.000 | 69.904 | 242,276.42 | 805,020.31 | | 805,020.31 | 16,952,813.56 | 17,757,833.87 |
| 03/01/22 | 549,018.43 | - | 5.000 | 68.199 | 256,001.88 | 805,020.31 | 1,610,040.62 | 805,020.31 | 16,403,795.13 | 17,208,815.44 |
| 09/01/22 | 537,922.51 | - | 5.000 | 66.536 | 270,546.73 | 808,469.24 | | 808,469.24 | 15,865,872.62 | 16,674,341.86 |
| 03/01/23 | 524,802.45 | - | 5.000 | 64.913 | 283,666.79 | 808,469.24 | 1,616,938.48 | 808,469.24 | 15,341,070.17 | 16,149,539.41 |
| 09/01/23 | 514,230.27 | - | 5.000 | 63.330 | 297,756.87 | 811,987.14 | | 811,987.14 | 14,826,839.90 | 15,638,827.04 |
| 03/01/24 | 501,688.07 | - | 5.000 | 61.785 | 310,299.07 | 811,987.14 | 1,623,974.28 | 811,987.14 | 14,325,151.83 | 15,137,138.97 |
| 09/01/24 | 491,614.72 | - | 5.000 | 60.278 | 323,960.68 | 815,575.40 | | 815,575.40 | 13,833,537.11 | 14,649,112.51 |
| 03/01/25 | 479,624.12 | - | 5.000 | 58.808 | 335,951.28 | 815,575.40 | 1,631,150.80 | 815,575.40 | 13,353,912.99 | 14,169,488.39 |
| 09/01/25 | 470,025.86 | - | 5.000 | 57.374 | 349,209.57 | 819,235.43 | | 819,235.43 | 12,883,887.13 | 13,703,122.56 |
| 03/01/26 | 458,561.82 | - | 5.000 | 55.974 | 360,673.61 | 819,235.43 | 1,638,470.86 | 819,235.43 | 12,425,325.31 | 13,244,560.74 |
| 09/01/26 | 449,416.07 | - | 5.000 | 54.609 | 373,552.59 | 822,968.66 | | 822,968.66 | 11,975,909.24 | 12,798,877.90 |
| 03/01/27 | 438,454.70 | - | 5.000 | 53.277 | 384,513.96 | 822,968.66 | 1,645,937.32 | 822,968.66 | 11,537,454.54 | 12,360,423.20 |
| 09/01/27 | 429,739.94 | - | 5.000 | 51.978 | 397,036.61 | 826,776.55 | | 826,776.55 | 11,107,714.60 | 11,934,491.15 |
| 03/01/28 | 419,258.48 | - | 5.000 | 50.710 | 407,518.07 | 826,776.55 | 1,653,553.10 | 826,776.55 | 10,688,456.12 | 11,515,232.67 |
| 09/01/28 | 410,954.22 | - | 5.000 | 49.473 | 419,706.38 | 830,660.60 | | 830,660.60 | 10,277,501.90 | 11,108,162.50 |
| 03/01/29 | 400,930.95 | - | 5.000 | 48.267 | 429,729.65 | 830,660.60 | 1,661,321.20 | 830,660.60 | 9,876,570.95 | 10,707,231.55 |
| 09/01/29 | 393,017.70 | - | 5.000 | 47.089 | 441,604.64 | 834,622.34 | | 834,622.34 | 9,483,553.25 | 10,318,175.59 |
| 03/01/30 | 383,431.90 | - | 5.000 | 45.941 | 451,190.44 | 834,622.34 | 1,669,244.68 | 834,622.34 | 9,100,121.35 | 9,934,743.69 |
| 09/01/30 | 375,891.07 | - | 5.000 | 44.820 | 462,772.23 | 838,663.30 | | 838,663.30 | 8,724,230.28 | 9,562,893.58 |
| 03/01/31 | 366,723.00 | - | 5.000 | 43.727 | 471,940.30 | 838,663.30 | 1,677,326.60 | 838,663.30 | 8,357,507.28 | 9,196,170.58 |
| 09/01/31 | 359,536.92 | - | 5.000 | 42.661 | 483,248.17 | 842,785.09 | | 842,785.09 | 7,997,970.36 | 8,840,755.45 |
| 03/01/32 | 350,767.72 | - | 5.000 | 41.620 | 492,017.37 | 842,785.09 | 1,685,570.18 | 842,785.09 | 7,647,202.64 | 8,489,987.73 |

| Date | Principal | Coupon | Yield | Dollar Price | Accreted Interest | Periodic Debt Service | Fiscal Year Debt Service | Scheduled Debt Service | Remaining Principal | Optional Prepayment |
|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/32 | 343,919.53 | - | 5.000 | 40.605 | 503,069.78 | 846,989.31 | | 846,989.31 | 7,303,283.11 | 8,150,272.42 |
| 03/01/33 | 335,531.25 | - | 5.000 | 39.615 | 511,458.06 | 846,989.31 | 1,693,978.62 | 846,989.31 | 6,967,751.86 | 7,814,741.17 |
| 09/01/33 | 329,004.92 | - | 5.000 | 38.648 | 522,272.70 | 851,277.62 | | 851,277.62 | 6,638,746.94 | 7,490,024.56 |
| 03/01/34 | 320,980.41 | - | 5.000 | 37.706 | 530,297.21 | 851,277.62 | 1,702,555.24 | 851,277.62 | 6,317,766.53 | 7,169,044.15 |
| 09/01/34 | 314,760.67 | - | 5.000 | 36.786 | 540,891.02 | 855,651.69 | | 855,651.69 | 6,003,005.86 | 6,858,657.55 |
| 03/01/35 | 307,083.58 | - | 5.000 | 35.889 | 548,568.11 | 855,651.69 | 1,711,303.38 | 855,651.69 | 5,695,922.28 | 6,551,573.97 |
| 09/01/35 | 301,155.88 | - | 5.000 | 35.014 | 558,957.36 | 860,113.24 | | 860,113.24 | 5,394,766.40 | 6,254,879.64 |
| 03/01/36 | 293,810.62 | - | 5.000 | 34.160 | 566,302.62 | 860,113.24 | 1,720,226.48 | 860,113.24 | 5,100,955.78 | 5,961,069.02 |
| 09/01/36 | 288,161.12 | - | 5.000 | 33.326 | 576,502.91 | 864,664.03 | | 864,664.03 | 4,812,794.66 | 5,677,458.69 |
| 03/01/37 | 281,132.80 | - | 5.000 | 32.514 | 583,531.23 | 864,664.03 | 1,729,328.06 | 864,664.03 | 4,531,661.86 | 5,396,325.89 |
| 09/01/37 | 275,748.30 | - | 5.000 | 31.721 | 593,557.53 | 869,305.83 | | 869,305.83 | 4,255,913.56 | 5,125,219.39 |
| 03/01/38 | 269,022.74 | - | 5.000 | 30.947 | 600,283.09 | 869,305.83 | 1,738,611.66 | 869,305.83 | 3,986,890.82 | 4,856,196.65 |
| 09/01/38 | 263,890.69 | - | 5.000 | 30.192 | 610,149.77 | 874,040.46 | | 874,040.46 | 3,723,000.13 | 4,597,040.59 |
| 03/01/39 | 257,454.33 | - | 5.000 | 29.456 | 616,586.13 | 874,040.46 | 1,748,080.92 | 874,040.46 | 3,465,545.80 | 4,339,586.26 |
| 09/01/39 | 252,562.77 | - | 5.000 | 28.737 | 626,307.02 | 878,869.79 | | 878,869.79 | 3,212,983.03 | 4,091,852.82 |
| 03/01/40 | 246,402.70 | - | 5.000 | 28.036 | 632,467.09 | 878,869.79 | 1,757,739.58 | 878,869.79 | 2,966,580.33 | 3,845,450.12 |
| 09/01/40 | 241,740.24 | - | 5.000 | 27.353 | 642,055.47 | 883,795.71 | | 883,795.71 | 2,724,840.09 | 3,608,635.80 |
| 03/01/41 | 235,844.14 | - | 5.000 | 26.685 | 647,951.57 | 883,795.71 | 1,767,591.42 | 883,795.71 | 2,488,995.95 | 3,372,791.66 |
| 09/01/41 | 231,399.93 | - | 5.000 | 26.035 | 657,420.21 | 888,820.14 | | 888,820.14 | 2,257,596.02 | 3,146,416.16 |
| 03/01/42 | 225,756.03 | - | 5.000 | 25.400 | 663,064.11 | 888,820.14 | 1,777,640.28 | 888,820.14 | 2,031,839.99 | 2,920,660.13 |
| 09/01/42 | 221,519.74 | - | 5.000 | 24.780 | 672,425.32 | 893,945.06 | | 893,945.06 | 1,810,320.25 | 2,704,265.31 |
| 03/01/43 | 216,116.82 | - | 5.000 | 24.176 | 677,828.24 | 893,945.06 | 1,787,890.12 | 893,945.06 | 1,594,203.43 | 2,488,148.49 |
| 09/01/43 | 212,078.62 | - | 5.000 | 23.586 | 687,093.86 | 899,172.48 | | 899,172.48 | 1,382,124.81 | 2,281,297.29 |
| 03/01/44 | 206,905.97 | - | 5.000 | 23.011 | 692,266.51 | 899,172.48 | 1,798,344.96 | 899,172.48 | 1,175,218.84 | 2,074,391.32 |
| 09/01/44 | 206,968.52 | - | 5.000 | 22.449 | 714,961.92 | 921,930.44 | | 921,930.44 | 968,250.32 | 1,890,180.76 |
| 03/01/45 | 201,920.51 | - | 5.000 | 21.902 | 720,009.93 | 921,930.44 | 1,843,860.88 | 921,930.44 | 766,329.81 | 1,688,260.25 |
| 09/01/45 | 198,157.73 | - | 5.000 | 21.368 | 729,211.32 | 927,369.05 | | 927,369.05 | 568,172.08 | 1,495,541.13 |
| 03/01/46 | 193,324.61 | - | 5.000 | 20.847 | 734,044.44 | 927,369.05 | 1,854,738.10 | 927,369.05 | 374,847.47 | 1,302,216.52 |
| 09/01/46 | 189,737.61 | - | 5.000 | 20.338 | 743,178.82 | 932,916.43 | | 932,916.43 | 185,109.86 | 1,118,026.29 |
| 03/01/47 | 185,109.86 | - | 5.000 | 19.842 | 747,806.57 | 932,916.43 | 1,865,832.86 | 932,916.43 | - | 932,916.43 |
| **Totals** | 26,310,757.06 | | | | 28,756,987.68 | 55,067,744.74 | 55,067,744.74 | | | |

**FIGURE 1:  DOWNTOWN PARKING DISTRICT MAP**

OHSUSA:754471747.4
US_ACTIVE:\44330807\5\64984.0003

# Boundary Map of City of Stockton CFD 2001-1 (Downtown Parking District)



## DOWNTOWN PARKING DISTRICT

Legend:

▨ Downtown Parking District

— Assessor's Parcel Line

EXHIBIT C

TERM SHEET—PROPOSED AMENDMENTS
TO
TEAM LEASE FOR STOCKTON EVENTS CENTER

**TERM SHEET – PROPOSED AMENDMENTS TO**
**TEAM LEASE FOR STOCKTON EVENTS CENTER**
**September 18, 2013**

The City of Stockton (City) staff and the Stockton Thunder (Team) have agreed upon certain modifications to the terms of the "Team Lease for Stockton Events Center" (Lease). The agreement is contingent on City Council approval and the City reaching a deal with National Public Finance Guarantee Corporation (NPFG) concerning the Stockton Events Center debt obligation. The terms below shall be incorporated into an amendment to the Lease.

| | |
|---|---|
| **1. Parties** | City of Stockton (City)<br><br>SC Hockey Franchise Corporation (Team) |
| **2. Rent** | Section 2.1 (a) of the Lease was previously amended as of October 1, 2010 to set Base Rent as follows for regular season home games:<br><br>　(i)　First five (5) Team Seasons of the Initial Term: $4,250 per regular season home game<br>　(ii)　Last five (5) Team Seasons of the Initial Term: $4,000 per regular season home game<br>　(iii)　First Option Term: $4,500 per regular season home game<br>　(iv)　Second Option Term: $5,000 per regular season home game<br><br>Section 2.1 (a) shall be further amended pursuant to this Term Sheet to increase the Base Rent payment by $2,000 per regular season home game. The Team is currently in the last five (5) Team Seasons of the Initial Term, which expires after the 2014-15 season. The new Base Rent payment schedule will be amended to read as follows:<br><br>　(i)　First five (5) Team Seasons of the Initial Term: $4,250 per regular season home game<br>　(ii)　Last five (5) Team Seasons of the Initial Term: $6,000 per regular season home game<br>　(iii)　First Option Term: $6,500 per regular season home game<br>　(iv)　Second Option Term: $7,000 per regular season home game<br><br>The total amount of additional Base Rent to be paid to the City is $72,000 per season. This is based on an increase of $2,000 in Base Rent for 36 regular season home games.<br><br>Rent for Pre-Season and Playoff games shall not change and shall remain as outlined in the Lease. |
| **3. Catering Services** | Section 2.3 (h) (Catering Services) shall be amended to reduce the percent of the Catering Services Adjusted Gross Revenue paid to the Team from 30% to 10%. |
| **4. Team** | Section 2.3 (d) (Team Merchandise) shall be amended to provide the Team the |

**TERM SHEET – PROPOSED AMENDMENTS TO
TEAM LEASE FOR STOCKTON EVENTS CENTER
September 18, 2013**

| | |
|---|---|
| **Merchandise** | exclusive right to sell Team Merchandise at Team Events and at the Arena Store. The Team shall retain 100% of Team Merchandise Net Revenue. The Team shall be responsible for and pay all expenses associated with the Team Merchandise program.  The Team shall no longer be required to pay the City 10% of Team Merchandise Net Revenue.

The Team shall require and make available its designated Merchandise Manager (currently Bryan Boyes) to oversee merchandise sales during non-hockey events and Bob Hope Theater events consistent with current practice.  The Team shall be responsible for any expenses associated with its Merchandise Manager and the City shall not be required to pay the Team or its Merchandise Manager to oversee merchandise sales for Team events or non-hockey events and Bob Hope Theater events. |
| **5. Luxury Suites Purchase by Team** | Section 2.3 (f) (Luxury Suites) shall be amended to include a Team Luxury Suites Purchase requirement. The Team shall purchase from the City five (5) luxury suites each season, currently identified as luxury suites 1, 2, 3, 9, and 18 (Team Luxury Suites), beginning with the 2013-14 season. Adjustments to the list of Team Luxury Suites shall be made following each hockey season by the mutual agreement of the parties.  The price for each of the Team Luxury Suites for the 2013-14 season shall be $30,000 per luxury suite for a total of $150,000 to be paid by the Team to the City. This Luxury Suites Purchase requirement shall extend throughout any Option Terms that are entered into under the Lease, and the price shall be adjusted annually based on the gross market price of luxury suites sold by the City/SMG on an annual basis at that time (current price for an annual luxury suite is $30,000). The Team shall have the right to sublease the Team Luxury Suites and retain all revenue therefrom. The Team must market the luxury suites in a manner that is consistent with the manner in which the City/SMG market the remaining luxury suite inventory. The Team shall also work in cooperation with the City/SMG to market all other luxury suites. The parties shall work together to develop a uniform set of policies for the luxury suites, including but not limited to: events, tickets, parking, food and beverage, etc.

Luxury Suite Lease or License Fee Revenue received by the City from the Luxury Suites Purchase requirement shall be included in the luxury suite revenue sharing formula in Section 2.3 (f) that provides the City 65% of the Luxury Suite Lease or License Fee Revenue and pays the Team 35% of such revenue.

The City/SMG shall continue to be responsible for expenses (including commissions) and fulfillment relating to all luxury suites. Commissions shall only be paid to one entity (either the City/SMG or the Thunder), which shall be the entity that is responsible for the sale of the luxury suite.

The Team shall be responsible for customer relations and servicing the Team |

**TERM SHEET – PROPOSED AMENDMENTS TO
TEAM LEASE FOR STOCKTON EVENTS CENTER
September 18, 2013**

|  |  |
|---|---|
|  | Luxury Suites, as well as any staffing expenses for Team employees selling and/or servicing Team Luxury Suites.<br><br>The Team shall be prohibited from selling the Team Luxury Suites to the entities listed below. In the event that the entities listed below do not buy a luxury suite by the end of the 2013-14 season, the Team shall have the right, in coordination with the City/SMG, to approach these entities. This right shall not apply if the entity is in a renewal option period.<br><br>(i)     Neumiller & Beardslee (Contracted)<br>(ii)    Golden Bear Insurance (Contracted)<br>(iii)   BAC (Contracted)<br>(iv)   Chase Chevrolet (Contracted)<br>(v)    DBI (Contracted)<br>(vi)   Dr. Hayashi (Contracted)<br>(vii)  Arnaiz Development (Pending)<br>(viii) Diede Construction (Pending)<br>(ix)   Collins Electric (Pending)<br>(x)    Central Valley Community Bank (Active Discussions)<br>(xi)   Dryco Construction (Active Discussions)<br>(xii)  Knife River Construction (Active Discussions)<br>(xiii) Silveria Team (Active Discussions)<br>(xiv) Save Mart Supermarkets (Active Discussions)<br>(xv)  UOP (Active Discussions)<br>(xvi) Port of Stockton (Active Discussions)<br>(xvii) Big Valley Ford (Active Discussions)<br>(xviii) AG Spanos (Active Discussions)<br>(xix) Van Ruiten Winery (Active Discussions)<br><br>The Team shall cooperate with the City in securing a naming rights partner and shall be prohibited from selling the Team Luxury Suites to active naming rights targets. The City shall have the right to reserve up to two luxury suites next to each other for a potential naming rights partner (currently identified as luxury suites 7 and 8). |
| **6. Performance Benchmarks** | The Lease shall be amended to include a new section to provide for additional payments to be made by the Team to the City in the event certain to performance benchmarks are achieved.<br><br>When the Team achieves 150,000 paid attendees for the season (excluding playoffs) and Fixed Advertising gross revenue exceeds $500,000, the Team shall pay to the City an additional $2.00 per ticket sold over the 150,000 benchmark for paid attendance. The City shall also receive 80% (rather than the 65% share outlined in Section 2.3 (e) (i)) of all Fixed Advertising revenue in excess of $500,000. |

**TERM SHEET – PROPOSED AMENDMENTS TO
TEAM LEASE FOR STOCKTON EVENTS CENTER
September 18, 2013**

|  |  |  |
|---|---|---|
|  |  | These amounts are in addition to any other payments required under the Lease. |
| 7. | **Loading Dock Parking** | The Team shall have access to two (2) parking spaces inside the gated area near the loading dock. In circumstances where the spaces are needed for an event, the parking spaces may be unavailable to the Team. Treatment related to availability of parking spaces for SMG and the Team in this area shall be consistent. |
| 8. | **Coach's Office** | The Team shall not be required to move out of the coach's office (referenced in Exhibit B Section 3.2) except in the circumstance that the specific event requires the use of the entire event floor as a condition of the event and the condition is a requirement for that event in other arenas as well.<br><br>The coach's office shall not be available to Team staff during non-Thunder events. |
| 9. | **Option Terms** | The items described above shall apply to any Option Terms and lease extensions (if exercised). |

"CITY"

City of Stockton, a charter city


_____

City Manager, City of Stockton           Date


"TEAM"

_____     Sept 20, 2013

Brad Rowbotham               Date
Chief Executive Officer, SC Hockey Franchise Corporation


Approved As To Form:
Preliminary Draft – Subject to Revision          Page 4 of 5

**TERM SHEET – PROPOSED AMENDMENTS TO
TEAM LEASE FOR STOCKTON EVENTS CENTER
September 18, 2013**

Office of the City Attorney

_____

City Attorney                                    Date