Philip J. Rhodes, State Bar No. 161537
PHIL RHODES LAW CORPORATION
P.O. Box 2911
Fair Oaks, CA  95628
(916) 295-1222
(916) 720-0403 (facsimile)
*pjrhodes@philrhodeslaw.com*

Attorney for 7th Inning Stretch, LLC

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 12-32118 |
| CITY OF STOCKTON, CALIFORNIA, | DCNo.  OHS-14 |
| Debtor. | **OPPOSITION TO THE CITY'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY 7TH INNING STRETCH, LLC**<br><br>Date:   October 28, 2013<br>Time:  10:00 a.m.<br>Dept:   Courtroom 35 |

## INTRODUCTION

7th Inning Stretch leases the Banner Island Ballpark from the City of Stockton.  In its negotiations with 7th Inning Stretch over whether to assume the lease, the City requested that 7th Inning Stretch produce its own financial records.  The City wants 7th Inning Stretch's financial records to gain an unfair advantage in the negotiation.

7th Inning Stretch has always performed the terms of the lease.  It pays a significant portion of the City's ownership and operational costs for the ballpark.  As a result, it has the most expensive lease in the California League.  The City has no rational legal justification for its demand for the financial records of 7th Inning Stretch, which is a privately-owned business.

## FACTUAL BACKGROUND

7th Inning Stretch, which operates the Stockton Ports Class A California League baseball team,

1

leases Banner Island Ballpark in downtown Stockton from the City of Stockton.  Declaration of Patrick Filippone, ¶¶ 3-4.  Under the agreement, 7th Inning Stretch occupies a small part of the ballpark 365 days a year consisting of administrative offices, the team store, the radio booth, the Ports locker room, and certain warehouse and storage areas.  Filippone Decl., ¶ 7.  In addition, 7th Inning occupies the remaining stadium for 70 Ports games and 20 Ports non-game events each year.  Filippone Decl., ¶ 7.  During the other two-thirds of the year, the City and its facility manager, SMG, have the exclusive right to book additional events at the ballpark. Filippone Decl., ¶ 12.

The lease agreement provides for rent, as well as an allocation of revenue generated from the ballpark.  The lease also recognizes that both parties bear responsibility for generating revenue from the ballpark.  When the parties signed the lease agreement in 2004, 7th Inning Stretch prepaid $1.2 million in rent for the original 25 year term of the agreement.  Filippone Decl., ¶ 7.  Currently, the City has approximately $768,000 in prepaid but unearned rent from 7th Inning Stretch.  Filippone Decl., ¶ 7.  In addition, 7th Inning Stretch pays a facility fee of $1.25 for each paid ticket, which increases every five years through the term of the lease.  Filippone Decl., ¶ 8.  7th Inning Stretch splits luxury suite revenue with the City equally.  Filippone Decl., ¶ 8.

The City also has substantial additional opportunity to generate revenue from the ballpark.  First, the City has the exclusive right to sell the ballpark naming rights.  Filippone Decl., ¶ 9.  It receives eighty percent of the naming rights revenue.  Filippone Decl., ¶ 9.  However, in the nine years since the ballpark opened, the City has not made serious attempts to sell the naming rights.  Filippone Decl., ¶ 9.  On numerous occasions, 7th Inning Stretch has offered to sell the naming rights, but the City has refused.  Filippone Decl., ¶ 9.  Second, the City has exclusive control over the ballpark the remaining two-thirds of the year to book events that generate revenue.  Filippone Decl., ¶ 12.

The City owns and operates Banner Island Ballpark, which the Ports lease a small portion of the year.  Except during the Ports' period of possession, the City exercises full control over the ballpark to schedule events and other activities to generate revenue.   Yet, in nine years since the ballpark opened, the City has failed to generate any significant additional revenue.  Filippone Decl., ¶¶ 9, 12.

**PROCEDURAL BACKGROUND**

7th Inning Stretch started negotiating with the City over the terms of the lease agreement in September 2012, more than a year ago.  Filippone Decl., ¶ 13.  7th Inning has fully demonstrated its willingness to increase the City's share of the revenue from the Ports' use of the ballpark.  7th Inning has always met with the City when requested, responded to the City's offers, and made numerous counteroffers of its own.  In fact, 7th Inning Stretch has suggested that the parties attempt mediation on several occasions since the service of the subpoena.  Rhodes Decl., ¶ 8.  The City has not responded to this suggestion in any manner.  Rhodes Decl., ¶ 8.

The City served the Rule 2004 exam order on 7th Inning Stretch on September 13, a Friday.  On either September 16 or 17, the next Monday or Tuesday, 7th Inning's counsel spoke with the City's counsel, Marc Levinson.  Rhodes Decl.,¶ 3.  During the conversation, 7th Inning Stretch expressly objected to the City's request for the records described in the subpoena.  Rhodes Decl.,¶ 3.   7th Inning Stretch advised the City that, without better legal justification or legal authority supporting the request, 7th Inning Stretch did not intend to produce the requested records.  Rhodes Decl.,¶ 3.

7th Inning Stretch did not receive any further communication from the City until October 11, the Friday before the appointed production date.  Rhodes Decl., ¶ 4.  The City did not offer any additional legal authority or legal rationale to supports its request for financial records.  7th Inning Stretch already has the most expensive lease in the California League.  Filippone Decl., ¶ 11.  Notwithstanding this, the City claims its review of the Ports' financial records will support an even more expensive lease.

**LEGAL ARGUMENT**

**The City's Demand for 7th Inning's Private Financial Records Is Overbroad and Improper**

The scope of an examination under Rule 2004 is quite broad, as the City accurately notes.  Most often, a creditor seeks to examine the debtor or the debtor's principals to investigate their financial condition or locate potential assets of the estate.  In this case, an examination is, as many courts describe it, a fishing expedition.

In the context of a third party examination of a non-debtor, insider, or affiliate under 2004, the scope is quite different.  Third parties may be subject to a Rule 2004 examination.  But, the examination

of a witness regarding matters unrelated to the debtor's affairs or the administration of the debtor's estate "is improper." *In re Continental Forge*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987). "It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs." *Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985). By necessity, a court must review an examination of a non-debtor drawn into litigation by a debtor's bankruptcy proceeding through a much narrower lens. "The language of the rule makes it 'evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct, or financial affairs so far as this relates to a debtor's proceeding in bankruptcy.'" *Id.* (*citing In re GHR Energy Corp.*, 35 B.R. 534, 537 (Bankr. D. Mass 1983). Particularly when a debtor seeks the private financial records of a non-debtor, which are among the most sacrosanct records of any privately-held business, a court should view the proposed Rule 2004 examination with a suspicious eye.

In this case, the City will have to decide whether to accept or reject its lease agreement with 7th Inning Stretch for the Banner Island Ballpark. Primarily, the City must focus on whether the agreement's price is equivalent or higher than it could obtain from another party or whether the asset is otherwise burdensome to the estate. The Ports already pay the highest rent among the nine teams in the California League that lease their ballparks. Filippone Decl., ¶ 11. The debtor can assume the contract, reject the contract, or, alternatively, negotiate a more advantageous contract for the estate. Given the unique nature of the asset, the City has attempted to negotiate a more advantageous contract for the estate.

Variously, the City contends that the financial records will "aid the City's evaluation," help it "determine what terms would be reasonable for a modified agreement," and help it "assess the long-term financial and operating viability of the Ports under an amended agreement." Motion to Compel, 8:5-6, 14-15, 16-17. These contentions cast the City in the wrong role. The City's only role in this context is to maximize the value of the asset it owns and operates, the Banner Island Ballpark.

7th Inning Stretch can and should determine for itself "what terms would be reasonable for a modified agreement." 7th Inning Stretch can also ensure its own "long-term financial and operating viability." The President of 7th Inning Stretch and its owner are far more capable of safeguarding the financial interests of the Ports.

If the City thought the financial records related to its decision to assume, reject or renegotiate the

4

1  lease, the City should have requested them in September 2012.  The City had competent counsel to advise

2  it at that time.  But, the City did not request these records until August 2013, almost a year later.  Filippone

3  Decl., ¶ 15.  The City's request for the financial records, at this late stage, demonstrates that the City has

4  made the request to exert additional pressure upon a local small business that makes a significant

5  contribution to the City.  Moreover, the City has admitted that it pursued this exercise to provide it

6  political cover.  Rhodes Decl., ¶ 3.

7  In effect, the City sits at the poker table and asks this court to show it the other player's hand.  The

8  court should not interject itself into this negotiation by compelling 7th Inning Stretch to produce its private

9  financial records.

10

**7th Inning Stretch Did Not Waive Its Objections to the City's Manifestly Overbroad Requests**

12  The City recognizes that any delay in serving written objections does not result in a waiver when

13  the request is manifestly overbroad.  Here, the request is manifestly overbroad.  The City has not asserted

14  any rational justification for requesting the financial records of a privately-held business.  Rather, the

15  City's request is nothing more than an overly-aggressive negotiating tactic.

16  Furthermore, courts have considered other factors to determine whether good cause exists for a

17  delay in responding including:  (1) the length of the delay; (2) the reason for the delay; (3) whether bad

18  faith exists; and (4) whether the delay prejudiced the party seeking discovery.  *Enron Corp. Sav. Plan v.*

19  *Hewitt Assocs.*, 258 F.R.D. 149, 156 (S.D. Tex. 2009).  In this case, all of these factors excuse any delay.

20  The delay was 10 days.  In addition, 7th Inning Stretch voiced its objections to the request and its intention

21  to resist only days after service of the subpoena, well prior to the time for written objections.  Rhodes

22  Decl., ¶ 3  The delay occurred primarily due to 7th Inning Stretch's counsel's illness.  Rhodes Decl., ¶ 7.

23  No bad faith exists.  Finally, the delay did not prejudice the opposing party.  The City has had more than a

24  year to request the records and bring this dispute before the court.  And, after receiving the subpoena, 7th

25  Inning Stretch promptly advised the City that it did not intend to comply.  Rhodes Decl., ¶ 3.

26

27

28

**The City Failed to Serve 7th Inning Stretch with This Motion to Compel**

According to the City's proof of service, it served the parties with this motion to compel on Friday, October 18, 2013.  It requested a hearing on ten days shortened notice.  The proof of service does not reflect service upon 7th Inning Stretch's known counsel or 7th Inning Stretch itself.  In addition, 7th Inning Stretch did not receive service of the motion to compel.  Rhodes Decl., ¶ 5.

**Request for Costs**

As a result of its improper, manifestly overbroad subpoena, 7th Inning Stretch has expended no less than 15 hours of attorney time and incurred no less than $4,875 in attorneys' fees.  Rhodes Decl., ¶ 6. 7th Inning Stretch requests that the court award 7th Inning Stretch its fees incurred in opposing the motion to compel.

WHEREFORE, 7th Inning Stretch requests that the court deny the City's motion and award 7th Inning Stretch its fees in defending against this motion to compel.

PHIL RHODES LAW CORPORATION

Dated:  October 25, 2013

 /s/ Philip J. Rhodes
PHILIP J. RHODES
Attorney for 7th Inning Stretch