**17**

1   James O. Johnston (Cal. Bar No. 167330)
    Joshua D. Morse (Cal. Bar. No. 211050)
2   JONES DAY
    555 South Flower Street, 50th Floor
3   Los Angeles, California 90071
    Telephone: (213) 489-3939
4   Facsimile: (213) 243-2539
    Email:  jjohnston@jonesday.com
5           jmorse@jonesday.com

6   *Attorneys for Franklin High Yield Tax-Free*
    *Income Fund and Franklin California High*
7   *Yield Municipal Fund*

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                   **EASTERN DISTRICT OF CALIFORNIA**

11                         **SACRAMENTO DIVISION**

12   In re:                          )   Case No. 12-32118
                                     )
13   CITY OF STOCKTON, CALIFORNIA,   )   D.C. No. OHS-11
                                     )
14                  Debtor.          )   Chapter 9
                                     )
15                                   )   **OBJECTION OF FRANKLIN HIGH**
                                     )   **YIELD TAX-FREE INCOME FUND**
16                                   )   **AND FRANKLIN CALIFORNIA**
                                     )   **HIGH YIELD MUNICIPAL FUND**
17                                   )   **TO CITY OF STOCKTON'S**
                                     )   **MOTION FOR AN ORDER**
18                                   )   **APPROVING DISCLOSURE**
                                     )   **STATEMENT WITH RESPECT TO**
19                                   )   **THE PLAN FOR THE**
                                     )   **ADJUSTMENT OF DEBTS OF CITY**
20                                   )   **OF STOCKTON, CALIFORNIA,**
                                     )   **DATED OCTOBER 10, 2013, AND**
21                                   )   **SETTING CONFIRMATION**
                                     )   **PROCEDURES**
22                                   )
                                     )   Date:   November 18, 2013
23                                   )   Time:   1:00 p.m.
                                     )   Dept:   C, Courtroom 35
24                                   )   Judge:  Hon. Christopher M. Klein
                                     )
25   _____ )

26

27

28

**TABLE OF CONTENTS**

<u>Page</u>

**PRELIMINARY STATEMENT** ................................................................. 1

**BACKGROUND** ..................................................................................... 3

**OBJECTION** ......................................................................................... 6

    **A.**    **The Disclosure Statement Must Provide Clear, Understandable Information About The Amount And Nature Of Claims To Be Allowed Under The Plan** ............................. 7

    **B.**    **The Disclosure Statement Must Provide Clear, Understandable Information About The Value Of The Distributions To Be Made Under The Plan** ........................................ 9

    **C.**    **The Disclosure Statement Must Include Accurate Projections** ........................................ 13

    **D.**    **The Disclosure Regarding The 2009 Golf Course/Park Bonds Is Inadequate** ........................................ 15

    **E.**    **Issues Related To Certain Relief Requested In The Motion** ....................... 16

**RESERVATION OF RIGHTS** .............................................................. 17

**CONCLUSION** ..................................................................................... 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Applegate Prop., Ltd.,*
    133 B.R. 827 (Bankr. W.D. Tex. 1991) ...................................................................6

*In re City of Stockton, California*, 486 B.R. 194 (Bankr. E.D. Cal. 2013) ....................................9

*In re County of Orange,*
    219 B.R. 543 (Bankr. C.D. Cal. 1997) ...................................................................6

*Duff v. United States Trustee (In re California Fidelity, Inc.),*
    198 B.R. 567 (9th Cir. BAP 1996) ...................................................................6

*In re Ferguson,*
    474 B.R. 466 (Bankr. D.S.C. 2012) ...................................................................13

*In re Ferretti,*
    128 B.R. 16 (Bankr. D.N.H. 1991) ...................................................................6, 7

*In re Hirt,*
    97 B.R. 981 (Bankr. E.D. Wis. 1989) ...................................................................14

*In re Jeppson,*
    66 B.R. 269 (Bankr. D. Utah 1986) ...................................................................7

*Kunica v. St. Jean Fin. Inc.,*
    233 B.R. 46 (S.D.N.Y. 1999) ...................................................................6

*In re Ligon,*
    50 B.R. 127 (Bankr. M.D. Tenn. 1985) ...................................................................9

*In re Malek,*
    35 B.R. 443 (Bankr. E.D. Mich. 1983) ...................................................................14

*In re Michelson,*
    141 B.R. 715 (Bankr. E.D. Cal. 1992) ...................................................................6, 7

*In re Oneida Motor Freight, Inc.,*
    848 F.2d 414 (3d Cir. 1988) ...................................................................6

*In re Oxford Homes, Inc.,*
    204 B.R. 264 (Bankr. D. Me. 1997) ...................................................................7

*In re Polytherm Indus., Inc.,*
    33 B.R. 823 (Bankr. W.D. Wis. 1983) ...................................................................9

*In re Prudential Energy Co.,*
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) ...................................................................9

*In re Stanley Hotel, Inc.,*
    13 B.R. 926 (Bankr. D. Colo. 1981) ...................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

Page

**Statutes, Rules and Other Authorities**

11 U.S.C. § 365 ..............................................................................................3, 5, 15

11 U.S.C. § 502 ..............................................................................................3, 5, 15

11 U.S.C. § 1125 ........................................................................................................6

S. REP. No. 95-989 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 5787 ...............................................................7

5 COLLIER ON BANKRUPTCY, ¶ 1125.03 (15th ed. 1992) ...............................6

7 COLLIER ON BANKRUPTCY, ¶ 1125.02[1] (16th ed. 2013) .........................7

Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund (collectively, "<u>Franklin</u>"), the sole holders of the $35,080,000 Stockton Public Financing Authority Lease Revenue Bonds, 2009 Series A (Capital Improvement Projects) (the "<u>2009 Golf Course/Park Bonds</u>"), hereby object to the *Motion For An Order Approving Disclosure Statement With Respect To The Plan For The Adjustment Of Debts Of City Of Stockton, California, Dated October 10, 2013, And Setting Confirmation Procedures* [Docket No. 1137] (the "<u>Motion</u>"), by which the City of Stockton, California (the "<u>City</u>"), seeks approval of the *Disclosure Statement With Respect To Plan For The Adjustment Of Debts Of City Of Stockton, California (October 10, 2013)* [Docket No. 1134] (the "<u>Disclosure Statement</u>") to accompany the *Plan For The Adjustment Of Debts Of City Of Stockton, California (October 10, 2013)* [Docket No. 1133] (the "<u>Plan</u>"),[1] and various notice and objection procedures related to the Confirmation Hearing.

## **<u>PRELIMINARY STATEMENT</u>**

The Disclosure Statement describes a Plan with two foundational anchors:

- <u>The unimpairment and reinstatement of the City's unfunded pension obligations</u>. The City previously listed those obligations as its single largest liability – in the amount of $147.5 million – but curiously never discloses that figure in the Disclosure Statement. The City, however, does state that it now projects more than $1.09 billion in payments to CalPERS over the thirty-year projection period of the Disclosure Statement, with annual payments to CalPERS projected to increase by 254% in just nine years and ultimately to rise to more than 329% of their current level.

- <u>Settlement agreements with the insurers who insured six of the seven bond issues subject to impairment in the chapter 9 case and with the SPOA</u>. Although the Disclosure Statement fails to value the consideration to be distributed, it appears that the Plan will provide the insurers with recoveries ranging from at least 52% to potentially 100% of the amount of their claims. The Plan also incorporates a settlement with the SPOA and its members, allowing a previously-disputed

---

[1]    Capitalized terms not defined in this Objection have the meanings given to them in the Disclosure Statement, the Solicitation Motion or the Plan, as applicable.

claim of $8.5 million and providing for the satisfaction of that claim through 44 hours of paid leave to each settling claimant, a distribution that the Disclosure Statement does not value.

In contrast, the City proposes to pay approximately $95,000 in satisfaction and discharge of all of its payment obligations in respect of Franklin's $35 million in 2009 Golf Course/Park Bonds, a recovery of a mere _**0.27%**_.  Franklin objects to that proposed treatment and will object to confirmation of the Plan in due course at the appropriate time.  Franklin reserves all rights in that regard and does not raise confirmation issues in this Objection.

At this stage, Franklin objects to the adequacy of the information in the Disclosure Statement because the City has failed to provide certain rudimentary information that is essential for any informed judgment regarding the Plan.  Among other things, as explained in more detail below, the Disclosure Statement must be amended to provide clear, readily-accessible information regarding:

- The amount and nature of the City's unfunded pension liabilities and other obligations in respect of current and future retirees.

- The amount and nature of the claims of Ambac, Assured Guaranty, NPFG, SPOA members, and Marina Towers with respect to the liabilities to be settled under the Plan and the value of the consideration to be distributed on account of such claims.

- Financial projections that actually and accurately reflect the City's future obligations upon effectiveness of the Plan and disclosure regarding the risk, among other things, that the City has underestimated the nature and extent of those liabilities.

- The existence and ramifications of the adversary proceeding that Franklin has commenced with respect to the agreements that form the basis for its claims.

Franklin also objects to certain of the procedural relief requested by the Motion, which seeks an unreasonably short timetable for confirmation and related proceedings.

Franklin raised these issues with the City more than two weeks ago but the City declined to engage in any meaningful discussion regarding supplemental disclosures.  Franklin remains ready and willing to work with the City to resolve this Objection through revised disclosures and a

modified confirmation schedule.  Absent such amendments, Franklin objects to the adequacy of the information in the Disclosure Statement and the relief requested in the Motion.

**BACKGROUND**

In September 2009, through the 2009 Golf Course/Park Bonds and related agreements, the City raised $35 million to finance construction of Fire Station No. 13, construction of the Police Communications Center, capital improvements to Fire Station No. 7, acquisition and construction of seven City parks, and numerous paving, bridge, widening, lighting, landscaping and other projects throughout the City.  Franklin purchased the 2009 Golf Course/Park Bonds upon issuance and remains the sole holder of the bonds, which are not insured.

On October 3, 2013, the City filed the proposed Disclosure Statement, the Plan, and the Motion, which seeks, among other things, "an order approving the Disclosure Statement" and establishing various procedures and deadlines relating to the Confirmation Hearing. Motion at 1, 3, 5-6.

The Disclosure Statement describes the Plan as "a Spartan one," Disclosure Statement at 12, and that is certainly true with respect to Franklin's claims in respect of the $35 million 2009 Golf Course/Park Bonds.  The Plan proposes to permanently discharge those claims through a *de minimis* payment of approximately $95,000, a recovery of a fraction of a cent on the dollar.  Specifically, through the Plan the City asserts that the agreements underlying the 2009 Golf Course/Park Bonds constitute leases of nonresidential real property within the meaning of section 365 of the Bankruptcy Code and seeks to reject them and to apply the limitations of section 502(b)(6) of the Bankruptcy Code to the resulting claim for damages, thereby limiting the claim for amounts due in respect of the 2009 Golf Course/Park Bonds – which mature in 2038 – to a maximum of three years of debt service.  *Id*. at 33, 57-58.  Then, the City proposes to make a distribution of 0.93578% of that capped claim as the only consideration provided for discharge of its obligations to Franklin.  *Id*. at 74-75.

In contrast, the Plan provides much less "Spartan" treatment for other, similarly-situated creditors.  In particular, the Plan provides for the following treatment of other major creditors (with recoveries as best as can be estimated from the inadequate information provided to date):

| Creditor/Class | Claim Amount | Treatment | Recovery |
|---|---|---|---|
| Ambac Fire/Police/ Library Certificates (Class 1) | Not disclosed; original principal amount $13,300,000 | Assignment of rights to Housing Set Aside Amounts, with general fund backstop; payment of attorneys' fees | Not valued; appears to be **100% plus** attorneys' fees |
| NPFG SEB Bonds (Class 2) | Not disclosed; original principal amount $13,965,000 | Unimpaired | **100%** |
| NPFG Arena Bonds (Class 3) | Not disclosed; original principal amount $47,000,000 | Paid from tax increment revenues with general fund backstop providing for modified debt service schedule with "slightly lower payments" | Not valued; appears to be **100%** |
| NPFG Parking Bonds (Class 4) | Not disclosed; original principal amount $32,785,000 | Rights to payment from new parking authority with additional revenues not currently pledged to the debt | Not valued; appears to be **100%** or greater |
| Assured Guaranty Office Building Bonds (Class 5) | Not disclosed; original principal amount $40,770,000 | Transfer of fee title in 400 East Main Building Property | Not valued; appears to be **100%** or greater |
| Assured Guaranty Pension Obligation Bonds (Class 6) | Not disclosed; petition date principal amount $124,280,000 | Modified debt service schedule plus Contingent Payments | Not valued; appears to be **52% guaranteed** plus contingent payments that "may result in Assured Guaranty receiving **payment in full**" |
| CalPERS Claims (Class 15) | Not disclosed; previously listed at $147,500,000 | Unimpaired | **100%** |
| SPOA Claims (Class 18) | $8,500,000; previously disputed in full | Provision of 44 hours of paid leave for each applicable SPOA member | Not valued |
| Marina Towers (not classified) | $1,875,000 | Transfer of property valued at $973,500 | **52%** |

(Recoveries discounted to present value with a 5% discount rate per the City's methodology)

On October 14, 2013, Franklin and the Indenture Trustee for the 2009 Golf Course/Park Bonds initiated an adversary proceeding against the City, styled *Wells Fargo Bank, National Association, et al. v. City of Stockton, California (In re City of Stockton, California)* and pending before this Court as Adversary Proceeding Number 13-02315 (the "Adversary Proceeding"), in which Franklin requests, among other things, (a) a declaration that the so-called "Golf Course/Park Lease Out" and "Golf Course/Park Lease Back" are not unexpired leases of nonresidential real property within the meaning of sections 365 and 502(b)(6) of the Bankruptcy Code; (b) valuation of the collateral securing Franklin's claims; and (c) alternatively, a claim for administrative rent.

Thereafter, heeding the City's request for early disclosure of "suggest[ed] changes, comments, additions or modifications,"[2] Franklin wrote to the City on October 23 to identify a number of material deficiencies in the information contained in the Disclosure Statement, among other issues.  Ex. A.  The City did not respond until November 2, at which time the City indicated that it was not interested in discussing Franklin's objections because the Disclosure Statement "has provided [Franklin] more than adequate information to know that it's going to vote no on the plan." Ex. B.  The City indicated that it will "make some changes" in response to Franklin's letter but that it "doubt[ed] that the changes the City will make will totally satisfy Franklin."  *Id.*

Counsel for Franklin and the City subsequently participated in a conference call on November 7, at which the City indicated that it would provide additional disclosure regarding the Adversary Proceeding and make minor revisions to Exhibit B to the Disclosure Statement, but was not inclined to address Franklin's other requested disclosures.  To date, the City has not provided any of its intended changes to Franklin, thus necessitating this Objection.

---

[2]  Notice of Motion at 2-3 ("The City requests that creditors and parties in interest who intend to suggest changes, comments, additions, or modifications not delay notifying the City and one another until such deadline.  Rather, the City requests that any suggestions be communicated formally or informally as soon as possible, as the City likely will file an amended plan and amended disclosure statement prior to the November 18 hearing.  The City's goal is to accommodate as many changes as possible in any revised versions.") [Docket No. 1138].

## **OBJECTION**

"Disclosure is the 'pivotal' concept in [a bankruptcy] reorganization." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (quoting 5 COLLIER ON BANKRUPTCY, ¶ 1125.03 (15th ed. 1992)); *accord In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988) (citing same). In particular, in the context of a proposed plan of adjustment, section 1125 of the Bankruptcy Code requires that plan proponent provide information that would enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1); *see, e.g.*, *Oneida*, 848 F.2d at 417 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").

"[T]he purpose of the disclosure statement is 'to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan.'" *In re County of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) (citing *Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571 (9th Cir. BAP 1996)). At the core, and in the most basic terms, a creditor must be able to determine "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

In assessing the adequacy of a proposed disclosure statement, the standard is not whether a failure to disclose certain information would harm creditors. Rather, the appropriate measure is whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) (emphasis in original); *see also In re Michelson*, 141 B.R. 715, 718-19 (Bankr. E.D. Cal. 1992) (at an "irreducible minimum," a disclosure statement must include an "explanation of why the proposed means of implementation [of the underlying plan] will be adequate to the task").

1    Similarly, there is no exemption from the requirement of adequate disclosure for creditors

2    who intend to object to a plan, as the City has suggested in its recent correspondence with Franklin.

3    To the contrary, adequate disclosure "is required even if all parties are subject to cram down,

4    because 'the opportunity for parties to appear and express a dissenting voice would be drastically

5    reduced'" otherwise.  7 COLLIER ON BANKRUPTCY, ¶ 1125.02[1] (16th ed. 2013) (quoting *In re*

6    *Jeppson*, 66 B.R. 269, 297 (Bankr. D. Utah 1986)).

7    "[T]he plan proponent bears the ultimate risk of nonpersuasion on the question of compliance

8    with the requirement to disclose adequate information."  *Michelson*, 141 B.R. at 720.  The City has

9    not met its burden with respect to the Disclosure Statement at hand.

10

11    **A.    The Disclosure Statement Must Provide Clear, Understandable Information About The Amount And Nature Of Claims To Be Allowed Under The Plan.**

12    One elemental aspect of adequate disclosure is an identification of the nature of the debtor's

13    liabilities, particularly the amount of claims and the basis for the liabilities.  *See, e.g.*, *In re Oxford*

14    *Homes, Inc.*, 204 B.R. 264, 269 n.17 (Bankr. D. Me. 1997) (disclosure must include "[i]nformation

15    regarding claims against the estate, including those allowed, disputed, and estimated."); *Ferretti*, 128

16    B.R. at 18 (same); *Jeppson*, 66 B.R. at 292 (same).  Indeed, Congress long ago recognized that "[a]

17    plan is necessarily predicated on knowledge of the assets and liabilities being dealt with."  S. REP.

18    No. 95-989, at 121 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907.  The Disclosure Statement

19    fails to provide this basic information.

20    Bond Claims.  For example, the City has failed to disclose the amount of any of the claims

21    that it proposes to allow through its settlements with Ambac, NPFG and Assured Guaranty.  The

22    Disclosure Statement should specify the proposed allowed amount of the claims relating to the

23    Ambac Fire/Police/ Library Certificates, the NPFG SEB Bonds, the NPFG Arena Bonds, the NPFG

24    Parking Bonds, the Assured Guaranty Office Building Bonds, and the Assured Guaranty Pension

25    Obligation Bonds.

26    CalPERS/Unfunded Pension Claims.  The Disclosure Statement indicates that, under the

27    Plan, "[t]he City will continue to honor its obligations to its employees and retirees to fund employee

28

FRANKLIN'S DISCLOSURE
STATEMENT OBJECTION

retirement benefits under the CalPERS Pension Plan, and CalPERS as trustee and the CalPERS

Pension Plan Participants retain all of their rights and remedies under applicable nonbankruptcy

law." Disclosure Statement at 76. The Disclosure Statement, however, never reveals the amount of

those obligations, which the City previously identified as its single largest liability in the amount of

$147.5 million.[3] Nor does it describe the nature of the liability, except to state that "[t]he City's

General Fund CalPERS obligation for the funding of retirement benefits for its employees in fiscal

years 2008-09 through 2010-11, before the City's pension reforms were fully implemented,

averaged 13.3% of total General Fund expenditures." *Id.* at 22. The wholesale assumption of the

City's largest liability obviously is material to the decision of creditors regarding the Plan,

particularly those creditors (like Franklin) for whom payments of less than one cent on the dollar are

proposed. Fulsome disclosure of the nature and basis for that liability must be provided.

SPOA Member Claims. The Plan provides for the allowance of alleged claims of members

of the SPOA relating to the City's modification of the 2009 MOU in the amount of $8.5 million.

The Disclosure Statement, however, indicates that "[t]he City disputes [those] Claims and contends

that the Claims would not be allowed in the chapter 9 case," *id.* at 77, and it provides no explanation

whatsoever regarding either the basis for such claims or the reasons why the City has stipulated to

the allowance of claims that it believes are not allowable. Given that the City proposes to treat those

claims far more favorably than the claims of other creditors, such information is highly material and

must be provided.

Marina Towers. The Disclosure Statement indicates that "[f]ive . . . surplus properties,

valued collectively at $973,500, were transferred as part of the City's settlement with Marina

Towers, LLC, pursuant to which Marina Towers, LLC agreed to withdraw its proof of claim for

$1,875,000. The settlement with Marina Towers, LLC puts these five properties back on the tax roll

in the hands of a capable developer. In addition, it resolves a legal issue of first impression

regarding the interplay between eminent domain and bankruptcy law." *Id.* at 62. In other words, the

City already has consummated a settlement by which it satisfied a disputed claim at more than 52

---

[3]    *See* List of Creditors Holding 20 Largest Unsecured Claims [Docket No. 4].

1  cents on the dollar.  Given the Court's prior admonition that "the day of reckoning" with respect to

2  settlements consummated during a chapter 9 case "comes at the plan confirmation hearing," *In re*

3  *City of Stockton, California*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013), far more disclosure is

4  needed with respect to the Marina Towers claim and settlement.  Disclosure must be provided with

5  respect to (a) the nature of the Marina Towers claim, (b) the City's defenses to that claim, and (c) the

6  basis for the settlement providing Marina Towers a recovery of more than 52%.

7

8  **B.  The Disclosure Statement Must Provide Clear, Understandable Information About The Value Of The Distributions To Be Made Under The Plan.**

9  It is axiomatic that a disclosure statement must explain and value the recoveries to be

10  provided to creditors, and that failure to do so renders a disclosure statement inadequate.  *See, e.g.*,

11  *In re Prudential Energy Co.*, 58 B.R. 857, 868 (Bankr. S.D.N.Y. 1986) (disclosure inadequate where

12  statement failed to identify "the value of the stock that is to be distributed"); *In re Ligon*, 50 B.R.

13  127, 130 (Bankr. M.D. Tenn. 1985) ("A description of available assets and their value is a vital

14  element of necessary disclosure."); *In re Polytherm Indus., Inc.*, 33 B.R. 823, 830 (Bankr. W.D. Wis.

15  1983) (disclosure inadequate where statement failed to provide a "present value analyses of

16  proposed payments to creditors").  Here, the inadequate disclosure regarding the nature of the City's

17  liabilities, as described above, is compounded by the fact that the Disclosure Statement also fails to

18  explain or value the property proposed to be distributed to various classes.

19  Ambac Fire/Police/Library Certificates.  The Disclosure Statement indicates that Ambac's

20  claim in respect of the Fire/Police/Library Certificates will be satisfied on the terms of the Ambac

21  Settlement Agreement, pursuant to which the City will pay Ambac's attorneys' fees and make

22  "certain General Fund Payments (as defined in the Ambac Settlement Agreement) towards the

23  principal of an interest on Certificates, the assignment to the 2003 Fire/Police/Library Certificates

24  Trustee of the City's rights under the Certificates, the collateral assignment and pledge to the 2003

25  Fire/Police/Library Certificates Trustee of all of the City's rights, title and interest under the 2003

26  Fire/Police/Library Certificates Reimbursement Agreement, including its right to the Housing Set-

27  Aside Amounts (the "2003 Housing Set-Aside Rights"), the further assignment of the 2003 Housing

28

FRANKLIN'S DISCLOSURE
STATEMENT OBJECTION

Set-Aside Rights by the 2003 Fire/Police/Library Certificates Trustee to Ambac if and when

required by the terms of the 2003 Fire/Police/Library Certificates Supplemental Trust Agreement (as

defined below), and the sale of certain City and Successor Agency properties for proceeds that will

be paid toward the principal of and interest on the Certificates." Disclosure Statement at 39-40.

The Disclosure Statement, however, does not otherwise describe or include a copy of the

Ambac Settlement Agreement, which makes that verbiage meaningless.  More importantly, nothing

in the Disclosure Statement or the Ambac Settlement Agreement provides any information regarding

the <u>value</u> of the consideration provided to Ambac.  The City must explain, in plain and simple terms,

what percentage recovery on its claims Ambac will receive.

<u>NPFG Arena Bonds</u>.  The Disclosure Statement indicates that NPFG's claim in respect of the

Arena Bonds will be satisfied on the terms of the NPFG Arena Settlement, pursuant to which,

"subject to the modification of the payment terms of the Arena Lease Back in accordance with the

terms of the NPFG Arena Settlement, on the Effective Date, the City will assume the Arena Lease

Back (as modified), and as a result, the City will continue to remain in possession, custody, and

control of the Arena." *Id.* at 43.

The City has included with the Plan a copy of a term sheet with NPFG.[4]  However, nothing

in the Disclosure Statement or that term sheet provides any information regarding the <u>value</u> of the

consideration provided to NPFG.  The City must explain, in plain and simple terms, what percentage

recovery on its Arena Bond claims NPFG will receive.

<u>NPFG Parking Bonds</u>.  The Disclosure Statement indicates that NPFG's claim in respect of

the Parking Bonds will be satisfied on the terms of the NPFG Parking Settlement, pursuant to which

"the City will create a new parking authority for the City that will be comprised of the Parking

Structure Properties plus other downtown parking structures and lots, and downtown parking meters

and parking enforcement revenues; [] revenues from the newly created parking authority will be

pledged to the 2004 Parking Bond Trustee to make payments from the revenues of the parking

---

[4]    The Motion indicates that the definitive settlement agreement with NPFG will be included within
"a Plan supplement" that is to be part of the Solicitation Package.  Motion at 3.  This is necessary
disclosure that must be provided.

1    authority; and [] the City's General Fund will have no liability for the modified payment schedule."

2    *Id.* at 46.

3         Nothing in the Disclosure Statement or the NPFG Settlement Agreement, however, provides

4    any information regarding the <u>value</u> of the consideration provided to NPFG.  In particular, the City

5    fails to disclose any information regarding the historical and projected future revenues received in

6    respect of the Parking Structure Properties or the "other downtown parking structures and lots, and

7    downtown parking meters and parking enforcement revenues" (the "<u>New Parking Revenue</u>") to be

8    pledged to the 2004 Parking Bonds Trustee.  Information regarding the New Parking Revenue is

9    particularly relevant given that neither the 2004 Parking Bonds Trustee nor NPFG currently has any

10    rights to such additional revenue.  And, as with its other claims, the City must explain, in plain and

11    simple terms, what percentage recovery on its Parking Bond claims NPFG will receive.

12         <u>Assured Guaranty Office Building Bonds</u>.  The Disclosure Statement indicates that Assured

13    Guaranty's claim in respect of the Office Building Bonds will be satisfied on the terms of the

14    Assured Guaranty Settlement, pursuant to which, "[t]he City will transfer fee title in the 400 E. Main

15    Office Building Property to Assured Guaranty or its designee at Assured Guaranty's election, subject

16    to the New 400 E. Main Lease.  Assured Guaranty may elect to keep the property or sell it at some

17    future date to another purchaser, subject to the New 400 E. Main Lease.  Assured Guaranty shall be

18    entitled to all rent and profits of the property after the transfer, and to all of the sales proceeds of the

19    property should Assured Guaranty elect to sell the property."  *Id.* at 53.

20         The City has included with the Plan a copy of a term sheet with Assured Guaranty.[5]

21    However, nothing in the Disclosure Statement or that term sheet provides any information regarding

22    the <u>value</u> of the consideration provided to Assured Guaranty.  In particular, there is no information

23    about the appraised or historical value of the 400 E. Main Office Building Property, meaning that

24    creditors have no information with which to ascertain the extent of Assured Guaranty's recovery.

25    Indeed, if the value of the property exceeds the amount of the claim, Assured Guaranty will receive a

26    _____

27    [5]    The Motion indicates that the definitive settlement agreement with Assured Guaranty will be
         included within "a Plan supplement" that is to be part of the Solicitation Package.  Motion at 3.
28    This also is necessary disclosure that must be provided.

1  recovery of more than 100% of its allowed claim.  This obviously is highly material information that

2  must be disclosed.

3      <u>Assured Guaranty Pension Obligation Bonds</u>.  The Disclosure Statement indicates that

4  Assured Guaranty's claim in respect of the Pension Obligation Bonds will be satisfied on the terms

5  of the Assured Guaranty Settlement, pursuant to which, (a) "[t]he City agrees to make non-

6  contingent payments on the Pension Obligation Bonds in each fiscal year equal to the sum of

7  the 2007 Lease Ask Payments, Special Fund Payments, and Supplemental Payments on the dates and

8  in the amounts set forth in the Assured Guaranty Term Sheet" (collectively, the "<u>Guaranteed</u>

9  <u>Payments</u>"); and (b) "Assured Guaranty shall also be entitled to Contingent Payments in accordance

10  with the City's Contingent Payment Model, a copy of which is attached to the Assured Guaranty

11  Term Sheet as Exhibit A.  If the City does not exceed its baseline financial projections in the

12  upcoming years, Assured Guaranty would receive no Contingent Payments.  However, if the City

13  were to exceed its financial projections over the years – which the City and Assured Guaranty

14  believe may be achievable – Assured Guaranty would receive Contingent Payments until Assured

15  Guaranty has received payment in full on the Pension Obligation Bond Class 6 Claims."  *Id.* at 60.

16      Here again, nothing in the Disclosure Statement or the Assured Guaranty term sheet provides

17  any information regarding the <u>value</u> of the consideration provided to Assured Guaranty.  In

18  particular, there is no information about the value of the Guaranteed Payments (which Franklin

19  estimates to have a present value of approximately 52% of the principal amount of the Pension

20  Obligation Bonds).  Nor is there any information about why the City and Assured Guaranty believe

21  that the City may be able to "exceed its financial projections" or about the nature and extent of the

22  Contingent Payments in the event that the City in fact does perform better than projected.  This

23  material information must be disclosed.

24      <u>SPOA Member Claims</u>.  The Disclosure Statement indicates that each holder of a formerly-

25  disputed SPOA member claim will receive forty-four hours of paid leave.  The Disclosure

26  Statement, however, again is silent as to the <u>value</u> of that consideration, meaning that creditors are

unable to ascertain the extent of recovery on those claims.  This material information must be provided.

**C.    The Disclosure Statement Must Include Accurate Projections.**

As the Disclosure Statement itself confirms, "[t]o satisfy the requirement set forth in section 943(b)(7) that the Plan be feasible, the City must demonstrate the ability to make the payments required under the Plan."  *Id.* at 87.  The City has attempted to meet that hurdle through the provision of information contained in the Long Range Financial Plan of City of Stockton attached as Exhibit B to the Disclosure Statement (the "Projections").  But, as explained below, the Projections are misleading, inaccurate, and do not adequately inform creditors of the City's "ability to make the payments required under the Plan."  *See, e.g.*, *In re Ferguson*, 474 B.R. 466, 476 (Bankr. D.S.C. 2012) (disclosure inadequate where it failed to "include any projections relating to the future tax liability of either the Debtor or his business"); *In re Hirt*, 97 B.R. 981, 982 (Bankr. E.D. Wis. 1989) (disclosure inadequate where there was "a lack of detail as to assets and liabilities").

To start, the Projections apparently do not reflect the City's actual obligations under the Plan. Rather, the Projections appear to model the "savings proposed under the original AB 506 process," Projections at 1, which differ materially from the payments to be made by the City under the Plan. The Projections also contradict themselves, as elsewhere they seem to indicate that the "debt reduction" line item reflects the proposed treatment of creditors under the Plan.  *Id.* at 14.  To make matters worse, the figures in Table 5 of the summary of the Projections, which purports to show "total restructuring savings," conflict with the actual projected "total restructuring" savings in the Projections themselves.  *Compare* Projections at 21 with Projections at 24, line 118.

The Projections also are presented in a misleading manner.  In particular, the Projections first present as ongoing expenses all of the City's existing prepetition liabilities, including the City's general fund bond debt and payments in respect of retiree health benefits.  Then, under the heading "Restructuring", the Projections set forth line items for "Debt Reductions" and "Retiree Medical Reductions" that back out the portion of those expenses that the City proposes to discharge. Confusingly, the "Restructuring" heading also lumps new revenue items (Measure A, fees, sales of

surplus property) with various reductions in expenses included elsewhere as ongoing projected

liabilities of the City (bond debt, retiree medical, efficiencies, alternative service delivery, other).  It

is simply impossible to determine from the Projections the nature and extent of the City's projected

post-confirmation expenses.

This is not adequate disclosure.  What is needed is a straightforward projection of the City's

post-confirmation revenues compared against its post-confirmation expenses.  *In re Malek*, 35 B.R.

443, 444 (Bankr. E.D. Mich. 1983) ("The Debtor should provide the projection of operations

subsequent to confirmation so that the Court may determine the feasibility of the plan.  The Debtor is

required to make a full, clear, and complete disclosure of all underlying assumptions.").  If the City

desires to demonstrate the savings it allegedly has achieved through the bankruptcy process, it

should do so elsewhere in the Disclosure Statement and not in Projections presented to establish the

feasibility of the Plan.

Relatedly, the City must include disclosure regarding the risk that the City has

underestimated the nature and extent of the liabilities it is assuming under the Plan.  In particular, the

City must explain the risks associated with its wholesale assumption of its unfunded pension

liabilities and the CalPERS pension plan, which the Projections indicate will increase by 254% in

just nine years and ultimately rise to more than 329% of their current level, with a projected total of

more than $1.09 billion in payments to CalPERS over the thirty-year period of the Projections.

There is no explanation of how the City calculated those expenses or any discussion of the risks

associated with those projected expenses, which historically have fluctuated substantially and not

been susceptible to accurate projection by the City.  Given the mammoth size of the expenses, those

risks must be explained in the Disclosure Statement.

Finally, the Projections assume continued receipt of Measure A sales tax revenues

throughout the <u>thirty</u>-year projection period.  In fact, the City candidly admits that, "[s]hould

Measure A fail, the projections attached to this Disclosure Statement, upon which the Plan is

premised, will not be achievable."  Disclosure Statement at 13; *see id.* at 87-88 ("The Plan Financial

Projections . . . assume that Measure A will pass.") and at 88 ("In the event that Measure A does not

FRANKLIN'S DISCLOSURE
STATEMENT OBJECTION

1    pass, the Financial Plan will not be valid.").  However, the Disclosure Statement does not reveal that

2    Measure A automatically "sunsets" (terminates) no later than <u>ten</u> years from the date of first

3    collection of taxes, if not sooner, unless the City Council affirmatively votes to extend the tax (after

4    at least two publicly-noticed meetings) upon specified required "findings based on evidence."  The

5    risk that a future City Council may choose not to (or may be unable to) extend the tax,

6    notwithstanding the projection of tax revenues in the Projections, clearly is material information that

7    bears directly upon the feasibility of the Plan, and fulsome disclosure must be made in this respect.

8    *See, e.g.*, *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981) ("the information to be

9    provided should be comprised of all those factors presently known to the plan proponent that bear

10   upon the success or failure of the proposals contained in the plan").

11   **D.     The Disclosure Regarding The 2009 Golf Course/Park Bonds Is Inadequate.**

12            As noted above, the Plan is premised on the rejection of the "Golf Course/Park Lease Out"

13   and "Golf Course/Park Lease Back" and the limitation of the Golf Course/Park Claims to a

14   maximum of three years of "rent" pursuant to section 502(b)(6) of the Bankruptcy Code, without

15   payment of any administrative rent.  Disclosure Statement at 33, 57-58.  Through the Adversary

16   Proceeding, Franklin has requested a declaration that the applicable agreements are not unexpired

17   leases of nonresidential real property within the meaning of sections 365 and 502(b)(6) of the

18   Bankruptcy Code, together with valuation of the collateral securing the Golf Course/Park Claims

19   and, alternatively, a claim for administrative rent.

20            Notably, the Plan does not account for the allowance of the Golf Course/Park Claims in the

21   full uncapped amount, the allowance of any secured portion of those claims, or the allowance and

22   payment of administrative rent.  The Disclosure Statement should disclose the existence of the

23   Adversary Proceeding and address the impact of a judgment adverse to the City, resulting in some or

24   all of the relief sought by Franklin, on the confirmation and feasibility of the Plan.

25            In addition, the Disclosure Statement states, without further explanation, that "the City may

26   contest or attempt to impose conditions upon" continued possession of the Golf Course/Park

27   Properties by the 2009 Golf Course/Park Bond Trustee and Franklin.  Disclosure Statement at 59.

28

1   To the extent that the City asserts that there exist conditions or limitations on such possession other

2   than as set forth in the documents governing the 2009 Golf Course/Park Bonds, the City should

3   specify those alleged conditions and limitations and the grounds for the City's assertion in this

4   regard.  Otherwise, the City's statement that it may contest or attempt to impose limitations on

5   continued possession of the Golf Course/Park Properties is misleading, as it offers creditors and

6   other constituents false hope that Franklin and the 2009 Golf Course/Park Bond Trustee will be

7   unable to take possession or otherwise exercise their remedies under the operative documents.

8   **E.    Issues Related To Certain Relief Requested In The Motion.**

9           Finally, two other deficiencies with respect to the relief requested in the Motion warrant the

10  Court's attention.  First, the Motion seeks approval of various notice procedures related to the

11  Confirmation Hearing, including the approval of the form of Confirmation Notice and form of ballot.

12  Motion at 3, 5-6.  The Motion, however, does not attach a form of Confirmation Notice, nor does it

13  indicate that a form of notice will be submitted or shared with parties in interest prior to the hearing

14  on the Solicitation Motion.  Regarding the form of ballot, the City has "propose[d] to use Official

15  Form No. 14 as the ballot model for all creditors entitled to vote" and to "seek input from other

16  parties . . . regarding the proposed form of ballot before submitting it for the Court's approval," *id*.

17  at 7, but no form of ballot has been filed or shared with Franklin to date (despite a request made

18  more than two weeks ago).  The Court should require the City to provide Franklin with the proposed

19  forms prior to the approval of same.

20          Second, the Motion assumes that the Disclosure Statement will be approved by the Court on

21  November 18 and seeks approval of a confirmation schedule based upon that date.  Under the

22  proposed schedule, the City contemplates that objections to confirmation of the Plan would be due

23  on or around December 30, 2013, *id*. at 5-6, right between the Christmas and New Year holidays.

24  Given the holidays and contested nature of confirmation, this is not a reasonable deadline.

25          Franklin and the City are in the process of discussing an agreed-upon discovery and pre-trial

26  schedule, and Franklin hopes to reach agreement with the City regarding an appropriate schedule

27

28

FRANKLIN'S DISCLOSURE
STATEMENT OBJECTION

1   before the hearing on the Motion.  Otherwise, Franklin will be prepared to discuss scheduling and

2   related matters at that hearing.

3

4                                **RESERVATION OF RIGHTS**

5          Franklin reserves all rights to object to the Plan on any and all grounds, including, without

6   limitation, those not mentioned in this Objection.

7

8                                    **CONCLUSION**

9          For the reasons set forth above, the Disclosure Statement lacks adequate information.

10  Franklin therefore requests that the Court deny the approval of the Motion unless the modifications

11  to the Disclosure Statement and notice and objection procedures identified herein are corrected by

12  the City and grant such other and further relief as this Court may deem just, proper and equitable.

13

14  Dated:  November 7, 2013                    JONES DAY

15

16                                      By:    */s/ James O. Johnston*
                                               James O. Johnston
17                                             Joshua D. Morse

18                                             *Attorneys for Franklin High Yield Tax-Free*
                                               *Income Fund and Franklin California High*
19                                             *Yield Municipal Fund*

20

21

22

23

24

25

26

27

28

                                                                    FRANKLIN'S DISCLOSURE
                                                                    STATEMENT OBJECTION
                                    - 17 -