**31**

1  MARC A. LEVINSON (STATE BAR NO. 57613)
   malevinson@orrick.com
2  NORMAN C. HILE (STATE BAR NO. 57299)
   nhile@orrick.com
3  PATRICK B. BOCASH (STATE BAR NO. 262763)
   pbocash@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
5  Sacramento, California  95814-4497
   Telephone:    +1-916-447-9200
6  Facsimile:    +1-916-329-4900
7  JEFFERY D. HERMANN (STATE BAR NO. 90445)
   jhermann@orrick.com
8  JOHN A. FARMER (STATE BAR NO. 242775)
   jfarmer@orrick.com
9  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street, Suite 3200
10 Los Angeles, California 90017-5855
   Telephone:    +1-213-629-2020
11 Facsimile:    +1-213-612-2499
12 Attorneys for Debtor
   City of Stockton

13

14                     UNITED STATES BANKRUPTCY COURT

15                      EASTERN DISTRICT OF CALIFORNIA

16                           SACRAMENTO DIVISION

17

| | |
|---|---|
| In re: | Case No.  2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | Chapter 9 |
| Debtor. | D.C. No. OHS-15 |
| | **CITY'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA (NOVEMBER 15, 2013)** |
| | <u>**Initial Confirmation Hearing / Status Conference**</u> |
| | Date:      March 5, 2014 |
| | Time:      9:30 a.m. |
| | Dept       Courtroom 35 |
| | Judge:     Hon. Christopher M. Klein |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................. 1

II.   PROCEDURAL BACKGROUND ......................................... 3

III.  STATEMENT OF FACTS .................................................... 3

IV.   ARGUMENT ....................................................................... 4

    A.    The Plan Complies with the Provisions of Title 11 Made Applicable in Chapter 9 (Section 943(b)(1)) ................................................................. 4

        1.    Section 1122:  Classification of Claims and Interests ................................ 4

            a.    Separate Classification of Claims ...................................... 6

            b.    Each Class Only Contains Substantially Similar Claims ................ 7

            c.    Pension Obligation Bonds Claims ...................................... 7

        2.    Section 1123:  The Plan Contains All Mandatory Provisions and Three Permitted Provisions ................................................................. 8

            a.    Section 1123(a):  Mandatory Plan Provisions ................................ 9

                (i)    Section 1123(a)(1):  The Plan Designates Classes of Claims ................ 9

                (ii)    Section 1123(a)(2):  The Plan Lists All Unimpaired Claims ................ 9

                (iii)    Section 1123(a)(3):  The Plan Describes the Treatment of Impaired Classes ................ 9

                (iv)    Section 1123(a)(4):  The Plan Provides the Same Treatment for Each Claim or Interest within a Class ........ 10

                (v)    Section 1123(a)(5):  The Plan Includes Adequate Means for Its Implementation ........ 10

            b.    Section 1123(b):  Permitted Plan Provisions ................................ 11

                (i)    Section 1123(b)(1):  Impairment/Nonimpairment ................ 11

                (ii)    Section 1123(b)(2):  Assumption/Rejection of Executory Contracts and Unimpaired Leases ................ 11

                (iii)    Section 1123(b)(3):  Claims Belonging to Debtor ................ 12

        3.    Section 1129(a)(2):  The City Has Complied with the Applicable Provisions of Title 11 ................ 12

        4.    Section 1129(a)(3):  The City Has Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law ................ 13

        5.    Section 1129(a)(6):  The City Is Not Subject to the Jurisdiction of Any Governmental Regulatory Commission Regarding Its Rates .......... 15

        6.    Section 1129(a)(8):  The Plan Has Been Accepted by All Classes Whose Acceptance Is Required ................ 15

        7.    Section 1129(a)(10):  The Plan Has Been Accepted by an Impaired Class ................ 16

# TABLE OF CONTENTS

Page

8.    Section 1129(b):  Confirmation of the Plan over the Non-Acceptance of Impaired Classes ............................................................ 17

B.    The Plan Complies with the Provisions of Chapter 9 (Section 943(b)(2)) ........... 18

C.    All Amounts to Be Paid by the City or by Any Person for Services or Expenses in the Case Have Been Fully Disclosed and Are Reasonable (Section 943(b)(3)) ................................................................................................ 18

D.    The City Is Not Prohibited by Law from Taking Any Action Necessary to Carry Out the Plan (Section 943(b)(4)) .......................................................... 19

E.    The Plan Provides for Payment of Administrative Claims (Section 943(b)(5)) ................................................................................................ 19

F.    The City Has Obtained Any Regulatory or Electoral Approval Necessary Under Applicable Non-Bankruptcy Law (Section 943(b)(6)) ............................ 20

G.    The Plan Is in the Best Interests of Creditors and Is Feasible (Section 943(b)(7)) ............................................................................................................ 21

1.    The Plan Is in the Best Interests of the City's Creditors .......................... 22

2.    The Plan Is Feasible ................................................................................ 24

V.    CONCLUSION ................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n of Retired Employees of the City of Stockton v. City of Stockton (In re City of Stockton)*,
    478 B.R. 8 (Bankr. E.D. Cal. 2012) ................................................................................ 20

*Barakat v. Life Ins. Co. of Va. (In re Barakat)*,
    99 F.3d 1520 (9th Cir. 1996) .......................................................................................... 5

*In re City of Colo. Springs Spring Creek Gen. Improv. Dist.*,
    177 B.R. 684 (Bankr. D. Colo. 1995) .......................................................................... 21

*In re City of San Bernardino*,
    499 B.R. 776 (Bankr. C.D. Cal. 2013) ........................................................................... 7

*In re City of Stockton*,
    493 B.R. 772 (Bankr. E.D. Cal. 2013) ........................................................................ 14

*In re City of Vallejo*,
    403 B.R. 72 (Bankr. E.D. Cal. 2009) ........................................................................... 19

*In re City of Vallejo*,
    No. 08-26813-A-9, 2008 WL 4180008 ........................................................................... 7

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ........................................................................................... 5

*In re Connector 2000 Ass'n, Inc.*,
    447 B.R. 752 (Bankr. D.S.C. 2011) ........................................................... 4, 12, 14, 18

*Diamond Z Trailer v. JZ L.L.C. (In re JZ L.L.C.)*,
    371 B.R. 412 (B.A.P. 9th Cir. 2007) ..................................................................... 11, 19

*Duffy v. U.S. Trustee (In re Cal. Fid.)*,
    198 B.R. 567 (B.A.P. 9th Cir. 1996) ........................................................................... 12

*Faitoute Iron & Steel Co. v. City of Asbury Park*,
    316 U.S. 502, 510 (1942) .............................................................................................. 22

*Koelbl v. Glessing (In re Koelbl)*,
    751 F.2d 137 (2nd Cir. 1984) ....................................................................................... 15

*In re Loop 76, LLC*,
    465 B.R. 525 (B.A.P. 9th Cir. 2012) ............................................................................. 5

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ........................................................................... 22

*In re New York City Off-Track Betting Corp.*,
  434 B.R. 131 (Bankr. S.D.N.Y. 2010) ................................................................. 20

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,
  314 F.3d 1070 (9th Cir. 2002) .......................................................................... 13

*Rider v. City of San Diego*,
  18 Cal. 4th 1035 (1998) ...................................................................................... 7

*Sandra L. Stolrow, Inc. v. Stolrow's, Inc. (In re Stolrow's Inc.)*,
  84 B.R. 167 (B.A.P. 9th Cir. 1988) .................................................................... 13

*In re Sanitary & Improv. Dist. No. 7*,
  98 B.R. 970 (Bankr. D. Neb. 1989) ................................................................... 19

*Steelcase Inc. v. Johnston (In re Johnston)*,
  21 F.3d 323 (9th Cir. 1993) ................................................................................. 5

*In re Texas Wyoming Drilling, Inc.*,
  486 B.R. 746 (Bankr. N.D. Tex. 2013) ............................................................... 20

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984) .................................................................. 12

*In re Valley Health Sys.*,
  429 B.R. 692 (Bankr. C.D. Cal. 2010) ............................................................... 20

*In re Wabash Valley Power Ass'n*,
  72 F.3d 1305 (7th Cir. 1995) ............................................................................... 5

**Statutes**

11 U.S.C.

  § 503(b)(1)(A) .............................................................................................. 19, 20

  § 541 ................................................................................................................... 20

  § 901(a) ............................................................................................................ 8, 9

  § 941 ................................................................................................................... 18

  § 942 ................................................................................................................... 18

  § 943(b) ............................................................................................................ 4, 25

  § 943(b)(3) ......................................................................................................... 18

  § 943(b)(7) ...................................................................................................... 21, 25

  § 1122(a) .......................................................................................................... 4, 5

§ 1123(a)(1) ................................................................................................. 9

§ 1123(a)(3) ................................................................................................. 9

§ 1125 ....................................................................................................... 12

§ 1125(b) ............................................................................................. 12, 13

§ 1126 ....................................................................................................... 12

§ 1126(a) ................................................................................................... 12

§ 1126(c) ................................................................................................... 16

§ 1126(f) ................................................................................................... 16

§ 1129(a)(8) ....................................................................................... 15, 16

§ 1129(b)(1) .............................................................................................. 17

**Other Authorities**

Cal. Const. art. 13A, § 1(a) ....................................................................... 23

*Collier on Bankruptcy*

¶ 943.03 ...................................................................................................... 4

¶ 943.03[1] ................................................................................................. 4

¶ 943.03[1][a] ........................................................................................... 12

¶ 943.03[1][b] ........................................................................................... 13

¶ 943.03[2] ............................................................................................... 18

¶ 943.03[3] ............................................................................................... 19

¶ 943.03[4] ............................................................................................... 19

¶ 943.03[7][a] ........................................................................................... 22

¶ 943.03[7][b] ........................................................................................... 24

H.R. REP. NO. 95-595, at 412 (1977) ........................................................ 12

S. REP. NO. 95-989 (1978) ........................................................................ 12

1    **I.    INTRODUCTION**

2         On July 11, 2012, two weeks after the City of Stockton (the "**City**") filed its petition

3    initiating this chapter 9 case, this Court appointed United States Bankruptcy Judge Elizabeth

4    Perris to serve as a judicial mediator [Dkt. No. 384].   By the fall of that year, the City and the

5    capital markets creditors were battling over the City's eligibility for chapter 9 relief.  At a hearing

6    conducted on October 30, 2012, concerning the use of evidence from the pre-bankruptcy AB 506

7    mediation conducted by former bankruptcy judge Ralph Mabey, the Court said the following:

> 8         Again I come back to the proposition that my experience in Chapter 11 cases has
>       been that the successful Chapter 11 cases are mostly negotiations in which most
> 9    of the parties agree to something, and to the extent that we have to use the fear of
>       the cram-down power, it really is to deal with a small group of hold-outs.  When
> 10   I translate the model to Chapter 9 and look at the attenuated powers of the
>       bankruptcy court in a Chapter 9 case, that causes me to conclude that the Chapter
> 11   11 negotiation model applies to Chapter 9 on steroids.  So that's exactly why I've
>       been proceeding as I've been proceeding.
> 12

13   Transcript of the hearing of October 30, 2012, at page 19, lines 7-18.

14        As the Court is well aware, the eligibility battle became a war, replete with time-

15   consuming and costly discovery, culminating with a three-day evidentiary hearing in March of

16   2013.  In the fall of 2012 and the winter of 2013, while the eligibility dispute was playing out, the

17   City engaged in mediation with a number of creditors, including the capital markets creditors, and

18   in settlement discussions with Ambac, a monoline insurer.  The mediation discussions with the

19   capital markets creditors intensified after the Court's April 1 oral ruling on eligibility.  After

20   months of intense negotiations orchestrated by Judge Perris, the City reached agreement on term

21   sheets with NPFG[1] and Assured Guaranty, the two capital markets creditors who spearheaded the

22   eligibility contest.  Under the auspices of Judge Perris, the City also reached agreement with the

23   SPOA, with the Retirees Committee, with Marina Towers, and with the Price Judgment Creditors.

24   Despite the best efforts of Judge Perris, there is no agreement between the City and Franklin,

25   which has filed and is prosecuting an adversary proceeding against the City [Adv. No. 13-

26

---

27   [1] Any capitalized term used but not defined herein shall have the meaning ascribed to it in the First Amended Plan for
     the Adjustment of Debts of City of Stockton, California (November 15, 2013) (the "**Plan**").  Dkt. No. 1204.  Unless

28   otherwise noted, all references to a "section" are to a section of title 11 of the United States Code (the "**Bankruptcy
     Code**").

CITY'S MEMORANDUM OF LAW IN SUPPORT OF
                                      CONFIRMATION OF FIRST AMENDED PLAN

02315-C] (the "**Adversary**"), which unsuccessfully objected to the City's proposed disclosure statement, and which long ago announced its intention to object to the City's plan of adjustment.[2]

For the reasons explained in this memorandum (the "**Memorandum**"), the City submits that the Court should confirm the Plan.  It should do so not because the Court's October 2012 vision of the case has proven true, although the fact that the City and its creditors have reached settlements is certainly relevant to some of the confirmation considerations.  Rather, the Court should confirm the Plan because the City will demonstrate that it has satisfied each of the Bankruptcy Code's confirmation requirements.

The stakes for the City, its creditors, and its employees are high.  Unlike a corporate chapter 11 debtor, a city in chapter 9 cannot be allowed to fail—the adverse consequences for all stakeholders are potentially catastrophic.  That is why the City and its major creditors, along with their professional advisors, have devoted thousands of hours to negotiating a Plan that is in their best interests, that is feasible, and that treats all constituencies fairly while providing a viable, long-term framework for the operation of the City.

In addition, the passage of both Measure A and Measure B by the Stockton voters in November of 2013—approximately a month after the filing of the first version of the proposed plan and disclosure statement—demonstrates that the Plan enjoys the support of the City's leaders and a majority of its residents, who recognize that, despite the sacrifices they will be required to endure, the Plan is the foundation for a fiscally secure future.  Indeed, the Plan has been carefully crafted to offer the greatest and earliest possible recoveries to the City's creditors while providing adequate police and fire protection to its residents and enabling the City to maintain streets and highways, to treat its employees and retirees fairly, and to create an environment in which its residents can prosper.

/ / /

/ / /

---

[2] The City filed the Plan on November 15, 2013.  Dkt. No. 1204.  It filed the Modified Disclosure Statement with Respect to First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) (the "**Disclosure Statement**") on November 21, 2013.  Dkt. No. 1215.  The Disclosure Statement was approved in an order filed on November 22, 2013.  Dkt. No. 1220 (the "**Disclosure Statement Order**").

II.    **PROCEDURAL BACKGROUND**

The Confirmation Hearing and the briefing schedule in connection therewith originally were set forth in the Disclosure Statement Order.  Dkt. No. 1220.  On December 10, 2013, the Court issued its Order Governing the Disclosure and Use of Discovery Information and Scheduling Dates, Etc. [Dkt. Nos. 1224 and 16, respectively] (the "**Scheduling Order**").  Among other things, the Scheduling Order supplemented the schedule set forth in the Disclosure Statement Order.  Subsequently, certain of these dates were further revised by stipulation of the parties.

The City was originally required to file and serve this Memorandum, which represents the City's initial statement on confirmation, no later than January 27, 2014.  Dkt. No. 1220 ¶ 13; Dkt. No. 1224 ¶ 52.  Pursuant to the Order Modifying Order Governing the Disclosure and Use of Discovery Information and Scheduling Dates, Etc., this deadline was extended to February 3, 2014.  Dkt. No. 1242 ¶ 3.  The deadline by which any party that sought discovery from the City may serve and file a timely objection to the confirmation of the Plan is February 26, 2014.  *Id.* The Court will conduct a status conference in both the Chapter 9 Case and the Adversary on March 5, 2014.  Dkt. No. 1224 ¶ 38.  The City may file a supplemental memorandum in support of the Plan (the "**Supplemental Memorandum**") no later than March 31, 2014; any party or third party that filed a timely objection to the confirmation of the Plan may file a supplemental objection to confirmation no later than April 21, 2014; and supplemental responsive pleadings to any objection to confirmation of the Plan may be filed no later than April 28, 2014.  Dkt. No. 1242 ¶ 7.  The Confirmation Hearing as well as the trial in the Adversary are scheduled to commence on May 12, 2014 at 9:30 a.m.  Dkt. No. 1242 ¶ 19.

III.    **STATEMENT OF FACTS**

Pertinent facts are set forth in the Disclosure Statement.  Additional facts—the scope of which will depend in part on Franklin's and any other opposition—will be set forth in the Supplemental Memorandum and any supporting declarations, as well as by testimony and declarations that may be adduced or submitted at the hearing on the confirmation of the Plan.

/ / /

**IV.      ARGUMENT**

A bankruptcy court "shall" confirm a plan of adjustment if the debtor has satisfied all the applicable confirmation requirements set forth in section 943(b) by a preponderance of the evidence.  *See In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 761 (Bankr. D.S.C. 2011). Section 943(b) lists seven conditions to confirmation.  11 U.S.C. § 943(b); *Collier on Bankruptcy* ¶ 943.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("While the section does not state that the court may confirm a plan *only if* all of these seven requirements are met, the strong implication is that the satisfaction of the same is necessary to confirmation.") (emphasis in original) (further references to this edition are cited as "***Collier***").  As demonstrated below, the Plan meets each of the seven confirmation requirements.

**A.      The Plan Complies with the Provisions of Title 11 Made Applicable in Chapter 9 (Section 943(b)(1)).**

Section 943(b)(1) requires that a plan of adjustment "compl[y] with the provisions of this title made applicable by sections 103(e) and 901 of this title."  The chapter 11 provisions made applicable by section 901 to the confirmation of a plan of adjustment include sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1123(d), 1124, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), and 1129(b)(2)(B).  Of these, perhaps the most important are those provisions of section 1129 that are made applicable in chapter 9 cases.  *See Collier* ¶ 943.03[1].  The Memorandum will discuss each of the section 1129 requirements as applicable to the Plan after its discussion of the Bankruptcy Code's other applicable requirements.

**1.      Section 1122:  Classification of Claims and Interests.**

Section 1122(a) provides that, except for administrative convenience classes dealt with in section 1122(b), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).

Separate classification of unsecured claims is permissible when the legal character of the respective claims is different, as long as the purpose of separate classification is not to secure the vote of an impaired, consenting class of claims.  *See Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1525 (9th Cir. 1996) (holding that even though similar claims may be placed in different classes, claims may not be classified separately solely to manipulate class voting); *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 328 (9th Cir. 1993) (citing *In re Los Angeles Land and Invs.*, 282 F. Supp. 448, 453-54 (D. Haw. 1968), for the proposition that "separate classifications of unsecured creditors justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors'"); *In re Loop 76, LLC*, 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012) (upholding separate classification).

Further, debtors and bankruptcy courts have considerable discretion in classifying claims under section 1122.  *See Steelcase Inc.*, 21 F.3d at  327 ("bankruptcy court judges must have discretionary power in classifying claims under *§ 1122(a)*") (emphasis in original); *see also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) (holding that section 1122(a) requires that a claim be classified in a particular class only if it is substantially similar to the other claims in that class, but it does not require that all similar claims be in the same class, and holding further that the bankruptcy court has substantial discretion to place similar claims in different classes); *In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1321 (7th Cir. 1995) (a debtor has "considerable discretion" to classify claims in a reorganization plan, and although a debtor may not separately classify claims solely to gerrymander affirmative votes, claims may be separately classified if significant differences exist between the legal rights of the holders that render the claims not substantially similar, if there are good business reasons to do so, or if the claimants have sufficiently different interests in the plan).

/ / /

/ / /

/ / /

CITY'S MEMORANDUM OF LAW IN SUPPORT OF
CONFIRMATION OF FIRST AMENDED PLAN

a.      **Separate Classification of Claims.**

The Plan provides for separate classification of Claims based on the differences in the nature of these Claims:

Class 1A:  Claims of Ambac – 2003 Fire/Police/Library Certificates.

Class 1B:  Claims of Holders of 2003 Fire/Police Library Certificates.

Class 2:  SEB Claims of the 2006 SEB Bond Trustee/NPFG – 2006 SEB Bonds.

Class 3:  Arena Claims of the 2004 Arena Bond Trustee/NPFG – 2004 Arena Bonds.

Class 4:  Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG – 2004 Parking Bonds.

Class 5:  Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty – 2007 Office Building Bonds.

Class 6:  Pension Obligation Bonds Claims.

Class 7:  Claims of DBW.

Class 8:  SCC 16 Claims.

Class 9:  Thunder Claims.

Class 10:  Claims of Holders of Restricted Revenue Bond and Note Payable Obligations.

Class 11:  Claims of Holders of Special Assessment and Special Tax Obligations.

Class 12:  General Unsecured Claims.

Class 13:  Convenience Class Claims.

Class 14:  Claims of Certain Tort Claimants.

Class 15:  Claims Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS, as Trustee under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants.

Class 16:  Claims of Equipment Lessors.

Class 17:  Workers Compensation Claims.

Class 18:  SPOA Claims.

Class 19:  Price Claims.

b.      **Each Class Contains Only Substantially Similar Claims.**

Each Claim in each particular Class is substantially similar to the other Claims in such Class.  Accordingly, the classification of Claims in the Plan complies with section 1122.

c.      **Class 6:  Pension Obligation Bonds Claims.**

Based on the discovery recently propounded by Franklin, the City anticipates that Franklin may argue that the Pension Obligation Bonds Claims are not validly classified in the Plan.  The City submits that the Pension Obligation Bonds Claims are validly classified separately from other General Unsecured Claims because they have a different legal character and because there are good business reasons to do so.  The Pension Obligation Bonds funded the payment of pension benefits for City employees, including those current and retired City employees whose compensation and benefits were paid by monies from the General Fund and those employees whose compensation and benefits were paid from Restricted Funds.  Such Restricted Funds may not lawfully pay General Fund obligations unrelated to such Restricted Funds.  *See In re City of Vallejo*, No. 08-26813-A-9, 2008 WL 4180008, at Findings of Fact 34-36, 40, 42, 54, 61-63, and 106g (Bankr. E.D. Cal. Sept. 5, 2008), *aff'd.* 408 B.R. 280, 285, 293 (B.A.P. 9th Cir. 2009); *In re City of San Bernardino*, 499 B.R. 776, 789 (Bankr. C.D. Cal. 2013); *Rider v. City of San Diego*, 18 Cal. 4th 1035, 1046 (1998).

The ratio of City employees compensated solely or partially from the General Fund and those compensated from Restricted Funds varies from year to year, depending, among other things, on the number of employees and the positions that they fill.  The City believes that about 17% funding of pension obligations from Restricted Funds is a reasonable estimate based on historical and projected data.  Because approximately 17% of the City's pension obligations may lawfully be funded by special fund revenue, such revenues may be used to pay 17% of the debt service obligations on the Pension Obligation Bonds, and the settlement with Assured Guaranty involving the Pension Obligation Bonds provides for such payment.  Thus, the legal character of the Pension Obligation Bonds is different than the legal character of the Class 12 General Unsecured Claims, and it is therefore appropriate for the City to separately classify the Pension Obligation Bonds.

Further, Assured Guaranty (the insurer of the Pension Obligation Bonds) has asserted that the Pension Obligation Bonds have special status because they represent the same underlying liability as the City's other pension funding obligations (which are being assumed under the Plan) and are thus obligations imposed by law (which the City confirmed at the time of issuance of the Pension Obligation Bonds through a validation action under California Code of Civil Procedure section 860 *et seq.*).  While the City has disputed and does dispute such contention, that theory has not been settled by any case law, and it is possible that a court would agree with Assured Guaranty.  In order to avoid the risk of litigation against and appeal by a well-represented and well-funded opponent, the City, exercising its business judgment, agreed to a settlement that reflects to some extent the risk that it might have to pay 100% on the Pension Obligation Bonds Claims.  For this additional reason, the Pension Obligation Bonds may be classified separately from the Class 12 General Unsecured Claims.

Finally, Assured Guaranty also holds Claims against the City relating to the 400 East Main Street Office Building Property, a commercial office building that the City had intended to become its new City Hall.  After arduous negotiations under the auspices of Judge Perris, the City agreed to settle the disputes as to both the Pension Obligation Bonds and the 400 East Main Street Office Building Property, including what the City believes is a very favorable lease of a portion of that property.  The New 400 E. Main Lease will provide the City with a functioning City Hall through at least June 30, 2022.  The City believes that Assured Guaranty would not have entered into the New 400 E. Main Lease on the same terms had it not reached an acceptable settlement on the Pension Obligation Bonds Claims.  Therefore, the City had an additional business justification for separately classifying these Claims.

### 2. Section 1123:  The Plan Contains All Mandatory Provisions and Three Permitted Provisions.

Section 1123(a) sets forth seven requirements which every chapter 11 plan must satisfy in order to be confirmed.  The first five are incorporated into chapter 9:  1123(a)(1)-(5).  11 U.S.C. § 901(a).  Section 901 also incorporates into chapter 9 the permissive provisions of

section 1123(b), several of which apply to the Plan.  As demonstrated below, the Plan fully complies with each of these requirements.

          **a.**        **Section 1123(a):  Mandatory Plan Provisions.**

                   **(i)**        **Section 1123(a)(1):  The Plan Designates Classes of Claims.**

      Section 1123(a)(1) requires a plan to designate classes of claims, other than claims of a kind specified in sections 507(a)(2), 507(a)(3), or 507(a)(8), and classes of interests. 11 U.S.C. § 1123(a)(1).  In a chapter 9 case and plan of adjustment, of course, there are no interests.  Moreover, sections 507(a)(3) and 507(a)(8) are not applicable in a chapter 9 case. 11 U.S.C. § 901(a).  Section III of the Plan designates 19 Classes of Claims (excluding Administrative Claims and Professional Claims, which need not be classified).  As described above in the discussion of section 1122, valid legal and business reasons exist for separately classifying the various Classes of Claims provided for in the Plan.  *See* § III.A.1 of this Memorandum.  Thus, the Plan satisfies the requirements of section 1123(a)(1).

                   **(ii)**       **Section 1123(a)(2):  The Plan Lists All Unimpaired Claims.**

      The Plan complies with the requirements of section 1123(a)(2) by specifying the Classes of Claims that are not impaired under the Plan, which are Classes 2, 8, 10, 11, 13, 15, 16, and 17. *See* Plan §§ IV.C., I., K., L., N., P., Q., R.

                   **(iii)**      **Section 1123(a)(3):  The Plan Describes the Treatment of Impaired Classes.**

      The Plan complies with the requirements of section 1123(a)(3) by specifying the treatment of impaired Classes of Claims, which are Classes 1A, 1B, 3, 4, 5, 6, 7, 9, 12, 14, 18, and 19.  *See* Plan §§ IV.A., B., D., E., F., G., H., J., M., O., S., T.

/ / /

/ / /

/ / /

/ / /

CITY'S MEMORANDUM OF LAW IN SUPPORT OF
CONFIRMATION OF FIRST AMENDED PLAN

    **(iv)**  **Section 1123(a)(4):  The Plan Provides the Same Treatment for Each Claim or Interest within a Class.**

  The Plan complies with the requirements of section 1123(a)(4) by providing for the same treatment for each Claim in each respective Class.  *See* Plan § IV.  In particular, the Class 12 General Unsecured Claims receive equal treatment within the Class in an amount equal to the Unsecured Claim Payout Percentage, which is equal to the percentage paid on account of the Retiree Health Benefit Claims.

    **(v)**  **Section 1123(a)(5):  The Plan Includes Adequate Means for Its Implementation.**

  The Plan complies with the requirements of section 1123(a)(5) by providing adequate means for its implementation.  The City prepared a detailed long-term financial plan that projects that, with the savings from the financial restructuring described in the Plan as well as new revenues, including projected new revenues from the passage of Measure A, the City will achieve a balanced and sustainable budget.  *See* Disclosure Statement, Exh. B at 1.

  The City will implement the Plan by continuing to operate, following the Effective Date, pursuant to the Charter of the City of Stockton, the California Constitution, and applicable state and federal laws.  *See* Plan § VII.  It also will continue to collect sales tax revenues, real property tax revenues, user utility taxes, and other taxes, fees, and revenues following the Effective Date.  Sales tax revenues will include approximately $28 million per year in new revenues as a result of the passage of Measure A in November 2013, which increased the sales tax from 8.25% to 9%.  *See* Disclosure Statement, Exh. B at 21.

  These revenues will enable the City to maintain and fund adequate municipal services, including fire and police protection, as well as to satisfy the City's obligations to its creditors as restructured pursuant to the Plan.  Toward this end, Measure B, which was also passed in November 2013, advises the City Council to use approximately 65% of the revenue generated by Measure A over time to enhance depleted police staffing and services under the Marshall Plan, and the remainder to fund the City's ongoing expenses, including the cost of implementing the Plan.

1          **b.**          **Section 1123(b):  Permitted Plan Provisions.**

2          Section 1123(b) sets forth the provisions that may, but need not, be incorporated into a

3    chapter 11 plan.  Each provision of the Plan is consistent with section 1123(b).

4

5          **(i)**          **Section 1123(b)(1):  Impairment/Nonimpairment.**

6          Section 1123(b)(1) provides that a plan may impair or leave unimpaired any class of

7    claims, secured or unsecured, or of interests. As stated in section III.A.2.a.(ii)-(iii) of this

8    Memorandum, the Plan specifies which Classes are impaired and which Classes are unimpaired.

9    *See also* Plan § IV.

10          **(ii)**          **Section 1123(b)(2):  Assumption/Rejection of Executory**
                          **Contracts and Unimpaired Leases.**
11

12          Section 1123(b)(2) provides that a plan may, subject to section 365, provide for the

13    assumption, rejection, or assignment of an executory contract or unexpired lease not previously

14    rejected.  In compliance with this provision, the Plan provides that the City will file motions to

15    reject certain unexpired leases and executory contracts and to assume certain unexpired leases and

16    executory contracts.  *See* Plan §§ VI.A., VI.C., VII.  The City will file a motion to reject the Golf

17    Course/Park Lease Out and the Golf Course/Park Lease Back, and it will file a motion to assume

18    the CalPERS Pension Plan.  The City may file motions seeking to assume or reject one or more of

19    the hundreds of executory contracts to which it is a party.  However, in light of the number of

20    contracts, the Plan provides that any Omitted Agreements shall be deemed assumed as of the

21    Effective Date, *provided*, *however*, that any non-debtor counter-party to any Omitted Agreement

22    may, within 63 days after receiving notice from the City that such agreement is being assumed,

23    file a motion in the Bankruptcy Court seeking an order reconsidering the assumption of the

24    agreement.  *See* Plan § VI.E.  To the extent that the City seeks neither to reject nor to assume a

25    particular executory contract or unexpired lease, such contract or lease will "ride through" this

26    bankruptcy case.  *See Diamond Z Trailer v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 422

27    (B.A.P. 9th Cir. 2007).

28    / / /

(iii)    **Section 1123(b)(3):  Claims Belonging to Debtor.**

Section 1123(b)(3) provides that a plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor, or the retention and enforcement by the debtor of any such claim or interest.  The Plan specifies that the City shall retain all of its claims, causes of action, rights of recovery, rights of offset, recoupment rights to refunds, and similar rights.  *See* Plan § VIII.

3.    **Section 1129(a)(2):  The City Has Complied with the Applicable Provisions of Title 11.**

Section 1129(a)(2) provides that a plan may be confirmed only if the plan proponent, which in chapter 9 can be only the debtor, complies with the applicable provisions of title 11. The legislative history to section 1129(a)(2) reveals that the purpose of this requirement is to include the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation.  *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989 (1978).

Section 1125(b) provides that a proponent may not solicit acceptances of its plan unless, at or before the time of such solicitation, there is transmitted to the solicitee a copy of the plan and a court-approved disclosure statement containing "adequate information."  11 U.S.C. § 1125(b); *Duffy v. U.S. Trustee (In re Cal. Fid.*), 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996); *see also In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 763 (Bankr. D.S.C. 2011); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("the proponent must comply with the ban on postpetition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126"); *Collier* ¶ 943.03[1][a]. Further, under section 1126, only holders of allowed claims may accept or reject a plan. 11 U.S.C. § 1126(a).

The City has complied with sections 1125 and 1126 regarding disclosure and plan solicitation.  In the Disclosure Statement Order, approved after notice and a hearing over the objection of Franklin, the Court ruled that the Disclosure Statement satisfied the requirements of section 1125(b).  Dkt. No. 1220 ¶¶ 1, 2. On or prior to December 13, 2013, the City served by mail the following documents on parties entitled to vote on the Plan (the documents, collectively,

constitute the "**Solicitation Package**"):  (a) the Plan; (b) the Modified Disclosure Statement; (c) the Disclosure Statement Order; (d) a letter from the Interim City Manager regarding the Plan; (e) notice of the Confirmation Hearing and related deadlines and procedures (the "**Confirmation Notice**"); and (f) a form of Ballot approved by the Court.  The City also timely mailed a Solicitation Package, with an appropriate Ballot, to each member of any Class impaired by the Plan:  Classes 1A, 1B, 3, 4, 5, 6, 7, 9, 12, 14, 18, and 19.[3]  *Id.*  These Classes are entitled to vote to accept or reject the Plan.  Plan § V.A.  Further, on January 27, 2014, the City filed and served on the special notice parties the Plan Supplement in Connection with the First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013).[4]  Dkt. No. 1236.  Thus, the City has complied with the requirements of section 1129(a)(2).

> ### 4.  Section 1129(a)(3):  The City Has Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law.

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  "What constitutes 'good faith' must be determined on a case by case basis, based upon the totality of the circumstances.  The determination of what constitutes 'good faith' based upon the totality of the circumstances in a particular case will necessarily be a *sui generis* fact-dependent exercise."  *Collier* ¶ 943.03[1][b].  Generally, a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed by the Bankruptcy Code.  *See Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).  It also requires a fundamental fairness in dealing with one's creditors, *see Sandra L. Stolrow, Inc. v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988), though the fact that a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding, *Sylmar Plaza*, 314 F.3d at 1075.

In the chapter 9 context, courts have found that the good faith requirement is satisfied by a showing that the debtor has disclosed all material information and is using chapter 9 to restructure

---

[3] Those holders of Class 12 Claims that hold Retiree Health Benefit Claims also received a letter from the Retirees Committee.
[4] Rust Omni served compact discs containing the Plan Supplement on all other parties entitled to vote on the Plan on January 30, 2014.

1    its debts and provide its creditors the potential for the greatest economic return from its assets.

2    *See In re Connector 2000 Ass'n, Inc.*, 447 B.R. at 763.

3        The Plan satisfies the good faith standard.  Ever since the City filed its petition for relief

4    under chapter 9, as well as in the months preceding the filing, the City's actions have

5    demonstrated good faith.  In its opinion decreeing that the City was eligible for relief under

6    chapter 9, the Court both recognized that the City was insolvent and also stated that it was

7    "persuaded by a preponderance of the evidence that the City 'desires to effect a plan to adjust

8    such debts' within the meaning of *§ 109(c)(4)* and, in view of its unilateral contract impairments

9    imposed by way of its pendency plan, has little choice but to effect a plan."  *In re City of*

10   *Stockton*, 493 B.R. 772, 787, 792 (Bankr. E.D. Cal. 2013) (emphasis in original).  Further, the

11   Court held that the City participated in the neutral evaluation process required by California law

12   in good faith, *id.* at 784-85, and negotiated with its unions and the capital markets creditors in

13   good faith, *id.* at 793.  In addition, it held that the City filed its chapter 9 petition in good faith:

14       In view of the multi-year effort to ratchet down expenses during which the city
         reduced employees and reduced employee compensation, its cash insolvency, its
15       service insolvency, its good faith negotiations or efforts to negotiate with
         creditors, and its inability to achieve significant further reductions without being
16       able to compel the impairment of contracts, the *§ 921(c)* good faith presumption
         in this instance is strong.
17

18   *Id.* at 795 (emphasis in original).

19       Further, sharing the Court's belief expressed in October 2012 (s*ee* page 1 of this

20   Memorandum) and its statement in the eligibility opinion that "successful reorganizations entail

21   substantial agreement among most of the parties," 493 B.R. at 783, the City's management team

22   and its outside professionals have devoted thousands of hours to negotiating with the City's

23   creditors, largely facilitated by Judge Perris, to reach settlement agreements.  This effort has

24   resulted in agreements with three of the four capital markets creditors[5] (Ambac, Assured

25   Guaranty, and NPFG) as well as all nine of the City's organized labor groups, the Retirees

26   Committee, DBW (Class 7), the Thunder (Class 9), SPOA (Class 18), the Price Judgment

27

28   _____
     [5] The settlements with the capital markets creditors necessarily include Wells Fargo, acting in its role as indenture trustee for the certificate holders and bond holders of issues insured by the capital markets creditors.

1    Creditors (Class 19), and the Ports (which may be the subject of a future modification of the

2    Plan).  In addition, NPFG, based on its settlement with the City, was able to reach a settlement

3    with the City's sub-sublessee of the parking garages, SCC 16, which is unimpaired in Class 8.

4    The only major creditor with which the City has been unable to reach an agreement is

5    Franklin, which has drawn battle lines by filing the Adversary and propounding discovery not

6    only on the City, but also on the Retirees Committee, Assured Guaranty, NPFG, Ambac,

7    CalPERS, and the company that manages the City's golf courses (the leases of which are subject

8    to a security interest in favor of Wells Fargo, as indenture trustee for the bond issuance that

9    Franklin purchased).

10   The City's almost completely[6] successful effort to replace confrontation with consensus

11   provides ample basis for this Court to conclude that "the plan was proposed with 'honesty and

12   good intentions.'"  *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2nd Cir. 1984) (quoting

13   *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2nd Cir. 1935).  The City has thus satisfied the

14   requirements of section 1129(a)(3).

15           **5.      Section 1129(a)(6):  The City Is Not Subject to the Jurisdiction of Any
16                     Governmental Regulatory Commission Regarding Its Rates.**

17   The City is not subject to any governmental rate-setting commission, and

18   section 1129(a)(6) is therefore not applicable.

19           **6.      Section 1129(a)(8):  The Plan Has Been Accepted by All Classes Whose
20                     Acceptance Is Required.**

21   Subject to the exceptions set forth in section 1129(b), including the cramdown

22   requirements discussed below, section 1129(a)(8) requires that each class of claims or interests

23   vote to accept a plan or that such class is not impaired under a plan.  11 U.S.C. § 1129(a)(8).  An

24   impaired class of claims accepts the plan if the holders of at least two-thirds in dollar amount and

25

---

26   [6] The City has reached agreements with Ambac (approximately $12,625,000), Assured (approximately
     $164,635,000), NPFG (approximately $88,860,000), and the Retired Health Benefit Claimants (approximately
27   $545,000,000), among other claimants.   The rounded cumulative amount of these Claims is $811,000,000.  The sole
     holdout among the major creditors is Franklin.   The face value of Franklin's Claim is approximately $35,080,000, but
28   after the City rejects the Golf Course/Park Lease Back and the Golf Course/Park Lease Out, section 502(b)(6) will
     reduce the Allowed amount of Franklin's Claim to approximately $10,000,000.

more than one-half number, in each case of only the voted claims (i.e., not counting those claims that fail to vote on the plan), vote to accept the plan.  11 U.S.C. § 1126(c).  A class that is not impaired is deemed to have accepted the plan.  11 U.S.C. § 1126(f).

Classes 2, 8, 10, 11, 13, 15, 16, and 17 are Unimpaired.  Thus, these Classes are deemed to have accepted the Plan.  11 U.S.C. § 1126(f).

Classes 1A, 1B, 3, 4, 5, 6, 7, 9, 12, 14, 18, and 19A are Impaired.  As such, these Classes are entitled to vote.  The deadline by which holders of Impaired Claims must vote to accept or reject the Plan in order for their Ballots to be counted is February 10, 2014.  Dkt. No. 1220 ¶ 11.

As of the date hereof, not all eligible Claimants in the Impaired Classes have submitted their Ballots.  However, many have.  As of January 31, 2014, Class 12, which includes Wells Fargo (as indenture trustee for the 2009 Golf Course/Park Bonds owned by Franklin), holders of Retiree Health Benefits Claims, and other general unsecured creditors not eligible for payment from one of the City's excess risk-sharing pools, has voted as follows (note that Wells Fargo, which votes Franklin's Class 12 Claim, has not yet voted):

| Voting Results for Class 12 through January 31, 2014 | | | |
|---|---|---|---|
| Number of Claimants Voting Yes; Percentage of Yes Votes | Number of Claimants Voting No; Percentage of No Votes | Monetary Amount of Claims Voting Yes; Percentage of Yes Votes | Monetary Amount of Claims Voting No; Percentage of No Votes |
| 915 votes; 98.81% | 11 votes; 1.19% | $447,054,601; 98.72% | $5,793,005; 1.28% |

Assuming that each Impaired Class votes to accept the Plan, the Plan complies with the requirement set forth in section 1129(a)(8).  But even if one or more Impaired Classes votes to reject the Plan, the Plan is nevertheless confirmable because, as demonstrated below, it satisfies the cramdown requirements of section 1129(b) with respect to any non-accepting Class.

### 7.    Section 1129(a)(10):  The Plan Has Been Accepted by an Impaired Class.

Section 1129(a)(10) requires that at least one class of claims that is impaired under the Plan accept the Plan, determined without including acceptances of the Plan by any insider.  As

stated above, the deadline by which holders of Impaired Claims must vote to accept or reject the Plan in order for their Ballots to be counted is February 10, 2014.  The City anticipates that Classes 1A, 1B, 3, 4, 5, 6, and 12, among other Classes, will vote to accept the Plan.  If the City's assumption is correct, the Plan satisfies section 1129(a)(10).

> **8.    Section 1129(b):  Confirmation of the Plan over the Non-Acceptance of Impaired Classes.**

Section 1129(b) authorizes the court to confirm a plan even if not all impaired classes have accepted the plan (a "cramdown"), provided that the plan has been accepted by at least one impaired class and that "the plan does not discriminate unfairly, and is fair and equitable, ***with respect to each class of claims or interests that is impaired under, and has not accepted***, the plan." (emphasis added) 11 U.S.C. § 1129(b)(1).

Although voting will not be complete until February 10, 2014, the City believes that it is likely that all of the Impaired Classes will vote to accept the Plan.  In particular, as shown above, Class 12 will accept the Plan in spite of the anticipated negative vote of Wells Fargo/Franklin, because Franklin does not hold a "blocking position".  Even if section 502(b)(6) were inapplicable to the amount of Franklin's Claim (and the City believes it is applicable, thereby limiting the amount of Franklin's Claim to about $10 million), and Franklin's Claim were Allowed in an amount of the outstanding amount of the relevant bonds (of about $35 million), Franklin still would not hold one-third in dollar amount of the Claims in Class 12.  Franklin's percentage, even at a $35 million Claim amount, would likely be about 5% of the dollar amount of all of the Class 12 Claims and would only make up 7% of the Class 12 Claims that have voted as of January 31, 2014 (if Franklin's claim were included in the amount voted).  If Franklin's Claim is limited to $10 million, such claim would constitute only about 2% of the voted claims in Class 12.

In the event that one or more Impaired Classes votes to reject the Plan, the City will provide a further discussion of the requirements of section 1129(b) in the supplemental memorandum in support of the Plan to be filed and served on March 31, 2014.

/ / /

**B.      The Plan Complies with the Provisions of Chapter 9 (Section 943(b)(2)).**

Section 943(b)(2) requires that a plan of adjustment "compl[y] with the provisions of this chapter."  Aside from the provisions of chapter 11 that are incorporated into chapter 9 through section 943(b)(1), the satisfaction of which is discussed in Section IV.A. of this Memorandum, chapter 9 has two provisions that address the Plan of adjustment.  *See Collier* ¶ 943.03[2].  Specifically, section 941 requires that the debtor file a plan, and section 942 provides that "[t]he debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of . . . chapter [9]."  11 U.S.C. §§ 941, 942; *In re Connector 2000 Ass'n*, 447 B.R. at 764.

Having been proposed by the City, the Plan satisfies section 941.  Likewise, the Plan meets the requirements of section 942.  The City filed the initial version of its plan of adjustment on October 10, 2013.  Dkt. No. 1133.  The City then filed the Plan on November 15, 2013.  Dkt. No. 1204.  In addition, as noted above, the City timely filed the Plan Supplement on January 27, 2014.  Dkt. No. 1236.  The Plan Supplement contained the Assured Guaranty Settlement Documents, the NPFG Arena Settlement Documents, and the NPFG Parking Settlement Documents.  A supplement to the Plan Supplement to be filed prior to February 10, 2014, will contain updated versions of such Plan Documents as well as the Price Settlement Documents and any other agreement or instrument contemplated by, or to be entered into pursuant to, the Plan.  As required by section 942, the City will not modify the Plan so that the Plan as modified fails to meet the requirements of chapter 9.

**C.      All Amounts to Be Paid by the City or by Any Person for Services or Expenses in the Case Have Been Fully Disclosed and Are Reasonable (Section 943(b)(3)).**

"The court shall confirm the plan if . . . all amounts *to be paid* by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable."  11 U.S.C. § 943(b)(3) (emphasis added).  While this section requires the disclosure of the payment of the City's expenses, "it does not authorize the allowance of, or require payment of, compensation for services provided to, or reimbursement of expenses

incurred by, the debtor.  The debtor's obligation to pay for services rendered and expenses incurred is governed by non-bankruptcy law." *See Collier* ¶ 943.03[3].  As with its vendors, the City has been paying its professionals on a current basis and does not expect that there will be any future payments that fall within the ambit of section 943(b)(3).  Accordingly, the City has satisfied the requirements of this section.

### D.    The City Is Not Prohibited by Law from Taking Any Action Necessary to Carry Out the Plan (Section 943(b)(4)).

Section 943(b)(4) prevents confirmation of a plan of adjustment that requires the debtor to take any action prohibited by law.  This section is intended to prevent chapter 9 debtors from using the bankruptcy court for the purpose of circumventing compliance with state law after confirmation.  *See In re Sanitary & Improv. Dist. No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989); *Collier* ¶ 943.03[4].  The City intends to comply with all laws, regulations, and ordinances following confirmation, and nothing in the Plan proposes an action in violation of existing applicable laws.  For example, by including Class 10 in the Plan, the City made it very clear that funds restricted to certain uses by applicable non-bankruptcy law would not and cannot be used to pay General Fund obligations.

### E.    The Plan Provides for Payment of Administrative Claims (Section 943(b)(5)).

Section 943(b)(5) provides that a plan cannot be confirmed unless it provides for the payment in full of all claims entitled to administrative priority.  "Administrative expenses" under section 503(b) has a meaning in a chapter 9 case that is different from that in a case under chapter 11.  Section 503(b)(1)(A) provides administrative priority for "the actual, necessary costs and expenses of preserving the estate."   11 U.S.C. § 503(b)(1)(A).  In a chapter 11 case, such claims include postpetition operating expenses as well as other postpetition obligations of the debtor necessary to preserve the estate.  But there is no estate in a chapter 9 case.  *See In re City of Vallejo*, 403 B.R. 72, 78 n.2 (Bankr. E.D. Cal. 2009); *accord Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 419 n.4 (B.A.P. 9th Cir. 2007).  There can be no "necessary costs of preserving the estate" in a case where no estate exists.  *In re New York City* / / /

1  *Off-Track Betting Corp.*, 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010) ("***OTB***"); *In re Texas*

2  *Wyoming Drilling, Inc.*, 486 B.R. 746, 759 (Bankr. N.D. Tex. 2013).

3        In *OTB*, the court considered the motions filed by several New York racetracks to compel

4  the debtor to pay certain statutorily-mandated fees that had accrued postpetition.  The court

5  rejected the argument that such payments were entitled to administrative priority under

6  section 503(b)(1)(A): "Because a chapter 9 debtor's property remains its own and does not inure

7  into a bankruptcy estate as provided by section 541 of the Bankruptcy Code, there can be no

8  administrative expenses for 'the actual and necessary costs of preserving the estate' as

9  contemplated by section 503(b)(1)(A) of the Bankruptcy Code." 434 B.R. at 142.

10        This conclusion is consistent with, and indeed mandated by, section 904.  As this Court

11  has stated, section 904 prevents bankruptcy courts from exercising jurisdiction over a

12  municipality's use of its revenues, absent the municipality's consent.  *See Ass'n of Retired*

13  *Employees of the City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 13

14  (Bankr. E.D. Cal. 2012) (§ 904 "bars the court, without the municipality's consent, from

15  interfering with its political or governmental powers, property or revenues, and use or enjoyment

16  of income-producing property);  *In re Valley Health Sys.*, 429 B.R. 692, 714 (Bankr. C.D. Cal.

17  2010)  ("By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete

18  control over its property and its operations, and is not restricted in its ability to sell, use, or lease

19  its property.").

20        Accordingly, no Claim is entitled to administrative expense priority under

21  section 503(b)(1)(A) in this case.  Further, to the best of its knowledge, the City is currently

22  paying all of its postpetition debts.

23      **F.**    **The City Has Obtained Any Regulatory or Electoral Approval Necessary Under Applicable Non-Bankruptcy Law (Section 943(b)(6)).**

24

25        Section 943(b)(6) requires that "any regulatory or electoral approval necessary under

26  applicable non-bankruptcy law in order to carry out any provision of the plan has been obtained,

27  or such provision is expressly conditioned on such approval."  Accordingly, "where a plan

28  proposes action that is not authorized by state law, or without satisfying state law requirements,

the plan cannot be confirmed." *See In re City of Colo. Springs Spring Creek Gen. Improv. Dist.*, 177 B.R. 684, 694-96 (Bankr. D. Colo. 1995) (denying confirmation of a prepackaged chapter 9 plan where the bond restructuring proposed under the plan was required to be approved through an election, and no election had been held and plan was not conditioned on such approval).

The Plan expressly provides that a condition precedent to the Effective Date is that "[t]he City shall have received any and all authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that are necessary to implement the Plan and that are required by law, regulation, or order." Plan § XIII.B.3.

The City needed and obtained voter approval of Measure A, which raised the sales tax to help provide new revenue necessary to fully implement the Plan.  Through City staff, the City Council has supervised the City's negotiations with various creditors and the preparation of the agreements documented in the Plan.  On October 3, 2013, the City Council approved the plan of adjustment and the disclosure statement that were filed on October 10.  On November 5, the people of Stockton passed Measure A as well as Measure B.  Subsequently, the City filed the Plan on November 15 and the Disclosure Statement on November 21, both of which reflect the passage of Measure A and Measure B.

In addition, the NPFG Settlement is contingent on the City's obtaining the required approval of the State of California Department of Finance of the restructuring of the Arena Pledge Agreement.  The City anticipates receiving such approval prior to the Effective Date.  Thus, the City has satisfied the requirements of section 943(b)(6).

### G.    The Plan Is in the Best Interests of Creditors and Is Feasible (Section 943(b)(7)).

Section 943(b)(7) requires that the court find that "the plan is in the best interests of creditors and is feasible."  11 U.S.C. § 943(b)(7).  As described below, the City believes that the Plan is in the best interest of creditors because the City has made a reasonable effort to propose a Plan that is a better alternative to such creditors than dismissal of the case.  Further, the City believes that the Plan is feasible because its long-range financial plan demonstrates its ability to make the payments required under the Plan and still maintain necessary municipal services.

1        **1.**        **The Plan Is in the Best Interests of the City's Creditors.**

2        In chapter 9, a plan is in the best interests of creditors when the plan is better than any of

3   the alternatives available to creditors.  *See Collier* ¶ 943.03[7][a].  This standard is not difficult to

4   satisfy:

> The "best interest" requirement of § 943(b)(7) is generally regarded as requiring
> that a proposed plan provide a better alternative for creditors than what they
> already have.  This is often easy to establish.  Since creditors cannot propose a
> plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot
> force sale of municipal assets under state law, their only alternative to a debtor's
> plan is dismissal.  Outside of bankruptcy, general unsecured creditors often have
> little possibility of being repaid, especially where the municipality's debt burden
> is too high to be retired by taxes.  Therefore, any possibility of payment under a
> Chapter 9 plan is often perceived by creditors as a better alternative.

11  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 37-38 (Bankr. D. Colo. 1999) (setting forth the

12  "best interests" standard in a case in which the parties agreed that the plan satisfied the standard

13  but in which the court ultimately denied confirmation because the plan was neither proposed in

14  good faith nor feasible).  Further, while a plan that makes little or no effort to repay creditors is

15  not in their best interests, the plan need not be the best possible scenario that the municipality

16  could have negotiated.  *See Collier* ¶ 943.03[7][a].  Instead, "[t]he courts must find a middle

17  ground between those extremes, and must apply the test to require a reasonable effort by the

18  municipal debtor that is a better alternative to its creditors than dismissal of the case."  *Id.*  The

19  City firmly believes that this Plan is in the best interests of its creditors.

20        Dismissal of the Chapter 9 Case is not in the best interests of the City's creditors.  The

21  result would be chaos because these creditors, of which there are hundreds, including the

22  approximately 1,100 holders of Retiree Health Benefit Claims, would be required to fend for

23  themselves in a mad scramble to litigate their claims in state court.  As the Supreme Court held in

24  the post-Depression case *Faitoute Iron & Steel Co. v. City of Asbury Park*, this "policy of every

25  man for himself is destructive of the potential resources upon which rests the taxing power which

26  in actual fact constitutes the security for unsecured obligations outstanding to a city."  316 U.S.

27  502, 510 (1942).  In fact, it is a hollow remedy:  "The experience of the two modern periods of

28  municipal defaults, after the depressions of '73 and '93, shows that the right to enforce claims

1 | against the city through mandamus is the empty right to litigate." *Id.* at 509-10.

2 |      If the Court does not dismiss the Chapter 9 Case but also does not confirm the Plan, the

3 | Court could conceivably permit the City to propose a new plan—ostensibly one that provides

4 | greater recoveries to certain creditors.  But having already considered alternatives to the Plan it

5 | has developed, negotiated, mediated, and proposed to the Court, any such alternatives would not

6 | be in the best interests of creditors.  The City developed the Plan in collaboration with all of its

7 | creditors, and was able to reach agreement with all except Franklin, which has decided to litigate

8 | instead of settle.  Any alternative plan that would alter the present treatment of creditors in the

9 | Plan, including the many creditors whose Claims have been resolved through the mediation of

10 | Judge Perris, would undo the monumental work that already has been done, likely would face

11 | fierce objections, and possibly would put the Chapter 9 Case squarely on the fatal road to

12 | dismissal—which, as stated above, would be disastrous for creditors as well as for City residents,

13 | employees, and retirees.

14 |      By contrast, in this Plan, the City makes a reasonable effort to repay its creditors fairly

15 | while retaining adequate revenues to provide the municipal services that its residents require.  The

16 | City has dramatically reduced expenses by eliminating staff positions, slashing pay and benefits

17 | to the employees who remain, and taking other cost-cutting measures.  Disclosure Statement at

18 | 23.  In fact, from fiscal year 2008-09 through 2011-12, the City cut approximately $90 million in

19 | General Fund expenses.  *Id.*  The City has also worked diligently to increase revenues, including

20 | the passage of Measure A.[7]  In addition, it has reached consensual agreements with ***all*** of its

21 | major creditors (including its nine labor unions and the Retirees Committee, on behalf of the

22 | approximately 1,100 holders of Retiree Health Benefit Claims that it represents), except for

23 | Franklin, on the treatment of their Claims.  Further, the voters of Stockton have expressed their

24 | support of the Plan by approving both Measure A and Measure B.

25 | / / /

26 |

---

27 | [7] Revenues from sales tax, projected to comprise 24.6% of the total General Fund revenue for fiscal year 2013-14, are the City's second largest source of revenue.  Disclosure Statement, Exh. B at 5.  As stated above, Measure A is projected to raise approximately $28 million annually.  *Id.* at 21.  Under the California Constitution, the maximum

28 | amount of real property taxes, which comprise the largest source of the City's General Fund revenue, "shall not exceed One percent (1%) of the full cash value of such property." Cal. Const. art. 13A, § 1(a).

CITY'S MEMORANDUM OF LAW IN SUPPORT OF
CONFIRMATION OF FIRST AMENDED PLAN

These facts demonstrate that the City has made a reasonable effort to propose a plan that is a better alternative to its creditors than dismissal of the Chapter 9 Case.  This Plan provides creditors with the greatest and earliest possible recoveries while preserving necessary City services and operations—and in the case of the additional police protection that the voters recommended in approving Measure B, enhancing these services to make the City a safer and more desirable place to live.  This outcome can only have a positive impact on the City's future tax and other revenues, which in turn makes the recoveries of its creditors that much more certain.

### 2.   The Plan Is Feasible.

Although worded differently since a municipality case cannot be converted to one under chapter 7, the chapter 9 feasibility standard is similar to the standard in a chapter 11 case.  The plan should demonstrate the debtor's ability to make the payments required under the Plan and to maintain post-confirmation operations, as necessary.  *See Collier* ¶ 943.03[7][b].

Here, the Long-Range Financial Plan of the City of Stockton, attached as Exhibit B to the Disclosure Statement, and the mediated agreements between the City and its creditors represent just the sort of balance that Congress intended the feasibility test to achieve.  In preparing this financial plan, the City carefully considered as many contingencies as possible in order to develop the most realistic revenue and expense projections it could.  That said, the City recognizes that its financial plans and budgets, however sound, will need to be amended if economic and financial circumstances change.  *See* Disclosure Statement, Exh. B at 1-3.  Where necessary, the City retained outside professionals with relevant expertise and experience and incorporated their input into the financial plan.

The financial plan set forth in Exhibit B is the same as the adopted 2013-14 General Fund budget, with three adjustments:  an increase of $429,000 in the General Fund's share of baseline pension obligation bond costs, the receipt of an estimated $3,000,000 in one-time property tax administration fee refunds from San Joaquin County, and the enactment of Measure A which adds $6,804,000 for one-quarter of the fiscal year (Measure B provides that 65% of the proceeds from Measure B be used to pay for law enforcement and crime prevention services in the City such as those described in the City's Marshall Plan).  The latter two items were not previously budgeted.

1   With these changes the budgeted ending balance at June 30, 2014, increases from zero to

2   $9,804,000.  As the City finalizes the FY2012-13 audit and issues budget updates for FY2013-14,

3   the budget forecast will be updated accordingly.

4        While no one can predict the future, the City believes that the projections in the financial

5   plan are reasonable and appropriate to generate the monies necessary to fund the Plan.  The City

6   continues to monitor closely trends in the national, state, and local economies, and their effects on

7   its finances.  It believes that the projections embedded in the plan are clear-eyed about the City's

8   still-challenging financial situation, but at the same time provide a legitimate, reasonably likely

9   path to achieving fiscal stability during the coming years.  Thus, the Plan satisfies

10   section 943(b)(7).

11   **V.**      **CONCLUSION**

12        For all of the reasons set forth above, the Plan meets all of the requirements set forth in

13   section 943(b) and should be confirmed.

14

15

16   Dated: February 3, 2014                  Orrick, Herrington & Sutcliffe LLP

17

18                         By: _____*/s/ Marc A. Levinson*_____

                                   Marc A. Levinson

19                                  Norman C. Hile

                                   Jeffery D. Hermann

20                                   Patrick B. Bocash

                                   John A. Farmer

21                          Attorneys for City of Stockton, Debtor

22

23

24

25

26

27

28