**109**

James O. Johnston (SBN 167330)
Charlotte S. Wasserstein (SBN 279442)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:     (213) 489-3939
Facsimile:     (213) 243-2539
Email: jjohnston@jonesday.com
          cswasserstein@jonesday.com

Joshua D. Morse (SBN 211050)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700
Email: jmorse@jonesday.com

*Attorneys for Franklin High Yield Tax-Freenice
Income Fund and Franklin California High
Yield Municipal Fund*

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Debtor. | Case No. 12-32118 (CMK)<br><br>Chapter 9<br><br>Adv. Proceeding No. 13-02315-C |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, FRANKLIN HIGH YIELD TAX-FREE INCOME FUND, AND FRANKLIN CALIFORNIA HIGH YIELD MUNICIPAL FUND,<br><br>Plaintiffs.<br><br>v.<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Defendant. | **SUBMISSION BY FRANKLIN HIGH YIELD TAX-FREE INCOME FUND AND FRANKLIN CALIFORNIA HIGH YIELD MUNICIPAL FUND OF EXPERT REPORT OF FREDERICK E. CHIN** |

Pursuant to the *Order Governing The Disclosure And Use Of Discovery Information And Scheduling Dates Related To The Trial In The Adversary Proceeding And Any Evidentiary Hearing Regarding Confirmation Of Proposed Plan Of Adjustment* [Docket No. 1224] (as amended), Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund (collectively, "Franklin"), hereby submits the Expert Report of Frederick E. Chin, MAI, CRE, a copy of which is attached hereto as Exhibit 1.

Dated: March 26, 2014           JONES DAY

                                   By:    */s/ Joshua D. Morse*
                                   James O. Johnston
                                   Joshua D. Morse
                                   Charlotte S. Wasserstein

                                   *Attorneys for Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund*

# **<u>EXHIBIT 1</u>**

March 26, 2014

James Johnston
Joshua Morse
Jones Day
555 South Figueroa Street
Fiftieth Floor
Los Angeles, California 90017

Re:  City of Stockton, Debtor, Case No. 12-32118 (CMK), Wells Fargo Bank, NA et.al. v. City of Stockton, California, ADV Case No. 13-2315

Gentlemen:

At your request, I considered various issues relating to the properties defined below in connection with the litigation involving Wells Fargo Bank, National Association, Franklin High Yield Tax-Free Income Fund, and Franklin California High Yield Municipal Fund (the "Plaintiffs") and the City of Stockton, California (the "Defendant" or "City").   My qualifications to perform this assignment, the scope of procedures performed, and my conclusions and opinions are included in this report.   The effective date of my report is March 26, 2014.

The properties are more specifically defined as:

- Swenson Golf Course, located at 6803 Alexandria Place, Stockton, San Joaquin County, California ("Swenson").
- Van Buskirk Golf Course, located at 1740 Houston Avenue, Stockton, San Joaquin County, California ("Van Buskirk").   Van Buskirk includes the golf course and the Van Buskirk Community Center.
- Van Buskirk Community Center, located at 714 Houston Avenue, Stockton, San Joaquin County, California ("Community Center").   The Community Center has been separately evaluated from Van Buskirk.
- Oak Park, located on East Alpine Avenue between North Sutter Street. and Alvarado Avenue, Stockton, San Joaquin County, California ("Oak Park").

Collectively, Swenson, Van Buskirk, Community Center and Oak Park are referred to in this report as the "Properties", "Site", "Facility", "Subject Facilities" or "Subject Properties".

**Qualifications to Perform the Assignment**

I, Frederick Chin, am a principal and founder of the Atalon Management Group, a national real estate advisory firm. My firm's focus includes identifying and implementing value-enhancing solutions for under-performing, challenging and troubled real estate situations.

I graduated from the University of Arizona with a Bachelor of Science degree in finance and real estate in 1984. While attending courses at the University of Arizona, I also worked full-time as a real estate appraiser and market analyst. My college course work included classes on general real estate, real estate appraisal, real estate law, real estate finance, and real estate investment and taxation. I have also taken and completed a variety of real estate appraisal courses taught by the Appraisal Institute and its predecessor entity, the American Institute of Real Estate Appraisers. I am a member of the Appraisal Institute and was awarded the MAI designation in 1987, a designation I continue to hold today. I am also a member (by invitation only) of the Counselors of Real Estate and hold its CRE designation.

Since 1979, I have been engaged full-time in providing real estate consulting, advisory, research, due diligence, financial structuring, valuation, ownership, restructuring and operational turnaround services. Over my career, I have evaluated a variety of property types with varying ownership interests. I have also served in executive management roles as Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), and Chief Restructuring Officer of public and private companies, and have also held positions as Owner/Investor and Managing Partner of private real estate companies.

I am an expert at analyzing and valuing golf courses and recreational properties of varying sizes and prominence. Relevant to this report, I have evaluated and appraised more than 50 public and private golf courses throughout the United States. Over 20 of these golf courses were located in California. In addition to these prior engagements, I provided real estate consulting services to the former National Golf Properties ("NGP"); at the time, NGP was the largest golf course public Real Estate Investment Trust ("REIT"). NGP retained me to evaluate its portfolio of over 145 public (including municipal courses) and semi-private golf courses throughout the United States. My engagement with NGP included, among other things, golf course valuation matters, methodologies and analyses of historical and prospective operating performance and their effects on REIT performance, and analyses of potential operational improvements and efficiencies. My analyses and findings were presented to the board of directors of NGP. I have also owned and overseen the operations of 2 public and 1 private golf course, and was the CEO and COO of a private company that owned two public golf courses, which were located in Las Vegas, Nevada.

Over my career, I have testified as a real estate expert in deposition and/or trial on over 50 occasions. I have testified in bankruptcy courts in Florida, New Jersey, Arizona, Louisiana, Nevada and California, and in State Courts in Arizona, Nevada, Washington and California. I have never been precluded from providing expert testimony on real estate matters.

I have not published any articles, newsletters or books in the past 10 years. Over the past four years, I have not testified as an expert witness in real estate valuation matters.

My compensation is $550 per hour. Travel time is billed at 50% of this hourly rate. My compensation for this assignment is not contingent on any outcome.

**Scope of the Report and Conclusions**

The focus of my report is the litigation between the Plaintiffs and the City. The issues I address in this report relate to:

1.  The fair market value of a possessory interest in Swenson, Van Buskirk, the Community Center and Oak Park through each of September 1, 2038, September 1, 2048, and July 1, 2053, as well as perpetually.

2.  Whether the amounts denominated as "rent" under that Lease Agreement (the "Lease Agreement") between the City and the Stockton Public Financing Authority (the "Authority") dated September 1, 2009, represented a fair market rent for the Properties and were related to the City's use and occupancy of the Properties, in each case as of the execution date of the Lease Agreement.

3.  The relevancy of the valuation conclusions reached in an appraisal of Swenson, Van Buskirk and Oak Park, as prepared by American Appraisal dated March 6, 2008, ("Appraisal Report") and included and referenced in the Official Statement dated August 20, 2009 ("Official Statement") for the Stockton Public Financing Authority Lease Revenue Bonds, 2009 Series A (Capital Improvement Projects) (the "Bonds").

4.  The fair market rental rate for the Properties as of the date of this report.

The facts and data I considered in preparing this report are identified on Exhibit A. I am also available to provide oral testimony to supplement my opinions and conclusions. I may review additional materials, including deposition testimony, reports and exhibits as they become available, and may render additional or rebuttal opinions.

As a result of the analyses performed, I formed the following conclusions:

1. **Possessory Valuation Conclusions**

   The estimated fair market values of a possessory interest in each of the Subject Properties through various dates are as follows:

   | Property | As of March 26, 2014 (1) | As of March 26, 2014 (2) | As of March 26, 2014 (3) | As of March 26, 2014 (4) |
   |---|---|---|---|---|
   | Swenson | $1,750,000 | $1,800,000 | $1,850,000 | $7,650,000 |
   | Van Buskirk* | $2,425,000 | $2,525,000 | $2,625,000 | $5,375,000 |
   | Community Center | $1,700,000 | $1,775,000 | $1,850,000 | $2,475,000 |
   | Oak Park | $240,000 | $250,000 | $260,000 | $1,835,000 |

   **(1)** Assumes possessory interest ends September 1, 2038
   **(2)** Assumes possessory interest ends September 1, 2048
   **(3)** Assumes possessory interest ends July 1, 2053
   **(4)** Assumes possessory interest runs perpetually

   **\*** Includes golf course and Community Center

   The marketing and exposure period for the Properties is estimated at 12 months.
   The basis of my valuation estimates presumes cash transactions.

2. **Contractual "Rent" Payment Conclusion**

   The amounts denominated as "rent" under the Lease Agreement did not represent a fair market rent for the Properties and were not related to the City's use and occupancy of the Properties as of the date of the Agreement. The Properties' historical financial performance indicates the Properties could have never supported the contractual rent established and owed under the leaseback agreement. The rent payable under the leaseback agreement was not in line or in no way related to the fair rental value (or the amount of rent that could have been paid) of the Properties at the time the lease was executed.

   I understand that the City contends that, at the time that the Lease Agreement was executed in 2009, "the rent payable thereunder was commensurate with the fair rental value *to the City* of continuing to operate the" Properties. The City notes that it periodically considers the value to its citizenry of the City's services and facilities, "considering the cost of the services and the funds available to provide such services and facilities, determining which are essential or non-essential." This assertion has no basis

4

or relevancy for purposes of establishing "fair market rent", as it is meaningless to any party other than the City.

Based on the above characteristics, the rent contained in the Lease Agreement was not a fair market rent at the time the agreement was executed in 2009.

**3.      Appraisal Report Conclusion**

The valuations ascribed in the Appraisal Report of the Properties, dated March 6, 2008, and cited in the Official Statement dated August 20, 2009, are not reflective of market value and are stated as such that they are not market value.  The Appraisal Report should not have been relied on or cited as a basis for loan underwriting.  In the Official Statement, the City and its underwriters and advisors misstate and misuse the Appraisal Report findings for the Properties, and further mislead third party readers of the Official Statement by adding undisclosed land value estimates to the Appraisal Report findings.  The Official Statement contains valuations that would mislead readers to believe that independent market valuations have been performed on the properties.  The Official Statement's use of the Appraisal Report is flawed, misleading and erroneous for any lending or extension of credit purpose.

**4.      Administrative Rent Conclusion**

(a) The contract rent for the Properties from the bankruptcy petition date through June 30, 2014 is $5,374,020.

(b) The current annual fair market rental rate for the Properties is $300,000, calculated as follows.

| Property | Occupancy Cost | Present Value - Possessory Interest Ending | | | Average Rent (Rounded) |
|---|---|---|---|---|---|
| | | 9/1/2038 | 9/1/2048 | 7/1/2053 | |
| Swenson | $117,019 | $138,000 | $124,800 | $123,600 | $126,000 |
| Van Buskirk | $53,834 | $57,180 | $52,020 | $51,780 | $54,000 |
| Community Center | N/A | $133,920 | $123,120 | $123,600 | $127,000 |
| Oak Park | $48,709 | $18,900 | $17,280 | $17,280 | $26,000 |
| **Total Rent** | **$219,561** | **$348,000** | **$317,220** | **$316,260** | **$300,000** |

**Procedures I Performed:**

- Inspected the Properties;
- Reviewed the underlying Site and Facility Lease between the City and the Authority dated

September 1, 2009 (the "Nominal Lease");

- Reviewed the Lease Agreement;
- Reviewed various correspondence, reports and financial information regarding the Properties produced in discovery by the City and its agents;
- Considered deposition testimony of City employees and consultants;
- Gathered and analyzed market information;
- Considered the marketability of possessory interests in the Properties;
- Formulated various valuation opinions regarding the Properties. Valuations have been presented in the form of a summary appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2 of Uniform Standards of Professional Appraisal Practice ("USPAP"). This report format, plus any work papers and oral testimony I may provide, incorporates a summary explanation of the data, reasoning and analysis that were used to develop the opinions of value.

**Underlying Assumptions Material to the Possessory interest Conclusions**

1. Plaintiff (or assignees) will hold a possessory interest in the Properties through either September 1, 2038, September 1, 2048, July 1, 2053, or perpetually.
2. The Lease Agreement is assumed to be terminated as of the date of valuation.
3. The possessory interest in the Properties can be segregated, allocated and held by different entities.
4. The Properties can be used and operated by entities other than the City.

# CERTIFICATE OF APPRAISAL

I certify, to the best of my knowledge and belief, to the following:

– The statements of fact contained in this report are true and correct.

– The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

– I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

– I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

– My engagement in this assignment was not contingent upon developing or reporting predetermined results.

– I have not previously appraised or provided professional appraisal services on the Properties.

– My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

– The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.

– The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

– I have made personal inspection of the Properties.

– The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

– Mark Kemper and Evan Forrest provided significant real property research assistance to the person signing this certification.

– As of the date of this report, Frederick Chin has completed the continuing education requirements of the Appraisal Institute.


Frederick E. Chin, MAI, CRE

# VALUATION METHODOLOGY

The three traditional approaches to value (Cost, Income and Sales Comparison) were considered to estimate the fair market value of a possessory interest in the Subject Properties. The applicability and relevancy of each valuation approach depends on the specific characteristics of the Properties, including:   1) age of improvements; 2) condition and functionality of the improvements relative to market competition; 3) the historical, current and anticipated demand of the improvements relative to the market; 4) their highest and best use as improved; 5) the length of the possessory interest; and 6) the nature of the possessory interest to be appraised.  Each of these characteristics has material impacts on the value of a possessory interest in the Properties.  Additionally, in the case of each of the Properties with a defined possessory interest ownership period and specific to the Cost Approach (where applicable), land value has been excluded.  In the case of the valuation of a possessory interest perpetually, land value has been estimated for Swenson, Van Buskirk and Oak Park.

SWENSON AND VAN BUSKIRK

Swenson and Van Buskirk do not have significant building improvements relative to the overall property size.  Additionally, most of the improvements are over 30 years old, and both building and site golf course improvements are in need of renovation, upgrading and additional capital improvements to enhance their appeal and marketability.  As such, the building improvements suffer from substantial physical and functional obsolescence.  Thus, the Cost Approach is not deemed to be relevant to estimate the possessory interest of these properties.

The Income Approach was applied to the golf courses.  Historically, since at least 2006, the subject golf courses have under-performed financially under the City's ownership and have experienced a consistent pattern of net operating losses before any payments specified in the Lease Agreement.  The net operating losses reflect the economic and competitive market conditions affecting the Stockton market, needed repairs and capital investments to the existing improvements and other ownership, operating and marketing challenges.  However, despite the golf courses' recent financial history, improvements to their revenue production are possible.  During 2011, the City engaged an external third party golf consultant to review and consider options for future golf course operations.  The consultant's golf report made financial projections regarding the golf courses' economic potential, presuming that a number of capital improvements and changes in operations would be implemented.  I have read these third party reports and concur that the possibility exists to enhance the revenue production of the golf courses, presuming ownership and management implemented a number of changes. Additionally, I have reviewed financial projections prepared by KemperSports, the current manager of Swenson and Van Buskirk.  I have considered KemperSports' and the consultant's projections, and for valuation purposes, applied an income capitalization method that would be

8

# VALUATION METHODOLOGY

used by prospective purchasers of troubled golf courses to indicate value ranges for a possessory interest in the courses for specified periods of time.

The Sales Comparison Approach was also used. This approach is considered the best indicator of value for the subject golf courses, as there have been a significant number of public golf courses that have sold throughout the United States, including a number of sales in California. The sales have similar characteristics to the Properties (except that they typically involved the sale of fee simple interests). These sales were purchased by private entities that frequently make additional investments in a golf course after consummation to enhance and improve their earning potential. Based on my research, the sales demonstrate meaningful units of comparison to assist in my estimation of value for the golf courses.

<u>OAK PARK</u>

In the case of Oak Park, while the improvements on the property are material in size and stature (namely the baseball stadium, senior center and ice rink), the improvements are old (most ranging from 44 to 65 years old) and suffer from significant deferred maintenance (in particular, the senior center and ice rink). Additionally, these particular facilities are specialized in use. As such, there is a considerable amount of functional obsolescence inherent in the improvements. Furthermore, given their specialized use, any competition in the marketplace that offers a more modern and functional, newer set of amenities, would negatively impact the value of the improvements. From all these regards, the improvements suffer from all forms of depreciation – physical, functional and external. Depreciation is hard to estimate given that all three forms exist. Thus, the Cost Approach was not used.

The Income Approach is not feasible to perform, as the property serves as a public use for the benefit of the community and has not been operated with an express intent to maximize revenue. Frequently, such uses generate operating losses that are consolidated with and handled as a part of a municipality's operating budget. For the past three years, the City estimates that the operating deficits for Oak Park aggregated approximately $843,000. The improvements serve a public use, and their existence is not based on their income producing capability.

The Sales Comparison approach has been used to estimate market value. Although many other improvements exist on the Oak Park site – baseball stadium, baseball/softball fields, tennis courts, a swimming pool complex and senior center - the contributory values of these other improvements are minimal because they are very specialized improvements with significant deferred maintenance. Of the improvements at Oak Park, the ice rink facility has the most value under its existing use. Fee simple sales of ice rinks were gathered for comparison

# VALUATION METHODOLOGY

purposes. Although no sale matched the improvements, location, condition and situation of the ice rink at Oak Park, the sales provided meaningful units of comparison to assist in my estimation of value for this facility.

<u>COMMUNITY CENTER</u>

The Community Center is a portion of Van Buskirk and has been separately delineated for valuation purposes. Originally built in the 1960's, the improvements were completely renovated and expanded in 2007 and configured for the express purpose as a local-serving community center. Specific to a community center use, the improvements are functional and given their age and fairly recent renovation, the improvements do not suffer from material functional obsolescence and only some physical deferred maintenance/depreciation. In this instance, the Cost Approach is given considerable weight.

The Income Approach is not considered a relevant approach to value, as the current use of the property is typically for public/community purposes and not for its income-producing ability.

The Sale Comparison Approach was not used, as the subject facility is purpose built for the City.

<u>POSSESSORY INTEREST</u>

The Properties are subject to the Nominal Lease, which permits possession and use of the Properties for an extended period of time for nominal rent. At the end of the term (as it may be extended), the possession of the Properties reverts to the City. The possessory interest created by the Nominal Lease is similar to a leasehold interest in the Properties. As such, my estimated values of the possessory interest reflect the amount a willing lessee would pay to a willing lessor, as of the date of analysis, for the right to use the Properties for specific periods of time. Once in possession, such lessee would then devise ways to efficiently, effectively and profitability manage and operate the Properties, while undertaking the time, effort and risk to hold the possessory position, as well as recapture its initial investment.

The Nominal Lease conditionally terminates on September 1, 2038. However, the Nominal Lease provides that, "[i]f, on September 1, 2038, the aggregate amount of Lease Payments (as defined in and as payable under the Lease Agreement) shall not have been paid, or provision shall not have been made for their payment, then the term of this [Nominal] Lease shall be extended until such Lease Payments shall be fully paid or provision made for such payment." I understand that, as part of the settlements to be implemented pursuant to the City's proposed plan for the adjustment of debts, the City has agreed to restructured debt obligations with terms that extend as far as July 1, 2053. As a result of the foregoing, I have been asked to value the possessory interest through four points in time: September 1, 2038 (the conditional

# VALUATION METHODOLOGY

termination date of the Nominal Lease), September 1, 2048 (ten years after the conditional termination date of the Nominal Lease), July 1, 2053 (the last date of the City's restructured debt obligations), and perpetually (the result that would occur if the City is unable to make all "Lease Payments" as provided for in the Nominal Lease). The first three periods have a finite end date, which would materially deter a lessee's ability to improve or redevelop the Properties to higher, better and more productive uses. In the case of a possessory interest perpetually, this interest is similar to fee simple ownership whereby a lessee would consider changing the use (re-zoning) to higher and better uses, likely as residential/mixed use residential and commercial. In any event, because of the limited periods of possession (as of 2038, 2048 and 2053) of the Nominal Lease, a change of use and subsequent redevelopment of the property with higher and better uses is risky (*e.g.*, the City and/or other governmental agencies could impose significant conditions that could deter economic feasibility, or could deny a rezoning of the Property) and in the instances with finite possessory dates, not likely economically feasible. The possessory interest with defined time periods also presents inherent challenges to the owner, as the possessory interest makes it difficult for a lessee to secure traditional financing. Prospective lenders would likely restrict the amount and timing of funds to improve, redevelop or re-use the property because of the ultimate reversion of those improvements to the City at the end of the term (except in the case of a possessory interest perpetually). A possessory interest with finite dates also challenges an owner due to the aging of the improvements and their need for increased capital expenditures. The existence of the Nominal Lease may also preclude potential tenants and sub-lessees of a redeveloped property.

The limitations created by the temporal nature of the Nominal Lease significantly and negatively impact fee simple value estimates in the Properties. This negative impact is exacerbated by the poor recent historical financial performance/negative operating losses of the Properties, in particular at Van Buskirk and Oak Park. Thus, a substantial discount exists relative to fee simple values. The discount applied is similar to the same concept as the discount for a partial, partnership or fractional interest in real estate. The amount of discount varies, depending on the length of the period of possession and whether sufficient demand exists to yield profitable operations for the Properties. In general, the discount is considerably less for Swenson than Van Buskirk, and significantly more for Oak Park than Van Buskirk.

Under the presumption that the possessory interest is perpetual, the negative impacts noted above are no longer applicable, as this particular interest is similar to a fee interest. A holder of a possessory interest perpetually does not face the same challenges and constraints related to financing, redeveloping and changing the use of the Properties. The highest and best use of the Properties is different as if in fee than if there are time period constraints of a possessory interest. It is reasonably probable, physically possible and economically feasible that the

# VALUATION METHODOLOGY

Properties could be converted into residential, commercial or mixed-uses. A change of use would have to occur, which I believe would be possible at some time during the possessory period perpetually. Indeed, given that the City would face the prospect of not obtaining possession of the Properties, it is highly likely that the City would facilitate a value-maximizing change in use, as the City rationally would desire for the Properties to be used in a way that maximizes taxes and other revenues for the City.

The valuation approach of the Properties with a possessory interest perpetually is different than with the presumption that there are time limitations of the possessory interest. In my opinion, the value of the Properties is land value, with the existing improvements considered to be interim uses until such time as a change of use can be achieved, as market conditions dictate, and when the existing improvements no longer can achieve material revenue production. I have used the sales of vacant land to estimate the Properties' value presuming a possessory interest perpetually.

# SUBJECT PROPERTY LOCATION MAP
## Swenson Golf Course



# SUBJECT PROPERTY LOCATION MAP
## Van Buskirk Golf Course & Community Center



# SUBJECT PROPERTY LOCATION MAP
## Oak Park



# SUBJECT PROPERTY SITE AND IMPROVEMENT INFORMATION

| Area | Swenson Golf Course | Van Buskirk Golf Course (includes Community Center) | Van Buskirk Community Center | Oak Park |
|---|---|---|---|---|
| Property Address | 6803 Alexandria Place | 1740 Houston Avenue | 714 Houston Avenue | Alpine Ave between North Sutter Street and Alvarado Avenue |
| General Location | Northwest side of Stockton: East of Interstate 5 along Benjamin Holt Drive | Southern side of Stockton: West of Interstate 5, just south of 8th Street | Southern side of Stockton: West of Interstate 5, just south of 8th Street | Central area of Stockton: Along Alpine Avenue, about 2.6 Miles east of Interstate 5 |
| Assessor Parcel # | 09711024 & 09711014 | 16307036 | 16307036 | 11527002 & 11527001 |
| Site Size | ~218.6 Acres | ~214.0 Acres; Golf Course ~194 acres. | ~20 Acres | ~61.2 Acres |
| Site Shape | Generally Rectangular | Irregular | Generally Rectangular | Generally Rectangular |
| Site Topography | Generally Flat | Generally Flat | Generally Flat | Generally Flat |
| Site Constraints (*i.e.*, overhead utility lines, levies, unusual elements) | Levy on northern boundary limits access; housing on southern and western boundaries limit access | Levy along the northwestern/western boundary; overhead utility lines bisecting the property to the east of the clubhouse; community park located on southeastern/eastern boundary | Levy along the northwestern/western boundary; overhead utility lines bisecting the property to the east of the clubhouse; community park located on southeastern/eastern boundary | None |
| Zoning | Public Facilities (PF) – Areas appropriate for a variety of Public/Quasi-Public Uses, including facilities and lands | Public Facilities (PF) – Areas appropriate for a Variety of Public/Quasi-Public Uses, including facilities and lands owned | Public Facilities (PF) – Areas appropriate for a Variety of Public/Quasi-Public Uses, including facilities and lands | Public Facilities (PF) – Areas appropriate for a Variety of Public/Quasi-Public Uses, including facilities and lands owned |

# SUBJECT PROPERTY SITE AND IMPROVEMENT INFORMATION

| Area | Swenson Golf Course | Van Buskirk Golf Course (includes Community Center) | Van Buskirk Community Center | Oak Park |
|---|---|---|---|---|
| | owned by the City, County, State, or Federal Governments, as well as religious facilities. The PF zoning is consistent with the Institutional and Parks and Recreational Land Use Designation of the Stockton General Plan 2035. | by the City, County, State, or Federal Governments, as well as religious facilities. The PF zoning is consistent with the Institutional and Parks and Recreational Land Use Designation of the Stockton General Plan 2035. | owned by the City, County, State, or Federal Governments, as well as religious facilities. The PF zoning is consistent with the Institutional and Parks and Recreational Land Use Designation of the Stockton General Plan 2035. | by the City, County, State, or Federal Governments, as well as religious facilities. The PF zoning is consistent with the Institutional and Parks and Recreational Land Use Designation of the Stockton General Plan 2035. |
| Access Roadways and Description | Accessible by Alexandria Place on the eastern border of the property | Accessible by Houston Avenue that runs along the northern border of the property. Manthey Road runs along the eastern border. | Accessible by Houston Avenue that runs along the northern border of the property. Manthey Road runs along the eastern border. | Accessible by Alpine Avenue on the South, Sutter Street on the West, and Fulton Street on the north |
| Flood Zone/FEMA | X Levee – Limited floodplain protected by levees | X Levee – Limited floodplain protected by levees | X Levee – Limited floodplain protected by levees | X Levee – Limited floodplain protected by levees |
| Utilities | Utilities located on property | Utilities located on property | Utilities located on property | Utilities located on property |
| Improvements and Description | 27-hole golf course designed by Jack Fleming <br>• 18-hole par-72 golf course (6,407 yards) and 9-hole par-3 executive golf course | 18-hole golf course designed by Larry Nordstrom <br>• 18-hole par-72 golf course (6,502 yards) <br>• 15 station driving | • Community Center building is approximately 17,237 square feet with a full gymnasium, a | • Park features group picnic areas, 20 picnic tables, 2 tot lots, 15 barbecue pits and 4 restrooms <br>• Improvements: 11 |

## SUBJECT PROPERTY SITE AND IMPROVEMENT INFORMATION

| Area | Swenson Golf Course | Van Buskirk Golf Course (includes Community Center) | Van Buskirk Community Center | Oak Park |
|---|---|---|---|---|
| | (1,380 yards)<br>• 15 station driving range, two putting greens, and practice bunker<br>• Improvements: 2,000 square foot pro shop, 5,000 maintenance/storage facility, 2,500 square foot café, about 200 parking spaces<br>• Improvements are of average construction quality at the time of original construction. | range and two putting greens<br>• Improvements: 2,000 square foot pro shop, 5,000 square foot maintenance/storage facility, 2,500 square foot café, and associated parking spaces<br>• Improvements are of average construction quality at the time of original construction. | fitness facility, an arts and crafts room and 2 multi-purpose rooms. The surrounding park includes a group picnic area, 13 picnic tables, a tot lot, 2 tennis courts, 2 ball fields, 3 basketball courts, 4 handball courts, 5 barbecue pits, 2 restrooms and other grass field areas.<br>• Improvements are of average construction quality at the time of renovation. | tennis courts, 2 regulation softball fields, the Billy Hebert Field (a 6,000 seat regulation professional minor league baseball field, renovated in 2002), a multi-use field, a community swimming pool complex with changing facilities, a 33,165 square foot ice rink facility with seating for 350, and a one-story senior center.<br>• Improvements are of average construction quality at the time of original construction. |
| Year Built | 1952 (Golf Course) | 1962 (Golf Course) | Originally constructed in the 1960's. Renovated and expanded in 2007. | Hebert Field – 1949<br>Tennis Clubhouse – 1924<br>Oak Park Clubhouse – 1949<br>Swimming Pool – 1947<br>Ice Arena – 1969 |

## SUBJECT PROPERTY SITE AND IMPROVEMENT INFORMATION

| Area | Swenson Golf Course | Van Buskirk Golf Course (includes Community Center) | Van Buskirk Community Center | Oak Park |
|------|---------------------|------------------------------------------------------|-------------------------------|----------|
| | | | | Senior Center – 1969 |
| Improvement Physical Condition | Fair - Average. Deferred maintenance and upkeep readily apparent. For example, parking lots need to be resurfaced, bathrooms are outdated and likely don't meet ADA requirements, carpeting is worn and dated, mechanical systems in clubhouse are likely in need of modernization. | Fair. Deferred maintenance and upkeep readily apparent. For example, parking lots need to be resurfaced, bathrooms are outdated and likely don't meet ADA requirements, carpeting is worn and dated, mechanical systems in clubhouse are likely in need of modernization. | Average – Good. Some deferred maintenance and upkeep evident. | Fair - Poor. Deferred maintenance and upkeep readily apparent. For example, parking lots needs to be resurfaced, bathrooms are outdated and likely don't meet ADA requirements. Ice Arena is in need of mechanical system upgrades. |
| Improvement Functionality for Intended Use | Fair | Fair | Good | Fair |
| Assessed Values | None | None | None | None |
| Property Taxes | None | None | None | None |
| Current Owner of Record | City of Stockton | City of Stockton | City of Stockton | City of Stockton |
| Pending sale, listings for sale, and changes in | None known | None known | None known | None known |

# SUBJECT PROPERTY SITE AND IMPROVEMENT INFORMATION

| Area | Swenson Golf Course | Van Buskirk Golf Course (includes Community Center) | Van Buskirk Community Center | Oak Park |
|---|---|---|---|---|
| property ownership in the past three years | | | | |
| Deed Restriction | None | The Van Buskirk site (approximately 214 acres) was deeded to the City in 1957 by Charles and Bertha Van Buskirk. The deed instructions were for the property to be used "for public recreation or public park purposes." | The Van Buskirk site (approximately 214 acres) was deeded to the City in 1957 by Charles and Bertha Van Buskirk. The deed instructions were for the property to be used "for public recreation or public park purposes." | None |
| Highest and Best Use (As if Vacant) – Possessory Interest perpetually | Golf Course (as currently zoned) for an interim period; ultimate use residential or mixed use (as rezoned) | Golf Course (as currently zoned) for an interim period; ultimate use residential, industrial or commercial use (as rezoned) | Public use (as currently zoned) | Public use (currently zoned) for an interim period; possible residential or mixed use (as rezoned) |
| Highest and Best Use (As Improved) – Possessory Interest as of 2038, 2048 and 2053 | Golf Course | Golf Course | Public community use | Public community use |

# DEFINITIONS

***Fair Market Value:***  The most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress.  *(Source:  The Appraisal of Real Estate, 13th Edition.)*

***Possessory Interest:***  1) The present right to control property, including the right to exclude others, by a person who is not necessarily the owner.  2) A present or future right to the exclusive use and possession of property.  *(Source:  Black's Law Dictionary Ninth Edition, 2009)*

***Fee Simple Estate:***  Absolute ownership of real property; owner entitled to the entire property with unconditional power of disposition during the owner's life, and upon death the property descends to the owner's heirs.  (*Source: Dictionary of Real Estate Terms, Eighth Edition, Jack P. Friedman*)

***Leased Fee Estate:***   An ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others.  The rights of the lessor (the leased fee owner) and the leased fee are specified by contract terms contained within the lease.  (*Source: Dictionary of Real Estate Appraisal, Third Edition, Appraisal Institute*)

***Leasehold Estate:***   The interest held by the lessee (the tenant or renter) through a lease conveying the rights of use and occupancy for a stated term under certain conditions.  (*Source: Dictionary of Real Estate Appraisal, Third Edition, Appraisal Institute*)

***Marketing Period:***  The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.  (*Source:  The Dictionary of Real Estate, 5th Edition*)

***Exposure Period:***  The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.  (*Source:  The Dictionary of Real Estate, 5th Edition*)

# DEFINITIONS

**<u>Highest and Best Use</u>**: The legally, financially, and physically possible use that, at the time of the appraisal, is most likely to produce the greatest net return to the land and/or buildings over a given period.  May be applied to property as if vacant or as improved.  (*Source:  The Dictionary of Real Estate, 5th Edition*)

# NOMINAL LEASE AGREEMENT

As of the date of analysis, the Properties were subject to two agreements. The first agreement involved the City as "lessor", and the Authority as "lessee", evidenced by the Nominal Lease dated September 1, 2009. Concurrently, a sub-interest was created with the Authority as "sub-lessor", and the City as "sub-lessee", evidenced by the Lease Agreement dated September 1, 2009.

The Nominal Lease and Lease Agreement do not separately segregate or allocate the rent payable or other monetary or other aspects of the Swenson, Van Buskirk and Oak Park Properties. All three Properties are subject to these agreements.

Presently, there are various disputes involving the Subject Properties; for purposes of this report, it is assumed that only the Nominal Lease exists and that the Authority may assign its possessory interest in the Subject Properties to one or more unrelated third parties, who are assumed to accept the Subject Properties subject to the original terms of the Nominal Lease.

The Lease Agreement is assumed to be terminated as of the date of my analysis.

A summary of the Nominal Lease follows:

**Nominal Lease Agreement Summary**

- The Nominal Lease between the City and the Authority includes the following parcels of real property:
  - Oak Park Site
  - Swenson Golf Course
  - Van Buskirk Golf Course & Community Center
- The Nominal Lease commenced on September 1, 2009 and shall end on September 1, 2038, unless extended or terminated sooner.
- Rent of one dollar ($1.00) was paid by the Authority and covers the entire term.
- The Authority shall use the site and facility solely for the purpose of leasing the site and facility to the City, except in the event of a default the Authority and its assigns may exercise the remedies provided in the Lease Agreement (including the right to possess and re-let the Properties).
- The City has the right to enter the site and facility at any reasonable time to inspect and make repair or improvements.
- Upon termination, the site and facility shall be returned to the City in good order and condition, reasonable wear and tear excepted.
- Any permanent improvements and structures existing at the time of the termination shall vest in the City.
- The City covenants and agrees to pay any and all assessments of any kind and all taxes.

# ECONOMIC OVERVIEW

The Subject Properties are located in Stockton, California. Stockton is the county seat for San Joaquin County, located roughly 90 miles east of San Francisco and 45 miles south of Sacramento. Stockton was incorporated in 1850 resulting from the 'Gold Rush' in California but transformed into an agriculturally based economy. Stockton is located along a channel heading into the Port of Stockton which results in Stockton being a shipping point for Northern California along the San Joaquin Delta. (Source: City of Stockton website). For purposes of this section, the Stockton MSA is comprised of San Joaquin County according to the State of California Employment Development Department.

### Stockton MSA Population and Labor Force



***Source:*** *University of Pacific (January 2014)*

# ECONOMIC OVERVIEW

## Stockton and California Unemployment Rates
(percent)



***Source:*** *University of Pacific (January 2014)*

# ECONOMIC OVERVIEW



**2013 Stockton MSA Employment By Industry**

| | Manufacturing | Construction & Mining | Trade, Transportation, & Utilities | Information | Financial Activities | Professional & Business Services | Education & Health Services | Leisure & Hospitality | Other Services | Federal Government | State & Local Government |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employed (000) | 17.9 | 8.0 | 51.7 | 1.7 | 7.5 | 17.3 | 29.4 | 18.3 | 6.6 | 3.5 | 33.1 |

**Source:** *University of Pacific (January 2014)*

# ECONOMIC OVERVIEW

### Stockton Real Personal Income
(percent change from one year ago)



***Source:*** *University of Pacific (January 2014)*

# ECONOMIC OVERVIEW

### Stockton MSA Housing Starts
### (Thousands)



**Source:**  *University of Pacific (January 2014)*

# ECONOMIC OVERVIEW



**Source:** *Zillow (February 2014)*

**Stockton Foreclosures**



**Source:** *Zillow (February 2014)*

# ECONOMIC OVERVIEW

According to the City of Stockton Annual Comprehensive Report 2012 (note that the City limits are smaller than the Stockton MSA), the largest employers in the City are:

| Employer | Employees | Percent of Total City Employment |
|---|---|---|
| San Joaquin County | 6,500 | 5.16% |
| Stockton Unified School District | 3,893 | 3.09% |
| St. Joseph's Medical Center | 2,500 | 1.99% |
| O-G Packing Company | 2,000 | 1.59% |
| City of Stockton | 1,683 | 1.34% |
| Diamond Walnut | 1,407 | 1.12% |
| Dameron Hospital | 1,200 | 0.95% |
| Pacific Gas and Electric | 1,100 | 0.87% |
| Kaiser Permanente | 1,065 | 0.85% |
| University of Pacific | 1,000 | 0.79% |

The Stockton market appears to be improving from a precipitous decline in employment and the downturn of the economy. Key economic statistics show improvement. The economic information below is from the University of Pacific's quarterly release based on Stockton MSA data.

- Per the University of Pacific, estimates of non-farm employment in the Stockton MSA is expected to increase 3.7% in 2014.
    - Trade, Transportation, and Utilities represent 26.5% of the total employment base and it is projected to have an average growth rate of 1.9% from 2014 – 2018.
    - Construction & Mining and State & Local Government are expected to lead the job growth in 2014 with 7.1% and 7.3% increases, respectively, representing 21.1% of the total employment base.
    - Construction & Mining is expected to grow at an average annual rate of 8.2% from 2014 - 2018, representing the largest growth rate for the area.

# ECONOMIC OVERVIEW

- o Federal Government and Information are expected to see the largest decreases in employment in 2014 at 2.8% and 0.1%. Government represents 2.7% of the total employment base.
- Unemployment peaked in the 4th quarter of 2010 at 17.6%, but has steadily decreased to 12.2% in 4th quarter of 2013.
- Government entities are the largest employers in the Stockton area. Since 2010, around 1,600 more employees were added totaling 34,300 in Q4 2013, but less than when peak employment in Q1 2008 of 36,700.
- Personal income has rebounded from negative changes since 2009 to 16 straight quarters of positive gains thru the end of 2013. Personal income has increased $3,400 over the past four years.
- Wages contracted in 2013 but are projected to grow 14% total thru 2018.
- Per capita income hit a trough in 2010 at $27,700, but has grown each year to $28,600 in 2013, just below the peak of $29,400 in 2007.
- Housing starts reached a trough in the 4th quarter of 2011 but are expected to demonstrate consistent additions, with new starts up 28.5% yearly through 2018.
- Further growth is expected from the Gross Metro Product at an annual rate of 3.5% thru 2018 with 3.6% growth projected in 2014 over 2013.

The Stockton housing market also appears to be improving. According to information from the website Zillow, Stockton housing prices increased from their trough of around $120,000 in late 2010 to just over $170,000 at the beginning of 2014, an increase of almost 40%. This rate of change is one of the highest in the country. Additionally, foreclosures peaked in 2008/09 but have been trending down each year since.

# NEIGHBORHOOD MAP
## Swenson Golf Course



**Neighborhood Boundaries:**
- ➢ North: Wagner Heights
- ➢ South: March Lane
- ➢ East: Pacific Avenue
- ➢ West: Embarcadero Drive

# NEIGHBORHOOD MAP
## Van Buskirk Golf Course & Community Center



**Neighborhood Boundaries:**
- ➢ North: Charter Way
- ➢ South: Levee
- ➢ East: Interstate 5
- ➢ West: Levee

# NEIGHBORHOOD MAP
## Oak Park



**Neighborhood Boundaries:**
- ➢ North: March Lane
- ➢ South: Harding Way
- ➢ East: Highway 99
- ➢ West: Pershing Avenue

# GOLF COURSE VALUATION
# INCOME APPROACH

The Income Approach was applied to Swenson and Van Buskirk.  This approach is based on the assumption that value is created by the expectation of economic benefits to be derived in the future.  Although recent historical performance (since 2006) has shown a consistent pattern of net operating losses, I believe privatization of the course and implementation of a new business model can yield improved financial results.  To assess the income-producing capabilities of Swenson and Van Buskirk, I reviewed golf course profit and loss statements from 2008-09 through 2012/13, and future projections for 2013/14 through 2015/16, prepared by the current golf course manager, KemperSports.  Below is a summary of the financial information.

| | Actuals | | | | | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|
| | 2008/09 | 2009/10 | 2010/11 | 2011/12 | 2012/13 | 2013/14 | 2014/15 | 2015/16 |
| **Swenson** | | | | | | | | |
| *Revenue* | $1,200,691 | $1,100,822 | $1,105,653 | $1,193,345 | $1,170,185 | $1,145,334 | $1,443,488 | $1,484,525 |
| *Expense* | $1,279,683 | $1,261,639 | $1,200,705 | $1,290,843 | $1,339,864 | $1,271,624 | $1,390,398 | $1,419,235 |
| **Net Income (Loss)** | ($78,992) | ($160,817) | ($95,052) | ($97,498) | ($169,679) | ($126,290) | $53,090 | $65,290 |
| **Van Buskirk** | | | | | | | | |
| *Revenue* | $549,882 | $569,477 | $531,837 | $576,148 | $538,337 | $548,045 | $700,640 | $724,350 |
| *Expense* | $831,771 | $846,462 | $802,663 | $754,091 | $704,000 | $763,339 | $830,177 | $843,708 |
| **Net Income (Loss)** | ($281,889) | ($276,985) | ($270,826) | ($177,943) | ($165,663) | ($215,294) | ($129,537) | ($119,358) |

**Note:** Financial information and projections from KemperSports

In 2011/12 a onetime termination fee of $100,000 was paid to Valley Crest, Inc. for early termination of a maintenance contract with Swenson and Van Buskirk.  The maintenance contract was terminated due to the selection of KemperSports as the new course manager for Swenson and Van Buskirk.  Under the management agreement, KemperSports is paid a management fee and is eligible for a bonus based on their ability to increasing revenue.  The bonus is payable regardless of whether the courses make a profit.  Additionally, the City allocates approximately $75,000 in City employee salaries to the golf courses.

During 2011, the City also engaged an external third party golf consultant (the "Golf Consultant") to analyze the golf courses and make certain recommendations.  I reviewed the Golf Consultant's 2011 golf report which provides financial projections and recommendations relating to the ongoing management and operations of the courses.  Below is a summary of the Golf Consultant's financial projections.

# GOLF COURSE VALUATION
# INCOME APPROACH

| Combined Golf Courses | FY2011-12 | FY2012-13 | FY2013-14 | FY2014-15 | FY2015-16 |
|---|---|---|---|---|---|
| Revenues | $2,185,684 | $2,455,916 | $2,638,840 | $2,692,927 | $2,753,558 |
| Expenditures | $2,262,686 | $2,275,559 | $2,358,673 | $2,394,144 | $2,430,016 |
| **Net Annual Activity** | **($77,002)** | **$180,357** | **$280,167** | **$298,783** | **$323,542** |
| Other Contract Costs | | | | | |
| Management Fees | $146,063 | $163,174 | $176,029 | $182,552 | $189,518 |
| Unanticipated/Emergency Costs | $40,000 | $46,500 | $48,825 | $48,825 | $45,000 |
| **Additional Contract Costs (ACC)** | **$186,063** | **$209,674** | **$224,854** | **$231,377** | **$234,518** |
| **Net Annual Activity less ACC** | **($263,065)** | **($29,317)** | **$55,313** | **$67,406** | **$89,024** |

*Source: Golf consultant, John Delorenzo's golf operations powerpoint presentation dated May 24, 2011.*

In the Golf Consultant's opinion, to achieve enhanced financial performance, an owner must make significant capital investments in Swenson and Van Buskirk. Some changes recommended by the Golf Consultant included increasing rates, making modifications to pass play, reducing free play, adding cart paths, making certain capital improvements and increasing marketing efforts. Many more improvements and investments are necessary to materially enhance performance; a competent owner with professional management would make these improvements.

I independently determined that golf course rates at the Properties could be increased, based on my inspection of comparable golf courses in Stockton. I compared and contrasted other golf courses to Swenson and Van Buskirk to assess potential areas of improvement, similar to what the Golf Consultant did. My analysis included a quantitative ranking system (on a 1-5 scale) to evaluate different aspects of each course with 1 being poor and 5 being excellent. Below is a chart with my observations.

**Stockton Area Golf Course Comparables**

| Category | Van Buskirk | Swenson | Swenson Exec | French Camp | Manteca Park | Micke Grove | Lockeford Springs | Reserve at Spanos | Elkhorn |
|---|---|---|---|---|---|---|---|---|---|
| *Golf Course* | | | | | | | | | |
| Tees | 2 | 3 | 3 | 1 | 5 | 3 | 3 | 4 | 4 |
| Fairways | 1 | 2 | 2 | 1 | 4 | 2 | 3 | 4 | 4 |
| Greens | 2 | 3 | 3 | 2 | 4 | 2 | 2 | 4 | 4 |
| Bunkers | 3 | 3 | 3 | 2 | 3 | 2 | 3 | 4 | 4 |
| Ponds | 2 | 3 | 3 | | 3 | 1 | 2 | 4 | 4 |
| Overall Design | 3 | 4 | 4 | 2 | 4 | 3 | 3 | 4 | 4 |
| Cart paths | | | | 2 | 4 | 3 | 3 | 4 | 4 |

# GOLF COURSE VALUATION
# INCOME APPROACH

| Category | Van Buskirk | Swenson | Swenson Exec | French Camp | Manteca Park | Micke Grove | Lockeford Springs | Reserve at Spanos | Elkhorn |
|---|---|---|---|---|---|---|---|---|---|
| *Facilities* | | | | | | | | | |
| Clubhouse | 1 | 2 | 2 | 1 | 5 | 3 | 4 | 4 | 3 |
| Pro Shop | 2 | 2 | 2 | 1 | 5 | 3 | 4 | 4 | 3 |
| Restrooms | 1 | 2 | 2 | 1 | 5 | 3 | 4 | 4 | 3 |
| Restaurant | 1 | 3 | 3 | 1 | 5 | | 4 | 4 | 3 |
| Maintenance | 2 | 3 | 3 | 1 | 3 | 1 | 3 | 3 | 3 |
| *Other* | | | | | | | | | |
| Driving Range | 2 | 3 | 3 | 1 | 4 | 3 | 3 | 4 | 4 |
| Location | 2 | 4 | 4 | 1 | 3 | 2 | 2 | 3 | 3 |
| Area | 2 | 4 | 4 | 1 | 3 | 2 | 2 | 4 | 4 |
| Golf Carts | 3 | 3 | 3 | 2 | 3 | 3 | 3 | 4 | 4 |
| Park Area | 4 | 4 | 4 | 3 | 4 | | | | |
| Other Equipment | 2 | 3 | 3 | 2 | 3 | | | | |
| Overall Rating | 2.06 | 3.00 | 3.00 | 1.47 | 3.89 | 2.40 | 3.00 | 3.88 | 3.63 |

| Rating Key |
|---|
| 1 - Poor Condition |
| 2 - Fair Condition |
| 3 - Good Condition |
| 4 - Very Good Condition |
| 5 - Excellent Condition |

For the same courses evaluated on above, round rates were assessed and compared to Swenson and Van Buskirk. Based on my overall ratings, it appears that round rates at Swenson and Van Buskirk are below the rates of comparable courses in the Stockton market and could be increased.

**Stockton Competitors Round Rates**

| Round Price | Van Buskirk | Swenson | French Camp | Manteca Park | Micke Grove | Lockeford Springs | Reserve at Spanos | Elkhorn |
|---|---|---|---|---|---|---|---|---|
| Ride Monday - Friday (Open - 11 AM) | $28 | $30 | | $33 & $36 | $39 | $40 | $47 | $46 |
| Walk Monday - Friday (Open - 11 AM) | $18 | $20 | $8 | $18 & $21 | $29 | $25 | $42 | $31 |
| Ride Monday - Friday (11 AM - 2 PM) | $25 | $25 | | $25 | $29 | $35 | $47 | $36 |
| Walk Monday - Friday (11 AM - 2 PM) | $15 | $15 | $8 | $18 & $21 | $19 | $20 | $42 | $21 |
| Ride Monday - Friday (2 PM - Close) | $20 | $20 | | $25 | $25 | $25 | $35 | $26 |
| Walk Monday - Friday (2 PM - Close) | $10 | $10 | $8 | $15 | $15 | $10 | $30 | $15 |

# GOLF COURSE VALUATION
# INCOME APPROACH

| Round Price | Van Buskirk | Swenson | French Camp | Manteca Park | Micke Grove | Lockeford Springs | Reserve at Spanos | Elkhorn |
|---|---|---|---|---|---|---|---|---|
| Ride Saturday/Sunday/Holiday (Open - 11 AM) | $30 | $35 | $20 | $36 & $43 | $49 | $55 | $59 | $53 |
| Walk Saturday/Sunday/Holiday (Open - 11 AM) | $20 | $25 | $12 | $21 & $28 | $39 | $40 | $54 | $38 |
| Ride Saturday/Sunday/Holiday (11 AM - 2 PM) | $25 | $30 | $20 | $36 & $43 | $35 | $45 | $59 | $43 |
| Walk Saturday/Sunday/Holiday (11 AM - 2 PM) | $15 | $20 | $12 | $21 & $28 | $25 | $30 | $54 | $28 |
| Ride Saturday/Sunday/Holiday (2 PM - Close) | $20 | $25 | $20 | $27 | $30 | $25 | $39 | $33 |
| Walk Saturday/Sunday/Holiday (2 PM - Close) | $10 | $15 | $12 | $16 | $20 | $10 | $34 | $18 |

I concur with the Golf Consultant that the possibility exists to enhance the revenue production of the golf courses.

To estimate the value of a possessory interest in Swenson and Van Buskirk, I have considered both the KemperSports and Golf Consultant's revenue projections and have applied the gross income multiplier ("GIM") income capitalization method. While other income capitalization methods are available (discounted cash flows and direct capitalization), Swenson and Van Buskirk have experienced net operating losses in the recent past which prohibit the use of these other methods. Capital and operational improvements are also needed at both Swenson and Van Buskirk to maximize value.

The GIM method is appropriate to use in the case of Swenson and Van Buskirk as it takes into account, in one single ratio, all the factors that market participants consider in pricing properties. It's also one method commonly employed to convert gross income to value for properties which have experienced persistent declines in revenues and weak or negative margins. According to the Society of Golf Appraisers ("SGA") 2014 Financing & Investing Survey, a number of buyers and sellers give credence as to the relevancy of the GIM approach. The survey information indicate GIM's generally in the .9 to 1.3X range for clubs with nominal or negative net margins. The SGA survey indicated that the average GIM for all clubs was 1.4x gross income.

The survey information is also corroborated with listings for sale of golf courses around the country. I have gathered 31 golf course listings of public, semi-private and private golf courses. Current listing prices reflect GIMs that commonly range from .77 to 1.77. Many of the listed

# GOLF COURSE VALUATION
# INCOME APPROACH

courses also are under-performing, whereby net operating incomes are negative, and whereby revenue enhancements and other operating improvements would likely be implemented after closing.

Historically, the number of rounds played annually and the average revenue per round (including golf, food and beverage and revenue from other sources) has varied, reflected on the following table.

|  | 2008/09 | 2009/10 | 2010/11 | 2011/12 | 2012/13 |
|---|---|---|---|---|---|
| **Swenson** | | | | | |
| *Revenue* | $1,200,691 | $1,100,822 | $1,105,653 | $1,193,345 | $1,170,185 |
| *Rounds Played* | 55,864 | 57,637 | 53,450 | 59,669 | 54,492 |
| **Avg Price Per Round** | **$21.49** | **$19.10** | **$20.69** | **$20.00** | **$21.47** |
| | | | | | |
| **Van Buskirk** | | | | | |
| *Revenue* | $549,882 | $569,477 | $531,837 | $576,148 | $538,337 |
| *Rounds Played* | 27,095 | 29,830 | 24,300 | 27,047 | 24,316 |
| **Avg Price Per Round** | **$20.29** | **$19.09** | **$21.89** | **$21.30** | **$22.14** |

**Note**: Approximately 20% to 25% of total rounds are member or discounted for youth programs.

***Source:*** *Revenue figures from KemperSports. Rounds played figures from Susan Wren.*

Based on my analysis of competitor rates, the past performance of the courses, and the enhancements in revenues that could be made, I project the courses could achieve the following revenues:

| Course | Estimated Annual Rounds (Projected) | Average Revenue per Round (All Sources) | Annual Gross Potential Revenues |
|---|---|---|---|
| Swenson | 56,000 | $24.00 | $1,344,000 |
| Van Buskirk | 26,000 | $23.50 | $611,000 |

Appling the GIMs to the revenue projections, the indicated value ranges are as follows:

**Swenson (Projection):**
- Potential Gross Income (2014-15) $1,344,000 times 1.3 to 1.5 = $1,747,000 to $2,016,000; rounded to $1,900,000

**Van Buskirk (Projection):**
- Potential Gross Income (2014-15) $611,000 times 1.1 to 1.35 = $672,000 to $825,000; rounded to $800,000

39

# GOLF COURSE VALUATION
# SALES COMPARISON APPROACH

Sales of golf courses throughout the country were collected and reviewed.  Since 2011, there were 719 golf course sales (source: National Golf Foundation).  Of the 719 sales, 537 were private facility courses, 163 were daily fee, and 19 were municipal facilities.  Furthermore, there were 36 golf course sales (6 were private courses, and 30 were daily fee courses) that occurred in California.

The public golf course sales demonstrated patterns in price per hole that is useful for comparing to Swenson and Van Buskirk.  While the locations of the golf course sales differ (some are located in more populated metropolitan areas, are located in neighborhoods with higher rate potential, are newer, have different appeal (USGA rankings, clubhouse improvements, course length)), and are different in condition/needed improvements, the price per hole ranged from $72,222 to $150,222, and per acre from $5,847 to $23,148.

**Relevant Golf Course Sale Comparables**

| Category | Swenson Golf Course | Woodhaven Golf Course | Sycamore Canyon Golf Course | Adobe Creek Golf Course | Darkhorse Golf Course | Woods Valley Golf Course | Valley Rose Golf Course |
|---|---|---|---|---|---|---|---|
| Location | Stockton | Palm Desert | Arvin | Petaluma | Auburn | Valley Center | Wasco |
| Golf Course Type | Municipal | Daily Fee | Daily Fee | Daily Fee | Daily Fee | Daily Fee | Daily Fee |
| Par | 72 | 70 | 72 | 72 | 72 | 71 | 72 |
| Sale Date | - | 2/15/2011 | 3/3/2011 | 3/21/2011 | 12/14/2012 | 10/24/2013 | 10/28/2013 |
| Sale Price | - | $2,500,000 | $1,300,000 | $2,500,000 | $1,450,000 | $2,704,000 | $2,050,000 |
| Holes | 27 | 18 | 18 | 18 | 18 | 18 | 18 |
| Price/Hole | - | $138,889 | $72,222 | $138,889 | $80,556 | $150,222 | $113,889 |
| Acres | 219 | 108 | 159 | 165 | 248 | 250 | 155 |
| Price/Acre | - | $23,148 | $8,174 | $15,127 | $5,847 | $10,816 | $13,212 |
| Course Length | 6,703 | 5,794 | 7,100 | 6,886 | 7,053 | 6,670 | 6,862 |
| USGA Course Rating | 69.8 | 67.1 | 74.2 | 73.8 | 75 | 72.2 | 74.1 |
| USGA Slope Rating | 113 | 118 | 125 | 131 | 140 | 131 | 126 |
| Ave. Price/Round | $25 - $31 | $49 - $69 | $25 - $29 | $36 - $52 | $45 - $69 | $40 - $55 | N/A |
| Clubhouse Rize | 9,500 | 34,000 | 10,800 | 15,000 | 14,700 | 7,150 | 9,500 |
| Year Built | 1952 | 1984 | 1989 | 1989 | 2002 | 2004 | 1991 |
| Geographic Location | - | Similar | Similar | Similar | Similar | Similar | Similar |

# GOLF COURSE VALUATION
# SALES COMPARISON APPROACH

As mentioned previously, I have also gathered listings of golf courses available for purchase. While these listings do not reflect consummated sales, they do provide additional supporting information.  In general, non-Hawaii courses range in listed price per hole from $64,815 to $194,444 (average $117,670 per hole for public courses), and from $6,064 to $35,000 per acre (average of $12,224).  These asking prices are certainly within the range of my overall sales database.

Based on the various similarities and differences of Swenson and Van Buskirk, I have estimated the following values presuming a fee simple ownership interest and before discounting for possessory interests:

**Swenson**:  $100,000 to $110,000 per hole (for 18 holes – the 9-hole executive course is considered in this estimate); $8,000 to $10,000 per acre; indicated value range:  $1.806 million to $2.186 million, rounded to $2,000,000

**Van Buskirk – Golf Course only**:  $60,000 to $70,000 per hole; $5,000 to $6,000 per acre; indicated value range:  $1.08 million to $1.358 million, rounded to $1,100,000

## GOLF COURSE RECONCILIATION OF VALUES

The Income and Sales Approaches were used to indicate values for the golf courses.  The fee simple interest indicated values from each approach are as follows:

| Property | Income Approach | Sales Approach | Reconciled Value (Assumes Fee Simple Ownership) |
|---|---|---|---|
| Swenson | $1,900,000 | $2,000,000 | $1,950,000 |
| Van Buskirk | $800,000 | $1,100,000 | $900,000 |

As indicated previously, the possessory interests are discounted from the fee simple values. The discounts are attributable to:  1) difficulty of obtaining financing to help defray capital investments necessary to enhance performance; 2) the financial operating history of the Properties that have reflected consistent years of financial losses; and 3) a prospective

# GOLF COURSE VALUATION
## SALES COMPARISON APPROACH

possessor will have to expend significant marketing and management resources to enhance the image and profitability of the courses with no certainty of achieving profitability.

The amount of discount for the possessory interest decreases as the length of the possessory time period increases (presuming possessory periods ending in 2038, 2048 and 2053). A longer possessory ownership period provides more financial flexibility to enhance performance and an extended payback period.

Assuming a possessory interest through September 1, 2038, I have applied a discount of approximately 10 percent to the fee simple value of Swenson, and a 20 percent discount to the fee simple value of Van Buskirk. Based on the other time periods of the possessory interests (other than a possessory interest perpetually), the following values are indicated (rounded):

| Property | As of March 26, 2014 (1) | As of March 26, 2014 (2) | As of March 26, 2014 (3) |
|---|---|---|---|
| Swenson | $1,750,000 | $1,800,000 | $1,850,000 |
| Van Buskirk (Golf Course Only) | $725,000 | $750,000 | $775,000 |

**(1)** Assumes possessory interest ends September 1, 2038
**(2)** Assumes possessory interest ends September 1, 2048
**(3)** Assumes possessory interest ends July 1, 2053

# OAK PARK VALUATION
# SALES COMPARISON APPROACH

Oak Park offers a unique mix of improvements for community/public use that include 11 tennis courts, 2 regulation softball fields, a 6,000 seat regulation professional minor league baseball field, a multi-use field, a community swimming pool complex with changing facilities, a 33,165 square foot ice rink facility and an approximately 5,000 square foot, one-story senior center. Most of the improvements that exist on the Oak Park site – baseball Stadium, baseball/softball fields, tennis courts, a swimming pool complex and senior center - have minimal value as they are older and in need of significant repairs and maintenance. Additionally, the improvements are very specialized and have limitations created by the possessory interest.

Although most of the improvements at Oak Park have minimal value, they have historically shown the ability to generate some revenue as seen in the financial summary below. With some capital improvements to enhance appeal and lower costs, revenue enhancement possibilities exist.

| REVENUE | 2009-10 | 2010-11 | 2011-12 | 2012-13 | % of Total Revenue |
|---|---|---|---|---|---|
| Oak Park Senior Center | | | | | |
| *Classes* | $3,507 | $3,095 | $5,764 | $5,344 | 1.0% |
| *Facility Rentals* | 10,006 | 10,288 | 13,477 | 12,256 | 2.5% |
| *Memberships* | 11,972 | 11,943 | 12,958 | 12,573 | 2.7% |
| Oak Park | | | | | |
| *Facility Rentals* | 24,381 | 24,404 | 22,830 | 19,697 | 5.1% |
| *Instructional Classes* | 900 | - | - | - | |
| Oak Park Swimming Pool | 13,828 | - | - | - | |
| Oak Park Ice Arena | 375,558 | 363,599 | 358,926 | 425,962 | 84.3% |
| Oak Park Ball Fields | 12,094 | 5,031 | 630 | 836 | 1.0% |
| Oak Park Tennis Center | 11,657 | 10,962 | 13,157 | 10,419 | 2.6% |
| **Total Revenue** | **$463,903** | **$429,322** | **$427,742** | **$487,087** | |

***Source:*** *The City of Stockton - Community Services - Recreation*

In my opinion, only the ice rink contributes material value to the property. Comparable sales were gathered from 2010 through 2013 for ice rinks throughout the country with similar types of improvements. Various factors were considered when comparable sales were selected, including location and city population, size of rink, age and condition of the facility and overall property size in acres. The following page summarizes the sales used.

# OAK PARK VALUATION
## SALES COMPARISON APPROACH

| Sale Date | Address | City | State | Zip Code | City Population | Sales Price | Size (SF) | Land (AC) | $/SF | $/Acre |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/13/2012 | 300 Bizzell Ave | Midwest City | OK | 73110 | 54,371 | $435,000 | 18,000 | 1.67 | $24 | $260,479 |
| 11/14/2012 | 201 S River Ridge Cir S | Burnsville | MN | 55337 | 60,306 | $800,000 | 11,000 | 1.82 | $73 | $439,560 |
| 10/23/2013 | 2095 Andrea Ln | Fort Myers | FL | 33912 | 62,298 | $995,000 | 17,600 | 1.88 | $57 | $529,255 |
| 1/22/2013 | 399 Alta Vista Ave | Fort Myers | FL | 33905 | 62,298 | $606,748 | 16,901 | 1.44 | $36 | $421,353 |
| 11/15/2012 | 11319 Memorial Pky SW | Huntsville | AL | 35803 | 180,105 | $1,500,000 | 21,728 | 2.37 | $69 | $632,911 |
| 3/30/2011 | 301 133rd St S | Tacoma | WA | 98444 | 198,397 | $500,000 | 18,864 | 2.00 | $27 | $250,000 |
| 4/30/2010 | 1420 George Washington Hwy N | Chesapeake | VA | 23323 | 222,209 | $1,800,000 | 19,620 | 4.08 | $92 | $441,176 |
| 4/28/2013 | 4649 Verona Rd | Madison | WI | 53711 | 233,209 | $94,700 | 21,120 | 2.70 | $4 | $35,074 |
| 9/14/2012 | 3131 W Hammer Ln | Stockton | CA | 95209 | 291,707 | $290,000 | 30,496 | 2.10 | $10 | $138,095 |
| 2/23/2011 | 950 Hillcrest Rd | Mobile | AL | 36695 | 412,992 | $642,500 | 21,209 | 2.06 | $30 | $311,893 |
| 12/8/2010 | 2020 Del Monte Ave | Monterey | CA | 93940 | 415,057 | $2,150,000 | 17,037 | 1.00 | $126 | $2,150,000 |
| 6/15/2011 | 800 Karen Ave | Las Vegas | NV | 89109 | 583,756 | $730,000 | 44,000 | 1.14 | $17 | $640,351 |
| 7/30/2010 | 2771 Clarke Rd | Memphis | TN | 38115 | 646,889 | $155,000 | 28,128 | 1.90 | $6 | $81,579 |
| 10/15/2012 | 8830 E WT Harris Blvd | Charlotte | NC | 28227 | 731,424 | $1,450,000 | 18,048 | 1.70 | $80 | $852,941 |
| | | | | | Average | $867,782 | 21,697 | 1.99 | $46 | $513,191 |

In many instances, properties with significant deferred maintenance and similar specialized improvements were acquired and subsequently razed to permit other uses. In such cases, the properties sold for a significant discount, essentially land value, with little value given to the improvements. Given the level of deferred maintenance and specialized improvements found at the Oak Park ice rink, I believe the improvements would fall into the lower range of value when comparing to sales of similar properties.

Based on the comparable sales, the fee simple value of the ice rink at Oak Park is $325,000 to $500,000, or approximately $10 to $15 per square foot of rink improvements. I rounded this estimate to $400,000. As previously noted, except for a perpetual possessory interest, the temporal possessory nature of the interest in Oak Park creates a substantial discount to fee value. Limitations created by the possessory interest restrict redevelopment possibilities. Additionally, it is possible that the on-going maintenance and capital expenditures needed to operate Oak Park could exceed any revenue producing abilities. As such, the possessory discount is significantly higher than that estimated for Swenson and Van Buskirk. I have discounted the fee value 40 percent (presuming a possessory interest through March 26, 2014). Based on other terms assumed for the possessory interest, my opinions are as follows:

# OAK PARK VALUATION
# SALES COMPARISON APPROACH

| Property | As of March 26, 2014 (1) | As of March 26, 2014 (2) | As of March 26, 2014 (3) |
|---|---|---|---|
| Oak Park | $240,000 | $250,000 | $260,000 |

**(1)** Assumes possessory interest ends September 1, 2038

**(2)** Assumes possessory interest ends September 1, 2048

**(3)** Assumes possessory interest ends July 1, 2053

# COMMUNITY CENTER VALUATION
# COST APPROACH

The Community Center at Van Buskirk serves the South Stockton Redevelopment Project Area. The 18,000 square foot facility opened in September 2007 after extensive renovations that include an indoor amphitheater, a climbing wall, a full gymnasium, a fitness facility, an arts and crafts room and two multipurpose rooms.  The center offers, among other things, free after-school programs and care, arts and crafts programs, dance programs, subsidized or free meals and brown bag giveaways, health and safety screenings and classes.  The center received the prestigious Award of Excellence in Design by the American Institute of Architects (AIA) in 2007.

In August 2006, a resolution of the Redevelopment Agency of the City approved the funding of $3,700,000 from bond proceeds for the renovation of the Community Center at Van Buskirk.  In March 2008, American Appraisal valued the reproduction cost of the Community Center at $3,154,000.

I have estimated the replacement cost of the Community Center using the Marshall Valuation Service Guide ("MVS"), a national cost estimating service.  The facility is characterized as a community center, Class C construction, of average quality.  Based on the methodology described in the MVS, the calculation on the following page summarizes the replacement cost new of the Facility.

# COMMUNITY CENTER VALUATION
## COST APPROACH

| Marshall Valuation Cost Calculation | | Comments |
|---|---|---|
| Class C (Average Construction) - Aug 2013 | $120.59 | Cost per SF |
| Van Buskirk Community Center Size | 17,237 | Square Footage |
| **Base Cost - Aug 2013** | **$2,078,610** | |
| Current Cost Multiplier | 1.02 | To bring cost current |
| **Base Cost - Feb 2014** | **$2,120,182** | |
| Add: Architect's Fee | $148,413 | |
| **Base Cost & Architects Fees** | **$2,268,595** | |
| Local Multiplier - Stockton | 1.19 | To adjust for geographical location |
| **Total Construction Cost** | **$2,699,628** | |
| Less: Depreciation - Deferred Maintenance | ($100,000) | |
| Less: Depreciation - Physical Deterioration | ($472,435) | Based on 40 year economic life and 7 years effective age |
| **Depreciated Replacement Cost - Building Improvements** | **$2,127,193** | |
| Contributory Value of Site Improvements | $50,000 | Parking lot, 13 picnic tables, a tot lot, 2 tennis courts, 2 ball fields, 3 basketball courts, 4 handball courts, 5 barbecue pits, 2 restrooms |
| **Total Depreciated Replacement Cost** | **$2,177,193** | |

I have applied a discount to the total depreciated replacement cost value of the Community Center based on the different time periods of the possessory interests (other than a possessory interest perpetually). The following values are indicated (rounded):

| Possessory Interest Discount | As of March 26, 2014 (1) | As of March 26, 2014 (2) | As of March 26, 2014 (3) |
|---|---|---|---|
| Total Depreciated Replacement Cost | $2,177,193 | $2,177,193 | $2,177,193 |
| *Less: Possessory Interest Discount* | 22% | 18% | 15% |
| **Value of Possessory Interest (Rounded)** | **$1,700,000** | **$1,775,000** | **$1,850,000** |

**(1)** Assumes possessory interest ends September 1, 2038
**(2)** Assumes possessory interest ends September 1, 2048
**(3)** Assumes possessory interest ends July 1, 2053

47

# VALUATION ASSUMING POSSESSORY
# INTEREST PERPETUALLY

A possessory interest perpetually is similar to fee ownership in a property. As such, the holder does not face the same challenges and constraints related to financing, redeveloping and changing the use of the Properties when specific ownership periods exist. The highest and best use of the Properties is different as if possession is perpetual than if time constrained. With perpetual possession, it is reasonably probable, physically possible and economically feasible that the improvements on the Properties would be demolished, and the land converted into residential, commercial or mixed-uses some time during the possessory period perpetually.

The value for the Properties with a possessory interest perpetually is land value. The existing improvements are considered to be interim uses until such time as a change of use can be achieved, and as market conditions dictate. I have used the sales of vacant land to estimate the Properties' value presuming a possessory interest perpetually.

Land sales were gathered for comparison purposes to the Properties. The size of the Properties - from 60 to over 200 acres - required that I search a broader area than the immediate Stockton area. As such, my sales database included those that were located along the I-5 corridor from Kern County to San Joaquin County. Sales that occurred from December 2012 to the present were gathered, and included land suitable for residential purposes. In total, over 500 sales were analyzed, of which 15 were deemed useful for comparison purposes due to their proximity to existing population or at the fringe of urban development and their size (in acres) that would allow larger scale residential/mixed residential commercial uses.

Over the past year and in the areas I researched and for the sales I selected, the overall sales volume was significant - over $98 million. The sales most useful for comparison to the Properties indicated a range in selling prices per acre from $10,145 to $77,165, with an average price of $27,000 per acre. Two of the sales considered were in San Joaquin County and were in excess of 100 acres. The first sale occurred in December 2012 for Tracy Hills for 2,204 acres for $60,000,000 ($27,223 per acre) with a specific development plan approved. The second sale occurred in October 2013 for Duck Creek Estates, an unimproved 114+ acre parcel that is located in Stockton a few miles east of Van Buskirk. That parcel sold for $1,392,600 ($12,210 per acre), and is comprised of non-contiguous parcels.

# VALUATION ASSUMING POSSESSORY
# INTEREST PERPETUALLY

Considering the location of the Properties, their size, environs and development potential, I conclude the following values per acre, presuming perpetual possession:

| Property | Site Size (Acres) | Value/Acre | Value (Rounded) |
|---|---|---|---|
| Swenson | 218.6 | $35,000 | $7,650,000 |
| Van Buskirk | 194 | $15,000 | $2,900,000 |
| Oak Park | 61.2 | $30,000 | $1,835,000 |

The valuation of the Community Center assuming a possessory interest perpetually, is equal to the total depreciated replacement cost of the facility, without a deduction for the leasehold discount, plus land value.

| Property | Total Depreciated Replacement Cost (Rounded) | Land Value (20 acres X $15,000 per acre) | Value |
|---|---|---|---|
| Community Center | $2,175,000 | $300,000 | $2,475,000 |

# FINAL VALUE CONCLUSIONS

Based on the foregoing, and considering the appropriate valuation approaches applied, my valuation conclusions are as follows:

| Property | As of March 26, 2014 (1) | As of March 26, 2014 (2) | As of March 26, 2014 (3) | As of March 26, 2014 (4) |
|---|---|---|---|---|
| Swenson | $1,750,000 | $1,800,000 | $1,850,000 | $7,650,000 |
| Van Buskirk* | $2,425,000 | $2,525,000 | $2,625,000 | $5,375,000 |
| Community Center | $1,700,000 | $1,775,000 | $1,850,000 | $2,475,000 |
| Oak Park | $240,000 | $250,000 | $260,000 | $1,835,000 |

**(1)** Assumes possessory interest ends September 1, 2038
**(2)** Assumes possessory interest ends September 1, 2048
**(3)** Assumes possessory interest ends July 1, 2053
**(4)** Assumes possessory interest runs perpetually

* Includes golf course and Community Center

# NATURE OF PAYMENTS UNDER LEASE AGREEMENT

Under the Lease Agreement, the "rent" payable by the City is equal to the amounts due in connection with the Bonds. I have considered whether that "rent" represented a fair market rent for the Properties and was related to the City's use and occupancy of the Properties as of the execution of the Lease Agreement.

Salient aspects of the Lease Agreement are as follows:

- The Lease Agreement between the Authority and the City provides for the City to "sublease" the Properties back from the Authority for the purpose of enabling the City to finance various capital improvements throughout the geographic boundaries of the City.
- The Authority authorized the issuance of Bonds in the aggregate principal amount of $35,080,000.
- The Lease Agreement commenced on September 1, 2009, and shall end on the earlier of September 1, 2038, or such earlier or later date on which the Bonds shall no longer be outstanding.
- "Rental" payments under the Lease Agreement are the amounts due and payable in respect of the Bonds.
- The Authority and the City "agree and determine" that the total payments under the Lease Agreement do not exceed the fair rental value of the Properties.

The City acknowledges that all such payments under the Lease Agreement have previously been assigned by the Authority to the Trustee in trust, for the benefit of the Owners of the Bonds, and the City consents to such assignment.

# NATURE OF PAYMENTS UNDER LEASE AGREEMENT

### SCHEDULE OF LEASE PAYMENTS

| Lease Payment Date | Lease Payment | Lease Payment Date | Lease Payment |
|---|---|---|---|
| 3/1/2010 | $1,154,233.47 | 9/1/2024 | $2,010,662.50 |
| 9/1/2010 | $1,207,918.75 | 3/1/2025 | $894,212.50 |
| 3/1/2011 | $1,207,918.75 | 9/1/2025 | $2,049,212.50 |
| 9/1/2011 | $1,207,918.75 | 3/1/2026 | $855,231.25 |
| 3/1/2012 | $1,207,918.75 | 9/1/2026 | $2,090,231.25 |
| 9/1/2012 | $1,207,918.75 | 3/1/2027 | $813,550.00 |
| 3/1/2013 | $1,207,918.75 | 9/1/2027 | $2,128,550.00 |
| 9/1/2013 | $1,732,918.75 | 3/1/2028 | $769,168.75 |
| 3/1/2014 | $1,190,200.00 | 9/1/2028 | $2,174,168.75 |
| 9/1/2014 | $1,755,200.00 | 3/1/2029 | $721,750.00 |
| 3/1/2015 | $1,171,131.25 | 9/1/2029 | $2,221,750.00 |
| 9/1/2015 | $1,771,131.25 | 3/1/2030 | $671,125.00 |
| 3/1/2016 | $1,150,881.25 | 9/1/2030 | $2,271,125.00 |
| 9/1/2016 | $1,790,881.25 | 3/1/2031 | $615,125.00 |
| 3/1/2017 | $1,129,281.25 | 9/1/2031 | $2,330,125.00 |
| 9/1/2017 | $1,814,281.25 | 3/1/2032 | $555,100.00 |
| 3/1/2018 | $1,106,162.50 | 9/1/2032 | $2,390,100.00 |
| 9/1/2018 | $1,836,162.50 | 3/1/2033 | $490,875.00 |
| 3/1/2019 | $1,081,525.00 | 9/1/2033 | $2,450,875.00 |
| 9/1/2019 | $1,861,525.00 | 3/1/2034 | $422,275.00 |
| 3/1/2020 | $1,055,200.00 | 9/1/2034 | $2,522,275.00 |
| 9/1/2020 | $1,890,200.00 | 3/1/2035 | $348,775.00 |
| 3/1/2021 | $1,027,018.75 | 9/1/2035 | $2,593,775.00 |
| 9/1/2021 | $1,917,018.75 | 3/1/2036 | $270,200.00 |
| 3/1/2022 | $996,981.25 | 9/1/2036 | $2,670,200.00 |
| 9/1/2022 | $1,946,981.25 | 3/1/2037 | $186,200.00 |
| 3/1/2023 | $964,918.75 | 9/1/2037 | $2,756,200.00 |
| 9/1/2023 | $1,979,918.75 | 3/1/2038 | $96,250.00 |
| 3/1/2024 | $930,662.50 | 9/1/2038 | $2,846,250.00 |

Financial information was compiled to analyze historical operational performance of the Properties before and after the issuance of the Bonds and the determination of the "rent" payment. The information presented below reflects income (loss) **before** and **after** the transaction was consummated. Some information for the Community Center and Oak Park was not available for this analysis.

# NATURE OF PAYMENTS UNDER LEASE AGREEMENT

| | Actuals | | | | | Forecast (1) |
|---|---|---|---|---|---|---|
| | 2008/09 | 2009/10 | 2010/11 | 2011/12 | 2012/13 | 2013/14 |
| **Swenson** | | | | | | |
| *Revenue* | $1,200,691 | $1,100,822 | $1,105,653 | $1,193,345 | $1,170,185 | $1,145,334 |
| *Expense* | $1,279,683 | $1,261,639 | $1,200,705 | $1,290,843 | $1,339,864 | $1,271,624 |
| **Net Income (Loss)** | **($78,992)** | **($160,817)** | **($95,052)** | **($97,498)** | **($169,679)** | **($126,290)** |
| **Van Buskirk** | | | | | | |
| *Revenue* | $549,882 | $569,477 | $531,837 | $576,148 | $538,337 | $548,045 |
| *Expense* | $831,771 | $846,462 | $802,663 | $754,091 | $704,000 | $763,339 |
| **Net Income (Loss)** | **($281,889)** | **($276,985)** | **($270,826)** | **($177,943)** | **($165,663)** | **($215,294)** |
| **Community Center (2)** | | | | | | |
| *Revenue* | $0 | $0 | $0 | $0 | $0 | $0 |
| *Expense* | $0 | $0 | $0 | $0 | $0 | $0 |
| **Net Income (Loss)** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| **Oak Park (3)** | | | | | | |
| *Revenue* | $0 | $463,903 | $429,322 | $427,742 | $487,087 | $420,000 |
| *Expense* | $0 | $603,465 | $605,017 | $795,171 | $787,633 | $537,595 |
| **Net Income (Loss)** | **$0** | **($139,562)** | **($175,695)** | **($367,429)** | **($300,546)** | **($117,595)** |
| **Total Income (Loss) (4)** | **($360,881)** | **($577,364)** | **($541,573)** | **($642,870)** | **($635,888)** | **($459,179)** |

**(1)** Golf course forecast from KemperSports.  Oak Park projection only includes the Ice rink forecast from SMG.
**(2)** No information provided.
**(3)** Oak Park financial information for 2008/09 was not provided.
**(4)** Total income does not include any lease payments between the Authority and City.

Using the combined financial information, I compared net operating results before and after contract "rent" called for under the Lease Agreement.  Financial results for the year ending June 30, 2009, the year prior to commencement of the Lease Agreement, indicate the Properties sustained an operating loss of approximately $361,000.  When the Lease Agreement commenced on September 1, 2009, the Properties did not have the ability to cover any rent obligation, much less the multimillion dollar "rent" provided under the Lease Agreement.

# NATURE OF PAYMENTS UNDER LEASE AGREEMENT

The blue line on the chart below represents the Properties' actual financial performance for the years ending June 30, 2009 through June 30, 2013 and a forecast for the year ending June 30, 2014. The red line represents the Properties financial performance with the contract "rent" obligation included.

The red line shows the dramatic impact of the added obligation of the Lease Agreement. To support the Lease Agreement "rent", revenues from the Properties would need to increase 2.4x the current levels, assuming that there was no commensurate increase in operating expenses. This dramatic increase in revenues is not achievable. Based on this information, it is readily apparent the Properties never had, nor were projected to have, the financial ability to pay the "rent" obligations under the Lease Agreement. The "rent" payable under the Lease Agreement was not in line or in no way related to the fair rental value (or the amount of rent that could have been paid) of the Properties or related to the City's use and occupancy of the Properties at the time the Lease Agreement was executed.



| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| NOL After Contract Rent | ($360,881) | ($1,731,597) | ($2,957,411) | ($3,058,708) | ($3,051,726) | ($3,382,298) |
| NOL Before Contract Rent | ($360,881) | ($577,364) | ($541,573) | ($642,870) | ($635,888) | ($459,179) |

54

## NATURE OF PAYMENTS UNDER LEASE AGREEMENT

I understand that the City contends that, at the time that the Lease Agreement was executed in 2009, "the rent payable thereunder was commensurate with the fair rental value *to the City* of continuing to operate the" Properties.  The City notes that it periodically considers the value to its citizenry of the City's services and facilities, "considering the cost of the services and the funds available to provide such services and facilities, determining which are essential or non-essential."  This assertion has no basis or relevancy for purposes of establishing "fair market rent", as it is meaningless to any party other than the City.   A normal fair market rent situation would involve a landlord that possesses real property that is marketable and in demand by third parties and whose rent would be determined by a free market exchange by third parties, all attempting to maximize their own positions.  Under a market exchange, a landlord would not base its rent payable on whether the tenant could profitably, efficiently or economically operate the property.

If the tenant's economic characteristics and ability to pay were assumed to be a relevant component of the rent determination, a very different Lease Agreement and leaseback agreement would have been written, economically and structurally, that would provide landlord additional economic benefits, as well as negative adjustments, over the term of the lease, based on various performance benchmarks as measured at different points in time.   The Lease Agreement does not contain any of these key provisions that allow for rent adjustments up or down based on the tenant's ability to pay.

Based on the above characteristics, the rent contained in the Lease Agreement was not a fair market rent at the time the agreement was executed in 2009.

# APPRAISAL COMMENTS

An appraisal of certain of the City's real estate assets was performed by American Appraisal, dated June 3, 2008 (the "Appraisal Report"). The Appraisal Report included the Swenson, Van Buskirk and Oak Park properties and included only the reproduction cost new of the improvements. The date of valuation of the Appraisal Report was as of March 6, 2008. The Appraisal Report and the valuations expressed for the Subject Properties were cited in the Official Statement, more specifically on page 15. In that Official Statement, the Subject Properties were purported to have "market values" of $8.6 million for Swenson; $8.3 million for Van Buskirk; and $19.4 million for Oak Park. The values used by the City and RBC specifically referenced the Appraisal Report. A footnote to the values in the Official Statement stated "based upon appraisals completed by American Appraisals, Inc. in June 2008."

I reviewed the Appraisal and the Official Statement. Clearly, the footnote contained in the Official Statement misstates and erroneously labels the valuations contained in the Appraisal Report as market values. The Appraisal Report does not purport to include "market values" of the assets; in fact, the Appraisal Report very clearly states that the purpose and function of the report is to express an opinion of the "cost of reproduction new of the subject assets for insurance placement and risk management (page 1 of the transmittal letter)." Page 3 of the Appraisal Report states "[t]he premise of value for the assets included in our report is cost of reproduction cost new for the identified real (exclusive of land) and personal property of City of Stockton, as of March 6, 2008." Page 4 of the Appraisal Report further states "In accordance with USPAP guidelines, all basic approaches to value were considered; however, because the purpose of our investigation was to express an opinion of the cost of reproduction cost new of the subject assets for insurance placement and risk management, it was considered appropriate to rely solely on the cost approach."

It is very clear that the Appraisal Report does not purport to express opinions of market value, but instead, clearly defines the values expressed for insurance purposes and no other purpose. The transmittal letter clearly states that ". . . this report is invalid if used for any other purpose (e.g. other than for insurance placement and risk management)."

Insurable value differs significantly from market value as defined and used in this report, as well as how market value is commonly understood by market participants. The cost of reproduction new as used throughout the Appraisal Report differs substantially from market value; reproduction cost new does not consider any depreciation (physical, functional or economic), nor is it tested against market transactions of similar properties. Furthermore, significant amounts of depreciation exist at the Properties.

# APPRAISAL COMMENTS

In addition to using insurable values for the Property improvements from the Appraisal Report, the City added real estate land values to Swenson, Van Buskirk and Oak Park. The City's estimated land values appear to have been prepared by the City's property department and were based on values attributable to properties of less than one acre in size and with residential zoning. The Properties are well over 1 acre and are not zoned residential. The land values represented approximately one third of the total market value disclosed in the Official Statement, or $11,744,708. To my knowledge, these land values were not reviewed by American Appraisal. The land values used by the City in the Official Statement reflect fee simple ownership. The additive aspect of land and the inconsistent methodology deployed further distorts and misstates the value of the Properties.

In their Official Statement, the City and RBC misstate and misuse the Appraisal Report, and mislead readers of the Official Statement to believe that independent market valuations have been performed on the properties by American Appraisal. Absent a review of the Appraisal Report and with reliance only on the Official Statement, a reader could easily be misled to believe that the market value of the Subject Properties had been independently derived and substantiated. Moreover, given the potentially limited nature of the possessory interests at issue, even use of a true market value of a fee simple interest in the Properties potentially would be misleading to purchasers of the Bonds.

In my opinion, the amounts and comments contained in the Official Statement should have not been relied on for underwriting purposes for the extension of credit or used in the sale of the Bonds. The Official Statement's use of the Appraisal Report's insurable values and the City's estimated land values is flawed, misleading and erroneous for any lending or extension of credit purpose.

# ADMINISTRATIVE RENT

I have been asked to consider (a) the "contract rent" accrued under the Lease Agreement for the period from the bankruptcy petition date through June 30, 2014; and (b) the fair market rent for the Properties for that period.

## Contract Rent

The amount of contract rent owed from June 28, 2012 through June 30, 2014 is $5,374,020.

| Bond Term | | |
|---|---|---|
| Debt | | $15,905,000 |
| Maturity Date | | 9/1/2029 |
| Rate | | 6.75% |
| Date | Interest Pmt | Sink Fund Redemption |
| 6/28/2012 - 9/1/2012 | $196,824.38 | - |
| 3/1/2013 | $536,793.75 | - |
| 9/1/2013 | $536,793.75 | $525,000 |
| 3/1/2014 | $519,075.00 | - |
| 3/2/2014 - 6/30/2014 | $348,933.75 | - |
| **Total** | **$2,138,420.63** | **$525,000.00** |

| Bond Term | | |
|---|---|---|
| Debt | | $19,175,000 |
| Maturity Date | | 9/1/2038 |
| Rate | | 7.00% |
| Date | | Interest Pmt |
| 6/28/2012 - 9/1/2012 | | $246,079.17 |
| 3/1/2013 | | $671,125.00 |
| 9/1/2013 | | $671,125.00 |
| 3/1/2014 | | $671,125.00 |
| 3/2/2014 - 6/30/2014 | | $451,145.14 |
| **Total** | | **$2,710,599.31** |

| Bonds - Combine Totals | | | |
|---|---|---|---|
| Date | Interest | Principal | Total |
| 6/28/2012 - 9/1/2012 | $442,903.54 | - | $442,903.54 |
| 3/1/2013 | $1,207,918.75 | - | $1,207,918.75 |
| 9/1/2013 | $1,207,918.75 | $525,000 | $1,732,918.75 |
| 3/1/2014 | $1,190,200.00 | - | $1,190,200.00 |
| 3/2/2014 - 6/30/2014 | $800,078.89 | - | $800,078.89 |
| **Total** | **$4,849,019.93** | **$525,000.00** | **$5,374,019.93** |

## Fair Market Rent

Based on my analysis of the Properties, I also have estimated the fair market rent for the Properties. I considered two approaches to determine fair market rent.

# ADMINISTRATIVE RENT

**Occupancy Cost Analysis**

The occupancy cost ratio which is most commonly used in the retail industry to measure reasonable occupancy costs and to help determine the amount of rent a business can afford to pay. Occupancy costs typically range from between 8 to 12 percent of gross revenue. The differences in rate are driven by many factors including location and accessibility, competition in the local market, general condition of the improvements, signage and specific location within a property. For the purposes of this analysis, 10 percent of the 2012/13 gross revenues reflects the fair market rate for the Properties. The Community Center's gross revenue was not available for this analysis.

| Property | Gross Revenue | Percent | Annual Rent |
|----------|---------------|---------|-------------|
| Swenson | $1,170,185 | 10.00% | $117,019 |
| Van Buskirk | $538,337 | 10.00% | $53,834 |
| Oak Park | $487,087 | 10.00% | $48,709 |
| **Total Rent** | | | **$219,561** |

**Present Value Analysis**

Another method I used to estimate fair market rent is based on the calculation of the net present value of a market rental rate over the holding period. In this analysis, the net present value of the total rent payments should equal the value of possessory interest. Using certain assumptions and the estimated value, one is solving for the starting annual rent. Assumptions I used in this analysis include a discount rate of 8 percent and an annual rent increase of 2 percent. The annual increase is based on a historical (20 year) average CPI increase which is tracked by the Bureau of Labor Statistics. Below is a summary of my calculation.

| Assumptions | Swenson | Van Buskirk | Community Center | Oak Park |
|-------------|---------|-------------|------------------|----------|
| *Value of Possessory Interest (1)* | $1,750,000 | $725,000 | $1,700,000 | $240,000 |
| *Annual Increases* | 2% | 2% | 2% | 2% |
| *Discount Rate* | 8% | 8% | 8% | 8% |
| *Starting Annual Rent* | $138,000 | $57,180 | $133,920 | $18,900 |

(1) Assumes possessory interest ends September 1, 2038

| Assumptions | Swenson | Van Buskirk | Community Center | Oak Park |
|-------------|---------|-------------|------------------|----------|
| *Value of Possessory Interest (2)* | $1,800,000 | $750,000 | $1,775,000 | $250,000 |
| *Annual Increases* | 2% | 2% | 2% | 2% |
| *Discount Rate* | 8% | 8% | 8% | 8% |
| *Starting Annual Rent* | $124,800 | $52,020 | $123,120 | $17,280 |

(2) Assumes possessory interest ends September 1, 2048

# ADMINISTRATIVE RENT

| Assumptions | Swenson | Van Buskirk | Community Center | Oak Park |
|---|---|---|---|---|
| *Value of Possessory Interest (3)* | $1,850,000 | $775,000 | $1,850,000 | $260,000 |
| *Annual Increases* | 2% | 2% | 2% | 2% |
| *Discount Rate* | 8% | 8% | 8% | 8% |
| *Starting Annual Rent* | $123,600 | $51,780 | $123,600 | $17,280 |

(3) Assumes possessory interest ends July 1, 2053

## Reconciliation of Occupancy Cost and Present Value Analysis

Below is a summary of the occupancy cost and present value rent analysis.  I will use the rounded average of the two methods.

| Property | Occupancy Cost | Present Value - Possessory Interest Ending | | | Average Rent (Rounded) |
|---|---|---|---|---|---|
| | | 9/1/2038 | 9/1/2048 | 7/1/2053 | |
| Swenson | $117,019 | $138,000 | $124,800 | $123,600 | $126,000 |
| Van Buskirk | $53,834 | $57,180 | $52,020 | $51,780 | $54,000 |
| Community Center | N/A | $133,920 | $123,120 | $123,600 | $127,000 |
| Oak Park | $48,709 | $18,900 | $17,280 | $17,280 | $26,000 |
| **Total Rent** | **$219,561** | **$348,000** | **$317,220** | **$316,260** | **$300,000** |

## Administrative Rent – Perpetual Possession

In the case of the administrative rent payable under the presumption that possession is perpetual, the second approach, the present value analysis, was used.  Since the possession period is perpetual, the discount rate is equal to the rent rate percentage.  Therefore:

| Property | Value | Annual Rent at 8% (Rounded) |
|---|---|---|
| Swenson | $7,650,000 | $612,000 |
| Van Buskirk | $2,900,000 | $232,000 |
| Community Center | $2,475,000 | $198,000 |
| Oak Park | $1,835,000 | $147,000 |
| **Totals** | **$14,860,000** | **$1,189,000** |

# ADDENDUM

# SUBJECT PHOTOGRAPHS

## Swenson Golf Course



1 - Clubhouse area looking west from the parking lot



2 - South end of the parking lot looking north

# SUBJECT PHOTOGRAPHS



3 - Northern boundary looking south



4 - South end of the parking lot looking south

# SUBJECT PHOTOGRAPHS

## Van Buskirk Golf Course



1 - Clubhouse area looking south from the parking lot



2 - East end of the parking lot looking west

## SUBJECT PHOTOGRAPHS



3 - Northeastern boundary looking south



4 - Northwestern boundary looking south

# SUBJECT PHOTOGRAPHS

## Van Buskirk Community Center



1 - Front entrance area looking south from the driveway



2 - South end of the tennis courts looking west

# SUBJECT PHOTOGRAPHS



3 - Eastern end of the parking lot looking east



4 - Northern end of basketball courts looking northwest

# SUBJECT PHOTOGRAPHS

## Oak Park



1 - Southeast side of Billy Hebert Field



2 - Eastern area of the park looking northeast to the ice rink

# SUBJECT PHOTOGRAPHS



3 - Western parking lot looking north to the softball/baseball fields



4 - Northeastern boundary looking west to the senior center

## SUBJECT PHOTOGRAPHS



5 - Western parking lot looking south to the tennis courts



6 - Alvarado Ave looking east to the baseball fields

# SUBJECT PHOTOGRAPHS



7 - Eastern parking lot looking west



8 - Eastern area of the park looking southwest to the pool

# DESCRIPTION OF THE SITE

**OAK PARK SITE**

PARCEL A:

A PORTION OF THE NORTHEAST QUARTER OF SECTION 18, OF C.M. WEBER'S GRANT, "EL RANCHO DEL CAMPO DE LOS FRANCESES", MORE PARTICULARY DESCRIBED AS FOLLOWS, TO-WIT:

COMMENCING AT THE SOUTHWEST CORNER OF THE MAXWELL OR SPERRY TRACT (SO CALLED), IN SAID SECTION 18 OF SAID C.M. WEBER'S GRANT, AND RUNNING THENCE SOUTH 73 DEGREES 55' WEST, ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 18, 17.33 CHAINS; THENCE NORTH 16 DEGREES 05' WEST 17.32 CHAINS TO A STAKE; THENCE NORTH 73 DEGREES 55' EAST 17.33 CHAINS TO A STAKE, THENCE SOUTH 16 DEGREES 05' EAST, 17.32 CHAINS TO THE POINT OF COMMENCEMENT.

A.P.N. 115-270-01 PORTION

PARCEL B:

LOT FOURTEEN (14) AS SHOWN UPON THE MAP ENTITLED "MAP OF THE SPERRY TRACT" FILED FOR RECORD OCTOBER 2, 1906, IN VOL. 3 OF MAPS AND PLATS, PAGE 51 , SAN JOAQUIN COUNTY RECORDS.

EXCEPTING THEREFROM ALL THAT PORTION DESCRIBED IN THE DEED TO PARK VILLAGE APARTMENTS, A CALIFORNIA NON-PROFIT PUBLIC BENEFIT CORPORATIN RECORDED JULY 12, 1996, AS SERIES NO. 96073005 SAN JOAQUIN COUNTY RECORDS.

A.P.N. 115-270-01 PORTION AND 115-270-02 PORTION.

PARCEL C:

BEGINNING AT A POINT ON THE SECTION LINE BETWEEN SECTIONS 18 AND 30 DISTANT THEREON 3437.2 FEET NORTHERLY FROM THE COMMON CORNER OF SECTIONS 18, 30, 31 AND 19 OF C.M. WEBER'S GRANT, "EL RANCHO DEL CAMP DE LOS FRANCESES," SAID POINT BEING 80 FEET WESTERLY MEASURED AT RIGHT ANGLES TO ENGINEER'S STATION 147+52.9 ON THE CENTERLINE OF THE WESTERN PACIFIC RAILROAD COMPANY'S MAIN LINE OF RAILROAD FROM SAN FRANCISCO, CALIFORNIA, TO SALT LAKE CITY, UTAH; THENCE SOUTH 73 DEGREES 05' WEST 1,145.30 FEET ALONG THE SOUTHERLY BOUNDARY OF A PORTION OF THAT PARTICULARLY TRACT OF LAND CONVEYED TO MARY S. SPERRY TO THE WESTERN PACIFIC RAILWAY COMPANY, RECORDED SEPTEMBER 15, 1906, IN BOOK A, VOL. 157 OF DEEDS, PAGE 7, RECORDS OF SAN JOAQUIN COUNTY, STATE OF CALIFORNIA; THENCE NORTH 16 DEGREES 55' WEST 45 FEET TO A POINT; THENCE NORTH 73 DEGREES 05' EAST 755.0 FEET TO A POINT; THENCE ON A CURVE TO THE LEFT HAVING A RADIUS OF 453.3 FEET A DISTANCE OF 565.96 FEET, THE LONG CHORD OF WHICH BEARS NORTH 35 DEGREES 53'55" EAST 530.90 FEET TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF THE ABOVE MENTIONED RAILROAD; SAID POINT BEING 50 FEET WESTERLY MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF SAID RAILROAD; THENCE SOUTH 16 DEGREES 30' EAST 50 FEET FROM AND PARALLEL TO SAID CENTERLINE OF SAID RAILROAD A

# DESCRIPTION OF THE SITE

DISTANCE OF 365.88 FEET TO A POINT; THENCE SOUTH 73 DEGREES 05' WEST 50.0 FEET TO THE POINT OF BEGINNING.

A.P.N. 115-270-02 PORTION

**SWENSON GOLF COURSE**

PARCEL A:

ALL THAT CERTAIN PIECE OR PARCEL OF LAND SITUATE, LYING AND BEING IN PORTIONS OF SECTIONS 19 AND 20, TOWNSHIP 2 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDIAN, CITY OF STOCKTON, COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SECTION CORNER COMMON TO SECTIONS 17,18, 19 AND 20, TOWNSHIP 2 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDAN; THENCE SOUTH 89 DEGREES 5713" EAST, ALONG THE NORTH LINE OF SAID SECTION 20, A DISTANCE OF 1,077.04 FEET TO A POINT; THENCE SOUTH 41 DEGREES 50' EAST 181.36 FEET TO A POINT AT THE NORTHEASTERLY CORNER OF THE PROPERTY DEEDED TO THE CITY OF STOCKTON ( RECORDED IN VOLUME 1040 AT PAGE 409 OF THE OFFICIAL RECORDS OF SAN JOAQUIN COUNTY); THENCE SOUTH 89 DEGREES 2018" WEST, ALONG THE NORTH LINE OF SAID CITY PROPERTY, 1,238.0 FEET, MORE OR LESS, TO THE EAST LINE OF "LINCOLN VILLAGE WEST, UNIT NO. 28" AS SAID EAST LINE AS SHOWN UPON THE OFFICIAL MAP THEREOF, FILED IN VOLUME 20 AT PAGE 72 OF THE BOOK OF MAPS AND PLATS, SAN JOAQUIN COUNTY; THENCE NORTH 00 DEGREES 01'54" WEST, ALONG SAID EAST LINE AND ITS NORTHERLY PROLONGATION, 149.85 FEET TO THE NORTH LINE OF THE AFORESAID SECTION 19; THENCE NORTH 89 DEGREES 21'07" EAST, ALONG SAID NORTH LINE OF SECTION 19, A DISTANCE OF 40.0 FEET TO THE HEREIN BEFORE-MENTIONED POINT OF BEGINNING.

A.P.N. 097-110-15 & 16

PARCEL B:

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF STOCKTON, COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

THAT PORTION OF SECTIONS 19 AND 20, TOWNSHIP 2 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WEST LINE OF ALEXANDRIA PLACE, SAID POINT BEING THE NORTHEAST CORNER OF THE PROPERTY SHOWN AS PARCEL E CONVEYED TO THE CITY OF STOCKTON BY DEED RECORDED DECEMBER 14, 1954, IN BOOK OF OFFICIAL RECORDS, VOL. 1696, PAGE 169, SAN JOAQUIN COUNTY RECORDS, SAID POINT BEARING SOUTH 82 DEGREES 00' WEST 160.38 FEET FROM AN IRON PIPE AT THE SOUTHEAST CORNER OF THE PROPERTY CONVEYED TO THE CITY OF STOCKTON BY DEED RECORDED MARCH 7, 1947, IN BOOK OF OFFICIAL RECORDS, VOL. 1040, PAGE 409, SAN JOAQUIN

# DESCRIPTION OF THE SITE

COUNTY RECORDS; THENCE ALONG THE WEST LINE OF SAID ALEXANDRIA PLACE, SOUTH 11 DEGREES 56' EAST A DISTANCE OF 49.45 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 20 FEET, AN ARC DISTANCE OF 25.65 FEET (THE LONG CHORD OF WHICH BEARS SOUTH 24 DEGREES 48'29.6 WEST) TO A POINT OF CURVE BEING ON THE NORTH LINE OF BENJAMIN HOLT DRIVE; THENCE ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 1,800 FEET, AN ARC DISTANCE OF 102.11 FEET; THENCE CONTINUING ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 1,800 FEET, AN ARC DISTANCE OF 125.14 FEET (THE LONG CHORD OF WHICH BEARS SOUTH 66 DEGREES 47'30" WEST); THENCE NORTH 21 DEGREES 13' WEST A DISTANCE OF 139.12 FEET TO A POINT ON THE SOUTH LINE OF SAID PROPERTY CONVEYED TO CITY OF STOCKTON BY DEED RECORDED IN BOOK OF OFFICIAL RECORDS, VOL. 1040, PAGE 409, SAN JOAQUIN COUNTY RECORDS; THENCE SOUTH 82 DEGREES 00' WEST 1125.03 FEET; THENCE SOUTH 5 DEGREES 3511" EAST 109.67 FEET; THENCE NORTH 85 DEGREES 28'45" WEST 507.45 FEET; THENCE SOUTH 82 DEGREES 00' WEST 1,224.34 FEET TO POINT; THENCE NORTHWESTERLY ON A CURVE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 20.0 FEET, AN ARC DISTANCE OF 31.42 FEET (THE LONG CHORD OF WHICH BEARS NORTH 47 DEGREES 34'44" WEST 28.28 FEET); THENCE NORTH 2 DEGREES 34'44" WEST 30.0 FEET; THENCE NORTHWESTERLY ALONG A CURVE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 360 FEET, AN ARC DISTANCE OF 299.10 FEET (THE LONG CHORD OF WHICH BEARS NORTH 26 DEGREES 22'50" WEST) TO THE WEST LINE OF PROPERTY CONVEYED TO CITY OF STOCKTON BY DEED RECORDED JULY 15, 1948 IN BOOK OF OFFICIAL RECORDS, VOL. 1133, PAGE 459, SAN JOAQUIN COUNTY RECORDS; THENCE NORTH 2,853.37 FEET TO A POINT IN THE NORTH LINE OF LAST SAID PROPERTY CONVEYED TO THE CITY OF STOCKTON, SAID POINT BEING WEST 40 FEET FROM SECTION LINE COMMON TO SECTIONS 19 AND 20; THENCE NORTH 89 DEGREES 2018" EAST 1,193.54 FEET, MORE OR LESS, TO A POINT WHICH BEARS SOUTH 89 DEGREES 5713" EAST A DISTANCE OF 1,077.04 FEET AND SOUTH 41 DEGREES 50' EAST A DISTANCE OF 181.36 FEET FROM THE SECTION CORNER COMMON TO SECTIONS 17, 18, 19 AND 20, TOWNSHIP 2 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDAN; THENCE NORTH 41 DEGREES 50' WEST 181.36 FEET TO A POINT ON THE NORTH LINE OF SAID SECTION 20; THENCE ALONG THE NORTH LINE OF SAID SECTION 20, SOUTH 89 DEGREES 50'20" EAST, 565.80 FEET TO THE INTERSECTION WITH THE NORTHERLY EDGE OF FIVE MILE CREEK; THENCE SOUTH 59 DEGREES 12' EAST 31.41 FEET; THENCE SOUTH 10 DEGREES 32' EAST 37.65 FEET; THENCE SOUTH 82 DEGREES 17' EAST 53.15 FEET; THENCE NORTH 62 DEGREES 42' EAST 56.37 FEET; THENCE NORTH 32 DEGREES 41' EAST 40.34 FEET TO NORTH LINE OF SAID SECTION 20; THENCE SOUTH 89 DEGREES 50'20" EAST 494.19 FEET TO THE NORTHWEST CORNER OF UNIT 27, LINCOLN VILLAGE, ACCORDING TO THE OFFICIAL MAP THEREOF FILED IN VOL. 14 OF MAPS, PAGE 129, SAN JOAQUIN COUNTY RECORDS; THENCE ALONG THE WESTERLY AND SOUTHERLY LINE OF SAID UNIT 27, LINCOLN VILLAGE, AS FOLLOWS: SOUTH 144.73 FEET; SOUTH 52 DEGREES 00' EAST 132.50 FEET; THENCE SOUTH 58 DEGREES 40' EAST, 201 FEET; THENCE SOUTH 71 DEGREES 50' EAST 129.79 FEET; THENCE EAST 100.00 FEET; THENCE NORTH 60 DEGREES 10' EAST 159.32 FEET TO CENTER LINE OF ALEXANDRIA PLACE, A 60 FOOT WIDE ROAD, AS SHOWN ON MAP OF SAID UNIT 27, LINCOLN VILLAGE; THENCE ALONG THE CENTER LINE OF SAID ALEXANDRIA PLACE, AS FOLLOWS:

SOUTH 6 DEGREES 20' EAST 44.26 FEET; THENCE SOUTHERLY ON A CURVE TO THE RIGHT, RADIUS OF 370 FEET (LONG CHORD BEARS SOUTH 1 DEGREES 25' WEST 99.79 FEET) AN ARC DISTANCE OF 100.09 FEET; THENCE SOUTH 9 DEGREES 10' WEST 120 FEET; THENCE SOUTHERLY ON A CURVE TO THE LEFT,

# DESCRIPTION OF THE SITE

RADIUS 470 FEET (LONG CHORD BEARS SOUTH 0 DEGREES 35' WEST 140.30 FEET) AN ARC DISTANCE OF 140.82 FEET; THENCE SOUTH 8 DEGREES 00' EAST 200.21 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE LEFT HAVING A RADIUS OF 330 FEET (THE LONG CHORD OF SAID CURVE BEARS SOUTH 16 DEGREES 43' EAST) AND HAVING AN ARC DISTANCE OF 100.41 FEET TO A POINT; THENCE SOUTH 25 DEGREES 26" EAST, A DISTANCE OF 23.67 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE RIGHT HAVING A RADIUS OF 330 FEET ( THE LONG CHORD OF SAID CURVE BEARS SOUTH 17 DEGREES 51' EAST) AND HAVING AN ARC DISTANCE OF 87.35 FEET TO A POINT; THENCE SOUTH 10 DEGREES 16' EAST, A DISTANCE OF 166.03 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE RIGHT HAVING A RADIUS OF 530 FEET (THE LONG CHORD OF SAID CURVE BEARS SOUTH 4 DEGREES 23' EAST) AND HAVING AN ARC DISTANCE OF 108.84 FEET TO A POINT; THENCE SOUTH 1 DEGREES 30' WEST A DISTANCE OF 76.71 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE LEFT HAVING A RADIUS OF 630 FEET ( THE LONG CHORD OF SAID CURVE BEARS SOUTH 4 DEGREES 3170" EAST) AND HAVING AN ARC DISTANCE OF 132.44 FEET TO A POINT; THENCE SOUTH 10 DEGREES 32'40" EAST, A DISTANCE OF 716.96 FEET TO A POINT; THENCE SOUTH 2 DEGREES 4672" EAST A DISTANCE OF 449.50 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE LEFT HAVING A RADIUS OF 200 FEET (THE LONG CHORD OF SAID CURVE BEARS SOUTH 1 DEGREES 23'50" EAST) AND HAVING AN ARC DISTANCE OF 73.56 FEET TO A POINT; THENCE SOUTH 11 DEGREES 56' EAST A DISTANCE OF 57.84 FEET TO A POINT, SAID POINT BEARS NORTH 78 DEGREES 04' EAST 30 FEET FROM POINT OF BEGINNING; THENCE SOUTH 78 DEGREES 04' EAST 30 FEET TO THE POINT OF BEGINNING.

EXCEPT THE EAST 30 FEET LYING IN ALEXANDRIA PLACE.

ALSO EXCEPTING THEREFROM ALL THAT PORTION DESCRIBED AS FOLLOWS:

ALL THAT REAL PROPERTY LOCATED IN THE NORTHWEST QUARTER OF SECTION 20, TOWNSHIP 2 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWESTERLY CORNER OF THAT CERTAIN 21.282 ACRE PARCEL OF LAND AS DEEDED TO THE CITY OF STOCKTON AND RECORDED IN BOOK OF OFFICIAL RECORDS IN VOLUME 2271 ON PAGE 125, SAN JOAQUIN COUNTY RECORDS; THENCE SOUTH 89 DEGREES 5070" EAST A DISTANCE OF 450.80 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 89 DEGREES 5070" EAST A DISTANCE OF 100 FEET; THENCE SOUTH 72 DEGREES 4114" WEST A DISTANCE OF 52.42 FEET; THENCE SOUTH 85 DEGREES 31'49" WEST A DSITANCE OF 50.16 FEET; THENCE NORTH 0 DEGREES 09'40" EAST A DISTANCE OF 19.79 FEET TO A POINT, SAID POINT BEING THE POINT OF BEGINNING.

A.P.N. 097-110-24

# DESCRIPTION OF THE SITE

**VAN BUSKIRK GOLF COURSE**

PARCEL A:

A TRACT OF LAND SITUATED IN THE COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, IN SECTION 22, TIN, R6E., M.D.B&M., AND SECTIONS 10 AND 11 OF C.M. WEBER GRANT, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A CONCRETE MONUMENT BEARING DUE SOUTH 1, 160.00 FEET FROM THE SOUTHWEST CORNER OF LOT NUMBERED 1 IN BLOCK NUMBERED 7 OF LEVER VILLAGE, UNIT NO. 1, AS PER MAP FILED IN BOOK OF MAPS VOLUME 14 AT PAGE 22, SAN JOAQUIN COUNTY RECORDS; THENCE DUE EAST 173.14 FEET TO A CONCRETE MONUMENT; THENCE EASTERLY ON A CURVE TO THE LEFT, RADIUS 2,410 FEET (LONG CHORD BEARS NORTH 79 DEGREES 34'43.5" EAST, 871.86 FEET) AN ARC DISTANCE OF 876.69 FEET TO A CONCRETE MONUMENT AT POINT OF REVERSE CURVE; THENCE EASTERLY ON A CURVE TO THE RIGHT, RADIUS 1,590 FEET (LONG CHORD BEARS NORTH 73 DEGREES 29'43.5" EAST, 240.53) AN ARC DISTANCE OF 240.76 FEET TO A CONCRETE MONUMENT AT END OF CURVE; THENCE NORTH 77 DEGREES 50' EAST 320.00 FEET TO A CONCRETE MONUMENT IN THE WESTERLY LINE AT THE FRENCH CAMP ROAD; THENCE ALONG THE WESTERLY LINE OF THE FRENCH CAMP ROAD, SOUTH 12 DEGREES 10' EAST, 1220 FEET TO THE NORTHERLY OR RIGHT BANK OF WALKER SLOUGH; THENCE DOWNSTREAM ALONG THE NORTHERLY OR RIGHT BANK OF WALKER SLOUGH, AS FOLLOWS:

NORTH 71 DEGREES 12' WEST, 220 FEET; NORTH 65 DEGREES 55' WEST, 247.5 FEET; NORTH 67 DEGREES 28' WEST, 446 FEET; NORTH 66 DEGREES 17' WEST, 199 FEET; NORTH 76 DEGREES 04' WEST 141 FEET; SOUTH 84 DEGREES 42' WEST, 357 FEET; SOUTH 84 DEGREES 20' WEST, 312 FEET TO A POINT THAT IS DUE SOUTH OF THE POINT OF BEGINNING; THENCE LEAVING WALKER SLOUGH, DUE NORTH 506 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION THEREOF CONVEYED TO THE STATE OF CALIFORNIA BY QUITCLAIM DEED, RECORDED MARCH 29, 1968, IN BOOK 3198, PAGES 288 AND 296, OFFICIAL RECORDS.

PARCEL B:

A TRACT OF LAND SITUATED IN THE COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, SECTION 22, TIN., R6E, M.D.B.&M., AND MORE PARTICUARLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A CONCRETE MONUMENT BEARING DUE SOUTH 1, 160.00 FEET FROM THE SOUTHWEST CORNER OF LOT NUMBERED 1 IN BLOCK NUMBERED 7 OF LEVER VILLAGE, UNIT NO. 1, AS PER MAP FILED IN BOOK OF MAPS, VOLUMNE 14, PAGE 22, SAN JOAQUIN COUNTY RECORDS; THENCE DUE SOUTH 506 FEET TO THE NORTHERLY OR RIGHT BANK OF WALKER SLOUGH; THENCE DOWNSTREAM ALONG THE NORTHERLY OR RIGHT BANK OF WALKER SLOUGH, AS FOLLOWS: SOUTH 81 DEGREES 08' WEST 86 FEET; SOUTH 63 DEGREES 37' WEST 140 FEET; SOUTH 53 DEGREES 16' WEST 162 FEET; SOUTH 50 DEGREES 47' WEST 253 FEET; SOUTH 37 DEGREES 53' WEST, 120 FEET; SOUTH 43 DEGREES 10' WEST, 332 FEET; SOUTH 49 DEGREES 56' WEST 165 FEET TO THE JUNCTION OF WALKER SLOUGH WITH FRENCH

# DESCRIPTION OF THE SITE

CAMP SLOUGH; THENCE DOWNSTREAM ALONG THE NORTHERLY OR RIGHT BANK OF FRENCH CAMP SLOUGH, AS FOLLOWS:

NORTH 78 DEGREES 46' WEST, 138 FEET; SOUTH 89 DEGREES 35' WEST, 411 FEET; SOUTH 85 DEGREES 17' WEST, 219 FEET; SOUTH 79 DEGREES 48' WEST, 152 FEET; NORTH 82 DEGREES 53' WEST, 89 FEET; NORTH 43 DEGREES 22' WEST, 99 FEET; NORTH 22 DEGREES 27' WEST, 222.65 FEET TO A POINT IN THE CENTER LINE OF THE 120 FOOT WIDE PACIFIC GAS AND ELECTRIC COMPANY EASEMENT FOR ELECTRIC TRANSMISSION LINES, DESCRIBED IN BOOK OF OFFICIAL RECORDS OF SAN JOAQUIN COUNTY, VOLUME 325, PAGE 91; THENCE ALONG THE CENTER LINE OF SAID EASEMENT, NORTH 28 DEGREES 45' EAST, 1140 FEET TO A POINT BEARING DUE WEST FROM THE POINT OF BEGINNING; THENCE DUE EAST 1,559.46 FEET TO THE POINT OF BEGINNING.

PARCEL C:
A TRACT OF LAND SITUATED IN THE COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, SECTIONS 21 AND 22, TIN, R6E., M.D.B.&M., AND MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO WIT:

COMMENCING AT A CONCRETE MONUMENT BEARING DUE SOUTH 1, 160.00 FEET FROM THE SOUTHWEST CORNER OF LOT NUMBERED 1 IN BLOCK NUMBERED 7 OF LEVER VILLAGE, UNIT NO. 1, AS PER MAP FILED IN BOOK OF MAPS, VOLUME 14 AT PAGE 22, SAN JOAQUIN COUNTY RECORDS; THENCE DUE WEST 1,559.46 FEET TO AN IRON PIPE IN THE CENTER LINE OF THE 120 FOOT WIDE PACIFIC GAS AND ELECTRIC COMPANY EASEMENT FOR ELECTRIC TRANSMISSION LINES, DESCRIBED IN BOOK OF OFFICIAL RECORDS OF SAN JOAQUIN COUNTY, VOLUME 325, AT PAGE 91, SAID LAST MENTIONED IRON PIPE BEING THE NORTHEAST CORNER AND THE TRUE POINT OF BEGINNING OF THE WITHIN DESCRIBED 35.87 ACRE TRACT; THENCE ALONG THE CENTERLINE OF SAID EASEMENT, SOUTH 28 DEGREES 45' WEST, 1,140.00 FEET TO THE RIGHT BANK OF FRENCH CAMP SLOUGH; THENCE DOWNSTEAM ALONG THE RIGHT BANK OF FRENCH CAMP SLOUGH, AS FOLLOWS:

NORTH 19 DEGREES 50' WEST, 221 FEET; NORTH 16 DEGREES 58' WEST, 199 FEET; NORTH 15 DEGREES 22' WEST, 124 FEET; NORTH 18 DEGREES 04' WEST, 149 FEET; NORTH 36 DEGREES 34' WEST, 111 FEET; NORTH 50 DEGREES 06' WEST, 151 FEET; NORTH 69 DEGREES 37' WEST, 120 FEET; SOUTH 76 DEGREES 16' WEST, 93 FEET; SOUTH 59 DEGREES 27' WEST, 187 FEET; SOUTH 88 DEGREES 44' WEST, 182 FEET; NORTH 83 DEGREES 10' WEST, 143 FEET; NORTH 74 DEGREES 56' WEST, 162 FEET; NORTH 70 DEGREES 33' WEST, 357 FEET; NORTH 83 DEGREES 02' WEST, 117 FEET; SOUTH 81 DEGREES 30' WEST, 269.96 FEET; THENCE LEAVING FRENCH CAMP SLOUGH, DUE NORTH 533 FEET TO AN IRON PIPE; THENCE DUE EAST 620 FEET TO AN IRON PIPE; THENCE SOUTH 85 DEGREES 15' EAST, 1,136 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE SOUTHEASTERLY ON A CURVE TO THE RIGHT, RADIUS 700 FEET, (LONG CHORD BEARS SOUTH 67 DEGREES 00' EAST, 438.43 FEET) AN ARC DISTANCE OF 445.93 FEET TO AN IRON PIPE AT END OF CURVE; THENCE SOUTH 48 DEGREES 45" EAST, 144.41 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE SOUTHEASTERLY ON A CURVE TO THE LEFT, RADIUS 367.32 FEET (LONG CHORD BEARS SOUTH 69 DEGREES 22'30" EAST, 258.78 FEET) AN ARC DISTANCE OF 264.45 FEET, TO THE IRON PIPE AT THE TRUE POINT OF BEGINNING.

# DESCRIPTION OF THE SITE

PARCEL D:

A TRACT OF LAND SITUATED IN THE COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, SECTION 21, TIN, R6E, M.D.B.&M., AND MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT AN IRON PIPE AT THE NORTHWEST CORNER OF THE 35.87 ACRE TRACT DESCRIBED IN DEED TO THE CITY OF STOCKTON, RECORDED IN BOOK OF OFFICIAL RECORDS OF SAN JOAQUIN COUNTY, VOLUME 2146 AT PAGE 233; THENCE DUE NORTH 42.99 FEET TO AN IRON PIPE, THENCE SOUTH 80 DEGREES 00' WEST 183.71 FEET TO AN IRON PIPE AT BEGINNING OF A CURVE; THENCE WESTERLY ON A CURVE TO THE RIGHT, RADIUS 730 FEET (LONG CHORD BEARS SOUTH 85 DEGREES 00' WEST, 127.25 FEET) AN ARC DISTANCE OF 127.41 FEET TO AN IRON PIPE AT END OF CURVE; THENCE DUE WEST 972.32 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE NORTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS OF 60 FEET (LONG CHORD BEARS NORTH 45 DEGREES 00' WEST, 84.85 FEET) AN ARC DISTANCE OF 94.25 FEET TO AN IRON PIPE AT END OF CURVE; THENCE DUE NORTH 843.85 FEET TO AN IRON PIPE; THENCE DUE WEST 1,140 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE NORTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS 60 FEET (LONG CHORD BEARS NORTH 45 DEGREES 00' WEST, 94.85 FEET) AN ARC DISTANCE OF 84.25 FEET TO AN IRON PIPE AT END OF CURVE; THENCE DUE NORTH 1,008 FEET TO AN IRON PIPE WHICH BEARS WEST 2,540 FEET AND SOUTH 140 FEET FROM AN IRON ROD AT THE INTERSECTION OF THE CENTER LINE OF EIGHTH STREET AND FRESNO AVENUE; THENCE DUE WEST, PARALLEL TO AND 140 FEET SOUTH OF THE CENTER LINE OF EIGHTH STREET, A DISTANCE OF 1,082 FEET TO THE RIGHT BANK OF SAN JOAQUIN RIVER; THENCE UPSTEAM ALONG THE RIGHT BANK OF THE SAN JOAQUIN RIVER, AS FOLLOWS:

SOUTH 29 DEGREES 40'34" EAST, 359.04 FEET; SOUTH 28 DEGREES 30' EAST, 203 FEET; SOUTH 19 DEGREES 30' EAST, 213 FEET; SOUTH 16 DEGREES 15" EAST, 280 FEET; SOUTH 25 DEGREES 20' EAST, 154 FEET; SOUTH 34 DEGREES 10' EAST, 255 FEET; SOUTH 39 DEGREES 45' EAST, 156 FEET; SOUTH 50 DEGREES 15' EAST, 415 FEET; SOUTH 53 DEGREES 43'40" EAST, 254.76 FEET; SOUTH 58 DEGREES 30' EAST, 183 FEET; SOUTH 63 DEGREES 30' EAST, 142 FEET; SOUTH 56 DEGREES 00' EAST, 360 FEET TO THE MOUTH OF FRENCH CAMP SLOUGH; THENCE UPSTREAM ALONG THE RIGHT BANK OF FRENCH CAMP SLOUGH, AS FOLLOWS:

SOUTH 53 DEGREES 20' EAST, 247 FEET; SOUTH 38 DEGREES 40' EAST, 344 FEET; SOUTH 34 DEGREES 13'30" E 256.71 FEET; SOUTH 48 DEGREES 15' EAST, 100 FEET; SOUTH 73 DEGREES 20' EAST, 183 FEET; SOUTH 80 DEGREES 00' EAST, 140 FEET; NORTH 81 DEGREES 10' EAST, 118 FEET; NORTH 59 DEGREES 20' EAST, 103 FEET; NORTH 53 DEGREES 00' EAST, 302 FEET; NORTH 54 DEGREES 05' EAST, 225 FEET; NORTH 58 DEGREES 15' EAST 125 FEET; NORTH 72 DEGREES 40' EAST, 100 FEET TO THE SOUTHWEST CORNER OF THE ABOVEMENTIONED 35.87 ACRE TRACT; THENCE ALONG THE WEST LINE OF SAID 35.87 ACRE TRACT, DUE NORTH 533 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION THEREOF CONVEYED TO CHARLES RAYMOND VAN BUSKIRK, ET UX, BY GRANT DEED, RECORDED MAY 17, 1967, IN BOOK 3124 PAGE 411, OFFICIAL RECORDS.

# DESCRIPTION OF THE SITE

PARCEL E:

A TRACT OF LAND SITUATED IN THE COUNTY OF SAN JOAQUIN, STATE OF CALIFORNIA, SECTIONS 21 AND 22, TIN., R6E., M.D.B.&M., AND MORE PARTICULARY DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT AN IRON PIPE AT THE NORTHWEST CORNER OF THE 35.87 ACRE TRACT DESCRIBED IN DEED TO THE CITY OF STOCKTON, RECORDED IN BOOK OF OFFICIAL RECORDS OF SAN JOAQUIN COUNTY, VOLUME 2146 AT PAGE 233; THENCE ALONG THE NORTHERLY LINE OF SAID 35.87 ACRE TRACT AS FOLLOWS:

DUE EAST 620 FEET TO AN IRON PIPE; SOUTH 85 DEGREES 15' EAST, 1136 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; SOUTHEASTERLY ON A CURVE TO THE RIGHT, RADIUS 700 FEET (LONG CHORD BEARS SOUTH 67 DEGREES 00' EAST, 438.43 FEET) AN ARC DISTANCE OF 445.93 FEET TO AN IRON PIPE AT END OF CURVE; SOUTH 48'45" EAST, 89. 25 FEET TO A CONCRETE MONUMENT AT THE SOUTHWEST CORNER OF THE 43.241 ACRE TRACT DESCRIBED IN DEED TO THE HOUSING AUTHORITY OF THE COUNTY OF SAN JOAQUIN, RECORDED IN BOOK OF OFFICIAL RECORDS OF SAN JOAQUIN COUNTY, VOLUME 2348 AT PAGE 265; THENCE ALONG THE WESTERLY LINE OF ABOVE MENTIONED 43.241 ACRE TRACT, NORTH 28 DEGREES 45' EAST, 102.43 FEET TO AN IRON PIPE;THENCE NORTH 48 DEGREES 45' WEST, 15.52 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE NORTHWESTERLY ON A CURVE TO THE LEFT, RADIUS 880 FEET (LONG CHORD BEARS NORTH 67 DEGREES 00' WEST, 551.17 FEET) AN ARC DISTANCE OF 560.60 FEET TO AN IRON PIPE AT END OF CURVE; THENCE NORTH 85 DEGREES 15' WEST, 1,047.98 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE WESTERLY ON A CURVE TO THE LEFT, RADIUS 2,060 FEET (LONG CHORD BEARS NORTH 87 DEGREES 37'30" WEST, 170.73 FEET) AN ARC DISTANCE OF 170.78 FEET TO AN IRON PIPE AT END OF CURVE; THENCE DUE WEST 406.12 FEET TO AN IRON PIPE AT BEGINNING OF CURVE; THENCE WESTERLY ON A CURVE TO THE LEFT, RADIUS 760 FEET (LONG CHORD BEARS SOUTH 85 DEGREES 00' WEST, 132.48 FEET) AN ARC DISTANCE OF 132.65 FEET TO AN IRON PIPE AT END OF CURVE; THENCE DUE SOUTH 73.45 FEET TO THE IRON PIPE AT THE POINT OF BEGINNING.

EXCEPTING THEREFROM THE NORTHERLY 60 FEET, WHICH WAS CONVEYED AS AN EASEMENT FOR ROADWAY PURPOSES ONLY.

PARCEL P:

COMMENCING AT THE INTERSECTION OF THE EXISTING CENTER LINE OF FRESNO AVENUE, A 40 FOOT WIDE STREET, WITH THE EXISTING CENTER LINE OF EIGHTH STREET, AN 80 FOOT WIDE STREET; THENCE SOUTH IN A DIRECT LINE A DISTANCE OF 2,038.40 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE SOUTH IN A DIRECT LINE A DISTANCE 30.46 FEET TO A POINT; THENCE SOUTH 80 DEGREES 00' WEST, A DISTANCE OF 183.71 FEET TO A POINT; THENCE SOUTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS 730.00 FEET (LONG CHORD BEARS SOUTH 85 DEGREES 00' WEST, 127.25) AN ARC DISTANCE OF 127.41 FEET TO A POINT; THENCE WEST IN A DIRECT LINE 972.32 FEET TO A POINT; THENCE NORTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS OF 60 FEET (LONG CHORD BEARS NORTH 45 DEGREES 00' WEST, 84.85 FEET) AN ARC DISTANCE OF 94.25 FEET TO A POINT; THENCE NORTH IN A DIRECT LINE A DISTANCE OF 311.79 FEET TO A POINT; THENCE SOUTH 52 DEGREES 16'57" EAST, A DISTANCE OF 400.00 FEET TO A POINT; THENCE SOUTH 87

# DESCRIPTION OF THE SITE

DEGREES 00' EAST, A DISTANCE OF 1,025.00 FEET TO A POINT, SAID POINT AS HEREINBEFORE REFERRED TO, THE TRUE POINT OF BEGINNING.

PARCEL G:

COMMENCING AT THE INTERSECTION OF THE EXISTING CENTER LINE OF FRESNO AVENUE, A 40 FOOT WIDE STREET, WITH THE EXISTING CENTER LINE OF EIGHTH STREET, A 80 FOOT WIDE STREET; THENCE SOUTH IN A DIRECT LINE A DISTANCE OF 2,038.40 FEET TO A POINT; THENCE SOUTH IN A DIRECT LINE, A DISTANCE OF 2,038.40 TO A POINT; THENCE SOUTH IN A DIRECT LINE, A DISTANCE OF 30.46 FEET TO A POINT; THENCE SOUTH 80 DEGREES 00' WEST, A DISTANCE OF 183.71 FEET TO A POINT; THENCE SOUTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS 730 FEET (LONG CHORD BEARS SOUTH 85 DEGREES 00' WEST, 127.25) AN ARC DISTANCE OF 127.41 FEET TO A POINT; THENCE WEST IN A DIRECT LINE 972.32 FEET TO A POINT; THENCE NORTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS 60 FEET (LONG CHORD BEARS NORTH 45 DEGREES 00' WEST., 84.85 FEET) AN ARC DISTANCE OF 94.25 FEET TO A POINT; THENCE NORTH IN A DIRECT LINE, A DISTANCE OF 311.79 FEET TO A POINT; THENCE NORTH 52 DEGREES 16'57" WEST, A DISTANCE OF 869.69 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE WEST IN A DIRECT LINE 452.04 FEET; THENCE NORTHWESTERLY ON A CURVE TO THE RIGHT, RADIUS 60 FEET (LONG CHORD BEARS NORTH 45 DEGREES 00' WEST 84.85 FEET) AN ARC DISTANCE OF 94.25 FEET TO A POINT; THENCE NORTH IN A DIRECT LINE 336.00 FEET TO A POINT; THENCE SOUTH 52 DEGREES 16'57" EAST, A DISTANCE OF 647.30 FEET TO A POINT, SAID POINT AS HEREINBEFORE REFERRED TO, THE TRUE POINT OF BEGINNING.

# ASSUMPTIONS AND LIMITING CONDITIONS

1.  LIMIT OF LIABILITY

The liability of Atalon Management Group, LLC, is limited to the client only and to the fee actually received.  Further, there is no obligation or liability to any third party.  If this report is placed in the hands of anyone other than client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions.  The Appraiser is in no way to be responsible for any costs incurred to discover or correct any deficiencies of any type present in the property; physically, financially, and/or legally.

2.  COPIES, PUBLICATION, DISTRIBUTION OF REPORT

Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for other than its intended use; the physical report(s) remain the property of the Firm for the use of the client, the fee being for the analytical services only.

The Bylaws and Regulations of the Appraisal Institute require each Member and Candidate to control the use and distribution of each appraisal report signed by such Member or Candidate.  Neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations, news, sales or other media for public communication without the prior written consent of the appraiser.

3.  CONFIDENTIALITY

This report is to be used only in its entirety and no part is to be used without the whole report.  All conclusions and opinions concerning the analysis as set forth in the report were prepared by the individual whose signature appear on this report.

4.  INFORMATION USED

No responsibility is assumed for the accuracy of information furnished by work of or work by others, the client, his designee, or public records.  The comparable data relied upon in this report has been confirmed with one or more parties familiar with the transaction or from affidavit or other source thought reasonable; all are considered appropriate for inclusion to the best of my factual judgment and knowledge.

# ASSUMPTIONS AND LIMITING CONDITIONS

5.  EXHIBITS

The sketches and maps in this report are included to assist the reader in visualizing the property and are not necessarily to scale.  Various photos, if any, are included for the same purpose as of the date of the photos.  Site plans are not surveys unless shown from separate surveyor.

6.  LEGAL, ENGINEERING, FINANCIAL, STRUCTURAL, OR MECHANICAL NATURE HIDDEN COMPONENTS, SOIL

No responsibility is assumed for matters legal in character or nature, nor of any architectural, structural, mechanical, or engineering nature.  No opinion is rendered as to the title, which is presumed to be good and merchantable.  The property is appraised as if free and clear, unless otherwise stated in particular parts of the report.

The legal description is assumed to be correct as used in this report as furnished by the client, his designee, or as derived by the Appraiser.

No advice or opinion is given regarding the condition of or compliance with any governmental regulations affecting the: mechanical equipment, structural integrity or legality of the improvements, and soil/subsoil, drainage, capacity of utilities and other site conditions and constraints.  I did not seek assistance from any qualified architect and/or engineer, nor did I seek any legal advice, research or opinions regarding liens, title status, or the legal marketability of such.  Any lender, owner or stakeholder in the Properties should conduct a thorough property conditions report and any other studies with qualified professionals (i.e. mechanical or structural inspections by qualified and licensed engineers, architects, or other expert) before making any decisions regarding the Properties.

The Appraiser has inspected as far as possible, by observation, the land and the improvements; however, it was not possible to personally observe the conditions beneath the soil or hidden structural or other components.  I have not critically inspected mechanical components within the improvements and no representations are made herein as to these matters unless specifically stated and considered in the report.  The value estimate considers there being no such conditions that would cause a loss of value.  The Appraiser does not warrant against the condition or occurrence of problems arising from soil conditions.

# ASSUMPTIONS AND LIMITING CONDITIONS

The appraisal is based on there being no hidden, unapparent, or apparent conditions of the property site, subsoil, or structures or toxic materials which would render it more or less valuable. No responsibility is assumed for any such conditions or for any expertise or engineering to discover them. All mechanical components are assumed to be in operable condition and status standard for properties of the subject type. Conditions of heating, cooling, ventilating, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. No judgment may be made by us as to adequacy of insulation, type of insulation, or energy efficiency of the improvements or equipment which is assumed standard for subject age and type.

If the Appraiser has not been supplied with a termite inspection, survey or occupancy permit, no responsibility or representation is assumed or made for any costs associated with the obtaining same or for any deficiencies discovered before or after they are obtained. No representation or warranties are made concerning obtaining the above mentioned items.

The Appraiser assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An Agent for the Federal Flood Insurance Program should be contracted to determine the actual need for Flood Hazard Insurance.

7. LEGALITY OF USE

The appraisal is based on the premise that there is full compliance with all applicable federal, state and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

8. DOLLAR VALUES, PURCHASING POWER

The market values estimated and the costs used are as of the date of the estimate of value. All dollar amounts are based on the purchasing power and price of the dollar as of the date of the value estimate.

# ASSUMPTIONS AND LIMITING CONDITIONS

9.   INCLUSIONS

Furnishings and equipment or personal property or business operations have been disregarded with only the real estate being considered in the value estimate.

10.  VALUE CHANGE, DYNAMIC MARKET, INFLUENCEES, ALTERATION OF ESTIMATE BY APPRAISER

The estimated market values, which are defined in the report, are subject to change with market changes over time; value is highly related to exposure, time, promotional effort, terms, motivation, and conditions surrounding the offering.  The value estimates consider the productivity and relative attractiveness of the property physically and economically in the marketplace.

The "Estimate of Market Value" in the appraisal report is not based in whole or in part upon the race, color or national origin of the present owners or occupants of the properties in the vicinity of the property appraised.

11.  CONSIDERATION OF HAZARDOUS SUBSTANCES IN THE APPRAISAL PROCESS

Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyl, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection.  The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated.   The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances such as asbestos, urea formaldehyde foam insulation or other hazardous substances or environmental conditions may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximately thereto that it would cause a loss in value.   No responsibility is assumed for such conditions, nor for any expertise or engineering knowledge required to discover them.

12.  AMERICAN WITH DISABILITIES ACT

The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  I have not made specific compliance survey and analysis of this property to determine whether

# ASSUMPTIONS AND LIMITING CONDITIONS

or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the ACT.  If so, this fact could have a negative effect upon the value of the property.  Since I have no direct evidence relating to this issue, I did not consider possible noncompliance with the requirements of the ADA in estimating the value of the Property.

# **EXHIBIT A**

# Exhibit A

## Facts Or Data Considered By Atalon Management

1. 100  Acre Land Comps.pdf
2. 2013ForeclosuresStudy_CountyWithCityBreakdown.pdf
3. 2013StateOfIndustry_01212013.pdf
4. 2035LandUseDiagram .pdf
5. 2MilePropertyPopulation_.xlsx
6. Aging on a Different Course _ American Architectural Foundation.pdf
7. AppendixAMarketDescription.pdf
8. Black Bear Executive Summary.pdf
9. Bos Landen Offering Memorandum.pdf
10. CBRE_GolfCourseBrochure.pdf
11. CommunityCenters_Since2012_Loopnet.pdf
12. CPI Increase Avg (20 years).xlsx
13. Elleair Maui OM.pdf
14. ES - Binks.pdf
15. ES - Eagle Ridge - Ft Myers.pdf
16. ES - GC Dublin.pdf
17. ES - Limestone Springs - 2013 Update.pdf
18. ES - Majestic.pdf
19. ES - Meadows Farms Revised.pdf
20. ES - Pelican Bay.pdf
21. ES - Piper Glen.pdf
22. ES - Tartan Fields.pdf
23. ES - TPC Eagle Trace.pdf
24. ES - TPC Michigan.pdf
25. ES - Wedgefield.pdf
26. ES - Wild Wing.pdf
27. ET 2014.pdf
28. Executive Summary - Cateechee.pdf
29. Executive Summary - Lands End.pdf
30. Exec_Summary_NCREIF_Report20134.pdf
31. Glen Annie OM.pdf
32. Golf Course Privatization Articles.pdf
33. Golf Facilities in the US 2014 Edition.pdf
34. GolfCourseListingOverview.xlsx
35. GolfCourseSalesCompsDatabase.xlsx
36. golfoperations.pdf
37. Horse Thief CC Offering Memorandum Lee  Assoc Current.pdf
38. June16_Aug_2013_SwensonCrimeMap.pdf
39. June16_Aug_2013_VanbuskirkCrimeMap.pdf

# Exhibit A

## Facts Or Data Considered By Atalon Management

40.　Kiahuna Golf Course, Kauai HI.pdf
41.　LandSalesComparables.xlsx
42.　Lynnwood_Golf_Analysis_022713v4.pdf
43.　MarcusMillichap_GolfCourseGroup_1stHalf2013Report.pdf
44.　MarcusMillichap_GolfCourseGroup_1stHalf2013Report2.xlsx
45.　Market discounting of partial ownership interests.doc
46.　MarketDiscountingOfPartialOwnershipInterests.pdf
47.　Marshall Valuation.pdf
48.　Minority interest discounts.doc
49.　Monroe ES Draft.pdf
50.　Monument OM.pdf
51.　NationalGolfFoundationGolfSales_January2014.xlsx
52.　Oak Park - School Map.pdf
53.　Oak-Hills-OM.pdf
54.　OakParkAssetsFromAmericanAppraisal2008Circa.pdf
55.　Old, Empty Stadiums Could Be Last-Minute Gifts - WSJ.pdf
56.　OM - Meadow Farms GC.pdf
57.　OM - Morgan Hill FINAL.pdf
58.　OM - Wedgefield GC.pdf
59.　OM - Wild Wing Plantation.pdf
60.　Operators - Stockton Assets.xlsx
61.　Plant City Stadium's days may be numbered.pdf
62.　Plant City trying to sell stadium, softball complex _ Tampa Bay Times.pdf
63.　Privatization of Golf Courses.pdf
64.　PwC - 1Q14SURVEY.pdf
65.　Rancho Mirage (MAR 2013 FINANCIAL).pdf
66.　RanchoMirage_Flyer.pdf
67.　Rent Analysis.xlsx
68.　Repositioning Golf Courses.pdf
69.　RiverWatch Executive Summary - Updated.pdf
70.　Sale Comps - OakParkSeniorBuildingAlternatives.pdf
71.　Sale Comps 2008-2011 (Less than 10 Acres).pdf
72.　Sale Comps 2010-2011.pdf
73.　Sale Comps 2012-2013 (Less than 10 Acres).pdf
74.　Sale Comps 2012-2014.pdf
75.　Sales Comps - Misc Asset Types 1.pdf
76.　Sales Comps - Misc Asset Types 2.pdf
77.　Sales Comps - Misc Asset Types 3.pdf
78.　sanctuary golf club.pdf

# Exhibit A

## Facts Or Data Considered By Atalon Management

79.   SeptNov_2013_SwensonCrimeMap.pdf
80.   SeptNov_2013_VanbuskirkCrimeMap.pdf
81.   SGA Rescue 9-1-1.pdf
82.   SGA_Newsletter_Spring 2014.pdf
83.   SMG Stockton __ Oak Park Ice Arena.pdf
84.   SMG Stockton __ Stockton Ballpark.pdf
85.   STATEOFTHEINDUSTRY2013.ppt
86.   Stockton Parks Info.pdf
87.   StocktonAssetsmap.pdf
88.   StocktonFinancialReport2012.pdf
89.   StocktonGolfCourseCompetitorsMap_Draft2_01202014.pdf
90.   StocktonMSA_5000_25000_Industrial_Retail.xlsx
91.   StocktonParcelsAerialMaps.pdf
92.   StocktonParcelsFloodplainMaps.pdf
93.   StocktonPropertiesLocationMap_.pdf
94.   StocktonZoningCode.pdf
95.   Suburban ice rinks default on bonds - In Other News - Crain's Chicago Business.pdf
96.   Swenson - Home Sales (Last 6 Months).xlsx
97.   Swenson Golf Course - Home Sales.docx
98.   Swenson Golf Course - School Map.pdf
99.   SwensonZoningMapAerial.pdf
100.  SycamoreRidgeOM_1019201217.pdf
101.  TheMarketValueOfPartialInterestsInRealProperty.pdf
102.  Treasure Hills IS LowRes.pdf
103.  UniversityOfPacificQuarterlyReportExcel.xlsx
104.  UniversityOfPacific_CA-Forecast-January2014.pdf
105.  Unsyndicated partial interest discounting.doc
106.  USAA Buys 916 KSF Industrial Portfolio in California's Central Valley.pdf
107.  ValuationOfFractionalInterestsInRealEstateLimitedPartnershipsAnotherApproach.pdf
108.  Van Buskirk Golf Course - Home Sales.docx
109.  Van Buskirk Golf Course - School Map.pdf
110.  Van Buskirk Home Sales (Last 6 Months).xlsx
111.  VanBuskirkAerial_WStreets.pdf
112.  VanBuskirkGoogleEarthAerial.pdf

# Exhibit A

## Documents Produced By The City, Including the Following

### (Identified by beginning Bates Number):

1.  CTY006352
2.  CTY012630    Fwd: golf.msg
3.  CTY012631    Golf 12-13 proforma at 4-11-12.pdf
4.  CTY014389    Oak Park Softball complex - maintenance cost.msg
5.  CTY015053    RE: Stockton Golf Courses September Financials.msg
6.  CTY016440    RE: Stockton Golf Courses July Financials.msg
7.  CTY016631    Stockton Golf Courses Jan FINALS.msg
8.  CTY016632    Stockton Jan Finals.pdf
9.  CTY016671    FW: Stockton Golf Courses Jan FINALS.msg
10. CTY016672    Stockton - January 2012.pdf
11. CTY016698    Depository Bank Rec_Stmt 1.2012.pdf
12. CTY016714    Stockton February.msg
13. CTY016715    Stockton - February 2012.pdf
14. CTY016737    Stockton Bank Recs.pdf
15. CTY016932    Stockton April.msg
16. CTY016933    Stockton - April 2012.pdf
17. CTY016954    Stockton April Bank Reconciliations.pdf
18. CTY017137    Stockton Golf Courses - May 2012.msg
19. CTY017138    Stockton - May 2012.pdf
20. CTY017152    Stockton Bank Recs - May 2012.pdf
21. CTY017172    Stockton Golf Courses - June 2012.msg
22. CTY017173    Stockton - June 2012.pdf
23. CTY017194    Stockton Bank Rec File.pdf
24. CTY017230    Stockton Golf Courses - July 2012.msg
25. CTY017231    Stockton - July 2012.pdf
26. CTY017251    Stockton Bank Rec File 07.12.pdf
27. CTY017343    Stockton Golf Courses - Aug 2012.msg
28. CTY017344    Stockton - Aug 2012.pdf
29. CTY017365    Stockton Bank Recs 08.12.pdf
30. CTY017486    Fwd: Scanned Doc from Stockton-San Joaquin County Public Library.msg
31. CTY017487    doc20120423175123.pdf
32. CTY017498    Re: golf.msg
33. CTY017499    Dec 2011 Exec Summary 1-25-12_2.pdf
34. CTY017507    Re: VB.msg
35. CTY017512    golf.msg
36. CTY017513    Golf 12-13 proforma 4-24-12 5 pm.pdf
37. CTY017514    Van Buskirk Property-maintenance costs.msg
38. CTY017515    Re: golf.msg

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 39. | CTY017743 | Re: Swimming Agreements.msg |
| 40. | CTY027151 | Golf Course Agreement - Comments to Kemper Version 4-20-11 .msg |
| 41. | CTY027154 | Stockton 5 year Proforma including Tom and Patty 3-24-11.xls |
| 42. | CTY027155 | Stockton Maintenance Equipment List.xls |
| 43. | CTY030388 | Budget message at 5-15-12.pdf |
| 44. | CTY030559 | Community Services 2012-13 Budget Section 5-14-12.pdf |
| 45. | CTY030573 | Community Services 2012-13 Budget Section 6-06-12.pdf |
| 46. | CTY030708 | 481 Golf Fund Community Services balanced to PP 8-22-12.xlsx |
| 47. | CTY030709 | 481 Golf Fund Community Services edit 5-8-12.xlsx |
| 48. | CTY030710 | 481 Golf Fund Community Services at 4-24-12 5 pm.xlsx |
| 49. | CTY030711 | Copy of 481 Golf Fund Community Services at 4-25-12.xlsx |
| 50. | CTY031445 | Golf Courtses Fees - Staff Rpt.pdf |
| 51. | CTY031450 | Golf Courtses RFP auth Staff Report.pdf |
| 52. | CTY033934 | Re: Fwd: Community Services Fund Narratives.msg |
| 53. | CTY033938 | Re: Supplemental Instructions Regarding Study Session Presentations.msg |
| 54. | CTY033940 | 12-13 Budget Workshop - Community Services 6-11-12.ppt |
| 55. | CTY033941 | golf update.msg |
| 56. | CTY048564 | Fwd: Stockton-Kemper Agreement.msg |
| 57. | CTY048565 | Text.htm |
| 58. | CTY048566 | TEXT.htm |
| 59. | CTY048567 | Text.htm |
| 60. | CTY048568 | Stockton%20CA%20Management%20Agt%20%282%2D22%2D11%29[1].doc |
| 61. | CTY048603 | 2011 GOLF Management Agreement - KSM FINAL edits to Pam 4.27.11 v.2.doc.msg |
| 62. | CTY048604 | 2011 GOLF Management Agreement - KSM FINAL edits to Pam 4.27.11 v.2.doc |
| 63. | CTY049728 | Re: Stockton Golf Courses September Financials.msg |
| 64. | CTY049730 | RE: Stockton Golf Courses September Financials.msg |
| 65. | CTY049902 | Oct 2011 Balance Sheet.pdf |
| 66. | CTY049915 | Oct 2011 OPIA IS.pdf |
| 67. | CTY053633 | 2-28-11 JJ July 9 Number 6 PUR 10-060 LEASE OR SALE OF STOCKTON GOLF COURSES.pdf |
| 68. | CTY053984 | Peter Juarez Oak Park Tennis - Reso-09-0108.pdf |
| 69. | CTY054002 | MOU Between SMG & COS - Staff Rpt.pdf |
| 70. | CTY054015 | All Start Sports - Staff Rpt.pdf |
| 71. | CTY054576 | 033112_arena fund_financials 06-06-12.xlsx |
| 72. | CTY054577 | 043012_arena fund_financials 06-12-12.xlsx |
| 73. | CTY054578 | 053112_arena fund_financials 07-31-12.xlsx |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| 74. | CTY054579 | 063012_arena fund_financials 08-16-12.xlsx |
| 75. | CTY054580 | 033112_arena fund_financials 06-04-12.xlsx |
| 76. | CTY054581 | 033112_arena fund_financials 06-05-12.xlsx |
| 77. | CTY054582 | April 2012 Balance Sheet.pdf |
| 78. | CTY054586 | 6-30-12 Balance Sheet.pdf |
| 79. | CTY054596 | 063012_arena fund_financials 08-16-12.xlsx |
| 80. | CTY056824 | C-11-202 KemperSports Management.pdf |
| 81. | CTY058184 | Re: Fwd: Fw: per Oct. 25th discussion.msg |
| 82. | CTY058186 | Re: DRAFT News Release - Oak Park Ice Arena.msg |
| 83. | CTY058190 | Re: Fwd: Fw: per Oct. 25th discussion.msg |
| 84. | CTY058192 | Update on Golf Recommendations for tonight's Budget Meeting .msg |
| 85. | CTY058193 | Re: Update on Golf Recommendations for tonight's Budget Meeting .msg |
| 86. | CTY058194 | Van Buskirk Golf Course CIP Project.msg |
| 87. | CTY058202 | VB.msg |
| 88. | CTY058207 | News Release - Oak Park O.K. to send?.msg |
| 89. | CTY058208 | Van Buskirk.msg |
| 90. | CTY058213 | Re: VB.msg |
| 91. | CTY059841 | Stockton-Kemper Agreement.msg |
| 92. | CTY059842 | Stockton%20CA%20Management%20Agt%20%282%2D22%2D11%29[1].doc |
| 93. | CTY060913 | Golf Starter App.msg |
| 94. | CTY060914 | Recreation Leader III-IV - Golf Starter - Shop Staff.pdf |
| 95. | CTY063819 | Fwd: Re: Property List.msg |
| 96. | CTY063822 | Leased Assets_1.pdf |
| 97. | CTY063823 | Municipal Utilities, Real Property Enterprised Owned_1.pdf |
| 98. | CTY063829 | City of Stockton Operational Properties_2.pdf |
| 99. | CTY063831 | City of Stockton Parks_1.pdf |
| 100. | CTY063835 | Potentially Marketable Properties_1.pdf |
| 101. | CTY063840 | Wendy Saunders.vcf |
| 102. | CTY065377 | Re: Information for Chapter 9.msg |
| 103. | CTY065378 | Cash_Disbursements_GeneralFund_July.xlsx |
| 104. | CTY068161 | Fwd: Recreation & Golf - Reports for meeting.msg |
| 105. | CTY068162 | REC 044 financial summary Per 4 at 11-6-12.pdf |
| 106. | CTY068163 | GOLF 481 financial summary Per 3 at 11-5-12.pdf |
| 107. | CTY069124 | RevEst2013_39060.xlsx |
| 108. | CTY071258 | Audit- Entertainment Venues.msg |
| 109. | CTY071259 | 8-31-11 Revised Combined IS.pdf |
| 110. | CTY071261 | 8-31-11 Revised OPIA IS.pdf |
| 111. | CTY071263 | 8-31-11 Revised RevenueExpenses ALL.pdf |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 112. | CTY071268 | 8-31-11 Revised BHT IS.pdf |
| 113. | CTY071270 | 8-31-11 Revised Arena IS.pdf |
| 114. | CTY071272 | 8-31-11 Revised BP IS.pdf |
| 115. | CTY071274 | 8-31-11 Revised BS.pdf |
| 116. | CTY071278 | 8-31-11 Acct Recon Box Office.pdf |
| 117. | CTY071281 | 8-31-11 Acct Recon Operating.pdf |
| 118. | CTY072086 | CAFR staff report.msg |
| 119. | CTY073186 | ((Autosaved-302844591650727136)).asd |
| 120. | CTY073767 | 2013-14 SJ County Assessed Values.msg |
| 121. | CTY073769 | PERS Rate Forecast.msg |
| 122. | CTY073770 | Segal Company PERS Rate Forecast-Sept 2013_5.pdf |
| 123. | CTY073930 | Termination of Original Plan staff report.msg |
| 124. | CTY074433 | Marketable Properties 08 21 12.xls |
| 125. | CTY074969 | 6-30-10 OPIA Balance Sheet.xls |
| 126. | CTY074970 | 6-30-10 OPIA IS.xls |
| 127. | CTY075276 | Economic Indicator Chart Links as of 1-11-2012.xlsx |
| 128. | CTY075319 | FY063010_arena fund_financials.xlsx |
| 129. | CTY075322 | 2011-2012 086 Fund Financials City & SMG combined 08-29-12.xlsx |
| 130. | CTY075323 | 2011-2012 086 Fund Financials City & SMG combined 08-30-12.xlsx |
| 131. | CTY075324 | 2011-2012 086 Fund Financials City & SMG combined 09-04-12.xlsx |
| 132. | CTY075674 | RE: Stockton Value Change Analysis.msg |
| 133. | CTY075676 | Category_Summary_39_STOCKTON_20111_Entire_Region.pdf |
| 134. | CTY076790 | List of City Owned Marketable Properties_revised 3-11-13.xlsx.msg |
| 135. | CTY076791 | List of City Owned Marketable Properties_revised 3-11-13.xlsx |
| 136. | CTY077023 | Fwd: Re: SMG Compilation/TB's.msg |
| 137. | CTY077024 | Re_ SMG Compilation_TB's.msg |
| 138. | CTY077025 | 063012_arena fund_financials 08-16-12.xlsx |
| 139. | CTY081336 | 2011-12 Budget Amendment summary 10-30-13.docx |
| 140. | CTY081360 | Arena CIP 11 19 2013 - Final.doc |
| 141. | CTY081365 | Arena CIP.doc |
| 142. | CTY082356 | Fwd: Fiscal Year 2012-213 Second Quarter Budget Status Update and Authorization to Amend 2012-13 Budget.msg |
| 143. | CTY084288 | Fwd: Letter sent to all Vendors - re Bankruptcy.msg |
| 144. | CTY084289 | 2012_6_25_Letter_VendorsPendencyPlan.pdf |
| 145. | CTY089128 | Re: 2009 Lease Revenue Bonds.msg |
| 146. | CTY089154 | Golf Course RFP.msg |
| 147. | CTY089395 | Golf Item.msg |
| 148. | CTY089396 | CM_Office_ci_stockton_ca_us_20110517_111500.pdf |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 149. | CTY089431 | Re: ck w/laurie.msg |
| 150. | CTY089432 | Golf 12-13 proforma 4-24-12.pdf |
| 151. | CTY089532 | Fwd: property tax memorandum 12 13.msg |
| 152. | CTY089533 | property tax memorandum 12 13.docx |
| 153. | CTY089585 | HDL Sales Tax 2012-13 Projection at 1-26-12.pdf |
| 154. | CTY089676 | Re: golf .msg |
| 155. | CTY089677 | Draft Golf operator contract - ASD Comments at 3-6-11.doc |
| 156. | CTY089840 | Re: golf .msg |
| 157. | CTY089841 | Draft Golf operator contract - ASD Comments at 3-6-11.doc |
| 158. | CTY090686 | Moody's - Draft Rating Report for City Review at 1-19-10.docx |
| 159. | CTY092721 | Re: 2012 CAFR FN Disclosures.msg |
| 160. | CTY092757 | Bowman Audit delivered 10 13 2011.pdf |
| 161. | CTY092774 | 2011-2012 Audit.pdf |
| 162. | CTY092791 | Re: SJ Co. Golf.msg |
| 163. | CTY092863 | Re: Urgent Golf Issues.msg |
| 164. | CTY093771 | golf white paper.msg |
| 165. | CTY093772 | Golf Program White Paper 3-26-13.pdf |
| 166. | CTY093925 | Re: Fwd: Action Required - Public Records Request for Golf Course Data - Due by 4/29.msg |
| 167. | CTY093931 | Venues PL- March 2013.msg |
| 168. | CTY093948 | Urgent Golf Issues.msg |
| 169. | CTY093950 | Fwd_ FW_ Swenson Park motor 3.msg |
| 170. | CTY093951 | FW_ Swenson Park motor 3.msg |
| 171. | CTY093952 | Swenson Motor #3.pdf |
| 172. | CTY093953 | FW_ Van Buskirk #2.msg |
| 173. | CTY093955 | Van Buskirk Pump #2 .pdf |
| 174. | CTY093993 | Fwd: Re: Community Services Power Point.msg |
| 175. | CTY093995 | CS FY 2013-14 Budget Presentation 5-18-13.pptx |
| 176. | CTY094153 | Fwd: Re: Hebert contract.msg |
| 177. | CTY094155 | Hiebert Field - All Star Sports 2011.pdf |
| 178. | CTY094397 | Re: For Kurt.msg |
| 179. | CTY094398 | memo - 2013-12-12 - Wilson to Council re_ Five Year Economic Forecast.doc |
| 180. | CTY094400 | GF Family&Friends 5yr Charts 121113_1_1.pdf |
| 181. | CTY094417 | Next steps - CAFR/Audit Report to City Council.msg |
| 182. | CTY094418 | 2011-12 Budget Amendment summary 10-30-13.docx |
| 183. | CTY096767 | RE: Stockton Events Center.msg |
| 184. | CTY096769 | IFG Contract_1.pdf |
| 185. | CTY096858 | IFG Termination Agreement.pdf |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 186. | CTY096904 | FIN_Util@ci.stockton.ca.us_20130516_225939_3.pdf |
| 187. | CTY096954 | City of Stockton golf courses May 2013 .msg |
| 188. | CTY096955 | City of Stockton golf 05.2013.pdf |
| 189. | CTY096976 | Stockton bank recs 05.31.13.pdf |
| 190. | CTY096995 | Stockton Sales Tax 05.2013.pdf |
| 191. | CTY096997 | May Sales Tax.xls |
| 192. | CTY096998 | RE: City of Stockton golf courses May 2013.msg |
| 193. | CTY096999 | Stockton Sales 06.15.2013.pdf |
| 194. | CTY097001 | June Sales Tax 6.15.13.xls |
| 195. | CTY107322 | Rec & Golf summary financial reports.msg |
| 196. | CTY107323 | Rec as of 9-27-12.pdf |
| 197. | CTY107325 | FINAL Union Bank Presentation - Entire Meeting Packet.msg |
| 198. | CTY107326 | 2012-09-28 - Union Bank Meeting Packet.pdf |
| 199. | CTY107357 | Updated September 2012 Pro Forma 11 x 17.pdf |
| 200. | CTY107379 | Recreation & Golf - Reports for meeting.msg |
| 201. | CTY107380 | REC 044 financial summary Per 4 at 11-6-12.pdf |
| 202. | CTY107381 | GOLF 481 financial summary Per 3 at 11-5-12.pdf |
| 203. | CTY107386 | golf update.msg |
| 204. | CTY107387 | Mid Yr program update 11-13-12.pdf |
| 205. | CTY107392 | Fwd: Doc in Color.msg |
| 206. | CTY107435 | Financial Summaries - Rec & Golf.msg |
| 207. | CTY107436 | REC 044 financial summary Per 6 at 1-16-13.pdf |
| 208. | CTY107452 | Kemper's Budget for 2013-14.msg |
| 209. | CTY107453 | FW_ Budget.msg |
| 210. | CTY107454 | FY13-14 Budget Template.Swenson jk 021513.pdf |
| 211. | CTY107455 | Combined Summary 13-14.Stockton jk 021513.pdf |
| 212. | CTY107456 | FY13-14 Budget Template.Van B jk 021513.pdf |
| 213. | CTY107556 | Re: soccer.msg |
| 214. | CTY107558 | Golf Program White Paper 3-26-13.docx |
| 215. | CTY107684 | Golf-review again.msg |
| 216. | CTY107685 | Golf Program White Paper 4-19-13.docx |
| 217. | CTY107740 | Fwd: Kemper-Monthly Client Report.msg |
| 218. | CTY107741 | Stockton Client Letter June 2013.doc |
| 219. | CTY107868 | FW_ Letters Explaining current issues.msg |
| 220. | CTY107869 | 9ed9dce9-37d9-43b0-ae30-18e467467cc9 |
| 221. | CTY107870 | bdc151b6-0c9a-447b-bcdf-cdfbc79a6689 |
| 222. | CTY108419 | Book1.xls |
| 223. | CTY108420 | Revised Budget Summary08-09 as of 10-21-08.xls |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 224. | CTY108647 | FW: Stockton: Information requests, questions regarding various obligations.msg |
| 225. | CTY109496 | CM_CBS_Interview_Charts.pdf |
| 226. | CTY110788 | Fwd: Stockton Golf Courses July Financials.msg |
| 227. | CTY110789 | Stockton Summary Income Statement July 2011.pdf |
| 228. | CTY110791 | Stockton Balance Sheet July 2011.pdf |
| 229. | CTY110793 | Stockton Detailed Income Statement July 2011.pdf |
| 230. | CTY110815 | Stockton Depository Bank Rec July 2011.xls |
| 231. | CTY110816 | Stockton Operating Bank Rec July 2011.xls |
| 232. | CTY110817 | Stockton Payroll Bank Rec July 2011.xls |
| 233. | CTY110818 | Depository Account Bank Statement.pdf |
| 234. | CTY110824 | Stockton Operating July 2011.pdf |
| 235. | CTY110826 | Stockton Payroll July 2011.pdf |
| 236. | CTY111015 | Re: Stockton Golf Courses July Financials.msg |
| 237. | CTY111017 | Stockton Summary Income Statement July 2011.pdf |
| 238. | CTY111019 | Stockton Balance Sheet July 2011.pdf |
| 239. | CTY111021 | Stockton Detailed Income Statement July 2011.pdf |
| 240. | CTY111043 | Stockton Depository Bank Rec July 2011.xls |
| 241. | CTY111044 | Stockton Operating Bank Rec July 2011.xls |
| 242. | CTY111045 | Stockton Payroll Bank Rec July 2011.xls |
| 243. | CTY111046 | Depository Account Bank Statement.pdf |
| 244. | CTY111052 | Stockton Operating July 2011.pdf |
| 245. | CTY111054 | Stockton Payroll July 2011.pdf |
| 246. | CTY111056 | Stockton Golf Courses August Financials.msg |
| 247. | CTY111057 | Stockton Summary Income Statement 0811.pdf |
| 248. | CTY111059 | Stockton Balance Sheet 0811.pdf |
| 249. | CTY111061 | Stockton Detailed Income Statement 0811.pdf |
| 250. | CTY111084 | Stockton Depository Bank Rec Aug 2011.xls |
| 251. | CTY111085 | Stockton Operating Bank Rec Aug 2011.xls |
| 252. | CTY111086 | Stockton Payroll Bank Rec Aug 2011.xls |
| 253. | CTY111087 | Stockton Payroll August 2011.pdf |
| 254. | CTY111089 | Stockton Operating August 2011.pdf |
| 255. | CTY111092 | Depository Account Statement.pdf |
| 256. | CTY111106 | Stockton Golf Courses September Financials.msg |
| 257. | CTY111107 | Stockton Summary Income Statement.pdf |
| 258. | CTY111109 | Stockton Balance Sheet.pdf |
| 259. | CTY111111 | Stockton Detailed Income Statement.pdf |
| 260. | CTY111133 | Stockton Depository Bank Rec Sept 2011.xls |

# Exhibit A

### Documents Produced By The City, Including the Following

### (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 261. | CTY111134 | Stockton Operating Bank Rec Sept 2011.xls |
| 262. | CTY111135 | Stockton Payroll Bank Rec Sept 2011.xls |
| 263. | CTY111305 | Stockton Golf Courses October Financials.msg |
| 264. | CTY111306 | Stockton Summary Income Statement.pdf |
| 265. | CTY111308 | Stockton Balance Sheet.pdf |
| 266. | CTY111310 | Stockton Detailed Income Statement.pdf |
| 267. | CTY111351 | Stockton Summary Income Statement 11.11.pdf |
| 268. | CTY111353 | Stockton Balance Sheet 11.11.pdf |
| 269. | CTY111355 | Stockton Detailed Income Statement 11.11.pdf |
| 270. | CTY111403 | Stockton Golf Courses Dec FINALS.msg |
| 271. | CTY111404 | Stockton Balance Sheet - FINAL.pdf |
| 272. | CTY111406 | Stockton Detailed Income Statement - FINAL.pdf |
| 273. | CTY111429 | Stockton Summary Income Statement - FINAL.pdf |
| 274. | CTY111747 | Fwd: Fund 86.msg |
| 275. | CTY111748 | 033112_arena fund_financials.xlsx |
| 276. | CTY112179 | Golf cash request.msg |
| 277. | CTY112180 | 481 Fund Cash Mgmnt MEMO-D Millican 8-13-12.docx |
| 278. | CTY112242 | Memo 2010-02-11 (Sloan) FY 2010-2015 CIP Program Budgetary Estimates.pdf |
| 279. | CTY112789 | B7a-Debt Use.doc |
| 280. | CTY113877 | Attachment Four Year Plan 2-15-12.pdf |
| 281. | CTY113878 | Attachment Four Year Projection 2-17-12.pdf |
| 282. | CTY113879 | Attachment C Four Year Plan 2-09-12.pdf |
| 283. | CTY113880 | Attachment B Four Year Plan 2-03-12.pdf |
| 284. | CTY113881 | Attachment C Four Year Plan 2-08-12.pdf |
| 285. | CTY115974 | Golf Course Analysis.pdf |
| 286. | CTY116032 | Newsletter.pdf |
| 287. | CTY116181 | Mime.822 |
| 288. | CTY116182 | Nov 2011 Aging.pdf |
| 289. | CTY116187 | Nov 2011 Arena IS.pdf |
| 290. | CTY116189 | Nov 2011 Balance Sheet.pdf |
| 291. | CTY116193 | Nov 2011 Ballpark IS.pdf |
| 292. | CTY116195 | Nov 2011 BHT IS.pdf |
| 293. | CTY116197 | Nov 2011 Box Office Recon.pdf |
| 294. | CTY116200 | Nov 2011 Combined IS.pdf |
| 295. | CTY116202 | Nov 2011 Financial Statements.pdf |
| 296. | CTY116265 | Nov 2011 OPIA IS.pdf |
| 297. | CTY116267 | Nov 2011 Ops Recon.pdf |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 298. | CTY116273 | Nov 2011 RevenueExpense IS.pdf |
| 299. | CTY116279 | Nov 2011 Financial Statements.pdf |
| 300. | CTY116601 | Priority Form FY2010-11 CIP - Swenson Golf Course Perimeter Fence Renovation(1).pdf |
| 301. | CTY116602 | Priority Form FY2010-11 CIP - Van Buskirk Golf Course Irrigation System Replacement(1).pdf |
| 302. | CTY116603 | Priority Form FY2010-11 CIP - Van Buskirk Golf Course Perimeter Fence Renovation(1).pdf |
| 303. | CTY116604 | Priority Form FY2010-11 CIP -Van Buskirk Golf Course Cart Path Installation(1).pdf |
| 304. | CTY117761 | golf.msg |
| 305. | CTY120119 | Stockton Golf Courses July Financial Statement Review 11AM Pacific Time.msg |
| 306. | CTY120120 | Untitled attachment 166023.txt |
| 307. | CTY120121 | Untitled attachment 166026.htm |
| 308. | CTY120122 | meeting.ics |
| 309. | CTY120123 | Untitled attachment 166029.htm |
| 310. | CTY120124 | Stockton Summary Income Statement July 2011.pdf |
| 311. | CTY120126 | Stockton Balance Sheet July 2011.pdf |
| 312. | CTY120128 | Stockton Detailed Income Statement July 2011.pdf |
| 313. | CTY120163 | Forecasts and 11-12 Update.EML |
| 314. | CTY120164 | Forecasts.pdf |
| 315. | CTY120166 | 11-12 update.pdf |
| 316. | CTY127120 | RE: Delinquent Report(s) of Financial Transactions.msg |
| 317. | CTY127563 | Re: Urgent Golf Issues.msg |
| 318. | CTY127565 | Re: Urgent Golf Issues.msg |
| 319. | CTY128022 | VB family terms .msg |
| 320. | CTY128468 | Kemper's Monthly Client Report.msg |
| 321. | CTY128469 | Monthly Client Report.msg |
| 322. | CTY128470 | Stockton Client Letter January 2013.doc |
| 323. | CTY128472 | Re: Ambac agreement and documents filed.msg |
| 324. | CTY129098 | Re: Urgent Golf Issues.msg |
| 325. | CTY129100 | Re: Urgent Golf Issues.msg |
| 326. | CTY129208 | Emailing: SMG Business Plan Staff reporrt 2013-2014.msg |
| 327. | CTY129209 | SMG Business Plan Staff reporrt 2013-2014.doc |
| 328. | CTY129214 | 2013-2014 SMG Stockton Business Plan.pdf |
| 329. | CTY129273 | smg.doc |
| 330. | CTY129343 | Re: Kemper agreement.msg |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 331. | CTY129344 | Contract C-11-202 NP KemperSports Management Inc - CITY OF STOCKTON GOLF COURSES MANAGEMENT AGREEMENT - Van Buskirk and Swenson Park Golf Courses Reso 11-0152 RM 11-313.pdf |
| 332. | CTY129395 | golf thru 4-30-13.msg |
| 333. | CTY129396 | GOLF 481 financial summary Per 10 at 6-3-13.pdf |
| 334. | CTY129398 | Fwd: RE: Visit at Swenson.msg |
| 335. | CTY129996 | See attached.msg |
| 336. | CTY129997 | PressConferencePowerPoint_October_01_2013.pdf |
| 337. | CTY130023 | fun fact #1,406,978.msg |
| 338. | CTY130335 | Attachment A - SMG 2013-2014 Business Plan[2].pdf |
| 339. | CTY130429 | SMG FY 12 13 Audit by Bowman.msg |
| 340. | CTY130430 | Bowman SMG FY 12 13 audit.pdf |
| 341. | CTY130679 | golf appropriation.msg |
| 342. | CTY133807 | Revenues/Receipts Open Items - 9/19/12 SMG Report - Bowman & Co.msg |
| 343. | CTY133808 | 2011 SMG AUDIT - Bowman & Company delivered 10 13 2011_1.pdf |
| 344. | CTY134750 | December Financials 2012.msg |
| 345. | CTY134751 | Dec 2012 AR.pdf |
| 346. | CTY134757 | Dec 2012 Arena IS.pdf |
| 347. | CTY134759 | Dec 2012 Balance Sheet.pdf |
| 348. | CTY134763 | Dec 2012 Ballpark IS.pdf |
| 349. | CTY134789 | Dec 2012 Combined IS.pdf |
| 350. | CTY134791 | Dec 2012 OPIA IS.pdf |
| 351. | CTY134800 | SMG Financial Statements.msg |
| 352. | CTY134801 | July 2012 Financials.msg |
| 353. | CTY134816 | July 2012 Combined IS.pdf |
| 354. | CTY134818 | July 2012 OPIA IS.pdf |
| 355. | CTY134849 | August 2012 Financials.msg |
| 356. | CTY135448 | Fwd: \| 08/28/2012 - New Business: (CM) SMG Business Plan.msg |
| 357. | CTY135449 | Contract C-11-093 NP SMG - Management Agreement - operation and maintenance of the Stockton Arena, Bob Hope Theatre, Oak Park Ice Arena, Banner Island Ballpark Reso 11-002 - B# 1257589 v.6.pdf |
| 358. | CTY135491 | _ 08_28_2012 - New Business_ (CM) SMG Business Plan.msg |
| 359. | CTY135492 | SMG BUSINESS PLAN.pdf |
| 360. | CTY135531 | SMG Business Plan 2012 August 28 staff report.doc |
| 361. | CTY135543 | Fwd: SMG.msg |
| 362. | CTY135544 | SMG.msg |
| 363. | CTY135545 | Reso 11 0022 and SMG agreement.pdf |
| 364. | CTY135656 | Golf Payment for October .msg |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 365. | CTY135657 | doc20120925134345.pdf |
| 366. | CTY136086 | Financials September 2012.msg |
| 367. | CTY136122 | Sept 2012 OPIA IS.pdf |
| 368. | CTY136451 | Stockton Golf Courses - Oct 2012.msg |
| 369. | CTY136452 | Stockton - Oct 2012.pdf |
| 370. | CTY136473 | Stockton Bank Rec File 10.12.pdf |
| 371. | CTY136919 | Stockton Golf Courses 12.2012.msg |
| 372. | CTY136920 | City of Stockton Financials 12.2012.zip?SP Detailed Income Statement 12.2012.pdf |
| 373. | CTY136931 | City of Stockton Financials 12.2012.zip?Stockton Balance Sheet 12.2012.pdf |
| 374. | CTY136933 | City of Stockton Financials 12.2012.zip?Stockton Summary Income Statement 12.2012.pdf |
| 375. | CTY136934 | City of Stockton Financials 12.2012.zip?SP Summary Income Statement 12.2012.pdf |
| 376. | CTY136935 | City of Stockton Financials 12.2012.zip?VB Summary Income Statement 12.2012.pdf |
| 377. | CTY136936 | City of Stockton Financials 12.2012.zip?VB Detailed Income Statement 12.2012.pdf |
| 378. | CTY138507 | SMG Contract.pdf |
| 379. | CTY138572 | Stockton golf courses June 2013 financials.msg |
| 380. | CTY138612 | Stockton Sales Tax 06.2013.pdf |
| 381. | CTY138614 | June Sales Tax.xls |
| 382. | CTY138643 | RE: June 30, 2012 City of Stockton Inventory.msg |
| 383. | CTY138644 | Swenson Park June docs.pdf |
| 384. | CTY138672 | Van Buskirk June docs.pdf |
| 385. | CTY138688 | June 2013 SMG Stockton Financials.msg |
| 386. | CTY138689 | June 2013 AR.pdf |
| 387. | CTY138698 | June 2013 Arena IS.pdf |
| 388. | CTY138700 | June 2013 Balance Sheet.pdf |
| 389. | CTY139167 | Copy of Stockton General Fund Debt 2-16-12.xls |
| 390. | CTY139168 | DS on 09 and 06 LRBs.pdf |
| 391. | CTY142970 | Fwd: VB golf course.msg |
| 392. | CTY142971 | F.msg |
| 393. | CTY142972 | Property at VB golf course (3.83 KB).msg |
| 394. | CTY142973 | doc20120412145533.pdf (235 bytes).msg |
| 395. | CTY143276 | GW_00006.xls |
| 396. | CTY143277 | GW_00007.xls |
| 397. | CTY145724 | Oak Park Ice 09-10 Budget 2-26-09.pdf |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 398. | CTY145725 | 12-31-09 Oak Park Ice Income.xls |
| 399. | CTY145726 | 6-30-09 Oak Park Ice Final Income Stmt.xls |
| 400. | CTY145727 | 1-31-10 Oak Park Ice.xls |
| 401. | CTY145728 | 10-31-09 Oak Park Ice.xls |
| 402. | CTY145729 | 2-28-10 Oak Park Ice.xls |
| 403. | CTY145730 | 3-31-10 Oak Park Ice.xls |
| 404. | CTY145731 | 4-30-10 Oak Park Ice.xls |
| 405. | CTY145732 | 6-30-10 Oak Park Ice.xls |
| 406. | CTY145733 | 9-30-09 Oak Park Ice.xls |
| 407. | CTY145734 | 10-31-10 Oak Park Ice.xls |
| 408. | CTY145735 | 11-30-10 Oak Park Ice.xls |
| 409. | CTY145736 | 12-31-10 Oak Park Ice.xls |
| 410. | CTY145737 | 7-31-10 Oak Park Ice.xls |
| 411. | CTY146193 | PFF Bond issue resurrected.msg |
| 412. | CTY146194 | City of Stockton PFF Pro Formas-2-20-09.xls |
| 413. | CTY146195 | Re: PFF Bond issue resurrected.msg |
| 414. | CTY146198 | PFF Bond Issue-Project List as of 6-25-09.pdf |
| 415. | CTY146199 | Fwd: Re: Budget Sections for Update.msg |
| 416. | CTY147155 | FY 12-13 to 16-17 - 5 Year Capital Improvement Program - Public Facilities Fees.xlsx |
| 417. | CTY147518 | FIN_accounting@ci.stockton.ca.us_20110428_094508.pdf |
| 418. | CTY147520 | Official Statement- 2009 Series A SPFA Lease Revenue Bonds (Capital Improvement PFF Bonds).pdf |
| 419. | CTY152541 | Draft 6 Fee Report 11-18-08.pdf |
| 420. | CTY154900 | Re: golf .msg |
| 421. | CTY178380 | |
| 422. | CTY189019 | Questions on Project Detail pages_CM.pdf |
| 423. | CTY189066 | 12-13 Budget Workshop - 5 Ent Venues 6-18-12 at 6-13-12 CG.ppt |
| 424. | CTY189501 | Fee Schedule Changes Report revise 6-11-12.xlsx |
| 425. | CTY189502 | Fee Increase Justification - Community Services.xlsx |
| 426. | CTY189503 | Fee Schedule Changes Report.xlsx |
| 427. | CTY197978 | 2011-12 5-Year CIP at 6-28-11_Budget Layout.xlsx |
| 428. | CTY198009 | Copy of 2011-12 5-Year CIP at 5-23-11 at 801 am_1.xlsx |
| 429. | CTY198010 | Copy of 2011-12 5-Year CIP at 5-23-11 at 801 am_2.xlsx |
| 430. | CTY198144 | Fair Value Adjustment PY Analysis 10-26-11 B.xlsx |
| 431. | CTY207686 | Re_Golf Courses-emails with C. Marshall-8-17-10.pdf |
| 432. | CTY210360 | Cost Sheet FY2010-11 CIP - Golf Course Pro Shop and Clubhouse Roof Repair and-or Replacement(1).pdf |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 433. | CTY212339 | PFF Forecast FY 13 14.pdf |
| 434. | CTY215014 | Re: golf.msg |
| 435. | CTY216050 | FIN_accounting@ci.stockton.ca.us_20110428_094508.pdf |
| 436. | CTY250773 | Parks Database.XLS |
| 437. | CTY250843 | PARKSV~1.XLS |
| 438. | CTY251200 | |
| 439. | CTY251202 | Oak Park Revenue and Expense 11-5-13.xlsx |
| 440. | CTY257073 | LM BD OPIA Repair May 2012.msg |
| 441. | CTY257074 | LM BD OPIA Repair May 2012.doc |
| 442. | CTY257951 | Golf info to appraiser.pdf |
| 443. | CTY257990 | City of Stockton - Agreement for Services.msg |
| 444. | CTY257991 | CityAttorney@ci.stockton.ca.us_20130813_160220.pdf |
| 445. | CTY257998 | City of Stockton Golf Courses.msg |
| 446. | CTY257999 | Confidential and Privileged - Appraisal of Swensen and Van Buskirk.msg |
| 447. | CTY258000 | A_0009 Site and Facility Lease.pdf |
| 448. | CTY258017 | Confidential and Privileged - RE City of Stockton Golf Courses.msg |
| 449. | CTY258019 | FW Appraisal of Van Buskirk Swensen Park Golf Courses.msg |
| 450. | CTY258020 | Engagement Letter City of Stockton.pdf |
| 451. | CTY258027 | Privileged and confidential - financial report.msg |
| 452. | CTY258028 | Golf - K Hopper appraisal 9-3-13.xlsx |
| 453. | CTY258029 | Re .msg |
| 454. | CTY258030 | RE City of Stockton Golf Courses.msg |
| 455. | CTY258031 | RE Confidential and Privileged - Appraisal proposal.msg |
| 456. | CTY258033 | Riverside_Golf_Course. JKH. 10 PM 3-15-08.pdf |
| 457. | CTY258105 | Re Confidential and Privileged - Appraisal of Swensen and Van Buskirk.msg |
| 458. | CTY258107 | RE Confidential and Privileged - Appraisal of Swensen and Van Buskirk01.msg |
| 459. | CTY258109 | Re Confidential and Privileged - Appraisal of Swensen and Van Buskirk03.msg |
| 460. | CTY258110 | A_0010 Lease Agreement.pdf |
| 461. | CTY258151 | Re Confidential and Privileged - Appraisal of Swensen and Van Buskirk04.msg |
| 462. | CTY258153 | ATT00001.bmp |
| 463. | CTY258154 | RE Confidential and Privileged - RE City of Stockton Golf Courses.msg |
| 464. | CTY258156 | Re Declined.msg |
| 465. | CTY258157 | Re Friday telephone conference.msg |
| 466. | CTY258158 | ATT00001.bmp |
| 467. | CTY258159 | RE Privileged confidential - appraisal.msg |
| 468. | CTY258161 | Swenson Park Van Buskirk Golf Course Invoice.msg |
| 469. | CTY258162 | INVOICE.pdf |
| 470. | CTY258163 | Todays Conference Call.msg |

# Exhibit A

## Documents Produced By The City, Including the Following

## (Identified by beginning Bates Number):

| | | |
|---|---|---|
| 471. | CTY258164 | Confidential Privileged - Hopper agreement 8-13.pdf |
| 472. | CTY258171 | Ken Hopper Qualifications.pdf |
| 473. | STOCK046177 | Stockton MOU 06 23 10 FINAL.docx |
| 474. | STOCK065631 | 11-12_Annual_Budget.pdf |
| 475. | STOCK078592 | FIN_accounting@ci.stockton.ca.us_20120312_170653.pdf |
| 476. | STOCK088856 | 12-13 Budget Workshop - 1 Full Presentation at 6-18-12 PM FINAL.ppt |
| 477. | STOCK090749 | 2010-2011 Budget Document.pdf |
| 478. | STOCK098959 | Deis Memo to Exec on Leave suspensions_CC_edits.doc |
| 479. | STOCK101300 | StocktonGolfOperationsPowerpointPresentationMay24,2011Final.ppt |
| 480. | STOCK101301 | Slide 4 Information.doc |
| 481. | STOCK103525 | Re: Power of Futbol.msg |
| 482. | STOCK103527 | THE POWER OF FUTBOL Stockton Program final.pdf |
| 483. | STOCK103554 | Crisis situation.pdf |
| 484. | STOCK103561 | Fwd: Re: Fw: Power of Futbol.msg |
| 485. | STOCK103564 | Fwd: Re: Power of Futbol.msg |
| 486. | STOCK105008 | Agreement IFG Facilities Mgmt Searchable 04-0126 IFG.pdf |
| 487. | STOCK105405 | Golf update.msg |
| 488. | STOCK105785 | SMG Business Plan Draft - 2012/2013.msg |
| 489. | STOCK108592 | Fwd: FW: quick question on business plan.msg |
| 490. | STOCK108594 | SMG Stockton Business Plan 2012-2013.pdf |
| 491. | STOCK112370 | Fwd: golf.msg |
| 492. | STOCK133781 | IFG termination agreement attested copy_1.pdf |
| 493. | STOCK145066 | B.12 - Council Reso 11-0152 - Approving Agmt with Kempersports Management for Operation and Maintenance of Van Buskirk and Swenson Park (March 2010).pdf |
| 494. | STOCK170120 | FIN_accounting@ci.stockton.ca.us_20110126.pdf |
| 495. | STOCK170270 | Fwd: Gross Up Budget.msg |
| 496. | STOCK175636 | Fwd: June 2012 Financials.msg |
| 497. | STOCK175637 | 6-30-12 AR.pdf |
| 498. | STOCK175643 | 6-30-12 Arena IS.pdf |
| 499. | STOCK175645 | 6-30-12 Balance Sheet.pdf |
| 500. | STOCK175649 | 6-30-12 Ballpark IS.pdf |
| 501. | STOCK175651 | 6-30-12 BHT IS.pdf |
| 502. | STOCK175653 | 6-30-12 Combined IS.pdf |
| 503. | STOCK175655 | 6-30-12 OPIA IS.pdf |
| 504. | STOCK175657 | 6-30-12 Supp IS.pdf |
| 505. | STOCK175663 | SMG Bank Rec's & Stmts 6-30-12.pdf |
| 506. | STOCK181858 | Re: Business Plan Exhibit D: CIP Year 1.msg |

# Exhibit A

### Documents Produced By The City, Including the Following

### (Identified by beginning Bates Number):

507. STOCK181859    Exhibit D CIP Year 1 with staff recs_2-FINAL.xls
508. STOCK181871    Re: CIP Funding mechanism.msg
509. STOCK181914    Business Plan - Draft Copy.msg
510. STOCK181915    Business Plan_8.15.doc
511. STOCK182003    Business Plan.msg
512. STOCK182004    Business Plan.pdf
513. STOCK182183    Re: Presentation.msg
514. STOCK182473    Fwd: Preliminary Budget - 2012-2013.msg
515. STOCK182474    Preliminary Budget - 2012-2013.pdf
516. STOCK183734    Re: Business Plan - Draft Copy.msg
517. STOCK183735    Business Plan_8.15 LM Edits.doc
518. STOCK183777    Fwd: Re: Business Plan.msg
519. STOCK183778    Stockton Arena Business Plan.pdf
520. STOCK183980    Re: Copy of Budget Three year proforma 2013-2015 Final (3).xls.msg
521. STOCK183982    OPIA.msg
522. STOCK184181    Copy of Budget Three year proforma 2013-2015 Final (3).xls.msg
523. STOCK184182    20120507115727.pdf
524. STOCK184183    20120507115708.pdf
525. STOCK184184    Draft memo.msg
526. STOCK184185    OPIA option memo.doc
527. STOCK184212    RE: Copy of Budget Three year proforma 2013-2015 Final (3).xls.msg
528. STOCK184214    20120509154328.pdf
529. STOCK184215    20120509154312.pdf
530. STOCK184229    Fwd: OPIA Issue.msg

# Exhibit A

## Documents Produced By KemperSports, Including the Following

## (Identified by beginning Bates Number):

| | | | |
|---|---|---|---|
| 1. | KSM 000001 | 39. | KSM 000704 |
| 2. | KDM 000005 | 40. | KSM 000705 |
| 3. | KSM 000010 | 41. | KSM 000706 |
| 4. | KSM 000013 | 42. | KSM 000708 |
| 5. | KSM 000018 | 43. | KSM 000710 |
| 6. | KSM 000019 | 44. | KSM 000712 |
| 7. | KSM 000020 | 45. | KSM 000713 |
| 8. | KSM 000021 | 46. | KSM 000714 |
| 9. | KSM 000022 | 47. | KSM 000715 |
| 10. | KSM 000023 | 48. | KSM 000716 |
| 11. | KSM 000024 | 49. | KSM 000717 |
| 12. | KSM 000025 | 50. | KSM 000719 |
| 13. | KSM 000026 | 51. | KSM 000720 |
| 14. | KSM 000027 | 52. | KSM 000721 |
| 15. | KSM 000028 | 53. | KSM 000724 |
| 16. | KSM 000029 | 54. | KSM 000725 |
| 17. | KSM 000030 | 55. | KSM 000726 |
| 18. | KSM 000031 | 56. | KSM 000728 |
| 19. | KSM 000032 | 57. | KSM 000729 |
| 20. | KSM 000033 | 58. | KSM 000730 |
| 21. | KSM 000034 | 59. | KSM 000731 |
| 22. | KSM 000035 | 60. | KSM 000732 |
| 23. | KSM 000036 | 61. | KSM 000733 |
| 24. | KSM 000375 | 62. | KSM 000734 |
| 25. | KSM 000687 | 63. | KSM 000735 |
| 26. | KSM 000689 | 64. | KSM 000736 |
| 27. | KSM 000690 | 65. | KSM 000737 |
| 28. | KSM 000692 | 66. | KSM 000738 |
| 29. | KSM 000693 | 67. | KSM 000739 |
| 30. | KSM 000694 | 68. | KSM 000740 |
| 31. | KSM 000695 | 69. | KSM 000741 |
| 32. | KSM 000697 | 70. | KSM 000742 |
| 33. | KSM 000698 | 71. | KSM 000743 |
| 34. | KSM 000699 | 72. | KSM 000744 |
| 35. | KSM 000700 | 73. | KSM 000745 |
| 36. | KSM 000701 | 74. | KSM 000746 |
| 37. | KSM 000702 | 75. | KSM 000747 |
| 38. | KSM 000703 | 76. | KSM 000753 |

# Exhibit A

## Documents Produced By KemperSports, Including the Following

## (Identified by beginning Bates Number):

77. KSM 000759
78. KSM 000761
79. KSM 000762
80. KSM 000764
81. KSM 000765
82. KSM 000766
83. KSM 000767
84. KSM 000768
85. KSM 000792
86. KSM 000795
87. KSM 000796
88. KSM 000799
89. KSM 000800
90. KSM 000802
91. KSM 000803
92. KSM 000850
93. KSM 000806
94. Comparison Report Part & Frequency (Swenson).xls
95. Comparison Report Part & Frequency.xls
96. Comparison Report Rounds by Ethnicity (Swenson).xls
97. Comparison Report Rounds by Ethnicity.xls
98. Comparison Report Rounds by HH Income (Swenson).xls
99. Comparison Report Rounds by HH Income.xls
100. Comparison Report Rounds by Pop Age (Swenson).xls
101. Comparison Report Rounds by Pop Age.xls
102. Complaint.pdf
103. Detailed Summary (Swenson).xls
104. Detail Summary.xls
105. Excerpts from City's Disclosure Statement.pdf
106. Exhibits A-F to Complaint.pdf
107. Future Golf Course List.xls
108. Golf Course List (Swenson).xls
109. Golf Course Listing.xls
110. KSM PRODUCTION DOCS 807 – 834.pdf
111. Microsoft Outlook – Memo Style.pdf
112. Stockton Sales report.pdf
113. Supply Demand (Swenson).xls
114. Supply Demand.xls