**51**

MICHAEL J. GEARIN *admitted pro hac vice*
MICHAEL B. LUBIC (SBN 122591)
MICHAEL K. RYAN *admitted pro hac vice*
MANOJ D. RAMIA (SBN 295718)
K&L GATES LLP
10100 Santa Monica Boulevard, Seventh Floor
Los Angeles, California 90067
Telephone:     310.552.5000
Facsimile:     310.552.5001
Email:         michael.gearin@klgates.com
               michael.lubic@klgates.com
               michael.ryan@klgates.com
               manoj.ramia@klgates.com

Attorneys for California Public Employees'
Retirement System

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No.    2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | D.C. No. OHS-15 |
| Debtor. | Chapter 9 |
| | **CALPERS' RESPONSE TO FRANKLIN'S OBJECTION TO CONFIRMATION OF THE CITY OF STOCKTON'S FIRST AMENDED PLAN OF ADJUSTMENT** |
| | Date:     May 12, 2014 |
| | Time:     9:30 a.m. |
| | Place:    Robert T. Matsui U.S. Courthouse, 501 I Street |
| | Department C, Fl. 6, Courtroom 35 Sacramento, CA 95814 |
| | Judge:    Hon. Christopher M. Klein |

**TABLE OF CONTENTS**

**Page**

I. BACKGROUND .......................................................................................................... 1

   A.    What Is CalPERS? ......................................................................................1

   B.    The California Government Code Requires the Preservation of the Integrity of the State's Public Employees' Retirement System. ....................4

        1.    A Sound Public Pension System Benefits the State and its Citizens. ................4

        2.    An Actuarially Sound Pension System is Essential for the Payment of Pension Benefits. ..............................................................4

   C.    Stockton's Relationship with CalPERS. ....................................................5

   D.    Explanation of the Nature of Certain Calculated Liabilities. ......................6

   E.    The Termination Process and the Consequences of Termination. ................9

        1.    Termination and the Termination Process. ........................................9

        2.    Termination Lien. ..................................................................11

        3.    Termination Is Not a Viable Option for Stockton. ...........................11

        4.    Potential Jeopardy to Tax Exempt Status. ......................................12

II. ARGUMENT ......................................................................................................... 14

   A.    Franklin's "Best Interests" Objection Misapprehends the Ability to Reduce the City's Obligations to CalPERS and the Consequences of Terminating the City's CalPERS Pension Plan. ..........................................14

   B.    Franklin's "Good Faith" Objection to the City's Decision to Continue its Relationship with CalPERS Is Legally and Factually Unsound. ................14

        1.    The City Has the Authority under 11 U.S.C. § 1123(b)(6) to Continue its Relationship with CalPERS. ..........................................14

        2.    Good Faith under 11 U.S.C. § 1129(a)(3) Does Not Require the City to Pursue Franklin's Suggestion that the City Attempt to "Adjust" its Obligations to CalPERS. ......................................15

        3.    The City's Decision to Continue its Relationship with CalPERS Satisfies the Good Faith Standard of 11 U.S.C. § 1129(a)(3). ..........................20

            a.    The City Reasonably Concluded that it Would Be at a Severe Competitive Disadvantage in Retaining and Attracting Employees Without a CalPERS Pension Plan. ......................................20

            b.    Terminating the CalPERS Pension Plan Would Likely Cause a Substantial Number of Employees to Leave the City's Employ to Preserve their Pension Benefits. ......................................21

III. CONCLUSION ......................................................................................................... 21

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
    787 F.2d 1352 (9th Cir. 1986).................................................................................19

*In re Addison Cmty. Hosp. Auth.*,
    175 B.R. 646 (Bankr. E.D. Mich. 1994) ...................................................................20

*Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996)........................................................................................18

*Arya v. CalPERS*,
    943 F. Supp. 2d 1062 (E.D. Cal. 2013).......................................................................2

*Ashwander v. TVA*,
    297 U.S. 288 (1936)...................................................................................................16

*In re Associated Vintage Grp., Inc.*,
    283 B.R. 549 (9th Cir. BAP 2002).............................................................................15

*Barroga v. Bd. of Admin. CalPERS*,
    No. 2:12-cv-01179, 2012 WL 5337326 (E.D. Cal. Oct. 26, 2012)...............................2

*Beal Bank USA v. Windmill Durango Office, LLC (In re Windmill Durango Office,
    LLC)*,
    481 B.R. 51 (9th Cir. BAP 2012)...............................................................................19

*Brunner v. New York State Higher Education Services Corp.*,
    831 F.2d 395 (2nd Cir.1987)......................................................................................17

*CalPERS v. Moody's Corp.*,
    No. C09-03628, 2009 WL 3809816 (N.D. Cal. Nov. 10, 2009).....................................2

*Camreta v. Greene*,
    131 S.Ct. 2020 (2011) ...............................................................................................16

*In re Carolina Tobacco Co.*,
    2006 WL 7074335 (Bankr. D. Ore. March 14, 2006), *aff'd*, 360 B.R. 702 (D. Ore.
    2007) ..........................................................................................................................18

*In re City of Detroit, Mich.*,
    504 B.R. 97 (Bankr. E.D. Mich. 2013) ...............................................................15, 16

*In re City of Stockton*,
    493 B.R. 772 (Bankr. E.D. Calif. 2013).....................................................................18

ii

*Clark v. Martinez,*
 543 U.S. 371 (2005) .................................................................................16

*In re EPB, Inc.,*
 172 B.R. 241 (Bankr. N.D. Ohio 1994) ...................................................18

*Fuqua Nat'l, Inc. v. United States,*
 334 F. Supp. 1116 (S.D. Ga. 1971) ..........................................................13

*In re General Teamsters, Warehousemen & Helpers Union, Local 890,*
 225 B.R. 719 (Bankr. N.D. Cal. 1998) .....................................................17

*Human Life of Wash., Inc. v. Brumsickle,*
 624 F.3d 990 (9th Cir. 2010) ...................................................................15

*In re Indian National Finals Rodeo Inc.,*
 453 B.R. 387 (Bankr. D. Mont. 2011) ......................................................18

*In re Marshall,*
 298 B.R. 670 (Bankr. C.D. Cal. 2003) .....................................................17

*In re Mount Carbon Metro. Dist.,*
 242 B.R. 18 (Bankr. D. Colo. 1999) .........................................................20

*Lyng v. N.W. Indian Cemetery Protective Ass'n.,*
 485 U.S. 439 (1988) .................................................................................16

*Nooner v. Norris,*
 594 F.3d 592 (8th Cir. 2010) ...................................................................19

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),*
 314 F.3d 1070 (9th Cir. 2002) ............................................................15, 20

*In re Richmond Unified School Dist.,*
 133 B.R. 221 (Bankr. N.D. Calif. 1991) ..................................................20

*Sec. Farms v. General Teamsters, Warehousemen & Helpers Union Local 890 (In re General Teamsters, Warehousemen and Helpers Union Local 890),*
 265 F.3d 869 (9th Cir. 2001) ...................................................................17

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,*
 508 U.S. 439 (1993) .................................................................................15

*Wells Fargo Bank v. Loop 76, LLC (In re Loop 76, LLC),*
 465 B.R. 525 (9th Cir. BAP 2012) ...........................................................19

*Wolph v. U.S. Department of Education (In re Wolph),*
 479 B.R. 725 (Bankr. N.D. Ohio 2012) ...............................................17, 18

iii

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009) ........................................................................................16

**State Cases**

*Bd. of Admin of PERS. v. Wilson*,
    52 Cal. App. 4th 1109 (1997) .........................................................4, 5, 6

*Bd. of Ret. of the Santa Barbara County Emps. Ret. Sys. v. Santa Barbara County
    Grand Jury*,
    58 Cal. App. 4th 1185 (1997) ...............................................................3

*Cal. Ass'n of Prof'l Scientists v. Schwarzenegger*,
    137 Cal. App. 4th 371 (2006) ...............................................................1

*City of Los Altos v. Bd. of Admin., PERS*,
    80 Cal. App. 3d 1049 (1978) ...............................................................5

*City of Oakland v. Pub. Emps. Ret. Sys.*,
    95 Cal. App. 4th 29 (2002) ..........................................................2, 3, 5

*Jasper v. Davis*,
    164 Cal. App. 2d 671 (1958) ...............................................................5

*Marsille v. City of Santa Ana*,
    64 Cal. App. 3d 764 (1976).................................................................5

*Valdes v. Cory*,
    139 Cal. App. 3d 773 (1983)............................................................4, 6

*Wheeler v. Bd. of Admin. of PERS*,
    25 Cal.3d 600 (1979) .......................................................................2

**Federal Statutes**

11 U.S.C. § 365 ..............................................................................5

11 U.S.C. § 523(a)(8) ......................................................................17

11 U.S.C. § 901(a) .........................................................................15

11 U.S.C. § 903 .............................................................................16

11 U.S.C. § 904 .............................................................................19

11 U.S.C. § 1123(b)(6) ................................................................14, 15

11 U.S.C. § 1129(a) .......................................................................17

11 U.S.C. § 1129(a)(3) ..............................................................*passim*

28 U.S.C. § 158(d)(2)(A) ...................................................................................... 16

I.R.C. § 503 .............................................................................................................. 12, 13

I.R.C. § 503(a)(1)(B) ............................................................................................ 12

I.R.C. § 503(b)(1) .................................................................................................. 13

I.R.C. § 503(b)(4) .................................................................................................. 13

I.R.C. § 503(b)(5) .................................................................................................. 13

Federal Insurance Contributions Act ("FICA") ................................................... 13

Federal Unemployment Tax Act ("FUTA") ......................................................... 13

**State Statutes**

Cal. Gov. Code § 20001 .......................................................................................... 2

Cal. Gov. Code § 20002 .......................................................................................... 2

Cal. Gov. Code § 20021 .......................................................................................... 3

Cal. Gov. Code § 20022 .......................................................................................... 9

Cal. Gov. Code § 20058 .......................................................................................... 1

Cal. Gov. Code § 20281 .......................................................................................... 1

Cal. Gov. Code § 20460 ................................................................................... *passim*

Cal. Gov. Code §§ 20460 to 20593 ....................................................................... 5

Cal. Gov. Code § 20487 ....................................................................................... 5, 6

Cal. Gov. Code § 20506 .......................................................................................... 5

Cal. Gov. Code § 20532 .......................................................................................... 5

Cal Gov. Code § 20570 ........................................................................................ 6, 9

Cal. Gov. Code § 20571 .......................................................................................... 9

Cal. Gov. Code § 20572 .......................................................................................... 9

Cal. Gov. Code § 20574 ..................................................................................... 10, 11

Cal. Gov. Code § 20576 ........................................................................................ 10

Cal. Gov. Code § 20577 ..................................................................................... 9, 11

Cal. Gov. Code § 20577.5 ................................................................................10, 11, 12

Cal. Gov. Code § 20578 ...........................................................................................11

Cal. Gov. Code §§ 20671-20776 ..............................................................................7

Cal. Gov. Code §§ 20790-20842 ..............................................................................7

Cal. Gov. Code § 20831 .............................................................................................5

Public Employees' Retirement Law, California Government Code § 20000, *et seq.*.................. *passim*

State Employees' Retirement Act. ..............................................................................6

**Constitutional Provisions**

Tenth Amendment....................................................................................16, 17

Eleventh Amendment....................................................................................2

Cal. Const., Article XVI, § 17....................................................................3

Cal. Const., Article XVI, § 17 subdiv. (b) ..................................................3

Cal. Const., Article XVI, § 17, subdiv. (e)..................................................3

California Constitution ............................................................................2, 3

Federal Constitution .................................................................................16

**Other Authorities**

CalPERS Actuarial Office, *Miscellaneous Plan of the City of Stockton Annual Valuation Report as of June 30, 2012*, at 28 (October 2013), http://www.calpers.ca.gov/eip-docs/about/pubs/public-agency-reports/cities-towns/2012/stockton-city-miscellaneous-2012.pdf ..............................................6, 8

General Counsel Memorandum 38972 (Mar. 25, 1983) ...............................12, 13

Public Affairs, *Facts at a Glance* (March 2014), https://www.calpers.ca.gov/eip-docs/about/facts/facts-at-a-glance.pdf ................................................................1

CalPERS Actuarial Office, *Safety Plan of the City of Stockton Annual Valuation Report as of June 30, 2012* (October 2013), http://www.calpers.ca.gov/eip-docs/about/pubs/public-agency-reports/cities-towns/2012/stockton-city-safety-2012.pdf ...........................................................................6, 8, 11

Vested Rights of CalPERS Members (July 2011) at 2 ("CalPERS Profile"), http://www.calpers.ca.gov/eip-docs/about/pubs/vested-rights-members.pdf ................................1

1    The California Public Employees' Retirement System ("CalPERS" or the "System") files this

2    Response to Franklin's Objection to Confirmation of the City's First Amended Plan of Adjustment

3    [Dkt. 1273] ("Franklin Objection").[1]

4    Franklin argues, among other things, that Franklin would be better off if the City would

5    somehow "confront" its obligations to CalPERS, and that the City did not act in good faith when it

6    decided to continue its relationship with CalPERS.  Franklin's arguments and assertions about

7    CalPERS reflect a fundamental misunderstanding about the relationship between CalPERS and the

8    City and the significant benefits the City derives from that relationship.

## I. BACKGROUND

### A.    What Is CalPERS?[2]

11    The California Legislature established CalPERS in 1932, in the midst of the Great

12    Depression, to provide retirement benefits to California State employees.  Beginning in 1939, public

13    "agencies" (including municipalities like Stockton) were allowed to elect to participate in CalPERS.

14    *See* Vested Rights of CalPERS Members (July 2011) at 2 ("CalPERS Profile"),

15    http://www.calpers.ca.gov/eip-docs/about/pubs/vested-rights-members.pdf.  CalPERS administers the

16    State's pension plan and healthcare services for almost 1.7 million California public employees,

17    retirees, and their families.  *See* CalPERS Office of Public Affairs, *Facts at a Glance* (March 2014),

18    https://www.calpers.ca.gov/eip-docs/about/facts/facts-at-a-glance.pdf.  A "state employee generally

19    becomes a member of the Public Employees' Retirement System . . . 'upon his or her entry into

20    employment.'"  *Cal. Ass'n of Prof'l Scientists v. Schwarzenegger*, 137 Cal. App. 4th 371, 376 (2006)

21    (quoting Cal. Gov. Code §§ 20058, 20281).  Local government employers may participate in the

22    CalPERS system to provide pension and retirement benefits to their employees.  Cal. Gov. Code

23    § 20460.

---

[1]"Franklin" refers collectively to Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund.

[2] The Court has inquired on multiple occasions as to the nature of the relationship between CalPERS and the City.  CalPERS provides a summary of information regarding that relationship here and will offer testimony on these facts at the confirmation trial.

1

CalPERS is an arm of the State of California, the operations of which are governed not by corporate organizational documents, but by the California Constitution and the California Government Code. CalPERS is an integral part of the State, and an agency through which the State acts. *See* Cal. Gov. Code § 20002 (stating CalPERS "is a unit of the Government Operations Agency"); *see also Arya v. CalPERS*, 943 F. Supp. 2d 1062, 1072 (E.D. Cal. 2013) ("[A] number of California district courts have concluded that CalPERS is in fact an arm of the state" and therefore "benefits from sovereign immunity under the Eleventh Amendment") (citing *Barroga v. Bd. of Admin. CalPERS*, No. 2:12-cv-01179, 2012 WL 5337326, at *5 (E.D. Cal. Oct. 26, 2012); *CalPERS v. Moody's Corp.*, No. C09-03628, 2009 WL 3809816, at *6 (N.D. Cal. Nov. 10, 2009)).[3]

The Public Employees' Retirement Law, California Government Code § 20000, *et seq.* ("PERL"), establishes the retirement system for certain State and local government employees. *City of Oakland v. Pub. Emps. Ret. Sys.*, 95 Cal. App. 4th 29, 33 (2002). The PERL "effect[s] economy and efficiency in the public service" by creating a pension plan to pay retirement compensation and death benefits. Cal. Gov. Code § 20001; *see also Wheeler v. Bd. of Admin. of PERS*, 25 Cal.3d 600, 605 (1979) ("Pension programs for public employees serve two objectives: to induce persons to enter into and continue in public service, and to provide subsistence for disabled or retired employees and their dependents." (internal quotation marks omitted)).

For public employees serving municipalities in California, the legislature created a three-party structure for CalPERS to provide retirement benefits. First, each municipality elects a "contract" with CalPERS that triggers the applicability of statutes and other laws and regulations governing the provision of pension benefits through CalPERS. Second, each public servant has an employment contract with the municipality that includes pension benefits. Finally, CalPERS has a constitutionally defined responsibility to provide pension benefits to its members and retirees and to protect these benefits.

---

[3] The California Attorney General recently affirmed its view that CalPERS is an "arm of the state." *See* Decl. of Michael B. Lubic [Dkt. 712] ("Lubic Decl."), Ex. 2 (relevant portions of State of California's Complaint against Standard & Poor's, filed Feb. 5, 2013) ¶ 37 ("PERS and STRS are arms of the State of California, operating under the California Constitution and the California Government Code.").

The CalPERS Board is governed by the California Constitution and statutes, such as Cal. Const., art. XVI, § 17 subdiv. (b), which mandates that the CalPERS Board[4] ensure the rights of CalPERS members and retirees to their full earned benefits.  *City of Oakland*, 95 Cal. App. 4th at 39-40.  In 1992, California voters approved Proposition 162, which gave the CalPERS Board exclusive authority over the administration and investment of pension funds.[5]  In enacting Proposition 162, the electorate amended article XVI, section 17 of the California Constitution, to read in part as follows:

> Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have **plenary authority and fiduciary responsibility** for investment of moneys and administration of the system, subject to . . . the following: [¶] . . . The retirement board shall . . . have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries.

*Bd. of Ret. of the Santa Barbara County Emps. Ret. Sys. v. Santa Barbara County Grand Jury*, 58 Cal. App. 4th 1185, 1192 (1997) (omissions in original) (internal quotation marks omitted). Proposition 162 amended the California Constitution to provide that the CalPERS Board has "the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets" of the system.  Cal. Const., art. XVI, § 17, subdiv. (e).  The intent behind the measure was to protect public pension funds by vesting the authority to direct actuarial determinations solely with the CalPERS Board.  *See* Lubic Decl., Ex. 4 at 36 (relevant portions of official ballot pamphlet (Nov. 3, 1992)).  By granting the CalPERS Board sole authority to administer the system, Proposition 162 prevented the legislative and executive branches from "raiding" pension funds to balance the State budget.  *Id.* at 38.

---

[4]  CalPERS Board refers to the Board of Administration of the Public Employer's Retirement System.  Cal. Gov. Code § 20021.

[5] The ballot pamphlet accompanying Proposition 162 explained that pension system boards should give "highest priority" to providing benefits to members and their beneficiaries. *City of Oakland*, 95 Cal. App. 4th at 54 (internal quotation marks omitted).

3

1

**B.** **The California Government Code Requires the Preservation of the Integrity of the State's Public Employees' Retirement System.**

2

    *1.* *A Sound Public Pension System Benefits the State and its Citizens.*

3

    In the late 1920s, the State of California created the Commission on Pensions of State

4

Employees to investigate the establishment and structure of a statewide public retirement system. *See*

5

Chapter 431 of the Statutes of 1927. The Commission engaged in a comprehensive process which

6

included open meetings, study of other public retirement systems, analysis of existing State employee

7

data and questionnaires to develop a proposed framework. Lubic Decl., Ex. 5 at 5-7 (relevant

8

portions of Report of the Commission on Pension of State Employees (December 31, 1928)). The

9

Commission Report described the State's public retirement system as a means to secure the

10

improvement of its working personnel. The Commission Report emphasized that, with the increasing

11

complexity of governmental and regulatory functions, a sound retirement system helps recruit top-

12

level talent for its workforce. *Id.* at 9. For the retirement system to be an effective tool, the

13

Commission stressed the need for the system to have a "sound financial basis." *Id.* This principle

14

remains true. California and its citizens benefit when the State and its local municipalities are able to

15

offer an overall competitive compensation and benefits package. But this holds true only if the

16

retirement system is able to fund the promised benefits.

17

    The safety, discipline, and rigor imposed on the public pension system by the PERL and

18

CalPERS are a vital assurance that pensions will be honored. For the overwhelming majority of

19

California's participating cities and other agencies, the CalPERS System has proven to be a sound

20

and fiscally manageable way of assuring employees that benefits will be paid when and as promised,

21

thus providing long-term financial security for public employees.

22

    *2.* *An Actuarially Sound Pension System is Essential for the Payment of Pension Benefits.*

23

    The funding of California pension plans must be safeguarded. California law guarantees

24

adequate funding for full payment to participants and beneficiaries. *Bd. of Admin of PERS. v. Wilson*,

25

52 Cal. App. 4th 1109, 1131–32 (1997); *see also Valdes v. Cory*, 139 Cal. App. 3d 773, 785-86

26

(1983). The right to an actuarially sound system is "necessarily implied" from a public employer's

27

28

CALPERS' RESPONSE TO FRANKLIN'S OBJECTION             2012-32118

commitment to provide a pension benefit, because otherwise the converse would impair the pension right.  *Wilson*, 52 Cal. App. 4th at 1133.

### C.    Stockton's Relationship with CalPERS.

Under the PERL, a municipality elects to participate in the CalPERS system by entering into a contract with CalPERS in compliance with Chapter 5 of the PERL, Cal. Gov. Code §§ 20460 to 20593.  Cal. Gov. Code § 20460.  The PERL specifies in detail the provisions of the contract, the procedure by which a public agency may elect to participate, and many other terms.  However, this "contract" is not of the same character as a commercial contract; rather, it is an election to participate in a statutory system of deferred compensation.  *See Jasper v. Davis*, 164 Cal. App. 2d 671, 675 (1958).  Once a city makes this statutory election, it is bound and controlled by the statutory provisions governing the system and the decisions of the CalPERS Board.  Cal. Gov. Code § 20506 ("Any contract heretofore entered into shall subject the contracting agency and its employees to all provisions of this part and all amendments thereto . . . ."); *see also City of Oakland v. PERS*, 95 Cal. App. 4th 29, 55 (2002) ("[B]y entering into a contract with the PERS system, and extending that contract to include safety members, the City bound itself to follow the applicable statutory definitions governing firefighters, and bound itself to abide by the lawful decisions of the PERS Board, including decisions to correct mistakes in classification of members.").[6]  The governing statutes require the municipality to timely pay all required employer contributions.  Cal. Gov. Code §§ 20532, 20831.  The PERL also prohibits the contracting agency from rejecting any contract pursuant to Section 365 of the Code.  *Id.* § 20487.[7]  The statutory pension provisions are a fundamental part of the

---

[6] *See also City of Los Altos v. Bd. of Admin., PERS*, 80 Cal. App. 3d 1049, 1052 (1978) ("The state statute dealing with PERS and the board of administration's interpretation and enforcement of those statutes preempt any municipal provisions."); *Marsille v. City of Santa Ana*, 64 Cal. App. 3d 764, 771 (1976) ("The Legislature has enacted statutes dealing with retirement of public employees.  State statutes dealing with PERS matters preempt municipal provisions . . . .") (citation omitted) (citing former version of § 20506).

[7] The legislative history of Cal. Gov. Code § 20487 makes clear that the California legislature intended the restrictions on assumption and assignment of the CalPERS rights and obligations to be modifications of the basis upon which the State has consented to allow municipalities to file for bankruptcy protection.  *See* pertinent pages of Legislative History of Cal. Gov. Code § 20487 attached as "Exhibit A" (Documents from deliberations by the California Senate and Assembly discuss the summary of the legislation as, "Would prohibit the debtor's trustee of a PERS contracting agency that has filed for Chapter 9 bankruptcy from making an election to end -- by rejection,

5

employment relationship, and should be read to require adequate funds to meet reasonable expectations of the employees. *Valdes*, 139 Cal. App. 3d at 786. Participating cities cannot alter their funding obligation to CalPERS. *Wilson*, 52 Cal. App. 4th at 1122.[8]

For this reason, the City's obligations to CalPERS are not limited to those found in the language of the document labeled a "contract"; rather, the City's obligations are defined primarily by applicable State law and regulations.

In September 1944, the City of Stockton, through its City Council, elected to participate in the California State Retirement System, subject to the provisions of the State Employees' Retirement Act. *See, e.g.*, Exs. 232, 233 & 234 (Stockton/CalPERS Original Contract & Certain Amendments).[9] The City's retirement plan has two subplans with different benefit formulas—safety employees and miscellaneous employees. *See* CalPERS Actuarial Office, *Safety Plan of the City of Stockton Annual Valuation Report as of June 30, 2012*, (October 2013), http://www.calpers.ca.gov/eip-docs/about/pubs/public-agency-reports/cities-towns/2012/stockton-city-safety-2012.pdf ("Safety Valuation Report"); CalPERS Actuarial Office, *Miscellaneous Plan of the City of Stockton Annual Valuation Report as of June 30, 2012*, at 28 (October 2013), http://www.calpers.ca.gov/eip-docs/about/pubs/public-agency-reports/cities-towns/2012/stockton-city-miscellaneous-2012.pdf ("Miscellaneous Valuation Report"). Most City employees who are not safety employees are part of the miscellaneous subplan.

### D. Explanation of the Nature of Certain Calculated Liabilities.

The City's financial obligations to CalPERS are calculated pursuant to the PERL. CalPERS determines the City's contribution obligations on an actuarial basis, taking into account expected

---

assignment, or assumption -- its contract with PERS," and analysis of the legislation is that it would "add language to the PERS law specifically prohibiting the debtor's trustee of a PERS local contracting agency that has filed for Chapter 9 Bankruptcy from making an election to end -- by rejection, assignment, or assumption, its contract with PERS.").

[8] As discussed more fully below, a participating agency may elect to terminate its participation in the retirement system prospectively, but such termination does not affect contribution obligations for benefits accrued prior to termination. *See* Cal Gov. Code § 20570.

[9] CalPERS will submit as exhibits and offer into evidence the Original Contract and all currently applicable amendments.

6

investment returns, inflation, employee life expectancy, projected retirement date, and projected compensation.  All actuarial calculations are necessarily based on a number of assumptions about the future.  Demographic assumptions include the percentage of employees that will terminate, die, become disabled, and retire in each future year.  Economic assumptions include future salary increases for each active employee and future investment returns.  *See* Decl. of David Lamoureux [Dkt. 713] ("Lamoureux Decl."), ¶ 5.  The basic premise of a defined benefit pension plan is that the payments are determined based on actuarial assumptions and calculations, and the risk is pooled among the participants in the plan.  For a homogeneous population, predictions for larger groups are more accurate than for smaller groups.  Accordingly, as a pool is made larger and larger, the volatility of the cost per member decreases because the risk is pooled among a larger group.  *Id.* at ¶ 6.

The "*Employee* Contribution," which is also known as a "Member Contribution," is an amount set by a California statute and is the percentage of compensation an individual employee must contribute through each paycheck to participate in the CalPERS system.  Cal. Gov. Code §§ 20671-20776; Lamoureux Dep. 39:16-25 & 40:1.[10]  The "*Employer* Contribution Rate" is an amount that is set by the CalPERS actuarial staff on an annual basis.  Cal. Gov. Code §§ 20790-20842.  The PERL mandates that CalPERS annually calculate each Employer's Contribution Rate based on a percentage of payroll.  Lamoureux Decl., ¶ 8.

The most recent Annual Valuation Reports prepared by CalPERS' actuaries for the City of Stockton were issued in October 2013, and provide valuations as of June 30, 2012.  These reports:

(1)   Set forth the actuarial assets (including actuarial and market valuations) and accrued liabilities (including the unfunded actuarial liability) of each plan as of June 30, 2012;

(2)   Determine the required Employer Contribution Rate for each plan for the fiscal year July 1, 2014 – June 30, 2015;

(3)   Provide actuarial information as of June 30, 2012, to the CalPERS Board of Administration and other interested parties; and

(4)   Provide pension information as of June 30, 2012, to be used in financial reports subject to Governmental Accounting Standards Board Statement 27 for a single employer defined benefit pension plan.

---

[10]  Cited portions of the deposition of David Lamoureux are attached as Exhibit 6 to the Lubic Decl.

7

*See* Miscellaneous Valuation Report & Safety Valuation Report; *see also* Lamoureux Decl., ¶ 9.[11]

For any given year, Employer Contribution Rates are calculated by adding together two different elements. The first element is the "Normal Cost," which means "the cost of providing one year of benefits to the current employees." Lamoureux Dep. 44:3-5. In other words, it is the plan's annual premium for service earned in the upcoming year in the absence of any unfunded or overfunded liability to be amortized. It is expressed as a percentage of payroll. Lamoureux Decl., ¶ 11. The second element is the payment toward any "Unfunded Liability," which (on an actuarial value basis) is obtained by comparing the actuarial value of the assets of the plan to the actuarial accrued liability of the plan. *Id.* Unfunded Liability is expressed as a lump sum dollar amount. *Id.* Because each employee member is guaranteed a certain level of benefits, the Employer Contribution Rate can vary from year to year based on the various actuarial factors discussed above. Lamoureux Dep. 40:2-7 & 41:12-16. Notably, Employer Contribution Rates, because they are determined as a percentage of payroll, also depend upon the amount of the City's payroll such that if an employer reduces its total payroll, its rates will increase even though the total amount contributed may decline.

The Unfunded Liability calculations described in the Annual Valuation Reports are not amounts currently owed by any employer. The Unfunded Liability is merely one component of the actuarial calculation used to determine the Employer Contribution Rate for the upcoming fiscal year. Lamoureux Decl., ¶ 12.[12] The total annual contribution is borne by both the employer and the employees, and the future benefits for current employees will be assured only if all contributions of both employer and employees are made timely and in full. *Id.* at ¶¶ 13-14.

---

[11] The Lamoureux Decl. discusses the valuation reports as of June 30, 2011, however, the procedure and types of information provided in the previous valuation reports discussed in his declaration and the most recent valuation reports are similar. The June 30, 2012 Valuation Reports are available at http://www.calpers.ca.gov/eip-docs/about/pubs/public-agency-reports/cities-towns/2012/stockton-city-safety-2012.pdf and http://www.calpers.ca.gov/eip-docs/about/pubs/public-agency-reports/cities-towns/2012/stockton-city-miscellaneous-2012.pdf.

[12] According to the most recent Annual Valuation Reports, the City must pay CalPERS approximately $29.8 million ($19.3 million for safety and $10.5 million for miscellaneous) during the 2013-2014 fiscal year in order to remain current on its payments to CalPERS. *See* Miscellaneous Valuation Report & Safety Valuation Report ("Required Employer Contribution" line item).

Finally, in the event of termination (discussed below), a terminated agency is required to make a payment to CalPERS in an amount determined by the CalPERS Board (based on actuarial calculations) to be sufficient to ensure payment of all vested pension rights of the terminated agency's employees accrued through the termination date. This is referred to as the "Termination Payment." *Id.*, ¶ 15. The PERL indicates that the Termination Payment is due immediately and is subject to interest, as discussed more fully below. Cal. Gov. Code § 20577; Lamoureux Dep. 191:17-23.

> **E.    The Termination Process and the Consequences of Termination.**

> > *1.    Termination and the Termination Process.*

As set forth in the PERL, some circumstances allow for the termination of the relationship, or a portion thereof, between a contracting agency[13] and CalPERS. For instance, contracts which have been in effect for at least five years can be terminated through approval of an ordinance or resolution of the contracting agency's governing body, or through an ordinance adopted by the electorate, with one year's notice to CalPERS. Cal. Gov. Code §§ 20570 & 20571. Also, if a contracting agency fails to pay its required periodic contributions within 30 days after demand by the CalPERS Board, or fails to file any information required in the administration of the system, or if the CalPERS Board determines the contracting agency no longer exists, the CalPERS Board may terminate the contract by resolution. *Id.* § 20572. A public agency may not enter into a new contract with CalPERS within three years of termination. *Id.* § 20460.

In the event of termination, the PERL requires the terminated agency to make a payment to CalPERS in an amount determined by the CalPERS Board (based on actuarial calculations) to be sufficient to ensure payment of all pension benefits of the terminated agency's employees accrued through the termination date. *Id.* § 20577. The Termination Payment is due immediately and subject to interest. *Id.* ("The amount of difference shall be subject to interest at the actuarial rate from the date of contract termination to the date the agency pays this system."). The Termination Payment

---

[13] "Contracting agency" means, among other entities, any public agency that has elected to have all or any part of its employees become members of this system and that has contracted with the board for that purpose. *See* Cal. Gov. Code § 20022.

9

goes into the "Terminated Agency Pool." *Id.* § 20577.5. Once the Termination Payment is made, CalPERS has no further recourse to a terminating employer.

When determining the Termination Payment, CalPERS is subject to actuarial risks including longevity risk, investment risk, inflation, and wage-growth risk associated with the future payment of the terminated agency's benefits. Lubic Decl., Ex. 13 (Dec. 2012 Agenda Item). Unlike in an ongoing plan, these risks cannot be addressed by adjusting contribution rates in future years. Because there is no mechanism for receiving additional payments should the actuarial assumptions not be met, the investments in the Terminated Agency Pool, and the assumptions to determine the Termination Payment, must be more conservative. Lamoureux Dep. 113:3-24. To address the longevity risk, the Termination Payment calculation includes an increase to the liabilities to address mortality fluctuations. *See* Cal. Gov. Code § 20576. To address investment risk, inflation, and wage-growth risk, the CalPERS Board has adopted a policy to determine the discount rate, inflation assumption, and wage growth assumption for termination calculations. *See* Lubic Decl., Ex. 11 (CalPERS Circular Letter No. 200-058-11 (August 19, 2011)); Lubic Decl., Ex. 12 (August 2011 Agenda Item). In addition, the CalPERS Board recently adopted a conservative asset allocation for the Terminated Agency Pool, providing that assets will be invested in treasury bonds. *See id.*, Ex. 13 (Dec. 2012 Agenda Item); Lamoureux Dep. 90:16-92:5, 110:6-25, 111:1-25 & 113:3-24.

A primary driver in determining the amount of the Termination Payment is the setting of the discount rate, which is "a reflection of the asset policy or how the assets are invested." *Id.* at 190:15-17. Given the conservative nature of the investments in the Terminated Agency Pool, the discount rate related to a Termination Payment is low when compared with the actuarial rate for the portfolio for ongoing participating agencies. *Id.* at 190:15-25 & 191 1-15. The cumulative effect of these policies is that a terminated agency's actuarial liability upon termination is larger than the actuarial liability on an ongoing basis.[14]

---

[14] Furthermore, a terminating agency owes CalPERS the costs of collection, including attorneys' fees. Cal. Gov. Code § 20574.

10

Stockton's Annual Valuation Reports each provide a line item for "unfunded termination liability," which is an estimate of how much Stockton would owe to CalPERS if its contracts had been terminated as of *June 30, 2012*. The Miscellaneous Plan lists this liability at $575,931,065 and the Safety Plan lists this liability at $1,042,390,452, for a total of more than $1.6 billion. *See* Miscellaneous Valuation Report at 28 & Safety Valuation Report at 28. If a terminated agency fails to pay the Termination Payment, benefits to employees must be reduced pro rata based on the amount of the Termination Payment that is not funded.[15] Cal. Gov. Code § 20577. CalPERS may reduce the benefits payable under the terminated contract only once. *Id.* After the terminated agency's assets and liabilities have been merged into the Terminated Agency Pool account, the PERL permits no further benefit adjustments. *Id.* § 20578.

## 2. Termination Lien.

When a plan is terminated, the PERL imposes a lien in favor of CalPERS "on the assets of a terminated contracting agency, subject only to a prior lien for wages." Cal. Gov. Code § 20574. Legislative history confirms that this section immediately provides CalPERS with the rights of a senior secured creditor as a matter of law. The legislature expressly intended to "grant PERS a lien against the assets of public agencies who have terminated their membership in the system, usually as a result of agency dissolution and bankruptcy who have unfunded liabilities owed to PERS for vested employee benefits and have no ability to pay such liabilities." *See* Lubic Decl., Ex. 7 at 35 (relevant portions of Legislative History of California Government Code § 20574).

## 3. Termination Is Not a Viable Option for Stockton.

If Stockton chose to terminate its relationship with CalPERS, the City would be faced with an immediately due and owing massive termination liability secured by a senior lien on all its assets.

Moreover, in a termination, CalPERS would continue benefits without reduction only if the Board were to find that benefit continuation will not impact the actuarial soundness of the Terminated

---

[15] CalPERS may choose to make no reduction or a lesser reduction if the CalPERS Board has made reasonable efforts to the collect the payment and the CalPERS Board determines that failure to make a reduction will not impact the actuarial soundness of the Terminated Agency Pool account. Cal. Gov. Code § 20577.5.

11

CALPERS' RESPONSE TO FRANKLIN'S OBJECTION                                    2012-32118

1    Agency Pool.  Cal. Gov. Code § 20577.5.  As a result, if Stockton could not fund its shortfall

2    following a hypothetical termination, CalPERS would be required to reduce benefits before merging

3    Stockton's assets into the Terminated Agency Pool.

4         Further, if the City chooses to terminate its relationship with CalPERS, the City could not

5    enter into a new relationship with CalPERS for at least three years from the date of termination.  *Id.*

6    § 20460.  Although the City's existing employees that had benefits accrued as of the termination date

7    in CalPERS would retain their benefits (albeit likely reduced dramatically), they would earn no

8    additional benefits, and new employees would have no retirement system in which to participate.

9    Such a situation would impact Stockton's ability to retain and hire new employees and further impair

10   its ability to provide essential services to its residents.

11              *4.       Potential Jeopardy to Tax Exempt Status.*

12         In addition to these State law constraints, any unilateral reduction of pension benefits may

13   ultimately impact the federal tax treatment of CalPERS' members' benefits.  A tax-qualified pension

14   plan must comply with its terms to maintain tax-qualified status.  If a tax-qualified plan's operation

15   does not comply with its terms, the plan has an operational failure that could jeopardize the plan's

16   tax-qualified status.  *See* Lubic Decl., Ex. 9 (Internal Revenue Procedure 2008-50, Section 5.01(2)(b),

17   2008-35 I.R.B. 464).  In the case of CalPERS, the PERL and the relevant parts of the California Code

18   of Regulations serve as the official plan document for federal tax purposes.  Thus, CalPERS and its

19   Board cannot take any action under the plan that is not authorized by the PERL without jeopardizing

20   the tax-qualified status of the plan.

21         A tax-qualified plan may not violate prohibited transaction rules.  Governmental plans that are

22   tax-qualified are subject to the prohibited transaction rules of Section 503 of the Internal Revenue

23   Code of 1986, as amended (the "IRC") and, if violated, the plan may lose its tax-qualified status.

24   I.R.C. § 503(a)(1)(B).  This section of the IRC generally requires arm's-length dealings between the

25   creator of the trust and the trustee.  *See* Lubic Decl., Ex. 10 (General Counsel Memorandum 38972

26   (Mar. 25, 1983) (citing S. Rep. No. 2375, 81st Cong., 2d Sess. 36-37, 1950-2 C.B. 483, 509-511)).

27   The prohibited transactions include: (1) the lending of any part of the trust income or corpus without

28   the receipt of adequate security and a reasonable rate of interest to the creator or contributor, (2) the

                                                      12

1  substantial purchase of securities or other property for more than adequate consideration from the

2  creator or contributor, and (3) the sale of a substantial part of its securities or property for less than

3  adequate consideration to the creator or contributor.  I.R.C. § 503(b)(1), (4) and (5).

4    Any restructuring of CalPERS' members' benefits could potentially violate the prohibited

5  transaction rules of IRC Section 503 if the restructuring applies to contributions already owed.  The

6  IRS has issued guidance regarding a City's delay in making immediate cash contributions for which

7  it was currently liable and held that "a loan may be implied and . . . transactions must be viewed

8  according to their real nature rather than mere form."  *See* Lubic Decl., Ex. 10 (General Counsel

9  Memorandum 38972 (Mar. 25, 1983) (citing *Fuqua Nat'l, Inc. v. United States*, 334 F. Supp. 1116

10  (S.D. Ga. 1971)).  Loss of tax-qualified status would mean that *all* members and retirees under the

11  CalPERS system, not just Stockton members, would have immediate tax liability.[16]  The IRS treats a

12  plan as disqualified for all plan years after an error has occurred until the error is corrected.  Under

13  this approach, a disqualification error that occurred prior to the open tax years (*i.e.*, occurred in years

14  for which the statute of limitations has run) can cause the plan to be treated as disqualified in the open

15  years if the IRS identifies the error.  If a plan is disqualified for some or all open tax years, the

16  employer, the plan participants, and the plan trust may suffer significant negative consequences.

17    In essence, any restructuring of CalPERS' members' benefits has the potential to cause great

18  financial harm to the both the City and its employees and retirees, as well as the State of California

19  itself, because it may jeopardize the tax-exempt status of CalPERS.

---

[16]  First, to the extent taxes were owed, the sponsoring employer may risk liability for failure to
withhold and remit income, FICA, and FUTA taxes on vested contributions and earnings owned by
the employees.  Second, if a plan loses its qualified status, the plan trust might be required to pay
taxes and penalties on the investment earnings earned during the disqualified years.  Finally, to the
extent that employees are vested or became vested in contributions made in (or with respect to) the
disqualified years, they may owe income and FICA taxes on such contributions and associated
investment earnings.  In addition, plan participants may also owe penalties for failure to pay taxes on
their income in a timely manner.  Former employees who received distributions from the plan during
the disqualified period must pay taxes on the entire amount of the distribution, even if they rolled the
distribution over to another plan or IRA.

CALPERS' RESPONSE TO FRANKLIN'S OBJECTION                                              2012-32118

## II. ARGUMENT

**A.** **Franklin's "Best Interests" Objection Misapprehends the Ability to Reduce the City's Obligations to CalPERS and the Consequences of Terminating the City's CalPERS Pension Plan.**

In the course of its argument that the City's plan is not in the best interests of creditors, Franklin contends that the City should "confront" its "pension problem," and claims that Franklin could recover "substantially more" outside bankruptcy. Franklin Objection at 23-30. On both points, Franklin's objection is uninformed.

Franklin does not explain how the City might "confront" its "pension problem" and "pension obligations." In particular, Franklin does not provide any alternative for the City's provision of pension benefits to its employees. Neither CalPERS nor the City has authority to reduce pension benefits, other than as a consequence of termination. Terminating the City's CalPERS Pension Plan would trigger an immediate obligation of the City to CalPERS of more than $1.6 billion. This obligation would be secured by a senior lien on all of the City's property, including the funds that Franklin speculates might be available to pay Franklin. Franklin Objection at 20 & 26. Any argument about "best interests" predicated on an illegal modification or hypothetical termination of the CalPERS Pension Plan must take those realities into account. Neither Franklin, nor other creditors nor the City itself would be better off under those circumstances and, accordingly, Franklin's best interests arguments fail.

**B.** **Franklin's "Good Faith" Objection to the City's Decision to Continue its Relationship with CalPERS Is Legally and Factually Unsound.**

As part of its "good faith" argument, Franklin asserts that what Franklin characterizes as the City's "wholesale assumption of its single largest liability - unfunded pensions" is evidence that the Plan lacks the good faith necessary for confirmation. Franklin Objection at 54. This proposition is legally and factually unsound.

*1.* *The City Has the Authority under 11 U.S.C. § 1123(b)(6) to Continue its Relationship with CalPERS.*

Franklin fails to cite the applicable standard for assessing compliance with the "good faith" requirement of 11 U.S.C. § 1129(a)(3). "A plan is proposed in good faith where it achieves a result

14

1  consistent with the objectives and purposes of the Code." *Platinum Capital, Inc. v. Sylmar Plaza,*

2  *L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).

3      Section 1123(b)(6) of the Code (which applies in chapter 9, *see* 11 U.S.C. § 901(a)), provides

4  that a plan may "include any other appropriate provision not inconsistent with the applicable

5  provisions of this title."  Section 1123(b)(6) defines the "outer boundary" of the broad "flexibility"

6  afforded to a plan proponent.  *In re Associated Vintage Grp., Inc.*, 283 B.R. 549, 560 (9th Cir. BAP

7  2002).

8      The Plan provision ratifying the CalPERS relationship is appropriate under section

9  1123(b)(6).  Nothing about the City's decision is "inconsistent with the applicable provisions" of

10  Title 11.  The City's decision to continue its relationship with CalPERS is consistent with applicable

11  state law and does not violate any nonbankruptcy federal law or policy.

12          2.      *Good Faith under 11 U.S.C. § 1129(a)(3) Does Not Require the City to Pursue*
                    *Franklin's Suggestion that the City Attempt to "Adjust" its Obligations to*
13                  *CalPERS.*

14      Franklin contends that the City might have attempted to "adjust" the City's obligations to

15  CalPERS, citing a decision applying Michigan law.  Franklin Objection at 55 (citing *In re City of*

16  *Detroit, Mich.*, 504 B.R. 97 (Bankr. E.D. Mich. 2013)).  Franklin is wrong, but the Court need and

17  should not decide that question.

18       The City has stated its intention to leave its obligations to CalPERS intact and therefore the

19  question of whether or not the City's obligations to CalPERS could or could not be impaired under

20  chapter 9 is not before this Court.  It would be improper for this Court to opine on any issue that is

21  not actually before it because Federal Courts lack the power under Article III to issue advisory

22  opinions.  *See, e.g.*, *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446

23  (1993) ("[A] federal court lacks the power to render advisory opinions.") (internal quotation marks

24  and alteration omitted); *see also Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th

25  Cir. 2010) ("Because the court's role is neither to issue advisory opinions nor to declare rights in

26  hypothetical cases, the case or controversy standard also requires that a claim be ripe for review.")

27  (internal quotation marks omitted).

28

1    Likewise, the question of whether the City's obligations to CalPERS, an undeniable arm of

2    the State of California, can or cannot be impaired in a chapter 9 case involve complex and thorny

3    statutory and constitutional questions involving the application of 11 U.S.C. § 903 and the Tenth

4    Amendment.  It has long since been settled that Federal Courts are duty-bound to refrain from

5    deciding constitutional questions if they are unnecessary to the issues before the Court or if the case

6    can be decided on non-constitutional grounds.  *See, e.g.*, *Camreta v. Greene*, 131 S.Ct. 2020, 2031

7    (2011) ("[A] 'longstanding principle of judicial restraint requires that courts avoid reaching

8    constitutional questions in advance of the necessity of deciding them.'") (quoting *Lyng v. N.W.*

9    *Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 445 (1988)); *see also Ashwander v. TVA*, 297 U.S.

10   288, 346-47 (1936) (Brandeis, J., concurring); *cf. Clark v. Martinez*, 543 U.S. 371, 380-81 (2005)

11   (explaining doctrine of constitutional avoidance in interpreting statutes and noting that construction

12   that avoids constitutional issues should prevail over one that raise constitutional issues).  Thus, this

13   Court should exercise judicial restraint and avoid deciding these questions because it raises issues of

14   the highest constitutional magnitude, which go to the very structure of Our Federalism (*i.e.*, the

15   relationship between the  Federal Government and the Sovereign States).

16   Franklin's reliance on *In re City of Detroit, Mich.*, 504 B.R. 97 (Bankr. E.D. Mich. 2013), is

17   sorely misplaced for several reasons.  First, that decision addressed whether a municipal, as opposed

18   to a State-run, pension system could be impaired in a chapter 9 case.  Given that municipalities do not

19   have the same sovereign rights as States under the Federal Constitution, *Ysursa v. Pocatello Educ.*

20   *Ass'n*, 555 U.S. 353, 362 (2009) ("Political subdivisions of States—counties, cities, or whatever—

21   never were and never have been considered as sovereign entities.") (internal quotation marks

22   omitted), the issues before the court in Detroit are wholly different than the issues that would be (but

23   are not presently) before this Court if the City attempted to impair its obligations to CalPERS.

24   Second, the Detroit decision applied Michigan state law to the municipal pension system.  Michigan

25   law regarding municipal pension systems is different that California law.  Third, the Detroit decision

26   is not binding on this Court, and frankly, given that the United States Court of Appeals for the Sixth

27   Circuit has taken the extraordinary step of granting review of that case under 28 U.S.C. 158(d)(2)(A),

28

16

CALPERS' RESPONSE TO FRANKLIN'S OBJECTION                                        2012-32118

1    any reliance on that case is, at best, questionable.  Nevertheless, even if the Detroit decision was

2    applicable (which it is not), it is simply wrong in its analysis of the Tenth Amendment.

3          The issue under section 1129(a)(3) is not whether an objecting party can dream up some

4    alternative plan that it may think is better, but whether the plan on the table is consistent with the

5    Code and is not the product of collusion, conflict of interest, or some other act of bad faith.

6          Section 1129(a)(3)  does not compel a debtor to "consider every feasible alternative form of

7    plan, so long as the proposed plan meets the requirements of § 1129(a)."  *In re Marshall*, 298 B.R.

8    670, 676 (Bankr. C.D. Cal. 2003).  There is "no authority . . . for the proposition that, in order to

9    propose a plan in good faith, a Chapter 11 debtor must explore and consider all possible alternative

10   forms of plans, or all feasible alternative forms, of even any alternative forms so long as the one that

11   is proposed meets the requirements of 11 U.S.C. § 1129(a)."  *In re General Teamsters,*

12   *Warehousemen & Helpers Union, Local 890*, 225 B.R. 719, 729 (Bankr. N.D. Cal. 1998) (holding,

13   *inter alia*, that a debtor union's decision not to seek a dues increase from its members in order to be

14   able to increase payment to creditors was not evidence of bad faith), *aff'd sub nom. Sec. Farms v.*

15   *General Teamsters, Warehousemen & Helpers Union Local 890 (In re General Teamsters,*

16   *Warehousemen and Helpers Union Local 890)*, 265 F.3d 869, 877 (9th Cir. 2001).

17          Franklin cites only one case to support its position that "good faith" under section 1129(a)(3)

18   can be challenged if an objecting creditor complains that the debtor did not exhaust options that the

19   objecting party recommends pursuing.  Franklin's case, *Wolph v. U.S. Department of Education (In*

20   *re Wolph)*, 479 B.R. 725 (Bankr. N.D. Ohio 2012), has nothing to do with section 1129(a)(3).  *Wolph*

21   involved an individual debtor with student loans who filed a chapter 7 petition.  The debtor sought a

22   discharge of the loans, and argued that the statutory exception of such loans from discharge, 11

23   U.S.C. § 523(a)(8), did not apply because she satisfied the "undue hardship" exception to the

24   exception.  *Id.* at 728-29.  The court looked to the test for undue hardship, originating in the decision

25   *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987).  That

26   *Brunner* test, in turn, considered as one element whether the debtor had made "good faith efforts to

27   repay the loans." *Id.* at 396.  Balancing a number of considerations, the court in *Wolph* treated as a

28   "negative" consideration the fact the debtor had agreed to make a partial payment on student loans

17

CALPERS' RESPONSE TO FRANKLIN'S OBJECTION                          2012-32118

that her parents had guaranteed, while proposing to pay nothing on the other student loans.  *Wolph*, 479 B.R. at 732.  It is beyond remote for Franklin to rely, as a key point in its argument on the statutory meaning of "good faith" proposal of a plan, on one court's use of a family-based preferential treatment of creditors as one of many considerations in applying a common-law "good faith" test for an exception to an exception from discharge.[17]  Moreover, even if *Wolph* had some bearing on this matter, Franklin has not attempted to show that the City had any analogous "personal motive" for allegedly favoring CalPERS.[18]

Franklin also says that the City lacked good faith because of the City's supposed "disregard" of out-of-court third-party comments about the City of Vallejo.[19]  Of course, the assertions about

---

[17] As the Court earlier noted in this case, "As these various versions of good faith in chapter 9 arise in different contexts, they may have different meanings."  *In re City of Stockton*, 493 B.R. 772, 784 (Bankr. E.D. Calif. 2013).

[18] To the extent that Franklin is using its "good faith" arguments about CalPERS to complain about classification or "unfair discrimination" as it relates to CalPERS, case law supports a decision by the City to distinguish the treatment of simple creditors like Franklin from that of creditors crucial to a successful reorganization.

Preserving employee relations and goodwill is a valid reason for separate classification.  In *Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (holding that debtor had a "legitimate reason" for separate classification of employees' workers compensation claims from other unsecured claims, based on anticipated negative worker reaction to nonpayment).

More broadly, courts have concluded that legitimate grounds for separate classification exist where the debtor has reasonable grounds to conclude that one group creditors has a different on-going interest and importance to the debtor's continued viability than does a different group of creditors.  The court in *In re EPB, Inc.*, 172 B.R. 241 (Bankr. N.D. Ohio 1994) concluded that the debtor had a legitimate basis for separate classification of a tort claimant "providing no continuing benefit to the Debtor's estate" from trade creditors who "provide a potential continuing benefit to the Debtor's estate which will sustain the Debtor's business if confirmation is achieved."  *In re EPB*, 172 B.R. at 244.

Courts within the Ninth Circuit have likewise held that debtors had legitimate justifications for separate classification in order to maintain their ability to operate.  *In re Carolina Tobacco Co.*, 2006 WL 7074335 (Bankr. D. Ore. March 14, 2006), *aff'd*, 360 B.R. 702, 714 (D. Ore. 2007), held that the debtor had a legitimate reason for separately classifying its obligations to make statutory escrow payments in order to be able to operate postpetition.  *In re Indian National Finals Rodeo Inc.*, 453 B.R. 387, 400 (Bankr. D. Mont. 2011), held that the debtor had legitimate business justification in separately classifying claims by creditors from whom the debtor "anticipated future aid or contributions of money and/or services."

[19] CalPERS notes that there are also articles saying that Vallejo is not in financial trouble.  *See, e.g.,* "Vallejo Bankrupt Again? 'We Are Not Going There,'" Calpensions, March 17, 2014 (quoting Vallejo Mayor Davis following a council vote closing a gap in the current budget, "It's going to be a tough struggle, but I'm sure we will get there," and City Manager Deborah Lauchner, "We are not on the brink of bankruptcy.  We are not going there.").

CALPERS' RESPONSE TO FRANKLIN'S OBJECTION                                    2012-32118

1    Vallejo's situation are inadmissible hearsay,[20] and Franklin has no evidence that the City in any case

2    "disregarded" what may or may not be happening there.  More fundamentally, to the extent that

3    Franklin is relying on Vallejo to question the feasibility of Stockton's Plan, Franklin's argument is

4    flawed.  Section 1129(a)(3) may include some consideration of feasibility in establishing good faith,

5    but that analysis only requires that feasibility be established.  *See Beal Bank USA v. Windmill*

6    *Durango Office, LLC (In re Windmill Durango Office, LLC)*, 481 B.R. 51, 67, 68 (9th Cir. BAP

7    2012) (noting in a chapter 11 case that the standard of feasibility is a "reasonable probability of

8    success" (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1363 (9th Cir.

9    1986)), and "a relatively low threshold of proof" will suffice (citing *Wells Fargo Bank v. Loop 76,*

10   *LLC  (In re Loop 76, LLC)*, 465 B.R. 525, 544 (9th Cir. BAP 2012))).  Even if Franklin could point to

11   an actual example of a failed chapter 9 plan, that example would have no more relevance than would

12   an analogous effort in a chapter 11 case to show that some other chapter 11 reorganizations have

13   failed.  Franklin's speculation regarding the Vallejo circumstances is also misleading.  It is a matter

14   of public record that in the past ten years, there have been only four municipal bankruptcy cases filed

15   in the State of California including Vallejo.  One of those cases (City of Mammoth Lakes) was

16   voluntarily dismissed within a matter of months.  These numbers belie Franklin's rhetoric about the

17   overwhelming burden of pension liabilities on municipalities and the risk of serial filings of chapter 9

18   cases in California.

19           The issue before the court is the feasibility of Stockton's plan, not anyone else's plan, and

20   speculation based on newspaper reports and reports by ratings agencies is patently inadmissible and

21   misleading.

22           This Court does not have an obligation to only confirm the most feasible plan, nor does it

23   have an obligation only to confirm a plan that *it believes* is in the best interests of the City in the long

24   term.  In fact, to impose its view of the most desirable plan for the City would conflict with § 904 of

25   the Bankruptcy Code because it would interfere with the governmental powers of the City.  This

26   

27   [20] For example, "[n]ewspaper articles are rank hearsay."  *Nooner v. Norris*, 594 F.3d 592, 603 (8th
     Cir. 2010) (internal quotation marks omitted).  Likewise, any article authored by the ratings agency
28   Moody's Inc., among other disqualifying factors, is equally "rank hearsay."

1    Court's only duty is to assess whether the actual Plan proposed by the City is feasible.  If it is not,

2    then this Court can reject the Plan and allow the City to propose a second plan, but the Court should

3    not reject the City's Plan because Franklin believes a better plan can be proposed.

          **3.**      *The City's Decision to Continue its Relationship with CalPERS Satisfies the*
                 *Good Faith Standard of 11 U.S.C. § 1129(a)(3).*

5           As noted above, "[a] plan is proposed in good faith where it achieves a result consistent with

6    the objectives and purposes of the Code." *In re Sylmar Plaza, L.P.*, 314 F.3d at 1074.  The purpose

7    of chapter 9 is to "foster[] the continuance of municipalities rather than their dissolution" so that they

8    can continue to provide "essential services to residents." *In re Addison Cmty. Hosp. Auth.*, 175 B.R.

9    646, 648 (Bankr. E.D. Mich. 1994).  Chapter 9 attempts "to meet the special needs of a municipal

10   debtor," *In re Richmond Unified School Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Calif. 1991).  "A

11   Chapter 9 plan must be consistent with the governmental nature and obligations of the Chapter 9

12   debtor." *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999).

13          Evidence at the confirmation hearing will establish that the City reasonably and genuinely

14   concluded that continuing the City's relationship with CalPERS was crucial to the City's efforts to

15   retain and attract employees performing the governmental services that are the City's reason for

16   existing.  The City's decision is consistent with the objectives and purposes of the Bankruptcy Code

17   and cannot be challenged on the basis of good faith.

         **a.**      **The City Reasonably Concluded that it Would Be at a Severe**
19                   **Competitive Disadvantage in Retaining and Attracting Employees**
                **Without a CalPERS Pension Plan.**

21          At the confirmation hearing, CalPERS and the City will show that a CalPERS pension plan is

22   the overwhelming choice for municipalities in California, and that to attract new employees and to

23   retain existing employees, the City is advantaged by its participation in CalPERS.  If the City were to

24   purport to terminate its relationship with CalPERS, it would trigger a massive termination obligation

25   and the City would be ineligible to begin a new CalPERS plan for three years. Cal. Gov. Code

26   § 20460.  Even if non-CalPERS plans were an available substitute, a concept for which Franklin has

27   produced no evidence, the City would be left bearing the costs of that replacement plan while also

28   facing the termination obligation.

1    The City has reasonably concluded that without a CalPERS plan, the City would be severely

2    disadvantaged in hiring new employees and retaining its existing ones.  This risk is especially grave

3    in the case of public safety personnel, who can likely find employment elsewhere with a California

4    city that does offer a CalPERS plan.  Particularly for a city, like Stockton, facing elevated rates of

5    violent crime, the loss of experienced public safety personnel could initiate a downward spiral

6    threatening the City's viability (including, of course, its ability to generate revenues to pay creditors).

7    In a chapter 9 case, when assessing feasibility, this concern must be part of the calculus.

8          **b.      Terminating the CalPERS Pension Plan Would Likely Cause a
                   Substantial Number of Employees to Leave the City's Employ to**
9          **Preserve their Pension Benefits.**

10    One particularly acute problem for the City if it were to terminate its CalPERS Pension Plan

11    is that current employees who wanted to preserve their existing pension benefit accrual levels would

12    have a strong incentive to stop working for the City and seek employment from another city or public

13    agency with CalPERS benefits, or CalPERS reciprocal benefits, as soon as possible.  Even the

14    announcement of an intent to terminate would likely begin a rush for the exits, especially by

15    employees who intend to accrue benefits for significant additional years and who have the most to

16    lose if their benefits are slashed following termination.

17                        **III. <u>CONCLUSION</u>**

18    For the foregoing reasons, Franklin's objections to the Plan based on the City's decision to

19    continue its relationship with CalPERS should be overruled.

20

21                              Respectfully submitted,

22                              Michael J. Gearin
                                Michael B. Lubic
23                              Michael K. Ryan
                                Manoj D. Ramia
24                              K&L GATES LLP

25

26    Dated: March 31, 2014          By:  */s/  Michael J. Gearin*
                                          Michael J. Gearin

27                                   Attorneys for California Public Employees'
28                                   Retirement System

21

# EXHIBIT A



# Legislative Research & Intent LLC

1107 9th Street, Suite 220, Sacramento, CA 95814
(800) 530.7613 · (916) 442.7660 · fax (916) 442.1529
www.lrihistory.com · intent@lrihistory.com

---

*Legislative History of*

# CALIFORNIA GOVERNMENT CODE
## § 20487 (Formerly § 20486)

*As Added By*
### Statutes of 1996, Chapter 502, § 1
### Senate Bill 1945 – Craven

© 2012 LRI, All Rights Reserved

No part of this report may be reproduced or transmitted in any form or by any means without the express written consent of Legislative Research & Intent LLC.  Reproduction of any part of this report beyond that permitted by the United States Copyright Act without the express written consent of the copyright owner is unlawful.

EXHIBIT A PAGE 24



# Legislative Research & Intent LLC

1107 9th Street, Suite 220, Sacramento, CA 95814
(800) 530.7613 · (916) 442.7660 · fax (916) 442.1529
www.lrihistory.com · intent@lrihistory.com

---

*Authentication of the Records and Table of Contents*

Legislative History Research Report Regarding:
CALIFORNIA GOVERNMENT CODE § 20487 (Formerly § 20486)
*As Added By* Statutes of 1996, Chapter 502, § 1, SB 1945 – Craven

I, Lisa Hampton, declare that this report includes:

- *Historical documents relating to the above legislation.* These documents were obtained by the staff of Legislative Research & Intent LLC and are true and correct copies of the originals obtained from the designated official, public sources in California unless another source is indicated, with the following exceptions:  In some cases, pages may have been reduced in size to fit an 8 ½" x 11" sized paper.  Or, for readability purposes, pages may have been enlarged or cleansed of black marks or spots. Lastly, paging and relevant identification have been inserted.

> Since 1983 LRI has specialized in the historical research surrounding the adoption, amendment and/or repeal of California statutes, regulations and constitutional provisions pursuant to California Code of Civil Procedure § 1859 which states in pertinent part:  "In the construction of a statute the intention of the Legislature ... is to be pursued, if possible ...."  Our research and expert witness services have assisted the courts in understanding and applying the underlying purpose of enactments in countless cases, such as *Redlands Community Hospital v. New England Mutual Life Insurance Co,* 23 Cal. App.4th 899 at 906 (1994).  LRI also provides similar research for other states and at the federal level. (Formerly Legislative Research Institute and Legislative Research, Incorporated.)

- *A table of contents itemizing the documents.* This table of contents cites the sources of the documents.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that I could and would so testify in a court of law if called to be a witness.

Executed August 13, 2012, in Sacramento, California.

Lisa Hampton, Research Director



# Legislative Research & Intent LLC

1107 9th Street, Suite 220, Sacramento, CA 95814
(800) 530.7613 · (916) 442.7660 · fax (916) 442.1529
www.lrihistory.com · intent@lrihistory.com

_____

# Documents Generated During Senate Deliberations

Legislative Research & Intent LLC hereby certifies that the accompanying record/s is/are true and correct copies of the original/s obtained from one or more official, public sources in California unless another source is indicated, with the following exceptions : In some cases, pages may have been reduced in size to fit an 8 ½" x 11" sized paper. Or, for readability purposes, pages may have been enlarged or cleansed of black marks or spots. Lastly, for ease of reference, paging and relevant identification have been inserted.

SENATE PUBLIC EMPLOYMENT & RETIREMENT COMMITTEE     BILL NO: SB 1945
Teresa Hughes, Chairwoman     Hearing date: 4/8/96
SB 1945 (Craven), as introduced     FISCAL: yes

<u>PERS:   BANKRUPTCY OF LOCAL CONTRACTING AGENCIES</u>

<u>HISTORY</u>:

    Sponsor: PERS Board of Administration

    Prior legislation: none


<u>SUMMARY</u>:

Would prohibit the debtor's trustee of a PERS contracting agency that
has filed for Chapter 9 Bankruptcy from making an election to end -- by
rejection, assignment, or assumption --  its contract with PERS.


<u>BACKGROUND</u>:

1)  The committee is advised that the recent Orange County fiscal crisis
has raised the possibility that a PERS' contracting agency could file a
Chapter 9 Bankruptcy, and that the agency's trustee in bankruptcy might
seek to reject its contract with PERS, thereby transferring the
liability for its retirees' retirement allowances to PERS.

2)  <u>Existing PERS law</u> contains the following sections relating to its
relationship with local governmental agencies that enter into a contract
with the system to provide retirement benefits to their employees:

    a) Section 20450 authorizes any public agency to contract for all or
    part of its employees to become members of PERS,

    b)  Section 20450.1 permits the PERS Board to refuse to contract for
    any benefit provision not specifically authorized which would
    adversely affect the administration of the system,

    c)  Section 20499.5 provides that a contracting agency forced to
    reduce employee compensation because of a fiscal emergency cannot
    reduce retirement benefits below the level before the reduction,

    d)  Section 20531 permits PERS to assess costs for late contributions
    and section 20531.5 permits PERS to charge interest on unpaid
    contributions,

    e)  Section 20562 permits PERS to cancel a contracting agency's
    contract when that agency has failed to pay after 30 days from
    written demand by the PERS Board; it may also terminate the contract
    by resolution effective 60 days after mailing to an agency it decides
    no longer exists,

    .f)  Section 20563 states that where the agency's accumulated
    contributions do not satisfy the actuarial equivalent set forth in
    section 20563, the agency must contribute the difference on terms
    fixed by the PERS Board; furthermore, the amount of the difference is
    subject to interest.  And, if the agency fails to pay, the Board may
    declare a proportional reduction in benefits.  However, section 20567
    assures that the right to a retirement allowance of an annuitant is
    not affected by termination of the contract unless the contracting
    agency fails to make its required contributions, and

page 1 (more)

g)  Section 20757.2 declares that despite any other provision of the law, no employer may refuse to make its contributions to CalPERS.

3)  Existing federal law, under Chapter 9 of the United States Bankruptcy Code, provides for reorganization of a municipality under strict parameters that include: insolvency; desire to adjust debts; agreement by creditors holding a majority of the outstanding amounts to be adjusted under the plan; and good faith negotiation with those creditors resulting in inability to succeed because of impracticability or the possibility of an unavoidable transfer under section 547 of the Bankruptcy Code.

U. S. Bankruptcy Code section 101(40) defines "municipality" to include any political subdivision or agency of the state.  Section 901 provides many of the general provisions of the Bankruptcy Code including sections 362 (automatic stay), 365 (executory contracts and unexpired leases), 1129 (confirmation of plan), and 1142 (implementation of plan).  But section 903 says that the power of a state to control the exercise of a municipality's governmental powers including expenditure for such an exercise is not limited.

And section 904 provides that without consent of the debtor or provision in the plan, the court may not interfere with the exercise of its governmental powers or use of its property and revenues. 28 U.S.C. § 959(b) says that the trustee shall manage the property like an owner or possessor would.

**California Government Code sections 53760 and 53761 effectively consent to the provisions of the Bankruptcy Code for its governmental subdivisions and taxing agencies.**

4)  The committee is advised by PERS bankruptcy counsel that federal Bankruptcy Code also contains the following:

a) Section 922 provides additional authority to that set forth in section 362, to stay all entities that seek to enforce any claim against a debtor,

b) Section 941 requires the debtor agency to file a plan. Section 943(b) ordains that the court shall affirm the plan if:  it complies with the Bankruptcy Code; contains no action prohibited by law; contains any regulatory or electoral approval necessary; and is both feasible and in the best interests of creditors,

c) Section 944 says the confirmed plan binds both the debtor and creditors even if they have not accepted the plan.

Under section 365 as applied to Chapter 9, any assumption, assignment, or rejection of a contract requires court approval.  Contracts must be assumed or rejected as a whole, not in part.  If assumed, all defaults and deficiencies must be cured.  Clauses in a contract canceling it because of insolvency are invalid.  Non-assignable contracts are also not subject to assumption or assignment.

**While the purpose of the federal bankruptcy law is to permit the impairment of contracts to effect a reorganization of debt, Chapter 9 only provides relief in states which have consented to its application. Only 18 states, including California, have done so.  Of those 18, a number have established conditions on the right to seek bankruptcy relief.  An example is requiring approval by a state agency before a municipality can apply for Chapter 9 relief.  New Jersey, Louisiana, Kentucky, Ohio, and Pennsylvania require such preapproval.  Other states -- North Dakota, Montana, and Kentucky -- and Louisiana set forth specific procedures which must be followed.**

page. 2 (more)

**ANALYSIS:**

This bill would add language to the PERS law <u>specifically prohibiting</u> the debtor's trustee of a PERS local contracting agency that has filed for Chapter 9 Bankruptcy from making an election to end -- by rejection, assignment, or assumption -- its contract with PERS.

**COMMENTS:**

1) The committee is advised that, <u>under existing PERS law</u>, if a PERS local contracting public agency were to file for reorganization under Chapter 9, PERS' ability to terminate a contract could be abrogated by the automatic stay.

In that event, CalPERS might not be able to assess for deficient contributions but may still be liable to annuitants whose allowances are not fully funded.

2) **SUPPORT:**

    California State Firefighters' Association
    California Professional Firefighters
    Service Employees International Union, California State Council

3) **OPPOSITION:**

    none to date

David Felderstein                    SB 1945
April 4, 1996

# SENATE BILL 1945

## PUBLIC EMPLOYMENT & RETIREMENT COMMITTEE

### April 8, 1996

MADAM CHAIRMAN AND MEMBERS:

SENATE BILL 1945 IS PROMPTED BY THE RECENT ORANGE COUNTY BANKRUPTCY.

THE BILL WOULD PROHIBIT PUBLIC AGENCIES CONTRACTING WITH CAL-PERS FROM TERMINATING, EITHER BY REJECTION, ASSIGNMENT, OR ASSUMPTION ITS OBLIGATIONS WITH THE RETIREMENT BOARD THROUGH CHAPTER 9 BANKRUPTCY FILINGS.

WITHOUT THIS CHANGE IN LAW, CAL-PERS MAYBE LIABLE TO CONTINUE PROVIDING BENEFITS TO EMPLOYEES OF PUBLIC AGENCIES EVEN IF DEPRIVED OF CONTRIBUTIONS BECAUSE OF A CHAPTER 9 DISCHARGE.

THE BILL VERY SIMPLY SPECIFIES THAT A PUBLIC AGENCY SUBJECT TO BANKRUPTCY MAY NOT ALTER ITS CONTRACT WITH

CAL-PERS WITHOUT THE PRIOR CONSENT OF THE RETIREMENT

BOARD.

I KNOW OF NO  OPPOSITION TO THE BILL AND WOULD ASK

FOR YOUR "AYE" VOTE.

EXHIBIT A PAGE 31

| | |
|---|---|
| **AMENDMENT DATE:** Original | **BILL NUMBER:** SB 1945 |
| **POSITION:** Neutral | **AUTHOR:** W. Craven |
| **SPONSOR:** Public Employees' Retirement System | |

## BILL SUMMARY

SB 1945 prohibits a local agency that has contracted with the Public Employees' Retirement System (CalPERS) for retirement program services from voiding its contract with CalPERS by filing for federal Chapter 9 Bankruptcy.

## FISCAL SUMMARY

No fiscal impact.

## COMMENTS

CalPERS sponsored this bill to prevent a public agency in financial distress, such as Orange County, from shifting the liability for funding its employees' retirement benefit payments to CalPERS.

| Code/Department Agency or Revenue Type | SO LA CO RV | PROP 98 | FC | (Fiscal Impact by Fiscal Year) (Dollars in Thousands) | | | | Fund Code |
|---|---|---|---|---|---|---|---|---|
| | | | | 1995-1996 | FC 1996-1997 | FC | 1997-1998 | |
| 1900/PERS | SO | No | | ----------- No/Minor Fiscal Impact -------------------- | | | | 0830 |

| Fund Code: | Title |
|---|---|
| 0830 | Public Employees Retirement Fund |

| Analyst/Principal (0931) W. Young | Date | Program Budget Manager Robert J. Straight | Date |
|---|---|---|---|
| _W. Young_ | 4-17-96 | _R. Straight_ | 4-18-96 |
| Department Deputy Director | | | Date |

| Governor's Office: | By: | Date: | Position Noted _____ |
|---|---|---|---|
| | | | Position Approved _____ |
| | | | Position Disapproved _____ |

BILL ANALYSIS                                                                 Form DF-43 (Rev 03/95 Buff)

**SENATE RULES COMMITTEE**
Office of Senate Floor Analyses
1020 N Street, Suite 524
(916) 445-6614     Fax: (916) 327-4478

<span style="text-align:right">SB 1945</span>

---

THIRD READING

---

Bill No:     SB 1945
Author:     Craven (R)
Amended:   As introduced
Vote:       21

---

SENATE PUBLIC EMP. & RET. COMMITTEE:  3-0, 4/8/96
AYES:  Haynes, Rogers, Hughes
NOT VOTING:  Costa, Solis

SENATE APPROPRIATIONS COMMITTEE:  Senate Rule 28.8

---

**SUBJECT:**    Public employees:  retirement

**SOURCE:**    Public Employees Retirement System Board of
Administration

---

**DIGEST:**   This bill prohibits contracting agencies and public agencies that
become subject to federal bankruptcy proceedings from rejecting retirement
coverage contracts or assuming or assigning those contracts without the
prior consent of the Public Employees Retirement System (PERS) Board.

**ANALYSIS:**   The Senate Public Employment and Retirement Committee
analysis indicates that the recent Orange County fiscal crisis has raised the
possibility that a PERS' contracting agency could file a Chapter 9
Bankruptcy, and that the agency's trustee in bankruptcy might seek to reject
its contract with PERS, thereby transferring the liability for its retirees'
retirement allowances to PERS.

CONTINUED PAGE 33

Case 12-32118    Filed 03/31/14    Doc 1308

Existing PERS law contains the following sections relating to its relationship with local governmental agencies that enter into a contract with the system to provide retirement benefits to their employees:

1.  Section 20450 authorizes any public agency to contract for all or part of its employees to become members of PERS,

2.  Section 20450.1 permits the PERS Board to refuse to contract for any benefit provision not specifically authorized which would adversely affect the administration of the system,

3.  Section 20499.5 provides that a contracting agency forced to reduce employee compensation because of a fiscal emergency cannot reduce retirement benefits below the level before the reduction,

4.  Section 20531 permits PERS to assess costs for late contributions and section 20531.5 permits PERS to charge interest on unpaid contributions,

5.  Section 20562 permits PERS to cancel a contracting agency's contract when that agency has failed to pay after 30 days from written demand by the PERS Board; it may also terminate the contract by resolution effective 60 days after mailing to an agency it decides no longer exists,

6.  Section 20563 states that where the agency's accumulated contributions do not satisfy the actuarial equivalent set forth in section 20563, the agency must contribute the difference on terms fixed by the PERS Board; furthermore, the amount of the difference is subject to interest. And, if the agency fails to pay, the Board may declare a proportional reduction in benefits. However, section 20567 assures that the right to a retirement allowance of an annuitant is not affected by termination of the contract unless the contracting agency fails to make its required contributions, and

7.  Section 20757.2 declares that despite any other provision of the law, no employer may refuse to make its contributions to CalPERS.

Existing federal law, under Chapter 9 of the United States Bankruptcy Code, provides for reorganization of a municipality under strict parameters that include: insolvency; desire to adjust debts; agreement by creditors

CONTINUED
EXHIBIT PAGE 34

Case 12-32118    Filed 03/31/14    Doc 1308

holding a majority of the outstanding amounts to be adjusted under the plan; and good faith negotiation with those creditors resulting in inability to succeed because of impracticability or the possibility of an unavoidable transfer under section 547 of the Bankruptcy Code.

U. S. Bankruptcy Code section 101(40) defines "municipality" to include any political subdivision or agency of the state. Section 901 provides many of the general provisions of the Bankruptcy Code including sections 362 (automatic stay), 365 (executory contracts and unexpired leases), 1129 (confirmation of plan), and 1142 (implementation of plan). But section 903 says that the power of a state to control the exercise of a municipality's governmental powers including expenditure for such an exercise is not limited.

And section 904 provides that without consent of the debtor or provision in the plan, the court may not interfere with the exercise of its governmental powers or use of its property and revenues. 28 U.S.C. § 959(b) says that the trustee shall manage the property like an owner or possessor would.

California Government Code sections 53760 and 53761 effectively consent to the provisions of the Bankruptcy Code for its governmental subdivisions and taxing agencies.

The Public Employment and Retirement Committee has been advised by PERS bankruptcy counsel that federal Bankruptcy Code also contains the following:

1. Section 922 provides additional authority to that set forth in section 362, to stay all entities that seek to enforce any claim against a debtor,

2. Section 941 requires the debtor agency to file a plan. Section 943(b) ordains that the court shall affirm the plan if: it complies with the Bankruptcy Code; contains no action prohibited by law; contains any regulatory or electoral approval necessary; and is both feasible and in the best interests of creditors,

3. Section 944 says the confirmed plan binds both the debtor and creditors even if they have not accepted the plan.

CONTINUED PAGE 35

Case 12-32118     Filed 03/31/14     Doc 1308

Under Section 365 as applied to Chapter 9, any assumption, assignment, or rejection of a contract requires court approval.  Contracts must be assumed or rejected as a whole, not in part.  If assumed, all defaults and deficiencies must be cured.  Clauses in a contract canceling it because of insolvency are invalid.  Non-assignable contracts are also not subject to assumption or assignment.

While the purpose of the federal bankruptcy law is to permit the impairment of contracts to effect a reorganization of debt, Chapter 9 only provides relief in states which have consented to its application.  Only 18 states, including California, have done so.  Of those 18, a number have established conditions on the right to seek bankruptcy relief.  An example is requiring approval by a state agency before a municipality can apply for Chapter 9 relief.  New Jersey, Louisiana, Kentucky, Ohio, and Pennsylvania require such preapproval.  Other states -- North Dakota, Montana, and Kentucky -- and Louisiana set forth specific procedures which must be followed.

This bill would add language to the PERS law specifically prohibiting the debtor's trustee of a PERS local contracting agency that has filed for Chapter 9 Bankruptcy from making an election to end -- by rejection, assignment, or assumption --  its contract with PERS.

Comments:

The Senate Public Employment and Retirement Committee states that, under existing PERS law, if a PERS local contracting public agency were to file for reorganization under Chapter 9, PERS' ability to terminate a contract could be abrogated by the automatic stay.

In that event, CalPERS might not be able to assess for deficient contributions but may still be liable to annuitants whose allowances are not fully funded.

**FISCAL EFFECT**:  Appropriation: No  Fiscal Com.: Yes  Local: No

**SUPPORT:**  (Verified  5/1/96)

Public Employees Retirement System Board of Administration (source)
California State Firefighters' Association
California Professional Firefighters

CONTINUED ON PAGE 36

Service Employees International Union, California State Council
California School Employees Association

DLW:lm  5/1/96  Senate Floor Analyses
SUPPORT/OPPOSITION:   SEE ABOVE
**** **END** ****

## SENATE BILL 1945

## SENATE FLOOR THIRD READING

MR. PRESIDENT & MEMBERS:

SENATE BILL 1945 IS PROMPTED BY THE RECENT ORANGE COUNTY BANKRUPTCY.

THE BILL WOULD PROHIBIT PUBLIC AGENCIES CONTRACTING WITH CAL-PERS FROM TERMINATING, EITHER BY REJECTION, ASSIGNMENT, OR ASSUMPTION ITS OBLIGATIONS WITH THE RETIREMENT BOARD THROUGH CHAPTER 9 BANKRUPTCY FILINGS.

WITHOUT THIS CHANGE IN LAW, CAL-PERS MAY BE LIABLE TO CONTINUE PROVIDING BENEFITS TO EMPLOYEES OF PUBLIC AGENCIES EVEN IF DEPRIVED OF CONTRIBUTIONS BECAUSE OF A CHAPTER 9 DISCHARGE.

THE BILL VERY SIMPLY SPECIFIES THAT A PUBLIC AGENCY SUBJECT TO BANKRUPTCY MAY NOT ALTER ITS CONTRACT WITH CAL-PERS WITHOUT THE PRIOR CONSENT OF THE RETIREMENT BOARD.

I KNOW OF NO OPPOSITION TO THE BILL AND WOULD ASK FOR YOUR "AYE" VOTE.

EXHIBIT A PAGE 38



# Legislative Research & Intent LLC

1107 9th Street, Suite 220, Sacramento, CA 95814
(800) 530.7613 · (916) 442.7660 · fax (916) 442.1529
www.lrihistory.com · intent@lrihistory.com

---

# Documents
# Generated During
# Assembly Deliberations

Legislative Research & Intent LLC hereby certifies that the accompanying record/s is/are true and correct copies of the original/s obtained from one or more official, public sources in California unless another source is indicated, with the following exceptions :  In some cases,  pages may have been reduced in size to fit an 8 ½"  x 11" sized  paper.  Or, for readability purposes, pages may have been enlarged or cleansed of  black marks or spots. Lastly, for ease of reference, paging and relevant identification have been inserted.

ASSEMBLY COMMITTEE ON PUBLIC EMPLOYEES, RETIREMENT AND SOCIAL SECURITY
Howard Kaloogian, Chairman
322-4320 / FAX 324-9991

BACKGROUND INFORMATION REQUEST

**Measure:** SB 1945                          **Date Sent:** June 6, 1996

**Author:** Senator Craven                    **Return by:** June 12, 1996
                                              to Room 2163

Author's Staff Contact:

Name: Scott Johnson                           Phone: 445·373 1

1.  What organization or governmental agency requested introduction?

    Sponsor: CAl PErs

    Contact: Sue Meyers                       Phone: ·326 - 3678

2.  Identify all previous or similar legislation by bill number and include
    the disposition of those measures, all previous votes in any committee in
    either house and relevant dates.

    None

3.  Please <u>attach an author's statement of purpose for this legislation</u>
    including the specific problem or deficiency in the law which the bill seeks
    to remedy--and how.  Also <u>state all resulting fiscal costs or impact</u> to the
    state or to any entity or individual.

4.  Please <u>attach any studies, reports, statistics or facts</u> which support the
    need for this measure.  Include interim studies and previous committee and
    floor analyses to similar legislation.

5.  Please attach copies of all letters of <u>support and opposition</u> received.
    Also list all known support and opposition and state precise reasons for
    positions.  Include all known positions of any governmental agency.

6.  Do you plan to <u>amend</u> this bill prior to hearing?  Yes____  No X

    If yes, please <u>attach a draft copy of the proposed amendments</u> or provide
    ASAP.  **Amendments in Legislative Counsel form must be received by committee
    (Rm. 2163) by noon Tuesday the week prior to the hearing date of this bill.**

7.  List the names and telephone numbers of the witnesses you plan to have
    testify.  Witnesses must be noticed with committee prior to hearing.

    Sue Meyers or Rep. from CAl Pers

---

Please Note:  No bill will be set until a completed BIR is received.

EXHIBIT A PAGE 40

Date of Hearing:  July 3, 1996

ASSEMBLY COMMITTEE ON PUBLIC EMPLOYEES RETIREMENT & SOCIAL SECURITY
Howard Kaloogian, Chairman

SB 1945 (Craven) - As Amended:  June 26, 1996

<u>SENATE VOTE</u>:  36-0

<u>SUBJECT</u>:  Public employees:  retirement.

<u>VOTE REQUIREMENT</u>:  Majority

<u>SUMMARY</u>:  Prohibits a CalPERS contracting agency debtor's trustee from making an election to end, by rejection, assignment, or assumption, its contract with CalPERS.  Allows public employees to participate in deferred compensation. Specifically, <u>this bill</u>:

1)  Prohibits a contracting agency or public agency seeking bankruptcy protection from rejecting any contract or agreement between the agency and the Board or, without prior consent of the Board, from assuming or assigning any contract or agreement between the agency and the Board.

2)  Permits all public employees to participate in deferred compensation programs.

<u>FISCAL EFFECT</u>:  Unknown

<u>BACKGROUND</u>:  Since the Orange County bankruptcy, concern regarding the possibility of a CalPERS' contracting agency filing a Chapter 9 Bankruptcy has arisen.  In particular, the concern is that such an agency's trustee in bankruptcy will choose to reject its contract with CalPERS thereby transferring the liability for its retirees' retirement allowances to CalPERS.

<u>ARGUMENTS IN SUPPORT</u>:  The state should protect its retirement system and its beneficiaries as a priority to prevent use of the Bankruptcy Code by a political subdivision or agency to avoid its obligations to its employees and annuitants.

<u>ARGUMENTS IN OPPOSITION</u>:  A bankruptcy judge might refuse to recognize the power of the state to control bankruptcy proceedings or to set conditions for using bankruptcy protection.

<u>REGISTERED SUPPORT / OPPOSITION</u>:

<u>Support</u>

CalPERS

<u>Opposition</u>/None on file.

<u>Analysis prepared by</u>:  Michael J. D'Arelli / aper&ss / (916)322-4320

**ASSEMBLY PUBLIC EMPLOYEES, RETIREMENT**
**AND SOCIAL SECURITY COMMITTEE**
**REPUBLICAN ANALYSIS**

SB 1945 (Craven) -- PUBLIC EMPLOYEES: RETIREMENT
      Version: 6/26/96       Chair: Kaloogian
      Analyzed: 7/1/96       Vote: Majority
      **Recommendation: Support**    Tax/Fee: No

SUMMARY:  **Prohibits contracting agencies and public agencies that become subject to federal bankruptcy proceedings from rejecting retirement coverage contracts or assuming or assigning those contracts without the prior consent of the Public Employees Retirement System (CalPERS) Board.**  States CalPERS' deferred compensation program is available to all public employees, not just CalPERS members.

FISCAL EFFECT:  No fiscal impact according to Dept. of Finance.

POTENTIAL EFFECTS:  Would prevent public agencies declaring bankruptcy from shifting the liability for funding employee retirement benefit payments to CalPERS.

SUPPORT:  CalPERS (sponsor); CA State Firefighters' Assoc.; CA Professional Firefighters; Service Employees International Union; CA School Employees Assoc.
OPPOSITION:  None on file.
GOVERNOR'S POSITION:  Unknown.

COMMENTS:
   o  **Existing PERS law** declares that no governmental agency may reduce or refuse to make its contribution to CalPERS.
   o  **Background:**  The idea for this bill arose out of the recent Orange County fiscal crisis.  There were concerns that the county's trustee in bankruptcy might try to reject its contract with CalPERS, which would stick CalPERS with the liability for the county employees' retirement allowances.
   o  **Purpose of bill:**  This bill would prevent a financially troubled agency from ending its CalPERS contract through bankruptcy without consent and leaving CalPERS liable for the agency's obligations.  Federal bankruptcy law authorizes this protection with requisite state legislation.
   o  **Deferred compensation:**  Language allowing CalPERS to offer its deferred compensation plan to all public employees rather than just CalPERS members is a technical cleanup.  CalPERS already offers its deferred compensation plan to all public employees.

Senate Republican Floor Vote -- 5/9/96 -- CONSENT CALENDAR
      (36-0)    Ayes: All Republicans except
              Abs.: Craven, Russell
Assembly Republican Committee vote
    PER&SS -- 7/3/96
        (>)      Ayes: >
              Noes: >
              Abs.: >
              N.V.: >
    Consultant: Todd Eberle

EXHIBIT A PAGE 42

# SENATE BILL 1945

## ASSEMBLY P E & R COMMITTEE

MR. CHAIRMAN & MEMBERS:

SENATE BILL 1945 IS PROMPTED BY THE RECENT ORANGE COUNTY BANKRUPTCY.

THE BILL WOULD PROHIBIT PUBLIC AGENCIES CONTRACTING WITH CAL-PERS FROM TERMINATING, EITHER BY REJECTION, ASSIGNMENT, OR ASSUMPTION ITS OBLIGATIONS WITH THE RETIREMENT BOARD THROUGH CHAPTER 9 BANKRUPTCY FILINGS.

WITHOUT THIS CHANGE IN LAW, CAL-PERS MAY BE LIABLE TO CONTINUE PROVIDING BENEFITS TO EMPLOYEES OF PUBLIC AGENCIES EVEN IF DEPRIVED OF CONTRIBUTIONS BECAUSE OF A CHAPTER 9 DISCHARGE.

THE BILL VERY SIMPLY SPECIFIES THAT A PUBLIC AGENCY SUBJECT TO BANKRUPTCY MAY NOT ALTER ITS CONTRACT WITH CAL-PERS WITHOUT THE PRIOR CONSENT OF THE RETIREMENT BOARD.

**I KNOW OF NO OPPOSITION TO THE BILL AND WOULD ASK FOR YOUR "AYE" VOTE.**

**(AUTHOR'S AMENDMENT)**

Provided by Legislative Research & Intent LLC (800) 530-7613