MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone:    +1-916-447-9200
Facsimile:    +1-916-329-4900

Attorneys for Debtor
City of Stockton

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Debtor. | Case No.  2012-32118<br><br>D.C. No. OHS-15<br><br>Chapter 9<br><br>**DECLARATION OF ROBERT DEIS IN SUPPORT OF CITY'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA (NOVEMBER 15, 2013)**[1]<br><br>Date:     May 12, 2014<br>Time:    9:30 a.m.<br>Dept:     C<br>Judge:   Hon. Christopher M. Klein |

---

[1] Paragraph 13 of the Order Modifying Order Governing The Disclosure And Use Of Discovery Information And Scheduling Dates Related To The Trial In The Adversary Proceeding And Any Evidentiary Hearing Regarding Confirmation Of Proposed Plan Of Adjustment (Dkt. No. 1242, modifying Dkt. No. 1224) contemplates that the Parties will submit direct testimony declarations for their respective witnesses by April 21, 2014.  Accordingly, the declarations submitted in support of this Supplemental Memorandum do not contain all of the information and do not attach all of the evidence that will be included in the direct testimony declarations that will be filed on April 21.

I, Robert Deis, hereby declare:

1.  I am the former City Manager of the City of Stockton, California (the "City" or "Stockton"), having held that position from July 1, 2010, until my retirement on November 1, 2013. I make this declaration in support of the City's Supplemental Memorandum Of Law In Support Of Confirmation Of First Amended Plan For The Adjustment Of Debts Of City Of Stockton, California (November 15, 2013). On February 15, 2013, I submitted a declaration in support of the City's Reply To Objections To Statement Of Qualifications Under Section 109(c) [Dkt. No. 708] ("Reply Declaration"). As discussed in the Reply Declaration, I have 33 years of experience in managing and trouble-shooting municipal and county finances in three states. I also have extensive experience submitting funding measures to the citizenry for multiple local governments in three states to address the unique needs of each entity.

*The City Commissions The FM3 Poll*

2.  Since before my tenure as the City Manager, the City had realized that an essential part of its recovery from the intransigent economic downturn of the Central Valley would include maximizing revenue increases and expenditure reductions while still maintaining a viable city. In early 2012, the City approached Fairbank, Maslin, Maullin, Metz & Associates ("FM3"), a public opinion research and strategy firm, to conduct a poll of Stockton voters on the possibility of a tax increase measure on the November 2013 ballot. FM3 polled voter support for variations of major new increases in two tax sources—sales tax and/or utility users tax ("UUT")—that would increase the City's General Fund revenue base to the maximum feasible. FM3's research included questions specifically tailored to measure voter support for such a measure under different circumstances, including a ¾- or ½-cent sales tax increase, a 2% increase in the UUT, or a combination of a ½-cent sales tax and 2% UUT increase. The polling included voter reaction to different proposed uses for the revenues created by the tax measure, to the inclusion of a sunset provision in the measure, and to the effect of the City's ongoing bankruptcy case. The City was extensively involved in the drafting of the questions included in the poll, with the goal of maximizing the City's chances of passing a new tax measure and maximizing general fund

DECL. OF ROBERT DEIS ISO CITY'S SUPPL. MEMO
OF LAW ISO FIRST AMENDED PLAN FOR THE
ADJUSTMENT OF DEBTS

1    revenues.  However, we also relied on the professional pollsters' judgment to ensure that the
2    results were statistically significant within acceptable margins for error and confidence factors.

3  3. The City received the results of FM3's poll in September 2012.  A true and correct
4    copy of FM3's polling report was attached as Exhibit B to the Reply Declaration.  The City also
5    received a summary of key findings from the FM3 survey, which was admitted into evidence as
6    Exhibit 106 in the Eligibility Contest.[2]  Not surprisingly, the results confirmed that a ¾-cent sales
7    tax measure had a greater probability of passing if all of the receipts went to public safety
8    purposes, including hiring additional police.  Fully 78% of voters indicated that they would
9    support a ¾-cent sales tax increase that dedicated its funding to enhancing police protection and
10   crime prevention.  However, such a special tax measure would require two-thirds voter approval,
11   and would not have provided funds to balance the General Fund budget without additional
12   reductions in services.  Such a "restricted tax" would not have allowed the City to pay creditors
13   and to plug the structural deficit in Stockton's Plan of Adjustment.

14  4. The poll results also showed substantially lower support for a ¾-cent sales tax
15   measure whose receipts would "primarily provide funding to existing debt holders, employee
16   compensation and benefits, and city-paid retiree medical benefits, but would not provide funding
17   to improve existing City services or restore services that have been previously cut," as only 21%
18   of those polled stated they would support such a measure.  This question was geared towards
19   determining voter sentiment for simply plugging the budgetary deficit of the current organization
20   at the time, and either avoiding or exiting bankruptcy without addressing service and other needs.
21   There was, however, a 71% level of polling support for a ¾-cent general sales tax measure that
22   provided funding for both increased public safety funding and general services.  As a general tax,
23   this required only a majority level of voter support for approval, and thus was more likely
24   ultimately to be enacted while also providing a funding solution that avoided further cuts in
25   service at the same time as voters were paying more in taxes.

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1204].

5. The poll results also show some other key facts. First, when voters were asked their opinion on increasing the UUT by 2%, support dropped to the 49% to 66% range depending on the version of the question. Second, when voters were asked their opinion on a measure including both a ½-cent sales tax increase and a 2% UUT increase, the level of support for both taxes dropped to 39%. Finally, when voters were questioned about their preferences after hearing possible negative campaign statements, voter support for the two sales tax options—½-cent and ¾-cent—dropped to 62% and 66% respectively, and voter support for the UUT increase dropped to 52%. When you consider the plus or minus 7% margin of error, the UUT increase was deemed not to be a viable option. Thus, the only funding measure that would maximize revenues, provide flexibility to pay creditors, and enhance public safety, and which still had a reasonable probability for success, was a ¾-cent general sales tax.

6. As I testified in the Reply Declaration, for a tax increase measure to be successful, it is crucial that a city have a compelling argument or a specific "product" that will be funded by the tax increase that resonates with voters. What did Stockton have to offer voters in 2012? The City was embroiled in a hotly contested fight over its eligibility for bankruptcy protection, creating the risk that any new tax revenues could be taken by the capital market creditors if the City were found ineligible. The City was in the midst of a record-breaking spike in homicides and violence. The City had nothing remotely positive to offer the voters in late 2012, but it did in 2013 after beginning the process of restructuring its finances through its bankruptcy filing and its successful negotiations with key creditors, and through unveiling its new Marshall Plan on Crime.

*The Tax Measure Is Proposed*

7. The Court's finding that the City was eligible for bankruptcy relief improved the conditions for a potential tax measure to succeed. The protection of the bankruptcy ensured that the City could propose a tax measure whose increase could be dedicated to a compelling product. We communicated to voters that, over time, roughly one third of the tax proceeds would go towards filling the structural hole, and roughly two thirds would go towards funding the Marshall Plan on Crime.

8.     Based on FM3's research, the city put Measures A and B on the November 2013 ballot. Measure A proposed to raise the sales tax by 0.75%, from 8.25% to 9%. Measure B was an advisory measure asking the electorate whether 65% of the proceeds from Measure A should be used to "pay for law enforcement and crime prevention services such as those described in Stockton's Marshall Plan on Crime" and 35% to "help end the bankruptcy and restore other City services."

9.     Even before the City Council voted to put Measures A and B on the November 2013 ballot, the measures faced competition and negative publicity. A developer-led faction publically discussed proposing an alternative tax measure that would have funded only new police hires and other criminal justice activities, and would have provided no funding for payments to be made under the Plan. I believe that such a measure, had it passed, would have devastated the General Fund and, in my opinion, would have been an indicator of "bad faith" on the part of the City. Moreover, because the presence of multiple tax increase measures on a ballot would have greatly decreased the chance of *any* tax increase measure passing, the City was caught in a struggle between Measures A and B and the competing measure. Happily, such measure never was placed on the ballot.

10.    But the troubles for Measures A and B were just beginning. City Council members reported that the Stockton voters with whom they interacted were evenly split on Measure A. All of the indications from the community were that the election would be a very close one. There was plenty of the negative campaigning that FM3's polling indicated would negatively affect voter sentiment.

11.    Yet another distraction was the lawsuit brought by Dean Andal, a Stockton resident, challenging the proposed language for the tax measure. Andal wanted any tax increase to be restricted to public safety only. His lawsuit was dismissed by the San Joaquin Superior Court as untimely. But if Andal had timely filed his lawsuit, the City may have been exposed to a protracted battle over the legitimacy of Measure A. The existence of Andal's lawsuit reflects the uncertainty and constant attacks that accompany virtually all tax increase measures in California. However, in my 33-year experience, I have never experienced the type of negative campaigning

and mistrust for a tax increase that I experienced in Stockton. This was due partly to Stockton's civic culture, partly to its distressed economy with high unemployment and poverty rates, and partly to the well-documented past dysfunction of Stockton's city government.

*The Tax Measure Passed By A Slim Margin*

12. In an important step forward on Stockton's road to recovery, both Measures A and B passed. Measure A passed by an extremely slim margin. Just 51.86% of voters—14,939 out of a total of 28,808 voting—voted in favor of the measure. If only 535 of the 14,939 voting yes had instead voted no, Measure A would have failed. Measure B passed by a wider margin, with 59.27% of voters voting yes. Measure A's narrow victory confirmed the City's business judgment that the voters likely would not tolerate a tax increase greater than 0.75%, while the comfortable passage of Measure B confirmed that the sales tax increase likely would not have passed if a larger portion of the revenues was dedicated to paying creditors instead of improving public safety and City services.

13. Thanks to the passage of Measure A, the City projects that it will receive $286 million in additional revenue over the next 10 years.[3] While approximately 65% of these revenues are committed to the restoration of police services and crime prevention, the remainder will enable the City to balance its General Fund budget without resorting to additional cuts in vital City services, while at the same time building up the City's reserves. This will put the City on a much more secure financial footing by funding the Plan of Adjustment. It will also restore the viability of the City as a municipality and as a community. However, there will still be other unmet needs of the City that can be addressed only with growth in the local economy.

*The City Could Not Raise Taxes Any More Than It Did*

14. The City was barely able to sell voters on a tax increase that paid for some of the City's most vital "products": law enforcement, crime prevention, and the restoration of City

---

[3] The tax will sunset when the City achieves economic recovery such that General Fund revenues regain the levels received in fiscal year 2008-09 adjusted for inflation, or in ten years, whichever comes first. However, the tax may remain in effect longer than 10 years if economic conditions warrant. There are review provisions that allow the tax to continue if findings are adopted at two noticed public hearings, after hearing the recommendation of the Citizens Advisory Committee, that the revenues are still necessary to carry out the purpose of the tax and that the total compensation of City employees is not excessive relative to other similar public sector employers.

services. In my experience, it would have been even more difficult, if not impossible, to pass a tax measure devoted solely to paying creditors like Franklin. This was supported by the City's polling. The City acted in good faith by asking the voters to pass the highest tax increase that the City thought feasible, and then working diligently to convince those voters to vote "yes."

15. Having successfully, albeitly barely, passed Measure A, it is unlikely that the City's residents would support another tax increase in the near future. I do not believe that Measure A would have passed without the strong but expensive campaign financed by the business community, and I do not believe that the business community has the interest or wherewithal to fund another campaign for yet more tax increases. Were the City's bankruptcy case dismissed, it could not, as Franklin seems to suggest, raise yet more tax revenue at the drop of a hat. Following the passage of Measure A, the City's 9% sales tax rate is now among the highest in the state.[4] More importantly, it is among the highest among nearby cities, which compete with Stockton for business. Manteca, Sacramento and Tracy all have an 8.5% sales tax rate, and Lodi and Elk Grove have an 8% rate. Modesto, whose attempt to increase its sales tax rate by 1% was rejected by Modesto voters in the November 2013 election, has a 7.625% rate. These cities now have a measurable advantage in the competition for business by virtue of their lower sales tax rates.

16. Moreover, the City must now prove that it will use the revenues created by Measure A to set the City on a secure fiscal path. Any additional tax increases in the near term will surely be viewed with skepticism by the City's voters. The City needs to prove that it is a good steward of the new sales tax proceeds and must follow through on its commitments of reducing crime and implementing the Marshall Plan on Crime. This will take years to accomplish. Before any more taxes are considered, the City will also have to identify a future need that resonates with the citizenry. Paying more money to creditors will likely not be one of them.

///

---

[4] There are 125 cities with a 9% tax statewide, representing 10.93 million of the total 30.78 million residents of cities, or 35.5% of the total city population in California. There are 258 cities with a lower sales tax rate, and only 18 with a rate higher than 9%.

*The City Cannot Effectively Raise Its UUT Rate*

17. Franklin's arguments that the City should raise its UUT rate miss the mark. In 2004, the City was forced to reduce the UUT from 8% to 6% in order to prevent challengers from bringing a ballot measure to reduce the UUT to 2% or 0%. Political pressure against increasing the UUT remains strong. The City placed a measure, Measure U, on the November 4, 2008 ballot, which the voters passed. The purpose of Measure U was to modernize the current UUT ordinance to treat taxpayers equally regardless of what technology they used for telecommunication and video services. Specifically, it was intended to protect the tax from litigation alleging that local phone taxes should have been repealed when the federal government ceased taxing long-distance calls in 2006. It was also intended to extend the tax to new technologies such as text messaging. In order to convince voters to support the extension of the UUT to new technologies, Measure U included a commitment to maintain the UUT at no higher than 6%.

18. Any subsequent effort to increase the UUT would run afoul of this pledge, and the FM3 polling results discussed above indicated a low a probability of a UUT increase passing. The language of Measure A polled initially at 71% support and wound up with only 51.86% "yes" votes after a bitter campaign. The 2% UUT alone polled initially at only 49%-66% support, which indicates it would not have survived a hard-fought electoral battle like the one that occurred in November 2013. A 2% UUT, *combined* with a ½-cent sales tax, secured only 39% polling support in the FM3 poll. Voters are as unlikely to be supportive of enacting two different taxes through two back-to-back elections as they would be doing it in a single election, and would accuse the City of misleading them on Measures A and B. As I mention above, the UUT is neither a popular tax nor one that is well-understood by the voting public. The UUT has little chance of being increased in the near future, and raising it is simply not a viable option.

/ / /

/ / /

/ / /

/ / /

Executed this 30th day of March 2014, at Santa Rosa, California. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

_____
Robert Deis