**16**

James O. Johnston (SBN 167330)
Charlotte S. Wasserstein (SBN 279442)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
Email: jjohnston@jonesday.com
       cswasserstein@jonesday.com

Joshua D. Morse (SBN 211050)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:  (415) 626-3939
Facsimile:  (415) 875-5700
Email: jmorse@jonesday.com

*Attorneys for Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Debtor. | Case No. 12-32118 (CMK)<br><br>D.C. No. OHS-15<br><br>Chapter 9<br><br>Adv. Proceeding No. 13-02315-C |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, FRANKLIN HIGH YIELD TAX-FREE INCOME FUND, AND FRANKLIN CALIFORNIA HIGH YIELD MUNICIPAL FUND,<br><br>Plaintiffs.<br><br>v.<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Defendant. | **MOTION OF FRANKLIN HIGH YIELD TAX-FREE INCOME FUND AND FRANKLIN CALIFORNIA HIGH YIELD MUNICIPAL FUND TO EXCLUDE PORTIONS OF TESTIMONY OF KENNETH DIEKER**<br><br>Date:   May 12, 2014<br>Time:   9:30 a.m.<br>Dept:   C, Courtroom 35<br>Judge:  Hon. Christopher M. Klein |

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................................... 1

RELEVANT BACKGROUND ................................................................................................... 2

ARGUMENT ............................................................................................................................... 4

    1.    Mr. Dieker's Testimony Regarding The Alleged Riskiness Of The Bonds Is Unhelpful And Irrelevant. ................................................. 4

    2.    Mr. Dieker's Opinion Regarding The Alleged Riskiness Of The Bonds Is Not The Product Of Reliable Principles And Methods. .............................. 7

        a.    Mr. Dieker's Analysis Of Allegedly Comparable Transactions Is Severely Flawed. ................................................................. 8

        b.    Mr. Dieker's Analysis OF Other Alleged Risks Is Invalid ............................ 10

CONCLUSION .......................................................................................................................... 13

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..............................................4, 7

*Daubert v. Merrell Dow* Pharms., Inc., 43 F.3d 1311 (9th Cir. 1995) ....................................7

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997) ........................................................................7

*Head v. Glacier Nw. Inc.*, 413 F.3d 1053 (9th Cir. 2005) .......................................................5

*Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802 (3d Cir. 1997) ............................................7

*In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 1994) ................................................7

*Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186 (1907) .....................................................6

*Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187 (9th Cir. 2007) ........................................4-5

*United States v. Mitchell,* 365 F.3d 215 (3d Cir. 2004) ........................................................4-5

**Statutes and Other Materials**

11 U.S.C. § 943 ........................................................................................................................6

Fed. R. Civ. P. 26 .....................................................................................................................1

Fed. R. Evid. 401 .....................................................................................................................5

Fed. R. Evid. 402 .......................................................................................................1, 2, 4, 5, 7

Fed. R. Evid. 701 .......................................................................................................1, 2, 4, 5, 7

Fed. R. Evid. 702 ..........................................................................................................1, 2, 4, 7

Standard & Poor's Ratings Services U.S. Public Finance Defaults
And Rating Transition Data: 2013 Update (March 31, 2014) .........................................11

Pursuant to the Scheduling Order[1] and Rules 402, 701 and 702 of the Federal Rules of Evidence, Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund (collectively, "Franklin") hereby move to exclude portions of testimony of Kenneth Dieker set forth in the *Declaration Of Kenneth Dieker In Support Of City's Supplemental Memorandum Of Law In Support Of Confirmation Of First Amended Plan For The Adjustment Of Debts Of City Of Stockton, California (November 15, 2013)* [Docket Nos. 1322-31 and 1336] (the "Dieker Declaration") and the *Direct Testimony Declaration Of Kenneth Dieker In Support Of Confirmation Of First Amended Plan For The Adjustment Of Debts Of City Of Stockton, California (November 15, 2013)* [Docket Nos. 1369-76 / Adv. Pro. Docket Nos. 64-71] (the "Dieker Direct Testimony"), in each case to the extent such testimony relates to alleged "risks" associated with Franklin's investment in the $35,080,000 Stockton Public Financing Authority Lease Revenue Bonds, 2009 Series A (Capital Improvement Projects) (the "Bonds"). In support of this Motion, Franklin states as follows:

## INTRODUCTION

Mr. Dieker served as financial advisor for the City in connection with issuance of the Bonds, and he was part of the team that made the City's "credit rating presentation" to Standard & Poor's ("S&P") that resulted in an "A" rating on the Bonds. Mr. Dieker also has served as financial advisor and interim debt manager for the City since 2011.

The City has identified Mr. Dieker as a "non-retained" expert who will provide alleged expert testimony pursuant Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure. Specifically, Mr. Dieker has opined that the Bonds "represented a risky investment relative to market conditions

---

[1] The term "Scheduling Order" means the *Order Governing The Disclosure And Use Of Discovery Information And Scheduling Dates Related To The Trial In The Adversary Proceeding And Any Evidentiary Hearing Regarding Confirmation Of Proposed Plan Of Adjustment* [Docket No. 1224 / Adv. Pro. Docket No. 16], as amended by the *Order Modifying Order Governing The Disclosure And Use Of Discovery Information And Scheduling Dates Related To The Trial In The Adversary Proceeding And Any Evidentiary Hearing Regarding Confirmation Of Proposed Plan Of Adjustment* [Docket No. 1242 / Adv. Pro. Docket No. 18]. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Scheduling Order, or the *Complaint For Declaratory Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), as applicable. Proposed trial exhibits are cited as "Ex. ___."

1    at the time, and [] Franklin was compensated at a higher rate under the [Bonds] as a result of that

2    risk."[2]

3          This testimony is inadmissible expert testimony under Rule 702 of the Federal Rules of

4    Evidence because it offers opinions and seeks to establish facts that are wholly irrelevant to any

5    issue to be decided and therefore is unhelpful to the Court, and because it is not based on any reliable

6    or sound methodology.  Similarly, notwithstanding its prior disclosures, should the City take the

7    position that the testimony is offered in Mr. Dieker's capacity as a percipient witness rather than an

8    expert, the testimony is irrelevant evidence inadmissible under Rule 402 of the Federal Rules of

9    Evidence and is unhelpful opinion testimony of a lay witness inadmissible under Rule 701 of the

10   Federal Rules of Evidence.

11         As contemplated by the Scheduling Order, Franklin will submit objections to the Dieker

12   Direct Testimony on or before April 25, 2014.  Those objections supplement the issues raised by this

13   Motion.

14

15                    **RELEVANT BACKGROUND**

16         When the City disclosed its initial slate of witnesses on January 31, 2014, it identified Mr.

17   Dieker as one of its "expert" witnesses, indicating that the City "expected [Mr. Dieker] to address

18   municipal debt financing [issues]."[3]  However, because Mr. Dieker was "not being retained

19   especially to provide expert testimony," the City took the position that Mr. Dieker "will provide

20   expert testimony under Federal Rule of Civil Procedure 26(a)(2)(C) and will not prepare [a] written

21   report[]."[4]  On February 20, 2014, the City served Franklin with the *City Of Stockton, California's*

22

23

---

[2] *See* Rule 26(a)(C) disclosure, dated March 18, 2014, at 3.  The City amended its Rule 26(a)(2)(C) disclosure on February 22, February 27, and March 18.  A copy of the March 18 version is attached to the accompanying *Declaration Of Joshua D. Morse In Support Of Motion Of Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund To Exclude Portions Of Testimony Of Kenneth Dieker* (the "Morse Decl.") as Exhibit A.

[3] *See* correspondence from P. Bocash, dated January 31, 2014, at 3, a copy of which is attached to the Morse Decl. as Exhibit B.

[4] *Id*. at 4.

1    *Disclosure Of Non-Retained Expert Testimony Pursuant To Federal Rule Of Civil*
2    *Procedure 26(a)(2)(C)*,[5] which stated as follows:

> Based on his 23 years of experience in this field (as of 2009) and his involvement as the City's Financial Advisor in the negotiation of the 2009 Agreement, Mr. Dieker may testify regarding how the 2009 Agreement compared to the City's other existing bond issuances and to bond transactions of other issuers being offered at the time. Specifically, Mr. Dieker will testify that the 2009 Agreement represented a risky investment relative to market conditions at the time, and that Franklin was compensated at a higher rate under the 2009 Agreement as a result of that risk. Mr. Dieker's testimony will be based on the history of the City's bond issuances, its negotiations with Franklin and others involving what became the 2009 Agreement, and the market conditions under which the City and Franklin entered into the 2009 Agreement.[6]

On March 31, 2014, the City filed the Dieker Declaration along with the *City's Supplemental Memorandum Of Law In Support Of Confirmation Of First Amended Plan For The Adjustment Of Debts Of City Of Stockton, California (November 15, 2013)* [Docket No. 1309] (the "Brief"). Thereafter, on April 21, 2014, the City filed the Dieker Direct Testimony, which is materially identical to the Dieker Declaration.

Apparently, the City intends to use Mr. Dieker's testimony to argue that the Bonds were a "risky" investment and that, as a result, Franklin should have expected nothing more than the sub-1% recovery that the City seeks to cram down on Franklin through the Plan. The City asserts that, as a result of Franklin's "assumption of the risk," the treatment proposed under the Plan represents a reasonable effort under the circumstances to repay the debt it owes to Franklin.[7]

Mr. Dieker's "expert" testimony regarding the alleged "riskiness" consumes five pages of each of the Dieker Declaration and the Dieker Direct Testimony.[8] It includes Mr. Dieker's recollection of the alleged weakness of the municipal bond market in 2008 and 2009 and the unsuccessful marketing in February 2009 of a proposed transaction that was substantially similar to the transaction underlying the Bonds that eventually was consummated in September 2009.[9] Mr.

---

[5] *See generally* Rule 26(a)(C) disclosure.
[6] Rule 26(a)(C) disclosure at 3.
[7] *See* Brief at 26.
[8] Dieker Declaration ¶¶ 5-17; Dieker Direct Testimony ¶¶ 5-17.
[9] Dieker Declaration ¶¶ 6-10; Dieker Direct Testimony ¶¶ 6-10.

1  Dieker also describes the "pre-pricing book" that he "prepared for the August 2009 sale [of the

2  Bonds]," and attempts to compare the pricing of the Bonds to other, admittedly-dissimilar

3  transactions that may or may not have priced at around the same time as the Bonds[10] (although Mr.

4  Dieker did not know whether they actually did).[11]  Ultimately, Mr. Dieker opines that "Franklin saw

5  an investment opportunity where other buyers were wary, and in that exchange, Franklin could

6  obtain higher yields than comparable issues priced around the same time."[12]

## ARGUMENT

Rule 702 of the Federal Rules of Evidence authorizes expert testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue," but only if the testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods," and only if "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Rule 701 in turn prohibits a lay witness from providing opinion testimony unless it is "(a)  rationally based on the witnesses's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Finally, Rule 402 provides that "[i]rrevelant evidence is not admissible."  Fed. R. Evid. 402.

As shown below, Mr. Dieker's testimony regarding the alleged riskiness of the Bonds is inadmissible because it is not relevant to any issue in these proceedings and therefore is unhelpful to the Court, and because his opinion is not the product of reliable principles and methods in any event.

**1.  Mr. Dieker's Testimony Regarding The Alleged Riskiness Of The Bonds Is Unhelpful And Irrelevant.**

As "gatekeeper," the Court must ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Rule 702 thus embodies "the twin concerns of 'reliability' . . . and 'helpfulness.'"  *Stilwell v.*

---

[10]  Dieker Declaration ¶¶ 11-16; Dieker Direct Testimony ¶¶ 11-16.

[11]  Transcript of Deposition of Kenneth Dieker ("Dieker Tr.") 131:7-138:12.  Relevant passages of the Dieker Tr. are attached to the Morse Decl. as Exhibit C.

[12]  Dieker Declaration ¶ 17; Dieker Direct Testimony ¶ 17.

1   *Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quoting *United States v. Mitchell*, 365

2   F.3d 215, 234 (3d Cir. 2004)). Among other things, expert testimony must be helpful in assisting the

3   trier of fact to determine an issue to be adjudicated. "Expert testimony which does not relate to any

4   issue in the case is not relevant, and ergo, non-helpful." *Id.* (citations omitted). Irrelevant testimony

5   is *de facto* non-helpful and must be excluded. *Id.*

6         Rules 701 and 402 continue this theme of relevance. Under Rule 701, opinion testimony of a

7   lay witness is inadmissible where not "helpful to clearly understanding the witness's testimony or to

8   determining a fact in issue." Fed. R. Evid. 701(b). *See Head v. Glacier Nw. Inc.*, 413 F.3d 1053,

9   1162-63 (9th Cir. 2005) ("A lay witness may give opinions that are: '(a) rationally based on the

10   perception of the witness, [and] (b) helpful to a clear understanding of the witness'[s] testimony or

11   the determination of a fact in issue.' . . . Assuming arguendo that the witness had personal

12   knowledge about whether getting the loader stuck was likely to have resulted from equipment abuse,

13   it is unclear how the witness's opinion about that would have been helpful to the jury in this case. . .

14   . Accordingly, we conclude that the district judge properly sustained the objection to the question

15   because an answer would not have been helpful to 'the determination of a fact in issue.'") (quoting

16   Fed. R. Evid. 701). Rule 402 similarly sets forth an absolute prohibition against admission of

17   irrelevant evidence. Fed. R. Evid. 402. The rules define relevant evidence as that which "has any

18   tendency to make a fact more or less probable than it would be without the evidence" where "the fact

19   is of consequence in determining the action." Fed. R. Evid. 401.

20         Here, there are two separate but related proceedings now before the Court – Franklin's

21   adversary proceeding and the contested matter regarding confirmation of the Plan. In the adversary

22   proceeding, Counts 2, 3, and 4 remain to be adjudicated. In those Counts, Franklin seeks in part

23   (a) a declaration that the agreements relating to the Bonds give rise to an allowed claim secured by a

24   valid, perfected and enforceable security interest in and lien upon certain property (Counts 2 and 3),

25   and (b) a determination of the value of the collateral that secures that claim (Count 4). The alleged

26   "risk" of Franklin's investment in the Bonds is not relevant to any aspect of those Counts, and is not

27   implicated by any defense raised by the City in its Answer. Accordingly, Mr. Dieker's opinion

28   about the alleged "risks" associated with the Bonds – whether offered in Mr. Dieker's capacity as an

- 5 -                              FRANKLIN'S MOTION TO EXCLUDE
                                   PORTIONS OF TESTIMONY OF KENNETH DIEKER

1  "expert" or a percipient witness – is irrelevant to any issue to be decided in the adversary proceeding
2  and is inadmissible.

3        Regarding the Plan, the City seeks confirmation pursuant to section 943 of the Bankruptcy
4  Code.  Franklin has objected to confirmation, among other things, on the grounds that the Plan (a) is
5  not in the best interest of creditors; (b) improperly classifies, disparately treats and unfairly
6  discriminates against Franklin's claim; and (c) was not proposed in good faith.  Mr. Dieker's opinion
7  regarding the riskiness of the Bonds is similarly irrelevant to any of Franklin's objections – it does
8  not relate to whether the Plan is in the best interest of creditors, whether the Plan properly classifies
9  and treats Franklin's claim, or whether the Plan was proposed in good faith.  Indeed, the testimony is
10 utterly irrelevant to any issue relating to the Plan.

11       The City nevertheless advances Mr. Dieker's opinion that that the Bonds "represented a risky
12 investment relative to market conditions at the time, and that Franklin was compensated at a higher
13 rate under the [Bonds] as a result of that risk."[13]  The City, however, has never connected that
14 opinion to any issue of fact or law in connection with the Plan, and the City has not cited, nor is
15 Franklin aware of, any authority linking the alleged riskiness of an investment to a determination of
16 the legal rights associated with enforcement of that investment.  Indeed, more than a century of
17 authority establishes that "[t]he priority is attached to the debt and not to the person of the creditor;
18 to the claim and not to the claimant." *Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 189 (1907).
19 Elsewhere, the City has conceded "that plans classify and treat 'claims' and not 'creditors.'"[14]

20       The question of how great of a risk the Bonds may have presented to Franklin in
21 September 2009, and how much Franklin was "compensated" for that alleged risk, thus is not
22 relevant to this Court's consideration of whether the Plan should be confirmed.  The Court ultimately
23 will determine confirmation in light of the specific terms of the Plan proposed by the City and the
24 factual evidence developed at trial.  Mr. Dieker's opinion regarding the putative riskiness of the
25 Bonds cannot assist the Court in determining whether the Plan should be confirmed and is otherwise
26 irrelevant to any other issue that possibly may come up in connection with the confirmation hearing.

---

[13] Rule 26(a)(C) disclosure at 3; *see also* Dieker Declaration ¶¶ 5, 11, 16-17; Dieker Direct Testimony ¶¶ 5, 11, 16-17.
[14] Brief at 8.

Accordingly, the testimony of Mr. Dieker set forth in paragraphs 5 through 17 of the Dieker Declaration and paragraphs 5 through 17 of the Dieker Direct Testimony is inadmissible should be excluded because it fails to meet the "helpfulness" standard of Rules 701 and 702 of the Federal Rules of Evidence and because it is irrelevant and inadmissible pursuant to Rule 402 of the Federal Rules of Evidence.

### 2. Mr. Dieker's Opinion Regarding The Alleged Riskiness Of The Bonds Is Not The Product Of Reliable Principles And Methods.

A qualified expert witness may offer an opinion where "based on sufficient facts or data" and resulting from the "product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Before accepting expert testimony, the Court "must ensure that any and all [such] testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. Ultimately, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995); *see, e.g.*, *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir. 1997) ("In order for the expert testimony to be 'reliable,' we have required that the testimony be based on the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'") (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir. 1994)).

Accordingly, an expert opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert," or where there is "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *accord* Fed. R. Evid. 702 advisory committee's note (2000 amendments) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'") (quoting *Daubert,* 43 F.3d at 1319).

Even if the Court concludes that Mr. Dieker's opinion regarding the alleged riskiness of the Bonds might be relevant and helpful, Mr. Dieker's testimony must still be excluded because it is not based on any reliable or sound methodology. Specifically, Mr. Dieker's comparison of the pricing of the Bonds to the alleged pricing of other "comparable" securities is patently invalid, and Mr. Dieker's assessment of other "risks" associated with the Bonds is demonstrably false.

### a. Mr. Dieker's Analysis Of Allegedly Comparable Transactions Is Severely Flawed.

To start, Mr. Dieker claims that the Bonds, "compared to the City's other existing bond issuances and to bond transactions of other issuers being offered at the time, were sold to Franklin at higher yields and with a term bond structure that clearly compensated Franklin for their [sic] risky investment."[15] The entire stated basis for this opinion is the "pre-pricing book" attached as Exhibit G to the Dieker Direct Testimony, which consists of a chart of "Bond Buyer and Treasury Yields (One Year)," three articles discussing the market for municipal bonds, information regarding U.S. Treasury rates from August 19, 2009, a chart summarizing the cost of issuance of the Bonds and four pages listing seven allegedly comparable bond transactions. At deposition, however, Mr. Dieker conceded that <u>none</u> of those materials are relevant to or support his opinion other than the final four pages of the document, which consist of a listing of the coupon and yield to maturity of the seven allegedly comparable transactions.[16]

According to Mr. Dieker, those seven transactions prove that the Bonds were a riskier investment than "bond transactions of other issues being offered at the time" because interest rate spreads for the seven "comps" were narrower than for the Bonds. Mr. Dieker thus concludes that, as a consequence, Franklin was compensated through a higher yield in connection with issuance of the Bonds. Mr. Dieker's conclusion is demonstrably false and therefore entirely unreliable and suspect.

To start, Mr. Dieker admits that "this is not an exact science and the municipal market is not as efficient as pricing on US treasuries and stocks."[17] Mr. Dieker's own data confirm this, as it demonstrates that higher-rated (and presumably less "risky") bonds can have larger spreads than lower-rated (and presumably more "risky") bonds. For example, Mr. Dieker's data show the A-rated Lancaster Redevelopment Agency tax allocation bonds to have spreads of +196 in 2029 and +207 in 2038, while the more "risky" BBB-rated San Francisco Redevelopment Financing Authority tax allocation bonds are shown to have <u>smaller</u> spreads of +187 in 2029 and +180 in 2038.[18] This holds

---

[15] Dieker Declaration at ¶ 11; Dieker Direct Testimony ¶ 11.

[16] Indeed, Mr. Dieker confirmed that the remainder of the information contained in the "pre-pricing book" did not inform his opinion at all. Dieker Tr. at 126:2-128:5.

[17] Dieker Declaration at ¶ 15; Dieker Direct Testimony ¶ 15.

[18] Dieker Ex. G at CTY207790, a copy of which is attached to the Morse Decl. as <u>Exhibit D</u>.

true across the data set.  The "risky" BBB-rated bonds appear to have smaller spreads at comparable periods than all of the "safer" A-rated bonds apparently considered by Mr. Dieker.[19]

Moreover, <u>none of seven allegedly "comparable" transactions were structured as "lease revenue" bonds like the Bonds</u>.  Six of the seven "comps" were "tax allocation" bonds with an entirely different structure and entirely different collateral.  Mr. Dieker admitted that the alleged difference in interest rate spreads between those "comps" and the Bonds could be attributed to the difference in collateral and structure.[20]  One of those six tax allocation bond transactions also had a higher rating (AA-) than the Bonds, which Mr. Dieker admitted also was likely to explain the difference in interest rate spreads in comparison to the Bonds.[21]  The seventh alleged "comp" had a different structure (general obligation), was higher rated (AA-), and involved and was a credit of a vastly larger municipality than the City (the City of Oakland).  Ultimately, Mr. Dieker had no choice but to concede that this was not a legitimate comparison to the Bonds.[22]

Additionally, the allegedly comparable transactions cited by Mr. Dieker relate to transactions that had not been priced or closed at the time that Mr. Dieker prepared his "pre-pricing book," and the "pre-pricing book" provided no information regarding actual pricing of those bonds.[23]  Incredibly, Mr. Dieker did not know whether <u>any</u> of the allegedly comparable transaction had even closed or were priced at the levels set forth in his "book."[24]

Finally, Mr. Dieker's underlying premise – that the allegedly comparable transactions had lower spreads and therefore were perceived as less risky – is simply false.  Some of the alleged "comps" have shorter maturities and others have call provisions that effectively shorten their maturity.  Mr. Dieker's own data shows that, when comparing the yields and spreads of the Bonds using those shorter maturity and call dates, the Bonds were priced nearly identically to the alleged

---

[19] Only the <u>higher</u> rated Paso Robles Redevelopment Agency tax allocation bonds (rated AA-) and the Oakland General Obligation Bonds (rated AA-) have smaller spreads.

[20] Dieker Tr. 131:7-138:12.

[21] Dieker Tr. 136:6-22 (regarding Paso Robles Redevelopment Agency tax allocation bonds).

[22] Dieker Tr. at 138:24-139:2 ("Q:  So what conclusion do you draw comparing Oakland general obligation bonds to the Stockton lease revenue bonds?  A:  This is not a great comp.").

[23] *Id*.

[24] Dieker Tr. at 128:6-139:10.

1   prices of two of the comparable transactions cited by Mr. Dieker.  For example, Mr. Dieker's pricing

2   data indicates that, if the maturity of the Coalinga Redevelopment Agency tax allocation bonds was

3   extended to the same 2038 maturity as the Bonds, a yield to maturity of 7.35% would result.[25]  The

4   yield to maturity for the Bonds that same year is shown to be <u>lower</u> (7.15%).  Using Mr. Dieker's

5   reasoning, the Bonds therefore were less "risky" than the Coalinga bonds.  Similarly, if the maturity

6   of the Hollister Redevelopment Agency tax allocation bonds was extended to 2038, Mr. Dieker's

7   data shows a yield to maturity of 7.23%,[26] also larger than the more "risky" bonds.

8         Clearly, none of the data upon which Mr. Dieker relies actually supports the opinions

9   offered.  Mr. Dieker's reliance on materially different bond transactions – for which he does not

10  know final pricing or even whether bonds ultimately were issued – is not the "product of reliable

11  principles and methods" and renders his opinion unreliable and invalid.  So too does Mr. Dieker's

12  patent misinterpretation of the data on which he purports to rely.  Mr. Dieker's testimony is classic

13  *ipse dixit* that falls far well short of the *Daubert* standard and has no place in these proceedings.

14        **b.    Mr. Dieker's Analysis Of Other Alleged Risks Is Invalid.**

15        In his Declarations, Mr. Dieker attempted to supplement his opinion by referencing additional

16  alleged "risk" assumed by Franklin.  In each case, Mr. Dieker's opinion is demonstrably wrong and

17  frankly incoherent.

18        <u>Alleged Bankruptcy And Insolvency Risk</u>.  For example, Mr. Dieker asserts that, "[i]n the

19  Official Statement [for the Bonds], Franklin was put on notice that the City's economic condition was

20  dire" and that Franklin accepted some unquantified level of risk because it was aware generally that the

21  City potentially could seek bankruptcy protection.[27]  In particular, Mr. Dieker cites to a section of the

22  Official Statement titled "Discussions Regarding Concerns Of The City's General Fund Solvency."[28]

23        Mr. Dieker, whose firm is listed as "Financial Advisor" in the introduction to the Official

24  Statement and who assisted the City in preparing the document,[29] knows better.  In fact, the Official

---

[25] Dieker Ex. G at CTY207791.

[26] Dieker Ex. G at CTY207792.

[27] Dieker Declaration at ¶ 5; Dieker Direct Testimony ¶ 5.

[28] Dieker Declaration at ¶ 5; Dieker Direct Testimony ¶ 5.

[29] Ex. 3011 (Official Statement) at i.  Relevant pages from Ex. 3011 are attached to the Morse Decl. as <u>Exhibit E</u>.

Case 12-32118    Filed 04/25/14    Doc 1427

1   Statement disproves Mr. Dieker's claim.  The Official Statement did disclose that, in February 2009, the
2   Stockton *Record* ran an article headlined "City Could Consider Bankruptcy," which indicated that a
3   member of the City Council had "requested that the City Attorney's Office give or cause to be given an
4   informational presentation on municipal bankruptcy."  The Official Statement, however, specifically
5   indicated that "[a]t least two facts in the article were inaccurate," and proceeded to clarify that "[t]he
6   informational presentation by the City Attorney's Office was not prepared or scheduled."[30]  The Official
7   Statement then quoted City Finance Officer Kathleen VonAchen "as stating that '[w]e're not declaring
8   bankruptcy,' and further emphasiz[ing] that solvency was the only option being pursued by the City."[31]
9   The section of the Official Statement cited by Mr. Dieker ultimately concluded by declaring that
10  "measures undertaken by the City administration to balance the budget have proven this solvency
11  statement to be correct."  One wonders – was Mr. Dieker falsifying information when he signed off on
12  the Official Statement, or is he simply rewriting history now?

13        Similarly, Mr. Dieker was part of the City's team that prepared and delivered materials to S&P in
14  connection with the ratings process for the Bonds.  Those materials, titled "Standard & Poor's Credit
15  Rating Presentation,"[32] paint a picture that is completely at odds with Mr. Dieker's new opinion
16  regarding "riskiness" of the Bonds.  In them, the City acknowledged that its "pursuit of [a] new financing
17  strategy ran into some challenges" in late 2008 and early 2009, but the City then unequivocally stated
18  that "[r]ecent events provide a more favorable environment"[33] warranting a high rating by S&P.  In
19  particular, the City noted that "[m]unicipal capital markets [are] more stable than in early 2009," that the
20  City "Council has addressed City budget challenges," and that a "[m]ajor source of repayment [of the
21  Bonds would come] from four PFF fund revenues related to projects."[34]  Here again, one wonders – was
22  Mr. Dieker dissembling then or now?  In any event, S&P must have believed the City.  The Bonds
23  received an "A" rating later that month and they were priced and closed shortly thereafter.  The

---

[30]  *Id*. at 27.

[31]  *Id*. at 28.

[32]  Ex. 2628 (CTY207822-849).  A copy of Ex. 2628 is attached to the Morse Decl. as <u>Exhibit F</u>.

[33]  Ex. 2628 (CTY207845).

[34]  Ex. 2628 (CTY207845-46).

FRANKLIN'S MOTION TO EXCLUDE
PORTIONS OF TESTIMONY OF KENNETH DIEKER

cumulative average one-year default rates since 1986 for municipal securities with an S&P public finance non-housing "A" rating is a mere 0.01%.[35] Hardly a "risky" investment.

Moreover, if Mr. Dieker were correct that there existed any additional "risk" associated with potential insolvency or a bankruptcy filing by the City, there clearly would have been an <u>increase</u> in interest rate from that contemplated for the City's proposed lease revenue bond transaction in February 2009 (before the specter of bankruptcy was raised by the City Council member) and that at which the Bonds ultimately priced. Mr. Dieker, however, admitted that the interest rates were the same,[36] thus undermining his own proposition.

<u>Alleged Risk Compared To Other City Debt</u>. Finally, Mr. Dieker attempts to assess the alleged riskiness of the Bonds by comparing them to the City's other bond financings.[37] Those comparisons are invalid, as the City's other bonds were sold <u>with insurance</u> and prior to the "Great Recession." Moreover, at the time that the Bonds were issued with an A rating, S&P reaffirmed its underlying rating of the underlying City's other bonds on an unenhanced (*i.e.*, uninsured) basis, and gave all of them with the <u>exact same A rating given to the Bonds</u>. Any attempt to distinguish between the Bonds and the City's "other existing bond issuances" thus is patently invalid.

For all of these reasons, Mr. Dieker's analysis and methodology are unsound and unreliable, and cannot serve as the basis for his alleged "expert" opinion in this case.

---

[35] Standard & Poor's Ratings Services U.S. Public Finance Defaults And Rating Transition Data: 2013 Update (March 31, 2014) at 36-36. A copy of the Standard & Poor's Update is attached to the Morse Decl. as <u>Exhibit M</u>.

[36] Dieker Tr. at 40:6-8.

[37] Dieker Declaration ¶ 11; Dieker Direct Testimony ¶ 11.

# CONCLUSION

Mr. Dieker's testimony and opinion regarding the alleged riskiness of the Bonds is irrelevant, unhelpful, and unreliable. Franklin requests that the Court exclude Paragraphs 5 through 17 of the Dieker Declaration and Paragraphs 5 through 17 of the Dieker Direct Testimony.

Dated: April 25, 2014                    JONES DAY

By:   */s/ Joshua D. Morse*
James O. Johnston
Joshua D. Morse
Charlotte S. Wasserstein

*Attorneys for Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund*