**32**

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone:     +1-916-447-9200
Facsimile:     +1-916-329-4900

Attorneys for Debtor
City of Stockton

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | D.C. No. OHS-15 |
| Debtor. | Chapter 9 |
| | **CITY'S SUPPLEMENTAL BRIEF IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED PLAN OF ADJUSTMENT, AS MODIFIED (AUGUST 8, 2014)** |
| | Date:        October 1, 2014<br>Time:        10:00 a.m.<br>Dept:        Courtroom 35<br>Judge:       Hon. Christopher M. Klein |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................. 1

II. ARGUMENT ...................................................................... 2

  A.  The City's Decision Not To Impair Pensions Was Made In Good Faith .............. 3

    1.  The Impact of Terminating The City's CalPERS Contract ........................ 4

      a.  Accrued Pensions Would Be Cut By 60% ................................. 4

      b.  The City Would Be Excluded From The CalPERS System ......... 5

      c.  City Employees Would Have No Pension Immediately Following Termination, Requiring The City To Enter The Social Security System ...................................................... 6

      d.  CalPERS Would Have A Claim For The $1.6 Billion Termination Liability ................................................... 7

    2.  CalPERS Is The Market Standard For Pensions In California, And No Feasible, Less-Costly Alternative Exists ........................... 7

      a.  Independent City-run System ..................................... 9

        (i)  An Independent System Would Be Less Efficient Than CalPERS, And Would Therefore Cost More ............ 9

        (ii)  An Independent System Would Cause The City To Incur Significant Start Up, Transition, And Maintenance Costs ........................................ 10

        (iii)  An Independent System Would Lack Reciprocity With CalPERS ........................................ 10

        (iv)  Conclusion: An Independent Pension System Is Not A Better Option For The City ........................ 11

      b.  Joining County/'37 Act System ............................... 12

      c.  Contracting with Private Pension Administrator ..................... 12

      d.  Conclusion ................................................... 13

    3.  The City Cannot Impair Pensions Without Irreparably Damaging Its Ability To Hire And Retain Employees ................................ 14

    4.  City Employees And Retirees Already Have Borne More Than Their Share Of The Bankruptcy Burden, And The City Has Reduced Its Pension Obligations Indirectly ............................ 19

    5.  The City's Impairment Of Pensions Will Breach Its Labor Agreements ................................................... 22

  B.  The City's Plan Properly Classifies Pension Claims Separately From General Unsecured Claims .............................................. 23

  C.  The CalPERS Lien Applies Outside Of Bankruptcy, And Would Limit What Creditors Could Expect To Receive If The City's Bankruptcy Case Were Dismissed ...................................................... 26

III. CONCLUSION ................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Association of Retired Employees of the City of Stockton v. City of Stockton,*
    478 B.R. 8 (Bankr. E.D. Cal. 2012)........................................................................ 20

*Barakat v. Life Ins. Co. of Va. (In re Barakat),*
    99 F.3d 1520 (9th Cir. 1996)...........................................................................24, 25

*In re City of Stockton, California,*
    493 B.R. 772 (Bankr. E.D. Cal. 2013).........................................................16, 19, 21

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),*
    280 F.3d 648 (6th Cir. 2002)............................................................................ 23

*In re Jersey City Medical Center,*
    817 F.2d 1055 (3d Cir. 1987)............................................................................ 26

*Steelcase Inc. v. Johnston (In re Johnston),*
    21 F.3d 323 (9th Cir. 1993)...........................................................................23, 24

*In re Wabash Valley Power Ass'n,*
    72 F.3d 1305 (7th Cir. 1995)............................................................................ 23

*Wells Fargo Bank, N.A. v. Loop 76 (In re Loop 76, LLC),*
    465 B.R. 525 (B.A.P. 9th Cir. 2012)..............................................................23, 24, 25

**Statutes**

11 U.S.C.

    § 545........................................................................................................ 27

    § 901(a) ...................................................................................................... 2

    § 926........................................................................................................ 27

    § 943......................................................................................................... 2

    § 943(b)(7)................................................................................................. 26

    § 1122.................................................................................................... 3, 23

    § 1122(a)................................................................................................... 23

    § 1123....................................................................................................... 3

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

§ 1129 ........................................................................................................... 2

§ 1129(a)(3) ................................................................................................... 3

§ 1129(b) ...................................................................................................... 26

Cal. Gov't Code

§§ 20000 *et seq.* ........................................................................................ 24

§ 20460 ........................................................................................................... 5

§ 20574 ........................................................................................................... 2

§ 20581 ........................................................................................................... 6

§§ 31450 *et seq.* ........................................................................................ 12

§ 31459 ......................................................................................................... 12

§ 31468(e) ..................................................................................................... 12

§ 31520 ......................................................................................................... 12

§ 31557(b) ..................................................................................................... 12

## I.     INTRODUCTION

At the hearing held on July 8, 2014, the Court requested a "more focused analysis" from the City and other supporters of its plan of adjustment[1] on whether and how the City's Plan could be confirmed in the event the Court concludes that the City's pension obligations to its current and former employees are capable of being impaired in bankruptcy. The Court raised several interconnected issues, including those relating to the California Government Code provision that grants CalPERS a senior and priming lien upon the termination of a pension plan.

The fact is that if Stockton has any hope of retaining its key employees, and particularly employees essential to public health and safety such as its sworn police officers, its *only* option is not to impair its pension obligations. The evidence in support of the City's decision is uncontroverted by any competent evidence, and Franklin, while complaining about the City's approach, has not suggested any feasible alternative. Instead, Franklin has opined that following the undisputed 60% reduction in pension benefits that would result from termination of the City's participation in CalPERS, City employees would remain on the job because once the damage was done, it was done. This baseless assumption completely ignores the evidence showing that City employees have job options outside of Stockton and that they would be incentivized to leave the City quickly in order to maximize their future pension benefits. In fact, City employees would be motivated to leave within six months of the termination in order to avoid losing their "classic" CalPERS status under the Public Employees' Pension Reform Act of 2013 ("**PEPRA**"). This rapid loss of employees in a short period would seriously impact the City's ability to provide necessary public services to its residents and businesses.

This brief discusses the overwhelming and incontrovertible evidence in support of the City's decision not to play chicken with its workforce, and contrasts Franklin's half-hearted and hollow arguments and "evidence" in opposition thereto. It also discusses why the City's decision,

---

[1] The Court's reference at the time of the July 8, 2014 hearing was to the City's First Amended Plan for the Adjustment of Debts of City of Stockton, California, as Modified (June 2, 2014) [Dkt. No. 1535]. The City subsequently filed a revised plan of adjustment in light of the Court's July 8 ruling on valuation, its First Amended Plan for the Adjustment of Debts of City of Stockton, California, as Modified (August 8, 2014) ("**Plan**"). Any capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan. Unless otherwise noted, all references to a "section" are to a section of the Bankruptcy Code.

1  as embodied in its Plan, satisfies the chapter 9 confirmation requirements of Bankruptcy Code

2  § 943 and those provisions of § 1129 incorporated by § 901(a), regardless of whether its pension

3  obligations can be impaired.  Finally, the brief discusses the CalPERS lien in the context of the

4  best interest of creditors test.

5  **II.    ARGUMENT**

6          The Court requested at the July 8th hearing that the City explain why the Court should

7  confirm the City's Plan even if the Court were to assume (1) that the City could impair its pension

8  obligations through bankruptcy, and (2) that the threatened lien under Cal. Gov't Code § 20574

9  ("**CalPERS Lien**") was unenforceable in bankruptcy.   Conf. Tr.[2], July 8, 2014, at 47:20-25

10 (comments of the Court).[3]   Ultimately, whether the City can legally impair pensions is a purely

11 academic question for the City.  Stockton has already reduced its pension obligations indirectly,

12 and has imposed drastic cuts to its staffing, compensation, and other post-employment benefits

13 (such as retiree medical).  All of these reductions have fallen squarely on the shoulders of the

14 City's retirees and current employees.  Any further cuts to pensions would further harm the same

15 retirees and current employees who have already been impaired and would irreparably damage

16 the City's ability to hire new employees and to retain experienced ones.  The lack of an

17 experienced and high-quality workforce would, in the opinion of the City Council and staff,

18 threaten the City's viability because there is no telling how quickly, if ever, the City could

19 recover from the loss of a large number of its key employees, including police officers.

20         The City thus submits that it is unnecessary for the Court to determine whether or not the

21 City has the legal ability to impair pensions.  Similarly, there is no need for the Court to

22 determine whether the lien imposed upon termination of a CalPERS pension plan by Government

23 Code § 20574 survives in chapter 9.  However, if the Court were to make such a ruling, it would

24 only potentially impact whether the Plan is proposed in good faith under Bankruptcy Code

25

26 [2] Transcript of Confirmation Proceedings ("**Conf. Tr.**").

27 [3] For the convenience of the Court and parties in interest, the City will file a separate pleading (or pleadings) that attach the pertinent parts of each trial exhibit and trial transcript cited herein.  In the case of transcripts, the pleading(s) will attach copies of only the pages cited and surrounding pages for context as necessary.  In the case of

28 declarations, the pleading(s) will attach only the declaration itself and those exhibits referred to in the brief, rather than all exhibits to the declaration.

§ 1129(a)(3) and whether the City has properly classified its creditors under Bankruptcy Code §§ 1122 and 1123.[4]

As to good faith, the evidence presented by the City, both at the confirmation hearing and during the eligibility phase, amply demonstrates that the City has no viable alternative to maintaining its pension obligations to its employees and retirees through the vehicle of the CalPERS plan. Impairing pensions would result in the termination of the City's CalPERS contract, a $1.6 billion termination liability that would swamp other claims, an exodus of City employees, and the unwinding of the City's negotiated deals with other creditors, including its nine unions. The City's decision not to impair its pension obligations, even in light of a potential ruling that such impairment is permissible, is thus made in the utmost good faith.

As to classification, any decision regarding the status of CalPERS would not necessitate a re-classification with regard to either Franklin or the pension claims. Even if the pension claims could be impaired, there are meaningful differences between the pension claims and other general unsecured claims, and the City has sound reasons for classifying them separately. Moreover, even if the City were forced to lump pension claims in with the rest of Class 12, none of the other creditors in that class would benefit, particularly Franklin. Rather, the $1.6 billion of pension claims would join Franklin and others in Class 12, overwhelming the Franklin claim. This is particularly true when coupled with the $545 million of Class 12 claims held by retirees and their beneficiaries on account of the elimination of their health benefits, as well as the renewed claims of the City's nine labor unions, because termination of the City's CalPERS-administered pension plans would violate its collective bargaining agreements.[5]

## A. The City's Decision Not To Impair Pensions Was Made In Good Faith.

In order to remain a viable, livable community, Stockton must be able to attract and retain qualified employees to provide City services and to maintain public health and safety. The record is replete with evidence from two City Managers, the Police Chief, the City's pension expert and

---

[4] As all of the other confirmation requirements have been thoroughly briefed by the parties, this brief will not address them.
[5] Moreover, such contracts would have to be renegotiated, likely at greater cost to the City because the unions would require additional compensation and/or benefits in light of the loss of pension benefits, leaving less money available for creditors going forward.

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    others establishing that the City cannot impair pensions without crippling its ability to hire and

2    retain employees.  The only contrary "evidence" is the anecdotal conjecture of Franklin's

3    financial expert that the employees in Detroit did not flee for other employers when their pensions

4    were threatened, and that therefore the City's employees will stay if their pensions are impaired.

5    This despite Stockton employees being able to transfer their pensions to virtually any other city,

6    county, or special district within California and being incentivized to do so within six months

7    after termination under PEPRA.

8              1.       **The Impact Of Terminating The City's CalPERS Contract.**

9              Even assuming away the asserted CalPERS Lien, the basic consequences of terminating

10   the City's CalPERS contract are undisputed:

11             a.       **Accrued Pensions Would Be Cut By 60%.**

12             CalPERS would reduce the pensions of City employees and retirees accrued through the

13   termination date pro rata by approximately 60%.  According to CalPERS' Deputy Chief Actuary,

14   David Lamoureux, upon termination CalPERS would require the City to pay an amount

15   "sufficient to ensure payment of all vested pension rights of the [City's] employees accrued

16   through the termination date."  Lamoureux DTD[6], ¶ 38.  Because the City lacks the ability to pay

17   the Termination Liability, which Lamoureux testified was approximately $1.6 billion as of June

18   30, 2012, "benefits to employees must be reduced pro rata based on the amount of the

19   Termination Payment that is not funded."  *Id.*, ¶ 41, 43; Leland DTD[7], ¶ 17 (calculating

20   termination liability).  Kim Nicholl, the City's pension expert, confirmed Lamoureux's testimony,

21   saying that because the City had accumulated assets into its pension plans equal to only 40% of

22   the plans' termination liabilities, the result would be a 60% reduction for all accrued benefits.

23   Conf. Tr., June 4, 2014, at 17:11-17 (testimony of Kim Nicholl).

24   / / /

25

26   [6] Direct Testimony Declaration of David Lamoureux in Support of CalPERS' Response to Franklin's Objection to
     Confirmation of the City of Stockton's First Amended Plan of Adjustment [Dkt. No. 1440, Trial Ex. 4015]
27   ("**Lamoureux DTD**").
     [7] Direct Testimony Declaration of Robert Leland in Support of Confirmation of First Amended Plan for the
28   Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1388, Trial Ex. 3057] ("**Leland DTD**").

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

This pro rata reduction would apply to the pension benefits of all employees and retirees equally. In other words, Stockton lacks the ability to impair some pensions more or less than others. Conf. Tr., May 14, 2014, at 180:24-181:5 (testimony of David Lamoureux). Thus, for example, the City could not remediate past "pension spiking." Counsel for Franklin acknowledged as much during closing argument:

> THE COURT: But what I'm still not getting is whether you have a solution for remedying past pension spiking that does not amount to getting so angry at a pension spiker that you are going to take a non-pension spiker out and shoot them.
>
> MR. JOHNSTON: I think that we heard Mr. Lamoureux testify that if there's an impairment of pension, the impairment applies ratably.
>
> THE COURT: That means across the board.
>
> MR. JOHNSTON: Yeah. So I don't know that there is a solution that says you can pick and choose among people with vested benefits and say you're not touched and you're touched. I don't believe that that can be done, at least according to Mr. Lamoureux's testimony.

Conf. Tr., June 4, 2014, at 198:12-25 (Franklin closing argument). Any impairment would therefore harm not only the relatively small number of those who receive large pensions, but also the vast majority of pensioners with modest pensions who have already seen substantial cuts to their post-employment benefits, including those at the bottom of the spectrum who currently receive very low benefits. For instance, termination would reduce the average retiree without medical benefits to an annual pension of $9,612. *See* Haase Elig. Decl.[8], ¶ 5 (average pension received by current retirees without medical benefits is $24,029). This would cause real and significant "collateral damage" for the City's current employees and retirees, particularly those 1,100 retirees who have already lost their health benefits.

### b.   The City Would Be Excluded From The CalPERS System.

The City would not be allowed to rejoin CalPERS for at least three years. *See* Cal. Gov't Code § 20460; Lamoureux DTD, ¶ 46. Even then, in order to rejoin CalPERS, the City would have to assume all of the liabilities for services performed under the terminated contract. *See* Cal.

---

[8] Declaration of Teresia Haase In Support of City of Stockton's Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 21, Trial Ex. 1052] ("**Haase Elig. Decl.**").

1   Gov't Code § 20581; Conf. Tr., May 14, 2014, at 184:8-11 (testimony of David Lamoureux).

2   Stated another way, in order to rejoin CalPERS, the City would have to re-assume all of the

3   liabilities that it owed prior to termination.  Thus, if pensions were impaired and the prediction of

4   City leaders and its pension expert about massive defections proved correct, after three years

5   when the City could rejoin CalPERS, it could do so only by paying the full cost.

   c.   **City Employees Would Have No Pension Immediately
6        Following Termination, Requiring The City To Enter The
7        Social Security System.**

8          As discussed in more detail below, it would take a minimum of six months, and

9   realistically at least a year, for the City to establish and implement its own pension system.  Conf.

10  Tr., June 4, 2014, at 21:11-23 (testimony of Kim Nicholl).  Alternatively, there would be at least

11  some lead time required for the City to join the San Joaquin County pension plan or to establish a

12  pension plan with a private administrator.  In any case, during this intervening period, City

13  employees would not be covered by any pension plan.  Instead, they would be covered by Social

14  Security, which provides a substantially lower level of benefits relative to the CalPERS benefits

15  and which Nicholl testified is "not like a retirement benefit really, realistically." *Id.*, at 49:6-7;

16  *see id.*, at 19:16-22 (employees must enter Social Security when they are not covered by a

17  pension plan).

18         There are two reasons why it is not in the best interest of the City or its employees to enter

19  the Social Security System.  First, because of differences in the funding of CalPERS and Social

20  Security, employees would receive less under Social Security than they would under CalPERS.

21  Conf. Tr., June 4, 2014, at 39:4-12 (testimony of Kim Nicholl).  Second, Social Security requires

22  that an employer and its employees each contribute 6.2% of payroll, which is money that could be

23  spent more efficiently. *Id.*, at 19:16-22.  Because the City could never exit Social Security, even

24  if it were later to establish or join a new pension plan, these required Social Security contributions

25  would continue until each covered employee's retirement. *Id.*  The contributions to Social

26  Security would not only decrease the amount of money available to the City to establish any new

27  pension system, but would also limit the City's financial ability to pay claims.

28  / / /

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

### d.    CalPERS Would Have A Claim For The $1.6 Billion Termination Liability.

As noted above, CalPERS, as the agent of the employees and retirees, would hold a claim for the entire $1.6 billion termination liability.   Needless to say, were the $1.6 billion claim secured by a valid lien on the City's assets, every other creditor would be worse off – including those who reached agreements with the City during the mediation conducted by Judge Perris. Even if the lien is unenforceable, though, CalPERS' unsecured $1.6 billion claim "would represent 73.3% of the unsecured claims pool, compared with a roughly 24.7% share for Retiree Health Benefit Claimants ($545 million) and an approximate 1.58% share for Franklin".  Leland DTD, ¶ 17 (assuming allowed unsecured Franklin claim of $35 million).[9]  It is unclear how Franklin can contend that it would receive a greater payout by forcing the City to take on an additional $1.6 billion claim (as well as the resurrected claims of the City's labor unions as a result of the City's negotiated deals coming undone) while simultaneously spending more money to establish a separate and less efficient pension system and to cover its required Social Security contributions.  The extremely unattractive prospect of the City setting up and administering its own pension system is discussed below.

### 2.    CalPERS Is The Market Standard For Pensions In California, And No Feasible, Less-Costly Alternative Exists.

Stockton's current and former City Managers each testified that a CalPERS pension is the "market standard for government employee pensions in California."  Wilson DTD[10], ¶ 15; *see*

---

[9] Due to the Partial Judgment and the Court's July 8, 2014, finding as to the amount of Franklin's secured claim, Franklin's unsecured claim is approximately $32 million.  Franklin may contend that the CalPERS claim would have to be reduced to present value, as it has asserted with regard to the retirees' claims.  As the City has discussed in its prior briefs, the Bankruptcy Code does not provide for such a reduction.  *See* City's Supplemental Memorandum of Law in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1309], section III.E.1, at 44-47.  Moreover, the CalPERS claim for its termination liability is *already* calculated at present value.  Lamoureux DTD, Ex. 6 [Dkt. No. 1441] (Safety Plan of the City of Stockton, Annual Valuation Report as of June 30, 2012) at 28 ("Hypothetical Termination Liability"), Ex. 7 (Miscellaneous Plan of the City of Stockton, Amended Annual Valuation Report as of June 30, 2012) at 28 ("Hypothetical Termination Liability").
[10] Direct Testimony Declaration of Kurt Wilson in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1383, Trial Ex. 3068] ("**Wilson DTD**").

*also* Deis DTD[11], ¶ 29. "Ninety-nine percent of government employees in California are in the CalPERS program or something very similar." Deis DTD, ¶ 29. The City cannot be a competitive employer while offering a less generous and efficient pension program than other government employers. Wilson DTD, ¶ 15 ("The City's ability to retain and attract a qualified workforce is dependent . . . on the competitiveness of its total compensation package. . . . In the absence of CalPERS or an equivalent plan, the City would be unable to compete with other employers."); *see also* Elig. Tr.[12], March 25, 2013 AM, at 60:2-7 (testimony of Robert Deis). The unavoidable fact is that there simply is no viable, less costly alternative for the City. Deis DTD, ¶ 29 ("No viable, less-expensive alternative exists"); Wilson DTD, ¶ 15.

At the hearing on July 8, 2014, the Court referenced several possible alternatives to the CalPERS system. Each had been discussed by City and CalPERS witnesses, including Stockton starting its own independent pension system, joining San Joaquin County's 1937 Act retirement system, or contracting with a private pension administrator. Conf. Tr., July 8, 2014, at 29:2-30:2 (comments by the Court). However, as the City's pension expert, Kim Nicholl, explained in detail, none of these alternatives constitutes a realistically feasible or beneficial option. An actuary with 25 years of experience working with public sector retirement systems, Nicholl is the Senior Vice President and National Public Sector Retirement Practice Leader for Segal Consulting. *See* Conf. Tr., June 4, 2014, at 9:16-10:3 (testimony of Kim Nicholl). She testified that due to the costs, delays, and other difficulties inherent to each of these three alternatives, none would ultimately provide comparative pensions at a lower cost than CalPERS, which is an established and experienced pension manager. The testimony of David Lamoureux further supported this conclusion. *See* Lamoureux DTD ¶ 13; Conf. Tr., May 14, 2014, at 188:17-22, 195:5-17 (testimony of David Lamoureux).

/ / /

/ / /

---

[11] Direct Testimony Declaration of Robert Deis in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1368, Trial Ex. 3046] ("**Deis DTD**").

[12] Transcript of Eligibility Proceedings ("**Elig. Tr.**").

### a.    Independent City-run System.

Nicholl and Lamoureux offered several reasons why a City-run pension system is not a viable concept.

#### (i)    An Independent System Would Be Less Efficient Than CalPERS, And Would Therefore Cost More.

Nicholl confirmed that a City-run pension system could not provide a level of benefits comparable to CalPERS benefits without costing the City more than the City is currently paying CalPERS – a sum Franklin's financial expert, Charles Moore, called "unsustainably high."  Conf. Tr., June 4, 2014, at 26:19-27:16 (testimony of Kim Nicholl); Moore Report[13], at 21.  A City-run pension system would begin its life with no assets, which would necessitate a more conservative investment strategy concentrated in bonds rather than one with a mixed portfolio of stocks, real estate, or other higher-yield investments like those held by CalPERS.  Conf. Tr., June 4, 2014, at 26:19-27:16, 50:15-21 (testimony of Kim Nicholl).  Due to the lower rate of return on bonds, the discount rate on the City-run pension plan would be lower than CalPERS' discount rate.  *Id.*, at 26:19-27:16.  In other words, the new City portfolio of pension assets would earn less than CalPERS earns on its investments, necessitating higher contributions or lower benefits to make up the difference.  *Id.*  An independent City pension system also would be subject to greater volatility in cost per member due to the risk being pooled among a smaller group of beneficiaries. Lamoureux DTD, ¶ 13.  Thus, for a comparable level of benefits, the "normal cost"[14] of a City-run pension system would cost the City more than the normal cost it is currently paying to CalPERS, and that cost would be more unpredictable from year to year.

/ / /

/ / /

/ / /

---

[13] Submission by Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund of Expert Report of Charles M. Moore [Dkt. No. 1293, Trial Ex. 2967], Ex. A ("**Moore Report**").

[14] Normal cost is defined by CalPERS as "The annual cost of service accrual for the upcoming fiscal year for active employees. The normal cost should be viewed as the long term contribution rate."  *See* Glossary, *available at* https://www.calpers.ca.gov/index.jsp?bc=/utilities/glossary/home.xml#lo.  It is assumed that at the outset a new pension plan operated by the City would have no unfunded liability, which would be the case if the Termination Liability were discharged.

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1          (ii)    An Independent System Would Cause The City To Incur
                   Significant Start Up, Transition, And Maintenance Costs.

2

3          The costs to the City for creating and maintaining its own pension system would be

4  substantial.  The City would need to hire an actuary and legal counsel to help set up the terms of

5  the plan.   Conf. Tr., June 4, 2014, at 20:8-21:10 (testimony of Kim Nicholl).  Starting from

6  scratch, Stockton would be compelled to install a system to administer contributions and benefits,

7  and hire staff to maintain data on active and retired employees, track beneficiaries of deceased

8  pension recipients, monitor deaths and process payments.  *Id.*  It would need to create and select a

9  board of trustees, along with crafting and adopting accompanying regulations for board decisions

10  regarding the plan.  *Id.* It would have to identify and hire a trustee to manage the system's assets.

11  *Id.*  It would need to spend time and money to develop an investment policy for the assets.  *Id.*

12  And perhaps most importantly, it would be compelled to expend resources bargaining with its

13  employees regarding the level of benefits under the new system, as required by state public labor

14  relations laws.  *Id.*  All of the foregoing would have to take place before the fledgling pension

15  system was installed, which according to Nicholl, would likely take at least one full year.  *Id.*, at

16  21:11-23.

17          Once the new independent pension system was up and running, the City would incur the

18  usual maintenance costs of administering it.  Without the economies of scale that CalPERS

19  enjoys, Conf. Tr., June 4, 2014, at 23:25-24:14 (testimony of Kim Nicholl), it is unclear how the

20  City could manage these costs without either further reducing benefits to its employees relative to

21  those provided by CalPERS, and/or requiring larger contributions.  Nicholl concluded that the

22  City could not offer an equivalent or better retirement package than CalPERS.  Conf. Tr., June 4,

23  2014, at 38:20-39:12, 49:8-13, 52:25-53:1 (testimony of Kim Nicholl).

24          (iii)   An Independent System Would Lack Reciprocity With
                   CalPERS.

25

26          A third reason why a City-run pension system is not a viable option is the likelihood that

27  the City would be unable to negotiate reciprocity[15] with CalPERS.  Lamoureux testified that

28

---

[15] Sometimes referred to as "portability."  Conf. Tr., May 14, 2014, at 184:15-21 (testimony of David Lamoureux).

1   reciprocity in the CalPERS context means that if an employee working for a CalPERS agency

2   moves to an agency that has reciprocity with CalPERS, that employee will receive the same level

3   of retirement benefits that he or she would have received if he or she never left the first agency,

4   rather than one stream of retirement benefits using the final salary at the first agency and another

5   using the final salary at the second agency.  Conf. Tr., May 14, 2014, at 184:15-185:25

6   (testimony of David Lamoureux).  Given reciprocal retirement systems, the salary used to

7   calculate the benefits for the employees' tenures at both agencies would be his or her highest

8   salary at either agency, typically the second, resulting in a higher ultimate benefits package; each

9   agency would be responsible for paying the benefits for the employee's years of service when it

10  employed the individual.  *Id.*

11          Nicholl testified that it is unlikely that CalPERS would agree to reciprocity with the City

12  were it to establish a City-run pension system, and gave two reasons.  First, CalPERS would be

13  wary of accepting reciprocity in light of the fact that the City would have just terminated its

14  CalPERS contract and defaulted on its pension obligations.  Conf. Tr., June 4, 2014, at 28:15-21

15  (testimony of Kim Nicholl).  Second, because the City likely would be offering lower benefits

16  than CalPERS, it would be counter to the interests of other CalPERS agencies for CalPERS to

17  agree to reciprocity with the City.  *Id.*, at 28:22-29:8.[16]  Without reciprocity, the City would be a

18  far less attractive employer to any public employee considering transferring from a CalPERS or

19  reciprocal agency or who might one day in the future wish to transfer to another CalPERS or

20  reciprocal agency.

21                          (iv)    Conclusion: An Independent Pension System Is Not A
                                    Better Option For The City.
22

23          In sum, a City-run pension system would likely cost more than remaining with CalPERS

24  and would provide City employees with an inferior benefits package.  Such a system would

25  encourage City employees to seek better opportunities at other CalPERS or reciprocal agencies

26

27  ───────────────────
    [16] The City's benefits would be lower than CalPERS' benefits for at least two reasons: (1) the investment constraints
28  discussed above and (2) the repercussions of joining the Social Security system during the gap between pension
    programs, also discussed above.

1    and would make it extremely difficult for the City to attract new employees and retain

2    experienced employees.  It is not a viable alternative.

3                             **b.**      **Joining County/'37 Act System.**

4             The Court also raised the possibility of the City joining San Joaquin County's 1937 Act

5    retirement system pursuant to the County Employees Retirement Law of 1937, Cal. Gov't Code

6    §§ 31450 *et seq.* (the "**37 Act**").[17]  Unfortunately, this option is not within the City's control.

7    While it is true that the City, as a "district" of San Joaquin County, is eligible to apply to join San

8    Joaquin County's retirement system under the '37 Act, Cal. Gov't Code §§ 31468(e),  the City

9    cannot join San Joaquin County's retirement system unless the County's Board of Retirement

10   consents by a majority vote.[18]  Cal. Gov't Code § 31557(b) ("officers and employees of any

11   district become members of the [county retirement] association on the first day of the calendar

12   month after . . . the [district's] governing body adopts by a two-thirds vote, a resolution providing

13   for the inclusion of the district in the retirement association and the board, by majority vote,

14   consents thereto"); *see* Cal. Gov't Code §§ 31459, 31520 (clarifying that the "board" referenced

15   in § 31557(b) is the County Board of Retirement).  It is unlikely that San Joaquin County's Board

16   of Retirement would be willing to accept Stockton into its '37 Act system as it seems doubtful

17   that San Joaquin County would be eager to take on a city that had just defaulted on its existing

18   pension obligations.  Moreover, because the benefits provided by San Joaquin's retirement

19   system are similar to, if not the same as, those provided under the City's current CalPERS plan

20   (under PEPRA), the costs for any new service for current employees would not reduce the City's

21   overall pension costs.

22                            **c.**      **Contracting with Private Pension Administrator.**

23            The Court also questioned whether the City could contract with a private pension

24   administrator.  Conf. Tr., July 8, 2014, at 29:2-13 (comments of the Court).  Simply put, the City

25

26   [17] At the July 8 hearing, the Court raised the possibility of the City transferring all or a portion of the assets and liabilities of its pension plan from CalPERS to either a '37 Act system or to a plan operated by a private

27   administrator.  Conf. Tr., July 8, 2014, at 29:21-30:24 (comments of the Court).  Because the City believes that CalPERS will be discussing the transfer of assets and liabilities extensively, the City's Brief focuses on the "post-

28   termination" option.
     [18] The City is not eligible to apply to join any other county's 1937 Act system.

1    is not aware of any cost-effective private pension administrator that could be an adequate

2    substitute for CalPERS. The Court, citing Lamoureux's testimony, mentioned the City of San

3    Clemente, California, as an example of a city with a private pension administrator. *Id.*

4    Lamoureux, however, testified that he was aware of San Clemente's use of a private pension

5    administrator only because San Clemente recently decided to join CalPERS – the strong inference

6    being that San Clemente believed that CalPERS provided a superior alternative to its private

7    administrator. Conf. Tr., May 14, 2014, at 191:5-17 (testimony of David Lamoureux). Notably,

8    Lamoureux also testified that he was not aware of any other California city other than San

9    Clemente that contracts with a private pension administrator. *Id.* Nicholl, with all of her

10   experience with public sector retirement systems, also testified that she was "not aware of any

11   third-party administrators that administer public sector pension plans." Conf. Tr., June 4, 2014, at

12   21:24-22:21 (testimony of Kim Nicholl). She testified that unlike private sector pension plans,

13   public sector pension plans vary so greatly across the nation that the economies of scale that

14   would create a market for third-parties administering such plans are lacking. *Id.* Even if the City

15   did locate a private pension administrator to administer its government plan, there is no reason to

16   believe that it would provide the same level of benefits at a lower cost than the City currently

17   pays to CalPERS. For instance, because a private pension administrator would be a for-profit

18   company, its profit margin would be an added cost that does not exist for public systems.

19   Furthermore, the experience and efficiencies available to CalPERS would be difficult for any

20   private administrator to match.

21                    **d.    Conclusion.**

22          Although theoretical alternatives to CalPERS administering the City's pension program

23   exist, none of the proposed alternatives is viable or cost-effective. Wilson DTD ¶ 15; Deis DTD

24   ¶ 29. Moreover, Franklin has not suggested a single feasible pension alternative that would save

25   the City money and prevent the loss of employees. In fact, during closing argument, the Court

26   asked counsel for Franklin point-blank what should be done with the City's pension liabilities.

27   Conf. Tr., June 4, 2014, at 189:18-190:8 (Franklin closing argument). Franklin's unhelpful

28   response was that the City could either impair CalPERS and pay Franklin, or not impair CalPERS

- 13 -

1    and pay Franklin. *Id.* However, Franklin has never explained how the City could avoid the

2    fallout of impairing its pensions or establish a separate pension system that would save it money

3    relative to staying with CalPERS with or without pushing employees out the door. This is

4    because no such alternative exists. The City's decision to continue paying its pension obligations

5    in full is thus not a matter of favoritism or a desire to punish Franklin (as Franklin has repeatedly

6    contended). Rather, the City simply has no better choice than the one it has made.

7              **3.    The City Cannot Impair Pensions Without Irreparably Damaging Its
                        Ability To Hire And Retain Employees.**
8

9              The City has maintained from the outset of its bankruptcy case that it cannot impair

10   pensions beyond what it has already done at the bargaining table without risking a large-scale

11   departure of its employees. The City's current and former employees have experienced

12   significant reductions in their compensation and benefits, and the evidence supports the City's

13   firm belief that reducing pension benefits through the Plan or otherwise in the bankruptcy case

14   will trigger a rush for the door by its employees, who already have made meaningful concessions

15   in order to keep the City afloat.

16             The City's concern about possible departures is neither speculative nor hypothetical. At

17   the eligibility hearing, the Chief of Police, Eric Jones, testified that he had spoken with City

18   police officers that "have said they will depart to another agency if the Department's PERS

19   contract is broken," while "[o]thers have stated that they will leave the Department if additional

20   compensation or benefits cuts occur." Jones Elig. Reply Decl.[19], ¶ 15; *see also* Jones Elig. Reply

21   Decl., ¶ 14 (referencing conversations with six former Stockton officers that had transferred to

22   different agencies, all of whom reiterated that they had left because of cuts to their pay and/or

23   benefits). Chief Jones further testified that he had conducted exit interviews with officers

24   transferring out of the Police Department, and that "[a]ll of the officers told [Jones] that monetary

25   issues were the primary reason they were leaving." Jones Elig. Reply Decl., ¶ 13. Many of those

26

27   _____

28   [19] Declaration of Eric Jones in Support of City of Stockton's Reply to Objections to Its Statement of Qualifications
     Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 710, Trial Ex. 1379] ("**Jones Elig. Reply
     Decl.**").

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1   officers experienced pay and benefit reductions as high as 20 to 30%, and some told Chief Jones

2   that they had difficulty paying bills or were worried about their retirement. *Id.*

3       Professor Justin McCrary, a City labor expert witness during the eligibility phase,

4   confirmed that reductions in compensation and benefits had "accelerated the normal process of

5   attrition" at the Stockton Police Department and reiterated that even "a modest pension reduction"

6   would likely cause a "significant number" of Stockton police officers to leave, which would in

7   turn "compromise the safety of the citizens of Stockton." McCrary Decl.[20], ¶¶ 5, 6. Chief Jones

8   was thus not merely hypothesizing when he testified that "[r]educing total compensation and

9   benefits to below market rates has already resulted in and would continue to hasten the departure

10  of employees to other police departments." Jones Elig. Decl.[21], ¶ 15. Since the eligibility

11  hearing, morale among the City's safety employees has remained low, and City employees

12  continue to look for greener pastures. Chief Jones reiterated in his confirmation declaration that

13  he has continued to speak with exiting officers and staff, and that "[m]ost officers, as well as []

14  managers and commanders, continue to tell [Jones] that if the Department's CalPERS contract is

15  broken, they will depart for another agency." Jones DTD[22], ¶ 7.

16      The City is already struggling to recruit and retain qualified officers. Of 365 budgeted

17  Police Department positions (not including 120 additional officer positions funded by the

18  November 2013 passage of Measure A), the City has been able to fill only 351. Jones DTD, ¶ 5.

19  This is in large part due to the constant loss of officers from the Department. From January 2012

20  to March 2014, the Police Department hired 134 officers, but saw 104 officers depart. *Id*. Much

21  of this attrition is due to the City's lack of competitiveness; "[o]f the 104 officers that left the

22  department . . . 44 left for other police departments." *Id*., ¶ 7. To make matters worse, the City is

23  losing its most experienced (and most valuable) officers. From July of 2009 to March of 2014,

24  the average tenure of officers and sergeants in the City's police department dropped from 14.22

---

[20] Declaration of Justin McCrary in Support of City of Stockton's Reply to Objections to Its Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 709, Trial Ex. 1378] ("**McCrary Decl.**").

[21] Declaration of Eric Jones in Support of City of Stockton's Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 30, Trial Ex. 1061] ("**Jones Elig. Decl.**").

[22] Direct Testimony Declaration of Eric Jones in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1364, Trial Ex. 3056] ("**Jones DTD**").

1   years to 9.34 years. *Id.*, ¶ 5. It is therefore not enough for the City to simply replace the officers

2   it loses. The City must be able to retain the experienced officers it has, and it cannot do so if it

3   cannot offer a competitive pension. This is particularly true for a department like Stockton's,

4   which may already be less appealing to potential officers than other cities with lower crime rates.

5   *See* Jones Elig. Decl., ¶ 15.

6       Meanwhile, crime remains a major concern. As of the Petition Date, Stockton had

7   experienced a spike in gun violence, record homicide rates, the tenth highest violent crime rate in

8   the nation, and the highest overall crime rate for a city its size in California. Jones Elig. Decl.,

9   ¶¶ 9-11. At the same time, the City had been forced to trim 22% of its sworn police officers over

10   the preceding 5 years. Montes Elig. Decl.[23], ¶ 28. In its eligibility opinion, the Court noted the

11   City's soaring crime rate and found that it was due in part to the "decimat[ion]" of the police

12   department. *In re City of Stockton, California*, 493 B.R. 772, 781, 789-90 (Bankr. E.D. Cal.

13   2013). While the City has seen a small improvement in some areas, it continues to be dogged by

14   a high crime rate. Jones DTD, ¶¶ 4, 8. Chief Jones declared on April 21, 2014, that "[v]iolent

15   crime, despite a reduction in 2013, is still extremely high in Stockton." *Id.*, ¶ 4. Stockton is still

16   the second most violent city in California, and is on pace with its record-breaking homicide rate

17   of 2012. *Id.*, ¶ 8. There has been no reduction in overall crime. *Id.*, ¶ 4. Given the City's

18   continuing high crime and difficulties in recruiting and retaining qualified police officers, it

19   cannot afford to roll the dice by cutting pensions and hoping its vital employees will stay.

20       The basic incentives to leave or stay are not restricted to police. Employees who have

21   other options – that is, the employees with the most experience, best performance, and marketable

22   specializations – will be the most likely to leave. This concern is nothing new. In its first

23   disclosure statement (filed on October 10, 2013), the City acknowledged that "[t]he maintenance

24   of pensions is critical to the City in order to retain employees—particularly police officers—

25   rather than losing them to other local governments," and noted that

26
27                 [i]n light of the severe cuts that City employees and retirees already
                have experienced, the City believes that any further significant

---

28   [23] Declaration of Laurie Montes In Support of City of Stockton's Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 23, Trial Ex. 1054] ("**Montes Elig. Decl.**").

1   reduction in pension benefits would almost certainly lead to a mass
exodus of City employees, as well as leaving the City hampered in
2   its future recruitment of new employees—especially experienced
police officers—on account of the noncompetitive compensation
3   package it would be offering new hires. . . . Such a sudden loss of
trained and experienced staff would be catastrophic and would
4   seriously jeopardize the City's ability to provide even the most
basic of essential public protections.  The City is unwilling to
5   further reduce or eliminate pensions thereby defaulting on its
contracts with its nine labor organizations, and, in effect, roll the
6   dice to see if employees flee.

7   Disclosure Statement with Respect to Plan for the Adjustment of Debts of City of Stockton,

8   California (October 10, 2013) [Dkt. No. 1134], at 24.

9         The only evidence offered by Franklin to contradict the testimony of City personnel (i.e.,

10   the Chief of Police, the current and former City Managers, the Human Resources Director and

11   others) and Professor McCrary regarding the likelihood that City employees will leave if pensions

12   are cut came from Franklin's financial expert, Charles Moore.  Moore, who has no experience in

13   city management or law enforcement,[24] who did not personally speak with any Stockton

14   employees[25] and who had no familiarity with even the most basic California laws relating to

15   taxation[26], testified that he did not believe that Stockton employees would depart because he was

16   not aware of employee departures in Detroit resulting from pension cuts, and because he believed

17   that "leaving is not going to change anything."  Conf. Tr., May 14, 2014, at 78:13-79:25

18   (testimony of Charles Moore).  Counsel for Franklin echoed Moore's testimony during closing

19   argument, and claimed that there will be no "pension Armageddon" because once City pensions

20   are cut, "[m]oving to another job would not help [City employees]" to recover any of their lost

21   vested benefits.  Conf. Tr. June 4, 2014, at 194:22-196:15 (Franklin closing argument).  Counsel

22   even went so far as to claim that "employees have no incentive whatsoever to leave the City in

23   the face of pension impairment."  *Id.*, at 171:19-23.

24         Charitably stated, this argument is naïve.  It was also flatly contradicted by testimony

25   from Jones, Deis, Wilson and Nicholl, as well as others.  While it is true that City employees

26   would be unable to recover accrued benefits that had been cut, Franklin ignores the significant

27
28

[24] Conf. Tr., May 14, 2014, at 83:16-85:2 (testimony of Charles Moore).
[25] *Id.* at 88:9-13.
[26] For example, Moore was unfamiliar with Propositions 8, 13, and 218.  *Id.* at 103:13-105:8.

incentives for employees to depart the City *going forward*.  First, as Nicholl testified, City

employees would have a major incentive to leave the City within six months of termination of the

CalPERS pension plan in order to avoid being permanently relegated to a lower level of benefits

under the new PEPRA standards.  *See* Conf. Tr., June 4, 2014, at 29:20-37:1 and Trial Ex. 3085

(Nicholl testimony discussing the incentive for an employee to leave Stockton if the CalPERS

contract is terminated).

Second, because the City would be prohibited from returning to CalPERS for three years

after termination, it is extremely unlikely that the City would be able to offer a competitive

pension, much less a competitive total post-employment benefits package in light of the

elimination of retiree medical benefits.  *See* Conf. Tr., June 4, 2014, at 38:20-39:12, 49:8-13,

52:25-53:1 (testimony of Kim Nicholl).  Employees will thus be incentivized to transfer to other

CalPERS agencies in order to receive better post-employment benefits.

Third, Nicholl explained that the time necessary for the City to create and establish a new

pension system would push employees out the door, as few, if any, employees with other job

options would be willing to wait around for a year or more to see what the City could come up

with.  In fact, it is quite likely that the City would be unable to establish a new pension system

before the six month PEPRA transfer window closed, meaning that City employees would be

forced to decide to leave before even knowing what the alternative would be.

Finally, Franklin simply ignores the loss of trust between the City and employees that

would result if the City, having already engaged in wide-reaching layoffs, having already wiped

out retiree medical benefits, and having already negotiated new CBAs with lower compensation

and increased employee pension contributions, took the final step of slashing accrued pensions.

Amazingly, during closing argument counsel for Franklin essentially ignored Nicholl's

testimony regarding the incentive for City employees to leave, and attempted to dismiss that

testimony by claiming, without any support, that it was "based on unrealistic assumptions."

Conf. Tr., June 4, 2014, at 196:4-8 (Franklin closing argument).  Nor did Franklin directly

address any of the specific testimony of the numerous City officers and staff who have day-to-day

contact with City employees.  Instead, Franklin's financial expert offered the vague (and dubious)

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

claim that he has "not seen any impact from an employment standpoint" resulting from pension cuts in Detroit. Conf Tr., May 14, 2014, at 79:7-12 (testimony of Charles Moore). Moore's opinion that Stockton can therefore cut pensions without fear of losing employees, based as it is on what may or may not have happened in Detroit and on the demonstrably incorrect assumption that City employees will have no incentive to leave, amounts to unsupported and unpersuasive conjecture. The testimony of the City's witnesses, which is based on conversations with current and departing employees, on the personal experience of those running the City, and on an analysis of the actual options and incentives facing City employees, irrefutably establishes that cuts to pensions would present a real and imminent threat to the City's ability to attract and retain employees, and thus to provide even the most basic public health and safety protections to residents.

### 4. City Employees And Retirees Already Have Borne More Than Their Share Of The Bankruptcy Burden, And The City Has Reduced Its Pension Obligations Indirectly.

The City has maintained throughout this bankruptcy case that the ultimate burden of any impairment of pensions will fall on its retirees and current employees, and not on CalPERS. Elig. Tr., March 25, 2013, AM, at 55:14-21 (testimony of Robert Deis) ("[R]eferring to CalPERS is like referring to the retirees."); Elig. Tr., March 27, 2013, at 438:10-21 (City closing argument) ("So if CalPERS were to be impaired . . . it is the employees who would suffer, not CalPERS."). The Court itself recognized this reality at the hearing held on July 8, 2014. Conf. Tr., July 8, 2014, at 39:19-40:10 (comments of the Court) (recognizing that the "financial risk of a shortfall in [the City's pension] payments" falls "on the employee."). The practical question facing the City is thus not whether it can legally impair CalPERS, but whether it can, or should, further impair its employees and retirees.

The City's workforce already has shouldered a disproportionate share of cuts. Before the chapter 9 petition was filed, the City reduced its total full-time workforce by approximately 25%, including large cuts to police, fire, and public works, and slashed employee compensation by as much as 23%. *In re City of Stockton*, 493 B.R. at 780; Montes Elig. Decl., ¶ 20; Deis Elig.

1  Decl.[27] ¶ 39.  In fact, the City imposed four consecutive years of compensation and service

2  reductions before entering bankruptcy.  Montes Elig. Decl. ¶ 26.  Through its negotiation of new

3  collective bargaining agreements, the City has further reduced its compensation and benefits.

4  Goodrich Elig. Reply Decl.[28], ¶ 8 ("Each of the [new] agreements resembled the deals that the

5  City sought from each group in the Ask," and included, among other terms, "elimination of

6  certain premium or 'add' pays and reductions in longevity pay, reductions in life insurance,

7  reductions in Long Term Disability Insurance," etc.).

8       The City has also wiped out retiree medical benefits (*Association of Retired Employees of*

9  *the City of Stockton v. City of Stockton,* 478 B.R. 8 (Bankr. E.D. Cal. 2012)), which the City

10  contends amounted to an approximately $545 million benefit.  *See* Trial Ex. 2044, at 2044_0005-

11  2044_0006 (summary of the Retirees Settlement); Amended List of Creditors and Claims

12  Pursuant to 11 U.S.C. §§ 924 and 925 (Retiree Health Benefit Claims) [Dkt. No. 1150].  Further,

13  the City has implemented its own lower retirement tier, as well as a new PEPRA level that will

14  further reduce pensions going forward.  By the City's estimate, the result is a 30-50% reduction to

15  the retirement package for current employees (50-70% for employees hired after January 1,

16  2013).  Deis DTD, ¶ 32.  These cuts have strained the City's relationship with its employees at a

17  time when those employees are working harder than ever.  *See* Deis Elig. Decl., ¶ 39.  Some

18  employees have lost their homes and/or were forced to declare bankruptcy.  Elig. Tr., March 25,

19  2013, AM, at 72:18-73:7 (testimony of Robert Deis).

20       The City has taken other steps to reduce its pension obligations as well.  The severe

21  staffing cuts prior to the Petition Date (20% of non-sworn police officer positions, 25% of sworn

22  police officer positions, 30% of fire positions, and 43% of non-safety positions) and

23  compensation reductions imposed by the City will significantly reduce the City's pension costs.

24  *See* Montes Elig. Decl., ¶ 20.  Additionally, the City has transferred a portion of its pension costs

25  to its employees through the negotiation of its collective bargaining agreements, which provide

26  _____

27  [27] Declaration of Robert Deis in Support of City of Stockton's Reply to Objections to Its Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 708, Trial Ex. 1377] ("**Deis Elig. Decl.**").

28  [28] Declaration of Ann Goodrich in Support of City of Stockton's Reply to Objections to Its Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 716, Trial Ex. 1384] ("**Goodrich Elig. Reply Decl.**").

1   for an increased employee pension contribution equal to 7-9% of the employee's salary.  The

2   City's implementation of its own lower retirement tier, as well as a new PEPRA level, will further

3   reduce pensions going forward.  As the Court stated in its eligibility opinion:

> Although the objectors complain bitterly that the City was not
> proposing directly to impair the rights of CalPERS, they do not
> address the obvious: material reductions in compensation to
> employees correlatively will tend to reduce the City's future
> pension obligations. In other words, renegotiated collective
> bargaining agreements providing for reduced compensation
> indirectly reduce the City's CalPERS obligations.

8   *In re City of Stockton*, 493 B.R. at 785.  At the July 8 hearing, the Court repeated that there was a

9   "de facto haircut [in pensions] associated with the reduction of employment and the various

10  concessions that had been made in collective bargaining agreements."  Conf. Tr., July 8, 2014, at

11  48:1-9 (comments of the Court).

12          Furthermore, while Franklin has sought to portray City pensions as exorbitant based on a

13  handful of outliers, the typical retiree pension is far from excessive.  To the contrary, the average

14  pension is relatively modest.  As of February 2012, the average pension received by retirees who

15  also were entitled to medical benefits was $51,000, while the average pension received by

16  employees without medical benefits was less than half that amount – $24,000.  Deis DTD, ¶ 32;

17  Haase Elig. Decl., ¶ 5; Millican Decl.,[29] Ex. A at 40, Figure 1.  As a result, the reduction in

18  benefits that would result from impairing the City's CalPERS contract "would leave many of the

19  City's retirees living below the poverty line." Deis DTD, ¶ 31.

20          Franklin also ignores that, due to the benefits reductions and burden shifting that have

21  been enacted, when the City's total post-employment compensation package (and not just

22  pensions) is considered, the City's obligations to former employees are already at the low end

23  compared to the "comparable cities" chosen by Franklin's own expert.  Conf. Tr., June 4, 2014, at

24  75:21-76:6, 76:24-77:10 and Trial Ex. 3086 (testimony of Andrew Belknap) (testifying that the

25  combined cost of post-employment benefits for Stockton was average among "comparable cities"

26  for Safety employees and ranked third-lowest for Miscellaneous employees).

27

28  [29] Declaration of David N. Millican in Support of City of Stockton's Statement of Qualifications Under Section
109(c) of the United States Bankruptcy Code [Dkt. No. 454, Trial Ex. 1376] ("**Millican Decl.**").

The City has done all that it can to reduce pensions and other post-employment obligations without terminating its relationship with CalPERS. And to their credit, the City's employees and retirees have accepted these reductions, after long and hard negotiations, as necessary to the City's long-term health. The City cannot now impair pensions, on top of all of the other cuts borne by active and former employees, without causing a mass exodus of its employees.

### 5. The City's Impairment Of Pensions Will Breach Its Labor Agreements.

In addition to risking a mass exodus of employees, any impairment of pensions would also unravel the City's current labor agreements, as well as its penny on the dollar settlement with the Retirees Committee – which was overwhelmingly ratified by the health benefits claimants who voted on the Plan[30]. Those agreements, which were the product of difficult negotiations and resulted in major compensation and benefits reductions (and a huge corresponding savings to the City), depend in part on the maintenance of pensions. During the confirmation hearing, counsel for the Retirees Committee stated that cutting pensions on top of the other sacrifices made by retirees would "create a change in the game," Conf. Tr., May 13, 2014, at 184:25-185:1 (comments of the Retirees Committee), and counsel for the Stockton Police Officers Association confirmed that "[t]he market for police officers is not going to bear any further cuts." Conf. Tr., June 4, 2014, at 149:8-9 (SPOA closing argument). If the labor agreements are unwound because the City is forced to impair pensions, the City will be back to square one with respect to its negotiations with these groups.[31] This would further strain the City's relationship with its employees and erase months of good faith negotiations overseen by Ralph Mabey prior to chapter 9 and Judge Perris following the filing of this case.

/ / /

---

[30] Of the 993 Class 12 ballots received, 977 ballots – representing 98.39% in number of votes and 91.25% in dollar amount of Class 12 claims – accepted the Plan. *See* Direct Testimony Declaration of Catherine Nownes-Whitaker in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1380, Trial Ex. 3065], ¶ 10.

[31] Moreover, as the current labor contracts were entered into after bankruptcy was filed, the treatment of those agreements as administrative versus general unsecured claims may have to be litigated.

**B.**     <u>The City's Plan Properly Classifies Pension Claims Separately From General Unsecured Claims.</u>

A potential ruling that pensions can be impaired would not render the Plan unconfirmable on account of its classification of claims. The underlying question is whether the City's classification of its unsecured pension claims separate from other general unsecured claims would still be appropriate in light of such a ruling. The answer to that question is an unqualified "yes." The City's decision to separately classify pension claims is based on concrete differences in the legal character of these claims and other unsecured claims and on the City's sound judgment that it cannot impair pensions without losing critical employees and threatening health and safety. Neither of those premises would be altered by a ruling that the City had the ability to impair pensions.

As discussed in detail in the City's earlier briefs, both debtors and bankruptcy courts are given significant discretion in the classification of claims under 11 U.S.C. § 1122, including the classification of unsecured claims. *See Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1993) ("bankruptcy court judges must have discretionary power in classifying claims under *§ 1122(a)*.") (emphasis in original); *In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1321 (7th Cir. 1995) (debtor has "considerable discretion" to classify claims, and may separately classify claims where significant differences exist between the legal rights of the holders that render the claims not substantially similar, if there are good business reasons to do so, or if the claimants have sufficiently different interests in the plan).

The Bankruptcy Appellate Panel for the Ninth Circuit has held that bankruptcy courts should apply a two-pronged analysis to determine whether the debtor has classified claims properly. *Wells Fargo Bank, N.A. v. Loop 76 (In re Loop 76, LLC)*, 465 B.R. 525, 537 (B.A.P. 9th Cir. 2012). First, the court must determine whether the claims are substantially similar. Dissimilar claims may not be classified in the same class, though similar claims are not necessarily required to be classified together. *See also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) (holding that bankruptcy courts may place similar claims in different classes because while section 1122(a)

requires that a claim may only be placed in a particular class if it is substantially similar to the other claims in that class, it does not require that all similar claims be placed within the same class). Second, if the claims are substantially similar, the debtor may classify them in different classes if it "can show that there is a business or economic justification for doing so." *Id.* at 536. *See also Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1525 (9th Cir. 1996) (holding that similar claims may be placed in different classes so long as the separate classification is not done solely to manipulate class voting); *Steelcase*, 21 F.3d at 328 (upholding separate classification of unsecured creditors "where the legal character of their claims is such as to accord them a status different from the other unsecured creditors.").

The Plan classifies pension claims separately from Franklin's unsecured claim, which is included in Class 12 along with the other General Unsecured Claims, including the Retiree Health Benefit Claims, the Leave Buyout Claims, the Claim filed by Michael A. Cobb and Other Postpetition Claims.[32]

Applying the first prong of the analysis set forth in *Loop 76*, the pension claims are not substantially similar to Franklin's unsecured claim. Indeed, above and beyond the fact that the City will struggle to survive if pension claims are impaired, there are fundamental differences between the pension claims and other unsecured claims. The City's obligations to CalPERS for the benefit of CalPERS Pension Plan Participants are of a distinctly different legal character than its obligations under the recharacterized lease back with Franklin. Specifically, in contrast to the lease back, through its contract with CalPERS, the City has elected to enter into a statutorily-created pension system that binds it to the provisions of the Public Employees' Retirement Law (Cal. Gov. Code § 20000 et seq.) (the "**PERL**"). Thus, the City's obligations to CalPERS are defined not only by the language of the CalPERS contract, but also by an extensive and complex state law. In addition, as is the case with the Pension Obligation Bonds Claims, restricted funds

---

[32] The City has also separately classified the Pension Obligation Bonds Claims based on: (1) the availability of certain restricted funds to pay a portion of the Pension Obligation Bonds Claims; (2) the settlement reached between the City and Assured Guaranty in light of potential litigation over the treatment of Pension Obligation Bonds Claims; and (3) the City's need for a continued lease at 400 East Main Street and the favorable lease acquired by virtue of the settlement. Because the treatment of the Pension Obligation Bonds Claims has been dealt with extensively in prior briefs, it will not be readdressed here.

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    are available to pay a portion of the City's pension claims, while they are not available to

2    Franklin's claims.[33]

3         Turning to the second prong of the analysis set forth in *Loop 76*, even if the pension

4    claims and Franklin's unsecured claim were substantially similar, the City may classify them

5    separately as long as it can demonstrate that there is a business or economic justification for doing

6    so. *In re Loop 76*, 465 B.R. at 536 ("The Code does not expressly state whether a plan must

7    classify similar claims together."). As evidenced by the record and described in detail in this

8    brief, there are indisputably sound bases for the City's decision to classify its pension claims

9    separately from the other General Unsecured Creditors in Class 12. The City simply has no

10    choice but to maintain its pensions in full. The City cannot impair its pensions and risk losing

11    critical City employees in droves and cannot avail itself of a feasible, timely, and less costly

12    pension alternative. Because the nature of the City's contract with CalPERS is such that

13    impairing pensions would force a complete termination of the contract, the imposition of an

14    immediate $1.6 billion termination liability, and a 3-year exclusion from the CalPERS system, the

15    City cannot just "take a little off the top" to pay other creditors. Without a feasible alternative,

16    the City's treatment of its pension claims is an all-or-nothing decision. The City has already done

17    what it could to indirectly reduce its pension obligations through staffing and compensation cuts,

18    thereby freeing up money for other creditors. It cannot go further without threatening its long-

19    term viability.

20         The classification scheme is in complete harmony with Ninth Circuit law. For example,

21    in *Barakat*, the Ninth Circuit held that the bankruptcy court did not err in its decision to invalidate

22    the debtor's separation of trade creditor claims from general unsecured claims because "'literally

23    thousands of companies are available to provide the[] services of the trade creditors, thus none of

24    the trade creditors were essential to Debtor's maintenance of the apartment building.'" *Barakat*,

25

26    [33] *See* Direct Testimony Declaration of Kenneth Dieker in Support of Confirmation of First Amended Plan for the

27    Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1369, Trial Ex. 3047], ¶ 22 (explaining that the POBs "funded payment of pension benefits for City employees, including current and retired City employees whose compensation and benefits . . . were paid by monies from Restricted Funds" and that,

28    "[b]ecause approximately 17% of City's pension obligations may lawfully be funded by special fund revenue, such revenues may be used to pay 17% of the debt service obligations on the POBs")

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    99 F.3d at 1528.  By contrast, here, it is essential that the City maintain its pensions in full for all

2    of the reasons set forth above.

3         Furthermore, in the event that Franklin argues that the Plan should not be confirmed

4    because it subjects Franklin's claim to unfair discrimination, it should be noted that the unfair

5    discrimination standard applies only under section 1129(b) when a class has not accepted a plan.

6    Here, the claimants in Class 12 have voted to accept the plan by an overwhelming margin.  *See*

7    *also In re Jersey City Medical Center*, 817 F.2d 1055 (3d Cir. 1987) (court rejected dissenting

8    creditor's contention that bankruptcy court erroneously confirmed chapter 9 debtor's plan on the

9    ground that disparate treatment of the dissenting creditor's class and the other general unsecured

10   creditors violated section 1129(b)). Here, Class 12 accepted the Plan, and the Plan was proposed

11   in good faith.

12        The City's business rationale for separately classifying its pension claims is unassailable.

13   Both the nature of the claims and the potential consequences of their impairment distinguish these

14   claims from the other General Unsecured Claims in Class 12.  Separate classification is therefore

15   entirely proper, and there is no reason that a ruling that pension claims can be impaired would

16   necessitate an alteration in the City's classification decisions.  Whether or not impairment is a

17   legal option, the City's decision to separately classify and maintain its pensions is firmly based on

18   its sound business judgment.

19   **C.    The CalPERS Lien Applies Outside Of Bankruptcy, And Would Limit What
             Creditors Could Expect To Receive If The City's Bankruptcy Case Were**
20   **        Dismissed.**

21        While the City takes no position on whether the CalPERS Lien is avoidable in a

22   bankruptcy case, the Court's discussion of that statutory lien implicates another element of the

23   confirmation process, namely the best interest of creditors test under Bankruptcy Code

24   section 943(b)(7).  The proper interpretation and application of the best interest test has been

25   extensively briefed, and the City will not repeat its arguments here.  However, it is worth noting

26   that under either party's theory, whether the Plan satisfies the best interests test depends at least in

27   part on how the City's creditors, including Franklin, would be treated outside of bankruptcy.

28

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    The existence of the CalPERS Lien leaves no doubt but that the City's non-CalPERS

2    creditors could only do worse in a classic "rush to the courthouse" scenario.  Even if the Court

3    were to hold that the CalPERS Lien was unenforceable in bankruptcy,[34] there is no reason to

4    believe that the lien would not be valid under California law outside the bankruptcy context.  As a

5    result, outside of bankruptcy, the City would have no option other than to continue making its

6    pension payments because not doing so would invite CalPERS to terminate the pension plan,

7    which would result in the CalPERS Lien attaching to all of the City's assets to secure payment of

8    the immediate $1.6 billion termination liability.  In that event, the claims of the City's other

9    creditors would be subordinate to CalPERS, and creditors could expect to receive only whatever

10   assets and income remained after CalPERS was paid.  If the City lacked the funds to pay its

11   current CalPERS obligation, the CalPERS Lien would effectively provide CalPERS the ability to

12   dictate who and how much the City was permitted to pay.

13        Thus, despite its claims to the contrary, Franklin could not possibly hope to receive a

14   greater recovery outside of bankruptcy than that provided in the Plan.  Not only would Franklin

15   be forced to compete with the City's other creditors for what few assets were left after CalPERS

16   enforced its lien, but the CalPERS Lien would also trump Franklin's own security.  This means

17   that Franklin would not even be able to recover the approximately $4 million of cash provided for

18   its secured claim under the Plan.

19   **III.    <u>CONCLUSION</u>**

20        The City urges the Court to confirm the Plan and to do so as promptly as possible.  During

21   the two years of this bankruptcy case, businesses have been reluctant to invest in Stockton and the

22   City has struggled with hiring and retaining personnel.  Potential employees are hesitant to join

23   the City so long as the future of the City's pensions is uncertain, while current employees eyeing

24   transfers to other agencies wonder if they need to leave while they have the chance.  Since the

25   July 8 hearing, the City has received a deluge of calls from employees, pensioners, and labor

26

27   [34] At the July 8 hearing, the Court raised the potential for the appointment of a trustee under 11 U.S.C. § 926 to
     pursue avoidance of the lien under Bankruptcy Code § 545.  Because the City does not intend to impair pensions, the
28   CalPERS Lien would not arise and the Court would not have to reach the issue of whether a trustee should be
     appointed to seek to set it aside.

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1  representatives seeking clarity on the future of City pensions.  Because of the high-level of public

2  concern on this issue, any further delay may well result in the ill consequences the City fears

3  *before* a final ruling can even be rendered.  The City is not asking the Court to confirm an

4  unconfirmable plan.  It has satisfied the Bankruptcy Code's confirmation requirements, and this

5  brief demonstrates that the City's decision not to impair pensions does not alter the fact of the

6  City's and the Plan's compliance with the Bankruptcy Code.

7       Based on the foregoing, the City respectfully requests that the Court confirm the Plan.

8

9  Dated: August 11, 2014                    MARC A. LEVINSON

10                                        NORMAN C. HILE

                                      PATRICK B. BOCASH

11                                        Orrick, Herrington & Sutcliffe LLP

12

13                   By: _____ */s/ Marc A. Levinson*_____

                                    MARC A. LEVINSON

14                                      Attorneys for Debtor

                                    City of Stockton

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CITY OF STOCKTON'S SUPP. BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT