**40**

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone:     +1-916-447-9200
Facsimile:     +1-916-329-4900

Attorneys for Debtor
City of Stockton

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No.  2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | D.C. No. OHS-15 |
| Debtor. | Chapter 9 |
| | **CITY'S SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED PLAN OF ADJUSTMENT, AS MODIFIED (AUGUST 8, 2014)** |
| | Date:        October 1, 2014<br>Time:        10:00 a.m.<br>Dept:        Courtroom 35<br>Judge:      Hon. Christopher M. Klein |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   ARGUMENT ................................................................................................ 2

   A.   The Court Need Not Reach The Question Of Whether The City's Pension Obligations Can Be Impaired Through Bankruptcy .............................. 2

   B.   The Plan Properly Classifies Franklin's Claim .................................... 3

   C.   The Plan Is In The Best Interests Of Creditors ................................... 5

      1.   The Plan Satisfies The Best Interests Of Creditors Test ............ 5

      2.   The City Is Not Hoarding Money In Its Long-Range Financial Plan Or In Its Public Facilities Fees ................................................... 8

      3.   The Payment Of Franklin's Secured Claim Is Consistent With The LRFP ........................................................................................ 11

   D.   The Plan Does Not Discriminate Unfairly Against Franklin .............. 13

      1.   The Unfair Discrimination Test Does Not Apply ..................... 13

      2.   Regardless, The Plan Does Not Unfairly Discriminate Against Franklin ...................................................................................... 15

         a.   The Ninth Circuit's Four-Factor Test Sets Forth The Requirements For Fair Discrimination Under Section 1129(b)(1) ......................................................................... 15

         b.   The City's Treatment Of Franklin And Its Other Creditors Satisfies The Ninth Circuit's Requirements For Fair Discrimination Under Section 1129(b)(1) ................... 17

            (i)    The Plan's Treatment Of Franklin And Its Other Creditors Is Supported By Many Reasonable Bases Rooted In The City's Business Judgment .......... 17

            (ii)   The Treatment Of Franklin And Its Other Creditors Is Necessary For The City's Adjustment Of Its Debts ............................................ 18

            (iii)  The City Proposed Its Treatment Of Franklin And Its Other Creditors In Good Faith ............................ 18

            (iv)   The Degree Of Difference Between The City's Treatment Of Franklin and Its Treatment Of Its Other Creditors Is Directly Related To Its Business Reasons For Offering Them Different Recoveries .................................................................. 19

            (v)    Summary ................................................................... 19

   E.   There Is No Viable, Less Costly Alternative To CalPERS That Would Allow The City To Offer Competitive Pension Benefits ...................... 20

      1.   None Of The Alternatives Considered By The City Would Provide Competitive Pension Benefits At A Lower Cost .......................... 20

      2.   A Defined Contribution Plan Is Not A Viable Alternative ....... 23

      3.   The City Is Not "Shielding" Employees From The Burden Of The Restructuring ............................................................................. 25

**TABLE OF CONTENTS**
(continued)

4.      If Pensions Are Cut, City Employees Will Leave And The City
Will Struggle To Attract Qualified Replacements....................................27

5.      The City Cannot Use Savings From Slashed Accrued Benefits To
Increase Benefits In The Future.............................................................30

F.      The City Has Proposed The Plan In Good Faith...................................32

G.      Even If The Court Were To Rule That The City's Relationship With
CalPERS Was An Executory Contract, The City's Decision To Assume
That Contract Would Be A Reasonable Exercise Of Its Business Judgment .......33

III.    CONCLUSION.............................................................................................34

**TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*Ass'n of Retired Employees of City of Stockton v. City of Stockton*,
    478 B.R. 8 (Bankr. E.D. Cal. 2012) ................................................................... 25

*In re Ambanc La Mesa Ltd.*,
    115 F.3d 650 (9th Cir. 1997), *cert. denied* 522 U.S. 1110 (1998) ...................... 15

*In re Anderson*,
    2012 WL 3133895 (Bankr. D. Mont. 2012) ........................................................ 15

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ........................................................ 14, 15

*In re Bashas' Inc.*,
    437 B.R. 874 (Bankr. D. Ariz. 2010) ................................................................. 15

*In re City of Stockton*,
    493 B.R. 772 (Bankr. E.D. Cal. 2013) ................................................................. 7

*In re Coastal Equities Inc.*,
    33 B.R. 898 (Bankr. S.D. Cal. 1983) ............................................................. 17, 18

*In re Corcoran Hosp. Dist.*,
    233 B.R. 449 (Bankr. E.D. Cal. 1999) ................................................................ 14

*In re Creekstone Apartments Assocs., L.P.*,
    168 B.R. 639 (Bankr. M.D. Tenn. 1994) ........................................ 16, 17, 18, 19

*In re Dow Corning Corp.*,
    244 B.R. 705 (Bankr. E.D. Mich. 1999) ............................................................. 19

*In re Freshley*,
    69 B.R. 96 (Bankr. N.D. Ga. 1987) .................................................................... 16

*In re Hawaiian Telecom Commc'ns, Inc.*,
    430 B.R. 564 (Bankr. D. Haw. 2009) ................................................................. 15

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987) ............................................................................ 14

*In re Kliegl Bros. Universal Elec. Stage Lighting Co.*,
    149 B.R. 306 (Bankr. E.D.N.Y. 1992) .......................................................... *passim*

*In re Loop 76, LLC*,
    465 B.R. 525 (B.A.P. 9th Cir. 2012) .................................................................... 3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) .................................................................. 5

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) ................................................................................ 33

*In re Perskin*,
    9 B.R. 626 (Bankr. N.D. Tex. 1981) ................................................................. 16

*In re Pierce County Hous. Auth.*,
    414 B.R. 702 (Bankr. W.D. Wash. 2009) ............................................................ 5

*In re Pomona Valley Medical Group, Inc.*,
    476 F.3d 665 (9th Cir. 2007) ............................................................................. 33

*Steelcase Inc. v. Johnston (In re Johnston)*,
    21 F.3d 323 (9th Cir. 1994) ................................................................................. 3

*In re Western Real Estate Fund, Inc.*,
    75 B.R. 580, 586 (Bankr. W.D. Okla. 1987) ..........................................16, 17, 19

*In re Wolff*,
    22 B.R. 510 (9th Cir. BAP 1981) ...................................................................... 15

**Statutes**

11 U.S.C.

    § 365 ................................................................................................................... 33

    § 943(b)(7) ....................................................................................................... 5, 6

    § 1122 .................................................................................................................. 3

    § 1129(a)(3) ....................................................................................................... 32

    § 1129(b) ............................................................................................................ 15

    § 1129(b)(1) ................................................................................................. *passim*

    § 1322(b)(1) ....................................................................................................... 15

Cal. Gov't Code § 20485 ...................................................................................... 24

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Other Authorities**

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*,
 72 Am. Bankr. L.J. 227 (1998)......................................................................................... 24

*Collier on Bankruptcy*

 ¶ 943.07[7][a] ................................................................................................................. 5

 ¶ 1122.03[3][a] ............................................................................................................. 14

 ¶ 1129.03[3]................................................................................................................... 15

 ¶ 1129.03[3][a] ............................................................................................................. 15

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

I.      **INTRODUCTION**

In formulating its plan of adjustment, Stockton was driven by a desire to achieve negotiated settlements with its various creditor constituencies—institutional debt, current employees and retirees, among others—each of which was owed millions if not hundreds of millions of dollars, and each of which was competing for a pot of money that is woefully inadequate to pay creditors in full.  But the City's overarching goal, in fact, its mandate, was to return to financial and service solvency such that its residents would remain and pay taxes, local businesses would thrive and new businesses would be established, City employees would continue to work for the City, and job-seekers would view Stockton businesses and the City itself as desirable employers.

The City is close to achieving those goals, but the fight in this Court goes on because the City has been unable to reach agreement with one creditor, Franklin.  Contrary to Franklin's assertions, Stockton did not single Franklin out and set out to punish it for failing to make a deal. Rather, given no choice because a settlement could not be reached, the City proposed a plan that satisfies the requirements of the Bankruptcy Code and that is confirmable over Franklin's objection.

The City is submitting this brief—hopefully the last it will file in this case – in response to the Court's questions and Franklin's arguments about pension obligations.  Franklin has made a full frontal assault on pensions, taking on CalPERS, among others, on the issue of whether the City and this Court have the power to impair pensions.  As it did in its opening brief filed on August 11th, the City does not join this battle because whether or not it has the legal ability to impair pensions, it will not risk its future by gambling on whether City employees will flee if their pensions are cut by 60% and on whether prospective employees will seek jobs in Stockton.

It is easy for Franklin to argue that the City must disavow its pension obligations because it bears no risk if the City's fears of employee flight bear out.  In that event, it will not be Franklin that suffers the harm.  And it is easy for Franklin to summarily dismiss all of the City's evidence in support of its business decision as "hypothetical" or "self-interested."  And it is easy for Franklin to submit no substantive evidence to rebut the City's decision and to rely instead on the

1   argument of counsel and the unsupported, anecdotal testimony of a financial (not pension, not

2   labor) expert from Michigan who did not speak with a single City officer, and who admitted

3   ignorance of nearly all of the critical California statutes and propositions at issue.  What is hard is

4   making the right decisions for the City and its constituents, negotiating meaningful settlements,

5   and creating in good faith a plan of adjustment that provides a fair recovery for the City's

6   creditors while also allowing the City to return to service and budget solvency.  City officials and

7   staff have of necessity made all of those hard decisions and, unlike Franklin, will have to live

8   with their consequences.

9          This brief, like the City's August 11 brief, discusses the evidence that proves beyond

10  question that the City's pension decision was rational, and, in fact, unavoidable.  The brief also

11  explains why the Plan satisfies the Bankruptcy Code's confirmation requirements.  The

12  confirmation discussion, among other things, points out the fallacy in Franklin's constant but

13  baseless assertions that cram down is at issue and that the Plan discriminates unfairly against it.

14         On October 1, the City will have been in bankruptcy for almost exactly 27 months.  The

15  City has acted in good faith throughout this case, and its residents have borne substantial service

16  cuts and have voted to impose a hefty sales tax increase in order to allow the City to propose a

17  feasible plan.  The City needs to move on.  For the reasons stated in this brief as well as in all of

18  the City's prior filings, the Court should confirm the Plan.

19  **II.     ARGUMENT**

20         **A.     The Court Need Not Reach The Question Of Whether The City's Pension
               Obligations Can Be Impaired Through Bankruptcy.**

21

22         The Court can confirm the Plan[1] without reaching the question of whether the City can

23  impair pensions, despite Franklin's protestations to the contrary.  *See* Franklin Post-Trial Br.,[2] at

24  5-9.  As demonstrated below, in the City's prior briefs, and at the Evidentiary Hearing, the Plan

25  satisfies all of the Bankruptcy Code confirmation requirements.  This would be the case even if

26

27  _____
    [1] First Amended Plan for the Adjustment of Debts of City of Stockton, California, as Modified (August 8, 2014)
    [Dkt. No. 1645] ("**Plan**"). Any capitalized term used but not defined herein shall have the meaning ascribed to it in
28  the Plan.
    [2] Franklin's Post-Trial Brief [Dkt. No. 1689] ("**Franklin Post-Trial Brief**").

1　the Court were to find that the City has the ability to impair pensions through bankruptcy if it

2　chose to do so.  The Court can therefore confirm the Plan while assuming, without deciding, that

3　the City has the ability to impair pensions.

4　　　　**B.　　The Plan Properly Classifies Franklin's Claim.**

5　　　　　Classification has been briefed at length[3], so the City will merely note that debtors are

6　afforded considerable discretion in classifying claims under 11 U.S.C. § 1122 and can separately

7　classify similarly-situated claims when their legal character is different or when there are business

8　or economic justifications for doing so.  *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323

9　(9th Cir. 1994); *In re Loop 76, LLC*, 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012).

10　　　　　Notwithstanding the proper classification scheme of the Plan, Franklin continues to accuse

11　the City of gerrymandering because it understands that the unfair discrimination test applies only

12　"with respect to *each class of claims* or interests that is impaired under, *and has not accepted*, the

13　plan."  11 U.S.C. § 1129(b)(1) (emphasis added).  Thus, as is discussed below, since Class 12 has

14　accepted the Plan by an overwhelming margin, Franklin, as a dissenting creditor within an

15　accepting class, lacks standing to object to the Plan on the ground of unfair discrimination.  And

16　while Franklin bemoans its treatment, it ignores the fact that almost all of the approximately

17　1,100 Retiree Health Benefit Claimants in Class 12 voted to give up lifetime health benefits for

18　themselves and their dependents.  This is a real and meaningful sacrifice made by the Retiree

19　Health Benefit Claimants in order to allow the City to confirm a feasible Plan, and not a ploy

20　manufactured to punish Franklin, as it repeatedly suggests.

21　/ / /

22　/ / /

23　/ / /

24　/ / /

25

26　---

[3] *See, e.g.,* City's Supplemental Memorandum of Law in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1309] ("**City Suppl. Mem.**"),

27　§ III.A; City's Memorandum of Law in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1243] ("**Conf. Mem.**"), § IV.A.1; City's

28　Supplemental Brief in Support of Confirmation of the First Amended Plan of Adjustment, As Modified (August 8, 2014) [Dkt. No. 1657] ("**City Post-Trial Br.**"), § II.B.

　　　CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    Franklin objects to its deficiency claim[4] being placed in the same class as the Retiree

2    Health Benefit Claims while the pension claims are classified separately, arguing, in effect, that

3    the Plan should create classes of creditors and not classes of claims. Ignoring the fact that it holds

4    both a secured and unsecured claim in different classes, Franklin continues to urge that both the

5    Retiree Health Benefit Claims and the pension-related claims (which are held by both employees

6    and retirees) should be placed into a single class, Class 12. Franklin's argument is clearly

7    inconsistent with basic bankruptcy law.[5]

8        As the City has explained in its prior submissions to the Court, classifying the unsecured

9    Retiree Health Benefit Claims (even though the approximately 1,100 Retiree Health Benefit

10   Claimants also hold pension claims) together with the unsecured Franklin deficiency claim (even

11   though Franklin holds a secured claim) is entirely proper because both sets of general unsecured

12   claims have the same legal character. As the City has also explained, separately classifying the

13   claims of other creditors that have entered into compromise agreements with the City (e.g.,

14   Ambac, NPFG, Assured, etc.) and/or whose claims have a contractual component that will be

15   assumed or honored by the City under the Plan (e.g., Stockton Police Officers' Association,

16   employee and retiree pension obligations, the SEB claims of NPFG, etc.) is entirely proper even

17   if some component of those claims could be characterized as being unsecured, because those

18   claims now have a different legal character than the purely unsecured claims of Franklin, of the

19   / / /

20

21   [4] Franklin's unsecured claim was created when the City, for tactical reasons, chose to forego litigating whether
     Franklin's collateral should be treated as a lease. The City decided to proceed in such a fashion to streamline the

22   bankruptcy case and simplify the issues at the Evidentiary Hearing. Franklin's contention that the City "concede[d]
     defeat before trial" on this issue misstates the record. As the City made abundantly
     clear in its Motion for Judgment, [Adv. Dkt. No. 28] ("**Mtn. For Judgment**"), it made the strategic decision to treat

23   Franklin's claim as a financing transaction in order to avoid "spend[ing] valuable time and resources on a battle over
     form," and did so "solely to move the case more quickly and efficiently towards confirmation of a plan of

24   adjustment." Mtn. for Judgment, at 2. Counsel for the City reiterated this purpose at the April 7, 2014 hearing on the
     Motion for Judgment, explaining that the City "filed this motion in an attempt to streamline the trial," and the Court

25   itself stated that "anything that actually simplifies the process will probably help everybody." Transcript, April 7,
     2014, at 25:25-26:15, 42:21-24. Franklin's description of the City's tactical decision as a concession of a "baseless

26   and discredited argument" is flat out wrong, if not intentionally misleading. Franklin Post-Trial Br., at 3.
     [5] Franklin complains bitterly that retirees and employees will receive payment of their pension benefits in full, and

27   continues to erroneously assert that it will receive a sub-1% payment on its claim—ignoring the $4,052,000 in cash it
     will be paid on account of its secured claim. Franklin Post-Trial Br., at 40 ("Franklin, on the other hand, gets no

28   corresponding benefit to accompany the sub-1% recovery on its unsecured claim."). In fact, Franklin makes more
     than two dozen references in its brief to its purported "sub-1%" recovery, but completely ignores that it is being paid
     100% of its secured claim. Franklin Post-Trial Br., at 1, 2, 4, 5, 6, 9, 34, 35, 36, 39, 40, 41, 45, 46, 52, 63, and 64.

1　Retiree Health Benefit Claimants and of the other Class 12 creditors, such as holders of Leave

2　Buyout Claims.

3　　　　Moreover, the City has valid business justifications for separately classifying the Claims

4　of NPFG, Assured, Ambac and others, among them being that separate classification is necessary

5　to implement the compromises and settlements reached with the holders of those claims.  The

6　City's business reasons for reaching agreement with NPFG in order to retain the Arena and the

7　parking garages, for reaching agreement with Ambac in order to retain the Essential Services

8　Building and for reaching agreement with Assured Guaranty in order to shed itself of the cost of

9　retaining 400 East Main in the long run while obtaining a new City Hall for the next 8 to 12 years

10　at a below market rate were the subject of testimony at the Evidentiary Hearing and briefs filed

11　previously.  The City's business reasons for concluding that its pension obligations are

12　significantly different than its pure general unsecured obligations also were the subject of

13　testimony at the Evidentiary Hearing, and are discussed below.

14　　　　**C.**　　　**The Plan Is In The Best Interests Of Creditors.**

15　　　　　　　**1.**　　　**The Plan Satisfies The Best Interests Of Creditors Test.**

16　　　　As the City has described in its prior briefs, the Plan satisfies the "best interests" test of 11

17　U.S.C. § 943(b)(7).[6]  In chapter 9, a plan satisfies the best interests test when it represents "a

18　reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal

19　of the case."  *See* Collier on Bankruptcy ¶ 943.03[7][a] (16th ed. 2014) ("**Collier**"); *see also In re*

20　*Pierce County Hous. Auth.*, 414 B.R. 702 (Bankr. W.D. Wash. 2009); *In re Mount Carbon Metro.*

21　*Dist.*, 242 B.R. 18, 37-38 (Bankr. D. Colo. 1999).  This is a relatively low standard.  *Mount*

22　*Carbon*, 242 B.R. at 37; *see also* Collier ¶ 943.03[7][a] ("The municipal debtor is not required to

23　meet too strict a standard, and the plan can go forward with the consent of all classes of creditors.

24　/ / /

25

26　[6] Franklin incorrectly claims that the Plan's supporters "say next to nothing" about the best interests test. Franklin Post-Trial Br. at 34.  While the City's Post-Trial Brief focused on the finite additional issues raised by the Court at

27　the July 8 hearing, the City has repeatedly and fully laid out its position that the Plan satisfies the best interests of creditors test.  *See* Conf. Mem., § IV.G.1; City Suppl. Mem., § III.B; City's Response to Supplemental Objection of Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund to Confirmation of

28　First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1435] ("**Response**"), § II; City Post-Tr. Br., § II.C.

1  The court must also temper its examination into the debtor's ability to pay with due regard for the

2  debtor's exercise of its political and governmental powers.").

3      Section 943(b)(7) requires only that the Plan be in the "best interests of creditors"

4  generally, and not in the best interests of Franklin as an individual dissenting creditor.  This is

5  clear from the plain language of section 943(b)(7), as well as the legislative history of that

6  section.  *See* City Suppl. Mem., at 19-21 (discussing 124 Cong. Rec. 32,403 (Sept. 28, 1978)

7  (statement of Rep. Edwards)).  Thus, contrary to Franklin's repeated assertions, the Plan need not

8  provide the best possible recovery to each individual creditor in order to satisfy the best interests

9  standard.  *Id.*  It need only make a reasonable effort to provide a better recovery to its creditors as

10  a whole than could be achieved through dismissal.[7]

11      The Plan undoubtedly satisfies this standard.  It makes a reasonable effort to provide a fair

12  recovery to its creditors as a whole, while allowing the City to continue its recovery and to

13  address lingering service and deferred maintenance needs.  The City's effort in this regard is

14  amply demonstrated by the City's earnest work to reduce expenses and raise revenues, including

15  the passage of Measure A, in order to provide for payment of creditors.  The City's reasonable

16  effort also is evidenced by the City's having reached mediated agreements with all but one of its

17  major creditors and creditor groups.  There can be no doubt that absent these efforts, creditor

18  recoveries would be substantially diminished.

19      The Plan also is clearly superior to any recovery that the City's creditors, including

20  Franklin, could hope to achieve outside of bankruptcy.  Dismissal of this bankruptcy case would

21  result in a chaotic race to the courthouse by thousands of individual claimants, the depletion of

22  the City's remaining resources, and the potential imposition of a staggering termination liability

23  and lien by CalPERS (the "**CalPERS Lien**").  As the Court itself has stated, if the City's

24  bankruptcy case were dismissed, the result would be even greater financial difficulties than the

25

26  [7] This plain reading of section 943(b)(7) was also adopted by the City of Detroit in its recent confirmation hearing.
Represented by Jones Day, Detroit argued that "the alternative of course in a Chapter 9 case is dismissal," that "the

27  relevant standard is not whether someone can conjure up . . . a particularly rosy scenario for that creditor," and that
"[t]he test in Chapter 9 for best interests looks at the creditor body as a whole."  *See* Request for Judicial Notice In

28  Support of City's Supplemental Reply Brief ("RJN"), Ex. A, at 4:10-5:3; *see also* RJN, Ex. A, at 12:22-13:2
("Chapter 9 very clearly states that the test relates to creditors generally").

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

City already faces. *In re City of Stockton*, 493 B.R. 772, 791-92 (Bankr. E.D. Cal. 2013) ("**Eligibility Opinion**") ("If the City's case were to be dismissed . . . then even more financial trouble would be in store."). The City's negotiated settlements with its retirees and labor organizations, and possibly with one or more of the other capital markets creditors, would unravel, sending the City and these creditors back to square one. Restarting these negotiations and litigations would deplete resources that would otherwise have gone towards creditor recoveries and remedying the City's service insolvency.

Moreover, the CalPERS Lien and the termination liability would prevent any meaningful recovery for the City's other creditors. Regardless of whether the CalPERS Lien is enforceable in bankruptcy, it would apply with full force absent bankruptcy. In that scenario, the City would have no alternative but to continue making its pension payments. If it did not, CalPERS would terminate the City's pension plan, and the CalPERS Lien would attach to all of the City's assets in order to secure payment of its immediate $1.6 billion termination liability. In the face of this massive liability secured by a priming lien, none of the City's other creditors could expect to receive any recovery until CalPERS was paid on a current basis, including the current portion of the City's unfunded pension obligation. All of the City's obligations, including Franklin's now-secured claim, would be subordinate to the CalPERS Lien. Under such circumstances, none of the City's creditors would be better off.

Nor would Franklin benefit if the City was forced to terminate its CalPERS contract in this bankruptcy case and take on an immediate $1.6 billion claim that would completely swamp Class 12, including Franklin's deficiency claim.[8] Franklin asserts, without any facts or analysis, that the termination liability would not diminish Franklin's recovery because "[t]ermination of the City's relationship with CalPERS would not result in a <u>new</u> liability." Franklin Post-Trial Br., at

---

[8] Franklin contends that the City's "current alleged termination liability is substantially smaller than the hypothetical liability calculated by CalPERS" as of June 30, 2012. Franklin Post-Trial Br., at 61. However, Franklin bases this assertion on new "evidence" (i.e. news articles) relating to a tiny fraction of the factors that go into calculating the City's termination liability and provides no calculation as to what the "new" termination liability should be. This is mere legal argument, and the media reports cited by Franklin are not proper evidence. The evidence presented at the Evidentiary Hearing, in the form of the testimony of David Lamoureux, was that the best estimate of the City's termination liability was $1.6 billion. Moreover, it is fair to say that even if that liability were reduced by as much as half a billion dollars to $1.1 billion (which is extremely unlikely), it would still dwarf Franklin's $32 million unsecured claim.

1    53 (emphasis in original).  This argument ignores the fact that the termination liability would

2    come due *immediately*, and would thus prevent any increase in payments to Class 12 in any case.

3    For instance, if the termination liability were added to Class 12,[9] then before the City could pay

4    any *other* class 12 claimant *more*, it first would have to pay CalPERS the approximately 1%

5    payout currently allotted to everyone else.  So, before Franklin could recover even one more

6    dollar, the City would need to come up with an additional $16 million to pay to the CalPERS

7    claim as of the Effective Date.  Then, for every additional dollar Franklin would hypothetically

8    recover above its current allotment, the City would also have to pay approximately $50 to

9    CalPERS and an additional $17 dollars to the Retiree Health Benefit Claimants (based on the

10   relative sizes of their claims).  So, in order for Franklin to receive even double its current

11   recovery (an additional ~$320,000), the City would have to find an additional $37.76 million

12   ($21.76 million in payments to Franklin, CalPERS, and the Retiree Health Benefit Claimants,

13   plus $16 million for the initial CalPERS payment) above and beyond what the Plan already

14   provides to Class 12.  The City clearly lacks the ability to pay this amount as of the Effective

15   Date.  In fact, the City would have less money available than it does today due to the need to

16   transition to a separate, less efficient pension system (discussed below).

17        Thus, there is no scenario in which Franklin or the City's creditors as a whole would

18   benefit either from the impairment of the City's pension obligations or the dismissal of the

19   bankruptcy case.  The Plan constitutes a reasonable effort to provide creditors with a better

20   recovery than they would achieve outside of bankruptcy, and as such, satisfies the best interests

21   test.

22        **2.    The City Is Not Hoarding Money In Its Long-Range Financial Plan Or In Its Public Facilities Fees.**

23

24        As part of its best interests argument, Franklin repeats its contention that the City has

25   "manipulated" its Long-Range Financial Plan ("**LRFP**") in order "to keep money from Franklin."

26   Franklin Post-Trial Br. at 35, n.94.  Franklin can maintain this argument only by turning a blind

27

28   [9] For the sake of mathematical simplicity, this section assumes the Franklin unsecured claim to be an even $32 million, the Retiree Health Benefit Claimants' claim for medical benefits to be $545 million, and the hypothetical termination liability to be $1.6 billion, and ignores the other claims (such as the leave buyout claims) in Class 12.

1   eye to the evidence presented in the declarations and live testimony of the City's witnesses. The

2   City's methodology in constructing the LRFP was clearly and carefully explained by Robert

3   Leland and Stephen Chase. In his direct testimony declaration, Leland, the principal author of the

4   LRFP, explained in detail the bases for the LRFP's revenue and expense projections. Leland

5   DTD[10], ¶¶ 3-10, 18-19. He also discussed the level and need for the LRFP's reserve and annual

6   contingency. *Id.* ¶¶ 11-17; *see also* Conf. Tr.[11], May 12, 2014, at 160:11-163:6 (testimony of

7   Robert Leland). During his live testimony, Leland explained that as the City receives new

8   information, it updates its projected revenues and expenses, as it did between its original and

9   current LRFP; in doing so, he provided concrete examples. Conf. Tr., May 12, 2014, at 107:19-

10   108:12, 116:5-117:24, 130:10-134:22, 135:21-136:11, 138:23-139:18 (testimony of Robert

11   Leland). Chase supplemented Leland's testimony with respect to updates to the City's public

12   facility fee (PFF) projections. Chase DTD[12] ¶¶ 14-20; Conf. Tr., May 13, 2014, at 88:22-89:6,

13   89:23-91:7 (testimony of Stephen Chase).

14       Nevertheless, Franklin argues that the LRFP "is designed to suck up every single extra

15   dollar generated by the City for hypothetical 'mission critical' expenses the City has not even

16   identified." Franklin Post-Trial Br. at 2. In order to do so, it mischaracterizes Leland's

17   testimony, claiming that he "conceded" that "'mission critical' is just a fancy name for a plug

18   number". *Id.* at 35. To the contrary, the City *has* identified what expenses mission critical

19   funding will cover. Leland testified at trial that there is a "daunting array of needs that the City

20   has not funded, including improving police further than the Marshall Plan, including improving

21   other services that the City has, dramatically increasing deferred maintenance expenditures,

22   replacing the computer system – the City hopes to not have to wait 20 years to do that." Conf.

23   Tr., May 12, 2014 at 162:19-163:6 (testimony of Robert Leland). The City uses 23-year-old

24   accounting and financial payroll systems that "need desperately to be replaced"; the City's

---

[10] Direct Testimony Declaration of Robert Leland in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1388, Trial Ex. 3057] ("**Leland DTD**").

[11] Transcript of Confirmation Proceedings ("**Conf. Tr.**").

[12] Direct Testimony Declaration of Stephen Chase in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1384, Trial Ex. 3045] ("**Chase DTD**").

1   workers' compensation funds are still running a deficit; and deferred maintenance is still millions

2   of dollars a year.  *Id.* at 118:20-120:2.  The City remains in a service-insolvent state for libraries,

3   administrative support, and recreation.  *Id.* at 169:10-14.  *See also* Leland DTD, Ex. L [Dkt. No.

4   1390, Trial Ex. 3059], at page 2 of 10 ("mission critical needs for spending" include "significant

5   expenditures for deferred building and facility maintenance, deferred tree maintenance, mobile

6   and portable radios for public safety, proposed technology projects identified in the City-wide

7   Technology Strategic Plan," and more).  Moreover, the City's mission critical expenditures will

8   be $0 for the first 19 years of the LRFP.  Conf. Tr., May 12, 2014 at 118:20-120:2 and 122:16-

9   123:20 (testimony of Robert Leland).  Thus, Franklin's allegation that the City has "rigged the

10  game" by arbitrarily manipulating its LRFP is specious.  Franklin Post-Trial Br., at 35.  The

11  City's mission critical expenses are not a plug number.  They are the real and necessary needs of

12  a city emerging from bankruptcy after years of recession.

13      Franklin also repeats its claim that the City "could pay Franklin from public facility fees

14  (PFFs)" and that future PFFs "could be devoted to repayment of Franklin."  Franklin Br. at 37-

15  38.  The City demonstrated at the Evidentiary Hearing and in its prior briefs[13] that such assertions

16  are incorrect.  Chase, the City's Community Development Director, testified to the requirement

17  that there be a "nexus" between the "level of service and/or infrastructure costs and the [PFF]

18  charged."  Chase DTD, ¶ 3.  Because of this requirement, PFFs can be used only for the purposes

19  for which the PFF was imposed.  *Id.*, ¶ 4.  Moreover, fewer PFF receipts will be available in the

20  future to pay Franklin because "the dollars are already spoken for."  Conf. Tr. May 13, 2014 at

21  85:19-86:4 (testimony of Stephen Chase).   Further, Chase testified that given the slow housing

22  recovery in Stockton, it is unlikely that sufficient PFF receipts will be received in the near future

23  to pay Franklin.  *Id.* at 137:24-138:12 (noting that "[t]he generation of such revenues has not met

24  the most recent forecasts that have come forward from the experts").

25      Franklin also trots out its oft-repeated argument that "[i]f the City averages just a half-

26  percent better than forecast, the City will generate nearly an extra half billion dollars over the

27  forecast period."  Franklin Post-Trial Br., at 36.  Of course, Franklin pays no heed to the

28

---

[13] *See* City Suppl. Br. at §§ III.A.2.c and III.B.4.d; Response at § II.C.

1 possibility that the City might perform a half-percent *worse* than projected.  Responsible

2 municipal forecasting requires that the City plan for the possibility of bad times, as well as good.

3 *See* Leland DTD, ¶¶ 14, 16, 26.  Such uncertainties are the reason the City and Assured Guaranty

4 agreed to a settlement that allows that creditor to share in the City's hoped-for future prosperity

5 without undercutting the City's economic safety net in the event of a future downturn.  The

6 settlement with Assured Guaranty left room for a similar settlement with Franklin.  The

7 Reimbursement Agreement Between Assured Guaranty Municipal Corp. and City of Stockton

8 ("**Reimbursement Agreement**"), which memorializes the contingent payment settlement and

9 was filed last February, provides that Franklin could have shared in up to 22% of the contingent

10 payments under that agreement if this Court approved a settlement at or before confirmation of a

11 plan of adjustment that provided for such contingent payments to Franklin.[14]  Needless to say, the

12 City and Franklin have been unable to reach a settlement.

13    Settlements in future chapter 9 (and chapter 11) cases will be impossible if creditors know

14 that they can hold out and vacuum up the savings created when the debtor reaches deals with

15 other creditors, particularly when the settling creditors are willing to share the upside with the

16 debtor and not lock the debtor into a payment schedule that will result in a future default if

17 revenues do not meet projections or if unexpected costs arise.

18 / / /

19 / / /

20

---

[14] The relevant portions of the Reimbursement Agreement provide as follows:

"Participating Creditors' Obligations" means (i) the [Pension Obligation] Bonds; and, (ii) in the event that the City enters into a settlement with Franklin that (x) is approved by the Bankruptcy Court at or before confirmation of the Plan of Adjustment and (y) includes participation in the Contingent General Fund Payments, the Stockton Public Financing Authority Lease Revenue Bonds, 2009 Series A (Capital Improvement Projects) (which had a principal amount as of June 28, 2012 of $35,080,000).

"Allocable Share" means a fraction, the numerator of which is the principal amount of the [Pension Obligation] Bonds and the denominator of which is the sum of all the principal amounts of all Participating Creditors' Obligations as of July 1, 2012; provided, however, that with respect to the Contingent General Fund Payments (i) payable prior to June 1, 2039, the Allocable Share shall be no less than 78%; and (ii) payable on or after June 1, 2039, the Allocable Share shall be equal to 100%.

Supplemental Plan Supplement In Connection With The First Amended Plan For The Adjustment Of Debts Of City Of Stockton, California (November 15, 2013) [Dkt. No. 1259, Trial Ex. 3033], Ex. 1.a, at pages 2 and 5.

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

### 3. The Payment Of Franklin's Secured Claim Is Consistent With The LRFP.

Franklin claims that the City "miraculously found $4 million – in just the first year of its forecast – to pay Franklin's secured claim." Franklin Post-Trial Br., at 2. However, this is neither a new development, nor is it miraculous. The $4 million will be paid from the Bankruptcy Fund, which was created by the City specifically to pay all costs associated with the bankruptcy process, including payments to creditors as well as professional fees.

The Bankruptcy Fund has largely been funded by salary savings resulting from the City's difficulties in retaining employees and hiring a sufficient number of new employees, resulting in numerous vacancies during fiscal years 2011-12 and 2012-13. As both City Manager Kurt Wilson and Chief of Police Eric Jones testified, the City is struggling to attract and retain new employees. See Wilson DTD[15], ¶ 15 ("the City is currently unable to fully operate its new Delta Water Supply Project because of an inability to attract and retain qualified employees"); Jones DTD[16], ¶ 5 (of 365 budgeted positions, "the police department has so far been able to fill only 351", in part because "hiring has outpaced attrition at an extremely slow pace").[17]

The General Fund contributions to the Bankruptcy Fund for fiscal years 2011-12 and 2012-13 were disclosed on line 106 of Attachment A1 to Exhibit 2006 at EX 2006_0034 (CTY257708) and were discussed by Leland at trial. Conf. Tr., May 12, 2014 at 151:9-20 (testimony of Robert Leland). The Bankruptcy Fund is described at pages L30-L31 of the City's 2013-14 budget. Trial Ex. 2700 at EX 2700_0280-EX 2700_0281 (FRK-CM0001623—FRK-CM0001624).

City staff estimates that an amount comparable to the 2012-13 contribution will be made by the General Fund in 2013-14 due to the continuing excessive employee turnover and inability to fill vacant positions that have plagued the City. This number will not be finalized until the

---

[15] Direct Testimony Declaration of Kurt Wilson in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1383, Trial Ex. 3068] ("**Wilson DTD**").

[16] Direct Testimony Declaration of Eric Jones in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1364, Trial Ex. 3056] ("**Jones DTD**").

[17] On September 16, 2014, the City added a new group of officers to its Police Department, bringing the City's total number of sworn police officers to 372. This still leaves the City with 113 unfilled sworn officer positions.

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    CAFR for 2013-14 is completed in late 2014 or early 2015.  Even with this additional

2    contribution, City staff expects that the resources of the Bankruptcy Fund will be fully consumed

3    by chapter 9 legal and administrative costs, payments associated with settlements reached to date,

4    and covering deficits in other funds, such as the grossly underfunded workers compensation

5    fund.

6            Thus, the Court should draw no adverse inference from the fact that the City is able to

7    pay Franklin its secured claim, as Franklin ironically suggests.

8        D.    **The Plan Does Not Discriminate Unfairly Against Franklin.**

9            1.    **The Unfair Discrimination Test Does Not Apply.**

10           At no fewer than 16 separate places in its Post-Trial Brief, Franklin complains that the

11   City is attempting to "cram down" the Plan.[18]  And Franklin uses the term "unfair discrimination"

12   (or a variant thereof) 24 times.[19]  Unfortunately for Franklin, repetition does not make cramdown,

13   let alone one element of cramdown, relevant.  While Franklin would rather ignore the "yes" votes

14   of nearly 1,000 other Class 12 claimants, the unavoidable fact is that Class 12 accepted the

15   Plan.[20]  As a dissenting member of an accepting class, Franklin may not invoke the "discriminates

16   unfairly" test because the clear and unambiguous language of Bankruptcy Code section

17   1129(b)(1) provides that it applies only with respect to a *class* of claims that has voted to reject

18   the plan:

19                   . . . the court, on request of the proponent of the plan, shall confirm
                 the plan notwithstanding the requirements of such paragraph if the
20               *plan does not discriminate unfairly*, and is fair and equitable, *with
                 respect to each class of claims* or interests *that is impaired under,
21               and has not accepted, the plan*.

22   (emphasis added).[21]

23   _____

24   [18] Franklin Post-Trial Br., at 1, 3, 4, 6, 9, 35, 38 n. 113, 40, 41, 45, 47, 52, and 64 (some pages include multiple references).

25   [19] Franklin Post-Trial Br., at 2, 7, 9, 22, 31, 34, 39, 40, 41, and 63 (some pages include multiple references).
     [20] Franklin's $4,052,000 secured claim comprises Class 20 under the Plan, and Franklin has not complained that it is
     being unfairly discriminated against with respect to the treatment of its secured claim. Nor can it, since it is receiving
26   a cash payment in the full amount of its secured claim.
     [21] The legislative history supports the plain meaning of the statute by providing:
27                   The criterion of unfair discrimination is not derived from the fair and equitable
                 rule or from the best interests of creditors test.  Rather it preserves just treatment
28               of a *dissenting class* from the class's own perspective.
     H.R. Report 95-595 at 417 (1977) (emphasis added).

                                          CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
                                          CONFIRMATION OF PLAN OF ADJUSTMENT

1    Section 1129(b)(1) does not provide that the unfair discrimination test applies to a creditor

2    within an accepting class that votes against a plan.  Instead, the protection such an outvoted

3    creditor receives is afforded by the best interests of creditors test, discussed above.  Franklin cites

4    no authority holding that the unfair discrimination test applies to any creditor or class other than a

5    dissenting class as a whole.

6    Franklin asserts that the Court should consider its unfair discrimination argument as part

7    of its improper classification objection, citing as authority a passage from Collier, paragraph

8    1122.03[3][a], and *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 455 (Bankr. E.D. Cal. 1999).

9    Franklin Post-Trial Br. at 40.  Neither demonstrates that courts should consider these disparate

10    requirements together.  Although the Collier passage refers to the language of section 1129(b)(1)

11    stating that it only applies to a class that has not accepted a plan as merely "technical[ ]," its only

12    authority for that assertion is *In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir. 1987).  Franklin

13    omits the citation to *Jersey City Med. Ctr.*, undoubtedly due to the fact the case held that because

14    the dissenting creditor's class accepted the plan, as Class 12 has, "§ 1129(b)(1) affords [the

15    dissenting creditor] no protection."  817 F.2d at 1062.  The Third Circuit proceeded to hold that it

16    "need not address whether the plan satisfies the 'cram down' provisions," *id.*, thereby reinforcing

17    the point that a court should disregard unfair discrimination arguments if a dissenting creditor's

18    class votes to accept the plan, which is directly *contrary* to Franklin's argument.

19    *Corcoran*, rather than helping Franklin's cause, instead further supports the City's

20    argument.  That case states that in considering classification issues, "courts must be guided by the

21    mandate of § 1129(b)(1) that the plan not discriminate unfairly with respect to a *class* of creditors

22    *that is impaired under the plan and has not voted to accept the plan.*"  233 B.R. at 455 (finding

23    classification proper and no unfair discrimination) (emphasis added).  It does not hold or opine

24    that courts should apply section 1129(b)(1) to a class that votes to accept a plan, as Class 12 has

25    here.

26    / / /

27    / / /

28    / / /

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

Section 1129(b)(1) has no application to Class 12, because it has resoundingly voted to accept the plan, and the thus the Plan is not a cram down plan with respect to Class 12.[22]

## 2. Regardless, The Plan Does Not Unfairly Discriminate Against Franklin.

As noted above, in cases where an impaired class rejects a plan, it may nonetheless be confirmed if it, among other things, does not discriminate unfairly. In other words, a plan may discriminate against a class of creditors if the discrimination is "fair"; otherwise, courts would have to read the word "unfairly" out of the statute. *See In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) ("Section 1129(b)(1) prohibits only unfair discrimination, not all discrimination."); Collier ¶ 1129.03[3] ("[t]here can be 'discrimination,' so long as it is not 'unfair.'").

### a. The Ninth Circuit's Four-Factor Test Sets Forth The Requirements For Fair Discrimination Under Section 1129(b)(1).

The Ninth Circuit has articulated a four-part test to determine whether discrimination between classes is fair:

> (1) the discrimination must be supported by a reasonable basis;
> (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination.

*In re Ambanc La Mesa Ltd.*, 115 F.3d 650, 656 (9th Cir. 1997), *cert. denied* 522 U.S. 1110 (1998) (citing *In re Wolff*, 22 B.R. 510, 5-12 (9th Cir. BAP 1981), a chapter 13 case) ("**Ambanc-Aztec test**").[23]

*Aztec* is often cited as the source of this test. *See, e.g.*, Collier ¶ 1129.03[3][a].[24] There, the court drew heavily from chapter 13 case law in setting forth the various factors, stating that

---

[22] However, in the event that the City is required to impair its pensions, the City expects that any subsequent plan would require a cram down because its retirees and employees will likely vote against the 60% pension reduction.

[23] *See In re Anderson*, 2012 WL 3133895, at *7-8 (Bankr. D. Mont. 2012) ("It is well settled in this Circuit that the *Wolff* test is applicable in cramdown situations under § 1129(b).") (citing *Ambanc*, 115 F.3d at 656-67) ; *In re Bashas' Inc.*, 437 B.R. 874, 925 (Bankr. D. Ariz. 2010); *In re Hawaiian Telecom Commc'ns, Inc.*, 430 B.R. 564, 605 (Bankr. D. Haw. 2009). Due to perceived redundancies, the test often boils down to "whether the proposed discrimination has a reasonable basis and is necessary for reorganization." *See* Collier ¶ 1129.03[3][a].

1   "[c]hapter 13 cases interpreting the fairness of discrimination among classes under § 1322(b)(1)

2   provide guidelines and analysis useful for § 1129(b)(1) purposes."  107 B.R. at 589-90 and n.1

3   (acknowledging the distinction between the purpose of unfair discrimination under sections

4   1129(b)(1) and 1322(b)(1)).  *Aztec* favorably cites both *In re Perskin*, 9 B.R. 626 (Bankr. N.D.

5   Tex. 1981) and *In re Freshley*, 69 B.R. 96 (Bankr. N.D. Ga. 1987).  *See Aztec*, 107 B.R. at 589.

6   *In re Perskin* held that a chapter 13 debtor's plan discriminated fairly in favor of credit cards that

7   were a "substantial benefit" to the debtor in his profession as a traveling salesman.  *In re Perskin*,

8   9 B.R. at 632.  Meanwhile, *In re Freshley* concluded that a chapter 13 debtor's plan fairly

9   discriminated against unsecured creditors where it proposed to pay 1% of their claims and 100%

10  of the debtor's student loan.  *In re Freshley*, 69 B.R. 96.  The *Freshley* debtor's justification for

11  the discrimination, which the court approved as "reasonable," was his intent to return to school

12  and desire to remain in the "good graces" of the school.  69 B.R. at 98.

13          Chapter 11 cases applying the *Ambanc-Aztec* test are in accord with these chapter 13

14  cases, whose theme is that business reasons can make discrimination "fair" under a plan.  *Kliegl*,

15  149 B.R. at 307-09 (debtor engaged in fair discrimination when its plan proposed to pay a union's

16  general unsecured claim at 75% and other general unsecured claims at 15% on the grounds that it

17  was "necessary" because the debtor's business relied on union workers and its continued

18  operation of a union shop was "absolutely critical to its ability to function successfully in its

19  industry."); *In re Creekstone Apartments Assocs., L.P.*, 168 B.R. 639, 644-45 (Bankr. M.D. Tenn.

20  1994) (plan discriminated fairly where it proposed to pay 100% to unsecured class, which

21  included "vendors whose services and products were essential to the successful operation" of the

22  debtor's business, but only 10% on another class's unsecured claims).

23          Courts have also held discrimination to be fair when it arises due to pre-confirmation

24  settlements.  In *In re Western Real Estate Fund, Inc.*, creditors that settled with the debtor

25  obtained more favorable plan treatment than creditors who did not settle.  75 B.R. 580, 586

26

---

27  [24] The fourth factor in the *Aztec* case is stated as "the treatment of the classes discriminated against," but courts and
    scholars often refer to the *Aztec* and *Ambanc* tests as synonymous.  *See In re Kliegl Bros. Universal Elec. Stage
    Lighting Co.*, 149 B.R. 306, 308 (Bankr. E.D.N.Y. 1992) (citing *Aztec*, but articulating and applying the *Ambanc*

28  test's fourth factor); Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11* ("**Markell**"), 72
    AM. BANKR. L.J. 227, 242 (1998) (treating the tests as synonymous).

1  (Bankr. W.D. Okla. 1987).  In approving the discrimination as fair, the court affirmed a policy

2  favoring pre-confirmation mediation:

3           [T]o hold as the objecting creditors suggest would discourage and
         remove any incentive for negotiation and resolution of differences
4        prior to confirmation.  Since the court believes that such "work
         outs" are fundamental to effective reorganization and rehabilitation
5        . . . the position urged by the objecting creditors cannot be accepted.

6  *Id.*; *see also In re Coastal Equities Inc.*, 33 B.R. 898, 905 (Bankr. S.D. Cal. 1983) (forbidding a

7  debtor from disfavoring holdouts would unfairly put holdouts in a "no-lose situation" and hinder

8  negotiations).

9                **b.      The City's Treatment Of Franklin And Its Other Creditors
                         Satisfies The Ninth Circuit's Requirements For Fair
10                        Discrimination Under Section 1129(b)(1).**

11       The City's proposal to pay Franklin approximately 12% of its total claim, while other

12  creditors receive between 52% and 100% on their claims, constitutes fair discrimination, even if

13  section 1129(b)(1) applied.

14                        (i)      The Plan's Treatment Of Franklin And Its Other Creditors
                                 Is Supported By Many Reasonable Bases Rooted In The
15                               City's Business Judgment.

16       The Plan meets the *Ambanc-Aztec* requirement that "the discrimination must be supported

17  by a reasonable basis" for several reasons.  First, with respect to the City's pension obligations to

18  its employees through CalPERS (as demonstrated throughout this case, CalPERS contends that

19  the PERL requires it either to accept 100% of payments due or to invoke its termination

20  procedure), the City exercised its business judgment to conclude that failing to fully fund its

21  pension obligations would cause a mass exodus of its employees and irreparably damage its

22  ability to hire new employees.  The lack of an experienced and high quality work force—which

23  would be the City's reality without the market standard CalPERS pension—would threaten the

24  City's ability to provide for the health, safety, and welfare of its citizens.  The City thus has a

25  reasonable and legitimate basis for treating its pension obligations differently than other debts in

26  the Plan.  *See Kliegl*, 149 B.R. at 309; *Creekstone Apartments*, 168 B.R. at 644-45.  Second, with

27  respect to the other creditors to which Franklin compares itself, the City's reasonable basis for

28  offering different treatment to them is two-fold.  First, those creditors hold valuable collateral that

1   the City will need post-confirmation, unlike Franklin, which holds non-essential collateral – for

2   which it is being paid in full.  Second, the City settled with those creditors through mediation

3   following the eligibility phase.  Rewarding Franklin for being the sole holdout would "discourage

4   and remove any incentive for negotiation and resolution of differences prior to confirmation."

5   *Western Real Estate Fund*, 75 B.R. at 586; *see also Coastal Equities*, 33 B.R. at 905.

6                (ii)    <u>The Treatment Of Franklin And Its Other Creditors Is</u>

7                          <u>Necessary For The City's Adjustment Of Its Debts.</u>

8       As described below, attempting to tinker with the City's pension obligations would, in the

9   opinion of City leaders, threaten the stability of the workforce. The City has already made deep

10   cuts to its services, Eligibility Opinion, 493 B.R. at 780-81; Disclosure Statement[25] at Summary

11   and §§ I, II.C, and II.D, and making additional personnel or service cuts would threaten its

12   viability.  *See Kliegl*, 149 B.R. at 309; *Creekstone Apartments*, 168 B.R. at 645.  Indeed, the City

13   has eliminated retiree medical benefits, lowered its current pension costs by shifting 7-9% of

14   pension payroll costs to employees and lowering salaries, implemented lower pensions for new

15   hires, and made many other reductions in compensation for employees in order to not only pay its

16   pension obligations but other creditors as well.  Deis DTD[26], ¶ 32.

17                (iii)    <u>The City Proposed Its Treatment Of Franklin And Its Other</u>

18                          <u>Creditors In Good Faith.</u>

19       The *Ambanc-Aztec* test next requires that the discrimination be proposed in good faith.  As

20   the case law set forth above demonstrates, disparate treatment in and of itself is not evidence of

21   unfair discrimination proposed in bad faith.  *See Creekstone Apartments*, 168 B.R. at 644-45.

22   Franklin can conjure up no evidence other than its placement in Class 12, and the City's

23   unwillingness to risk massive employee defections, to indicate that the City proposed its Plan in

24   anything but good faith.  And, as discussed in detail below and in the City's prior briefs, the City

25   has numerous good faith business justifications for this disparate treatment.

26

27   [25] Modified Disclosure Statement with Respect to First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1215, Trial Ex. 3031] ("**Disclosure Statement**").

28   [26] Direct Testimony Declaration of Robert Deis in Support of Confirmation of First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1368, Trial Ex. 3046] ("**Deis DTD**").

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1    (iv)    <u>The Degree Of Difference Between The City's Treatment Of Franklin and Its Treatment Of Its Other Creditors Is Directly Related To Its Business Reasons For Offering Them Different Recoveries.</u>

2

3

4          The City has demonstrated that it cannot pay its pension obligations anything less than

5    100% without risking a mass exodus of its employees and impairing its ability to hire qualified

6    employees going forward.  So, to the extent the City's pension obligations constrain what it can

7    pay Franklin, the City's degree of discrimination against Franklin in relation to pensions is

8    directly related to the City's need to pay its pension obligations and its business justification for

9    doing so, *i.e.*, maintaining its ability to retain and attract qualified employees.  *See Kliegl*, 149

10   B.R. at 309.  Second, the difference between what the City is offering Franklin and what it is

11   offering other creditors to which Franklin compares itself is directly related to (i) the disparate

12   legal character of Franklin's unsecured claim, (ii) the value to the City of the collateral properties

13   associated with the other creditors' claims, and (iii) the City's need to facilitate negotiations with

14   those creditors.  *See Creekstone Apartments*, 168 B.R. at 644-45; *Western Real Estate Fund*, 75

15   B.R. at 586.

16               (v)    <u>Summary</u>

17          As a result, even if section 1129(b)(1) applied, which it does not, the City's disparate

18   treatment of Franklin's claim constitutes fair discrimination under the Ninth Circuit's test.[27]

19   ───────────────

20   [27] Some courts outside of the Ninth Circuit have adopted an alternative test, set forth in Markell.  *See, e.g.*, *In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999). Under that test, there is a rebuttable presumption of unfair discrimination if there is:

21          (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

24   Markell, 72 AM. BANKR. L.J., at 228.  Franklin has not argued (3)(b) as a basis for discrimination, so the City will only discuss (3)(a). A plan proponent may rebut the presumption in the case of (3)(a), *i.e.*, differing percentage recoveries, by "showing that [the] lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization." *Id.*  Putting aside that Franklin is not a member of a dissenting class, and assuming that the rebuttable presumption of unfair discrimination would apply in this case, the City would be able to overcome that presumption.  Outside of bankruptcy, Franklin could not possibly hope for a better recovery than it is currently being offered as it would have to get in line to sue the City with all of the City's other creditors behind CalPERS and the CalPERS Lien attaching to all of the City's assets to secure payment of an immediate $1.6 billion termination liability.  *See* City's Post-Trial Br., at § II.C. Further, the greater recoveries to the other classes are offset by their contributions to the adjustment of the City's debts: their collateral has value to the City going forward, they

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

**E.**     **There Is No Viable, Less Costly Alternative To CalPERS That Would Allow The City To Offer Competitive Pension Benefits.**

        **1.**     **None Of The Alternatives Considered By The City Would Provide Competitive Pension Benefits At A Lower Cost.**

As demonstrated by the City's August 11 Post-Trial Brief and by the testimony at the Evidentiary Hearing, there is no viable alternative pension system that would allow the City to offer competitive pensions at a lower cost than CalPERS. Per the testimony of Kim Nicholl, the reasons for this are several. For one, any new City pension system would not benefit from the economies of scale and established investment expertise that CalPERS enjoys. The City would not be able to diversify its investment portfolio to the same extent or take on as much risk as CalPERS, which has billions of dollars in assets. In fact, because a new City pension plan would start with no assets, it would be forced to assume a more conservative investment strategy. Conf. Tr., June 4, 2014, at 26:19-27:16, 50:13-21 (testimony of Kim Nicholl). An alternative pension plan would therefore almost certainly produce a lower rate of return than the City's current CalPERS Plan, resulting in higher contributions, lower benefits, or both. *Id.* Additionally, an independent City pension plan (or similar alternative) would be subject to greater volatility in its cost per member due to its smaller asset base and reduced diversification, resulting in a higher "normal cost" than the City is currently paying to CalPERS. Lamoureux DTD[28], ¶ 13.

The City also would incur numerous costs in establishing a new pension system and/or would have to pay a premium to a for-profit administrator. *See, e.g.* Conf. Tr., June 4, 2014, at 20:8-21:10 (Nicholl testimony discussing costs of establishing a City-run system). Such costs would have to be absorbed by the new system in the form of higher contributions or lower benefits. Moreover, there would be substantial delay in the establishment of a new system, particularly if the City were to create a new, independent pension plan. During that ramp-up period, City employees would be without a pension, and would be unlikely to remain with the

---

negotiated and compromised with the City, and in the case of pensions, City employees and retirees have made substantial contributions to materially lower the City's costs of funding future pension obligations. As a result of the Plan's treatment of pension obligations, the City is able to retain and attract qualified employees, a necessity for Stockton's viability as a city.

[28] Direct Testimony Declaration of David Lamoureux in Support of CalPERS' Response to Franklin's Objection to Confirmation of the City of Stockton's First Amended Plan of Adjustment [Dkt. No. 1440, Trial Ex. 4015] ("**Lamoureux DTD**").

1   City in the hope that the City's new pension plan would be equivalent to the CalPERS plan.

2   Moreover, the City would be required to enter its employees into the Social Security system (and

3   the City, having entered Social Security as a covered employer, would then be unable to leave

4   under current law) during the gap in coverage, incurring an ongoing cost to the City of 6.2% of

5   payroll.[29]  *See id.*, at 19:14-22.  Finally, a new pension system would likely lack reciprocity with

6   the CalPERS system.  *Id.* at 28:15-29:8.  This would put the City at a competitive disadvantage

7   with other CalPERS or CalPERS-reciprocal agencies because potential employees prefer the

8   flexibility of being able to transfer within CalPERS or CalPERS-reciprocal systems. *See id.* at

9   27:17-28:14 ("[Y]our benefit would be much lower from that first employer without reciprocity,

10  so it's a very valuable benefit").

11        Franklin offered no evidence showing that these alternatives would allow the City to

12  provide better or equal pension benefits at a lower cost.  Instead, it speculates that these

13  alternatives are viable, and dismisses Nicholl's extensive description of the problems and

14  challenges of each as "hypothetical."  Franklin Post-Trial Br., at 48.[30]  Clearly, the fact that the

15  City has not attempted to implement any of these alternatives in no way undercuts Nicholl's

16  expert testimony as to the requirements, costs, and limitations of each alternative.

17        Franklin also misleadingly claims that the City "never seriously considered" these

18  alternatives based on statements by the City's witnesses that they did not explore alternatives to

19  CalPERS *prior to the petition date*.  Franklin Post-Trial Br., at 44.  Because the threat of the

20  termination liability and the CalPERS Lien made any pre-petition termination completely

21  infeasible, the City naturally focused on developing the Ask and attempting to avoid chapter 9, or

---

[29] Franklin suggests that the City could avoid the need to participate in Social Security by "tim[ing] its exit from bankruptcy to coincide with the establishment of a replacement retirement benefit."  Franklin Post-Trial Br., at 49, n. 161.  However, this purported solution would leave the City languishing in bankruptcy for months, if not years, while it established a new pension plan and negotiated and prosecuted a brand new plan of adjustment.  During that time, the City would be unable to hire qualified new employees and would continue to struggle with retention.  Moreover, it would do little to address the fact that whatever alternative pension plan was eventually established would almost certainly be less appealing to current and potential City employees than a CalPERS pension, particularly since the economic future of the City would be, charitably stated, uncertain.  Furthermore, even if the City could avoid a gap in coverage, it would still be forced to enter Social Security if its new pension plan did not meet federal regulations.

[30] Throughout its Post-Trial Brief, Franklin repeatedly labels as "hypothetical" any testimony or argument it wishes the Court to dismiss out of hand, regardless of its factual bases.  *See* Franklin Post-Trial Brief, at 12 (the actuarial risk of termination to CalPERS), 35 (mission critical expenses), 37 (same), 48 (Nicholl's testimony regarding alternative pension plans), 49 (testimony regarding the risk of employee departures).

1    at least reach agreement with some of its creditor constituencies.  After the City entered chapter 9,

2    however, it spent significant time considering its options, and concluded (based on the reasons

3    described by Nicholl) that none of the pension alternatives were viable and cost-effective.  Wilson

4    DTD, ¶ 15; Deis DTD, ¶ 29; *see also* Conf. Tr., June 4, 2014 (testimony of Kim Nicholl), at 20:1-

5    21:23 and 26:15-29:8 (City-run plan); 21:24-22:21 (plan administered by a third-party); 19:9-22

6    and 49:4-7 (Social Security).

7            When not ignoring or dismissing testimony as hypothetical, Franklin cites to selective

8    snippets in an attempt to claim that the evidence offered by the City and CalPERS actually

9    supports its conjecture.  For instance, despite Nicholl testifying on multiple occasions that a City

10   plan could not compete with CalPERS' retirement benefits, Franklin says that Nicholl "testified

11   that she did not 'have any basis' for assessing whether the benefits under an alternative program

12   might be more lucrative than benefits under the CalPERS system.  Shockingly, neither she nor the

13   City ever did the analysis." Franklin Post-Trial Br. 48.  These allegations are untrue, and they

14   mischaracterize Nicholl's testimony.  What Nicholl said was that she did not "have any basis" for

15   agreeing with Mr. Johnston's suggestion that "Stockton might even be able to offer a more

16   lucrative plan, if it was freed from the burden of paying for pension-spiking and the sins of the

17   past that had been the subject of the case." Conf. Tr., June 4, 2014, at 49:16-21 (testimony of Kim

18   Nicholl).  She did not say that she lacked a basis to determine whether an alternative pension

19   program could provide equal or more lucrative benefits than CalPERS at a lower cost, a concept

20   she had already analyzed and had discussed at length on direct examination.  Nicholl's unrefuted

21   testimony was that the City could not offer an equivalent or better retirement package than

22   CalPERS for a number of reasons: (i) the City's system would have a lower discount rate, (ii) it

23   would entail substantial start up, transition, and maintenance costs, and (iii) it would be hampered

24   by Social Security contributions.  *Id.*, at 38:20-39:12, 49:8-13, 52:23-53:1 (testimony of Kim

25   Nicholl).

26          Perhaps worse than Franklin's strategy of ignoring or mischaracterizing Nicholl's

27   testimony is its baseless assertion that the City "scrambled Ms. Nicholl – taking advantage of the

28   three-week trial break," thus suggesting that the City used the break to manufacture new

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1  testimony. Franklin Post-Trial Br., at 48. Nicholl was present, ready, and able to testify during

2  the originally scheduled trial dates. The reason she could not testify in May, as the Court is well

3  aware, was Franklin's decision to ignore the Court's ruling on trial time allotment. On the first

4  day of trial, after hearing the argument of counsel, the Court clearly and unambiguously ruled that

5  it was satisfied that a 50-50 split of the available trial time was fair. Conf. Tr., May 12, 2014 at

6  19:18-20:4 (comments of the Court). Rather than abide by that ruling, Franklin proceeded to use

7  the lion's share of the allotted trial time. Then, when the City objected, counsel for Franklin's

8  response was that "this was precisely why I said that the allocation of time at the beginning of the

9  case would be completely prejudicial." Conf. Tr., May 14, 2014, 70:17-19 (comments of

10  Franklin). Put simply, Franklin rejected the Court's decision because it disagreed with the result.

11  Having caused the month-long delay was bad enough, but to suggest that the City used the delay

12  (which the City sought to avoid) to create new testimony marks a new low for Franklin.

13        While Franklin is quick to cast aspersions and to dismiss testimony it does not like as

14  hypothetical, it failed to proffer any evidence of its own to show that any of its suggested

15  alternatives is superior to the CalPERS system. Instead, it defaults to vague speculation, bereft of

16  any detail or analysis. Nicholl's testimony clearly and accurately describes the reasons why the

17  City concluded that it could not provide a CalPERS-equivalent pension plan at a lower cost

18  through any of these alternatives. If the City believed it could save money, retain its current

19  employees, and attract new hires by leaving CalPERS, it would do so. As no such alternative has

20  presented itself, the City has chosen the best available option.

21        **2.        A Defined Contribution Plan Is Not A Viable Alternative.**

22        In addition to the other alternatives discussed by the City, Franklin speculates – with no

23  analysis whatsoever – that the City could switch to a defined contribution retirement plan.

24  Franklin Post-Trial Br., at 47. Franklin even goes so far as to deem such a plan "the most logical

25  alternative", *id.*, yet it failed at the Evidentiary Hearing and in its brief to offer even one iota of

26  evidence that a defined contribution plan would provide employees competitive pension benefits.

27  This is because a defined contribution plan, when funded with the same contributions as a defined

28  benefit plan, will provide lower benefits.

1    Nicholl testified that defined contribution plans tend to earn 1-2% less each year than

2    defined benefit plans.   Conf. Tr., June 4, 2014, at 38:10-19 (testimony of Kim Nicholl).

3    Additionally, "in a defined contribution plan, all the risks of the plan have been shifted from the

4    employer to the employee" including the risk that the investments will yield lower benefits. *Id.*,

5    at 37:10-23.  Franklin omits the first point, despite citing to that testimony, and dismisses the

6    latter as "obvious".  Franklin Post-Trial Brief, at 48-49.  To a "rational" City employee or

7    potential employee, however, a plan that provides lower benefits and that transfers all of the risks

8    to him or her is hardly a meaningful alternative.  Moreover, Franklin's unsupported claim that a

9    defined contribution plan "suffers from none of the 'start up, transition and maintenance' costs"

10   of other alternatives is patently incorrect.  Franklin Post-Trial Br., at 47 (emphasis in original).

11   For one, a defined contribution plan incurs its own administration costs, which would result either

12   from the City setting up its own system or because the City would have to pay a private

13   administrator, which would expect some amount of profit, to do so.  The City also would have to

14   spend significant time and money negotiating with its labor unions to adopt a defined contribution

15   plan, with no guarantee of success and with the likely outcome that the City would have to make

16   other significant concessions to make-up for the reduced benefits.

17        Defined contribution plans also suffer from other deficiencies compared to defined benefit

18   plans.  For instance, defined contribution plans do not include a disability retirement feature,

19   which is of particular importance to the City's public safety employees.  Defined contribution

20   plans are limited to funds saved, whereas defined benefit plans are provided for the beneficiary's

21   lifetime and include survival benefits.  Defined contribution plans are also subject to caps on

22   annual contributions.  When these considerations are added to the generally lower benefits and

23   the transfer of investment risk, it is no surprise that defined contribution plans are not the market

24   standard for public agencies in California.[31]

25   / / /

26

27   ───────────────
     [31] Franklin suggests that Cal. Gov't Code § 20485 establishes defined contribution plans as the "desired alternative."
     Franklin Post-Trial Br., at 47.  As is evident from its plain language, that section merely notes the Legislature's intent
28   that agencies contracting with CalPERS have the option to supplement their CalPERS pensions with a defined
     contribution plan if they so choose.

1    **3.    The City Is Not "Shielding" Employees From The Burden Of The Restructuring.**

2

3    Contrary to reams of evidence and the Court's own findings, Franklin asserts that the City

4    is "shielding employees from the burden of this restructuring." Franklin Post-Trial Br., at 1. This

5    could hardly be further from the truth. As the evidence presented at the Eligibility and

6    Evidentiary Hearings has shown, employees already have borne a disproportionate share of the

7    costs of the City's restructuring, both through unilateral cuts and through months of difficult

8    negotiations. *See* City Post-Trial Br., at § II.A.4. Moreover, the Court's own findings of fact

9    bear this out. *See* Eligibility Opinion, 493 B.R. at 779-780; *Ass'n of Retired Employees of City of*

10   *Stockton* ("***ARECOS***") *v. City of Stockton*, 478 B.R. 8 (Bankr. E.D. Cal. 2012).

11   Before filing its bankruptcy case, the City cut its workforce by a quarter[32] and slashed

12   compensation by as much as 23%. Eligibility Opinion, 493 B.R. at 780; Montes Elig. Decl.[33],

13   ¶ 20; Deis Elig. Decl.[34], ¶ 39. Then, the City further reduced compensation and benefits when it

14   negotiated new collective bargaining agreements. Goodrich Elig. Reply Decl.[35], ¶ 8. Retiree

15   medical benefits for both current and former employees have been completely eliminated.

16   *ARECOS*, 478 B.R. at 14. City employees are now paying a greater portion of their pension

17   costs, and the City has implemented its own lower retirement tier, in addition to the new PEPRA

18   level. Leland DTD, ¶ 37 (City's elimination of employer-paid member contributions); *id.*, ¶ 18(e)

19   (City's new pension tiers); Goodrich DTD[36], ¶ 17 (same). Moreover, the negotiated reductions to

20   compensation in the City's collective bargaining agreements will result in reduced pension

21

22   [32] Franklin reiterates its complaint that the concessions made by the City's employees "merely reduced 'above market' pay and benefits to a 'market' level" (without citing to any evidence of what it defines as the "market").

23   Franklin Post-Trial Br., at 45. Not only does this continue to ignore the reduction of compensation and benefits for many employees to below-market levels, it also disregards the impact on employees that were laid off. Compensation

24   and benefits for those employees were not reduced to a 'market' level, they were reduced to nothing going forward.
     [33] Declaration of Laurie Montes In Support of City of Stockton's Statement of Qualifications Under Section 109(c) of

25   the United States Bankruptcy Code [Dkt. No. 23, Trial Ex. 1054] ("**Montes Elig. Decl.**").
     [34] Declaration of Robert Deis in Support of City of Stockton's Reply to Objections to Its Statement of Qualifications

26   Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 708, Trial Ex. 1377] ("**Deis Elig. Decl.**").
     [35] Declaration of Ann Goodrich in Support of City of Stockton's Reply to Objections to Its Statement of

27   Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 716, Trial Ex. 1384] ("**Goodrich Elig. Reply Decl.**").
     [36] Direct Testimony Declaration of Ann Goodrich in Support of Confirmation of First Amended Plan for the

28   Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1381, Trial Ex. 3055] ("**Goodrich DTD**").

1  payments for those employees in the future.  *See* Eligibility Opinion, 493 B.R. at 785 ("[M]aterial

2  reductions in compensation to employees correlatively will tend to reduce the City's future

3  pension obligations.").

4      In the same vein, Franklin once again raises the specter of pension spiking, but continues

5  to fail to place the issue in context.  Franklin Post-Trial Br., at 1, 42.  As the City has explained,

6  while a handful of employees engaged in pension spiking, the typical retiree pension is modest.

7  As of February 2012, retirees entitled to medical benefits received an average pension of $51,000,

8  while retirees not entitled to medical benefits received an average pension of $24,000.  Deis

9  DTD, ¶ 32; Haase Elig. Decl.[37], ¶ 5; Millican Decl.[38], Ex. A at 40, Figure 1; *see* City Post-Trial

10  Br., at 21.  Moreover, in its Eligibility Opinion, the Court found that the City had taken measures

11  to "dampen[] opportunities for 'pension spiking.'"  Eligibility Opinion, 493 B.R. at 779-80. Thus,

12  while Franklin would have the Court believe that impairing pensions is necessary to rectify pre-

13  bankruptcy pension spiking, the real effect will be to push many of the City's pensioners below

14  the poverty line. Deis DTD, ¶ 31.  Franklin essentially acknowledged as much when it told the

15  Court that it saw no way to remedy past pension spiking without also punishing retirees with

16  average pensions.  Conf. Tr., June 4, 2014, at 198:12-25 (Franklin closing argument) ("COURT:

17  But what I'm still not getting is whether you have a solution for remedying past pension spiking

18  that does not amount to getting so angry at a pension spiker that you are going to take a non-

19  pension spiker out and shoot them. . . . MR. JOHNSTON: I don't believe that can be done.").

20      Despite this unavoidable concession, and despite the clear evidence of compensation and

21  benefit reductions, Franklin does not hesitate to cast the City's workforce as unscathed by the

22  bankruptcy.  To the contrary, the City's employees and retirees have made real and meaningful

23  sacrifices that have enabled the City to propose a plan of adjustment that will enable it to emerge

24  from bankruptcy on solid fiscal footing.

25  / / /

26

27  ---

[37] Declaration of Teresia Haase In Support of City of Stockton's Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 21, Trial Ex. 1052] ("**Haase Elig. Decl.**").

28  [38] Declaration of David N. Millican in Support of City of Stockton's Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 454, Trial Ex. 1376] ("**Millican Decl.**").

### 4.      **If Pensions Are Cut, City Employees Will Leave And The City Will Struggle To Attract Qualified Replacements.**

If the City impairs pensions in addition to the substantial compensation and benefits cuts it has already imposed, it faces the very real possibility that its employees will depart for greener pastures and that qualified replacements will be hard to find. As described in detail in the City's Post-Trial Brief, this concern is "neither speculative nor hypothetical." *See* City Post-Trial Br., at § II.A.3. To the contrary, it is based on the express statements of the City's labor unions, interviews of employees, the state of the market for public employees, the City's current hiring difficulties, and the systemic incentives for employees to transfer to other CalPERS agencies to preserve their future pension earnings.

CalPERS is the market standard for public employee pensions in California, and the testimony of the City's current and former City Managers makes clear that in order to adequately compete to hire and retain qualified employees, the City must be able to offer a CalPERS pension or reasonable equivalent. *See* Wilson DTD, ¶ 15; Deis DTD, ¶ 29; City Post-Trial Br., at 7-8. Chief of Police Eric Jones testified at length regarding morale in his department and his personal conversations with current police officers who have stated that they will leave the Department if further compensation or benefits cuts occur as well as with departing officers who cited financial concerns as their reason for leaving. Jones Elig. Reply Decl.[39], ¶¶ 13-15; Jones DTD, ¶ 7. Chief Jones also testified that the City is already having difficulty recruiting and retaining qualified officers, despite the passage of Measure A. Jones DTD, ¶ 5.[40] Particularly troubling is the loss of the City's more experienced officers. *Id.* (testifying that over 5 years, the average tenure of officers and sergeants at the City's police department dropped from 14.22 years to 9.34 years). Meanwhile, all of this has occurred while the City continues to struggle with a staggeringly high crime rate. Jones DTD, ¶¶ 4, 8; *see also* Eligibility Opinion, 493 B.R. at 781, 789-90 (finding that the City's high crime rate was due in part to the reduced number of police officers).

---

[39] Declaration of Eric Jones in Support of City of Stockton's Reply to Objections to Its Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code [Dkt. No. 710, Trial Ex. 1379] ("**Jones Elig. Reply Decl.**").

[40] *See also* footnote 17.

1    The testimony of Deis, Wilson and Jones was confirmed by the City's labor unions. The

2 briefs filed by the Stockton City Employees Association, *et al.*, and the Stockton Police Officers

3 Association and Stockton Police Managers Association assert that terminating the CalPERS

4 relationship will cause employees to leave.  *See* Memorandum of Stockton City Employees

5 Association, et al., Regarding Impairment of Pensions and in Support of Stockton's Plan of

6 Adjustment [Dkt. No. 1650] at 8-10 and fn 11 ("The suggestion that, having made substantial

7 compensation and benefits sacrifices and then having their pensions substantially impaired, the

8 City's employees would simply settle in and accept these financial blows is more than risible.");

9 Supplemental Memorandum of the Stockton Police Officers Association and Stockton Police

10 Managers Association in Support of Confirmation of the City's First Amended Plan of

11 Adjustment, as Modified [Dkt. No. 1659] at 2, 6, 8-11, and 14 ("If Stockton terminated its

12 CalPERS relationship, any police officer hired before January 1, 2013, would be foolish to stay at

13 Stockton longer than six months after the termination, rather than moving to another agency as a

14 classic member"; "Stockton is already struggling to attract and retain police officers; a difficult

15 situation would become effectively impossible if the City's relationship with CalPERS were

16 terminated.  Even the current discussions about the *potential* rejection of the CalPERS 'contract'

17 is causing safety employees to seriously consider their options.") (emphasis in original).

18    Furthermore, the Nicholl testimony described in detail the key incentives that City

19 employees will have to seek other employment in the event that their pensions are impaired.

20 Franklin's argument is essentially that because employees would be unable to recover any

21 impairment of accrued benefits, they will stay.  The critical flaw in this criticism is that it ignores

22 not only the lost goodwill of those employees, but also the clear incentives presented to

23 employees looking *forward*.[41]  First, as Nicholl testified, employees will have a strong incentive

24 to flee to another CalPERS agency within six months of the termination of their CalPERS

25 benefits in order to avoid being permanently consigned to a lower benefits level under PEPRA.[42]

26

---

[41] Despite Franklin's insistence that it is taking a forward-looking approach for employees, *see* Franklin Post-Trial
27 Br., at 50, its refusal to consider the tangible incentives facing employees belies its argument.
[42] Franklin implies that recent changes to PEPRA, as described in the various media reports it cites, will eliminate
28 this incentive. Franklin Post-Trial Br., at 50.  As has become its practice, Franklin offers no specifics and no
explanation as to why this would be the case, and quickly moves on.  Put simply, Franklin's insinuation greatly

1   *See* Conf. Tr., June 4, 2014, at 29:20-37:1 (testimony of Kim Nicholl) and Trial Ex. 3085.

2   Second, Nicholl testified that it is extremely unlikely that the City would be able to offer a

3   competitive pension through any of the alternative pension plans the City might choose.  Third,

4   because of the delay inherent in establishing an alternative pension system, City employees are

5   unlikely to wait and see what sort of plan the City could create.  Instead, employees will use that

6   time to seek other employment, particularly in light of the six-month window to maintain their

7   "classic" CalPERS standing.  Finally, Franklin disregards the loss of trust between the City and

8   its employees that would result from the impairment of pensions (in addition to all of the other

9   cuts that have been imposed), and argues that City employees will simply make the "rational"

10   decision to remain with the City.   Based on the clear import of the evidence, however, the

11   "rational" employee whose pension is impaired is much more likely to leave than to stay.

12       Franklin remains true to form and attempts to dismiss this evidence out of hand as

13   "completely hypothetical" and "self-serving."[43]  Franklin Post-Trial Br., at 49.  The City's

14   evidence consists of conversations with current and departing employees, an analysis of the

15   incentives actually facing the City's workforce, the costs and benefits of the City's pension

16   alternatives, and the experience of those who run the City day-to-day.  In contrast, Franklin failed

17   to present any meaningful, substantive evidence to counter the testimony of the City's Police

18   Chief, City Managers, Human Resources Director, labor consultants, and pension expert

19   regarding the likelihood that City employees will depart en masse if their pensions are reduced.

20   Franklin bases its assertion that the City's concern with the possibility of employee flight is

21   "hypothetical" on the ground that "the City has never even hinted that it might seek to terminate

22   its relationship with CalPERS."  Franklin Post-Trial Br., at 49.  Essentially, Franklin wants the

23   City to cut pensions and see what happens, despite the clear statements of City staff, City

24   / / /

---

26   overstates the referenced changes, and City employees would still be subject to the six-month transfer window in the
     event the City's CalPERS contract is terminated in order to avoid being permanently relegated to a lower benefit
     level.

27   [43] In contrast to its glowing support of the testimony of Charles Moore, its paid expert, Franklin chidingly refers to
     the testimony of Chief Jones regarding his conversations with current and former City police officers regarding their
28   motivations and incentives as "self-serving."  Franklin Post-Trial Br., at 49.  The City stipulates that the Chief of
     Police has an interest in keeping police officers on the street.

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1　employees and the City labor unions that cuts will lead to employee departures.  The City cannot

2　abide such a risk.

3　　　　　The sole evidence offered by Franklin to support its speculation is the anecdotal testimony

4　of Charles Moore about what he believes happened in Detroit.[44]  Moore's testimony regarding

5　the threat of employee departures – which is presented essentially in its entirety at pages 51-52 of

6　Franklin's brief – includes no specifics, no corroborating evidence, and no concrete suggestions

7　as to what alternative pension plan the City could provide in order to retain its employees.

8　Neither Franklin nor Moore offers any evidence or analysis showing how the City could provide

9　competitive pensions outside of CalPERS; nor do they provide any tangible evidence to show that

10　City employees will not depart if their pensions are terminated.  Moreover, Moore's claim that

11　there will be no employee exodus is based on the assumption that employees will be better off if

12　they stay.  As demonstrated by the testimony of numerous City employees and the City's pension

13　expert, as well as the briefs of the City's labor unions, that assumption is clearly and definitively

14　disproved by the evidence.[45]  The evidence before the Court shows that the City has a real and

15　legitimate concern that impairing its pensions will have a disastrous effect on its ability to hire

16　and retain qualified employees, and, consequently, on its ability to provide a basic level of public

17　safety and services.

18　　　　　**5.**　　**The City Cannot Use Savings From Slashed Accrued Benefits To**
19　　　　　　　　 **Increase Benefits In The Future.**

20　　　　　Franklin asserts that the City has not shown that alleged savings from impairing accrued

21　benefits would not exceed the additional costs and delays created by switching to an alternative

22　pension plan.  Franklin Post-Trial Br., at 48. Franklin offers no evidence or analysis of its own on

---

[44] Moore's testimony with respect to the City's employees should be afforded no weight since he did not speak with a single City officer when conducting his due diligence.  *See* Conf. Tr., May 14, 2014, at 19:18-20:3, 88:1-89:16 (testimony of Charles Moore).  So, too, with respect to his views on the operation of a California local government, as he admitted ignorance of nearly all of the California statutes and propositions that might bear on the City's financial situation.  *Id.* at 103:13-105:8.

[45] Franklin also cites to Lamoureux's testimony that "***there is nothing that a City employee could do to eliminate or lessen the benefit reduction***." (emphasis in original).  Franklin Post-Trial Br., at 49.  However, Franklin is careful to omit Lamoureux's testimony that while City employees could not affect the reduction of Stockton benefits, the employees could leave the City in order to not be subject to reduced benefits going forward.  Conf. Tr., May 14, 2014, at 205:19-23 (testimony of David Lamoureux).  Franklin's citation to this supposedly "devastating" testimony, *see* Franklin Post-Trial Br., at 48, is another instance of Franklin assuming City employees will just take their lumps while ignoring the prospective incentives for them to leave.

1   the matter, and instead bases its implication on the fact that the City cannot, without going

2   through the process of actually adopting an alternative, establish an exact amount for the

3   additional cost.  Such speculation ignores the obvious problems with depending on cutting

4   accrued benefits in order to pay for future benefits.

5        As Nicholl explained, any of the alternative pension plans the City might chose would

6   likely result in a substantial additional cost to provide comparable benefits.  Moreover, it is not as

7   if the City could simply impair its pensions and then use all of the extra money to pay Franklin

8   and its new pensions.  At a minimum, as described above, a large chunk of that money would

9   have to be spent on covering the newly created claims. In addition to going back to the drawing

10  board with its nine labor unions, the City also would be required to renegotiate any number of its

11  current settlements, most notably its one-cent-on-the-dollar settlement with the Retirees

12  Committee.  Franklin also ignores the likelihood that the City, as part of its negotiations with its

13  unions, would have to make additional concessions in order to compensate employees for the cut

14  benefits if it were to have any chance of keeping those employees. Thus, it is likely that any

15  savings that did accrue from slashing pensions would be consumed by the combination of higher

16  pension costs, additional bankruptcy claims, renegotiated settlements and the need to fund higher

17  compensation in light of lost benefits.  Franklin has offered no evidence that there would be any

18  "leftover" amount to pay creditors, and even if the City could save money in the short-term by

19  cutting accrued benefits enough to cover the costs of a more expensive pension plan, those

20  savings will eventually be used up, and the City will be left with a more expensive pension plan

21  in perpetuity.

22       Franklin also ignores the other ways in which a non-CalPERS pension would be less

23  attractive to employees, such as the lack of reciprocity with the CalPERS system and the greater

24  investment risks associated with a City-only system.  If offered a choice between a CalPERS

25  pension and a non-CalPERS pension with the same annual benefit, current and potential

26  employees will opt for the greater freedom, security, and portability provided by the CalPERS

27  system.  Based on these considerations, Franklin's implication that the City can simply slash past

28  benefits in order to fund higher future benefits is mere speculation.

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1      **F.      The City Has Proposed The Plan In Good Faith.**

2           Franklin makes the bizarre claim that "the City's entire argument proceeds on the

3      assumption that there is a 'good faith' or 'business judgment' exemption from the Bankruptcy

4      Code's statutory prerequisites to confirmation." Franklin Post-Trial Br., at 34. The City's good

5      faith in proposing the Plan is not an exemption, but an *affirmative requirement* of Bankruptcy

6      Code § 1129(a)(3).[46] Franklin clearly understands this and has challenged the City's good faith.

7      *See* Franklin Post-Trial Br., at 7 (listing alleged bases for objection). Franklin can thus hardly be

8      surprised that the City offered evidence of its good faith in support of confirmation.

9           As described above, the evidence overwhelmingly establishes that the City has a real and

10     imminent concern that impairing pensions would critically damage its ability to hire and retain

11     qualified employees. The inescapable reality is that CalPERS remains the market standard for

12     public employee pensions in California, and there is no viable, cost-effective alternative to

13     remaining in the CalPERS system. Additionally, the City's decision not to impair pensions was

14     also based on its need to maintain its labor agreements, as well as its mediated settlement with the

15     Retirees Committee. Those agreements were the result of long and difficult negotiations, and

16     created substantial savings for the City. However, each requires the maintenance of the City's

17     pension obligations. If the City is forced to impair pensions, months of negotiations would be

18     wiped out, putting the City back at square one with these creditors, and further eroding the City's

19     relationship with its employees.

20          This does not mean that the City has done nothing to address its pension and other post-

21     employment benefit costs. As the Court has recognized, the substantial reductions in the City's

22     workforce and compensation will result in lower pension costs down the road. Eligibility

23     Opinion, 493 B.R. at 785. So, too, will the City's implementation of new, lower pension tiers and

24     its shifting of a portion of its pension costs to employees. On top of those reductions, the City has

25     completely eliminated its massive retiree health liability. And in addition to those compensation

26     and benefit reductions, the City's voters passed Measure A, which will raise substantial additional

27     funds for the payment of creditors.

28

---

[46] The relevance of the City's "business judgment" is discussed below.

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
                                          CONFIRMATION OF PLAN OF ADJUSTMENT

1    The City's decision not to impair pensions is not some mean-spirited ploy designed to

2    punish Franklin, despite its protestations.[47]  At every stage of its bankruptcy case, the City has

3    sought to cut costs, increase revenues, and strike deals with its creditors.  With regard to its

4    pension liabilities, the City thoughtfully considered its options and came to the conclusion that it

5    simply could not impair pensions without risking the wholesale flight of its employees.  That

6    decision was not made lightly, and was not the result of any ill-will on the City's part.  Rather, the

7    City came to the good faith conclusion that remaining with CalPERS was the only feasible

8    option.

9    G.    **Even If The Court Were To Rule That The City's Relationship With
         CalPERS Was An Executory Contract, The City's Decision To Assume That
10        Contract Would Be A Reasonable Exercise Of Its Business Judgment.**

11       As with the issue of good faith, Franklin makes the perplexing argument that the City is

12   attempting to create a "business judgment exemption" to the requirements of chapter 9.  Franklin

13   Post-Trial Br., at 34.  Once again, this contention misapprehends the City's briefing.  In the event

14   that the Court rules that the City's relationship with CalPERS constitutes an executory contract,

15   the reasonableness of the City's decision to assume said contract under § 365 would be placed at

16   issue.  *See In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007)

17   (bankruptcy courts apply the "business judgment rule" to evaluate a debtor's assumption or

18   rejection of an executory contract); *Orion Pictures Corp. v. Showtime Networks (In re Orion*

19   *Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).  This is plainly Franklin's objective, as it

20   argues in no uncertain terms that the City's pension obligations should be deemed an executory

21   contract.  Franklin Post-Trial Br., at 14-15 (twice stating that CalPERS is "plainly wrong" to

22   argue otherwise).  The City's discussion of its business judgment is therefore part and parcel of its

23   contention that the Court can confirm the Plan regardless of its decision on the issue of impairing

24   pensions.  Even if Franklin were to succeed in convincing the Court that the City's pensions can

25   be impaired as an executory contract, the evidence demonstrates that the City has made a

26   completely justified business decision to assume that agreement.  Franklin's attempt to cast the

27

28   ———————————
     [47] Franklin repeatedly refers to its treatment under the City's Plan as "punitive", notwithstanding the fact that such
     treatment was overwhelmingly consented to by the rest of Class 12.  Franklin Post-Trial Br., at 9, 46, 47, 63.

CITY'S SUPPL. REPLY BRIEF IN SUPPORT OF
CONFIRMATION OF PLAN OF ADJUSTMENT

1   City's argument as to its business judgment as relating to a non-existent "exemption" is simply

2   nonsensical.

3   **III.     <u>CONCLUSION</u>**

4        Based on the foregoing, the City respectfully requests that the Court confirm the Plan.

5

6   Dated: September 18, 2014                    MARC A. LEVINSON
                                                 NORMAN C. HILE
7                                                PATRICK B. BOCASH
                                                 Orrick, Herrington & Sutcliffe LLP
8

9

10                                              By:  _____*/s/ Marc A. Levinson*_____
                                                     MARC A. LEVINSON
11                                                   Attorneys for Debtor
                                                     City of Stockton
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28