FILED

FEB - 4 2015

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re:                                )
                                      )        Case No. 12-32118-C-9
CITY OF STOCKTON, CALIFORNIA,         )
                                      )
                Debtor                )
_____)

**OPINION REGARDING CONFIRMATION AND STATUS OF CALPERS[1]**

Before:   Christopher M. Klein
          Chief Bankruptcy Judge

Marc A. Levinson, Orrick, Herrington & Sutcliffe LLP, Sacramento, California, for Debtor.

Michael J. Gearin, K&L Gates LLP, Los Angeles, California, for California Public Employees' Retirement System.

James O. Johnston, Jones Day, Los Angeles, California, for Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund.

---

[1]This opinion supplements this court's oral rulings rendered in open court on October 1 and 30, 2014.

KLEIN, Bankruptcy Judge:

Resolving the single objection to confirmation of the chapter 9 plan of adjustment of debts by the City of Stockton necessitates answering the threshold question whether, as a matter of law, pension contracts entered into by the City, including the pension administration contract, may be rejected pursuant to Bankruptcy Code § 365.  11 U.S.C. § 365.

After answering that question of law in the affirmative, we come to the main question:  whether, as matters of law and fact, the City's chapter 9 plan should be confirmed even though the plan does not directly impair the City-sponsored pensions.

Franklin Templeton Investments ("Franklin") objects to confirmation, contending that the City's failure to modify pensions means that the plan (1) is not proposed in good faith and (2) that Franklin's unsecured claim should be separately classified so that Franklin can be deemed to be a separate, non-accepting class as to which the plan may be confirmed only if, with respect to Franklin, it is fair and equitable and does not unfairly discriminate against it.  11 U.S.C. §§ 1122(a), 1129(a)(3) & 1129(b).

If Franklin's unsecured claim is not separately classified, then the fair-and-equitable-and-not-unfairly-discriminatory analysis of § 1129(b) would not apply to this plan because Franklin's claim is dwarfed and out-voted in the single class of unsecured claims.  The value given up by retirees who accepted the plan is on the order of ten times the value lost by Franklin.

The California Public Employees' Retirement System ("CalPERS"), which by contract administers the City-sponsored

2

pensions, says that California law insulates its contract from rejection and that the pensions themselves may not be adjusted. Although, as will be seen, it is doubtful that CalPERS even has standing to defend the City pensions from modification, CalPERS has bullied its way about in this case with an iron fist insisting that it and the municipal pensions it services are inviolable.  The bully may have an iron fist, but it also turns out to have a glass jaw.

This decision determines that the obstacles interposed by CalPERS are not effective in bankruptcy.  First, the California statute forbidding rejection of a contract with CalPERS in a chapter 9 case is constitutionally infirm in the face of the exclusive power of Congress to enact uniform laws on the subject of bankruptcy under Article I, Section 8, of the U.S. Constitution — the essence of which laws is the impairment of contracts — and of the Supremacy Clause.  U.S. CONST. art. I, § 8 & art. VI.  Second, the $1.6 billion lien granted to CalPERS by state statute in the event of termination of a pension administration contract is vulnerable to avoidance in bankruptcy as a statutory lien.  11 U.S.C. § 545.  Third, the Contracts Clauses of the Federal and State Constitutions, as implemented by California's judge-made "Vested Rights Doctrine," do not preclude contract rejection or modification in bankruptcy.  Finally, considerations of sovereignty and sovereign immunity do not dictate a different result.

Hence, as a matter of law, the City's pension administration contract with CalPERS, as well as the City-sponsored pensions themselves, may be adjusted as part of a chapter 9 plan.

3

But, when one turns to the question of plan confirmation, pensions must be viewed as but one aspect of total compensation.

The City's plan achieves significant net reductions in total compensation (including lower pensions for new employees and elimination of up to $550 million in unfunded health benefits) that employees accepted in exchange for preserving existing pensions.

All capital markets creditors, except Franklin, accepted a package of restructured bond debt in impairments reflecting their relative rights in collateral.  Franklin did not fare as well because it took poor collateral to support its loan.

Viewing compensation as a whole package, and comparing those net reductions with the net reductions for capital markets creditors, the plan is, in law and fact, appropriate to confirm.

## Jurisdiction

Jurisdiction is founded on 28 U.S.C. § 1334.  The question whether to confirm a chapter 9 plan of adjustment is a core proceeding that a bankruptcy judge may hear and determine.  28 U.S.C. § 157(b)(2)(L).

The premise of Franklin's objection to confirmation is its theory that the City's pensions administered by CalPERS may be modified and that the plan should not be confirmed unless the pensions are modified.  The City's plan does not propose to adjust the CalPERS pension.[2]  The ferocity of CalPERS' resistance

---

[2]The City's Plan of Adjustment provides with respect to its local pension that it labels as "CalPERS Pension Plan":

4

to Franklin's position (and of other financial creditors who have since compromised) throughout this case belies its assertion that the question is moot.[3]  Since the answer to the question is essential to resolve Franklin's objection, it is not moot.

## I
## Structure of City's Pensions

In addition to acting as the pension system for employees of the State of California, CalPERS contracts with California municipalities in competition with other pension administrators to administer local pensions for municipalities. Public Employees' Retirement Law, Cal. Gov't Code § 20460

---

P. Class 15 – Claims of CalPERS Pension Plan Participants Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS under the CalPERS Pension Plan.

2. Treatment.
The City will continue to honor its obligations under the CalPERS Pension Plan, and CalPERS and the CalPERS Pension Plan Participants retain all of their rights and remedies under applicable nonbankruptcy law. Thus, CalPERS and the CalPERS Pension Plan Participants will be entitled to the same rights and benefits to which they are currently entitled under the CalPERS Pension Plan. CalPERS, pursuant to the CalPERS Pension Plan, will continue to provide pension benefits for participants in the manner indicated under the provisions of the CalPERS Pension Plan and applicable nonbankruptcy law.

First Amended Plan For the Adjustment of Debts of City of Stockton, California, As Amended (August 8, 2014), at 43-44.

[3]Cf. WM. SHAKESPEARE, HAMLET, act III, sc. ii ("The lady doth protest too much, methinks.").

("PERL").[4]  The Stockton-sponsored pension plan is such a plan.

### A

The City's pension obligation is established by contract between the City and its employees.  The terms of the City-sponsored pension conform to a template that CalPERS is willing to administer by contract.  The City could also select a different administrator in the public or private sector or establish its own administration system.

If one were to diagram the relevant relationships, one would draw a triangle in which the corners are the City, CalPERS, and City employees.  There are three distinct relationships.  First, the City agrees with its employees to provide pensions.  Second, the City agrees with CalPERS that CalPERS will administer City pensions by collecting payments from the City and investing those funds so as to produce enough to pay the pensions, and then paying on behalf of the City.  Third, CalPERS promises City employees that it will pay the pensions.

From the viewpoint of the law of contract, there are three connected bilateral relationships.  Two legs of the triangle are

---

[4]PERL § 20460 provides:

§ 20460.  Public Agency Participation

Any public agency may participate in and make all or part of its employees members of this [CalPERS] system by contract entered into between its governing body and the [CalPERS] board pursuant to this part.  However, a public agency may not enter into the contract within three years of termination of a previous contract for participation.

Cal. Gov't Code § 20460.

contracts: between City and employees and between City and
CalPERS.  The third leg is a third-party beneficiary relationship
according to which pensioners are intended third-party
beneficiaries of the City's contract with CalPERS.  See CalPERS'
Brief in Support of Stockton's Petition, Dkt. No. 711, at 5.

B

CalPERS does not bear financial risk from reductions by the
City in its funding payments because state law requires CalPERS
to pass along the reductions to pensioners in the form of reduced
pensions.  Rather, it is the pensioners, present and future,
themselves who are at risk of loss.[5]

As noted, a municipality is free to establish its own self-
funded, self-administered pension system, commonly funded by
individual or group life insurance or annuity contracts.[6]  It may

---

[5]It is not necessary to explore CalPERS' motivations for its
extraordinary legal effort in this case in defense of pensions
for which it bears little financial risk.  For whatever reason,
CalPERS chose to intrude itself into this case and repeatedly (at
virtually every hearing) insist that it is impossible as a matter
of law to reject or modify its pension administration contract
and the related pensions.  This opinion answers the question that
CalPERS kept thrusting upon the court.

[6]Such a funding mechanism is recognized in PERL § 20462:

§ 20462 Existing Pension Trust or Retirement Plan Continued

The governing body of a public agency that has
established a pension trust or retirement plan funded by
individual or group life insurance or annuity contracts may,
notwithstanding any provision of this [PERL] to the
contrary, enter into a contract to participate in this
[CalPERS] system, and continue the trust or plan with
respect to service rendered prior to the contract date.

7

join a county pension system or another municipality's pension system.  It may contract with a private entity to administer its pensions.  Nor does there appear to be an impediment to agreeing in collective bargaining to pay into a union-administered pension plan.  Or, it may contract with CalPERS.

A municipality is entitled to shift from one pension administrator to another.  If it shifts away from CalPERS, it cannot enter into a new CalPERS contract for three years.  Cal. Gov't Code § 20460.

The key legal point to draw from this structure is that the authority of CalPERS to interject itself into the potential modification of a municipal pension in California under the Federal Bankruptcy Code is doubtful.  As CalPERS does not guaranty payment of municipal pensions and has a connection with a municipality only if that municipality elects to contract with CalPERS to service its pensions, its standing to object to a municipal pension modification through chapter 9 appears to be lacking.

Nevertheless, the reality is that CalPERS has captured a substantial portion of the local pension servicing market in California.  As of June 2014,[7] it services pensions sponsored by 1580 local public agencies and 1513 school districts under a variety of benefit formulas with optional contract provisions. Only 32 percent (552,888 employees) of its members are state employees, another 31 percent (531,697 employees) are local

---

Cal. Gov't Code § 20462 (1st sentence).

[7]CalPERS at a Glance, www.calpers.ca.gov.

1    government employees, and 37 percent (631,388 employees) are

2    school employees.  But there are also large public pension plans

3    in California that CalPERS does not administer.[8]

4

5                                II

6                              CalPERS

7         A municipality that contracts with CalPERS is not dealing

8    with an ordinary contractual counterparty.

9

10                                A

11        First, CalPERS enjoys some natural competitive advantages

12   over other local pension servicers.  CalPERS pension rights are

13   "portable" in that they can be carried by an employee from one

14   CalPERS employer to another CalPERS employer.  By limiting

15   pension provisions to standard features approved by CalPERS, it

16   can keep track of benefits as they accumulate, charging each

17   employer its appropriate contribution.  That "portability"

18   facilitates nimble public-sector career management in California.

19

20                                B

21        Second, the PERL, in the course of nearly 800 pages in the

22   California Government Code, mandates myriad non-negotiable

23   _____

24        [8]The U.S. Census reported that nationally the average state-
     administered plan held $10 billion in assets.  The following
25   local plans not administered by CalPERS hold more assets that the
     average state plan:  Los Angeles County Employees ($31 billion);
26   Los Angeles Fire and Police ($12 billion); and San Francisco City
     and County Employees ($12 billion).  ALICIA H. MUNNELL, STATE AND
27   LOCAL PENSIONS: WHAT NOW? 22 (Brookings Inst. 2012) ("MUNNELL")
     (citing 2010 U.S. Census data).
28

provisions and practices that might otherwise be negotiable in contracts with a private pension provider.  A municipality that wishes to contract with CalPERS must choose from a template of benefit formulae and optional contract provisions acceptable to CalPERS.  Hence, there is less of the freedom of contract than one might experience in dealing with a private pension provider.

Second, the CalPERS board is not typical of a private board. The thirteen-member CalPERS board is selected on a political basis: seven public officials or appointees thereof and six persons elected by the employees participating in CalPERS.[9]

---

[9]PERL § 20090 provides:

Composition and Continuation of Board

The Board of Administration of the Public Employees' Retirement System is continued in existence.  It consists of:
(a) One member of the State Personnel Board, selected by and serving at the pleasure of the State Personnel Board.
(b) The Director of Human Resources.
(c) The Controller.
(d) The State Treasurer.
(e) An official of a life insurer and an elected official of a contracting agency, appointed by the Governor.
(f) One person representing the public, appointed jointly by the Speaker of the Assembly and the Senate Committee on Rules.
(g) Six members elected under the supervision of the board as follows:
(1) Two members elected by the members of this system [employees] from the membership thereof.
(2) A member elected by the active state members of this system from the state membership thereof.
(3) A member elected by and from the active local members of this system who are employees of a school district or a county superintendent of schools.
(4) A member elected by and from the active local members of this system other than those who are employees of a school district or a county superintendent of schools.

10

The California Constitution restricts the ability of the state legislature to reform the composition of the CalPERS board. CAL. CONST. art. XVI, § 17(f).[10]

The California Constitution also provides that the board of a public pension or retirement system, be it CalPERS, a county system, or a city system, has "plenary authority and fiduciary responsibility for investment of moneys and administration of the system" and proceeds to spell out various duties and to limit the ability of the state legislature to affect investment policies. CAL. CONST. art. XVI.[11]

---

(5) A member elected by and from the retired members of this system.

Cal. Gov't Code § 20090.

[10]The CalPERS board (and of any other public pension board with elected employee members) enjoys this protection from the vagaries of legislative process:

(f) With regard to the retirement board of a public pension or retirement system which includes in its composition elected employee members, the number, terms, and method of selection or removal of members of the retirement board which were required by law or otherwise in effect on July 1, 1991, shall not be changed, amended, or modified by the Legislature unless the change, amendment, or modification enacted by the Legislature is ratified by a majority vote of the electors of the jurisdiction in which the participants of the system are or were, prior to retirement, employed.

CAL. CONST. art. XVI, § 17(f).

[11]Relevant portions of Article XVI provide:

(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system.  The retirement board shall

11

Once a municipality agrees to a CalPERS contract, the CalPERS board gets into a position to block changes in the municipality's pensions by saying a local change would adversely affect the system.[12]  In view of the composition of the board, of which elected current and retired employees comprise six thirteenths (46%), one can easily imagine board opposition being interposed to an amendment of a municipality's plan or administrative provisions that its employees do not like.[13]

---

also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries.  The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.

CAL. CONST. art. XVI, § 17(a).

(g) The Legislature may by statute continue to prohibit certain investments by a retirement board where it is in the public interest to do so, and provided that the prohibition satisfies the standards of fiduciary care and loyalty required of a retirement board pursuant to this section.

CAL. CONST. art. XVI, § 17(g).

[12]PERL § 20461 provides:

Refusal of Board to Contract

The board may refuse to contract with, or to agree to an amendment proposed by, any public agency for any benefit provisions that are not specifically authorized by this [PERL] and that the board determines would adversely affect the administration of this system.

Cal. Gov't Code § 20461.

[13]Scholarly literature is inconclusive regarding the effect of employees and retirees on pension boards on the likelihood

12

In effect, municipal employees are permitted indirectly to participate in negotiations between a municipality and CalPERS. The process of voluntarily adjusting a CalPERS pension requires that the municipality, first, negotiate with its employees regarding the pension and, second, run the gauntlet of also satisfying the CalPERS board.

The PERL also operates to involve CalPERS in negotiations between a municipality and its employees.[14]  In short, while

---

that Annual Required Contributions ("ARCs") will be made in full (i.e., full annual funding).  One view says employees and retirees on boards may favor benefit expansion or higher cost-of-living increases over funding.  Another view says they have a greater stake in the plan's success and will favor full regular funding.  Studies show mixed results.  MUNNELL at 83–84, 101–02.

[14]For example, PERL § 20463 provides:

    (a) The governing body of a public agency, or an employee organization, recognized under Chapter 10 (commencing with Section 3500) of Division 4 of Title 1, that represents employees of the public agency, that desires to consider the participation of the agency in this [CalPERS] system or a specific change in the agency's contract with this system, may ask the board for a quotation of the approximate contribution to this system that would be required of the agency for that participation or change.
    (b) If the governing body of a public agency requests a quotation, it shall provide each employee organization representing employees that will be affected by the proposed participation or change with a copy of the quotation within five days of receipt of the quotation.
    (c) If an employee organization requests a quotation, the employee organization shall provide the public agency that will be affected by the proposed participation or change with a copy of the quotation within five days of receipt of the quotation.
    (d) The board may establish limits on the number of quotations it will provide for each contract and the fees, if any, to be assessed for each quotation provided.  The limits and fees established by the board shall be applied in the same manner to a public agency or an employee

13

privity of contract may be between the municipality and CalPERS, the reality of the operation of the CalPERS process has employees participating in those discussions armed with the muscle of employee representatives constituting 46 percent of the board.

Although the PERL contemplates that a municipality is free to shift to a different pension administrator, the ferocity of CalPERS' behavior in this case indicates that it has a policy of, by overt and passive aggression, resisting attempts to make such shifts.  Some PERL provisions fuel that policy.

C

In PERL § 20487, the California legislature singled out CalPERS, and no other municipal pension administrator, for special protection in chapter 9 bankruptcy cases by forbidding the rejection of any contract between a municipality and CalPERS under 11 U.S.C. § 365.  Further, PERL § 20487 purports to give CalPERS a veto over any assumption or assignment of a contract between it and a municipality in chapter 9.[15]  The efficacy of

---

organization.

Cal. Gov't Code § 20463.

[15]PERL § 20487 provides:

Notwithstanding any other provision of law, no contracting agency or public agency that becomes the subject of a case under the bankruptcy provisions of Chapter 9 (commencing with Section 901) of Title 11 of the United States Code shall reject any contract or agreement between that agency and the board pursuant to Section 365 of Title 11 of the United States Code or any similar provision of law; nor shall the agency, without the prior written consent of the board, assume or assign any contract or agreement

14

that section in a chapter 9 case will be addressed later in this opinion.

D

The PERL nominally permits a municipality to shift from CalPERS to another pension provider or system.  Thus, CalPERS is authorized to negotiate terms of a switch.[16]

Nevertheless, PERL discourages such a shift by imposing a termination charge that is backed by a confiscatory statutory lien.  PERL § 20574.[17]

---

between that agency and the board pursuant to Section 365 of
Title 11 of the United States Code or any similar provision
of law.

Cal. Gov't Code § 20487.

[16]PERL § 20573 provides:

Notwithstanding any other provision of law, the board
may negotiate with the governing board of the terminating
agency, or the governing board of any agency or agencies
which may be assuming any portion of the liabilities of the
terminating agency as to the effective date of termination
and the terms and conditions of the termination and of the
payment of unfunded liabilities.
For purposes of payment of unfunded actuarial
liabilities this section shall also apply to inactive
contracting agencies, or an inactive member category as
determined by the board.

Cal. Gov't Code § 20573.

[17]PERL § 20574 provides:

A terminated agency shall be liable to the [CalPERS]
system for any deficit in funding for earned benefits, as
determined pursuant to Section 20577, interest at the
actuarial rate from the date of termination to the date the
agency pays the system, and for reasonable and necessary

15

1

The PERL § 20574 termination lien operates as follows.  Upon termination, either voluntary or involuntary, CalPERS holds accumulated contributions for the benefit of employees and beneficiaries with respect to previously-credited service.[18]  All plan assets are merged into a single termination pool that CalPERS invests on a conservative basis, according to the testimony of its Assistant Chief Actuary, so as to yield about

---

costs of collection, including attorney's fees.  The board shall have a lien on the assets of a terminated agency, subject only to a prior lien for wages, in an amount equal to the actuarially determined deficit in funding for earned benefits of the employee members to the agency, interest, and collection costs.  The assets shall also be available to pay actual costs, including attorney's fees, necessarily expended for collection of the lien.

Cal. Gov't Code § 20574.

[18]PERL § 20576(a) provides:

(a) Upon termination of a contract, the board shall hold for the benefit of the members of this [CalPERS] system who are credited with service rendered as employees of the contracting agency and for the benefit of beneficiaries of the system who are entitled to receive benefits on account of that service, the portion of the accumulated contributions then held by this system and credited to or as having been made by the agency that does not exceed the difference between (1) an amount actuarially equivalent, including contingencies for mortality fluctuations, as determined by the actuary and approved by the board, the amount this system is obligated to pay after the effective date of termination to or on account of persons who are or have been employed by, and on account of service rendered by them to, the agency, and (2) the contributions, with credited interest thereon, then held by this system as having been made by those persons as employees of the agency.

Cal. Gov't Code § 20576(a).

half of the rate of return realized on CalPERS' general
investment pools.[19]

The amount of underfunding in the termination pool is
determined under PERL § 20577.[20]  The terminating municipality

---

[19]PERL § 20576(b) provides:

(b) All plan assets and liabilities of agencies whose
contracts have been terminated shall be merged into a single
pooled account to provide exclusively for the payment of
benefits to members of these plans.  Recoveries from
terminated agencies for any deficit in funding for earned
benefits for members of plans of terminated agencies, and
interest thereon, shall also be deposited to the credit of
the terminated agency pool.

Cal. Gov't Code § 20576(b).

[20]PERL § 20577 provides:

If, at the date of termination, the sum of the
accumulated contributions credited to, or held as having
been made by, the contracting agency and the accumulated
contributions credited to or held as having been made by
persons who are or have been employed by the agency, as
employees of the agency, is less than the actuarial
equivalent specified in clause (1) of subdivision (a) of
section 20576, the agency shall contribute to this [CalPERS]
system under terms fixed by the board, an amount equal to
the difference between the amount specified in clause (1) of
subdivision (a) of Section 20576 and the accumulated
contributions.  The amount of the difference shall be
subject to interest at the actuarial rate from the date of
contract termination to the date the agency pays this
system.  If the agency fails to pay to the board the amount
of the difference, all benefits under the contract, payable
after the board declares the agency in default therefor,
shall be reduced by the percentage that the sum is less than
the amount in clause (1) of subdivision (a) of Section 20576
as of the date the board declared the default.  If the sum
of the accumulated contributions is greater than the amount
in clause (1) of subdivision (a) of Section 20576, an amount
equal to the excess shall be paid by this system to the
contracting agency, including interest at the actuarial rate
from the date of contract termination to the date this

17

must fully fund the termination pool.  As of the time of termination, CalPERS calculates the difference between accumulated contributions and the total amount that would be required to be in the termination pool to enable CalPERS to pay all then-vested benefits of the terminating municipality in full. The municipality is then billed for the difference.

The PERL § 20574 lien enforces the debt determined under PERL § 20577.  It applies to all assets of the terminated contracting municipality.  The provision that it is "subject only to a prior lien for wages" means that it jumps into line ahead of all other liens.

The effect of shifting accumulated contributions from the CalPERS general investment pool to the termination pool means that a municipality that has theretofore been deemed fully funded instantaneously becomes underfunded by virtue of lower projected investment returns in the termination pool.  Since the termination pool is invested on a more conservative basis than the normal pool, it produces lower yields.

2

Deep down, the reason for the sudden underfunding is simple. Pension funding status is a measure of the extent to which assets

---

system makes payment.  The market value used shall be the value calculated in the most recent annual closing.
    The right of an employee of a contracting agency, or his or her beneficiary, to a benefit under this system, whether before or after retirement or death, is subject to the reduction.

Cal. Gov't Code § 20577.

18

on hand, plus future required contributions, plus future
investment earnings are sufficient to pay benefits.  A formula is
set forth in the margin.[21]

Elementary mathematics teach that if a pension is fully
funded (i.e. a funding ratio of 1.0, colloquially stated in
percent), then the sum of the assets on hand, plus the present
value of future required contributions, plus the present value of
future investment earnings, exactly equal the present value of
all benefits to be paid.

If everything is equal where the expected rate of return on
future earnings is 8 percent, then a reduction in the investment
earning assumption from 8 percent to 3 percent causes the funding
ratio to drop below 100 percent.  Hence, fully funded status
could only be restored by increasing future required
contributions.

That is what happens with the CalPERS termination lien when
a terminating entity's assets are shifted to the termination
pool.  What may have been fully funded at the regular CalPERS 7.5
percent expected rate of return becomes underfunded at the
termination pool 2.98 percent expected rate of return.  The
problem is exacerbated because the future required contributions
are instantly accelerated to one lump sum.

That lump sum liability resulting from a potential shift to
the termination pool, in the case of the City, is $1.6 billion.

---

[21]Funding Ratio = (assets on hand + future required
contributions + future investment earnings) ÷ Benefits.

19

3

The actual analysis of the problem of the sudden descent into underfunded status that has just been stated in oversimplified form is much more complex because of the need to place actual numbers on future benefits, future contributions, and future investment returns and discount them to present value. Actuaries specialize in the mind-numbing computations needed to produce the basic numbers, while the appropriate discount rate strays into the realm of economists.

There is a debate currently raging among economists over the appropriate discount rate to apply in assessing the fiscal health of public pensions.

All agree that standard financial theory requires that future streams of payments be discounted to present value at a rate that reflects their risk.  The problem becomes determining the correct discount rate.

In the mathematics of finance, decreasing the discount rate applied to future benefits increases the present discounted value of those benefits.  When the value of benefits is compared with the value of plan assets, the lower the discount rate, the higher the contributions required to keep a plan in fully-funded status.

In the private sector, the discount-rate issue has been largely settled by the Financial Accounting Standards Board ("FASB") guidance that certain corporate bond rates be used as discount rates to determine funded status of private pensions. MUNNELL, at 59.

In the public sector, the practice is to base discount rates on expected investment returns instead of rates on government

20

bonds.   Therein lies controversy.

The Governmental Accounting Standards Board ("GASB"), which sets standards of accounting and reporting for state and local governments, recommends that the funded status of public pensions be determined using a discount rate of 8 percent, based on expected investment return on assets.   MUNNELL, at 59.[22]

Many economists disagree with GASB and argue that it is more appropriate to measure funding status of public pensions using a lower riskless rate of return analogous to the corporate bond rates used to discount private sector pensions, such as a long-term Treasury rate, instead of a higher expected long-run investment return on assets.   They reason that there is an implicit public guarantee that assures public pensions will be paid regardless of investment returns, which makes it hazardous to determine funded status and make benefit promises based on anticipated investment returns that may not come to pass.   In lay terms, they say using expected investment returns amounts to counting the chickens before they hatch.

By way of example, when estimating the overall national unfunded liability of state and local government pension plans, the difference between using an assumed riskless rate of 5 percent and using the 8 percent GASB-recommended rate affected the total aggregate unfunded liability by more than 300 percent.

---

[22]GASB was established in 1984 by agreement of the Financial Accounting Foundation and ten national associations of state and local government officials.   GASB recommendations are advisory but have achieved credibility among auditors and bond raters that leads most state and local governments to comply with them; some jurisdictions make compliance with them mandatory.   MUNNELL, at 16-18.   CalPERS generally complies with GASB standards.

21

MUNNELL, at 61-62.[23]

    CalPERS is actually more conservative than GASB in that, instead of the 8 percent GASB rate, it has recently adjusted its rate to 7.5 percent, based on 2.75 percent for inflation and 4.75 percent for investment return (net of expenses).

    The expected return rate in the CalPERS termination pool is the yield on 30-year Treasury obligations – 2.98 percent as of June 30, 2012.  The lower termination expected return rate leads to the claim that termination of the CalPERS pension administration contract for Stockton would yield a liability of $1.6 billion, even though the underfunded status for the City's two pension plans is about $211 million on an actuarial basis.

4

    In this respect, PERL § 20577 functions as a "golden handcuff" and a "poison pill."  If the fully-funded municipality does not terminate its CalPERS contract, then its accumulated pension contributions will remain in the normal investment pool, and it will remain fully funded (except to the extent that

---

[23]The explanation is:

    decreasing the discount rate increases the present discounted value of future benefits and thereby the unfunded liability.  ... In 2010, the aggregate liability was $3.4 trillion, calculated under a discount rate of 8 percent.  A riskless discount rate of 5 percent raises that liability to $5.2 trillion.  Since actuarial assets in 2010 were $2.6 trillion, the unfunded liability rises from $0.8 trillion ($3.4 trillion less $2.6 trillion) to $2.6 trillion ($5.2 trillion less $2.6 trillion).

MUNNELL, at 61-62.

CalPERS itself may, on a global basis, be underfunded).  But if it terminates, then it faces a sobering termination bill that renders it underfunded.

Here, CalPERS says the City is deemed to be in full compliance with its funding obligations (underfunding of between $212 million and $412 million due to changed CalPERS assumptions about the future is being recouped by additional annual payments).[24]  But, on a termination basis, CalPERS says the City would owe it about $1.6 billion.[25]

The enforcement mechanism for the termination liability is a lien created by PERL § 20574.  The lien arises on account of the PERL § 20577 termination liability and is senior to all liens

---

[24]Stockton's funding status is stated in the October 2013 CalPERS Annual Valuation Reports as of June 30, 2012.

Stockton Safety Plan:
    Entry Age Normal Accrued Liability - $830,040,184.
    Actuarial Value of Assets - $685,764,728
    Market Value of Assets - $571,679,198
    Unfunded Liability (Actuarial Value) - $144,275,456
    Unfunded Liability (Market Value) - $258,360,986
    Funded Ratio (Actuarial Value) - 82.6%
    Funded Ratio (Market Value) - 68.9%

Stockton Miscellaneous Plan:
    Entry Age Normal Accrued Liability - $584,540,872
    Actuarial Value of Assets - $517,244,333
    Market Value of Assets - $431,187,495
    Unfunded Liability (Actuarial Value) - $67,296,539
    Unfunded Liability (Market Value) - $153,353,377
    Funded Ratio (Actuarial Value) - 88.5%
    Funded Ratio (Market Value) - 73.8%

Lamoureux Decl., Ex. 6 & 7.

[25]$1,618,321,517 to be precise: Safety Plan - $1,042,390,452; Miscellaneous Plan - $575,931,065.  Lamoureux Decl., Ex. 6 & 7.

other that a prior lien for wages.[26]

Accordingly, CalPERS says there would be a $1.6 billion priming lien. If enforceable, then a lien of such proportions could cripple opportunities to restructure municipal debt. The threat of such a lien casts a pall over any municipal restructuring in which pension obligations are part of the financial predicament.

The termination lien is presumptively valid as a matter of California law. A question addressed later in this opinion is whether, as a matter of overriding federal law, the termination lien is efficacious in a chapter 9 municipal debt adjustment.

5

In principle, the notion that a terminating entity must pay any pension underfunding makes good business sense. If a pension administrator is to be liable for payment of a promised pension in full, then surely it is entitled to minimize the financial

---

[26]PERL § 20574 provides:

A terminated agency shall be liable to the system for any deficit in funding for earned benefits, as determined pursuant to Section 20577, interest at the actuarial rate from the date of termination to the date the agency pays the [CalPERS] system, and for reasonable and necessary costs of collection, including attorney's fees. The board shall have a lien on the assets of a terminated contracting agency, subject only to a prior lien for wages, in an amount equal to the actuarially determined deficit in funding for earned benefits of the employee members of the agency, interest, and collection costs. The assets shall also be available to pay actual costs, including attorney's fees, necessarily expended for collection of the lien.

Cal. Gov't Code § 20574.

24

risk by insisting that the obligations it has undertaken be fully funded.  Any responsible public or private sector pension administrator would insist on no less.

Correlatively, one would expect a well-advised pension administrator's contract to provide that a consequence of underfunding would be pro rata reduction of pensions.  CalPERS is no exception.

CalPERS is not liable to pay underfunded pensions in full. If the terminating municipality does not pay the termination liability, then "all benefits under the contract, payable after the board declares the agency in default therefor, shall be reduced by the percentage" of the underfunding of the termination pool.  Cal. Gov't Code § 20577.

6

The rub is that CalPERS does not bear the financial risk of loss from underfunding a municipal pension.  Benefits to retirees are automatically reduced if a terminating municipality does not pay its CalPERS bill in full.  Cal. Gov't Code § 20577.

The automatic reduction of benefits dictated by PERL § 20577 when a municipality does not pay its pension bill casts a different light on the CalPERS termination lien because it means that CalPERS bears no financial risk of underfunding of the termination pool.  Rather, the individual members and their beneficiaries are the ones who bear the risk of inadequate funding.  In effect, CalPERS is merely a servicing agent that does not guarantee payment.

If CalPERS is not liable for the consequences of municipal

25

pension underfunding, then it follows that it is not accurate to say, as Franklin argues, that CalPERS is the largest creditor of the City.  That obligation, if it exists, is a debt owed to past and present municipal employees.

Rather, CalPERS is a creditor in its own right only for the fees that it is permitted to charge for administering the City's pensions.  The real creditors are the employees, retirees, and their beneficiaries who will bear the burden of any reduction in the City's pensions.

At this juncture, the triangle of bilateral contractual relationships becomes important to the analysis.  The consequence of rejecting the CalPERS contract would be to terminate CalPERS as the administrator of the City's pensions.  But that would not terminate the contractual relationships between the City and its employees to provide pensions.  Impairing the direct employer-employee pension obligations would require impairing contracts to which CalPERS is not party.

III

Chapter 9 and Federal-State Relationship

The structure of the federal-state relationship, as previously explained, regarding restructuring of municipal debt is dictated by the U.S. Constitution.  Ass'n of Retired Employees of the City of Stockton v. City of Stockton (In re City of Stockton, CA), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012) ("Stockton II").

26

A

Constitutional Background

Congress has the power, exclusive of the states, to legislate uniform laws on the subject of bankruptcy.  U.S. CONST. art. I, § 8, cl. 4.

The essence of bankruptcy is impairing the obligation of contract.  United States v. Bekins, 304 U.S. 27, 54 (1938); Ashton v. Cameron Cnty. Water Improvement Dist., 298 U.S. 513, 530 (1936); Sturges v. Crowninshield, 17 U.S.(4 Wheat.) 122, 191 (1819); Stockton II, 478 B.R. at 15.

The states are forbidden to enact any law impairing the obligation of contract.  U.S. CONST., art. I, § 10, cl.1.

The Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws.  U.S. CONST., art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo (In re City of Vallejo), 432 B.R. 262, 268-70 (E.D. Cal. 2010), aff'g 403 B.R. 72, 76-77 (Bankr. E.D. Cal. 2009); Stockton II, 478 B.R. at 16.


B

History of Chapter 9

As explained in prior decisions in this case, municipal debt adjustment under federal bankruptcy law dates back to the 1930s.

After the false start disapproved in Ashton, the Supreme Court held the predecessor of chapter 9 to be constitutional on the theory that a state sovereign can elect to enlist the

27

assistance of the federal sovereign, by way of its exclusive
federal bankruptcy power, to impair contracts that the state is,
by virtue of the Contracts Clause, powerless to impair.  Bekins,
304 U.S. at 51; Ashton, 298 U.S. at 530; Stockton II, at 17-18.

Before 1976, adjustment of municipal debts was essentially
limited to bond financing.  So-called "prepackaging" was
mandatory.  No case could be commenced unless pre-filing
acceptances to proposed plan treatment had been obtained from a
stated majority of the affected bond creditors.  Thus, the law
focused on dealing with the problems of unanimity commonly
required in bond indentures, including the so-called "holdout"
problem in which a minority withholds its consent in an effort to
drive a better bargain.

In 1976, former chapter IX was revised to open the door to
restructure all municipal debts.  That revision was carried
forward into the 1978 Bankruptcy Code as chapter 9.

C

Balancing State and Federal Sovereignty

It is always necessary to pay attention to issues of
sovereignty within our federal system.  There is a state
sovereign and a federal sovereign.  The ability of the federal
sovereign to intrude in such matters as the control of
subdivisions of the state sovereign is constrained by the Tenth
Amendment.  U.S. CONST. amend. X.  Congress has structured chapter
9 to accommodate those concerns.

28

1

## State as Gatekeeper

The first step in honoring the balance between federal and state sovereignty is the requirement that only the state may authorize a chapter 9 filing by any of its municipalities.   11 U.S.C. § 109(c)(2).

This makes the state the gatekeeper and entitles it to establish prerequisites to filing.   In re City of Stockton, 475 B.R. 720, 727 (Bankr. E.D. Cal. 2012) ("Stockton I").

California exercises its gatekeeping function by requiring that, before filing a chapter 9 case a California municipality must either engage in a neutral evaluation process with a mediator for a specified period or declare a fiscal emergency under specified procedures.   Cal. Gov't Code § 53760.

A municipality that has satisfied California's statutory prerequisites has the state's permission to proceed through the gate into a chapter 9 case.

2

## Bankruptcy Code §§ 903 and 904

Once a chapter 9 case has been filed in the circumstances authorized by the state, the federal Bankruptcy Code controls all proceedings in the case.   Stockton I, 475 B.R. at 727-28.

The primacy of the Bankruptcy Code does not, however, mean that state sovereignty can be disregarded.

Rather, the Bankruptcy Code contains limitations designed to assure that the federal court and the federal process does not unduly intrude upon the state's power to control the exercise of

"political or governmental powers" of a municipality.   11 U.S.C. §§ 903 & 904.

Neither section purports to delineate which powers are "political" or "governmental"?  Correlatively, what powers are not included within those concepts?  Neither question appears to have been closely examined in prior cases.

Since CalPERS argues that the California statute forbidding the rejection of a contract with CalPERS under 11 U.S.C. § 365 in a chapter 9 case is a legitimate exercise of the state's power to control the "political" or "governmental" powers of the municipality, those questions need to be answered here.

a

The first facet of honoring the sovereignty of a state within chapter 9 is Bankruptcy Code § 903, which reserves certain state powers.  That section provides that chapter 9 does not limit or impair the "power of a state" to control a municipality "in the exercise of the political or governmental powers of such municipality."  11 U.S.C. § 903.[27]

_____

[27]Bankruptcy Code § 903 provides:

> This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but —
> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and
> (2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

11 U.S.C. § 903.

b

The second facet is Bankruptcy Code § 904, which limits bankruptcy court authority over the municipality.  The chapter 9 court may not, without the consent of the municipality (either directly or through a plan), interfere with any of the "political or governmental powers" of the municipality, may not interfere with any municipal property or revenues, and may not interfere with municipality's use or enjoyment of any income-producing property.  11 U.S.C. § 904.[28]

3

Section 903 is the linchpin of CalPERS' argument that the California legislature, despite the Supremacy Clause of the U.S. Constitution, can protect CalPERS from provisions of the Federal Bankruptcy Code in a chapter 9 case that the state has authorized to be filed.

a

In defending the state statutes creating the CalPERS

---

[28]Bankruptcy Code § 904 provides:

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with —
> (1) any of the political or governmental powers of the debtor;
> (2) any of the property or revenues of the debtor; or
> (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904.

31

termination lien and the special CalPERS immunity from contract avoidance under Bankruptcy Code § 365, CalPERS contends that the § 903 power of the state to "control" a municipality in the exercise of municipal "political or governmental powers" means that it can "control" decisions by the City from exercising Bankruptcy Code powers by dictating which contracts may not be rejected or modified in the chapter 9 case.

Thus, CalPERS says that such an exercise of "control" is implemented by PERL § 20487 prohibiting modification of a contract with CalPERS to service municipal pensions.  Similarly, it views the PERL § 20574 termination lien as invulnerable to attack in chapter 9.

It is noteworthy that these PERL provisions creating the termination lien and the immunity from Bankruptcy Code contract modification are nonuniform.  They selectivey protect only CalPERS and CalPERS pensions.  They do not apply to any other California municipal pension.  A California city pension system created by a California municipality (e.g., Los Angeles, San Diego, or Fresno) does not enjoy those CalPERS protections.  Nor does a California county pension system created under the so-called 1937 Act or a municipal pension administered by a private-sector pension servicer.

The PERL's special protections for the pension servicing contract incidentally protect the underlying pensions in a manner that forges an alliance between CalPERS and municipal employees. If the City's contract with CalPERS to service its pensions could be rejected, then the pensions, even if not otherwise modified, could be moved to a servicer that does not enjoy the CalPERS

32

termination lien and the CalPERS immunity from Bankruptcy Code
§ 365 contract modification.

b

The key to the analysis of the §§ 903 and 904 restrictions
is the meaning of exercise of "political or governmental powers"
of a municipality.

The phrase "political or governmental powers" suggests that
Congress had in mind the existence of a broader array of
municipal powers that are not "political or governmental."

For guidance, we have only the language and context of the
statute.  To the extent that it is legitimate to consider
legislative history, the legislative history is opaque.

Two clues are provided by the language of § 904.  First, the
need to be specific in § 904(2) about "property or revenues"
implies that "property or revenues" are not necessarily subsumed
within the concept of "political or governmental powers."  11
U.S.C. § 904(2).  Second, the need to be specific in § 904(3)
about "use or enjoyment" of income-producing property implies
that "use or enjoyment" of income-producing property is similarly
not subsumed within "political or governmental powers."  11
U.S.C. § 904(3).

Since the concept of "political or governmental" powers is
central to both sections 903 and 904, it follows that those clues
in § 904 also inform the analysis of § 903.

Further, the abrogation of a state's sovereign immunity in
§ 106 indirectly illuminates the meaning of "political or
governmental" powers in § 903.  While sovereign immunity refers

33

to a multifaceted agglomeration of difficult-to-corral doctrines, it is unquestionably an incident of sovereignty.

The Bankruptcy Code abrogates sovereign immunity with respect to, among other things, the basic bankruptcy trustee avoiding powers set forth at §§ 544-549.  11 U.S.C. § 106(a)(1). Those avoiding powers enable a trustee or, pursuant to § 902(5), a chapter 9 municipal debtor to avoid, for example, transfers to a state that qualify as preferences under § 547, fraudulent transfers under § 548, and, under § 545, statutory liens in favor of the state.  11 U.S.C. §§ 545, 547, and 548.

It is beyond cavil that § 106 applies in chapter 9 cases. In the first place, all of the sections of chapter 1 of the Bankruptcy Code apply in chapter 9.  11 U.S.C. § 103(f).[29]  This includes, in particular, § 106 abrogating sovereign immunity.  In addition, § 901 expressly makes, among other avoiding powers, the avoiding powers relating to § 545 statutory liens, § 547 preferences, and § 548 fraudulent transfers, applicable in chapter 9 cases.  11 U.S.C. § 901(a).

These specific provisions of the Bankruptcy Code that apply in chapter 9 in a context in which the municipal debtor can avoid certain liens and transfers in favor of the state, whose sovereign immunity has expressly been abrogated under § 106(a), indicate that § 903 "political or governmental" functions do not

---

[29]That section provides:

> (f) Except as provided in section 901 of this title, only chapters 1 and 9 of this title apply in a case under such chapter 9.

11 U.S.C. § 103(f).

include the financial relations that are implicit in those
avoiding powers.

To be sure, however, some expenditures are reserved to state
control by § 903.  The statutory text mentions associated
expenditures:  "does not limit or impair the power of a State to
control ... a municipality ... in the exercise of the political
or governmental powers of such municipality, <u>including</u>
expenditures for such exercise."  11 U.S.C. § 903 (emphasis
supplied).

The question becomes what are "expenditures for such
exercise" as distinguished from other expenditures?

One clue comes from the plan confirmation requirement that
there be compliance with nonbankruptcy law regarding <u>regulatory
and electoral approval</u> of plan provisions that are otherwise
required under nonbankruptcy law.  11 U.S.C. § 943(b)(6)
(emphasis supplied).[30]

Requirements for electoral approval implicated the
foundation of any republican form of government — the people
speak through elections.  As an exercise of political power,
state law directs the circumstances in which elections are

---

[30]Section 943(b)(6) states this essential element of plan
confirmation:

(b) The court shall confirm the plan if —
    ...
    (6) any regulatory or electoral approval necessary
    under applicable nonbankruptcy law in order to carry out any
    provision of the plan has been obtained, or such provision
    is expressly conditioned on such approval;

11 U.S.C. § 943(b)(6).

35

1  required and may allocate to municipalities responsibility for
2  funding elections.

3        Thus, for example, an important source of funding for the
4  City's chapter 9 plan now under consideration for confirmation is
5  premised on an increase in local sales tax.  The compromises that
6  were achieved through mediation with the capital markets
7  creditors and the retirees contemplated additional revenue from a
8  local sales tax increase.  Since California law requires a vote
9  of the people to approve local sales tax increases, the question
10  was put before the voters and approved in a duly-scheduled
11  election.

12        Similarly, regulatory approval requirements, which usually
13  are justified on police power or related power-of-government
14  theories, are § 903 "political or governmental" powers.

15        In sum, § 903 "political or governmental" powers relate to
16  basic requirements of government and political polity and exclude
17  financial and employment relations.  To hold otherwise would read
18  out of the Bankruptcy Code a number of provisions that plainly
19  apply in chapter 9.

20        This conclusion leads back to CalPERS.  State law does not
21  mandate pensions for municipal employees.  A California
22  municipality that chooses to provide a pension (virtually all do)
23  is permitted to establish its own pension system (some do), to
24  contract with private sector pension providers (others do), to
25  participate in county-sponsored pension systems (ditto), or to
26  contract with CalPERS (many, including Stockton, do).

27        Nothing about basic state government structure or procedure
28  necessitates CalPERS.  Rather, CalPERS is merely one of numerous

competitors in the California municipal pension market.  There is
nothing inherently "governmental" or "political" about a CalPERS
municipal pension, as opposed to a municipal pension administered
by a different entity, within the meaning of § 903 that would
make the special treatment for CalPERS that is not afforded to
other California municipal pension providers an exercise of § 903
"political or governmental" powers.

The PERL § 20574 termination lien and the PERL § 20487
prohibition on rejection in chapter 9 of a municipality's CalPERS
pension servicing contract do not reflect the exercise of the
"political or governmental" powers protected by § 903.

Although the CalPERS statutes have been enacted through the
political processes, they do not relate to basic matters of
government and exercise of police and regulatory powers.  Rather,
they relate to aspects of administrative terms of employment that
are tangential — albeit important —  to government.  They involve
financial matters that are of the character of the sort of
financial matters that are legitimately within the ambit of the
financial reorganization contemplated by chapter 9.

In other words, hiding behind the § 903 protection of the
exercise of "political or governmental" powers does not work for
CalPERS.

In order to accept the CalPERS argument that § 903 insulates
the PERL § 20574 termination lien from avoidance and the PERL
§ 20487 ban on application of 11 U.S.C. § 365 to CalPERS from
Supremacy Clause preemption, too many chapter 9 provisions that
unambiguously apply to a state would have to be ignored.
Permitting a state to modify the federal Bankruptcy Code amounts

to an impermissible encroachment on the power of Congress to
establish uniform laws on the subject of bankruptcies.   U.S.
Const. art. I, § 8.

     The "political or governmental" functions in § 903 refer to
basic matters of the organization and operation of government
that are incidents of sovereignty, but do not extend to financial
relations between the state and its municipalities.

     Sovereignty as protected by the Tenth Amendment is honored
by the state's threshold control over whether, and under what
procedures, one of its municipalities may file a chapter 9 case.
The specialized relief in the form of the ability to cause
municipal contracts to be impaired under the exclusive federal
authority to impair contracts implemented by the Bankruptcy Code
is available to a state on an all-or-nothing, take-or-leave-it
basis.   While § 903 protects the basic incidents of state
sovereignty — described as "political and governmental" powers —
from encroachment, contractual relations as between state and
municipality are generally outside the ambit of "political or
governmental" powers.


                              IV

                         California Law

     Having concluded that § 903 does not give the state a blank
check to rewrite the federal Bankruptcy Code, several specific
points of California law warrant analysis.

                              38

A

California Vested Rights Doctrine

1
2
3       The California Supreme Court has construed the Contracts

4  Clause of the California Constitution to recognize an unusually

5  inflexible "vested right" in public employee pension benefits.

6  E.g., Betts v. Bd. of Admin. of Pub. Employees' Retirement Sys.,

7  21 Cal.3d 859, 863-64 (1978); Allen v. City of Long Beach, 45

8  Cal.2d 128, 131 (1955); Kern v. City of Long Beach, 29 Cal.2d

9  848, 853 (1947).

10      In contrast, the United States Supreme Court takes a less

11  rigid view of the extent of a "vested right" in retiree benefits.

12  M&G Polymers USA, LLC v. Tackett, U.S. Supreme Ct., No. 13-1010,

13  decided Jan. 26, 2015, Slip Op. at 7-14.

14      CalPERS places great reliance on the strength of a "vested

15  right" under the Contracts Clause of California Constitution,

16  which it describes as prohibiting the "unconstitutional

17  impairment" of a public pension contract.  CalPERS Legal Office,

18  Vested Rights of CalPERS Members: Protecting the Pension Promises

19  Made to Public Employees, at 8-11 (July 2011).

20      The CalPERS backup position is the same argument founded on

21  the Contracts Clause of the United States Constitution.  Id. at

22  12.  The difference between the two positions is that the

23  California Supreme Court is the arbiter of the state

24  constitution, but the United States Supreme Court is the arbiter

25  of the federal constitution.

26      The rigidity of the California vested rights doctrine is a

27  factor behind the current pressure on public pensions in

28  California.  It encourages dysfunctional strategies to circumvent

39

limitations and peculiarities in California public finance.[31]

The fatal flaw in the "vested rights" analysis of California public pensions is that neither the Contracts Clause of the

---

[31]A useful overview of the predicament of California public pensions, and of financing issues faced by the City, is provided by Professor Munnell:

> California is in trouble because a retroactive expansion of benefits in the late 1990s made the state one of the most generous in the nation, but, unlike Illinois and New Jersey, it is not guilty of deliberately underfunding its plans. Nevertheless, pension commitments are putting enormous pressure on both state and local budgets in California.
> ... [paragraph omitted.]
> Three factors — an enhanced incentive to promise pensions rather than pay wages from the Proposition 13 property tax limitation in 1978, a big retroactive pension benefit increase in 1999, and the financial collapse in 2008 — have created the current situation in which pension costs are high, only partially funded, and set to consume in increasingly large share of state and local budgets.
> Proposition 13 gave the legislature more responsibility over the financing of services and thereby shifted power from the locality to the state. At the same time, it made legislative action more difficult by requiring a two-thirds vote to raise tax revenues. The result was budget gridlock and fiscal gimmicks, such as handing out improved pensions in lieu of pay increases. Similarly, local governments, barred by Prop 13 from raising property taxes, often used promises of higher pensions to get through labor negotiations. In most — but not all — cases, however, the benefit promises were accompanied with funding commitments.
> The break with prefunding occurred in 1999 when the governor and the legislature made up for a long freeze on state worker pay by approving a bill that raised pension benefits to their current high levels. The changes were made retroactive, thereby increasing the compensation for work done years or even decades earlier. Lawmakers accepted CalPERS's estimates that investment returns from the booming [1999] stock market would cover most of the costs of the higher benefits.

MUNNELL, at 119-20.

40

California Constitution nor the Contracts Clause of the Federal Constitution prevents Congress from enacting a law impairing the obligation of contract.  The Supremacy Clause of the Federal Constitution resolves conflicts between a clear power of Congress and a contrary state law in favor of Congress.

As explained above, so long as California authorizes its municipalities to be debtors in cases under Chapter 9 of the Bankruptcy Code, municipal contracts may be impaired by way of a confirmed chapter 9 plan of adjustment of municipal debts.

B

## PERL Bar to Bankruptcy Code § 365

CalPERS contends that § 903 authorizes California to forbid the rejection of a pension servicing contract between it and a municipality, which is the gravamen of PERL § 20487:

> Notwithstanding any other provision of law, no contracting agency or public agency that becomes the subject of a case under the bankruptcy provisions of Chapter 9 (commencing with Section 901) of Title 11 of the United States Code shall reject any contract or agreement between that agency and the [CalPERS] board pursuant to Section 365 of Title 11 of the United States Code or any similar provision of law; nor shall the agency, without the prior written consent of the board, assume or assign any contract or agreement between that agency and the board pursuant to Section 365 of Title 11 of the United States Code or any similar provision of law.

Cal. Gov't Code § 20487.

It argues that providing such special protection for CalPERS, but no other entity providing or servicing a California municipal pension, is a "political or governmental" function insulated by § 903 from interference by the bankruptcy court.

There are multiple flaws in the CalPERS theory.  First, no

incident of state sovereignty is implicated in a contractual transaction when a municipality is free to contract with private sector entities as an alternative.

Second, PERL § 20487 merely operates to protect CalPERS in its capacity as creditor with a claim based on a rejected or modified contract.  A competitor of CalPERS in the business of servicing California municipal pensions receives no such protection.  As already explained, this is neither "political" nor "governmental" in nature.

Third, honoring PERL § 20487 would be inconsistent with Bankruptcy Code provisions that unambiguously apply to a state that permits its municipalities to obtain chapter 9 relief.  For example, § 106(a)(1) abrogates sovereign immunity with respect to § 944, which binds creditors to the terms of a confirmed chapter 9 plan and discharges the municipality from all debts not perpetuated by the plan.

Fourth, special insulation of a state actor in a municipal insolvency is contrary to chapter 9 precedent.  The State of Texas once permitted the Mission Independent School District to file a municipal restructuring case involving bonded indebtedness on the condition that in the case there be no discharge of any bond owned by the State of Texas.  The Fifth Circuit rejected that condition as invalid.  Mission Indep. School Dist. v. Texas, 116 F.2d 175, 178 (5th Cir. 1940), cert. denied, 313 U.S. 562 (1941).[32]

---

[32]The Fifth Circuit explained:

The Bankruptcy Act as a law of Congress made in pursuance of

42

The invalid <u>Mission Independent School District</u> protection
is not materially distinguishable from the consequence of PERL
§ 20487.  The effect of the provision is that the State of
California is protecting itself — i.e., CalPERS — from
consequences to which CalPERS' competitors are exposed.  That is
no different than the State of Texas saying that no bond owned by
the State can be impaired.

To honor PERL § 20487 would amount to permitting a state to
usurp the exclusive power of Congress to legislate uniform laws
on the subject of bankruptcy.

C

<u>PERL Termination Lien</u>

The termination lien established by PERL § 20574 is not a
major impediment to rejection of a CalPERS pension servicing
contract.  PERL § 20574 provides:

> A terminated agency shall be liable to the [CalPERS]
> system for any deficit in funding for earned benefits, as
> determined pursuant to Section 20577, interest at the
> actuarial rate from the date of termination to the date the
> agency pays the system, and for reasonable and necessary
> costs of collection, including attorney's fees.  The board
> shall have a lien on the assets of a terminated agency,
> subject only to a prior lien for wages, in an amount equal

---

the Constitution of the United States, is part of the
supreme law. It makes no provision for separate or
preferential treatment of a bondholding state as a creditor.
The State of Texas bought the bonds it holds for the school
fund, and paid for them just as others did. It obtained no
better right to repayment. The bonds it holds against its
own subdivisions as an investment stand just as though they
were municipal bonds issued in another state. The State of
Texas is simply a bond creditor as others are.

<u>Mission Indep. School Dist.</u>, 116 F.2d at 178.

1    to the actuarially determined deficit in funding for earned
2    benefits of the employee members to the agency, interest,
     and collection costs.  The assets shall also be available to
3    pay actual costs, including attorney's fees, necessarily
     expended for collection of the lien.

4    Cal. Gov't Code § 20574.

5        The legislative history of the 1982 enactment of PERL

6    § 20574 explains that it is premised, in part, on the possibility

7    of contract termination in a federal bankruptcy case:

8            Section 5. Grants PERS a lien against the assets of
         public agencies who have terminated their membership in the
9        system, usually as a result of agency dissolution and
         bankruptcy, and who have unfunded liabilities owed to PERS
10       for vested employee benefits and have no ability to pay such
         liabilities.
11           PERS is currently only an unsecured creditor.

12   Lamoureux Direct Testimony, Ex. 13.

13       The PERL § 20574 termination lien qualifies as a "statutory

14   lien" under the Bankruptcy Code.  A "statutory lien" is a lien

15   arising solely by force of a statute on specified circumstances

16   or conditions or lien for distress of rent, even if not based on

17   statute.  11 U.S.C. § 101(53).[33]

18       By its terms, the termination lien arises solely as a result

19   of PERL § 20574 upon termination of a CalPERS pension servicing

20   contract and only if there is an "actuarially determined deficit

21

22   [33]Bankruptcy Code § 101(53) provides:

23

24       (53) The term "statutory lien" means lien arising solely
     by force of a statute on specified circumstances or
25   conditions, or lien for distress of rent, whether or not
     statutory, but does not include security interest or
26   judicial lien, whether or not such interest or lien is
     provided by or is dependent on a statute and whether or not
27   such interest or lien is made fully effective by statute.

28   11 U.S.C. § 101(53).

                              44

in funding for earned benefits." PERL § 20574.  Given the
strength of the California vested rights doctrine for municipal
pensions, it is quite unlikely that such a termination would
occur before the filing of a chapter 9 case.

The Bankruptcy Code authorizes the avoidance of statutory
liens that are not perfected or enforceable at the time of the
commencement of the case.  11 U.S.C. § 545(2).[34]

Since Stockton had not terminated its contract with CalPERS
as of the commencement of its chapter 9 case, it would be legally

---

[34]Bankruptcy Code § 545 provides:

§ 545. Statutory liens.

The trustee may avoid the fixing of a statutory lien on
property of the debtor to the extent that such lien —
    (1) first becomes effective against the debtor —
        (A) when a case under this title concerning the
debtor is commenced;
        (B) when an insolvency proceeding other than under this
title concerning the debtor is commenced;
        (C) when a custodian is appointed or authorized to take
or takes possession;
        (D) when the debtor becomes insolvent;
        (E) when the debtor's financial condition fails to meet
a specified standard; or
        (F) at the time of an execution against property of the
debtor levied at the instance of an entity other than the
holder of such statutory lien;
    (2) is not perfected or enforceable at the time of the
commencement of the case against a bona fide purchaser that
purchases such property at the time of the commencement of
the case, whether or not such a purchaser exists, except in
any case in which a purchaser is a purchaser described in
section 6323 of the Internal Revenue Code of 1986, or in any
other similar provision of State or local law;
    (3) is for rent; or
    (4) is a lien for distress of rent.

11 U.S.C. § 545.

45

1 impossible for a lien that had not yet arisen to be perfected or
2 enforceable as of that date.

3     The § 545 statutory lien avoidance provision applies in a
4 chapter 9 case.  11 U.S.C. § 901(a).

5     Sovereign immunity is abrogated with respect to § 545.  11
6 U.S.C. § 106(a)(1).

7     The consequence of avoidance of a statutory lien on property
8 of the estate is that the avoided transfer is preserved for the
9 benefit of the estate.  11 U.S.C. § 551.[35]  By virtue of a
10 special chapter 9 definition, of "property of the estate" means
11 property of the debtor.  11 U.S.C. § 902(1).

12     As with the statutory lien avoidance provision, § 551
13 applies in chapter 9 cases and is the subject of an abrogation of
14 sovereign immunity.  11 U.S.C. §§ 901(a) & 106(a)(1).

15     It follows that the fixing of the CalPERS termination lien
16 would be avoidable in a chapter 9 case and the debtor
17 municipality would hold subject property free of the statutory
18 lien.

19     Despite public rhetoric in this case that has been based on
20 an uncritical assumption that the CalPERS termination lien would

21

22     [35]Bankruptcy Code § 551 provides:
23
24     § 551. Automatic preservation of avoided transfer.

25         Any transfer avoided under section 522, 544, 545, 547,
26     548, 549, or 724(a) of this title, or any lien void under
        section 506(d) of this title, is preserved for the benefit
        of the estate but only with respect to property of the
27     estate.

28 11 U.S.C. § 551.

1  be a major obstacle to dealing with CalPERS, the vulnerability of

2  that lien to avoidance under § 545 renders it a toothless tiger.

3

4                                    V

5                         Pensions in Chapter 9

6      None of this means that public pensions can be rejected or

7  unilaterally modified willy-nilly.

8      Although the business judgment rule governs most § 365

9  contract rejections, the Supreme Court held in its 1984 Bildisco

10  decision that a higher standard applies to rejection of a

11  collective bargaining agreement.  NLRB v. Bildisco & Bildisco,

12  465 U.S. 513, 527 (1984); In re G.I. Indus., Inc. v. Benedor

13  Corp., 204 F.3d 1276, 1282 (9th Cir. 2000) (business judgment);

14  Klein Sleep Prods., Inc. v. Nostas Assocs., 78 F.3d 18, 25 (2d

15  Cir. 1996) (same).

16      Under the Bildisco standard, rejection requires a finding

17  that the policy of successful rehabilitation of debtors would be

18  served by rejection.  In making that finding, the court must

19  balance the interests of the affected parties  — debtors,

20  creditors, employees — and must consider the consequences of the

21  alternatives on the debtor, on the value of creditors' claims and

22  any ensuing hardship and the impact on employees.  The court also

23  must consider the degree of hardship faced by each party and must

24  consider any qualitative differences between the types of

25  hardship each may face.  Bildisco, 465 U.S. at 527.[36]

26  _____

27      [36]The Supreme Court said:

28          Since the policy of Chapter 11 is to permit successful

                                    47

While Congress supplanted the <u>Bildisco</u> analysis in chapter 11 cases with the enactment of § 1113 for collective bargaining agreements and § 1114 for retiree benefits, neither of those provisions is incorporated by § 901 into chapter 9.

The judicial consensus is that in chapter 9 the <u>Bildisco</u> analysis applies to § 365 rejection of executory collective bargaining agreements. <u>Stockton II</u>, 478 B.R. at 23; <u>Int'l Bhd of Elec. Workers, Local 2376 v. City of Vallejo (In re City of Vallejo)</u>, 422 B.R. 262, 270-72 (E.D. Cal. 2010); <u>Orange County Employees' Ass'n v. County of Orange (In re County of Orange)</u>, 179 B.R. 177, 183 (Bankr. C.D. Cal. 1995).

The same considerations that led the Supreme Court to impose a more stringent standard to the rejection or modification of collective bargaining agreements apply to executory municipal pension plans. There is no reason to believe that the <u>Bildisco</u> standard would not apply to using chapter 9 to force changes in

rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted. Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties-the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.

<u>Bildisco</u>, 465 U.S. at 527.

48

municipal pension plans.

But the situation is potentially different with respect to a municipality's contract with a pension servicer, such as CalPERS, to service the municipality's pensions.  That contract is essentially administrative in nature and does not govern the terms of the municipal pension.  It may be that the business judgment rule would govern the rejection of the CalPERS contract to service a municipality's pensions.  If a lower-cost provider were to emerge, a municipality may, as a matter of business judgment, be able to shift servicers.  As the City does not propose to reject the CalPERS servicing contract, that question can be left to another day.

VI

Confirmation of the Stockton Plan of Adjustment

This brings us to the question of confirmation of the City's plan of adjustment.[37]

A

At the outset, two myths inherent in the rhetoric of this case need to be dispelled.  Repetition of incorrect statements does not make them correct.

---

[37]Specific findings of fact and conclusions of law were rendered orally on the record in open court on October 30, 2014, in compliance with Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052 and 9014.  This opinion supplements those findings.

49

1

First, the assertion that CalPERS is the largest creditor of the City is not correct.   CalPERS in its own right is only a small-potatoes creditor for the expenses that it is entitled to charge for administering the City-sponsored pension.

The debt relevant to Franklin's rhetoric is the City's obligation to its employees to fund the City-sponsored pension. As has been explained, CalPERS must pass on to retirees the City's shortfalls in funding its City-sponsored pension, which makes CalPERS merely a pass-through conduit to the actual creditors.   Cal. Gov't Code § 20577.   Hence, the potential pension liability makes the employees and retirees the largest creditors of the City, not CalPERS.

2

Second, the assertion that pensions are not affected by the City's plan of adjustment incorrectly suggests that employees and retirees are not sharing the pain with capital markets creditors. To the contrary, the reality is that the value of what employees and retirees lose under the plan is greater than what capital markets creditors lose.

One result of this case is that the City terminated its program for lifetime retiree health benefits valued on the schedules at nearly $550 million for existing retirees.   Although Franklin says that sum is too high, it concedes that the value is at least $300 million.   Prospective retirees also lose that expectation and receive nothing in return.   In contrast, Franklin loses about $32 million.

Likewise, pension liabilities are also indirectly reduced as a result of curtailed pay and curtailed future pay increases in the renegotiated collective bargaining agreements.

B

This court's findings of fact and conclusions of law addressed all of the essential elements for plan confirmation and need not be repeated here.  Several key points will provide perspective.

When evaluating the financial situation of the City, it is misleading to focus on comparing the situation on the day the chapter 9 case was filed with the situation at the time of confirmation.  Any useful before-and-after view requires that one take into account the effect of the effort to reduce municipal costs during the several years before the case was filed.  By the time the case was filed, the City had been pared down to core functions and been reduced to a situation in which such essential services as police were being operated below sustainable standards.  The murder rate had soared.  Police responded only to crimes in progress.  A wrecker had to accompany fire engines on emergency calls.

During the pre-filing mediation required by California law, agreements were achieved modifying all unexpired collective bargaining agreements.  And there had been substantial progress on a new contract to replace the expired police contract, which was completed several months after the case was filed.

The quid pro quo for the concessions made by labor in the new and modified collective bargaining agreements was the City's

51

promise not to modify pensions subject to the servicing contract
with CalPERS.  Pensions would be neither increased nor decreased.
This is neither irrational nor inappropriate.  Pension
underfunding is not a burning issue for the City, which is
current on its pension contribution obligations.  As noted above,
on an actuarial basis the City's two plans are funded at 82.6
percent and 88.5 percent, which is below the goal of 100 percent.
Future required payments to return to a better funded status
following CalPERS' recent reduction in its expected rate of
investment return are built into the budget on which the plan is
based; they are for a finite number of years and do not support
the argument that the required contributions to CalPERS are on an
endless upward spiral.  The evidence suggests that funding ratios
are improving, rather than deteriorating.  To mandate that
pensions be modified would so fundamentally change the balance in
the labor negotiations as to unravel all of the concessions
achieved.

During the case, there were extensive mediation sessions
with Bankruptcy Judge Elizabeth Perris.  In addition to resolving
outstanding labor issues, complex agreements were hammered out
with all of the capital markets creditors except Franklin.
Payments were adjusted, terms were extended by about a decade,
bond debt was reduced, the City's pledge of its general revenues
as collateral was extinguished, and the City obtained the use of
such facilities as its new city hall that had been taken over by
creditors.

The ability to pay the capital markets creditors the agreed
amounts contemplated a tax increase that, under California law,

required a vote of the people.  The voters of the City ultimately
approved a sales tax increase in the greatest amount and longest
period permitted by California law.  If that tax increase had not
been approved, all the parties agreed that the mediated plan
would be dead, putting the case back to "square one."

Franklin differs from the other capital markets creditors in
that it issued its $36 million in bonds without taking equivalent
collateral.  It turned out that its collateral was worth only
about $4 million, which sum is being paid in full by the City.
The rest is unsecured debt, to be paid the same 1 percent as all
other unsecured creditors, including the retirees on their $550
million in terminated health benefits.

There is no evidence suggesting that Franklin was misled
about the quality of its collateral when it entered into its
transaction with the City; nor is there any evidence to suggest
that Franklin's pricing of the transaction did not reflect the
greater risk being undertaken in order to get a higher return.

It is interesting that the settlement with the other capital
markets creditors included an additional "sweetener" fund that
would become available by about 2040 if the City prospers.  Part
of that fund was offered to Franklin and held open for Franklin
to join even during the confirmation hearing, but Franklin
refused the offer.

The time has come to decide the confirmation question.  The
myriad parties in interest, save Franklin, have agreed upon a
consensual plan of adjustment that reflects a complex balance
achieved through many months of exhaustive mediation.

As explained in open court, this court is persuaded that no

53

1  better plan is likely under the circumstances.   Everyone has made
2  substantial concessions.

3      Franklin is receiving about $4.35 million on its $36 million
4  in bonds that were largely unsecured.   While that is unfortunate
5  for Franklin, it reflects the bargain that Franklin made and the
6  risk that it undertook.   Its 12 percent overall return is not so
7  paltry or unfair as to undermine the legitimacy of classification
8  in the plan or the good faith of the plan proponent.

9

10                          Conclusion

11      Although pensions may, as a matter of law, be modified by
12  way of a chapter 9 plan of adjustment and although a CalPERS
13  pension serving contract may be rejected without fear of an
14  enforceable termination lien, the City's choice to achieve
15  savings in total compensation by negotiating salary and benefit
16  adjustments rather than pension modification is appropriate.
17  Total compensation, of which pensions are a component, has been
18  reduced.   Indeed, the City's employees and retirees have
19  surrendered more value in this chapter 9 case than the capital
20  markets creditors.

21      The plan is feasible and is in the best interests of
22  creditors.   All other element of confirmation having been
23  established, the plan will be CONFIRMED.

24      Dated:   February 4, 2015.

25

26      _____

27          UNITED STATES BANKRUPTCY JUDGE

28

                          54

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Marc A. Levinson
400 Capitol Mall #3000
Sacramento CA 95814-4407

Office of the U.S. Trustee
Robert T Matsui United States Courthouse
501 I Street, Room 7-500
Sacramento CA 95814

Jerrold E. Abeles
555 W 5th St 48th Fl
Los Angeles CA 90013

Steven H. Felderstein
400 Capitol Mall #1450
Sacramento CA 95814-4434

Christina M. Craige
555 W 5th St #4000
Los Angeles CA 90013

Michael J. Gearin
K&L Gates LLP
Seventh Floor
10100 Santa Monica Blvd
Los Angeles, CA 90067

Alan C. Geolot
1501 K St NW
Washington DC 20005

Guy S. Neal
1501 K St NW
Washington DC 20005

Michael M. Lauter
4 Embarcadero Ctr 17th Fl
San Francisco CA 94111-4109

55

Robert S. McWhorter
621 Capitol Mall, 25th Floor
Sacramento CA 95814

Allan H. Ickowitz
777 S. Figueroa Street, 34th Floor
Los Angeles CA 90017

Roberto J. Kampfner
633 West Fifth Street Suite 1900
Los Angeles CA 90071

James O. Johnston
555 S Flower St 50th Fl
Los Angeles CA 90071

Scott H. Olson
560 Mission Street, Suite 3100
San Francisco CA 94105

William A. Van Roo
13863 Quaterhorse Dr.
Grass Valley CA 95949

Richard A. Lapping
101 California Street, Ste. 3900
San Francisco CA 94111

Lawrence A. Larose
200 Park Ave
New York NY 10166-4193

Sarah L. Trum
1111 Louisiana 25th Fl
Houston TX 77002

Donna T. Parkinson
400 Capitol Mall Suite 2560
Sacramento CA 95814
David E. Mastagni
1912 I St
Sacramento CA 95811

Robert B. Kaplan
2 Embarcadero Center 5th Fl
San Francisco CA 94111-3824

Nicholas DeLancie
Two Embarcadero Center, 5th Floor
San Francisco CA 94111

John A. Vos
1430 Lincoln Ave
San Rafael CA 94901

Jeffry A. Davis
44 Montgomery St 36th Fl
San Francisco CA 94104

Abigail V. O'Brient
3580 Carmel Mountain Rd #300
San Diego CA 92130

William W. Kannel
1 Financial Center
Boston MA 02111

George S. Emblidge
220 Montgomery St #2100
San Francisco CA 94104

John P. Briscoe
Law Offices of Mayall Hurley, PC
2453 Grand Canal Blvd., 2nd Floor
Stockton, CA 95207