MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone:     +1-916-447-9200
Facsimile:     +1-916-329-4900

Attorneys for Debtor
City of Stockton

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CITY OF STOCKTON, CALIFORNIA,<br><br>Debtor. | Case No.  2012-32118<br><br>Chapter 9<br><br>**ORDER CONFIRMING FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA, AS MODIFIED (AUGUST 8, 2014)**<br><br><u>Continued Confirmation Hearing</u><br>Date:        October 30, 2014<br>Time:        10:00 a.m.<br>Dept:        Courtroom 35<br>Judge:       Hon. Christopher M. Klein |

The City of Stockton (the "City") having proposed and filed the following:

1.     First Amended Plan for the Adjustment of Debts of City of Stockton, California, As Modified (August 8, 2014) [Dkt. No. 1645] (the "Plan"), a copy of which is attached as Exhibit A;

2.     Modified Disclosure Statement with Respect to First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1215]; and

/ / /

RECEIVED
January 21, 2015
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0005427166

3.     Second Supplemental Plan Supplement in Connection with the First Amended

Plan for the Adjustment of Debts of City of Stockton, California, As Modified (August 8, 2014)

[Dkt. Nos. 1842 (Exhibits 1 and 2) and 1843 (Exhibits 3 through 8)] (collectively, the"Second

Supplemental Plan Supplement"). [1]

The Bankruptcy Court, having entered the Order (1) Approving Modified Disclosure

Statement with Respect to First Amended Plan for the Adjustment of Debts of City of Stockton,

California (November 15, 2013); (2) Setting Confirmation Procedures; and (3) Scheduling Filing

Dates and the Confirmation Hearing [Dkt. No. 1220], having considered the evidence adduced at

the Confirmation Hearing, the pleadings, and the arguments of the City and the other interested

parties in this case, and having made its findings of fact and conclusions of law pursuant to

Bankruptcy Rules 7052 and 9014 at hearings conducted on October 1 and October 30, 2014:

**IT IS HEREBY ORDERED that**:

1.     The Plan is confirmed.

2.     Subpart (iii) of definition 69 of the Plan (Contracts for Loan Guarantee)

erroneously refers to "a promissory note issued by the City numbered B-03-MC-06-0036."  Such

subpart of Definition 69 of the Plan is modified to refer to "a promissory note issued by the City

numbered B-03-MC-06-0026."

3.     The last sentence of definition 102 of the Plan (Golf Course/Park Unsecured

Claim) is revised to read as follows:  "The Allowed amount of the Golf Course/Park Unsecured

Claim as of the date of confirmation of the Plan is $30,480,190.00, which is: (i) $34,532,190.00

minus (ii) the Allowed Amount of the Golf Course/Park Secured Claim."

4.     The objection to the Plan filed by creditors Franklin High Yield Tax-Free Income

Fund and Franklin California High Yield Municipal Fund [Dkt. No. 1273] and all other

objections to the Plan are overruled.

5.     The record of the Confirmation Hearing is closed.

/ / /

---

[1] Capitalized terms used but not defined in this Order have the meanings set forth in the Plan.

ORDER CONFIRMING FIRST AMENDED PLAN
FOR CITY OF STOCKTON, CALIFORNIA ,
AS MODIFIED (AUGUST 8, 2014)

6.      Any holder of a Claim that has accepted or rejected the November 15, 2013, plan of adjustment [Dkt. No. 1204] is deemed to have accepted or rejected the Plan. The City is not required to resolicit acceptances or rejections of the Plan.

7.      All transactions contemplated under the Plan, the Second Supplemental Plan Supplement and documents related thereto are hereby authorized and approved.

8.      The assumption of executory contracts and unexpired leases pursuant to Section VI.A. of the Plan is approved. Any party to an executory contract or unexpired lease assumed by the City that asserts that any payment or other performance is due as a condition to the proposed assumption shall, within 90 days of the Effective Date, file with the Bankruptcy Court and serve upon the City a written statement and accompanying declaration in support thereof, specifying the basis for its Claim. The failure to timely file and serve such a statement shall be deemed to be a waiver of any and all objections to the proposed assumption and any claim for cure amounts of the agreement at issue.

9.      If a party to an executory contract or unexpired lease assumed by the City timely asserts that any payment or other performance is due as a condition to the proposed assumption, and the Bankruptcy Court enters an order determining that the City is required to pay a cure amount or otherwise render performance as a condition to such assumption, then the City may elect, within 14 days after the date of any such order, to reject such executory contract or unexpired lease by filing a motion with the Bankruptcy Court seeking approval of such rejection.

10.      The rejection by the City of the following executory contracts or unexpired leases is approved: (1); Office Building Standby Agreement; (2) Lease, dated as of June 21, 1988, between the City, as lessor, and Stockton Sailing Club, a California corporation, as lessee, as amended by the First Amendment to Lease, dated as of August 22, 1994; (3) Lease, dated as of December 27, 1974, between the City, as lessor, and Stephens Marine, Inc., a California corporation, as lessee, as amended; and (4) Agreement for Purchase and Sale of Real Property, dated as of August 17, 2004, by and between the City and the County of San Joaquin. Upon the Effective Date, such executory contracts and unexpired leases shall be deemed rejected by the City without further action by the City or the Bankruptcy Court.

11.    Without prejudice to the right of the City or any other party in interest to object to a proof of claim filed after any applicable bar date as untimely, and except as expressly provided in any order approving a Rejection Motion, any proof of claim filed after the date that is 35 days after the date of entry of this Order shall be deemed not timely filed and shall be disallowed in its entirety without any further action by the City or the Bankruptcy Court.

12.    On the Effective Date, and upon the City's payment to the Retiree Health Benefit Claimants of an aggregate amount of $5,100,000 for the Allowed Retiree Health Benefit Claims as provided in Class 12 of the Plan, the Retirees Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 9 Case, and, except for the limited purpose of presenting to the City any invoices for fees and expenses, the Retirees Committee shall be deemed dissolved.

13.    Within 14 days of the entry of this Order, the City shall, pursuant to Bankruptcy Rule 3020(c)(2), cause to be served by mail to all creditors, parties in interest, and all parties to the City's executory contracts and unexpired leases a Notice of Entry of this Order ("Notice of Entry") in the form of or substantially similar to Exhibit B hereto.  The mailing of the Notice of Entry shall include a CD containing this Order, the Plan and the Second Supplemental Plan Supplement, and shall provide that any party in interest desiring a paper copy of such documents may request these documents at no cost from the City's claims agent, Rust Omni, via the City's chapter 9 website, U.S. Mail, or facsimile.

14.    The City shall cause the Notice of Entry to be published in a newspaper of general circulation in the City.  The Plan need not be reprinted in such publication, which shall instead provide information enabling any interested party to obtain a copy of the Plan or this Order at no cost via internet or U.S. Mail.

/ / /

/ / /

/ / /

/ / /

/ / /

ORDER CONFIRMING FIRST AMENDED PLAN
FOR CITY OF STOCKTON, CALIFORNIA ,
AS MODIFIED (AUGUST 8, 2014)

1    15.    In the event of any inconsistency between the Plan and this Order, this Order shall

2  govern.

3

4  Dated: February 04, 2015

5

6  _____

7  United States Bankruptcy Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

**70**

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone:    +1-916-447-9200
Facsimile:    +1-916-329-4900

JEFFERY D. HERMANN (STATE BAR NO. 90445)
jhermann@orrick.com
JOHN A. FARMER (STATE BAR NO. 242775)
jfarmer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017-5855
Telephone:    +1-213-629-2020
Facsimile:    +1-213-612-2499

Attorneys for Debtor
City of Stockton

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | Chapter 9 |
| Debtor. | **FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA, AS MODIFIED (AUGUST 8, 2014)** |

# TABLE OF CONTENTS

**Page**

I.  DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION ................. 1

    A.  Definitions ......................................................................... 1

    B.  Rules of Construction ...................................................... 30

    C.  Plan Supplement, Supplemental Plan Supplement, and Second Supplemental Plan Supplement ......................................... 31

II.  TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS ............... 31

    A.  Treatment of Administrative Claims ............................... 31

    B.  Treatment of Professional Claims ................................... 31

    C.  Priority Claims in Chapter 9 .......................................... 32

    D.  Deadline for the Filing and Assertion of Other Postpetition Claims, Administrative Claims and Professional Claims ................... 32

III.  DESIGNATION OF CLASSES OF CLAIMS ................................. 32

IV.  TREATMENT OF CLAIMS ............................................................ 34

    A.  Class 1A – Claims of Ambac – 2003 Fire/Police/Library Certificates ............... 34

        1.  Impairment and Voting ...................................... 34

        2.  Treatment ........................................................... 34

    B.  Class 1B – Claims of Holders of 2003 Fire/Police/Library Certificates ............. 34

        1.  Impairment and Voting ...................................... 34

        2.  Treatment ........................................................... 35

    C.  Class 2 – SEB Claims of the 2006 SEB Bond Trustee/NPFG – 2006 SEB Bonds ........................................................................ 35

        1.  Impairment and Voting ...................................... 35

        2.  Treatment ........................................................... 35

    D.  Class 3 – Arena Claims of the 2004 Arena Bond Trustee/NPFG – 2004 Arena Bonds ........................................................... 35

        1.  Impairment and Voting ...................................... 35

        2.  Treatment ........................................................... 36

    E.  Class 4 – Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG – 2004 Parking Bonds ................................ 36

        1.  Impairment and Voting ...................................... 36

        2.  Treatment ........................................................... 36

    F.  Class 5 – Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty – 2007 Office Building Bonds ................. 37

**TABLE OF CONTENTS**
(continued)                                                                    **Page**

       1.     Impairment and Voting ................................................. 37

       2.     Treatment .................................................................... 37

G.    Class 6 – Pension Obligation Bonds Claims ............................ 37

       1.     Impairment and Voting ................................................. 37

       2.     Treatment .................................................................... 38

H.    Class 7 – Claims of DBW ...................................................... 38

       1.     Impairment and Voting ................................................. 38

       2.     Treatment .................................................................... 38

I.     Class 8 – SCC 16 Claims ....................................................... 39

       1.     Impairment and Voting ................................................. 39

       2.     Treatment .................................................................... 39

J.     Class 9 – Thunder Claims ...................................................... 39

       1.     Impairment and Voting ................................................. 39

       2.     Treatment .................................................................... 39

K.    Class 10 – Claims of Holders of Restricted Revenue Bond and Note Payable Obligations ............................................................... 40

       1.     Impairment and Voting ................................................. 40

       2.     Treatment .................................................................... 40

L.     Class 11 – Claims of Holders of Special Assessment and Special Tax Obligations ................................................................. 41

       1.     Impairment and Voting ................................................. 41

       2.     Treatment .................................................................... 41

M.   Class 12 – General Unsecured Claims ................................... 41

       1.     Impairment and Voting ................................................. 41

       2.     Treatment .................................................................... 42

N.    Class 13 – Convenience Class Claims ................................... 42

       1.     Impairment and Voting ................................................. 42

       2.     Treatment .................................................................... 43

O.    Class 14 – Claims of Certain Tort Claimants ......................... 43

       1.     Impairment and Voting ................................................. 43

       2.     Treatment .................................................................... 43

P.    Class 15 – Claims of CalPERS Pension Plan Participants Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS under the CalPERS Pension Plan ............. 43

       1.     Impairment and Voting ................................................. 43

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

**TABLE OF CONTENTS**
(continued)

|   |   | 2. | Treatment | 43 |
| Q. | | Class 16 – Claims of Equipment Lessors | | 44 |
|   | | 1. | Impairment and Voting | 44 |
|   | | 2. | Treatment | 44 |
| R. | | Class 17 – Workers Compensation Claims | | 44 |
|   | | 1. | Impairment and Voting | 44 |
|   | | 2. | Treatment | 44 |
| S. | | Class 18 – SPOA Claims | | 44 |
|   | | 1. | Impairment and Voting | 44 |
|   | | 2. | Treatment | 45 |
| T. | | Class 19 – Price Claims | | 45 |
|   | | 1. | Impairment and Voting | 45 |
|   | | 2. | Treatment | 45 |
| U. | | Class 20 – Golf Course/Park Secured Claim | | 45 |
|   | | 1. | Impairment and Voting | 45 |
|   | | 2. | Treatment | 45 |

V.   ACCEPTANCE OR REJECTION; CRAMDOWN ..................................... 46

    A.   Voting of Claims ......................................................................... 46

VI.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 46

    A.   Assumption of Executory Contracts and Unexpired Leases.................. 46

    B.   Cure Payments............................................................................. 47

    C.   Rejection of Executory Contracts and Unexpired Leases.................... 47

    D.   Claims Arising From Rejection....................................................... 48

VII.   IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS

    PLAN ................................................................................................ 48

VIII.   RESERVATION OF THE CITY'S RIGHTS OF ACTION ........................... 49

IX.   DISTRIBUTIONS ............................................................................. 49

    A.   Distribution Agent ........................................................................ 49

    B.   Delivery of Distributions ............................................................... 49

    C.   Distributions of Unclaimed Property................................................ 50

    D.   Distributions of Cash .................................................................... 50

**TABLE OF CONTENTS**
(continued)

| | | | Page |
|---|---|---|---|
| | E. | Timeliness of Payments | 51 |
| | F. | Compliance with Tax, Withholding, and Reporting Requirements | 51 |
| | G. | Time Bar to Cash Payments | 51 |
| | H. | No De Minimis Distributions | 52 |
| | I. | No Distributions on Account of Disputed Claims | 52 |
| | J. | No Postpetition Accrual | 52 |
| | K. | CalPERS Pension Plan | 52 |
| X. | | DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS | 53 |
| | A. | Claims Objection Deadline; Prosecution of Objections | 53 |
| | B. | Payments and Distributions with Respect to Disputed Claims | 53 |
| XI. | | EFFECT OF CONFIRMATION | 53 |
| | A. | Discharge of the City | 53 |
| | B. | Injunction | 54 |
| | C. | Term of Existing Injunctions or Stays | 55 |
| | D. | Exculpation | 55 |
| | E. | Releases Among Releasing Parties and Released Parties | 55 |
| | F. | Good Faith Compromise | 57 |
| XII. | | RETENTION OF AND CONSENT TO JURISDICTION | 58 |
| XIII. | | CONDITIONS PRECEDENT | 59 |
| | A. | Conditions Precedent to Confirmation | 59 |
| | B. | Conditions Precedent to Effective Date | 60 |
| | | 1. Confirmation Order | 60 |
| | | 2. Plan Documents | 60 |
| | | 3. Authorizations, Consents, Etc. | 60 |
| | | 4. Timing | 61 |
| | C. | Waiver of Conditions to Effective Date | 61 |
| | D. | Effect of Failure of Conditions | 61 |
| | E. | No Admission of Liability | 61 |
| XIV. | | MISCELLANEOUS PROVISIONS | 62 |
| | A. | Dissolution of the Retirees Committee | 62 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**
**(continued)**                                                                            **Page**

B.   Severability .................................................................................... 62
C.   Governing Law ............................................................................... 62
D.   Effectuating Documents and Further Transactions ........................... 62
E.   Notice of Effective Date ................................................................. 63

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

The City of Stockton, California, a debtor under chapter 9 of the Bankruptcy Code in the case styled *In re City of Stockton, California*, Case No. 2012-32118, currently pending in the United States Bankruptcy Court for the Eastern District of California, hereby proposes the following First Amended Plan of Adjustment of Debts for City of Stockton, California, As Modified (August 8, 2014), pursuant to section 941 of the Bankruptcy Code.[1]

Please refer to the Disclosure Statement for a discussion of the City's financial condition, the developments throughout the Chapter 9 Case, and for other important information. The City encourages you to read this Plan and the Disclosure Statement in their entirety before voting to accept or reject this Plan.  No materials other than the Disclosure Statement and the various exhibits and schedules attached to or incorporated therein have been approved for use in soliciting acceptance or rejection of this Plan.

## I.    DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

### A.    Definitions.

1.    **2003 Fire/Police/Library Certificates** means the 2003A Fire/Police/Library Certificates and the 2003B Fire/Police/Library Certificates.

2.    **2003 Fire/Police/Library Certificates Reimbursement Agreement** means that certain Reimbursement Agreement, dated as of June 1, 2003, by and between the Successor Agency and the City.

3.    **2003 Fire/Police/Library Certificates Supplemental Trust Agreement** means the First Supplemental Trust Agreement, dated as of May 9, 2013, by and among Wells Fargo, the Financing Authority, and the City, the form of which is attached as Exhibit B to the Declaration of Robert Deis in Support of the City of Stockton's Motion Under Bankruptcy Rule 9019 for Approval of Its Settlement with Ambac Assurance Corporation, filed in the Chapter 9 Case on February 26, 2013 [Dkt. No. 725].

/ / /

/ / /

---

[1] The definitions of capitalized terms used throughout this Plan are set forth in Section I(A).  As set forth in Section I.B., unless otherwise noted, all references to a "section" are references to a section of the Bankruptcy Code.

**4.    2003 Fire/Police/Library Certificates Trust Agreement** means the Trust Agreement, dated as of June 1, 2003, by and among Wells Fargo, the Financing Authority, and the City, relating to the 2003 Fire/Police/Library Certificates.

**5.    2003 Fire/Police/Library Certificates Trustee** means Wells Fargo, as trustee under the 2003 Fire/Police/Library Certificates Trust Agreement, or any successor trustee thereunder.

**6.    2003A Fire/Police/Library Certificates** means the Certificates of Participation (Redevelopment Housing Projects) Series 2003A, issued on June 27, 2003, in the original principal amount of $1,160,000.

**7.    2003B Fire/Police/Library Certificates** means the Certificates of Participation (Redevelopment Housing Projects) Taxable Series 2003B, issued on June 27, 2003, in the original principal amount of $12,140,000.

**8.    2004 Arena Bond Indenture** means the Indenture of Trust, dated as of March 1, 2004, by and between the Successor Agency and the 2004 Arena Bond Trustee, relating to the 2004 Arena Bonds.

**9.    2004 Arena Bond Insurance Policy** means the Municipal Bond New Issue Insurance Policy No. 04010198 issued by NPFG, as successor to Financial Guaranty Insurance Company, with respect to the 2004 Arena Bonds.

**10.    2004 Arena Bond Trustee** means Wells Fargo, as indenture trustee under the 2004 Arena Bonds Indenture, or any successor indenture trustee thereunder.

**11.    2004 Arena Bonds** means the Successor Agency of the City of Stockton Revenue Bonds, Series 2004, (Stockton Events Center – Arena Project), issued on March 26, 2004 in the original aggregate principal amount of $47,000,000.

**12.    2004 Parking Bond Indenture** means the Indenture of Trust, dated as of June 1, 2004, by and between the Financing Authority and the 2004 Parking Bond Trustee, relating to the 2004 Parking Bonds.

/ / /

/ / /

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

**13.**     **2004 Parking Bond Insurance Policy** means the Municipal Bond New Issue Insurance Policy No. 04010390 issued by NPFG, as successor to Financial Guaranty Insurance Company, with respect to the 2004 Parking Bonds.

**14.**     **2004 Parking Bond Trustee** means Wells Fargo, as indenture trustee under the 2004 Parking Bonds Indenture, or any successor indenture trustee thereunder.

**15.**     **2004 Parking Bonds** means the Stockton Public Financing Authority Lease Revenue Bonds, Series 2004, (Parking and Capital Projects), issued on June 25, 2004, in the original aggregate principal amount of $32,785,000.

**16.**     **2006 SEB Bond Insurance Policy** means the Financial Guaranty Insurance Policy No. 47756(1) issued by NPFG, as successor to MBIA Insurance Corporation, with respect to the 2006 SEB Bonds.

**17.**     **2006 SEB Bond Trustee** means Wells Fargo, as indenture trustee under the 2006 SEB Bonds Indenture, or any successor indenture trustee thereunder.

**18.**     **2006 SEB Bonds** means the Stockton Public Financing Authority 2006 Lease Revenue Refunding Bonds, Series A, issued on April 6, 2006, in the original aggregate principal amount of $13,965,000.

**19.**     **2006 SEB Indenture** means the Indenture of Trust, dated as of March 1, 2006, by and between the Financing Authority and the 2006 SEB Bond Trustee, relating to the 2006 SEB Bonds.

**20.**     **2007 Office Building Bond Insurance Policy** means, collectively, the Financial Guaranty Insurance Policy No. D-2007-293 and the Financial Guaranty Insurance Policy No. D-2007-295, each issued by Assured Guaranty with respect to the 2007 Office Building Bonds (Series A) and the 2007 Office Building Bonds (Series B), respectively.

**21.**     **2007 Office Building Bond Trustee** means Wells Fargo as the indenture trustee under the 2007 Office Building Bonds Indenture, or any successor indenture trustee thereunder.

**22.**     **2007 Office Building Bonds** means, collectively, the 2007 Series A Bonds and the 2007 Series B Bonds.

**23.**    **2007 Office Building Bonds Indenture** means the Indenture of Trust, dated as of November 1, 2007, by and between the Financing Authority and the 2007 Office Building Bond Trustee, relating to the 2007 Office Building Bonds.

**24.**    **2007 Series A Bonds** means the Stockton Public Financing Authority Variable Rate Demand Lease Revenue Bonds, 2007 Series A (Building Acquisition Financing Project), issued on November 29, 2007, in the original aggregate principal amount of $36,500,000.

**25.**    **2007 Series B Bonds** means the Stockton Public Financing Authority Taxable Variable Rate Demand Lease Revenue Bonds, 2007 Series B (Building Acquisition Financing Project), issued on November 29, 2007, in the original aggregate principal amount of $4,270,000.

**26.**    **2009 Golf Course/Park Bond Trustee** means Wells Fargo as the indenture trustee under the 2009 Golf Course/Park Bonds Indenture, or any successor indenture trustee thereunder.

**27.**    **2009 Golf Course/Park Bonds** means the Stockton Public Financing Authority Lease Revenue Bonds, 2009 Series A (Capital Improvement Projects), issued on September 9, 2009, in the original aggregate principal amount of $35,080,000.

**28.**    **2009 Golf Course/Park Bonds Indenture** means the Indenture of Trust, dated as of September 1, 2009, by and between the Financing Authority and the 2009 Golf Course/Park Bond Trustee, relating to the 2009 Golf Course/Park Bonds.

**29.**    **400 E. Main Office Building Property** means the office building located at 400 E. Main Street in the City.

**30.**    **AB 506** means Assembly Bill 506, codified at California Government Code 53760 *et seq.*

**31.**    **Additional Tax Increment Revenues** has the meaning set forth in the definition of Arena Lease Back Transaction.

**32.**    **Administrative Claim** means the costs or expenses of administration of the Chapter 9 Case not already paid by the City, allowed under section 503(b) and entitled to

1  priority under section 507(a)(2) to the extent made applicable in Chapter 9:  (i) which the City

2  agrees is an Allowed administrative expense; or (ii) which the Bankruptcy Court determines is an

3  Allowed administrative expense.  The City's consent to the Bankruptcy Court adjudicating

4  Administrative Claim status is given without the City in any way consenting or agreeing that

5  Claims for postpetition obligations of the City are or would be entitled to status as Administrative

6  Claims as "the actual necessary costs and expenses of preserving the estate" under section 503(b),

7  and the City reserves its right to maintain that such Claims would instead constitute Other

8  Postpetition Claims.

9         **33.    <u>Allowed</u>** means,

10             (a)      with reference to any Claim, a Claim that

11                 (i)      has been listed on the list of creditors filed by the City, as

12  such list may be amended from time to time pursuant to Bankruptcy Rule 1009; is not listed as

13  unliquidated, contingent or disputed; and for which no contrary proof of claim has been filed

14  (subject to objection as set forth in the next subsection);

15                 (ii)      is asserted in a proof of claim filed in compliance with

16  section 501 and any applicable orders of the Bankruptcy Court or listed in the list of creditors

17  filed by the City and as to which:  (A) no objection has been, or subsequently is, filed within the

18  deadline established pursuant to Section X(A) of the Plan (as such deadline may be extended by

19  the Bankruptcy Court upon application of the City from time to time); (B) the Bankruptcy Court

20  has entered a Final Order allowing all or a portion of such Claim (but only in the amount so

21  allowed); or (C) the Bankruptcy Court has entered a Final Order under section 502(c) estimating

22  the amount of the Claim for purposes of allowance;

23                 (iii)      is subject to a stipulation between the City and the holder of

24  such Claim providing for the allowance of such Claim;

25                 (iv)      is deemed "Allowed" pursuant to this Plan;

26                 (v)      is designated as "Allowed" in a pleading entitled

27  "Designation Of Allowed Claims" (or a similar title of the same import) filed with the

28  Bankruptcy Court by the City on or after the Effective Date; or

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

(b)     with reference to any Administrative Claim or Other Postpetition Claim, as to which the Bankruptcy Court has entered a Final Order allowing all or a portion of such Administrative Claim or Other Postpetition Claim (but only in the amount so allowed).

**34.**    **Ambac** means Ambac Assurance Corporation, a Wisconsin stock insurance corporation.

**35.**    **Ambac Effective Date** means the first Business Day following the day on which all the conditions contained in section 5.1 of the Ambac Settlement Agreement have either occurred or been expressly waived by the parties thereto.

**36.**    **Ambac Insurance Policy** means the Financial Guaranty Insurance Policy No. 21154BE  issued by Ambac in connection with the Fire/Police/Library Lease Back Transaction, which insures the 2003 Fire/Police/Library Certificates executed and delivered by the 2003 Fire/Police/Library Certificates Trustee to fund affordable housing projects in the City.

**37.**    **Ambac Settlement Agreement** means the Stipulation and Settlement Agreement, dated as of February 26, 2013, by and among the City, the Financing Authority, the 2003 Fire/Police/Library Certificates Trustee, and Ambac, which is attached as Exhibit A to the Declaration of Robert Deis in Support of the City of Stockton's Motion Under Bankruptcy Rule 9019 for Approval of Its Settlement with Ambac Assurance Corporation, filed in the Chapter 9 Case on February 26, 2013 [Dkt. No. 725].

**38.**    **Arena** means that property described as Parcel 4, as shown on the Parcel Map filed for record in the office of the Recorder of the County of San Joaquin, State of California, on March 4, 2003, in Book 23 of Maps, page 15, and the Arena located thereon, an indoor facility capable of hosting events such as ice hockey, indoor football, indoor soccer, concerts, boxing events, rodeos, and other such indoor events, and located at 248 West Fremont Street in downtown Stockton.

**39.**    **Arena Claims of the 2004 Arena Bond Trustee/NPFG** means the Claims arising in connection with the Arena Lease Back Transaction (which claims are asserted by the 2004 Arena Bond Trustee at the direction of NPFG (as the insurer of the 2004 Arena Bonds) as a result of the assignment by the Successor Agency of all of its rights under the Arena Lease Out

6

and the Arena Lease Back to the 2004 Arena Bond Trustee), as modified by the NPFG

Settlement.  The Arena Claims of the 2004 Arena Bond Trustee/NPFG do not include any claims

arising out of non-payment of the 2004 Arena Bonds as all such claims are claims against the

Successor Agency and are not obligations of the City (except to the extent specifically provided

under the terms of the NPFG Settlement).

       **40.**     **Arena Lease Back** means that certain Lease Agreement, dated as of

March 1, 2004, pursuant to which the Successor Agency leased the Arena to the City.

       **41.**     **Arena Lease Back Transaction** means, collectively, all transactions

memorialized in, among other things, the 2004 Arena Bonds, Arena Lease Out, and the Arena

Lease Back, and all related documents in connection therewith.

       **42.**     **Arena Lease Out** means that certain Site Lease, dated as of March 1,

2004, pursuant to which the City leased the Arena to the Successor Agency.

       **43.**     **Arena Pledge Agreement** means that certain Pledge Agreement, dated as

of March 1, 2004, between the City, as pledgor, and the Successor Agency, as pledgee, pursuant

to which the City pledged certain incremental tax revenues expected to be collected from the

West End Urban Renewal Project No. 1.

       **44.**     **Assured Guaranty** means, collectively, Assured Guaranty Municipal

Corp. and Assured Guaranty Corp.

       **45.**     **Assured Guaranty Settlement** means the settlement among the City and

Assured Guaranty relating to the Office Building Lease Back Transaction and the Pension

Obligation Bonds, the terms of which settlement are memorialized in the Assured Guaranty

Settlement Documents.

       **46.**     **Assured Guaranty Settlement Documents** means the documents

implementing the Assured Guaranty Settlement, copies of which documents are annexed as

Collective Exhibit 1 to the Plan Supplement.

       **47.**     **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy

Court in the Plan Solicitation Order accompanying the Disclosure Statement and provided to each

holder of a Claim entitled to vote to accept or reject this Plan.

**48.** **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 9 Case.

**49.** **Bankruptcy Court** means the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, or such other court that lawfully exercises jurisdiction over the Chapter 9 Case.

**50.** **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 9 Case, together with the local rules of the Bankruptcy Court applicable to the Chapter 9 Case.  Unless otherwise indicated, references in this Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules of Bankruptcy Procedure.

**51.** **Bar Date** means the applicable date by which a particular proof of claim must be filed, as established by the Bankruptcy Court.

**52.** **BEDI** means the Brownfields Economic Development Initiative.

**53.** **BEDI Grant** means the award by HUD of $1,212,807 in BEDI grant funds for costs chargeable to the City's fiscal year 2003 BEDI award for the Downtown Stockton Waterfront Project, the award of which is contingent upon the City's compliance with the terms set forth in that certain letter dated May 7, 2014, from Yolanda Chávez, Deputy Assistant Secretary for Grant Programs, HUD, to the Honorable Anthony Silva.

**54.** **Business Day** means a day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York, are required or authorized to close by law or executive order.

**55.** **CalPERS** means the California Public Employees' Retirement System.

**56.** **CalPERS Pension Plan** means the pension plan between CalPERS and the City, dated as of September 1, 1944, as amended (CalPERS ID 6373973665).

**57.** **CalPERS Pension Plan Participants** means those current and former City employees and their survivors and other dependents who are the beneficiaries of the CalPERS Pension Plan.

/ / /

58.     **Cash** means cash and cash equivalents, including withdrawable bank deposits, wire transfers, checks, and other similar items.

59.     **Chapter 9 Case** means the case under chapter 9 of the Bankruptcy Code commenced by the City, styled *In re City of Stockton, California,* Case No. 2012-32118, currently pending in the Bankruptcy Court.

60.     **City** means the City of Stockton, California, the debtor in the Chapter 9 Case.

61.     **City Council** means the duly elected legislative body of the City.

62.     **CJPRMA** means California Joint Powers Risk Management Authority.

63.     **Claim** has the meaning set forth in section 101(5).

64.     **Class** means any group of Claims classified herein pursuant to section 1123(a).

65.     **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

66.     **Confirmation Hearing** means the hearing to be conducted by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned, reconvened or continued from time to time.

67.     **Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 943.

68.     **Construction Agreement** means that certain "Agreement Regarding Construction Costs" dated as of April 29, 2008, among SCC 16, the City, and the Successor Agency, relating to the City's obligation to reimburse SCC 16 for construction costs paid by SCC 16 that the City was otherwise liable to pay, for the construction of improvements to certain premises located in the Edmund S. Coy Parking Structure leased by SCC 16.

69.     **Contracts for Loan Guarantee** means (i) that certain Contract of Loan Guarantee Assistance Under Section 108 of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. §5308, dated December 27, 2000, by and between the City, as borrower, and HUD, as guarantor, for two promissory notes issued by the City both numbered B-

9

98-MC-06-0026; (ii) that certain Contract of Loan Guarantee Assistance Under Section 108 of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5308, dated December 27, 2000, by and between the City, as borrower, and HUD, as guarantor, for a promissory note issued by the City numbered B-98-MC-06-0026-A; and (iii) that certain Contract of Loan Guarantee Assistance Under Section 108 of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5308, dated March 2, 2006, by and between the City, as borrower, and HUD, as guarantor, for a promissory note issued by the City numbered B-03-MC-06-0036.

70.    **Convenience Class Claim** means any Allowed Claim that is greater than $0.00 in Allowed amount and less than or equal to $100 in Allowed amount or irrevocably reduced to $100 in Allowed amount at the election of the holder of the Allowed Claim as evidenced by the Ballot submitted by such holder; *provided, however*, that an Allowed Claim may not be subdivided into multiple Claims of $100 or less for purposes of receiving treatment as a Convenience Class Claim.

71.    **DBW** means the California Department of Boating and Waterways, now the Boating and Waterways division of the Department of Parks and Recreation.

72.    **DBW Settlement Agreement** means the agreement implementing the DBW settlement between the City and DBW, annexed as Exhibit 4 to the Supplemental Plan Supplement and annexed as an exhibit to the Second Supplemental Plan Supplement.

73.    **Dexia** means Dexia Crédit Local, a banking corporation duly organized and existing under the laws of the Republic of France, acting through its New York branch.

74.    **Disallowed** means a Claim or portion thereof that:  (i) has been disallowed by a Final Order of the Bankruptcy Court; (ii) has been listed by the City in its list of creditors, as it may be amended from time to time in accordance with Bankruptcy Rule 1009, as in the amount of $0.00, contingent, disputed, or unliquidated, and as to which no proof of claim has been filed by the applicable deadline or deemed timely filed pursuant to any Final Order of the Bankruptcy Court; (iii) as to which the holder thereof has agreed to be equal to $0.00 or to be withdrawn, disallowed or expunged; or (iv) has not been listed in the list of creditors and as to which no proof

of claim has been filed by the applicable deadline or deemed timely filed pursuant to a Final Order of the Bankruptcy Court.

75. **Disclosure Statement** means the disclosure statement, and all exhibits and schedules incorporated therein, that relates to this Plan and was approved by the Bankruptcy Court pursuant to section 1125 in an order filed on November 22, 2013, as the same may be amended, modified, or supplemented in accordance with the Bankruptcy Code.

76. **Disputed Claim** means any Claim or portion thereof that has not become Allowed and that is not Disallowed. In the event that any part of a Claim is a Disputed Claim, except as otherwise provided in this Plan, such Claim shall be deemed a Disputed Claim in its entirety for purposes of distribution under this Plan unless the City otherwise agrees in writing in its sole discretion. Without limiting the foregoing, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, reduce, subordinate, or estimate such Claim shall be deemed to be a Disputed Claim.

77. **Edmund S. Coy Parking Structure** means the parking structure located at N. Hunter Street and E. Channel Street in the City.

78. **Effective Date** means the first Business Day after the Confirmation Date on which the conditions specified in Section XIII of the Plan have been satisfied or waived.

79. **Eligibility Contest** means, collectively, the trial on the City's eligibility to be a debtor under Chapter 9 of the Bankruptcy Code and all ancillary and related pleadings, discovery, hearings, and actions.

80. **Exculpated Party** means each or any of the City, NPFG, Assured Guaranty, Ambac, the Indenture Trustee in all its capacities (except in its capacity as the 2009 Golf Course/Park Bond Trustee), and the respective Related Persons of each of the foregoing.

81. **Events Center Project** has the meaning set forth in the definition of Arena Lease Back Transaction.

82. **Final Order** means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not

been reversed, stayed, modified, or amended and as to which: (i) the time to appeal or petition for review, rehearing, or certiorari has expired and no appeal or petition for review, rehearing, or certiorari is then pending; or (ii) any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

83.     **Financing Authority** means the Stockton Public Financing Authority, a joint powers authority organized and existing under the laws of the state of California and that certain Joint Exercise of Powers Agreement dated as of June 16, 1990, by and between the City and the Successor Agency.

84.     **Fire/Police/Library Lease Back** means that certain Lease Agreement, dated as of June 1, 2003, pursuant to which the Financing Authority leased the Fire/Police/Library Properties to the City.

85.     **Fire/Police/Library Lease Back Transaction** means, collectively, all transactions memorialized in, among other things, the 2003 Fire/Police/Library Certificates Reimbursement Agreement, the 2003 Fire/Police/Library Certificates, the Fire/Police/Library Lease Out, the Fire/Police/Library Lease Back, and all related documents in connection therewith.

86.     **Fire/Police/Library Lease Out** means that certain Site and Facility Lease, dated as of June 1, 2003, pursuant to which the City leased the Fire/Police/Library Properties to the Financing Authority.

87.     **Fire/Police/Library Lease Out Assignment Agreement** means the Assignment Agreement by and between the Financing Authority and the 2003 Fire/Police/Library Certificates Trustee, in substantially the form annexed to the Ambac Settlement Agreement as Exhibit A (and referred to in the Ambac Settlement Agreement as the "Site Lease Assignment Agreement").

88.     **Fire/Police/Library Properties** means, collectively, the City's Main Police Facility, located at 22 E. Market Street; the Maya Angelou Southeast Branch Library, located at 2324 Pock Lane; Fire Station No. 1, located at 1818 Fresno Avenue; Fire Station No. 5, located at 3499 Manthey Road; and Fire Station No. 14, located at 3019 McNabb Street.

FIRST AMENDED PLAN, AS MODIFIED (AUGUST 8, 2014)

89.     **Fourth Floor Lease of 400 E. Main** means that certain 400 East Main Street Office Lease dated as of June 1, 2012, between Main Street Stockton LLC and The City of Stockton.

90.     **Franklin** means, collectively, Franklin Advisers, Inc., Franklin High Yield Tax-Free Income Fund, and Franklin California High Yield Municipal Fund.

91.     **General Fund** means the City's chief operating fund, which is used to account for all financial resources except those required to be accounted for in another fund (such as the Restricted Funds).

92.     **General Liability Claim** means a tort or contract Claim filed against the City pursuant to the Government Claims Act, California Government Code section 810 *et seq*.

93.     **General Unsecured Claim** means any unsecured Claim *that is not* (i) an Administrative Claim; (ii) a General Liability Claim; or (iii) a Workers Compensation Claim; *but excluding* the unsecured portion, if any, of the claims of the holders of the Claims in Classes 1A and 1B (Ambac), 2, 3, and 4 (NPFG), and 5 and 6 (Assured Guaranty), which unsecured claims, if any, will be paid in accordance with the various settlements with such holders.

94.     **Golf Course/Park Claims** means, collectively, the Golf Course/Park Secured Claim and the Golf Course/Park Unsecured Claim.  The Allowed amount of the Golf Course/Park Claims is $36,603,625.93.

95.     **Golf Course/Park Collateral** means the right of the 2009 Golf Course/Park Bond Trustee to take possession of the Golf Course/Park Properties through September 1, 2038, or such other date as is determined by the Bankruptcy Court to be the termination date for such possession.  The Bankruptcy Court determined the value of the Golf Course/Park Collateral on July 8, 2014.

96.     **Golf Course/Park Lease Back** means that certain Lease Agreement, dated as of September 1, 2009, pursuant to which the Financing Authority leased the Golf Course/Park Properties to the City.

/ / /

/ / /

13

97.    **Golf Course/Park Lease Back Rental Payments** means the semi-annual rental payments in varying amounts that the City agreed to make as tenant under the Golf Course/Park Lease Back.

98.    **Golf Course/Park Lease Back Transaction** means, collectively, all transactions memorialized in, among other things, the 2009 Golf Course/Park Bonds, the Golf Course/Park Lease Out, and the Golf Course/Park Lease Back, and all related documents in connection therewith.

99.    **Golf Course/Park Lease Out** means that certain Site and Facility Lease, dated as of September 1, 2009, pursuant to which the City leased the Golf Course/Park Properties to the Financing Authority.

100.    **Golf Course/Park Properties** means, collectively, Oak Park, the Van Buskirk Golf Course, and the Swenson Golf Course.

101.    **Golf Course/Park Secured Claim** means the Secured Claim of the 2009 Golf Course/Park Bond Trustee arising from the recharacterization of the Golf Course/Park Lease Back Transaction as a secured financing transaction pursuant to the Partial Judgment.  The Allowed amount of the Golf Course/Park Secured Claim as of the date of confirmation of the Plan is the value of the Golf Course/Park Collateral, which the Bankruptcy Court determined to be $4,052,000 at the continued Confirmation Hearing held on July 8, 2014.  The Bankruptcy Court valued the component parts as follows:  the possessory interest of (a) Swenson Golf Course:  $1,572,500; (b) Van Buskirk Golf Course:  $658,750; (c) Van Buskirk Community Center:  $1,600,000; and (d) Oak Park:  $221,000.[2]

102.    **Golf Course/Park Unsecured Claim** means the Class 12 unsecured Claim of the 2009 Golf Course/Park Bond Trustee arising from the recharacterization of the Golf Course/Park Lease Back Transaction as a secured financing transaction pursuant to the Partial Judgment.  The Allowed amount of the Golf Course/Park Unsecured Claim as of the date of

---

[2] At the July 8 hearing, the Court rounded the sum of these values ($4,052,250) to $4,052,000.

FIRST AMENDED  PLAN, AS
MODIFIED (AUGUST 8, 2014)

confirmation of the Plan is equal to:  (i) $36,603,625.93 minus (ii) the Allowed amount of the Golf Course/Park Secured Claim.

103.    **HUD** means the U.S. Department of Housing and Urban Development.

104.    **Impaired** means a Claim or interest that is impaired within the meaning of section 1124.

105.    **Indenture Trustee** means the 2003 Fire/Police/Library Certificates Trustee, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee, the 2006 SEB Bond Trustee, the 2007 Office Building Bond Trustee, the 2009 Golf Course/Park Bond Trustee, and/or the Pension Obligation Bonds Trustee, as the context requires.

106.    **Insurance Policies** means the 2004 Arena Bond Insurance Policy, the 2004 Parking Bond Insurance Policy, the 2006 SEB Bond Insurance Policy, the 2007 Office Building Bond Insurance Policy, and the Ambac Insurance Policy.

107.    **Insured Portion** means that portion of an Allowed Workers Compensation Claim or an Allowed General Liability Claim that is covered by one or more of the excess risk-sharing pools of which the City is a member, up to the amount of the policy limits, including any excess coverage policies.

108.    **Leave Buyout Claim** means a Claim of a former City employee on account of unpaid sick leave or other compensation or reimbursement due upon such employee's retirement or other separation from City service.

109.    **Marina Construction Loan** means that certain Stockton Waterfront Marina $13,300,000 Loan Contract, dated as of June 21, 2004.

110.    **Marina Construction Loan Agreement** means the amended Marina Construction Loan.

111.    **Marina Project** has the meaning set forth in the Marina Construction Loan Agreement.

112.    **Market Street Garage** means the structure located within the City's Central Parking District on Market Street between Sutter and California Streets.

/ / /

15

113.    **New 400 E. Main Lease** means the lease to the City of a portion of the 400 E. Main Office Building Property, a copy of which lease is included in the Assured Guaranty Settlement Documents.

114.    **Notice of the Effective Date** shall have the meaning ascribed to such phrase in Section XIV(E) of the Plan.

115.    **NPFG** means National Public Finance Guarantee Corporation, a New York stock insurance corporation.

116.    **NPFG Arena Settlement** means the settlement between the City and NPFG relating to the Arena Lease Back Transaction, the terms of which settlement are memorialized in the NPFG Arena Settlement Documents.

117.    **NPFG Arena Settlement Documents** means the documents implementing the NPFG Arena Settlement, copies of which documents are annexed as Collective Exhibit 2 to the Plan Supplement.

118.    **NPFG Parking Settlement** means the settlement between the City and NPFG relating to the Parking Structure Lease Back Transaction, the terms of which settlement are memorialized in the NPFG Parking Settlement Documents.

119.    **NPFG Parking Settlement Documents** means the documents implementing the NPFG Parking Settlement, copies of which documents are annexed as Collective Exhibit 3 to the Plan Supplement.

120.    **NPFG Settlement** means, collectively, the NPFG Arena Settlement, the NPFG Parking Settlement, and the NPFG/SEB Settlement.

121.    **NPFG/SEB Settlement** means the settlement between the City and NPFG relating to the SEB Lease Back Transaction, the terms of which settlement are embodied herein.

122.    **Oak Park** means the public park of approximately 61.2 acres in the City, bounded on the east by Union Pacific railroad tracks, on the north by East Fulton Street, on the south by East Alpine Street, and on the west by North Sutter and Alvarado Streets.

123.    **Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty** means the Claims arising in connection with the Office Building

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

Lease Back Transaction, which Claims are asserted by the 2007 Office Building Bond Trustee at the direction of Assured Guaranty as a result of the assignment by the Financing Authority of all of its rights under the Office Building Lease Out and the Office Building Lease Back to the 2007 Office Building Bond Trustee.

124.    **Office Building Lease Back** means that certain Lease Agreement, dated as of November 1, 2007, pursuant to which the Financing Authority leased the 400 E. Main Office Building Property to the City.

125.    **Office Building Lease Back Transaction** means, collectively, all transactions memorialized in, among other things, the 2007 Office Building Bonds, the Office Building Lease Out, and the Office Building Lease Back, and all related documents in connection therewith.

126.    **Office Building Lease Out** means that certain Site and Facility Lease, dated as of November 1, 2007, pursuant to which the City leased the 400 E. Main Office Building Property to the Financing Authority.

127.    **Office Building Standby Agreement** means that certain Standby Bond Purchase Agreement, dated as of November 29, 2007, entered into by the City, the Financing Authority, and Dexia.

128.    **Other Postpetition Claims** means Claims asserted against the City for services rendered to, or goods delivered to, or obligations incurred by, the City after the Petition Date that do not constitute Administrative Claims.

129.    **Parking Authority** means the Parking Authority of the City of Stockton, a public body corporate and politic, organized and existing under and by virtue of the laws of the State of California.

130.    **Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG** means the Claims arising in connection with the Parking Structure Lease Back Transaction, as modified by the NPFG Settlement.  The Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG do not include any claims arising out of non-payment of the 2004 Parking Bonds, as all such claims are non-recourse claims against the Financing Authority secured only by the

assignment by the Financing Authority of the Parking Structure Lease Back Rental Payments and are not obligations of the City (except to the extent specifically provided under the terms of the NPFG Settlement).

       **131.**    **Parking Structure Lease Back** means that certain Lease Agreement, dated as of September 1, 2004, pursuant to which the Financing Authority leased the Parking Structure Properties to the City.

       **132.**    **Parking Structure Lease Back Transaction** means, collectively, the transactions memorialized in the 2004 Parking Bonds, the Parking Structure Lease Out, and the Parking Structure Lease Back.

       **133.**    **Parking Structure Lease Out** means that certain Site and Facility Lease, dated as of June 1, 2004, pursuant to which the City leased the Parking Structure Properties to the Financing Authority.

       **134.**    **Parking Structure Properties** means, collectively, the Edmund S. Coy Parking Structure, the Stockton Events Center Parking Structure, and the Market Street Garage.

       **135.**    **Partial Judgment** means the Partial Judgment in Favor of Plaintiffs entered on April 21, 2014 in the Recharacterization Adversary Proceeding [Adv. Dkt. No. 56].

       **136.**    **Pension Obligation Bonds** means the City of Stockton 2007 Taxable Pension Obligation Bonds issued on April 5, 2007 in the aggregate principal amount of $125,310,000 pursuant to articles 10 and 11 (commencing with section 53570) of chapter 3 of part 1 of division 2 of title 5 of the Government Code of the State of California and the Pension Obligation Bonds Indenture.

       **137.**    **Pension Obligation Bonds Claims** means the Claims arising in connection with the Pension Obligation Bonds.

       **138.**    **Pension Obligation Bonds Indenture** means that certain Indenture of Trust, dated as of April 1, 2007, by and between the City and the Pension Obligation Bonds Trustee.

/ / /

/ / /

**139.**    **Pension Obligation Bonds Insurance Policy** means that certain Municipal Bond Insurance Policy No. 208382-N issued by Assured Guaranty, as successor to Financial Security Assurance, with respect to the Pension Obligation Bonds.

**140.**    **Pension Obligation Bonds Trustee** means Wells Fargo, as indenture trustee under the Pension Obligation Bonds Indenture, or any successor indenture trustee thereunder.

**141.**    **Petition Date** means June 28, 2012.

**142.**    **Plan** means this First Amended Plan of Adjustment of Debts of City of Stockton, California (November 15, 2013), together with any exhibits (including any Plan Supplement and exhibits annexed to any Plan Supplement), each in their present form or as they may be altered, amended or modified from time to time in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

**143.**    **Plan Document** means any agreement or instrument contemplated by, or to be entered into pursuant to, this Plan, that is in form and substance acceptable to the City, has been duly and validly executed and delivered, or deemed executed by the parties thereto, and for which all conditions to its effectiveness have been satisfied or waived.

**144.**    **Plan Solicitation Order** means the Order Approving (1) Modified Disclosure Statement with Respect to First Amended Plan for the Adjustment of Debts of City of Stockton (November 15, 2013); (2) Setting Confirmation Procedures; and (3) Scheduling Filing Dates and the Confirmation Hearing [Dkt. No. 1220], entered on November 22, 2013, by which the Bankruptcy Court approved the Disclosure Statement as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of this Plan and established certain rules, deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

**145.**    **Plan Supplement** means the Plan Supplement in Connection with the First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1236], filed on January 27, 2014, which includes drafts reflecting the material economic terms of the Assured Guaranty Settlement Documents, the NPFG Arena Settlement

Documents, and the NPFG Parking Settlement Documents.  The Supplemental Plan Supplement

includes updated drafts of these documents as well as additional documents, as will the Second

Supplemental Plan Supplement.

146.    **Ports License Agreement** means that certain "Events Center Ball Park

License Agreement" dated as of March 2, 2004, between the City and 7th Inning Stretch, LLC

regarding the terms and conditions upon which the Ports may use the Banner Island Ballpark

located next to the Arena.

147.    **Ports** means, collectively, the professional minor-league baseball team

known as the Stockton Ports and 7th Inning Stretch, LLC.

148.    **Ports Settlement** means the settlement between the City and the Ports

regarding the Claims of the Ports and the terms of the City's financial support of the Ports.  The

terms of the Ports Settlement are implemented by the Ports Settlement Documents.

149.    **Ports Settlement Documents** mean the documents implementing the Ports

Settlement, which as of the date hereof have not been finalized.  However, the term sheet, which

sets forth the material terms of the Ports Settlement, is annexed as an exhibit to the Second

Supplemental Plan Supplement.

150.    **Pre-Confirmation Date Claims** means all Claims against the City that

arose prior to the Confirmation Date.

151.    **Price Claims** mean the Claims of the Price Judgment Creditors, who filed

a proof of claim in the Chapter 9 Case in the amount of $1,423,164.

152.    **Price Judgment Creditors** mean Richard Price and five other low-income

individuals who were displaced from single-room-occupancy housing units in downtown

Stockton in connection with the City's code-enforcement activities, and the Interfaith Council of

San Joaquin (formerly Stockton Metro Ministry Inc.), who collectively filed an action against the

City, the Successor Agency, and other parties on May 2, 2002, captioned as *Price, et al. v. City of*

*Stockton, et al.*, U.S. District Court for the Eastern District of California, case no. 2:02-cv-00065-

LKK-KJM.

/ / /

153.    **Price Settlement** means the settlement between the City and the Price Judgment Creditors regarding the Price Claims.  The terms of the Price Settlement are summarized by the Price Settlement Documents.

154.    **Price Settlement Documents** mean the documents implementing the Price Settlement, copies of which are annexed as Exhibit 5 to the Supplemental Plan Supplement.

155.    **Professional Claim** means a Claim required to be filed pursuant to Section II(B) of the Plan for approval of amounts, if any, to be paid after the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan.

156.    **Recharacterization Adversary Proceeding** means the adversary proceeding that the 2009 Golf Course/Park Bond Trustee, Franklin High Yield Tax-Free Income Fund, and Franklin California High Yield Municipal Fund commenced by filing a Complaint for Declaratory Relief against the City in the Bankruptcy Court.  [Dkt. No. 1181, commencing Adversary Case 13-2315].

157.    **Rejection Motion** means the motion or motions to be filed by the City pursuant to section 365(a) by which the City shall seek approval and authorization for the rejection of such executory contracts and unexpired leases as shall be identified in such motion(s).

158.    **Related Persons** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, and any Person claiming by or through any of them.

159.    **Released Party** means each or any of NPFG, Assured Guaranty, Ambac, the Indenture Trustee, and the respective Related Persons of each of the foregoing.

160.    **Restricted Funds** means the approximately 200 special purpose and enterprise funds administered by the City, the use of which is restricted by, among other things, grants, federal law, the California Constitution, or other California law, such that the assets of the Restricted Funds may not lawfully be used to pay obligations of the General Fund, but which can

be used to pay the Pension Obligation Bonds and the Restricted Revenue Bond and Note Payable Obligations.

      **161.**    **Restricted Revenue Bond and Note Payable Obligations** means, collectively, (i) the City of Stockton Revenue Certificates of Participation 1998 Series A (Wastewater System Project), the City of Stockton Certificates of Participation 2003 Series A (Wastewater System Project), the Stockton Public Financing Authority 2005 Water Revenue Bonds, Series A (Water System Capital Improvement Project), Stockton Public Financing Authority Water Revenue Bonds, Series 2009A (Delta Water Supply Project) & Taxable Build America Bonds Series 2009 B (Delta Water Supply Project), Stockton Public Financing Authority Variable Rate Demand Water Revenue Bonds, Series 2010A (Delta Water Supply Project), including all installment purchase agreements, security agreements, trust indentures, reimbursement agreements, fee letters, and other agreements with respect thereto to which the City is a party and which are payable from and secured by special and restricted sources of revenues; and (ii) the City's obligations under that certain Installment Purchase Agreement, dated as of May 1, 2002, by and between the City and California Statewide Communities Development Authority, to make installment payments, from certain revenues of the City's water system, that relate to California Statewide Communities Development Authority Water and Wastewater Revenue Bonds (Pooled Financing Program), Series 2002A.

      **162.**    **Retiree Health Benefit Claim** means a Claim by a former City employee or dependent on account of or in any way related to the City's postpetition reduction of its contribution to health benefit payments to former City employees and dependents.

      **163.**    **Retiree Health Benefit Claimant** means a former City employee (or dependent) who was eligible for retiree health benefits based on his or her collective bargaining agreement at the time of retirement and: (i) who was receiving City retiree health benefits as of June 30, 2012 (which includes any retiree who had waived coverage prior to that date but was otherwise eligible, or any retiree who had exceeded the 15-year cap for under-65 retiree health benefits, but who was eligible for a City retiree benefit for an over-65 retiree); or (ii) who retired prior to July 1, 2012 with his or her last day on payroll having occurred on or before June 30,

2012; or (iii) who was a surviving spouse of a deceased retiree who was receiving retiree benefits on June 30, 2012.

164.    **Retirees Committee** means the Official Committee of Retirees, appointed in the Chapter 9 Case on April 1, 2013 [Dkt. No. 846], by the Office of the United States Trustee pursuant to sections 1102(a)(1) and 1102(b)(1), as the membership thereof may have been reconstituted from time to time by the Office of the United States Trustee.

165.    **Retirees Settlement** means the agreement between the City and the Retirees Committee by which the City agrees to propose a plan of adjustment containing the provisions set forth in the Retirees Settlement.

166.    **Rights of Action** means any rights, claims, or causes of action owned by, accruing to, or assigned to the City pursuant to the Bankruptcy Code or pursuant to any contract, statute, or legal theory, including without limitation any rights to, claims, or causes of action for recovery under any policies of insurance issued to or on behalf of the City.

167.    **Risk Management Internal Service Fund** means the fund established by the City to accumulate resources for interdepartmental charges expended on self insurance for General Liability Claims.  The City also has other internal service funds.

168.    **Rust Omni** means Rust Consulting/Omni Bankruptcy, the Ballot Tabulator in the Chapter 9 Case.

169.    **SCC 16** means Stockton City Center 16, LLC, a California limited liability company.

170.    **SCC 16 Claims** means any Claim of SCC 16 arising out of the Construction Agreement.

171.    **SCC 16 Lease** means that certain Master Lease dated February 26, 2008 between the City, as lessor, and SCC 16, as lessee, whereby the City subleased to SCC 16 a portion of that certain parcel of real property situated in Stockton commonly known as The Coy Parking Garage, and more particularly described in the Lease.

172.    **SCC 16 Promissory Note** means that certain promissory note executed by the City in favor of SCC 16 pursuant to, and in accordance with, the Construction Agreement.

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

173.    **SCC 16 Settlement** means the settlement, if any, memorialized in the SCC Settlement Agreement.

174.    **SCC Settlement Agreement** means that certain settlement agreement, if any, among the City, the 2004 Parking Structure Bond Trustee, and SCC 16.

175.    **SEB Claims of the 2006 SEB Bond Trustee/NPFG** means the Claims (if any) arising under the SEB Lease Back or the SEB Lease Out.

176.    **SEB Lease Back** means that certain Lease Agreement, dated as of March 1, 2006, pursuant to which the Financing Authority leased the SEB Properties to the City.

177.    **SEB Lease Back Transaction** means, collectively, the transactions memorialized in the 2006 SEB Bonds, SEB Lease Out, and the SEB Lease Back.

178.    **SEB Lease Out** means that certain Ground Lease, dated as of March 1, 2006, pursuant to which the City leased the SEB Properties to the Financing Authority.

179.    **SEB Properties** means the Stewart/Eberhardt Building located at 22 East Weber Avenue, in the City, and the adjacent public parking facility located at 15 North El Dorado Street.

180.    **Second Supplemental Plan Supplement** means the Second Supplemental Plan Supplement in Connection with the First Amended Plan for the Adjustment of Debts of City of Stockton, California, As Modified (August 8, 2014), to be filed by the City, which includes the Assured Guaranty Settlement Documents, the NPFG Arena Settlement Documents, the NPFG Parking Settlement Documents, the DBW Settlement Document, the Price Settlement Documents, and the Thunder Settlement Documents as approved by the City Council by resolution dated April 15, 2014, as well as the term sheet executed by the City and the Ports.

181.    **Secured Claim** means a Claim that is secured, in whole or in part, (i) by a lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law; or (ii) as a result of rights of setoff under section 553; but in any event only to the extent of the value, determined in accordance with section 506(a), of the holder's interest in the City's interest in property or to the extent of the amount subject to such setoff, as the case may be.

182.  **SIR Claim Portion** means the portion of a Workers Compensation Claim or General Liability Claim subject to the City's self insurance retention.  For any resolved Workers Compensation Claim, the SIR Claim Portion is the first $500,000.  For any resolved General Liability Claim, the SIR Claim Portion is the first $1,000,000.  The SIR Claim Portion is an obligation of the City rather than an obligation of any excess risk-sharing pool of which the City is a member.

183.  **Special Assessment and Special Tax Obligations** means, collectively:

- Stockton Public Financing Authority Reassessment Revenue Bonds (Arch Road and Stockton Business Park Assessment Districts) Series 1998, including claims related to those certain:
  - Stockton Airport Business Park Ltd. Obligation Refunding Improvement Bonds Project 84-1 Phase IV, Series 229 (Local Obligation Bonds);
  - Stockton Airport Business Park Ltd. Obligation Refunding Improvement Bonds Project 84-1 Phase V, Series 230 (Local Obligation Bonds);
  - Stockton Airport Business Park Ltd. Obligation Refunding Improvement Bonds Project 84-1 Phase I, Series 231 (Local Obligation Bonds);
- City of Stockton Camera Estates Community Facilities District No. 2003-1 Special Tax Bonds, Series 2003;
- City of Stockton Limited Obligation Improvement Bonds March Lane/Holman Assessment District 2003-1;
- City of Stockton Limited Obligation Improvement Bonds Mosher Assessment District 2003-02;
- City of Stockton Limited Obligation Improvement Bonds Waterford Estates East Phase II Assessment District 2003-03;

/ / /

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

- Stockton Public Financing Authority Refunding Revenue Bonds (West Eighth Street Reassessment District);
- City of Stockton South Stockton Community Facilities District No. 90-1 2005 Special Tax Refunding Bonds;
- Stockton Public Financing Authority Refunding Revenue Bonds (2005 Assessment Districts Refinancing) Series A Senior Lien Bonds and Series B Subordinate Lien Bonds:
  - City of Stockton Limited Obligation Refunding Bond Blossom Ranch Assessment District No. 93-1 (Reassessment and Refunding of 2005);
  - City of Stockton Limited Obligation Refunding Bond La Morada Assessment District No. 96-4 (Reassessment and Refunding of 2005);
  - City of Stockton Limited Obligation Refunding Bond Morada North Assessment District No. 2002-01 (Reassessment and Refunding of 2005);
  - City of Stockton Limited Obligation Refunding Bond Morada Ranch Assessment District No. 2000-01 (Reassessment and Refunding of 2005);
  - City of Stockton Limited Obligation Refunding Bond Waterford Estates East Assessment District No. 2002-03 (Reassessment and Refunding of 2005);
- City of Stockton Community Facilities District No. 90-2 (Brookside Estates) 2005 Special Tax Refunding Bonds;
- Stockton Public Financing Authority Revenue Bonds (Redevelopment Projects) 2006 Series A and Taxable Revenue Bonds (Housing Projects) 2006 Series C;

/ / /

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

1        • City of Stockton Community Facilities District No. 1 (Weston Ranch)

2          Special Tax Refunding Bonds, Series 2006;

3        • City of Stockton Spanos Park West Community Facilities District

4          No. 2001-1 Special Tax Refunding Bonds, Series 2006;

5        • City of Stockton Community Facilities District No. 2006-1 (Riverbend)

6          Special Tax Bonds, Series 2006;

7        • City of Stockton Community Facilities District No. 2006-3

8          (Northbrook) Woodside Improvement Area 1 Special Tax Bonds,

9          Series 2007;

10       • City of Stockton Arch Road East Community Facilities District No. 99-

11         02 2007 Special Tax Bonds;

12       • City of Stockton 2001 Combined Assessment District Refunding, 2001

13         Charter Way (86-4), North Stockton Interim Sewer (88-2), and Little

14         John Creek (97-01) 2001 Limited Obligation Improvement Refunding

15         Bonds;

16       • Stockton Public Financing Authority 2008 Refunding Revenue Bonds:

17         o City of Stockton Limited Obligation Refunding Bonds,

18            Reassessment District No. 91-1R (Local Obligation Bonds);

19         o Stockton Public Financing Authority Communities Facilities

20            District No. 90-4 (Spanos Park) Special Tax Refunding Bonds

21            (Local Obligation Bonds); and

22       • All installment purchase agreements, security agreements, trust

23         indentures, reimbursement agreements, fee letters, and other

24         agreements with respect thereto to which the City is a party and which

25         are payable from and secured by special and restricted sources of

26         revenues.

27     **184.**   **SPOA** means the Stockton Police Officers' Association.

28    / / /

**185.    SPOA Claims** means the Claims of members of the SPOA in the approximate amount of $13 million included in and resolved under the SPOA MOU.

**186.    SPOA MOU** means the Memorandum of Understanding between the City and the SPOA effective July 1, 2012, through June 30, 2014, as approved by the City, a copy of which is attached as Exhibit 5 to the Plan Supplement.

**187.    Stockton Events Center Parking Structure** means the structure located at the intersection of Fremont and Van Buren streets in the City.

**188.    Successor Agency** means the City, acting in its capacity as Successor Agency to the Redevelopment Agency of the City of Stockton following the dissolution of such agency.  References to actions by the Successor Agency in the Plan incorporate references to actions taken and agreements entered into by the former Redevelopment Agency of the City of Stockton prior to its dissolution and the Successor Agency's succession in interest.

**189.    Supplemental Plan Supplement** means the Supplemental Plan Supplement in Connection with the First Amended Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013) [Dkt. No. 1259], filed on February 10, 2014, which includes drafts reflecting the material economic terms of the Assured Guaranty Settlement Documents, the NPFG Arena Settlement Documents, the NPFG Parking Settlement Documents, the DBW Settlement Document, the Price Settlement Documents.

**190.    Swenson Golf Course** means the property in the City located on approximately 219 acres at 6803 Alexandria Place.

**191.    Thunder Claims** means the Claims arising in connection with the Thunder License Agreement, as modified by the Thunder Settlement.

**192.    Thunder License Agreement** means that certain agreement dated as of March 2, 2004, titled "Team Lease for Stockton Events Center (Ice Hockey Team)" between the City and IFG-Stockton Franchise Group, Inc. as the same may have been amended from time to time, relating to the rights of the Stockton Thunder ice hockey team to use the facilities of the Arena.

/ / /

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

**193.** Thunder Settlement means that certain settlement between the City and SC Hockey Franchise Corporation, as successor to IFG-Stockton Franchise Group, Inc., regarding the treatment under this Plan of the claims arising out of the Thunder License Agreement, the material terms of which agreement are set forth in the Thunder Settlement Term Sheet.

**194.** **Thunder Settlement Documents** means the documents implementing the Thunder Settlement, copies of which are annexed as an exhibit to the Second Supplemental Plan Supplement.

**195.** **Thunder Settlement Term Sheet** means that certain Term Sheet— Proposed Amendments to Team Lease for Stockton Events Center, dated as of September 18, 2013, a copy of which is attached as Exhibit E to the Disclosure Statement and incorporated by reference.

**196.** **Unimpaired** means a Claim that is not Impaired within the meaning of section 1124.

**197.** **Uninsured Portion Claim** means the amount in excess of the Insured Portion of an Allowed Workers Compensation Claim or an Allowed General Liability Claim that is covered by one or more of the excess risk-sharing pools of which the City is a member.

**198.** **Unsecured Claim Payout Percentage** means the percentage of the Allowed amount of General Unsecured Claims that will be paid to holders of Class 12 Claims, equal to the percentage paid on account of the Retiree Health Benefit Claims (unless the amount of the Retiree Health Benefit Claims changes, that percentage will be equal to 0.93578%, i.e., $5,100,000 divided by $545,000,000), or such other amount as is determined by the Bankruptcy Court before confirmation of this Plan to constitute a pro-rata payment on such other General Unsecured Claims; *provided*, *however*, the dollar amount to be paid on account of General Unsecured Claims other than the Retiree Health Benefit Claims on the Effective Date shall not exceed $500,000.  If the amounts to be paid exceed $500,000, then such excess amounts shall be made in two equal annual installments on the first and second anniversary of the Effective Date, together with simple interest accruing from and after the Effective Date at 5% per annum.  Such excess amounts may be prepaid at the option of the City.

FIRST AMENDED  PLAN, AS MODIFIED (AUGUST 8, 2014)

199.    **Wells Fargo** means Wells Fargo Bank, National Association, acting solely in its role as 2003 Fire/Police/Library Certificates Trustee, the 2004 Arena Bond Trustee, the 2004 Parking Bond Trustee, the 2006 SEB Bond Trustee, the 2007 Office Building Bond Trustee, the 2009 Golf Course/Park Bond Trustee, the Pension Obligation Bonds Trustee, as well as in its role as trustee, fiscal agent or other like capacity with respect to certain of the Restricted Revenue Bond and Note Payable Obligations and the Special Assessment and Special Tax Obligations.

200.    **Workers Compensation Claims** means those Claims pursuant to California workers compensation law (California Labor Code section 3200 *et seq.*) of current and former City employees who have suffered an eligible injury while employed by the City

201.    **Workers Compensation Internal Service Fund** means the fund established by the City to accumulate resources for interdepartmental charges expended on self insurance for Workers Compensation Claims.

**B.    Rules of Construction.**

The following rules of construction apply to this Plan:  (a) unless otherwise specified, all references in this Plan to "sections" (lowercased) are references to a section of the Bankruptcy Code; (b) unless otherwise specified, all references in this Plan to "Sections" and "Exhibits" (uppercased) are to the respective Section in or Exhibit to this Plan, as the same may be amended or modified from time to time; (c) the headings in this Plan are for convenience of reference only and do not limit or otherwise affect the provisions of this Plan; (d) words denoting the singular number include the plural number and vice versa; (e) the rules of construction set forth in section 102 apply; (f) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply; (g) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (h) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to an particular section, subsection, or clause contained in this Plan.

/ / /

FIRST AMENDED  PLAN, AS
MODIFIED (AUGUST 8, 2014)

**C.**    **Plan Supplement, Supplemental Plan Supplement, and Second Supplemental Plan Supplement.**

On January 27 and February 10, respectively, the City electronically filed with the Bankruptcy Court and Rust Omni served in CD-ROM format by U.S. mail on all parties entitled to vote on the Plan the Plan Supplement [Dkt. No. 1236] and the Supplemental Plan Supplement [Dkt. No. 1259]. Further, the City will electronically file with the Bankruptcy Court and Rust Omni will serve in CD-ROM format by U.S. mail on all parties entitled to vote on the Plan the Second Supplemental Plan Supplement. The City has made (and in the case of the Second Supplemental Plan Supplement, will make) each of these documents electronically available on its website. The exhibits and schedules contained in these documents are incorporated into, and are a part of, the Plan as if set forth herein.

**II.**    **TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**A.**    **Treatment of Administrative Claims.**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the City or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.

**B.**    **Treatment of Professional Claims.**

Pursuant to section 943(b)(3), all amounts paid following the Effective Date or to be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan must be disclosed to the Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional Claim, in full satisfaction, release, and discharge of such Claim, Cash in an amount equal to that portion of such Claim that the Bankruptcy Court approves as reasonable, on or as soon as reasonably practicable following the date on which the Bankruptcy Court enters a Final Order determining such reasonableness. The City, in the ordinary course of

its business, and without the requirement for Bankruptcy Court approval, may pay for professional services rendered and costs incurred following the Effective Date.

### C.      Priority Claims in Chapter 9.

The only priority claims incorporated into chapter 9 through section 901 are Administrative Claims allowed under section 503(b) and entitled to priority under section 507(a)(2).  The treatment of all such Administrative Claims is set forth immediately above in Sections II(A) and II(B).  No other kinds of priority claims set forth in section 507 are recognized in chapter 9 cases, and Claims that are not Administrative Claims herein and that would constitute administrative expenses in a case under another chapter of the Bankruptcy Code, including Other Postpetition Claims, are treated in chapter 9 and in this Plan as General Unsecured Claims.

### D.      Deadline for the Filing and Assertion of Other Postpetition Claims, Administrative Claims and Professional Claims.

**All proofs of claim for Other Postpetition Claims arising on or after August 16, 2013, and requests for payment or any other means of preserving and obtaining payment of Administrative Claims that have not been paid, released, or otherwise settled, and all requests for approval of Professional Claims, must be filed with the Bankruptcy Court and served upon the City no later than 30 days after the date on which the Notice of Effective Date is served.**  Any proof of claim for Other Postpetition Claims, or request for payment of an Administrative Claim or a Professional Claim, that is not timely filed by such date will be forever barred, and holders of such Claims shall be barred from asserting such Claims in any manner against the City.  For the avoidance of doubt, proofs of claim for Other Post-Petition Claims that arose before August 16, 2013 must have been filed by August 16, 2013, in order to be considered timely.

## III.   DESIGNATION OF CLASSES OF CLAIMS

Pursuant to sections 1122 and 1123(a)(1), all Claims other than Administrative Claims and Professional Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

FIRST AMENDED  PLAN, AS
MODIFIED (AUGUST 8, 2014)

Class 1A – Claims of Ambac – 2003 Fire/Police/Library Certificates;

Class 1B – Claims of Holders of 2003 Fire/Police/Library Certificates;

Class 2 – SEB Claims of the 2006 SEB Bond Trustee/NPFG;

Class 3 – Arena Claims of the 2004 Arena Bond Trustee/NPFG;

Class 4 – Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG –
2004 Parking Structure Bonds;

Class 5 – Office Building Claims of the 2007 Office Building Bond
Trustee/Assured Guaranty – 2007 Office Building Bonds;

Class 6 – Pension Obligation Bonds Claims;

Class 7 – Claims of DBW;

Class 8 – SCC 16 Claims;

Class 9 – Thunder Claims;

Class 10 – Claims of Holders of Restricted Revenue Bond and Note Payable
Obligations;

Class 11 – Claims of the Holders of Special Assessment and Special Tax
Obligations;

Class 12 – General Unsecured Claims.

This Class includes:

- General Unsecured Claims;

- The Golf Course/Park Unsecured Claim;

- Retiree Health Benefit Claims;

- Leave Buyout Claims;

- The Claim filed by Michael A. Cobb; and

- Other Postpetition Claims.

Class 13 – Convenience Class Claims;

Class 14 – Claims of Certain Tort Claimants;

/ / /

/ / /

Class 15 – Claims of CalPERS Pension Plan Participants Regarding City's

Obligations to Fund Employee Pension Plan Contributions to CalPERS under the

CalPERS Pension Plan;

Class 16 – Claims of Equipment Lessors;

Class 17 – Workers Compensation Claims;

Class 18 – SPOA Claims;

Class 19 – Price Claims; and

Class 20 – Golf Course/Park Secured Claim.

IV.     **TREATMENT OF CLAIMS**

    A.     **Class 1A – Claims of Ambac – 2003 Fire/Police/Library Certificates.**

        1.     **Impairment and Voting.**

Class 1A is Impaired by this Plan since the treatment of this Class will affect the

legal, equitable, or contractual rights of Ambac, the holder of the Claims.  Accordingly, this Class

is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

        2.     **Treatment.**

The treatment of the Class 1A Claims will be as set forth in the Ambac Settlement

Agreement, which should be consulted for the precise terms of the treatment.  The Plan does not

modify, amend, or alter the amounts due to the holders of the 2003 Fire/Police/Library

Certificates or the obligations of Ambac to pay principal or redemption price of, or interest on,

the 2003 Fire/Police/Library Certificates as and when such amounts become due under the 2003

Fire/Police/Library Certificates Trust Agreement, which payments shall be made by Ambac in

accordance with, and subject to, the terms of the Ambac Insurance Policy.  Ambac, as the holder

of the Class 1A Claims, is entitled to vote to accept or reject this Plan in accordance with the Plan

Solicitation Order.

    B.     **Class 1B – Claims of Holders of 2003 Fire/Police/Library Certificates.**

        1.     **Impairment and Voting.**

Class 1B is Impaired by this Plan since the treatment of this Class will affect the

legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, Ambac, as

the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

        **2.**      **Treatment.**

The treatment of the Class 1B claimants, the 2003 Fire/Police/Library Certificates holders, is identical to the treatment of Ambac, the Class 1A claimant.

**C.**    **Class 2 – SEB Claims of the 2006 SEB Bond Trustee/NPFG – 2006 SEB Bonds.**

        **1.**      **Impairment and Voting.**

Class 2 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, NPFG, as the deemed holder of the Claims in this Class, is not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

        **2.**      **Treatment.**

On the Effective Date, the City will assume the SEB Lease Back and the SEB Lease Out under section 365(a) pursuant to the NPFG/SEB Settlement.  The finding by the Bankruptcy Court that the Plan is feasible shall constitute adequate assurance of future performance of the SEB Lease Back and the SEB Lease Out.  The Plan does not modify, amend, or alter the 2006 SEB Bonds or the obligations of NPFG to pay principal or redemption price of, or interest on, the 2006 SEB Bonds as and when such amounts become due under the 2006 SEB Bond Indenture, which payments shall be made by NPFG in accordance with, and subject to, the terms of the 2006 SEB Bond Insurance Policy.

**D.**    **Class 3 – Arena Claims of the 2004 Arena Bond Trustee/NPFG – 2004 Arena Bonds.**

        **1.**      **Impairment and Voting.**

Class 3 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, NPFG, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.      Treatment.**

The treatment of the Class 3 Claims will be as set forth in the NPFG Arena Settlement, which should be consulted for the precise terms of the treatment.  The Plan does not modify, amend, or alter the 2004 Arena Bonds or the obligations of NPFG to pay principal or redemption price of, or interest on, the 2004 Arena Bonds as and when such amounts become due under the 2004 Arena Bond Indenture, which payments shall be made by NPFG in accordance with, and subject to, the terms of the 2004 Parking Bond Insurance Policy.  On the Effective Date, without the need to file any further motions, the Arena Lease Out and the Arena Lease Back shall be assumed, subject to the modification of the City's obligations pursuant to the terms of the NPFG Arena Settlement.

**E.      Class 4 – Parking Structure Claims of the 2004 Parking Bond Trustee/NPFG – 2004 Parking Bonds.**

**1.      Impairment and Voting.**

Class 4 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, NPFG, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.      Treatment.**

The treatment of the Class 4 Claims will be as set forth in the NPFG Parking Settlement Documents, which should be consulted for the precise terms of the treatment.  On the Effective Date, without the need to file any further motions, the Parking Structure Lease Out shall be assumed, and any and all rights and obligations thereunder shall be assigned to the Parking Authority, with the obligations of the City limited by the NPFG Parking Settlement Documents. To the extent the City determines it is necessary or desirable to do so, in addition to those executory contracts being assigned to the Parking Authority by virtue of the above, the City reserves the right to file before or after the Effective Date a motion in which it will seek authority to assign to the Parking Authority certain executory contracts and unexpired leases executed in connection with the Parking Structure Lease Out that are assumed under the Plan.

The Plan does not modify, amend, or alter the 2004 Parking Bonds or the obligations of NPFG to pay principal or redemption price of, or interest on, the 2004 Parking Bonds as and when such amounts become due under the 2004 Parking Bond Indenture, which payments shall be made by NPFG in accordance with, and subject to, the terms of the 2004 Parking Bond Insurance Policy.

**F.      Class 5 – Office Building Claims of the 2007 Office Building Bond Trustee/Assured Guaranty – 2007 Office Building Bonds.**

**1.      Impairment and Voting.**

Class 5 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holder of the Claims, and, accordingly, Assured Guaranty, as the holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.      Treatment.**

The treatment of the Class 5 Claims will be as set forth in the Assured Guaranty Settlement, which should be consulted for the precise terms of the treatment.

**G.      Class 6 – Pension Obligation Bonds Claims.**

**1.      Impairment and Voting.**

Class 6 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, Assured Guaranty, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.  The Plan does not modify, amend or alter the Pension Obligation Bonds or the obligations of Assured Guaranty to pay principal or redemption price of, or interest on Pension Obligation Bonds as and when such amounts become due under Pension Obligation Bonds Indenture, which payments shall be made by Assured Guaranty in accordance with, and subject to, the terms of the Pension Obligation Bonds Insurance Policy.

/ / /

/ / /

2. **Treatment.**

The treatment of the Class 6 Claims will be as set forth in the Assured Guaranty Settlement, which should be consulted for the precise terms of the treatment. The Plan does not modify, amend, or alter the Pension Obligation Bonds or the obligations of Assured Guaranty to pay principal or redemption price of, or interest on Pension Obligation Bonds as and when such amounts become due under Pension Obligation Bonds Indenture, which payments shall be made by Assured Guaranty in accordance with, and subject to, the terms of the Pension Obligation Bonds Insurance Policy.

H. **Class 7 – Claims of DBW.**

1. **Impairment and Voting.**

Class 7 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holder of the Claims in this Class is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

2. **Treatment.**

The treatment of the Class 7 Claims will be as set forth in the DBW Settlement Agreement. The General Fund will have no obligation to pay debt service on this obligation, or to reimburse operating expenses to DBW should DBW take over operations of the Marina Project. DBW will retain its pledge of rents and leases generated from the Marina Project. However, the pledge of gross revenues will be converted to a pledge of revenues net of all reasonable and direct operating expense of the Marina Project, calculated on a fiscal year basis ending June 30 of each year pursuant to section 928(b). Upon no less than 120 days notice to the City, DBW may take possession of the facilities comprising the Marina Project, and if DBW elects to continue operations of the Marina Project, DBW will be responsible for payment of all operating expenses of the Marina Project. If DBW should elect to continue operations, DBW shall provide adequate security of the premises. The General Fund shall have no liability, directly or indirectly, for the Claims of DBW, and the City may decide at any time to cease subsidizing the operating deficits of the operation of the Marina Project. DBW has stated to the City an

interest in exercising its remedy of taking possession of the Marina Project.  The real property

that is the subject of the Marina Project shall be that real property described in Exhibit A to this

Plan, and should DBW exercise its remedy of taking possession of the Marina Project, DBW shall

succeed to possession and control only over the real property set forth in Exhibit A.

**I.     Class 8 – SCC 16 Claims.**

**1.     Impairment and Voting.**

Class 8 is not Impaired by this Plan since the treatment of this Class will not affect

the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the

holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in

accordance with the Plan Solicitation Order.

**2.     Treatment.**

To the extent SCC 16 has any offset rights arising under the Construction

Agreement, SCC 16 shall apply any such offsets against amounts owing under the SCC 16

Promissory Note.  On the Effective Date, pursuant to the Plan, without the need to file any further

motions, the SCC 16 Lease shall be assumed, and any and all rights and obligations thereunder

shall be assigned to the Parking Authority.  On the Effective Date, any and all rights of the City

under the SCC 16 Settlement, the Construction Agreement shall be assumed and assigned by the

City to the Parking Authority.

**J.     Class 9 – Thunder Claims.**

**1.     Impairment and Voting.**

Class 9 is Impaired by this Plan since the treatment of this Class will affect the

legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of

the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the

Plan Solicitation Order.

**2.     Treatment.**

The treatment of the Class 9 Claims will be as set forth in the Thunder Settlement,

which should be consulted for the precise terms of the treatment.

/ / /

39

**K.      Class 10 – Claims of Holders of Restricted Revenue Bond and Note Payable Obligations.**

**1.      Impairment and Voting.**

Class 10 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.      Treatment.**

Class 10 consists of Claims of the holders of Restricted Revenue Bond and Note Payable Obligations, which are secured by special and restricted sources of revenues.

Restricted Revenue Bond and Notes Payable Obligations.  The City's Restricted Revenue Bond and Notes Payable Obligations are secured by a pledge of and lien on revenues of various of the City's systems and enterprises, which are restricted revenues pursuant to the California Constitution, and are "special revenues" as defined in section 902(2).  These revenues are not a part of or available to the General Fund, and the General Fund is not obligated to make any payment on the Restricted Revenue Bond and Note Payable Obligations.  The City may transfer amounts from the restricted revenues to the General Fund only to pay costs which are incurred by the General Fund to provide the facility or enterprise-related services and which are allocated to the enterprises on a reasonable basis in accordance with the City's accounting and allocation policies and pursuant to the provisions of the relevant documents related to the Restricted Revenue Bonds and Notes Payable Obligations.  Such transfers are treated by the facility or enterprise as operation and maintenance expenses.  The City will continue to apply restricted revenues to pay the Restricted Revenue Bond and Notes Payable Obligations as required by the terms of such obligations.

/ / /

/ / /

/ / /

/ / /

**L.**     **Class 11 – Claims of Holders of Special Assessment and Special Tax Obligations.**

      **1.**     **Impairment and Voting.**

Class 11 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

      **2.**     **Treatment.**

Class 11 consists of Claims of the holders of Special Assessment and Special Tax Obligations, which are secured by special and restricted sources of revenues consisting of specific levies on real property within certain financing districts created by the City.

Special Assessment and Special Tax Obligations.  The Special Assessment and Special Tax Obligations are secured by certain special assessments and special taxes levied on specific real property within the respective districts for which these obligations were issued. These special assessment and special tax revenues are legally restricted to the payment of debt service on the Special Assessment and Special Tax Obligations under California statutes and the California Constitution, are "special revenues" as defined in section 902(2), and cannot be used for any other purpose or be transferred to the General Fund.  The General Fund is not obligated to pay debt service on the Special Assessment and Special Tax Obligations.  The City will continue to apply revenues from the applicable special assessments and special taxes to pay the Special Assessment and Special Tax Obligations as required by the terms of such obligations.

**M.**     **Class 12 – General Unsecured Claims.**

      **1.**     **Impairment and Voting.**

Class 12 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

/ / /

41

2.        **Treatment.**

The Claims in this Class include without limitation:  (i) the Retiree Health Benefit Claims; (ii) the Golf Course/Park Unsecured Claim; (iii) the Leave Buyout Claims; (iv) the Claim filed by Michael A. Cobb; and (v) Other Postpetition Claims.

Pursuant to the Retirees Settlement, on the Effective Date, the City will pay the Retiree Health Benefit Claimants an aggregate amount of $5,100,000 in full satisfaction of the Allowed Retiree Health Benefit Claims, and no other retiree health benefits will be provided by the City.  If required by state or federal law, the City will withhold from the aggregate $5,100,000 payment any taxes or other deductions to be withheld from the individual payment to each Retiree Health Benefit Claimant.  The individual recipient is responsible for any tax liability for this payment, and the City will not provide any advice to any recipient as to the taxable impact of this payment.

All other General Unsecured Claims shall receive cash on the Effective Date in the amount equal to a percentage of the Allowed amount of such Claims, which percentage equals the Unsecured Claim Payout Percentage, or such other amount as is determined by the Bankruptcy Court before confirmation of this Plan to constitute a pro-rata payment on such other General Unsecured Claims; *provided*, *however*, that the dollar amount to be paid on account of General Unsecured Claims other than the Retiree Health Benefit Claims on the Effective Date shall not exceed $500,000.  If the amounts to be paid exceed $500,000, then such excess amounts shall be made in two equal annual installments on the first and second anniversary of the Effective Date, together with simple interest accruing from and after the Effective Date at 5% per annum.  Such excess amounts may be prepaid at the option of the City without penalty.

N.        **Class 13 – Convenience Class Claims.**

1.        **Impairment and Voting.**

Class 13 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

2.      **Treatment.**

Holders of Convenience Class Claims will receive cash on the Effective Date in the amount of their Allowed Convenience Class Claim, but not to exceed $100.

O.      **Class 14 – Claims of Certain Tort Claimants.**

1.      **Impairment and Voting.**

Class 14 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

2.      **Treatment.**

The SIR Claim Portion of each Allowed General Liability Claim will be paid on the Effective Date from the Risk Management Internal Service Fund, and will receive the same percentage payment on the dollar of Allowed Claim as will the holders of Allowed Class 12 Claims.  The Insured Portion of each Allowed General Liability Claim is not Impaired, and shall be paid by the applicable excess risk-sharing pool.

P.      **Class 15 – Claims of CalPERS Pension Plan Participants Regarding City's Obligations to Fund Employee Pension Plan Contributions to CalPERS under the CalPERS Pension Plan.**

1.      **Impairment and Voting.**

Class 15 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holder of such Claims, and, accordingly, the holder of the Claims in this Class is not entitled to vote to accept or reject this Plan.

2.      **Treatment.**

The City will continue to honor its obligations under the CalPERS Pension Plan, and CalPERS and the CalPERS Pension Plan Participants retain all of their rights and remedies under applicable nonbankruptcy law.  Thus, CalPERS and the CalPERS Pension Plan Participants will be entitled to the same rights and benefits to which they are currently entitled under the CalPERS Pension Plan.  CalPERS, pursuant to the CalPERS Pension Plan, will

/ / /

continue to provide pension benefits for participants in the manner indicated under the provisions of the CalPERS Pension Plan and applicable nonbankruptcy law.

**Q.    Class 16 – Claims of Equipment Lessors.**

      **1.    Impairment and Voting.**

Class 16 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holder of such Claims, and, accordingly, the holders of the Claims in this Class is not entitled to vote to accept or reject this Plan.

      **2.    Treatment.**

Any equipment leases not specifically rejected by the Rejection Motion will be assumed under this Plan.  The City believes that it is current on all such equipment leases and therefore no cure payments are required.

**R.    Class 17 – Workers Compensation Claims.**

      **1.    Impairment and Voting.**

Class 17 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

      **2.    Treatment.**

The City must pay Allowed SIR Claim Portions related to Workers Compensation Claims in full.  If not, the City will lose its State workers compensation insurance for those claims in excess of the SIR Claim Portions, exposing the City's current and former workers to grave risk. The City will pay the SIR Claim Portions related to Worker Compensation Claims from the Workers Compensation Internal Service Fund.

**S.    Class 18 – SPOA Claims.**

      **1.    Impairment and Voting.**

Class 18 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of

/ / /

the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.     Treatment.**

The City will honor the SPOA Claims held by SPOA members on the terms and conditions set forth in the SPOA MOU.

**T.     Class 19 – Price Claims.**

**1.     Impairment and Voting.**

Class 19 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.     Treatment.**

The treatment of the Class 19 Claims will be as set forth in the Price Settlement, which should be consulted for the precise terms of the treatment.

**U.     Class 20 – Golf Course/Park Secured Claim.**

**1.     Impairment and Voting.**

The treatment of the Golf Course/Park Secured Claim set forth below is the result of the entry by the Bankruptcy Court of the Partial Judgment.  Class 20 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holder of the Claim, and, accordingly, the holder of the Claim in this Class is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.     Treatment.**

a.     The City will pay to the 2009 Golf Course/Park Bond Trustee the full amount of the Allowed Golf Course/Park Secured Claim (i.e., $4,052,000) in cash on the Effective Date, in full and complete satisfaction of the Allowed Golf Course/Park Secured Claim.

b.     Such payment will be in complete satisfaction of the Allowed Golf Course/Park Secured Claim, and all liens and security interests in any properties of the City and

1   the Financing Authority that secure it will be fully satisfied and released by the holder of the

2   Allowed Golf Course/Park Secured Claim upon payment.

3                   c.      For the avoidance of doubt, and in furtherance of the Partial

4   Judgment, the Golf Course/Park Lease Out and the Golf Course/Park Lease Back are terminated

5   as of the Effective Date.

6   **V.**     **ACCEPTANCE OR REJECTION; CRAMDOWN**

7          **A.**     **Voting of Claims.**

8           Each holder of an Allowed Claim (and, as applicable as specified herein, Ambac,

9   NPFG, and Assured Guaranty) classified into Classes 1A, 1B, 3, 4, 5, 6, 7, 9, 12, 14, 18, 19, and

10  20 shall be entitled to vote each such Claim to accept or reject this Plan.  The holder of the

11  Class 20 Claim is deemed not to have accepted the Plan.

12          With respect to any Class of Impaired Claims that fails to accept this Plan, the

13  City, as proponent of this Plan, will request that the Bankruptcy Court nonetheless confirm this

14  Plan pursuant to the so-called "cramdown" powers set forth in section 1129(b).

15  **VI.**    **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

16         **A.**     **Assumption of Executory Contracts and Unexpired Leases.**

17          Without the need to file any further motions, in addition to the assumption of

18  equipment leases in Class 16, the City elects to assume and will assume as of the Effective Date

19  all executory contracts and unexpired leases to which it is a party (and will assign certain of those

20  executory contracts as set forth in the Plan) except:  (i) for those unexpired leases and executory

21  contracts specified in subsection C. below; and (ii) as otherwise provided in this Plan.  Further, as

22  set forth in Section IV.E.2 dealing with the treatment of the Class 4 Claims, and in addition to the

23  assignment described and effected therein, to the extent the City determines it is necessary or

24  desirable to do so, the City reserves the right to file before or after the Effective Date a motion in

25  which it will seek authority to assign to the Parking Authority certain executory contracts and

26  unexpired leases executed in connection with the Parking Structure Lease Out that are assumed

27  under the Plan.

28  / / /

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

**B.**     **Cure Payments**.

        The Bankruptcy Court shall resolve all disputes regarding: (i) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (ii) the ability of the City to provide "adequate assurance of future performance" within the meaning of section 365 under the contract or lease to be assumed; and (iii) any other matter pertaining to such assumption and assignment. Any party to an executory contract or unexpired lease that is to be assumed by the City that asserts that any payment or other performance is due as a condition to the proposed assumption shall file with the Bankruptcy Court and serve upon the City a written statement and accompanying declaration in support thereof, specifying the basis for its Claim within 90 days of the Effective Date. The failure to timely file and serve such a statement in accordance shall be deemed to be a waiver of any and all objections to the proposed assumption and any claim for cure amounts of the agreement at issue.

**C.**     **Rejection of Executory Contracts and Unexpired Leases**.

        The Golf Course/Park Lease Out and the Golf Course/Park Lease Back (to the extent that such leases, which were recharacterized by the Partial Judgment, remain in effect notwithstanding the treatment in Section IV.U.2.c) and the Office Building Standby Agreement are rejected under this Plan, without the need to file any motions.

        In addition, no later than 120 days after the Effective Date, the City will file a Rejection Motion, in which it will seek authority to reject certain executory contracts and unexpired leases, which may include those listed below. The City is currently unaware of any other executory contracts and unexpired leases that may be included in the Rejection Motion, but reserves the right to add others.

- Lease, dated as of December 27, 1974, between the City, as lessor, and Stephens Marine, Inc., a California corporation, as lessee, as amended;
- Lease, dated as of June 21, 1988, between the City, as lessor, and Stockton Sailing Club, a California corporation, as lessee, as amended by the First Amendment to Lease, dated as of August 22, 1994;

/ / /

- Agreement for Purchase and Sale of Real Property, dated as of August 17, 2004, by and between the City and the County of San Joaquin; and

- Ports License Agreement (only if the City and the Ports have been unable to reach an agreement on the Ports Settlement Documents prior to 120 days after the filing of the Notice of the Effective Date).

**D.    Claims Arising From Rejection.**

Proofs of claim arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the City no later than 28 days after the date on which notice of entry of the order approving the Rejection Motion is served on the parties to the executory contracts and expired leases subject to the Rejection Motion.  Any Claim for which a proof of claim is not filed and served within such time will be forever barred and shall not be enforceable against the City or its assets, properties, or interests in property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 12 (General Unsecured Claims) and treated accordingly.

**VII.    IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN**

Following the Effective Date, the City will continue to operate pursuant to the City Charter, the California Constitution, and other applicable laws.

Pursuant to the Rejection Motion, the City will reject certain (i) unexpired leases and (ii) executory contracts, including, without limitation, the Ports License Agreement, if the City and the Ports have been unable to reach an agreement on the Ports Settlement Documents prior to 120 days after the Effective Date.

On the Effective Date, pursuant to the Plan, without the need to file any further motions, the City will assume, among other leases, (i) the SEB Lease Out and the SEB Lease Back; and (ii) the Arena Lease Out and the Arena Lease Back, as modified by the NPFG Arena Settlement.  Further, pursuant to the NPFG Parking Settlement, the City will assign the Parking Structure Lease Out and the Parking Structure Lease Back to the Parking Authority of the City of Stockton, and the Parking Authority of the City of Stockton will assume all of the City's obligations under the Parking Structure Lease Out and the Parking Structure Lease Back.  On the

Effective Date, pursuant to the Plan, without the need to file any further motions, the SCC 16

Lease shall be assumed, and any and all rights and obligations thereunder shall be assigned to the

Parking Authority.  On the Effective Date any and all rights of the City under the SCC 16

Settlement, the Construction Agreement shall be assumed and assigned by the City to the Parking

Authority.

## VIII.  RESERVATION OF THE CITY'S RIGHTS OF ACTION

All of the City's claims, causes of action, rights of recovery, rights of offset,

recoupment rights to refunds, and similar rights shall be retained by the City.  The failure to list in

the Disclosure Statement any potential or existing Right of Action retained by the City is not

intended to and shall not limit the rights of the City to pursue any such action.  Unless a Right of

Action is expressly waived, relinquished, released, compromised, or settled (in this Plan or

otherwise), the City expressly reserves all Rights of Action for later adjudication and, as a result,

no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue

preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to

such Rights of Action upon or after the confirmation or consummation of this Plan or the

Effective Date.  In addition, the City expressly reserves the right to pursue or adopt against any

other Entity any claims alleged in any lawsuit in which the City is a defendant or an interested

party.

## IX.  DISTRIBUTIONS

### A.  Distribution Agent.

On or after the Effective Date, the City may retain one or more agents (including

Rust Omni) to perform or assist it in performing the distributions to be made pursuant to this

Plan, which agents may serve without bond.  The City may provide reasonable compensation to

any such agent(s) without further notice or Bankruptcy Court approval.

### B.  Delivery of Distributions.

All distributions to any holder of an Allowed Claim shall be made at the address of

such holder as set forth in the books and records of the City or its agents, unless the City has been

notified by such holder in a writing that contains an address for such holder different from the

address reflected in the City's books and records. All such notifications of address changes and all address confirmations should be mailed to: Rust Consulting/Omni Bankruptcy, 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367. All distributions to the Indenture Trustee shall be made in accordance with the relevant indenture, as applicable.

**C.**    **Distributions of Unclaimed Property.**

If any distribution to any holder of a Claim is returned to the City or its agent as undeliverable, no further distributions shall be made to such holder unless and until the City is notified in writing of such holder's then-current address. Any unclaimed distributions shall be set aside and held in a segregated account to be maintained by the City pursuant to the terms of this Plan. No later than 63 days after the date of the first distributions under the Plan, the City shall file with the Bankruptcy Court a list of unclaimed distributions, together with a schedule that identifies the name and last-known addresses of the holders of any unclaimed distributions. The City shall not be required to make any further attempt to locate the holders of any unclaimed distributions. Any distribution under the Plan that remains unclaimed after 91 days following the date of the first distributions under the Plan (including, without limitation, because the distribution made to the last known address is returned as undeliverable), shall be deemed not to have been made and, together with any accrued interest or dividends earned thereon, shall be transferred to and vest in the City for any use as the City sees fit. The City shall not be obligated to make any further distributions on account of the Claim with respect to which such distribution was made, and such Claim shall be treated as a Disallowed Claim. Nothing contained herein shall affect the discharge of the Claim with respect to which such distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against the City or its assets, estate, properties, or interests in property.

**D.**    **Distributions of Cash.**

Any payment of Cash to be made by the City or its agent pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the City.

/ / /

**E.    Timeliness of Payments.**

Any payments or distributions to be made pursuant to this Plan shall be deemed to be timely made if made within 14 days after the dates specified in this Plan.  Whenever any distribution to be made under this Plan shall be due on a day that is not a Business Day, such distribution instead shall be made, without interest on such distribution, on the immediately succeeding Business Day, but shall be deemed to have been timely made on the date due.

**F.    Compliance with Tax, Withholding, and Reporting Requirements.**

The City shall comply with all tax, withholding, reporting, and like requirements imposed on it by any government unit, including without limitation, any payments related to CalPERS's required pension obligations, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099, or 1042) or withholding is required, the City shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information which is required by law to avoid withholding has not been received by the City, the City at its sole option may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

**G.    Time Bar to Cash Payments.**

Checks issued by the City on account of Allowed Claims shall be null and void if not negotiated within 91 days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the City by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date.  After such date, all Claims in respect of voided checks will be discharged and forever barred and the City will retain all moneys related thereto.

FIRST AMENDED  PLAN, AS
MODIFIED (AUGUST 8, 2014)

**H.    No *De Minimis* Distributions.**

        Notwithstanding any other provision of this Plan, no Cash payment of less than $10 will be made by the City on account of any Allowed Claim.

**I.    No Distributions on Account of Disputed Claims.**

        Notwithstanding anything to the contrary in this Plan, no distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

**J.    No Postpetition Accrual.**

        Unless otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, the City will not be required to pay to any holder of a Claim any interest, penalty, or late charge accruing with respect to such claim on or after the Petition Date.  This provision does not apply to holders of the 2003 Fire/Police/Library Certificates, the 2004 Arena Bonds, the 2004 Parking Bonds, the 2006 SEB Bonds, the 2007 Office Building Bonds, and the 2009 Golf Course/Park Bonds, which bonds are not themselves obligations of the City and therefore are not Claims.  Therefore, the holders of such bonds and certificates will retain all of their rights to postpetition interest, penalties, and late charges.   This provision also does not apply to Assured Guaranty, as the deemed holder of the Pension Obligation Bonds Claims, which shall receive interest on any payments required of the City by the Assured Guaranty Settlement Documents on account of such Pension Obligation Bonds Claims, which payments are delayed by a failure to satisfy or waive the conditions to the Effective Date.  Any such delayed payments shall accrue interest at the rate specified in the Assured Guaranty Settlement Documents.

**K.    CalPERS Pension Plan.**

        Except as set forth in Section IX(F), this Section IX shall not apply to the CalPERS Pension Plan.

/ / /

/ / /

## X.  DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS

### A.  Claims Objection Deadline; Prosecution of Objections.

The City will have the right to object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part. Unless otherwise ordered by the Bankruptcy Court, the City must file and serve any such objections to Claims by not later than 182 days after the Effective Date (or, in the case of Claims lawfully filed after the Effective Date, by not later than 182 days after the date of filing of such Claims).

### B.  Payments and Distributions with Respect to Disputed Claims.

After the Effective Date has occurred, at such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the City or its agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under this Plan.  Such distributions, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the Claim becomes an Allowed Claim), but in no event more than 63 days thereafter.  Unless otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

## XI.  EFFECT OF CONFIRMATION

### A.  Discharge of the City.

Pursuant to section 944, upon the Effective Date, the City will be discharged from all Debts of the City and Claims against the City other than (i) any Debt specifically and expressly excepted from discharge by this Plan or the Confirmation Order, or (ii) any Debt owed to an entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.  The rights afforded in the Plan and the treatment of all holders of Claims, whether such Claims are Impaired or Unimpaired under the Plan, will be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses

1   incurred thereon from and after the Petition Date, whether against the City or any of its

2   properties, assets, or interests in property.  Except as otherwise provided herein, upon the

3   Effective Date, all Pre-Confirmation Date Claims will be and shall be deemed to be satisfied,

4   discharged, and released in full, be they Impaired or Unimpaired under this Plan.  For the

5   avoidance of doubt, as provided in Class 15 herein, nothing in the Plan discharges, releases, or

6   impairs obligations of the City under the CalPERS Pension Plan, and CalPERS and the CalPERS

7   Pension Plan Participants retain all of their rights and remedies under applicable nonbankruptcy

8   law with respect to the CalPERS Pension Plan.

9          Notwithstanding any other provision of this Plan or the Confirmation Order, the

10  City's obligations pursuant to the Contracts For Loan Guarantee shall remain extant and

11  enforceable and not subject to discharge pursuant to section 944; *provided, however*, that the City

12  retains all defenses to the enforceability of any such obligations under applicable nonbankruptcy

13  law.

14      **B.      <u>Injunction.</u>**

15          Except as otherwise expressly provided in this Plan, all entities who have held,

16  hold, or may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after

17  the Confirmation Date from:  (i) commencing or continuing in any manner any action or other

18  proceeding of any kind with respect to any such Pre-Confirmation Date Claim against the City or

19  its property; (ii) enforcing, attaching, collecting, or recovering by any manner or means any

20  judgment, award, decree, or order against the City or its property with respect to such Pre-

21  Confirmation Date Claims; (iii) creating, perfecting, or enforcing any lien or encumbrance of any

22  kind against the City or its property; and (iv) asserting any right of setoff, subrogation, or

23  recoupment of any kind against any obligation due to the City with respect to any such Pre-

24  Confirmation Date Claim, except as otherwise permitted by section 553.  For the avoidance of

25  doubt, nothing in the Plan enjoins CalPERS or any CalPERS Pension Plan Participant with

26  respect to the CalPERS Pension Plan.

27  / / /

28  / / /

C.    **Term of Existing Injunctions or Stays**.

Unless otherwise provided, all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

D.    **Exculpation.**

Except with respect to obligations specifically arising pursuant to or preserved in this Plan, including but not limited to the Insurance Policies, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim in connection with or arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, (i) the administration of the Chapter 9 Case, (ii) the negotiation, pursuit, confirmation, solicitation of votes for, consummation or implementation of the Plan, (iii) the administration of the Plan or property to be distributed under the Plan, (iv) the AB 506 process, (v) any document, release, contract, or other instrument entered into in connection with, or relating to, the Plan or the settlements referenced within the Plan or (vi) any other transaction contemplated by, or entered into, in connection with the Plan; *provided*, *however*, that nothing in this Section XI(D) shall be deemed to release or exculpate any Exculpated Party for its willful misconduct or gross negligence.  In all respects, each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan.

E.    **Releases Among Releasing Parties and Released Parties.**

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, (i) THE CITY AND EACH OF ITS RELATED PERSONS (COLLECTIVELY, THE "**CITY RELEASING PARTIES**") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH, AND DISCHARGE EACH AND ALL OF THE RELEASED PARTIES (AND

1  EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER

2  RELEASED, WAIVED AND DISCHARGED BY THE CITY RELEASING PARTIES) AND

3  THEIR RESPECTIVE PROPERTIES AND RELATED PERSONS; AND (ii) EACH OF NPFG,

4  ASSURED GUARANTY, AMBAC, THE INDENTURE TRUSTEE IN ALL ITS CAPACITIES

5  (EXCEPT IN ITS CAPACITY AS THE 2009 GOLF COURSE/PARK BOND TRUSTEE)

6  (COLLECTIVELY WITH THE CITY RELEASING PARTIES, THE "**RELEASING**

7  **PARTIES**") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY,

8  ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE,

9  WAIVE, VOID, EXTINGUISH, AND DISCHARGE THE CITY (AND THE CITY SHALL BE

10 DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY SUCH RELEASING

11 PARTIES), OF AND FROM ANY AND ALL OF THE FOLLOWING:  CLAIMS, CAUSES OF

12 ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER DEBTS,

13 OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS, AND

14 LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE AB 506

15 PROCESS AND THE ELIGIBILITY CONTEST), WHETHER KNOWN OR UNKNOWN,

16 FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR

17 CONTINGENT, MATURED OR UNMATURED, EXISTING AS OF THE EFFECTIVE DATE

18 OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT,

19 OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION,

20 TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING

21 OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR

22 RELATED IN ANY WAY IN WHOLE OR IN PART TO THE CITY OR ITS ASSETS AND

23 PROPERTY, THE CHAPTER 9 CASE, THE DISCLOSURE STATEMENT, THIS PLAN OR

24 THE SOLICITATION OF VOTES ON THIS PLAN THAT SUCH RELEASING PARTY

25 WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY

26 OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR

27 OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON

28 BEHALF OF SUCH RELEASING PARTY (WHETHER DIRECTLY OR DERIVATIVELY)

1   AGAINST ANY OF THE RELEASED PARTIES OR THE CITY, AS APPLICABLE;

2   *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS RELEASE

3   SHALL NOT OPERATE TO WAIVE OR RELEASE (i) ANY CAUSES OF ACTION, CLAIMS

4   OR AGREEMENTS EXPRESSLY SET FORTH IN AND/OR PRESERVED BY THIS PLAN

5   OR ANY PLAN SUPPLEMENT, INCLUDING BUT NOT LIMITED TO THE INSURANCE

6   POLICIES;  AND/OR (ii) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THIS

7   PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER

8   AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH

9   THIS PLAN OR ASSUMED PURSUANT TO THIS PLAN OR ASSUMED PURSUANT TO

10  FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL

11  BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR

12  ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW,

13  REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR

14  APPROVAL OF ANY PERSON.

15        **F.        Good Faith Compromise.**

16              Pursuant to Bankruptcy Rule 9019, to the extent applicable, and in consideration

17  for the distributions and other benefits provided under this Plan, the provisions of this Plan,

18  including the exculpation and release provisions contained in this Article XI, constitute a good

19  faith compromise and settlement of all Claims, causes of action or controversies relating to the

20  rights that a holder of a Claim may have with respect to any Claim against the City, any

21  distribution to be made pursuant to the Plan on account of any such Claim and any and all Claims

22  or causes of action of any party arising out of or relating to the AB 506 Process or the Eligibility

23  Contest.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of

24  the Effective Date, of the compromise or settlement of all such Claims or controversies and the

25  Bankruptcy Court's finding that all such compromises or settlements are in the best interests of

26  the City and the holders of Claims, and are fair, equitable, and reasonable.

27  / / /

28  / / /

FIRST AMENDED  PLAN, AS
MODIFIED (AUGUST 8, 2014)

## XII.    RETENTION OF AND CONSENT TO JURISDICTION

Following the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code and relating to the City, (ii) arising in or related to the Chapter 9 Case or this Plan, and (iii) otherwise for the following:

1.    to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the City is a party or with respect to which the City may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

2.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, and all other contracts, settlement agreements, instruments, releases, exculpations, and other agreements or documents related to this Plan;

3.    to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the City after the Effective Date or that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 Case, whether or not such action initially is filed in the Bankruptcy Court or any other court;

4.    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

5.    to hear and determine any objections to Claims or to proofs of Claim filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

6.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

7.    to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142(b);

8.      to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9.      to the extent that the City elects to bring such matters before the Bankruptcy Court, to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

10.      to hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or enforcement of this Plan or the Confirmation Order or the extent of any Entity's obligations incurred in connection with, released, enjoined, or exculpated under this Plan or the Confirmation Order;

11.      to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of this Plan;

12.      to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement;

13.      to hear any other matter for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

14.      to hear and determine all disputes or controversies arising in connection with or relating to the terms or enforcement of any relevant agreements; and

15.      to enter a final decree closing the Chapter 9 Case.

This Section XII shall not apply to any Claims, disputes, controversies, or other matters arising under or in connection with the CalPERS Pension Plan.

## XIII.   CONDITIONS PRECEDENT

### A.      Conditions Precedent to Confirmation.

The conditions precedent to confirmation of the Plan are: (i) the entry of the Confirmation Order in form and substance satisfactory to the City, and which is reasonably

satisfactory to Assured Guaranty, Ambac, NPFG, and the Indenture Trustee; and (ii) the approval of the State of California Department of Finance of the restructuring of the Arena Pledge Agreement as described in the NPFG Settlement.

**B.    Conditions Precedent to Effective Date.**

The "effective date of the plan," as used in section 1129, shall not occur, and this Plan shall be of no force and effect, until the Effective Date.  The occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XIII(C)) of the following conditions precedent:

1.    **Confirmation Order**.  The Confirmation Order shall have been entered, shall be in full force and effect, and shall be a Final Order (but the requirement that the Confirmation Order be a Final Order may be waived by the City at any time).

2.    **Plan Documents**.  All agreements and instruments contemplated by, or to be entered into pursuant to, this Plan shall be in form and substance acceptable to the City (and in the case of all agreements and instruments between the City and Ambac, Assured Guaranty, NPFG, and the Indenture Trustee, acceptable to Ambac, Assured Guaranty, NPFG, and the Indenture Trustee, respectively); shall have been duly and validly executed and delivered (including, but not limited to, any documents necessary to be executed on or prior to the Effective Date so as to implement the Ambac Settlement, the Assured Guaranty Settlement, and the NPFG Settlement, respectively, and the satisfaction or waiver of the conditions precedent to the Ambac Settlement, the Assured Guaranty Settlement, and the NPFG Settlement, respectively), or deemed executed by the parties thereto; and all conditions to their effectiveness shall have been satisfied or waived.

3.    **Authorizations, Consents, Etc.** The City shall have received any and all authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that are necessary to implement the Plan and that are required by law, regulation or order.

4. **Timing**.  The Effective Date shall occur on the first Business Day on which the conditions set forth in Section XIII(B)(1) and (B)(2) are satisfied or waived; *provided* that, unless otherwise ordered by the Bankruptcy Court, the Effective Date must occur by no later than 182 days after the Confirmation Date.

C. <u>**Waiver of Conditions to Effective Date.**</u>

The City may waive in whole or in part any condition to effectiveness of this Plan. If a condition to the occurrence of the Effective Date is the occurrence of the conditions to the effectiveness of the Ambac Settlement Agreement, the Assured Guaranty Settlement, or the NPFG Settlement, then such condition may not be waived without the prior written consent of Ambac, Assured Guaranty, of NPFG, as applicable.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

D. <u>**Effect of Failure of Conditions.**</u>

In the event that the conditions to effectiveness of this Plan have not been timely satisfied or waived, and upon notification submitted by the City to the Bankruptcy Court, (i) the Confirmation Order shall be vacated, (ii) no distributions under this Plan shall be made, (iii) the City and all holders of Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) all of the City's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the City or any other entity or to prejudice in any manner the rights, remedies, or claims of the City or any entity in any further proceedings involving the City.

E. <u>**No Admission of Liability.**</u>

The Plan constitutes a settlement and compromise between and among the City and various parties.  The Plan shall not be deemed an admission or concession by any party with respect to any factual or legal contention, right, defense, or position taken by the City.

/ / /

/ / /

**XIV.    MISCELLANEOUS PROVISIONS**

      **A.    Dissolution of the Retirees Committee.**

          On the Effective Date, the Retirees Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 9 Case, and the Retirees Committee shall be deemed dissolved and its appointment terminated.

      **B.    Severability.**

          If any term or provision of this Plan is held by the Bankruptcy Court or any other court having jurisdiction, including on appeal, if applicable, to be invalid, void, or unenforceable, the Bankruptcy Court, in each such case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

      **C.    Governing Law.**

          Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to principles of conflicts of laws.

      **D.    Effectuating Documents and Further Transactions.**

          Each of the officials and employees of the City is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or

1  documents and take such actions as may be necessary or appropriate to effectuate and further

2  evidence the terms and provisions of this Plan.

3  **E.**     **Notice of Effective Date.**

4          On or before 14 days after occurrence of the Effective Date, the City or its agent

5  shall mail or cause to be mailed to all holders of Claims the Notice of the Effective Date, which

6  will inform such holders of: (a)  entry of the Confirmation Order; (b)  the occurrence of the

7  Effective Date; (c)  the assumption and rejection of the City's executory contracts and unexpired

8  leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such

9  rejection; (d)  the deadline established under this Plan for the filing of Administrative Claims; (e)

10  the procedures for changing an address of record pursuant to Section IX; and (f)  such other

11  matters as the City deems to be appropriate.

12  DATED:  August 8, 2014                      CITY OF STOCKTON, CALIFORNIA

13

14                                              By: _____

15                                                  Kurt O. Wilson
                                                    City Manager
16

17  Submitted By:

18  ORRICK, HERRINGTON & SUTCLIFFE LLP

19

20  By:_____/s/ *Marc A. Levinson*_____
         Marc A. Levinson
21       Jeffery D. Hermann
         Norman C. Hile
22       Patrick B. Bocash
         John A. Farmer
23  Attorneys for the City of Stockton

24

25

26

27

28

FIRST AMENDED PLAN, AS
MODIFIED (AUGUST 8, 2014)

**EXHIBIT A**
**TO**
**THE FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA AS MODIFIED (AUGUST 8, 2014)**

**DESCRIPTION OF MARINA PROJECT REAL PROPERTY**

All interests or rights in and to that certain real property situated in the County of San Joaquin, State of California, described by the assessor parcel numbers listed below:

APN: 137-010-02

APN: 137-010-03

APN: 137-010-08

APN: 137-010-06

APN: 137-260-30

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

OHSUSA:758574950.3

- 1 -

# Exhibit B

3

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
NORMAN C. HILE (STATE BAR NO. 57299)
nhile@orrick.com
PATRICK B. BOCASH (STATE BAR NO. 262763)
pbocash@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone:      +1-916-447-9200
Facsimile:      +1-916-329-4900

Attorneys for Debtor
City of Stockton

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 2012-32118 |
| CITY OF STOCKTON, CALIFORNIA, | Chapter 9 |
| Debtor. | **NOTICE OF ENTRY OF ORDER CONFIRMING FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF STOCKTON, CALIFORNIA, AS MODIFIED (AUGUST 8, 2014)** |

TO ALL CREDITORS, PARTIES IN INTEREST, PARTIES TO THE CITY'S

EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND THEIR ATTORNEYS OF

RECORD:

PLEASE TAKE NOTICE that on January __, 2015, the United States Bankruptcy Court

for the Eastern District of California entered the Order Confirming First Amended Plan For The

Adjustment Of Debts Of City Of Stockton, California, As Modified (August 8, 2014) (the

"Order" confirming the "Plan").

PLEASE TAKE FURTHER NOTICE that a CD containing a copy of (i) the Order,

including its exhibits (one of which is the Plan), and (ii) the City's Second Supplemental Plan

1   Supplement has been included with this Notice.  Paper copies of the Order, its exhibits, and the

2   Second Supplemental Plan Supplement can be obtained at no cost by (i) visiting the City's

3   chapter 9 website (stocktonchapter9.com) and requesting a copy or (ii) mailing or faxing a request

4   to Rust Consulting/Omni Bankruptcy at the following address: Rust Consulting/Omni

5   Bankruptcy, 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367 (facsimile: 818-783-

6   2737).

7          PARTICULARLY FOR PARTIES TO THE CITY'S EXECUTORY CONTRACTS AND

8   UNEXPIRED LEASES, PLEASE TAKE FURTHER NOTICE that:

9          1. Pursuant to the Plan and the Order, the City has rejected the following contracts: (1)

10  Office Building Standby Agreement; (2) Lease, dated as of June 21, 1988, between the City, as

11  lessor, and Stockton Sailing Club, a California corporation, as lessee, as amended by the First

12  Amendment to Lease, dated as of August 22, 1994; (3) Lease, dated as of December 27, 1974,

13  between the City, as lessor, and Stephens Marine, Inc., a California corporation, as lessee, as

14  amended; and (4) Agreement for Purchase and Sale of Real Property, dated as of August 17,

15  2004, by and between the City and the County of San Joaquin.

16         2. Subject to Paragraph 3 of this Notice, the City is assuming all other executory contracts

17  and unexpired leases.  The City believes that it is not in default under any such executory

18  contracts and unexpired leases.  Pursuant to the Plan, any party to an assumed executory contract

19  or unexpired lease that asserts that any payment or other performance is due as a condition to the

20  assumption shall, no later than 90 days after the Effective Date of the Plan[1], file with the

21  Bankruptcy Court and serve upon counsel for the City a written statement and accompanying

22  declaration in support thereof, specifying the basis for its claim.  The failure to timely file and

23  serve such a statement and declaration shall be deemed to be a waiver of any and all objections to

24  the assumption and to any claim for cure amounts of the agreement at issue.

25         3. Notwithstanding Paragraph 2 of this Notice, the agreements relating to Wells Fargo

26  Bank, National Public Finance Guaranty, Assured Guaranty Corp. and Ambac Assurance

27

28  _____
    [1] The Plan defines the Effective Date as the first business day after the conditions specified in Section XIII of the Plan have been satisfied.

1 Corporation have been assumed pursuant to the Plan and have been modified as set forth in the

2 Plan and in the documents contained in the Second Supplemental Plan Supplement.

3      For additional information, creditors and parties in interest, including those who are

4 parties to the City's executory contracts or unexpired leases, may contact counsel for the City,

5 Patrick Bocash, Orrick, Herrington & Sutcliffe LLP, at pbocash@orrick.com or by mail at the

6 address in the upper left hand corner of the first page of this Notice of Entry.

7

8

9 Dated: January __, 2015           MARC A. LEVINSON
NORMAN C. HILE
10                                            PATRICK B. BOCASH
Orrick, Herrington & Sutcliffe LLP
11

12

13                           By: _____
MARC A. LEVINSON
14                                  Attorneys for Debtor
City of Stockton

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OHSUSA:759330136.5         - 3 -       NOTICE OF ENTRY OF ORDER CONFIRMING
CITY'S PLAN OF ADJUSTMENT